UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.'S  MEMORANDUM OF LAW  IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The defendant, Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman") respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment.

## I.     PRELIMINARY STATEMENT

On or about April 11, 2005, Landworks Creations, LLC ("Landworks") filed a Complaint in Worcester Superior Court against United States Fidelity & Guaranty Company ("USF&G"). Landworks' claims arose out of the design and construction of the Shrewsbury Middle School in Shrewsbury, Massachusetts (the "Project").  Landworks made claims against USF&G for breach of contract and violations of M.G.L. c. 93A and 176D.  USF&G acted as a surety to Standen Construction Company ("Standen"), the Project's defaulted general contractor.  Landworks was a sitework subcontractor to Standen.  On May 12, 2005, the case was removed to the United States District Court for the District of Massachusetts.  Landworks and USF&G spent the next

fifteen months engaged in disputes concerning a remand to the Superior Court, motions to compel discovery, and a motion to sever and stay.

Lovett-Silverman was a construction consultant to USF&G, assisting it in the Project's completion after Standen defaulted. Through informal discovery of Lovett-Silverman's Project files, an internal e-mail drafted by a part-time, outside consultant to Lovett-Silverman was produced. This e-mail formed the basis of Landworks' subsequent Amended Complaint, which it served on August 4, 2006. The Amended Complaint added Lovett-Silverman as a defendant and added new claims against USF&G. The Amended Complaint contains causes of action against Lovett-Silverman for: (1) fraud; (2) tortious interference; and (3) violation of M.G.L. c. 93A.

In the six months since the filing of the Amended Complaint, the parties have engaged in extensive written and oral discovery regarding each and every claim brought by Landworks. Depositions have been taken of the Project's architect, Lovett-Silverman employees, and corporate designees from Lovett-Silverman, Landworks and USF&G. Such discovery has failed to uncover any factual basis whatsoever for the allegations made by Landworks against Lovett-Silverman. Indeed, the allegations, as testified to by Landworks' own corporate designee, are based on a manifest misunderstanding of Lovett-Silverman's role and obligations on the Project and a willful misconstruction of the facts. For the reasons stated herein, Lovett-Silverman is entitled to summary judgment as a matter of law on each claim brought against it by Landworks.

## II.    **STATEMENT OF UNDISPUTED FACTS**

Lovett-Silverman incorporates by reference its Local Rule 56.1 Statement of Undisputed Facts, filed simultaneously herewith.

## III.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for a trial." <u>Tyler v. United States</u>, 397 F.Supp. 2d 176, 178  (D. Mass. 2005) <u>quoting</u> <u>Mesnick v. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fr. R. Civ. P. 56(c).  The burden is on the moving party to show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine only if "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F. 3d 731, 735 (1st Cir. 1995) (internal citation omitted).  A fact is material only if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Tyler</u>, 397 F. Supp. 2d. at 178.

The "court must 'view the entire record in the light most favorable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.'  If no genuine issue of material fact emerges, then the motion for summary judgment may be granted."

McCarthy v. Northwest Airlines, Inc., 56 F. 3d 313, 315 (1ˢᵗ Cir. 1995) (internal citations omitted).

**B.    LOVETT-SILVERMAN IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II AS  LANDWORKS HAS NOT AND CANNOT STATE OR PRESENT EVIDENCE OF FRAUD BY LOVETT-SILVERMAN**

**1.    Landworks' Fraud Claim Fails to Present a Genuine Issue of Material Fact for Trial**

Even if Count II was pled with the requisite specificity as established by Fed. R. Civ. P. 9(b)[1], Landworks has still failed to establish a genuine issue of material fact with respect to its fraud claim.  To establish a cause of action for fraud or fraudulent misrepresentation, a plaintiff "must show that the defendant [1] made a false representation of a material fact [2] with knowledge of its falsity [3] for the purpose of inducing the plaintiff to act thereon, and [4] that the plaintiff reasonably relied upon the representation as true and acted upon it [5] to his damage." Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 68 (1st Cir. 2005). A plaintiff cannot maintain such a claim without alleging that fraudulent representations were made.  See Sprague Energy Corp. v. Massey Coal Sales Co., 2006 U.S. Dist. LEXIS 10582, at *17 (D. Mass. March 15, 2006) (denying claim for fraud where plaintiff "fail[ed] to set forth any 'content' – namely, the existence of any actual false statement").

---

[1] Count II  fails the particularity test of Fed. R. Civ. P. 9(b), because it does not identify any misrepresentations.  Nor does it identify the time, place, content or person making any alleged misrepresentation.  Petricca v. Simpson, 862 F. Supp.13, 15-16 (D. Mass. 1994).   Indeed, Landworks cannot cure this shortcoming.  When asked to identify how Lovett-Silverman engaged in fraud on Landworks, Neal Matthews, Landworks' corporate designee, did not testify that any Lovett-Silverman employees made false or fraudulent representations to him.  SOF ¶¶ 50, 55-56, 59-60. This failure justifies the granting of summary judgment in favor of Lovett-Silverman on Count II.

4

a.  **There is no evidence to support the allegation that Lovett-Silverman failed to effectuate payments of monies due and owing to the Plaintiff; indeed, it is undisputed that Lovett-Silverman had no responsibility to effectuate payments from the Surety.**

As part of its fraud allegation, Landworks alleged that Lovett-Silverman failed to "effectuate payments of monies due and owing" to Landworks.  SOF ¶ 50.  On its face, such an allegation does not constitute fraud.  Moreover, the Agreement between Lovett-Silverman and USF&G sets forth Lovett-Silverman's scope of work.  SOF ¶ 9.  This scope was confirmed at depositions by Lovett-Silverman and USF&G, the two parties to the Agreement.  SOF ¶¶ 8-10.  As James Peters, the corporate designee of USF&G, testified, USF&G hired Lovett-Silverman to be its consultant, providing experience and support regarding USF&G's performance and payment bond obligations after Standen defaulted.  SOF ¶ 8.  As Anthony Lardaro, the Vice-President of Lovett-Silverman, testified, Lovett-Silverman was to compile Project costs and determine the terms of each subcontractor's contractual scope of work.  SOF ¶ 10.

Landworks' corporate designee, Neal Matthews, testified at his deposition that the basis for the fraud allegation was his understanding that "Lovett-Silverman ... [had to] go through all of your billing to make certain what you said you were owed you were owed.  And then they would, in turn, give that to the surety, and the surety would pay you."  SOF ¶ 51.  Mr. Matthews further admitted that he did not know "who was the decision maker, whether it was USF&G or whether it was Lovett-Silverman".  SOF ¶ 47.  Such "unsupported speculation" that Lovett-Silverman was responsible for effectuating payment, especially where Landworks' own corporate designee has admitted to a lack of understanding as to Lovett-Silverman's role,  should not be considered by the Court.  McCarthy, 56 F. 3d at 315.  Landworks' misunderstanding does not create a dispute of material fact suitable for trial.

Most importantly, the failure of one party to perform an act, even if that act is a duty, is not fraudulent as it does not meet the standard of a "false statement of material fact". Robinson v. Bodoff, 355 F. Supp. 2d 578, 584 (D. Mass. 2005). (holding that "allegations of poor communication and ignored requests sound in negligence, not fraud or misrepresentation"). As evidenced by Lovett-Silverman's limited scope of work with USF&G, Lovett-Silverman was not responsible for paying Landworks or any other subcontractor, nor was it responsible for determining if subcontractors merit payment. SOF ¶ 8-10, 48-49. USF&G's corporate designee, James Peters, testified that payment applications would be submitted by the general contractor to USF&G, who would in turn pay the general contractor out of funds received by the Town of Shrewsbury. The general contractor would then pay the subcontractors. SOF ¶¶ 48-49. Moreover, if the Court indulges the inference that Lovett-Silverman was responsible for paying subcontractors or "effectuating payment", such an inference of non-payment still does not create a genuine issue of material fact because such failure does not amount to fraud. See Robinson, 355 F. Supp. 2d. at 584. No rational factfinder could resolve the dispute over whether Lovett-Silverman failed to effectuate payment and thus committed fraud in Landworks' favor. Thus, Lovett-Silverman is entitled to summary judgment as a matter of law.

> **b.** **There is no evidence to support the allegation that Lovett-Silverman excluded the Plaintiff from the Project, failed to communicate with the Plaintiff and failed to engage in good faith and fair dealing. Moreover, none of these allegations constitute fraud.**

Landworks' Fraud claim further alleges that Lovett-Silverman "engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract" SOF ¶ 50. Again, these allegations do not

constitute fraud.  Moreover, there is no genuine dispute as to any material fact concerning these allegations and at most, Plaintiff has only  made "improbable inferences" based upon a serious misunderstanding of Lovett-Silverman's role on the Project.  <u>McCarthy</u>, 56 F. 3d at 315.

On or about the Summer of 2005, Jackson defaulted and Lovett-Silverman again assisted USF&G in completing the Project.  SOF ¶ 25-26.  USF&G used a ratification process for each subcontractor  "to establish terms and conditions under which [the subcontractors] would be prepared to resume their subcontract responsibilities and complete their obligations."  SOF ¶ 27.  Landworks was subject to this process and in March 2005, had already filed suit against USF&G.  SOF ¶ 24.

On or about August 17, 2005, Mr. Matthews called Robert Bullock, whom he had not spoken to before, to discuss returning to the Project.  SOF ¶ 31.  Robert Bullock, a Project Manager for Lovett-Silverman, was in charge of reviewing work completed and in need of completion with respect to the exterior trades.  SOF ¶ 29.  Mr. Bullock responded by asking Mr. Matthews to forward contracts, change orders, invoice balances and information pertaining to the value of work performed by Landworks in order to develop a ratification agreement.  SOF ¶ 32.

That same afternoon, Al Falango, a part-time, outside consultant to Lovett-Silverman, informed James Peters and Russ Fuller, Esquire, of USF&G about Mr. Matthews' interest in returning to the Project.  SOF ¶ 33.  Mr. Falango wrote, "Should we pursue this guy [Neal Matthews]?  I know you [Mr. Fuller] have issues with him."  SOF ¶ 34.   No response to Mr. Falango's statement regarding Mr. Fuller's alleged "issues" was given by Mr. Peters or Mr. Russell and USF&G's deponent, Mr. Peters, was unaware of what those issues could have been. SOF ¶ 34.  However, James Peters instructed Mr. Bullock not to engage in any correspondence with Mr. Matthews while the lawsuit against USF&G was pending and to inform Mr. Matthews

that all future communications should occur between attorneys for Mr. Matthews and USF&G. SOF ¶¶ 36-38.

In the view of USF&G and its in-house counsel, Russ Fuller, the fact that Landworks had sued USF&G created a situation unsuitable for USF&G's outside construction consultant, Lovett-Silverman, to handle. SOF ¶ 38. Though USF&G had "no specific written policy" for handling subcontractor claims, there was "a general expectation that if there were negotiations involving matters in litigations that counsel would be involved." SOF ¶ 42. In keeping with this directive from USF&G, Mr. Bullock wrote to Mr. Matthews to inform him that "we were told that we cannot deal with Landworks while the legal case is pending" and "we are willing to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys [for Landworks and USF&G]". SOF ¶¶ 39-40. Mr. Bullock's statements to Mr. Matthews, explaining that communication must go through the attorneys, was consistent with USF&G's desires and did not contravene any company policy. Moreover, it certainly does not constitute any fraudulent misrepresentation.

Despite undisputed evidence establishing that Lovett-Silverman was under instruction from USF&G not to deal directly with Landworks, Mr. Matthews, the corporate designee of Landworks, remains steadfast that Lovett-Silverman "[denied Landworks] access to the Project" by refusing to "tak[e] [his] request that [he] made for [Lovett-Silverman] to meet with attorneys present to mediate, negotiate the amounts owed to [Landworks]". SOF ¶ 44. Such testimony creates an improbable inference unsupported by any fact. Perplexingly, Mr. Matthews admits to having seen the full e-mail exchange between USF&G and Mr. Bullock, in which USF&G directs Lovett-Silverman to have no contact with Landworks, before he chose to file suit against Lovett-Silverman. SOF ¶ 43. Thus, Landworks was well-aware that Lovett-Silverman was only

8

acting at the direction of the entity it had been hired to assist and that it had been directed not to

deal with Landworks. Lovett-Silverman's limited scope of duties also shows that Lovett-

Silverman did not have the authority to independently give Project access to subcontractors or

negotiate claims if under orders not to do so. SOF ¶ 8-10.

     Mr. Matthews testified that Landworks' Amended Complaint is based upon Lovett-

Silverman's "conduct of ... not relating to me ... that Russ Fuller had a problem with me ... and

that's why they couldn't deal with me." SOF ¶ 35. Even if true such alleged behavior cannot

constitute fraud. It is settled under Massachusetts law that Landworks cannot allege that Lovett-

Silverman committed fraud in giving statements of "opinion, estimate or judgment." Pearce, 392

F. Supp. 2d. at 73. Even assuming that Lovett-Silverman had a duty to share USF&G's

counsel's alleged opinion with Mr. Matthews, "concealment alone does not constitute fraud."

Cherniack v. Newcombe, 1997 Mass. Super LEXIS 546, at *10 (January 14, 1997) (internal

citations omitted). Mr. Bullock was not the originator of Mr. Fuller's opinion. SOF ¶ 34.

Though Mr. Bullock knew of the e-mail from Mr. Falango to Mr. Fuller, "nondisclosure can be

actionable only where there is a 'duty' to disclose such as when the parties are in a fiduciary

relationship." Urman v. So. Boston Sav. Bank, 3 Mass. L. Rep. 123, at *13 (Mass. Super. Oct.

19, 1994). It is undisputed that Landworks did not have a contract with Lovett-Silverman. SOF

¶ 14. Mr. Bullock had no duty to disclose a statement that did not originate with him, did not

concern him, and was not verified. Furthermore, there was no fiduciary responsibility towards

Landworks on Lovett-Silverman's part. SOF ¶ 8-10.

     It is undisputed and established by testimony from Mr. Bullock and Mr. Peters, that

Lovett-Silverman did not have the authority to allow or deny Project access to any subcontractor.

SOF ¶ 36-38,45. Thus, the claim that Lovett-Silverman "exclude[ed] ... [Landworks] from the

9

Project without cause" is a "conclusory allegation" that creates no genuine issue of material fact for trial. <u>McCarthy</u>, 56 F. 3d at 315. Lovett-Silverman's undisputed scope of duties to USF&G leaves no room for speculation that it had the authority to exclude any entity from the Project. Any doubt concerning the reason for Landworks' alleged exclusion from the Project would have been cured by Robert Bullock's offer to Mr. Matthews to have his attorney contact attorneys for USF&G. In fact, counsel for Landworks did contact Brad Carver, Esq., counsel for USF&G shortly after Mr. Matthews' exchange with Robert Bullock. SOF ¶ 41. Any alleged "fraud" on Lovett-Silverman's part would have been negated by a direct exchange between counsel for both Landworks and USF&G. Viewed in the light most favorable to Landworks, there is no genuine issue of material fact which has the potential to affect the outcome of the suit concerning the fraud allegation. Thus, Lovett-Silverman is entitled to summary judgment as a matter of law.

> **c.     There is no evidence to support the allegation that Lovett-Silverman devised and carried out a conspiracy to 'bang' Landworks, which, in any event, would not constitute fraud.**

Plaintiff's contention that Lovett-Silverman committed fraud in that it "devised and carried out a conspiracy to 'bang' Landworks" also fails to present a genuine triable issue. SOF ¶ 50. Landworks complains of an internal Lovett-Silverman e-mail in which its part-time consultant, Al Falango, wrote, "We can try to bang the subs but I think that we can never recover from them what we are spending." SOF ¶ 50. Landworks has described this e-mail in several pleadings as the reason for adding Lovett-Silverman as an additional party to this litigation and the crux of Landworks' allegations. To wit, reference to this e-mail appears in every count made against Lovett-Silverman in the Amended Complaint. SOF ¶¶ 50, 64, 70.

Mr. Matthews testified on behalf of Landworks that he believed that "bang" meant "that there was a realization sometime on this job that it was not going well and that it was not going

to go well and that there needed to be savings wherever it could be made." SOF ¶ 57. Indeed, this characterization conforms with Mr. Falango's meaning of the phrase "bang" and the way in which it was understood by USF&G and other Lovett-Silverman employees. Mr. Falango explained to James Peters that by "banging the subs," he meant "identify[ing] instances where we had incurred costs or would incur costs to ... complete work or to correct defective work, which would be chargeable back to the account of the involved subcontractor." SOF ¶ 54. Anthony Lardaro, the Vice-President of Lovett-Silverman, testified that the term "bang" is a slang term describing "back-charg[ing] subcontractors for costs when others perform work on their behalf." SOF ¶ 53. James Peters testified that the term "bang the subs" is "slang" and is used "where [USF&G] had incurred costs to complete or fix ... defective work, which would be chargeable back to the account of the involved subcontractor." SOF ¶ 45. Neal Matthews testified that "[t]o back charge a subcontractor would be to back charge them for incomplete work that they had not corrected themselves ... and to present them with a bill for work they had done to correct whatever." SOF ¶ 55.

Back charging subcontractors for unfinished or defective work is sound construction practice meant to keep project costs as low as possible and to make subcontractors responsible for work which they agreed to complete in a workmanlike manner. Nothing in this practice gives rise to even an inference of fraud. In Landworks' own words, "they [USF&G] were going to have to try to recuperate costs as best they could to drive the overall cost of the project down, because they were going to run over any of the projections that they had." SOF ¶ 58. Back charging is one such way of legitimately and lawfully recuperating money spent due to a subcontractor's failure to perform its work properly. Such behavior is not fraudulent.

Even if the Court views the phrase "banging" in the light most favorable to Landworks –
meaning failing to pay the subcontractors what they are legitimately owed – such a
characterization still fails to present a genuine issue of material fact for trial to support any of
Landworks' claims against Lovett-Silverman.  A fact is material only if it "might affect the
outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Tyler, 397
F. Supp. 2d. at 178.  That Lovett-Silverman allegedly meant the phrase "bang" in a malicious
way is irrelevant to a fraud claim.  A malicious intent or actions meant to harm another are not
"false representation[s] of a material fact with knowledge of its falsity for the purpose of
inducing the plaintiff to act thereon".  Eureka, 400 F.3d at 68.  Thus, Lovett-Silverman is entitled
to summary judgment as a matter of law.

> **d.    Plaintif has not and cannot produce evidence to support the
> allegation that Lovett-Silverman supported USF&G in
> defam[ing] Landworks.  Moreover, defamation does not
> constitute fraud.**

Lastly, Landworks' allegation that Lovett-Silverman assisted USF&G "in defam[ing] the
Plaintiff" is not actionable under a claim of fraud and presents no triable issue.  Neal Matthews
testified on behalf of Landworks that Lovett-Silverman:

> "made statements about [Landworks'] deficiency in the work which are not
> attributable to me or Landworks, and that in so making these statements without
> first investigating the validity of then, that that's defamatory."

SOF ¶ 61.

Furthermore, Mr. Matthews testified that in assisting USF&G with its allegedly false

counterclaim, Lovett-Silverman:

> "provid[ed] information that was knowingly false – for example, passing off work
> that was not within the scope of Landworks as the scope of Landworks, and by

otherwise lying to Landworks as to why Landworks was not being permitted to return to the site."

SOF ¶ 62.

Such allegations do not give rise to a claim for fraud.  First, Landworks has not identified the particular defamatory statements Lovett-Silverman is alleged to have made to support USF&G.  Second, assuming that defamatory statements are contained in the counterclaim that only USF&G filed against Landworks in this action, such statements were not made with the intent of "inducing the plaintiff to act thereon."  Eureka, 400 F.3d at 68.  If, as Landworks alleges, these statements are false, Landworks would have no reason to rely upon them as true.  Thus, Landworks cannot maintain that Lovett-Silverman committed fraud by assisting USF&G in making these allegedly defamatory statements.

Absent a showing that Lovett-Silverman made a  "false representation of material fact with knowledge of its falsity," see Danca v. Taunton Sav. Bank, 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982), Landworks has failed to raise a genuine issue with regard to any of the required elements of a common law fraud claim.  Thus, Lovett-Silverman is entitled to summary judgment as a matter of law on Count II of the Amended Complaint.

### C.    LOVETT-SILVERMAN IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF THE AMENDED COMPLAINT

Count III of Landworks' Amended Complaint ("Tortious Interference") does not present a genuine issue of material fact.  The count alleges that "Lovett-Silverman, by carrying out its program of "banging" the subcontractors, did tortuously (sic) interfere in the contract between the Plaintiff and USF&G, for ulterior motives." SOF ¶  64.  A plaintiff's claim for tortious interference must prove that: (1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in

13

addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed

by the defendant's actions.  Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (1st Cir.

2006).  The Supreme Judicial Court of Massachusetts has held "improper motive or means" to

mean "actual malice."  Shea v. Emmanuel Coll., 425 Mass. 761, 764, 682 N.E.2d 1348, 1351

(Mass. 1997). Actual malice, in turn, is defined as "any spiteful, malignant purpose, *unrelated to*

*the legitimate corporate interest*. (emphasis added)" Id. (citation and internal quotation marks

omitted).

When asked to identify the basis for this count, Neal Matthews, Landworks' corporate

designee, testified that Lovett-Silverman:

> "did not investigat[e] [Landworks'] claim , by not at least looking into the
> possibilities that ... monies were owed, and ... by not ... giving [Landworks] a full
> and fair hearing on the amounts that I say were owed to [Landworks] ... and not
> presenting them to the surety".

SOF ¶ 65.  Such alleged inaction on the part of Lovett-Silverman does not constitute

tortious interference with Landworks' contract.

Landworks, by virtue of having a contract with both Standen and Jackson, had a

contractual relationship with USF&G, the Project's surety.  Landworks cannot put forth any

evidence, however, that Lovett-Silverman induced USF&G to break its contract with Landworks.

Indeed, Neal Matthews' only basis for this claim is that Lovett-Silverman did not perform a duty

(investigating Landworks' claim against USF&G) that was indisputably not within its scope.

SOF ¶¶ 8-10, 65.  Extensive discovery has produced no evidence that Lovett-Silverman induced

USF&G to break its contractual relationship with Landworks. In response to an interrogatory

asking, "State the basis of your contention ... that Lovett-Silverman interfered in the business

relationship between Landworks and USF&G", Landworks answered:

> Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. ... An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF&G with false data provided by Lovett-Silverman.

SOF ¶ 67.  By reference to other interrogatory answers, Landworks also answered,

> ... Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information.  Based upon the e-mails subsequently identified, it is clear that Landworks would be barred from its right to perform its work.

SOF ¶ 67.

Such alleged conduct of fabricating a contention of "abandonment", providing false data for USF&G's counterclaim, and pumping Landworks for information, even if true, does not constitute an inducement to USF&G to break a contract with Landworks.  Landworks itself alleges that the counterclaim and alleged false data used to support it was a joint venture between Lovett-Silverman and USF&G.  SOF ¶ 68.  There is no suggestion in the record, or even Plaintiff's allegations, that Lovett-Silverman drafted the language of the USF&G counterclaim or that it had any role in the Surety's decision to file the claim.  Indeed, it is undisputed that USF&G simply asked Lovett-Silverman, its hired consultant, to review the status of the site work, and Lovett-Silverman determined that there was incomplete or incorrectly done work. SOF ¶ 69.

Even if it were true that Lovett-Silverman provided false evidence for the counterclaim, Landworks has not provided any evidence to show that Lovett-Silverman provided false evidence with "any spiteful, malignant purpose, unrelated to the legitimate corporate interest." Shea, 425 Mass. at 764.  Anthony Lardaro of Lovett-Silverman testified that Lovett-Silverman used each subcontractor's subcontract agreement to determine each subcontractor's scope of work.  SOL ¶ 10, 69.  Such a method of determining a subcontractors' responsibility was related

to the legitimate corporate interest of determining if Landworks was accountable for extra Project costs. Whether one refers to this method as "banging" or back charging, it is undisputed that it is a legitimate business practice. SOF ¶¶ 53-55.

Furthermore, there is no evidence that Al Falango's internal "bang the subs" e-mail was even given to USF&G, let alone that it was given to it in furtherance of an alleged malicious goal to take money from the Project's subcontractors. Each person identified in the "To:" or "Cc:" lines of the e-mail are Lovett-Silverman employees. Indeed, James Peters testified that he had not seen this communication until *after* Landworks filed suit against USF&G when it was produced in response to an informal discovery request. SOF ¶ 59. Thus, Landworks has no evidence to support its contention that Lovett-Silverman's alleged "program of banging" the subcontractors in any way induced USF&G, who was not privy to the only communication making such a reference, to break its contract with Landworks. Because there is no genuine issue of material fact regarding Landworks' claim for tortious interference, Lovett-Silverman is entitled to summary judgment as a matter of law on Count III of the Amended Complaint.

### D.    LOVETT-SILVERMAN IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VI OF THE AMENDED COMPLAINT

#### 1.    Massachusetts Courts Have Consistently Held That the Failure to Send a 93A Demand Letter Thirty Days Before Filing Suit is Grounds for Dismissal

Lovett-Silverman is entitled to summary judgment on Landworks' Chapter 93A claim because Landworks failed to send a Chapter 93A demand letter to Lovett-Silverman prior to filing suit, and because the claim raises no genuine issue of material fact for trial.

The purpose of a Chapter 93A demand letter is to facilitate the settlement and damage assessment aspects of M.G.L. c. 93A, and as such, the demand letter and notice therein is a procedural requirement, the absence of which is a bar to suit. <u>Slaney v. Westwood Auto, Inc.</u>,

366 Mass. 688, 704-705 (1975) (noting that plaintiff must plead that it sent a demand letter to prospective defendant at least thirty days prior to filing complaint). In order to comply with the statute, the demand letter must be sent thirty days before the commencement of the action, must identify the particular acts alleged to be unfair or deceptive, and must identify the injury suffered as a result. Spring v. Geriatric Authy. of Holyoke, 394 Mass. 274, 288 (1985) (affirming trial judge's judgment notwithstanding the verdict based on plaintiff's failure to plead and prove service of 93A demand letter to defendant because "the legislature has made it clear that those procedural steps [of] … M.G.L. c. 93A are not merely technical, but are important conditions precedent to recovery under the statutes"); Cassano v. Gogos, 20 Mass. App. Ct. 348, 353 (1985) (denying relief under 93A due to failure of demand letter to reference the deceptive practice under which recovery was obtained).

Landworks did not serve a Chapter 93A demand letter on Lovett-Silverman. SOF ¶ 72. This failure precludes Landworks from asserting a Chapter 93A claim. As a result, Lovett-Silverman is entitled to summary judgment as a matter of law on Count VI.

### 2.    Landworks' 93A Claim Fails to Meet Any of the Statute's Prerequisites

Even if Landworks had sent a demand letter prior to filing suit, it cannot raise any issue of material fact for trial concerning this claim. In Count VI of the Amended Complaint ("Violations of c. 93A") Landworks alleges:

> "Lovett-Silverman set out to harm Landworks by denying it access to the Project and to funds due and owing ... [and] The pattern and practice of fraud, tortous (sic) interference and such conduct constitutes violations of c. 93A".

Amended Complaint at ¶¶ 70-71.

Landworks cannot show that any action by Lovett-Silverman was unfair or deceptive. Even Landworks' President, Neal Matthews, distanced himself from the serious allegations made

in the Amended Complaint and expressed a manifest misunderstanding of Lovett-Silverman's

role on the Project.  When asked, "Are you aware of any other subcontractors at the site who you

would say were strong-armed or extorted by Lovett-Silverman?", Neal Matthews testified,

> "I didn't think I ever used the word 'extorted' by Lovett-Silverman.  ... I think
> that would be a term I would not apply to them."

SOF ¶ 72.  Furthermore, Mr. Matthews testified,

> "I don't know of the dealings with other subcontractors with Lovett-Silverman. ....
> So I don't know if other subcontractors were strong-armed or not."

SOF ¶ 73.  When asked, "Do you believe that Lovett-Silverman strong-armed

Landworks?", Neal Matthews testified, "*I don't know if it constitutes strong-arming*."

(emphasis added)  SOF ¶ 74.

In its response to Lovett-Silverman's interrogatory asking, "Please identify each

subcontractor that you allege ... was denied rights by Lovett-Silverman and set forth the specific

rights denied by each such subcontractor", Landworks answered:

> "Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly
> extortionist conduct in attempting to dangle payment with a precondition of
> waiving legal rights under G.L. c. 149 § 29.  This also violated Plaintiff's rights,
> and may even have been criminal in nature."

Landworks further answered,

> The e-mail traffic that has been produced indicates that *Lovett-Silverman were
> nothing more than the Surety's foul-mouthed thugs, operating on the ground as
> on-the-ground hatchet men*.  Aside from the language about "banging" the
> subcontracts (sic), Landworks finds it significant that Al Falango of Lovett-
> Silverman would send an e-mail .. to Rick Noblet [also a Lovett-Silverman
> employee] referring to "my F-in" vacation."  On August 17, 2005, Al Falango
> sent an e-mail to a claims attorney, Russ Fuller, ... referring to the president of
> Landworks as "this guy."  Landworks is not a "guy."  It is a well-know (sic) and
> respected corporation.  This kind of e-mail confirms that Lovett-Silverman
> consultants were not behaving in the type of professional, credible construction
> consultants tasked with representing the best interests of all involved in this
> project

SOF ¶ 75 (emphasis added).

In order for Landworks to succeed with a Chapter 93A claim, it would have to establish that Lovett-Silverman engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2. Liability under Chapter 93A is determined by analyzing whether the practice in question is within any recognized conception of unfairness, is immoral or unscrupulous, or causes substantial injury to consumers. Ellis v. Safety Ins. Co., 41 Mass. App. Ct. 630 (1996). The mere alleged breach of a legal obligation, without more, does not amount to an unfair or deceptive trade practice. Framingham Auto Sales, Inc. v. Workers' Credit Union, 41 Mass. App. Ct. 416, 418 (1996); Squeri v. McCarrick, 32 Mass. App. Ct. 203, 207 (1992) (an alleged negligent act by itself does not give rise to a claim under Chapter 93A); Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 10, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (explaining that "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce" in order to support a Chapter 93A action). Certainly Mr. Matthews, an individual with over twenty years of experience in the construction industry, would be inured to rough language and slang. SOF ¶ 12. Heightened sensitivity is not the basis of a Chapter 93A claim.

Landworks' allegations concerning alleged errors committed by Lovett-Silverman do not rise to the level of conduct required for a Chapter 93A claim. Accordingly, Landworks' Chapter 93A claim should fail as a matter of law. See Squeri, 32 Mass. App. Ct. at 207.

## CONCLUSION

For all of the above reasons, Lovett-Silverman respectfully requests the court to enter summary judgment in its favor on Count II (Fraud), Count III (Tortious Interference), and Count

VI (violation of G.L. c. 93A), and dismiss the plaintiff's Amended Complaint as to all counts against it with prejudice.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

Dated:  March 23, 2007

01073806

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

_____
LANDWORKS CREATIONS, LLC.        )       C.A. NO.05-CV-40072 FDS
                                  )
      Plaintiff                  )
                                    )
v.                                    )
                                  )
UNITED STATES FIDELITY AND GUARANTY )
COMPANY and                    )
LOVETT-SILVERMAN CONSTRUCTION   )
CONSULTANTS, INC.              )
                                  )
      Defendants              )
_____)

**STATEMENT OF FACTS OF THE DEFENDANT LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC., IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Defendant Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman")

respectfully submit this Statement of Facts in Support of its Motion for Summary Judgment.

**II.      STATEMENT OF FACTS**

1.      This matter arises from the design and construction of the Shrewsbury Middle

School in Shrewsbury, Massachusetts (the "Project").  Amended Complaint at ¶ 6, attached to

the Affidavit of Julie Ciollo, Esq., Tab 1 ("Tab 1") as Exhibit A.

2.      Standen Contracting Company, Inc. "Standen" was the first general contractor on

the Project.  Amended Complaint, Tab 1 at Ex. A, ¶ 5.

3.      On or about the Winter of 2004, Standen defaulted on the Project.  Deposition of

James Peters, February 23, 2007 ("Peters Depo."), at 22:22-24, attached Tab 1 as Exhibit B.

4.     James Peters, a regional claims officer and corporate designee of Defendant United States Fidelity & Guaranty Company ("USF&G") pursuant to F. R. Civ. P. 30(b)(6), testified that Standen was bonded by USF&G, who had "an obligation to discharge [Standen's] responsibilities under that bond."  Peters Depo., Tab 1 at Ex. B, 22:22-24.

5.     USF&G's responsibilities included "labor materials, [and] services ... incorporated in the bonded construction project."  Peters Depo., Tab 1 at Ex. B, 23:4-5.

6.     "United States Fidelity & Guaranty Company [USF&G] is one of several underwriting companies that make up part of the St. Paul Travelers Companies."  Peters Depo., Tab 1 at Ex. B, 7:17-19.

7.     On or about January 10, 2003, Lovett-Silverman entered into an Agreement with St. Paul Fire and Marine Insurance Company ("St. Paul") (the "Lovett-Silverman Agreement"). A true and accurate copy is attached to Tab 1 as Exhibit C.

8.     USF&G, through St. Paul, hired Lovett-Silverman to be its consultant, providing "construction-related experience and support in response to [USF&G's] specific request and involving matters pertaining to the discharge of [USF&G's] performance bond obligation and in matters pertaining to the discharge of [USF&G's] payment bond obligations"  after Standen defaulted.  Peters Depo., Tab 1 at Ex. B at 46:6-11.

9.     By the terms of its Agreement with St. Paul/USF&G, Lovett-Silverman was tasked to:

> Complete a preliminary investigation of the ... Shrewsbury Middle School ...
> assess the progress to date and the ability of the principal to complete the work; ...
> ratify subcontractors and suppliers; [and] assist in the assignment of the
> Completion contractor.

Lovett-Silverman Agreement, Tab 1 at Ex. C at Exhibit A.

10.    Anthony Lardaro, Lovett-Silverman's Vice-President, testified that as part of its duties on the Project, Lovett-Silverman was to:

> [C]ompile the costs involved with finishing the work, ... determine the scope of the work that [subcontractors] were to perform pursuant to their subcontract agreement or purchase order agreement ... [and] assess the costs actually expended to perform any of that scope by others.

Deposition of Anthony Lardaro, January 11, 2007 ("Lardaro Depo.") at 56:3-17, attached to Tab 1 as Exhibit D.

11.    On August 28, 2003, the Plaintiff, Landworks Creations LLC ("Landworks"), entered into an agreement (the "Standen Agreement") with the Project's then-General Contractor, Standen Contracting Company, Inc. ("Standen") pursuant to which Landworks was to perform sitework for the Project.  A true and accurate copy is attached to Tab 1 as Exhibit E.

12.    Neal Matthews, Landworks President, has experience in the construction industry dating back over twenty years.  Deposition of Neal Matthews, Day One, February 13, 2007 ("Matthews Depo."), at 9:7-19, attached to Tab 1 as Exhibit F.

13.    Landworks' agreed-to scope of work included:

> "Site Demolition"; "Site Preparation": "Earthwork"; Bit[uminous] Conc[rete] Paving & Markings"; "New Track Surfaced Areas"; "Asphalt"; "Granite Curbing"; "Storm Drainage"; "Water Systems": and "Lawns and Grasses".

Standen Agreement, Tab 1 at Ex. E, p. 8.

14.    Landworks did not have a contract with Lovett-Silverman.  <u>See</u> the testimony of Neal Matthews, corporate designee under Fed. R. Civ. P. 30(b)(6) and President of Landworks, who testified that Landworks "did not have a contract with Lovett-Silverman."  Matthews Depo., Day One, Tab 1 at Ex. F, 77:16-20.

15.    "Standen ... was bonded by United States Fidelity & Guaranty Co." ("USF&G"). Amended Complaint, Tab 1 at Ex. A, ¶ 7.

16.     In the Spring of 2004, "Standen got into difficulty" and defaulted on the Project. Peters Depo., Tab 1 at Ex. B, 60:10-14.

