UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | |
|---|---|
| LANDWORKS CREATIONS, LLC | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY AND | ) |
| GUARANTY COMPANY and | ) |
| LOVETT-SILVERMAN CONSTRUCTION | ) |
| CONSULTANTS, INC. | ) |
| | ) |
| Defendants | ) |

AFFIDAVIT OF WILLIAM V. GALLAGHER IN SUPPORT OF THE PLAINTIFF'S
OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT,
LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.

I, William V. Gallagher, do depose and swear as follows:

1. I am a Project Manager / Owner's Representative at Daedalus Projects, a construction management firm located in Boston

2. I have been retained as an expert witness on the issue of construction project management at the Shrewsbury Middle School project ("the Project"). My resume, attached hereto, details my background in both public and private construction management.

3. I have reviewed, with regard to the Project, the construction file of Landworks Creations, LLC, and the deposition transcripts of the project architect, Katie Crocket, of Lovett-Silverman employees Tony Lardaro, Bill Mertz and Robert Bullock, of USF & G representative Jim Peters and of the Neal Matthews of Landworks. I have also reviewed

1

the deposition exhibits, documents produced by the parties in this case and by the project architect, and I have spoken in extensive and exhaustive detail with Neal Matthews.

4. I base my opinions upon the specific facts and documents in this case, as well as upon my prior experience as a construction manager on public and private projects.

5. When a construction consultant or construction manager takes over a project that is already underway, and in which a general contractor has left a job or has undergone business failure, there are certain tasks that are customarily performed in order to get the work back on track and finished. These tasks include:

a. Assessing the status of the work and the work performed by each subcontractor. Defining the scope of each sub contractor's contractual obligations and the work remaining is crucial.

b. Ascertaining the status of payment to subcontractors, who generally and customarily suspend work or demobilize pending review of payment issues. Reviewing open proposed change orders, agreed upon change orders not processed, extra payment claims of the sub contractor and claimed back charges from the General Contractor, Owner or Owner's agents is customary.

c. Ratifying subcontractors, that is, bringing the subcontractors back to work under the control of the Surety on public projects.

d. Completing the work in the fastest way possible especially when the project is a public school and the learning process is hindered. This minimizes the incurred costs towards the Owner, Owner's agents, Surety and Sub contractor.

6. It is always preferred by construction consultants and managers to ratify prior subcontractors; these subcontractors generally know the Project better than the new

2

consultants, and are generally the best source of information about the Project and what needs to be done to get the project finished. They also do not require time to get up to speed on the work, they can mobilize quickly, and they are generally locked-in to a lower price than replacement subcontractors by the nature of the contract date. They can be held accountable for their own punch list, deficient and back charged items rather than having another sub contractor come finish the open items and argue of the value at a latter date.

7. In addition, it is often difficult to find a subcontractor willing to pick up where another subcontractor has left off and where a project is already troubled. As a general rule in the construction industry, a subcontractor is brought back to work unless there is a compelling reason not to bring a subcontractor back to work.

8. The fact that a subcontractor may be owed money, or may be claiming to be owed money, is not, customarily, a compelling reason not to engage a subcontractor to complete the work. Almost without exception the cost of the replacement sub-contractor to finish is more than the monies left to complete the scope.

9. In my review, I noted that Lovett-Silverman did not engage in specific tasks customarily employed by construction managers and construction consultants when taking over or assessing a project in mid-stream. By way of example, and not by way of exhaustive list, Lovett-Silverman failed, with regard to Landworks, to:

a. consult with agents or employees of Standen and Jackson to ascertain the status of the work and the scope of the contracts with sub-contractors, and the status of those contracts and entitlements to payment with those contracts

    b. consult with the project architect to ascertain the project architect's knowledge of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors

    c. consult with the project's owner's representative (CTM) to ascertain CTM's knowledge of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors.

    d. consult with the landscape architect (Waterman) to ascertain Waterman's knowledge of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors.

    e. consult with officials of the town of Shrewsbury to ascertain the knowledge of those individuals of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors.

    f. consult with Landworks to ascertain the understanding of Landworks to ascertain the status of the work and the scope of the contracts as perceived by Landworks, and the status of the contracts and entitlement to payment with the contracts

    g. consult with other subcontractors, such as Frias Concrete, to ascertain whether such subcontractors were, in fact, working for Landworks, as Lovett-Silverman hypothesized.

