Robert N. Meltzer
*Attorney At Law*

P.O. Box 1459
Framingham, MA 01701
508.872.7118
robmeltzer@aol.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC | ) | |
| | ) | |
| Plaintiff | ) | AFFIDAVIT OF ROBERT |
| | ) | MELTZER IN SUPPORT OF |
| v. | ) | PLAINTIFF, LANDWORKS |
| | ) | CREATIONS, LLC'S |
| UNITED STATES FIDELITY AND | ) | OPPOSITION TO THE MOTION |
| GUARANTY COMPANY and | ) | OF DEFENDANT, LOVETT- |
| LOVETT-SILVERMAN CONSTRUCTION | ) | SILVERMAN FOR SUMMARY |
| CONSULTANTS, INC. | ) | JUDGMENT PURSUANT TO |
| | ) | F.R..C.P. 56(c) AND F.R.C.P. |
| Defendants | ) | 56(f) |

I, Robert N. Meltzer, do depose and swear as follows:

1. I am counsel for the Plaintiff in the above-captioned matter. I have represented clients

in more than 400 claims brought under G.L. c. 149 §29. Every case but this one has proceeded in

the state courts of the Commonwealth, including approximately 75 cases involving USF & G.

2. The deposition pages and exhibits attached hereto are true and accurate copies of these

documents. The documents appended are:

Exhibit A: excerpts from the Deposition of James Peters

Exhibit B: excerpts from the Deposition of Katy Crocket

Exhibit C: excerpts from the Deposition of Bill Meritz

Exhibit D: excerpts from the Deposition of Robert Bullock

Exhibit E: Deposition Exhibits referenced in the Memorandum of law

3. This affidavit is also submitted pursuant to F.R.C.P. 56(f).



1

Robert N. Meltzer
*Attorney At Law*

P.O. Box 1459
Framingham, MA 01701
508.872.7116
robmeltzer@aol.com

4. This Court has stayed discovery as to the claims policies of USF & G. In so doing, the Court has prevented the Plaintiff from conducting discovery on a vital point for this Opposition, and so this affidavit is submitted pursuant to F.R.C.P. 56(f).

5. In order to understand the extent of Lovett-Silverman's conduct, this Court requires an understanding of how dramatically this claim was mishandled when compared to claims involving similar projects during the same time frame.

6. In the Plaintiff's Mandatory Disclosures, the Plaintiff has identified a project known as Hull High School, and the Plaintiff has identified witnesses to that project. Like the case at bar, the Hull High School project involved Jackson Construction, a project failure in 2005, USF & G as the Surety and Hermes, Netburn as Surety counsel. Plaintiff's counsel has been involved in a number of Jackson cases similar to both Hull High School and Shrewsbury Middle School. I have attached as Exhibit F several exhibits relevant to Hull High School. The first is the Verified Complaint for a subcontractor on that project, filed in August of 2005. The second is the ratification agreement signed in May of 2006. The last is an e-mail between the plaintiff in that case and the construction consultant for USF & G. These documents, which are consistent with the manner in which USF & G handle claims, shows that ratification does occur after the filing of suit, and that communication between the consultant and the plaintiff does occur following suit. These elements demonstrate that Robert Bullock was not telling the truth to Neal Matthews in August of 2005.

6. Discovery into claims practices will also demonstrate how unusual it was for this matter to be removed to this Court, and how unusual it was to have one claim handled serially by four top-drawer law firms. Discovery will also demonstrate how unusual this claim was in the sense of total lack of cooperation and communication toward the claimant, totally unlike the



The Mountain States Law Group
COLORADO · MASSACHUSETTS · UTAH
IDAHO
info@mountainstateslawgroup.com

2

Robert N. Meltzer
*Attorney At Law*

P.O. Box 1459
Framingham, MA 01701
508.872.7116
robmeltzer@aol.com

accepted practice not only in the construction industry, but also amongst the construction law bar.

7. When the Plaintiff is permitted to delve into discovery relating to unfair settlement practices, it is expected that Lovett-Silverman's conduct in the case at bar deviates dramatically not only from industry custom and practice, but also deviates dramatically from the Surety's own practices. This particular discovery will also show why Landworks was reasonable in believing that Lovett-Silverman was working toward ratification in August of 2005 and why it was reasonable to believe that Lovett-Silverman was acting honestly toward it.

8. Because of the stay of discovery on the claims practices, the Plaintiff is restricted from providing this evidence to the Court at this time.

9. As further part of the Plaintiff's claim under c. 176D, the Plaintiff would have conducted discovery in to the other 20 lawsuits arising out of the Shrewsbury project. This discovery would have highlighted the process of "banging" and would have provided to this Court further evidence of volitional fraud. The Court should note that the appropriate witnesses have been identified in mandatory disclosures, even though the Plaintiff was barred from conducting this relevant discovery.

10. Because of the stay of discovery on the claims practices, the Plaintiff is restricted from providing this evidence to the Court.

Sworn under the pains and penalties of perjury this 17th day of April, 2007.



The Mountain States Law Group
COLORADO · MASSACHUSETTS · UTAH
IDAHO
info@mountainstateslawgroup.com

3

# EXHIBIT A

1 (Pages 1 to 4)

Page 3

| | |
|---|---|
| Pages:  1 - 174 | 1 |
| Exhibits:  117 - 121 | 2 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CA NO. 05-CV-40072FDS

LANDWORKS CREATIONS, LLC     )
    Plaintiff,     )
           )
v.     )
           )
UNITED STATES FIDELITY AND     )
GUARANTY COMPANY and     )
LOVETT-SILVERMAN CONSTRUCTION     )
CONSULTANTS, INC.,     )
    Defendants.     )

* * * * * * *

DEPOSITION OF JAMES M. PETERS, JR., called
as a Witness by Counsel for the Plaintiff, pursuant
to the applicable provisions of the Massachusetts
Rules of Civil Procedure, before Ann M. Lavoie,
Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, taken at Mountain
States Law Group, P.O. Box 1459, Framingham,
Massachusetts, on Tuesday, February 27, 2007,
commencing at 10:20 a.m.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX: (508) 752-4611

---

**Page 3**

```
 1              I N D E X
 2
 3   Testimony of:              Page
 4   James M. Peters, Jr.
 5     By Mr. Meltzer             4
 6
 7
 8
 9
10              E X H I B I T S
11
     No.  Description              Page
12   117  Notice of Taking Deposition of      6
          Person or Persons Most Knowledgeable
13
14   118  Notice of Taking Deposition        6
          of James M. Peters, Jr.
15   119  Business Card               71
16   120  Summons                  160
17   121  Plaintiff's First Set of         161
          Interrogatories to be Answered by USF&G
18
19   *** EXHIBITS RETAINED BY COUNSEL ***
20
21
22
23
24
```

---

**Page 2**

```
 1           A P P E A R A N C E S
 2
 3
 4   MOUNTAIN STATES LAW GROUP
     By:  Robert N. Meltzer, Esq.
 5        P.O. Box 1459
          Framingham, Massachusetts 01701
 6        508-872-7116
 7
          Appearing for the Plaintiff
 8
 9
     HERMES, NETBURN, O'CONNOR & SPEARING, PC
10   By:  Eric C. Hipp, Esq.
          265 Franklin Street
11        Seventh Floor
          Boston, Massachusetts 02110
12        617-210-7750
13        Appearing for United States Fidelity
          and Guaranty
14
15
     DONOVAN HATEM, LLP
16   By:  Marianne E. Brown, Esq.
          World Trade Center East
17        Two Seaport Lane
          Boston, Massachusetts 02210
18        617-406-4500
19        Appearing for Lovett-Silverman Construction
          Consultants, Inc.
20
21
22
23
24
```

---

**Page 4**

```
 1           S T I P U L A T I O N S
 2
 3
 4           It is stipulated by and between
 5   counsel for the respective parties that the
 6   deposition transcript will be read and signed by the
 7   deponent within thirty (30) days of receipt of the
 8   transcript under the pains and penalties of perjury.
 9   The filing and notary is hereby waived.
10           It is further agreed that all
11   objections, except as to form of the question and
12   motions to strike are reserved until the time of
13   trial.
14
15           James M. Peters, Jr., having been
16   satisfactorily identified and duly sworn by the
17   Notary Public, was examined and testified as
18   follows:
19
20   EXAMINATION
21   BY MR. MELTZER:
22       Q.  Can you state your name for the record?
23       A.  James Michael Peters, Jr.
24       Q.  Mr. Peters, have you ever been deposed
```

14 (Pages 53 to 56)

| Page 53 | Page 55 |
|---|---|
| 1     When did you become involved or first hear<br>2 about the Shrewsbury Middle School claim?<br>3     A. In the general time frame of February 2005.<br>4     Q. On that one, who first made you aware of<br>5 that particular project?<br>6     A. I don't recall.<br>7     Q. Did you have an understanding, in February<br>8 of 2005, what the status was of the Shrewsbury<br>9 Middle School project?<br>10     A. My understanding was that it was being<br>11 completed by Jackson Construction Company pursuant<br>12 to the terms of a completion agreement.<br>13     Q. Did you bring yourself up to speed with<br>14 what was happening with that project?<br>15     A. Over a period of time.<br>16     Yes.<br>17     Q. How did you bring yourself up to speed?<br>18     A. I obtained copies of documents that we had<br>19 that pertained to the Shrewsbury Middle School<br>20 project.<br>21     I made some site visits, discussed the<br>22 matter with Russ Warner, a member of our<br>23 construction engineering group, who had been<br>24 involved in the project. | 1 projects unrelated to Standen.<br>2     Q. Which was the other Standen project that<br>3 they were completing?<br>4     A. It was the new highway facility that was<br>5 being built for the Town of Westford, Massachusetts.<br>6     Q. Do you know how Jackson came to be the<br>7 replacement contractor for that job?<br>8     A. I only have a general understanding.<br>9     Q. What's your general understanding?<br>10     A. My general understanding is that at the<br>11 time that United States Fidelity and Guaranty<br>12 Company was looking for a replacement contractor<br>13 that Jackson Construction Company was an existing<br>14 bond account of United States Fidelity and Guaranty<br>15 Company.<br>16     I don't know how their name became<br>17 identified but, at some point in time, it had been<br>18 identified.<br>19     And Tiffany Schaak commenced some<br>20 discussions with them that led to a completion<br>21 agreement being developed.<br>22     Q. Was it known that Jackson was a bond<br>23 account at the time that they were given the<br>24 opportunity to be the completion contractor for |

| Page 54 | Page 56 |
|---|---|
| 1     Q. Was Lovett-Silverman involved in the<br>2 project in February of 2005?<br>3     A. No.<br>4     I don't think so.<br>5     Q. You said that Jackson was finishing the<br>6 project when you first became involved in this<br>7 situation?<br>8     A. Yes.<br>9     Q. Who is Jackson Construction?<br>10     A. Jackson Construction Company was a company<br>11 based in Canton, Massachusetts, that was in the<br>12 business of undertaking general construction<br>13 projects.<br>14     Q. They were brought in to complete Standen's<br>15 work on the Shrewsbury Middle School?<br>16     A. Yes.<br>17     Q. Had they completed any other projects for<br>18 your company under performance bond obligations that<br>19 your company held?<br>20     A. They were involved in completing another<br>21 construction project that related to the Standen<br>22 matter.<br>23     I don't recall whether or not they were<br>24 involved in completing any other construction | 1 USF&G on the Standen project?<br>2     A. That's my understanding.<br>3     Yes.<br>4     Q. Is that something that happens in your<br>5 company of performance obligations; that you'll take<br>6 an existing bond account and retain them as a<br>7 completion contractor?<br>8     A. It does happen from time to time.<br>9     Yes.<br>10     Q. What other occasions can you recall where<br>11 that's happened?<br>12     A. It occurred in the case of the new highway<br>13 facility at Westford, Massachusetts.<br>14     Q. Also with Jackson?<br>15     A. Yes.<br>16     Q. Anyone else?<br>17     A. It occurred in connection with the MJ<br>18 Paquette matter in New Jersey.<br>19     Q. The situation with Jackson, when Jackson as<br>20 an existing bond account became the completion<br>21 contractor on the two Standen projects, do you know<br>22 if anybody made a determination that Jackson's own<br>23 financial stability could handle those completion<br>24 contracts? |

b09373aa-b5d5-4d84-8647-bde4fa055042

Page 57

1    A. No, I do not.
2    Q. It is your understanding that Jackson then
3 was someone identified by USF&G for this project, to
4 complete the Standen project at Shrewsbury Middle
5 School?
6    A. It's my understanding that the
7 identification of Jackson as a candidate was done
8 within United States Fidelity and Guaranty.
9    Yes.
10    Q. Do you know if there were any conversations
11 with Lovett-Silverman about retaining Jackson on
12 that project?
13    A. I don't recall.
14    I don't recall.
15    Q. Do you know if Lovett-Silverman was
16 involved in that selection process of a replacement
17 contractor?
18    A. I don't remember the specifics of their
19 involvement.
20    Q. Have you ever seen a document where your
21 company provided a list of potential replacement
22 contractors to Lovett-Silverman?
23    A. I don't have a recollection of that.
24    Q. Do you ever recall seeing a document where

Page 58

1 your company provided a list of replacement
2 contractors that had been identified to the Town of
3 Shrewsbury?
4    A. I don't recall.
5    Q. When your company brings in a replacement
6 contractor, like Jackson, is there a formal
7 agreement signed between your company and the
8 replacement contractor?
9    A. I would say that, as a matter of general
10 practice, that usually happens.
11    Yes.
12    Q. Is it a form agreement that's generally
13 used?
14    A. There are some samples of agreements, but
15 they're not universally used or required.
16    Q. Do you know, with regard to the Jackson
17 agreement, who prepared that agreement?
18        MR. HIPP: Objection as to form.
19 Which Jackson agreement are you referring?
20        MR. MELTZER: We're talking about
21 the agreement to complete the work on the Shrewsbury
22 Middle School.
23    A. I can only comment that Tiffany Schaak was
24 involved in the process. But, as to specifically

Page 59

1 who drafted it and the development of it, I wasn't
2 involved.
3    Q. Have you looked at the document in the last
4 year?
5    A. I believe so.
6    Yes.
7    Q. When have you looked at it?
8    A. It's been within the last 12 months.
9    Q. Do you know why you looked at it?
10    A. I don't have that specific recollection.
11    Q. What does the phrase "ratification" mean to
12 you?
13    A. My general understanding, as it is used in
14 our business, is the form of agreement whereby a
15 subcontractor generally would agree to fulfill the
16 terms and conditions of its subcontract in an
17 undertaking where the surety would agree to either
18 undertake certain payments or certain obligations.
19    Q. Does that word get used interchangeably
20 with a hold agreement?
21    A. They do appear to be used somewhat
22 interchangeably.
23    Yes.
24    Q. Could you walk me through a time line -- I

Page 60

1 realize you were not personally involved with this
2 from the moment of failure on the Standen/Shrewsbury
3 project -- but the time line as it transpired from
4 the failure of Standen until the time the work was
5 back up and running under Jackson, how that would
6 all unfold?
7    A. Is this with respect to Shrewsbury?
8    Q. Yes.
9    A. I have a general recollection of how
10 Standen got into difficulty in the spring of 2005
11 and that Jackson became involved within a relatively
12 short period of time thereafter.
13    Q. 2005 or 2004?
14    A. I'm sorry. 2004.
15    Yes. Spring of 2004.
16    Q. At what point would Lovett-Silverman have
17 been brought in on the Shrewsbury Middle School
18 project?
19    A. I don't have a specific recollection.
20    Q. They'd have been brought in before Jackson
21 was on the job?
22    A. I could only say that I have a general
23 understanding that they were involved in issues that
24 followed Standen's default, but I don't recall

b09373aa-b5d5-4d84-8647-bde4fa055042

Page 61

1    specifically when their responsibilities commenced.
2        Q. If we had Standen failing, generally in the
3    spring of '04, and we know there is some kind of
4    document signed between your company and Jackson as
5    a replacement contractor, did Lovett-Silverman come
6    between the failure of Standen and the execution of
7    the agreement with Jackson?
8        A. I don't recall when the agreement with
9    Lovett-Silverman was executed.
10       Q. At some point would there have been a
11   process of ratifying the subcontractors on the
12   Shrewsbury Middle School project?
13       A. Following the --
14       Q. Standen defaulting.
15       A. Yes.
16       Q. Who would have been involved in the
17   ratification process?
18       A. My general recollection is that Tiffany
19   Schaak and Jeremy Medeiros were involved. I have a
20   general understanding that representatives of
21   Lovett-Silverman would have been involved.
22           And, to one extent or another, Russ Warner
23   would have had involvement in that process.
24       Q. When the replacement contractor was brought

Page 62

1    in on a project like this, following a performance
2    bond obligation, would the replacement contractor
3    also sign a contract of any kind with the warding
4    authority; in this case, the Town of Shrewsbury?
5        A. The circumstances would vary in each of
6    these instances.
7            In the case of the Shrewsbury Middle
8    School, it's my recollection that Jackson did not
9    sign an agreement directly with the Town of
10   Shrewsbury to the best of my knowledge.
11       Q. They had an agreement with Travelers or
12   some portion of Travelers as the replacement
13   contractor?
14       A. That's correct.
15       Q. Who at Jackson submitted requisitions and
16   monthly bills to when they receive them from
17   subcontractors?
18       A. My general recollection is that there was a
19   process of exchanging pencil copies of the
20   applications with the Shrewsbury architect and that
21   copies of those requisitions would generally be
22   shared with the United States Fidelity and Guaranty
23   Company.
24       Q. Who would actually write the checks?

Page 63

1        Which checkbook, which company would be the
2    checks that Jackson would receive or the replacement
3    contractor would generally receive for Shrewsbury
4    Middle School?
5        A. In the case of the Shrewsbury Middle
6    School, payments made to Jackson were made by United
7    States Fidelity and Guaranty Company.
8        Q. Was the Town of Shrewsbury at all involved
9    in the selection of Jackson as a replacement
10   contractor?
11       A. I don't have any information concerning
12   whether they were involved or not.
13       Q. Had you ever heard that they were involved?
14       A. No.
15       Q. Have you ever heard that their opinion was
16   solicited on the subject of bringing Jackson in on
17   that project?
18       A. I don't know.
19       Q. Do you know if at all the town was involved
20   in the ratification process following the failure of
21   Standen on the subcontractors?
22       A. Not that I'm aware of.
23           No.
24       Q. Do you recall ever seeing any documentation

Page 64

1    from the Town of Shrewsbury to the surety
2    identifying specific subcontractors that the town
3    would prefer not be ratified following the failure
4    of Standen?
5        A. No.
6        Q. Do you recall seeing any documents
7    submitted to your company from the project architect
8    identifying certain subcontractors that should not
9    be ratified on this particular project?
10       A. No.
11       Q. Have you ever seen a situation where either
12   an awarding authority or an architect, following the
13   failure of a general contractor, requested that
14   specific contractors not be retained?
15       A. Not that I recall.
16       Q. Do you recall seeing any documentation from
17   Lovett-Silverman to your company identifying
18   specific subcontractors that in Lovett-Silverman's
19   opinion should not be ratified after the Standen
20   failure?
21       A. No.
22       Q. I'm going to show you a document that we've
23   marked as Exhibit 78 prior and ask if you've ever
24   seen that document?

b09373aa-b5d5-4d84-8647-bde4fa055042

Page 73

1  company?
2      A. Not that I understand. No.
3      Q. Did it come as a surprise to you personally
4  when Jackson failed?
5      A. Yes.
6      Q. How did you learn that Jackson was failing?
7      A. By observation of their performance on the
8  Shrewsbury project and by virtue of the
9  notifications, which we had received from various
10 subcontractors or suppliers, concerning their
11 failure to make timely payments.
12     Q. How many notifications did the surety
13 receive about failure to make payments?
14     A. I don't recall.
15     Q. Was there a particular individual at your
16 company that was assigned the Jackson matters?
17     A. In what capacity?
18     Q. Handling claims that were coming in during
19 that time frame, before their failure in 2005?
20     A. With respect to the Standen matter?
21     Q. Matters in general.
22     A. I guess I could respond to your question
23 this way: To the extent that there were claims that
24 pertained to Jackson and its role on the two Standen

Page 74

1  projects, I would have been the primary person.
2          And to the extent that there were claims
3  that were presented, that pertained to other
4  projects of Jackson, that there would be others
5  within the Travelers bond operations that would have
6  handled those matters.
7      Q. Do you know who those individuals would
8  have been?
9      A. I have a recollection that they would have
10 included Tom McAuley and Gordon Patterson.
11     Q. Would there be any kind of regular
12 communication between you and either of those two
13 individuals, Gordon and Tom, about Jackson and the
14 impact of their failure on each other's projects?
15     A. I wouldn't characterize it as regular
16 communication.
17     No.
18     Q. Would there be an informal group within
19 your company of people that were dealing in various
20 ways with Jackson that would be addressing a
21 cross-disciplinary ad hoc committee on Jackson's
22 failure?
23     A. There was communication between us around
24 the time that we were considering declaring Jackson

Page 75

1  to be in default and terminating their contracts on
2  Shrewsbury and Westford.
3      Q. Do you have any personal knowledge how many
4  bonded jobs Jackson was performing at the time of
5  their failure, bonded by your company?
6      A. No.
7      Q. Do you have any range?
8      A. No.
9      Q. You said that you had observed in their
10 performance that they were failing.
11         What did you observe?
12     A. The general observation was that the
13 progress on the completion of the Shrewsbury and the
14 Westford projects had slowed and the project owner
15 increasingly was expressing concerns about their
16 failure to complete the project.
17     Q. The project owner being Town of Shrewsbury
18 in our case?
19     A. Yes.
20     Q. Who would the project owner be complaining
21 to or expressing discontent to or concerns to your
22 company?
23     A. To me.
24     Q. Who would you be in contact with from the

Page 76

1  part of the owner?
2      A. The town manager. His name is Dan Morgado.
3      Q. How often would you talk to Dan Morgado?
4      A. I don't have a specific recollection as to
5  the frequency.
6      Q. Did you communicate with him by email?
7      A. I don't have a specific recollection.
8      Q. What kind of comments was he making to you
9  about the performance of Jackson?
10     A. I just have a general recollection of him
11 expressing concern about the failure of Jackson to
12 timely complete the project.
13     Q. How often were you going down to the
14 Shrewsbury Middle School in 2005?
15     A. I have a recollection of at least two to
16 three visits during the spring or summer of 2005.
17         There might have been more occasions, but I
18 don't remember. I remember at least on a couple of
19 occasions being there.
20     Q. Who would you meet with when you went down
21 there?
22     A. I recall an initial meeting that just
23 included Russ Warner. There may have been others
24 but none come to mind.