17.     On or about the Spring of 2004, Jackson Construction Company ("Jackson") became the Project's General Contractor.  Lardaro Depo., Tab 1 at Ex. D, 25:2-10; Peters Depo., Tab 1 at Ex. B, 60:10-14.

18.     On or about April 29, 2004, Landworks entered into an agreement with Jackson (the "Jackson Agreement").  A true and accurate copy is attached to Tab 1 as Exhibit H.

19.     Landworks' scope of work on the Jackson Agreement included

"Site Demolition"; "Site Preparation": "Earthwork"; "Bituminous Concrete Paving & Markings"; "Granite Curbing"; "Storm Drainage Systems & Sewer Systems"; "Water Systems": and "Lawns and Grasses".

Jackson Agreement, Tab 1 at Ex. H, Article 2.25.

20.     Neal Matthews testified that on or about June of 2004, Landworks "asked for a reconciliation of the application for payments that [he] had turned in" but did not receive any reconciliation.  Matthews Depo., Day One, Tab 1 at Ex. F,  63:12-16.

21.     According to Landworks, on or about August of 2004, "the payment application [from Jackson] was cut in half" from what Landworks had expected to receive.  Matthews Depo., Day One, Tab 1 at Ex. F, 63:18-22.

22.     According to Landworks, Jackson did not pay Landworks in September or October of 2004.  Matthews Depo., Day One, Tab 1 at Ex. F, 63:12-13.

23.     As of March 2005, Landworks was no longer performing work on the Project. Matthews Depo. Day One, Tab 1 at Ex. F, 72:5-20.

24.     On or about March 29, 2005, Landworks filed a Complaint in the Worcester Superior Court against USF&G, making claims for breach of contract and violation of M.G.L. c.

93A and 176D and seeking damages for money alleged to be owing for work performed on the Project. A true and accurate copy of the Complaint is attached to Tab 1 as Exhibit I.

25.     USF&G's corporate designee testified that on or about the Summer of 2005, "there was a perception from the Town [of Shrewsbury] that Jackson had not been paying subcontractors. Peters Depo., Tab 1 at Ex. B, 72:8-10; 77:17-21.

26.     Before USF&G considered Jackson to be in default, "Lovett-Silverman became involved again in [the] Project". Peters Depo., Tab 1 at Ex. B, 82:12-17.

27.     There was a "ratification process following the failure of Jackson ... [because] it was in [USF&G's] best interest to establish terms and conditions under which [the subcontractors] would be prepared to resume their subcontract responsibilities and complete their obligations." Peters Depo., Tab 1 at Ex. B, 85:10-17.

28.     Lovett-Silverman acknowledges that it is "common procedure, once a contractor is in default, for subcontractors not to return to the work until they are ratified." Deposition of Robert Bullock, Project Manager for Lovett-Silverman, January 11, 2007, attached to Tab 1 as Exhibit J at 40:23-41:4.

29.     Robert Bullock, a Project Manager for Lovett-Silverman, was "tasked with reviewing the condition of the [Project] site" to "see what site work remained" and "the exterior trades" or "anything outside the building." Bullock Depo., Tab 1 at Ex. J, 18:4-7; Lardaro Depo., Tab 1 at Ex. D, 28:23-29:3.

30.     As part of his duties on the Project, Mr. Bullock "made a list of items which needed to be completed during [his] walk-through of the [Project] site and review of the [Project] plans." Bullock Depo., Tab 1 at Ex. J, 47: 2-4.

31.     On or about August 17, 2005, Neal Matthews "called [Robert Bullock] up ... and ... told him that [he wanted to] get back to work, and finish this job and be done with it."  Mr. Matthews got Mr. Bullock's phone number from the Shrewsbury Clerk of the Works.  Matthews Depo., Day One, Tab 1 at Ex. F, 76:6-10; 78:11-18.

32.     Mr. Bullock responded by asking Mr. Matthews to forward contracts, change orders, invoice balances and information pertaining to the value of work performed by Landworks in order to develop a ratification agreement for Landworks.  E-mail from Robert Bullock to Neal Matthews, August 17, 2005, 2:42 p.m. ("Bullock E-mail, 8/17/05, 2:42 p.m."), attached to Tab 1 at Exhibit K.

33.     That same afternoon, Al Falango, a part-time, outside consultant to Lovett-Silverman, informed James Peters and Russ Fuller, Esquire, of USF&G of Mr. Matthews' request to return to the Project.  E-mail from Al Falango to Russ Fuller, James Peters and Robert Bullock, August 17, 2005, 3:00 p.m. ("Falango E-mail, 8/17/05, 3:00 p.m."), attached to Tab 1 as Exhibit L.

34.     Mr. Falango wrote, "Should we pursue this guy [Neal Matthews]?  I know you have issues with him."  Falango E-mail, 8/17/05, 3:00 p.m., Tab 1 at Ex. L.

35.     When asked, "What was your basis for this allegation that Lovett-Silverman strong-armed the subcontractors?", Mr. Matthews testified that the allegation is based upon:

> [Lovett-Silverman's] conduct of ... not relating to me ... that Russ Fuller had a problem with me ... and that's why they couldn't deal with me.

Matthews Depo., Day Two, Tab 1 at Ex. G,106:1-5.

36.     James Peters of USF&G then "requested that [Lovett-Silverman consultants] refrain from direct communications as a result of the existence of litigation [regarding] Landworks".  Peters Depo., Tab 1 at Ex. B, 105:11-16.

6

37.    Mr. Peters also

"asked Lovett-Silverman to refrain from engaging in negotiations with
Landworks and to suggest that if there was any communication with them that it
would be more appropriate for those communications to be exchanged between
Landworks counsel and USF&G's counsel."

Peters Depo., Tab 1 at Ex. B,106:2-8, E-mail of James Peters to Al Falango and Russell

Fuller, August 18, 2005, 10:49 a.m. (Peters E-mail, 8/18/05, 10:49 a.m.), attached to Tab

1 as Exhibit M.

38.    Mr. Peters' "concern was that if there were to be negotiations concerning

whatever role Landworks might be seeking in connection with this matter that those

communications be coordinated with counsel."  Peters Depo., Tab 1 at Ex. B, 106:17-20.

39.    Following the directive from USF&G, on August 19, 2005, Mr. Bullock wrote to

Mr. Matthews to inform him that "we were told that we cannot deal with Landworks while the

legal case is pending."  E-Mail from Robert Bullock to Neal Matthews, August 19, 2005, 8:09

a.m. ("Bullock E-mail, 8/19/05, 8:09 a.m."), attached to Tab 1 as Exhibit N.

40.    Mr. Bullock also wrote to Mr. Matthews that he was

"told by [USF&G] that he could not speak with [Neal Matthews] ... while the
lawsuit was pending" and "we are willing to discuss this with you, but in light of
the lawsuit, discussion should go through the attorneys" for Landworks and
USF&G.

Matthews Depo., Day Two, Tab 1 at Ex. G, 81:11-14, 89:16-19; Bullock Depo., Tab 1,

Ex. J at 56:12-15.; E-Mail from Robert Bullock to Neal Matthews, August 19, 2005, 4:36

p.m. ("Bullock E-mail, 8/19/05, 4:36 p.m."), attached to Tab 1 as Exhibit O.

41.    On August 30, 2005, counsel for Landworks wrote to Brad Carver, Esq., counsel

for USF&G, stating:

"Please find enclosed the e-mails we discussed.  My client and I are prepared to meet at any time to do what is necessary to secure payment and get me (sic) client back to work."

Letter from Robert Meltzer, Esq. to Brad Carver, Esq., August 30, 2005, attached to Tab 1 as Exhibit P.

42.     USF&G had "no specific written policy" for handling subcontractor claims, only "a general expectation that if there were negotiations involving matters in litigations that counsel would be involved."  Peters Depo., Tab 1 at Ex. B,106:23-24.

43.     Mr. Matthews admitted that before Landworks chose to file suit against Lovett-Silverman, he had knowledge of "the e-mail traffic between the parties" in which USF&G directs Lovett-Silverman to have no contact with Landworks.  Matthews Depo., Day Two, Tab 1 at Ex. G, 104:15-23.

44.     When asked, at his 30(b)(6) deposition on behalf of Landworks, "how it is that Lovett-Silverman denied you access to the project?", Neal Matthews testified:

Lovett-Silverman denied access to Landworks by refusing to "taking [his] request that [he] made for [Lovett-Silverman] to meet with attorneys present to mediate, negotiate the amounts owed to [Landworks].

Matthews Depo., Day Two, Tab 1 at Ex. G,109:13-21.

45.     Under the terms of its Agreement with USF&G, Lovett-Silverman had no obligation to mediate or negotiate with subcontractors on behalf of USF&G, especially when explicitly told by USF&G *not* to do so. <u>See</u> scope of work in the Lovett-Silverman Agreement, Tab 1 at Ex. C, Exhibit A.

46.     When asked, at his 30(b)(6) deposition, "What is your basis to assert that Lovett-Silverman had the authority to authorize payments?", Neal Matthews testified as to his own

"belief" as to Lovett-Silverman's duties and responsibilities under its Agreement with USF&G, stating:

> "Lovett-Silverman was charged with investigating the claim [and to find] out which portions of it were valid ... and then ... tell the surety ... the amount that is owed."

Matthews Depo., Day Two, Tab 1 at Ex. G, 101:10-16.

47.     Neal Matthews admitted that he did not know "who was the decision maker, whether it was USF&G or whether it was Lovett-Silverman." Matthews Depo., Day Two, Tab 1 at Ex. G, 102:1-5. Amended Complaint Tab 1 at Ex. A, ¶ 12.

48.     In fact, as the 30(b)(6) designee for USF&G testified, it is undisputed that "[w]hen Jackson would submit requests for payment and requisitions to pay subcontractors ... preliminary payment applications would be submitted to Russ Werner" of St. Paul. Peters Depo., Tab 1 at Ex. B, 77:22-78:2.

49.     USF&G's witness further testified that "the payments to be made to the subcontractors would be made out of ... funds that [USF&G] received from the Town of Shrewsbury and then ... remitted to Jackson." Peters Depo., Tab 1 at Ex. B, 79:9-12.

50.     Count II ("Fraud") of Landworks' Amended Complaint alleges that in providing its consulting services, Lovett-Silverman:

> (a) "failed to effectuate payments of monies due and owing";
>
> (b) ... "engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract";
>
> (c) ... "devised and carried out a conspiracy to 'bang' Landworks"; and
>
> (d) supported USF&G in "defam[ing] the Plaintiff".

Amended Complaint at Tab 1, Ex. A ¶ 20.

51.    Landworks' corporate designee, Neal Matthews testified that the basis for this

allegation was his understanding that:

> Lovett-Silverman ... [had to] go through all of your billing to make certain what
> you said you were owed you were owed.  And then they would, in turn, give that
> to the surety, and the surety would pay you.

Matthews Depo., Day Two, Tab 1 at Ex. G, 101:8-24.

52.    Landworks' bases its entire case against Lovett-Silverman on an internal Lovett-

Silverman e-mail in which Al Falango writes:

> "I don't think 825k is enough for the contingency we already know we have busts
> in the track work, site work, electric (major), roofs and doors (major) even though
> the town is holding money I still think we could possibly break the 800k mark
> with these, we've already spent 400k on G and R for one month and we still don't
> have checks for the subs.  We can try to bang the subs but I think that we can
> never recover from them what we are spending."

E-mail from Al Falango to Tony Lardaro and Robert Bullock, September 21, 2005 at

9:08 a.m., attached to Tab 1 as Exhibit Q; Lardaro Depo., Tab 1 at Ex. D, 60:8; Peters

Depo., Tab 1 at Ex. B, 167:12-13; Amended Complaint, Tab 1 at Ex. A, ¶¶ 12, 14, 20, 23,

27, 40.

53.    As Tony Lardaro, Lovett-Silverman's Vice-President and recipient of Mr.

Falango's internal e-mail testified, the term "bang" is a "slang" term describing "back-charg[ing]

subcontractors for costs when others perform work on their behalf."  Lardaro Depo., Tab 1 at Ex.

D, 61:22-62:3.

54.    James Peters also testified that the term "bang the subs" is "slang" and is used

"where [USF&G] had incurred costs to complete or fix ... defective work, which would be

chargeable back to the account of the involved subcontractor."  Peters Depo., Tab 1 at Ex. B,

168:10-19.

55.     When asked, "Can you tell me what it means to back charge a subcontractor", Mr.

Matthews agreed that:

> "[t]o back charge a subcontractor would be to back charge them for incomplete
> work that they had not corrected themselves ... and to present them with a bill for
> work they had done to correct whatever."

Matthews Depo. Day One, Tab 1 at Ex. F, 172:3-8.

56.     According to Mr. Matthews, he believed that the phrase "bang" meant "to try to

extract more from [a person or entity] than what was maybe the original intentions (sic) of

getting from them."  Matthews Depo. Day One, Tab 1 at Ex. F, 174:7-9.

57.     When asked, given Mr. Matthews' definition of bang, "do you believe that

Lovett-Silverman engaged in a bang of Landworks?", Mr. Matthews further testified:

> "I believe that there was a realization sometime on this job that it was not going
> well and that it was not going to go well and that there needed to be savings
> wherever it could be made."

Matthews Depo., Day One, Tab 1 at Ex. F, 174:19-22.

58.     Mr. Matthews further testified:

> "[T]hey [USF&G] were going to have to try to recuperate costs as best they could
> to drive the overall cost of the project down, because they were going to run over
> any of the projections that they had."

Matthews Depo., Day One, Tab 1 at Ex. F, 175:1-5.

59.     It is undisputed that the internal e-mail communication between Al Falango and

others at Lovett-Silverman was not produced to USF&G until after Landworks filed suit against

USF&G and it was turned over with Lovett-Silverman's Project files in informal discovery.  At

that time, Mr. Peters discussed the inappropriateness of using the term "bang" with Mr. Falango.

Peters Depo., Tab 1 at Ex. B, 167:4-8.

60.     In addition to the allegation that Lovett-Silverman wrongfully intended to "bang" Landworks, Landworks' further bases its Fraud Count on the alleged "compilation of ... a false counterclaim that Lovett-Silverman helped prepare for [USF&G]".  Matthews Depo., Day Two, Tab 1 at Ex. G, 107:7-10.

61.     When asked at his 30(b)(6) deposition, how "did [Lovett-Silverman defame you?", Neal Matthews testified:

> "Lovett-Silverman made statements about [Landworks'] deficiency in the work which are not attributable to me or Landworks, and that in so making these statements without first investigating the validity of them, that that's (sic) defamatory."

Matthews Depo., Day One, Tab 1 at Ex. F, 107:23-108:3.

62.     In answering Lovett-Silverman's First Set of Interrogatories, Landworks claims that in assisting USF&G with its allegedly false counterclaim,

> Lovett-Silverman "provid[ed] information that was knowingly false – for example, passing off work that was not within the scope of Landworks as the scope of Landworks, and by otherwise lying to Landworks as to why Landworks was not being permitted to return to the site."

Landworks' Supplemental Answers to Lovett-Silverman's First set of Interrogatories ("Answers to Interrogatories"), at Answer 5, attached to Tab 1 as Exhibit P.

63.     To the contrary, it is undisputed that Lovett-Silverman simply reviewed the Landworks subcontract to determine its scope of work.  Lovett-Silverman "determine[d] the scope of work that each party was responsible to perform ... by reading the subcontract agreement or the purchase order agreement" for each subcontractor.  Lardaro Depo., Tab 1 at Ex. D, 56:8-14.  Bullock Depo., Tab 1 at Ex. J, 50:14-24.

64.     Count III of the Amended Complaint ("Tortious Interference") alleges that

>Lovett-Silverman, by carrying out its program of "banging" the subcontractors, did tortuously (sic) interfere in the contract between the Plaintiff an USF&G, for ulterior motives.

Amended Complaint, Tab 1 at Ex. A, ¶ 23.

65.     When asked, "how is it that you believe that Lovett-Silverman interfered in your contract with the surety?", Neal Matthews testified that:

>Lovett-Silverman did not investigat[e] [Landworks'] claim , by not at least looking into the possibilities that ... monies were owed, and ... by not ... giving [Landworks] a full and fair hearing on the amounts that I say were owed to [Landworks] ... and not presenting them to the surety.

Matthews Depo., Day Two, Tab 1 at Ex. G, 108:18-109:5.

66.     Contrary to Neal Matthews' testimony as to what he thinks Lovett-Silverman's scope of work should have been, it is undisputed that in fact, it was not within Lovett-Silverman's scope of work to investigate claims made by subcontractors against USF&G or to preside over a hearing for such subcontractors. Lovett-Silverman Agreement, Tab 1 at Ex. B., Exhibit A; Peters Depo., Tab 1 at Ex. B at 46:6-11; Lardaro Depo., Tab 1 at Ex. D, 56:3-17.

67.     In response to an interrogatory asking, "State the basis of your contention ... that Lovett-Silverman interfered in the business relationship between Landworks and USF&G", Landworks responded:

>Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. ... An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF&G with false data provided by Lovett-Silverman.

By reference to other interrogatory answers, Landworks also replied,

>... Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information.  Based upon the e-mails subsequently identified, it is clear that Landworks would be barred from its right to perform its work.

Answers to Interrogatories, Tab 1 at Ex. P, Answers No. 17 and 18.

68.     Neal Matthews testified that he believed that "Lovett-Silverman prepared the counterclaim to give to USF&G so that they could file a counterclaim against me."  Matthews Depo., Day One, Tab 1 at Ex. F, 102:2-4.

69.     To the contrary, it is undisputed that in fact, USF&G "tasked Lovett-Silverman with doing a review of the status of the project ... and they identified aspects of the site work that were either incomplete or which required corrective measures."  Peters Depo., Tab 1 at Ex. B, 142:4-9.

70.     In Count VI of the Amended Complaint ("Violations of c. 93A") Landworks alleges:

> "Lovett-Silverman set out to harm Landworks by denying it access to the Project and to funds due and owing ... [and] The pattern and practice of fraud, tortous (sic) interference and such conduct constitutes violations of c. 93A by Lovett-Silverman."

Amended Complaint Tab 1 at Ex. A, ¶¶ 38, 40.

71.     The Amended Complaint also alleges that Lovett-Silverman "engag[ed] in extortion toward the subcontractors."  Amended Complaint, Tab 1 at Ex. A ¶ 12

72.     Landworks did not send an M.G.L. c. 93A demand letter to Lovett-Silverman at any time prior to filing suit against Lovett-Silverman.  <u>See</u> Affidavit of Julie A. Ciollo, affirming that no such letter was sent to Lovett-Silverman.

73.     When asked, "Are you aware of any other subcontractors at the site who you would say were strong-armed or extorted by Lovett-Silverman?", Neal Matthews testified,

> "I didn't think I ever used the word 'extorted' by Lovett-Silverman.  ... I think that would be a term I would not apply to them."

Matthews Depo., Day One, Tab 1 at Ex. F, 114:10-11.

74.     Furthermore, Mr. Matthews testified,

"I don't know of the dealings with other subcontractors with Lovett-Silverman. ....
So I don't know if other subcontractors were strong-armed or not."

Matthews Depo., Day One, Tab 1 at Ex. F, 114:12-15.

75.     When asked, "Do you believe that Lovett-Silverman strong-armed Landworks?",

Neal Matthews testified,

"I don't know if it constitutes strong-arming."

Matthews Depo., Day One, Tab 1 at Ex. F, 109:11-17.

76.     In its response to Lovett-Silverman's interrogatory asking,

" Please identify each subcontractor that you allege ... was denied rights by
Lovett-Silverman and set forth the specific rights denied by each such
subcontractor",

Landworks answered,

"Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly
extortionist conduct in attempting to dangle payment with a precondition of
waiving legal rights under G.L. c. 149 § 29.  This also violated Plaintiff's rights,
and may even have been criminal in nature."

Landworks further answered,

The e-mail traffic that has been produced indicates that *Lovett-Silverman were
nothing more than the Surety's foul-mouthed thugs, operating on the ground as
on-the-ground hatchet men*.  Aside from the language about "banging" the
subcontracts (sic), Landworks finds it significant that Al Falango of Lovett-
Silverman would send an e-mail .. to Rick Noblet [also a Lovett-Silverman
employee] referring to "my F-in" vacation."  On August 17, 2005, Al Falango
sent an e-mail to a claims attorney, Russ Fuller, ... referring to the president of
Landworks as "this guy."  Landworks is not a "guy."  It is a well-know (sic) and
respected corporation.  This kind of e-mail confirms that Lovett-Silverman
consultants were not behaving in the type of professional, credible construction
consultants tasked with representing the best interests of all involved in this
project.

Supplemental Answers to Interrogatories, Tab 1 at Ex. M, Answer No. 7 (emphasis
added).

77.     In its response to Lovett-Silverman's interrogatory asking,

" State the basis of your contention ... that Lovett-Silverman's conduct constitutes a violation of c. 93A",

Landworks answered,

"Banging Landworks, lying about their status, assisting in the preparation of a false lawsuit and other such conduct, all for the purposes of avoiding payment, sounds like unfair and deceptive trade practices to this Plaintiff."

Supplemental Answers to Interrogatories, Tab 1 at Ex. M, Answer No. 21.

<div style="margin-left: 40%;">

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

</div>

Dated:  March 23, 2007

01074882

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

LANDWORKS CREATIONS, LLC          )
                                  )
Plaintiff                         )
                                  )
v.                                )          AMENDED COMPLAINT
                                  )
UNITED STATES FIDELITY AND        )
GUARANTY COMPANY and              )
LOVETT-SILVERMAN CONSTRUCTION     )
CONSULTANTS, INC.                 )
                                  )
Defendants                        )

1.  Plaintiff, Landworks Creations, LLC ("the Plaintiff") is a limited liability corporation

    with a principal place of business at 1500A Lafayette Road in Portsmouth in the State of

    New Hampshire.

2.  Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("USF & G") is an

    insurance company with a place of business at 124 Grove Street, Franklin, Norfolk

    County, in the Commonwealth of Massachusetts.

3.  Defendant, Lovett-Silverman Construction Consultants, Inc. ("L-S") is a business entity

    with a principle place of business at 380 Townline Road, Haupauge, in the state of New

    York.

4.  Jurisdiction may be had over L-S based upon the conducting of business by L-S in the

    Commonwealth of Massachusetts, and by nature of its torts within the Commonwealth of

    Massachusetts, and based upon the existence of offices within the Commonwealth of

    Massachusetts.

1

5. The Plaintiff entered into a contract with Standen Contracting Company, Inc. of North Dartmouth, Massachusetts.

6. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project")

7. Standen Contracting Company, Inc. was bonded by USF & G, United States Fidelity & Guaranty Co.

8. Standen Contracting Company, Inc. was unable to complete its work at the Project, and USF & G, pursuant to its obligations under a performance bond SW5041 assumed responsibility for completion of the Project in the stead of Standen Contracting Company, Inc.

9. The Plaintiff has performed it work under the Standen contract, and is owed funds by USF & G for the work performed.

10. USF & G has failed to pay the Plaintiff for work performed at the Project, to the extent of $135,101.00.

11. At some point in the winter of 2004-2005, or in the spring of 2005, USF & G brought L-S to the Project to oversee completion of the Project.

12. L-S engaged in a scheme to reduce costs to USF & G on the Project by refusing to authorize payments to subcontractors, including the Plaintiff, by engaging in extortion toward the subcontractors, by strong-arming the subcontractors and by attempting to deny the subcontractors their rights under their contracts.

13. L-S also engaged in conduct that compelled subcontractors to file suit to receive payment, as part and parcel of a scheme to extort payments from subcontractors to USF & G through frivolous and fraudulent lawsuits.

2

14. In the words of Al Falango at L-S, there was an organized and on-going effort by L-S "to bang the subs…"

15. Landworks was a victim of L-S's conduct.

COUNT I
BREACH OF CONTRACT
LANDWORKS v. USF & G

16. The Plaintiff restates allegations 1-16 and incorporates them by reference.

17. USF & G breached its contract by failing to perform its obligations to make payment under the bond between USF & G and Standen for the benefit of the Plaintiff..

18. As a result of this breach, the Plaintiff has been denied its expectancy and has otherwise been harmed.

COUNT II
FRAUD
LANDWORKS v. BOTH DEFENDANTS

19. The Plaintiff restates allegations 1-18 and incorporates them by reference.

20. The Defendants engaged in specific conduct which serve as fraud on the Plaintiff:

a.  the Defendants failed to effectuate payments of monies due and owing

b.  knowing that funds were due and owing, the Defendants engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract

c.  knowing that funds were due and owing, the Defendants devised and carried out a conspiracy to "bang" Landworks.

3

d.  knowing that the Plaintiff was not culpable for defects at the site, USF & G alone and with the support of L-S defamed the Plaintiff, making knowingly false statements in court papers to defend its failure to pay, and otherwise, by its conduct, implying defects in performance that harmed the Plaintiff in its business

e.  knowing that the Plaintiff was not culpable for defects at the site, USF & G filed false statements with this Court, obstructed access to documents by thwarting the discovery process, asserted false affirmative defenses, manipulated the legal system by removing this matter to the federal court in the hope of slowing the progress of litigation, assisted in and filed a knowingly false counterclaim.

f.  Knowing that the Plaintiff was not culpable for defects at the site, USF & G has engaged in a pattern and practice of hindering or delaying the resolution of this litigation.

21. This conduct, which constituted fraud on the Plaintiff, caused harm to the Plaintiff.

<div align="center">

COUNT III
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

</div>

22. The Plaintiff restates allegations 1-21 and incorporates them by reference.

23. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere in the contract between the Plaintiff and USF & G, for ulterior motives.

24. L-S was aware of the advantageous business relationship between the Plaintiff and USF & G.

25. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

## COUNT IV
## TORTOUS INTERFERENCE
## LANDWORKS v. BOTH DEFENDANTS

26. The Plaintiff restates allegations 1-25 and incorporates them by reference.

27. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere in the contract between the Plaintiff and USF & G, for ulterior motives.

28. L-S was aware of the advantageous business relationship between the Plaintiff and USF & G.

29. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

## COUNT V
## CONVERSION
## LANDWORKS v. USF & G

30. The Plaintiff restates allegations 1-29 and incorporates them by reference.

31. USF & G received the benefit of the Plaintiff's work, to a value of $135,000.

32. USF & G kept that value.

33. USF & G converted the value of that work to its own benefit.

34. As a result of this conversion, the Plaintiff has been harmed.

## COUNT VI
## VIOLATIONS OF c. 93A AND c. 176D
## LANDWORKS v. BOTH DEFENDANTS

35. The Plaintiff restates allegations 1-34

36. The Plaintiff and both defendants are involved in trade or commerce.

37. Defendant, USF & G failed to investigate a claim and make prompt payment. Notwithstanding that liability was reasonably clear, USF & G has declined to make full settlement of the claim, without cause or excuse.

38. Defendant, L-S, set out to harm Landworks by denying it access to the Project and to funds due and owing.

39. The Plaintiff has made demand for its funds, a demand which has been ignored.

40. The pattern and practice of fraud, tortous interference and such conduct constitutes violations of c. 93A by L-S.

41. The pattern and practice by USF & G of refusing to make payments and to investigate violate both c. 93A and c. 176D.

42. As a result of this conduct, the Plaintiff has been harmed in its business.

COUNT VII
VICARIOUS LIABILITY
LANDWORKS v. USF & G

43. The Plaintiff restates allegations 1-42

44. To the extent that L-S was acting as an agent of USF & G,  USF & G is liable for the torts of its agents.

45. The Plaintiff was harmed by the tortous conduct of L-S.

46. Defendant, USF & G is liable for that harm.

COUNT VIII
NEGLIGENT SUPERVISION
LANDWORKS v. USF & G

47. The Plaintiff restates allegations 1-46

48. To the extent that L-S was acting as an agent of USF & G, USF & G had a duty to supervise its agent to assure that the agent did not commit harm.

49. Defendant, USF & G breached that duty.

As a result of its negligence, the Plaintiff was harmed.

WHEREFORE, the Plaintiff respectfully requests that:

1.  this Honorable Court enter judgment against USF & G as to all Counts in which it is named;

2.  this Honorable Court enter judgment against L-S as to all Counts in which it is named

3.  this Honorable Court award the Plaintiff the amount of $135,101 together with interest and costs, trebled, along with attorney's fees

4.  this Honorable Court award damages in an amount that will make the Plaintiff whole on the tort claims, trebled, along with attorney's fees; and

5.  this Honorable Court award any further relief as deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer_____
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: June 20, 2006

# EXHIBIT B

Page 7

identification.)

    **Q.**  (By Mr. Meltzer) Mr. Peters, could you please tell me where you reside?

    A.  I reside in Simsbury, Connecticut.

    **Q.**  What is the address?

    A.  38 Latimer Lane.

    **Q.**  How long have you lived there?

    A.  Approximately 27 years.

    **Q.**  Do you have any plans to move from there in the next year?

    A.  No.

    **Q.**  Who is your employer?

    A.  I'm employed by, in this case, United States Fidelity and Guaranty Company.

    **Q.**  When you say "in this case," what do you mean by that?

    A.  United States Fidelity and Guaranty Company is one of several underwriting companies that make up part of the St. Paul Travelers Companies.

    **Q.**  Do you actually receive a paycheck from USF&G?

    A.  No.

    **Q.**  Where does your paycheck come from?

    A.  My recollection is that the paycheck is

Page 22

1    the Commonwealth of Massachusetts?

2        A.  I don't recall that I have been deposed in

3    the Commonwealth of Massachusetts.

4        **Q.**  Within the category of handling claims on

5    surety bonds, can you explain what kind of surety

6    bonds we are talking about, in terms of the kind of

7    bonds?

8        A.  For the most part they include performance

9    bonds, payment bonds, and occasionally some bonds of

10    a miscellaneous nature that might pertain to the

11    operations of a construction company.

12        **Q.**  When you say "performance bonds," what does

13    that phrase mean to you?

14        A.  It is a bond that is generally conditioned

15    upon the performance by our bond principal of a

16    construction contract.

17            And, to the extent that the principal

18    fulfills the obligations of that underlying

19    contract, then the bond would be null and void, to

20    the extent that the principal would default and be

21    terminated on that obligation.

22            The surety would, generally speaking, have

23    an obligation to discharge its responsibilities

24    under that bond.

Page 23

1    Q.  Payment bond; what does that mean to you?

2    A.  A payment bond is generally conditioned

3    upon the obligation of the bond principal to pay for

4    labor, materials, or services that are incorporated

5    in the bonded construction project.

6         To the extent that they don't, there is an

7    obligation under that bond, and the surety would

8    have an obligation to discharge that responsibility.

9    Q.  Does the Travelers have their own

10   construction company?

11   A.  Not that I know of.

12       No.

13   Q.  When Travelers has to take up an obligation

14   under a performance bond is there a policy or set of

15   policies in writing that explain how those

16   obligations are to be met by the Travelers?

17   A.  No.

18   Q.  Were you aware of any kind of committees or

19   groups that exist within the Travelers for purposes

20   of creating policies for handling claims under

21   performance bonds?

22   A.  No.

23   Q.  If there are no written policies that

24   dictate that, what is the general method for how the

Page 46

1    obligations were at this project; the Shrewsbury

2    Middle School?

3        A.   What I understand it to be?

4             Yes, I think I do.

5        Q.   What are those obligations?

6        A.   In essence, to provide construction-related

7    experience and support in response to our specific

8    request and involving matters pertaining to the

9    discharge of our performance bond obligation and in

10   matters pertaining to the discharge of our payment

11   bond obligations.

12       Q.   Do you know when that document you referred

13   to was prepared?

14       A.   The more specific one was prepared around

15   the time of when the Standen claim arose.

16            I don't recall when the more general

17   agreement was executed.

18       Q.   Do you have an understanding that

19   Lovett-Silverman became involved when Standen

20   failed?

21       A.   That's my general recollection.

22       Q.   Do you know when Standen failed?

23       A.   My general recollection is it's sometime in

24   the early part of 2004.

Page 60

1    realize you were not personally involved with this

2    from the moment of failure on the Standen/Shrewsbury

3    project -- but the time line as it transpired from

4    the failure of Standen until the time the work was

5    back up and running under Jackson, how that would

6    all unfold?

7        A.   Is this with respect to Shrewsbury?

8        Q.   Yes.

9        A.   I have a general recollection of how

10   Standen got into difficulty in the spring of 2005

11   and that Jackson became involved within a relatively

12   short period of time thereafter.

13       Q.   2005 or 2004?

14       A.   I'm sorry.  2004.

15            Yes.  Spring of 2004.

16       Q.   At what point would Lovett-Silverman have

17   been brought in on the Shrewsbury Middle School

18   project?

19       A.   I don't have a specific recollection.

20       Q.   They'd have been brought in before Jackson

21   was on the job?

22       A.   I could only say that I have a general

23   understanding that they were involved in issues that

24   followed Standen's default, but I don't recall

Page 72

1      A.   I was.

2      Q.   How about from their side?

3      A.   My primary contact was Bob Barton.

4      Q.   Do you know what Bob Barton's position with

5   the company was?

6      A.   My general understanding is he was an

7   officer.  I don't remember his title.

8      Q.   During the time between the period when

9   they signed the agreement and then their failure in

10  the summer of 2005, were they also still a bond

11  account for your company?

12     A.   Not an active one.

13          No.

14     Q.   When did they start becoming an active

15  account?

16     A.   I don't recall.

17     Q.   Do you know if it was during that time

18  between signing that contract and the time of that

19  failure?

20     A.   That's my general understanding.

21          Yes.

22     Q.   During that time period before they stopped

23  being an active account were their finances under

24  any kind of regular audit or inspection by your

Page 77

1          I do recall a meeting in that same trip

2   with Dan Morgado just by way of an introduction.

3          I recall attending a meeting with Russ

4   Warner and Bob Barton from Jackson and various

5   members of the representatives of the Town of

6   Shrewsbury.

7      Q.  Do you recall Bob Barton explaining why the

8   work wasn't being completed in a timely manner?

9      A.  I have a general recollection that he was

10  being tasked by the town to respond to questions of

11  that nature.

12         Yes.

13     Q.  Do you recall what he said, in terms of his

14  explanation?

15     A.  I don't remember the specifics.

16         No.

17     Q.  Was there a perception that Jackson had not

18  been paying subcontractors?

19     A.  There was a perception from the town.  Yes.

20         And I think at a point in time USF&G shared

21  that same perception.

22     Q.  When Jackson would submit requests for

23  payment and requisitions to pay the subcontractors,

24  who would those requisitions be submitted to?

Page 79

1      A.   My general understanding is that Jackson

2   would be paid in accordance with the payment

3   applications that had been approved by the architect

4   and by the Town of Shrewsbury.

5      Q.   Was there an expectation to keep the job

6   moving that Jackson would pay the subcontractors and

7   then be reimbursed on those amounts?

8      A.   My general recollection of the sequence is

9   that the payments to be made to the subcontractors

10  would be made out of the proceeds of the funds that

11  we had received from the Town of Shrewsbury and then

12  had, in turn, remitted to Jackson.

13          And to the extent that there were

14  subcontractors who were entitled to be paid in the

15  same proportion that those payments had been

16  received from the town that the payments would be

17  made to them.

18     Q.   Did the money go from the town, then to the

19  surety, down to Jackson for payment to

20  subcontractors?

21          Was that the general route?

22     A.   That would be my general understanding.

23     Q.   And was there an issue that not enough

24  money was being provided by the town to trickle down

Page 82

1    A.   Again, I don't have a specific

2  recollection.

3    Q.   Do you recall at that time frame whether

4  particular subcontractors stated that they would not

5  return to the job until they had received payment on

6  their invoices?

7    A.   I have a general recollection that

8  allegations of that type had been made at some

9  point.

10    Q.   Do you know which subcontractors?

11    A.   I don't have a specific recollection.

12    Q.   At some point did Lovett-Silverman become

13  involved again in this project?