10. Lovett-Silverman's own employees testified that the only steps taken to ascertain the scope of the Landworks contract consisted of reading the Standen and Jackson contracts, as well as a prior ratification agreement.

11. In the construction industry, particularly involving contracts with site contractors, the scope of a contract cannot be determined by mere contract documents. Change orders,

4

scope modifications, agreements made in the field and extras given by the sub contractor in lieu of certain relief of contractual obligations must be considered also.

12. Lovett-Silverman's employees testified that they viewed the recitation of the site work sections defining the scope of the work to be all conclusive. However, in the construction industry, particularly public construction, where all site work is collected under Division 2, the recitation of all specification under Division 2 does not constitute the scope, but rather then location where the broad scope of work is included. In other words, since parts of the work are found in multiple parts of Division 2, all elements of Division 2 are customarily included.

13. The assertions made by Lovett-Silverman that the scope of work can be entirely found by strictly construing the contract, without further investigation, contradicts both custom and industry practice, and reflects a failure to perform the usual investigation performed in the context of this case.

14. Similarly, it is evident, because Lovett-Silverman conducted no investigation, that Lovett-Silverman never considered or had the ability to consider, whether the Jackson contract was binding or even in force and effect for purposes of defining scope.

15. This investigation would be particularly important in this case; as Neal Matthews noted in his deposition testimony, Jackson engaged in a pattern and practice of demanding extra work outside of the Landworks scope as Jackson neared insolvency. These items of extra work confirm that the prior scope had been limited, and that defining the scope of obligation could not be inferred from earlier contract documents.

16. I have seen documentation that demonstrates that Landworks removed its forces from the Project in January of 2005, and that it was scheduled to complete its work in the spring of

5

2005. It is customary for site contractors to engage in "winter shut down," as weather conditions preclude certain types of work from being performed. This is customary in the industry, and it is not considered "abandonment" of the work. Furthermore, I conclude that a sub contractor who abandoned the job with no intention of returning would not have left his as-built notes, contract drawings, written scope, considerable hand tools and materials at a place of storage onsite designated for his use during construction.

17. I have also seen documentation that both Landworks and many other sub contractors did not return to the Project after the failure of Jackson and pending payment, and that this has been acknowledged both by Lovett-Silverman and USF & G. This is also customary in the construction industry; following failure of a general contractor, it is essential for a pause in the work so that the scope of remaining work may be assessed and the issue of unpaid invoices to the subcontractors may be addressed. In the construction industry, it is not customary to assume that a sub contractor who is awaiting payment following the failure of a general contractor has "abandoned" the work.

18. I have reviewed the so-called "deficiency reports." These are merely "punch list" items. Punch list items are inventories of work that have yet to be performed or which have minor deviations which must be fixed before the work is acceptable to the owner of the project. Most of the deficiency items were corrected or were agreed to be corrected by Landworks after they returned from winter shut down.

19. Punch lists occur on every job, and are distributed to every contractor and subcontractor. Even though punch lists may be titled "deficiencies" or "defective items," they are customary on every job and merely inventory work left to be performed. Normally, the deficiencies are identified at the very end of the project. The existence of punch lists,

both by industry custom and industry standards, does not create a presumption of breach of contract by the contractor or subcontractor.

20. I have seen documents in this case which indicate that Landworks had punch list items to complete. Since the work had not yet reached completion when Jackson failed, this is not unusual or unexpected. I have seen no documents that demonstrate the existence of defects in the work performed by Landworks that would cause concern to a construction manager or construction consultant, or which would suggest an inability or unwillingness to complete the work.

21. I have seen nothing in the papers or documents or testimony in this case that would indicate a compelling need to replace Landworks as the site contractor.

22. On the contrary, the record shows that Landworks was always ready, willing and able to perform work that needed to be done, demonstrating a degree of teamwork that should have made Landworks a desirable subcontractor on the Project. As a construction manager and consultant, I always encourage these kinds of extra-mile subcontractors to become pro-active in getting the work done. This would also be customary in the industry.

23. I have seen in the materials in this case a demonstration of what transpires when a consultant declines to ratify a subcontractor; the difficulty had by Lovett-Silverman in trying to find a site subcontractor at a reasonable price who could perform the work confirms why, customarily, a subcontractor is retained. I believe the school would have opened sooner and at a lesser cost to USF & G based on reduced general conditions costs and rework of completed scope not protected or maintained.