Page 109

1  matter.
2      Q. Did you ever discuss the Hull High School
3  matter with Gordon Patterson?
4      A. My only recollection is that there was a
5  storm and some severe damage to the roof that
6  occurred at some point in that general time frame.
7      I was wasn't involved in the specifics of
8  the claim handler.
9      Q. I want to clarify: There was no particular
10  written policy that stated that Lovett-Silverman was
11  barred from communicating with Landworks as a matter
12  of surety policy?
13      A. Not that I'm aware of.
14      No.
15      Q. Did you ever tell anybody at
16  Lovett-Silverman that a subcontractor could not be
17  ratified while litigation was in process?
18      A. No. I don't have a specific recollection
19  of that.
20      Q. Are you aware of any instances in which a
21  subcontractor was ratified even though litigation
22  had already commenced against the surety?
23      A. I have a general recollection that
24  arrangements were made that led to a ratification

Page 110

1  that included the reaching of a resolution of the
2  litigation.
3      Q. Was there any kind of written policy that
4  stated once litigation commenced the surety could
5  not consider that party for ratification?
6      A. Not that I'm aware of.
7      No.
8      Q. Do you recall ever attending any kind of
9  event sponsored by the surety in which that was
10  stated to be the company policy?
11      A. No.
12      Q. When you first became involved in the
13  project at the Shrewsbury Middle School, in the
14  spring of 2005, did anybody from the town
15  specifically state any reservations about ratifying
16  Landworks?
17      A. Not that I recall.
18      Q. How about from the architect specifically
19  as to Landworks?
20      A. Not that I recall.
21      Q. How about from CTM?
22      A. Not that I recall.
23      Q. Waterman Design?
24      A. Not that I recall.

Page 111

1      Q. Did you ever speak to anybody at Jackson
2  about the quality of Landworks work?
3      A. I have a general recollection of having had
4  some conversations with Bob Barton about Landworks,
5  but I don't recall the substance of whether the
6  substance of those conversations focused on quality
7  of the work.
8      Q. Do you recall in the spring or summer of
9  2005 hearing anybody, in any capacity, specifically
10  identifying Landworks as a problem subcontractor?
11      A. I have a general recollection of having had
12  some conversations with Bob Barton about Landworks
13  not having a continuing presence on the project and
14  that there were some payment issues.
15      Q. Was that unique to Landworks on this job?
16      A. The issue of continuing presence was not
17  something that was necessarily shared by a number of
18  other subcontractors.
19      The issue of some payment issues was
20  something that was more widespread.
21      Q. Amongst numerous subcontractors?
22      A. Yes.
23      Q. Would having payment issues with Jackson a
24  bar to ratification following a default of Jackson?

Page 112

1      A. No.
2      Q. Was there any kind of policy that stated
3  that having a payment problem with a prior
4  contractor would constitute a bar to ratification?
5      A. No.
6      Q. Have you heard of any subcontractors on
7  this project who declined to return to the site
8  pending payment issues?
9      A. Yes. I have a general recollection of
10  that.
11      Q. Do you know if any subcontractors did not
12  return or declined to come to the job because of
13  payment issues?
14      A. Yes.
15      Q. Do you know who those were?
16      A. I have a general recollection that Century
17  Drywall was an instance where there was some payment
18  issues, and we were unable to realize a
19  reconciliation of their claims and their
20  subcontract.
21      Q. Any others?
22      A. I don't recall specific names.
23      Q. How many subcontractors on the Shrewsbury
24  Middle School have filed suit against USF&G seeking

Page 113

1   payment under the bond?
2       A. A little bit over 20.
3       Q. Have filed suit?
4       A. Yes.
5       Q. In Shrewsbury Middle School or in general?
6       A. In connection with the Shrewsbury Middle
7   School.
8           That would include in connection with
9   Standen's default and Jackson's default.
10      Q. Can you identify as many of those as you
11  can and whether they are Standen or Jackson
12  defaults?
13      A. I don't know that I would parse them out as
14  between Standen and Jackson.
15      Q. Can you do them by trade?
16      A. Coughlin Electric.
17      Q. They were the electrician, Division 15, on
18  this project?
19      A. They were the electrician.
20      Q. They actually filed suit?
21      A. Yes. That's my recollection.
22      Q. Who else?
23      A. Escoa.
24      Q. Also an electrician?

Page 114

1       A. Yes.
2       Q. They filed suit?
3       A. Yes.
4       Q. Who else?
5       A. Landworks.
6       Q. Who else?
7       A. Kittridge Equipment.
8       Q. Do you know what they provided?
9       A. Kitchen equipment. Cafeterias.
10      Q. They filed suit?
11      A. Yes.
12      Q. Who else?
13      A. Century Drywall.
14      Q. That's in suit in Worcester now; correct?
15      A. That's in suit. I'm not certain of the
16  venue.
17      Q. Who else?
18      A. Daddario.
19      Q. Plumbing?
20      A. I don't recall their scope.
21      Q. Did they also file suit?
22      A. Yes.
23      Q. Who else?
24      A. Allstate Steel.

Page 115

1       Q. And that's in suit?
2       A. It was.
3           Well, I'm not certain of the current status
4   of that.
5       Q. Who else?
6       A. I don't recall any other names.
7       Q. How about K&K?
8       A. The name sounds familiar, but I can't put
9   it into context.
10      Q. How about KMD?
11      A. I recall them as a subcontractor. I don't
12  recall that there was litigation involved.
13      Q. How about a floor subcontractor?
14      A. I don't recall if there was litigation
15  involving a flooring subcontractor.
16      Q. How about Steelco?
17      A. Steelco did bring an action.
18      Q. Is there others you can't recall?
19      A. I presume so. Yes.
20      Q. Were all these matters being presented by
21  the same counsel for USF&G?
22      A. No.
23      Q. What law firms were being used to defend
24  these matters?

Page 116

1       A. Some were being represented by Hermes,
2   Netburn, O'Connor, and Spearing.
3           Some were represented by Little, Medeiros,
4   Kinder, Pulman, and Whitney.
5           At some point Hinshaw & Culbertson
6   represented us in one or more of those actions.
7       Q. Anyone else?
8       A. None that come to mind.
9       Q. Is Little Medeiros still doing work for the
10  surety on defending cases involving Massachusetts
11  public school projects?
12      A. Yes.
13      Q. How about Hinshaw Culbertson?
14      Q. Does your question deal with active cases?
15      Q. Yes. Active cases.
16      A. I don't have a recollection of any active
17  cases that they have.
18      Q. Little Medeiros still has active cases?
19      A. In connection with the Standen matter?
20      Q. How about in general?
21          Are they still representing USF&G in
22  Massachusetts?
23      A. Hinshaw Culbertson?
24      Q. Yes.

b09373aa-b5d5-4d84-8647-bde4fa055042

| Page 117 | Page 119 |
|---|---|
| 1  A. Yes, they are. | 1  sent over from Cetrulo & Capone to Hinshaw |
| 2  Q. Little Medeiros is still representing USF&G | 2  Culbertson? |
| 3  in Massachusetts as well? | 3  A. Yes. |
| 4  A. In certain Standen-related matters. | 4  Q. Were you part of that decision to make that |
| 5  Q. Who makes a determination of which law firm | 5  change? |
| 6  is representing a surety in any particular case in | 6  A. Yes. |
| 7  the Commonwealth? | 7  Q. Why was that change made? |
| 8  A. The determination is generally made by the | 8  MR. HIPP: Objection. |
| 9  assigned claim manager, manager or attorney, as the | 9  Attorney-client privilege. |
| 10 case may be. | 10 MR. MELTZER: Same motion to |
| 11 Q. At the Shrewsbury Middle School who would | 11 compel. |
| 12 have made that determination? | 12 Q. (By Mr. Meltzer) At some point was this |
| 13 A. At what time? | 13 matter then sent over to Hermes Netburn? |
| 14 Q. In 2005. | 14 A. Yes. |
| 15 A. During the time that I was involved, I | 15 Q. Were you part of that decision to shift |
| 16 would have been involved in the counsel selection | 16 that matter as well? |
| 17 decisions. | 17 A. Yes. |
| 18 Q. Would you have been involved in the | 18 Q. Tell me why you made that determination? |
| 19 determination to send this matter to Little Medeiros | 19 MR. HIPP: Objection based on |
| 20 when the case was filed by Landworks? | 20 attorney-client privilege. |
| 21 A. No, I was not. | 21 MR. MELTZER: Move to compel that |
| 22 Q. Were you involved when the matter was | 22 one as well. |
| 23 shifted to Cetrulo & Capone? | 23 Q. (By Mr. Meltzer) Would it be common in a |
| 24 A. Either Cetrulo & Capone or Hinshaw | 24 lawsuit involving the surety in Massachusetts, in |

| Page 118 | Page 120 |
|---|---|
| 1  Culbertson. I don't recall when Mr. Carver changed | 1  2005, for a case to be handled by four different law |
| 2  firms. | 2  firms? |
| 3  Q. Do you recall being involved in that | 3  A. I think the answer to that question depends |
| 4  decision to transfer the matter away from Little | 4  on the circumstances of the particular case. |
| 5  Medeiros? | 5  Q. On the Shrewsbury Middle School, how many |
| 6  A. Yes. | 6  of these cases were handled by four different law |
| 7  Q. Do you know why that determination was | 7  firms within an eight-month period? |
| 8  made? | 8  A. This is the only one that I know of. |
| 9  MR. HIPP: Objection. | 9  Q. Are you aware that this case was originally |
| 10 MR. MELTZER: Are you instructing | 10 filed in the Worcester Superior Court? |
| 11 him not to answer? | 11 A. That's my general understanding. |
| 12 MR. HIPP: Yeah. You're getting | 12 Q. You know that at some point it was removed |
| 13 into attorney-client issues. | 13 to the U.S. District Court? |
| 14 MR. MELTZER: If you instruct him | 14 A. Yes. |
| 15 not to answer, I'll move to compel the answer to | 15 Q. Can you tell me why the determination was |
| 16 that. | 16 made to move the case to the United States District |
| 17 Q. (By Mr. Meltzer) Can you tell me why | 17 Court? |
| 18 Cetrulo & Capone was selected as replacement | 18 MR. HIPP: Objection on the basis |
| 19 counsel? | 19 of attorney-client privilege. |
| 20 MR. HIPP: Objection for the same | 20 MR. MELTZER: Move to compel on |
| 21 reason. | 21 that one as well. |
| 22 MR. MELTZER: Same motion to | 22 Q. (By Mr. Meltzer) How many cases involving |
| 23 compel. | 23 the Shrewsbury Middle School were removed to the |
| 24 Q. (By Mr. Meltzer) Was this matter ultimately | 24 U.S. District Court? |

b09373aa-b5d5-4d84-8647-bde4fa055042

31 (Pages 121 to 124)

Page 121

1    A. I don't recall.
2    Q. Can you think of any others involving the
3    Shrewsbury Middle School that have been moved to the
4    U.S. District Court?
5    A. I don't recall.
6        (A brief recess was taken.)
7    Q. (By Mr. Meltzer) Was there any kind of
8    formal policy at the surety that determined how
9    counsel was selected to represent the surety in any
10   given case?
11   A. The decision is wanted to be made by the
12   assigned claim attorney or manager.
13       Generally, the expectation is that the
14   claim attorney or counsel will utilize counsel on
15   what we would identify to be our list of panel
16   counsel, which are attorneys that are generally
17   cleared to represent us.
18       But there are some exceptions to that
19   general practice.
20   Q. Is there any policy to explain why a case
21   will be moved from attorney to attorney in the same
22   case?
23   A. That would be something that would be
24   dictated by the claim manager or attorney's

Page 122

1    evaluation of the particulars of that circumstance.
2    Q. Other than the Landworks case, can you
3    recall any other cases that you've been involved in,
4    in the last two years, that have had four different
5    law firms representing the surety within an
6    eight-month period?
7    A. No.
8    Q. Is there any formal policy within the
9    surety that explains when a case should be removed
10   for a state to a federal court?
11   A. Not that I'm aware of.
12   Q. Do you know why Landworks was not ratified
13   in this case?
14       MR. HIPP: Objection as to form.
15       I assume you're referring to after the
16   Jackson default.
17       MR. MELTZER: Yes.
18   A. I don't have a specific recollection as to
19   why Landworks was not ratified but would respond to
20   your question in this way: At the time that we were
21   — our consultant, Lovett-Silverman, had been
22   contacted by Landworks with an expression of
23   interest to become ratified, we had identified them
24   es a contractor who had been absent from the project

Page 123

1    site for a number of months.
2        The site work, which was the subject of
3    their original subcontract responsibilities, was an
4    issue that had some urgency associated with it and
5    efforts were being made to identify other
6    alternatives for completion of that work about the
7    same time that Landworks contacted Lovett-Silverman.
8    Q. How did you determine that they had been
9    absent from the project for a length of time?
10   A. That was my general understanding from what
11   I recall from discussions with Bob Barton of Jackson
12   Construction Company.
13   Q. What period of time were those absences
14   occurring?
15   A. My general understanding is that there had
16   not been a presence roughly after the first of the
17   year 2005 through the summer months when we issued
18   Jackson's default and termination.
19   Q. Were there other subcontractors who were
20   absent during that time frame; in the spring,
21   early-summer of 2005?
22   A. I don't recall.
23   Q. Have you heard that Landworks did not
24   return to the site because of nonpayment of their

Page 124

1    invoices?
2    A. I had heard that there were some issues
3    with respect to payment. As to why they did not
4    return to the site, I don't have a specific
5    recollection.
6    Q. Had you ever heard that Landworks had left
7    the site due to winter conditions?
8    A. I don't have that recollection.
9    Q. Other than Bob Barton saying there had been
10   absences during the time frame from the beginning of
11   2005 through the summer, are there any other reasons
12   that you've heard why Landworks was not ratified?
13       MR. HIPP: Objection as to form.
14   A. My general understanding is is that they
15   hadn't been evident on the project site and, as a
16   consequence, their work was not being maintained.
17       I had the general understanding that
18   Jackson was considering engaging the services of
19   another site work contractor in the early part of
20   the summer to take up and to complete the work that
21   was within Landworks' subcontract.
22   Q. Did you ever see any correspondence from
23   Landworks, in the spring of 2005, indicating that
24   they were ready, willing, and able to return to work

b09373aa-b5d5-4d84-8647-bde4fa055042

35 (Pages 137 to 140)

Page 137

1    A. This is a pleading that was prepared by
2    attorneys.
3    Q. Does that reflect your understanding of
4    what's in the subcontract between Landworks and
5    Standen?
6    A. It's a paraphrase of their subcontract that
7    conforms with my general understanding.
8    Q. Paragraph 10, On or about April 29, 2004,
9    Landworks entered into a subcontract with Jackson.
10    See that reference?
11    A. Yes.
12    Q. When did you first see that subcontract?
13    A. I don't recall.
14    Q. Did you ever discuss the terms of that
15    subcontract with Jackson, anybody at Jackson?
16    A. I don't recall.
17    Q. Do you recall ever having a conversation
18    with anybody from Jackson in which you inquired
19    about the scope of Landworks' responsibilities on
20    this project?
21    A. I don't recall.
22    Q. Did you ever have that kind of conversation
23    .with anybody from Standen?
24    A. No.

Page 138

1    Q. Did you ever instruct anybody at
2    Lovett-Silverman to have a conversation with Jackson
3    to ascertain Jackson's understanding of the
4    subcontract?
5    A. I don't recall.
6    Q. During the time frame early-2005 was
7    anybody at the surety still in contact with anybody
8    from Standen?
9    A. Repeat the question.
10        (Last question read back.)
11    A. Not other than through counsel.
12    Q. Was any effort made through counsel to
13    ascertain the scope of Landworks' scope with Standen
14    with the Shrewsbury Middle School project?
15        MR. HIPP: Objection on the basis
16    of attorney-client privilege.
17        MR. MELTZER: Move to compel.
18    Q. (By Mr. Meltzer) Moving down to paragraph
19    11, Landworks abandoned its work at the project in
20    the fall of 2004.
21        Did I read that correctly?
22    A. Yes.
23    Q. Tell me what that's based upon?
24        MR. HIPP: Same objection on

Page 139

1    attorney-client privilege.
2        You can answer if it's to the extent of
3    your own personal knowledge and not attorney-client
4    communications.
5    A. The information would have come to me
6    through our attorneys and would require me to
7    disclose information of that nature.
8    Q. Are you aware of any statutory provisions
9    in Massachusetts law that limit when site work can
10    be performed in the Commonwealth due to seasonal
11    constraints?
12        MR. HIPP: Same objection on
13    attorney-client privilege.
14        You can answer to the extent you have your
15    own personal knowledge.
16    A. I don't have a recollection of a
17    Commonwealth of Massachusetts statute.
18    No.
19    Q. Are you aware of any industry standards
20    that dictate when certain site work can be performed
21    in the Commonwealth of Massachusetts due to seasonal
22    restraints?
23    A. I'm not aware of a specific industry
24    standard.

Page 140

1    No.
2    Q. How about any ordinance in the Town of
3    Shrewsbury?
4    A. I'm not aware of en ordinance in the Town
5    of Shrewsbury.
6    Q. Have you ever heard the term "winter
7    shutdown"?
8    A. In general terms, yes.
9    Q. What does that mean?
10    A. It would typically refer to activities that
11    were not to be performed due to the reasons that
12    would have to do with the climate.
13    Q. What kind of work?
14    A. Typically exterior work.
15    Q. Site work?
16    A. Yes.
17    Q. Do you know if there was any winter
18    shutdown provisions at the Shrewsbury Middle School
19    project for site work?
20    A. I have a recollection that there was some
21    restrictions on the time period within which seeding
22    activity could be undertaken.
23    Q. How about paving activity?
24    A. I don't have a specific recollection.

b09373aa-b5d5-4d84-8647-bde4fa055042

**Page 165**

1  Should we pursue this guy?
2      I know you have issues with him.
3      Do you recall seeing this email?
4      A. I don't have an independent recollection,
5  other than from this.
6      Q. As you sit here today, do you know whether
7  Russ had issues with the president of Landworks?
8      A. The only issues that I'm aware of were the
9  existence of the litigation.
10     There may be other issues that were in his
11  mind, but I would only be speculating.
12     Q. Did you have any discussions with Russ
13  Fuller about what those issues were?
14     A. I only have a general recollection of
15  having discussed this situation with Russ Fuller.
16  But I don't have a specific recollection of the
17  particular conversations.
18     Q. In terms of the issues, plural, as you sit
19  here today, even though you're CC'd on this --
20  actually, you're a direct recipient -- you don't
21  know what that refers to?
22     A. The only thing that I would be in a
23  position to respond to specifically was the
24  existence of the litigation.