14    A.   Yes.

15    Q.   Do you know when that occurred?

16    A.   It occurred in advance of our giving notice

17  to Jackson that we consider them to be in default

18  under the terms of their completion agreement.

19    Q.   Did your company have a performance bond

20  that pertained to Jackson for completion of the

21  Shrewsbury Middle School project?

22    A.   Not a performance bond that was issued on

23  behalf of Jackson as a bond principal.

24    Q.   Do you know if they had a performance bond

Page 85

1    John Lovett.

2          There may be others.  I don't recall.

3       Q.  What would Al Falango's responsibilities

4    have been, as you understood them?

5       A.  To assist us in a general way with respect

6    to our efforts to locate and secure a replacement

7    contractor for Jackson and, to some extent, to

8    participate in the subcontractor ratification and

9    payment bond claim processing activities.

10      Q.  Why would there be a ratification process

11   following the failure of Jackson?

12      A.  To the extent that we wanted to be able to

13   utilize existing subcontractors.

14          We believed that it was in our interest to

15   establish terms and conditions under which they

16   would be prepared to resume their subcontract

17   responsibilities and complete their obligations.

18      Q.  Would the subcontractors who had signed

19   ratification agreements after the failure of Standen

20   be expected to sign a second, what's referred to as

21   a hold agreement?

22      A.  In most instances, yes.

23          Although, I think the particular form that

24   we used referred to it as a ratification agreement,

Page 105

1  ratification?

2      A.  It would depend on the circumstances.

3      Q.  What circumstances?

4      A.  There were some instances in which, by

5  agreement with counsel, our consultants would be

6  asked to become involved in some communications.

7      There were other instances in which counsel

8  representing one or more subcontractors would

9  initially make contact with one of our consultants.

10      And I have a recollection of one instance

11  in which I had requested that our consultants

12  refrain from direct communications as a result of

13  the existence of litigation in one particular

14  matter.

15      Q.  Which matter was that?

16      A.  The Landworks Creations litigation.

17      Q.  Tell me, again, what you determined was

18  appropriate for communication there?

19      A.  It was my understanding that we were

20  involved in litigation with Landworks.

21      My understanding was that Landworks had

22  been -- that our consultant, Lovett-Silverman, had

23  been contacted by Landworks and that they had

24  expressed an interest in exploring the possibility

Page 106

1    of having their subcontract ratified.

2          I asked Lovett-Silverman to refrain from

3    engaging in negotiations with Landworks and to

4    suggest that if there was any communication with

5    them that it would be more appropriate for those

6    communications to be exchanged between Landworks

7    counsel and United States Fidelity and Guaranty

8    Company's counsel.

9      Q.  Was there a policy specifically that

10   precluded the consultant from speaking to Landworks

11   specifically?

12     A.  There was not a policy that would have

13   precluded them from speaking to Landworks.

14         It's really more that the substance of the

15   communications that I had a concern about.

16     Q.  What was your concern?

17     A.  My concern was that if there were to be

18   negotiations concerning whatever role Landworks

19   might be seeking in connection with this matter that

20   those communications be coordinated with counsel.

21     Q.  Was that a policy throughout USF&G, those

22   matters be handled in that way?

23     A.  I can't say that there is a specific

24   written policy.

Page 142

1   of attorney-client privilege.

2          You can answer to the extent you have your

3   own personal knowledge.

4          A.   My general understanding is that we tasked

5   Lovett-Silverman with doing a review of the status

6   of the project prior to the time that G&R was

7   brought in and that they had identified that there

8   were aspects of the site work that were either

9   incomplete or which required corrective measures.

10         Q.   You relied on Lovett-Silverman for that

11  discovery?

12         A.   That's my understanding.   Yes.

13         Q.   Who at Lovett-Silverman?

14         A.   Bob Bullock is one name that comes to mind.

15  There may have been others.

16         Q.   Do you know what he did as part of his

17  investigation that led to this discovery?

18         A.   I have a general understanding that he made

19  one or more visits to the site.

20         Q.   What else did he do?

21         A.   I have a general recollection of having

22  prepared some documents evidencing his findings.

23         Q.   Do you know if he spoke to anybody at

24  Jackson?

Page 167

     Do you recall seeing this email?

A.  Yes.

Q.  When did you first see this email?

A.  I don't know that I could pin a date on it.

     My general recollection is is that it was a
document that was identified during the course of
discovery of Lovett-Silverman's business records and
it was brought to my attention after that.

Q.  You had a chance to read this email?

A.  Yes, I have.

Q.  You saw the language at the bottom that
says, We can try to bang the subs, but I think that
we can never recover from them what we are spending.

     See that reference?

A.  Yes.

Q.  In fact, at the top of that paragraph it
actually talks about site work; correct?

A.  Among other things, yes.

Q.  Do you know what it means to bang subs?

A.  I don't know what Mr. Falango meant by
that.

Q.  Did you ever call up Al Falango and ask him
what he meant by it?

A.  I remember having a conversation with him

Page 168

1    about it.

2        Q.  When was that conversation?

3        A.  After I had seen the email.

4        Q.  Why did you have a conversation with him

5    about it?

6        A.  Because I wanted to understand more clearly

7    what he was talking about and to express some

8    disappointment in his choice of words.

9        Q.  Why disappointment?

10       A.  Because it appears to be the use of slang,

11   which could be taken out of context.

12       Q.  Did he explain to you what he meant by

13   that; we can try to bang the subs?

14       A.  My understanding was that he was talking

15   about to identify instances where we had incurred

16   costs or would incur costs to complete or to fix

17   corrective -- to complete work or to correct

18   defective work, which would be chargeable back to

19   the account of the involved subcontractor.

20       Q.  That's what he said?

21       A.  In general terms, yes.

22       Q.  Do you recall when that conversation took

23   place?

24       A.  Again, it was after I had seen the email.

# EXHIBIT C

COPY

<div align="center">

**EXHIBIT A**

**FIRE AND MARINE WORK ASSIGNMENT**
Revision 0
April 13, 2004

</div>

**THIS WORK ASSIGNMENT** is subject to the terms of the Professional Services Agreement between the parties, dated January 10, 2003 (the "Agreement"). The terms of this Work Assignment shall control if there is a conflict with the terms of the Agreement.

PRINCIPAL:     Standen Contracting Company, Inc.

CONTRACTOR: Lovett Silverman Construction Consultants

SERVICES PERFORMED BY:    Al Falango, Rick Noblet

FEES:

| | | |
|---|---|---|
| Number of Work Hours: ___800_ x $ __130___ /hr | $ | 104,000 |
| Number of Travel Hours: _____ x $_____ /hr | $ | Included above |
| Transportation Costs: | $ | 5,000 |
| Lodging/Meals: | $ | 0 |
| Other: Miscellaneous expenses (photographs, copies, etc.) | $ | 15,000 |

ESTIMATED TOTAL:                                  $        124,000

START DATE:   January 01, 2004

END DATE:     July 31, 2004

CLAIM NO(S).:       SW5041

PROJECT NO(S).:

PROJECT NAME(S):     Shrewsbury Middle School, Shrewsbury Massachusetts
                          Westford – North Street, Westford Massachusetts
                          Bryantville Elementary, Pembroke, Massachusetts
                          Wrentham Safety Complex, Wrentham Massachusetts
                          Old Hammondtown School, Mattapoisett Massachusetts

FIRE AND MARINE CONTACT: Russ Werner (410) 578-2025

RECEIVED

JUN 2 8 2004

SURETY CLAIM

DESCRIPTION OF SERVICES:

1. Complete a preliminary investigation of the jobsites at Shrewsbury Middle School and Westford to assess the progress to date and the ability of the principal to complete the work.
2. Obtain project documentation from the office's of Standen Contracting
3. Shrewsbury:
   a. Ratify subcontractors and suppliers
   b. Assist in the assignment of the Completion contractor,

4. Westford:

a. Ratify subcontractors and suppliers
b. Solicit lump sum price for completion of work and review same.
c. Assist in assignment of the Completion contractor

5. Bryantville Elementary & Wrentham Safety Complex:
   a. Investigate work remaining of these two projects
   b. Obtain available documentation from Standen's office.
   c. Advise as to best course of action to complete the work at these sites
   d. Assist in completion of work.
   e. Ratify subcontractors and suppliers.

6) Old Hammondtown
   a. Investigate work remaining.
   b. Obtain available documentation from Standen's office.
   c. Advise as to best course of action to complete the work at these sites.
   d. Assist in completion of work.
   e. Ratify subcontractors and suppliers.


SPECIAL TERMS AND CONDITIONS:


Contractor represents that it does not currently represent any other party with any interest in this matter and that there are otherwise no conflicts of interest to this work assignment which would in any way impair Contractor to fulfill its obligations to Fire and Marine or its ability to provide objective information to Fire and Marine.

IN WITNESS WHEREOF, the parties by their authorized representatives have signed this Work Assignment.

ST. PAUL FIRE AND MARINE                    CONTRACTOR
INSURANCE COMPANY

Signature: _____                  Signature: _____

Name:  Robert E. Schumaker                   Name:  ANTHONY J. LAZNARD

Title:  Director of Engineering              Title:  REGIONAL MANAGER

Date:  5/28/04                               Date:  5/18/04

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY

Signature: _____

Name:  Russ Werner

Title:  Engineer

Date: May 19, 2004


cc:    Claim Attorney

       File

# EXHIBIT D

Page 25

1    A.   No, sir.

2    Q.   Was your involvement with this project

3    ongoing after February 2003?

4    A.   Subsequent to ratifications, the surety

5    obtained a completion contract to finish the work in

6    lieu of Standen.  Our services ended at that point.

7    Q.   Do you know who that replacement contractor

8    was?

9    A.   I believe it was Jackson Construction

10   Company.

11   Q.   Had you ever heard of Jackson Construction

12   Company before the Shrewsbury Middle School project?

13   A.   No, sir.

14   Q.   At some point did you become involved in

15   this project?

16   A.   Yes.

17   Q.   Do you know when that was?

18   A.   I want to say it was in May, around May of

19   '05, I believe.

20   Q.   So about two years later?

21   A.   I think so, yeah.

22   Q.   How did you get involved in May of 2005?

23   A.   Apparently Jackson was having some

24   difficulty in completing the project in Shrewsbury,

Page 28

1    A.   I don't know that.

2    Q.   Can you tell me what Lovett-Silverman's

3    involvement was after May of 2005, after the

4    preliminary exposure reports were generated?

5    A.   We were asked to ratify contractors that

6    were interested in completing their scope of work.

7    We were asked to solicit bids for the completion of

8    the remaining work.  And we were asked to help

9    negotiate open change orders with the school.  And

10   we were asked to monitor the completion of the work

11   for the surety.

12   Q.   Who were the individuals for

13   Lovett-Silverman who were actively involved in that

14   process?

15   A.   Al Falango, Robert Bullock, Pedro Rosario,

16   Bill Meritz.

17   Q.   Were any of the various scopes of

18   responsibility assigned to individuals, or were they

19   all working on everything?

20   A.   We tried to split up the responsibilities.

21   Pedro handled most of the mechanical, electrical and

22   plumbing, light safety issues.  Bill Meritz, I

23   believe, did most of the interior trades.  And Bob

24   Bullock did mostly the exterior trades.

Page 56

1      Q.   What is the involvement of Lovett-Silverman

2   during that process?

3      A.   I assume we would compile the costs

4   involved with finishing the work, and pass that on

5   to the bonding company.

6      Q.   What would be the process for determining

7   what the party would be responsible for?

8      A.   In most cases we would determine the scope

9   of work that the party was responsible to perform

10  pursuant to their subcontract agreement or purchase

11  order agreement.

12     Q.   How would the scope be determined?

13     A.   By reading the subcontract agreement or the

14  purchase order agreement.

15     Q.   What else would you do?

16     A.   We would assess the costs actually expended

17  to perform any of that scope by others.

18     Q.   Were you involved in this process at the

19  Shrewsbury Middle School?

20     A.   Which process?

21     Q.   Of assessing back charges against prior

22  subcontractors.

23     A.   I wasn't involved in the actual process of

24  it, no.

Page 60

1    Q.  Have you discussed this e-mail with anyone,

2    other than counsel, in preparation for this

3    deposition?

4    A.  Other than Al Falango and Robert Bullock,

5    no.

6    Q.  Go to the end of the paragraph, the long

7    paragraph at the end, there is a sentence that

8    starts with, "We can try to bang the subs."  Do you

9    see that reference?

10   A.  Yes.

11   Q.  Do you ever recall seeing that reference

12   September 21st, 2005?

13   A.  I don't recall seeing it at that point.

14   Q.  Do you know what it means to try to bang

15   the subs?

16   A.  I know what it means in the context of this

17   e-mail.

18   Q.  Why don't you tell me.

19   A.  It means to back charge the subcontractors

20   for costs incurred by others in performing their

21   work.

22   Q.  Which subs are being referred to?

23   A.  My interpretation of what he is referring

24   to is the track sub, site sub, the electric sub,

Page 61

1    roof and door sub.

2        Q.   What do you base that on?

3        A.   What did he base what on?

4        Q.   Why do you think it's those subs?

5        A.   He is referring to busts in their figures.

6        Q.   When you talk about "busts," what does that

7    mean?

8        A.   Busts, in this contract, I take to mean

9    what is remaining in those subcontractors' accounts

10   versus what our estimate to complete the remaining

11   scope of work related to their accounts is.

12       Q.   Did you respond to this e-mail to Al?

13       A.   I believe I did, yes.

14       Q.   Did you ask him what he meant by the phrase

15   "try to bang the subs"?

16       A.   No.

17       Q.   Did you know what he meant in the context

18   of this e-mail?

19       A.   Yes.

20       Q.   Is banging the subs something

21   Lovett-Silverman does all the time?

22       A.   We back charge subcontractors for costs

23   when others perform work on their behalf.

24       Q.   Do you know why the phrase is used to "try

# EXHIBIT E

# Standen Contracting Company Inc.

**Date:**    **August 28, 2003**                     **Contract Number:   573-059**

**THIS AGREEMENT,** made as of the day and year written above by and between **STANDEN CONTRACTING COMPANY, INC.** of 445 Faunce Corner Road, N. Dartmouth, MA. 02747 (hereinafter referred to as "the Contractor")

And the subcontractor:     **Landworks**
                           **PMB 291**
                           **1500A Lafayette Road**
                           **Portsmouth, NH 03801**

The Contractor has made a general contract for construction dated ___**October 1, 2002**___ with
The Owner:   **Town of Shrewsbury**
             **100 Maple Avenue**
             **Shrewsbury, MA 01545**

For the construction of the following project:     **Shrewsbury Middle School – West**
                                                   **45 Oak Street**
                                                   **Shrewsbury, MA 01545**

The Architect for the project is:     **Lamoureux Pagano Associates**
                                      **14 East Worcester Street**
                                      **Worcester, MA 01604**

## The Contractor and Subcontractor agree as follows:

**ARTICLE 1. THE WORK.** The Subcontractor agrees to furnish all labor, materials, equipment and all else required to perform and complete the following Work required by the general contract: **Earthwork, Seeding & Site Demolition**

*CODE:*    *2-100-010-S*                     *Amount: $824,823.00*

This Subcontract includes Addenda No. 1, 2, 3, 4, 5 and Alternates 1,2,3,4 & 5
This Subcontract includes Exhibit "A"  Scope of work      Dated   August 28, 2003
                          Exhibit "B"  Unit Pricing        Dated   N/A
                          Exhibit "C"  Safety Program      Dated   August 28, 2003
                          Exhibit "D"  Drawing Schedule    Dated   November 7, 2002
                          Exhibit "E"  Tax Exempt Cert.    Dated   November 4, 2002
                          Exhibit "F"  Project Schedule    Dated   Pending Issuance

All of the work is to be done in accordance with the contract documents, defined as the general contract and other contract documents enumerated therein, including general, supplementary and other conditions, drawings, specifications, addenda and modifications (all of said documents being a part of this Subcontract) and in accordance with the provisions of this Subcontract. The Subcontractor agrees to be bound to the contractor by the terms of the General contract and to assume to the Contractor, with respect to that portion of the work described above, all obligations and responsibilities that the Contractor has assumed to the Owner.

**ARTICLE 2. PAYMENT:**

2.1 The contractor agrees to pay the Subcontractor, as full payment for all Work, including labor, materials, services, equipment and transportation, the sum of:     **Eight Hundred Twenty Four Thousand Eight Hundred Twenty Three Dollars and No Cents**

95% · MAM

**Dollars ($824,823.00)** payable in monthly
Payments as follows: **Ninety percent (90%)** of all work performed during the previous month and for which payment has been received by the Contractor.

Final payment shall be made to the Subcontractor promptly upon receipt of final payment by the Contractor. Provided that an application for payment is actually received by the contractor from the subcontractor not later than the twentieth day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next application for payment which the contractor is entitled to submit to the Owner. The Contractor shall pay the Subcontractor each progress payment within ten working days after the Contractor receives payment from the Owner, subject to the provisions of Section 2.1 hereof

2.2 It shall be a condition precedent to the Contractor's obligation to make any payment to the Subcontractor that the Contractor shall have first received payment for the Subcontractor's Work from the Owner. The Subcontractor agrees to look only to those amounts actually received by the contractor from the Owner as the source of payment to the Subcontractor. The Subcontractor understands and agrees that the Subcontractor shall have no obligation to pay any sum to the Subcontractor if the Contractor shall not have received a corresponding payment from the Owner, and the Subcontractor (not the Contractor) assumes the risk of nonpayment by the Owner. Any payments that may be made by the Contractor to the Subcontractor prior to the Contractor's receipt of payment from the Owner shall be accepted by the Subcontractor solely as payment on account and shall not constitute a waiver of the provisions of this Section 2.2.

## ARTICLE 3. SUBCONTRACTOR'S OBLIGATION

3.1 The Subcontractor agrees that it shall do, perform, obtain, furnish and provide, at its own expense, all work, labor, materials, permits, tools, equipment, scaffolding and staging in a workmanlike manner and to the full satisfaction of the Architect, Contractor and Owner, and in proper cooperation with the Contractor and other Subcontractors so as not delay or otherwise interfere with or obstruct their work; that it shall provide sufficient, safe and proper facilities at all times for the Inspection of its Work; that it shall, within twenty-four hours or such reasonable time as the Contractor allows, after receiving written notice from the Contractor, at its own cost and expense, remove from the grounds or building all materials condemned by the Architect, Owner or Contractor, and to take down and/or rebuild all portions of the Work which the Architect, Owner or Contractor shall, by like written notice, condemn as unsound oz- improper, or as in any way failing to conform to the Contract Documents. Work performed and materials furnished by the Subcontractor and not approved by the Architect, Owner and Contractor shall not be accepted.

3.2 The Subcontractor shall, at its own cost and expense, apply for and obtain all necessary permits and the Subcontractor further agrees that all Work performed and materials furnished by it under this Subcontract shall comply strictly with the laws, ordinances, regulations, rules and orders of the municipal, state and federal government and of any and all of their departments, bureaus and boards in force in the locality in which the Work is done (hereinafter "the governing laws"), and that it will comply promptly with the governing laws and that it will perform the Work and furnish the materials in accordance with the governing laws whether the Work and materials to accomplish the same are or are not included and provided for in the Contract Documents; and all such Work and materials made necessary by the governing laws in order to complete the Work shall be performed and furnished without additional charge or expense to the Contractor. The Subcontractor will be responsible for all violations of the governing laws will indemnify the Contractor for any loss or damage resulting to the Contractor as a result of any such violation.

3.3 The Subcontractor shall promptly prepare and furnish all shop drawings, samples, submittals, certificates and similar information, as required, for the approval of the Architect, Engineer, Contractor and Owner and as required for the efficient, expeditious and prompt performance of the Work. The Subcontractor shall, upon the request of the Contractor, provide such reports, certificates and information to the Owner and the Architect as may be reasonably requested by them at no cost or expense to the Contractor.

3.4 The Subcontractor agrees to perform the work diligently in accordance with the directions of the Contractor and in compliance with the job schedules of the Contractor. The Subcontractor shall at all times provide a sufficient number of workers and sufficient materials and equipment to accomplish the foregoing. It is specifically understood that time is of the essence of this agreement. The Subcontractor may be held liable for all damages, costs, losses and expenses resulting directly or consequentially from its failure to meet time limits contained or referred to in the Contract Documents. A labor dispute, other than an industry-wide dispute, shall not provide an excuse for failure to meet such time limits. The Subcontractor shall promptly notify the Contractor of any anticipated delay in its Work and the cause therefor and shall also notify the Contractor of any delay anticipated in the Work of others and of any deficiency in the Work of others which may cause delay in the progress of the Subcontractor's Work. No provision in the Contract Documents shall in any way prevent or interfere with the Contractor's right to modify or change the time for the performance of the Work and the completion thereof to meet the requirements of the Contractor for the efficient completion of the Project as may be determined by the Contractor in its absolute discretion.

3.5 If any matters contained in the specifications have been omitted from the plans or vice versa, the same shall be construed as if contained in both. Any matters contained in any portion of the Contract Documents shall be construed as being part of the Work covered by this Subcontract. The Subcontractor shall promptly inform the Contractor in writing of any inconsistency in the Contract Documents or the Subcontractor shall be barred from making any claims based on such inconsistency. The decision of the Architect or the Contractor resolving any such inconsistency shall be binding on the Subcontractor and shall be deemed to be included in the Work of the Subcontract.

3.6 The Subcontractor shall, at its own expense, remove from the site all debris caused by the Work of this Subcontract as and when required by the Contractor and, if the Subcontractor fails to do so, the Contractor, without further notice, may cause such removal of debris and all amounts incurred by the Contractor in so doing shall be chargeable against any amounts due or to become due to the Subcontractor.

3.7 The Subcontractor agrees that it will remove from the Project site any worker or supervisor whose employment thereon shall be objected to by the Contractor, the Owner or the Architect.

**3.8** The Subcontractor shall promptly notify the Contractor of any actual or threatened labor dispute or difficulty. In the event that any labor dispute or difficulty arises which is related in any manner to or involves the Subcontractor's employees, agents suppliers or sub –subcontractors, thereby causing any delay, interference, or stoppage of any portion of the Work, and such delay, interference or stoppage continues for twenty-four (24) hours), the Contractor may, at its option, then, or at any time thereafter, terminate this Subcontract in accordance with the provisions of Section 4.1, and the Contractor shall thereupon have no further liability hereunder to the Subcontractor except as provided in Section 4,.1. In lieu of or prior to such termination, the Contractor may suspend the Subcontractor's right to be on the Project site or to perform any of the Work.

**3.9** At the request of the Contractor, the Subcontractor shall cooperate to the fullest extent in the resolution of labor disputes including, without limitation, and at the Subcontractor's expense, the filing of complaints with the National Labor Relations Board, State Labor Agency or other courts of competent jurisdiction, as may be appropriate, to prosecute such complaints and appear and testify and execute such affidavits and documents as may be necessary and desirable in connection therewith as well as to appear, testify and execute affidavits and documents in any proceeding brought by the Contractor.

**3.10** The Subcontractor shall be responsible for the prevention of accidents and agrees to comply with and abide by any safety program established by the Contractor or the Architect and with all laws, regulations and codes concerning safety as they shall be applicable to the Work. If the Subcontractor fails or neglects to comply with the safety program or any of the applicable laws, regulations or codes concerning safety, the Contractor may take whatever measures are necessary to bring the Subcontractor's performance into compliance and the Contractor may deduct the cost of such measures from any payments due or to become due to the Subcontractor.

**3.11 CHANGES IN THE WORK.** Without invalidating this Subcontract, the Subcontractor may be ordered in writing by the Contractor to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions including those required by modifications to the general contract. The Subcontractor shall make no claim for extension of the time for performance or for additional compensation unless done in pursuance of a written Change Order from the Contractor and such claim must be presented to the Contractor prior to the commencement of the Work affected by the Change Order. No claim for extra work or for a change in the work will be recognized or paid for unless agreed to in writing by the Contractor before the extra work is done or the change is made, such agreement to specify in detail the extra work or change to be performed and the adjustment to the Subcontract price and/or time for performance to result therefrom. Payments on account of extra work or changes shall be made as provided in the Contract Documents. At the written direction of the Contractor, the Subcontractor shall promptly perform any such extra work or change in the Work notwithstanding that a Change Order shall not have been issued, or the price has not been agreed upon. Any dispute arising therefrom shall be subsequently resolved between the parties.

**3.12 CLAIMS.** The Subcontractor shall make no claim for additional compensation for any work done by it or by reason of any act of the Contractor during the performance of this Subcontract unless done pursuant to a written order from the Contractor, and notice of all such claims shall be given to the Contractor in writing before the next ensuing payment under this Subcontract after commencement of such additional Work or it shall be considered as abandoned by the Subcontractor. The Subcontractor understands that no officer, employee or other representative of the Contractor has the authority to waive compliance with this provision except as authorized by a vote of the Directors of the Contractor.

**3.13** The subcontractor agrees that it shall have no claim for money damages or additional compensation for delay no matter how caused, but for any delay or increase in the time required for the performance of this Subcontract not due to the fault of the Subcontractor, it shall be entitled only to such extension of time for performance of its Work as shall be actually allowed to the Contractor or by the Contractor.

**3.14** If, and to the extent that, reimbursement is authorized for the performance of overtime work, the amounts to be reimbursed to the Subcontractor are limited to the premium portion of the hourly rate plus taxes imposed by law. No allowance shall be permitted for any portion of fringe benefits, insurance, overhead or profit.

**3.15** The Subcontractor agrees to cause the prompt discharge and release of any claims and liens (provided that same are asserted by a sub-subcontractor or supplier of the Subcontractor or any other party claiming through the Subcontractor) against the Contractor, the Contractor's surety, the Owner and the property involved in the Work, which claims or liens are based upon or relate to the Work performed or to be performed by the Subcontractor. If the Subcontractor fails to cause the discharge of any such claim or lien after three (3) days written notice, the Contractor may cause the discharge of such claim or lien and deduct all costs, expenses and attorney's fees thereby incurred from any amounts due or to become due to the Subcontractor. If required, the Subcontractor shall provide evidence satisfactory to the Contractor that, within five (5) days after receipt of payment from the Contractor, the Subcontractor has paid or discharged all of its obligations relating in any manner to the Work and covered by such payment (including, but not limited to, any obligations for withholding taxes and fringe benefits). If the Subcontractor fails to satisfy such requirement, then, and without prejudice to any other of its rights or remedies, the Contractor may pay the same directly and deduct the amount of such payment from any sums due or to become due to the Subcontractor. The Contractor may withhold any payments thereafter coming due to the Subcontractor until such requirement has been satisfied as to all payments theretofore made.

3.16 If, and to the extent that, the Subcontractor shall do any Work based upon the direct order, direction or request of the Owner or the Architect, the Contractor shall have no liability whatsoever with respect thereto.

**3.17 WARRANTIES.** The Subcontractor warrants that all materials and equipment furnished by it will be new unless otherwise specified in the Contract Documents and that all Work will be of first-class quality, free from faults and defects and in conformance with the Contract Documents. The Subcontractor does hereby guaranty its Work and, without limiting the foregoing, agrees to make good, at no cost to the Contractor or the Owner, any and all defects due to nonconformity or imperfect workmanship or materials; and the Subcontractor shall pay for any damages resulting therefrom, including any for which the Contractor may be liable under the Contract Documents or by law. All warranties, guarantees and agreements contained in this Subcontract shall apply to any nonconformity, defect or damage, which may appear within one year from the date of the Final Completion of the Project or such longer time as may be provided in the Contract Documents. Upon written notice from the Architect, Owner or Contractor of the nature and existence of such nonconformity, defect or damage, the Subcontractor shall proceed immediately to cure such nonconformity or defect and any damage resulting therefrom. The foregoing guaranty shall be in addition to, and does not supersede, the terms of any special guaranty or warranty given by the Subcontractor or provided in the Contract Documents. It is further agreed that no payment under this Subcontract shall be proof of the proper performance of the Subcontract, either in whole or in part, nor shall any payment be construed as an acceptance of defective Work.

**3.18 INSURANCE.** The Subcontractor shall maintain Workers' Compensation Insurance as required by law and shall also purchase and maintain in force such insurance as the Contractor may require, with insurance companies approved by the Contractor. If the Contract Documents require additional insurance to be provided, the Subcontractor shall provide the same. Coverage's shall be maintained without interruption from the date of commencement of the Subcontractor's Work until the date of final payment and termination of any coverage required to be maintained after final payment. Certificates of insurance acceptable to the Contractor and naming the Contractor as an insured shall be filed with the Contractor prior to the commencement of the Subcontractor's Work. These certificates and the insurance policies required by this Section or the Contract Documents shall contain a provision that coverage's afforded thereunder will not be canceled or allowed to expire until at least thirty days' prior written notice has been given to the Contractor. If any of the insurance coverage's are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment.

## SECTION 4, CONTRACTOR'S RIGHTS AND REMEDIES

4.1 Should the Subcontractor at any time refuse or neglect to supply a sufficient number of properly skilled workers or materials of the proper quality and quantity, or fail in any respect to prosecute the Work promptly and diligently, or fail to complete punch list work in a timely fashion, or fail to produce any documentation required by the Contract Documents (including warranties, special warranties, manuals and other submittals) in a timely fashion, or fail to perform any of the agreements on its part contained in this Subcontract or the Contract Documents, the Contractor shall be at liberty, after twenty-four (24) hours' written notice, which notice may be delivered by telecopier, to provide any such labor or materials and deduct the cost thereof from any amounts due or to become due to the Subcontractor; and the Contractor shall also be at liberty, without further notice and without prejudice to any other remedy the Contractor may have, to terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor deems expedient. If the unpaid balance of the Subcontract sum exceeds the expense of finishing the Subcontractor's Work (including reasonable compensation for the additional architectural, managerial, professional and administrative services of both the Contractor and third parties, and reasonable attorney's fees incurred lay the Contractor, and sums charged to the Contractor for delay, damages and attorney's fees as provided in the Contract Documents), such excess shall be paid to the Subcontractor subject to other provisions of this Subcontract, including Article 2; but if such expense exceeds such unpaid balance, the Subcontractor shall pay the difference to the Contractor on demand.

4.2 If the Subcontractor shall be adjudged a bankrupt or shall file a petition in bankruptcy or for reorganization under any provisions of the bankruptcy laws, or if such a petition is filed against the Subcontractor and is not dismissed within ten (10) days thereafter, or if the Subcontractor shall make an assignment or trust mortgage for the benefit of creditors, or if a receiver is appointed for all or a substantial portion of the Subcontractor's property or business, or if the Subcontractor seeks relief from its obligations under any applicable law or by voluntary agreement with its creditors, then, in any of such events, the Contractor may, without prejudice to any other right or remedy provided in this Subcontract or by law, terminate this Subcontract and finish the Subcontractor's obligations as provided in Section 4.1 hereof.

4.3 Any amounts chargeable to the Subcontractor under any provision of this Subcontract may, at the election of the Contractor, be deducted from any payment or payments otherwise due or to become due to the Subcontractor under this Subcontract or any other subcontract with the Subcontractor, or the Contractor may sue the Subcontractor therefor. The Subcontractor further agrees that no portion of the Work hereunder shall be assigned or sublet without the written consent of the Contractor and any attempt to do so shall constitute an abandonment by the Subcontractor and sufficient grounds for termination of the Subcontractor as provided in Section 4.1. It is also agreed that any damage, loss, cost or expense, including attorney's fees suffered or incurred by the Contractor as a result of the failure of the Subcontractor to perform any of its obligations under this Subcontract, shall be chargeable to and paid by the Subcontractor.

**ARTICLE 5. INDEMNITY**

**5.1** To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Contractor, the Owner, the Owner's lender and the Architect, and all agents and employees of any of them, from and against any and all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from, in whole or in part, the performance of the Subcontractor's work under this Subcontract, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property, including the loss of use resulting therefrom, but only to the extent caused in whole or in part by the negligent acts or omissions of the Subcontractor, the Subcontractor's sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 5.1.

**5.2** Without limiting the provisions of section 5.1, the Subcontractor shall also indemnify and hold harmless the Contractor from and against any and all liability, loss, cost, damage and expense, including reasonable attorney's fees, based upon or arising out of: (a) any legal or equitable attachments (including, but not limited to, attachments by means of trustee process) made or attempted; (b) liens, including tax liens, asserted against the Subcontractor and served or levied upon the Contractor or Owner; or (c) any violation of law.

**ARTICLE 6. MISCELLANEOUS**

**6.1** Notwithstanding any provision anywhere in the Contract Documents to the contrary, the Contractor shall not be required to engage in any arbitration proceeding relating to the Subcontract or the Subcontractor unless the Contractor elects, in writing, to participate in such arbitration proceeding.

**6.2** Nothing contained in this Subcontract shall create any contractual relationship between the Subcontractor and the Owner nor shall it create any obligation on the part of the Owner to pay or see to the payment of any sums to the Subcontractor.

**6.3** Should any provision of this Subcontract be invalid as a matter of law or public policy, such invalidity shall affect only such provision and shall not invalidate or affect the remaining provisions of this Subcontract.

**6.4** This Subcontract shall be governed by the laws of the Commonwealth of Massachusetts applicable to contracts made and to be performed entirely within the commonwealth.

**6.5** This Subcontract constitutes the entire agreement of the parties hereto relative to the subject matter hereof and all prior negotiations with respect to and drafts of this Subcontract are merged herein. This Subcontract may not be modified or amended except by a writing signed by an officer of the Contractor.

**6.6 THE SUBCONTRACTOR HEREBY ACKNOWLEDGES AND AGREES THAT THE CONTRACTOR'S FIELD PERSONNEL DO NOT HAVE AUTHORITY TO MODIFY IN ANY WAY THE SCOPE OF THIS AGREEMENT WHERE SUCH MODIFICATION SHALL AFFECT THE PRICE TO BE PAID TO THE SUBCONTRACTOR OR WHERE SUCH MODIFICATION MAY PRODUCE A VARIANCE WITH THE CONTRACT DOCUMENTS.**

WITNESS our hands and seals, hereunto duly authorized, on the dates written below:

Standen Contracting, Inc

Landworks
(Subcontractor)

By: _____

Title: CEO
Date: 9/4/03

By: _____

Title: Owner
Date: 9/03/03

**SHREWSBURY MIDDLE SCHOOL - WEST**

45 OAK STREET, SHREWSBURY, MA

RENOVATIONS

A. FURNISH LABOR, EQUIPMENT, MATERIALS AND SUPERVISION NECESSARY TO PERFORM THE WORK OF THE
FOLLOWING SECTIONS IN THEIR ENTIRETY:

| | |
|---|---|
| 02060 | SITE DEMOLITION |
| 02100 | SITE PREPERATION |
| 02200 | EARTHWORK |
| 02240 | GEOTEXTILE FABRICS |
| 02250 | EROSION CONTROL |
| 02511 | BITUMINOUS CONCRETE PAVING & MARKINGS |
| 02515 | CONCRETE PAVEMENT (PREP. ONLY) |
| 02525 | GRANITE CURBING |
| 02649 | TRACER TAPE |
| 02705 | STORM DRAINAGE SYSTEMS & SEWER SYSTEMS |
| 02710 | UNDERDRAIN SYSTEM AND SLIT DRAINAGE SYSTEM ATHLETIC FIELDS |
| 02713 | WATER SYSTEMS |
| 02930 | LAWNS AND GRASSES |

B. IN ADDITION, THE FOLLOWING ARE INCLUDED IF NOT MENTIONED ELSEWHERE. IT IS THE INTENT THAT THE ITEMS LISTED
BELOW ARE A GENERAL GUIDELINE. IT SHOULD NOT BE CONSTRUED THAT THIS IS THE ONLY LIMIT OF WORK. ALL WORK
WHETHER LISTED BELOW OR NOT WILL BE IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS.

1 DIVISION 1 - GENERAL REQUIREMENTS.
2 SEE ATTACHED SECOND SHEET FOR FULLER SCOPE BUT NOT LIMITED TO.
3 UNDERDRAIN SAND TO BE FURNISHED BY STANDEN CONTRACTING COMPANY, INC.
4 MILESTONE FOR SEEDING OF ATHLETIC FIELDS IS OCTOBER 15, 2003.