24. I have seen no document in this case that would serve as a termination of the Landworks' contract. As a construction consultant reviewing the file, I would assume, from reviewing the file, that Landworks continued to have a binding contract in the form of the post-Standen ratification agreement which defined the rights of the parties, and the obligation of the Surety to deal in good faith with Landworks' claims for payment and its demand for its right to return to work. It would be customary in the construction industry to view the situation in this way.

25. I have reviewed the e-mail from Lovett-Silverman that suggests that USF & G would not talk to Landworks because a lawsuit was filed. It is always prudent to reopen communication with a sub-contractor who has filed suit in an effort to persuade him to return to work and drop the claim, but it is not customary, or proper as I understand the law to demand dismissal as a condition precedent to returning to work. Even if this statement was true, this would not be the custom of the industry; protection of payment bond claims by filing suit to comply with the law is regarded as part and parcel of making a claim, much like filing a mechanic's lien is a statutory vehicle to protect rights.

26. I have also seen the e-mail from Lovett-Silverman in which an employee of Lovett-Silverman refers to shortages of money, and the idea of "banging" the subcontractors.

27. Banging the subcontractors has a very specific meaning in the construction industry, especially when paired with the first part of the e-mail reflecting a shortage of funds. Banging the subcontractors means withhold payment from them, or denying them their rights under their contracts, in the hopes of either forcing the subcontractors to compromise their claims, to be forced to file suit on the payment bond to defer payment

for years, to likely compromise a claim as part of a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial distress.

28. Banging the subcontractors is a form of violence to them, and it is a means and method of denying subcontractors what may be theirs. In the construction industry, the less violent, but equally suggestive term for this inappropriate behavior would be "strong arming." This includes the practice of withholding payment until the sub contractor yields to accepting another agreement with more scope or at a lesser fee.

29. I have noted from the deposition of James Peters of USF & G that more than 20 lawsuits were filed on the payment bond in this Project; that would easily represent the vast majority of subcontractors working on the Project. I also note that this refers to the number of claims in suit, and would not include the subcontractors who settled for less in order to avoid suit.

30. In the construction industry, this number of lawsuits on a single public project is highly unusual, and suggests an intentional failure to address claims by Lovett-Silverman and the Surety, as opposed to systemic failure by all of the subcontractors.

31. In light of the unusual number of claims, paired with lack of competent review of the project details by Lovett-Silverman, read in conjunction with the e-mail identifying the shortage of funds, and coupled with the statement about "banging" the subcontractors, It is evident that Lovett-Silverman intentionally engaged in conduct, which includes failing to engage in reasonable conduct, which would interfere with Landworks' rights under the original Standen contract or subsequent ratification of the original contract.

9

32. The number of defects in performance by Lovett-Silverman in terms of deviation from industry custom and practice when dealing with subcontractors following the failure of a general contractor are substantial and pervasive.

33. The deviations from industry custom and practice are so complete that it would suggest to any competent construction manager a willful deviation from custom, as it would be almost impossible for negligence to explain these deviations.

34. In short, the facts presented, in my opinion, based upon my expertise and experience in the field, is that Landworks is a banged subcontractor, and that it was intentionally prevented from doing its work on the Project and addressing its claim with the Surety, and from receiving payment for its work, and was otherwise forced to file suit to collect money that appears to be appropriate due and owing.

Sworn under the pains and penalties of perjury this 29th day of March, 2007

_____
William V. Gallagher  LEED AP

# William V. Gallagher
1 Homestead Drive
Medfield, MA 02052
(617) 276-4801  wvgallagher@verizon.net

**STRENGTHS**
- Proven talents contributing to numerous multimillion-dollar projects in commercial/community construction projects.
- Effective and proactive working with trades people, company/organizational contacts, attorneys and other to mediate problems and deliver project solutions.
- Background includes strengths in budgeting/financial control, prioritizing and scheduling work, and coordinating assignments with sub contractors, purchasing, hiring, and training personnel, and moving projects through successful completion.
- A hands-on manager who enjoys working with people from diverse international backgrounds.
- Familiarity working with and responding to the needs of both aging and state-of-the-art mechanical systems and building structures.