**Page 166**

1      Q. Would you expect your consultants to be
2  respectful of subcontractors working on a public
3  construction project?
4      A. Yes.
5      Q. Would it be respectful to refer to the
6  president of a subcontractor as "this guy"?
7      A. It's a choice of words that I probably
8  wouldn't use myself, but I don't know that any
9  disrespect is intended.
10     Q. Take a look for a moment at No. 58. Same
11  question: Looking at that first sentence, is that
12  the kind of language you are accustomed to seeing
13  for a consultant working for USF&G?
14         MR. HIPP: Objection as to form.
15  Which of the emails are you referring?
16         MR. MELTZER: I'm referring to the
17  top one. It says, Hi, Al. I just got back from my
18  F-ing vacation.
19     A. That's not something that I would normally
20  expect to see.
21     No.
22     Q. Does that strike you as professional?
23     A. Not particularly.
24     Q. Look at No. 43 for a moment.

**Page 167**

1      Do you recall seeing this email?
2      A. Yes.
3      Q. When did you first see this email?
4      A. I don't know that I could pin a date on it.
5      My general recollection is is that it was a
6  document that was identified during the course of
7  discovery of Lovett-Silverman's business records and
8  it was brought to my attention after that.
9      Q. You had a chance to read this email?
10     A. Yes, I have.
11     Q. You saw the language at the bottom that
12  says, We can try to bang the subs, but I think that
13  we can never recover from them what we are spending.
14     See that reference?
15     A. Yes.
16     Q. In fact, at the top of that paragraph it
17  actually talks about site work; correct?
18     A. Among other things, yes.
19     Q. Do you know what it means to bang subs?
20     A. I don't know what Mr. Falango meant by
21  that.
22     Q. Did you ever call up Al Falango and ask him
23  what he meant by it?
24     A. I remember having a conversation with him

**Page 168**

1  about it.
2      Q. When was that conversation?
3      A. After I had seen the email.
4      Q. Why did you have a conversation with him
5  about it?
6      A. Because I wanted to understand more clearly
7  what he was talking about and to express some
8  disappointment in his choice of words.
9      Q. Why disappointment?
10     A. Because it appears to be the use of slang,
11  which could be taken out of context.
12     Q. Did he explain to you what he meant by
13  that; we can try to bang the subs?
14     A. My understanding was that he was talking
15  about to identify instances where we had incurred
16  costs or would incur costs to complete or to fix
17  corrective -- to complete work or to correct
18  defective work, which would be chargeable back to
19  the account of the involved subcontractor.
20     Q. That's what he said?
21     A. In general terms, yes.
22     Q. Do you recall when that conversation took
23  place?
24     A. Again, it was after I had seen the email.

## Page 169

1    Q. Do you know if Lovett-Silverman had already
2  been added as a party to this case, when you had
3  that conversation with him?
4    A. I don't recall the time sequence.
5    Q. Other than this reference in this email,
6  had you seen that phrase before?
7    A. I don't have a recollection of seeing it.
8  No.
9    Q. Have you ever talked to anybody, other than
10  Al Falango, about what "bang the subs" means in the
11  construction industry in Massachusetts?
12    A. I have a general recollection of talking
13  with John Lovett and Tony Lardaro about it.
14    Q. Why did you talk to them about it?
15    A. I wanted to make sure that they were aware
16  of the existence of this email and the use of the
17  language.
18    Q. Would use of that language trouble you?
19    A. Yes.
20    Q. Why?
21    A. Because it was, I thought, inappropriate
22  language to be used in connection with our business
23  matters.
24    Q. Is it policy of USF&G to, quote, try to

## Page 170

1  bang subs?
2    A. Whatever that means, it's not our policy.
3    Q. Going to the second part where it talks
4  about, We can never recover from them what we are
5  spending, do you know what that means?
6    A. I can't put myself in the mind of Al
7  Falango. I can only tell you what inference I would
8  draw from it.
9    Q. What inference would you draw from that?
10    A. That the costs that were being incurred,
11  that would be subject to back charge, subcontractors
12  would not be able to be recovered out of the
13  remaining contract balances on those subcontracts.
14    Q. What was John Lovett's reaction to your
15  communication with him about this language?
16    A. My general understanding is that he shared
17  my concern.
18    Q. Is USF&G continuing to do business with
19  Lovett-Silverman in Massachusetts?
20    A. Yes.
21    Q. What's the most recent project they've
22  commenced for USF&G or the surety in general?
23    A. I don't have a recollection of any
24  projects, other than the ones where they're involved

## Page 171

1  with Standen in Massachusetts – in the Standen
2  case.
3    Q. Other than the Standen ones, you're not
4  aware of any that they have commenced recently on
5  behalf of USF&G?
6    A. Not that I have personal knowledge of.
7    Q. Looking at the beginning part of that
8  bottom paragraph, where it says, I don't think the
9  825K is enough for the contingency.
10    Do you know what that means?
11    A. I can only respond to your question this
12  way: Lovett-Silverman was tasked with developing
13  some estimated costs to complete. And this was an
14  effort to try to estimate what those costs would be.
15    Q. Was it your understanding of USF&G or the
16  surety, when Lovett-Silverman started this job, that
17  Lovett-Silverman would bring this job in within the
18  original construction budget?
19    A. Where are you –
20    Q. In general, was it your expectation or the
21  expectation of the surety that Lovett-Silverman
22  would complete this job and bring it in within the
23  original construction budget?
24    A. Lovett-Silverman wasn't tasked with the

## Page 172

1  responsibility of completing the project, so they
2  couldn't have done something within a budget. It
3  wasn't their responsibility.
4    Q. Any idea why there was concern then about
5  whether the 825K is enough?
6    A. We had asked them to give us information
7  about the estimated cost to complete, in order to
8  establish our loss reserves for this particular
9  matter.
10    Q. Is there a policy at the surety for
11  awarding this kind of outside consulting work to
12  construction consultants who bring in the best work
13  for the least money?
14    A. No.
15    Q. Was that kind of statement ever made to
16  Lovett-Silverman?
17    A. Not that I'm aware of.
18    Q. Can you tell me what you did in preparation
19  for this deposition today to be ready for this?
20    MR. HIPP: Objection on the basis
21  of attorney-client privilege.
22    Q. (By Mr. Meltzer) Other than communicating
23  with your attorney?
24    A. If I can respond –

# EXHIBIT B

## Page 1

Volume I
Pages 1 - 138

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION
C.A. No. 05-CV-40072 FDS

LANDWORKS CREATIONS, LLC.
Plaintiff,
vs.
UNITED STATES FIDELITY
AND GUARANTY COMPANY and
LOVETT-SILVERMAN CONSTRUCTION
CONSULTANTS, INC.,
Defendants.

- - - - - - -

DEPOSITION of KATHRYN CROCKETT, called as a
witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Norma Flynn Borell, CSR No.
102793, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
taken at the offices of THE MOUNTAIN STATES LAW
GROUP, 160 Speen Street, Framingham, Massachusetts,
on Wednesday, January 10, 2007, at 9:10 AM.

***********************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (817) 535-2727
TOLL FREE: (866) 244-8858
FAX: (508) 752-4611
***********************

## Page 2

```
 2
 3
         THE MOUNTAIN STATES LAW GROUP
 4    Robert N. Meltzer, Esq.
      160 Speen Street, SU 307
 5    P.O. Box 1459
      Framingham, Massachusetts 01701
 6    for the Plaintiff.
 7
 8    HERMES, NETBURN, O'CONNOR & SPEARING
      BY: Eric C. Hipp, Esq.
 9    265 Franklin Street
      Boston, Massachusetts 02109
10    for the Defendant/United States Fidelity
         and Guaranty Company.
11
12
         DONOVAN & HATEM LLP
13    BY: Julie A. Ciollo, Esq.
      Two Seaport Lane
14    Boston, Massachusetts 02210
      for the Defendant/Lovett-Silverman
15       Construction Consultants, Inc.
16
17
         POJANI, HURLEY, RITTER & SALVIDIO, LLP
18    BY: William J. Ritter, Esq.
      446 Main Street, 21st Floor
19    Worcester, Massachusetts 01608
      for the Deponent.
20
21  ALSO PRESENT:
22    Neal Matthews
23
24
```

## Page 3

```
 1            INDEX
 2  Testimony of:   Direct Cross Redirect Recross
 3    KATHRYN CROCKETT
 4  by Mr. Meltzer  5
 5
           EXHIBITS
 6
      Exhibit No.    Description       For I.D.
 7
       1      Under Drainage Document      39
 8
       2      Storm Drainage Document      41
 9
10     3      Water Systems Document       41
11     4      Irrigation Document       43
12     5      Site Improvements Document   44
13     6      E-Mail dated 6/8/05       81
14     7      Memo dated 10/10/01        84
15     8      Letter dated 12/30/02      88
16     9      Letter dated 10/14/04      89
17    10      Letter dated 9/26/05       93
18    11      E-Mail dated 10/6/05       95
19    12      Letter dated 8/26/04       97
20    13      Letter dated 11/04/04      100
21    14      Letter dated 2/2/05       102
22    15      Alternate No. 5          103
23    16      E-Mail dated 11/5/04      109
24    17      Letter dated 10/4/04      110
```

## Page 4

```
 1  CONTINUED:
 2    18      Estimate          112
 3    19      Letter of Transmittal     112
 4    20      Letter of Transmittal     113
 5    21      Letter dated 10/24/05      114
 6    22      Letter dated 12/6/05      115
 7    23      Construction Meeting #107  119
 8    24      Construction Meeting #103  120
 9    25      Construction Meeting #98   124
10    26      Oak Middle School Completion
              Game Plan         125
11
      27      Status of Project      126
12
      28      E-Mail dated 12/8/04      130
13
      29      E-Mail dated 6/30/04      131
14
      30      E-Mail dated 2/27/04      132
15
16
17
18
19
20
21  ** EXHIBITS RETAINED BY ATTORNEY MELTZER **
22
23
24
```

Page 133

1   Landworks bringing to their attention there was a
2   deficiency on the grades?
3      A. I have not seen a letter to Landworks.
4      Q. Do you know if Landworks was given an
5   opportunity to correct the grades that you just
6   referenced?
7      A. I do not.
8      Q. Other than grades, what other issues would
9   you put as deficiencies?
10     A. I know Landworks was responsible for the
11  concrete at the accessible sidewalks that had to be
12  redone.
13     Q. Do you know if they were given an
14  opportunity to do that work?
15     A. I do not know.
16     Q. Have you ever seen any correspondence to
17  Landworks directing them to complete that work, to
18  do that work?
19     A. I haven't seen it.
20     Q. Were you ever present at any conversations
21  where Landworks refused to do that work?
22     A. There is that activity schedule where it
23  says the ramps were disputed by Landworks. And I do
24  recall that.

Page 134

1      Q. Did they say they were refusing to do that
2   work, even though it was disputed?
3      A. I don't recall.
4      Q. Have you ever seen any correspondence to
5   Landworks stating if work was not done, their
6   contract would be terminated?
7      A. I haven't.
8      Q. Have you ever seen any kind of termination
9   letter to Landworks?
10     A. No.
11     Q. Were you ever asked by the surety to put
12  together a list of deficiencies as to work done by
13  Landworks?
14     A. Not specifically to Landworks.
15     Q. As to who?
16     A. As to the project.
17     Q. Did you put together that list of
18  deficiencies?
19     A. I don't recall if it was specifically for
20  the bonding company, but we do that as a contractual
21  obligation.
22     Q. In that particular document, did you
23  identify by subcontractor who those deficiencies
24  belonged to?

Page 135

1      A. No.
2         MR. MELTZER: Let's take a quick
3   five-minute break.
4         (Short recess taken.)
5         MR. MELTZER: That's all I have.
6         MR. HIPP: No questions.
7         MS. CIOLLO: No questions.
8         (Adjourned at 12:30 PM.)

Page 136

1         I, KATHRYN CROCKETT, do hereby
2   certify that I have read the foregoing transcript of
3   my testimony, and further certify that said
4   transcript is a true and accurate record of said
5   testimony.
6         DATED AT _____,
7   this _____ day of __ _____, 2007.
8
9
10
11  _____
12
13
14
15
16
17        SIGNED UNDER THE PAINS AND
18        PENALTIES OF PERJURY.
19
20
21
22
23
24

# EXHIBIT C

1 (Pages 1 to 4)

**Page 1**

Volume I
Pages 1 - 53

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION
C.A. No. 05-CV-40072 FDS

LANDWORKS CREATIONS, LLC.,
    Plaintiff,
    vs.
UNITED STATES FIDELITY
AND GUARANTY COMPANY and
LOVETT-SILVERMAN CONSTRUCTION
CONSULTANTS, INC.,
    Defendants.

* * * * * * *

DEPOSITION of WILLIAM A. MERITZ, called as a
witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Norma Flynn Borell, CSR No.
102793, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
taken at the offices of THE MOUNTAIN STATES LAW
GROUP, 160 Speen Street, Framingham, Massachusetts,
on Thursday, January 11, 2007, at 11:20 AM.

************************

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-8856
FAX: (508) 752-4611
************************

**Page 2**

2
3
4    THE MOUNTAIN STATES LAW GROUP
     Robert N. Meltzer, Esq.
     160 Speen Street, SU 307
5    P.O. Box 1459
     Framingham, Massachusetts 01701
6    for the Plaintiff.
7
8    HERMES, NETBURN, O'CONNOR & SPEARING
     BY: Eric C. Hipp, Esq.
9    265 Franklin Street
     Boston, Massachusetts 02109
10   for the Defendant/United States Fidelity
     and Guaranty Company.
11
12
     DONOVAN & HATEM LLP
13   BY: Marianne E. Brown, Esq.
     Two Seaport Lane
14   Boston, Massachusetts 02210
     for the Defendant/Lovett-Silverman
15      Construction Consultants, Inc.
16
17   ALSO PRESENT:
18      Neal Matthews
19
20
21
22
23
24

**Page 3**

1          I N D E X
2    Testimony of:    Direct  Cross  Redirect  Recross
3    WILLIAM A. MERITZ
4    by Mr. Meltzer      4
5          E X H I B I T S
6
     Exhibit No.    Description          For I.D.
7
         44    E-Mail dated 8/22/05      20
8
         45    E-Mail dated 9/08/05      22
9
         46    E-Mail dated 9/15/05      26
10
         47    E-Mail dated 9/15/05      28
11
         48    E-Mail dated 9/26/05      33
12
         49    E-Mail dated 10/5/05      39
13
         50    E-Mail dated 11/4/05      41
14
         51    E-Mail dated 1/16/06      45
15
         52    E-Mail dated 1/25/06      46
16
         53    E-Mail dated 2/1/06       49
17
18
19
20
21
22
23   ** EXHIBITS RETAINED BY ATTORNEY MELTZER **
24

**Page 4**

1          STIPULATIONS
2          It is stipulated by and between
3    counsel for the respective parties that the
4    deposition transcript will be read and signed by the
5    deponent within forty-five (45) days of receipt of
6    transcript under the pains and penalties of perjury.
7    The filing and the notarization are hereby waived.
8          It is further agreed that all
9    objections, except as to the form of the question,
10   and motions to strike, are reserved until the time
11   of trial.
12          WILLIAM A. MERITZ, having been
13      satisfactorily identified and duly sworn
14      by the Notary Public, was examined and
15      testified as follows:
16          DIRECT EXAMINATION
17   BY MR. MELTZER:
18   Q. Would you state your name for the record?
19   A. William A. Meritz.
20   Q. Mr. Meritz, have you ever been deposed
21   before?
22   A. No.
23   Q. Okay. My name is Rob Meltzer. I am an
24   attorney for Landworks, a plaintiff in this case

## Page 45

1          (Exhibit No. 51 marked for
2    Identification.)
3       Q. Have you ever seen this e-mail?
4       A. I see it now.
5       Q. Do you recall seeing it at the time?
6       A. I do not recall.
7       Q. Do you recall having any conversations with
8    anybody about this particular e-mail?
9       A. I do not remember.
10      Q. Were you at all involved in determining
11   back charges against Landworks?
12      A. Repeat the question.
13      Q. Were you involved in establishing the back
14   charges against Landworks?
15      A. I don't recall.
16      Q. Do you recall being involved in any
17   meetings where back charges against Landworks were
18   discussed?
19      A. No.
20      Q. In January of 2006, did you make any effort
21   to determine the scope of Landworks' contract?
22      A. I don't recall.
23      Q. Do you recall if you made any effort to
24   determine if, in fact, there was a prior landscaper

## Page 46

1    when Jackson was on the project?
2       A. Repeat that question.
3       Q. In January of 2006, did you make any effort
4    to determine if there had been a landscaper working
5    on this project when Jackson was on the project?
6       A. I don't recall.
7       Q. In January of 2006, did you make any
8    inquiry into who was responsible for providing
9    material for site work on the project?
10      A. I don't recall.
11      Q. In January of 2006, did you make any
12   inquiry as to who was responsible for doing exterior
13   electric work at the project?
14      A. Repeat that question.
15          (Pending question read back.)
16      A. I do not recall.
17          MR. MELTZER: Let's mark this as
18   Exhibit 52.
19          (Exhibit No. 52 marked for
20   Identification.)
21      Q. Have you seen this e-mail before?
22      A. I see it now.
23      Q. Do you see it says, "We are preparing a
24   report to the surety regarding Landworks. Do you

## Page 47

1    have any correspondence in your files pertaining to
2    deficient work performed by Landworks?"
3          Do you see that paragraph?
4       A. Yes, I do.
5       Q. Prior to February 1st, 2006, were you
6    instructed to begin preparing a report to the
7    surety?
8       A. I do not recall.
9       Q. It says, "We are preparing a report." Who
10   does that "we" refer to?
11      A. I don't recall.
12      Q. Do you recall sending this request for
13   information to Katie Crockett?
14      A. I do not.
15      Q. Do you recall getting a response from her?
16      A. I do not recall.
17      Q. Were you involved in preparing a report to
18   the surety regarding Landworks?
19      A. Repeat that question.
20          (Pending question read back.)
21      A. I don't remember.
22      Q. When it says "we are preparing a record,"
23   do you know if that report was finalized?
24      A. I do not remember.

## Page 48

1       Q. Do you recall seeing a draft version?
2       A. I do not remember.
3       Q. Would it be typical on a project of this
4    kind to prepare a written report to the surety
5    regarding e subcontractor?
6       A. Repeat that question.
7          (Pending question read back.)
8       A. Perhaps.
9       Q. Okay. Did you do that for other
10   subcontractors on this project?
11      A. I don't remember.
12      Q. Do you know why this was being done
13   particularly in February of 2006?
14      A. No.
15      Q. After February 1st, 2006, have you ever
16   seen any documentation which identifies specifically
17   deficiencies in Landworks' work?
18      A. I don't remember.
19      Q. As I sit here today, can you tell me one
20   item, even one item, that Landworks had done that
21   was deficient?
22      A. I don't remember.
23          MR. MELTZER: Let's mark this as
24   Exhibit 53.

# EXHIBIT D

1 (Pages 1 to 4)

---

## Page 1

Volume I
Pages 1 - 122

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION
C.A. No. 05-CV-40072 FDS

LANDWORKS CREATIONS, LLC.
  Plaintiff,
  vs.
UNITED STATES FIDELITY
AND GUARANTY COMPANY and
LOVETT-SILVERMAN CONSTRUCTION
CONSULTANTS, INC.,
  Defendants.

. . . . . . .

DEPOSITION of ROBERT S. BULLOCK, called as a
witness by counsel for the Plaintiff, pursuant to
the applicable provisions of the Federal Rules of
Civil Procedure, before Norma Flynn Borelli, CSR No.
102793, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
taken at the offices of THE MOUNTAIN STATES LAW
GROUP, 160 Speen Street, Framingham, Massachusetts,
on Thursday, January 11, 2007, at 1:30 PM.