C. ACKNOWLEDGE AND INCLUDE:

1. ALL PLANS AND SPECIFICATIONS AND ALL ALTERNATES.
2. ADDENDA NUMBERED #1, #2, #3, #4, & #5
3. CONSTRUCTION PHASING AND SCHEDULE.
4. PREVAILING WAGES
5. EQUAL EMPLOYMENT OPPORTUNITY RATIOS
6. UNIT PRICES ( SEE SEPARATE ATTACHMENT IF APPLICABLE)

D. PROVIDE:

1. INSURANCE:
   a. LIMITS PER SPECIFICATIONS
   b. MUST PROVIDE INSURANCE CERTIFICATES NAMING STANDEN CONTRACTING COMPANY, INC.
      AND THE TOWN OF SHREWSBURY AS ADDITIONAL INSURED.
2. COST BREAKDOWNS ON A.I.A. FORMAT.
3. CERTIFIED PAYROLL AFFIDAVITS TO BE SUBMITTED WEEKLY.
4. SHOP DRAWINGS AND SUBMITTALS ON A TIMELY BASIS.
   NOTE:  IF PRODUCTS SUBMITTED FOR APPROVAL ARE SUBSTITUTIONS FROM THOSE SPECIFIED, PROVIDE
          DATA OF SPECIFIED PRODUCT ALONG WITH COMPARISON INFORMATION TO PROVE EQUAL
5. COMPANY SAFETY PROGRAM.

# SHREWSBURY MIDDLE SCHOOL

## EARTHWORK EXHIBIT A

02060,02070,02100,02200,02240,02250,02511,02515,02525,
02649,02705,02710,02713,02800,02808,02810,02815,02930

WORK INCLUDES BUT IS NOT LIMITED TO THE FOLLOWING:

NOTE. ALL ALTERNATES HAVE BEEN ACCEPTED AND ARE TO BE INCLUDED IN BASE BID PRICING. EACH ITEM LISTED ON THIS PAGE REFERENCES WORK THROUGHOUT THE ENTIRE SITE.

| | | |
|---|---|---|
| | PREVAILING WAGE | |
| | TAX EXEMPT | |
| | PER PLANS & SPECS | |
| | STABING, HOISTING, RIGGING INCLUDED | |
| | | |
| | ADDENDUM NO. : 1, 2, 3, 4, 5 | |
| | | |
| | ENGINEERING; GIVEN INITIAL LAY-OUT POINTS BY GC | |
| | PERMITS/FEES | |
| | AS-BUILTS | |
| | SNOW REMOVAL | |
| | POLICE DUTY | |
| | BARRELS/BARRICADES | |
| | UNLOAD REBAR | |
| | ACKNOWLEDGE RECEIPT OF GEOTECH DATA 00320 | |
| | | |
| 02060 | SITE DEMOLITION | |
| | REMOVE ASPHALT ; SAWCUT AS REQ'D | |
| | REM. EXIST./ PREP FOR NEW HC SIDEWALK RAMPS | |
| | DEMO ALL CHAIN LINK FENCE | |
| | TRENCH FOR REMOOVAL OF EXISTING GAS LINE | |
| | REMOVE EXISTING GAS LINE / BACKFILL | |
| | DEMO. LIGHT POLE BASES | |
| | REM. HYDRANT, CAP | |
| | REM. SITE CONC. PADS | |
| | REM. IRRIGATION SYS. | |
| | REM. BALLFIELD DRAINAGE SYS. | |
| | REM. BOCCEE COURT | |
| | REM. PLAY STRUCTURE AND BASE AT COURTYARD | |
| | REM. JERSEY BARRIERS | |
| 02100 | SITE PREPERATION | |
| | PREPFOR ALT #5 FIELD EVENT WORK | |
| | | |
| | REM. & REINST. GRANITE SIGN ("LIONS CLUB") | |
| | RELOCATE FIELD SIGN | |
| | CLEAR / GRUB | |
| | STRIP LOAM | |
| | STOCKPILE LOAM ON-SITE | |
| | RESPREAD LOAM AS REQ'D, MODIFY/ IMPORT AS REQ'D | |
| | REM. & STORE GRANITE CURBING | |
| | CAP EXIST. WATER WHERE SHOWN | |
| | DISPOSE OF EXCESS SITE MATERIAL | |
| | PREP FOR SITE PADS | |
| | NEW GAS LINE TRENCHING & BEDDING | |
| | REGRADE TO EXTEND LOT PAVING AS SHOWN | |
| | ENLARGE PLANTER, PART OF GENERAL SITE PREP | |
| | RELOCATE TICKET BOOTH. INCLUDES DEMO EX. FND. | |
| | RELOCATE STORAGE BUILDING, INCLS DEMO EX. FND. | |
| | | |
| | INTERIOR EXCAVATION & BACKFILL | |
| | GAS TRAP, HANDICAP LIFT, FOLDING PART. PIERS | |
| | MEZZANINE FOOTINGS. | |

| | | |
|---|---|---|
| 02200 | EARTHWORK | |
| | DEWATERING | |
| | SET PINS AT CORNERS OF FIELDS | |
| | EXCAV. WITHIN BLDG. FOR NEW UTILITIES & FTGS | |
| | IMPORT, PLACE NEW SLAB BASE WITHIN BLDG | |
| | ADJUST SITE STRUCTURES AS REQ'D | |
| | E & B for UTILITIES, COMPLETE INCL: PIPE, MH, CB, etc., | |
| | WATER | |
| | SEWER | |
| | SITE DRAINAGE | |
| | BLDG. DRAINAGE | |
| | CUTS/FILLS; BRING SITE TO PROPOSED GRADE | |
| | BASE & PREP FOR ASPHALT AT PLOT & SIDEWALK | |
| | SIDEWALK BASE / PREP FOR CONC. | |
| | SITE ENCASED CONDUIT:   TRENCH & BACKFILL ONLY | |
| | TRENCH/BKFILL FOR CONDUIT BET. UTILITY POLES | |
| | UTILITY POLE BASES:   EXCAVATE & BKFILL | |
| | | INSTALL POLE BASES |
| | | FURNISH POLE BASES |
| | REPLACE PIPING UNDER GRANDSTAND | |
| | SAVE REUSE MAT'L AT SKINNED AREAS; REPAIR FIELDS | |
| | EXCAV. FOR NEW LOADING DOCK & EXT. | |
| | EARTHWORK/BASE/etc. TO MODIFY TRACK LENGTH | |
| 02240 | GEOTEXTILE FABRICS WHERE SHOWN | |
| 02250 | EROSION CONTROL | |
| | CLEAR / GRUB | |
| | SNOW FENCING | |
| | HAY BALES | |
| 02511 | BIT. CONC. PAVING & MARKINGS | |
| | NEW BIT. CONC. OVERLAY | |
| | NEW ASPHALT TOP COURSE WHERE INDICATED | |
| | ASPHALT CURB | |
| | NEW TRACK SURFACED AREAS:COLDPLANE EXIST. | |
| | NEW TRACK SURFACED AREAS:ASPHALT TOP COAT | |
| | ASPHALT  @ OFF-SITE STREET PATCH | |
| | @ PARKING LOTS & DRIVES | |
| | @ SIDEWALKS | |
| | @ SWALE | |
| | ASPHALT PATCH | |
| | PAVEMENT MARKINGS | |
| 02515 | CONCRETE PAVEMENT (PREP. ONLY) | |
| 02525 | GRANITE CURBING; PER DRWGS and SPECS | |
| 02649 | TRACER TAPE | |
| 02705 | STORM DRAINAGE and SEWER SYSTEMS | |
| | F & I NEW GREASE TRAP | |
| | F & I NEW STORM WATER DETENTION BED | |
| 02710 | UNDERDRAIN SYSTEM; COMPLETE, PLANS/SPECS | |
| | 3" x 10" SAND DRAIN SLIT SYSTEM | |
| | STRIP DRAIN SYSTEM | |
| | SAND BED, IMPORT AS REQUIRED, MEET SPEC | |
| | LOAM, IMPORT / BLEND AS REQUIRED , MEET SPEC. | |
| 02713 | WATER SYSTEMS | |
| | F & I NEW WATER LINE; PROVIDE STREET TAP & HYD. | |
| 02930 | LAWNS AND GRASSES | |

# August 28, 2003

# Exhibit C

### Standen Contracting Safety Program Acknowledgement

Attached to and constituting an integral part of the subcontract between Standen Contracting Co., Inc., as the contractor, and **LANDWORKS** as the subcontractor, with respect to the Project known as the Wrentham Public Safety Complex.

Representation from the subcontractor is in the form of a person, who is in a supervisory position with the subcontractor's firm, is required at all weekly Safety Meetings conducted by Standen's Project Superintendent. Attendance will be monitored by means of a sign-in sheet. This requirement will be waived if the subcontractor produces a Company Safety Plan, which is acceptable to Standen Contracting. If one exists, the subcontractor should submit its Company Safety Plan to Standen Contracting for review and record. Standen Contracting will inform the subcontractor in writing as to the status on acceptability.

For any breach of violation of the terms or provisions of any program or law referred t in the subcontract by any employee, agent, materialman, supplier or contractor of subcontractor. Which breach, as determined by Contractor, Contractor shall have the right, in addition to all other rights and remedies available to Contractor as a result thereof, and in addition to anything else contained in the subcontract, to assess against subcontractor a fine according to the Schedule of Fines attached hereto. If subcontractor shall fail to pay Contractor the amount of any such fine upon demand, Contractor may deduct the amount of any such fine from the next or any succeeding payment due subcontractor under the subcontract.

It is understood and agreed that nothing herein contained is intended to relieve the subcontractor of its legal and contractual obligations to comply with the subcontract. The Contractor is not assuming the responsibility of enforcement, inspection, or policing for safety compliance, all of which remain with the subcontractor. If, however, Contractor does find violations, Contractor, in addition to the other remedies afforded Contractor, has the right to assess fines as aforesaid.

Subcontractor acknowledges that the fines set forth on the Schedule of Fines are reasonable and appropriate in order to encourage compliance with all safety programs and laws.

## Standen Contracting Company, Inc.

MAR 04 2004 15:51                                                    603 749 1838        PAGE.09

## Safety Violation Assessment Schedule

| Violation | Warning | 2nd Offense | 3rd Offense | 4th Offense |
|---|---|---|---|---|
| Guardrails / Staging | No $ | $50.00 | $100.00 | $200.00 |
| Floor Openings Roof Perimeter & Barricades | $50.00 | $100.00 | $200.00 | $500.00 |
| Compressed Gas | $100.00 | $200.00 | $500.00 | Dismissal |
| Electrical Panel | $50.00 | $100.00 | $200.00 | Dismissal |
| Ladder | No $ | $50.00 | $100.00 | $200.00 |
| Clothing (protective) | No $ | $50.00 | $100.00 | Dismissal |
| Housekeeping | No $ | $50.00 | $100.00 | $200.00 |
| Power Tool | No $ | $50.00 | $100.00 | $200.00 |
| Fire Prevention | $50.00 | $100.00 | $200.00 | Dismissal |
| Non-Attendance of Required Safety Meetings | No $ | $50.00 Per Employee | $50.00 Per Employee | $50.00 Per Employee |

Page 2 of 2



<div style="text-align: right; border: 1px solid black;">
Current Drawing List
</div>

Summary Log, Grouped by Discipline

**Shrewsbury Middle School**
45 Oak Street
Shrewsbury, MA

Project # 573-000
Tel:    Fax:

**Standen Contracting Inc.**

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| **Architectural** | | | | | | | | | |
| A1.1 | 0 | Legend, Partition Types and Master Plans | 7/1/2002 | | 100 | | Construction Set | | |
| A10.1 | 0 | Millwork | 7/1/2002 | | 100 | | Construction Set | | |
| A10.2 | 0 | Millwork | 7/1/2002 | | 100 | | Construction Set | | |
| A10.3 | 0 | Millwork | 7/1/2002 | | 100 | | Construction Set | | |
| A10.4 | 0 | Millwork Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A10.5 | 0 | Existing Millwork and Misc. Details | 7/1/2002 | | 100 | | Construction Set | | |
| A11.1 | 0 | Door Schedule | 7/1/2002 | | 100 | | Construction Set | | |
| A11.2 | 0 | Door Schedule, Hollow Metal Frame Types and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A12.1 | 0 | Room Finish Schedule | 7/1/2002 | | 100 | | Construction Set | | |
| A12.2 | 0 | Room Finish Schedule and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A2.1 | 0 | Roof Plan and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A3.1 | 0 | Ground Floor Plan | 7/1/2002 | | 100 | | Construction Set | | |
| A3.2 | 0 | First Floor Plan, Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| A3.3 | 0 | First Floor Plan, Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| A3.4 | 0 | First Floor Plan, Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| A3.5 | 0 | First Floor Plan, Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| A4.1 | 0 | Ground Floor Reflected Ceiling Plan | 7/1/2002 | | 100 | | Construction Set | | |
| A4.2 | 0 | First Floor Reflected Ceiling Plan, Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| A4.3 | 0 | First Floor Reflected Ceiling Plan, Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| A4.4 | 0 | First and Second Floor Reflected Ceiling Plan, Section C-C | 7/1/2002 | | 100 | | Construction Set | | |



MAR 04 2004 15:52

603 749 1839    PAGE.11

MAR 04 2004 15:53

683 749 1838

PAGE 12

**Current Drawing List**
Summary Log, Grouped by Discipline

| Numbe | Rev | Title | ReV Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| A4.5 | 0 | First Floor Reflected Ceiling Plan, Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| A5.1 | 0 | Exterior Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A5.2 | 0 | Exterior Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A5.3 | 0 | Exterior Elevations /Building Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.1 | 0 | Wall Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.2 | 0 | Canopy Sections, Elevations and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.3 | 0 | Aluminum Windows, Curtain Wall Door Entry Frame Types & Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.4 | 0 | Miscellaneous Details | 7/1/2002 | | 100 | | Construction Set | | |
| A7.1 | 0 | Stair Plans, Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A8.1 | 0 | Toilet Room Plans and Elevations / Interior Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A8.2 | 0 | Corridor Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A9.1 | 0 | Kitchen Equipment Plan | 7/1/2002 | | 100 | | Construction Set | | |
| D1.1 | 0 | Demolition Plans | 7/1/2002 | | 100 | | Construction Set | | |
| D1.2 | 0 | First Floor Demolition Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.1 | 0 | Existing Conditions Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.10 | 0 | Enlarged Plans, Planting Plan and Details (Alternate) | 7/1/2002 | | 100 | | Construction Set | | |
| L1.2 | 0 | Site Preparation /Demolition Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.3 | 0 | Site Grading & Utility Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.4 | 0 | Irrigation Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.5 | 0 | Layout and Materials Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.6 | 0 | Enlarged Site Plan & Details | 7/1/2002 | | 100 | | Construction Set | | |
| L1.7 | 0 | Planting Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.8 | 0 | Miscellaneous Details | 7/1/2002 | | 100 | | Construction Set | | |
| L1.9 | 0 | Alternates | 7/1/2002 | | 100 | | Construction Set | | |

**Electrical**

| | | | | | | | | | |
|-------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| CT0.1 | 0 | Comm-Tech Legend & Notes | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.1 | 0 | Comm-Tech Ground Floor - | 7/1/2002 | | 100 | | Construction Set | | |

*Prolog Manager*          Printed on: 11/7/2002          standen master                                    Page 2

**Current Drawing List**
Summary Log, Grouped by Discipline

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| | | Section A-A & B-B | | | | | | | |
| CT1.2 | 0 | Comm-Tech First Floor – Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.3 | 0 | Comm-Tech First Floor – Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.4 | 0 | Comm-Tech First Floor – Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.5 | 0 | Comm-Tech First Floor – Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| CT2.1 | 0 | Comm-Tech Detail Sheet | 7/1/2002 | | 100 | | Construction Set | | |
| CT2.2 | 0 | Comm-Tech Part Plans & Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| CT2.3 | 0 | Comm-Tech Part Plans & Elevations & Risers | 7/1/2002 | | 100 | | Construction Set | | |
| E0.1 | 0 | Electrical Legend, Notes & Drawing List | 7/1/2002 | | 100 | | Construction Set | | |
| E0.2 | 0 | Electrical Site Plan | 7/1/2002 | | 100 | | Construction Set | | |
| E0.3 | 0 | Electrical Lighting Details & Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E1.1 | 0 | Electrical Demolition Part Plan | 7/1/2002 | | 100 | | Construction Set | | |
| E1.2 | 0 | Electrical First Floor Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| E2.1 | 0 | Electrical Lighting Plan Ground Floor – Section A-A, B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E2.2 | 0 | Electrical Lighting Plan First Floor – Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| E2.3 | 0 | Electrical Lighting Plan First Floor – Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E2.4 | 0 | Electrical Lighting Plan First Floor – Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| E2.5 | 0 | Electrical Lighting Plan First Floor – Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| E3.1 | 0 | Electrical Power Plan Ground Floor – Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E3.2 | 0 | Electrical Power Plan First Floor – Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| E3.3 | 0 | Electrical Power Plan First Floor – Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E3.4 | 0 | Electrical Power Plan First Floor – Section C-C | 7/1/2002 | | 100 | | Construction Set | | |

**Current Drawing List**
Summary Log, Grouped by Discipline

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| E3.5 | 0 | Electrical Power Plan First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| E3.6 | 0 | Electrical Roof Plan | 7/1/2002 | | 100 | | Construction Set | | |
| E4.1 | 0 | Electrical Power Riser and Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E4.2 | 0 | Electrical Miscellaneous Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E4.3 | 0 | Electrical Mechanical Scedules | 7/1/2002 | | 100 | | Construction Set | | |
| E4.4 | 0 | Electrical Kitchen Equipment Schedule & Details | 7/1/2002 | | 100 | | Construction Set | | |
| E4.5 | 0 | Electrical Miscellaneous Riser Diagrams & Details | 7/1/2002 | | 100 | | Construction Set | | |
| E4.6 | 0 | Electrical Telecommunications Riser & Miscellaneous Details | 7/1/2002 | | 100 | | Construction Set | | |

**Fire Protection**

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| F0.1 | 0 | Fire Protection Legend Details & Hydraulic Info. | 7/1/2002 | | 100 | | Construction Set | | |
| F1.1 | 0 | Fire Protection Ground Floor - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| F1.2 | 0 | Fire Protection First Floor - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| F1.3 | 0 | Fire Protection First Floor - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| F1.4 | 0 | Fire Protection First Floor - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| F1.5 | 0 | Fire Protection First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| F1.6 | 0 | Fire Protection Second Floor - Section C-C & D-D | 7/1/2002 | | 100 | | Construction Set | | |

**Mechanical**

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|-----------|--------|----------|---------------|----------|
| BC1.0 | 0 | Building Control Legend & Notes | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.1 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.2 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.3 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |

MAR 04 2004 15:55

**Current Drawing List**
Summary Log, Grouped by Discipline

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| BC1.4 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.5 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| H0.0 | 0 | HVAC Legends & Notes | 7/1/2002 | | 100 | | Construction Set | | |
| H2.0 | 0 | Ground and First Floor HVAC Demolition Plans | 7/1/2002 | | 100 | | Construction Set | | |
| H2.1 | 0 | Ground Floor Plan HVAC Ductwork - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H2.2 | 0 | First Floor Plan HVAC Ductwork - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| H2.3 | 0 | First Floor Plan HVAC Ductwork - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H2.4 | 0 | First Floor Plan HVAC Ductwork - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| H2.5 | 0 | First Floor Plan HVAC Ductwork - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| H2.6 | 0 | Roof HVAC Plan | 7/1/2002 | | 100 | | Construction Set | | |
| H3.1 | 0 | Ground Floor Plan HVAC Piping - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H3.2 | 0 | First Floor Plan HVAC Piping - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| H3.3 | 0 | First Floor Plan HVAC Piping - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H3.4 | 0 | First Floor Plan HVAC Piping - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| H3.5 | 0 | First Floor Plan HVAC Piping - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| H4.1 | 0 | HVAC Part Plans and Details | 7/1/2002 | | 100 | | Construction Set | | |
| H5.1 | 0 | HVAC Details Sheet 1 | 7/1/2002 | | 100 | | Construction Set | | |
| H5.2 | 0 | HVAC Details Sheet 2 | 7/1/2002 | | 100 | | Construction Set | | |
| H5.3 | 0 | HVAC Details Sheet 3 | 7/1/2002 | | 100 | | Construction Set | | |
| H6.1 | 0 | HVAC Schedules Sheet 1 | 7/1/2002 | | 100 | | Construction Set | | |
| H6.2 | 0 | HVAC Schedules Sheet 2 | 7/1/2002 | | 100 | | Construction Set | | |
| H6.3 | 0 | HVAC Schedules Sheet 3 | 7/1/2002 | | 100 | | Construction Set | | |

**Plumbing**

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| P0.1 | 0 | Plumbing Legend | 7/1/2002 | | 100 | | Construction Set | | |

603 749 1838

*Prolog Manager*     Printed on: 11/7/2002     standen master     Page 5

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| P0.2 | 0 | Plumbing Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| P1.1 | 0 | Plumbing Underground – Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| P1.2 | 0 | Plumbing Ground Floor – Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| P1.3 | 0 | Plumbing First Floor - Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| P2.1 | 0 | Plumbing Ground Floor - Section A-A /B-B | 7/1/2002 | | 100 | | Construction Set | | |
| P2.2 | 0 | Plumbing First Floor - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| P2.3 | 0 | Plumbing First Floor - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| P2.4 | 0 | Plumbing First Floor - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| P2.5 | 0 | Plumbing First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| P3.1 | 0 | Plumbing Enlarged Kitchen Plan & Diagrams | 7/1/2002 | | 100 | | Construction Set | | |

**Structural**

| Numbe | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|-------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| S1.1 | 0 | Lower Foundation Plan - Section A-A and B-B | 7/1/2002 | | 100 | | Construction Set | | |
| S2.1 | 0 | Main Level Foundation Plan Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| S2.2 | 0 | Main Level Foundation Plan Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| S2.3 | 0 | Main Level Foundation Plan Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| S2.4 | 0 | Main Level Foundation Plan Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| S2.5 | 0 | Main Level Foundation Plan Sections | 7/1/2002 | | 100 | | Construction Set | | |
| S3.1 | 0 | Roof Framing Plan - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| S3.2 | 0 | Roof Framing Plan - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| S3.3 | 0 | Roof Framing Plan - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| S3.4 | 0 | Roof Framing Plan - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| S3.5 | 0 | Roof Framing Sections | 7/1/2002 | | 100 | | Construction Set | | |

**Current Drawing List**
Summary Log, Grouped by Discipline

| Numbe | Rev | Title | Rev. Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| S3.6 | 0 | Roof Framing Sections | 7/1/2002 | | 100 | | Construction Set | | |
| S4.1 | 0 | Auditorium, Gymnasium and Boys Locker Room Framing | 7/1/2002 | | 100 | | Construction Set | | |
| S5.1 | 0 | Wall Anchor Details | 7/1/2002 | | 100 | | Construction Set | | |
| S6.1 | 0 | Typical Details and General Notes | 7/1/2002 | | 100 | | Construction Set | | |

10/08/02  12:36 FAX 1 508 842 0587     1 508 842 0587     SHREWS TOWN HALL _     ☑ 001

# EXHIBIT E

ST-2

**MASSACHUSETTS DEPARTMENT OF REVENUE**

**CERTIFICATE OF EXEMPTION**



Certification is hereby made that the organization herein named is an exempt purchaser under General Laws, Chapter 64H, Sections 6(d) and (e). All purchases of tangible personal property by this organization are exempt from taxation under said chapter to the extent that such property is used in the conduct of the business of the purchaser. Any abuse or misuse of this certificate by any tax-exempt organization or any unauthorized use of this certificate by any individual constitutes a serious violation and will lead to revocation. Willful misuse of this Certificate of Exemption is subject to criminal sanctions of up to 1 year in prison and $10,000 ($50,000 for corporations) in fines. (See reverse side).

TOWN OF SHREWSBURY
100 MAPLE AVENUE
SHREWSBURY, MA. 01545

EXEMPTION NUMBER E
046-001-300

ISSUE DATE
01/04/89

CERTIFICATE EXPIRES ON
NONE

NOT ASSIGNABLE OR TRANSFERABLE

COMMISSIONER OF REVENUE
STEPHEN W. KIDDER

# NOVEMBER 4, 2002

# EXHIBIT F

63

1                           AFTERNOON SESSION

2          BY MS. BROWN:

3          Q.    What happened -- can you explain to us what

4    happened with Jackson ceasing work on the project

5    and what you and Landworks experienced at that time

6    and the time leading up to it.  Did you know Jackson

7    was in trouble?

8                MR. MELTZER:  Objection to the form.

9          A.    I had suspicions that Jackson was in

10   trouble.  It started in August of 2004 --

11         Q.    What were your suspicions based on?

12         A.    In June of 2004, I asked for a

13   reconciliation of the application for payments that

14   I had turned in, and Rich McGuinness said that he

15   would get that to me, and in the next two subsequent

16   meetings he did not.

17               From that point on I started continuously

18   asking for them each week.  In August of 2004 the

19   payment application -- and the payments had been

20   pretty close to what I was applying for -- the

21   payment application was cut in half, the amount of

22   money that I actually received.  And I asked him

23   why, and I don't remember the reason he gave me, but

24   it was a reason that did not ring true.

72

1    the winter.  There was items that were left to be

2    worked on in the spring that we were supposed to

3    start on.  I continued with the lines trying to

4    contact them.  They were not returning calls.

5            Sometime in February, 1st of February, I

6    believe it was the clerk of the works had told me

7    that Jackson was in trouble, that they were probably

8    going to be asked to be removed from the site by the

9    Town.  That continued on until March, when there was

10   very little work being done inside the building, as

11   well as out.

12           I made inquiries of the clerk if any work

13   was going on.  He said there was very little work

14   being done at the site, that most of the contractors

15   had left the site.  I asked them why.  He said

16   "nonpayment."  And then -- I don't know exactly when

17   Jackson was asked to leave the site.  I know that I

18   continued through my attorneys and through myself to

19   try to contact them and USF&G, but I didn't get any

20   response from them.

21       Q.    What work did you have left to complete at

22   that point in time?

23       A.    In the east portion of the football field,

24   there was the removal of the debris that was left

76

1    following week.  And he's like, "And you are the

2    site contractor of record, so I'm assuming you're

3    going to be back next week."  And I was like, "Well,

4    hopefully that's true, but I haven't heard

5    anything."

6              I asked him who he spoke with.  He told me

7    that it was Mr. Bullock.  And I asked him if he had

8    a telephone number for Mr. Bullock so I could call

9    him.  And he said that he did, and he gave me the

10   telephone number, and then I called Mr. Bullock.

11   I'm not certain -- it was August 11th or 15th or

12   something like that.

13             So I called him and told him that I had

14   heard that I was going to be back on the site.  And

15   he sort of struck me as sort of being taken a little

16   bit off guard by it.  And he was like, "Well" --

17        Q.   You hadn't had any conversations directly

18   with Lovett Silverman at this point; is that

19   correct?

20        A.   Not this time.

21        Q.   We talked about the earlier time?

22        A.   Yes.

23        Q.   At --

24        A.   When Standen failed.

1      Q.    When Standen failed.  What was your

2   understanding of who Lovett Silverman was?

3      A.    My understanding from the Standen failure

4   was that Lovett Silverman was brought in to sort

5   through the subcontractors that were doing work on

6   site, to look at the amounts of money that were owed

7   to them, and that they would determine if they were

8   owed that money, and then they would sign them to

9   subcontract hold agreements so that they could then

10  proceed with the work, working under the -- being

11  paid by the bonding company.

12     Q.    And by a subcontractor holding agreement,

13  are you referring to what has been talked about in

14  other depositions as being ratification agreements?

15     A.    Yes.

16     Q.    Now, you did not have a contract with

17  Lovett Silverman yourself, Landworks; is that

18  correct?

19     A.    No, I did not have a contract with Lovett

20  Silverman.

21     Q.    In fact, the only contracts that you,

22  Landworks, had that are involved in the middle

23  school project are the two that we looked at earlier

24  today --

1          MR. MELTZER:  Objection.

2      Q.   -- is that correct, the Standen contract

3  and the Jackson contract?

4      A.   I would think that the subcontract hold

5  agreement would also be like a contract.

6      Q.   From the Standen failure?

7      A.   Yes.

8      Q.   Back to the telephone conversation with Mr.

9  Bullock.  So can you explain what was said back and

10 forth in that conversation, as you best recall.

11     A.   So I called him up, and so, after telling

12 him who I was and explaining to him that -- what had

13 been told to me by the clerk, I believe he said that

14 he thought that I didn't have any interest in

15 completing the site work.  And I told him that that

16 was not the case, that the only thing I had ever

17 wanted to do was to be paid, get back to work, and

18 finish this job and to be done with it.

19          And he said that that was good, that they

20 had much preferred to work with the people that were

21 already involved with the project.  And he said --

22 he told me at that time, he was like, "What I will

23 need from you are a set of items," and I don't

24 recall exactly what he explained to me they were at

102

1  USF&G?

2     A.    I'm saying Lovett Silverman prepared the

3  counterclaim to give to USF&G so that they could

4  file a counterclaim against me.  And there are items

5  in there that -- first of all, it appears that it

6  has been hastily put together, in that there's a

7  deadline to meet, and it's more important to meet

8  that deadline than it is to get it right, and there

9  are items in there that are clearly not my work.

10 And --

11    Q.    Like what, for example?

12    A.    It appears to me, in the counterclaim, that

13 the track is in there, and the track being all the

14 track.  And you have seen the change order or the

15 letter of intent from Jackson about the scope

16 dealing with the removal of the old asphalt and the

17 overlay of the track, but then also the rubberized

18 surface.

19        I mean, there's going to be -- I figure

20 there's going to be an argument where they're going

21 to say that I owed the pavement on the track, and I

22 am going to that I did not.  There was never any

23 doubt that there was always a contractor hired for

24 doing the work for putting down the surface on the

1          Now, the job sat unmanned from late fall --

2    no, it wouldn't be late fall, it would be early

3    winter -- wasn't actively manned daily until I'm not

4    certain when.  August of 2005 is when they were

5    talking about bringing contractors back on site.  I

6    don't know who maintenanced the site.  I don't know

7    what kind of damage it suffered over the period of

8    the winter and the spring.

9          In speaking to some of the deficiencies, I

10   don't know how much of that would have been

11   considered, you know, damage done by others.  And I

12   think that if they're speaking to deficiencies in

13   the work, then some of that is defamatory.

14   Q.   Are you saying that Lovett Silverman made

15   false statements, knowingly made false statements

16   about deficiencies in the work and who caused those

17   deficiencies?

18          MR. MELTZER:  Objection.

19   A.   I think that they may have made statements

20   about deficiencies in the work, and I'm a little

21   troubled by the word "knowingly," because that would

22   ask me to actually know their mind-set.

23          I think that they made statements about

24   deficiency in the work that are not attributable to

 1   me or to Landworks, and that in so making these

 2   statements without first investigating the validity

 3   of them, that that's defamatory.

 4       Q.   Anything else that Lovett Silverman did

 5   that involved false statements with regard to you?

 6       A.   I think the counterclaim, in presenting

 7   this counterclaim, that they were attributing work

 8   to me that was clearly, in my opinion, not in my

 9   scope of work, and that by presenting that as fact,

10   I think, was a false statement and contributed to

11   the prolonging of this whole ordeal.

12       Q.   Other than what you've just testified to

13   regarding the counterclaim, and setting aside the

14   counterclaim, are there any other false statements

15   that you're aware of that Lovett Silverman has made

16   regarding Landworks?

17       A.   Not that I can recall at this time.

18       Q.   Do you believe that Lovett Silverman

19   engaged in extortion toward you?

20           MR. MELTZER:   Objection.

21       A.   Even though I would be -- I easily applied

22   that word to Jackson in their practice, I don't

23   think that I would apply the word "extortion" to

24   Lovett Silverman.

1              I think that when they stated in their

2    e-mail streams to me that basically they could not

3    speak with me as long as I have a lawsuit pending,

4    it's a continuation of the holding the carrot out of

5    "If you drop this lawsuit" -- and this is only my

6    opinion of this -- "If you drop this lawsuit, then

7    we can speak with you."  And that to me is not

8    extortion, but sort of a coercion to get something

9    out of me in response of getting something out of

10   them.

11       Q.    Do you believe that Lovett Silverman

12   strong-armed Landworks?

13       A.    I believe that Lovett Silverman, through

14   the progression from August of 2005 through 2006,

15   engaged in a pattern of things that -- engaged in a

16   pattern of conduct that I don't know if it

17   constitutes strong-arming, but I think it

18   constituted trying to apply certain charges to me

19   that were clearly not mine, and that in doing so,

20   they were basically taking money away from me.

21       Q.    And what specifically was this pattern of

22   conduct?

23       A.    Starting with the e-mail in which Mr.

24   Bullock, I think, gave a false reason for why he

114

1    A.    I can't think of something right now.

2  There may be one or two more instances, but there is

3  nothing that has stuck in my mind as much as those

4  two instances.

5    Q.    Are you aware of any other subcontractors

6  at the site who you would say were strong-armed or

7  extorted by Lovett Silverman?

8    A.    I don't think I ever used the word

9  "extorted" by Lovett Silverman.  I think, as I

10 stated before, I think that would be a term that I

11 would not apply to them.

12        I don't know of the dealings with other

13 subcontractors with Lovett Silverman.  I can only

14 tell you my dealings with them.  So I don't know if

15 other contractors were strong-armed or not.  I know

16 other contractors had to file suit on this job to

17 get paid.

18        MS. BROWN:  I don't have anything further

19 right now.  Mr. Hipp is going to ask you a few

20 questions.

21                CROSS EXAMINATION

22    BY MR. HIPP:

23    Q.    Good afternoon, Mr. Matthews.  As you know,

24 my name is Eric Hipp, and I represent United States

172

1        A.    I can only tell you what I believe it is.

2        Q.    That's my question, what you believe it is.

3        A.    To back charge a subcontractor would be to

4    back charge them for incomplete work or damaged work

5    that they had not corrected themselves.

6        Q.    And what does it mean to back charge?

7        A.    It means to present them with a bill for

8    work they had done to correct whatever.

9        Q.    It means to present them with a bill, or it

10   means to --

11       A.    If you're going to -- I'm sorry.  I didn't

12   mean to interrupt you.

13       Q.    Maybe you can just explain, in a given

14   circumstance, what it would mean to back charge.

15            MR. MELTZER:   Objection.

16       Q.    Does it mean to say the amount that you

17   claim you're due, you, subcontractor, is going to be

18   reduced by X amount as a back charge because of

19   defects in the work?  Does it mean that?  I'm not

20   trying to put words in your mouth, but I would like

21   to know what it means, in your own words, what it

22   means for a subcontractor to be back charged on a

23   job.

24       A.    I think it can mean several things.

174

1    that basically you've got their materials on site,

2    and then you're going to, after doing so, you're

3    going to bang them down to reduce their price to

4    you, give you a better price.

5         And I've heard it used to say, "I'm going

6    to bang this person that's doing this work for me,"

7    and try to extract more from them than what was

8    maybe the original intentions of getting from them.

9    I don't know if that's clear enough for you, but

10   that's my understanding of it.

11       Q.   When I was questioning you earlier, I was

12   asking you about what you believed Lovett Silverman

13   had done wrong on this project, and we talked about

14   different ways of characterizing what they had done.

15   And I want to ask you, do you believe that Lovett

16   Silverman engaged in a bang of Landworks?

17       A.   Yes.

18       Q.   And you how would you describe that?

19       A.   I believe that there was a realization

20   sometime on this job that it was not going well and

21   that it was not going to go well and that there

22   needed to be savings made wherever it could be made.

23       This is my feeling now, my interpretation

24   of things, and that there was a determination made

175

1    at some time that they were going to have to try to

2    recuperate costs as best they could to drive the

3    overall cost of the project down, because they were

4    definitely going to run over any of the projections

5    that they had.