**EXPERIENCE**

**Daedalus Projects Inc.**: *Clerk of the Works/Project Manager; 2000-Present*
- Acted as the Owner's Project Manager for the Franklin Senior Center, Medfield Adult Community Center, Medfield Parks and Recreation. Coordinated the program development of the Medfield Department of Public Works and new Police and Fire building.
- Acted as the Owner's Representative on the following public sector projects;
- Worcester State College six story, 500 cars capacity precast parking garage. Ensured the safety of the students while a 300 ton crane set structure. Included a 265 X 31 feet segmented retaining wall.
- Harvard University 80,000 sq. ft LEED Platinum office remodeling project. Converted a heavy timber frame diary manufacturing plant into state of the art office space. Special recognition from Tom Vautin, VP Operations. Project included two 1500 ft geo-thermal wells and a pollution cleansing vegetated bio-swale.
- Williams Middle School 110,000 sq. ft. new construction project valued at $26 million. On time on budget despite correcting mold infection caused by the general contractor. Included 465 GPM municipal well and onsite sewage treatment plant.
- Apponequet Regional High School 140,000 sq. ft. remodeling project valued at $11 million. Extremely tight budget, coordinated moving teachers and students during this double shifted, three phased project.

**Sciaba**: *Site Superintendent/Project Manager; 1999- 2000*
- Deliver results on community projects including $3 million contract for complete renovations of 3 fire departments (approximately $1 million each) and $1+ million contract to update elementary school to make it handicapped accessible.

**Callahan Construction Co.**: *Assistant Project Manager, 1998-1999*
- Worked closely with senior executives John Spath and Mike Callahan, with responsibilities as project engineer and for reviewing/processing submittal samples and revising change orders. Multitasked wide-ranging leadership duties on $16 million Cohasset Elementary School. $15.4 million Tewksbury Elementary School, $14 million Hyde Park High School. $3 million Brooks Public Library, and $2.4 million Bridgewater Middle School Projects.

**Town of Bridgewater**: *Clerk of the Works, 1996-1998*
- Successfully moved 1,400+ elementary/middle school children from substandard buildings to new classrooms via $12.4 million renovation and personally saved Town of Bridgewater $300,000 via negotiations of project terms with general contractor's attorney. Supervised $3.2 million Bridgewater Public Library, $1.8 million Williams Middle School, and $160,000 Bridgewater Fire Department renovations projects.

**The Boston Building Company/Hale Street Properties**: *Founder/Partner, 1995-1996*
- Launched and grew business, securing 5 and 6-figure contracts with North Key West restaurant and C.J. Scooters as well as renovation and development of 2 factories (Bridgewater, MA) into commercial/retail space and complete overhaul of Plymouth County Sheriffs Brockton office.

**All-Temp Service:** *Project Manager/Site Supervisor, 1993-1995*
- Completed HV AC/R duties from hands-on work to system design including duct and controls. Attended Old Colony Trade School during this time.

**E.T. Engineering and Construction Management**: *Independent Contractor, 1991-1993*
- Conducted field-work involving EDM total stations and residential/commercial site development.

**American Environmental:** *Superintendent, 1989-1991*
- Led multi-state projects including contracts with American Standard, Boston City Hall, The Green School, Filenes at Downtown Crossing, The Lake Placid Club, and The North End Library.

**EDUCATION**

**United States Navy**: *1981-1989*
- Meritoriously promoted twice ahead of schedule. Studies included Aviation Fundamentals, Basic Avionics, Advanced Avionics, Ground and Search Radar, Advanced Microprocessors, Avionics Cryptologic Systems, Instructor Training School, and Basic and Advanced First Aid.

**New England Theological College:** *1983-1987*
- Studies included Old Testament Survey, New Testament Survey, Greek and Hebrew, Pastoral Counseling, and Middle East History.

**Embry-Riddle Aviation University**: *1982-1983*
- Studies included Aviation Management, Introduction to Computer Programming, and Pre-Calculus.

**PROFESSIONAL DEVELOPMENT**

Massachusetts Construction Supervisors license, OSHA 10 hour safety course, Boston ABC License course, LEED Accredited Professional credential. I recently was asked to speak at Harvard University's Green Campus Initiative symposium and at Build Boston January 2007 in reference to construction site procedures and systems.

**COMPUTERS**

Expedition Contract Control, Microsoft Word, Lotus 1-2-3, and the Internet

**INTERESTS**

Sea kayaking, rock climbing, and reading.