••••••••••••••••••••••••
FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303 * (617) 536-2727
TOLL FREE: (888) 244-6858
FAX: (508) 752-4611
••••••••••••••••••••••••

---

## Page 2

1
2  APPEARANCES:
3
  THE MOUNTAIN STATES LAW GROUP
4    Robert N. Meltzer, Esq.
  160 Speen Street, SU 307
5    P.O. Box 1459
  Framingham, Massachusetts 01701
6    for the Plaintiff.
7
8  HERMES, NETBURN, O'CONNOR & SPEARING
  BY: Eric C. Hipp, Esq.
9    265 Franklin Street
  Boston, Massachusetts 02109
10   for the Defendant/United States Fidelity
    and Guaranty Company.
11
12
  DONOVAN & HATEM LLP
13   BY: Marianne E. Brown, Esq.
  Two Seaport Lane
14   Boston, Massachusetts 02210
  for the Defendant/Lovett-Silverman
15     Construction Consultants, Inc.
16
17 ALSO PRESENT:
18   Neal Matthews
19
20
21
22
23
24

---

## Page 3

1
2           I N D E X
3 Testimony of:    Direct Cross Redirect Recross
4 by Mr. Meltzer  4
5           E X H I B I T S
6

| Exhibit No. | Description | For I.D. |
|---|---|---|
| 54 | E-mail dated 8/17/05 | 26 |
| 55 | E-mail dated 8/18/05 | 34 |
| 56 | E-Mail dated 8/19/05 | 42 |
| 57 | E-mail dated 8/19/05 | 46 |
| 58 | E-mail dated 8/19/05 | 55 |
| 59 | E-mail dated 8/23/05 | 68 |
| 60 | E-mail dated 9/15/05 | 78 |
| 61 | E-mail dated 7/18/05 | 83 |
| 62 | E-mail dated 9/5/05 | 87 |
| 63 | E-mail dated 2/1/06 | 112 |
| 64 | E-mail dated 8/5/05 | 116 |
| 65 | E-mail dated 2/2/06 | 118 |

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24 ** EXHIBITS RETAINED BY ATTORNEY MELTZER **

---

## Page 4

1         STIPULATIONS
2     It is stipulated by and between
3 counsel for the respective parties that the
4 deposition transcript will be read and signed by the
5 deponent within forty-five (45) days of receipt of
6 transcript under the pains and penalties of perjury.
7 The filing and the notarization are hereby waived.
8     It is further agreed that all
9 objections, except as to the form of the question,
10 and motions to strike are reserved until the time of
11 trial.
12     ROBERT J. BULLOCK, having been
13   satisfactorily identified and duly sworn
14   by the Notary Public, was examined and
15   testified as follows:
16     DIRECT EXAMINATION
17 BY MR. MELTZER:
18   Q. State your name for the record?
19   A. Robert Bullock.
20   Q. Mr. Bullock, have you ever been deposed
21 before?
22   A. No.
23   Q. I will give you some ground rules. My name
24 is Rob Meltzer. I represent Landworks in this case,

Page 93

1  Concrete?
2      A. In this e-mail?
3      Q. How about other than this e-mail?
4      A. No.
5      Q. Ever see any references to them in any
6  documents prepared by Jackson?
7      A. No.
8      Q. Do you see where it says, "They were
9  probably a sub to Landworks"?
10     A. Yes.
11     Q. Were you ever able to establish if Frias
12 Concrete was a sub to Landworks?
13     A. It wasn't. I wasn't asked to establish
14 that.
15     Q. Have you ever seen any documents suggesting
16 they were a sub to Landworks?
17     A. No.
18     Q. Do you know if by Monday, January 16th,
19 2006, it had been positively ascertained what
20 exactly Landworks' scope of work had been?
21     A. We had the scope of work that we received,
22 the exhibit that's in the subcontract. That's their
23 scope of work.
24     Q. As of this January 18th, e-mail, No. 51

Page 94

1  we've marked, it's not known if Frias was a sub to
2  Landworks, is that correct?
3      A. Yes.
4      Q. There are still doubts as to who was
5  working for Landworks?
6      A. With regard to subs to Landworks, yes.
7      Q. You don't know if Frias was to Jackson as
8  opposed to being to Landworks?
9      A. I don't know.
10     Q. Were you ever asked to investigate that
11 matter by anyone?
12     A. I was not.
13     Q. Take a look at No. 52.
14     A. Okay.
15     Q. I want to start --
16         MS. BROWN: I'm not done reading
17 it yet.
18         MR. MELTZER: Take your time.
19     Q. I want to start on Page 5 of 6, the e-mail
20 that is addressed to Bob and Jason. Could you tell
21 me what instigated the creation of this e-mail on
22 December 21st, 2005, at 2:14 PM?
23     A. I don't recall what instigated it.
24     Q. There is a reference here, you asked Bob

Page 95

1  and Jason to "please include any photos and
2  videotape of these specific items before and after."
3  Do you see the reference?
4      A. Yes.
5      Q. Did you receive any photos and videos in
6  response to this e-mail?
7      A. I don't know.
8      Q. You state further down, "Also I am sending
9  my current list of the site work scope." Do you see
10 that reference?
11     A. Yes.
12     Q. Underneath, you have got this whole section
13 in all caps, correct?
14     A. Yes.
15     Q. Where did you get that material that's
16 attached there?
17     A. From the scope of work.
18     Q. This is the exhibit to the Jackson
19 contract?
20     A. Yes.
21     Q. Is there more to that exhibit than this?
22     A. I don't know.
23     Q. As of December 21, 2005, did you have any
24 conversation with Landworks since the August 2005

Page 96

1  conversation discussing their scope?
2      A. No.
3      Q. By December 21, 2005, had you had any
4  conversation with anybody from Jackson Construction
5  confirming the scope of Landworks' work on this
6  project?
7      A. No.
8      Q. As of December 21, 2005, had you spoken to
9  anybody at CTM about Landworks' scope on this
10 project?
11     A. No.
12     Q. As of December 21, 2005, had you spoken to
13 anybody at Waterman about the scope?
14     A. Landworks' scope?
15     Q. Yes.
16     A. No.
17     Q. This December 21, 2005, 2:45 e-mail, is
18 based entirely on an understanding of scope drawn
19 from the exhibit to the Jackson contract?
20     A. Yes.
21     Q. Had you looked at any other documents to
22 ascertain scope by December 21, 2005?
23     A. Just the subcontract with Jackson.
24     Q. By December 21, 2005, had you reviewed any

| Page 97 | Page 99 |
|---|---|
| 1  schedules of values? | 1  Q. What was the basis for your understanding |
| 2  A. No. | 2  of this 33,474 was within Landworks' scope? |
| 3  Q. This all-capped section you have here, is | 3  A. They were responsible for lawns and |
| 4  that cut and pasted from something? | 4  grasses. |
| 5  A. I don't recall. | 5  Q. So this comes from -- |
| 6  Q. Directing your attention on Page 4 of 6, | 6  A. They were responsible for this work in the |
| 7  there is another e-mail, same people. There is a | 7  subcontract. |
| 8  reference there to Bob and Jason included in the | 8  Q. This is from the exhibit from the Jackson |
| 9  December 21st e-mail. Do you see that reference? | 9  contract? |
| 10  A. Yes. | 10  A. The subcontract, yes. |
| 11  Q. Had you not received the information by | 11  Q. Next section, "landscaper, labor, |
| 12  January 9, 2006? | 12  equipment, perimeter building, lawns, things of that |
| 13  A. No. | 13  nature"? |
| 14  Q. Had you been getting pressure to provide | 14  A. Yes. |
| 15  this information? | 15  Q. What is your basis for asserting these are |
| 16  A. No. | 16  the responsibility of Landworks? |
| 17  Q. Why did you send this e-mail on January 9, | 17  A. The subcontract between Jackson and |
| 18  2006? | 18  Landworks. |
| 19  A. There was a due date. | 19  Q. Relying entirely on the exhibit to the |
| 20  Q. What was the due date? | 20  Jackson contract? |
| 21  A. I don't recall. | 21  A. Relying on the subcontract. |
| 22  Q. Due date for what? | 22  Q. The document exhibit you refer to in your |
| 23  A. The information. | 23  December 21, 2005 e-mail? |
| 24  Q. What was going to happen when this due date | 24  A. Referring to their scope of work. |

| Page 98 | Page 100 |
|---|---|
| 1  arrived? | 1  Q. Which is shown on Page 5 of 6? |
| 2  A. I was getting my job done. | 2  A. Not just that. |
| 3  Q. Was somebody pressuring you to get this | 3  Q. What else? |
| 4  information? | 4  A. The subcontract. The entire contract. |
| 5  A. I don't recall pressure. | 5  Q. Based upon the Jackson subcontract? |
| 6  Q. Take a look on Page 3 of 6, an e-mail dated | 6  A. Yes. |
| 7  Tuesday, January 10, 2006 at 3:20 PM from Jason | 7  Q. When it goes down and says, "Turf Links, |
| 8  Goodwin to you. | 8  53,094 total to date"? |
| 9  A. Yes. | 9  A. Yes. |
| 10  Q. Going down this category, it provided a | 10  Q. What is that for? |
| 11  list of material where it says "loam, fill and | 11  A. Seeding and fertilizer. |
| 12  sand"? | 12  Q. Of what? |
| 13  A. Yes. | 13  A. The lawn areas. |
| 14  Q. Do you know what that reference to | 14  Q. That's not the athletic fields, you said, |
| 15  "material," what that refers to? | 15  right? |
| 16  A. That refers to actual cost for loam, fill, | 16  A. I don't recall. It may be athletic fields, |
| 17  and sand. | 17  too. I don't recall. |
| 18  Q. That includes the lawns around the building | 18  Q. We have the next one "Cape and Island, 185 |
| 19  and so forth? | 19  for a purchase order." |
| 20  A. Yes. | 20  A. Yes. |
| 21  Q. Was it your understanding as of January 10, | 21  Q. What is that for? |
| 22  2006, that this entire category coming out to 33,474 | 22  A. That is for the track. I believe it is the |
| 23  was within Landworks' scope? | 23  whole track. |
| 24  A. That was my understanding. | 24  Q. Is it your testimony that "185" is scope |

26  (Pages 101 to 104)

Page 101

1  within Landworks' subcontract with Jackson?
2      A. If this includes the rubber track, the
3  rubber track is not part of Landworks' contract.
4      Q. Do you know how much of that 185?
5      A. I don't know.
6      Q. There is a section for G&R. Comes out to
7  only about 1,300, but concrete form for head walls?
8      A. Yes.
9      Q. Would you state that is Landworks' scope of
10  work?
11      A. Yes.
12      Q. Based upon what?
13      A. I don't recall.
14      Q. Then we have electrical work at the
15  football field, 12,450. Would you tell me why that
16  would be within Landworks' scope?
17      A. It was removed under site demolition.
18      Q. Under site demolition, that belonged to
19  Landworks?
20      A. If it was damaged by them.
21      Q. Was it damaged by them?
22      A. During this site demolition. My
23  investigation showed it was.
24      Q. What investigation was that?

Page 102

1      A. Discussions.
2      Q. With whom?
3      A. Bob Cox when I walked around with him in
4  July.
5      Q. What did he tell you?
6      A. I don't recall exactly, but that's why I
7  listed it as Landworks.
8      Q. You don't recall exactly what he told you?
9      A. No.
10      Q. Your understanding was based upon some July
11  conversation with Bob Cox, Landworks damaged
12  electrical?
13      A. Yes.
14      Q. Did Bob Cox point out something and say,
15  Landworks damaged this?
16      A. Yes.
17      Q. Specifically he mentioned Landworks?
18      A. I don't recall.
19      Q. Did he say site guy or Landworks?
20      A. I don't recall.
21      Q. What exactly were you looking at that he
22  claimed was broken?
23      A. At that point we were looking around the
24  track area where the site demolition took place.

Page 103

1      Q. Who did the site demolition there?
2      A. Site demolition is part of Landworks'
3  contract.
4      Q. Do you know for a fact that Landworks did
5  site demolition?
6      A. I know it's part of their contract,
7  subcontract.
8      Q. When does site demolition usually occur on
9  a construction project like this?
10      A. It can occur any time. This is not
11  building a new building. This is a remote area of
12  the job. It could occur any time.
13      Q. It could have occurred at the beginning of
14  the job?
15      A. It could have.
16      Q. Site contractor in the beginning of this
17  could have done that damage?
18      A. Could have.
19      Q. Do you know if Landworks was the site
20  contractor at the beginning of the job?
21      A. I don't know.
22      Q. Bottom of Page 2 of 6. There is an e-mail
23  from you addressed to the esteemed attorney Eric C.
24  Hipp, sitting to my right, saying, "Here is the

Page 104

1  input from G&R regarding the site work scope." Do
2  you see this?
3      A. Yes.
4      Q. Did you have any conversations with
5  Attorney Hipp about this January 10th, 2006 e-mail?
6          MR. HIPP: Objection.
7      A. Oral.
8      Q. Do you recall at any time having any
9  conversation with Attorney Hipp in which you explain
10  that you are basing your understanding of the scope
11  on Jackson's subcontract with Landworks?
12          MR. HIPP: Objection.
13      A. I don't recall.
14      Q. You don't recall writing any e-mails that
15  stated that?
16      A. I don't recall.
17      Q. Turn to the top of Page 2 of 6. Do you see
18  where it requests documentary support for these
19  charges? "Thank you for the e-mail regarding the
20  back charges." Do you see where it says, "Where is
21  the documentary support for these charges?"
22      A. Yes.
23      Q. Did you provide that documentary support?
24      A. Yes.

Page 105

1    Q. What did that consist of?
2    A. It consisted of tickets for material and
3    G&R Invoices and their subcontractor invoices.
4    Q. Did you provide any documents to Attorney
5    Hipp that referenced the scope of Landworks?
6        MR. HIPP: Objection.
7    A. No.
8    Q. I am going to direct your attention then to
9    Page 1, an e-mail from you to Bob Morel end Jason
10   Goodwin, asking that certain information be provided
11   no later than Monday, June 30, 2006. Do you see
12   that?
13   A. Yes.
14   Q. There is an e-mail above that from Jason
15   Goodwin to you. Do you see that reference?
16   A. Yes.
17   Q. Was documentation provided that supported
18   the paragraph at the top of that e-mail?
19   A. Pardon me?
20   Q. Was the documentation that was provided,
21   did it reference the top of that? "All the
22   documentation is represented by the invoices I have
23   supplied." Do you see that reference?
24   A. Yes.

Page 106

1    Q. It says here they supplied documents each
2    month to LSCC.
3    A. Yes.
4    Q. In addition to that, did G&R Construction
5    actually go themselves and pull together a new batch
6    of documents for submission?
7    A. I don't recall.
8    Q. You don't recall if they asked LSCC to
9    gather that information together?
10   A. I don't recall that. I don't remember.
11   Q. Do you recall seeing the Griffin Electric
12   Invoice?
13   A. No, I don't.
14   Q. Have you ever seen a Griffin Electric
15   invoice that indicates they are fixing things broken
16   by Landworks?
17   A. I don't remember.
18   Q. As you sit here today, you are not sure
19   what the Griffin invoice showed?
20   A. No. I just don't remember the Griffin
21   Invoice that I am referring to here, or he is
22   referring to here.
23        (Short recess taken.)
24   Q. Do you recall seeing this e-mail?

Page 107

1    A. Yes.
2    Q. Why was this e-mail generated, do you know?
3        MR. HIPP: Objection. Which
4    e-mail are you referring to?
5        MR. MELTZER: Look at the string.
6    The reason I put that in is I want to get the string
7    of the whole exhibit.
8        MS. BROWN: We've looked at this
9    before.
10   Q. I am looking at the first e-mail.
11   A. Okay. The e-mail from Jason to me.
12   Q. Do you know why it was generated?
13   A. No.
14   Q. Directing your attention to these costs to
15   complete.
16   A. Yes.
17   Q. The reference "six plus concrete ramps, not
18   ADA," do you know what that means?
19   A. Yes.
20   Q. What does that mean?
21   A. The ramps were not placed per ADA
22   requirements.
23   Q. Do you know who poured those ramps?
24   A. No.

Page 108

1    Q. We had a reference at some point to a
2    company called Frias who was involved in this
3    project. Do you remember that we were discussing that a
4    few moments ago?
5    A. I remember.
6    Q. Do you know if they poured those ramps?
7    A. I don't know.
8    Q. Same thing for the concrete stoop. Do you
9    know who poured it?
10   A. No.
11   Q. "Touch up seeding fertilizing," do you know
12   where that is located?
13   A. I don't recall.
14   Q. You get to "the installation of athletic
15   equipment," do you know what athletic equipment is
16   involved there?
17   A. I don't know the specific pieces, no.
18   Q. Why is that being attributed to Landworks
19   in this e-mail, do you know?
20        MR. HIPP: Objection.
21   Q. If you know.
22   A. I don't know.
23   Q. A reference to "asphalt at flagpoles," do
24   you know what that means?

Page 109

1    A. Yes.
2    Q. What is that?
3    A. There was asphalt missing around the
4    flagpole.
5    Q. What kind of asphalt was it, do you know?
6    A. Wearing.
7    Q. Are we talking bituminous or concrete?
8    A. Bituminous.
9    Q. Do you know whose scope of work that was?
10   A. Subcontract for Landworks.
11   Q. You are referring back to the exhibit of
12   the Jackson and Landworks' subcontract?
13   A. Yes.
14   Q. Does this specify asphalt flagpole in that
15   subcontract? Did it stay as part of the scope?
16   A. It shows it on the drawings, yes.
17   Q. When you say "it's close to 10,000," was
18   that work previously done?
19   A. I don't see this.
20   Q. Was the asphalt missing or defective?
21   A. Missing.
22   Q. It hadn't been done?
23   A. Yes.
24   Q. How about the sidewalk next to Sherwood

Page 110

1    School, what's the issue with that?
2    A. Missing.
3    Q. Not done at all?
4    A. Not done at all.
5    Q. Not talking defective --
6    A. Yes.
7    Q. "Concrete pad at oil tongue, 10,000." Do
8    you know what that refers to?
9    A. That refers to cracks in the concrete pads
10   over the oil tank.
11   Q. Do you know who poured that concrete?
12   A. No.
13   Q. Do you have any reason to believe it was
14   Landworks?
15   A. No.
16   Q. What does "loam repair after track and
17   paving installed," what does that mean?
18   A. After the track will be installed, the
19   equipment putting the track down will inevitably
20   damage those areas.
21   Q. This was for repair of areas damaged during
22   the track installation?
23   A. Yes.
24   Q. "Fence around track and at school, 50,000,"

Page 111

1    what does that refer to?
2    A. That's the fence.
3    Q. Steelco's company?
4    A. Yes.
5    Q. That's not Landworks?
6    A. Correct.
7    Q. "Grading and drainage at paved area
8    adjacent to track." What paved area is that?
9    A. I don't know.
10   Q. See where the parentheses says, "Unforeseen
11   conditions. Leave if unclear"?
12   A. Yes.
13   Q. Any idea what it means?
14   A. No.
15   Q. Do you have any reason to believe that
16   $75,000 is attributable to Landworks?
17   A. I just don't recall that issue.
18   Q. On this final as-built, 15,000, do you know
19   what that is?
20   A. There is a requirement to do an as-built
21   survey.
22   Q. Of what?
23   A. The grading.
24   Q. As we've already discussed, you don't know

Page 112

1    if it had been done prior to February of 2006?
2    A. As I stated before, I had no survey in our
3    possession.
4    Q. And you hadn't asked Landworks for one in
5    your prior conversation?
6    A. Correct.
7         MR. MELTZER: Let's mark this as
8    Exhibit 63.
9         (Exhibit No. 63 marked for
10   Identification.)
11   Q. I am going to ask you to look at No. 53.
12   Do you recall seeing that document?
13   A. Yes. I'd like to read it.
14   Q. By all means.
15   A. Okay.
16   Q. Do you see there is a reference in the
17   e-mail that, "Bill sent to Katie Crockett, the
18   architect, requesting correspondence in your files
19   pertaining to deficient work performed by
20   Landworks," do you see that reference?
21   A. Where is it?
22   Q. It says, Thank you for --
23   A. I know it's in here.
24   Q. Here.