6           With respect to myself, my feeling is that

7    if they did not have to pay the $135,000 to me to

8    get me back on the site, and if they could then

9    bring in another site contractor, which they would

10   not have to initially pay to remobilize for the

11   site, then they could get this work done, and they

12   could at that time use the $135,000 and put it

13   toward the work that was being done by the

14   contractor.

15       Q.    When you say "they," it was USF&G that you

16   contend owed you that money, right?

17       A.    That's correct.

18       Q.    Not Lovett Silverman?

19       A.    That's correct.

20       Q.    Now, what facts do you have to back up this

21   belief?

22       A.    Communications between individuals that

23   work for Lovett Silverman, the e-mail that basically

24   states banging the subcontractors.

# EXHIBIT G

2-81

1    and was not caused by construction damage.

2        Q.    Are you familiar with the item referenced

3    in No. 92?

4        A.    No, sir.  I can't be certain of where that

5    sidewalk is.  I have an idea of where it is, but I

6    can't be certain.

7        Q.    Would that damage have been caused by

8    Landworks?

9        A.    No, sir.  It was --

10            MR. MELTZER:  Objection.

11        A.    I'm sorry.

12        Q.    He made an objection.  You can go ahead and

13    answer.

14        A.    It would have been an area, if it's the

15    area that I am thinking about, it would have been an

16    area that was outside of the limits of our work.

17        Q.    Item No. 93, is that work within the scope

18    of Landworks' responsibility to complete?

19        A.    In lawn areas, no, sir.  That was not in my

20    obligations to complete or in my contract to

21    complete.  It was outside my scope of work.

22        Q.    Could you describe just generally where the

23    lawn areas at the project that were not within the

24    scope of Landworks' contract work -- let me ask it

1    they expected me to maintain them.  But if they had

2    to be maintained, I had done the maintenance on

3    them.

4        Q.    I believe it was your testimony previously

5    that once grass grows back over the top of the sand

6    slit drains, maintenance would not be required?

7        A.    That's correct.

8        Q.    As of December 7th, 2004, had the grass

9    grown back over the sand slit drains?

10       A.    It was starting to knit itself in, but it

11   had not completely established on top of it.  There

12   were still areas that were open.

13       Q.    Under "Curbing and edging," were any of

14   these items within the scope of Landworks'

15   responsibility to correct?

16       A.    The first item is yes.  Second item was no,

17   but I moved it anyway.  The next item, as far as I

18   know, was still talking about that upper walkway,

19   and as I have marked beside it, it meets the ADA

20   requirement.

21           And the miscellaneous damage to the curb,

22   by the time this had been generated, in December,

23   the paving had been in since August, end of August,

24   and bituminous curb is going to start to get

1          Q.     Mr. Matthews, I direct your attention to

2     Paragraph 12.  You state that "Lovett Silverman

3     engaged in a scheme to reduce costs to USF&G on the

4     project by refusing to authorize payments to

5     subcontractors, including the Plaintiff."  Do you

6     see that?

7          A.     Yes.

8          Q.     What is your basis to assert that Lovett

9     Silverman had the authority to authorize payments?

10          A.     From the previous ratification, Lovett

11    Silverman was charged with investigating the claim.

12    Once they found out which portions of it were valid,

13    then they would sit there and they would put

14    together the ratification about how much was owed.

15    And then they would tell the surety at that time

16    that this is the amount that is owed to this

17    contractor, for them to be ratified or to be held.

18               So that's what I am gauging this on, that

19    basically you had to work through the surety's -- or

20    through Lovett Silverman for them to go through all

21    of your billing to make certain what you said you

22    were owed you are owed.  And then they would, in

23    turn, give that to the surety, and the surety would

24    pay you.

2-102

1      Q.    Do you know for a fact who was the decision

2   maker, whether it was the surety or whether it was

3   Lovett Silverman?

4            MR. MELTZER:  Objection.

5      A.    No, I do not.

6      Q.    Now, you testified a few days ago that you

7   do not believe that Lovett Silverman engaged in

8   extortion.  Do you recall that testimony?

9            MR. MELTZER:  Objection.

10     A.    Yes, I do.  I think I said that they were

11  more coercive, not extorting.

12     Q.    Is this a mistake in Paragraph 12 --

13           MR. MELTZER:  Objection.

14     Q.    -- of your complaint, that Lovett Silverman

15  engaged in a scheme by engaging in extortion towards

16  subcontractors?

17           MR. MELTZER:  Objection.

18     A.    No.  No.

19     Q.    Are you changing your testimony?

20           MR. MELTZER:  Objection.

21     Q.    You said "extortion" was a very strong

22  word, you said two days ago.  Are you now changing

23  your testimony?

24           MR. MELTZER:  Objection.

2-104

1    any; is that correct?

2            MR. MELTZER:  Objection.

3        A.    Like I said, I would have to review to make

4    certain what there is in documents.  There are so

5    many documents to go back over, I cannot recall all

6    of them right now.  But I would have to review them

7    and see.

8        Q.    Now, are there any other -- we went through

9    this before.  I don't want to repeat the questions

10   that I asked you before.  You recall I asked you

11   before about strong-arming and asked you what

12   evidence you had that you were strong-armed by

13   Lovett Silverman, not USF&G, but Lovett Silverman?

14       A.    Yes.

15       Q.    And in the context here of this scheme to

16   reduce costs to the surety by refusing to authorize

17   payments to subcontractors and strong-arming the

18   subcontractors, do you have any evidence to support

19   that allegation?

20           MR. MELTZER:  Objection.

21       A.    The conduct that was exhibited by the

22   e-mail traffic back and forth between the parties

23   and Lovett Silverman --

24       Q.    I'm not talking about -- those e-mails you

1    in my opinion, see is the conduct of first not

2    relating to me what I saw as the truth being, that

3    Russ Fuller had a problem with me or whoever it was

4    had a problem with me, and that's why they couldn't

5    deal with me.

6         Secondly, in that even though the surety

7    had -- may have told them they couldn't deal with

8    me, that it was still, in my opinion, the

9    responsibility of Lovett Silverman to investigate

10   clearly, plainly and thoroughly the claim that I had

11   that I was owed money.

12        And for them not to do any type of

13   investigation, from August of 2005 until they were

14   pressed to make a counterclaim in the December-

15   January time frame following, then it lacks a

16   sincerity about their actions.  I mean, it's not --

17   they're not presenting in their counterclaim an

18   accurate portrayal of things that were in my scope

19   of work.

20        Q.   Can we look just briefly, and we'll be

21   done, on Count III.  Well, Count II is a fraud

22   count.  You've accused Lovett Silverman of fraud.

23   Can you explain in your own words how it is that you

24   believe that Lovett Silverman engaged in a fraud on

2-107

1    you.

2            MR. MELTZER:  Objection.  Asked and

3    answered at least four times.

4            MS. BROWN:  We haven't talked about Count

5    II at all yet.

6        Q.   Go ahead.

7        A.   The compilation of what I believe to be a

8    false counterclaim that Lovett Silverman helped

9    prepare for the surety, I believe, in my opinion is

10   fraud.

11       Q.   Anything else?

12       A.   At this moment, I can't think of anything

13   else, but I may.

14       Q.   Okay.  Well, if you do, you can tell your

15   attorney, and he will supplement your response?

16       A.   Yes.

17       Q.   Now, Count III is tortious -- it's a

18   misspelling here, it's t-o-r-t-i-o-u-s, but

19   computers constantly make those corrections to these

20   legal words.

21           MR. MELTZER:  What are you looking at

22   that's spelled wrong?

23           MS. BROWN:  Tortious.  It's spelled with an

24   I, isn't it?

2-108

1          MR. MELTZER:  No.  It's fine.  That's the

2     way it is.

3          MS. BROWN:  That's fine?  You spell it

4     without an I?  Okay.

5     Q.    Tortuous, but in the law we mean tortious,

6     with an I, interference, not tortures us.  But would

7     you look at Paragraph 23 of Count III, please.

8          You state, "Lovett Silverman, by carrying

9     out its program of 'banging' the subcontractors, did

10    tortuously interfere with the contract between the

11    Plaintiff and USF&G for ulterior motives."

12         And I would like to ask you, just in your

13    own words, how is it that you believe that Lovett

14    Silverman interfered in your contract with the

15    surety?

16         MR. MELTZER:  Objection.  Asked and

17    answered.

18    A.    I believe that they interfered with my

19    relationship with the surety, in that by not

20    investigating the claim, by not at least looking

21    into the possibilities that these monies were owed,

22    and by -- it was evident that they were having

23    trouble finding a site contractor to complete the

24    work, and that the surety, up until the point that

1    basically I filed suit against them, didn't seem to

2    have any problem with me -- that by not sitting

3    there, giving me a full and fair hearing on the

4    amounts that I say were owed to me, and not

5    presenting them to the surety as "Maybe we should

6    sit down and talk with this person," was interfering

7    with the working relationship that I had had with

8    USF&G.

9        Q.    Thank you.   Now, Paragraph 38, this is the

10   last question I have on the amended complaint,

11   "Defendant Lovett Silverman set out to harm

12   Landworks by denying it access to the project and to

13   funds due and owing."  Can you tell me how it is

14   that Lovett Silverman denied you access to the

15   project?

16       MR. MELTZER:   Objection.   Asked and

17   answered.  Go ahead.

18       A.    By not proceeding with or, as I stated

19   before, by not taking the request that I made for

20   them to meet with attorneys present to work this

21   out, to mediate, negotiate the amounts owed to me

22   out, so that I could return to work on the job site

23   and to finish what my contractual obligations were.

24       Q.    So Lovett Silverman --

# EXHIBIT H



Jackson Construction Company
20 Dan Road    Suite 3
Canton, MA 02021

PH (781) 737-1500
FX (781) 737-1550

RECEIVED

JUN 17 2004

JACKSON CONSTRUCTION
COMPANY

LANDWORK CREATIONS, LLC
PMB 291 1500A Layayette Road
Portsmouth, NH 03801

PH 603-498-1295

SUBCONTRACT NO.
381-02-200

AGREEMENT made this **29ᵀᴴ** day of **APRIL** in the year **TWO THOUSAND FOUR**

between **JACKSON CONSTRUCTION COMPANY, 20 Dan Road, Canton, MA 02021**, a Massachusetts Business Trust, the

Contractor,

and **LANDWORK CREATIONS, LLC**, the Subcontractor, concerning the project

**SHREWSBURY MIDDLE SCHOOL - WEST**
45 Oak Street, Shrewsbury, MA 01545

For **TOWN OF SHREWSBURY**, the Owner.

**The Contractor and Subcontractor agree as follows:**

---

**ARTICLE 1.    THE CONTRACT DOCUMENTS**

This Subcontract consists of the following Contract Documents: this Agreement and any Exhibits attached hereto, the Contract between the Owner and Contractor dated **MARCH 1, 2004**, the Conditions of the Contract between the Owner and Contractor (General, Supplementary and other Conditions), Drawings, Specifications, all Addenda issued prior to execution of the Contract between the Owner and Contractor, all Change Orders issued subsequent thereto.

**ATTACHED TO AND MADE PART OF THIS CONTRACT**
**ATTACHMENT "A"** STANDARD ATTACHMENTS
  Affirmative Action Program for Equal Employment Opportunity
  Safety Policy
    Exhibit #1 – OSHA Hazard Communications Standard Requirements
    Exhibit #2 – Problem Solving Procedures
    Exhibit #3 – Safety Policy Fines/Backcharges
    Exhibit #4 – Accident/Incident Report
    Exhibit #5 – Weekly Safety Meeting Report
    Exhibit #6 – Safety & Health Program Requirements
  Drug Free Workplace Policy
  Wage Breakdown
  Weekly Payroll Report
  Subcontractor Requisition for Payment
  Continuation Sheet (Application and Certificate for Payment)
  Trade Contractor Certification Indemnification of Wavier & Liens
  Tax Exempt Certificates
**ATTACHMENT "B"** SPECIFICATIONS
**ATTACHMENT "C"** DRAWING INDEX
**ATTACHMENT "D"** LIST OF ADDENDUM
**ATTACHMENT "E"** SCHEDULE
**ATTACHMENT "F"** PREVAILING WAGE RATES

All of the above documents are a part of this Subcontract and shall be available for inspection by the Subcontractor upon request.

**ARTICLE 2.    THE WORK**

The Subcontractor shall furnish all labor, materials, plant equipment, permits and other facilities and things necessary or proper for or incidental to, and shall do all things to perform and complete, the following (hereinafter collectively referred to as the Work:)

THIS SUBCONTRACT SHALL COMPLETE ALL Site Work PER SECTION(S) 02060 SITE DEMOLITION, 02100 SITE PREPARATION, 02200 EARTHWORK, 02240 GEOTEXTILE FABRICS, 02250 EROSION CONTROL, 02511 BITUMINOUS CONCRETE PAVING & MARKINGS, 02515 CONCRETE PAVEMENT, 02525 GRANITE CURBING, 02649 TRACER TAPE, 02705 STORM DRAINAGE SYSTEMS & SEWER SYSTEMS, 02710 UNDERDRAIN SYSTEM - ATHLETIC FIELD, 02713 WATER SYSTEMS, AND 02930 LAWNS AND GRASSES IN ACCORDANCE WITH PLANS AND SPECIFICATIONS DATED 7/01/2002 INCLUDING ADDENDA 1-5 AND ALTERNATES 1-5, IF APPLICABLE, AS PREPARED BY LAMOUREUX PAGANO ASSOCIATES, 14 EAST WORCESTER STREET, WORCESTER, MA 01604 FOR SHREWSBURY MIDDLE SCHOOL.

The work shall include but not necessarily limited to the following:

1. Submission of Certificate of Insurance with limits in accordance with Contract Documents. JCC Job #381, Shrewsbury Middle School – West to be included in the description box. The Town of Shrewsbury and Jackson Construction Company are to be listed as additionally insured.

2. Provide eleven (11) complete sets of submittal and shop drawings as specified for all items for Architect/Engineer's approval prior to work on site.

3. Coordination Drawings.

4. Warranty / Guarantees and Maintenance instructions at job close out per contract documents.

---

5. Subcontractor agrees to maintain a reasonable and consistent effort to complete all work in accordance with the project schedule.

6. Project Completion Date:   August 24, 2004

7. Union labor, unless otherwise noted.

8. Tax Exempt Project  [046-001-300].

9. Worker Conduct, Appearance, and Rules.

   A. Worker Conduct, Appearance, and Rules: Because this project is in close proximity to the existing occupied school, the conduct of each worker at the job site is of paramount importance. The Owner reserves the right to require any worker to be banished from the Owner's property.

      (1) **Privacy-Conduct:** All work of the Contract with the maximum effort to maintain the privacy of the Owner's operations, staff, and students. Do not permit workers to peer into areas of the existing building visible from the work area. Invasion of privacy is a major infraction of the work rules.

      (2) **General Conduct and Demeanor:** All construction workers shall treat the Owner's staff, students, and the public professionally with respect and courtesy. Appropriate work attire is required. Foul language and loud conduct are prohibited.

      (3) **Radios and Television:** The use of entertainment devices including personal devices with headphones or earphones is strictly prohibited at all times. Control the volume of communication radios and loudspeakers to avoid creating a nuisance.

      (4) **Smoking:** Smoking is strictly prohibited on school property.

      (5) **Sexual Harassment:** All forms of physical and verbal sexual harassment including, with limitation: touching, whistling, sexually explicit stories, jokes, drawings, photos, and representations, exhibitionism, and all other sexually oriented offensive behavior is strictly prohibited and is a major infraction of the work rules.

      (6) **Student Contact:** Except for necessary warnings and safety related instructions, construction personnel are strictly prohibited from having any direct or indirect contact with students including, with limitation, verbal or written communication, touching, staring, whistling, howling, and any other action or behavior which makes a student uncomfortable or which could be interpreted by the student as harassment. A violation of this type may be considered, on a case-by-case basis, as a major infraction of the work rules.

      (7) **Warnings and Dismissal:** For minor infractions of the rules, the Owner may issue a warning. Only one warning will be allowed per worker from the Owner's property. For major infractions of the work rules, the worker shall be dismissed immediately without prior warning and possibly subject to criminal prosecution.

10. Provide all labor and equipment rates [Wage Breakdown] with signed contract.

11. Submit weekly-certified payroll reports and Equal Employment Opportunity Ratios (two copies). [Once you have begun work at the job site they must be sent weekly even if there was no work performed.]

12. Requisitions are due by the 25th of each month. Submit three copies with Schedule of Values.

13. Clean up of debris to Jackson's dumpster unless otherwise noted.

14. If applicable, Jackson Construction Company shall issue deductive change orders to Landwork Creations, LLC for benefits in conjunction with the Laborers' Unified Trust Agreement. If Landwork Creations, LLC falls delinquent in the payment of their benefits to the Laborers' Union, Jackson Construction shall continue to issue deductive change orders for these benefits.

15. Subcontractor shall furnish, erect, and maintain all scaffolding as required for the performance of their work unless otherwise noted.

16. The Subcontractor agrees to Project Restrictions i.e. off-hours, start time, noise levels, etc. required by the Owner, as instituted and enforced by the project superintendent or his representatives.

17. Subcontractor shall perform the WORK in the safest and most responsible manner. This includes all obligations pursuant to Accident prevention, but not limited to:

    A. Safety indoctrination of all employees before start work.

    B. Providing all employees with personal protective equipment including hard hats, safety glasses, gloves, back belts, etc. and require their use at all times.

    C. Plan and organize weekly toolbox meetings solely for the purpose of discussing project safety.

18. Subcontractor agrees to establish and implement a Hazard Communication Program. This includes, but is not limited to, furnishing Material Safety Data Sheets to the Contractor upon receipt and implementing a training program on the jobsite.

19. It is agreed and understood that this scope is general in nature and is not intended to include each, and every, item of work required by the Subcontractor to comply with the Contract Documents.

20. Subcontractor acknowledges that he has visited the jobsite and is fully aware of the existing conditions and constraints involved with performing THE WORK.

21. Smoking is prohibited within all areas of the project. The Contractor will designate an area for the purpose of smoking in the general vicinity of the project. Subcontractor shall inform his employees of this policy and be solely responsible for policing their actions.

22. Allowances for changes in THE WORK shall be as follows:

    A. Change proposals shall be submitted in a timely manner and include a detailed breakdown of all costs including but not limited to labor (breakdown by classification), material, equipment, and subcontractors.

23. Related Documents:

    A. All of the contract documents, including General Conditions and Supplementary Conditions and Division 1 General Requirements, apply to the work in this section.

24. ALTERNATE(S), if applicable.

25. **Furnish labor, equipment, materials and supervision necessary to perform the work of the following sections in their entirety:**

A.  02060 Site Demolition.
B.  02100 Site Preparation.
C.  02200 Earthwork.
D.  02240 Geotextile Fabrics.
E.  02250 Erosion Control.
F.  02511 Bituminous Concrete Paving & Markings.
G.  02515 Concrete Pavement.
H.  02525 Granite Curbing.
I.  02649 Tracer Tape.
J.  02705 Storm Drainage Systems & Sewer Systems.
K.  02710 Underdrain System - Athletic Field.
L.  02713 Water Systems.
M.  02930 Lawns and Grasses.

The Subcontractor shall complete the work in a first-class manner equal in all respects to the best standards of practice and to the full satisfaction of contractor, the architect and/or owner, all in accordance with, or as reasonably implied by, the Contract Documents; and the Subcontractor does hereby agree to be bond to and assume toward the Contractor all of the obligations and responsibilities pertaining to the Work that the Contractor, by the Contract Documents, has assumed to the Owner, except as specifically modified by this Subcontract.

### ARTICLE 3.    COMMENCEMENT OF WORK

. The Contractor shall, as soon as practicable following execution of the Subcontract, notify the Subcontractor to attend a scheduling conference for the purpose of reviewing and analyzing the time, labor and material requirements of the Subcontractor. To such conference the Subcontractor shall bring what he believes to be a practicable schedule showing the dates on which he proposes to order material necessary for the Work and the order and time within which he plans to complete various portions of the work and the personnel to be utilized. Following such scheduling conference and analysis by Contractor of Subcontractor's requirements, the Subcontractor shall submit to Contractor a schedule revised as a result of such conference and analysis; such revised or further revised) schedule, when accepted in writing by the contractor, shall be the job Schedule of Record, which shall at all times govern the Subcontractor's prosecution of the Work, as may from time to time be modified by the directions of the Architect or by Change Order. The Subcontractor acknowledges the right of the Contractor to fix finally the schedule of Subcontractor based on data submitted by Subcontractor, other subcontractors, and requirements of the contract between Owner and Contractor. As part of the Job Schedule of Record the Subcontractor shall warrant that he has satisfied himself (a) that sufficient labor is available to him to perform the Work according to the Job Schedule of Record and (b) that he has placed firm orders for all materials required by the Work. The Subcontractor shall commence the Work on notice from the contractor and shall complete such work faithfully and diligently under the direction of the Contractor in accordance with the Job Schedule of Record. ALL TIME LIMITS STATED IN THE CONTRACT DOCUMENTS AND THE JOB SCHEDULE OF RECORD ARE OF THE ESSENCE OF THIS SUBCONTRACT, NO EXTENSION OF

TIME WILL BE VALID WITHOUT THE CONTRACTORS WRITTEN CONSENT. THE SUBCONTRACT, AT THE OPTION OF THE CONTRACTOR, MAY BE HELD RESPONSIBLE FOR ALL DAMAGES, COSTS, LOSSES, AND EXPENSES RESULTING DIRECTLY OR CONSEQUENTIALLY FROM HIS FAILURE TO MEET TIME LIMITS.

### ARTICLE 4.    PROGRESS OF WORK

The Subcontractor shall, al all times, provide sufficient working forces and shall do and perform and finish at his own expense all things necessary or proper for or incidental to the prosecution of the Work in accordance with the Job Schedule of Record, as it may be modified from time to time by the directions of the Architect or by Change Order or in accordance with the reasonable needs of the Contractor. The Subcontractor shall at all times cooperate with the schedule consultant of Contractor, if one is appointed, or the Contractor's scheduling agent. If the Subcontractor falls behind the Job Schedule of Record, the Contractor may order the Subcontractor, by written notice, to increase the number of shifts, overtime operation, days of work and the amount of construction, plant, materials, equipment and other facilities as the Contract may deem appropriate to regain time lost, all without additional cost to the Contractor. If the Subcontractor fails to comply with such written directions and notice within 48 hours after the giving of such notice, or within such further time as the Contract may allow, the Contractor shall have the right to furnish such plant, materials, equipment and other facilities, employ such additional men, do such other things as it had specified in its notice to the Subcontractor, all at the Subcontractor's expense, and/or at its option, hold the Subcontractor in default under the provisions of this Subcontract and terminate the Subcontract in accordance with the provisions of Article 9 hereof.

### ARTICLE 5.    THE SUBCONTRACT PRICE

The Contractor shall pay the Subcontractor in current funds for the performance of his obligations under this Subcontract, subject to additions and deductions as herein provided, the total sum of

**($303,535.00)** (the Subcontract Price).

**Three Hundred Three Thousand Five Hundred Thirty-five-00/100 Dollars**

*MWU 6/12/04*

RM 6/21/04

95%

### ARTICLE 6.    PAYMENTS IN GENERAL AND PROGRESS PAYMENTS

The Contractor agrees to pay the Subcontractor as follows: 90% of the value of the labor performed, plant and equipment furnished, and materials incorporated into the Work, and, if approved by the Architect, materials stored on the site in any one month as to which the Subcontractor has presented proper bills, vouchers and receipts for such stored materials at the main office of the Contractor on or before the twenty-seventh day of the month, to be paid ;not later than the fifteenth day following receipt of each payment from the Owner by the Contractor. The Subcontractor shall, before the first application for payment, submit to the Contractor a schedule of values of the various parts of the Work aggregating the total sum of this Subcontract, made out in such detail as the Contractor may reasonably require (or as may be required by the Owner), and supported by such evidence as to its

correctness as the Contractor may request.  This schedule, when approved by the Contractor, shall be used by the Subcontractor as a basis for application for payment, unless it is found to be in error, in which event it shall be revised to the reasonable satisfaction of the Contractor.  The Subcontractor shall furnish to the Contractor with the second application for payment, and with each application for payment thereafter, a completed and signed Subcontractor's Partial Payment Waiver And Release in the form provided by the Contractor.  In no event shall the Contractor be required or obligated to pay to the Subcontractor any amounts in excess of the amount previously received by the Contractor from the Owner and attributable to the Work of the Subcontractor.  Receipt of progress and/or final payments by the Contractor from the Owner shall be, in each instance, a condition precedent to the Subcontractor's right to receive his share of any such payment from Contractor.  The Subcontractor shall indemnify and save the Contractor harmless from all claimed and actual obligations of Subcontractor to tax authorities, subcontractors, workmen, material men and furnishers and/or; lessors of machinery and parts thereof, equipment, and all supplies, including, without limitation, gasoline, oil and commissary, incurred in the furtherance of the performance of this Subcontract.  The Subcontractor shall upon request provide to the Contractor reasonably satisfactory evidence that all obligations of the foregoing nature have been paid, discharged or waived, and if the Subcontractor fails to do so the Contractor may, after two days' written notice to the Subcontractor either pay any such unpaid bills, withhold or retain in addition to retainage provided for under the first sentence of this Article from payments otherwise due or to become due to Subcontractor such sums of money the Contractor deems sufficient to pay any and all such claims until such time as satisfactory evidence is furnished that all such claims have been satisfied or discharged.  In no event, however, shall the provisions of this Article be construed to impost any obligation upon the Contractor to either the subcontractor or his Surety and in paying unpaid bills of the subcontractor the Contractor shall be deemed the agent of the subcontractor; any such payment shall be considered as a payment made under the Subcontract by the Contractor to the subcontractor and the Contractor shall not be liable to the Subcontractor as to any such payment made in good faith.  Any sum or sums chargeable to the Subcontractor under any of the Articles of this Subcontract may, at the option of the Contractor, be deducted from any payment or payments which otherwise are due or may become due to the Subcontractor hereunder.  No part nor the whole of the Work to be performed hereunder shall be sublet or assigned, nor monies due or to become due, nor rights with respect thereto, shall be assigned without the prior written consent of the Contractor and in the event that the Subcontractor shall purport or attempt to assign or sublet any part of or the whole of the Work or monies or rights with respect thereto without such consent, such purported assignment, subletting or attempt may, at the option of the Contractor, be deemed a repudiation of this Subcontract and a refusal by the Subcontractor to perform the same constituting a default hereunder and in any such case the Contractor shall have, cumulatively, the remedies provided for in Article 9 hereof and under law.

## ARTICLE 7.    FINAL PAYMENT

Final payment shall be due when the Work is fully completed and performed in accordance with the Contract Documents and is reasonably satisfactory to the Contractor, Architect and Owner.  The right to final payment shall be subject to the terms and conditions of Article 6.  Before issuance of final payment, the Subcontractor shall submit additional evidence reasonably satisfactory to the Contractor showing that all known liabilities and indebtedness, including, without limitation, those referred to in Article 6 arising out of or resulting from or incurred in connection with the Subcontractor's performance of this Subcontract, have been satisfied.

## ARTICLE 8.
## INSPECTION AND CORRECTION OF WORK

The Subcontractor shall provide proper facilities for the inspection of the Work at all times by the Contractor, Architect, Owner, and other parties interested therein.  The Subcontractor shall promptly take down and remove from the premises all materials, whether worked or unworked, and all portions of the Work condemned by the Architect or Contractor as failing to conform to the Subcontract notwithstanding that such material or work may have been previously overlooked by the Architect or the Contractor and accepted or estimated for payment, the provisions of the Conditions regarding the replacement of such Work to govern the Subcontractor's obligations hereunder with respect thereto.  If the Subcontractor shall fail to remove condemned Work or materials, the Contractor may remove at the Subcontractor's expense and store same for the account of the Subcontractor and may replace all condemned Work and materials at the expense of the Subcontractor.  In the event, the Contractor deems it inexpedient to correct such Work or materials a deduction in the Subcontract Price shall be made if acceptable to the Architect and the Owner.  Neither the issuance of a final certificate for payment nor any provision of the Contract Documents shall relieve the Subcontractor of responsibility for negligence or for faulty materials or workmanship within the period provided by law or his guaranty, whichever period is longer, and upon written notice shall remove the same or correct such defects and pay for any damages to other work resulting there from.

## ARTICLE 9.    CONTRACTOR'S RIGHT TO TERMINATE AND DAMAGES

If the Subcontractor shall be involved in financial difficulties as evidenced by:

(a)  his admitting in writing his inability to pay his debts generally as they become due;

(b)  his filing a petition in bankruptcy or for reorganization or for the adoption of an arrangement under the Bankruptcy Act (as now or in the future amended) or an answer or other pleading admitting or failing to deny the material allegations of such a petition or seeking, consenting to or acquiescing in the relief therein provided;

(c)  his making an assignment for the benefit of his creditors;

(d)  his consenting to the appointment of a receiver for all or a substantial part of his property;

(e)  his being adjudicated a bankrupt;

(f)  the entry of a court order which shall not be vacated, set aside or stayed within 10 days from the date of entry,  (i)

appointment of a receiver or trustee for all or a substantial part of his property, or (ii) approving a petition filed against him for, or effecting an arrangement in, bankruptcy or for a reorganization pursuant to said Bankruptcy Act or for any other judicial modification or alternation of the rights of creditors; or

(g) the assumption of custody or sequestration by a court of competent jurisdiction of all or substantially all of his property, which custody or sequestration shall not be suspended or terminated with 10 days from its inception;

or if the Subcontractor should refuse or fail, except in cases in which extension of time is approved in writing by the Contractor, to meet the time requirements of the Job Schedule of Record, or to furnish enough skilled workmen, proper materials, equipment, facilities, plant or to make timely orders of materials, or if he should fail to make prompt payment to his subcontractors or suppliers or if he shall fail to make payments when due to any governmental unit as required by applicable tax laws and regulations, or if he shall disregard laws or ordinances or the instructions of the Contractor and/or Architect or otherwise be guilty of a violation of any provision of this Subcontract, then the Contractor may, without prejudice to any other right or remedy and after giving the Subcontractor and his Surety, if any, three days' written notice, terminate the employment of the Subcontractor, take possession of the premises and all materials, tools and equipment thereon and finish the Work in whatever manner it may deem expedient. In such event, the Subcontractor shall not be entitled to any further payment until the Work is finished; if the unpaid balance of the Subcontract Price shall exceed the expense of finishing the Work, including reasonable compensation for additional architectural, managerial, professional (including reasonable attorneys' fees) and administrative services and sums chargeable to Contractor for delay or otherwise, such excess shall be paid to the Subcontractor. If such expenses and sums chargeable shall exceed such unpaid balance, the Contractor shall retain the unpaid balance and the Subcontractor shall pay the differences to the contractor. The Contractor shall have, in addition, all of its rights in law and equity against the Subcontractor to enforce claims for damages and other relief.

Notwithstanding the above paragraph, the Contractor reserves the right to terminate this Subcontract for its convenience upon written notice to the Subcontractor stating the extent and effective date of such termination. Immediately upon receipt of such notice, the Subcontractor shall then provide similar written notice to its Sub-Subcontractors and suppliers and shall thereupon stop all work and place not further orders or Sub-Subcontracts for materials, services, equipment or supplies, except as may be necessary to complete portions of the Work not terminated, to protect property in the Subcontractor's possession in which the Owner or Contractor has or may acquire an interest, or to otherwise take any other action toward termination of the Work which the Contractor may direct. In such instance of termination for convenience, the Subcontractor will be paid an equitable amount for its work completed under the Subcontract and other reasonable cancellation costs incurred as a result of said termination. Prior to making any payments under this clause, the Contractor shall have the right to audit the records of the Subcontractor.

## ARTICLE 10.    CHANGES IN THE WORK

The Contractor, without invalidating the Subcontract, may order extra work or make changes by altering, adding to or deducting from the Work, the Subcontract Price to be adjusted if, and as provided for, in the Conditions. All such work shall be executed under the original conditions, except that any claim for extension of time caused thereby shall be adjusted in accordance with the determination of the Architect at the time of ordering such change. The Subcontractor shall make no claim for extension of time or extra compensation for extra work or any change unless done in pursuance of a written Change Order from the Contractor, and such claim is presented to the Contractor prior to commencement of the extra work, and no claim for any addition or extra shall be valid unless so ordered. The Subcontractor shall immediately furnish a detailed estimate of the costs of any extra work so ordered. The value of any such extra work or change shall be determined by one or more or a combination of the following methods:

(1) By unit bid prices names in the Subcontract or subsequently agreed upon;

(2) By an agreed lump sum;

(3) By cost and percentage or by cost and a fixed fee,

all as provided for in the portions of the Conditions relating to changes in the Work.

The Subcontractor shall furnish satisfactory evidence of all costs and shall give the Contractor access to accounts relating thereto. Payments on account of extra work or changes shall be made only in accordance with the Architect's determination as provided for in the Conditions. The Subcontractor shall obtain and deliver to the Contractor, if requested, the written assent of any Surety on any bond furnished by the subcontractor to such changes before the same are made.

## ARTICLE 11.    GENERAL GUARANTY OF WORK

The Subcontractor warrants that all materials and equipment furnished and incorporated by him in the Work shall be new unless otherwise specified and that all Work under this Subcontract shall be of first-class quality, free from all faults and defects and in accordance with the Contract Documents. All Work not conforming to these requirements, including substitutions not properly approved may be considered defective. The Subcontractor shall execute a written guaranty and warranty applicable to all phases of the Work in accordance with this Subcontract and all other applicable provisions of the Contract Documents pertaining to warranties and guarantees. The Subcontractor shall remedy any defects due to faulty materials or workmanship and pay for the damage to other work resulting there from, which shall appear within the period of one year from the date of final payment, unless a longer period is specified. Neither occupancy of the premises by the Owner, nor any provision in the Contract Documents, nor final payment, shall constitute an acceptance of work not done in accordance with the Contract Documents, nor relieve the Subcontractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship, nor shall nay of the foregoing, or any provision of the Contract Documents, nor shall any of the foregoing, or

any provision of the Contract Documents, nor any special guaranty be held to limit the Subcontractor's liability for defects or faulty materials less than the legal limit of liability in accordance with the law of the place of building. The Contractor shall give notice of observed defects with reasonable promptness.

### ARTICLE 12.    INDEMNITY

The Subcontractor shall indemnify and hold harmless the Contractor and all of its agents and employees from and against all claims, damages, losses and expenses (including attorneys' fees) arising out of or resulting from the performance of the Subcontractor's Work (or failure in such performance), provided that any such claim, damage, loss or expense (a) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (b) is caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly contracted with by him (subcontractors or suppliers) or anyone for whose acts he may be liable, regardless of whether it is caused in part by a party indemnified hereunder. In any and all claims against the Contractor or any of its agents or employees by any employee of the Subcontractor, anyone directly or indirectly employed by him or anyone for whose acts he may be liable or anyone having contracted with the Subcontractor, the indemnification obligation under this Article 12 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's Compensation acts, disability benefit acts or other employee benefit acts. The obligations of the Subcontractor under this Article 12 shall not extend to the liability of the Architect, his agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, his agents or employees, provided such giving or failure to give is the primary cause of the injury or damage.

The Subcontractor shall provide in the policy of comprehensive General Public Liability insurance required by this Subcontract Agreement a contractual indemnity endorsement, which insures Subcontractor's liability under the provisions of this Article 12.

Any sum or sums chargeable to the Subcontractor under this provision, or any other provision, of this Subcontract may at the election of the Contractor, be deducted from any payments otherwise due or to become due to the Subcontractor under this or any other Subcontract between the Contractor and the Subcontractor.

### ARTICLE 13.    INSURANCE

The Subcontractor shall maintain Liability Insurance for the risks and in the limits specified below UNLESS OTHERWISE STATED IN THE SPECIFICATIONS DATED 7/01/2002, AS PREPARED BY LAMOUREUX PAGANO ASSOCIATES, 14 EAST WORCESTER STREET, WORCESTER, MA  01604 FOR SHREWSBURY MIDDLE SCHOOL.