Page 113

1    A. Okay.
2    Q. Do you recall seeing this e-mail in
3    February of 2006?
4    A. I remember the e-mail.
5    Q. Do you recall, after this e-mail was sent,
6    the architect, Katie Crockett, provided to
7    Lovett-Silverman a list of deficient work performed
8    by Landworks?
9    A. I don't recall that. I don't recall.
10    Q. Do you recall receiving any list from CTM
11    identifying deficient work performed by Landworks?
12    A. I don't recall.
13    Q. Do you recall seeing any kind of
14    documentation from Waterman identifying deficient
15    work performed by Landworks?
16    A. I don't recall.
17    Q. With the exception of the comment made by
18    Cox, which we talked about, in July, had anybody
19    ever said to you from July 2005 and today, that
20    Landworks performed deficiently on this project?
21    A. I don't recall.
22    Q. Have you ever seen any correspondence from
23    anybody identifying work that was not performed
24    correctly by Landworks specifically?

Page 114

1    A. I don't recall that list.
2    Q. In that same e-mail that Bill Meritz sent
3    to Katie Crockett, they wrote, "We are preparing a
4    report to the surety regarding Landworks." Have you
5    ever seen a report to the surety regarding Landworks
6    after February 1st, 2006?
7    A. No.
8    Q. As you sit here today in January of 2007,
9    can you identify any work done by Landworks itself
10    that was deficient on this project as opposed to
11    perhaps not performed?
12    A. I don't recall.
13    Q. Prior to this project, had you ever heard
14    of Landworks?
15    A. No.
16    Q. When you were talking to Neal Matthews in
17    August of 2005, the conversation we talked about,
18    did you ever discuss with him what Landworks does?
19    A. I did not.
20    Q. Did you ever investigate what they do?
21    A. No, I didn't.
22    Q. Did you ever search the web trying to find
23    information on them?
24    A. No.

Page 115

1    Q. Ever ask anybody in the industry?
2    A. I did not.
3    Q. As you sit here today, do you have any idea
4    what the bulk of their work is?
5    A. No.
6    Q. Where they work?
7    A. No.
8    Q. Who they work for?
9    A. No.
10    Q. What their usual scope of business is?
11    A. No.
12    Q. Their reputation in the community?
13    A. No.
14    Q. In your various travels in the construction
15    business, has anybody ever mentioned Landworks to
16    you?
17    A. No.
18    Q. Has anybody, outside of this project in
19    your travels in the construction industry, ever made
20    derogatory comments to you about Landworks?
21    A. I don't recall any.
22    Q. In your travels in the industry since 2005,
23    have you ever mentioned Landworks to anybody on any
24    other project in any context?

Page 116

1    A. I don't recall.
2    Q. I'm going to ask you about an older e-mail.
3    We have an e-mail here from Bill Meritz to you. I'm
4    not sure exactly what was attached, but there is a
5    message from you to Bill Meritz, 1:05 PM, August 5.
6    It says, "Now we know who had the contract for
7    asphalt and lawns." On August 5th, 2005, who had
8    the contract for asphalt and who had the contract
9    for lawns?
10    A. Landworks.
11    Q. That's based upon Exhibit A?
12    A. Based upon their subcontract.
13        MR. MELTZER: Let's mark that as
14    Exhibit 64.
15        (Exhibit No. 64 marked for
16    Identification.)
17    Q. Seeing that reference to Frias Concrete
18    that we've talked about, does that change, in your
19    mind, who had the concrete work on this job?
20    A. I don't think it changes in my mind, no.
21    It doesn't change that in my mind.
22    Q. If we found out who Frias was and they did
23    the concrete work on this project, you would still
24    take the position it was Landworks' scope?

# EXHIBIT E

Shrewsbury Middle School – West
Shrewsbury, Massachusetts

EXHIBIT: 23
CROCKETT
DATE: 1-10-07
N. FLYNN BORELLI

## CONSTRUCTION MEETING #107

23 December 2004

ATTENDANCE:    Dan Morgado, Town Manager
               Ron Alarie, Building Inspector
               Gerry LaFlamme, Fire Chief
               Bob Cox, Superintendent of Public Buildings
               Patrick Collins, School Dept. Business Manager
               Frank Leonardo, Jackson Construction Co.
               Jack Ferguson, CTM
               Duffy Lanciani, Clerk of the Works
               Michael Pagano, Lamoureux Pagano Associates
               Katie Crockett, Lamoureux Pagano Associates

| ITEM: | DISCUSSION: | RESPONSIBILITY: |
|---|---|---|

6.4.2    Project Schedule – see previous minutes for more info.

Balance of lockers to be delivered on Saturday, September 18. (885 on site    CTM/JCC
currently). JCC to install balance of lockers (10/7). 83 additional lockers
delivered (not yet installed). Balance due 11/12 (11/11). More (undefined
quantity) delivered 11/18 (11/18).

JCC reported that if the requisition payments continue at the current pace,
construction will last another 11 months (11/18).

JCC reported that their goal is to have C&D ready (except locker rooms, public
buildings department area) for occupancy Jan. 3, 2005. The sequence of
events required for that process was reviewed including: testing of life safety
systems, isolation of contractor work (after hours only) from student
occupancy, safe egress routes, below ceiling punch list, etc.(12/16)

*JCC distributed an Activity Schedule for some items remaining to complete the
project (attached)(12/23).*

*The School Department would like to occupy the Gym and 1 Bldg. C classroom
on Jan. 3 and the balance of C&D on Jan. 12. The town's Builders' Risk
insurance renewal is due mid- Jan. with notification by Jan. 5. All efforts should
be made to have C&D substantially complete by Jan. 5. Emergency systems to
be tested Monday, Dec. 27 @ 8:00am. JCC to confirm that all systems are
prepared by Sunday morning, Dec. 26. (12/23).*

8.26.1    Partial Occupancy Schedule: A&B (See previous minutes for more info.)
- Some fire doors are not closing properly (i.e. gaps between pairs of
  doors, etc.) Some fire doors in A &B were cut to close properly. JCC
  must replace (11/4). *JCC intends to certify relabeled doors. The
  Owner will not accept relabeling in lieu of replacement (12/23).*
- Installation of metal doors and hardware unacceptable in many cases –
  i.e. spliced rods, doors that are larger than openings – must be
  replaced (9/30).
- 3 fire extinguishers must be installed (11/4). Duffy to confirm
  locations (11/18).
- All exterior emergency lighting must be operational (11/4). JCC to
  confirm schedule (11/18).

LAMOUREUX · PAGANO
ASSOCIATES. ARCHITECTS

Page 1

# Shrewsbury Middle School – West
Shrewsbury, Massachusetts

## CONSTRUCTION MEETING #107                    23 December 2004

9.9.1    Other A & B Issues                                                                 JCC
- Security testing scheduled for 11/7 (10/14). 95% complete (11/18).
- Building electric ground has not yet been installed (10/14). Ongoing (11/4).
- MEP above ceiling punch list has not yet been completed. MEP below ceiling punch list to be conducted this week (11/18).
- Cable in tunnel must be properly supported. Ongoing (11/18).
- Preparation for appliances (electrical and cutouts) incomplete in Room 141 (10/7).    School Dept. to forward cut sheets to JCC for coordination. 220 required for dryer and oven (10/21).
- Door 253 required (reverse swing) for separation between SPED classroom and Library Media (10/21).
- Video distribution has not been installed (10/21). Or ordered (12/2).
- Balancing ongoing. Room 159 problematic (11/18).
- Incomplete window installation (plywood openings, broken hardware, etc.) continue to create heating issues (12/9).
- *JCC to confirm status of balancing report. JCC reports that all areas have air supply; controls to be confirmed (12/23)*
- *LPA below ceiling punch list to begin 12/27(12/23).*

9.9.2    Fire Damage Area                                                                 JCC
- Roof edge and associated roof work (11/4). 2 millwork cabinets remain to be installed, sink installation underway (11/18).
- *Metal panel installation/caulking unacceptable at courtyard area: excessive joint size and spliced materials (12/23).*

9.9.3    C & D Buildings                                                                 JCC
- (Note 9/16): Lift schedule to be verified by JCC. Due 10/25 (10/21). Mason required for installation. JCC negotiating mason's return (11/18). *Existing steel beam problematic for installation. JCC awaiting structural direction (12/16).*
- Some panels remain to be installed, horizontal batten strip remains to be installed on all elevations (10/14). Back on site; 1 week to complete. Currently 80% caulked (11/18). JCC to confirm that vertical batten strips can drain any condensation build up due to lack of horizontal batten strips (12/9).
- (Note 11/4): Corian edges at counters in gym lobby must be eased.
- (Note 11/11): Stage floor refinishing schedule undefined.
- (Note 11/18): Gym speakers schedule to remain are not on site and require replacement.
- (Note 12/9): Fire alarm installed except three devices, to be programmed Saturday, Dec. 11. *Retesting scheduled for 12/27 (12/23).*
- (Note 12/9): Lack of glazing at gym vestibule doors is problematic for school programming. JCC reports glazing due early next week.
- (Note 12/9): 3 hollow metal frames not installed.

9.2.1    Site Issues (see previous minutes for more info.)                              JCC
- MAG Irrigation to install rain sensor, prepare as-builts, train the owner,

---

## Shrewsbury Middle School – West
Shrewsbury, Massachusetts

## CONSTRUCTION MEETING  #107                23 December 2004

    (10/21).  Owner to accept credit for winterization of irrigation system
    (12/9).

| | | |
|---|---|---|
| 9.9.7 | Roof (See previous minutes for more info.)<br>(Note 12/2):  JCC claims that some roof edge damage (at the gym building)<br>was unavoidable due to metal panel installation requirements.  CTM claims<br>that much of the damage was done during roof equipment demolition prior to<br>metal panel installation. | JCC |
| 9.16.2 | Overhead Door Issues<br>Structural steel at the overhead doors is incomplete.  Infill above lintel is<br>required at overhead doors (10/14).  Angle remediation with backer rod and<br>caulk acceptable (11/4). | JCC |
| 9.30.1 | As-Builts<br>JCC to provide Coghlin list of ESCOA incorrect items (10/21).<br>JCC reported that they do not have site as-builts (11/4).<br>Yankee as-builts and O&M manuals expected within a week.  Royal Steam in<br>progress (11/18). | JCC |
| 9.30.2 | Kitchen Issues (See previous minutes for more info.)<br>Other Issues:<br>   •  Coiling doors are due in late Nov. (11/4).<br>   •  Stove and kettle won't light.  JCC to review Kitchen deficiency items<br>      (11/18). | JCC |
| 10.4.1 | Electrical Issues Meeting (See previous minutes for more info.)<br>Assembly Sound Systems<br>   •  On order – long lead time.<br>RFIs:  Coghlin reports that RFIs issued in September have not yet been<br>answered.  LPA has no records of these RFIs. JCC to review status. (12/16) | |
| 12.2.1 | Punch List:  JCC hand delivered list of items complete on punch list.  JCC to<br>notify LPA when ready for re-inspection. | JCC |
| 12.23.1 | Sprinkler System Issues<br>   •  December 20 water ran through the dry system.  Fire Chief reminded<br>      JCC that the dry system must be properly cleaned to ensure that no<br>      water is left in the system.  This must be done prior to the next fire<br>      alarm system test.  Also, all sprinkler signage must be installed<br>      including valves. (12/23)<br>   •  On December 21, a sprinkler line froze and burst in Vest. 320.  JCC to<br>      investigate and seal any areas where air infiltration could be a problem<br>      (12/23).<br>   •  On December 23, the Fire Chief found that the sprinkler system was<br>      not in operation and the fire alarm system was not working properly<br>      while the school was occupied.  A fire watch was established until the<br>      close of school day when the system would be reset (12/23). | JCC |

LAMOUREUX · PAGANO
ASSOCIATES. ARCHITECTS

# Shrewsbury Middle School – West
Shrewsbury, Massachusetts

## CONSTRUCTION MEETING  #107

23 December 2004

Next Meeting: Thursday, Dec. 30, 2004, 10:30am.

Meeting Minutes by: Katie Crockett
Cc:  Fernand Tomaz        Rob Johnson        Michael Pagano    Todd Manning

9710-MS/Minutes/Contractor/Construction Meeting #107.doc

Oak Middle School
Activity Schedule
12/20/2004

| | Activity | Schedule | Notes | Responsible |
|---|---|---|---|---|
| **Sitework** | | | | |
| | Handicap Ramps | | | Landworks/Frias |
| | Site signs | | Disputed | |
| | 6 sona tubes | 30-Jan | | JCC |
| | Change order to install lights | 30-Jan | | Coughlin |
| | Paving | Sping '05 | | Landworks |
| | at Flagpole Island | Sping '05 | | Landworks |
| | at front of shed | Sping '05 | | Landworks |
| | running track | Sping '05 | | Landworks |
| | long jump pit | Sping '05 | | Landworks |
| | High Jump Base | Sping '05 | | Landworks |
| | 75 feet of walkway to Sherwood school field | Sping '06 | | Landworks |
| | Rubberize track and High Jump Pit | Sping '05 | | Trackiite |
| | Fencing around Track and entrance to Sherwood Field | Sping '06 | | Steelco |
| | Install 2 foul line poles | Sping '05 | | Trackiite |
| | Straighten center rail at CLF gate eats end of property | Sping '05 | | Steelco |
| | Install bases at benches | Sping '05 | | Need to Buy/Trackiite |
| | Replace base collar at flagpole | Sping '05 | | Landworks |
| | Excavate electric line for ticket booth | Sping '05 | | Add for Landworks not for JCC |
| | 2 Rails for stairs | 12/27-12/31 | | Ralph's |
| | Pour shot put pad | Sping '05 | | JCC |
| | 2 Long jump pits replaced | Sping '05 | | Trackiite |
| | Reinstall granite monuments | Sping '05 | | Landworks |
| | Paint lines on running tracks | Sping '05 | | Trackiite |
| | Paint lines parking lot SE side at front | Sping '05 | | Landworks |
| | Reinstall Bergstrom filed sign | Sping '05 | | Landworks |
| | Install HC signs and posts (6) each | Sping '05 | | Barb/Need to Buy? |
| | Complete seeding | Sping '05 | | Landworks |
| **JCC** | Complete Headwalls | Sping '05 | | JCC |

Oak Middle School
Activity Schedule
12/20/2004

| Building Exterior | | | |
|---|---|---|---|
| *The damage roof edge | | Weather | Stanley |
| Repair damaged roof edge | | 12/27-12/31 | Bristol |
| Complete Canopy sheathing | | 1/8 - 1/15 | Stanley |
| Complete Canopy metal roofing | | Weather | Century |
| Complete Canopy soffit | | Weather | Century |
| Paint exterior trim at auditorium | | 1/19/2005 | Sunrise |
| Complete metal panel trim at building | | 1/19/2005 | Sunrise |
| Complete caulking at metal panel trim | | | |
| **"C" Wing** | | | |
| Complete Garage door controls | | 12/27 - 12/31 | AFCO |
| Install 2X2 lights at room 402 | | | Coughlin |
| Install roll up doors in cafeteria | | 12/27 - 12/31 | AFCO |
| Tile around roll up doors | | 30-Dec | McLaughlin |
| Install counter at roll up doors | | 29-Dec | Kitteridge |
| Paint Girl's locker room | | 12/27 - 12/31 | Century |
| *Pending architect's direction on the ceiling | | | |
| Install door and frame at Boy's and Girl's locker rm | | 24-Dec | Bristol |
| Complete epoxy floor at locker rooms | | 24-Dec | Cutting edge |
| Complete wheel chair lift* | | 31-Dec | AFCO |
| * Pending architect's resolution of interfering beam | | | |
| Complete stair treads | | 31-Dec | Bristol |
| Install Grilles at Boy's locker room | | 31-Dec | Ralph's |
| Install remaining door and frame at Boy's locker room | | 24-Dec | Bristol |
| Install Gym pads | | 15-Jan | Pappas |
| Complete Gym Curtains | | 22-Jan | Pappas |
| Interior signage C&D Wing | | 28-Jan | Pappas |
| Rubber floor in Rm 485 | | | Brodney |
| Painting & Taping Room #497 | | 12/27-12/31 | Century |
| **"D" Wing** | | | |

**Oak Middle School**
**Activity Schedule**
-12/20/2004

|  | | 12/27 - 12/31 | |
|---|---|---|---|
|  | Clean out garage | | JCC |
|  | Finish Garage Paint | 12/27 - 12/31 | Century |
|  | Covers for speakers and abandoned electric boxes | 12/27 - 12/31 | Ralph's |
|  | Install doors and frames Rm 502 | 22-Dec | Bristol |
|  | Cement in old access opening Rm 502 | 23-Dec | JCC |
|  | Pour ramp at garage door rm 367 | | JCC |
|  | Install HM frames at old louvers Rm 361 | 24-Dec | Bristol |
|  | Repair ceiling stair #12 | 24-Dec | JCC |
|  | Finish Counters Rm 331 | 31-Dec | Bristol |
|  | Finish counters at auditorium | 24-Dec | Bristol |
| **Ground floor A&B** | | | |
|  | Complete shelving storage Rm 131 | 31-Dec | Bristol |
|  | Complete glass in display cases lower "B" wing | 31-Dec | Architectural Window |
|  | Relocate light fixtures in corridor 130 | 31-Dec | K & K |
|  | Install new access panel in stair #2 | 31-Dec | Ralph's |
|  | Install carpet transition strips | 31-Dec | Brodney |
| **1st Floor A&B** | | | |
|  | Complete curtains in nurse's area | | Kreative |
|  | Install Marker board in room 305 | 24-Dec | Boston Blackboard |
|  | Install missing cabinet in storage room 333A | 31-Dec | Bristol |
|  | Install glass shelving in media center display case | 31-Dec | Architectural Window |
|  | Reverse frame Rm 253 | 31-Dec | Bristol |
|  | Install carpet transition strip in media center | 31-Dec | Brodney |
|  | Complete taping around doors Rm 252A and 253 | 24-Dec | JCC |
|  | Handles for display cases | 15-Jan | Bristol |
|  | Window sill at room 283 | 15-Jan | Bristol |
| **General Notes** | | | |
|  | Relabel and Reinstall fire doors | 12/27/2004 | JCC |

**Oak Middle School**
**Activity Schedule**
**12/20/2004**

| | | |
|---|---|---|
| Complete Ceiling tile | substantially complete | K & K |
| Complete testing of fire alarm systems | 12/27-12/29 | Coughlin |
| Complete change order corrections by Architectural Windo | 15-Jan | Architectural Window |
| Install remaining door strikes | 15-Jan | Bristol |
| Punchlist work on building interior | substantially complete | Week ending 12/31 Various |
| Testing and Balancing Heat System | substantially complete | KMD |
| Control System Training | 15-Jan | KMD |
| Miscellaneous touch up painting | 31-Dec | Century |
| Correction of floor tile marks | 31-Dec | BloomSouth |
| | | |
| | | |

Message



Page 1 of 2

## Julie Ciollo

| From: | Pedro Rosario [prosario@lovett-silverman.com] |
|---|---|
| Sent: | Monday, August 15, 2005 4:45 PM |
| To: | d_schultz@kmd-bsmc.com |
| Cc: | 'Tony Lardaro'; 'Al Falango'; 'Robert Bullock'; 'Bill Meritz' |
| Subject: | Shrewsbury Middle School/Ratification Analysis |
| Importance: | High |
| Attachments: | KMD Rat.Analysis PMR 80405.xls |

Mr. David Schultz; Mr. David Dupre:

Attached is our updated ratification analysis for your review. I have updated the analysis by adding the amounts that the Architect is holding regarding certain credits and punch list items. I will send to you the punch list items in question via fax but the most important items of work under the HVAC contract is air and water balancing and completion & commissioning of the ATC by Johnson Controls. In addition, our analysis lists the outstanding amounts due to Johnson Controls and Cleaver Brooks, and very possibly the Balancer.

As you can see and as I've discussed with you both the change order for the claims have to be placed aside in moving forward and getting KMD back to the project. As I have also stated the claims have to be reviewed by Lovett Silverman with the proper back up and documentation to validate the clams. I disagree with Mr.. Dupre that these change orders are approved; there is no indication on the documents that have been submitted to us that they are. Therefore, we can not agree to KMD's demand that they be paid a substantial amount of contract funds to return to Shrewsbury and complete their HVAC work. As we stated above, the critical portion of the HVAC work is the air and water balancing and the completion and commissioning of temperature controls, which we do not know who the firm is that is to perform the work and, as acknowledged by Mr.. Schultz, how much money is due to them before they return to complete their balancing work.

Therefore, we need to know by tomorrow if KMD Mechanical is going to return to the project to complete their work, have their balancer back on-site or not. There is very little time left to to perform certain contract work so that the school can obtain their certificate of occupancy. Call me first thing tomorrow morning regarding this matter.