1.  Workers Compensation

    | | | |
    |---|---|---|
    | a. | State: | Statutory |
    | b. | Applicable Federal (e.g. long-shoremen, harbor work, Work at or outside U.S. Boundaries); | Statutory |
    | c. | Maritime: | $N/A |
    | d. | Employer's Liability: | $1 Million |
    | e. | Benefits Required by Union labor contacts: | As applicable |

2.  Comprehensive General Liability must be occurrence policy (including Premises-Operations; Independent Contractors' Protective; Products and Completed Operations; Broad Form Property Damage);

    a.  Bodily Injury:

    | | |
    |---|---|
    | $ 1 Million | Each Occurrence |
    | $ 1 Million | Aggregate, Products and Completed Operations |

    b.  Property Damage:

    | | |
    |---|---|
    | $ 1 Million | Each Occurrence |
    | $ 2 Million | Aggregate |

    c.  Products and Completed Operations Insurance shall be maintained for a minimum of ☒ 1  ☐ 2 year(s) after final payment and Contractor shall continue to provide evidence of such coverage to Owner on an annual basis during the aforementioned period.

    d.  Property Damage Liability Insurance shall include coverage for the following hazards:

    ☒ X (Explosion)

    ☒ C (Collapse)

    ☒ U (Underground)

    e.  Contractual Liability (Hold Harmless Coverage);

    1.  Bodily Injury:

    | | |
    |---|---|
    | $ 1 Million | Each Occurrence |

    2.  Property Damage:

    | | |
    |---|---|
    | $ 1 Million | Each Occurrence |
    | $ 2 Million | Aggregate |

    f.  Personal Injury, with Employment Exclusion deleted:

    | | |
    |---|---|
    | $ 1 Million | Aggregate |

3.  Comprehensive Automobile Liability (owned, non-owned, hired):

(a) Bodily Injury:

$ **1 Million** —         Each Person
$ **2 Million** —         Each Accident

(b) Property Damage:

$ **5 Million** —         Each occurrence

4.  Aircraft Liability (owned and non-owned) when applicable, as follows:

☐ With limits proposed by Contractor for Owner's approval

☒ Not applicable

Evidence of the above coverage, represented by certificates issued by the insurance carrier, which must be satisfactory to Contractor, shall be furnished to the Contractor prior to the signing of this Subcontract. Certificates of Insurance shall state that the Contractor will be notified in writing at least ten (10) days prior to cancellation or renewal of any insurance. All insurance held by the Subcontractor shall also name the Contractor and Owner as Insured.

### ARTICLE 14.    LIENS

No part of the retained percentage (or any other sums withheld) shall become due until the Subcontractor, if so required, shall deliver to the Contractor a complete release of all liens arising out of this Subcontract, or receipts in full in lieu thereof and, if required in either case, an affidavit that so far as he has knowledge or information, the releases and receipts include all the labor and material for which a lien could be filed; but the Subcontractor may, if any of his subcontractors refuse to furnish a release or receipt in full, furnish a bond satisfactory to the Contractor to indemnify the Contractor against any lien. The Subcontractor shall use his best efforts to prevent any laborers, materialman's, mechanic's or other similar liens from being filed or otherwise imposed on any part of the Work or the site. If any laborer's, material men's, mechanic's or other similar lien or claim of lien is filed or otherwise imposed by the Subcontractor or any sub-subcontractor, material men or supplier in connection with the Work, and the Subcontractor does not cause such lien to be released and discharged forthwith or file a bond in lieu thereof, Contractor shall have the right to pay all sums necessary to obtain its release and discharge. The Contractor shall have the right to deduct all amounts so paid from the Subcontract Price or to deduct the same from the next succeeding Requisition until the total amount expended shall be recouped. If any liens remain unsatisfied after all payments to the Subcontractor are made, the Subcontractor shall reimburse the Contractor for all monies that the latter may be compelled to pay in discharging such a lien, including all cost and expenses (including reasonable attorneys' fees). The Subcontractor shall indemnify, defend and hold harmless the Contractor and Owner from all costs and expense, including attorneys' fees, claims, losses, demands, causes of action or suits of whatever nature arising out of any such lien.

### ARTICLE 15
### OMISSIONS AND SUBSURFACE CONDITIONS

In the event that any matters contained in the Specifications have been omitted from the Plans or vice versa,

the same shall be construed as if contained in both. The Subcontractor shall promptly inform the Contractor in writing of any inconsistency in the specifications and Plans. Any changes made therein by the Architect or the Contractor shall thereupon be binding upon the Subcontractor, and similarly any portion of the general specifications to which this Subcontract pertains which are omitted from the specifications shall be construed a binding in this agreement.

Should conditions encountered below the surface of the ground be determined by the Architect to materially differ from the conditions indicated by the plans and specifications, any adjustment in the Subcontract Price, claimed by either party, shall be determined in accordance with Article 10 hereof.

### ARTICLE 16.
### COMPETENCE OF WORKMEN-LABOR CONDITIONS

The Subcontractor shall promptly discharge from the Work such employees as the Contractor or the Architect finds not competent or compatible with other personnel on the job. The Subcontractor shall promptly notify the Contractor of any labor dispute or difficulty. The Subcontractor agrees to procure materials and supplies from such sources and to perform all Work on the Project with labor and Subcontractors that will work harmoniously with other elements of labor involved in the construction of the Project. In the event that any labor dispute and/or difficulty arises, in any way related to the Subcontractor's employees or independent contractors, thereby causing any delay in any portion of the entire job, and such delay, interference or stoppage continues for three (3) days, the Contractor may, at its option, terminate this contract under Article 9 for default, and the Contractor shall have no further liability hereunder to the Subcontractor, except as provided in Article 9. The Subcontractor expressly agrees not to participate in or accede to any stoppage in the Work, which may result from any labor dispute.

### ARTICLE 17.
### NO CLAIMS FOR DAMAGES FOR DELAY

In the event of delay in the Work the Subcontractor agrees that he hall have no claim for money damages or additional compensation for delay regardless of how such delay is caused, but in the case of any delay in the Work not due to his fault he shall be entitled only to such extension of time for the performance of the work as shall be allowed to the Contractor by the Owner and/or Architect. All claims for such extension of time shall be made in the manner and within the time provided for in the Contract Documents between the Owner and Contractor for like claims by the Contractor upon the Owner.

### ARTICLE 18.
### PAYMENT AND PERFORMANCE BONDS

The Subcontractor shall, simultaneously with execution of this Subcontract, deliver to the Contractor and pay all premiums for performance and payment bonds running to the Contractor in sums equal to __0__% of the Subcontract Price in the case of the performance bond, and __0__% of the Subcontract Price in the case of the payment bond, each such bond to have corporate sureties satisfactory to the Contractor, conditioned

---



upon the faithful performance by the Subcontractor of the Subcontractor in each and every of its particulars, as it may from time to time be modified by Change Order, such bonds to be in such form and otherwise to contain such provisions as are satisfactory to the Contractor.

### ARTICLE 19.    WEATHER CONDITIONS

In the event of temporary suspension of Work during inclement weather or whenever the Architect shall direct, the Subcontractor will protect carefully his work and all materials on the job site connected with the furtherance of his Work against damage or injury from the weather. If, in the opinion of the Contractor and/or the Architect, any work or materials shall have been damaged or injured by reason of failure on the part of the Subcontractor or any of his subcontractors so to protect his work, such materials shall be removed and replaced or work redone at the expense of the Subcontractor.

### ARTICLE 20.
### ALL WORK SUBJECT TO CONTRACT DOCUMENTS AND ARCHITECT'S CONTROL

The Subcontractor acknowledges that he has familiarized himself with all the details of the Contract Documents, including the Conditions and all addenda thereto, and the Plans and Specifications relating to the Work undertaken by him under this Subcontract and particularly the authority over and control of the Work granted to the Architect and Contractor there under and hereunder and agrees to be bound in each respect and in every detail in accordance with the terms thereof and hereof. All disputes arising under this Subcontract shall be determined by the Architect as provided for in said Conditions. To the extent the Conditions provide that any such determination by the Architect shall be binding on the Contractor all such determinations shall be equally binding upon the Subcontractor. Notwithstanding any provision contained in any Contract Document requiring arbitration, Subcontractor agrees that any dispute under this Subcontract shall be submitted to Arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association only upon the written election of Contractor to submit to arbitration. Contractor may, in its sole discretion, withhold such election to arbitrate. Subcontractor's execution hereof constitutes and acknowledges Subcontractor's agreement to arbitrate at such election of Contractor. Each such dispute, which is submitted to arbitration, shall be heard before the American Arbitration Association in Boston, Massachusetts unless the Contractor specifies some other location.

The Subcontractor agrees, upon Contractor's written demand thereof, to become a party to and be bound by any arbitration proceeding involving the contractor, the Architect or the Owner to the extent that such proceedings involve any of the rights or obligations of the Subcontractor hereunder.

### ARTICLE 21.    ACCIDENT PREVENTION

The Subcontractor shall be responsible for the prevention of accidents, and agrees to comply with all laws, regulations and codes concerning safety as they shall be applicable to the Work and to the safety standards established during the

progress of the Work by the Architect and/or Contractor. Should the Subcontractor neglect to adopt corrective safety measures ordered by the Architect and/or Contractor, the Contractor may perform them and deduct the cost from any payments due or to become due the Subcontractor. The absence of a stop order from the Contractor shall in no way relieve the Subcontractor of his responsibility. The Subcontractor agrees to comply with and be bound by the Contractor's Safety Policy, which is attached hereto and made part of this Subcontract.

### ARTICLE 22.    CLEAN UP

The Subcontractor shall, at his own expense, periodically clean up and remove from the job site all debris caused by the Work hereunder, and such clean up and removal shall include the removal of all debris and refuse left by the Subcontractor's working forces from meal periods, or from the uncrating of materials. The Subcontractor shall, upon the completion of his Work, clean up and remove from the job site all his plant, materials and equipment and all debris and refuse caused by the Work and/or his working forces. If the Subcontractor fails to clean up as provided herein, the Contractor may, upon 24 hours' written notice to the Subcontractor, cause such clean up of debris and elimination of nuisances and removal to be done at the expense and for the account of the Subcontractor. The decision of the Contractor as to the identity of the person or persons responsible for clean up and removal of debris, refuse, plant and equipment and materials, the cost thereof and the responsibility for such cost, shall be final and any charge back to Subcontractor for clean up and removal shall not be appealable to the Architect or any other forum but shall be conclusive.

### ARTICLE 23.
### SUBCONTRACTOR'S OBLIGATION TO EXPEDITE WORK

If delay is caused the Contractor or other subcontractors of the Contractor through the fault of the Subcontractor (or his subcontractors or suppliers) the Subcontractor shall be liable to the Contractor for all direct and consequential damages, including losses, costs and expenses (including attorneys' fees) resulting from such delay or non-performance. The Subcontractor shall promptly notify the Contractor in writing of any anticipated delay. The Subcontractor shall cooperate with the Contractor in scheduling and performing his Work to avoid conflict or interference with the work of others. The Subcontractor shall promptly submit shop drawings and samples as required in order to perform his Work efficiently, expeditiously and in a manner that will not cause delay in the progress of the Work of the Contractor or other subcontractors.

### ARTICLE 24.
### COMPLIANCE WITH LAWS AND REGULATIONS

The Subcontractor shall comply with Federal, State and local tax laws, social security acts, unemployment compensation acts and workmen's compensation acts and all other laws, regulations, ordinances, and by-laws applicable to the performance of his Subcontract. The Subcontractors work shall conform strictly to all applicable laws and ordinances in



force in the locality in which the Work is done. The Subcontractor acknowledges that he has carefully examined and is thoroughly familiar with and will comply with the provisions in the Conditions and in Exhibits hereto relating to Wage Rate, Apprentices' Overtime, Posting Minimum Wage Rate, Payment of Employees (by Subcontractors), Anti-Kickback Statute and Regulations, Wage Underpayments and Adjustments, Payrolls of Subcontractors, Interest of Officials and Prohibited Interests. The Subcontractor will comply with the provisions of the Occupational Safety and Health Act of 1970 (or any successor). The Subcontractor is required to implement the Community Provisions of Chapter #470 of the Acts of 1983 of the General Laws of Massachusetts, the so-called "Right to Know" law, effective September 6, 1984. The Subcontractor shall indemnify and hold the Contractor harmless for any loss, expense, cost, or damage occasioned by any violation of provisions of any or all of the foregoing.

## ARTICLE 25.
## EQUAL EMPLOYMENT OPPORTUNITIES

The Contractor is dedicated to the furtherance of equal employment opportunity. Therefore, there are incorporated herein by reference, whether or not strictly applicable by law to the Work, federal Executive Order 11246 or any successor thereto; Title VII of the Civil Rights Act of 1964; the Massachusetts Fair Employment Practice law; or regulations and rulings under each or any of the foregoing; and all amendments to each and any of the foregoing. The Subcontractor agrees to be bound by and to comply with the provisions of all of the foregoing and to maintain an affirmative action program and plan to assure equal employment opportunity throughout the performance of the Work. Without in any way limiting the right of the Contractor under Article 9 hereof, the Subcontractor shall indemnify and hold the Contractor harmless for any loss, expense, cost or damage occasioned by any failure to observe the provisions of this Article 25.

## ARTICLE 26.    NOTICES

All notices to the Subcontractor having to do with this Subcontract shall be deemed sufficient if delivered in writing to any representative of the Subcontractor or if mailed, by

certified or registered mail, to his address on the signature page hereof. All notices to the Contractor shall be sent to it at

> 20 Dan Road
> Canton, MA 02021

Either party may designate another address for notice by written notice delivered or mailed as aforesaid to the other party.

## ARTICLE 27.    SECURITY

Contractors shall have no liabilities to Subcontractor for security of materials, equipment, or tools at the job site, which shall be stored and used there solely at risk of Subcontractor. Subcontractor shall comply with all security rules of general applicability promulgated by Contractor.

## ARTICLE 28.    SEVERABILITY

In the event any provision of this Subcontract shall be found to be prohibited by law, such provision shall be ineffective only to the extent of such prohibition, and shall not in any manner invalidate or affect the enforceability of the remaining provisions of this Subcontract.

## ARTICLE 29.    EXHIBITS

See exhibits listed on page one (1) of this contract which have been initialed for identification by the parties and constitute a part hereof.

## ARTICLE 30.    FINAL AGREEMENT ·

It is understood that this Subcontract, including all instruments incorporated herein be reference, constitutes the full and complete agreement now existing between the Contractor and Subcontractor and supersedes any and all prior agreements or understanding, written or oral, express or implied, between the Contractor and Subcontractor, except as otherwise expressly provided herein.



IN WITNESS WHEREOF, the parties have hereto, by their duly authorized representatives, set their hands and seals as of the day and year first above written. Each person signing below who purports to do so in a representative capacity personally warrants and represents to the other party that he is fully authorized to execute and deliver this Subcontract and that the corporation, trust or other body he purports to represent is empowered to enter into this Subcontract and will become fully bound by his execution and delivery.

CONTRACTOR:

**JACKSON CONSTRUCTION COMPANY**

By: _Richard M'Guinness_     _6-21-6_
                                  Date

_____Richard McGuinness_____
               Printed Name

_____Project Manager_____
                  Title

SUBCONTRACTOR:

**LANDWORK CREATIONS, LLC**

By: _Neal W. Matthews_     _6/12/04_
                                 Date

_Neal  H.  Matthews_
               Printed Name

_Principal_
                 Title

ADDRESS OF SUBCONTRACTOR:

**PMB 291 1500A Lavayette Road**

**Portsmouth, NH  03801**

---

# Attachment A

## SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street, Shrewsbury, MA 01545

### JCC JOB #381

**ATTACHED TO AND MADE PART OF**
JACKSON CONSTRUCTION COMPANY
&
**LANDWORK CREATIONS, LLC**
**Contract 381-02-200**

### TABLE OF CONTENTS

| | |
|---|---|
| Affirmative Action Program for Equal Employment Opportunity | Page 2 |
| Safety Policy | Pages 3-4 |
| Exhibit #1 – *The Occupational Safety & Health Administration (OSHA) Hazard Communications Standard 1926.59(E)(2) Requirements* | Page 5 |
| Exhibit #2 – *Problem Solving Procedures* | Page 6 |
| Exhibit #3 – *Safety Policy Fines / Backcharges* | Page 7 |
| Exhibit #4 – *Jackson Construction Company Incident Report* | Page 8 |
| Exhibit #5 – *Jackson Construction Company Weekly Safety Meeting Report* | Page 9 |
| Exhibit #6 – *Safety & Health Program Requirements* | Pages 10-12 |
| **Think Safety ---- Work Safety Statement  (to be signed and returned)** | Page 12 |
| Drug Free Workplace Policy   **Statement of Understanding   (to be signed and returned)** | Page 13 |
| Weekly Payroll Report Form and EEO Anti-Discrimination & Affirmative Action Program | Pages 14-16 |
| Wage Breakdown   **(to be completed and returned for each job classification)** | Page 17 |
| Subcontractor Requisition for Payment  (to be completed 25th day of month) | Page 18 |
| Continuation Sheet (Application and Certificate for Payment) | Page 19 |
| Trade Contractor Certification Indemnification & Waiver of Liens | Page 20 |
| Owner's Certificate of Exemption   (Form ST-2)  Massachusetts | Page 21 |
| Contractor's Exempt Purchase Certificate   (Form ST-5C)  Massachusetts | Page 22 |



**AFFIRMATIVE ACTION PROGRAM**
**FOR**
**EQUAL EMPLOYMENT OPPORTUNITY**

JACKSON CONSTRUCTION COMPANY is an Affirmative Action contractor.    Our involvement in equal employment opportunities is a matter of tradition.

In past years we were actively involved with C.A.B. at their Roxbury office.  We were participants and committee attendees during the formation and structuring of the original Boston Plan and cooperated with Third World organizations.

As a result of the JACKSON CONSTRUCTION COMPANY's aggressive and affirmative history in assisting minority employment, the Federal Government selected us to participate as a joint venture with a minority contractor on several occasions.  One case was a school building at Ft. Devens, Ayer, MA and the other was the National Cemetery at Otis Air Force Base in Bourne, Massachusetts.

JACKSON CONSTRUCTION COMPANY will not discriminate against any employee or applicant for employment because of race, creed, color, sex or national origin. JACKSON CONSTRUCTION COMPANY shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, creed, color, sex or national origin.  Such action shall include, but not be limited to the following:

    a)    Employment, upgrading, demotion or transfer

    b)    Recruitment or recruitment advertising

    c)    Layoff or termination

    d)    Rate of pay or other forms of compensation

    e)    Selection for training, including apprenticeship

    f)    Employment of Veterans of the Vietnam War

    g)    Handicapped people

JACKSON CONSTRUCTION COMPANY in all solicitations or advertisement for employees placed by or on behalf of the Company states that all qualified applicants will receive consideration for employment without regard to race, creed, color, sex or national origin.

JACKSON CONSTRUCTION COMPANY sends to each labor union or representative of workers with which we have a collective bargaining agreement or other contract or understanding advising the labor union or workers' representative of our commitments.

JACKSON CONSTRUCTION COMPANY notifies subcontractors/vendors during negotiations of our company E.E.O. policy.  Our program as well as Owner requirements become attachments or riders to the ultimate subcontract document.

JACKSON CONSTRUCTION COMPANY notifies Job Superintendents who have hiring responsibilities of our company's E.E.O. and Affirmative Action Policy including non-segregated facilities.

JACKSON CONSTRUCTION COMPANY is fully cognizant of Federal Executive order 11246 and the Boston Resident Plan.

As a result of many years experience we have established a mailing list of small businesses and minority owned businesses.   During the pre-bid period invitations are equally sent to all subcontractors and vendors qualified to provide the particular expertise required for the project being bid.  For those requiring pre-bid assistance, our Estimating Department offers to review the plans, specifications and clarifications necessary for an appropriate subcategory bid.

Upon award of a contract, JACKSON CONSTRUCTION COMPANY has often contacted the several associations representing minority companies in an effort to stimulate the inclusion of qualified minority companies in the local construction industry on a fair and equal competitive basis.  Our objective in this regard is to increase the number of minority companies with expertise for the variety of vendor or subcontract services needed for a building project.  We assume that the involvement of these companies will result in the employment of skilled minority employees.

Our company philosophy has been and continues to make a good faith effort to achieve the goals of equal opportunity for all.



SAFETY POLICY

Project safety is not only a requirement but it is most important for the successful operation of JACKSON CONSTRUCTION COMPANY.

JACKSON CONSTRUCTION COMPANY has formulated the following written policy to indicate their commitment in providing a safe and healthy work environment for its employees, subcontractors and their employees, visitors to the worksite and to the general public.

To achieve a safe and healthy work environment, JACKSON CONSTRUCTION COMPANY requires as a condition of -

a)   Employment:  All employees adhere to the policies, procedures, rules and responsibilities set forth elsewhere pertaining to safety;

b)   Subcontracts and Purchase Orders:   JACKSON CONSTRUCTION COMPANY requires all applicable state, federal and local rules, regulations and laws pertaining to safety and the environment, including OSHA's Haz-Com Standard 1926.59 (e) 2, are adhered to. (See EXHIBIT #1)  Failure to comply with any of the above will be considered as a breach of a contract.

c)   Visitation to the Site:  All visitors must follow the safety rules and regulations set forth by JACKSON CONSTRUCTION COMPANY.

It will be expected by all on the site to report any unsafe conditions to JACKSON CONSTRUCTION COMPANY management personnel on the site.  (See EXHIBIT #2)

The constant monitoring of the procedures and operations of all concerned at the project will assure safety to the general public.

The Safety Engineer, Job Superintendent and Foremen have the full support of the JACKSON CONSTRUCTION COMPANY in enforcing this policy.

PROJECT SAFETY

JACKSON CONSTRUCTION COMPANY takes a "pro-active approach" to project safety.  It will be monitored on a daily basis by the Project Superintendent and the field crew.  Moreover, on a regular basis, or as needed, the company Safety Engineer will:

a)   visit the site to conduct a more thorough safety investigation; looking for potential hazards and violations and to document those findings.

b)   correspond with the subcontractors' management to point out any violations and hazards. The Safety Engineer has the authority and support of JACKSON CONSTRUCTION COMPANY to issue fines and penalties as described in the section entitled "Fines/Backcharges." (See EXHIBIT #3)

c)   require each subcontractor to forward a copy of their company's safety policy, safety program and their Haz-Com Program signed by their designated Safety Person, along with their signed contract or letter of intent.

d)   require a pre-job safety meeting with each subcontractor to clearly identify their responsibilities in regard to safety.

e)   require immediate notification of all accidents/incidents and resultant reports.  (See EXHIBIT #4)

f)   keep the client informed of any subcontractor who is in continual noncompliance of the established program.

## HAZARDOUS SUBSTANCES

If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Subcontractor, the Subcontractor's Sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor will, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other Subcontractors and other employees on the site.

In the event the Subcontractor encounters on the site material reasonably believed to be asbestos or polychlorinated biphenyl (PCB) which has not been rendered harmless, the Subcontractor will immediately stop Work in the area affected and report the condition to the Contractor in writing. The Work in the affected area will resume in the absence of asbestos or polychlorinated biphenyl (PCB), or when it has been rendered harmless, by written agreement of the Contractor and Subcontractor, or in accordance with final determination by the Architect on which arbitration has not been demanded or by arbitration as provided in this agreement. The Subcontractor will not be required pursuant to Article 5 to perform without consent any Work relating to asbestos or polychlorinated biphenyl (PCB).

## INSURANCE

Each subcontractor's certificate of insurance will be monitored to verify that the coverage is up to date, including Workers' Compensation, and that all requirements are met. No subcontractors will be allowed on the project until JACKSON CONSTRUCTION COMPANY has received their certificate of insurance.

## TRAINING

Weekly toolbox talks/safety meetings will be held for all JACKSON CONSTRUCTION COMPANY employees. Each employee will be asked to acknowledge, by signature, that training or talks were given them. This includes JACKSON CONSTRUCTION COMPANY's Haz-Com Program. These talks will relate to the ongoing activity that the construction is in at the time. (See EXHIBIT #5)

## WELCOME TO JOBSITE POLICY

All Subcontractors, Superintendent and/or Foremen will be given JACKSON CONSTRUCTION COMPANY's Safety and Health Program Requirements (EXHIBIT #6) on the first day they are scheduled to commence work on the project. It will be their responsibility to understand, implement and abide by such rules and regulations and assure their employees, vendors, the supplier's and/or visitors to do the same.

Other programs that will be addressed are emergency first aid, fire safety and evacuation, and drug/alcohol abuse.



EXHIBIT #1



### THE OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION (OSHA)
### HAZARD COMMUNICATIONS STANDARD 1926.59 (E)(2) REQUIREMENTS

The Occupational Safety and Health Administration (OSHA) Hazard Communications Standard 1926.59 (e)(2) requires that on multi-employer work sites such as building construction, all employers ...........

- **MUST** provide other employers (subcontractors) with a copy of their Material Safety Data Sheets (MSDS) for each hazardous chemical to which other subcontractors' employees may be exposed.

- **MUST** exchange information about precautionary measures necessary to protect employees.

- **MUST** provide an indication of the type of labeling system in use where exposures may occur to other employer's (subcontractors') employees.

To coordinate this exchange of hazard information and to insure that all employees have sufficient information to protect themselves at the workplace, JACKSON CONSTRUCTION COMPANY requires that a copy of all MSDS's that your company intends to use on this project be forwarded to

(1)   the Job Superintendent who will put this document in a readily available central file and

(2)   Jackson Construction Company's Safety Engineer at our main office.



---

EXHIBIT #2

## PROBLEM SOLVING PROCEDURES

It is JACKSON CONSTRUCTION COMPANY's intent to provide a safe work place for all on the site. All supervisory personnel have been instructed to observe and correct unsafe conditions. If you observe a condition that needs corrective action, you should immediately:

1.  Correct the situation yourself, if possible; e.g., replace a missing guardrail.

2.  If the situation is beyond your capabilities, report this condition to your immediate supervisor.

3.  If you feel that the corrective action is not effective or is not being expedited, you may contact the company's Safety Engineer, Mark Walraven at 781-737-1527.

We appreciate your concern and cooperation in making our projects SAFE PROJECTS.



EXHIBIT #3



## SAFETY POLICY FINES/BACKCHARGES

In addition to all of the remedies and rights granted to JACKSON CONSTRUCTION COMPANY elsewhere under the Contract Documents, JACKSON CONSTRUCTION COMPANY may assess backcharges against the subcontractor for continued safety violations as follows:

> In the event of a safety violation, a verbal warning AND a written warning will be given to the worker (if applicable), the Foreman of the subcontractor and the subcontractor's home office.

> If after the issuance of said verbal and written warnings, the safety violation has not been corrected, a second written notice will be given with the backcharge amount attached. A copy of this will be sent to the subcontractor's home office, Jackson Construction Company's office and to the subcontractor's insurance carrier.

It is expressly understood that although JACKSON CONSTRUCTION COMPANY may from time to time issue verbal or written warnings and in some instances issue fines, such actions by JACKSON CONSTRUCTION COMPANY will in no way relieve the subcontractor(s) of their obligations and/or liabilities with respect to safety laws, rules and regulations.

The amount of the backcharge will be in accordance with the listed schedule below:

| CATEGORY "A" - $100.00 | CATEGORY "B" - $500.00 |
|---|---|
| Hard Hats | Open Electrical Panels |
| Safety Glasses | Missing Protective Cages |
| Work Boots | Damaged Cords - Missing Ground Pins, Cuts |
| Unsecured Gas Cylinders | Damaged Electrical Equipment |
| Safety Gas Cans | Missing or Improper Lighting |
| Backup Alarms | Floor Openings |
| Damaged Ladders | Missing or Not Replacing Guardrails |
| Missing Blade Guard | Scaffold Not Erected Properly |
| Housekeeping | Trenches |
| Other | Other |

## JACKSON CONSTRUCTION COMPANY

## INCIDENT REPORT

Job Location: __45 Oak Street, Shrewsbury, MA  01545_____    Job No. __381_____

Job Name:____SHREWSBURY MIDDLE SCHOOL - WEST_____

Date of Loss: _____    Day of Week: _____

Hour of Day: _____    Type of Loss: _____

Claimant's Name:_____

     Address: _____

     Phone Number: (Home) _____    (Work)_____

     Employer: _____

Witness:  Name: _____

     Address: _____

     Phone Number: (Home) _____    (Work)_____

Description: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Date of this Report:_____

Reported by _____

Signed by: _____

EXHIBIT #5

## JACKSON CONSTRUCTION COMPANY

### WEEKLY SAFETY MEETING REPORT

Date: _____

Project Name: SHREWSBURY MIDDLE SCHOOL - WEST _____ Project No. 381 _____

Topic: _____

_____

Conducted by: _____

Number of People in Attendance: _____

Suggestions Offered: _____

_____

_____

_____

_____

Comments: _____

_____

_____

_____

_____

Discussion of Recent Accidents or Near Misses: _____

_____

_____

_____

_____

How to Prevent/Avoid: _____

_____

_____

Signatures of Those in Attendance:

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

SUBCONTRACTOR: **Landwork Creations, LLC**

WELCOME TO JACKSON CONSTRUCTION COMPANY'S
SAFETY AND HEALTH PROGRAM REQUIREMENTS

PROJECT: Shrewsbury Middle School - West - JCC #381

** PLEASE READ AND SIGN LAST PAGE**

| PROJECT TEAM: | | JOB PHONE: |
|---|---|---|
| Project Manager: | Richard McGuinness | 781-737-1500 |
| Project Superintendent: | Frank Leonardo | Cell #508-326-7617 |
| Safety & Health Director: | Mark Walraven | 781-737-1527 |
| Designated Site Safety Person: | Frank Leonardo | Cell #508-326-7617 |

| EMERGENCY NUMBERS: | | EMERGENCY REPAIR: |
|---|---|---|
| Fire - | 911 | Electric: |
| Police - | 911 | Telephone: |
| Ambulance - | 911 | Water: |
| | | Gas: |

1. Floor openings will be covered or barricaded. Under no circumstances will any person permit an opening to be left uncovered or unbarricaded.

2. Guard rails and barricades will be erected and maintained. If removed for access, they will be replaced immediately by the removing party.

3. New employees and subcontractor employees will be given a brief safety orientation by their supervisors or the Project Supervisor before they start to work. This orientation will apply to general instructions regarding safety rules of the project.

4. Tool Box Safety Meetings will be held weekly. Attendees and minutes of the meetings are recorded. ATTENDANCE IS MANDATORY.

5. Signs and posters bearing pertinent regulations will be used to convey warnings, directions, and instructions to Personnel and the public as required by the contractor and the client. The observance of warning signs will be required of the company personnel and visitors while on the job.

6. HARD HATS - All project construction areas will be considered "Hard Hat Areas." The wearing of hard hats by ALL employees, subcontractors, and visitors in the construction area will be strictly enforced. Long pants, shirts and hard sole shoes will be worn. Tennis shoes, sandals, etc. are prohibited.

7. All injuries no matter how slight must be reported to your Foreman IMMEDIATELY. All doctors' referrals must be authorized through the job office unless an emergency situation exists.

8. No horseplay, fighting, creating a disturbance, or scuffling is permitted. Offenders are subject to disciplinary action.

9. Report all unsafe practices and conditions to your foreman at once. If not corrected within a reasonable length of time, report to the job superintendent.

10. Housekeeping, safety and efficiency go hand in hand. Always keep your job clean. If you do not, we will, at your expense.

11. All projecting nails will be removed or turned down immediately.

12. Familiarize yourself with the fire extinguisher, first aid, and emergency egress locations.

13. Do not use defective or broken tools and equipment. Use the proper tool or equipment for any job you do. Make sure that all guards and protective devices are in place and operating correctly.

14. Goggles, and protective clothing and footwear must be worn when chipping, grinding, welding, cutting and working with compressed air, or when necessary to be close to such an operation being performed by another employee.

15. Riding on equipment or trucks is forbidden.

16. Do not attempt to lift or move heavy loads without adequate assistance. Learn to lift properly. Lift with your leg muscles, not your back.

17. Do not place speed above SAFETY. If each worker will be watchful of everyone else, as well as himself, accidents can be held to a minimum.

18. Always face ladders when ascending or descending. Tie off all ladders and report broken or unsafe ladders immediately.

19. Keep clear of swinging buckets, loads and counterweights. Never walk on a blind side of equipment.

20. Only authorized persons are permitted to operate specific equipment; follow these regulations: No one but qualified personnel or electrician is to make repairs and service electrical equipment.

21. No employee will be allowed to report for work while under the influence of intoxicants or drugs. Possession of intoxicants, tranquilizers, narcotics or other dangerous drugs is prohibited and will result in company action. Violators of this policy will be subject to disciplinary action.

22. Materials and equipment will be stored in a safe manner. All major deliveries will be arranged and coordinated with the Jackson Construction Company Project Superintendent.

23. Spillage of any liquids of any kind on floors will be immediately cleaned up to avoid slipping, falling, or possible fire.

24. Personnel protective equipment (safety glasses, respirators, earmuffs or plugs, special gloves, special boots, safety belts, etc.) will be provided as required by the hazards involved in work assignments. This equipment must be worn when specified by project supervision, or when conditions warrant their use.

25. All fire lanes, aisles, stairways, passageways, etc., are to be kept clean and free from loose materials and debris. No such space will be used for storage of any kind.

26. STUDY YOUR JOB FROM THE SAFETY ANGLE. Think before start work. Search out the hazards and take precautions to prevent accidents from happening. Be sure you have all necessary protective equipment with you when you start to work. If you are in doubt about hazards or the proper protective clothing or equipment, consult your supervisor.



Landwork Creations, LLC  Subcontract 381-02-200

27. It is imperative that all SUBCONTRACTORS on the jobsite comply with Jackson Construction Company's Safety Policy and that of all Industry Standard Safety and Health Regulations. Any SUBCONTRACTOR not complying with these regulations is subject to fines assessed as backcharges, as follows:

First Offense - The job foreman will be verbally warned and a written notification will be forwarded to the home office.

Second Offense - If after the issuance of the first notice the violation is not corrected, penalties will be assessed per the schedule below:

| CATEGORY "A" - $100.00 | CATEGORY "B" - $500.00 |
|---|---|
| Hard Hats | Open Electrical Panels |
| Safety Glasses | Missing Protective Cages |
| Work Boots | Damaged Cords - Missing Ground Pins, Cuts |
| Unsecured Gas Cylinders | Damaged Electrical Equipment |
| Safety Gas Cans | Missing or Improper Lighting |
| Backup Alarms | Floor Openings |
| Damaged Ladders | Missing or Not Replacing Guardrails |
| Missing Blade Guard | Scaffold Not Erected Properly |
| Housekeeping | Trenches |
| Other | Other |

It is expressly understood that although Jackson Construction Company may from time to time issue verbal or written warnings and in some instances issue fines, such actions by Jackson Construction Company will in no way relieve the subcontractor(s) of their obligation's and/or liabilities with respect to safety laws, rules and regulations.

---

### WELCOME TO JACKSON CONSTRUCTION COMPANY'S
### SAFETY AND HEALTH PROGRAM REQUIREMENTS

#### THINK SAFETY ***** WORK SAFELY STATEMENT

I have read and understand the rules and information on the preceding pages and any violations on my part or anyone working under my supervision will be grounds for disciplinary action and/or removal from this project.

SIGNED: _Oril N Pribille_

COMPANY: **Landwork Creations, LLC**

DATE: _6/12/04_

---

## DRUG FREE WORKPLACE POLICY

JACKSON CONSTRUCTION COMPANY is committed to maintaining a drug free workplace in accordance with the federal law known as the "Drug Free Workplace Act, effective March 1989".

The policy of the JACKSON CONSTRUCTION COMPANY is to not allow the use of alcoholic beverages nor the use of any illegal drugs by ANY PERSON working on or visiting any of our construction sites.