Sincerely,

Pedro M. Rosario

Lovett Silverman Construction Consultants, Inc.

Hauppauge, New York

Telephone: (631) 979-7600; Facsimile: (631) 979-7602

1 0/1 1 /200 6

EXHIBIT 33
LARDARO
DATE: 8-11-07
N. FLYNN BORELLI

Page 4 of 6

**Sent:** Tuesday, August 16, 2005 8:24 AM
**To:** Robert Bullock
**Subject:** RE: Shrewsbury Middle School - Steelco Chain Link Fence

I will fax it there right now. Are there other fax numbers for your colleagues you copies on the message from last night?

-----Original Message-----
**From:** Robert Bullock [mailto:rbullock@lovett-silverman.com]
**Sent:** Tuesday, August 16, 2005 8:13 AM
**To:** cmpatten@mnplaw.com
**Subject:** RE: Shrewsbury Middle School - Steelco Chain Link Fence

Carlotta
I am out of my office until Thursday. Would it be possible to email the contract to me or fax it to my attention at the following: (646) 390-6542. Thanks

---

**From:** Carlotta M. Patten [mailto:cmpatten@mnplaw.com]
**Sent:** Tuesday, August 16, 2005 7:40 AM
**To:** Robert Bullock
**Cc:** 'Al Falango'; 'Tony Lardaro'
**Subject:** RE: Shrewsbury Middle School - Steelco Chain Link Fence

I am faxing you the contract right now.

-----Original Message-----
**From:** Robert Bullock [mailto:rbullock@lovett-silverman.com]
**Sent:** Monday, August 15, 2005 11:47 PM
**To:** cmpatten@mnplaw.com
**Cc:** 'Al Falango'; 'Tony Lardaro'
**Subject:** RE: Shrewsbury Middle School - Steelco Chain Link Fence

Carlotta,

The attached is what you faxed me in July. I do not see a contract between Jackson and Steelco in this attachment. If you have a signed contract between Jackson and Steelco please send it to me.

What I am looking for is an executed agreement describing the full scope of Steelco's work and the original, mutually agreed to, price. I need this so I know what Jackson and Steelco agreed to in writing before the fencing work was started. From this I would be able to calculate the value of the remaining work. I do not see anything in the attached where Jackson agreed to the price that Steelco shows on their invoices (pages 5, 6, and 7 of 7) and statement (page 4 of 7). Also, I can not determine what Steelco would be doing in the future for the Balance to Finish of $47,830 shown on Page 7 of 7. I have meetings from 9 AM to 3:30 PM and again 7PM to 9 PM. Hopefully this email better describes what we need. Sorry for any confusion.
Thanks,

Bob Bullock
Lovett Silverman Construction Consultants Inc.
Cell:   717-422-7518
Web Site: Lovett-Silverman.com

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this

communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Carlotta M. Patten [mailto:cmpatten@mnplaw.com]
**Sent:** Monday, August 15, 2005 9:23 PM
**To:** Robert Bullock
**Subject:** RE: Shrewsbury Middle School - Steeco Chain Link Fence

Bob,

I sent you the contract back in July. It seems that I am a bit confused by your email below.

Please call me tomorrow. I have a meeting from 9 to 11 but am available other than that.

[Carlotta M. Patten] -----Original Message-----
**From:** Robert Bullock [mailto:rbullock@lovett-silverman.com]
**Sent:** Monday, August 15, 2005 2:30 PM
**To:** cmpatten@mnplaw.com
**Subject:** RE: Shrewsbury Middle School - Steeco Chain Link Fence

> Carlotta,
> Without a contract in place between Steelco and Jackson or Standen I
> am not sure the draft ratification is correct. What is the scope of the
> remaining work? What is Steelco's value for the remaining work?
> Bob

> **From:** Carlotta M. Patten [mailto:cmpatten@mnplaw.com]
> **Sent:** Monday, August 15, 2005 2:33 PM
> **To:** Robert Bullock
> **Subject:** Shrewsbury Middle School - Steeco Chain Link Fence

> Bob,
> I am back in the office. I am writing to inquire as to the status of the
> ratification and my letter to you dated August 4 with a further breakdown
> of remobilization costs.
> Thank you,
> Carlotta Patten

> Carlotta McCarthy Patten, Esq.
> Metaxas, Norman & Pidgeon, LLP
> 900 Cummings Center Suite 207T
> Beverly, MA 01915
> Phone: (978)927-8000
> Fax: (978)922-6464
> Email: cmpatten@mnplaw.com
> www.mnplaw.com

**Julie Ciollo**

EXHIBIT 34
LARDARO
DATE: 1-11-07
N. FLYNN BORELLI

| | |
|---|---|
| **From:** | Tony Lardaro [tlardaro@lovett-silverman.com] |
| **Sent:** | Thursday, August 18, 2005 8:54 PM |
| **To:** | Robert Bullock |
| **Subject:** | Re: Shrewsbury Middle School - Data required for Financial Analysis |

Bob,
What e-mails are you referring to? From your e-mail I gathered that you were going to meet
with Landworks to see if they could finish the sitework and they have a lawsuit against
the Surety and Jackson. If that's the case, just tell them that we've been told we can't
deal with them while the case is pending.

Tony
-----Original Message-----
From: "Robert Bullock" <rbullock@lovett-silverman.com>
Date: Thu, 18 Aug 2005 20:23:35
To:"'Al Falango'" <afalango@lovett-silverman.com> Cc:"'Tony Lardaro'" <tlardaro@lovett-silverman.com>
Subject: FW: Shrewsbury Middle School - Data required for Financial Analysis

Al,


I am going to cancel this meeting based on your email and Jim Peters. Should I mention to
him why we are not meeting:


We are presently a defendant in a legal action brought by your company against Jackson
Construction and USF&G.    The underlying issue is a dispute regarding your sitework
subcontract on the Shrewsbury Middle School project.  If Landworks is interested in
settling that legal action and resuming their work, they should communicate that desire
through their counsel to Brad Carver who represents USF&G in that litigation.


From: Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
 Sent: Thursday, August 18, 2005 3:35 PM
 To: Robert Bullock
 Subject: Re: Shrewsbury Middle School - Data required for Financial Analysis


Either day will be find to meet.  Let me know what day will be best for you and I'll be
down at 9:00am.  I assume the best place would be at the school so we can go over what has
to be done to finish the work.


Thank you,


Neal H. Matthews

1

----- Original Message -----

From: Robert Bullock

To: 'Neal H. Matthews'

Sent: Thursday, August 18, 2005 9:10 AM

Subject: RE: Shrewsbury Middle School - Data required for Financial Analysis


Neal,

I can meet with you Tuesday or Wednesday of next week.    Let me know if 9:00 AM either day
will work for you.


Robert J. Bullock, PE

Lovett Silverman Construction Consultants Inc.


Phone: 717-796-9595

Fax:      717-766-1715

Cell:     717-422-7518


The information contained in this e-mail is confidential information intended only for the
use of the individual or entity named. If the reader of the message is not the employee or
agent responsible to deliver it to the intended recipient, you are hereby notified that
any dissemination, distribution, or copying of this communication is strictly prohibited.
If you have received this communication in error, please immediately notify the sender by
reply e-mail and then delete the message.


From: Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
Sent: Wednesday, August 17, 2005 6:07 PM
To: Robert Bullock
Subject: Re: Shrewsbury Middle School - Data required for Financial Analysis


Dear Bob,

      Thank you for taking the time to talk with me.  The amount of paper work I have with

back up is such that transmittal through e-mail or fax may not go through without some
interruption.  Jackson Construction Co. had all of this information and should have passed
it on to St. Paul. I would like to meet with you and see if we can resolve this in a
manner that would be to the advantage of St. Paul and myself.  Delayed payment and non-
payment started in August of 2004 by Jackson and after many months of calls to them and
St. Paul I needed to protect my rights under Massachusetts law. This is the only reason
that I have filed suit.  I have always preferred to have been paid what is owed to me,
(Landworks Creations, LLC) and complete this project.  I feel that I can do this more cost
effective than if you have to hire another contractor.  I can make copies of all paper
work and bring them with me when we meet.  I will put together an overview of the complete
amount owed in th!

 e format you have sent to me.  You may contact me with any questions or comments.



Thank you,

Neal H. Matthews

Landworks Creations, LLC

----- Original Message -----

From: Robert Bullock

To: lonewolf@maine.rr.com

Sent: Wednesday, August 17, 2005 2:42 PM

Subject: Shrewsbury Middle School - Data required for Financial Analysis

Neil,

Here is the text from the letter we send out for the Data required to get started on the
ratification:

LSCC is consultant to the St.    Paul in connection with the completion of work on the
above referenced project.  We anticipate work at the site to proceed again immediately and
the job to move forward to completion as expeditiously as possible. Jackson Construction
Corp will be replaced by G & R Construction, Inc. and future direction of this project
will be managed by them.

Please provide the following information to start developing your ratification agreement:

1)        Original Contract Amount.

3

2)      Change Orders to the Original Contract.

3)      Credit Change orders to Original Contract.

4)      Value of Work performed to date or Approved Material Stored at Site.

5)      Total Payments Received from Standen and Jackson.

6)      Retainage Held to Date.

7)      Outstanding Balance.

8)      Last Invoice Paid

9)      Last Invoice Submitted but not Paid, if any


If you have any questions or comments concerning the above or require anything further in
connection with this claim, please give me a call, I can be reached at the following
numbers:

                    Cell    717 422 7518                              Fax   717 766 1715


Robert J. Bullock, PE


Lovett Silverman Construction Consultants Inc.

19 Goldenrod Drive

Carlisle, PA   17013


Phone: 717-796-9595

Fax:      717-766-1715

Cell:     717-422-7518

Web Site: Lovett-Silverman.com


The information contained in this e-mail is confidential information intended only for the
use of the individual or entity named. If the reader of the message is not the employee or
agent responsible to deliver it to the intended recipient, you are hereby notified that
any dissemination, distribution, or copying of this communication is strictly prohibited.
If you have received this communication in error, please immediately notify the sender by
reply e-mail and then delete the message.

**Julie Ciollo**

EXHIBIT 37
LARDARO
DATE: 1-11-07
N. FLYNN BORELLI

| | |
|---|---|
| **From:** | Bill Meritz [bmeritz@lovett-silverman.com] |
| **Sent:** | Wednesday, September 21, 2005 10:26 AM |
| **To:** | 'Robert Bullock'; 'Al Falango'; tlardaro@lovett-silverman.com |
| **Cc:** | 'Pedro Rosario'; 'ajwerth' |
| **Subject:** | RE: Shrewsbury CTC |

Bob,

You are correct regarding the Owner's decision to pulverize the track and that the Surety is responsible for 33%.

At the owner's meeting yesterday, Bob Morgado indicated that the district wants the track pulverized ( change order) and in addition wants some electrical conduit work performed as no charge in consideration of the electrical damage by the G/C. I requested that Dan please provide us in writing with a proposal. Dan directed the Architect to issue documents regarding their planned changes and demands.

-----Original Message-----
From: Robert Bullock [mailto:rbullock@lovett-silverman.com]
Sent: Wednesday, September 21, 2005 8:56 AM
To: 'Al Falango'; tlardaro@lovett-silverman.com
Cc: 'Bill Meritz'; 'Pedro Rosario'
Subject: RE: Shrewsbury CTC

Under the Committed/Estimated column we included estimated costs for site work $100,000, landscaping $250,000, electric $600,000, Roof $2,000, and doors $275,000. These are our best estimates at this time. If we believe this is not enough we should revisit the estimate for each line item.

As for the track, I believe Bill has new information that the owner will agree to a change order to pulverize the existing track, and re-grade.
The
surety would be responsible only for the original specified repair of 33% of the track area. G&R is putting together a price to pulverize the track.

-----Original Message-----
From: Al Falango [mailto:afalango@lovett-silverman.com]
Sent: Wednesday, September 21, 2005 9:29 AM
To: tlardaro@lovett-silverman.com
Cc: 'Robert Bullock'
Subject: RE: Shrewsbury CTC

I only see sub costs I'm concerned there's not enough there to cover them

-----Original Message-----
From: Tony Lardaro [mailto:tlardaro@lovett-silverman.com]
Sent: Wednesday, September 21, 2005 9:25 AM
To: Al Falango
Subject: Re: Shrewsbury CTC


Aren't we carrying estimated dollars in the CTC (outside the contingency
amount) for these items already? -----Original Message-----
From: "Al Falango" <afalango@lovett-silverman.com>
Date: Wed, 21 Sep 2005 09:07:36
To:"'Tony Lardaro'" <tlardaro@lovett-silverman.com>,        "'Robert
Bullock'" <rbullock@lovett-silverman.com>
Cc:"'Bill Meritz'" <bmeritz@lovett-silverman.com>,
<awerth@lovett-silverman.com>
Subject: Shrewsbury CTC

1

On the Shrewsbury CTC

The C/O logs lists all c/o's as pco's are they approved change orders or still pco's

Bill Meritz had mentioned a slew of potential c/o's for work done by JCC for
the town under protest, (Tony wants AJ to pick this up) should we make mention of these potential receivables even if we cant put a number on them.

I dont think the 825k is enough for the contingency we already know we have
busts in the track work, site work , electric (major), roofs and doors (major) even though the town is holding money I still think we could possibly break the 800k mark with these, we've already spent 400k on G and R
for one month and we still dont have checks for the subs. We can try to bang
the subs but I think that we can never recover from them what we are spending.

2

## Robert Bullock



EXHIBIT 45
MERITZ
DATE: 1-11-07
N. FLYNN BORELLI

**From:** Bill Meritz [bmeritz@lovett-silverman.com]

**Sent:** Thursday, September 08, 2005 11:26 AM

**To:** 'Al falango'

**Cc:** 'Robert Bullock'; 'Pedro Rosario'; 'Tony Lardaro'

**Subject:** Shrewsbury Middle School- Job Progress meeting 9/6/05

Gentlemen:

I attended the meeting at the Town of Shrewsbury offices; In attendance were:

| Katie Crocket | LPA |
| Mike Pagano | LPA |
| Dan Morgano | Town of Shrewsbury |
| Robert Cox | Town of Shrewsbury |
| Bob Morel | G & R Construction |
| Jason Goodwin | G & R Construction |
| Dave Willet | G & R Construction |
| Duffy Lanciani | Clerk of the Works |
| Jack Ferguson | CTM |
| Rich Melanson | Griffin Electric |

The following is a summary of the discussions:

Mike Pagano requested a status report pertaining to contract ratifications. I provided them with a status of each subcontractor listed by the Architect as having an impact on the project concerning finishing the work. Dan Morgano asked weather the Surety has issued checks to the subcontractors yet. I indicated that we have requested checks for many of them and others we were still finalizing their ratifications.

Dave Willet indicated that several contractors were working without ratifications.

Mike Pagano asked for a status report on Occupancy issues pertaining to Gerald Laflamme (Fire Chief) email of 8/28/05 received from John Sabonaitis. I indicated that Griffin Electric will verify that all work described in the contract documents will be provided. The Architect will review this 'Wish List' from the Fire Chief and will begin preparing affidavits for issuance to the school. I also indicated that any work outside the contract will be treated as a change order. Mike Pagano will be contacting the Fire Marshall.

G & R reported the following:

Painting: The painter will be switching to nights next week in order to continue the painting punch list.

Flooring: Replacement of VCT tiles as per the punch list is complete. The Architect will reinspect. Issues remain with the blue VCT (different color). G & R has ordered a closer replacement tile for the blue for attic stock. The architect will review. The blue tile installed as per punch list work is a problem throughout the building.

Room 485 (Phys Ed) – G & R reported that the floor is scheduled to be completed by weeks end. Underlayment application and repair of the access frame have been completed to correct the tripping hazard. Vinyl base is back ordered. The architect will punch out this area next week.

Boys and Girls Locker Rooms – G & R reported that nearly all the Architect's punch list items have been completed. Upon completion G & R will have these areas cleaned and ready for the Architect's inspection next week. The handicap chair lift has been certified. G & R has requested paperwork from AFCO.

Electrical Work: Griffen reported that 85% of the interior electrical work has been completed. Issues regarding outstanding fixture lenses in room 485 remain outstanding. Fixture lenses (<12) were scavenged from this room and installed in classrooms. The lenses are on back order. Griffen requested that this order be expedited via

overnight delivery. (LSCC requested a price). In any event Griffen will install temporary lenses prior to the room being completed. Griffen repaired defective wiring for pole lights in the front of the building and determined that these nonlit lights were a district problem (Bob Cox Agreed). It was determined that lights in the rear of the building do not work due to contractor damage (1 Pole light) and incomplete conduits and wiring at two other locations. Griffen will issue a cost to complete repairs. Additionally, the single pole light diagonally across from the generator will have to be powered up by digging a trench 300 'to the nearest pole beneath grass. Griffen will provide a sketch to the Architect. As far as the lighting around the track, Griffen indicated that power to only 1 pole from the service panel could be determined. Griffen has concerns regarding the existing underground track lighting feeders as well as the existing service panel. I asked Griffen to issue a report based upon their findings. The issue of restrikes for the front canopy lighting was discussed. It appears that perhaps they are only needed at the front entrances. The architect will investigate this and report.

Canopy Work – Bob Morel reported that they have a contractor on board to complete the canopy once the lighting issue has been settled. The Architect questioned the frost protection wiring and Griffen indicated that the wiring is incomplete. Furthermore the Architect indicated that bug screens need to be installed at the louvers at both ends of the canopy. Jack Ferguson of CTM said that perhaps the Architect should examine the steel work at the canopy/front entrance intersection. The Architect will have their structural engineer examine the installation. Katie indicated that all rusting metal be addressed.

Windows/Window Repairs – The Architect indicated that the installed windows in the gymnasium were of the wrong type of glass (punch list). G & R is in contact with Architectural Windows concerning this matter.LSCC will follow up. G & R will review the window repair work performed by Architectural Windows. Duffy Lanciani is also reviewing the window repair work per the CCD issued as a C/O to Jackson/Architectural windows.

AFCO – G & R reported that the handicap lift has been certified. AFCO still needs to address items pertaining to the installed cafeteria/ snack bar stainless steel roll up doors. Additionally, the overhead door operator in at the left side of the maintenance garage and the door track on the left side was damaged during construction and needs replacement. G & R will be contacting AFCO.

Work Schedule – Mike Pagano raised the issue of a completion schedule for all the outstanding work. He stated that although this is a requirement, both the owner and the architect are willing to temporarily waive this requirement considering the fact that G & R have been successful in coordinating all interior work with the school principal. However, the owner needs a written schedule with completion dates as soon as possible. Bob Morel indicated that they will be on site throughout the Christmas break and will need to return in the spring to fertilize the fields.

Site Work – Bob Morel reported that negotiations are continuing with subcontractors and Bob Bullock of LSCC. The Architect indicated that the contact documents specifically indicate that temperature sensitive work can not be performed when ambient outside temperatures fall below 45 degrees. Furthermore, Bob Morel indicated that he has meetings planned with another site contractor and plans to begin work by the end of next week.

## General Meeting Notes

### Track Lighting

Based upon their investigation, Griffen Electric has determined that 2 four inch trunk lines each carrying 8 # 8 conductors go to two separate light poles from the existing service panel. One trunk line to the nearest pole can be electrified. The other trunk line to the opposite pole no longer exists. He one inch conduit installed between the two opposite light poles is too small to carry the necessary conductors. The existing buried conduits and splice boxes between the poles have problems. Bob Cox indicated that the wiring is indeed old and suspect and should be replaced. He asked if the Surety would be willing to install new conduits for the purpose of installing new wiring for the site lighting or perhaps negotiate a change order. This offer was summarily dismissed by Mike Pagano and Bob Morgano who indicated that the contractor was responsible for restoring all site lighting. At that moment Bob Cox left the meeting. Katie Crockett indicated that the demolition contractor caused all the damage and they expect the site lighting to be restored. Dave Willet asked about the status of the uninstalled electrical vault. The architect will investigate and review the site electrical drawings.

To summarize, issues with the site lighting abound. Griffen will produce a report for us to review. The existing equipment, conduits, and wiring may not be code compliant. Griffen has serious concerns about repairing the existing wiring and reenergizing it. We will need the architect to direct us in writing on how to proceed with respect to the contract drawings.