The manufacture, purchase, distribution, dispensing, possession, sale of controlled substances, alcohol or illegal drugs on the work site or in the immediate vicinity of the workplace is prohibited.

Being under the influence of a drug or alcohol on the job may pose serious safety and health risks, not only to the user but to those working with or around the user. As a condition of your employment on a JACKSON CONSTRUCTION COMPANY project you are expected to adhere to this policy. You should know that violation of this rule is a serious offense and could lead to discipline, including suspension from work or discharge from Jackson Construction Company's employment.

Furthermore, if you are convicted of violating any drug statute for offenses, which occurred at work, you are expected to notify your employer within five (5) days of your conviction. The employer must so notify the agency within 10 days. If you do not notify your employer, you will also be subject to discipline up to and including suspension and discharge.

Help is available if you are experiencing problems with drug abuse or alcohol. Each state has an occupational program officer who assists in identifying resources in your area. This official is usually located in the state capital.

Resources for Drug and Alcohol Assistance can be obtained by calling any of the following toll-free numbers:

| | |
|---|---|
| 1-800-356-9996 | Al-Anon |
| 1-800-527-5344 | American Council on Alcoholism |
| | |
| 1-800-COCAINE | Cocaine Hotline |
| 1-800-843-4971 | National Institute on Drug Abuse Help line |

Attached you will find a "Statement of Understanding." Please read and sign your name to this form and forward it to your supervisor.

---

### DRUG FREE WORKPLACE POLICY

### STATEMENT OF UNDERSTANDING

I, _____Neal A. Matthews_____ have read in its entirety and fully understand JACKSON CONSTRUCTION COMPANY's Drug Free Workplace Policy.

Signed _____Neco Matthew_____    Date 6/12/04

Company  LANDWORK CREATIONS, LLC

Witness _____Amber Price_____    Date 6/12/04

---

Landwork Creations, LLC  Subcontract 381-02-200





# WEEKLY  PAYROLL  REPORT  FORM

**Company Name:** ___LANDWORK CREATIONS, LLC___          [ ] **Prime Contractor:** _____

**Project Name:** ___SHREWSBURY MIDDLE SCHOOL - WEST___   [ ] **Subcontractor**
                  ___JCC JOB #381___                          **List Prime Contractor:** _____

**Awarding Auth.:** ___TOWN OF SHREWSBURY___

                                                              **Employer Signature:** _____
**Work Week Ending:** _____

                                                              **Print Name & Title:** _____
[ ] __Final Report__

| Employee Name & Address | Work Classification | Hours Worked | | | | | | | (A) Tot. Hrs. | (B) Hourly Base Rate | Employer Contributions | | | (F) (B+C+D+E) Hourly | (G) (A*F) Weekly |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | S | M | T | W | T | F | S | | | (C) Health & Welfare | (D) Pension | (E) Supp. Unemp. | Total Wage (prev wage) | Total Amount |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

**NOTE:**  **Every contractor and subcontractor is required to submit a copy of their weekly payroll records to the Awarding Authority**

# WEEKLY PAYROLL RECORDS REPORT
# & STATEMENT OF COMPLIANCE

In accordance with Massachusetts General law c149, §27B, a true and accurate record must be kept of all persons employed on the public works project for which the enclosed rates have been provided. A Payroll Form has been printed on the reverse of this page and includes all the information required to be kept by law. Every contractor or subcontractor is required to keep these records and preserve them for a period of three years from the date of completion of the contract.

In addition, every contractor and subcontractor is required to submit a copy of their weekly payroll records to the awarding authority. This is required to be done on a weekly basis. Once collected, the awarding authority is also required to preserve those records for three years.

In addition, each such contractor, subcontractor or public body shall furnish to the Department of Labor & Workforce Development / Division of Occupational Safety within fifteen days after completion of its portion of the work a statement, executed by the contractor, subcontractor or public body who supervises the payment of wages, in the following form:

## STATEMENT OF COMPLIANCE

_____
(Date)

I, _____, _____
(Name of signatory party)                                        (Title)

do hereby state:

That I pay or supervise the payment of the persons employed by

**LANDWORK CREATIONS, LLC.**
(Contractor, subcontractor or public body)
on the
**SHREWSBURY MIDDLE SCHOOL - WEST**
(Building or project)

and that all mechanics and apprentices, teamsters, chauffeurs and laborers employed on said project have been paid in accordance with wages determined under the provisions of sections twenty-six and twenty-seven of chapter one hundred and forty nine of the General Laws.

Signature _____

Title _____

DIVISION OF OCCUPATIONAL SAFETY, 100 CAMBRIDGE STREET, 11TH FL., BOSTON, MA 02202

  

# SHREWSBURY MIDDLE SCHOOL – WEST PROJECT
## Equal Opportunity Anti-Discrimination and Affirmative Action Program
### Reporting Form

Date: _____                                                    Page ___ of ___

Contractor: ___Landwork Creations, LLC_____    Contact: _____    Telephone:_603-498-1295_____

Address: _____PMB 291 1500A Lavayette Road_____    Fax: _____    E-mail:_____

____Portsmouth, NH  03801_____    Period of this Report: _____    Report Number: _____

| Job Title/Classification | Total Work Hours as of Last Report | Total Minority Work Hours as of Last Report | Percent Minority Hours | Total Work Hours this Report | Total Minority Work Hours this Report | Percent Minority Hours | Updated Total Work Hours | Updated Total Minority Work Hours | Percent Minority Hours |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Signature of Preparer: _____    Check Here If This Is A Final Report _____

Landwork Creations, LLC  Subcontract 381-02-200




## WAGE RATE BREAKDOWN

**NOTE:** FILL OUT A COMPLETE FORM FOR ALL JOB CLASSIFICATIONS. I.E. CARPENTERS, LABORER, ETC. MAKE COPIES OF THIS FORM AS REQUIRED.

**SUBCONTRACTOR:** LANDWORK CREATIONS, LLC

**PROJECT:** SHREWSBURY MIDDLE SCHOOL - WEST

**Job Classification:** _____

**JCC JOB#:** 381

| STRAIGHT TIME | | OVERTIME | | PREMIUM TIME | |
|---|---|---|---|---|---|
| **BASE RATE** attach union contract | $_____ | **BASE RATE** attach union contract | $_____ | **BASE RATE** attach union contract | $_____ |
| **FRINGE BENEFITS** per union contract | $_____ | **FRINGE BENEFITS** per union contract | $_____ | **FRINGE BENEFITS** per union contract | $_____ |
| **MEDICARE** 1.45% | $_____ | **MEDICARE** 1.45% | $_____ | **MEDICARE** 1.45% | $_____ |
| **FICA** 6.2% | $_____ | **FICA** 6.2% | $_____ | **FICA** 6.2% | $_____ |
| **FUTA** | $_____ | **FUTA** | $_____ | **FUTA** | $_____ |
| **SUTA** | $_____ | **SUTA** | $_____ | **SUTA** | $_____ |
| **GENERAL LIABILITY** copy of insurance form stating rate | $_____ | **GENERAL LIABILITY** copy of insurance form stating rate | $_____ | **GENERAL LIABILITY** copy of insurance form stating rate | $_____ |
| **WORKMAN'S COMP.** copy of insurance form stating rate | $_____ | **WORKMAN'S COMP.** copy of insurance form stating rate | $_____ | **WORKMAN'S COMP.** copy of insurance form stating rate | $_____ |
| **PROFIT & OH%** | $_____ | **PROFIT & OH%** | $_____ | **PROFIT & OH%** | $_____ |
| **HOURLY RATE** | $_____ | **HOURLY RATE** | $_____ | **HOURLY RATE** | $_____ |

From:  **LANDWORK CREATIONS, LLC**                          To: Jackson Construction Company
                                                               20 Dan Road    Suite 3
                                                               Canton, MA  02021

### SUBCONTRACTOR REQUISITION FOR PAYMENT

Requisition Number_____    Date _____
Job  381
       SHREWSBURY MIDDLE SCHOOL - WEST
       45 Oak Street, Shrewsbury, MA  01545

| | | | |
|---|---|---|---|
| 1. | Original Contract Amount | | **$303,535.00** _____ |
| 2. | Approved Change Order #_____ - #_____ | | $_____ |
| 3. | Adjusted Contract Sum | | $_____ |
| 4. | Work Completed to date _____% | ($            ) | $_____ |
| 5. | Less _10_% Retainage | | $_____ |
| 6. | | Subtotal | $_____ |
| 7. | Less Payments Received to Date | | $_____ |
| 8. | Less Backcharges Accepted to Date | | $_____ |
| 9. | | BALANCE DUE | $_____ |

In consideration of this payment, the Subcontractor does hereby waive, release and relinquish all claims against Owner and Jackson, all claims and rights of lien and all claims upon Jackson's bond for work performed and materials supplied up to and including the date of _____
                                                               (Date)

The Subcontractor hereby certifies that payment has been made through the aforementioned date in connection with the performance of this contract (1) to all his subcontractors and sub-subcontractors, (2) to all suppliers of material and equipment, and (3) to all his employees and employees of his subcontractors and sub-subcontractors including all union benefits as required.  The Subcontractor further certifies that he has complied with Federal, State and Local employees Withholding Tax and Deposit requirements insofar as applicable to the performance of this contract.

Dated:_____          **LANDWORK CREATIONS, LLC** _____
                                                 (SUBCONTRACTOR)

                                       By:_____
                                                 (SIGNATURE & TITLE)

| |
|---|
| Subscribed and sworn to before me this_____day of_____ , _____.<br><br>_____ My commission expires _____<br>Notary public |





<div style="text-align: right">

**JCC Job #381**
**Landwork Creations, LLC**

</div>

**CONTINUATION SHEET**

**APPLICATION AND CERTIFICATE FOR PAYMENT**
Containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

Application No. _____
Application Date: _____
Period To: _____
Architect's Project No. _____

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREV (D + E) | E THIS PERIOD | F MATERIALS CURRENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED & STORED TO DATE (D + E + F) | % (G / C) | H BALANCE TO FINISH (C – G)l | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**TRADE CONTRACTOR CERTIFICATION,**
### INDEMNIFICATION AND WAIVER OF LIENS

PROJECT:    <u>JCC Job #381</u>
          <u>SHREWSBURY MIDDLE SCHOOL - WEST</u>
          <u>45 Oak Street, Shrewsbury, MA 01545</u>

    In connection with the submissions of Application for Payment No. _____, this undersigned hereby:

1.    CERTIFIES to <u>JACKSON CONSTRUCTION COMPANY AND TOWN OF SHREWSBURY</u> that all laborers and all trade subcontractors, materialmen, services, machinery, equipment, insurance, and supplies ("work") to or through the undersigned on the above-captioned project have been duly paid for all said work, furnished up to and including the date of the previous Application for Payment ($ _____), and further certifies that all taxes and bills of any other descriptive title in connection with the work furnished for or through the undersigned up to the date of the previous Application for Payment have been made in full;

2.    WAIVES, relinquishes, and dissolves all rights to any lien upon the property, real estate, buildings, or improvements comprising the above-captioned project or upon which any work was performed or materials and equipment supplied up to date of the Previous Application for Payment.

3.    AGREES to indemnify and save harmless <u>JACKSON CONSTRUCTION COMPANY AND TOWN OF SHREWSBURY</u> their successors and assigns, from all liens (including without limitation, General Laws Chapter 254, Mechanics Liens and Internal Revenue Service Liens), claims and demands, and all expenses incurred, including attorney's fees and costs of defense for or on account of or in any way growing out of claims for payment for any work and any labor performed and material and equipment furnished to or through the undersigned in connection with the above captioned project.

    This certification, indemnification, and waiver of liens is made by the undersigned for the purpose of inducing <u>JACKSON CONSTRUCTION COMPANY AND TOWN OF SHREWSBURY</u> to make payment under the Application for Payment No. _____.

SIGNED AND SEALED this _____ day of _____ _____.

TRADE CONTRACTOR: <u>LANDWORK CREATIONS, LLC</u>

BY: _____

### COMMONWEALTH OF MASSACHUSETTS

_____ County, _____, _____

    Then personally appeared before me _____ and took oath that he/she is the duly elected _____ of _____ that the certifications made in the above paragraphs of the foregoing instrument are true, that the foregoing is his/her free act and deed and that of said company, and that he/she is duly authorized to execute, seal, and deliver this instrument on behalf of _____.

Notary public: _____ My commission expires _____.

ST-2 Certificate of Exemption

ST-2

## MASSACHUSETTS DEPARTMENT OF REVENUE

## CERTIFICATE OF EXEMPTION



Certification is hereby made that the organization herein named is an exempt purchaser under General Laws, Chapter 64H, Sections 5(d) and (e). All purchases of tangible personal property by this organization are exempt from taxation under said chapter to the extent that such property is used in the conduct of the business of the purchaser. Any abuse or misuse of this certificate by any tax-exempt organization or any unauthorized use of this certificate by any individual constitutes a serious violation and will lead to revocation. Willful misuse of this Certificate of Exemption is subject to criminal sanctions of up to 1 year in prison and $10,000 ($50,000 for corporations) in fines. (See reverse side).

TOWN OF SHREWSBURY
100 MAPLE AVENUE
SHREWSBURY, MA. 01545

EXEMPTION NUMBER E
046-001-300
ISSUE DATE
01/04/89
CERTIFICATE EXPIRES ON
NONE

NOT ASSIGNABLE OR TRANSFERABLE

COMMISSIONER OF REVENUE
STEPHEN W. KIDDER

ST-5C          Contractor's          Exempt          Purchase          Certificate

Form ST-5C

## THE COMMONWEALTH OF MASSACHUSETTS
### DEPARTMENT OF REVENUE
### SALES AND USE TAX BUREAU

---

## CONTRACTOR'S EXEMPT PURCHASE CERTIFICATE

---

To:   Seller's
      Name _____
      Address _____

   I hereby certify under the penalties of perjury that I am engaged in the performance of the following described contract for the construction, reconstruction, alteration, remodeling or repair of a building or structure for an exempt governmental agency or for a certified exempt organization; and that the following described quantities of building materials and supplies are being purchased for use exclusively in said contract:

Name of Exempt Agency
   or Organization _____**Town of Shrewsbury**_____

Address _____**100 Maple Avenue, Shrewsbury, MA 01545**_____

Exemption No. ____**046-001-300**____   Contract No. ____**JCC #381**____

Date of Contract ____**March 1, 2004**____   Est. Date of Completion ____**August 24, 2004**____

Location and Description of Project _____**JCC Job #381**_____

_____**Shrewsbury Middle School**_____

_____**45 Oak Street, Shrewsbury, MA 01545**_____

Description of Kind and Quantity of Property to be Purchased _____

_____**ALL MATERIALS**_____

To the best of my knowledge and belief, building materials and supplies used in said contract are exempt from the sales and use tax under the provision of Subsection 6 (f) of Section 1 of Chapter 14 of the Acts of 1966. I will maintain adequate records to show the disposition of all building materials and supplies purchased under this certificate. I hereby assume full liability for the payment of any use tax due in the event that the property purchased under this certificate is used for any other purpose.

Signature _____   Title ____**Chief Financial Officer**____
Name of Firm ____**JACKSON CONSTRUCTION COMPANY**____
Address _____**20 Dan Road, Canton, MA 02021**_____
Date ____**March 1, 2004**____   Registration No. ____**012 312 638**____

FORM 1972 HOBBS & WARREN, INC., BOSTON, MASS. 02101          THIS FORM APPROVED BY COMMISSIONER OF REVENUE

---

Landwork Creations, LLC  Subcontract 381-02-200

# EXHIBIT I

# COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

**(LS)**

CORPORATE LITIGATION
HARTFORD

APR 26 2005

*Landworks Creations, LLC*

RECEIVED PM

Plaintiff (s)

v.

*USF&O*

Defendant (s)

Superior Court
**Department of the Trial Court
of the Commonwealth
Civil Action**

No. **05-0647** *C*

)
)
)
)
)
)   **SUMMONS**
)
)
)
)

\*   To the above-named Defendant:

You are hereby summoned and required to serve upon *Robert N. Meltzer*
............................................................................................ plaintiff's attorney,
whose address is *P.O. Box 1459, Framingham MA 01701*...........................
an answer to the complaint which is herewith served upon you, within 20 days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgement by default will be taken against you for the relief demanded in the complaint.
You are also required to file your answer to the complaint in the SUPERIOR COURT
Department of the Trial Court at WORCESTER either before service upon plaintiff's
attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counter-
claim any claim which you may have against the plaintiff which arises out of the
transaction of occurrence that is the subject matter of the plaintiff's claim or you will
thereafter be barred from making such claim in any other action.

~~Barbara J. Rouse~~

Witness, S████████████████████, Esquire, at Worcester, the *11th*.........................
day of ...........*April*.................................in the year of ~~our Lord~~ two thousand and
............*05*....

*Francis A. Ford*

**Clerk**

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption.
   If a separate summons is used for each defendant, each should be addressed to that particular defendant.