#### Lockers

I indicated that I am still awaiting documents pertaining to change orders and credits from PENCO. Dave Willet indicated that they have already been on site working to address punch list items. ·

#### G & R Invoices

Jason Goodwin reported that he is still preparing AIA forms for both the Surety and the owner. Katie Crockett requested that G & R submit to her a report on all items completed per her punch list for inspection purposes.

Bob Morgano reported that the Surety has yet to address direct payments by the Town as well as back charges. He explained to all that all retainage was paid to Jackson upon substantial completion (I was under the impression that substantial completion was never attained!) and that the remaining contract balance represents the value of the monetized punch list. Dan told G & R to requisition per the monetized punch list.

#### Site

Dan Morgado indicated that it is imperative that the site work begin while time permits.
Mike Pagano indicated that the football field and baseball infields were still under warranty by the contractor and that they were responsible for maintenance and security.
Dan Morgado indicated that in the event that the football field could not be used, the district was prepared to transport the teams to other sites and back charge the Surety.
G & R agreed that we can work around this issue with regards to the peewee football people.

Duffy Lanciani asked the architect to provide the latest field drawings as well as all SK Drawings.

Bob Cox indicated that a school fair is scheduled for September 24, 2005 at the front lawn and requested that G & R address any safety issues.

#### Tunnels

Final inspection report and sign off remain outstanding.

#### Work Force

G & R gave a brief review of project manpower.

#### Project Directory

Katie Crockett requested that G & R provide a complete project directory with copies sent to all attendees.

#### Next Meeting

The next meeting is scheduled for 1pm at Town Hall on Tuesday, September 13, 2005.

Sincerely,
Bill Meritz
Lovett Silverman Construction Consultants, Inc.
Hauppauge, New York
Telephone: (631) 979-7600; Facsimile: (631) 979-7602
www.lovett-silverman.com

The document(s) accompanying this transmittal contains information from the consulting firm of Lovett Silverman Construction Consultants, Inc. that is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking of any action in reliance upon the contents of this transmittal information is strictly prohibited and the document(s) should be returned to this firm immediately. If you have received this transmittal in error, please notify this firm immediately at (631) 979-7600.

> **EXHIBIT 47**
> MERITZ
> DATE: 1-11-07
> N. FLYNN BORELLI

Page 1 of 1

## Julie Ciollo

**From:** Jason Goodwin [jgoodwin@grconstruction.net]

**Sent:** Thursday, September 15, 2005 12:58 PM

**To:** rfuller@stpaultravelers.com; wwerner@stpaultravelers.com; jpeters@stpaultravelers.com

**Cc:** Robert Bullock; afalango@lovett-silverman.com; bmeritz@lovett-silverman.com; Bob Morel

**Subject:** subcontractor ratifications

Good afternoon,

G&R has contacted several of the key subs needed to complete the project. They have been very cooperative up to this point; however they will not come back to the job and perform any work until they have received payment. It is my understanding that Lovett-Silvermann has all the paper work is in place for these ratifications. G&R is making every effort to complete the work outlined, but it is imperitive that we have these key subs on site. G&R is at a stand still in a lot of areas. Please advise on how we are to proceed. Thank you.

Jason Goodwin
jgoodwin@grconstruction.net

G&R Construction Co., Inc.
150 Wood Road
Suite # 1000
Braintree, MA 02184
T (781) 849-9093 x102
F (781) 849-9094

EXHIBIT 5 1
_MERITZ_
DATE: _1-11-07_
N. FLYNN BORELLI

Page 1 of 1

## Robert Bullock

| From: | Bill Meritz [bmeritz@lovett-silverman.com] |
|---|---|
| Sent: | Monday, January 16, 2006 2:45 PM |
| To: | 'Robert Bullock' |
| Subject: | Jackson Construction "Completion Game Plan" |

Attachments: DOC (72).pdf

Bob, I located Jackson Construction's "Oak Middle School Game Plan". A copy is attached

It is worth noting that Frias Concrete poured the sidewalks at the front entrance (all of them)? As you know they are not included in the Committed Cost Report. They were probably a sub to Landworks.

Please see page 2 Woods and Plastics – Bristol (Note J and S Door Installation Services)

Sincerely,
Bill Meritz
Lovett Silverman Construction Consultants, Inc.
Hauppauge. New York
Telephone: (631) 979-7600; Facsimile: (631) 979-7602
Cell Phone; (631) 335-8970
www.lovett-silverman.com

The document(s) accompanying this transmittal contains information from the consulting firm of Lovett Silverman Construction Consultants. Inc. that is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure. copying, distribution. or taking of any action in reliance upon the contents of this transmittal information is strictly prohibited and the document(s) should be returned to this firm immediately. If you have received this transmittal in error. please notify this firm immediately at (631) 979-7600.

Message



Page 1 of 1

## Julie Ciollo

**From:**   Al Falango [afalango@lovett-silverman.com]

**Sent:**   Wednesday, August 17, 2005 2:56 PM

**To:**   'Robert Bullock'

**Subject:** RE: Shrewsbury - Landworks

Dont do that if you haven't done it already

-----Original Message-----
**From:** Robert Bullock [mailto:rbullock@lovett-silverman.com]
**Sent:** Wednesday, August 17, 2005 2:33 PM
**To:** 'Al Falango'
**Subject:** Shrewsbury - Landworks

The president of Landworks just called me and expressed an interest in being ratified. I told him he will have to drop his law suit, but welcomed this idea and I forwarded the requirements for ratification and my contact information

Message



Page 1 of 1

## Julie Ciollo

**From:**   Al Falango [afalango@lovett-silverman.com]

**Sent:**   Thursday, August 18, 2005 11:56 AM

**To:**   'Robert Bullock'

**Subject:** RE: Shrewsbury - Land works

Bob
Pull back on land works sorry for the misinformation this morning

-----Original Message-----
**From:** Peters Jr,James Michael [mailto:JPETERS@stpaultravelers.com]
**Sent:** Thursday, August 18, 2005 10:49 AM
**To:** Al Falango; Fuller,Russell W
**Cc:** Robert Bullock; bcarver@hinshawlaw.com; Werner,William R
**Subject:** RE: Shrewsbury - Landworks

We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G.  The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

By copy of this email to Brad Carver, I am giving him notice of this issue.

James M. Peters, Jr.
St Paul Travelers Bond Claim
One Tower Square  - 4 PB
Hartford, CT 06183

Tel:  (860) 954-6497
Fax: (860) 277-5722
Email: james.m.petersjr@stpaultravelers.com

-----Original Message-----
**From:** Al Falango [mailto:afalango@lovett-silverman.com]
**Sent:** Wednesday, August 17, 2005 3:00 PM
**To:** Fuller,Russell W; Peters Jr,James Michael
**Cc:** 'Robert Bullock'
**Subject:** Shrewsbury - Landworks

Russ

The president of Landworks called LSCC and expressed an interest in being ratified.  Should we pursue this guy , I know you have issues with him.

**Julie Ciollo**

**From:** Peters Jr,James Michael [JPETERS@stpaultravelers.com]
**Sent:** Thursday, August 18, 2005 10:49 AM
**To:** Al Falango; Fuller,Russell W
**Cc:** Robert Bullock; bcarver@hinshawlaw.com; Werner,William R
**Subject:** RE: Shrewsbury - Landworks

We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G. The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

By copy of this email to Brad Carver, I am giving him notice of this issue.

James M. Peters, Jr.
St Paul Travelers Bond Claim
One Tower Square - 4 PB
Hartford, CT 06183

Tel: (860) 954-6497
Fax: (860) 277-5722
Email: james.m.petersjr@stpaultravelers.com

-----Original Message-----
**From:** Al Falango [mailto:afalango@lovett-silverman.com]
**Sent:** Wednesday, August 17, 2005 3:00 PM
**To:** Fuller,Russell W; Peters Jr,James Michael
**Cc:** 'Robert Bullock'
**Subject:** Shrewsbury - Landworks

[redacted]

Message



EXHIBIT 61
Bulleck
DATE: 1-11-07
N. FLYNN BORELLI

Page 1 of 1

## Robert Bullock

From:    Al Falango [afalango@lovett-silverman.com]

Sent:    Monday, July 18, 2005 8:55 AM

To:      'Robert Bullock'

Subject: FW: Shrewsbury

-----Original Message-----
From: Rick Noblet [mailto:rnoblet@lovett-silverman.com]
Sent: Monday, July 18, 2005 8:27 AM
To: 'Al Falango'
Subject: RE: Shrewsbury

Hi Al,

I just got back from my F-in vacation. I don't know if you are all set on this or not but I used a contractor on a Case at a School in Lakeville/Freetown Mass. They were outstanding and were very professional with a great product. M.O. N. Landscaping Inc. There office is in N. Dartmouth, MA. 1-508-679-3994. I worked with a Superintendent named Paul Bernardo (Cell 1-508-612-1108). He may not remember my name as I stopped by once a week or so and asked questions. We never had a first name relationship. They built soccer fields, baseball fields (4) with sodded infields, raised pitchers mounds, a practice football field, replaced shrubs and plants, watered, fertilized, and fixed a poorly installed and not working irrigation system on a very large area including changing the programmable timing system on which Zone to water next. Emanuel Bros. I also used but they have grown considerably and I am not sure how much work you have. I know they are in the North Suburbs (Chelmsford I think) of Boston. I used them on a Sewage Treatment Plant in Northbridge, MA. They did lawn, site work, shrubs, beds, flowers, and hydro mulch/seeding of settlement basins etc. I don't have a name or number but I am sure they are in information. I worked with a Rick (general superintendent) but I don't have any other information. They are good but seemed to want more volume jobs. They came in and blew out the entire job in a few days and disappeared. They did fine but I wanted them to come do some areas when they were ready (kind of piece meal) and they chose to overrun the place with people. It worked, looked good and the client was happy. They also watered every day all summer until the job was sold.    Rick

From: Al Falango [mailto:afalango@lovett-silverman.com]
Sent: Monday, July 11, 2005 12:43 PM
To: 'Michael Melnick'; 'Rick Noblet'
Subject: Shrewsbury

I need the numbers of some site guys that can handle a substantial amount of school site work, minor drainage, grass prep and planting etc.

Any names you have would be a big help.

4/17/2006

03/23/2004   10:27   17913441040          HARTFORD ROOFING                    PAGE   02



## SUBCONTRACTOR HOLD AGREEMENT
## CONDITIONAL PARTIAL RELEASE

Principal:      Standen Contracting Company, Inc. _____     __Landworks__
                                                                   Subcontractor

Project:        Shrewsbury Middle School

Project Owner:  Town of Shrewsbury, MA

Claim No.:      0400SWS041295001     Bond No.: SW5041

I (we) am (are) a subcontractor to Standen Contracting Co., Inc. on the above-named contract for the work on the above described project. A copy of the subcontract and approved change orders are attached hereto as Exhibit A and by this reference fully incorporated herein.

| | | |
|---|---|---|
| 1. | Amount of my (our) original subcontract/purchase order: | $824,823.00 |
| 2. | Changes in subcontract amount approved by Standen Contracting Co., Inc.: | $ 73,221.00 * |
| 3. | Total or adjusted subcontract amount: | $898,044.00 |
| 4. | Value of work performed and/or approved material stored at job site through 3/1/04: | $643,325.47 |
| 5. | Total payments received from Standen Contracting Co., Inc.: | $433,544.60 |
| 6. | Net amount due through 3/1/04: | $177,614.60 |
| 7. | Retainage on No. 4 above: | $ 32,166.27 |
| 8. | Value to be performed after 3/1/04: | $254,718.53 |

In consideration of my (our) being paid within ten days from the date of this Agreement by United States Fidelity & Guaranty or their successors or assigns (collectively Surety), the net amount of $177,614.60 due (No. 6 above) and its agreement to pay the (us) our retainage of $32,166.27 (No. 7 above) within 30 days of acceptance of the project by the Owner, the expiration of the applicable lien or claim period and Surety's actual receipt of the retainage from the Owner, I (we) hereby agree to perform the balance of the work amounting to $254,718.53 (No. 8 above) as a subcontractor in accordance with the terms and conditions of the Undersigned's subcontract with Standen Contracting Co., Inc. In further consideration of the payment of the sum stated in No. 6 above paid by Surety and when the check has cleared the bank and has been paid, this agreement shall release and forever discharge Surety from all actions, causes of action, claims and demands that the Undersigned, any heirs, legal representatives, or assigns of the Undersigned may now have or arising out of any of the work performed on the above-referenced project, but only to the extent of the payment set forth in No. 6 above and through the date set forth in No. 4 above. If there are any exceptions, they are noted on the attached sheet. The Undersigned hereby agrees to perform the balance of the work as a subcontractor for the Surety or Surety's designee or assignee in accordance with the terms and conditions of the Undersigned's subcontract.

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned, to the extent of the payment made hereunder, hereby assigns its claims for labor, material, or equipment rental, lien rights, stop notice rights and causes of action against Standen Contracting Co., Inc and the Owner to Surety with the Undersigned appointing Surety its irrevocable attorney to demand payment for and enforce payment of said liens, stop notices, and cause of action, including, but not limited to, bringing suit hereon, providing releases therefore, and taking all steps to perfect the same, and all at the Surety's sole discretion, election and expense.

IT IS FURTHER UNDERSTOOD AND AGREED that the agreement of Surety or its designee or assignee to pay retainage or any future payments is subject to any defenses or claims of the principal, the Surety or its designee or assignee has or may have arising out of the subcontract that exist now or that may arise in the future that entitle the Owner, the principal or Surety and/or its designee or its assignee to back charge, set off, or deduct from the retainage or any future payments any amounts for which the Undersigned may be or is responsible for. The execution of this Agreement shall not waive or estop the Surety from raising any such defenses or claims.

Page 1 of 2

IT IS FURTHER UNDERSTOOD AND AGREED that Surety is in the process of negotiations with the Owner on the referenced contract. If proper arrangements can be made with the Owner for takeover and relet of this project your subcontract, purchase order, change orders or agreement may be assigned to a new general contractor or construction manager. The continued use of you as a subcontractor on this project is at the sole discretion of Surety and is further conditioned upon approval by the completion contractor and/or Owner. If it is determined by Surety to either not use you as a subcontractor or assign your subcontract agreement, then any retainage hold will be directed to you within 30 days after project acceptance and retentions are released by the Owner and received by Surety assuming there are no backcharges, setoffs or claims against you.

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned certifies that any labor, material, and/or subcontractor furnished by the Undersigned, was actually furnished, delivered, or used in construction of the aforementioned project.

THE UNDERSIGNED FURTHER WARRANTS AND REPRESENTS AND HEREBY certifies that all just and lawful billings, accounts and/or amounts due from the undersigned and/or its subcontractors or material suppliers for labor, material, equipment employed in the performance of this contract have been fully paid in accordance with the terms and conditions of said contract(s) and that there are no amounts for which the undersigned would be responsible under the above agreement, all amounts having been fully paid and other terms of the relevant subcontract, material supply contract or purchase order having been fully complied with by the undersigned.

IT IF FURTHER UNDERSTOOD AND AGREED that the Undersigned covenants with Surety and the Owner that the money received hereby will be treated as trust moneys, and used to pay all persons or companies who have furnished labor and/or materials at the subcontractor's request on the aforementioned project, and that a good and sufficient release of all claims and waiver of lien will be obtained from all such persons or companies. In addition, all costs incurred by Surety because of failure to obtain such waiver and release of all claims, or arising from any breach of these covenants or promises made in this Agreement, including any attorney's fees reasonably incurred thereby, will be paid by the Undersigned.

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned has carefully read this Hold Agreement and the same is signed with the proper authority as the free act and deed of said Undersigned.

DATED this 23 day of march 2004

(Subcontractor)

By: CAON TRAILTH

Title: Owner

DATED this 24 day of March 2004

(Surety) VSF5 7

By: _____ Senior Claim Attorney

Authorized Representative

* Additional $9,864.00 in potential change order for unresolved C/O work to be reviewed and negotiated if found valid by LSCC and Jackson CC.

Page 2 of 2

# EXHIBIT F

| CIVIL ACTION COVER SHEET | DO T NO.(S) | T al Court of Massachusetts Superior Court Department County: |
|---|---|---|

**PLAINTIFF(S)**
Hermes Engineering

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
Rob Meltzer, PoBox 1455
Fram. MA 0701  5088727116
Board of Bar Overseers number: ≤3 474

**DEFENDANT(S)**
USP EXP - Jackson Const Co

ATTORNEY (if known)

### Origin code and track designation

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO. **EO9**  TYPE OF ACTION (specify) Breach of contract  TRACK (A)  IS THIS A JURY CASE? ( X )Yes ( ) No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ... $ .........
2. Total Doctor expenses ... $ .........
3. Total chiropractic expenses ... $ .........
4. Total physical therapy expenses ... $ .........
5. Total other expenses (describe) ... $ .........
Subtotal $ .........

B. Documented lost wages and compensation to date ... $ .........
C. Documented property damages to date ... $ .........
D. Reasonably anticipated future medical and hospital expenses ... $ .........
E. Reasonably anticipated lost wages ... $ .........
F. Other documented items of damages (describe)
$ .........

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

$ .........
TOTAL $ .........

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)

Provide a detailed description of claim(s): failure to pay subcontractor on public project

TOTAL $62,7,265.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____ DATE: 8/17/05

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO:

HERMES ENGINEERING, INC.                )
                                        )
Plaintiff              ·                )
                                        )
v.                                      )    ·    VERIFIED COMPLAINT
                                        )
UNITED STATES FIDELITY AND              )
GUARNTY COMPANY and JACKSON             )
CONSTRUCTION CO.                        )
                                        )
Defendants                              )

1.  Plaintiff, Hermes Engineering, Inc. ("the Plaintiff") is a Massachusetts corporation with a

    principal place of business at 60 Tripp Street, Framingham, Middlesex County in the

    Commonwealth of Massachusetts.

2.  Defendant, Jackson Construction Co. ("the Defendant") is a Massachusetts business with

    an address of 20 Dan Road in Canton, Norfolk County, in the Commonwealth of

    Massachusetts.

3.  Defendant, United States Fidelity & Guaranty Co. ("the Surety") is an insurance

    company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the

    Commonwealth of Massachusetts.

4.  The Defendant entered into a contract with the Plaintiff under which the Plaintiff agreed

    to perform certain construction work for the Defendant at the Hull High School in Hull,

    Massachusetts. ("the Project")

1

5. The Plaintiff is the Division 15 HVAC Contractor at the Project and is thus subject to, and entitled to, the protection and remedies of G.L. c. 149, which directs the conduct of public construction projects.

6. The Defendant agreed to pay the Plaintiff for the work performed by the Plaintiff on its behalf.

7. The Plaintiff performed its contractual obligations, providing invoices for work performed on behalf of the Defendant.

8. Notwithstanding the Plaintiff's performance and acceptance of the work, the Defendant had not paid the Plaintiff for the Plaintiff's work.

9. The Plaintiff is owed $624,265.53 for work performed on behalf of the Defendant at the Project.

10. The Defendant failed to perform its obligations to the Town of Hull, and has been terminated from the Project, leaving the Plaintiff unpaid.

## COUNT I
## BREACH OF CONTRACT
## HERMES v. JACKSON

11. The Plaintiff restates paragraphs 1-10 and incorporates them herein by reference.

12. The Defendant's failure to pay the Plaintiff for completed services constitutes a breach of the contract between the Plaintiff and the Defendant.

13. As a result of the Defendant's breach, the Plaintiff has sustained the loss of its expectancy under the contract, and has sustained incidental and consequential damages foreseeable at the time of contract formation.

2

## COUNT II
## QUANTUM MERUIT
## HERMES v. JACKSON

14. The Plaintiff restates paragraphs 1-13 and incorporates them herein by reference.

15. The Plaintiff has provided work worth $624,265.53 for which it has not been

    compensated, as demonstrated on the attached Exhibit A.

16. The Defendant has received the benefit of this work and has been otherwise unjustly

    enriched as a result of the Plaintiff's work.

17. The Defendant owes the Plaintiff the value of the work.

## COUNT III
## BREACH OF IMPLIED COVENANTS
## HERMES v. JACKSON

18. The Plaintiff restates paragraphs 1-17 and incorporates them herein by reference.

19. The Defendant's conduct, as described herein, did breach the implied covenant of good

    faith and fair dealing which is contained within each contract in the Commonwealth.