TRUE COPY, ATTEST:

~~~~
DEPUTY SHERIFF

DATE *4-2-05*

PLEASE CIRCLE TYPE OF ACTION INVOLVED: TORT — MOTOR VEHICLE TORT —
CONTRACT EQUITABLE RELIEF — CH. 93A — MEDICAL MALPRACTICE — OTHER

\*      NOTICE TO DEFENDANT: You need not appear personally in court to answer the complaint, but
       if you claim to have a defense, either you or your attorney must serve a copy of your written
       answer within 20 days as specified herein AND also file the original in the Clerk's Office, Superior
       Court, Room 21.

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                          SUPERIOR COURT DEPARTMENT
                                        OF THE TRIAL COURT
                                        CIVIL ACTION NO:

LANDWORKS CREATIONS, LLC        )
                                )
Plaintiff                       )
                                )
v.                              )          VERIFIED COMPLAINT
                                )
UNITED STATES FIDELITY AND      )
GUARNTY COMPANY                 )
                                )
Defendant                       )

1. Plaintiff, Landworks Creations, LLC ("the Plaintiff") is a limited liability corporation
   with a principal place of business at 1500A Lafayette Road in Portsmouth in the State of
   New Hampshire.

2. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") is
   an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk
   County, in the Commonwealth of Massachusetts.

3. The Plaintiff entered into a contract with Standen Contracting Company, Inc. of North
   Dartmouth, Massachusetts.

4. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at
   the Shrewsbury Middle School ("the Project").

5. Standen Contracting Company, Inc. was bonded by the Defendant, United States Fidelity
   & Guaranty Co.

6. Standen Contracting Company, Inc. was unable to complete its work at the Project, and
   the Defendant, pursuant to its obligations under a performance bond SW5041 assumed

1

Case 4:05-cv-40072-FDS    Document 68-11    Filed 03/23/2007    Page 4 of 8
MAR-29-2005  17:01    OFFICES OF    P.02/04
Case 4:05-cv-40072-FDS    Document 29-2    Filed 04/03/2006    Page 4 of 8

responsibility for completion of the Project in the stead of Standen Contracting Company, Inc.

7.  The Plaintiff has performed it work under the Standen contract, and is owed funds by the Defendant for the work performed.

8.  The Defendant has failed to pay the Plaintiff for work performed at the Project, to the extent of $135,101.00.

## COUNT I
## BREACH OF CONTRACT

9.  The Plaintiff restates allegations 1-8 and incorporates them by reference.

10. The Defendant breached its contract by failing to perform its obligations to make payment under the bond between the Defendant and Standen for the benefit of the Plaintiff..

11. As a result of this breach, the Plaintiff has been denied its expectancy and has otherwise been harmed.

## COUNT II
## VIOLATION OF G.L. c. 93A and 176D

12. The Plaintiff restates allegations 1-11 and incorporates them by reference.

13. Notwithstanding that liability was reasonably clear, the Defendant has declined to make full settlement of the claim, without cause or excuse.

14. The Plaintiff has made demand for its funds, a demand which has been ignored.

15. As a result of this conduct, the Plaintiff has been harmed in its business.

WHEREFORE, the Plaintiff respectfully requests that:

2

1. this Honorable Court enter judgment against the Defendant as to all Counts;

2. this Honorable Court award the Plaintiff the amount of $135,101 together with interest and costs, trebled, along with attorney's fees; and

3. this Honorable Court award any further relief as deemed appropriate by this Court.


THE PLAINTIFF DEMANDS A TRIAL BY JURY


Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,


_____
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: March 29, 2005

3

Case 4:05-cv-40072-FDS    Document 68-11    Filed 03/23/2007    Page 6 of 8
MAR-29-2005  17:01        OFFICES OF                                    P.04/04
Case 4:05-cv-40072-FDS    Document 29-2    Filed 04/03/2006    Page 6 of 8

**VERIFICATION**

I, Neal Matthews, an officer of Landworks Creations, LLC and duly authorized to sign this document on behalf of the corporation, do hereby certify that I have reviewed the attached document, and that the facts contained herein stating the funds owed are true to the best of my knowledge and belief, and represent a true and accurate accounting of the funds due and owing to Landworks Creations, Inc.

Signed under the pains and penalties of perjury this 29th day of March, 2005

_Neal Matthews_
Neal Matthews

4

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                          SUPERIOR COURT DEPARTMENT
                                        OF THE TRIAL COURT
                                        CIVIL ACTION NO: 05-647C

LANDWORKS CREATIONS, LLC          )
                                  )
Plaintiff                         )
                                  )
v.                                )    PLAINTIFF'S FIRST
                                  )    REQUEST FOR PRODUCTION
UNITED STATES FIDELITY AND        )    OF DOCUMENTS FROM THE
GUARANTY COMPANY                  )    DEFENDANT, USF & G
                                  )
Defendant                         )


         Now comes the Plaintiff, Landworks Creations, LLC ("the Plaintiff") and requests that

Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") provide

the following documents pursuant to Mass. R. Civ. P. 34. If any document is deemed by the

Defendant to be subject to a privilege of any kind, request is made for the creation and provision

of a privilege log, containing specific information sufficient for the Plaintiff to understand the

nature of the document, the date of creation of the document, the creator of the document, the

recipient of the document and the general subject matter of the document:


Request 1: A complete copy of the USF & G claim file demonstrating the independent

investigation by USF & G of the claim made by Landworks against the surety bond on or about

March 17, 2005, including, but not limited to correspondence, e-mails, photographs, memoranda,

documents received and, documents provided, that formed the basis of USF & G's denial of the

Plaintiff's claim for funds owed on the Shrewsbury project referenced in the Plaintiff's

Complaint.

<div align="center">1</div>

Request 2: A copy of the contract between USF & G and Jackson Construction for the

Shrewsbury Project referenced in the Plaintiff's Complaint.

Request 3: Copies of invoices and requisitions tendered by Jackson to USF & G with regard to

the Plaintiff's work, and any documents that reference payment, or failure to make payment, to

the Plaintiff for its work.

Request 4: Copies of any and all correspondence in the possession of the Defendant between any

party or parties that in any way references, evidences, relates to or refers to the Plaintiff's work

at the Shrewsbury project, including correspondence to and from Jackson, to and from the

Defendant, and to and from the town of Shrewsbury, its agents, employees, construction

managers, clerks of the work, servants or assigns.

Request 5: Copies of any and all change orders that in any way relate to the Plaintiff's work at

the Project.

> Respectfully Submitted,
> **Landworks Creations, LLC**
> By its attorney,
>
> _____
> Robert N. Meltzer, BBO #564745
> PO Box 1459
> Framingham, MA 01701
> Phone: (508) 872-7116

Dated: April 11, 2005

2

# EXHIBIT J

Page 18

1    Q.  For what reason?

2    A.  To see if they were completed or not.

3    Q.  Okay.  What else did you do?

4    A.  I was tasked with reviewing the condition

5    of the site.

6    Q.  Meaning what?

7    A.  See what work remained.

8    Q.  What else did you do?

9    A.  Reviewed drawings.

10   Q.  What else?

11   A.  I reviewed some of the documents that were

12   in the office that we were given.

13   Q.  Where did those documents come from?

14   A.  I don't know.

15   Q.  Where was that office?

16   A.  In the school.

17   Q.  Did you talk to the project architect in

18   that first couple months?

19   A.  Yes.

20   Q.  Who was the project architect?

21   A.  Katie.  I forgot her last name.

22   Q.  Crockett?

23   A.  Yes.

24   Q.  What did you talk to her about?

Page 40

1    Q. Was there another e-mail on the morning of

2    August 18th, between you and Al Falango?

3    A. I don't recall.

4    Q. Did you have a telephone conversation with

5    Al Falango on the morning of the 18th?

6    A. I don't recall.

7    Q. When he talks about "the misinformation

8    this morning," you don't know what that refers to?

9    A. I don't remember.

10    Q. During these two or three days, August

11    17th, 18th, when this conversation was transpiring,

12    did anybody involved in the series of conversations

13    ever state there were any deficiencies in the work

14    performed by Landworks?

15    A. Repeat.

16    Q. During these two days, between all this

17    correspondence between various people, did anybody

18    ever state that there had been any deficiencies on

19    the work done by Landworks under Jackson?

20    A. I don't remember.

21    Q. In your experience at Lovett-Silverman and

22    other particular companies you worked for, is it

23    common procedure, once a contractor is in default,

24    for subcontractors not to return to the work until

Page 41

1  they are ratified?

2      A.  Repeat, please.

3              (Pending question read back.)

4      A.  Yes.

5      Q.  Who is William Werner?

6      A.  I don't know.

7      Q.  Look at the second page of No. 55 for a

8  moment.

9      A.  Okay.

10     Q.  This, you will notice, is the same e-mail

11  as we've already had on Page 1.  You will notice at

12  the bottom it seems to be blacked out.  Do you see

13  that?

14     A.  Yes.

15     Q.  Do you know who blacked that out?

16     A.  No.

17     Q.  Have you ever talked to anybody about why

18  that might be blacked out?

19     A.  No.

20              (Short recess taken.)

21     Q.  If you would take a look at that.  Does

22  this look familiar to you?

23     A.  Yes.

24              MR. MELTZER:  For the record, I'm

1    list?

2        A.   I made a list of items which needed to be

3    completed during my walk-through of the site and

4    review of the plans.

5        Q.   What did that list look like?

6        A.   Rephrase.

7        Q.   You said there is a list.  A physical list?

8        A.   Yes.

9        Q.   Was it handwritten?

10       A.   No.

11       Q.   Typed?

12       A.   Yes.

13       Q.   Was it typed after your visit to the site?

14       A.   Yes.

15       Q.   When is the last time you saw that list?

16       A.   I don't know.

17       Q.   Do you maintain files in Pennsylvania, your

18   home, on this project?

19       A.   Yes.

20       Q.   Do you provide copies of what is in your

21   personal possession to the home office in New York?

22       A.   No.

23       Q.   This list that you have, where would that

24   list be filed?

Page 50

A.  Weeds.  Predominantly weeds.

Q.  No evidence something had been planted?

A.  No.

Q.  This may have been work to be completed as opposed to remedial?  You are not saying the work that was done had to be ripped up and redone?

A.  The lawns.

Q.  The islands?

A.  Sure it had to be ripped up, what I saw.

Q.  The next sentence, "I will look at Landworks' scope and make a list,"  did you look at Landworks' scope?

A.  Yes.

Q.  How did you look at Landworks' scope?

A.  I looked at the exhibit with their subcontractor.

Q.  Whose subcontractor?

A.  The subcontract between them and Jackson.

Q.  What subcontract?  What does it look like?

A.  Please rephrase.

Q.  Tell me physically what that contract looks like.  Can you describe what that contract was?  No idea?

A.  It's a subcontract.

Page 56

1   to the one that was sent to you from Al Falango,

2   right, so we're on the same time frame?

3              MR. HIPP:  You are wanting to

4   compare 58 and 34?

5              MR. MELTZER:  Let's look at 57.

6   Q.  You have this 8:09 e-mail?

7   A.  Yes.

8   Q.  This was sent obviously shortly before the

9   one was sent by Al Falango at 8:14 AM, so we're

10  clear on the time frame?

11  A.  Yes.

12  Q.  Your comment, "We checked with surety and

13  we were told we cannot deal with Landworks while the

14  legal case is pending," correct?

15  A.  Correct.

16  Q.  Now we're going to look at 34 for a moment.

17  The message that was sent, it says, "We are

18  presently a defendant in a legal action brought by

19  your company."

20  A.  I see.

21              MS. BROWN:  To clarify, let's go

22  off the record.

23              (Discussion off the record.)

24  Q.  On Exhibit 34, that's an e-mail from you to

# EXHIBIT K

**To:** 'Neal H. Matthews'
**Sent:** Thursday, August 18, 2005 9:10 AM
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,
I can meet with you Tuesday or Wednesday of next week.   Let me know if 9:00 AM either day will work for you.

Robert J. Bullock, PE
Lovett Silverman Construction Consultants Inc.

Phone: 717-796-9595
Fax:    717-766-1715
Cell:    717-422-7518

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Wednesday, August 17, 2005 6:07 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Bob,
    Thank you for taking the time to talk with me.  The amount of paper work I have with back up is such that transmittal through e-mail or fax may not go through without some interruption.  Jackson Construction Co. had all of this information and should have passed it on to St. Paul.  I would like to meet with you and see if we can resolve this in a manner that would be to the advantage of St. Paul and myself.  Delayed payment and non-payment started in August of 2004 by Jackson and after many months of calls to them and St. Paul I needed to protect my rights under Massachusetts law.  This is the only reason that I have filed suit.  I have always preferred to have been paid what is owed to me, (Landworks Creations, LLC) and complete this project.  I feel that I can do this more cost effective than if you have to hire another contractor.  I can make copies of all paper work and bring them with me when we meet.  I will put together an overview of the complete amount owed in the format you have sent to me.  You may contact me with any questions or comments.


Thank you,
Neal H. Matthews
Landworks Creations, LLC

    ----- Original Message -----
    **From:** Robert Bullock
    **To:** lonewolf@maine.rr.com
    **Sent:** Wednesday, August 17, 2005 2:42 PM
    **Subject:** Shrewsbury Middle School - Data required for Financial Analysis

Neil,
Here is the text from the letter we send out for the Data required to get started on the ratification:

LSCC is consultant to the St. Paul in connection with the completion of work on the above referenced project.  We anticipate work at the site to proceed again immediately and the job to move forward to

2/9/2007

completion as expeditiously as possible. Jackson Construction Corp will be replaced by G & R Construction, Inc. and future direction of this project will be managed by them.

Please provide the following information to start developing your ratification agreement:

1) Original Contract Amount.
2) Change Orders to the Original Contract.
3) Credit Change orders to Original Contract.
4) Value of Work performed to date or Approved Material Stored at Site.
5) Total Payments Received from Standen and Jackson.
6) Retainage Held to Date.
7) Outstanding Balance.
8) Last Invoice Paid
9) Last Invoice Submitted but not Paid, if any

If you have any questions or comments concerning the above or require anything further in connection with this claim, please give me a call, I can be reached at the following numbers:

Cell  717 422 7518           Fax  717 766 1715

Robert J. Bullock, PE

Lovett Silverman Construction Consultants Inc.
19 Goldenrod Drive
Carlisle, PA  17013

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518
Web Site: Lovett-Silverman.com

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

2/9/2007

# EXHIBIT L

**Julie Ciollo**

| | |
|---|---|
| **From:** | Al Falango [afalango@lovett-silverman.com] |
| **Sent:** | Wednesday, August 17, 2005 3:00 PM |
| **To:** | 'Fuller,Russell W'; 'Peters Jr,James Michael' |
| **Cc:** | 'Robert Bullock' |
| **Subject:** | Shrewsbury – Landworks |

EXHIBIT

113

Russ

The president of Landworks called  LSCC and expressed an interest in being ratified.   Should we pursue this guy , I know you have issues with him.

# EXHIBIT M

## Julie Ciollo

| | |
|---|---|
| **From:** | Peters Jr,James Michael [JPETERS@stpaultravelers.com] |
| **Sent:** | Thursday, August 18, 2005 10:49 AM |
| **To:** | Al Falango; Fuller,Russell W |
| **Cc:** | Robert Bullock; bcarver@hinshawlaw.com; Werner,William R |
| **Subject:** | RE: Shrewsbury - Landworks |

We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G. The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

By copy of this email to Brad Carver, I am giving him notice of this issue.


James M. Peters, Jr.
St Paul Travelers Bond Claim
One Tower Square  - 4 PB
Hartford, CT 06183

Tel:  (860) 954-6497
Fax: (860) 277-5722
Email: james.m.petersjr@stpaultravelers.com

-----Original Message-----
**From:** Al Falango [mailto:afalango@lovett-silverman.com]
**Sent:** Wednesday, August 17, 2005 3:00 PM
**To:** Fuller,Russell W; Peters Jr,James Michael
**Cc:** 'Robert Bullock'
**Subject:** Shrewsbury - Landworks


Russ

The president of Landworks  called  LSCC and expressed an interest in being ratified.   Should we pursue this guy , I know you have issues with him.

3/22/2007

# EXHIBIT N

## Julie Ciollo

**From:**   Robert Bullock [rbullock@lovett-silverman.com]
**Sent:**   Friday, August 19, 2005 8:09 AM
**To:**   'Neal H. Matthews'
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,

We checked with the Surety and we were told that we can not deal with Landworks while the legal case is pending.

Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Thursday, August 18, 2005 3:35 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Either day will be find to meet.  Let me know what day will be best for you and I'll be down at 9:00am.  I assume the best place would be at the school so we can go over what has to be done to finish the work.

Thank you,
Neal H. Matthews

> ----- Original Message -----
> **From:** Robert Bullock
> **To:** 'Neal H. Matthews'
> **Sent:** Thursday, August 18, 2005 9:10 AM
> **Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis
>
> Neal,
> I can meet with you Tuesday or Wednesday of next week.   Let me know if 9:00 AM either day will work for you.
>
> Robert J. Bullock, PE
> Lovett Silverman Construction Consultants Inc.
>
> Phone: 717-796-9595
> Fax:   717-766-1715
> Cell:  717-422-7518
>
> The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

3/22/2007

# EXHIBIT O

## Julie Ciollo

**From:**     Robert Bullock [rbullock@lovett-silverman.com]
**Sent:**     Friday, August 19, 2005 4:36 PM
**To:**       'Neal H. Matthews'
**Cc:**       'Fuller,Russell W'
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,

We are willing to continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys.

Thanks.
Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Friday, August 19, 2005 9:45 AM
**To:** Robert Bullock
**Cc:** Rob N. Meltzer
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Mr. Bullock,
    I'm sorry to hear that.  I felt that I could have provided information and service to St. Paul that would have saved them expense in completing the project.  There were many things in the actions of Town of Shrewsbury and Jackson Construction Company that should have been corrected before the project moved forward.  It is unfortunate that the surety did not respond to my and my lawyers numerous inquiries concerning Jackson's refusal to pay for work that was requested and completed.  Much of the work was billable to the Town of Shrewsbury.  They had requested the work to be done and as of my last contact with them, they had not been billed by Jackson or the surety for the work.  I guess that when people become entrenched in certain mind sets they can not see the benefit of just talking to resolve problems.  The Town of Shrewsbury would have no incentive to have me come back as they will benefit from having work completed in which they think they will not have to pay for.  As for St. Paul continuing to not address my legitimate concerns, it shows me they still are acting in bad faith.  It's sad that individuals can not step back from the overall picture and have a meaningful discussion based on respect of each other's positions.

Respectfully,
Neal H. Matthews
| ----- Original Message -----
| **From:** Robert Bullock
| **To:** 'Neal H. Matthews'
| **Sent:** Friday, August 19, 2005 8:09 AM
| **Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,

We checked with the Surety and we were told that we can not deal with Landworks while the legal case is pending.

Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Thursday, August 18, 2005 3:35 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Either day will be find to meet. Let me know what day will be best for you and I'll be down at 9:00am. I assume the best place would be at the school so we can go over what has to be done to finish the work.

Thank you,
Neal H. Matthews

----- Original Message -----
**From:** Robert Bullock
**To:** 'Neal H. Matthews'
**Sent:** Thursday, August 18, 2005 9:10 AM
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,
I can meet with you Tuesday or Wednesday of next week. Let me know if 9:00 AM either day will work for you.

Robert J. Bullock, PE
Lovett Silverman Construction Consultants Inc.

Phone: 717-796-9595
Fax:   717-766-1715
Cell:  717-422-7518

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Wednesday, August 17, 2005 6:07 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Bob,

Thank you for taking the time to talk with me.  The amount of paper work I have with back up is such that transmittal through e-mail or fax may not go through without some interruption.  Jackson Construction Co. had all of this information and should have passed it on to St. Paul.  I would like to meet with you and see if we can resolve this in a manner that would be to the advantage of St. Paul and myself.  Delayed payment and non-payment started in August of 2004 by Jackson and after many months of calls to them and St. Paul I needed to protect my rights under Massachusetts law.  This is the only reason that I have filed suit.  I have always preferred to have been paid what is owed to me, (Landworks Creations, LLC) and complete this project.  I feel that I can do this more cost effective than if you have to hire another contractor.  I can make copies of all paper work and bring them with me when we meet.  I will put together an overview of the complete amount owed in the format you have sent to me.  You may contact me with any questions or comments.


Thank you,
Neal H. Matthews
Landworks Creations, LLC


----- Original Message -----
**From:** Robert Bullock
**To:** lonewolf@maine.rr.com
**Sent:** Wednesday, August 17, 2005 2:42 PM
**Subject:** Shrewsbury Middle School - Data required for Financial Analysis

Neil,
Here is the text from the letter we send out for the Data required to get started on the ratification:

LSCC is consultant to the St. Paul in connection with the completion of work on the above referenced project.  We anticipate work at the site to proceed again immediately and the job to move forward to completion as expeditiously as possible. Jackson Construction Corp will be replaced by G & R Construction, Inc. and future direction of this project will be managed by them.

Please provide the following information to start developing your ratification agreement:
1)  Original Contract Amount.
2)  Change Orders to the Original Contract.
3)  Credit Change orders to Original Contract.
4)  Value of Work performed to date or Approved Material Stored at Site.
5)  Total Payments Received from Standen and Jackson.
6)  Retainage Held to Date.
7)  Outstanding Balance.
8)  Last Invoice Paid
9)  Last Invoice Submitted but not Paid, if any

If you have any questions or comments concerning the above or require anything further in connection with this claim, please give me a call, I can be reached at the following numbers:
        Cell  717 422 7518                Fax  717 766 1715

Robert J. Bullock, PE

Lovett Silverman Construction Consultants Inc.
19 Goldenrod Drive
Carlisle, PA  17013

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518
Web Site: Lovett-Silverman.com

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

# EXHIBIT P

\*\*\*\*\*\*\*\*\*\*\*\*\* -COMM. JOL. IL- \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* DATE AUG-30-2005 \*\*\*\*\* TIME 16:14 \*\*\* P.01

MODE = MEMORY TRANSMISSION          START=AUG-30 16:13      END=AUG-30 16:14

FILE NO.= 106

| STN NO. | COM | ABBR NO. | STATION NAME/TEL.NO. | PAGES | DURATION |
|---------|-----|----------|----------------------|-------|----------|
| 001 | OK | ☎ | 16172137001 | 004/004 | 00:01'16" |

-LAW OFFICES OF

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* -ROBERT MELTZER - \*\*\*\* -                     - \*\*\*\*\*\*\*

**ROBERT N. MELTZER**
ATTORNEY AT LAW
P.O. Box 1459
FRAMINGHAM, MASSACHUSETTS 01701

(508) 8/2-7116
fax (508) 872-8204

robrmeltzer@aol.com

August 30, 2005

Hinshaw & Culbertson
One International Place
Boston, MA 02110
Attn: Brad Carver, Esq.
BY FAX 617-213-7001

Re:   Landworks Creations, LLC v. USF & G
      Civil Action No: 05-40072-FDS

Dear Brad:

Please find enclosed the e-mails we discussed.

My client and I are prepared to meet at any time to do what is necessary to secure
payment and get my client back to work.

Very truly yours,

Robert N. Meltzer

Cc:   client

**Robert N. Meltzer**
*Attorney At Law*

February 15, 2007

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02110
Attn: Eric C. Hipp Esq.
BY FAX 617-728-0052

Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, MA 02210
Attn: Julie Ciollo, Esq.
BY FAX 617-406-4501

         Re:    <u>Landworks Creations, LLC v. USF & G</u>
                Civil Action No: 05-40072 -FDS

Dear Counsel:

        I am enclosing a letter from my files which you may not have seen.

        I did notice that this letter was not included in the USF & G documents that Eric's
office made available for inspection and copying.

        The e-mails referenced in the letter would be the chain of e-mails that we have
marked at numerous depositions.

        Thank you.

                                          Very truly yours,

                                          Robert N. Meltzer

Cc:     client

P.O. Box 1459
Framingham, MA 01701
508.872.7116
robmeltzer@aol.com

**The Mountain States Law Group**
COLORADO · MASSACHUSETTS · UTAH
IDAHO
info@mountainstateslawgroup.com

# EXHIBIT Q

## Julie Ciollo

**From:**    Al Falango [afalango@lovett-silverman.com]

**Sent:**    Wednesday, September 21, 2005 9:08 AM

**To:**      'Tony Lardaro'; 'Robert Bullock'

**Cc:**      'Bill Meritz'; awerth@lovett-silverman.com

**Subject:** Shrewsbury CTC

On the Shrewsbury CTC

The C/O logs lists all c/o's as pco's are they approved change orders or still pco's

Bill Meritz had mentioned a slew of potential c/o's for work done by JCC for the town under protest, (Tony wants AJ to pick this up) should we make mention of these potential receivables even if we cant put a number on them.

I dont think the 825k is enough for the contingency we already know we have busts in the track work, site work , electric (major), roofs and doors (major) even though the town is holding money I still think we could possibly break the 800k mark with these, we've already spent 400k on G and R for one month and we still dont have checks for the subs. We can try to bang the subs but I think that we can never recover from them what we are spending.

# EXHIBIT R

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| LANDWORKS CREATIONS, LLC. | ) C.A. NO.05-CV-40072 FDS |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY AND GUARANTY | ) |
| COMPANY and | ) |
| LOVETT-SILVERMAN CONSTRUCTION | ) |
| CONSULTANTS, INC. | ) |
| | ) |
| Defendants | ) |
| | ) |

**PLAINTIFF LANDWORKS, LLC.'S SUPPLEMENTAL ANSWERS TO
DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.'S
FIRST SET OF INTERROGATORIES TO PLAINTIFF**

**INTERROGATORY NO. 1:**

Identify the individual signing the interrogatories.

Answer 1: Neal H. Matthews, of Landworks Creations, LLC.

**INTERROGATORY NO. 2:**

In preparing your answers to these interrogatories, did you make such inquiry of your attorney or other representatives, and review your records in such a manner to enable you to make full and true answers and, if so, identify by name, the present address of, each person consulted and each document reviewed in preparing your answers to these interrogatories.

Answer 2: Objection. The Plaintiff objects to this interrogatory in that it specifically seeks to invade the attorney/client privilege, and is otherwise not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Answer 2. I spoke only to my attorney. Since the date of the initial answers, I have also spoken to William Gallagher, of 1 Homestead Drive, Medfield, who will likely be serving as Landworks Creations, LLC's expert witness. I have reviewed my own business records, as well as records provided by USF & G, Lovett-Silverman, and the project architect. My understanding is the some of the records of the project architect may have included records from the town of Shrewsbury. I have also reviewed deposition transcripts of individuals of Lovett-Silverman and the project architect. I have also re examined certain pleadings in this case, including the Complaint, the Amended Complaint and the Counterclaim. I have also reviewed photographs of the site.

## INTERROGATORY NO. 3:

With respect to each person you or your attorney expect to call as an expert witness at trial, state the name and address of each such expert witness; the subject matter on which each such expert is expected to testify; the facts and opinions as to which each such expert is expected to testify; and a summary of the grounds for each such opinion.

Answer: The Plaintiff has not yet determined who it intends to call as an expert witness and reserves the right to supplement this answer in a timely manner.

Supplemental Answer: The Plaintiff is likely to call William Gallagher as its expert witness. Mr. Gallagher is a construction manager of substantial experience, and knowledge of the local construction industry. He has extensive knowledge of public construction practices and policies, as well as means and methods. He is expected to testify as to these areas, and he is expected to testify as to the numerous ways that the defendants in these cases violated the practices and policies, as well as the means and methods usually employed in bringing public construction projects to completion. He is expected to testify as to the rights that Landworks identifies in Supplemental Answer 7, and the industry practice with regard to how owners, contractors and consultants generally behave with regard to rights and obligations of the parties, and that both the Surety and Lovett-Silverman disregarded those rights. He is expected to further testify that in his experience the concept of "banging" the subcontractors means the practice of refusing, in bad faith, to pay subcontractors, forcing them to file suit, to compromise valid claims as a business decision, to delay payment or, in an ideal circumstance, hope that the subcontractor cannot afford to pursue a claim, or goes out of business before payment can be made. Mr. Gallagher has been reviewing the documents in this case, including the deposition transcripts, the plans and specifications. At this juncture, several deposition transcripts, including the deposition transcript of USF & G, is not available for Mr. Gallagher's inspection and review. Consequently, he has not yet finalized his conclusions and opinions, which he expects to do shortly after the transcript is received. This answer will be further supplemented shortly, as the transcript of the USF & G representative is expected shortly.

## INTERROGATORY NO. 4:

List the name, address, professional background, and/or occupation of each and every expert whom Landworks does not expect to call at trial, but whom Landworks has retained or specifically employed in anticipation of the instant litigation or in preparation for trial of this action.

Answer: The Plaintiff has not yet determined who it intends to call as an expert witness and reserves the right to supplement this answer in a timely manner.

## INTERROGATORY NO. 5:

State the basis of your claim in paragraph 12 of your Amended Complaint that Lovett-Silverman strong-armed subcontractors, by defining the term "strong-arm" and identifying, with particularity, "strong-arming" behavior engaged in by Lovett-Silverman, and identifying specifically each subcontractor so affected by each alleged act of "strong-arming."

Answer: The Plaintiff relies upon statements explicitly made by Lovett-Silverman agents and employees in e-mails provided to the Plaintiff, and referenced specifically in the document request served on Lovett-Silverman. Lovett-Silverman's own employees and agents concede that there was insufficient funds to pay the subcontractors, and Lovett-Silverman's own employees and agents talked about "banging" the subcontractors. Lovett-Silverman's own employees and agents colluded with USF & G on the false charge of abandonment, and in the false filing of a counterclaim by providing information that was knowingly false—for example, passing off work that was not within the scope of Landworks as the scope of Landworks, and by otherwise lying to Landworks as to why Landworks was not being permitted to return to the site. It appears that Lovett-Silverman engaged in this same conduct with the other subcontractors mentioned in the Lovett-Silverman e-mails. In short, the e-mail record confirms that Lovett-Silverman and USF & G were banging the subcontractors, which the Plaintiff construes as "strong-arming." The Plaintiff looks forward to hearing an innocuous explanation for why banging subcontractors and aiding the filing of false lawsuits is not "strong-arming." The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its discovery requests and produces long-overdue documents.

## INTERROGATORY NO. 6:

Please identify each right that you allege, in paragraph 12 of the Amended Complaint, Lovett-Silverman denied the subcontractors, and identify the contractual basis for each right.

Answer: Landworks, LLC had a legal right to complete its work pursuant to its ratification agreement with USF & G. Lovett-Silverman clearly interfered in that right.

## INTERROGATORY NO. 7:

3

Please identify each subcontractor that you allege, in paragraph 12 of the Amended Complaint, was denied rights by Lovett-Silverman and set forth the specific rights denied by each such subcontractor.

Answer: The subcontractors were, in part, identified in the Plaintiff's document requests. The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its own discovery requests by producing long-overdue documents.

Supplemental Answer: Landworks Creations, LLC first became aware of the possibility that the Surety was acting in bad faith toward its subcontractors from someone, who I cannot recall, who worked for the town of Shrewsbury. Landworks ultimately saw an e-mail from Al Falango of Lovett-Silverman to Tony Lardaro and Robert Bullock at Lovett-Silverman dated September 21, 2005 in which it was discussed that "we can try to bang the subs but I think that we can never recover from them what we are spending." In the construction community in Massachusetts, this phrase has a very definite meaning.

The phrase indicates that, based upon the shortage of funds identified in the same September 21, 2005 e-mail ("I don't think the 825k is enough for the contingency…"), the Surety, by its consultant, is going to stonewall payment to subcontractors, forcing them to either accept deep discounts in order to file suit, or by forcing them to file suit in the hope that the subcontractor will discount the amount owed to avoid litigation costs, or in the hope that false backcharges will gain traction in litigation, or that the subcontractor will cease to go out of business without every getting payment. The phrase at the end, referring to recovering funds, further suggests a plan to file false counterclaims to make the subcontractors either reduce their claims, or pay for the cost overruns on the project.

It has now been confirmed by James Peters of USF & G that at least 20 subcontractors were required to file suit, including Coughlin Electric, ESCOA, Landworks, Kitridge Equipment. Century Drywall, Dadario, All State Steel and Steelco. Landworks has also heard of suits by the carpet installer, and by K & K, the records of which are available at the Worcester Superior Court. In addition, the employee from Shrewsbury suggested that KMD Mechanical was required to reduce the amounts it was owed in order to get paid.

On a project of approximately $14,000,000, it thus appears that almost every subcontractor was required to file suit, or to compromise legitimate claims in order to be paid. The substantial number of suits and claims confirms that Lovett-Silverman and the Surety moved forward to "bang" the subcontractors. The frivolous counterclaim filed against Landworks indicates an operation attempt to bang Landworks and get money back.

Counsel for Century Drywall has informed the Plaintiff that USF & G's conduct in responding to its suit has also been heavy handed and clearly delay-oriented. Indeed, USF & G simply failed to respond to discovery, and was put in to default.

Landworks has worked with the Zilioli family for a number of years. It has been the understanding of Landworks in 2005 that one of the Zilioli companies, perhaps Framingham Excavating, was a party to a case in which the Massachusetts court specifically ruled that

subcontractors on a public job, including site contractors, have a right to suspend work pending payment, and that a contractor is not obligated to continue incurring costs when it is not being paid. It is Landworks' understanding that a subcontractor has a right to do this without being declared to have "abandoned" the work. Since this is an important part of construction law, Landworks has assumed and inferred that USF & G and Lovett-Silverman understand this as well. Landworks therefore infers that the insistence by Lovett-Silverman and USF & G in the Counterclaim that Landworks abandoned the job is a deliberately false effort to distort the facts and deny Landworks its rights under the law.

It is also the Plaintiff's understanding that a subcontractor has the "right" to a termination letter, or some kind of communication expressing the position of the other contracting party. It is my understanding from years of work that a subcontractor is entitled to be paid money owing to it if it is terminated for the convenience of the owner of contractor, and that the subcontractor is entitled to the profit and overhead. It is also the Plaintiff's understanding that, because the ratification agreement was not terminated, the failure of the Surety and USF & G to either terminate the contract, or behave with good faith, violated Landworks' rights. This inference is drawn from all of the e-mails, especially the "bang" the subcontractor e-mail, the August 2005 correspondence pertaining to a meeting with Landworks, and the January-February e-mail in which the false and frivolous Counterclaim was created.

It is Landworks belief that each subcontractor has a right to payment for the work completed by the subcontractor, and to be treated in decent and respectful manner. Massachusetts state law also requires that claims be investigated in a responsible and reasonable manner, and to be free from defamatory conduct about their work. The fact that more than 20 subcontractors had to file suit or fight for their money to protect their rights indicates that individual subcontractors were not at fault, but rather that there was a systematic effort, evidenced by the September 21, 2005 e-mail, to deny them their rights to payment, reasonable settlement of claims and the right to be free from unfair and deceptive trade practices conducted for the purposes of saving money for the Surety.

Landworks believes that it has a right, as a subcontractor on a public project, to have a reasonable investigation performed by the Surety's construction consultant to ascertain the scope of work, and to provide an opportunity to return to that work unless good cause is shown. Substantial e-mail traffic indicates that Lovett-Silverman breached that obligation. For example, an e-mail dated January 16, 2006 from Bill Meritz to Robert Bullock of Lovett-Silverman refers to Frias Concrete, and notes that "they were probably a sub to Landworks." In fact, Frias was a sub to Jackson Construction. Another e-mail of September 26, 2005 from Bill Meritz to Robert Bullock confirms that no reasonable investigation was being performed by Lovett-Silverman. In that e-mail, it is confirmed that the sole method of investigating the scope of Landworks Creations, LLC's scope was reading certain contracts. This evidence has confirmed, by oral testimony of Lovett-Silverman officials and the Surety, that neither Lovett-Silverman nor the Surety, spoke to the town, the project architect, the landscape architect or the clerk of the works, or even the parties to those contracts, to understand the scope of the Landworks contract. These e-mails confirm, along with the testimony, that the Plaintiff's right to a reasonable investigation and fair treatment was completely disregarded.

This issue continues throughout this case; Lovett-Silverman and the Surety continue to allege that Landworks did not perform its work adequately and in a workmanlike manner. However, this position has been determined to be false. An e-mail from Katie Crockett, the project architect, to Bill Meritz, dated February 1, 2006, confirms that the site work was not completed, not that it was deficient in scope by each subcontractor. Indeed, the e-mail referenced demonstrates an inability of the project architect to identify deficiencies as to Landworks specifically just prior to the Surety filing a Counterclaim stating the contrary. Continuing efforts by the Surety and Lovett-Silverman to elevate punch-list items to defective work is an ongoing act of fraud against Landworks.

Landworks also believes that every subcontractor is entitled to a uniform and consistent method of addressing claims. Various e-mails confirm that Lovett-Silverman was operating with different methodologies, creating further unfairness in the process. Am e-mail from Bill Meritz to Al Falango dated September 8, 2005, demonstrates the unevenness, stating that some sub-contractors were allowed back without ratification. An e-mail of September 15, 2005 from Bill Meritz to Al Falango discusses the uneven ratification process. Another example of discriminatory unevenness was found in an e-mail from Jason Goodwin to a number of individuals on September 15, 2005 in which it was noted that some contractors who were not on site due to non-payment were being ratified and returned to work, while the Surety has used the same issue by Landworks to declare "abandonment." Deposition Exhibit 33 indicates that Lovett-Silverman and the Surety were uneven and inconsistent in their decisions as to whether or not they would speak to claimants and their attorneys—no one has been able to provide a comprehensive explanation as to why these entities could speak freely to Steelco, but not to Landworks.

On this same topic, the Plaintiff notes that USF & G's attorney spent nearly two days of deposition time walking through Landworks' change orders, scope of work and theory of payment. Landworks notes that this was the kind of conversation that Landworks intended to have with Lovett-Silverman in August of 2004. In the same July 18, 2005 e-mail from Al Falango to Robert Bullock in which Rick talks about his "f-in vacation," it is noted that Lovett-Silverman was struggling to find a new site contractor. Landworks was ready, willing and able to perform the work on the project. All that was necessary to get Landworks back to work was a good faith attempt to resolve the outstanding payment issue. The fact that a desperate consultant wouldn't talk to Landworks, notwithstanding that no one had specifically stated deficiencies in Landworks' ability to perform, infers that the key obstacle, payment, was the basis for lack of communication and refusal to speak. This particular e-mail demonstrates that a decision had been made not to talk to Landworks because Landworks would have required funds to return to work.

In regard to the same issue, Landworks learned through the deposition of James Peters that the Surety has no written policies or guidelines for handling surety claims, and does not provide training seminars to its claims adjustors to ensure a predictable and even and consistent method of claim adjudication. The subcontractors, who are beneficiaries of these payment and performance bonds, have every right to expect that their claims will be handled in a uniform and predictable manner that ensures fairness and even handedness, and does not result in ad hoc conduct that appears extortionists or discriminatory.

Landworks also believes that every subcontractor is entitled to honesty from the Surety and its consultant. Deposition exhibits 34, 55 and 58 show that Lovett-Silverman was being dishonest to Landworks in its explanation as to why Lovett-Silverman would not meet with Landworks. These e-mails demonstrate that USF & G requested that Lovett-Silverman inform Landworks that the issues should be addressed between counsel. Instead, Lovett-Silverman told Landworks (August 17, 2005) that "he will have to drop his law suit" if Landworks wished to be ratified. The response from Al Falango that same day, "don't do that if you haven't done it already" demonstrates that even Al Falango recognized the extortionist flavor in the prior e-mail. In any event, Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly extortionist conduct in attempting to dangle payment with a precondition of waiving legal rights under G.L. c. 149 §29. This also violated the Plaintiff's rights, and may even have been criminal in nature.

The Plaintiff believes that it, like every other subcontractor, has the right to a speedy and fair trial in the Superior Court under the law. Landworks believes that in agreeing to come to Massachusetts to engage in public construction work, it has submitted to the jurisdiction of the state court identified in the law, and that the Surety has equally accepted that jurisdiction. The Superior Court seems to have an expertise in these matters, and handles them routinely. The Plaintiff notes that this case has been substantially slowed by several elements. First, although over twenty lawsuits have been filed in the Middle School project, USF & G decided, apparently, only to remove this case to the federal court. Also, USF & G has admitted that it had four different law firms on this case, serially. Since USF & G wouldn't admit why it fired three experienced Boston firms, the jury can infer, if it wishes, that USF & G moved this case around until it found a lawfirm willing to file the counterclaim that was apparently so frivolous. The Plaintiff bases its inference from the testimony of James Peters and the e-mails from February and January of 2006 in which the counterclaim was being concocted, and from the fact that this case was so singled out for different treatment, implying a greater need for delay while a counterclaim was fabricated. The facts suggest to Landworks that there was no legitimate basis for a counterclaim when the suit was originally filed.

The Plaintiff believes it has a legal right to know the basis of a counterclaim against it so that it may question witnesses and prepare a defense. The fact that the Surety's own representative could not even identify the contract which, it was alleged, had been breached, demonstrates and infers that the Counterclaim has never had any merit.

Finally, the Plaintiff believes that it has a right to treated respectfully and with dignity and respect. The e-mail traffic that has been produced indicates that Lovett-Silverman were nothing more than the Surety's foul-mouthed thugs, operating as on-the-ground hatchet men. Aside from the language about "banging" the subcontracts, Landworks finds it significant that Al Falango of Lovett-Silverman would send an e-mail dated July 18, 2005 to Rick Noblet referring to "my F-in vacation." On August 17, 2005, Al Falango sent an e-mail to a claims attorney, Russ Fuller, at the Surety, referring to the president of Landworks as "this guy." Landworks is not a "guy." It is a well-know and respected corporation. This kind of e-mail confirms that the Lovett-Silverman consultants were not behaving in the type of professional, credible construction consultants tasked with representing the best interests of all involved in this project.

**INTERROGATORY NO. 8:**

Please identify the specific subcontractors who filed suit to receive payment, including the case name and docket number of each such lawsuit filed by the subcontractors, as alleged in paragraph 13 of the Amended Complaint.

Answer: The subcontractors were, in part, identified in the Plaintiff's document requests. The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its own discovery requests by producing long-overdue documents.

Supplemental Answer: James Peters stated in his deposition that approximately 20 lawsuits have been filed. This has confirmed the September 21, 2005 e-mail that the Surety and Lovett-Silverman has engaged in the practice of "banging" the subcontractors. Landworks does not have the information pertaining to the docket information of each of these lawsuits, which apparently were filed in disparate courts throughout the Commonwealth. Landworks notes that in the deposition of James Peters, this agent of USF & G couldn't even discuss the counterclaim without getting in to attorney/client privilege issues. Landworks notes, without waiving any rights to the attorney/client privilege, that Landworks is put in to the same bind with this question, noting that Landworks has been aware that its attorney continually bumps in to Shrewsbury Middle School cases in random courts, from Suburban Insulation in Norfolk to Century Drywall in Worcester, making it abundantly clear that voluminous litigation has been in progress, of which Attorney Hipp is apparently the person most knowledgeable of the specifics. Attorney Hipp is on the Plaintiff's mandatory disclosures and will likely testify as to this issue, since USF & G cannot.

**INTERROGATORY NO. 9:**

Please identify, by invoices or specific written demands, the specific payments sought by each individual subcontractor, as alleged in paragraph 13 of the Amended Complaint.

Answer: With the exception of Landworks' own claim, Landworks has no idea. As to other subcontractors, the question is irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence as required by F.R.C.P. 26.

**INTERROGATORY NO. 10:**

Please define the terms "frivolous" and "fraudulent" and describe in what way, as to each lawsuit individually, the lawsuits filed by subcontractors to receive payment, as alleged in paragraph 13 of the Amended Complaint, were frivolous and fraudulent.

Answer: Objection. The Plaintiff objects to the interrogatory as it is vague and unclear As to other subcontractors, the specifics are irrelevant. Paragraph 13 refers to the patently frivolous and fraudulent lawsuits against Landworks cooked up by Lovett-Silverman and USF & G.

Supplemental Answer: The counterclaim filed against Landworks was both frivolous and fraudulent, and was consistent with the e-mail of September 21, 2005 which referenced plans to recover funds. At this point in this case, with discovery at an end, there has not been a shred of evidence to support the claims of the counterclaim. Indeed, in February 1, 2006, Bill Meritz sent an e-mail to the project architect asking "do you have any correspondence in your file pertaining to deficient work performed by Landworks?" The project architect was unable to provide any such documentation showing "deficient" work to Landworks' scope. Nonetheless, this did not stop Lovett –Silverman in its correspondence from identifying site costs that were unrelated to Landworks and from assisting the Surety in preparing a Counterclaim against Landworks that was utterly without merit.

Paragraph 11 of the Counterclaim made false statements that "Landworks abandoned its work at the Project in the fall of 2004." In fact, Landworks remained on the site until the typical winter shut down that affects all site contractors. Exhibit 63 includes an e-mail from G & R Construction to Robert Bullock of Lovett-Silverman dated January 10, 2006 in which G & R notes that "there will be more site work done in the spring time," acknowledging that winter shut down is part and parcel of this project, not abandonment. Nonetheless, the Surety claimed that Landworks "abandoned" the work for suspending exterior work due to inclement conditions. In addition, the Surety has had no logical explanation for how a contractor, who is begging to return to work, can be said to have abandoned the work. Exhibit 121 marked at the deposition of James Peters consisted of interrogatories served by sheriff on USF & G in April of 2005 in which the Plaintiff, in exasperation of the Surety's refusal to talk to the Plaintiff, asked, in question 2 "please explain why the Defendant has refused to discuss the Plaintiff's return to the Project, and has otherwise declined to participate in discussions pertaining to a return to the Project." Thus, there is evidence, contrary to the Counterclaim, that the Plaintiff was endeavoring to return to the site in April of 2005. A schedule marked at the deposition of the project architect confirmed that Landworks' work was to be performed in the spring of 2005, not earlier. The deposition of the person most knowledgeable at USF & G specifically sought information on this topic, asking the same question as specified in the interrogatory. The Surety continues to insist, in a manner bordering on fantasy, that the Plaintiff abandoned the work.

Paragraph 13 refers to substandard work, and paragraph 12 refers to "substandard and unworkmanlike." There has never been a shred of documentation to support these claims. Based upon the fact that the project architect informed Lovett-Silverman that she did not have documents specifically identifying such deficiencies in response to Meritz' e-mail, it was known that these statements were false when made in the pleading.

Count I of the Counterclaim claims damages for breach of contract. The representative of USF & G, at his deposition, couldn't even specify which contract Landworks was alleged to have breached. One would assume, when filing a claim for breach of contract, that the suing party could at least, in good faith, identify the contract being breached.

9

Paragraph 17 alleges that Landworks failed to perform in accordance with plans and specifications, but USF & G could not testify at to the basis of that statement.

In addition, even though the Counterclaim was drafted a year ago, the representative of USF & G couldn't identify damages or explain the basis for damages, stating that they were still being calculated.

The Plaintiff intends to move for summary judgment on this Counterclaim, as it is apparent that USF & G has absolutely no basis to support its Counterclaim, and can't even state the basis for it.

This interrogatory asks for the Plaintiff's definition of frivolous and fraudulent. To Landworks, it means filing a counterclaim without any legal basis, without any foundation, without any investigation, without any capacity to explain the claim and without any notion of the damages being sought, even a year after the Counterclaim was drafted. The Counterclaim is so fraudulent and frivolous that even the witness for USF & G couldn't identify which contract was breached, and what work was not right. In short, this Counterclaim seems to fall within the category of the September 21, 2005 e-mail concerning "banging" the subcontractors and getting money back. It is clear that this Counterclaim was filed to encourage Landworks to compromise the underlying claim. Finally, the Plaintiff notes that using this tactic, with its potential to harm the reputation of Landworks, without any basis, constitutes fraud, as it damages the reputation of the Plaintiff in the community, which should not be allowed with impunity.

**INTERROGATORY NO. 11:**

State the basis of your contention in paragraph 14 of your Amended Complaint that there was an organized and ongoing effort by Lovett-Silverman "to bang the subs," defining the term "bang the subs" and describing with particularity how the alleged effort was ongoing.

Answer: The employees and agents of Lovett-Silverman admitted to this in their own e-mails. The conduct perpetrated against Landworks makes it clear that the scheme was carried in to operation.

**INTERROGATORY NO. 12:**

State the basis of your contention in paragraph 20 of your Amended Complaint that Lovett-Silverman engaged in specific conduct which serves as fraud on you.

Answer: See Answer 5, which is not an exclusive list. Lovett-Silverman simply lied to Landworks and engaged in conduct which denied Landworks the lawful right to complete its work under its ratification agreement. Lovett-Silverman, by its own e-mails with USF & G and its counsel, were complicit in filing a false lawsuit against Landworks.

Supplemental Answer: The Plaintiff refers to Supplemental Answer 7 and Supplemental Answer 10

## INTERROGATORY NO. 13:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the "harm" referenced in paragraph 21 of the Amended Complaint.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records. Supplemental Answer: The Plaintiff refers to its Supplemental Answer 7 and 10.

## INTERROGATORY NO. 14:

For each item of damage you have allegedly suffered as a result of conduct of Lovett-Silverman, identify the item and dollar amount of damage followed by the conduct giving rise to such damage, the methodology used to calculate such item of damage and the basis for your contention that Lovett-Silverman caused such damage.

Answer: The amount is specified in the Complaint. The amount of attorney's fees is not yet determined. The Plaintiff is seeking treble damages. The Plaintiff reserves the right to supplement this answer.

## INTERROGATORY NO. 15:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the "program of 'banging'" that Lovett-Silverman allegedly engaged in, referenced in paragraphs 14, 20(c), 23, and 27 of your Amended Complaint.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records.

## INTERROGATORY NO. 16:

State the basis of your contention in paragraph 20(d) of the Amended Complaint that Lovett-Silverman supported US F&G in defaming Landworks, describing in detail the nature

of such support, making specific reference to written documents evidencing such alleged support, and providing the dates of such efforts and the names of the person(s) lending such support.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records.

Supplemental Answer: The Plaintiff refers to its Supplemental Answer 7 and Supplemental Answer 10. The Plaintiff also refers to the serious of e-mails marked as Exhibit 63 and 65, which was the communication between Lovett-Silverman and the Surety's counsel in February of 2006 discussing the Counterclaim. These e-mails show a hasty attempt to fashion some form of counterclaim in order to comply with deadlines of the federal court. Most telling is an e-mail from Attorney Hipp to Robert Bullock on February 2, 2006 in which even Attorney Hipp seems to recognize something amiss with Lovett-Silverman's accounting, which appeared to be totally inconsistent. In fact, it will be noted at trial that the questions that Attorney Hipp asked in February of 2006 appear to be the first indication of an intelligent attempt to sort out the issue of site work scope and cost, a process which continued at the Plaintiff's deposition. It should also be noted that, notwithstanding that Attorney Hipp was asking probing, logical questions, the responses provided by Lovett-Silverman were deficient and inadequate, and continued the practice of failing to investigate. In short, Lovett-Silverman responded with false, knee-jerk answers, rather than engaging in intelligent investigation of the questions. An example of this is found in an earlier e-mail from Robert Bullock to Jason Goodwin on January 25, 2006, in which Bullock wrote "Bill said he will extract the information from your billings and forward it to Eric. Please provide the break down of your future site work costs to Eric, Bill and me, no later than Monday." Thus, Lovett-Silverman was fabricating numbers based not-upon Landworks' actual scope, but rather on the broader scope by G & R. There is no evidence that Lovett-Silverman ever attempted to parse out Landworks' scope, assess the values, and calculate costs as against the credits offered by Landworks. The Court should also note that as late as January 25, 2006, even Attorney Hipp was looking for "documentary support for these charges," making one wonder how what the Surety was doing in terms of investigating this claim between March of 2005 and January of 2006. When pushed, Lovett-Silverman, as shown in the exhibits, merely took the completion price of non-scope work, and attributed it all to Landworks. Attorney Hipp is on the witness list and is expected to testify at trial how the information provided to him was incorporated in to the Counterclaim, since USF & G's representative apparently could not.

## INTERROGATORY NO. 17:

State the basis of your contention in paragraph 24 of your Amended Complaint that Lovett-Silverman was aware of the advantageous business relationship between Landworks and US F&G, identifying the person(s) with such awareness, and please define the term "advantageous business relationship."

Answer: The information is contained in the e-mails that have already been produced. Landworks was in communication with Lovett-Silverman, particularly Robert Bullock. In

these conversations, Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information. Based upon the e-mails subsequently identified, it is clear that Landworks would be barred from its right to perform its work. The term advantageous business relationship is self explanatory.

## INTERROGATORY NO. 18:

State the basis of your contention in paragraph 25 of your Amended Complaint that Lovett-Silverman interfered in the business relationship between Landworks and US F&G.

Answer: Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. See the answer to Interrogatory 5 and Interrogatory 17. An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF & G with false data provided by Lovett-Silverman.

## INTERROGATORY NO. 19:

State the basis of your contention in paragraph 38 of your Amended Complaint that Lovett-Silverman set out to harm Landworks by denying it access to the Project and to funds due and owing.

Answer: See, interrogatory 5, 17 and 18.

## INTERROGATORY NO. 20:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to your allegedly ignored demand for funds, as referenced in paragraph 39 of your Amended Complaint.

Answer: This information has previously been provided.

## INTERROGATORY NO. 21:

State the basis of your contention in paragraph 40 of your Amended Complaint that Lovett-Silverman's conduct constitutes a violation of c. 93A.

Answer: Banging Landworks, lying about their status, assisting in the preparation of a false lawsuit and other such conduct, all for the purposes of avoiding payment, sounds like unfair and deceptive trade practices to this Plaintiff.

## INTERROGATORY NO. 22:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the alleged harm your business has undergone, as referenced in paragraph 42 of your Amended Complaint.

Answer: I do not yet have all of the information, as this case is ongoing. I have been denied payment for my work, and for work of my subcontractors, even though I have paid those subcontractors. I was denied the right to complete the work, which was vital for the ongoing success of the company; the company had to borrow funds to maintain its operations. The company has been forced to incur substantial attorney's fees to seek funds that were not in dispute until Lovett-Silverman discovered it did not have the funds to pay the subcontractors, as revealed in the e-mails. My company, which has never been subject to claims of defective workmanship, has been defamed for the purposes of saving USF & G money. The documents that support this are kept in the usual course of business, and will be produced. My understanding is that defamation damages are presumed. Attorney's fees cannot be calculated at this point, nor can the treble damages.

Sworn under the pains and penalties of perjury this 9th day of March, 2007

14

As to Objections,


Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,


The Mountain States Law Group
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: March 9, 2007


## CERTIFICATE OF SERVICE


    I, Robert N. Meltzer, do hereby certify that on this 28th of February, 2007  I served a copy of the foregoing on the following counsel of record by first class mail, postage prepaid:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Eric Hipp, Esq.

Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, MA 02210
Attn: Julie Ciollo, Esq.


Robert N. Meltzer


15