20. As a result of this breach, the Plaintiff has been harmed.

## COUNT IV
## BREACH OF M.G.L. c. 93A §11
## HERMES v. JACKSON

21. The Plaintiff restates paragraphs 1-20 and incorporates them herein by reference.

22. Both parties to this dispute are engaged in trade and commerce.

23. The Defendant's conduct, as described herein, went beyond mere breach of contract, to

    egregious and heavy-handed attempts to extort concessions and otherwise deprive the

3

Plaintiff of its legal rights, and to otherwise deny the Plaintiff its rights under the

contracts based upon superior economic position.

24. The Defendant's conduct, as described herein, was unfair and deceptive under M.G.L. c.

93A, which proscribes this type of conduct.

25. As a result of this breach, the Plaintiff has been harmed in its business.

## COUNT V
### VIOLATION OF G.L. c. 149 §29
### HERMES v. USF & G

26. The Plaintiff restates paragraphs 1-25 and incorporates them herein by reference.

27. The Defendant. was bonded by the Defendant, United States Fidelity & Guaranty Co.

28. The Defendant failed to complete its payment obligations at the Project with regard to the

sums owed to the Plaintiff.

29. The Plaintiff has performed it work under the Jackson contract, and is owed funds by the

Defendant for the work performed.

30. The Plaintiff gave timely notice of its claim to the Surety as required under G.L. c. 149

§29.

31. The Surety has failed to make timely payment, and to otherwise comply with the

provisions of c. 149 §29, which are intended to provide security to the Plaintiff for

payment on public projects.

32. The Defendant has failed to pay the Plaintiff for work performed at the Project.

## COUNT VI
### VIOLATION OF G.L. c. 93A and 176D
### HERMES v. USF & G

33. The Plaintiff restates allegations 1-32 and incorporates them by reference.

4

34. Notwithstanding that liability was reasonably clear, the Defendant has declined to make full settlement of the claim, without cause or excuse.

35. The Plaintiff has made demand for its funds, a demand which has been ignored.

36. As a result of this conduct, the Plaintiff has been harmed in its business.

WHEREFORE, the Plaintiff respectfully prays that this Honorable Court:

1. Enter judgment for the Plaintiff as pled in Counts Count I-III and ordering an award of damages in the amount of $624,265.53;

2. Enter judgment for the Plaintiff as to Count IV, and ordering the trebling of damages and the award of attorney's fees;

3. Enter judgment for the Plaintiff as to Count V, requiring the surety to pay the sum awarded forthwith,;

4. Enter judgment for the Plaintiff as to Counts VI, and ordering the trebling of damages and the award of attorney's fees and

5. Any further relief deemed just and appropriate by this Honorable Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
**Hermes Engineering, Inc.**
By its attorney

Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: August 17, 2005

5

## VERIFICATION

I, Phillip Horowitz, an officer of Hermes Engineering, Inc. and duly authorized to sign this document on behalf of the corporation, do hereby certify that I have reviewed the attached document, and that the facts contained herein stating the funds owed are true to the best of my knowledge and belief, and represent a true and accurate accounting of the funds due and owing to Hermes Engineering, Inc.

Signed under the pains and penalties of perjury this 4th day of August, 2005

Phillip Horowitz

6

# Hermes Engineering, Inc.
## Mechanical Contractors
**60 Tripp Street • Framingham, MA  01702-8751 • (508) 270-8842 • FAX (508) 270-9146**

June 15, 2005

Town of Hull
School Building Committee
7 Hadassah Way
Hull, MA. 02045
Certified Mail/Return Receipt: 7005-1160-0003-7876-0218

**DEMAND FOR DIRECT PAYMENT**

|  |  |
|---|---|
| Subtrade: | Hermes Engineering, Inc. (HVAC) |
| G.C.: | Jackson Construction Company |
| Project: | Hull High School, Hull, MA. |

Hermes Engineering, Inc. has substantially completed our subcontract work on the above project in accordance with the Plans and Specifications and request payment of the entire balance due under our subcontract from the General Contractor (Jackson Construction Company), who has failed to pay. This is a written demand for the balance of $511,277.82 due under the subcontract, a breakdown of which is as follows:

| | | | |
|---|---|---|---|
| Subcontract Price: | | | $1,831,750.00 |
| Plus Change Orders: | | | |
| CO#1 | Furnish & Install Insulated Dampers in Stage Area | $10,760.00 | |
| CO#2 | Provide Gas Burners on Existing Steam Boilers | $12,000.00 | |
| CO#3 | No Description – Back Charge | ($    511.00) | |
| CO#4 | No Description – Back Charge | ($   640.00) | |
| CO#5 | Disagree Mason did not do Coordination | ($1,185.00) | |
| CO#6 | Water Damage | $  580.00 | |
| | Pan for RAC-1 11/13/03 (see revised) | $4,581.52 | |
| Total Change Order Work Approved: | | | 25,585.52 |
| Total Subcontract with Change Orders: | | | $1,857,335.52 |
| Completed Pending Work: | | | |
| 1. | Combustion Air Louver sub. 9/26/03 | $ 1,708.56 | |
| 2. | Replace Spec. Return Grills @ Stage w/ Black Iron | $  878.76 | |
| 3. | Add End Panels to 14 Unit Vents in Phase II. Shelving Units will be 15 ¼" deep. | $ 2,056.88 | |
| 4. | Holes for Ductwork were cut by Jackson Construction (see attached) | $ 1,078.54 | |
| 5. | Remove & Reinstall Ductwork due to corrective work in Library | $   506.19 | |
| 6. | No Gas/Frozen Coils – 1/16/04 | $ 5,032.33 | |
| 7. | Modify Cabinet Unit Heaters to fit in existing conditions (Service Order #1587) | $   422.82 | |
| 8. | Remedial work in Cafeteria (Service Order #2442) | $ 1,562.00 | |
| 9. | Replace Cabinet Unit Heaters due to Water Damage | $  895.00 | |
| 10. | Add 10'0" to Existing Flue | $ 3,000.00 | |
| 11. | Temporary Heat | $59,576.06 | |
| 12. | Maintenance of Temporary Heat | $18,981.00 | |
| 13. | Phase I-IIIA Coord. Dwgs. & Existing Conditions | $44,564.04 | |
| 14. | Phase I Roofing Delays | $28,088.52 | |
| 15. | Phase I Approvals of HVAC Equipment | $30,531.00 | |
| 16. | Phase I Approval of Color Selection | $28,088.52 | |
| 17. | Phase II Coord. Dwgs. | $10,584.08 | |

| | | |
|---|---|---|
| 18. | Phase II Roofing Delays | $ 3,256.64 |
| 19. | Phase II Shelving Installation Delay | $ 4,884.96 |
| 20. | Phase II Arch./Clerk non-payment | $25,238.96 |
| 21. | Phase II Moving delays | $24,424.80 |
| 22. | Phase III Schedule Abatement to Coord. Dwgs. | $11,398.24 |
| 23. | Phase III Impact Notice 2/4/04 | $20,354.00 |
| 24. | Phase III Failure to Cut 7 openings | $ 6,513.08 |
| 25. | Phase III Unable to order Shelving | $ 4,884.96 |
| 26. | Phase III Failure to install Louvers | $ 3,256.64 |
| 27. | Phase III Failure to Form & Pour Pad | $   720.48 |
| 28. | Phase III Roofer Delay | $11,398.24 |
| 29. | Phase III Incorrect Blocking for Shelving | $ 2,442.48 |
| 30. | Phase IIIA Returns & Grilles | $ 6,965.72 |
| 31. | Phase IIIA Roofing Delays | $13,026.56 |
| 32. | Phase IIIA On-Job Delays | $26,098.66 |
| 33. | Demolition | ($36,000.00) |
| 34. | Cleaning | ($11,790.00) |
| 35. | Delays | ($31,000.00) |
| 36. | Masonry Work | ($ 7,417.00) |
| 37. | Frozen Sprinklers | ($ 2,063.10) |

| | |
|---|---|
| Total Pending Work: | $402,418.72 |
| Total with Pending Work: | $2,259,754.24 |
| Total Payments: | $1,635,488.71 |
| **Total Balance Due:** | **$624,265.53** |

Please make direct payment to us of $511,277.82, the entire balance less $112,987.71 (5% retainage), in accordance with chapter 30, section 39F of the General Laws.

Hermes Engineering, Inc.

By: _____
Phillip E. Horowitz, President

On this _____ day of June, 2005, before me the undersigned notary public, personally appeared _____ proved to me through satisfactory evidence of identification, which were _____, to be the person whose name is signed on the preceding or attached document who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

_____
Notary Public:
My Commission Expires:

CC. General Contractor: Jackson Construction Company – 7004-2510-0000-0827-2899
    Bonding Company: U.S. Fidelity & Guaranty Company – 7004-2510-0000-0827-2905
    Architect: Architecture Involution, LLC (Ai3) -7005-1160-0003-7876-0225
    Attorney: Robert Meltzer

**SUBCONTRACTOR RATIFICATION AGREEMENT**
**CONDITIONAL PARTIAL RELEASE**
**AND INDEMNITY AGREEMENT**

| | | |
|---|---|---|
| **Principal:** | Jackson Construction Co. | Hermes Engineering, Inc |
| | | Subcontractor |
| **Project:** | Hull High School – Hull, MA | |
| **Project Owner:** | Town of Hull, MA | |
| **Claim No.:** | 090-SC-SK363501-RG | |
| **Bond No.:** | SK3835 | |

I (we) am (are) a subcontractor on the above-named contract for the work described as follows:

Describe scope of work:    HVAC

Specification Section(s):

| | |
|---|---|
| 1. Original Subcontract Amount | 1,831,760.00 |
| 2. Approved Subcontract Change Orders (C.O. No.'s 1, 2, 3, 4 and 6 – executed by both parties) | 29,457.72 |
| 3. Subcontract Sum To Date (Line 1 + 2) | 1,861,207.72 |
| 4. Value of work performed and/or approved material stored at jobsite (excluding punchlist work) | 1,861,207.72 |
| 5. Retainage on Line No. 4 (equals value of open punchlist) | 139,865.00 |
| 6. Total Earned Less Retainage (Line 4 less Line 5) | 1,721,342.72 |
| 7. Total Payments Received from Jackson Construction | 1,697,348.81 |
| 8. Current Payment Due (Line 6 less Line 7) | 23,993.91 |
| 9. Value to be performed to Finish (Line 3 less Line 4) | 0.00 |
| 10. Value of reserved claims per Subcontractor (see attached Exhibit A), does not include interest and attorneys fees to which the Subcontractor may be entitled, if any, in connection with the lawsuit pending in the Middlesex Superior Court captioned Hermes Engineering Inc. v. USF&G, Civil Action No. 05-2968. | 402,438.75 |
| 11. Value of reserved claims / backcharges known to date (per Principal and or Surety) (see attached Exhibit B), value of reserved claims does not include claim for offset against Subcontractor for amounts which the Subcontractor fails to pay Emerson-Swan Company, d/b/a Sytec Controls for labor and materials provided to the Project at issue in the lawsuit pending in the Middlesex Superior Court captioned Emerson-Swan Company, d/b/a Sytec Controls v. Hermes Engineering, Inc. et al. Civil Action No. 05-2854. Subcontractor reserves its rights with respect to this action. | (91,226.10) |

In consideration of my (our) being paid within fifteen (15) days from the date this Agreement is fully executed by UNITED STATES FIDELITY AND GUARANTEE COMPANY, or its successors or assigns (Surety), for the net amount of $ 23,993.91 due (No. 8 above) and its agreement to pay me (us) our retainage of $ 139,866.00 (No. 5 above) on a progress basis, as punch list items are completed, signed off by the Architect / Owner, and paid by the Owner, and Surety's receipt of the retainage from the Owner, I (we) hereby agree to perform the balance of the work amounting to $ 0.00 (No. 9 above) as well as punch list work amounting to $139,866.00 (No. 5 above) as a subcontractor in accordance with the terms and conditions of the Undersigned's subcontract with Jackson Construction Co., Inc. (Principal), which subcontract is hereby reaffirmed and/or reinstated. (A complete current punch list, as authored by the Owner's representatives, is attached as Exhibit C to this Agreement.) In further consideration of the payment of the sum stated in No. 8 above paid by Surety and when the check has cleared the bank and has been paid, the Subcontractor hereby releases and forever discharges Surety from all actions, causes of action, claims and demands that the Undersigned, any heirs, legal representatives, or assigns of the Undersigned may now have or that might subsequently accrue arising out of any of the work performed on the above-referenced project, excepting only the amount set forth in No. 8 above, to the extent of actual work performed, and claims as reserved in No. 10 above. The Undersigned hereby agrees to perform the balance of the work as a subcontractor for the Surety's designee or assignee in accordance with the terms and conditions of the Undersigned's subcontract with the Principal including, but not limited to, all warranties.

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned, to the extent of the payment made hereunder, hereby assigns its claims for labor, material, or equipment rental, lien rights, stop notice rights and causes of action against the Principal and the Owner to Surety with the Undersigned constituting Surety its irrevocable attorney-in-fact to demand payment for and enforce payment of said liens, stop notices, and causes of action, including, but not limited to, bringing suit hereon, providing releases therefore, and taking all steps to perfect the same, and all at the Surety's sole discretion and election.

IT IS FURTHER UNDERSTOOD AND AGREED that the agreement of Surety or its designee or assignee to pay retainage or any future payments is subject to any defenses or claims the Principal, the Surety or its designee or assignee may have arising out of the subcontract that exist now or that may arise in the future that entitle the Owner, Principal, or Surety and/or its designee or its assignee to back charge, set off, or deduct from the retainage or any future payments any amounts for which the Undersigned may be or is responsible, including but not limited to the amount under No. 11, above. The execution of this Agreement shall not waive or estop the Surety from raising any such defenses or claims.

IT IS FURTHER UNDERSTOOD AND AGREED that Surety is in the process of negotiations with the Owner on the referenced contract. If proper arrangements can be made with the Owner for the completion of this project pursuant to the terms of the Surety's performance bond, your subcontract, purchase order, change orders or agreement may be assigned to a new general contractor or construction manager. In the interim, the Undersigned agrees and shall continue to perform the balance of the work for the Surety or its designee or assignee. All future billings under the subcontract shall be presented to the Surety until such time as the Surety notifies the Undersigned that the Surety has appointed a designee or assignee. The continued use of you as a subcontractor is at the sole discretion of Surety. If it is determined by Surety to either not use you as a subcontractor or assign your subcontract agreement, then any retainage held will be directed to you within 30 days after project acceptance and retentions are released by the Owner and received by Surety assuming there are not backcharges against you. At the sole discretion of the Surety or its designee or assignee, any one of them may terminate any or all of the work provided for in the subcontract prior to its completion, at their convenience. In such event, an equitable settlement for the work performed under the subcontract and this Agreement shall be made. The Undersigned shall be paid for the reasonable value of the work performed up to the time of termination for which payment has not been made, together with a pro rata portion of its profit and overhead which is directly attributable to the performed, but unpaid for work.

Subcontractor Hold Agreement
Conditional Partial Release & Indemnity Agreement

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned certifies that any labor, material, and/or subcontractor furnished by the Undersigned, was actually furnished, delivered, or used in construction of the aforementioned project.

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned covenants with Surety and the Owner that the money received hereby will be treated as trust moneys, and used to pay all persons or companies who have furnished labor and/or materials at the Undersigned's request on the aforementioned project, and that a good and sufficient release of all claims and waiver of lien will be obtained from all such persons or companies including but not limited to Emerson-Swan Company, d/b/a Sytec Controls. In addition, all costs incurred by Surety because of failure to obtain such waiver and release of all claims, or arising from any breach of these covenants or promises made in this Agreement, including any attorney's fees reasonably incurred thereby, will be paid by the Undersigned.

THE UNDERSIGNED FURTHER WARRANTS AND REPRESENTS AND HEREBY certifies that, to the extent of payments received by the undersigned, all just and lawful billings, accounts and/or amounts due from the undersigned and/or its subcontractors or material suppliers for labor, material, equipment employed in the performance of this contract have been fully paid or will be fully paid, including but not limited to Emerson-Swan Company, d/b/a Sytec Controls.

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned will indemnify the Surety and its General Contractor / Construction Manager and save the Surety and its General Contractor / Construction Manager harmless from any claim, demand, lien, or right of lien which may now or hereafter be asserted by the Undersigned or any laborer, materialman, supplier, or subcontractor of the Undersigned, who asserts a claim, demand, or lien arising out of or in any manner connected with, directly or indirectly, labor performed materials furnished or any other work performed on the project. The Undersigned further agrees to defend the Surety and its General Contractor / Construction Manager in all actions arising therefrom, paying any costs, expenses, attorney's fees, and any other fees incidental thereto.

To the fullest extent permitted by law, the undersigned shall indemnify and hold harmless the Surety and its General Contractor / Construction Manager against any and all claims, losses, liability, damages, costs, expenses and attorneys fees on account of any injury or claimed injury, to persons or property, tangible or intangible, arising out of or claim to arise out of any act or omission of the undersigned, its agents, servants, employees, representatives, subcontractors, or suppliers.

**[ REMAINDER OF PAGE LEFT INTENTIONALLY BLANK ]**

Subcontractor Hold Agreement
Conditional Partial Release & Indemnity Agreement

IT IS FURTHER UNDERSTOOD AND AGREED that the Undersigned has carefully read this Agreement and the same is signed with the proper authority as the free act and deed of said Undersigned.

DATED this __22__ day of __MARCH__, 2006.

SUBCONTRACTOR: Hermes Engineering, Inc.

By: _____

Print Name: _PHILIP HOROWITZ_

Title: _PRES._

Address: _60 TRIPP ST._
_FRAMINGHAM, MA_
_01702_

Phone: _508(270)-8842_

Fax: _508(270)-9146_

E-mail: _HERMES GOGO@AOL.COM_

DATED this _20_ day of _April_, 2006.

UNITED STATES FIDELITY AND GUARANTEE COMPANY

By: _____

Print Name: Gordon Paterson

Title: Claim Counsel

Address: One Tower Square
Bond Claim – 14 CZ
Hartford, CT 06183

Phone: 860-277-2409
Fax: 860-277-5722
E-mail: GPATERSO@stpaultravelers.com

11/15/05

Subcontractor Hold Agreement
Conditional Partial Release & Indemnity Agreement

Subj:   **Fwd: FW: HHS - Punchlist Review #5 (Mechanical)**
Date:   6/27/2006 7:26:06 AM Eastern Standard Time
From:   Hermes6060
To:     Robmeltzer

Forwarded Message:

| | |
|---|---|
| Subj: | **FW: HHS - Punchlist Review #5 (Mechanical)** |
| Date: | 6/26/2006 9:59:56 PM Eastern Standard Time |
| From: | jlemieux@vertexeng.com |
| To: | hermes6060@aol.com |
| CC: | tscalzo@vertexeng.com, pnetburn@HNSO.ORG |
| *Sent from the Internet (Details)* | |

FYI

**From:** Jon Lemieux -- Vertex
**Sent:** Monday, June 26, 2006 9:57 PM
**To:** 'Troy Randall'
**Cc:** Debbe Bennett; Patrick Tompkins, PE; Wayne E Mattson; John Barton; tgould923@comcast.net; Mike Pellegri -- Vertex; Terry Scalzo -- Vertex
**Subject:** RE: HHS - Punchlist Review #5 (Mechanical)
**Importance:** High

Troy
That only addresses the items on the "G & V" tab of the spreadsheet (see revisions attached). However items were also reviewed on the Phase I, II, III and IIIa tabs as well. Please advise as those items total over $23K together - on top of those listed below. (Please be advised that items listed as "Out of Scope" are being dealt with by CTA/USF & G directly with Hermes.)
Thank you!
Jon

**From:** Troy Randall [mailto:randall@AI-3.com]
**Sent:** Monday, June 26, 2006 4:34 PM
**To:** tgould923@comcast.net; Mike Pellegri -- Vertex; John Barton
**Cc:** Jon Lemieux -- Vertex; Debbe Bennett; Patrick Tompkins, PE; Wayne E Mattson
**Subject:** HHS - Punchlist Review #5 (Mechanical)

On Thursday, June 22nd our mechanical engineer, Wayne Mattson (Griffith & Vary, Inc.) met with Terry Scalzo (Vertex Engineering) and Phil Horowitz (Hermes Engineering) to review the mechanical (HVAC) Hull High School punchlist. As a result, the following items of incomplete work, listed by "Reference No.", have been completed and can be removed from the punchlist (Exhibit A):

**HVAC Punchlist**
8, 14, 15, 17, 18, 19, 20, 21, 30, 36, 40, 42, 48, 87, 88, 89, 91

Please let me know if you have any questions.
Thank you,
Troy Randall