UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | |
|---|---|
| LANDWORKS CREATIONS, LLC )<br><br>Plaintiff )<br> )<br>v. )<br> )<br>UNITED STATES FIDELITY AND )<br>GUARANTY COMPANY and )<br>LOVETT-SILVERMAN CONSTRUCTION )<br>CONSULTANTS, INC. )<br> )<br>Defendants ) | AFFIDAVIT OF NEAL<br>MATTHEWS IN SUPPORT OF<br>PLAINTIFF, LANDWORKS<br>CREATIONS, LLC'S<br>OPPOSITION TO THE MOTION<br>OF DEFENDANT, LOVETT-<br>SILVERMAN FOR SUMMARY<br>JUDGMENT PURSUANT TO<br>F.R..C.P. 56(c) |

I, Neal Matthews, do depose and swear as follows:

1. I have personal knowledge of the business affairs of Landworks Creations,LLC.

2. This affidavit is submitted in support of the opposition to the Motion for Summary Judgment.

3. Landworks Creations, LLC was involved with the project throughout many major landmarks, including the departure of the original site contractor (Hole Story), the failure of Standen, the original ratification of Landworks Creations, LLC following the Standen failure, and the slow decline and failure of Jackson (which began in the fall of 2004). To this day, Landworks Creations, LLC has never been formally terminated from the Project, and even after two years of litigation, I have not seen any explanation for why Landworks Creations, LLC has not been paid for its work.

4. After two years of being ignored by the parties of this case I finally had a chance to present my side of the story. It was the kind of conversation that may have prevented this whole

1

sordid mess, if only the defendants would have sat for a reasonable conversation with me in August of 2005 instead of having me tell it in my deposition. I have told my side of this story endlessly. I was deposed for nearly ten hours. I have provided nearly 15 pages of interrogatory answers. I have also sat through all of the depositions in this case, and I have personally heard all of the witnesses deny any knowledge of any wrongdoing by Landworks Creations, LLC at the Project, or provide any explanation for why Landworks hasn't been paid.

5. Nonetheless, the Motion for Summary Judgment seems to either deliberately take my statements out of context, or to skew them, or to simply put a spin on statements that makes no sense. I am attaching a complete copy of my sworn testimony (Exhibit A) and the interrogatory answers (Exhibit B), which I believe need to be provided to this Court. I think the Court will agree, upon reading it, that Lovett-Silverman has left out all of the testimony that shows that its motion has no basis.

6. The notion that Lovett-Silverman did not mislead Landworks makes no sense to me. The initial phone conversations with Robert Bullock in August of 2005 finally gave me the expectation that this ordeal would be over soon. In his conversation with me he stated that he wanted to ratify Landworks Creations and I was optimistic that Landworks' would be back to work soon and payment issues would be resolved. On August 17, 2005, I received e-mail from Robert Bullock that fully and reasonably led me to believe that I would be completing this job and that Lovett-Silverman, as agent for USF & G, was reviewing my payment claim in good faith. There was no mention that I had abandoned the job, or any suggestion that Lovett-Silverman had any doubts about my ability to finish the project. There was no reference to defective work, or concerns about Landworks' ability to do the job effectively and efficiently. There was only talk of ratification and payment.

2

7. In my interrogatory answers, number 7, I explained what I believed my rights were on the Project. The Affidavit of William Gallagher, confirm that my understanding was reasonable and consistent with industry practice.

8. Landworks Creations, LLC relied on Lovett-Silverman's assurances, and I never construed his statement that he could not talk to me directly to mean that Landworks was being terminated, or that Lovett-Silverman believed it had the right to simply ignore my claim, or fail to investigate my claim for the Surety. I was misled as to what Lovett-Silverman was doing. I did not fully understand that Lovett-Silverman was "banging" the subcontractors until USF & G provided this e-mail. I was also surprised to find out that Robert Bullock was having conversations by e-mail within the Surety and Lovett-Silverman during the time he was corresponding to me, in a way which proved that he was not talking to me in good faith.

9. I fully believe that I was lied to by Lovett-Silverman, by words and actions, and the e-mail that has been provided confirms it.

10. I relied on these words and actions. If I had received a termination letter, or if I had been informed that my claim was simply being ignored, there were things I could have and would have done to protect my rights or to get back to the job. By the time of these e-mails in August of 2005, I knew the project architect and town officials. I could have contacted them and informed them that their interests, like mine, were not being protected. I could have made attempts to contact the Surety directly. I could have contacted the insurance commission, or the Office of the Attorney General, or CTM or Waterman Design. I could have contacted the newspaper. As it was, and based upon what Lovett-Silverman said, I sat and waited for them to do what they said they were doing.

3

11. Landworks Creations, LLC was badly harmed by my reliance on the representations made by Lovett-Silverman. The Motion for Summary Judgment makes it sound like the effect of this whole thing was that I couldn't buy another yacht or some other luxury item. In fact, the reliance almost destroyed the company, and continues to cause hardship to this very day.

12. Landworks borrowed money to pay subcontractors, and has had the carrying costs of these loans. Landworks has used other money to pay subcontractors that could have been used within the company. At this point, Landworks has paid for a substantial portion of the Project, and it hasn't been repaid. Landworks also had to give a credit for work not performed, another loss.

13. Because Landworks expected to return to the Project, Landworks did not take other work, or seek other work which would have rendered it incapable of returning to the Project. Landworks took this action because the August 17, 2005 e-mail told me that a ratification process was under way. The funds paid out to support the work at Shrewsbury could have been used for expanding the company, or otherwise growing the company.

14. Landworks has also had to pay legal fees, and has had its reputation trashed in the community by false statements about abandonment, defective work and other such things. Even if this does not rise to actionable defamation, these kinds of comments harm a company that is dependent on its good reputation.

15. The actions by Lovett-Silverman have delayed payment, and have nearly put the company out of business. Before this job, Landworks Creations credit was impeccable. Every vendor, sub contractor and supplier was paid before the terms given. I had vendors lined up to supply me for jobs, because my reputation was that I would pay my bills fully and quickly. That is not the case now. This damage to my reputation is the most egregious damage to me. It cost

4

me my ability to perform work as effectively and efficiently as I was able to do before. I lost my insurance coverage in the fall of 2005. Using money to pay off all other vendors for the Shrewsbury job in expectation that I would be ratified and could complete my work there, I was left short of funds in the fall to maintain insurance coverage. For the next two months I had to decline work and refinance to cover my company with proper insurance. Because I had to take reduced coverage I can not take projects of the size and scope as I had before. With the reduced work load the profit is not there to pay the service on the debt and pay the legal bills also, causing a net lost to the company for the last two years.

16. This is consistent with banging the subcontractors, as my expert notes.

17. In short, Lovett-Silverman, by its actions and words, lied. I believed the lie because I trust people to do the right thing. Believing Lovett-Silverman has cost this company substantially, and continues to cost this company by continuing to litigate and assist in litigating a bogus counterclaim. This motion itself seems to be designed as yet one more way to bleed Landworks' resources.

18. As my deposition testimony states, I have been in the construction business a long time, and I have seen some tough negotiations and tough stances and conduct that generally shows that construction is a rough business.

19. Even with my experience, I find it absolutely shocking that a company like Lovett-Silverman could cold-bloodedly carry out a plan to put subcontractors out of business in order to avoid paying them, and that it would callously force all of the subcontractors to sue for their money.

20. I believe that I would qualify as an expert as to construction practices. The notion that Lovett-Silverman's conduct would not rise to the level of unfair and deceptive trade practices is

5

ridiculous. I'm used to the business, and I think this conduct is not only deplorable, but also unconscionable and shocking. I find it even more shocking that Lovett-Silverman would even put it in writing in an e-mail that it was doing so. It seems even more shocking to me that Lovett-Silverman could file papers with this Court telling the Court that its conduct was acceptable, and that Landworks was not harmed, or even suggesting to the Court that there is anything specious in being a victim of subcontractor banging. There is a certain arrogance by Lovett-Silverman here that the Court should take note of when reviewing these papers.

Sworn under the pains and penalties of perjury this 17th day of April, 2007.

Red H Maille

# EXHIBIT A

# In The Matter Of:

*Landworks Creations, LLC v.*
*United States Fidelity and Guaranty Company, et al.*

---

*Neal H. Matthews, Vol. 1*
*February 13, 2007*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File matthews1.v1, Pages 1-180

**Word Index included with this Min-U-Script®**

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

---

**Page 1**

Volume I
Pages 1 to 180
Exhibits 66 - 89

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

- - - - - - - - - - - - - - - - -x
                                  :
LANDWORKS CREATIONS, LLC,         :
        Plaintiff,                :
                                  :
    vs.                           :  Civil Action No.
                                  :  05-CV-40072 FDS
UNITED STATES FIDELITY AND        :
GUARANTY COMPANY and              :
LOVETT SILVERMAN CONSTRUCTION     :
CONSULTANTS, INC.,                :
        Defendants.               :
                                  :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF NEAL H. MATTHEWS,
individually and as designee of LANDWORKS CREATIONS,
LLC, a witness called on behalf of the Defendant
Lovett Silverman Construction Consultants, Inc.,
taken pursuant to the Federal Rules of Civil
Procedure, before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Hermes, Netburn, O'Connor & Spearing, P.C., 265
Franklin Street, Seventh Floor, Boston,
Massachusetts, on Tuesday, February 13, 2007,
commencing at 10:20 a.m.
PRESENT:
    The Mountain States Law Group
        (by Robert N. Meltzer, Esq.)
        160 Speen Street, Suite 307, Framingham,
        MA 01701, for the Plaintiff.
    (Continued on Page 2)

---

**Page 2**

PRESENT (Continued):

    Hermes, Netburn, O'Connor & Spearing, P.C.

        (by Eric C. Hipp, Esq.)

        265 Franklin Street, Seventh Floor, Boston,

        MA 02110-3113, for the Defendant United

        States Fidelity and Guaranty Company.

    Donovan Hatem LLP (by Marianne E. Brown, Esq.)

        World Trade Center East, Two Seaport Lane,

        Boston, MA 02210, for the Defendant Lovett

        Silverman Construction Consultants, Inc.

                    * * * *

---

**Page 3**

[1]
[2]  WITNESS                    I N D E X
[3]  NEAL H. MATTHEWS      DIRECT  CROSS   REDIRECT  RECROSS
[4]    BY MS. BROWN           6
[5]    BY MR. HIPP                     114
[6]                             * * * *
[7]                        E X H I B I T S
[8]  NO.              DESCRIPTION                    PAGE
[9]  66  Agreement between Standec                     6
         Contracting Company, Inc., and
[10]     Landworks dated August 28, 2003,
         with attached Exhibits A, C, D and E
[11]
[12] 67  Agreement between Jackson                     6
         Construction Company and Landworks
[13]     Creations, LLC, dated April 29,
         2004, with attachments
[14] 68  Lamoureux Pagano Drawings L 1.1-1.10         28
         for Shrewsbury Middle School project
[15]
[16] 69  Five-page Jackson Construction               35
         Company document entitled "Oak
[17]     Middle School Completion Game Plan"
[18] 70  Letter from Richard McGuinness to            36
         Neal H. Matthews dated September 15,
[19]     2004, with attached fax cover sheet
         dated 9/20/04
[20] 71  Five-page CTM document entitled              44
         "Contractor Deficiency List,
[21]     3/19/04," with handwritten
         annotations
[22]
[23] 72  Fax cover sheet from Jennifer                53
         Mitchell to Neal Matthews dated
[24]     7/26/04, with attachments, Bates
         Nos. 00624-629

---

**Page 4**

[1]                   E X H I B I T S, Continued
[2]  NO.              DESCRIPTION                    PAGE
[3]  73  Fax cover sheet from Jennifer                56
         Fletcher to Neal Matthews dated
[4]      8/27/04, with attachments, Bates
         Nos. 00597-601
[5]
[6]  74  Fax cover sheet from Jennifer                59
         Fletcher to Neal Matthews dated
[7]      10/19/04, with attachments, Bates
         Nos. 00538-546
[8]  75  17 pages of printouts of e-mails            85
         dated August 17-23, 2005
[9]
[10] 76  Document entitled "United States           117
         Fidelity and Guaranty Company's
[11]     Answer to Amended Complaint and
         Counterclaim," dated August 24, 2006
[12] 77  Document entitled "United States           117
         Fidelity and Guaranty Company's
[13]     Amended Answer and Counterclaim
         Filed with Leave of Court," dated
[14]     June 13, 2006
[15] 78  Two-page document entitled                 122
         "Subcontractor Hold Agreement,
[16]     Conditional Partial Release," dated
         March 23, 2004
[17]
[18] 79  Jackson Construction Company Change        134
         Orders Nos. 1-3 for Landworks
[19]     Creations, LLC
[20] 80  Landworks Creations, LLC, Proposed         139
         Change Order SMS0104 dated April 6,
[21]     2004, with attached job work orders
[22] 81  Landworks Creations, LLC, Proposed         142
         Change Order SMS0204 dated April 6,
[23]     2004
[24]

---

Page 5

E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 82 | Landworks Creations, LLC, Proposed Change Order SMS0304 dated April 6, 2004, with attached proposal from Standen Contracting Company dated December 4, 2003 | 142 |
| 83 | Landworks Creations, LLC, Proposed Change Order SMS0404 dated April 11, 2004, with handwritten annotations, with attached job work orders | 150 |
| 84 | Landworks Creations, LLC, Proposed Change Order SMS0804 dated April 11, 2004 | 151 |
| 85 | Landworks Creations, LLC, Proposed Change Order SMS0904 dated July 20, 2004, with attached job work orders | 153 |
| 86 | Landworks Creations, LLC, Proposed Change Order SMS01004 dated 8/31/04, with attached payroll summaries | 154 |
| 87 | Landworks Creations, LLC, Proposed Change Order SMS01104 dated 8/31/04, with handwritten annotations, with attached job work orders | 158 |
| 88 | Landworks Creations, LLC, Proposed Change Order SMS01204 dated 8/31/04, with handwritten annotations | 162 |
| 89 | Landworks Creations, LLC, Proposed Change Order SMS0104 dated 8/31/04, with handwritten | 165 |

* * * *

Page 6

PROCEEDINGS

(Documents marked as Exhibits 66 and 67 for identification)

NEAL H. MATTHEWS

a witness called for examination by counsel for the Defendant Lovett Silverman Construction Consultants, Inc., having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BROWN:

Q. Good morning, Mr. Matthews. We've met already.

A. Yes.

Q. And as you know, my name is Marianne Brown, and I'm an attorney for the Defendant Lovett Silverman, and we're here today to take your deposition and ask you some questions about the lawsuit that's pending in Federal Court.

I'm going to give you some preliminary instructions and then proceed with questions about the circumstances that gave rise to the complaint.

I suppose my first preliminary statement is

Page 7

just that we're here just to ask you basic simple questions about your understanding of the facts surrounding this lawsuit, and we -- and Mr. Hipp here is the attorney for USF&G, and he may also have some questions for you. Neither of us intend to ask you difficult or complicated questions. We intend to ask you simple, straightforward questions that you can answer, and then we'll be on our way.

So if we do ask you a question that you don't understand, please feel free to ask us to rephrase it or clarify what we intended. Do you understand?

A. Yes, ma'am.

MR. MELTZER: Do you want to get stipulations on the record?

MS. BROWN: The usual stipulations, Counsel?

MR. HIPP: That's fine.

MR. MELTZER: Read and sign, 30 days, waive notary.

MS. BROWN: That's fine, read and sign, 30 days, waive notary, as we have with the other depositions.

Q. And as for my instructions to you, in

Page 8

addition to asking you to feel comfortable and just to understand the questions and just answer the questions as I ask them, I would ask you also to give a verbal response, a yes, a no, not an uh-huh, and, like you just did, a nice nod, which is the normal way we converse with each other, but the court reporter can't transcribe that response, so it doesn't help us in establishing a record of the facts giving rise to the case. Do understand that?

A. I understand.

Q. And if you need a break at any time -- of course, you've seen, you have been present for some of the other depositions, so you know the routine. You can just ask for a break, and we'll be happy to accommodate you.

A. Okay.

Q. All right. Now, can you tell us a little bit about your educational background. If you can tell high school and then through any post-high-school education you have had.

A. Yes, ma'am. I graduated from Garner Senior High School in 1978. I attended North Carolina State University from 1979 to 1983. I received a Bachelor of Science in biological and agricultural

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 9

[1] engineering technologies, soil and water
[2] conservation engineering. That's the extent of my
[3] educational background.
[4]     Q.  And could you summarize, as you have seen
[5] other witnesses do, your work history from your
[6] graduation from college up to the present.
[7]     A.  From 1983 -- give me just one second to get
[8] these dates right. From June of 1983 until January
[9] of 1984, I worked with A-1 Services Limited in
[10] Raleigh, North Carolina. In January of 1984 I
[11] formed my own business, which was Neal. H Matthews,
[12] doing business as Landworks. From 1984 until
[13] December of 1989, that was in continuous operation.
[14]     In 1989 I moved to Milton, Massachusetts.
[15] I took a job first with Landscape Collaborative out
[16] of Watertown, Massachusetts. And I worked with them
[17] from -- is the Flower Show in April or is it in
[18] March? I think it was March of 1990 until January
[19] 12th, 1992.
[20]     Q.  Let me just stop you there, because I'll
[21] lose track otherwise. If we could go to your first
[22] employment, where was that located?
[23]     A.  That was in Raleigh, North Carolina.
[24]     Q.  And that was -- your second employment was

Page 10

[1] with Landworks?
[2]     A.  Yes. I started my business in January of
[3] 1984.
[4]     Q.  And what did your business, Landworks, do
[5] in those years?
[6]     A.  It started off as a landscape construction
[7] company. It dealt mainly with landscaping around
[8] new home construction. We progressed into grading
[9] around -- clearing lots and doing drainage and
[10] grading around these houses. At the same time we
[11] started doing some renovation work on golf courses.
[12]     Q.  Where were these homes and golf courses
[13] located?
[14]     A.  All in Raleigh, the Raleigh-Durham area of
[15] North Carolina. And we then progressed to doing
[16] some, like I said, some renovation work on golf
[17] courses in Raleigh and Cary, North Carolina.
[18]     By the time that -- sometime in the period
[19] of 1987, we were moving more into the golf course
[20] construction. We were doing renovation on golf
[21] courses, sand traps, greens, tees. And we finally,
[22] in 1987 to 1988, built a nine-hole golf course,
[23] private golf course, in Raleigh, North Carolina,
[24] Homestead Farms course.

Page 11

[1]     In 1989 I shut the business down because of
[2] the move that we made to Milton, Massachusetts.
[3]     Q.  In those years was your work -- up until
[4] 1989, up until your move to Massachusetts, was your
[5] work exclusively in North Carolina?
[6]     A.  Yes, it was.
[7]     Q.  And then beginning with your move to
[8] Massachusetts, the first company you worked for out
[9] of Watertown, what did you do there?
[10]     A.  I was the construction manager for
[11] Landscape Collaborative. I oversaw the construction
[12] projects that -- various construction projects that
[13] they did.
[14]     Q.  And where were those projects located?
[15]     A.  Those projects ranged -- mainly it was done
[16] in the Boston-Cambridge area. We did one project in
[17] Greenwich, Connecticut, and to the best of my
[18] recollection, then mainly in the Metro Boston area.
[19]     Q.  And I think that takes us up to where we
[20] were with your work history --
[21]     A.  1992.
[22]     Q.  And what happened next?
[23]     A.  In 1992 I went to work for Pitt
[24] Construction Corporation out of Acton, Mass. I was

Page 12

[1] their construction superintendent. My duties were
[2] involved in the overall management of construction
[3] projects, the field construction projects,
[4] coordination of any subcontractors we might have,
[5] assisting the engineer, staff engineer, in
[6] estimations and coordination of all business records
[7] that were in relation to the jobs that we were
[8] doing.
[9]     Those jobs ranged from Maine, New
[10] Hampshire, Massachusetts, Rhode Island, from what I
[11] can remember is the scope of the work we were doing.
[12]     Q.  And for how long were you in that position?
[13]     A.  I worked with them from 1992 until February
[14] of 1997.
[15]     Q.  And then what happened next?
[16]     A.  And then I restarted my company, Neal H.
[17] Matthews doing business as Landworks.
[18]     Q.  And what have you been doing since then
[19] with Landworks, from 1997 to the present?
[20]     A.  90 percent of my business is golf course
[21] construction, earthwork, drainage, rough shaping of
[22] golf courses, and about 10 percent athletic fields
[23] and parks and other -- if you'll give me just a
[24] second to search the word -- other sort of

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 13

[1] playground type facilities.
[2] **Q.** And where are you headquartered?
[3] **A.** Out of Portsmouth, New Hampshire.
[4] **Q.** And where are your job sites?
[5] **A.** My job sites range from Maine, New
[6] Hampshire, Massachusetts, Rhode Island, Connecticut.
[7] We've worked in Virginia, North Carolina,
[8] Pennsylvania.
[9] **Q.** Have you ever done any work in New York?
[10] **A.** No work in New York, no.
[11] **Q.** Now, as you know, this case involves
[12] circumstances where a surety took over a site from
[13] the general contractor. Have you ever been working
[14] on a project where that happened, other than or in
[15] addition to this particular situation involving the
[16] Shrewsbury Middle School?
[17] **A.** No.
[18] **Q.** So this was your first experience in going
[19] through this process of working with a surety and
[20] the ratification or nonratification of a
[21] subcontract?
[22] **A.** Yes, except for we went through it twice on
[23] this project.
[24] **Q.** First Standen and then Jackson?

Page 14

[1] **A.** That's correct.
[2] **Q.** How did you get involved with the Middle
[3] School Shrewsbury project?
[4] **A.** I was contacted by Rob -- Dick Hammon,
[5] excuse me, of R.A. Hammon Company, and he asked me
[6] if I would be interested in doing the construction
[7] of athletic field and other site utilities at
[8] Shrewsbury Middle School in Shrewsbury. And I told
[9] him that I would be interested, and he had Bill
[10] Gambill of Standen Construction call me. And Mr.
[11] Gambill stated that they needed a site contractor to
[12] start on the athletic fields at Shrewsbury Middle
[13] School fairly quickly.
[14] **Q.** What was your understanding of what the
[15] scope of work was going to be, your general
[16] understanding from these initial conversations?
[17] **A.** The initial conversation was that the main
[18] focus was for the athletic fields, to get the grass
[19] established on the athletic fields. Mr. Gambill
[20] further stated that there was minor underground
[21] utilities to be installed and paving.
[22] **Q.** Now, do you remember the time frame for
[23] these conversations?
[24] **A.** It was in June of 2003, I believe.

Page 15

[1] **Q.** And did you have any understanding from the
[2] outset about the time frame for getting this work
[3] done?
[4] **A.** Yes. My initial meetings with Mr. Gambill,
[5] there was a major concern about the athletic fields,
[6] because they had been promised for the Pee Wee
[7] Football leagues. And they wanted the grass seeded
[8] by September 15th, the deadline for seeding grass in
[9] Massachusetts.
[10] And I told him at that time that it was --
[11] you know, that they were just contacting me in June,
[12] because all of this had to be bid out. And he
[13] explained to me then that if we could do it quickly,
[14] that they needed a contractor almost immediately to
[15] start on these ball fields.
[16] **Q.** Could you explain to us the way you
[17] anticipated your business working on this project.
[18] You just stated "bid it out." I would like you to
[19] explain the extent to which you would do the work or
[20] you would bid it out and what that means, in the
[21] context of this project.
[22] **A.** When I stated "bid it out," I meant that I
[23] needed to prepare the bid for the job, for Standen.
[24] **Q.** For yourself?

Page 16

[1] **A.** For myself and the work that I would do.
[2] **Q.** So did you intend to have yourself or your
[3] own employees do all the work?
[4] **A.** Yes.
[5] **Q.** Thank you. I would like to show you a
[6] document now that we've marked as Exhibit 66, which
[7] I believe is your contract with Standen, that is the
[8] contract between Landworks and Standen, but I would
[9] like you to just take a moment and look at it and
[10] see for yourself.
[11] **A.** (Reviewing document)
[12] **MR. MELTZER:** Off the record.
[13] (Discussion off the record)
[14] **A.** Yes, ma'am, I've seen this.
[15] **Q.** And is this in fact the contract between
[16] Standen and Landworks for the work at the Shrewsbury
[17] Middle School?
[18] **A.** It would appear to me that this is the
[19] contract, yes.
[20] **Q.** Can you explain what the bidding process
[21] was that you made reference to, how it progressed in
[22] this case.
[23] **A.** I put together a proposal for Standen
[24] Contracting in early June, and I sent that to Bill

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 17

[1] Gambill. The initial proposal was well over a
[2] million dollars. And they then contacted me back
[3] after receiving the proposal, and the only thing
[4] that I really remember about that process was that
[5] they were looking for savings on the job, after I
[6] gave them the initial proposal.
[7]    Q. Did you make any changes to your proposal?
[8]    A. Yes, I did.
[9]    Q. And what were those changes?
[10]    A. I told Standen that one of the largest
[11] costs was for sand to be placed under the athletic
[12] fields, there was a 10-inch sand layer, and if they
[13] so chose to purchase the materials, that they could
[14] have an added benefit of saving my markup on the
[15] materials. And so I reduced the amount of the
[16] initial proposal by -- I'm not exactly certain -- it
[17] was between $250,000 and $225,000.
[18]    Q. Did you make any other significant changes
[19] in the bidding process --
[20]    A. No, not at that time.
[21]    Q. Now, I would like to direct your attention
[22] to the document which we've marked as Exhibit 66,
[23] which we'll call the Standen contract, and I'd like
[24] to direct your attention to what is identified as

Page 18

[1] Page 8 at the bottom from a fax transmission,
[2] although I believe it's Page 7 if we counted the
[3] pages. And that's Earthwork Exhibit A, dated
[4] October 28th, 2003. This is referred to in the
[5] first page of the contract as "Exhibit A, Scope of
[6] work."
[7]    Is this in fact the scope of work for the
[8] project as Landworks and Standen had agreed at the
[9] time that this contract was entered into?
[10]    A. (Reviewing document)
[11]    MR. MELTZER: Which Exhibit A are you
[12] looking at? I'm a little confused.
[13]    MS. BROWN: This.
[14]    MR. MELTZER: Not Exhibit A that's the page
[15] before it?
[16]    MS. BROWN: Counsel, thank you. That's a
[17] good point.
[18]    Q. Exhibit A appears to have two pages to it,
[19] Mr. Matthews. So not to confuse you further, but I
[20] would like to direct your attention also to the page
[21] that precedes the page we've been looking at.
[22]    A. (Reviewing document)
[23]    MR. HIPP: Off the record.
[24]    (Discussion off the record)

Page 19

[1]    MS. BROWN: Back on the record.
[2]    Q. Mr. Matthews, I am going to be asking you
[3] about these two documents. As we discussed off the
[4] record, the first page, Exhibit A, does appear to be
[5] the scope of work with a notation at B.2 on that
[6] page, "see the attached second sheet for fuller
[7] scope but not limited to," so that these two
[8] documents appear to go together and to constitute a
[9] written expression of the scope of work at the time
[10] that this contract was entered into.
[11]    Would you agree with that?
[12]    A. Give me just one second to read this
[13] Section B right here, please.
[14]    Q. Sure.
[15]    A. (Reviewing document) It is the exhibit
[16] that shows the scope of work, except for the second
[17] page of the exhibit includes some work that had
[18] already been completed before I was brought to the
[19] site and some work that was not in my scope of work.
[20]    Q. Can you identify first the work, looking at
[21] Page 2 of Exhibit A, that was already completed when
[22] you entered into this contract.
[23]    A. Most of the asphalt had already been
[24] removed from site, under Section 02060, "Site

Page 20

[1] Demolition." Most of the -- where it says "Remove
[2] asphalt; sawcut as required," most of the asphalt
[3] had already been removed. Most of the handicap --
[4] the existing handicap sidewalk ramps had also been
[5] removed. The trench for removal of gas line, the
[6] gas line requested that they be allowed to do all
[7] the work on the gas line. So this was not in our
[8] work to do.
[9]    Q. The gas company?
[10]    A. Whatever the public utility was that
[11] supplied the gas, they generally like to have their
[12] own contractors do all gas line work. And so that
[13] fell under a scope that they did, removal of that
[14] gas line.
[15]    Q. Would you happen to know who did that work?
[16]    A. I'm not certain who did that work, no.
[17]    Q. And would you know who had removed the
[18] asphalt or removed the existing ramps?
[19]    A. It would be in an assumption, but the
[20] original site contractor was Hole Story, and I
[21] assumed that they had removed that.
[22]    Q. That's fine. And actually, that brings me
[23] to another one of my instructions, that you not
[24] assume or not guess in answering the questions, and

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 21

[1] if you do do so, to let me know that you're making
[2] an assumption, just as you just did, so I appreciate
[3] that.
[4]    A. I had been told that Hole Story had done
[5] this work, and so I did not physically see them do
[6] it, but I had made the assumption that they had.
[7]    The demo of the light pole bases had
[8] already been done. The play structure had been
[9] removed already from the courtyard, and I had
[10] excluded from Standen any work inside the building,
[11] because there was not enough time to go over the
[12] internal drawings of the building to work them up a
[13] price for installation of, like, the piping, various
[14] things that they needed inside the building.
[15]    Q. Where are inside jobs identified?
[16]    A. "Remove the play structure and base at the
[17] courtyard." I'm assuming that is the courtyard --
[18] there was only one courtyard, and that was actually
[19] inside of the building, enclosed inside of the
[20] building. And the structure had already been
[21] removed anyhow. And so -- I mean, that wasn't in my
[22] scope to remove it.
[23]    Under Section 02100, "Site Preparation,"
[24] the granite curb, the remove and store granite curb,

Page 22

[1] that had already been done by a previous contractor.
[2] And the new gas line trenching and bedding, as I
[3] stated before, was done by a contractor that was
[4] working for the public utility.
[5]    The ticket booth had already been removed,
[6] where it says "Relocate ticket booth, includes
[7] demo," and the next part is sort of blurred on this
[8] one. But the ticket booth and their footings had
[9] already been removed.
[10]    And down below that, the "Interior
[11] Excavation and Backfill," we had agreed that we
[12] would do all work within ten feet of the building
[13] and that anything inside of the building that needed
[14] to be done would proceed on a time and materials
[15] basis. The mezzanine footings had already been
[16] excavated under that section.
[17]    Under Section 02200, "Earthwork," the
[18] excavation within the building had been excluded.
[19] The site encased conduit had already been installed.
[20] The utility pole bases was just the excavation and
[21] backfill.
[22]    And we had excluded, going to Section
[23] 02511, we had excluded from the contract anything
[24] dealing with the track, the track surfaces.

Page 23

[1]    Q. Are you referring to the "New track surface
[2] areas, cold plane exist," and the "New track surface
[3] areas, asphalt top coat," those two entries?
[4]    A. Yes, because to cold plane the existing --
[5] the track contained a rubberized surface, and the
[6] rubberized surface actually contains a glue and
[7] asbestos type material, which is like hazardous
[8] material. And I told Standen, Bill Gambill from
[9] Standen Contracting, that we could not remove that,
[10] because there was no way for our company to legally
[11] dispose of it. And so then we excluded, like, what
[12] he had brought to my attention to be Alternate 3, I
[13] think, which was for the surfacing of the track.
[14]    Q. Is there a reference here to Alternate 3?
[15] I don't see that, the term you just used.
[16]    A. It may have been -- I think Alternate 3 --
[17] I don't believe it was Addendum 3. I think it was
[18] Alternate 3. It may have been Addendum No. 3. But
[19] I thought that it was an alternate -- it was listed
[20] as an alternate, and that the addendums were
[21] different from the alternates on this job.
[22]    Q. Are there any other items on this Page 2 of
[23] the scope of work which were excluded from your
[24] scope of work?

Page 24

[1]    A. 02710, the sand bed was -- the sand was
[2] purchased by Standen. And the rest of it appears to
[3] be my scope.
[4]    Q. Now, correct me if I'm wrong, but I believe
[5] you also made a statement that there were additional
[6] items, in addition to what was identified here, and
[7] you wanted to -- perhaps I misunderstood your
[8] testimony, but I thought you testified initially
[9] that there were deletions and also additions. So
[10] I'm asks you, are there any additions?
[11]    A. Did I say "additions"? I'm sorry, I'm not
[12] trying to be difficult.
[13]    Q. No, I'm not either. Perhaps you didn't.
[14] Then let me just ask the question simply. Were
[15] there any additions to this scope of work that are
[16] not reflected on this document we've identified as
[17] Exhibit 66 and these two pages, Exhibit A to it?
[18]    A. (Reviewing document) Yes. Under "Site
[19] Demolition," the grandstands were removed. The
[20] grandstands and the press box were removed.
[21]    Q. Any other additions to this scope of work?
[22]    A. Not to my recollection.
[23]    Q. Now, how did it come about that these
[24] changes were made to the contract?

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 25

[1] A. The initial contract was written by -- was
[2] written from my initial -- not my initial, but my
[3] final proposal given to Standen, which removed the
[4] sand from the contract. And that's what I had told
[5] them that would be included into my scope of work.
[6]        In writing the contract out, because I was
[7] pressed for time, and as he had written it out,
[8] there was a rush to get this put in place so that we
[9] could get started for work, and I don't know that
[10] any additions or deletions were actually talked
[11] about.
[12]       I think it was basically an acknowledgement
[13] that, under our scope of work, that there was
[14] demolition to do. Some of the demolition had
[15] already been done, and that which had already been
[16] done was obviously not in part of the contract, and
[17] that our scope of work would encompass these areas
[18] that still needed to be demolished.
[19]       The site preparation was basically set
[20] forth in the grading plan, what had to be done.
[21]       The exclusion of the interior was done just
[22] for expediency's sake so that we could go ahead and
[23] begin to start our work.
[24] Q. But you don't recall any specific

Page 26

[1] conversations that you had with anyone, "Hey, you
[2] know, we're not going to -- we all understand that
[3] Landworks is not going to do" --
[4] A. With Bill Gambill, yes. The track was the
[5] main concern, because we had told him that we could
[6] not remove the surface of the track. And he said to
[7] us at that time that that was no problem, because he
[8] had a contractor for the track work, and I just let
[9] it go at that.
[10] Q. Did he tell you who the contractor was?
[11] A. Tracklite was the contractor for the track.
[12]       Irrigation, in speaking with irrigation, in
[13] the initial conversations about doing the athletic
[14] fields and getting them prepared, we were asking if
[15] we were going to be responsible, that water systems
[16] include the irrigation system. And he said no, that
[17] he had a contractor -- he had a contract for the
[18] irrigation system also for the athletic fields.
[19]       The demolition of the press box and the
[20] grandstands, I believe, was contained in one of the
[21] addendums or alternates, and I was still thinking
[22] that there were alternates, like 1 through 4, or 1
[23] through 5 also.
[24]       I'm pretty certain that there was not only

Page 27

[1] addendums to the contract, but there were alternates
[2] to the contract, and that the Town of Shrewsbury had
[3] exercised these alternates. And I think that might
[4] be where some of that is coming in, and I don't have
[5] the alternates to know which one specifically
[6] related to which function here.
[7] Q. I understand. Do you have any recollection
[8] of any additional change orders or other
[9] documentation of changes in the scope of work with
[10] regard to Standen, the Standen contract?
[11] A. Yes. Through the progress of trying to
[12] build the fields, then it was realized that there
[13] was going to be no way that these would be seeded
[14] by -- I think he had placed in here October 15th,
[15] which is a month out of the recommended seeding
[16] dates. And to get these fields playable for the
[17] next year, I had suggested to them that they might
[18] consider sodding the fields.
[19]       They originally said it would be too
[20] expensive, and we offered the sod to them for the
[21] cost of the sod, and they decided to do that. So
[22] they wrote a change order for sod.
[23]       In addition to that, there were various
[24] minor changes in which debris that had collected

Page 28

[1] around the building from other trades, they decided
[2] that they would have us help them to clean these
[3] areas. And generally this was at the request of the
[4] fire marshal.
[5]       Without going back and checking my notes,
[6] I'm not certain of the other change orders. I know
[7] that there were other minor change orders also.
[8]       MS. BROWN: We discussed off the record
[9] that we have a document here which we won't be
[10] marking as an exhibit, but which we can identify for
[11] future reference, which will assist us today in
[12] getting a general understanding of where this work
[13] had to be performed at the Shrewsbury Middle School.
[14]       So I would like the record to reflect that
[15] we are looking at a document which was produced by
[16] USF&G which was produced -- which was created by
[17] Lamoureux Pagano Associates, Architects.
[18]       MR. MELTZER: Off the record for a minute.
[19]       (Discussion off the record)
[20]       (Document marked as Exhibit 68
[21]        for identification)
[22]       MS. BROWN: Counsel for USF&G has kindly
[23] agreed that we will be marking this as Exhibit 68.
[24] We won't be writing on it, because it is an

Neal H. Matthews, Vol. I
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 29

[1] original. It is entitled "Existing Conditions
[2] Plan," and it is numbered L 1.1.
[3]       Counsel, have I sufficiently identified
[4] this document for purposes of our discussion?
[5]       MR. MELTZER: You certainly have.
[6]       MR. HIPP: Yes.
[7]       MS. BROWN: Thank you.
[8]   BY MS. BROWN:
[9]   Q. Now, Mr. Matthews, can you orient us here
[10] to the scope of your work.
[11]      MR. HIPP: I'm sorry. Off the record for
[12] just a second.
[13]      (Discussion off the record)
[14]   Q. So here we have the middle school, the
[15] Shrewsbury High School here --
[16]   A. It should be the middle school.
[17]      MR. MELTZER: Just for the record, this was
[18] the original Shrewsbury High School and became the
[19] middle school when they built a new high school. So
[20] this was the original existing conditions, which
[21] show a high school instead of middle school.
[22]   Q. Mr. Matthews, you referred to the courtyard
[23] as being within the school. Is this the courtyard
[24] that's identified here within the school building?

Page 30

[1]   A. That's correct.
[2]   Q. And is this the track over here to the
[3] bottom of the page?
[4]   A. Yes, it is.
[5]   Q. And where was the grass, the seeding to
[6] take place?
[7]   A. I'm referencing L 1.3. The seeding was to
[8] be the athletic fields, which are the football field
[9] encased in the track area, and the combination
[10] baseball, soccer field, which is -- let me -- north
[11] of the football field and track areas, and the areas
[12] that were adjacent to the -- that were adjacent to
[13] the fields.
[14]   Q. Can you describe for us where the other
[15] significant work was that needed to be performed.
[16]   A. Total work on the site?
[17]   Q. Yes. For example, the grandstands. We can
[18] go through the list, if you like. I can walk you
[19] through or you can just explain yourself.
[20]   A. I'm going to start back on Sheet L 1.2.
[21] This will be to the best of my memory at this time,
[22] and we'll start in the front of the school. The
[23] pavement around the flagpole area had already been
[24] removed. All the granite curbing in front of the

Page 31

[1] building mezzanine had been removed. And this
[2] pavement here had been removed (indicating).
[3]       The section of pavement that is in the
[4] courtyard, the outer courtyard by the cafeteria --
[5] and I know that you don't know where the cafeteria
[6] is, but if you need to reference this later, it will
[7] jar my memory, but the cafeteria would be right here
[8] adjacent to this -- had already been removed.
[9]       And the pavement that extended along the
[10] side of the gymnasium to the back of the building,
[11] close to the track, all of this pavement had already
[12] been removed.
[13]       The flagpole here has been removed, all of
[14] these horseshoe pits and the bocce court have been
[15] removed, along with the ticket booth had already
[16] been removed.
[17]       Then what was left was the fencing around
[18] the track to come out. The grandstands, which are
[19] shown here, with the press box -- that would be on
[20] the south side of the track -- had to be removed.
[21]       The section of pavement by the front of the
[22] shop area had to be removed, and a portion of the
[23] pavement at the northwest corner of the building had
[24] to be removed.

Page 32

[1]       All of the handicap ramps in the front of
[2] the building had already been removed.
[3]   Q. Can you tell us, please, in this period
[4] of -- well, I'll let you look, if you want to add
[5] anything else.
[6]   A. That's all that I can think of now. It may
[7] not be everything that had already been removed --
[8] the grandstand was the only thing, in addition, that
[9] I can remember right now, but as I look at it, it
[10] may jar my memory for something else.
[11]   Q. Now, considering the time period when you
[12] were working for Standen and prior to when Jackson
[13] took over from Standen, considering that time
[14] period, can you please explain to us the work that
[15] you performed and how that work progressed, actual
[16] work.
[17]   A. The initial scope of the work was to
[18] concentrate entirely on the athletic fields. The
[19] athletic fields, the topsoil was stripped from them,
[20] placed in a stockpile in the easternmost portion of
[21] the site. The athletic fields were placed to
[22] subgrade. We installed the underdrain system and
[23] the catch basins, manholes that these were tied
[24] into. Standen started bringing in the underdrain

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 33

[1] sand. We placed that out, and then we placed the
[2] topsoil.
[3]       At that point the subcontractor for the
[4] irrigation system was called in to install the
[5] irrigation, and we started doing work on the other
[6] portions of the site, which were the rest of the
[7] demolition.
[8]       And I'm going to have to back up, because,
[9] in doing the work on the athletic fields, the first
[10] thing that we did was to remove the fencing around
[11] the football field/track area, and the grandstand,
[12] because that was — we needed to do that to proceed
[13] with doing that work.
[14]       That's how far, I think, that we had
[15] proceeded into the fall of 2003, when there became a
[16] problem with payment from Standen.
[17]     Q. Now, did Standen ever identify any
[18] deficiencies with your work during that period?
[19]     A. No, ma'am.
[20]     Q. Now I would like to show you what we have
[21] marked as Exhibit 67, which I believe is the
[22] Jackson-Landworks contract. Take a moment to review
[23] that, and I'll ask you to identify it.
[24]     A. (Reviewing document) I have seen most of

Page 34

[1] this and would identify it as my contract; however,
[2] I think there were some portions of it that were not
[3] given to me, that are not really contract related,
[4] but are incidentals to items given on the contract.
[5]     Q. But this is your signature, dated June
[6] 12th, 2004, on this contract?
[7]     A. Yes, ma'am.
[8]     Q. Page 10.
[9]       Between the fall of 2003 and this contract,
[10] the signature date of June 12th, 2004, did you
[11] perform any work at the middle school project?
[12]     A. Yes, I did.
[13]     Q. And what work did you perform?
[14]     A. We started completing the installation of
[15] the sod on the athletic fields in April of 2004 and
[16] were doing other incidental grading and work around
[17] the site.
[18]     Q. And did the scope of work change between
[19] the Standen contract and the Jackson contract?
[20]     A. No. We resumed work under the subcontract
[21] hold agreement that was negotiated by Lovett
[22] Silverman and myself, and that was the basis of us
[23] going back to work. It was my understanding that
[24] the scope of work would have been the same as the

Page 35

[1] Standen contract.
[2]     Q. If we look at Article 2, "The Work," on
[3] Page 1 of the Jackson contract, would you agree that
[4] the numbering system by which areas of work to be
[5] performed are identified, that that numbering system
[6] correlates to the numbering system in the original
[7] Standen contract?
[8]     A. May I have that, please. (Reviewing
[9] documents) Their numbering is — no, I'm sorry.
[10] Their numbering is a little different, but...
[11] (Reviewing documents) Yes, they seem to be the
[12] same.
[13]     Q. That's all the questions I have on that
[14] document at this time.
[15]       (Discussion off the record)
[16]         (Document marked as Exhibit 69
[17]          for identification)
[18]       (Recess)
[19] BY MS. BROWN:
[20]     Q. We have marked the next document as Exhibit
[21] 69. I've shown you what we've marked as Exhibit 69.
[22] Have you seen this document before?
[23]     A. I don't know. I don't — I hesitate,
[24] because it has "Oak Middle School" on that, and I

Page 36

[1] thought they were still referring to it as
[2] Shrewsbury Middle School. I'm not certain if I've
[3] seen this or not.
[4]     Q. If we could just look together at the
[5] middle of Page 1 of that document, which refers to
[6] Landworks, would you agree that you were responsible
[7] for the work as written in that document?
[8]     A. No.
[9]     Q. And how do you disagree?
[10]     A. Item v, "Asphalt at the running track."
[11]     Q. Do you know why Jackson Construction
[12] Company would identify the asphalt at the running
[13] track as within your scope if it was not?
[14]     MR. MELTZER: Objection.
[15]     A. No, I do not.
[16]     MS. BROWN: Would you mark this, please.
[17]         (Document marked as Exhibit 70
[18]          for identification)
[19]     Q. I'll show you what we've marked as Exhibit
[20] 70, which is a letter to you from Jackson, signed by
[21] you as agreed, dated September 15th, 2004.
[22]     A. (Reviewing document) Yes, I've seen this.
[23]     Q. And is that your signature on that letter?
[24]     A. Yes, it is.

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 37

[1]  Q.  And what does that letter signify?
[2]  A.  Jackson had asked if I could remove the
[3]  rubberized surface on the track. And I told them
[4]  that I couldn't, because it was considered hazardous
[5]  material, and I could not dispose of it. And they
[6]  asked me, if they provided the hauling, the removal
[7]  of it, could I remove the surface.
[8]       I told them the only thing I had to remove
[9]  the surface would be a Skidsteer loader and
[10]  front-end loader, and we could try that to remove
[11]  it. The rubberized surface was in bad condition.
[12]  It was lifting up off the track. I did not see why
[13]  we could not. So they asked me to proceed with
[14]  that.
[15]       They also asked me if I could provide them
[16]  with a price for the inch and a quarter overlay on
[17]  the track, asphalt overlay. And then there was some
[18]  additional sodding, because of discrepancies in the
[19]  dimensions of the football field, that they asked me
[20]  to add to the sides of the football field.
[21]  Q.  Is that -- are all those changes to the
[22]  original scope of work?
[23]  A.  Yes.
[24]  Q.  And are they all memorialized in Exhibit

Page 38

[1]  70?
[2]  A.  Would you explain "memorialized."
[3]  Q.  Set forth, stated, identified.
[4]  A.  Well, "the increase in cost for track work"
[5]  is kind of vaguely worded, but I understood that to
[6]  be the increase for removing the rubberized track
[7]  surface and the adding of the inch and a quarter
[8]  overlay.
[9]  Q.  And did you undertake to do that work?
[10]  A.  We performed the removal of the rubberized
[11]  track surface, and we added the additional sod that
[12]  had been requested. And I got a quotation from
[13]  Lynch Paving for the inch and a quarter overlay.
[14]  Q.  But the actual overlay did not take place
[15]  or --
[16]  A.  Did not take place, no.
[17]  Q.  And why not?
[18]       MR. MELTZER: Objection.
[19]  A.  I'm not certain at what time of year that
[20]  we moved into. The agreement was put out sometime
[21]  in September, as I can see by the date. But I know
[22]  that we were moving into an October time frame, and
[23]  the fall of that year was becoming extremely cold in
[24]  that area. It was getting to an end point for

Page 39

[1]  paving to go down. And Jackson had not paid for the
[2]  initial paving of the parking lots that we had
[3]  already completed.
[4]  Q.  And those are the reasons why the work was
[5]  not performed?
[6]  A.  Yes.
[7]  Q.  Now, I think we already talked about the
[8]  fact that the athletic fields were part of your site
[9]  work scope, correct?
[10]  A.  I'm sorry, could you repeat that.
[11]  Q.  I believe we already talked about the fact
[12]  that the work on the athletic fields was part of
[13]  your site -- your scope of work?
[14]  A.  Yes.
[15]  Q.  And did you perform any additional work on
[16]  the athletic fields other than what you've spoken
[17]  about already today, during the Jackson contract?
[18]  A.  We placed the sod on the athletic fields
[19]  during the Jackson contract, and we repaired the
[20]  irrigation system.
[21]  Q.  Anything else?
[22]  A.  We installed the admixture for the infield,
[23]  the baseball infield.
[24]  Q.  Now, was grading part of your scope of

Page 40

[1]  work?
[2]  A.  As it pertains to the athletic fields or
[3]  generally the whole site?
[4]  Q.  The whole site.
[5]  A.  Yes.
[6]  Q.  And you did perform grading work?
[7]  A.  Yes, we did.
[8]  Q.  Can you describe the grading work that you
[9]  performed.
[10]  A.  Overall for the whole site, or are you
[11]  looking for something specific?
[12]  Q.  Overall for the whole site.
[13]  A.  The grading was to take the site from
[14]  existing grades to design grades, and we performed
[15]  that work.
[16]  Q.  Did you complete that work?
[17]  A.  Not all of it, no.
[18]  Q.  What was left incomplete?
[19]  A.  The east side of the track/football field
[20]  area still had some demolition debris that was left
[21]  and needed to be graded. And there may have been
[22]  some miscellaneous grading to do in between the
[23]  track area and the baseball field.
[24]  Q.  Was bituminous concrete paving part of your

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 41

[1] scope of work?
[2]    A.  Yes.
[3]    Q.  And did you perform that work?
[4]    A.  Yes.
[5]    Q.  And can you describe what work you
[6] performed.
[7]    A.  We paved the areas designated on the plans
[8] to be paved, the parking lots, the front entrance,
[9] the service road leading from the parking lots to
[10] the far east of the site, and the service road that
[11] went along the east portion of the building by the
[12] gymnasium, the walkways that went down to the
[13] building doors.
[14]    Q.  Was any of this paving work left undone?
[15]    A.  Yes.
[16]    Q.  And what was not completed?
[17]    A.  The 75-foot walkway that connected what at
[18] that time I knew as the elementary school playground
[19] to the service road on the far east of the site was
[20] not completed. The final portion of pavement for
[21] around the storage shed area on the east side of
[22] building beside the gymnasium and shop areas was not
[23] completed. And the final paving around the flagpole
[24] area at the front of the building was not completed.

Page 42

[1] And I believe that was it that was not completed.
[2]    Q.  Were there any -- we already spoke about
[3] your testimony that you had no deficiencies in your
[4] work during the period of time when Standen was the
[5] general contractor. Were there any deficiencies in
[6] your work when Jackson took over?
[7]       MR. MELTZER: Objection as to form. Answer
[8] the question, if you understand it.
[9]    A.  Are you speaking at the beginning when they
[10] took over, or are you speaking sort of towards the
[11] end of the year, of 2004?
[12]    Q.  Throughout the course of the project with
[13] Jackson, did Jackson ever assert to you that it
[14] believed there were deficiencies in your work?
[15]    A.  I believe Jackson gave me a deficiency
[16] report of some items of my work, yes.
[17]    Q.  And do you remember when that was?
[18]    A.  That was in -- I can remember two. One was
[19] in the spring of 2004 that dealt with some
[20] settlement in the areas on the athletic fields.
[21]       And then the other one would have been late
[22] fall, I believe, in 2004, which dealt -- the only
[23] thing that I can remember off of that, there were
[24] some concerns about the sidewalk that ran from the

Page 43

[1] northern end of the baseball field that ran from the
[2] elementary school down to the Shrewsbury Middle
[3] School. There was a small section of about ten feet
[4] that they were saying did not meet the ADA
[5] requirements.
[6]    Q.  As to the first deficiency notice, do you
[7] recall your response to that and what happened
[8] there?
[9]    A.  We repaired the settlement areas that had
[10] been identified by Waterman Design.
[11]    Q.  As to the second deficiency report, do you
[12] recall what your response was to that?
[13]    A.  On the portion of the sidewalk -- and
[14] that's the only thing that I can remember from that
[15] report without pulling that report out and seeing it
[16] in front of me and seeing what the deficiencies
[17] were -- the section of the sidewalk, Katie Crockett
[18] and myself went to look at it, and my interpretation
[19] of the ADA was that this sidewalk ran beside a
[20] thoroughfare, and that the ADA did not apply to
[21] sidewalks that were running beside existing
[22] thoroughfares.
[23]       And the only section of it that was
[24] slightly below the minimum -- or the maximum

Page 44

[1] requirement for slope was the ten-foot section in
[2] the corner, where the catch basin sort of bound the
[3] elevation of what it could be.
[4]       I don't know that there was any final
[5] resolve from that. She still held that, you know,
[6] it was slightly more than what they had wanted, and
[7] I held that it didn't require an ADA -- it did not
[8] fall under the ADA. I related that to Rich
[9] McGuinness, and he said that he would relay that
[10] also to the architect and to CTM.
[11]       MS. BROWN: Off the record for a moment.
[12]          (Document marked as Exhibit 71
[13]           for identification)
[14]          (The witness reviews document)
[15]    Q.  Mr. Matthews, we've identified a document
[16] called "Contractor Deficiency List," dated March 19,
[17] 2004, as Exhibit 71, and I want to ask you if you've
[18] seen this document before.
[19]    A.  Yes.
[20]    Q.  Do you recognize the handwriting on this
[21] document?
[22]    A.  No, I do not.
[23]    Q.  I would like to go through this document
[24] and simply address the numbered items which have the

Page 45

[1] name "Landworks" next to them, and I will identify
[2] those for you, and then I will ask you your
[3] knowledge regarding the items so marked.
[4]       So I would begin on the -- if you would
[5] like to take a moment and look through the whole
[6] document, that's fine.
[7]    A. I'm sorry, I do recognize handwriting on
[8] what's shown at the top as being Page 4 that's my
[9] handwriting on that page. So I'm assuming this was
[10] in my possession at some time.
[11]    Q. You don't recall, sitting here today,
[12] having seen it before?
[13]    A. No, I recall seeing this document. I'm
[14] just saying -- you asked me if I recognized the
[15] handwriting on this, and I don't recognize who wrote
[16] the notes on the sides and everything, but at the
[17] bottom of Page No. 4, that's my handwriting where it
[18] has "Doug" and some telephone numbers and "John" and
[19] a telephone number.
[20]    Q. It is actually Page 3 of 5 as marked?
[21]    A. I'm sorry.
[22]    Q. Fax transmission 4?
[23]    A. Page 3 of 5, yes.
[24]    Q. Okay. Now, if we could begin with the item

Page 46

[1] which is marked 7 on the first page, "Damage to
[2] exterior gate valve shutoff box, located behind
[3] Storage Room 492."
[4]    A. Yes.
[5]    Q. Do you recall what that refers to and why
[6] that was on the contractor deficiency list?
[7]    A. There was a gate box that we had damaged,
[8] probably a piece of equipment had run over, and the
[9] gate valve was to be removed. So we eventually
[10] removed the gate valve completely.
[11]    Q. Item 12, "Damage to existing bituminous
[12] sidewalk located 100 feet south of the
[13] administrative entrance and adjacent A Wing ground
[14] floor classroom, west side." Do you recall that
[15] issue?
[16]    A. No. 12?
[17]    Q. Yes.
[18]    A. Yes, I do.
[19]    Q. And do you know what was done in response
[20] to that deficiency item?
[21]    A. If it is the area that I believe it is, it
[22] is in the outer courtyard that was designated by the
[23] cafeteria. The original contractor had gone in, had
[24] used track equipment across that asphalt, and it was

Page 47

[1] cut up. That area received an overpave of pavement,
[2] and so at that time it was addressed.
[3]    Q. The next is Item 14, "Damage to the curb
[4] adjacent to the parking area opposite front
[5] entrances." Do you know what that deficiency
[6] referred to?
[7]    A. I'm not certain about that one. I'm not
[8] certain about that one. If I were to tell you what
[9] I think it is, it would be speculation.
[10]    Q. That's okay. We don't need you to
[11] speculate today.
[12]       By the way, I'm asking you about the items
[13] that have the name "Landworks" next to them, but if
[14] you see any of these items that don't have
[15] "Landworks" next to them, but you know were either
[16] deficiencies that related to Landworks' work or were
[17] deficiencies that were addressed by Landworks,
[18] please let me know.
[19]    A. Item No. 10, "Damage to fill cover at
[20] exterior below ground oil tank" --
[21]    Q. Yes.
[22]    A. -- with question marks around it, in the
[23] end, they tried to get me to repair that. That had
[24] been done by the initial contractor, the same one

Page 48

[1] that damaged the asphalt at that time. But it was
[2] well documented that that had been done by Hole
[3] Story.
[4]    Q. On Page 2 I see Items 26, 30 and 32. Do
[5] you see any other items that were either directed to
[6] Landworks or addressed by Landworks?
[7]    A. And you said 26?
[8]    Q. Yes.
[9]    A. 26, we damaged the outside corner of the
[10] building, it was probably about ten bricks, and had
[11] the mason that was working on site repair it, and I
[12] paid him to do that.
[13]    Q. Item 27, also I would like to ask you -- I
[14] believe I see "Landworks" written to the left of
[15] Item 27.
[16]    A. Yes. That was granite curb in that same
[17] area that I had mentioned to you before where they
[18] were talking about the bituminous pavement in the
[19] courtyard adjacent to the cafeteria, and the granite
[20] curb in that area had also been damaged when they
[21] tracked equipment across the top of it.
[22]    Q. And who caused that damage?
[23]    A. Hole Story.
[24]    Q. Were you involved in repairing that damage?

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. I
February 13, 2007

Page 49

[1]  A.  Yes, I was.
[2]  Q.  Item 30?
[3]  A.  Yes.
[4]  Q.  How was the running track edge damaged as
[5]  identified in Item 30?
[6]  A.  The track was changed from a 400-yard
[7]  configuration to a 400-meter, or maybe it was a 440-
[8]  yard. Anyhow, it was changed to a metric based
[9]  track. The inside of the -- actually, the east
[10]  edge, I believe, of the track had to be excavated
[11]  out and base material placed in.
[12]      We were doing the subgrade work. Standen
[13]  had asked us to place the base in there, and we had
[14]  placed that base material in there. In excavating
[15]  adjacent to the track, part of the asphalt was
[16]  damaged.
[17]  Q.  Did Landworks repair that damage?
[18]  A.  No.
[19]  Q.  Item 32?
[20]  A.  Yes.
[21]  Q.  How was this damage caused that's
[22]  identified in Item 32?
[23]  A.  The damage was to the conduit in between
[24]  the light poles that ran on both sides of the

Page 50

[1]  football field, and to conduit only. These light
[2]  poles were fed overhead from the press box area, and
[3]  the wires that actually ran the lights ran from pole
[4]  to pole around this.
[5]      There was conduit that was connecting the
[6]  poles underground, starting at the west end and
[7]  going down and making a loop around to the north
[8]  side of the track. And the wires, though, that fed
[9]  these had been cut from the No. 1 pole on the
[10]  southeast side of the track.
[11]      We broke the conduit, and later on it
[12]  became an issue. I stated to everyone that the
[13]  conduit was not carrying the wires that were
[14]  lighting the poles. It seemed to become an issue,
[15]  so we replaced the broken conduit.
[16]  Q.  I noticed next to Item 32 there is a date,
[17]  October 17, '03.
[18]  A.  Yes.
[19]  Q.  And next to 30 there's the same date,
[20]  October 17, '03. Do you know what that date refers
[21]  to?
[22]  A.  No, I do not.
[23]  Q.  Do those dates refresh your recollection
[24]  about the date of the incident giving rise to the

Page 51

[1]  deficiency?
[2]  MR. MELTZER: Objection.
[3]  A.  No. I would be more inclined to think that
[4]  that was when it was probably first brought up into
[5]  a construction meeting as opposed to an actual date
[6]  of when this might have happened
[7]  Q.  Let's look at Page 3. Again, I'll ask you
[8]  whether any of these deficiencies relate either to
[9]  work that Landworks performed or to corrections in
[10]  the deficiencies that Landworks undertook.
[11]  A.  (Reviewing document)  Okay. I'm ready.
[12]  Other than the items listed, I don't see anything
[13]  else on that that was on work that would have fallen
[14]  under my scope.
[15]  Q.  By "items listed," are you referring --
[16]  which items are you referring to?
[17]  A.  I'm talking about the ones that have
[18]  Landworks' name written beside them.
[19]  Q.  That would be Items 40 and 43; is that
[20]  correct?
[21]  A.  Yes, ma'am.
[22]  Q.  All right. Let's talk about Item 40
[23]  briefly. It says explicitly that the Landworks
[24]  loader hit the fire hydrant. Do you recall that?

Page 52

[1]  A.  No. It wasn't the loader that hit that.
[2]  It was the excavator that ran over the top of it
[3]  during the snow and pressed it down. There was also
[4]  another contractor that -- I believe it was the
[5]  drywall contractor -- that had backed a truck on the
[6]  side of it and broken a hose bib off of it. We
[7]  replaced the hydrant.
[8]      The hydrant would not have had to have been
[9]  replaced -- the only thing that would have had to
[10]  have been done was reset -- had they not broken off
[11]  the bib off the side of it. But we replaced the
[12]  hydrant, and I believe that I had turned in a change
[13]  on that. I think it was a contested one, but I had
[14]  turned in the change on that.
[15]  Q.  Can you describe what the issue was in Item
[16]  43.
[17]  A.  The water line from Sherwood Avenue that
[18]  was coming into the site, the existing conditions
[19]  for the gate valves was not accurate. So that the
[20]  gate valve that they showed us, that we were
[21]  supposed to hook the water line into, was not in the
[22]  location that it was supposed to be.
[23]      So we had to move the water line over a
[24]  little bit. And I think this is only stating that

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 53

[1] the Lamoureux Pagano was going to review and I would
[2] need to provide an accurate as-built from that. I
[3] wasn't asking for any more money in that. I think
[4] they were sort of -- this was CYA time for this.
[5]     Q. Turning to Page 4 of 5, are there any items
[6] here that either relate to Landworks' performance on
[7] the site or corrective action by Landworks?
[8]     A. (Reviewing document) I don't see any.
[9]     Q. Turning to Page 5, then, I ask you the same
[10] questions.
[11]     A. I see No. 59.
[12]     Q. Yes. Snowplow damage to the curb and
[13] sidewalk. Do you recall that incident?
[14]     A. No, because we did not plow the snow in
[15] that winter.
[16]     Q. So do you have any explanation as to why
[17] "Landworks" was written there next to Item 59?
[18]     A. No, I do not.
[19]     MS. BROWN: Off the record.
[20]     (Discussion off the record)
[21]     MS. BROWN: Exhibit 72, dated 7/26.
[22]     (Document marked as Exhibit 72
[23]     for identification)
[24]     (The witness reviews document)

Page 54

[1]     Q. Sir, do you recognize Exhibit 72 as a fax
[2] transmission which you received from Jackson
[3] Construction Company on or about July 26th, 2004?
[4]     A. I've seen the document attached to this,
[5] yes.
[6]     Q. And was it faxed to you from Jackson
[7] Construction Company on July 26th, 2004?
[8]     A. I don't know when it was faxed to me, but I
[9] have seen the document, the cover page and the
[10] document.
[11]     Q. Did you do anything in response to
[12] receiving this communication?
[13]     A. The lower areas, under No. 1, the
[14] irregularities were fixed.
[15]     Q. You're referring to Item No. 1 on the June
[16] 30th, 2004, letter of Waterman Design Associates?
[17]     A. Yes.
[18]     Q. Did you take any action in response to Item
[19] 2, "Final compaction of athletic fields"?
[20]     A. No, except for, in a meeting with Katie
[21] Crockett and Rich McGuinness and CTM and the Town --
[22] the compaction test was taken fully a year after the
[23] topsoil had been placed on the grounds. And because
[24] of the failure of Standen and the shutdown, I

Page 55

[1] considered most of the compaction to be done at that
[2] time and not by anything that we had done
[3] mechanically to the field, and if they would like it
[4] aerated, I would be glad to provide that service to
[5] them for a cost.
[6]     Q. And did they take you up on that offer to
[7] provide those services at a cost?
[8]     A. No. I never heard anything else about core
[9] aeration of the fields.
[10]     Q. Turning to Item 3, "Slit Sand Drain
[11] installation"?
[12]     A. Yes.
[13]     Q. Did Landworks undertake any tasks with
[14] regard to this?
[15]     A. We installed the slit drains, yes.
[16]     Q. Did Landworks take any action with regard
[17] to Item 4 on this letter, "Release of playing
[18] fields"?
[19]     A. (Reviewing document) I don't know that
[20] Item No. 4 is a request for action. It's just a
[21] statement of fact that some of the areas adjacent to
[22] the fields had just been freshly seeded and that
[23] they would not sustain high traffic until the grass
[24] was fully established.

Page 56

[1]     Q. Are there any statements in this letter
[2] that you disagree with or take issue with?
[3]     A. The only thing that I have any -- let's
[4] see. If you will give me just one second, let me
[5] completely read Item 3 first, please.
[6]     Q. Yes.
[7]     A. (Reviewing document) The only thing that I
[8] would take exception on this is under Item No. 2,
[9] which dealt with the soil compaction levels being at
[10] an average of 91 percent, and that somehow that I
[11] would have to take remedial action.
[12]     As I stated to you before, these fields had
[13] sat basically for approximately eight months, I
[14] believe, before they were -- we were allowed to get
[15] back to work on them, and that if there was any
[16] compaction, that it was done by weathering and not
[17] by anything that we had done.
[18]     Q. Thank you.
[19]     (Document marked as Exhibit 73
[20]     for identification)
[21]     Q. Now, Mr. Matthews, I've shown you a
[22] document which we've marked as Exhibit 73, which
[23] appears to be a fax dated August 27th, 2004, from
[24] Jennifer Fletcher of Jackson Construction Company to

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. I
February 13, 2007

Page 57

[1] you at Landworks. Can you identify this document as
[2] such?
[3]     A. Yes.
[4]     Q. And do you recall receiving this fax?
[5]     A. Yes.
[6]     Q. And as with the previous document we
[7] identified as Exhibit 72, this document, this
[8] facsimile transmission, includes a letter from
[9] Waterfield Design Associates, correct?
[10]     A. Waterman Design Associates.
[11]     Q. I'm sorry, Waterman.
[12]     A. Yes, it does.
[13]     Q. And in this case the letter is dated August
[14] 26, 2004, and it is to Mr. Todd Manning and Ms.
[15] Katie Crockett.
[16]         Can you take a moment and review this
[17] letter. As we just reviewed the prior letter, we'll
[18] go through it.
[19]     A. (Reviewing document)  Yes, I've seen it.
[20]     Q. Did you take any action in response to
[21] receiving this letter?
[22]     A. Yes.
[23]     Q. And what was that?
[24]     A. "Surface undulations" -- and I'm going to

Page 58

[1] go down from A through what they have identified.
[2] The two areas in the baseball field, one in the
[3] infield near the first base, and about 185 feet
[4] beyond first base, these were, again, repaired.
[5] This was the second time repairing the areas by the
[6] two areas. One was in an area where a manhole was
[7] installed, the one that they're showing at 185 feet,
[8] and the other one was by the first base line where
[9] there was a continual problem with, like, washing.
[10]         The six areas in the baseball field, left
[11] field, center field, and right field, were taken
[12] care of. I'm not certain about what the size of the
[13] football field. But most of the small areas were
[14] identified and taken care of.
[15]         The slit drain settlements, which was
[16] expected, we continuously added sand into these
[17] areas. Generally after a rainstorm, they would --
[18] there would be more settlement into them. It was
[19] the nature of how they are installed, and we kept
[20] those up as an ongoing measure.
[21]         We made irrigation system repairs, but it
[22] was clearly not in my scope, but the irrigation
[23] contractor would not return to the site. And we
[24] removed the weeds from the infield, and we redressed

Page 59

[1] the soil, and we added the Turface admixture to the
[2] infield even though that was not in my scope.
[3]         The pitcher's rubber and the bases, I did
[4] not add. That was not in my scope. And I did
[5] supply to Rich McGuinness a fertilization program
[6] and gave him a recommendation for doing that.
[7]     Q. Are there any observations in this letter
[8] with which you disagree?
[9]     A. No.
[10]         (Document marked as Exhibit 74
[11]          for identification)
[12]     Q. I'll ask you to take a moment and review
[13] what we have marked as Exhibit 74.
[14]     A. (Reviewing document)  Yes, I've seen this.
[15]     Q. Is this a fax transmission from Jennifer
[16] Fletcher at Jackson Construction Company to you at
[17] Landworks dated October 19th, 2004?
[18]     A. It would appear that it is, yes.
[19]     Q. Do you recall receiving this?
[20]     A. I don't recall receiving the fax, but I do
[21] recall seeing the attached document to it.
[22]     Q. And by "attached document," you're
[23] referring to the letter dated September 24th, 2004,
[24] from Katie Crockett to Richard McGuinness, the

Page 60

[1] project manager at Jackson Construction Company?
[2]     A. Yes.
[3]     Q. And I'll ask you these two questions again,
[4] whether you did anything in response to receiving
[5] this letter, and whether you agree with statements
[6] made in the letter.
[7]     A. As stated to you before, the sidewalk at
[8] the north end of the baseball field, when you had
[9] asked me if there was deficiency in some work, this
[10] was the one that I was talking about.
[11]         There is a drawing attached to this
[12] document that shows that section that is adjacent to
[13] the catch basin there, where it lists the slopes. I
[14] think maximum allowable was 5 percent, and just
[15] below the catch basin there is 4.9. And then at
[16] about a ten-foot section of the sidewalk, it was
[17] slightly out of what the ADA was.
[18]         Since this was going adjacent to a
[19] thoroughfare, I met with Katie Crockett, and I told
[20] her that I did not believe that that actually had to
[21] comply with the ADA, since sidewalks put into
[22] adjacent to an existing thoroughfare do not have to
[23] meet that criteria.
[24]         With regard to the concrete ramps --

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 61

[1]  Q. At the tennis court parking?
[2]  A. At the tennis court parking, the concrete
[3]  ramp at Oak Street, the Oak Street parking lot
[4]  concrete ramp, the north parking lot concrete ramp
[5]  and the concrete near gymnasium entry, I did not
[6]  take any action. It was not in my scope of work to
[7]  place the concrete ramps. Jackson Construction had
[8]  installed them.
[9]  Q. Do you have any understanding as to why
[10] those ramps were deficient?
[11] A. They -- no. It would be speculation on my
[12] part. I was told something by the person doing the
[13] inspection of them, but I'm not certain if that was
[14] correct or not.
[15] Q. And what were you told?
[16] A. I was told that the cross slope for the
[17] ramps was greater than what was allowable for the
[18] ADA.
[19] Q. And who would have been responsible for
[20] that mistake?
[21] A. The person that finished the concrete, that
[22] poured the concrete.
[23] Q. Did you do -- did Landworks perform the
[24] grading which took place prior to the ramps being

Page 62

[1]  installed?
[2]  A. Yes, we did.
[3]  Q. And was that grading done properly?
[4]  A. Yes, it was.
[5]  Q. Do you agree with the statements in this
[6]  letter that these ramps needed to be rebuilt?
[7]  MR. MELTZER: Objection.
[8]  A. I really didn't have an opinion of them, of
[9]  the ramps, and I really did not spend the time to
[10] take a look at them to see if they were incorrect or
[11] not.
[12] MS. BROWN: I'd like to take a break at
[13] this point, and we will come back at a little bit
[14] before one, if we can.
[15] (Luncheon recess)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 63

[1]  AFTERNOON SESSION
[2]  BY MS. BROWN:
[3]  Q. What happened -- can you explain to us what
[4]  happened with Jackson ceasing work on the project
[5]  and what you and Landworks experienced at that time
[6]  and the time leading up to it. Did you know Jackson
[7]  was in trouble?
[8]  MR. MELTZER: Objection to the form.
[9]  A. I had suspicions that Jackson was in
[10] trouble. It started in August of 2004 --
[11] Q. What were your suspicions based on?
[12] A. In June of 2004, I asked for a
[13] reconciliation of the application for payments that
[14] I had turned in, and Rich McGuinness said that he
[15] would get that to me, and in the next two subsequent
[16] meetings he did not.
[17] From that point on I started continuously
[18] asking for them each week. In August of 2004 the
[19] payment application -- and the payments had been
[20] pretty close to what I was applying for -- the
[21] payment application was cut in half, the amount of
[22] money that I actually received. And I asked him
[23] why, and I don't remember the reason he gave me, but
[24] it was a reason that did not ring true.

Page 64

[1]  Payments were starting to stretch out more.
[2]  I then started asking daily for a reconciliation on
[3]  the application for payments, and they were still
[4]  not forthcoming.
[5]  In September they missed their payment
[6]  completely, and I was not getting a response from
[7]  Jackson. And so I had my attorney in New Hampshire
[8]  contact Jeremy Medeiros to inquire about some
[9]  problems. And so at that time I knew that there was
[10] something that was beginning to run amiss.
[11] Q. And what happened next?
[12] A. They missed the September payment, they
[13] missed the October payment. And at the same time
[14] they were starting to become more belligerent in
[15] requesting work that I considered to be additional
[16] work to be done, and they were holding the carrot of
[17] payment out for certain other items to be done.
[18] There was a continuous problem all through
[19] this job in that garbage would collect at the
[20] entrances from construction inside the school
[21] building, and there had been no provisions made for
[22] cleaning these materials up, and so then it would
[23] fall back on me. They would ask me to do it
[24] internally. That was as a 911 measure, that the

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 65

[1] fire marshal had visited the site and said they were
[2] going to close down the site if these areas were not
[3] cleaned up.
[4]        And so I would have daily slips signed for
[5] the work being done. But as it progressed more and
[6] more to the end of the job, they were saying, "You
[7] have to do this." It wasn't -- it was no longer a
[8] request.
[9]        Some of the seeding on the outside of the
[10] building itself, which I considered not in my scope
[11] of the work, because there was a landscaper that had
[12] been contracted by Standen Contracting to do the
[13] seeding around the building, they were saying that
[14] was my scope of work to do.
[15]    Q. Do you remember who that landscaper was?
[16]    A. I don't recall. I have seen the name
[17] subsequent to this case being brought, but right now
[18] I don't remember their name.
[19]    Q. If you think of it later, you can tell your
[20] attorney, and he will tell us.
[21]    A. Okay. He may know, but I don't know the
[22] name.
[23]        They were also asking for seeding and
[24] grading and repairs and improvements to be made in

Page 66

[1] areas that were never in the scope of work, in
[2] anybody's scope of work.
[3]    Q. What would that be?
[4]    A. The areas to the southwest of the school.
[5] And I'm now pointing to the drawing to show you.
[6] But this area in here (indicating) was completely
[7] out of the scope of work, and there had been various
[8] trades that had used an entrance on the side of the
[9] building, and they had used that entrance during wet
[10] times, so they had rutted up the grass areas.
[11]        And now they were saying that, "Well, you
[12] have to seed that." First of all, I'm not the
[13] landscape seeder. My scope was to seed the athletic
[14] fields and adjacent areas. And these areas fall
[15] completely out of the scope of work for the site.
[16]    Q. Is that clear from the scope of work
[17] documents that we looked at earlier today, that
[18] distinction you just drew between seeding around the
[19] athletic fields or site work around the athletic
[20] fields and site work over on the other side of the
[21] school? If I looked at Exhibit A again, would I be
[22] able to tell?
[23]    A. No. I don't think so. I don't think so.
[24] There are some sections that might be, let's say,

Page 67

[1] earthwork section that might encompass more than one
[2] contractor. So earthwork site preparation might be
[3] included in two contractors' scope of work. And I
[4] don't know if there was a distinction between turf
[5] grass for the athletic fields and turf grass for the
[6] landscaped areas.
[7]        But no matter whose scope it will
[8] eventually be determined, this was never in
[9] anybody's scope, and they were now saying that this
[10] work had to be completed at no additional cost.
[11]        In April, I think, around April 7th of
[12] 2004, I had sent Rich McGuinness a letter stating
[13] what other work had to be completed that was not in
[14] the contract, and the additional landscape seeding
[15] at that time I had placed in that letter to him,
[16] along with some other items. I'm not certain
[17] exactly what they were at this time.
[18]        But they were becoming more belligerent,
[19] and CTM was becoming also more belligerent to
[20] Jackson, and then in return Jackson was becoming
[21] more belligerent to all the various trades that were
[22] on the job. And people were being asked to do more
[23] and being told to do more, and excuses for
[24] nonpayment were always that the bonding company had

Page 68

[1] not sent the money to them yet, and that besides the
[2] fact, "You still have a little bit more to do."
[3]        There were various things that they had
[4] said about the certified payrolls. The certified
[5] payrolls I would turn in monthly. Then they were
[6] saying they didn't have certified payrolls, so I
[7] would make copies and turn them in to them. And it
[8] just continued to deteriorate through the late
[9] summer and early fall of 2004, until finally my
[10] lawyer in New Hampshire eventually got ahold of
[11] Jeremy Medeiros of USF&G, who set up a meeting
[12] between Jackson and myself at Thanksgiving in 2004.
[13]    Q. And what happened during that meeting?
[14]    A. About two weeks before the meeting Rich
[15] McGuinness, after I had again cornered him and asked
[16] him for reconciliation of the application for
[17] payments, gave me the reconciliation for the total
[18] job, which I was surprised to get, because most
[19] people hold that information close at hand.
[20]        But it had become evident when I got that
[21] that there was enough money that had been applied
[22] for and what the Town had said had been paid for to
[23] pay for the work that had been done. The paving
[24] took place in August, and it was now the 1st of

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 69

[1] November, and I hadn't received payment for it.
[2]     And so in this meeting I brought down all
[3] my billing records, and then I started to realize
[4] that they had not processed any of the additional
[5] work that I had sent in to them. It was some
[6] $80,000 worth. And that plus the balance that was
[7] left on the contract was equaling to the amount
[8] that -- or was pretty close to the amounts that I
[9] said that they had owed me.
[10]     So at that meeting he went down through the
[11] list of the changes, and he agreed to most of them.
[12] There were some that he said he needed more
[13] documentation for. And there were some that he said
[14] were not -- were being done under protest.
[15]     So at that meeting, at that time, they then
[16] issued a joint check for the paving contractor for
[17] the first portion of the paving that had been done,
[18] but not the second portion. And --
[19]     Q. "They" being Jackson and USF&G --
[20]     A. Jackson had actually issued the check to
[21] me. And it was a joint check to Lynch Paving, J.H.
[22] Lynch. And then there was a smaller check -- I
[23] think it was like $89,000 to Lynch and then 12,000-
[24] some-odd dollars to me in that meeting. And then

Page 70

[1] they promised also that they were going to issue
[2] change orders for the rest of the change order work,
[3] and that they would submit those for payment, and
[4] all that would be cleared up and taken care of.
[5]     The 1st of December came around, and I had
[6] not received any of the signed change orders. I
[7] continued to call them, and I didn't get any
[8] response. The final response -- I spoke to Rich
[9] McGuinness once in December, and I think the last
[10] time I talked to him was around January 8th. And he
[11] told me then that it wasn't coming from him, it was
[12] coming from Bob Barton, and that really I would have
[13] to -- I needed to try to get in contact with him.
[14]     Q. Who is Bob Barton?
[15]     A. Bob Barton was -- he was Rich McGuinness's
[16] boss. In the scheme of things of how Jackson
[17] actually called their people, I'm not certain what
[18] he was considered. I think Rich McGuinness was like
[19] a project manager. Bob Barton would be the next
[20] level up in management.
[21]     Q. So did you do that? Did you contact Mr.
[22] Barton?
[23]     A. He would not return my calls. So I had my
[24] lawyer call. He spoke to him one time. The only

Page 71

[1] thing my lawyer told me about the conversation was
[2] that --
[3]     MR. MELTZER: Just a second.
[4]     THE WITNESS: Actually, I'll probably --
[5]     MR. MELTZER: I'm not going to have you --
[6]     THE WITNESS: I'm sorry.
[7]     A. I had my lawyer call him, and there was
[8] nothing that came forth from that.
[9]     Then I had my lawyer to try to contact
[10] USF&G. And I kept --
[11]     Q. Now, had USF&G taken over the project as
[12] surety yet or not?
[13]     A. It was my understanding that USF&G had
[14] taken over the project at the failure of Standen.
[15]     Q. Had they taken it over from Jackson? Had
[16] Jackson failed at that point?
[17]     A. I'm not really certain how to answer that
[18] question, because I'm not certain how -- what that
[19] relationship was, because the way it was explained
[20] to me was that USF&G was actually now doing the
[21] project, that Jackson was there as sort of a
[22] management for them, but I'm not certain what that
[23] was.
[24]     I continued site visits once a week through

Page 72

[1] the winter. There was items that were left to be
[2] worked on in the spring that we were supposed to
[3] start on. I continued with the lines trying to
[4] contact them. They were not returning calls.
[5]     Sometime in February, 1st of February, I
[6] believe it was the clerk of the works had told me
[7] that Jackson was in trouble, that they were probably
[8] going to be asked to be removed from the site by the
[9] Town. That continued on until March, when there was
[10] very little work being done inside the building, as
[11] well as out.
[12]     I made inquiries of the clerk if any work
[13] was going on. He said there was very little work
[14] being done at the site, that most of the contractors
[15] had left the site. I asked them why. He said
[16] "nonpayment." And then -- I don't know exactly when
[17] Jackson was asked to leave the site. I know that I
[18] continued through my attorneys and through myself to
[19] try to contact them and USF&G, but I didn't get any
[20] response from them.
[21]     Q. What work did you have left to complete at
[22] that point in time?
[23]     A. In the east portion of the football field,
[24] there was the removal of the debris that was left

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 73

[1] there and then some seeding in those areas. There
[2] was a shot put pit that had to be put in. There was
[3] some grading that needed to be done in between the
[4] track area and the baseball field. It needed to be
[5] seeded.
[6]     And the long jump area, the long jump
[7] running approaches had been placed in the wrong
[8] location, because this is the set of plans that I
[9] had to work on, and there is actually an addendum
[10] set of plans that came out and moved -- shifted
[11] these like ten feet to the west. So they needed to
[12] be moved and placed.
[13]     The walkway between the field at the
[14] elementary school down to the service road needed to
[15] be put in. Surface pavement needed to be put in
[16] around the storage shed. Surface pavement and a
[17] little bit of curbing needed to be placed around the
[18] flagpole, and I think that an island in the
[19] northwest teachers' parking lot needed topsoil
[20] placed in it. And to the best of my recollection,
[21] that's what I can remember needing to be done.
[22]     Q. And what happened next after you had this
[23] conversation with the town clerk?
[24]     A. Can I have -- I don't mean to be evasive,

Page 74

[1] but I think I need to ask him one thing about what I
[2] can and I can't say.
[3]     MR. MELTZER: Can we take a minute.
[4]     THE WITNESS: It would only be 30 seconds.
[5]     MS. BROWN: That's fine. No problem.
[6]     (The witness and his counsel confer
[7]     outside the room)
[8]     Q. I suppose we're just going through the
[9] chronology of what you learned next and what you did
[10] in response to what you learned, what actions you
[11] took in the period of time following this
[12] conversation that you had with the town clerk.
[13]     A. Yes.
[14]     Q. So do you understand my question?
[15]     A. Yes. At that time my lawyer, my New
[16] Hampshire lawyer, turned it over to my attorney now,
[17] and then he proceeded on that.
[18]     There was not much that I heard from anyone
[19] from a period of March until August.
[20]     Q. Of 2005?
[21]     A. Yes, of 2005, yes.
[22]     Q. Did there come a time when you filed a
[23] lawsuit?
[24]     A. Yes. And I'm not certain of the specific

Page 75

[1] date of that, but it was first of March?
[2]     Q. Of 2005?
[3]     A. Of 2005. First of March in 2005, end of
[4] February, first of March.
[5]     MR. HIPP: The 17th of March.
[6]     Q. The 17th of March. The record will reflect
[7] when it was. But approximately in March of 2005?
[8]     A. Yes.
[9]     Q. Had you ever filed suit before on a job
[10] where you're working?
[11]     A. No.
[12]     Q. So what happened next?
[13]     A. In August I would visit the site from time
[14] to time, and there didn't seem to be much going on
[15] from that time frame of March until into the summer
[16] outside the building.
[17]     And then in August I got a telephone call
[18] from the clerk of the works that -- and he said to
[19] me, he's like, "So I hear you're going to be back to
[20] work next week." And I was like, "Well, that's news
[21] to me. It's good news, but what have you heard?"
[22]     And he told me that Lovett Silverman had
[23] told the Town in the meeting that the site
[24] contractor was going to be back on site the

Page 76

[1] following week. And he's like, "And you are the
[2] site contractor of record, so I'm assuming you're
[3] going to be back next week." And I was like, "Well,
[4] hopefully that's true, but I haven't heard
[5] anything."
[6]     I asked him who he spoke with. He told me
[7] that it was Mr. Bullock. And I asked him if he had
[8] a telephone number for Mr. Bullock so I could call
[9] him. And he said that he did, and he gave me the
[10] telephone number, and then I called Mr. Bullock.
[11] I'm not certain -- it was August 11th or 15th or
[12] something like that.
[13]     So I called him and told him that I had
[14] heard that I was going to be back on the site. And
[15] he sort of struck me as sort of being taken a little
[16] bit off guard by it. And he was like, "Well" --
[17]     Q. You hadn't had any conversations directly
[18] with Lovett Silverman at this point; is that
[19] correct?
[20]     A. Not this time.
[21]     Q. We talked about the earlier time?
[22]     A. Yes.
[23]     Q. At --
[24]     A. When Standen failed.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 77

[1]     Q.   When Standen failed. What was your
[2]  understanding of who Lovett Silverman was?
[3]     A.   My understanding from the Standen failure
[4]  was that Lovett Silverman was brought in to sort
[5]  through the subcontractors that were doing work on
[6]  site, to look at the amounts of money that were owed
[7]  to them, and that they would determine if they were
[8]  owed that money, and then they would sign them to
[9]  subcontract hold agreements so that they could then
[10]  proceed with the work, working under the -- being
[11]  paid by the bonding company.
[12]     Q.   And by a subcontractor holding agreement,
[13]  are you referring to what has been talked about in
[14]  other depositions as being ratification agreements?
[15]     A.   Yes.
[16]     Q.   Now, you did not have a contract with
[17]  Lovett Silverman yourself, Landworks; is that
[18]  correct?
[19]     A.   No, I did not have a contract with Lovett
[20]  Silverman.
[21]     Q.   In fact, the only contracts that you,
[22]  Landworks, had that are involved in the middle
[23]  school project are the two that we looked at earlier
[24]  today --

Page 78

[1]     MR. MELTZER:  Objection.
[2]     Q.   -- is that correct, the Standen contract
[3]  and the Jackson contract?
[4]     A.   I would think that the subcontract hold
[5]  agreement would also be like a contract.
[6]     Q.   From the Standen failure?
[7]     A.   Yes.
[8]     Q.   Back to the telephone conversation with Mr.
[9]  Bullock. So can you explain what was said back and
[10]  forth in that conversation, as you best recall.
[11]     A.   So I called him up, and so, after telling
[12]  him who I was and explaining to him that -- what had
[13]  been told to me by the clerk, I believe he said that
[14]  he thought that I didn't have any interest in
[15]  completing the site work. And I told him that that
[16]  was not the case, that the only thing I had ever
[17]  wanted to do was to be paid, get back to work, and
[18]  finish this job and to be done with it.
[19]     And he said that that was good, that they
[20]  had much preferred to work with the people that were
[21]  already involved with the project. And he said --
[22]  he told me at that time, he was like, "What I will
[23]  need from you are a set of items," and I don't
[24]  recall exactly what he explained to me they were at

Page 79

[1]  that time. Part of them were billing records and
[2]  some other items.
[3]     And I told him that I could provide him
[4]  that, and I gave him my e-mail address, and asked
[5]  him -- or he asked me for my e-mail address, because
[6]  I asked him if he would fax me a copy of what his
[7]  requirements were so that I could make sure I got
[8]  everything to him quickly, and he asked me if I had
[9]  an e-mail address, and I told him that I did. He
[10]  said, "Because I am on the road, it would be easier
[11]  for me to just e-mail it to you," and I told him
[12]  that would be fine.
[13]     Then the conversation turned to the track,
[14]  and he asked me at that time, he was like, "What is
[15]  your understanding of the track work?" And I'm
[16]  like, "My understanding of the track work is that
[17]  Standen had contracted with Tracklite to do the
[18]  track work." And he told me that that was his
[19]  understanding of it also.
[20]     And he thanked me for calling him, and it
[21]  was a pleasant conversation, and I can remember that
[22]  I was pretty upbeat about it, because after -- you
[23]  know, from basically November the year before until
[24]  August, there had been really nothing forthcoming

Page 80

[1]  from anyone, and this was the first person that I
[2]  had actually been able to speak to about it.
[3]     And so, when I got back to the office, I
[4]  checked my e-mail. He had sent his requirements.
[5]  And then I -- as I started pulling everything out,
[6]  he had asked me to fax it to him, and I was, like,
[7]  thinking to myself that it was an awful lot of
[8]  documents, and I get a little bit paranoid when I
[9]  start faxing so many documents through a fax
[10]  machine, because normally halfway through it jams or
[11]  whatever, and I'm not certain what has been sent or
[12]  not.
[13]     So I wrote him back an e-mail and asked
[14]  him, since there was a lot of documents, if I could
[15]  just meet him at the site and give him the
[16]  documents, and at that time go over with him any
[17]  questions that he may have that he might find
[18]  beneficial in helping him process this, and that I
[19]  can meet him any time on the site.
[20]     He wrote me back on e-mail and said that --
[21]  and I believe the next e-mail he wrote me back was
[22]  that he could meet me like two days in the next
[23]  week, which day would be better. And I told him to
[24]  pick a date, it didn't matter to me which day it

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 81

[1] was, nine o'clock would be fine, and I would meet
[2] him there on the site.
[3]      And then I believe the next e-mail that I
[4] got from him, he inquired if I had a lawsuit pending
[5] against USF&G. And I told him that I did, but the
[6] only reason that I had filed the lawsuit was to
[7] protect my rights under Massachusetts law, and that
[8] I had always just preferred to settle this out and
[9] get back to work and finish it.
[10]      And then he wrote back to me and told me
[11] that he had been told by the surety that he could
[12] not speak with me -- I don't know if it was speak
[13] with me or deal with me, but basically he couldn't
[14] deal with me while the lawsuit was pending.
[15]      And I wrote him back --
[16]   Q. Did that surprise you?
[17]   A. Yes. It deflated me.
[18]   Q. Did you think that you could file a lawsuit
[19] for unfair and deceptive trade practices against
[20] USF&G and then continue to do business directly with
[21] it and a company like Lovett Silverman? Was that
[22] what your expectation was?
[23]      MR. MELTZER: Objection.
[24]   A. My expectation was that at some time, that

Page 82

[1] someone would have to sit down and speak with me
[2] about my claims against USF&G.
[3]   Q. In the lawsuit?
[4]   A. No. That at some time, because even if I
[5] had filed a lawsuit -- and this is just my
[6] understanding, and I may be wrong -- but my
[7] understanding is that I had never been released from
[8] my contractual duties for this job, and they were
[9] still going to have to deal with me one way or
[10] another. They were going to have to fire me or they
[11] were going to have to remove me somehow, or they
[12] were going to have to sit down and say, "Okay, let's
[13] look at what you've got and see if we can resolve
[14] this without having to go through all this."
[15]      And --
[16]   Q. But you did get an answer to -- you did get
[17] a response through the mechanism that you started of
[18] the lawsuit, right? You got an answer to your
[19] complaint?
[20]   A. At the time that I --
[21]      MR. MELTZER: Objection.
[22]      THE WITNESS: I'm sorry.
[23]      MR. MELTZER: You can answer.
[24]   Q. You did get a response. You said you

Page 83

[1] expected a response, and you filed the lawsuit and
[2] you got a response, correct?
[3]   A. At that time I don't believe I had a
[4] response.
[5]   Q. From USF&G?
[6]   A. I don't think I had a response. I think at
[7] that time, sometime in April or maybe May, USF&G
[8] removed the case to the Federal Court, and then it
[9] just sat there, and I don't know how long it takes
[10] to read these things, but it took them six months to
[11] read this.
[12]   Q. The judge or the court?
[13]   A. Whoever, I don't know who reads it, and to
[14] make the determination. But I don't believe that
[15] there was any response to it at first, other than to
[16] try to remove it. I'm not absolutely certain, but
[17] from my knowledge, there wasn't anything.
[18]      Did you want me to continue on with the
[19] e-mail --
[20]   Q. Certainly. So I think I asked you the
[21] question -- I will ask you this question about your
[22] first conversation with Mr. Bullock. When Mr.
[23] Bullock told you that he was surprised that you were
[24] interested in continuing to do business with USF&G

Page 84

[1] at the site, do you have an understanding as to why
[2] he was surprised?
[3]      MR. MELTZER: Objection.
[4]   A. I don't recall having any opinion of why he
[5] might have been surprised.
[6]   Q. It didn't occur to you that it might be
[7] because you had filed this breach of contract and
[8] deceptive trade practices claim against USF&G?
[9]      MR. MELTZER: Objection.
[10]   A. No, because of the continuation of the
[11] conversation. He said to me that he preferred to
[12] ratify the people that were, you know, involved with
[13] the project and that it would be beneficial to
[14] ratify me to get this work going.
[15]   Q. And then at a later point in these e-mail
[16] exchanges, he asked you about whether there was a
[17] lawsuit or not?
[18]   A. Yes, he did.
[19]   Q. And then what happened next?
[20]   A. I wrote him back and I told him that I was
[21] sorry to hear that this was the case, because it had
[22] always been my intention -- the only thing I ever
[23] wanted to do was to go back to the job and finish
[24] this job, and that the only reason that I filed the

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 85

[1] lawsuit was because I had had no response from
[2] anyone involved on the other side, and that to
[3] protect my rights under Massachusetts law was the
[4] only reason that I filed this, and that it was a
[5] shame that two sides couldn't sit down and have a
[6] conversation, just like this.
[7]     I mean, you've got your job to do, I
[8] understand that, but we can sit here, and we can be
[9] civil about it, and we can speak and we can see if
[10] we can find, you know, a common ground.
[11]     Q.  I understand. I think you told me -- we'll
[12] take a second and we can find those e-mails, and it
[13] will help the conversation. I think I have them
[14] all.
[15]     MS. BROWN:  We can mark them all as Exhibit
[16] 75.
[17]     (Document marked as Exhibit 75
[18]     for identification)
[19]     Q.  Actually, Mr. Matthews, as you can see from
[20] these e-mails, if we look at the top, I think it
[21] looks like we see on Page 1, Mr. Bullock asks you to
[22] send nine items, and you respond about the -- we'll
[23] just go through these quickly, if you don't mind.
[24] We don't need to take a lot of time with them.

Page 86

[1]     You respond that you are not sure you
[2] really want to send this through the fax machine,
[3] just as we were just talking about. And then as you
[4] stated, Mr. Bullock says, "I can meet with you
[5] either Tuesday or Wednesday of next week," and you
[6] say, "Either day would be fine."
[7]     And then on the third stapled set of
[8] e-mails that we have collectively marked here as
[9] Exhibit 75, Bob says, "Neal, we checked with the
[10] surety, and we were told we cannot deal with
[11] Landworks while the legal case is pending." And
[12] then you wrote a response at the top of the page,
[13] Friday, August 19th, "Dear Mr. Bullock, I'm sorry to
[14] hear that."
[15]     I wanted to ask you a couple of questions
[16] about this response, if you would be so kind.
[17]     A.  Sure.
[18]     Q.  "I felt that I could have provided
[19] information and service to St. Paul that would have
[20] saved them expense in completing the project. There
[21] were many things in the actions of the Town of
[22] Shrewsbury and Jackson Construction Company that
[23] should have been corrected before the project moved
[24] forward."

Page 87

[1]     Do you remember what you were referring to
[2] when you said that?
[3]     A.  Yes.
[4]     Q.  And what was that?
[5]     A.  The relationship between Jackson and the
[6] Town had deteriorated to the point -- I think if you
[7] look at CTM's deficiency and job meeting notes, you
[8] will see that there is a deterioration in the
[9] relationship of the two working together. It became
[10] adversarial in the end.
[11]     The Town was becoming more adversarial to
[12] everyone involved in the project, in that any
[13] concerns brought up to them about -- I'll just use
[14] an item -- inside the building, because I said in
[15] many of these meetings that the hood ventilators for
[16] ventilation of the building became just a long,
[17] drawn-out intransigence on both sides, because
[18] neither one would -- they'd just sit and say, "We
[19] don't know exactly what you want," and the Town
[20] would say, "We don't care if you don't know what we
[21] want. You're supposed to put it in. You're
[22] supposed to know."
[23]     Jackson was working out of sequence, a
[24] logical sequence of work. That was causing problems

Page 88

[1] in site work, and they were not providing
[2] information that was needed to complete site work in
[3] a timely fashion. And Jackson was using extortion,
[4] for lack of a better word, to --
[5]     Q.  Well, that's a very weighted word. I mean,
[6] is that really the word you want to use?
[7]     A.  Yes, it is, because I don't use it lightly.
[8]     Q.  What does it mean to you, "extortion"?
[9]     A.  Extortion would be to me that -- I'll give
[10] you an instance. There was a change that they
[11] wanted to make; they wanted to bring a conduit out
[12] of the side of the shop area and run it into the
[13] area where the new ticket booth would be placed. It
[14] was not the area that it was originally to be placed
[15] in. We had already run the conduit from the
[16] original areas.
[17]     They would not provide a change order for
[18] doing it. And so to get it installed, they said
[19] plainly, "If you want to see any more payment,
[20] you're going to put the conduit in." I would
[21] consider that extortion.
[22]     Q.  In your next sentence, and this is
[23] consistent with what you've been saying, "It is
[24] unfortunate that the surety did not respond to me,"

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 89

[1] I think you meant to say, "and my lawyer's numerous
[2] inquiries concerning Jackson's refusal to pay for
[3] work that was requested and completed. Much of the
[4] work was billable to the Town of Shrewsbury."
[5] What is that a reference to, that much of
[6] the work was billable to the Town of Shrewsbury?
[7] A. There were several change orders that had
[8] been given to Jackson the previous year, the ones
[9] that I had spoke to earlier about sitting down in
[10] the Thanksgiving meeting with them, of going over,
[11] that were billable to the Town of Shrewsbury. And
[12] as of this date right here, I had seen no evidence
[13] that those bills had actually been turned in to the
[14] Town for payment.
[15] Q. Okay. Now, in the next set of e-mails, we
[16] have a response from Bob to you, "Neal, We are
[17] willing to discuss this with you, but in light of
[18] the lawsuit, discussion should go through the
[19] attorneys."
[20] A. I'm sorry. Which --
[21] Q. If you go to the next set. You see this is
[22] your e-mail we were just reading, and here is the
[23] response. I am asking you if you recall that
[24] response.

Page 90

[1] A. Yes.
[2] Q. Did you understand what he was saying, that
[3] because of the lawsuit, discussions needed to go
[4] through attorneys?
[5] A. In my mind it was so that he didn't get
[6] himself into trouble, he needed to have, like, the
[7] attorney for USF&G present to have any discussion.
[8] Q. Did you think --
[9] A. That was just my --
[10] Q. Your opinion?
[11] A. My opinion of it.
[12] Q. But you didn't think that was unreasonable
[13] on its face?
[14] A. No. And I think that, you know, my
[15] response to him was fairly close after that, that I
[16] had written to him to suggest that I -- that Mr.
[17] Bullock and myself, and the attorneys for St. Paul
[18] and my attorney, you know, meet at the end of the
[19] month at a time that would be convenient for them,
[20] at Shrewsbury Middle School, to see if we could work
[21] this out, and resolve -- by resolve the matter, I
[22] meant all of it, resolve it so that we could do away
[23] with it.
[24] Q. And, by the way, do you see in Mr.

Page 91

[1] Bullock's e-mail to you that he has copied a Russ
[2] Fuller?
[3] A. Yes.
[4] Q. Do you know who Russ Fuller is?
[5] A. No, I don't.
[6] Q. Does it refresh your recollection if I tell
[7] you that he is an attorney for USF&G?
[8] A. Someone may have told me that before,
[9] because I had an idea that he might have been an
[10] attorney for USF&G. I think that when I saw it up
[11] there, I figured that must have been who it was.
[12] Q. Now, if we go to the next stapled set of
[13] documents, you see Bob's response back to you.
[14] "Neal, I will pass this suggestion along to Russ
[15] Fuller at St. Paul Travelers." Do you see that?
[16] A. Yes. I do.
[17] Q. Now, at this point, you had not named
[18] Lovett Silverman or had you named -- you had not
[19] named Lovett Silverman as a Defendant in this case,
[20] had you?
[21] A. No, I had not.
[22] Q. And did you have an understanding that
[23] Lovett Silverman worked under contract with the
[24] surety?

Page 92

[1] A. I wasn't certain what the working
[2] relationship was now with the surety.
[3] Q. And did you have an understanding as to who
[4] called the shots, whether Bob Bullock called the
[5] shots or the surety called the shots as to resolving
[6] this dispute with you and how this dispute with you
[7] would be resolved?
[8] MR. MELTZER: Objection as to form.
[9] Q. I mean, can you see reading this e-mail
[10] that Mr. Bullock is saying that St. Paul is the
[11] decision maker, and not Lovett Silverman, and he
[12] must pass this on to St. Paul?
[13] MR. MELTZER: Objection.
[14] A. In my discussion with him and my subsequent
[15] e-mails to him, in my opinion, Lovett Silverman was
[16] charged with finding out, you know, what were the
[17] disputes and ratifying the subcontractors if they,
[18] you know, wanted to be ratified, and working this
[19] out for St. Paul's.
[20] But other than that, I'm not certain -- in
[21] my opinion they were the ones that were the lead in
[22] being able to sort through the mess of the Jackson
[23] failure and ratifying people. They were the only
[24] people that I knew to talk to to get the process

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 93

[1] going.

[2] Q. And when we were at the depositions of the
[3] Lovett Silverman people, your attorney showed them
[4] the e-mails from the surety, instructing them not to
[5] deal with you. Do you remember those e-mails?

[6] A. Yes.

[7] Q. So in hindsight --

[8] A. I'm sorry. I'm sorry. Would you repeat
[9] that.

[10] Q. At the time of these e-mails, there were
[11] other e-mails that went from the surety to Lovett
[12] Silverman?

[13] A. Yes.

[14] Q. Saying -- instructing Mr. Bullock at Lovett
[15] Silverman not to deal with you directly, and
[16] instructing Lovett Silverman to tell you that
[17] communications had to go through the lawyers because
[18] of the lawsuit. Do you remember seeing those
[19] e-mails --

[20] MR. MELTZER: Objection.

[21] Q. -- at the Lovett Silverman depositions?

[22] A. I don't remember that that way. What I
[23] remember -- what really sticks out in my mind about
[24] the set of e-mails that dealt with this was an

Page 94

[1] e-mail that was written by somebody to Bob Bullock
[2] in which he asked about Landworks, and "Is there any
[3] reason why we're not pursuing this guy?"

[4] And someone writes back that Russ Fuller
[5] has a problem with this guy. And then he states
[6] that -- he says something to the effect that "Then I
[7] will tell him that we can't deal with him as long as
[8] the lawsuit is pending." And then someone else
[9] writes back and says, "Don't do that if you have not
[10] already done so."

[11] So through all this my feeling was that,
[12] you know, these were people that I had dealt with
[13] before. I had seen, you know, the first
[14] ratification.

[15] Q. Yes.

[16] A. And that these were the people that I
[17] needed to talk to, to go through. And to be taken
[18] from a point of where it looked like they were going
[19] to -- let's get this resolved and everything, and
[20] then all of a sudden saying they can't talk to me,
[21] and I think even in the e-mails that I had
[22] written about this where I suggested we meet with
[23] him, I think I wrote him one more e-mail that said,
[24] "Did you pass the information along, and will they

Page 95

[1] meet?", and then finding out later on that this was
[2] not really the case.

[3] It wasn't the case that they couldn't deal
[4] with me. It was a case that one person, who I have
[5] never met in my life, as far as I know, has a
[6] problem with me, and --

[7] Q. That would be Russ Fuller, the lawyer?

[8] A. Russ Fuller or whoever it was -- I'm not
[9] certain if -- I know that in one e-mail it says
[10] that, I think it was, "Russ Fuller has a problem
[11] with this guy." It was in response to an e-mail
[12] from Mr. Bullock saying, "Why aren't we pursuing
[13] this guy?" And he says, well, I think it was, "Russ
[14] Fuller has a problem with this guy."

[15] And then to find that out later on, just --
[16] you know, it just added more to the fact that the
[17] only thing we had to do was to talk about this, and
[18] we could have resolved it, and nobody would talk to
[19] me.

[20] And to have everything, you know, my life,
[21] sitting there put on hold for three years because
[22] one person will not talk to me -- lawsuits can be
[23] resolved every day. They can be resolved without
[24] having to go through depositions and courtrooms and

Page 96

[1] anything else if just they would talk. And the only
[2] thing he had to tell me then was give me an honest
[3] answer, and I don't think that he gave me an honest
[4] answer.

[5] THE WITNESS: If you don't mind, can I have
[6] just like a minute or two.

[7] MS. BROWN: Yes, we'll take a short break.

[8] (Recess)

[9] BY MS. BROWN:

[10] Q. Did you think that Landworks and the surety
[11] were legally obligated to ratify your contract, your
[12] Jackson contract?

[13] MR. MELTZER: Objection. Answer if you
[14] understand the question.

[15] A. Actually, I considered I already had a
[16] contract with the surety. That's what I considered
[17] the ratification agreement to be, was a contract
[18] with the surety to proceed and finish the work on
[19] the Shrewsbury Middle School.

[20] Q. Which contract are you referring to?

[21] A. I'm talking about the ratification
[22] agreement.

[23] Q. After the Standen failure?

[24] A. After the Standen failure, Lovett Silverman

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 97

(1) had ratified me. And my understanding of that,
(2) which I don't know the legal stuff, but my
(3) understanding of that was that was basically going
(4) to be my contract to finish the job, the
(5) ratification agreement.
(6)     Q. So you didn't believe that you needed a new
(7) contract after Jackson failed?
(8)     A. No, not really. I believe that I had one
(9) that had been -- that had been negotiated before.
(10) But I had never been through this before, so I
(11) didn't -- I was sort of -- I didn't know, but I felt
(12) that I had a contract already with USF&G, or St.
(13) Paul's, whoever, that was the ratification
(14) agreement, that that was my contract with them.
(15) So...
(16)     Q. Now, just before we took our break, we were
(17) finishing up this series of e-mails, and I believe
(18) you made reference -- Mr. Bullock said to you,
(19) "Neal, I will pass the suggestion along to Russ
(20) Fuller at St. Paul Travelers." And then you
(21) responded back a few days later, "Dear Mr. Bullock,
(22) Did you pass on my request... and if so, what was
(23) the response?"
(24)     And Mr. Bullock says, "See my response to

Page 98

(1) you of Friday, August 19th." This is the final
(2) page. "This matter has been passed to the surety's
(3) attorney. The communication will come through the
(4) attorneys. Thank you." And I think you testified
(5) about your disappointment about receiving this
(6) response.
(7)     A. Yes.
(8)     Q. Now, do you believe that Mr. Bullock lied
(9) to you about anything here?
(10)     A. I believe that he lied to me -- that to me
(11) is a strong word also, so let me restate that. I
(12) don't believe that Mr. Bullock was truthful,
(13) completely truthful to me, when he stated the
(14) reasons why he could not deal with me.
(15)     Q. What do you think --
(16)     A. I don't believe -- I have no reason to
(17) suspect that his last response on Tuesday, August
(18) 23rd, was not being truthful, that he had already
(19) passed this on to the attorneys. But prior to that,
(20) I think that the initial statement, that he said
(21) that he couldn't deal with me because of the pending
(22) lawsuit, was untruthful.
(23)     Q. And what was the truth, in your view?
(24)     A. That he couldn't deal with me because Russ

Page 99

(1) Fuller had a problem with me.
(2)     Q. Any other untruths that you believe you
(3) were told by Mr. Bullock?
(4)     A. At this time I can't think of any more, no.
(5)     Q. Did you have any communications with anyone
(6) else at Lovett Silverman? And now I'm referring not
(7) to at the time of the ratification of the contract
(8) you had with Standen, but I'm referring to the post-
(9) Jackson-failure time frame.
(10)     A. Mr. Bullock was, as far as I know, Mr.
(11) Bullock was the only one that I had contact with.
(12) He was the only one at that time who spoke to me or
(13) communicated to me in e-mail also.
(14)     Q. Do you believe Lovett Silverman did
(15) anything wrong in how Lovett Silverman handled the
(16) Jackson failure and dealt with you on the Jackson
(17) failure? Should they have done something different?
(18)     MR. MELTZER: Objection.
(19)     A. Yes.
(20)     Q. What did Lovett Silverman do that was wrong
(21) in your mind?
(22)     A. I think that they could have taken my
(23) information and that they could have looked at it
(24) for the validity of it and could have communicated

Page 100

(1) to the surety that there was a legitimate claim here
(2) and that maybe we should speak with them. And this
(3) is only, now I'm talking about, the portion of the
(4) second ratification process. This doesn't go any
(5) further than that point right there. There are
(6) other issues later.
(7)     Q. And what else should they have done --
(8) we're talking about this time frame in August of
(9) 2005, the time of these e-mails that you believe
(10) that Lovett Silverman was wrong in their conduct and
(11) that they should have done what you just described.
(12) Is there anything else that you think Lovett
(13) Silverman did wrong and should have done
(14) differently?
(15)     A. I can't think of anything at this point in
(16) time.
(17)     Q. Did there come another point in time when
(18) you believe Lovett Silverman did something wrong?
(19)     A. Yes.
(20)     Q. And what was that?
(21)     A. That would have been in early 2006. I'm
(22) not certain what the dates are. But there are
(23) e-mails in which attorneys for the surety asked
(24) Lovett Silverman to help prepare a counterclaim

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 101

[1] against Landworks, against myself.
[2]     From the stream of e-mails, it appears that
[3] it starts in the fall or early winter of 2005, and
[4] there is little done with it until early 2006. And
[5] then it is a pressing issue, that there is a
[6] deadline to meet, and there has not been much done
[7] to get it to them, a counterclaim.
[8]     So instead of legitimately looking into it,
[9] instead of someone calling me up and saying, "What
[10] was your understanding of this? Whose work was this
[11] supposed to be? And how much, you know, do you
[12] think you had left to do?", no one spoke to me.
[13]     Then they placed everything, it appeared to
[14] me, that was considered site work into one package,
[15] where they came up with a figure of some $828,000 --
[16] I'm not certain of the exact amount; it was over
[17] $800,000 -- for a counterclaim.
[18]     The initial Hole Story contract was
[19] $200,000 less than my initial proposal of $1 million
[20] something. My initial -- or my contract with
[21] Standen was only 870-some thousand, and they had
[22] prepared a counterclaim against me for 800 --
[23] greater than $800,000.
[24]     Q. When you say "they," you're referring to

Page 102

[1] USF&G?
[2]     A. I'm saying Lovett Silverman prepared the
[3] counterclaim to give to USF&G so that they could
[4] file a counterclaim against me. And there are items
[5] in there that -- first of all, it appears that it
[6] has been hastily put together, in that there's a
[7] deadline to meet, and it's more important to meet
[8] that deadline than it is to get it right, and there
[9] are items in there that are clearly not my work.
[10] And --
[11]     Q. Like what, for example?
[12]     A. It appears to me, in the counterclaim, that
[13] the track is in there, and the track being all the
[14] track. And you have seen the change order or the
[15] letter of intent from Jackson about the scope
[16] dealing with the removal of the old asphalt and the
[17] overlay of the track, but then also the rubberized
[18] surface.
[19]     I mean, there's going to be -- I figure
[20] there's going to be an argument where they're going
[21] to say that I owed the pavement on the track, and I
[22] am going to that I did not. There was never any
[23] doubt that there was always a contractor hired for
[24] doing the work for putting down the surface on the

Page 103

[1] track, and that appears to me to be lumped into
[2] this.
[3]     There was always a landscaper hired to do
[4] the seeding in what I say are landscaped areas,
[5] areas adjacent to the building, and that appears to
[6] be lumped into this counterclaim.
[7]     And in my opinion, I think the school and
[8] the Town of Shrewsbury placed pressure also to have
[9] any other area that needed to be seeded, graded, or
[10] whatever, done, and that also was lumped into this
[11] counterclaim. And that to me is preparing a false
[12] counterclaim against me.
[13]     Q. And what Lovett Silverman failed to do was
[14] consult with you directly to gather information
[15] before providing this information to USF&G?
[16]     A. I think that was one of the things.
[17]     Q. What else?
[18]     A. I think that they should have, even though
[19] they might have been receiving pressure to supply
[20] figures for a counterclaim, that they should have
[21] basically stood back and said, "We can't prepare a
[22] counterclaim of the scope that you're requesting and
[23] do it thoroughly without more time."
[24]     So it would have been a process that would

Page 104

[1] have involved, let's say, speaking with me, it would
[2] have been a process involved of looking over the
[3] site scope as originally laid down by the architect,
[4] and it would have been a process of applying
[5] different amounts to different people.
[6]     I have suspicions -- and the counterclaim
[7] is not clearly defined, and I guess that will be
[8] clearly defined later -- that the concrete pad on
[9] top of the oil tanks in the area of the courtyard
[10] adjacent to the cafeteria had to be repaired, and
[11] that was cracked and the damage done to the curbing
[12] in this area in the courtyard months before I was
[13] ever even contracted to do work on the site.
[14]     And that's been, in my opinion, rolled into
[15] one counterclaim and taken up before the Federal
[16] Court and given as fact. And I don't believe it's
[17] fact.
[18]     Q. Is there anything else that you believe
[19] Lovett Silverman did wrong with regard to you and
[20] the Shrewsbury Middle School?
[21]     A. I don't know. I don't know what any of the
[22] other --
[23]     Q. You have sued -- really, you've sued Lovett
[24] Silverman now, you have added Lovett Silverman in

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. I
February 13, 2007

Page 105

[1] addition to USF&G. So my question is, what is it
[2] that you believe -- I'm not asking a lawyer type
[3] question. I'm asking you, what do you believe,
[4] what's the basis of your lawsuit against Lovett
[5] Silverman? What do you believe Lovett Silverman did
[6] wrong? Is there anything else you want to add?
[7]    A. No. I think that they, as I stated, that
[8] they were deceptive in my initial conversations to
[9] me.
[10]    Q. What you said that -- deceptive in that --
[11]    A. They were not completely truthful, that
[12] they could just explicitly have said that basically,
[13] "Russ Fuller has a problem with you and told us that
[14] we can't deal with you."
[15]    Q. You believe they should have told you that?
[16]    A. Yes. And then secondly, that they put
[17] together a false counterclaim against me when asked
[18] to do so.
[19]    Q. False in the ways that you just described?
[20]    A. Yes.
[21]    Q. And in any other ways?
[22]    A. Off the top of my head, I can't think of
[23] any, but I'll study on it more.
[24]        MS. BROWN: I'd like to take five minutes,

Page 106

[1] if we can do that. We've been going for an hour and
[2] 20 minutes.
[3]        (Recess)
[4]    BY MS. BROWN:
[5]    Q. Now, just so I understand your claims
[6] against my client, Lovett Silverman, do you believe
[7] that Lovett Silverman made any defamatory statements
[8] about you?
[9]        MR. MELTZER: Objection.
[10]    A. In regards to did they make any defamatory
[11] statements, I would say -- are you asking
[12] specifically to one person or another or --
[13]    Q. Yes. If we were -- I was asking you before
[14] we took this break what Lovett Silverman did wrong,
[15] and we sort of went through what you represented to
[16] be by and large the universe of what they did wrong.
[17] Ask now I'm asking you, did they defame you? Did
[18] anyone at Lovett Silverman defame you?
[19]        MR. MELTZER: Objection.
[20]    A. I think part of the counterclaim also dealt
[21] with deficient work, and I had not recognized
[22] anything as being deficient work that we had not
[23] tried to make whole while I was still actively on
[24] the job site.

Page 107

[1]        Now, the job sat unmanned from late fall --
[2] no, it wouldn't be late fall, it would be early
[3] winter -- wasn't actively manned daily until I'm not
[4] certain when. August of 2005 is when they were
[5] talking about bringing contractors back on site. I
[6] don't know who maintenanced the site. I don't know
[7] what kind of damage it suffered over the period of
[8] the winter and the spring.
[9]        In speaking to some of the deficiencies, I
[10] don't know how much of that would have been
[11] considered, you know, damage done by others. And I
[12] think that if they're speaking to deficiencies in
[13] the work, then some of that is defamatory.
[14]    Q. Are you saying that Lovett Silverman made
[15] false statements, knowingly made false statements
[16] about deficiencies in the work and who caused those
[17] deficiencies?
[18]        MR. MELTZER: Objection.
[19]    A. I think that they may have made statements
[20] about deficiencies in the work, and I'm a little
[21] troubled by the word "knowingly," because that would
[22] ask me to actually know their mind-set.
[23]        I think that they made statements about
[24] deficiency in the work that are not attributable to

Page 108

[1] me or to Landworks, and that in so making these
[2] statements without first investigating the validity
[3] of them, that that's defamatory.
[4]    Q. Anything else that Lovett Silverman did
[5] that involved false statements with regard to you?
[6]    A. I think the counterclaim, in presenting
[7] this counterclaim, that they were attributing work
[8] to me that was clearly, in my opinion, not in my
[9] scope of work, and that by presenting that as fact,
[10] I think, was a false statement and contributed to
[11] the prolonging of this whole ordeal.
[12]    Q. Other than what you've just testified to
[13] regarding the counterclaim, and setting aside the
[14] counterclaim, are there any other false statements
[15] that you're aware of that Lovett Silverman has made
[16] regarding Landworks?
[17]    A. Not that I can recall at this time.
[18]    Q. Do you believe that Lovett Silverman
[19] engaged in extortion toward you?
[20]        MR. MELTZER: Objection.
[21]    A. Even though I would be -- I easily applied
[22] that word to Jackson in their practice, I don't
[23] think that I would apply the word "extortion" to
[24] Lovett Silverman.

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 109

[1]    I think that when they stated in their
[2]  e-mail streams to me that basically they could not
[3]  speak with me as long as I have a lawsuit pending,
[4]  it's a continuation of the holding the carrot out of
[5]  "if you drop this lawsuit" — and this is only my
[6]  opinion of this — "if you drop this lawsuit, then
[7]  we can speak with you." And that to me is not
[8]  extortion, but sort of a coercion to get something
[9]  out of me in response of getting something out of
[10]  them.
[11]    Q. Do you believe that Lovett Silverman
[12]  strong-armed Landworks?
[13]    A. I believe that Lovett Silverman, through
[14]  the progression from August of 2005 through 2006,
[15]  engaged in a pattern of things that -- engaged in a
[16]  pattern of conduct that I don't know if it
[17]  constitutes strong-arming, but I think it
[18]  constituted trying to apply certain charges to me
[19]  that were clearly not mine, and that in doing so,
[20]  they were basically taking money away from me.
[21]    Q. And what specifically was this pattern of
[22]  conduct?
[23]    A. Starting with the e-mail in which Mr.
[24]  Bullock, I think, gave a false reason for why he

Page 110

[1]  could not speak with me, and then continuing on
[2]  through a set of e-mails that I have read through
[3]  where certain items that were done on work were just
[4]  randomly placed to me, Landworks must have done this
[5]  work. The concrete work, who put in the concrete
[6]  ramps, was one of the e-mails, and it was attributed
[7]  to me. And it was not work that I had done. It was
[8]  work that Jackson Construction had done. The --
[9]    Q. Now, let's stop with that. Let me make
[10]  sure I understand what you're saying. You're saying
[11]  that there is an e-mail where Lovett Silverman says
[12]  that you had done certain work, certain concrete
[13]  work, and that that was incorrect, that someone else
[14]  had done that work instead?
[15]    A. That's correct.
[16]    Q. And you are saying this is an example of
[17]  conduct that amounts to strong-arming Landworks?
[18]    MR. MELTZER: Objection.
[19]    Q. Have I lost track of the pending question?
[20]    A. No, you've asked me, do I feel that Lovett
[21]  Silverman strong-armed me?
[22]    I feel that Lovett Silverman did not treat
[23]  me fairly, and that when I made inquiry into getting
[24]  back to work, that they refused to speak to me. And

Page 111

[1]  I felt that later on, when asked to do so, they
[2]  prepared a claim against me that they knew was not
[3]  completely truthful, and that in doing so, that they
[4]  caused me financial harm.
[5]    And I think that the counterclaim is the
[6]  biggest portion of that, because I have seen with
[7]  other companies that when these disputes get to a
[8]  point of trying to mediate or arbitrate or try them,
[9]  that one side will say, "You owe me X amount of
[10]  money," and then the other side will try to inflate
[11]  their counterclaim, and doing so to either
[12]  intimidate or to hopefully end up with a more
[13]  favorable decision. And I think that that is a
[14]  strong-arm tactic.
[15]    Q. Anything else?
[16]    A. No. That's all I can think of.
[17]    Q. Okay. Do you believe that Lovett Silverman
[18]  attempted to deny you rights?
[19]    A. I feel that Lovett Silverman did not
[20]  present the initial — this is just my opinion —
[21]  the initial case of going to the surety and saying,
[22]  "This is the contractor that's been on the site.
[23]  This is the contractor that knows by far the most
[24]  about what is going on with the site work. We

Page 112

[1]  should sit down with him and find out whether or not
[2]  we can ratify him and dispose of this case against
[3]  you and get this work completed, because this
[4]  contractor is going to be the contractor that can do
[5]  it the most efficient."
[6]    And in not doing so -- in not doing so,
[7]  then I think that they have interfered with a more
[8]  speedy resolve of this.
[9]    Q. Anything else?
[10]    A. Not that I can think of.
[11]    Q. Going back to filing the original lawsuit
[12]  against USF&G, do you believe that Lovett Silverman
[13]  acted in any way which caused you to file that
[14]  lawsuit or contributed to your need to file that
[15]  lawsuit?
[16]    MR. MELTZER: Objection.
[17]    A. You're asking me -- can you clarify that.
[18]    Are you asking me that at the time that I filed the
[19]  initial lawsuit against USF&G, was it my opinion at
[20]  that time, did Lovett Silverman cause any reason for
[21]  me to file the lawsuit against them?
[22]    Q. Yes, that's my question.
[23]    A. At that point, no.
[24]    Q. They hadn't done anything up to that point

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. I
February 13, 2007

Page 113

[1]  in time?
[2]      MR. MELTZER: Objection.
[3]      Q. Lovett Silverman had not done anything up
[4]  to that point that would have caused you to sue
[5]  USF&G? Is that what you just said? I didn't
[6]  understand your answer.
[7]      A. At the point that I filed the lawsuit, I
[8]  don't know if Lovett Silverman was even involved in
[9]  the project, so I don't know if they had done
[10]  anything at that point in time.
[11]      Subsequent to filing the lawsuit and
[12]  reading through the e-mail traffic is when, in my
[13]  opinion, that I find conduct that I don't consider
[14]  fair.
[15]      Q. And what would that conduct be?
[16]      A. I think I've previously stated the conduct
[17]  of the initial contact with Mr. Bullock in not
[18]  giving me a completely truthful answer of why he
[19]  couldn't deal with me, and then the conduct of
[20]  preparing the counterclaim.
[21]      Q. Any other conduct that anyone at Lovett
[22]  Silverman engaged in that you believe was unfair
[23]  towards you?
[24]      MR. MELTZER: Objection.

Page 114

[1]      A. I can't think of something right now.
[2]  There may be one or two more instances, but there is
[3]  nothing that has stuck in my mind as much as those
[4]  two instances.
[5]      Q. Are you aware of any other subcontractors
[6]  at the site who you would say were strong-armed or
[7]  extorted by Lovett Silverman?
[8]      A. I don't think I ever used the word
[9]  "extorted" by Lovett Silverman. I think, as I
[10]  stated before, I think that would be a term that I
[11]  would not apply to them.
[12]      I don't know of the dealings with other
[13]  subcontractors with Lovett Silverman. I can only
[14]  tell you my dealings with them. So I don't know if
[15]  other contractors were strong-armed or not. I know
[16]  other contractors had to file suit on this job to
[17]  get paid.
[18]      MS. BROWN: I don't have anything further
[19]  right now. Mr. Hipp is going to ask you a few
[20]  questions.
[21]          CROSS EXAMINATION
[22]  BY MR. HIPP:
[23]      Q. Good afternoon, Mr. Matthews. As you know,
[24]  my name is Eric Hipp, and I represent United States

Page 115

[1]  Fidelity & Guaranty Company in this matter, and I do
[2]  have a few questions for you.
[3]      Just while -- I'm not going to mark this as
[4]  an exhibit, but have you ever seen a copy of that
[5]  document before?
[6]      MR. MELTZER: Off the record.
[7]      (Discussion off the record)
[8]      A. (Reviewing document)
[9]      THE WITNESS: Answer?
[10]      MR. MELTZER: Answer the question.
[11]      A. Okay. I'm not trying to be flip about
[12]  this, but I've got, like, five or six of these
[13]  formats like this, and I believe that I have seen
[14]  this before. But I'm just looking -- it doesn't
[15]  look exactly like the form that I would have
[16]  received it in, which is probably because of, like,
[17]  this up at the top. But I believe that I have seen
[18]  this before, yes.
[19]      Q. So maybe -- the copy you have seen doesn't
[20]  have the language at the top --
[21]      A. This case stuff up here, and the "Document
[22]  34," filed on these dates, with the pages on it.
[23]      Q. But with the exception of that very top
[24]  line, that does look like a document you've seen, a

Page 116

[1]  copy of which you've seen before?
[2]      A. I believe so.
[3]      MR. HIPP: Do you want to talk with him?
[4]      MR. MELTZER: Yes, for just one second.
[5]      (The witness and his counsel confer
[6]      outside the room)
[7]      Q. Looking at this document again, with the
[8]  exception possibly of the very top line, this does
[9]  appear to be a document you've seen before?
[10]      A. I believe so.
[11]      Q. And is that document USF&G's answer and
[12]  counterclaim in this litigation?
[13]      A. It says that it is USF&G's amended answer
[14]  and counterclaim filed with leave of court.
[15]      Q. Okay. Now, turning to -- or I should say
[16]  directing your attention to Pages 6 through 9,
[17]  particularly do those pages appear to constitute
[18]  USF&G's counterclaim against Landworks in this
[19]  litigation?
[20]      MR. MELTZER: Do you have a copy of that?
[21]      MR. HIPP: I don't.
[22]      A. (Reviewing document) I'm sorry, would
[23]  you -- could you just repeat --
[24]      Q. Sure. Directing your attention to I

Neal H. Matthews, Vol. I
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 117

[1] believe it's pages marked at the top 6 through 9, do
[2] those pages appear to constitute USF&G's
[3] counterclaim against Landworks in this litigation?
[4]     A. Reading it now, that's what it would
[5] appear.
[6]         MR. MELTZER: Can I see it for a minute?
[7]         MR. HIPP: Yes. Why don't we take a break.
[8] I'll make copies.
[9]         (Pause)
[10]        MR. HIPP: We'll just go ahead and mark
[11] this as the next exhibit.
[12]             (Document marked as Exhibit 76
[13]             for identification)
[14]        MR. HIPP: I'm sorry. I just handed out
[15] the wrong one.
[16]             (Discussion off the record)
[17]             (Document marked as Exhibit 77
[18]             for identification)
[19] BY MR. HIPP:
[20]    Q. So directing your attention to Exhibit
[21] 77 --
[22]    A. Pages 6 through 9?
[23]    Q. Exactly, Pages 6 through 9, which
[24] constitutes USF&G's counterclaim against Landworks

Page 118

[1] in this litigation, particularly on Page 8 it has a
[2] claim for breach of contract and a claim for
[3] negligence.
[4]     Is there any dollar amount that's requested
[5] by USF&G that's asserted against Landworks anywhere
[6] in this counterclaim?
[7]     A. On Page 8?
[8]     Q. Anywhere in the counterclaim. I'm sorry,
[9] anywhere in the counterclaim, Pages 6 through 9.
[10]    A. (Reviewing document) I do not see a dollar
[11] amount.
[12]    Q. You, I believe, testified earlier about a
[13] counterclaim of $828,000, I think is what you said,
[14] that had been made by the surety; is that correct?
[15]    A. I think that what I said was that there was
[16] a counterclaim prepared by Lovett Silverman for the
[17] surety in the amount of 820-some-odd thousand
[18] dollars.
[19]    Q. But looking at the counterclaim as filed in
[20] this litigation, it doesn't ask for any particular
[21] dollar amount; is that correct?
[22]    A. It doesn't ask for a particular dollar
[23] amount in this document that I have before me.
[24]    Q. Okay. Now I'll show you the next -- now,

Page 119

[1] directing your attention to what's been marked as
[2] Exhibit 76, have you seen that document before? If
[3] you want to compare it to Exhibit 77, that's fine.
[4]     A. (Reviewing document) I don't have a clear
[5] recollection of this document, and I'm not saying
[6] that I haven't seen it, it's just that I don't have
[7] a clear recollection of this document.
[8]     Q. I particularly direct your attention to
[9] Pages 11 through 14 with respect to whether you've
[10] seen this document before or not.
[11]    A. To answer that question, I have to go back
[12] to -- the reason that I'm not certain if I've seen
[13] this document is because of something on previous
[14] pages. So I would still have to state that I'm not
[15] certain that I have seen this. I'm not certain that
[16] I have seen this document. I'm not saying that I
[17] haven't seen it; I'm just not certain.
[18]    Q. Can I ask, what is on the previous pages
[19] that gives you pause?
[20]    A. Like on Page 4, where, under the counts,
[21] it's like, "Landworks versus USF&G," and then it's
[22] like, "Landworks versus Both Defendants," and I just
[23] don't recall seeing a format where it was "Landworks
[24] versus Both Defendants."

Page 120

[1]     So I may have seen this and read through it
[2] and just -- that might have been something that I
[3] just skipped over and was reading the actual
[4] responses or the counts in here, and not really paid
[5] that much attention to it.
[6]     But in looking at it closely now, I do not
[7] recall seeing "Landworks versus Both Defendants."
[8] That statement just -- I hesitate to say that I
[9] have. It's not to say that I have not, and I hate
[10] to be vague like that, but I'm not certain if I have
[11] or not.
[12]    Q. That's fine. I wouldn't consider your
[13] answer vague. It's actually fairly specific. It's
[14] certainly fine.
[15]    A. And you wanted me to look at --
[16]    Q. Pages 11 through 14. I'll just indicate to
[17] you that this is USF&G's counterclaim that was made
[18] at the time of the answer to the amended complaint.
[19] I guess my same question holds. Is there any dollar
[20] amount that's requested by USF&G against Landworks
[21] in this counterclaim?
[22]    A. I do not see a dollar amount on those
[23] pages.
[24]    Q. Let's go back to Exhibit 66. Now, I

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 121

[1] believe, as we explained earlier, Exhibit 66 is the
[2] subcontract between Standen Contracting Company and
[3] Landworks Creations — I'm sorry, and --
[4] A. Just Landworks.
[5] Q. Landworks. That's correct?
[6] A. That's correct.
[7] Q. And on -- as indicated on the bottom, Page
[8] 6, is that your signature on behalf of Landworks?
[9] A. Yes.
[10] Q. And I believe you had testified earlier
[11] that your first contact with -- that during your
[12] contacts with Bill Gambill of Standen Contracting
[13] before this document was signed, you discussed the
[14] scope of what would be performed by Landworks on
[15] this project?
[16] A. Yes.
[17] Q. And you had certain conversations about
[18] additions and exclusions?
[19] A. Yes.
[20] Q. Am I correct that all those conversations
[21] occurred before Landworks entered into a contract
[22] with Standen?
[23] A. Are you asking me, did they occur before I
[24] signed this contract?

Page 122

[1] Q. Yes. Specifically the conversations with
[2] Bill Gambill where you discussed exclusions and
[3] additions to this contract.
[4] A. Yes.
[5] Q. Just to be clear, all those conversations
[6] all occurred before you signed this contract?
[7] A. To the best of my recollection, most of
[8] those conversations took place before the contract
[9] was issued, yes.
[10] (Document marked as Exhibit 78
[11] for identification)
[12] Q. I'll ask you if you've seen a copy of that
[13] document before.
[14] A. (Reviewing document) I have seen this
[15] document, except for next to Item 6, there's a
[16] handwritten "PD," and the one I have doesn't have
[17] that on there.
[18] Q. The one that you've seen previously doesn't
[19] have that handwritten note?
[20] A. That's correct.
[21] Q. And does this document appear to be a copy
[22] of the ratification agreement or subcontractor hold
[23] agreement between Landworks and USF&G as it relates
[24] to the Shrewsbury Middle School project?

Page 123

[1] A. That's what it appears, yes.
[2] Q. Would you turn to the last page there. Is
[3] that your signature in the block there on behalf of
[4] Landworks?
[5] A. Yes, it is.
[6] Q. I'm sorry, can I get Exhibit 66 back. Mr.
[7] Matthews, on Exhibit 66, the subcontract between
[8] Standen and Landworks, do you see the subcontract
[9] amount on the first page there is \$824,823.00?
[10] A. Yes.
[11] Q. And is it your understanding that that was
[12] the full contract amount?
[13] A. Yes.
[14] Q. Turning your attention to Exhibit 78, the
[15] ratification agreement, could you describe what your
[16] understanding of this document is, what the
[17] agreement was between you and USF&G.
[18] A. This agreement, my understanding of this
[19] agreement was that this agreement would be the
[20] agreement that we would continue to work under. The
[21] subcontract hold agreement was the working agreement
[22] to proceed with the work.
[23] Q. So the date of Exhibit 66, the original
[24] subcontract, is August 28, 2003; is that correct?

Page 124

[1] A. The date of the contract, Standen contract?
[2] Q. Yes. I believe it's indicated right on the
[3] first page (indicating).
[4] A. There it is, yes, it's dated August 28,
[5] 2003. Prior to that, we worked under a letter of
[6] intent.
[7] Q. And on Page 6 of the Standen subcontract,
[8] it appears that both of the signatures on behalf of
[9] Standen and Landworks were in September of 2003; is
[10] that correct?
[11] A. That's correct.
[12] Q. So that after Standen defaulted at this
[13] project, Landworks entered into the ratification
[14] agreement with USF&G; is that correct?
[15] A. Yes.
[16] Q. And in particular, as shown in the
[17] ratification agreement, you signed on behalf of
[18] Landworks on March 23rd, 2004?
[19] A. Yes.
[20] Q. And it was signed by the surety the next
[21] day?
[22] MR. MELTZER: Objection.
[23] A. It was signed the next day. I'm not
[24] certain who signed it.

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 125

[1]   Q. Okay.
[2]   A. Is that Tiffany Schaak?
[3]   Q. I believe it is.
[4]   A. She writes worse than my wife.
[5]   Q. So as a result of the surety and Landworks
[6]   executing the ratification agreement, did Landworks
[7]   receive immediate payment -- or I should say payment
[8]   within a short period after signing?
[9]   A. Yes.
[10]  Q. Do you recall how much that was?
[11]  A. It was the $177,614.60.
[12]  Q. And what is the -- as of March of 2004, how
[13]  much was left for Landworks to complete the
[14]  Shrewsbury High School project? I should say
[15]  Shrewsbury Middle School project.
[16]  A. There was $254,718 left on the contract,
[17]  and then there was an additional -- I'm going to
[18]  have to read it from here -- at that time, $9,864 in
[19]  unresolved change order work.
[20]  Q. Had that work already been completed?
[21]  A. That work had already been completed.
[22]  Q. But in terms of work left to be completed,
[23]  was the value of that $254,718.53?
[24]  A. Let me back up one second. I'm not certain

Page 126

[1]   if all of that work had been completed. Some of it
[2]   may have been change orders that were signed for for
[3]   work to do.
[4]       In addition to that, there were proposals
[5]   that the Town had requested in the fall of 2003 for
[6]   work to be done, and at the time that Standen failed
[7]   and we were going through this process, or just
[8]   before they had failed, the Town had accepted some
[9]   of those proposals. And then everything was just
[10]  sort of put into limbo.
[11]      So the $254,718 was the value left to be
[12]  performed on contract work, along with some
[13]  additions that the Town had already approved and
[14]  Standen had approved.
[15]  Q. Let me go through this. Line 1 on this
[16]  ratification agreement indicates that the original
[17]  sum contract was $824,823; is that correct?
[18]  A. That's correct.
[19]  Q. And that's the same amount reflected on
[20]  Exhibit 66?
[21]  A. Yes.
[22]  Q. Line 2 indicates changes in subcontract
[23]  amount approved by Standen Contracting of $73,221;
[24]  is that correct?

Page 127

[1]   A. That's correct.
[2]   Q. And it also has a star which you were
[3]   referring to which refers to an additional $9,864 in
[4]   potential change order work that was unresolved?
[5]   A. Yes.
[6]   Q. So without considering the $9,864 amount,
[7]   the total or adjusted subcontract amount as of March
[8]   of 2004 was $898,044; is that correct?
[9]   A. Yes.
[10]  Q. And then after counting the value of work
[11]  performed, total payments made previous -- total
[12]  payments made pursuant to this agreement, there was
[13]  retainage withheld of $32,166.27; is that correct?
[14]  A. It's a little bit blurry on mine, but that
[15]  appears to be correct, yes, sir.
[16]  Q. And then the value to be performed was
[17]  $254,718.53?
[18]  A. Yes, that's correct.
[19]  Q. These proposals that you were referring to
[20]  from the Town for extra work, were those -- those
[21]  proposals were from before March of 2004?
[22]  A. Yes. Some of them, yes.
[23]  Q. Are those proposals that have been accepted
[24]  not reflected in these numbers?

Page 128

[1]   A. Yes, because they had not been converted to
[2]   change orders. They were proposals given to the
[3]   Town for work to be done inside the courtyard.
[4]   There was some work to be done inside the building
[5]   for installation of the force main flanges for the
[6]   water line to be brought in for the fire protection
[7]   and the flanges for the domestic water feed. There
[8]   was a oil and water gas separator that had to be
[9]   placed in the shop area, and that was in the process
[10]  of being processed through all this.
[11]  Q. Was all that work performed by Landworks?
[12]  A. That work was performed later by Landworks,
[13]  yes.
[14]  Q. Was that work reflected in change orders
[15]  subsequent to March of 2004?
[16]  A. I believe so, yes.
[17]  Q. So as of -- I'm sorry, you have a point?
[18]  A. You said that that was reflected in change
[19]  orders later in the process? In the November
[20]  meeting with Jackson, I found at that time that some
[21]  of those change orders for the work that the initial
[22]  proposals were made in the fall of 2003 still had
[23]  not been processed after the work had been completed
[24]  in the early spring of 2004.

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 129

[1]    Q. So the work on the proposals that you're
[2] referring to was performed before March of 2004, the
[3] execution of this ratification agreement?
[4]    A. The proposals were, yes. It had been
[5] accepted as additions.
[6]    Q. I'm sorry. I'm asking if the work had been
[7] performed.
[8]    A. The work had not been performed. The work
[9] was performed after the ratification agreement was
[10] signed.
[11]    Q. Directing your attention to the paragraph
[12] at the top of Page 2, could you read -- since you're
[13] having a difficult time reading it, I will read it
[14] aloud, and you tell me if I've read it accurately.
[15]        Starting at the far right of the third
[16] line, it says, "The continued use of you as a
[17] subcontractor on this project is at the sole
[18] discretion of Surety and is further conditioned upon
[19] approval by the completion contractor and/or Owner.
[20] If it is determined by Surety to either not use you
[21] as a subcontractor or assign your subcontract
[22] agreement, then any retainage held will be directed
[23] to you within 30 days after project acceptance and
[24] retentions are released by the Owner and received by

Page 130

[1] Surety, assuming there are no back charges, setoffs
[2] or claims against you." Did I read that accurately?
[3]    A. As far as I can tell, yes.
[4]    Q. Do you understand what that provision of
[5] this subcontractor hold agreement or ratification
[6] agreement means?
[7]    A. If they determined that they didn't want to
[8] use you, that they would terminate you.
[9]    Q. Let me turn your attention back to Exhibit
[10] 67. I might have asked this before, but this
[11] appears to be the subcontract signed between Jackson
[12] Construction and Landworks; is that correct?
[13]    A. That's what it would appear to be.
[14]    Q. And I think this was asked earlier, but
[15] I'll just double-check. On Page 10, is that your
[16] signature on behalf of Landworks Creations, LLC?
[17]    A. Yes, it is.
[18]    Q. And what is the date of your signature on
[19] Page 10?
[20]    A. It's the 12th of June, 2004.
[21]    Q. Does that date correlate with your
[22] recollection of when you signed the subcontract with
[23] Jackson?
[24]    A. It would be in that time frame, because the

Page 131

[1] payment for April was overdue, and they said that
[2] they wouldn't pay me unless I signed a contract with
[3] them. And that was the first I heard that I had to
[4] sign a contract with them.
[5]    Q. So let me direct your attention to Article
[6] 5 on Page 3. What does -- what is the subcontract
[7] price for the Jackson/Landworks subcontract
[8] agreement?
[9]    A. It says $303,535.
[10]    Q. Now, as of the ratification agreement, the
[11] work left to be performed was $254,718.53; is that
[12] correct?
[13]    A. That's correct.
[14]    Q. And the retainage withheld was $32,166.27;
[15] is that correct?
[16]    A. That's correct.
[17]    Q. So the combination of those two would be
[18] some $286,900; is that accurate?
[19]    A. That's accurate.
[20]    Q. Can you explain the difference between that
[21] amount and the subcontract price in the Jackson
[22] subcontract?
[23]    A. I can try, because I only found out the
[24] reason for the difference in the November meeting

Page 132

[1] with Jackson. It had always been my assumption that
[2] the way they came with this figure was they had
[3] added the contract amount with the retainage, and
[4] then they had added the outstanding change orders to
[5] this amount. And then they had added -- they had
[6] requested from me, in early April of 2004, any
[7] charges for demobilization and remobilization, legal
[8] fees, and there was something else, and there was
[9] not a lot that was added to that. And they had
[10] added these up and placed them into the contract
[11] amount.
[12]        In the November meeting -- and I believe
[13] there is a copy of that, and all this paperwork is
[14] floating around -- Rich McGuinness gave me an
[15] account of how they came up with that number, and it
[16] made absolutely no sense, because basically they had
[17] picked certain change orders and added it to the
[18] contract amount and the retainage, but they hadn't
[19] chosen other ones, and his numbers didn't add up
[20] also.
[21]        So after this November meeting, I wasn't
[22] certain how they had come up with the $303,535
[23] number. But according to them, they had taken the
[24] two figures that are on the subcontract hold

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 133

[1] agreement, added them together, and then they had
[2] added to that portions of the $9,864, and then one
[3] or two other of the outstanding proposals that were
[4] for work to be performed from -- that were made in
[5] 2003.
[6]    Q. I believe you testified, in addition, there
[7] was some sort of charge for demobilization and
[8] remobilization and legal fees?
[9]    A. That's what I had -- I had provided them
[10] with that in early April. They asked me -- it was a
[11] person named Martin, his first name was Martin, that
[12] called me from Jackson Construction. They wanted to
[13] know if there were any other charges for this job.
[14]    I'm like, "Charges like what?", and he was
[15] like, "Well, for demobilization, remobilization, any
[16] damages or any legal fees." And I'm like, "They're
[17] minor," and I think that the total of these was
[18] something in the neighborhood of $4,500. That
[19] figure seems to stick in my head. And I was
[20] assuming that that had been added to this along with
[21] the additional $9,864.
[22]    And then there was something else I can't
[23] think of right now. I would have to go back through
[24] the paperwork and look at it again.

Page 135

[1] Landworks?
[2]    A. Yes.
[3]    Q. It appears that Change Order No. 2, the
[4] copy in front of you, was not signed by Landworks?
[5]    A. Yes, but I believe it was signed by me.
[6]    Q. Could you tell me, what was the work
[7] performed indicated in this Change Order No. 1?
[8]    A. I would have to reference the slips. Since
[9] it was slip work, it was -- I would have to
[10] reference the slips. I'm not certain.
[11]    Q. The same question with Change Order No. 2:
[12] Do you recall what work that was done?
[13]    A. I would have -- once again, I would have to
[14] reference the slips to make certain.
[15]    Q. And the same thing with No. 3?
[16]    A. I would have to reference the slips on the
[17] top line, and then the PCO No. 39, I would have to
[18] look at that.
[19]    Q. Now, on Change Order No. 1 it indicates
[20] that the original contract amount is $303,535; is
[21] that correct?
[22]    A. Yes.
[23]    Q. And that's the amount indicated in Article
[24] 5 of the Jackson subcontract?

Page 134

[1]    But in the meeting in November, Rich
[2] McGuinness sat down, and he had this sheet which was
[3] like a worksheet that he had used to add these
[4] figures up, but the numbers weren't -- did not match
[5] exactly to this.
[6]    Q. Let me ask, comparing the scope of work
[7] indicated in the Standen subcontract in that Exhibit
[8] A, is that identical to the scope of work indicated
[9] in Article 2 of the Jackson subcontract?
[10]    A. (Reviewing documents) Yes, it is.
[11]    MR. HIPP: Would you mark these.
[12]    (Document marked as Exhibit 79
[13]    for identification)
[14]    Q. Let me ask if you've seen these three
[15] documents which we've marked as Exhibit 79, if you
[16] have seen those documents before.
[17]    A. Yes, I have.
[18]    Q. And what do they appear to be?
[19]    A. They appear to be change orders issued by
[20] Jackson Construction.
[21]    Q. And these are change orders that were
[22] signed by Jackson?
[23]    A. Yes, they were.
[24]    Q. And at least two of them were signed by

Page 136

[1]    A. Yes.
[2]    Q. And the amount of Change Order No. 1 was
[3] $4,279?
[4]    A. That's correct.
[5]    Q. Which leads to a revision -- a revised
[6] contract amount of $307,814; is that correct?
[7]    A. That's correct.
[8]    Q. And then Change Order No. 2 in the amount
[9] of $5,155 was approved, leading to a revised amount
[10] of $312,969; is that correct?
[11]    A. Yes, that's correct.
[12]    Q. And Change Order No. 3 added an additional
[13] $41,519, leading to a revised contract amount of
[14] $354,488; is that correct?
[15]    A. That's correct.
[16]    Q. Are there any other change orders that were
[17] issued and signed by Jackson and Landworks for this
[18] project?
[19]    A. No. There were submittals for change
[20] orders from me to Jackson, but I had not received
[21] back from Jackson forms like these for the change
[22] orders. And that was part of the discussion of the
[23] November meeting.
[24]    Q. Can you tell me, do you recognize that

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 137

[1] document?
[2] A. Yes, I do.
[3] Q. What is that?
[4] A. That is my change order submitted to
[5] Jackson Construction for work performed on slips.
[6] Q. And do you recall what that work was?
[7] A. Part of it was for cleanup around the
[8] building. I'm not certain of the work performed on
[9] Slip No. 1026. Actually, I would need to see the
[10] slips to make certain.
[11] Q. The slips are attached.
[12] A. I'm sorry. The first two slips indicate
[13] backfilling interior plumbing and removal of debris
[14] from the building. The second two slips indicate
[15] the moving of Jersey barriers around gas tanks,
[16] temporary gas tanks that were installed for heating
[17] the building, and the next slip was for snow removal
[18] around parts of the building. The next slip is for
[19] snow removal, and then the slip next to that was for
[20] the removal of a pine tree that was in the way of
[21] installation of more temporary gas tanks in front of
[22] the building. And then the next slip was for the
[23] backfill of some interior plumbing.
[24] Q. Now, the dates on these slips range from

Page 139

[1] A. That's correct.
[2] Q. Why was this work submitted to Jackson as
[3] opposed to submitted to Standen?
[4] A. Because the work was performed -- I'm not
[5] certain why the work on the 30th -- that might have
[6] been just because of the time of the billing going
[7] out, but the rest of the work was work that was
[8] being done at the time that Standen was failing on
[9] the job.
[10] Q. I believe you said that that amount could
[11] be part of the $9,864 that was unresolved?
[12] A. That is possible. That is possible,
[13] because I think there was another one for ledge
[14] removal for around $5,000.
[15] MR. HIPP: Let me mark that as the next
[16] exhibit.
[17] (Document marked as Exhibit 80
[18] for identification)
[19] Q. Have you seen that next exhibit before?
[20] A. Yes.
[21] Q. And what is that?
[22] A. It's a change order for removal of ledge.
[23] Q. And you see the handwriting at the top
[24] there, "Included in contract"?

Page 138

[1] October of 2003 through January of 2004; is that
[2] correct?
[3] A. That's correct.
[4] Q. Now, the total of this proposed change
[5] order is $4,828.73; is that correct?
[6] A. That's correct.
[7] Q. And was this proposed change order included
[8] in the amounts indicated on the ratification
[9] agreement dated March 2004?
[10] A. I'm not certain of that. It may have been
[11] part of the $9,864.
[12] Q. Now, the date on the proposed change order
[13] is April 6th, 2004; is that correct?
[14] A. That's correct.
[15] Q. And this proposed change order is SMS0104?
[16] A. That's correct.
[17] Q. Can I ask, what does the "SMS" stand for?
[18] A. Shrewsbury Middle School. And then it is
[19] basically Shrewsbury Middle School with the number
[20] of the change order. 01 would be the first change
[21] order, and 04 would be the year.
[22] Q. Okay. This was a change order sent to
[23] Jackson in April of 2004 for work performed prior to
[24] the ratification agreement; is that correct?

Page 140

[1] A. Yes.
[2] Q. Is that your handwriting?
[3] A. Yes, it is.
[4] Q. What did you mean by that?
[5] A. That the price for removing ledge was
[6] included in the contract.
[7] Q. In which contract?
[8] A. It was included in my proposal, and my
[9] proposal laid out what trench ledge and what open
[10] ledge would be charged for.
[11] Q. Could you tell me about who requested this
[12] work.
[13] A. The work was approved for by the Town of
[14] Shrewsbury through their construction manager, CTM,
[15] and I'm not certain if it was Jack Kokernak or Jim
[16] Ferguson, but the work -- this work was also done in
[17] the previous winter. The removal of the ledge was
[18] actually done in the winter.
[19] Then when the job was shut down, this was
[20] for the installation of the water line -- when the
[21] job was shut down, then this was just sort of held
[22] in statis until the following spring in April.
[23] Q. I'm not sure if you answered my question.
[24] I asked you, who requested this work to be done?

Case 4:05-cv-40072-FDS    Document 77-3    Filed 04/18/2007    Page 9 of 30

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 141

[1]   A.  The work had to be done, because the water
[2]  line -- to get the water line to the elevation that
[3]  it needed to be, ledge had to be removed, and there
[4]  was -- ledge removal was not part of the contract,
[5]  even though the amounts for paying for ledge removal
[6]  were stated in the contract.
[7]   Q.  The amounts paying for ledge removal were
[8]  indicated in which contract?
[9]   A.  In the general contractor's contract with
[10]  the Town. So in Standen's contract with the Town of
[11]  Shrewsbury, the excavation of ledge was -- I
[12]  couldn't charge $125 a cubic yard for trench ledge,
[13]  because in the general contractor's contract with
[14]  the Town, ledge was given a unit price, and their
[15]  price per unit was $75 a cubic yard.
[16]          Those figures were provided to me by CTM,
[17]  because I would have charged them $125 a cubic yard
[18]  for trench ledge. That's what the going rate was at
[19]  that point. However, in speaking with Jack Ferguson
[20]  and Jim Kokernak, they said there was a cap on the
[21]  amount that you could charge for open face ledge for
[22]  blasting and for trench ledge, and trench ledge was
[23]  capped at $75 a cubic yard.
[24]   Q.  Are the Proposed Change Orders 1 and 2 the

Page 142

[1]  potential change order work that was unresolved that
[2]  was reflected in the asterisk on the subcontract
[3]  hold agreement?
[4]   A.  That's possible, but they don't add up
[5]  exactly to what it should be, because that's 4820
[6]  something, and this is 5100, so that would have made
[7]  it 9928 something, and this is 9864. So I'm not
[8]  certain.
[9]          MR. HIPP: Can we mark that as the next
[10]  one, and go ahead and mark this as the one after it.
[11]          (Documents marked as Exhibits
[12]           81 and 82 for identification)
[13]   Q.  Directing your attention to Exhibit 82,
[14]  have you seen this document before?
[15]   A.  Yes, I have.
[16]   Q.  Is this a Proposed Change Order No. 3 from
[17]  Landworks?
[18]   A.  Yes, it is.
[19]   Q.  And what is this work for?
[20]   A.  This is work for bringing the domestic
[21]  water line and the fire protection water lines from
[22]  ten feet outside the building into the building.
[23]   Q.  And who requested that this work be done?
[24]   A.  Standen Contracting.

Page 143

[1]   Q.  And when was this work performed?
[2]   A.  This work was performed -- actually
[3]  performed? I would have to go back and check notes,
[4]  but it was done in spring, maybe early summer of
[5]  2004.
[6]   Q.  Was that work performed after the
[7]  ratification agreement was signed?
[8]   A.  Yes, it was.
[9]   Q.  Let me ask you, on Page 2 of Exhibit No.
[10]  82, it appears that it was directed to Bill Gambill
[11]  of Standen?
[12]   A.  Yes.
[13]   Q.  And what's the date there?
[14]   A.  December 4th, 2003.
[15]   Q.  And what's the -- was Change Order No. 3
[16]  originally offered or submitted to Standen?
[17]   A.  No. It was given to Standen as a proposal
[18]  for bringing the water lines from ten feet outside
[19]  the building into the building.
[20]   Q.  So after submitting the proposal to Standen
[21]  in December of 2003, you resubmitted it to Jackson
[22]  in April of 2004?
[23]   A.  That's correct.
[24]   Q.  Is this proposed change order reflected on

Page 144

[1]  the ratification agreement?
[2]   A.  I'm sorry, I was reading that. I'm sorry.
[3]   Q.  Is the $6,292 indicated on Change Order No.
[4]  3 reflected --
[5]   A.  I don't think so.
[6]   Q.  -- in this subcontract hold agreement?
[7]   A.  I don't think so. I'm not completely
[8]  certain, but I do not believe it is, no. This work
[9]  was done -- I would have to check. I would need to
[10]  check and see when this work was actually done.
[11]          That work may have been done, may have been
[12]  done, in the early winter of 2004, but I'm not
[13]  certain. I was thinking that was spring work, but
[14]  I'm not -- I'm not certain on that. I would have to
[15]  go back and check my logs to see.
[16]   Q.  Let me show you the next one. Do you
[17]  recognize that document?
[18]   A.  Yes.
[19]   Q.  What is that?
[20]   A.  That is for a catch basin to be installed
[21]  at the south center portion of the track in the
[22]  approximate area of where the old grandstand stood.
[23]   Q.  This is Proposed Change Order No. 4 from
[24]  Landworks?

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 145

[1] A. Yes.

[2] Q. And this was submitted to Jackson in April

[3] of 2004?

[4] A. Yes.

[5] Q. Who requested that this work be performed?

[6] A. By my note at the top of the page, it was

[7] requested by Katie Crockett at Lamoureux Pagano and

[8] Bob Cox of the Town.

[9] Q. And was this work performed?

[10] A. Yes, it was.

[11] Q. And do you recall when it was performed?

[12] A. In checking the slips on it, it was

[13] performed in August and September of 2004.

[14] Q. The proposed change order was submitted in

[15] April of 2004; is that correct?

[16] A. That's correct.

[17] Q. And work was performed in August and

[18] September of 2004?

[19] A. That's correct.

[20] Q. Did Jackson ever give you a change order

[21] for this work?

[22] A. No.

[23] Q. Why --

[24] A. Because the Town requested a change order

Page 146

[1] for installing the catch basin. The Town and

[2] Lamoureux Pagano requested a change order for the

[3] installation of a catch basin, and so I gave them a

[4] change order. And then they requested a detailed

[5] breakdown of the cost for the change order, and

[6] which I provided.

[7] And after doing so, they directed me to

[8] proceed on a time and materials basis, because they

[9] didn't like the cost of it, even though they felt

[10] that the prices were fair prices. They felt that

[11] they didn't want it to take as long. But it was a

[12] fairly deep manhole on the side of the embankment

[13] here that was not easily just going to be excavated.

[14] Also the reason for putting the catch basin

[15] in was because the 15-inch RCP line as it is shown

[16] right here was actually not 15-inch RCP, it was 15-

[17] inch corrugated metal which was being tied in

[18] together with a 12-inch RCP line, and somebody had

[19] just taken the two pipes and stuffed them together,

[20] which you could not do.

[21] So to make the connection between the new

[22] RCP pipe and the corrugated metal pipe, the only way

[23] to do that and get a proper fitting was to put a

[24] catch basin or a manhole there. But they had told

Page 147

[1] me -- directed me to do it on a T&M basis, and

[2] that's why the slips are connected.

[3] Q. Could I ask, on each of the four slips, is

[4] there a signature?

[5] A. Yes, there is.

[6] Q. And that signature verifies the time?

[7] A. Yes.

[8] Q. Whose signature is that?

[9] A. That is the clerk of the works. It is

[10] Robert, and I don't know how to pronounce his last

[11] name, but it's like, what it is, Lancioni or -- he's

[12] been identified as --

[13] Q. I believe it's Lanciani.

[14] A. Lanciani. Robert Lanciani was also known

[15] as Duffy, and that was the name that everyone called

[16] him, was Duffy. And so that's why I always have

[17] trouble remembering that, because he's just Duffy to

[18] me.

[19] Q. So was this -- so after the slips were

[20] signed, were they submitted to Jackson or submitted

[21] to the Town?

[22] A. They were submitted to Jackson to bill to

[23] Shrewsbury.

[24] Q. And when were they submitted to Jackson to

Page 148

[1] bill to Shrewsbury?

[2] A. I would have to go back and check, but it

[3] would have been probably the end of September.

[4] Q. And do you know how much was actually

[5] incurred by Jackson or was billed by Jackson on that

[6] T&M basis?

[7] A. I found out in November of 2004 that they

[8] hadn't billed for it yet, at that meeting, because I

[9] had it in a list of, you know, change order work,

[10] what I can put down as my change order work to them,

[11] and they still had not submitted it to the Town.

[12] And that's when I found that subsequently,

[13] that all these slip item works and change order

[14] works, anything that the Town had requested, that

[15] work that could have been billed to the Town, they

[16] had not processed it yet and billed it to the Town.

[17] So I don't know how much they billed to the

[18] Town eventually, or it if they -- I have seen an

[19] e-mail from Lovett Silverman subsequently that this

[20] item, I believe, is brought up in, if it's been

[21] billed

[22] Q. I think we're getting a little off track.

[23] I was asking how much Landworks billed for this

[24] work.

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 149

[1]    A. I would have to go back and look at the
[2]  final tally. I know it was 14,000-some-odd dollars,
[3]  but I don't think it was exactly $14,241.
[4]    Q. Was that submitted as part of a different
[5]  change order, other than Change Order No. 4?
[6]    A. I don't think so. I don't think so. I
[7]  think this was for accounting purposes was what --
[8]  for keeping everything in a sequence, this is what
[9]  was placed in. The amount of $14,241 was the amount
[10]  of the change order, and what I may have done was to
[11]  issue just a straight billing for this amount to
[12]  them. And I don't know, I would have to go back and
[13]  look through the file and see.
[14]    Q. So there would be -- so you don't recall if
[15]  you submitted an amended Change Order No. 4 to
[16]  Jackson or if you submitted some other document to
[17]  Jackson for this work?
[18]    A. No, I don't recall.
[19]       MR. HIPP: Can you mark that as the next
[20]  numbered exhibit, please.
[21]    A. And to be honest with you, $14,241 may have
[22]  been what was actually billed to them, because, as I
[23]  look at the breakdown of this, that might be
[24]  represented by what's on these slips, and I would

Page 150

[1]  have to go back and just check those slips against
[2]  this to see if that's what it is.
[3]       If that is what if is, if the slips
[4]  coincided with the amounts on the front of this,
[5]  then that would be the actual billing change order.
[6]       (Document marked as Exhibit 83
[7]       for identification)
[8]    Q. If this were the actual billing change
[9]  order that was submitted to Landworks to Jackson,
[10]  the date of it appears to be April 2004; is that
[11]  correct?
[12]    A. Yes.
[13]    Q. Which would be before the work was actually
[14]  performed?
[15]    A. Yes.
[16]    Q. So would that just be a typo, or would this
[17]  not have been what was submitted?
[18]    A. No. Whenever I have a document -- there
[19]  was a change order that was given to the Town on
[20]  April 11th, 2004, for the work to be performed.
[21]  Now, the work was performed at a subsequent later
[22]  date, but the original date of the change order was
[23]  from April 11th, 2004, and I do not change the date
[24]  of an item. I keep it in the same stream.

Page 151

[1]       If I have to go back in and -- if someone
[2]  requests that I delete a certain portion of it,
[3]  let's say the work hasn't been performed yet, and I
[4]  issue a change order for this amount of $14,241, and
[5]  they say take off the $5,000 whatever, pipe boot, I
[6]  would go back in and then make it $9,241.
[7]       I would keep the same date of the change
[8]  order, and because it's sequenced, the change order
[9]  in the file, as the date of April 11th, so then I
[10]  can pull it up, and then the numbers of which change
[11]  order it is stay in order.
[12]    Q. Okay. Just to be clear, the original
[13]  document that was submitted, would that have been a
[14]  proposal to the Town, or would that have been a
[15]  proposed change order to Jackson?
[16]    A. That would have been a proposed change
[17]  order to Jackson for the Town to approve.
[18]       (Document marked as Exhibit 84
[19]       for identification)
[20]    Q. Do you recognize -- let me make sure I just
[21]  handed everyone the right thing. What is that
[22]  document that you are holding?
[23]    A. A change order for demolition of courtyard
[24]  debris.

Page 152

[1]    Q. And it's Proposed Change Order No. 8?
[2]    A. 8.
[3]    Q. And who requested this work?
[4]    A. It was requested by Katie Crockett of
[5]  Lamoureux Pagano and Bob Cox of the Town of
[6]  Shrewsbury.
[7]    Q. How was that request made by the Town? Was
[8]  it made directly to you on behalf of Landworks, or
[9]  how did that work?
[10]    A. No. It was -- I don't know specifically
[11]  about this one. I have a vague recollection of in a
[12]  meeting, the courtyard, there was various shrubbery
[13]  that was still left in the courtyard, and there was
[14]  some timber. I don't know what you would call it.
[15]  It's like a timber border. And there were some
[16]  other debris inside the courtyard. And they
[17]  requested, through Jackson, to have me give a price
[18]  for removal of that debris.
[19]       So I would put it into a form like this.
[20]  Or if it was an amount this small, I might just say
[21]  to them, "It would be approximately $2150," and they
[22]  would say, "That's fine. I want to get the work
[23]  done." And then I would place it into a format of
[24]  $2150 on a change order and issue it to Jackson.

Case 4:05-cv-40072-FDS   Document 77-3   Filed 04/18/2007   Page 12 of 30

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 153

[1]  Q. Do you have any written record of approval
[2]  for this work?
[3]  A. I think that the -- a lot of this work was
[4]  noted in the job notes from -- the meeting notes
[5]  from the job site. It would be like Lamoureux
[6]  Pagano's copious notes that they took during job
[7]  meetings. And then I would have to go back and
[8]  check to see if there was a proposal given to them
[9]  that was accepted.
[10]     MR. HIPP: Could you mark this as the next
[11] exhibit.
[12]             (Document marked as Exhibit 85
[13]          for identification)
[14]  Q. Do you recognize that document?
[15]  A. Yes, I do.
[16]  Q. And what is that?
[17]  A. That is a Change Order 9, given to Jackson
[18] Construction on July 20th, 2004. It contains slips
[19] attached to it.
[20]  Q. The slips that are attached to Proposed
[21] Change Order No. 9 are dated between April 2004 and
[22] July 2004; is that correct?
[23]  A. Yes.
[24]  Q. And the date of Change Order No. 9 is July

Page 154

[1]  2004?
[2]  A. That's correct.
[3]  Q. Who requested that this work be done?
[4]  A. (Reviewing document) Richard McGuinness
[5]  and Frank Leonardo of Jackson Construction Company.
[6]  Q. They requested that you perform these
[7]  various tasks on a T&M basis?
[8]  A. Yes.
[9]             (Document marked as Exhibit 86
[10]          for identification)
[11]  Q. Do you recognize Exhibit 86 as Proposed
[12] Change Order No. 10?
[13]  A. Yes.
[14]  Q. And what is this change order for?
[15]  A. This change order was for the premium for
[16] overtime that was requested by Paul Bordileri -- is
[17] that how you pronounce his name?
[18]  Q. Bordieri, I believe
[19]  A. -- Bordieri of Jackson Construction, who
[20] came to the site, had a big meeting with the school,
[21] and decided that we all just needed to work more.
[22] And so he had a meeting with all the subcontractors,
[23] and he authorized overtime work to be used to try to
[24] advance the schedule more.

Page 155

[1]  Q. Do you know Paul Bordieri, Sr., as opposed
[2]  to Paul Bordieri, Jr.?
[3]  A. I didn't know that there were two of them.
[4]  This was the short, squat one.
[5]  Q. Is this an older gentleman or a younger
[6]  gentleman? How old is the Paul Bordieri you're
[7]  referring to?
[8]  A. Relatively speaking, I think he was
[9]  about -- I don't know, he looked like he may have
[10] been 55 or so. Which one weighs 250 pounds?
[11]             (Discussion off the record)
[12]  A. I was not aware that there was a junior or
[13] a senior. The person introduced himself as Paul
[14] Bordieri, and I'm sorry that I cannot pronounce that
[15] better. I can describe him for you, if you would
[16] like.
[17]  Q. Do you know the job title or position of
[18] Paul Bordieri with respect to Jackson Construction
[19] Company?
[20]  A. It was told to me by Frank Leonardo,
[21] Richard McGuinness, Jack Ferguson and Duffy that he
[22] was the owner of Jackson Construction.
[23]  Q. I would relate to you that the person that
[24] you are describing is most likely Paul Bordieri, Sr.

Page 156

[1]  A. Okay.
[2]  Q. So is it your testimony that Paul Bordieri,
[3]  Sr., the owner of Jackson Construction Company,
[4]  requested specifically that Landworks perform
[5]  overtime work in August of 2004?
[6]  A. Not only requested it from Landworks, but
[7]  requested it from most every subcontractor that was
[8]  on the job site, to put in overtime.
[9]  Q. And what work was performed at this
[10] overtime rate?
[11]  A. A lot of it that I can recall was the
[12] installation of the water line from -- what is
[13] that -- from, like, Sherwood Avenue. I believe it
[14] was the removal of the old water line, the capping
[15] of the old water lines, and then for the preparation
[16] of paving, for paving that they wanted to have done
[17] in August. That was the big push, was for paving in
[18] August.
[19]  Q. And attached to Change Order No. 10 appears
[20] to be payroll summaries for particular employees of
[21] Landworks?
[22]  A. That's correct.
[23]  Q. Is there a John April employed by
[24] Landworks?

Case 4:05-cv-40072-FDS   Document 77-3   Filed 04/18/2007   Page 13 of 30

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 157

[1]   A. Yes, there is.
[2]   Q. And Michael Mirto?
[3]   A. At that time, yes.
[4]   Q. A Raymond Verdelotti?
[5]   A. Yes.
[6]   Q. And a Steve Kelly?
[7]   A. At that time, yes.
[8]   Q. So the specific request by Paul Bordieri
[9]   was that Landworks' four employees work overtime.
[10]  Would that have meant to work weekends, to work
[11]  longer than eight-hour days, or how was that to be
[12]  done?
[13]  A. He did not specify that it would be done in
[14]  any certain way. He just requested that we start
[15]  putting in overtime hours on a job that -- as you
[16]  probably are well aware, any job that is done for a
[17]  municipality is prevailing wage, and most
[18]  contractors generally like to keep the overtime
[19]  rates down, or it runs into an extremely large
[20]  amount of money going out.
[21]       It was my policy that we would work 40
[22]  hours a week on this job and any other prevailing
[23]  wage job that I have ever done. That's my policy,
[24]  unless the contractor or the owner requested

Page 158

[1]   overtime work to be done, which, normal business
[2]   practice, then you would charge a premium for the
[3]   overtime.
[4]            (Document marked as Exhibit 87
[5]             for identification)
[6]   Q. Do you recognize that document as Proposed
[7]   Change Order No. 11?
[8]   A. Yes.
[9]   Q. And what was this work for?
[10]  A. Part of it was for cleaning up of trash
[11]  behind the building. Part of it is for the repair
[12]  of the irrigation head that a vehicle had driven
[13]  over and repairing the ruts in the field. And part
[14]  of it was for replacement of a hydrant head and the
[15]  moving of -- removing of transformers for the Town,
[16]  and to replace a gate box in front of the school.
[17]  Q. Who requested that this work be performed
[18]  by Landworks?
[19]  A. It was requested by Rich McGuinness and/or
[20]  Frank Leonardo.
[21]  Q. Is that your handwriting on the first page?
[22]  A. Yes, it is.
[23]  Q. What is meant by your handwritten note on
[24]  the first page?

Page 159

[1]   A. Oh, Slip 1104, after the November meeting,
[2]   they wanted a breakdown of the costs for the gate
[3]   box risers, for the replacement of the buried gate
[4]   valve, and for the -- and the time that it cost to
[5]   put it in, for information of what to bill back to
[6]   the Town of Shrewsbury. Richard McGuinness had
[7]   requested that.
[8]   Q. Sorry. Just to understand, the Slip 1104
[9]   was for a total of $2150?
[10]  A. Yes.
[11]  Q. And why was only $464 charged to the Town?
[12]  A. $464 was chargeable to the Town because
[13]  they had requested that the gate box for that
[14]  hydrant -- for it to be raised. It was broken, and
[15]  they requested that it be raised up.
[16]  Q. On that one, the first one, "Replace broken
[17]  portion of hydrant head"?
[18]  A. Yes.
[19]  Q. Who had broken that?
[20]  A. That was done by the rigging contractor.
[21]  Q. Is this the fire hydrant that you were
[22]  testifying before that --
[23]  A. (Nods head)
[24]  Q. -- I think before you said it was the

Page 160

[1]   drywall contractor?
[2]   A. Yes. I was mistaken. It was the rigging
[3]   contractor.
[4]   Q. I believe you testified earlier this was a
[5]   hydrant that Landworks had driven over during the
[6]   snow?
[7]   A. Yes.
[8]   Q. But then was later broken by another
[9]   contractor?
[10]  A. Yes. The nipple was broken off the side of
[11]  the hydrant. And the reason I said rigging -- or
[12]  drywall contractor was because they use the same
[13]  type of boom trucks to load in what they were
[14]  loading in.
[15]  Q. That's fine. I'm just trying to make
[16]  sure --
[17]  A. But it was the rigging contractor, as I've
[18]  noted it here.
[19]  Q. Landworks doesn't accept any responsibility
[20]  for the hydrant?
[21]  A. No. This hydrant was actually leaning, and
[22]  so the straightening of the hydrant, I felt, we had
[23]  caused by driving over the top of it.
[24]       So we straightened the hydrant, but the

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 161

[1] hydrant was also a hydrant that was fed by a water
[2] line that was approximately -- I think it was a
[3] little over 9 1/2 feet down in the ground.
[4]     So the whole back side of the hill where it
[5] was placed at had to be excavated out. It's this
[6] hydrant right here, and it slopes off like this
[7] (indicating). So to remove it, straighten it, and
[8] place it back up, we did that on our own charge.
[9] The replacement of the head for the hydrant, though,
[10] I back charged to -- or I charged to Jackson for
[11] them to back charge to whoever the rigging
[12] contractor was.
[13]     Q.  And on Slip No. 1048, there's a reference
[14] by Mr. Leonardo to back charge to SMI?
[15]     A.  Yes, that's correct.
[16]     Q.  Do you know anything about that, why this
[17] was going to be back charged to SMI?
[18]     A.  Because they had driven a vehicle out onto
[19] the baseball field, and they had driven over the top
[20] of an irrigation head and broken it.
[21]     Q.  Do you know who "SMI" refers to?
[22]     A.  I can't recall at this time. If I think
[23] about it for a while, I'll probably be able to
[24] recall, but I can't think of it.

Page 162

[1]     MR. MELTZER:  Off the record.
[2]     (Discussion off the record)
[3]         (Document marked as Exhibit 88
[4]         for identification)
[5]     Q.  Do you recognize the next document that
[6] I've shown you?
[7]     A.  Yes, I do.
[8]     Q.  And is that Proposed Change Order No. 12?
[9]     A.  Yes, it is.
[10]     Q.  And what is -- first, who requested this
[11] work be performed?
[12]     A.  Bob Cox. This was done at a meeting -- I'm
[13] not certain of the exact date of the meeting, but we
[14] were discussing the hydrant at this portion of the
[15] building, which is adjacent to the shop and adjacent
[16] to the new service road.
[17]     The configuration of the water line, where
[18] the existing old water line comes under the building
[19] and then makes a 90 degree turn and connects into
[20] the line that is feeding this hydrant, wasn't
[21] exactly correct. And there was an old valve box
[22] manhole there and another valve still in line on
[23] this abandoned portion of the pipe.
[24]     So right here where it states to cut and

Page 163

[1] cap the existing water line, there was an old
[2] manhole and one old main line valve and then one
[3] two-inch, and it would only be an assumption, but it
[4] was a two-inch tap that was faced towards the
[5] athletic fields that I was assuming that was a
[6] portion of the irrigation, and he had requested that
[7] we remove all of that apparatus and not leave it
[8] buried underground. And when we were excavating to
[9] cap this water line is when we discovered that.
[10]     Q.  So this was a proposed change order
[11] submitted to Jackson. Is there any -- are there any
[12] slips or any other documentation to demonstration
[13] that this work was performed,
[14]     A.  No, except for the clerk of the works
[15] watched us perform the work, as he would on most of
[16] the water line connections. The clerk of the works
[17] would actually visually look at it, inspect it, and
[18] give us the okay as to whether or not we could
[19] backfill it or not.
[20]     Q.  Back on Exhibit 83, there were slips that
[21] were signed by the clerk of the works?
[22]     A.  Yes.
[23]     Q.  But Mr. Lanciani didn't sign any slips for
[24] this work?

Page 164

[1]     A.  No, because they had requested that I
[2] perform the work on Change Order No. 4 as a time and
[3] material basis, and so every day I needed someone to
[4] verify that we had worked for that amount of time
[5] and used that amount of material for it, and so I
[6] would have him sign a slip, since it was a T&M.
[7]     This work I had just given them a flat
[8] price of $3,000, we would take out all the valving
[9] and the manhole and get rid of it for $3,000, and
[10] they said to go ahead with it. So I would just
[11] issue -- if it was time and material, then it would
[12] be accompanied by slips that would be signed. And
[13] if it was just an item that they had taken a price
[14] on, then I would just issue a change order for it.
[15]     Q.  Do you have a written approval from the
[16] Town for this work?
[17]     A.  I don't know. I don't know if I -- because
[18] all of this work was being done in the same time
[19] frame that they were trying to get everything paid,
[20] and they wanted to get it done quickly, which was
[21] probably stupidity on my part not to cover myself,
[22] but this was also a work that was requested be done
[23] in a job meeting. And unless it is -- unless it is
[24] noted right there in the job meeting notes, I do

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 165

[1] not, I don't believe, have something that signs or
[2] authorizes the work.
[3]    Q. If there was a request made for this work
[4] at a job meeting, would you have been able to quote
[5] a price immediately?
[6]    A. For something this small, yes, because it
[7] was pretty straightforward of how much time it would
[8] take to remove it. If it was something that called
[9] for installation of materials, then I would have to
[10] wait, and generally what I would do is issue a
[11] proposal for it, because I would have to call and
[12] get quotations for materials.
[13]       MR. HIPP: Let's go to the next one.
[14]       (Discussion off the record)
[15]       (Document marked as Exhibit 89
[16]       for identification)
[17]       (Brief recess)
[18] BY MR. HIPP:
[19]    Q. So in front of you is a document that
[20] appears to be Landworks Change Order -- Proposed
[21] Change Order No. 13; is that correct?
[22]    A. Yes, that's correct.
[23]    Q. And what is this work for?
[24]    A. This work was to change the configuration

Page 167

[1] about -- the handicap ramps were supposed to run
[2] directly adjacent to Oak Street. They were going to
[3] come off of the one side of the entryway and then --
[4] or both sides of the entryway is where the handicap
[5] ramps should have been, which would have been
[6] parallel to Oak Street.
[7]       Because the elevation of the sidewalk was
[8] so much higher than the street, then they could not
[9] transition the handicap ramp down into the -- to
[10] give it the proper slope going into the entryway.
[11] To do so, they would have had to remove the granite
[12] curbing along Oak Street, and they would have to
[13] have moved it back like 30 feet on each side so that
[14] they could gradually slope the sidewalks down until
[15] they met the requirement for ADA.
[16]       And the only reason on this portion they
[17] decided that it was necessary, instead of ignoring
[18] the ADA rule beside a thoroughfare, was that it
[19] would have been an 18-inch dropoff, so that each
[20] ramp would be like a 3-to-1 slope, which they
[21] considered dangerous.
[22]       To alleviate that, what they decided to do
[23] was to move the handicap ramps from directly
[24] adjacent of Oak Street to approximately ten feet

Page 166

[1] of the concrete accessible curbs and ramps that are
[2] shown on Drawing L 1.5 at the front entrance of the
[3] school. There was not enough room to allow these
[4] handicap ramps to slope down evenly, running
[5] parallel to Oak Street.
[6]       So the architect, along with Jackson
[7] Construction, decided that they would curve the
[8] asphalt berm into the site, and that they would make
[9] the handicap ramps approximately 10, 15 feet in on
[10] the site, running from one island to the other,
[11] instead of as shown on the plan.
[12]    Q. And who requested that this work be
[13] performed?
[14]    A. Lamoureux Pagano and Richard McGuinness --
[15] I'm sorry, Mr. Pagano, I can't think of his first
[16] name right now, of Lamoureux Pagano and Richard
[17] McGuinness of Jackson Construction.
[18]    Q. The concrete ramps referred to in Change
[19] Order 13, the concrete handicap ramps, are those
[20] different than the handicap ramps that were
[21] discussed earlier with the incorrect slope?
[22]    A. No. They were the same ramps, but this
[23] change order isn't speaking about the ramps that
[24] were installed. This change order is talking

Page 168

[1] inside the site, where there were two islands, and
[2] to have the walkways in here where the transitional
[3] grade was only six inches higher.
[4]       And at that time, to do that, then they
[5] would have had to have added bituminous berm here
[6] and bituminous berm here at the entranceway to this
[7] one and also the same thing at the lower entryway.
[8] And that was the cost associated with Change Order
[9] No. 13, was the addition of the bituminous berm in
[10] those areas.
[11]    Q. Okay. And is there any written approval or
[12] documentation that this work was performed?
[13]    A. I don't know, because it was directed to
[14] Jackson Construction, who then directed me to put
[15] together a change order form.
[16]    Q. I recalled you saying that Michael Pagano
[17] of the architect requested that you perform this
[18] work?
[19]    A. He didn't request that I perform this work.
[20] He requested the work to be performed, Michael
[21] Pagano, and then Richard McGuinness requested it.
[22]    Q. Did they --
[23]    A. On a walk-through up at the site, Mike
[24] Pagano told Rich McGuinness how he wanted to correct

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Page 169

[1] the problem here.
[2]     Q. Were you there at that discussion?
[3]     A. I was there, but I was not part of the
[4] discussion of how to correct that.
[5]     Q. But you heard --
[6]     A. I heard them discussing that, along with
[7] Frank Leonardo, and about the issue of the handicap
[8] ramps at the front of the site.
[9]         He then also said, "Are there any other
[10] costs associated with it?", from what best I can
[11] remember during that walk-through. And I told him
[12] then that we would have to add bituminous berm
[13] through here.
[14]        So he turned to Rich, because there was
[15] always a big problem with the architect talking to
[16] the subcontractor. We were admonished any time that
[17] we would make direct contact with them. So they
[18] would have to speak with a representative of
[19] Jackson, who would have to request it from me.
[20]        MS. BROWN: Can I take it from here?
[21]        MR. HIPP: Sure.
[22]        MS. BROWN: I just have a few more follow-
[23] up questions, and I have a question about what you
[24] just said.

Page 170

[1]           REDIRECT EXAMINATION
[2] BY MS. BROWN:
[3]     Q. Who was it who told you you couldn't have
[4] any direct contact with whom?
[5]     A. Both Richard McGuinness and Bob Barton had
[6] told many subcontractors on many different occasions
[7] that we were not to speak with representatives of
[8] the Town of Shrewsbury or with the architects
[9] without a representative of Jackson Construction
[10] present.
[11]    Q. And did you think that was appropriate?
[12]        MR. MELTZER: Objection.
[13]    Q. That's a good word.
[14]    A. How about silly?
[15]    Q. Did you have an objection to that?
[16]    A. No. I really didn't have an objection to
[17] that. I thought it was something silly. I thought
[18] it caused a drawing out of the process, that
[19] everything that was being done on the job could have
[20] been done much quicker if they would -- if you did
[21] not have to follow silly protocols.
[22]    Q. But other than it being silly, you didn't
[23] think it was wrong or unfair?
[24]        MR. MELTZER: Objection.

Page 171

[1]     A. The only instances that I can think of that
[2] I thought it was unfair was that -- I understood
[3] that they wished that all direction to the
[4] subcontractors was to be made through them. And
[5] when I say "them," I mean Jackson Construction. And
[6] I understood that.
[7]         I thought that there were two occasions
[8] that I can remember where subcontractors were
[9] requested to go to the job site meetings. And on
[10] both occasions, we were let known beforehand that we
[11] were to answer questions that were directed to us,
[12] but we were not to bring up grievances that we may
[13] have.
[14]    Q. And where were you to bring up grievances?
[15]    A. We were to bring up grievances with Jackson
[16] themselves.
[17]    Q. I had a question about some terminology
[18] that we referred to at Exhibit 87, and that was back
[19] charging, and there was a back charge to SMI that
[20] was identified on Page 3 of Exhibit 87?
[21]    A. Yes.
[22]    Q. Can you tell me what it means to back
[23] charge a subcontractor.
[24]        MR. MELTZER: Objection.

Page 172

[1]     A. I can only tell you what I believe it is.
[2]     Q. That's my question, what you believe it is.
[3]     A. To back charge a subcontractor would be to
[4] back charge them for incomplete work or damaged work
[5] that they had not corrected themselves.
[6]     Q. And what does it mean to back charge?
[7]     A. It means to present them with a bill for
[8] work they had done to correct whatever.
[9]     Q. It means to present them with a bill, or it
[10] means to --
[11]    A. If you're going to -- I'm sorry. I didn't
[12] mean to interrupt you.
[13]    Q. Maybe you can just explain, in a given
[14] circumstance, what it would mean to back charge.
[15]        MR. MELTZER: Objection.
[16]    Q. Does it mean to say the amount that you
[17] claim you're due, you, subcontractor, is going to be
[18] reduced by X amount as a back charge because of
[19] defects in the work? Does it mean that? I'm not
[20] trying to put words in your mouth, but I would like
[21] to know what it means, in your own words, what it
[22] means for a subcontractor to be back charged on a
[23] job.
[24]    A. I think it can mean several things.

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 173

[1]  Q. Okay.
[2]  A. In this instance, on this slip, No. 1048,
[3]  SMI, according to the language of Frank Leonardo,
[4]  was going to be back charged for the cost of
[5]  repairing an irrigation head that they had driven
[6]  over and broken. They had caused damage, and they
[7]  had, I guess, no means of fixing that damage, and I
[8]  did.
[9]        Whereas I had damaged the bricks on the
[10] side of a building, and instead of allowing someone
[11] to randomly back charge me for that, I took the
[12] mason that was working on the job site, and I paid
[13] him to fix the work, and then asked the contractor,
[14] Jackson, to approve that the fix was made.
[15]  Q. Can you think of any other examples of back
[16] charging?
[17]  A. For incomplete work that may not have been
[18] done.
[19]  Q. And have you ever heard the word "bang"
[20] used as slang for a back charge?
[21]       MR. MELTZER: Objection.
[22]  A. I don't think I've heard the word -- I have
[23] heard the term "bang" used with respect to squeezing
[24] someone, in that if you're going to bang a supplier,

Page 175

[1]  at some time that they were going to have to try to
[2]  recuperate costs as best they could to drive the
[3]  overall cost of the project down, because they were
[4]  definitely going to run over any of the projections
[5]  that they had.
[6]        With respect to myself, my feeling is that
[7]  if they did not have to pay the $135,000 to me to
[8]  get me back on the site, and if they could then
[9]  bring in another site contractor, which they would
[10] not have to initially pay to remobilize for the
[11] site, then they could get this work done, and they
[12] could at that time use the $135,000 and put it
[13] toward the work that was being done by the
[14] contractor.
[15]  Q. When you say "they," it was USF&G that you
[16] contend owed you that money, right?
[17]  A. That's correct.
[18]  Q. Not Lovett Silverman?
[19]  A. That's correct.
[20]  Q. Now, what facts do you have to back up this
[21] belief?
[22]  A. Communications between individuals that
[23] work for Lovett Silverman, the e-mail that basically
[24] states banging the subcontractors.

Page 174

[1]  that basically you've got their materials on site,
[2]  and then you're going to, after doing so, you're
[3]  going to bang them down to reduce their price to
[4]  you, give you a better price.
[5]        And I've heard it used to say, "I'm going
[6]  to bang this person that's doing this work for me,"
[7]  and try to extract more from them than what was
[8]  maybe the original intentions of getting from them,
[9]  I don't know if that's clear enough for you, but
[10] that's my understanding of it.
[11]  Q. When I was questioning you earlier, I was
[12] asking you about what you believed Lovett Silverman
[13] had done wrong on this project, and we talked about
[14] different ways of characterizing what they had done.
[15] And I want to ask you, do you believe that Lovett
[16] Silverman engaged in a bang of Landworks?
[17]  A. Yes.
[18]  Q. And you how would you describe that?
[19]  A. I believe that there was a realization
[20] sometime on this job that it was not going well and
[21] that it was not going to go well and that there
[22] needed to be savings made wherever it could be made.
[23]       This is my feeling now, my interpretation
[24] of things, and that there was a determination made

Page 176

[1]  Q. What else in addition to that e-mail?
[2]  A. There were other e-mails, and I would have
[3]  to go back through all of the e-mails, because there
[4]  was a tremendous amount of e-mail traffic in which
[5]  they speak about certain trades or certain people
[6]  who did this work.
[7]        The handicap ramps, for example, concrete
[8]  ramps, that was attributed to me. That was another
[9]  item added to, say, my account that was going to be
[10] deducted from me or taken back from me that would be
[11] added back to the overall account of the job.
[12]  Q. Is that part of your allegation that Lovett
[13] Silverman behaved improperly in connection with the
[14] counterclaim? Does that go to that?
[15]  A. I think that it's an overall pattern. It
[16] doesn't necessarily have to be to the counterclaim.
[17]  Q. Because we went over this probably three or
[18] four or five times this morning and early this
[19] afternoon, trying to get the entire scope of the
[20] facts that you believe demonstrate that my client
[21] did something wrong with regard to you.
[22]       And we're closing up for the day, and I
[23] just wanted to swing back one more time and make
[24] sure we had covered everything. If there is

**Landworks Creations, LLC v.**
**United States Fidelity and Guaranty Company, et al.**

Neal H. Matthews, Vol. 1
February 13, 2007

Page 177

[1] anything else you thought of -- we can ask again on
[2] Friday when we finish up, but I want to make sure I
[3] understand.
[4]      A.   I mean, I may have a more clear
[5] recollection on Friday, because we have sort of
[6] switched gears from Lovett Silverman and what I felt
[7] they were doing on the job, and then to more along
[8] my billing line.  And so my mind is now focused
[9] through that.  So now I would have to go back into
[10] it and think it over again.
[11]      Q.   But nothing else comes to mind?
[12]      A.   Nothing else comes to mind right now.
[13]           MS. BROWN:  Okay.  I wanted to just state
[14] on the record something that I think counsel all
[15] discussed in advance, but since we're closing, that
[16] Mr. Matthews is here today as the 30(b)(6)
[17] representative of Landworks, and he is also
[18] testifying individually.  Is that correct, Mr.
[19] Meltzer?
[20]           MR. MELTZER:  That's correct.
[21]           MR. HIPP:  Yes.
[22]           MS. BROWN:  Anything else?  (No response)
[23] Then this deposition is suspended until Friday at
[24] noon in Mr. Meltzer's office.

Page 178

[1]           MR. MELTZER:  Thank you.
[2]           MS. BROWN:  Thank you so much for your time
[3] today.
[4]           THE WITNESS:  Thank you.
[5]           (Whereupon the deposition was
[6]           suspended at 5:04 p.m.)

Page 179

[1]                    C E R T I F I C A T E
[2]      I, NEAL H. MATTHEWS, do hereby certify that I
[3] have read the foregoing transcript of my testimony,
[4] and further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]      Dated at _____, this ____ day of _____,
[9] 2007.
[10]
[11]
[12]                         _____
[13]

Page 180

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                 )
[3]      I, Carol H. Kusinitz, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, hereby certify that
[6] there came before me on the 13th day of February,
[7] 2007, at 10:20 a.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]      I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]      In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this ___ day of
[21] February, 2007.
[22]                         _____
[23]                              Notary Public
[24]                         My commission expires  6/7/13

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. I
February 13, 2007

**$**

$1 101:19
$125 141:12,17
$135,000 175:7,12
$14,241 149:3,9,21;151:4
$177,614.60 125:11
$200,000 101:19
$2150 152:21,24;159:9
$225,000 17:17
$250,000 17:17
$254,718 125:16;126:11
$254,718.53 125:23;
127:17;131:11
$286,900 131:18
$3,000 164:8,9
$303,535 131:9;132:22;
135:20
$307,814 136:6
$312,969 136:10
$32,166.27 127:13;
131:14
$354,488 136:14
$4,279 136:3
$4,500 133:18
$4,828.73 138:4
$41,519 136:13
$464 159:11,12
$5,000 139:14;151:5
$5,155 136:9
$6,292 144:3
$73,221 126:23
$75 141:15,23
$80,000 69:6
$800,000 101:17,23
$824,823 126:17
$824,823.00 123:9
$828,000 101:15;118:13
$89,000 69:23
$898,044 127:8
$9,241 151:6
$9,864 125:18;127:3,6;
133:2,21;138:11;139:11

**0**

01 138:20
02060 19:24
02100 21:23
02200 22:17
02511 22:23
02710 24:1
03 50:17,20
04 138:21

**1**

1 26:22,22;35:3;36:5;50:9;
54:13,15;85:21;126:15;
135:7,19;136:2;141:24
1.1 29:2
1.2 30:20

1.3 30:7
1.5 166:2
1/2 161:3
10 12:22;34:8;47:19;
130:15,19;154:12;156:19;
166:9
100 46:12
1026 137:9
1048 161:13;173:2
10-inch 17:12
11 119:9;120:16;158:7
1104 159:1,8
11th 76:11;150:20,23;
151:9
12 46:11,16;162:8
12,000- 69:23
12-inch 146:18
12th 9:19;34:6,10;130:20
13 165:21;166:19;168:9
14 47:3;119:9;120:16
14,000-some-odd 149:2
15 166:9
15- 146:16
15-inch 146:15,16
15th 15:8;27:14;36:21;
76:11
17 50:17,20
17th 75:5,6
185 58:3,7
18-inch 167:19
19 44:16
1978 8:22
1979 8:23
1983 8:23;9:7,8
1984 9:9,10,12;10:3
1987 10:19,22
1988 10:22
1989 9:13,14;11:1,4
1990 9:18
1992 9:19;11:21,23;12:13
1997 12:14,19
19th 59:17;86:13;98:1
1st 68:24;70:5;72:5

**2**

2 19:21;23:22;35:2;48:4;
54:19;56:8;126:22;129:12;
134:9;135:3,11;136:8;
141:24;143:9
20 106:2
2003 14:24;18:4;33:15;
34:9;123:24;124:5,9;
126:5;128:22;133:5;138:1;
143:14,21
2004 34:6,10,15;36:21;
42:11,19,22;44:17;54:3,7,
16;56:23;57:14;59:17,23;
63:10,12,18;67:12;68:9,
12;124:18;125:12;127:8,
21;128:15,24;129:2;
130:20;132:6;138:1,9,13,
23;143:5,22;144:12;145:3,

13,15,18;148:7;150:10,20,
23;153:18,21,22;154:1;
156:5
2005 74:20,21;75:2,3,3,7;
100:9;101:3;107:4;109:14
2006 100:21;101:4;109:14
20th 153:18
23rd 98:18;124:18
24th 59:23
250 155:10
26 48:4,7,9;57:14
26th 54:3,7
27 48:13,15
27th 56:23
28 123:24;124:4
28th 18:4

**3**

3 23:12,14,16,17,18,18;
45:20,23;51:7;55:10;56:5;
131:6;135:15;136:12;
142:16;143:15;144:4;
171:20
30 7:19,21;48:4;49:2,5;
50:19;74:4;129:23;167:13
30b6 177:16
30th 54:16;139:5
32 48:4;49:19,22;50:16
34 115:22
39 135:17
3-to-1 167:20

**4**

4 26:22;45:8,17,22;53:5;
55:17,20;119:20;144:23;
149:5,15;164:2
4.9 60:15
40 51:19,22;157:21
400-meter 49:7
400-yard 49:6
43 51:19;52:16
440- 49:7
4820 142:5
492 46:3
4th 143:14

**5**

5 26:23;45:20,23;53:5,9;
60:14;131:6;135:24
5:04 178:6
5100 142:6
55 155:10
59 53:11,17

**6**

6 116:16;117:1,22,23;
118:9;121:8;122:15;124:7
66 6:3;16:6;17:22;24:17;
120:24;121:1;123:6,7,23;

126:20
67 6:3;33:21;130:10
68 28:20,23
69 35:16,21,21
6th 138:13

**7**

7 18:2;46:1
7/26 53:21
70 36:17,20;38:1
71 44:12,17
72 53:21,22;54:1;57:7
73 56:19,22
74 59:10,13
75 85:16,17;86:9
75-foot 41:17
76 117:12;119:2
77 117:17,21;119:3
78 122:10;123:14
79 134:12,15
7th 67:11

**8**

8 18:1;118:1,7;152:1,2
80 139:17
800 101:22
81 142:12
82 142:12,13;143:10
820-some-odd 118:17
83 150:6;163:20
84 151:18
85 153:12
86 154:9,11
87 158:4;171:18,20
870-some 101:21
88 162:3
89 165:15
8th 70:10

**9**

9 116:16;117:1,22,23;
118:9;153:17,21,24;161:3
90 12:20;162:19
91 56:10
911 64:24
9864 142:7
9928 142:7

**A**

A-1 9:9
abandoned 162:23
able 66:22;80:2;92:22;
161:23;165:4
absolutely 83:16;132:16
accept 160:19
acceptance 129:23
accepted 126:8;127:23;
129:5;153:9
accessible 166:1

accommodate 8:15
accompanied 164:12
according 132:23;173:3
account 132:15;176:9,11
accounting 149:7
accurate 52:19;53:2;
131:18,19
accurately 129:14;130:2
acknowledgement
25:12
across 46:24;48:21
acted 112:13
action 52:4;54:18;55:16,
20;56:11;57:20;61:6
actions 74:10;86:21
actively 106:23;107:3
Acton 11:24
actual 32:15;38:14;51:5;
120:3;150:5,8
actually 20:22,21;18;
23:6;25:10;45:20;49:9;
50:3;60:20;63:22;69:20;
70:17;71:20;73:9;80:2;
89:13;107:22;120:13;
140:18;143:2;144:10;
146:16;148:4;149:22;
150:13;160:21;163:17
Actually 71:4;85:19;
96:15;137:9
ADA 43:4,19,20;44:7,8;
60:17,21;61:18;167:15,18
add 32:4;37:20;59:4;
105:6;132:19;134:3;142:4;
169:12
added 17:14;38:11;58:16;
59:1;95:16;104:24;132:3,
4,5,9,10,17;133:1,2,20;
136:12;168:5;176:9,11
addendum 73:9
Addendum 23:17,18
addendums 23:20;
26:21;27:1
adding 38:7
addition 8:1;13:15;24:6;
27:23;32:8;105:1;126:4;
133:6;168:9;176:1
additional 24:5;27:8;
37:18;38:11;39:15;64:15;
67:10,14;69:4;125:17;
127:3;133:21;136:12
additions 24:9,10,11,15,
21;25:10;121:18;122:3;
126:13;129:5
address 44:24;79:4,5,9
addressed 47:2,17;48:6
adjacent 30:12,12;31:8;
46:13;47:4;48:19;49:15;
55:21;60:12,18,22;66:14;
103:5;104:10;162:15,15;
167:2,24
adjusted 127:7
administrative 46:13
admixture 39:22;59:1

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

admonished 169:16
advance 154:24;177:15
adversarial 87:10,11
aerated 55:4
aeration 55:9
afternoon 114:23;176:19
AFTERNOON 63:1
again 58:4;60:3;66:21;
68:15;116:7;133:24;
135:13;177:1,10
Again 51:7
against 81:5,19;82:2;
84:8;101:1,1,22;102:4;
103:12;105:4,17;106:6;
111:2;112:2,12,19,21;
116:18;117:3,24;118:5;
120:20;130:2;150:1
agree 19:11;35:3;36:6;
60:5;62:5
agreed 18:8;22:11;28:23;
36:21;69:11
agreement 34:21;38:20;
77:12;78:5;96:17,22;97:5,
14;122:22,23;123:15,17,
18,19,19,20,21,21;124:14,
17;125:6;126:16;127:12;
129:3,9,22;130:5,6;131:8,
10;133:1;138:9;24:142:3;
143:7;144:1,6
agreements 77:9,14
agricultural 8:24
ahead 25:22;117:10;
142:10;164:10
ahold 68:10
allegation 176:12
alleviate 167:22
allow 166:3
allowable 60:14;61:17
allowed 20:6;56:14
allowing 173:10
almost 15:14
along 31:9,15;41:11;
67:16;91:14;94:24;97:19;
126:12;133:20;166:6;
167:12;169:6;177:7
aloud 129:14
alternate 23:19,20
Alternate 23:12,14,16,18
alternates 23:21;26:21,
22;27:1,3,5
although 18:2
always 67:24;81:8;84:22;
102:23;103:3;132:1;
147:16;169:15
amended 116:13;120:18;
149:15
amiss 64:10
amount 17:15;63:21;
69:7;101:16;111:9;118:4,
11,17,21,23;120:20,22;
123:9,12;126:19,23;127:6,
7;131:21;132:3,5,11,18;
135:20,23;136:2,6,8,9,13;

139:10;141:21;149:9,9,11;
151:4;152:20;157:20;
164:4,5;172:16,18;176:4
amounts 69:8;77:6;
104:5;110:17;138:8;141:5,
7;150:4
and/or 129:19;158:19
answered 140:23
anticipated 15:17
apparatus 163:7
appear 16:18;19:4,8;
59:18;116:9,17;117:2,5;
122:21;130:13;134:18,19
appeared 101:13
appears 18:18;24:2;
56:23;101:2;102:5,12;
103:1,5;123:1;124:8;
127:15;130:11;135:3;
143:10;150:10;156:19;
165:20
application 63:13,19,21;
64:3;68:16
applied 68:21;108:21
apply 43:20;108:23;
109:18;114:11
applying 63:20;104:4
appreciate 21:2
approaches 73:7
appropriate 170:11
approval 129:19;153:1;
164:15;168:11
approve 151:17;173:14
approved 126:13,14,23;
136:9;140:13
approximate 144:22
approximately 56:13;
75:7;152:21;161:2;166:9;
167:24
April 9:17;34:15;67:11,
11;83:7;131:1;132:6;
133:10;138:13,23;140:22;
143:22;145:2,15;150:10,
20,23;151:9;153:21;
156:23
arbitrate 111:8
architect 44:10;104:3;
166:6;168:17;169:15
architects 170:8
Architects 28:17
area 10:14;11:16,18;30:9,
23:31:22;33:11:38:24;
40:20,23:41:21,24;46:21;
47:1,4;48:17,20;50:2;58:6;
66:6;73:4,6;88:12,13,14;
103:9;104:9,12;128:9;
144:22
areas 23:2,3;25:17;28:3;
30:11,11;35:4;41:7,22;
42:20;43:9;54:13;55:21;
58:2,5,6,10,13,17;65:2;
66:1,4,10,14,14;67:6;73:1;
88:16;103:4,5;168:10
argument 102:20

around 10:7,9,10;28:1;
30:23;31:17;33:10;34:16;
41:21,23;47:22;50:4,7;
65:13;66:18,19;67:11;
70:5,10;73:16,17;132:14;
137:7,15,18;139:14
Article 35:2;131:5;134:9;
135:23
asbestos 23:7
as-built 53:2
aside 108:13
asphalt 19:23;20:2,2,18;
23:3;36:12;37:17;46:24;
48:1;49:15;102:16;166:8
Asphalt 36:10
assert 42:13
asserted 118:5
assign 129:21
assist 28:11
assisting 12:5
associated 168:8;169:10
Associates 28:17;54:16;
57:9,10
assume 20:24
assumed 20:21
assuming 21:17;45:9;
76:2;130:1;133:20;163:5
assumption 20:19;21:2,
6;132:1;163:3
asterisk 142:2
athletic 12:22;14:7,12,18,
19;15:5;17:11;26:13,18;
30:8;32:18,19,21;33:9;
34:15;39:8,12,16,18;40:2;
42:20;54:19;66:13,19,19;
67:5;163:5
attached 19:6;54:4;
59:21,22;60:11;137:11;
153:19,20;156:19
attempted 111:18
attended 8:22
attention 17:21,24;18:20;
23:12;116:16,24;117:20;
119:1,8;120:5;123:14;
129:11;130:9;131:5;
142:13
attorney 6:17;7:4;64:7;
65:20;74:16;90:7,18;91:7,
10;93:3;98:3
attorneys 72:18;89:19;
90:4,17;98:4,19;100:23
attributable 107:24
attributed 110:6;176:8
attributing 108:7
August 56:23;57:13;
63:10,18;68:24;74:19;
75:13,17;76:11;79:24;
86:13;98:1,17;100:8;
107:4;109:14;123:24;
124:4;145:13,17;156:5,17,
18
authorized 154:23
authorizes 165:2

Avenue 52:17;156:13
average 56:10
aware 108:15;114:5;
155:12;157:16
away 90:22;109:20
awful 80:7

**B**

B2 19:5
Bachelor 8:24
back 17:2;28:5;30:20;
31:10;33:8;34:23;56:15;
62:13;64:23;75:19,24;
76:3,14;78:9,17;80:3,13,
20,21;81:9,10,15;84:20,
23;91:13;94:4,9;97:21;
103:21;107:5;110:24;
112:11;119:11;120:24;
123:6;125:24;130:1,9;
133:23;136:21;143:3;
144:15;148:2;149:1,12;
150:1;151:1,6;153:7;
159:5;161:4,8,10,11,14,17;
167:13;171:18,19,22;
172:3,4,6,14,18,22;173:4,
11,15,20;175:8,20;176:3,
10,11,23;177:9
Back 19:1;78:8;163:20
backed 52:5
backfill 22:21;137:23;
163:19
Backfill 22:11
backfilling 137:13
background 8:18;9:3
bad 37:11
balance 69:6
ball 15:15
bang 173:19,23,24;174:3,
6,16
banging 175:24
barriers 137:15
Barton 70:12,14,15,19,
22;170:5
base 21:16;49:11,13,14;
58:3,4,8
baseball 30:10;39:23;
40:23;43:1;58:2,10;60:8;
73:4;161:19
based 49:8;63:11
bases 21:7;22:20;59:3
basic 7:1
basically 25:12,19;56:13;
79:23;81:13;97:3;103:21;
105:12;109:2,20;132:16;
138:19;174:1;175:23
basin 44:2;60:13,15;
144:20;146:1,3,14,24
basins 32:23
basis 22:15;34:22;105:4;
146:8;147:1;148:6;154:7;
164:3
became 29:18;33:15;

50:12;87:9,16
become 50:14;64:14;
68:20
becoming 38:23;67:18,
19,20;87:11
bed 24:1
bedding 22:2
beforehand 171:10
begin 25:23;45:4,24
beginning 11:7;42:9;
64:10
behalf 121:8;123:3;124:8,
17;130:16;152:8
behaved 176:13
behind 46:2;158:11
belief 175:21
belligerent 64:14;67:18,
19,21
below 22:10;43:24;47:20;
60:15
beneficial 80:18;84:13
benefit 17:14
berm 166:8;168:5,6,9;
169:12
beside 41:22;43:19,21;
51:18;167:18
besides 68:1
best 11:17;30:21;73:20;
78:10;122:7;169:10;175:2
better 80:23;88:4;155:15;
174:4
beyond 58:4
bib 52:6,11
bid 15:12,18,20,22,23
bidding 16:20;17:19
big 154:20;156:17;169:15
biggest 111:6
bill 147:22;148:1;159:5;
172:7,9
Bill 14:9;16:24;23:8;26:4;
121:12;122:2;143:10
billable 89:4,6,11
billed 148:5,8,15,16,17,
21,23;149:22
billing 69:3;79:1;139:6;
149:11;150:5,8;177:8
bills 89:13
biological 8:24
bit 8:18;52:24;62:13;68:2;
73:17;76:16;80:8;127:14
bituminous 40:24;46:11;
48:18;168:5,6,9;169:12
blasting 141:22
block 123:3
blurred 22:7
blurry 127:14
Bob 70:12,14,15,19;86:9;
89:16;92:4;94:1;145:8;
152:5;162:12;170:5
Bob's 91:13
bocce 31:14
bonding 67:24;77:11
boom 160:13

**Landworks Creations, LLC v.**
**United States Fidelity and Guaranty Company, et al.**

**boot** 151:5
**booth** 22:5,6,8;31:15;
88:13
**border** 152:15
**Bordieri** 154:18,19;
155:1,2,6,14,18,24;156:2;
157:8
**Bordileri** 154:16
**boss** 70:16
**Boston** 11:18
**Boston-Cambridge**
11:16
**both** 49:24;87:17;124:8;
167:4;171:10
**Both** 119:22,24;120:7;
170:5
**bottom** 18:1;30:3;45:17;
121:7
**bound** 44:2
**box** 24:20;26:19;31:19;
46:2;7;50:2;158:16;159:3,
13;162:21
**breach** 84:7;118:2
**break** 8:11,14;62:12;96:7;
97:16;106:14;117:7
**breakdown** 146:5;
149:23;159:2
**bricks** 48:10;173:9
**Brief** 165:17
**briefly** 51:23
**bring** 88:11;171:12,14,15;
175:9
**bringing** 32:24;107:5;
142:20;143:18
**brings** 20:22
**broke** 50:11
**broken** 50:15;52:6,10;
159:14,16,19;160:8,10;
161:20;173:6
**brought** 19:18;23:12;
51:4;65:17;69:2;77:4;
87:13;128:6;148:20
**Brown** 6:16
**BROWN** 6:12;7:16,21;
18:13,16;19:1;28:8,22;
29:7,8;35:19;36:16;44:11;
53:19,21;62:12;63:2;74:5;
85:15;96:7,9;105:24;
106:4;114:18;169:20,22;
170:2;177:13,22;178:2
**build** 27:12
**building** 21:10,12,14,19,
20;22:12,13,18;28:1;
29:24;31:1,10,23;32:2;
41:11,13,22,24;48:10;
64:21;65:10,13;66:9;
72:10;75:16;87:14,16;
103:5;128:4;137:8,14,17,
18,22;142:22,22;143:19,
19;158:11;162:15,18;
173:10
**built** 10:22;29:19
**Bullock** 76:7,8,10;78:9;

83:22,23;85:21;86:4,13;
90:17;92:4,10;93:14;94:1;
95:12;97:18,21,24;98:8,
12:99:3,10,11;109:24;
113:17
**Bullock's** 91:1
**buried** 159:3;163:8
**business** 9:11,12;10:2,4;
11:1;12:6,17,20;15:17;
81:20;83:24;158:1

**C**

cafeteria 31:4,5,7;46:23;
48:19;104:10
call 14:10;17:23;70:7,24;
71:7;75:17;76:8;152:14;
165:11
called 6:5;33:4;44:16;
70:17;76:10,13;78:11;
92:4,4,5;133:12;147:15;
165:8
calling 79:20;101:9
calls 70:23;72:4
came 70:5;71:8;73:10;
101:15;132:2,15;154:20
can 7:8;8:14,17;18:12;11;
28:10;29:9;30:17,18,19;
32:6,9,14;38:21;41:5;
42:18,23;43:14;62:14;
63:3;65:19;73:21;74:2;
78:9;79:21;80:19;82:13,
23;85:8,8,9,9,10,12,15,19;
86:4;92:9;95:22,23;96:5;
106:1;108:17;109:7;
111:16;112:2,4,10,17;
114:13;123:6;130:3;
131:23;148:10;151:10;
155:15;156:11;169:10;
171:1,8;172:1,13,24;177:1
Can 16:20;19:20;30:14;
32:3;40:8;52:15;57:1,16;
73:24;74:3;117:6;119:18;
131:20;136:24;138:17;
142:9;149:19;169:20;
171:22;173:15
cap 141:20;163:1,9
capped 141:23
capping 156:14
care 58:12,14;70:4;87:20
Carolina 8:22;9:10,23;
10:15,17,23;11:5;13:7
carrot 64:16;109:4
carrying 50:13
Cary 10:17
case 8:9;13:11;16:22;
57:13;65:17;78:16;83:8;
84:21;86:11;91:19;95:2,3,
4;111:21;112:2;115:21
catch 32:23;44:2;60:13,
15;144:20;146:1,3,14,24
cause 112:20
caused 48:22;49:21;

107:6;111:4;112:13;
113:4;160:23;170:18;
173:6
causing 87:24
ceasing 63:4
center 58:11;144:21
certain 17:16;20:16;
26:24;28:6;36:2;38:19;
47:7,8;58:12;61:13;64:17;
67:16;70:17;71:17,18,22;
74:24;76:11;80:11;83:16;
92:1,20;95:9;100:22;
101:16;107:4;109:18;
110:3,12,12;119:12,15,15,
17;120:10;121:17;124:24;
125:24;132:17,22;135:10,
14;137:8,10;138:10;139:5;
140:15;142:8;144:8,13,14;
151:2;157:14;162:13;
176:5,5
certainly 29:5;120:14
Certainly 83:20
certified 68:4,4,6
change 27:8,22;28:6,7;
34:18;52:12,14;70:2,2,6;
88:10,17;89:7;102:14;
125:19;126:2;127:4;128:2,
14,18,21;132:4,17;134:19,
21;136:16,19,21;137:4;
138:4,7,12,15,20,20,22;
139:22;142:1;143:24;
145:14,20,24;146:2,4,5;
148:9,10,13;149:5,10;
150:5,8,19,22,23;151:4,7,
8,10,15,16,23;152:24;
154:14,15;163:10;164:14;
165:24;166:23,24;168:15
Change 135:3,7,11,19;
136:2,8,12;141:24;142:16;
143:15;144:3,23;149:5,15;
152:1;153:17,21,24;
154:12;156:19;158:7;
162:8;164:2;165:20,21;
166:18;168:8
changed 49:6,8
changes 17:7,9,18;
24:24;27:9,24;37:21;
69:11;126:22
characterizing 174:14
charge 133:7;141:12,21;
158:2;161:8,11,14;171:19,
23;172:3,4,6,14,18;173:11,
20
chargeable 159:12
charged 92:16;140:10;
141:17;159:11;161:10,10,
17;172:22;173:4
charges 109:18;130:1;
132:7;133:13
Charges 133:14
charging 171:19;173:16
check 69:16,20,21,22;
143:3;144:9,10,15;148:2;

150:1;153:8
checked 80:4;86:9
checking 28:5;145:12
chose 17:13
chosen 132:19
chronology 74:9
circumstance 172:14
circumstances 6:23;
13:12
civil 85:9
claim 84:8;100:1;111:2;
118:2,2;172:17
claims 82:2;106:5;130:2
clarify 7:11;112:17
classroom 46:14
clean 28:2
cleaned 65:3
cleaning 64:22;158:10
cleanup 137:7
clear 66:16;119:4,7;
122:5;151:12;174:9;177:4
cleared 70:4
clearing 10:9
clearly 58:22;102:9;
104:7,8;108:8;109:19
clerk 72:6,12;73:23;
74:12;75:18;78:13;147:9;
163:14,16,21
client 106:6;176:20
close 31:11;63:20;65:2;
68:19;69:8;90:15
closely 120:6
closing 176:22;177:15
coat 23:3
coercion 109:8
coincided 150:4
cold 23:2,4;38:23
Collaborative 9:15;
11:11
collect 64:19
collected 27:24
collectively 86:8
college 9:6
combination 30:9;
131:17
comfortable 8:1
coming 27:4;52:18;
70:11,12
common 85:10
communicated 99:13,24
communication 54:12;
98:3
communications 93:17;
99:5
Communications
175:22
compaction 54:19,22;
55:1;56:9,16
companies 111:7
company 10:7;11:8;
12:16;20:9;23:10;67:24;
77:11;81:21
Company 14:5;36:12;

54:3;7:56:24;59:16:60:1;
86:22;115:1;121:2;154:5;
155:19;156:3
compare 119:3
comparing 134:6
complaint 6:23;82:19;
120:18
complete 40:16;72:21;
88:2;125:13
completed 19:18,21;
39:3;41:16,20,23,24;42:1;
67:10,13;89:3;112:3;
125:20,21,22;126:1;
128:23
completely 46:10;56:5;
64:6;66:6,15;98:13;
105:11;111:3;113:18;
144:7
completing 34:14;78:15;
86:20
completion 129:19
complicated 7:6
comply 60:21
concentrate 32:18
concern 15:5;26:5
concerning 89:2
concerns 42:24;87:13
concrete 40:24;60:24;
61:2,4,4,5,7,21,22;104:8;
110:5,5,12;166:1,18,19;
176:7
condition 37:11
conditioned 129:18
conditions 29:20;52:18
Conditions 29:1
conduct 100:10;109:16,
22;110:17;113:13,15,16,
19,21
conduit 22:19;49:23;
50:1,5,11,13,15;88:11,15,
20
confer 74:6;116:5
configuration 49:7;
162:17;165:24
confuse 18:19
confused 18:12
connected 41:17;147:2
Connecticut 17:17;13:6
connecting 50:5
connection 146:21;
176:13
connections 163:16
connects 162:19
conservation 9:2
consider 27:18;88:21;
113:13;120:12
considered 37:4;55:1;
64:15;65:10;70:18;96:15,
16;101:14;107:11;167:21
considering 32:11,13;
127:6
consistent 88:23
constitute 19:8;116:17;

Case 4:05-cv-40072-FDS    Document 77-3    Filed 04/18/2007    Page 22 of 30

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

117:2
constituted 109:18
constitutes 109:17;
117:24
construction 10:6,8,20;
11:10,11,12;12:1,2,3,21;
14:6:51:5:64:20:140:14
Construction 6:6:11:24;
14:10;36:11;54:3,7;56:24;
59:16;60:1;61:7;86:22;
110:8;130:12;133:12;
134:20;137:5;153:18;
154:5,19;155:18,22;156:3;
166:7,17;168:14;170:9;
171:5
consult 103:14
Consultants 6:6
contact 64:8;70:13,21;
71:9;72:4,19;99:11;
113:17;121:11;169:17;
170:4
contacted 14:4;17:2
contacting 15:11
contacts 121:12
contained 23:5;26:20
contains 23:6;153:18
contend 175:16
contested 124:12
context 15:21
continual 58:9
continuation 84:10;
109:4
continue 81:20;83:18;
123:20
continued 68:8;70:7;
71:24;72:3,9,18;129:16
continuing 83:24;110:1
continuous 9:13;64:18
continuously 58:16;
63:17
contract 16:7,8,15,19;
17:23;18:5,9;19:10,22;
22:23;24:24;25:1,4,6,16;
26:17;27:1,2,10;33:22;
34:1,3,4,6,9,19,19;35:13,
7;39:17,19;67:14;69:7;
77:16,19;78:2,3,5;84:7;
91:23;96:11,12,16,17,20;
97:4,7,12,14;99:7;101:18,
20;118:2;121:21,24;122:3,
6,8;123:12;124:1,1;
125:16;126:12,17;131:2,4;
132:3,10,18;135:20;136:6,
13;139:24;140:6,7;141:4,
6,8,9,10,13
contracted 65:12;79:17;
104:13
Contracting 16:24;23:9;
65:12;121:2,12;126:23;
142:24
contractor 13:13;14:11;
15:14;20:20;22:1,3;26:8,
10,11,17;42:5;46:6,23;

47:24:52:4,5:58:23:67:2;
69:16;75:24;76:2;102:23;
111:22,23;112:4,4;129:19;
157:24;159:20;160:1,3,9,
12,17;161:12;173:13;
175:9,14
Contractor 44:16
contractors 20:12;72:14;
107:5;114:15,16;157:18
contractor's 141:9,13
contractors' 67:3
contracts 77:21
contractual 82:8
contributed 108:10;
112:14
convenient 90:19
conversation 14:17;
71:1;73:23;74:12;78:8,10;
79:13,21;83:22;84:11;
85:6,13
conversations 14:16,23;
26:1,13;76:17;105:8;
121:17,20;122:1,5,8
converse 8:6
converted 128:1
coordination 12:4,6
copied 91:1
copies 68:7;117:8
copious 153:6
copy 79:6;115:4,19;
116:1,20;122:12,21;
132:13;135:4
core 55:8
corner 31:23;44:2;48:9
cornered 68:15
Corporation 11:24
corrected 86:23;172:5
corrections 51:9
corrective 5:7
correlate 130:21
correlates 35:6
corrugated 146:17,22
cost 27:21;38:4;55:5,7;
67:10;146:5,9;159:4;
168:8;173:4;175:3
costs 17:11;159:2;
169:10;175:2
counsel 6:5;74:6;116:5;
177:14
Counsel 7:17;18:16;
28:22;29:3
counted 18:2
counterclaim 100:24;
101:7,17,22;102:3,4,12;
103:6,11,12,20,22;104:6,
15;105:17;106:20;108:6,7,
13,14;111:5,11;113:20;
116:12,14,18;117:3,24;
118:6,8,9,13,16,19;120:17,
21;176:14,16
counting 127:10
counts 119:20;120:4
couple 86:15

course 8:12;10:19,22,23,
24;12:20;42:12
courses 10:11,12,17,21;
12:22
court 8:7;31:14;61:1,2;
83:12;116:14
Court 6:20;83:8;104:16
courtrooms 95:24
courtyard 21:9,17,17,18;
29:22,23;31:4,4;46:22;
48:19;104:9,12;128:3;
151:23;152:12,13,16
cover 47:19;54:9;164:21
covered 176:24
Cox 145:8;152:5;162:12
cracked 104:11
created 28:16
Creations 121:3;130:16
criteria 60:23
Crockett 43:17;54:21;
57:15;59:24;60:19;145:7;
152:4
cross 61:16
CROSS 114:21
CTM 44:10;54:21;67:19;
140:14;141:16
CTM's 87:7
cubic 141:12,15,17,23
curb 21:24,24;47:3;48:16,
20;53:12
curbing 30:24;73:17;
104:11;167:12
curbs 166:1
curve 166:7
cut 47:1;50:9;63:21;
162:24
CYA 53:4

D

daily 64:2;65:4;107:3
damage 48:22,24;49:17,
21,23;53:12;104:11;107:7,
11;173:6,7
Damage 46:1,11;47:3,19
damaged 46:7;48:1,9,20;
49:4,16;172:4;173:9
damages 133:16
dangerous 167:21
date 34:10;38:21;50:16,
19,20,24;51:5;75:1;80:24;
89:12;123:23;124:1;
130:18,21;138:12;143:13;
150:10,22,22,23;151:7,9;
153:24;162:13
dated 18:3;34:5;36:21;
44:16;53:21;56:23;57:13;
59:17,23;124:4;138:9;
153:21
dates 9:8;27:16;50:23;
100:22;115:22;137:24
day 80:23,24;86:6;95:23;
124:21,23;164:3;176:22

days 7:19,22;80:22;
97:21;129:23;157:11
deadline 15:8;101:6;
102:7,8
deal 81:13,14;82:9;86:10;
93:5,15;94:7;95:3;98:14,
21,24;105:14;113:19
dealing 22:24;102:16
dealings 114:12,14
dealt 10:7;42:19,22;56:9;
93:24;94:12;99:16;106:20
Dear 86:13;97:21
debris 27:24;40:20;
72:24;137:13;151:24;
152:16,18
December 9:13;70:5,9;
143:14,21
deceptive 81:19;84:8;
105:8,10
decided 27:21;28:1;
154:21;166:7;167:17,22
decision 92:11;111:13
deducted 176:10
deep 146:12
defamatory 106:7,10;
107:13;108:3
defame 106:17,18
defaulted 124:12
defects 172:19
Defendant 6:6,17;91:19
Defendants 119:22,24;
120:7
deficiencies 33:18;42:3,
5,14;43:16;47:16,17;51:8,
10;107:9,12,16,17,20
deficiency 42:15;43:6,
11;46:6,20;47:5;51:1;60:9;
87:7;107:24
Deficiency 44:16
deficient 61:10;106:21,
22
defined 104:7,8
definitely 175:4
deflated 81:17
degree 162:19
delete 151:2
deletions 24:9;25:10
demo 21:7;22:7
demobilization 132:7;
133:7,15
demolished 25:18
demolition 25:14,14;
26:19;33:7;40:20;151:23
Demolition 20:1;24:19
demonstrate 176:20
demonstration 163:12
deny 111:18
deposition 6:19;177:23;
178:5
depositions 7:23;8:13;
77:14;93:2,21;95:24
describe 30:14;40:8;
41:5;52:15;123:15;155:15;

174:18
described 100:11;105:19
describing 155:24
design 40:14
Design 43:10;54:16;57:9,
10
designated 41:7;46:22
detailed 146:4
deteriorate 68:8
deteriorated 87:6
deterioration 87:8
determination 83:14;
174:24
determine 77:7
determined 67:8;129:20;
130:7
Dick 14:4
difference 131:20,24
different 23:21;35:10;
99:17;104:5,5;149:4;
166:20;170:6;174:14
differently 100:14
difficult 7:6;24:12;129:13
dimensions 37:19
direct 17:21,24;18:20;
119:8;131:5;169:17;170:4
DIRECT 6:11
directed 48:5;129:22;
143:10;146:7;147:1;
168:13,14;171:11
directing 116:16;117:20;
119:1
Directing 116:24;129:11;
142:13
direction 171:3
directly 76:17;81:20;
93:15;103:14;152:8;167:2,
23
disagree 36:9;56:2;59:8
disappointment 98:5
discovered 163:9
discrepancies 37:18
discretion 129:18
discuss 89:17
discussed 19:3;28:8;
121:13;122:2;166:21;
177:15
discussing 162:14;169:6
discussion 29:4;89:18;
90:7;92:14;136:22;169:2,4
Discussion 16:13;18:24;
28:19;29:13;35:15;53:20;
115:7;117:16;155:11;
162:2;165:14
discussions 90:3
dispose 23:11;37:5;
112:2
dispute 92:6,6
disputes 92:17;111:7
distinction 66:18;67:4
document 16:6,11;
17:22;18:10,22;19:15;
24:16,18;28:9,15;29:4;

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

33:24;35:14,20,22;36:5,7,
22;44:14,15,18,21,23;45:6,
13;51:11;53:8,24;54:4,9,
10;55:19;56:7,22;57:1,6,7,
19;59:14,21,22;60:12;
115:5,8,24;116:7,9,11,22;
118:10,23;119:2,4,5,7,10,
13,16;121:13;122:13,14,
15,21;123:16;137:1;
142:14;144:17;149:16;
150:18;151:13,22;153:14;
154:4;158:6;162:5;165:19
Document 28:20;35:16;
36:17;44:12;53:22;56:19;
59:10;85:17;115:21;
117:12,17;122:10;134:12;
139:17;150:6;151:18;
153:12;154:9;158:4;162:3;
165:15
documentation 27:9;
69:13;163:12;168:12
documented 48:2
documents 19:3,8;35:9,
11;66:17;80:8,9,14,16;
91:13;134:10,15,16
Documents 6:2;142:11
dollar 118:4,10,21,22;
120:19,22
dollars 17:2;69:24;
118:18;149:2
domestic 128:7;142:20
done 11:15;13:9;15:3;
21:4,8;22:1,3,14;25:15,16,
20,21;46:19;47:24;48:2;
52:10;55:1,2;56:16,17;
62:3;64:16,17;65:5;68:23;
69:14,17;72:10,14;73:3,
21;78:18;94:10;99:17;
100:7,11,13;101:4,6;
103:10;104:11;107:11;
110:3,4,7,8,12,14;112:24;
113:3,9;126:6;128:3,4;
135:12;139:8;140:16,18,
24;141:1;142:23;143:4;
144:9,10,11,12;149:10;
152:23;154:3;156:16;
157:12,13,16,23;158:1;
159:20;162:12;164:18,20,
22;170:19,20;172:8;
173:18;174:13,14;175:11,
13
doors 41:13
double-check 130:15
doubt 102:23
Doug 45:18
down 11:1;22:10;39:1;
41:12;43:2;50:7;52:3;58:1;
65:2;69:2,10;73:14;82:1,
12;85:5;89:9;102:24;
104:3;112:1;134:2;140:19,
21;148:10;157:19;161:3;
166:4;167:9,14;174:3;
175:3

drain 58:15
Drain 55:10
drainage 10:9;12:21
drains 55:15
drawing 60:11;66:5;
170:18
Drawing 166:2
drawings 21:12
drawn-out 87:17
drew 66:18
drive 175:2
driven 158:12;160:5;
161:18,19;173:5
driver's 6:8
driving 160:23
drop 109:5,6
dropoff 167:19
drywall 52:5;160:1,12
due 172:17
Duffy 147:15,16,17;
155:21
duly 6:9
during 33:18;39:17,19;
42:4;52:3;66:9;68:13;
121:11;153:6;160:5;
169:11
duties 12:1;82:8

E

earlier 66:17;76:21;
77:23;89:9;118:12;121:1,
10;130:14;160:4;166:21;
174:11
early 16:24;68:9;100:21;
101:3,4;107:2;128:24;
132:6;133:10;143:4;
144:12;176:18
earthwork 12:21;67:1,2
Earthwork 18:3;22:17
easier 79:10
easily 108:21;146:13
east 40:19;41:10,11,19,
21;49:9;72:23
easternmost 32:20
edge 49:4,10
education 8:20
educational 8:18;9:3
effect 94:6
efficient 112:5
eight 56:13
eight-hour 157:11
either 24:13;47:15;48:5;
51:8;53:6;86:5;111:11;
129:20
Either 86:6
elementary 41:18;43:2;
73:14
elevation 44:3;141:2;
167:7
else 32:5,10;39:21;51:13;
55:8;94:8;96:1;99:6;100:7,
12;103:17;104:18;105:6;

108:4;110:13;111:15;
112:9;132:8;133:22;176:1;
177:1,11,12,22
e-mail 79:4,5,9,11;80:4,
13,20,21;81:3;83:19;
84:15;89:22;91:1;92:9;
94:1,23;95:9,11;99:13;
109:2,23;110:11;113:12;
148:19;175:23;176:1,4
e-mails 85:12,20;86:8;
89:15;92:15;93:4,5,10,11,
19,24;94:21;97:17;100:9,
23;101:2;110:2,6;176:2,3
embankment 146:12
employed 156:23
employees 16:3;156:20;
157:9
employment 9:22,24
encased 22:19;30:9
enclosed 21:19
encompass 25:17;67:1
end 38:24;42:11;43:1;
47:23;50:6;60:8;65:6;75:3;
87:10;90:18;111:12;148:3
engaged 108:19;109:15,
15;113:22;174:16
engineer 12:5,5
engineering 9:1,2
enough 21:11;68:21;
166:3;174:9
entered 18:9;19:10,22;
121:21;124:13
entire 176:19
entirely 32:18
entitled 29:1
entrance 41:8;46:13;
66:8,9;166:2
entrances 47:5;64:20
entranceway 168:6
entries 23:3
entry 61:5
entryway 167:3,4,10;
168:7
equaling 69:7
equipment 46:8,24;
48:21
Eric 114:24
established 14:19;55:24
establishing 8:8
estimations 12:6
evasive 73:24
even 59:2;82:4;94:21;
103:18;104:13;113:8;
141:5;146:9
Even 108:21
evenly 166:4
eventually 46:9;67:8;
68:10;148:18
everyone 50:12;87:12;
147:15;151:21
evidence 89:12
evident 68:20
exact 101:16;162:13

exactly 17:16;67:17;
72:16;78:24;87:19;115:15;
134:5;142:5;149:3;162:21
Exactly 117:23
examination 6:5
EXAMINATION 6:11;
114:21;170:1
examined 6:9
example 30:17;102:11;
110:16;176:7
examples 173:15
excavated 22:16;49:10;
146:13;161:5
excavating 49:14;163:8
excavation 22:18,20;
141:11
Excavation 22:11
excavator 52:2
except 13:22;19:16;
54:20;122:15;163:14
exception 56:8;115:23;
116:8
exchanges 84:16
excluded 21:10;22:18,
22,23;23:11,23
exclusion 25:21
exclusions 121:18;122:2
exclusively 11:5
excuse 14:5
excuses 67:23
executing 125:6
execution 129:3
exercised 27:3
exhibit 19:15,17;28:10;
115:4;117:11;139:16,19;
149:20;153:11
Exhibit 16:6;17:22;18:3,
5,11,14,18;19:4,21;24:17,
17;28:20,23;33:21;35:16,
20,21;36:17,19;37:24;
44:12,17;53:21,22;54:1;
56:19,22;57:7;59:10,13;
66:21;85:15,17;86:9;
117:12,17,20;119:2,3;
120:24;121:1;122:10;
123:6,7,14,23;126:20;
130:9;134:7,12,15;139:17;
142:13;143:9;150:6;
151:18;153:12;154:9,11;
158:4;162:3;163:20;
165:15;171:18,20
Exhibits 6:2;142:11
exist 23:2
existing 20:4,18;23:4;
29:20;40:14;43:21;46:11;
52:18;60:22;162:18;163:1
Existing 29:1
expectation 81:22,24
expected 58:16;83:1
expediency's 25:22
expense 86:20
expensive 27:20
experience 23:18

experienced 63:5
explain 15:16,19;16:20;
30:19;32:14;38:2;63:3;
78:9;131:20;172:13
explained 13:3;71:19;
78:24;121:1
explaining 78:12
explanation 53:16
explicitly 51:23;105:12
expression 19:9
extended 31:9
extent 9:2;15:19
exterior 46:2;47:20
extorted 114:7,9
extortion 88:3,8,21;
108:19,23;109:8
Extortion 88:9
extra 127:20
extremely 38:23;157:19

F

face 90:13;141:21
faced 163:4
facilities 13:1
facsimile 57:8
fact 16:15;18:7;39:8,11;
55:21;68:2;77:21;95:16;
104:16,17;108:9
facts 7:2;8:9;175:20;
176:20
failed 71:16;76:24;77:1;
97:7;103:13;126:6,8
failing 139:8
failure 54:24;71:14;77:3;
78:6;92:23;96:23,24;
99:16,17
fair 113:14;146:10
fairly 14:13;90:15;110:23;
120:13;146:12
fall 33:15;34:9;38:23;
42:22;44:8;64:23;66:14;
68:9;101:3;107:1,2;126:5;
128:22
fallen 51:13
false 103:11;105:17;
107:15,15;108:5,10,14;
109:24
False 105:19
far 33:14;41:10,19;95:5;
99:10;111:23;129:15;
130:3
Farms 10:24
fashion 88:3
favorable 111:13
fax 18:1;54:1;56:23;57:4;
59:15,20;79:6;80:6,9;86:2
Fax 45:22
faxed 54:6,8
faxing 80:9
February 12:13;72:5,5;
75:4

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

fed 50:2,8;161:1
Federal 62;0;83:8;104:15
feed 128:7
feeding 162:20
feel 7:10;8:1;110:20,22;
111:19
feeling 94:11;174:23;
175:6
fees 132:8;133:8,16
feet 22:12;43:3;46:12;
58:3,7;73:11;142:22;
143:18;161:3;166:9;
167:13,24
fell 20:13
felt 86:18;97:11;111:1;
146:9,10;160:22;177:6
fencing 31:17;33:10
Ferguson 140:16;
141:19;155:21
fertilization 59:5
few 97:21;114:19;115:2;
169:22
Fidelity 115:1
field 12:3;14:7;30:8,10,
11;37:19,20;40:19,23;
43:1;50:1;55:3;58:2,10,11,
11,11,13;60:8;72:23;73:4,
13;158:13;161:19
field/track 33:11
fields 12:22;14:12,18,19;
15:5,15;17:12;26:14,18;
27:12,16,18;30:8,13;
32:18,19,21;33:9;34:15;
39:8,12,16,18;40:2;42:20;
54:19;55:9,18,22;56:12;
66:14,19,20;67:5;163:5
figure 101:15;102:19;
132:2;133:19
figured 91:11
figures 103:20;132:24;
134:4;141:16
file 81:18;102:4;112:13,
14,21;114:16;149:13;
151:9
filed 74:22;75:9;81:6;
82:5;83:1;84:7,24;85:4;
112:18;113:7;115:22;
116:14;118:19
filing 112:11;113:11
fill 47:19
final 25:3;41:20,23;44:4;
70:8;98:1;149:2
Final 54:19
finally 10:21;68:9
financial 111:4
find 80:17;85:10,12;
95:15;112:1;113:13
finding 92:16;95:1
fine 7:18,21;20:22;45:6;
74:5;79:12;81:1;86:6;
119:3;120:12,14;152:22;
160:15
finish 78:18;81:9;84:23;

96:18;97:4;177:2
finished 61:21
finishing 97:17
fire 28:4;51:24;65:1;
82:10;128:6;142:21;
159:21
first 6:8,24;9:15,21;11:8;
13:18;18:5;19:4,20;33:9;
43:6;46:1;51:4;56:5;58:3,
4,8;69:17;75:1,4;80:1;
83:15,22;94:13;102:5;
108:2;121:11;123:9;124:3;
131:3;133:11;137:12;
138:20;158:21,24;159:16;
162:10;166:15
First 13:24;66:12;75:3
fitting 146:23
five 105:24;115:12;176:18
fix 173:13,14
fixed 54:14
fixing 173:7
flagpole 30:23;31:13;
41:23;73:18
flanges 128:5,7
flat 164:7
Fletcher 56:24;59:16
flip 115:11
floating 132:14
floor 46:14
Flower 9:17
focus 14:18
focused 177:8
follow 170:21
follow- 169:22
following 74:11;76:1;
140:22
follows 6:10
football 30:8,11;33:11;
37:19,20;50:1;58:13;72:23
Football 15:7
footings 22:8,15
force 128:5
form 42:7;63:8;92:8;
115:15;152:19;168:15
format 119:23;152:23
formats 115:13
formed 9:11
forms 136:21
forth 25:20;38:3;71:8;
78:10
forthcoming 64:4;79:24
forward 86:24
found 128:20;131:23;
148:7,12
four 147:3;157:9;176:18
frame 14:22;15:2;38:22;
75:15;99:9;100:8;130:24;
164:19
Frank 154:5;155:20;
158:20;169:7;173:3
free 7:10
freshly 55:22
Friday 86:13;98:1;177:2,

5,23
front 30:22,24;31:21;
32:1;41:8,24;43:16;47:4;
135:4;137:21;150:4;
158:16;165:19;166:2;
169:8
front-end 37:10
full 123:12
fuller 19:6
Fuller 91:2,4,15;94:4;
95:7,8,10,14;97:20;99:1;
105:13
fully 54:22;55:24
function 27:6
further 14:20;18:19;
100:5;114:18;129:18
future 28:11

G

Gambill 14:10,11,19;
15:4;17:1;23:8;26:4;
121:12;122:2;143:10
garbage 64:19
Garner 8:21
gas 20:5,6,7,9,11,12,14;
22:2;128:8;137:15,16,21
gate 46:2,7,9,10;52:19,
20;158:16;159:2,3,13
gather 103:14
gave 6:23;17:6;42:15;
59:6;63:23;68:17;76:9;
79:4;96:3;109:24;132:14;
146:3
gears 177:6
general 13:13;14:15;
28:12;42:5;141:9,13
generally 20:11;28:3;
40:3;157:18;165:10
Generally 58:17
gentleman 155:5,6
given 25:3;34:3,4;89:8;
104:16;128:2;141:14;
143:17;150:19;153:8,17;
164:7;172:13
gives 119:19
giving 8:9;50:24;113:18
glad 55:4
glue 23:6
golf 10:11,12,16,19,20,22,
23;12:20,22
good 18:17;75:21;78:19;
170:13
Good 6:13;114:23
grade 168:3
graded 40:21;103:9
grades 40:14,14
grading 10:8,10;25:20;
34:16;39:24;40:6,8,13,22;
61:24;62:3;65:24;73:3
gradually 167:14
graduated 8:21
graduation 9:6

grandstand 32:8;33:11;
144:22
grandstands 24:19,20;
26:20;30:17;31:18
granite 21:24,24;30:24;
48:16,19;167:11
grass 14:18;15:7,8;30:5;
55:23;66:10;67:5,5
greater 61:17;101:23
greens 10:21
Greenwich 11:17
grievances 171:12,14,15
ground 46:13;47:20;
85:10;161:3
grounds 54:23
Guaranty 115:1
guard 76:16
guess 20:24;104:7;
120:19;173:7
guy 94:3,5;95:11,13,14
gymnasium 31:10;
41:12,22;61:5

H

half 63:21
halfway 80:10
Hammon 14:4,5
Hampshire 12:10;13:3,6;
64:7;68:10;74:16
hand 68:19
handed 117:14;151:21
handicap 20:3,4;32:1;
166:4,9,19,20;167:1,4,9,
23;169:7;176:7
handled 99:15
handwriting 44:20;45:7,
9,15,17;139:23;140:2;
158:21
handwritten 122:16,19;
158:23
happen 20:15
happened 11:22;12:15;
13:4;43:7;51:6;63:3,4;
64:11;68:13;73:22;75:12;
84:19
happy 8:14
harm 111:4
hastily 102:6
hate 120:9
hauling 37:6
hazardous 23:7;37:4
head 105:22;133:19;
158:12,14;159:17,23;
161:9,20;173:5
headquartered 13:2
hear 75:19;84:21;86:14
heard 55:8;74:18;75:21;
76:4,14;131:3;169:5,6;
173:19,22,23;174:5
heating 137:16
held 44:5,7;129:22;
140:21

help 8:8;28:2;85:13;
100:24
helping 80:18
hesitate 35:23;120:8
Hey 26:1
high 8:19;29:19,21;55:23
High 8:22;29:15,18;
125:14
higher 167:8;168:3
hill 161:4
himself 90:6;155:13
hindsight 93:7
Hipp 7:3;114:19,24
HIPP 7:18;18:23;29:6,11;
75:5;114:22;116:3,21;
117:7,10,14,19;134:11;
139:15;142:9;149:19;
153:10;165:13,18;169:21;
177:21
hired 102:23;103:3
history 9:5;11:20
hit 51:24;52:1
hold 34:21;68:19;77:9;
78:4;95:21;122:22;123:21;
130:5;132:24;142:3;144:6
holding 64:16;77:12;
109:4;151:22
holds 120:19
Hole 20:20;21:4;48:2,23;
101:18
home 10:8
homes 10:12
Homestead 10:24
honest 96:2,3;149:21
hood 87:15
hook 52:21
hopefully 76:4;111:12
horseshoe 31:14
hose 52:6
hour 106:1
hours 157:15,22
houses 10:10
hydrant 51:24;52:7,8,12;
158:14;159:14,17,21;
160:5,11,20,21,22,24;
161:1,1,6,9;162:14,20

I

idea 91:9
identical 134:8
identification 6:3;28:21;
35:17;36:18;44:13;53:23;
56:20;59:11;85:18;117:13,
18;122:11;134:13;139:18;
142:12;150:7;151:19;
153:13;154:10;158:5;
162:4;165:16
identified 6:7;17:24;
21:15;24:6,16;29:3,24;
35:5;38:3;43:10;44:15;
49:5,22;57:7;58:1,14;
147:12;171:20

fed - identified (6)

Min-U-Script®

Doris O. Wong Associates, Inc.

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

Identify 19:20;28:10;
33:17,23;34:1;36:12;45:1;
57:1
ignoring 167:17
immediate 125:7
Immediately 15:14;165:5
important 102:7
improperly 176:13
improvements 65:24
Inc 6:7
inch 37:16;38:7,13;
146:17
inches 168:3
incident 50:24;53:13
incidental 34:16
incidentals 34:4
inclined 51:3
include 26:16
included 25:5;67:3;
138:7;140:6,8
included 139:24
includes 19:17;22:6:57:8
incomplete 40:18;172:4;
173:17
incorrect 62:10;110:13;
166:21
increase 38:4,6
incurred 148:5
indicate 120:16;137:12,
14
indicated 121:7;124:2;
134:7,8;135:7,23;138:8;
141:8;144:3
indicates 126:16,22;
135:19
indicating 31:2;66:6;
124:3;161:7
individually 177:18
individuals 175:22
infield 39:22,23;58:3,24;
59:2
inflate 111:10
information 68:19;86:19;
88:2;94:24;99:23;103:14,
15;159:5
initial 14:16,17;15:4;17:1,
6,16;25:1,2,2;26:13;32:17;
39:2;47:24;98:20;101:18,
19,20;105:8;111:20,21;
112:19;113:17;128:21
initially 24:8;175:10
inquire 64:8
inquired 81:4
inquiries 72:12;89:2
inquiry 110:23
inside 21:10,14,15,19,19;
22:13;49:9;64:20;72:10;
87:14;128:3,4;152:16;
168:1
inspect 163:17
inspection 61:13
install 33:4
installation 21:13;34:14;

55:11;128:5;137:21;
140:20;146:3;156:12;
165:9
installed 14:21;22:19;
32:22;39:22;55:15:58:7,
19;61:8:62:1;88:18;
137:16;144:20;166:24
installing 146:1
instance 88:10;173:2
instances 114:2,4;171:1
instead 29:21;101:8,9;
110:14;166:11;167:17;
173:10
instructing 93:4,14,16
instructions 6:22;7:24;
20:23
intend 7:5,6;16:2
intended 7:11
intent 102:15;124:6
intention 84:22
intentions 174:8
interest 78:14
interested 14:6,9;83:24
interfered 112:7
interior 25:21;137:13,23
interior 22:10
internal 21:12
internally 64:24
interpretation 43:18;
174:23
interrupt 172:12
intimidate 111:12
into 10:8,19;18:9;19:10,
22;25:5;32:24;33:15;
38:20,22;51:4;52:18,21;
58:16,18:60:21;75:15;
88:12;90:6;101:8,14;
103:1,6,10;104:14;110:23;
121:21;124:13;126:10;
132:10;142:22;143:19;
152:19,23;157:19;162:19;
166:8;167:9,10;177:9
intransigence 87:17
introduced 155:13
investigating 108:2
involved 12:2;14:2;
48:24;77:22;78:21;84:12;
85:2;87:12;104:1,2;108:5;
113:8
involves 13:11
involving 13:15
irregularities 54:14
irrigation 26:12,16,18;
33:4,5;39:20;58:21,22;
158:12;161:20;163:6;
173:5
Irrigation 26:12
island 73:18;166:10
Island 12:10;13:6
islands 168:1
Issue 46:15;50:12,14;
52:15;56:2;70:1;101:5;
149:11;151:4;152:24;

164:11,14;165:10;169:7
issued 69:16,20;122:9;
134:19;136:17
issues 100:6
item 45:24;46:20;87:14;
148:13,20;150:24;164:13;
176:9
Item 36:10;46:11;47:3,19;
48:13,15;49:2,5,19,22;
50:16;51:22;52:15;53:17;
54:15,18;55:10,17,20;
56:5,8;122:15
items 23:22;24:6;34:4;
42:16;44:24;45:3;47:12,
14;48:5;51:12,15,16;53:5;
64:17;67:16;72:1;78:23;
79:2;85:22;102:4,9;110:3
Items 48:4;51:19

─────────

**J**

Jack 140:15;141:19;
155:21
Jackson 13:24;32:12;
34:19;35:3;36:11,20;37:2;
39:1,17,19;42:6,13,13,15;
54:2,6;56:24;59:16;60:1;
61:7;63:4,6,9;64:7;67:20,
20;68:12;69:19,20;70:16;
71:15,16,21;72:7,17;78:3;
86:22;87:5,23;88:3;89:8;
92:22;96:12;97:7;99:16,
16;102:15;108:22;110:8;
128:20;130:11,23;131:21;
132:1;133:12;134:9,20,22;
135:24;136:17,20,21;
137:5;138:23;139:2;
143:21;145:2,20;147:20,
22,24;148:5,5;149:16,17;
150:9;151:15,17;152:17,
24;153:17;154:5,19;
155:18,22;156:3;161:10;
163:11;166:6,17;168:14;
169:19;170:9;171:5,15;
173:14
Jackson/Landworks
131:7
Jackson-failure 99:9
Jackson-Landworks
33:22
Jackson's 89:2
jams 80:10
January 9:8,10,18;10:2;
70:10;138:1
jar 31:7;32:10
Jennifer 56:24;59:15
Jeremy 84:8;68:11
Jersey 137:15
JH 69:21
Jim 140:15;141:20
job 9:15;13:4,5;15:23;
17:5;23:21;64:19;65:6;
67:22;68:18;75:9;78:18;

82:8;84:23,24;85:7;87:7;
97:4;106:24;107:1;114:16;
133:13;139:9;140:19,21;
153:4,5,6;155:17;156:8;
157:15,16,22,23;164:23,
24;165:4;170:19;171:9;
172:23;173:12;174:20;
176:11;177:7
jobs 12:7,9;21:15
John 45:18;156:23
Joint 69:16,21
Jr 155:2
judge 83:12
July 54:3,7;153:18,22,24
jump 73:6,6
June 9:8;14:24;15:11;
16:24;34:5,10;54:15;
63:12;130:20
junior 155:12

─────────

**K**

Katie 43:17;54:20;57:15;
59:24;60:19;145:7;152:4
keep 150:24;151:7;
157:18
keeping 149:8
Kelly 157:6
kept 58:19;71:10
kind 38:5;86:16;107:7
kindly 28:22
knew 41:18;64:9;92:24;
111:2
knowingly 107:15,21
knowledge 45:3;83:17
known 147:14;171:10
knows 111:23
Kokernak 140:15;141:20

─────────

**L**

lack 88:4
laid 104:3;140:9
Lamoureux 28:17;53:1;
145:7;146:2;152:5;153:5;
166:14,16
Lanciani 147:13,14,14;
163:23
Lancioni 147:11
landscape 10:6;66:13;
67:14
Landscape 9:15;11:11
landscaped 67:6;103:4
landscaper 65:11,15;
103:3
landscaping 10:7
Landworks 9:12;10:1,4;
12:17,19;16:8,16;18:8;
26:3;36:6;45:1;47:13,15,
17;48:6,6,14;49:17;51:9,
10,23;53:17;55:13,16;
57:1;59:17;61:23;63:5;
67:17,22;86:11;94:2;

96:10;101:1;108:1,16;
109:12;110:4,17;116:18;
117:3,24;118:5;119:21,22,
23;120:7,20;121:3,4,5,8,
14,21;122:23;123:4,8;
124:9,13,18;125:5,6,13;
128:11,12;130:12,16;
135:1,4;136:17;142:17;
144:24;148:23;150:9;
152:8;156:4,6,21,24;
158:18;160:5,19;165:20;
174:16;177:17
Landworks' 47:16;
51:18;53:6;157:9
language 115:20;173:3
large 106:16;157:19
largest 17:10
last 70:9;98:17;123:2;
147:10
late 42:21;68:8;107:1,2
later 31:6;50:11;65:19;
84:15;95:1,15;97:21;
100:6;104:8;111:1;128:12,
19;150:21;160:8
law 81:7;85:3
lawsuit 6:20;7:3;74:23;
81:4,6,14,18;82:3,5,18;
83:1;84:17;85:1;89:18;
90:3;93:18;94:8;98:22;
105:4;109:3,5,6;112:11,
14,15,19,21;113:7,11
lawsuits 95:22
lawyer 68:10;70:24;71:1,
7,9;74:15,16;95:7;105:2
lawyers 93:17
lawyer's 89:1
layer 17:12
lead 92:21
leading 41:9;63:6;136:9,
13
leads 136:5
leagues 15:7
leaning 160:21
learned 74:9,10
least 134:24
leave 72:17;116:14;163:7
ledge 139:13,22;140:5,9,
10,17;141:3,4,5,7,11,12,
14,18,21,22,22
left 31:17;40:18,20;41:14;
48:14;58:10;69:7;72:1,15,
21,24;101:12;125:13,16,
22;126:11;131:11;152:13
legal 86:11;97:2;132:7;
133:8,16
legally 23:10;96:11
legitimate 100:1
legitimately 101:8
Leonardo 154:5;155:20;
158:20;161:14;169:7;
173:3
less 101:19
letter 36:20,23;37:1;

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

54:16;55:17;56:1;57:8,13,
17,17,21;59:7,23;60:5,6;
62:6;67:12,15;102:15;
124:5
level 70:20
levels 56:9
license 6:8
lied 98:8,10
life 95:5,20
lifting 37:12
light 21:7;49:24;50:1;
89:17
lighting 50:14
lightly 88:7
lights 50:3
likely 155:24
limbo 126:10
limited 19:7
Limited 9:9
line 20:5,6,7,12,14;22:2;
52:17,21,23;58:8;115:24;
116:8;128:6;129:16;
135:17;140:20;141:2,2;
142:21;146:15,18;156:12,
14;161:2;162:17,18,20,22;
163:1,2,9,16;177:8
Line 126:15,22
lines 72:3;142:21;143:18;
156:15
list 30:18;46:6;69:11;
148:9
List 44:16
listed 23:19;51:12,15
lists 60:13
litigation 116:12,19;
117:3;118:1,20
little 8:17;18:12;35:10;
52:24;62:13;68:2;72:10,
13;73:17;76:15;80:8;
101:4;107:20;127:14;
148:22;161:3
LLC 130:16
load 160:13
loader 39:9,10;51:24;
52:1
loading 160:14
located 9:22;10:13;
11:14;46:2,12
location 52:22;73:8
logical 87:24
logs 144:15
long 12:12;73:6,6;83:9;
87:16;94:7;109:3;146:11
longer 65:7;157:11
look 16:9;32:4,9;35:2;
36:4;43:18;45:5;51:7;
62:10;77:6;82:13;85:20;
87:7;115:15,24;120:15;
133:24;135:18;149:1,13,
23;163:17
looked 66:17,21;77:23:
94:18;99:23;155:9
looking 17:5;18:12,21;

19:20;28:15;40:11;101:8;
104:2;115:14;118:19;
120:6
Looking 116:7
looks 85:21
loop 50:7
lose 9:21
lost 110:19
lot 61:3,4;73:19;80:7,14;
85:24;132:9;153:3;156:11
lots 10:9;39:2;41:8,9
Lovett 6:6,17;34:21;
75:22;76:18;77:2,4,17,19;
81:21;91:18,19,23;92:11,
15;93:3,11,14,16,21;
96:24;99:6,14,15,20;
100:10,12,18,24;102:2;
103:13;104:19,23,24;
105:4,5;106:6,7,14,18;
107:14;108:4,15,18,24;
109:11,13;110:11,20,22;
111:17,19;112:12,20;
113:3,8,21;114:7,9,13;
118:16;148:19;174:12,15;
175:18,23;176:12;177:6
lower 54:13;168:7
lumped 103:1,6,10
Luncheon 62:15
Lynch 38:13;69:21,22,23

## M

ma'am 7:13;8:21;16:14;
33:19;34:7;51:21
machine 80:10;86:2
main 14:17;26:5;128:5;
163:2
Maine 12:9;13:5
mainly 10:7;11:15,18
maintenanced 107:6
major 15:5
maker 92:11
makes 162:19
making 21:1;50:7;108:1
management 12:2;
70:20;71:22
manager 11:10;60:1;
70:19;140:14
manhole 58:6;146:12,24;
162:22;163:2;164:9
manholes 32:23
manned 107:3
Manning 57:14
many 80:9;86:21;87:15;
170:6,6
March 9:18,18;44:16;
72:9;74:19;75:1,3,4,5,6,7,
15:124:18;125:12;127:7,
21;128:15;129:2;138:9
Marianne 6:16
mark 36:16;85:15;115:3;
117:10;134:11;139:15;
142:9,10;149:19;153:10

marked 6:2;16:6;17:22;
28:20;33:21;35:16,20,21;
36:17,19;44:12;45:3,20;
46:1;53:22;56:19,22;
59:10,13;85:17;86:8;
117:1,12,17;119:1;122:10;
134:12,15;139:17;142:11;
150:6;151:18;153:12;
154:9;158:4;162:3;165:15
marking 28:10,23
markup 17:14
marks 47:22
marshal 28:4;65:1
Martin 133:11,11
mason 48:11;173:12
Mass 11:24
Massachusetts 9:14,16;
11:2,4,8;12:10;13:6;15:9;
81:7;85:3
match 134:4
material 23:7,8;37:5;
49:11,14;164:3,5,11
materials 17:13,15;
22:14;64:22;146:8;165:9,
12;174:1
matter 67:7;80:24;90:21;
98:2;115:1
Matthews 6:13;9:11;
12:17;18:19;19:2;29:9,22;
44:15;56:21;85:19;114:23;
123:7;177:16
MATTHEWS 6:4
maximum 43:24;60:14
may 7:4;23:16,18;32:6,
10;40:21;65:21;80:17;
82:6;91:8;107:19;114:2;
120:1;126:2;138:10;
144:11,11;149:10,21;
155:9;171:12;173:17;
177:4
May 35:8;83:7
maybe 49:7;83:7;100:2;
115:19;143:4;174:8
Maybe 172:13
McGuinness 44:9;54:21;
59:5,24;63:14;67:12;
68:15;70:9,18;132:14;
134:2;154:4;155:21;
158:19;159:6;166:14,17;
168:21,24;170:5
McGuinness's 70:15
mean 21:21;73:24;85:7;
88:5,8;92:9;102:19;140:4;
171:5;172:6,12,14,16,19,
24;177:4
means 15:20;130:6;
171:22;172:7,9,10,21,22;
173:7
meant 15:22;89:1;90:22;
157:10;158:23
measure 58:20;64:24
mechanically 55:3
mechanism 82:17

Medeiros 64:8;68:11
mediate 111:8
meet 43:4;60:23;80:15,
19,22;81:1;86:4;90:18;
94:22;95:1;101:6;102:7,7
meeting 51:5;54:20;
68:11,13,14;69:2,10,15,24;
75:23;87:7;89:10;128:20;
131:24;132:12,21;134:1;
136:23;148:8;152:12;
153:4;154:20,22;159:1;
162:12,13;164:23,24;
165:4
meetings 15:4;63:16;
87:15;153:7;171:9
Meltzer 177:19
MELTZER 7:14,19;16:12;
18:11,14;28:18;29:5,17;
36:14;38:18;42:7;51:2;
62:7;63:8;71:3,5;74:3;
78:1;81:23;82:21,23;84:3,
9;92:8,13;93:20;96:13;
99:18;106:9,19;107:18;
108:20;110:18;112:16;
113:2,24;115:6,10;116:4,
20;117:6;124:22;162:1;
170:12,24;171:24;172:15;
173:21;177:20;178:1
Meltzer's 177:24
memorialized 37:24;
38:2
memory 30:21;31:7;
32:10
mentioned 48:17
mess 92:22
met 6:13;60:19;95:5;
167:15
metal 146:17,22
metric 49:8
Metro 11:18
mezzanine 22:15;31:1
Michael 157:2;168:16,20
middle 29:14,16,19,21;
34:11;36:5;77:22
Middle 13:16;14:2,8,12;
16:17;28:13;35:24;36:2;
43:2;90:20;96:19;104:20;
122:24;125:15;138:18,19
might 12:4;27:3,17;51:6;
66:24;67:1,2;80:17;84:5,6;
91:9;103:19;120:2;130:10;
139:5;149:23;152:20
Mike 168:23
million 17:2;101:19
Milton 9:14;11:2
mind 85:23;90:5;93:23;
96:5;99:21;114:3;177:8,
11,12
mind-set 107:22
mine 109:19;127:14
minimum 43:24
minor 14:20;27:24;28:7;
133:17

minute 28:18;74:3;96:6;
117:6
minutes 105:24;106:2
Mirto 157:2
miscellaneous 40:22
missed 64:5,12,13
mistake 61:20
mistaken 160:2
misunderstood 24:7
moment 16:9;33:22;
44:11;45:5;57:16;59:12
money 53:3;63:22;68:1,
21;77:6,8;109:20;111:10;
157:20;175:16
month 27:15;90:19
monthly 68:5
months 56:13;83:10;
104:12
more 10:19;44:6;51:3;
53:3;58:18;64:1,14;65:5,6;
67:1,18,19,21,22,23;68:2;
69:12;87:11;88:19;94:23;
95:16;99:4;102:7;103:23;
105:23;111:12;112:7;
114:2;137:21;154:21,24;
169:22;174:7;176:23;
177:4,7
morning 6:13;176:18
most 20:2;33:24;55:1;
58:13;68:18;69:11;72:14;
111:23;112:5;122:7;
155:24;156:7;157:17;
163:15
Most 19:23;20:1,3
mouth 172:20
move 11:2,4,7;52:23;
167:23
moved 9:14;38:20;73:10,
12;86:23;167:13
moving 10:19;38:22;
137:15;158:15
much 74:18;75:14;78:20;
89:5;101:6,11;107:10;
114:3;120:5;125:10,13;
148:4,17,23;165:7;167:8;
170:20;178:2
Much 89:3
municipality 157:17
must 91:11;92:12;110:4
myself 16:1;34:22;43:18;
68:12;72:18;80:7;90:17;
101:1;164:21;175:6

## N

name 6:16;45:1;47:13;
51:18;65:16,18,22;114:24;
133:11;147:11,15;154:17;
166:16
named 91:17,18,19;
133:11
nature 58:19
Neal 9:11;12:16;86:9;

Case 4:05-cv-40072-FDS    Document 77-3    Filed 04/18/2007    Page 27 of 30

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

89:16;91:14;97:19
NEAL 6:4
near 58:3;61:5
necessarily 176:16
necessary 167:17
need 8:11;31:6;47:10;
53:2;74:1;78:23;85:24;
112:14;137:9;144:9
needed 14:11;15:14,23;
21:14;22:13;25:18;30:15;
33:12;40:21;62:6;69:12;
70:13;73:3,4,11,14,15,17,
19;88:2;90:3,6;94:17;97:6;
103:9;141:3;154:21;164:3;
174:22
needing 73:21
negligence 118:3
negotiated 34:21;97:9
neighborhood 133:18
neither 87:18
Neither 7:5
new 10:8;22:2;29:19;
88:13;97:6;146:21;162:16
New 12:9;13:3,5,9,10;
23:1,2;64:7;68:10;74:15
news 75:20,21
next 11:22;12:15;22:7;
27:17;35:20;45:1;47:3,13,
15;50:16,19;53:17;63:15;
64:11;70:19;73:22;74:9;
75:12,20;76:3;80:21,22;
81:3;84:19;86:5;88:22;
89:15,21;91:12;117:11;
118:24;122:15;124:20,23;
137:17,18,19,22;139:15,
19;142:9;144:16;149:19;
153:10;162:5;165:13
nice 8:5
nine 81:1;85:22
nine-hole 10:22
nipple 160:10
nobody 95:18
nod 8:5
Nods 159:23
nonpayment 67:24;
72:16
nonratification 13:20
noon 177:24
normal 8:6;158:1
normally 80:10
north 30:10;50:7;60:8;
61:4
North 8:22;9:10,23;10:15,
17,23;11:5;13:7
northern 43:1
northwest 31:23;73:19
notary 7:20,22
Notary 6:9
notation 19:5
note 122:19;145:6;158:23
noted 153:4;160:18;
164:24
notes 28:5;45:16;87:7;

143:3;153:4,4,6;164:24
notice 43:6
noticed 50:16
November 69:1;79:23;
128:19;131:24;132:12,21;
134:1;136:23;148:7;159:1
number 45:19;76:8,10;
132:15,23;138:19
numbered 29:2;44:24;
149:20
numbering 35:4,5,6,9,10
numbers 45:18;127:24;
132:19;134:4;151:10
numerous 89:1

**O**

Oak 35:24;61:3,3;166:5;
167:2,6,12,24
objection 170:15,16
Objection 36:14;38:18;
42:7;51:2;62:7;63:8;78:1;
81:23;82:21;84:3,9;92:8,
13;93:20;96:13;99:18;
106:9,19;107:18;108:20;
110:18;112:16;113:2,24;
124:22;170:12,24;171:24;
172:15;173:21
obligated 96:11
observations 59:7
obviously 25:16
occasions 170:6;171:7,
10
occur 84:6;121:23
occurred 121:21;122:6
o'clock 81:1
October 18:4;27:14;
38:22;50:17,20;59:17;
64:13;138:1
off 10:6;16:13;18:24;19:3;
28:8,19;29:13;35:15;
37:12;42:23;52:6,10,11;
53:20;76:16;115:7;117:16;
148:22;151:5;155:11;
160:10;161:6;162:2;
165:14;167:3
Off 16:12;18:23;28:18;
29:11;44:11;53:19;105:22;
115:6;162:1
offer 55:6
offered 27:20;143:16
office 80:3;177:24
oil 47:20;104:9;128:8
old 102:16;144:22;155:6;
156:14,15;162:18,21;
163:1,2
older 155:5
once 70:9;71:24;135:13
one 9:7;11:16;17:10;
19:12;20:23;21:18;22:8;
26:20;27:5;42:21;47:7,8,
24;52:13;56:4;58:2,7,8,12;
60:10;62:14;67:1;70:24;

74:1;82:9;87:18;94:23;
95:4,9,22;97:8;99:11,12;
101:12,14;103:16;104:15;
106:12;110:6;111:9;114:2;
116:4;117:15;122:16,18;
125:24;133:2;139:13;
142:10,10;144:16;152:11;
155:4,10;159:16,16;163:2,
2;165:13;166:10;167:3;
168:7;176:23
One 42:18;58:6
ones 51:17;89:8;92:21;
132:19
ongoing 58:20
only 17:3;21:18;26:24;
32:8;37:8;42:22;43:14,23;
50:1;52:9,24;56:3,7;70:24;
74:4;77:21;78:16;81:6;
84:22,24;85:4;92:23;
95:17;96:1;99:11,12;
100:3;101:21;109:5;
114:13;131:23;146:22;
156:6;159:11;163:3;
167:16;168:3;171:1;172:1
onto 161:18
open 140:9;141:21
operation 9:13
opinion 62:8;84:4;90:10,
11;92:15,21;103:7;104:14;
108:8;109:6;111:20;
112:19;113:13
opposed 51:5;139:3;
155:1
opposite 47:4
ordeal 108:11
order 27:22;70:2;88:17;
102:14;125:19;127:4;
137:4;138:5,7,12,15,20,21,
22;139:22;142:1;143:24;
145:14,20,24;146:2,4,5;
148:9,10,13;149:5,10;
150:5,9,19,22;151:4,8,8,
11,11,15,17,23;152:24;
154:14,15;163:10;164:14;
166:23,24;168:15
Order 135:3,7,11,19;
136:2,8,12;142:16;143:15;
144:3,23;149:5,15;152:1;
153:17,21,24;154:12;
156:19;158:7;162:8;164:2;
165:20,21;166:19;168:8
orders 27:8;28:6,7;70:2,
6;89:7;126:2;128:2,14,19,
21;132:4,17;134:19,21;
136:16,20,22
Orders 141:24
orient 29:9
original 20:20;29:1,18,
20;35:6;37:22;46:23;
88:16;112:11;123:23;
126:16;135:20;150:22;
151:12;174:8
originally 27:19;88:14;

104:3;143:16
others 107:11
otherwise 9:21
out 9:15;11:8,24;15:12,
18,20,22;25:6,7;27:15;
31:18:33:1;38:20;43:15;
49:11;60:17;64:1,17;66:7,
15;72:11;73:10;80:5;81:8;
87:23;88:11;90:21;92:16,
19;93:23;95:1,15;109:4,9,
9;112:1;117:14;131:23;
139:7;140:9;148:7;157:20;
161:5,18;164:8;170:18
Out 13:3
outer 31:4;46:22
outset 15:2
outside 48:9;65:9;74:7;
75:16;116:6;142:22;
143:18
outstanding 132:4;133:3
over 13:12;17:1;21:11;
30:2;32:13;42:6,10;46:8;
52:2,23;66:20;71:11,14,
15;74:16;80:16;89:10;
101:16;104:2;107:7;120:3;
158:13;160:5,23;161:3,19;
173:6;175:4;176:17;
177:10
overall 12:2;175:3;
176:11,15
Overall 40:10.12
overdue 131:1
overhead 50:2
overlay 37:16,17;38:8,13,
14;102:17
overpave 47:1
oversaw 11:11
overtime 154:16,23;
156:5,8,10;157:9,15,18;
158:1,3
owe 111:9
owed 69:9;77:6,8;102:21;
175:16
own 9:11;16:3;20:12;
161:8;172:21
owner 155:22;156:3;
157:24
Owner 129:19,24

**P**

package 101:14
pad 104:8
Pagano 28:17;53:1;
145:7;146:2;152:5;166:14,
15,16;168:16,21,24
Pagano's 153:6
page 18:5,14,20,21;19:4,
6,17;30:3;45:9;46:1;54:9;
86:12;98:2;123:2,9;124:3;
145:6;158:21,24
Page 18:1,2;19:21;23:22;
34:8;35:3;36:5;45:8,17,20,

23;48:4;51:7;53:5,9;85:21;
118:1,7;119:20;121:7;
124:7;129:12;130:15,19;
131:6;143:9;171:20
pages 18:3,18;24:17;
115:22;116:17;117:1,2;
119:14,18;120:23
Pages 116:16;117:22,23;
118:9;119:9;120:16
paid 39:1;48:12;68:22;
77:11;78:17;114:17;120:4;
164:19;173:12
paperwork 132:13;
133:24
paragraph 129:11
parallel 166:5;167:6
paranoid 80:8
parking 39:2;41:8,9;47:4;
61:1,2,3,4;73:19
parks 12:23
part 22:7;25:16;39:8,12,
24;40:24;49:15;61:12;
106:20;136:22;138:11;
139:11;141:4;149:4;
158:13;164:21;169:3;
176:12
Part 79:1;137:7;158:10,11
particular 13:15;118:20,
22;124:16;156:20
particularly 116:17;
118:1;119:8
parts 137:18
pass 91:14;92:12;94:24;
97:19,22
passed 98:2,19
pattern 109:15,16,21;
176:15
Paul 86:19;90:17;91:15;
92:10,12;97:20;154:16;
155:1,2,6,13,18,24;156:2;
157:8
Paul's 92:19;97:13
pause 119:19
Pause 117:9
paved 41:7,8
pavement 30:23;31:2,3,
9,11,21,23;41:20;47:1;
48:18;73:15;16;102:21
paving 14:21;39:1,2;
40:24;41:14,23;68:23;
69:16,17;156:16,16,17
Paving 38:13;69:21
pay 68:23;89:2;131:2;
175:7,10
paying 141:5,7
payment 33:16;63:19,21;
64:5,12,13,17;69:1;70:3;
88:19;89:14;125:7,7;131:1
payments 63:13,19;64:3;
68:17;127:11,12
Payments 64:1
payroll 156:20
payrolls 68:4,5,6

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

PCO 135:17
PD 122:16
Pee 15:6
pending 6:20;81:4,14;
86:11;94:8;98:21;109:3;
110:19
Pennsylvania 13:8
people 67:22;68:19;
70:17;78:20;84:12;92:23,
24;93:3;94:12,16;104:5;
176:5
per 141:15
percent 12:20,22;56:10;
60:14
perform 34:11,13;39:15;
40:6;41:3;61:23;154:6;
156:4;163:15;164:2;
168:17,19
performance 53:6
performed 28:13;30:15;
32:15;35:5;38:10;39:5;
40:9,14;41:6;51:9;121:14;
126:12;127:11,16;128:11,
12;129:2,7,8,9;131:11;
133:4;135:7;137:5,8;
138:23;139:4;143:1,2,3,6;
145:5,9,11,13,17;150:14,
20,21;151:3;156:9;158:17;
162:11;163:13;166:13;
168:12,20
perhaps 24:7
Perhaps 24:13
period 10:18;32:3,11,14;
33:18;42:4;74:11,19;
107:7;125:8
person 61:12,21;80:1;
95:4,22;106:12;133:11;
155:13,23;174:6
pertains 40:2
physically 21:5
pick 80:24
picked 132:17
piece 46:8
pine 137:20
pipe 146:22,22;151:5;
162:23
pipes 146:19
piping 21:13
pit 73:2
pitcher's 59:3
pits 31:14
Pitt 11:23
place 25:8;30:6;38:14,16;
49:13;61:7,24;68:24;
122:8;152:23;161:8
placed 17:11;27:14;
32:20,21;33:1,1;39:18;
49:11,14;54:23;67:15;
73:7,12,17,20;88:13,14;
101:13;103:8;110:4;128:9;
132:10;149:9;161:5
plainly 88:19
plan 25:20;166:11

Plan 29:2
plane 23:2,4
plans 41:7;73:8,10
play 21:8,16
playable 27:16
playground 13:1;41:18
playing 55:17
pleasant 79:21
please 7:10;19:13;32:3,
14;35:8;36:16;47:18;56:5;
149:20
plow 53:14
plumbing 137:13,23
plus 69:6
pm 178:6
point 18:17;33:3;38:24;
62:13;63:17;71:16;72:22;
76:18;84:15;87:6;91:17;
94:18;100:5,15,17;111:8;
112:23,24;113:4,7,10;
128:17;141:19
pointing 66:5
pole 21:7;22:20;50:3,4,9
poles 49:24;50:2,6,14
policy 157:21,23
portion 31:22;32:20;
41:11,20;43:13;69:17,18;
72:23;100:3;111:6;144:21;
151:2;159:17;162:14,23;
163:6;167:16
portions 33:6;34:2;133:2
Portsmouth 13:3
position 12:12;155:17
possession 45:10
possible 139:12,12;
142:4
possibly 116:8
post- 99:8
post-high- 8:19
potential 127:4;142:1
pounds 155:10
poured 61:22
practice 108:22;158:2
practices 81:19;84:8
precedes 18:21
preferred 78:20;81:8;
84:11
preliminary 6:21,24
premium 154:15;158:2
preparation 25:19;67:2;
156:15
Preparation 21:23
prepare 15:23;100:24;
103:21
prepared 26:14;101:22;
102:2;111:2;118:16
preparing 103:11;113:20
present 8:12;9:6;12:19;
90:7;111:20;170:10;172:7,
9
presenting 108:6,9
press 24:20;26:19;31:19;
50:2

pressed 25:7;52:3
pressing 101:5
pressure 103:8,19
pretty 26:24;63:20;69:8;
79:22;165:7
prevailing 157:17,22
previous 22:1;57:6;89:8;
119:13,18;127:11;140:17
previously 113:16;
122:18
price 21:13;37:16;131:7,
21;140:5;141:14,15;
152:17;164:8,13;165:5;
174:3,4
prices 146:10,10
prior 32:12;57:17;61:24;
98:19;138:23
Prior 124:5
private 10:23
probably 46:8;48:10;
51:4;71:4;72:7;115:16;
148:3;157:16;161:23;
164:21;176:17
problem 26:7;33:16;58:9;
64:18;74:5;94:5;95:6,10,
14;99:1;105:13;169:1,15
problems 64:9;87:24
proceed 6:22;22:14;
33:12;37:13;77:10;96:18;
123:22;146:8
proceeded 33:15;74:17
process 13:19;16:20;
17:4,19;80:18;92:24;
100:4;103:24;104:2,4;
126:7;128:9,19;170:18
processed 69:4;128:10,
23;148:16
produced 28:15,16
production 6:8
program 59:5
progress 27:11
progressed 10:8,15;
16:21;32:15;65:5
progression 109:14
project 11:16;13:14,23;
14:3;15:17,21;18:8;34:11;
42:12;60:1;63:4;70:19;
71:11,14,21;77:23;78:21;
84:13;86:20,23;87:12;
113:9;121:15;122:24;
124:13;125:14,15;129:17,
23;136:18;174:13;175:3
projections 175:4
projects 11:12,12,14,15;
12:3,3
prolonging 108:11
promised 15:6;70:1
pronounce 147:10;
154:17;155:14
proper 146:23;167:10
properly 62:3
proposal 16:23;17:1,3,6,
7,16;25:3;101:19;140:8,9;

143:17,20;151:14;153:8;
165:11
proposals 126:4,9;
127:19,21,23;128:2,22;
129:1,4;133:3
proposed 138:4,7,12,15;
143:24;145:14;151:15,16;
163:10
Proposed 141:24;
142:16;144:23;152:1;
153:20;154:11;158:6;
162:8;165:20
protect 81:7;85:3
protection 128:6;142:21
protest 69:14
protocols 170:21
provide 37:15;53:2;55:4,
7;79:3;88:17
provided 37:6;86:18;
133:9;141:16;146:6
providing 88:1;103:15
provision 130:4
provisions 64:21
public 20:10;22:4
Public 6:9
pull 151:10
pulling 43:15;80:5
purchase 17:13
purchased 24:2
purposes 29:4;149:7
pursuant 127:12
pursuing 94:3;95:12
push 156:17
put 16:23;25:8;38:20;
60:21;73:2,2,15,15;87:21;
88:20;95:21;102:6;105:16;
110:5;126:10;146:23;
148:10;152:19;156:8;
159:5;168:14;172:20;
175:12
putting 102:24;146:14;
157:15

## Q

quarter 37:16;38:7,13
quicker 170:20
quickly 14:13;15:13;79:8;
85:23;164:20
quotation 38:12
quotations 165:12
quote 165:4

## R

RA 14:5
rainstorm 58:17
raised 159:14,15
Raleigh 9:10,23;10:14,
17,23
Raleigh-Durham 10:14
ramp 61:3,4,4;167:9,20
ramps 20:4,18;32:1;

60:24;61:7,10,17,24;62:6,
9;110:6;166:1,4,9,18,19,
20,22,23;167:1,5,23;
169:8;176:7,8
ran 42:24;43:1,19;49:24;
50:3,3;52:2
randomly 110:4;173:11
range 13:5;137:24
ranged 11:15;12:9
rate 141:18;156:10
rates 157:19
ratification 13:20;77:14;
94:14;96:17,21;97:5,13;
99:7;100:4;122:22;123:15;
124:13,17;125:6;126:16;
129:3,9;130:5;131:10;
138:8,24;143:7;144:1
ratified 92:18;97:1
ratify 84:12,14;96:11;
112:2
ratifying 92:17,23
Raymond 157:4
RCP 146:15,16,18,22
read 7:21;19:12;56:5;
83:10,11;110:2;120:1;
125:18;129:12,13,14;
130:2
Read 7:19
reading 89:22;92:9;
113:12;120:3;129:13;
144:2
Reading 117:4
reads 83:13
ready 51:11
realization 174:19
realize 69:3
realized 27:12
really 17:4;34:3;62:8,9;
70:12;71:17;79:24;86:2;
88:6;93:23;95:2;97:8;
104:23;120:4;170:16
reason 63:23,24;81:6;
84:24;85:4;94:3;98:16;
109:24;112:20;119:12;
131:24;146:14;160:11;
167:16
reasons 39:4;98:14
rebuilt 62:6
recall 25:24;43:7,12;
45:11,13;46:5,14;51:24;
53:13;57:4;59:19,20,21;
65:16;78:10,24;84:4;
89:23;108:17;119:23;
120:7;125:10;135:12;
137:6;145:11;149:14,18;
156:11;161:22,24
recalled 168:16
receive 125:7
received 8:23;47:1;54:2;
63:22;69:1;70:6;115:16;
129:24;136:20
receiving 17:3;54:12;
57:4,21;59:19,20;60:4;

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 1
February 13, 2007

98:5;103:19
recess 62:15;165:17
Recess 35:18;96:8;106:3
recognize 44:20;45:7,15;
54:1;136:24;144:17;
151:20;153:14;154:11;
158:6;162:5
recognized 45:14;106:21
recollection 11:18;
24:22;27:7;50:23;73:20;
91:6;119:5,7;122:7;
130:22;152:11;177:5
recommendation 59:6
recommended 27:15
reconciliation 63:13;
64:2;68:16,17
record 7:15;8:8;16:12,13;
18:23,24;19:1,4;28:8,14,
18,19;29:11,13,17;35:15;
44:11;53:19,20;75:6;76:2;
115:6,7;117:16;153:1;
155:11;162:1,2;165:14;
177:14
records 12:6;69:3;79:1
recuperate 175:2
REDIRECT 170:1
redressed 58:24
reduce 174:3
reduced 17:15;172:18
reference 16:21;23:14;
28:11;31:6;89:5;97:18;
135:8,10,14,16;161:13
referencing 30:7
referred 18:4;29:22;47:6;
166:18;171:18
referring 23:1;36:1;
51:15,16;54:15;59:23;
77:13;87:1;96:20;99:6,8;
101:24;127:3,19;129:2;
155:7
refers 36:5;46:5;50:20;
127:3;161:21
reflect 28:14;75:6
reflected 24:16;126:19;
127:24;128:14,18;142:2;
143:24;144:4
refresh 50:23;91:6
refusal 89:2
refused 110:24
regard 27:10;55:14,16;
60:24;104:19;108:5;
176:21
regarding 45:3;108:13,
16
regards 106:10
relate 51:8;53:6;155:23
related 27:6;34:3;44:8;
47:16
relates 122:23
relation 12:7
relationship 71:19;87:5,
9;92:2
Relatively 155:8

relay 44:9
Release 55:17
released 82:7;129:24
Relocate 22:6
remedial 56:11
remember 12:11;14:22;
17:4;32:9;42:17,18,23;
43:14;63:23;65:15,18;
73:21;79:21;87:1;93:5,18,
22,23;169:11;171:8
remembering 147:17
remobilization 132:7;
133:8,15
remobilize 175:10
removal 20:5,13;37:6;
38:10;72:24;102:16;
137:13,17,19,20;139:14,
22;140:17;141:4,5,7;
152:18;156:14
remove 21:22,24;23:9;
26:6;33:10;37:2,7,8,10;
82:11;83:16;161:7;163:7;
165:8;167:11
Remove 20:1;21:16
removed 19:24;20:3,5,
17,18,21;21:9,21;22:5,9;
24:19,20;25:3;30:24;31:1,
2,8,12,13,15,16,20,22,24;
32:2,7;46:9,10;58:24;72:8;
83:8;141:3
removing 38:6;140:5;
158:15
renovation 10:11,16,20
repair 47:23;48:11;49:17;
158:11
repaired 39:19;43:9;58:4;
104:10
repairing 48:24;58:5;
158:13;173:5
repairs 58:21;65:24
repeat 39:10;93:8;116:23
rephrase 7:11
replace 158:9
Replace 159:16
replaced 50:15;52:7,9,11
replacement 158:14;
159:3;161:9
report 42:16;43:11,15,15
reporter 8:7
represent 114:24
representative 169:18;
170:9;177:17
representatives 170:7
represented 106:15;
149:24
request 28:3;55:20;65:8;
97:22;152:7;157:8;165:3;
168:19;169:19
requested 20:6;38:12;
89:3;118:4;120:20;126:5;
132:6;140:11,24;142:23;
145:5,7,24;146:2,4;
148:14;152:3,4,17;154:3,

6,16;156:4,6,7;157:14,24;
158:17,19;159:7,13,15;
162:10;163:6;164:1,22;
166:12;168:17,20,21;
171:9
requesting 64:15;103:22
requests 151:2
require 44:7
required 20:2
requirement 44:1;167:15
requirements 43:5;79:7;
80:4
reset 52:10
resolve 44:5;82:13;
90:21,21,22;112:8
resolved 92:7;94:19;
95:18,23,23
resolving 92:5
respect 119:9;155:18;
173:23;175:6
respond 85:22;86:1;
88:24
responded 97:21
response 8:4,7;43:7,12;
46:19;54:11,18;57:20;
60:4;64:6;70:8,8;72:20;
74:10;82:17,24;83:1,2,4,6,
15;85:1;86:12,16;89:16,
23,24;90:15;91:13;95:11;
97:23,24;98:6,17;109:9;
177:22
responses 120:4
responsibility 160:19
responsible 26:15;36:6;
61:19
rest 24:2;33:6;70:2;139:7
restarted 12:16
restate 98:11
resubmitted 143:21
result 125:5
resumed 34:20
retainage 127:13;129:22;
131:14;132:3,18
retentions 129:24
return 58:23;67:20;70:23
returning 72:4
review 33:22;53:1;57:16;
59:12
reviewed 57:17
Reviewing 16:11;18:10,
22;19:15;24:18;33:24;
35:8,11;36:22;51:11;53:8;
55:19;56:7;57:19;59:14;
115:8;116:22;118:10;
119:4;122:14;134:10;
154:4
reviews 44:14;53:24
revised 136:5,9,13
revision 136:5
Rhode 12:10;13:6
Rich 44:8;54:21;59:5;
63:14;67:12;68:14;70:8,
15,18;132:14;134:1;

158:19;168:24;169:14
Richard 59:24;154:4;
155:21;159:6;166:14,16;
168:21;170:5
rid 164:9
rigging 159:20;160:2,11,
17;161:11
right 8:17;9:8;19:13;31:7;
32:9;51:22;58:11;65:17;
82:18;89:12;100:5;102:8;
114:1,19;124:2;129:15;
133:23;146:16;151:21;
161:6;162:24;164:24;
166:16;175:16;177:12
rights 81:7;85:3;111:18
ring 63:24
rise 6:23;8:9;50:24
risers 159:3
road 41:9,10,19;73:14;
79:10;162:16
Rob 14:4
Robert 147:10,14
rolled 104:14
room 74:7;116:6;166:3
Room 46:3
rough 12:21
routine 8:13
rubber 59:3
rubberized 23:5,6;37:3,
11;38:6,10;102:17
rule 167:18
run 46:8;64:10;88:12,15;
167:1;175:4
running 36:10,12;43:21;
49:4;73:7;166:4,10
runs 157:19
rush 25:8
Russ 91:1,4,14;94:4;95:7,
8,10,13;97:19;98:24;
105:13
ruts 158:13
rutted 66:10

S

sake 25:22
same 10:10;34:24;35:12;
47:24;48:16;50:19;53:9;
64:13;120:19;126:19;
135:11,15;136:20;151:7;
160:12;164:18;166:22;
168:7
sand 10:21;17:11,12;
24:1,1;25:4;33:1:58:16
Sand 55:10
sat 56:13;83:9;107:1;
134:2
satisfactorily 6:7
saved 86:20
saving 17:14
savings 17:5;174:22
saw 91:10
sawcut 20:2

saying 43:4;45:14;65:6,
13;66:11;67:9;68:6;88:23;
90:2;92:10:94:20;95:12;
101:9;102:2;107:14;
110:10,10,16;111:21;
119:5,16;168:16
Saying 93:14
Schaak 125:2
schedule 154:24
scheme 70:16
school 8:19,20;29:14,16,
19,19,21,21,23,24;30:22;
34:11;41:18;43:2;64:20;
66:4,21;73:14;77:23;
103:7;154:20;158:16;
166:3
School 8:22;13:16;14:3,
8,13;16:17;28:13;29:15,
18:35:24;36:2;43:3;90:20;
96:19;104:20;122:24;
125:14,15;138:18,19
Science 8:24
scope 12:11;14:15;18:7;
19:5,7,9,16,19;20:13;
21:22;23:23,24;24:3,15,
21;25:5,13,17;27:9;29:10;
32:17;34:18,24;36:13;
37:22;39:9,13,24;41:1;
51:14;58:22;59:2,4;61:6;
65:10,14;66:1,2,7,13,15,
16;67:3,7,9;102:15;
103:22;104:3;108:9;
121:14;134:6,8;176:19
Scope 18:5
search 12:24
second 9:7,24;12:24;
19:6,12,16;29:12;43:11;
56:4;58:5;69:18;71:3;
85:12;100:4;116:4;125:24;
137:14
secondly 105:16
seconds 74:4
section 22:16;31:3,21;
43:3,17,23;44:1;60:12,16;
67:1
Section 19:13,24;21:23;
22:17,22
sections 66:24
seed 66:12,13
seeded 15:7;27:13;55:22;
73:5;103:9
seeder 66:13
seeding 15:8;27:15;30:5,
7;65:9,13,23;66:18;67:14;
73:1;103:4
seeing 43:15,16;45:13;
59:21;93:18;119:23;120:7
seem 35:11;75:14
seemed 50:14
seems 133:19
send 85:22;86:2
senior 155:13
Senior 8:21

Case 4:05-cv-40072-FDS    Document 77-3    Filed 04/18/2007    Page 30 of 30

Neal H. Matthews, Vol. I
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

sense 132:16
sent 124:24;67:12;68:1;
69:5;80:4,11;138:22
sentence 88:22
separator 128:8
September 15:8;36:21;
38:21;59:23;64:5,12;
124:9;145:13,18;148:3
sequence 87:23,24;
149:8
sequenced 151:8
series 97:17
service 41:9,10,19;55:4;
73:14;86:19;162:16
services 55:7
Services 9:9
SESSION 63:1
set 25:19;68:11;73:8,10;
78:23;86:7;89:15,21;
91:12;93:24;110:2
Set 38:3
setoffs 130:1
setting 108:13
settle 81:8
settlement 42:20;43:9;
58:18
settlements 58:15
several 89:7;172:24
shame 85:5
shaping 12:21
shed 41:21;73:16
sheet 19:6;134:2
Sheet 30:20
Sherwood 52:17;156:13
shifted 73:10
shop 31:22;41:22;88:12;
128:9;162:15
short 96:7;125:8;155:4
shot 73:21
shots 92:4,5,5
show 16:5;29:21;33:20;
36:19;66:5;118:24;144:16
Show 9:17
showed 52:20;93:3
showing 58:7
shown 31:19;35:21;45:8;
56:21;124:16;146:15;
162:6;166:2,11
shows 19:16;60:12
Shrewsbury 13:16;14:3,
8,8,12;16:16;27:2;28:13;
29:15,18;36:2;43:2;86:22;
89:4,6,11;90:20;96:19;
103:8;104:20;122:24;
125:14,15;138:18,19;
140:14;141:11;147:23;
148:1;152:6;159:6;170:8
shrubbery 152:12
shut 11:1;140:19,21
shutdown 54:24
shutoff 46:2
side 31:10,20;40:19;
41:21;46:14;50:8,10;52:6,

11:66:8,20;85:2;88:12;
111:9,10;146:12;160:10;
161:4;167:3,13;173:10
sides 37:20;45:16;49:24;
85:5;87:17;167:4
sidewalk 20:4;42:24;
43:13,17,19;46:12;53:13;
60:7,16;167:7
sidewalks 43:21;60:21;
167:14
sign 7:19,21;77:8;131:4;
163:23;164:6
signature 34:5,10;36:23;
121:8;123:3;130:16,18;
147:4,6,8
signatures 124:8
signed 36:20;65:4;70:6;
121:13,24;122:6;124:17,
20,23,24;126:2;129:10;
130:11,22;131:2;134:22,
24;135:4,5;136:17;143:7;
147:20;163:21;164:12
significant 17:18;30:15
signify 37:1
signing 125:8
signs 165:1
silly 170:14,17,21,22
Silverman 6:6,18;34:22;
75:22;76:18;77:2,4,17,20;
81:21;91:18,19,23;92:11,
15;93:3,12,15,16,21;
96:24;99:6,14,15,20;
100:10,13,18,24;102:2;
103:13;104:19,24,24;
105:5,5;106:6,7,14,18;
107:14;108:4,15,18,24;
109:11,13;110:11,21,22;
111:17,19;112:12,20;
113:3,8,22;114:7,9,13;
118:16;148:19;174:12,16;
175:18,23;176:13;177:6
simple 7:1,7
simply 24:14;44:24
sit 82:11,12;85:5,8;87:18;
112:1
site 13:12;14:7,11;19:19,
24;20:20;22:19;25:19;
30:16;32:21;33:6;34:17;
39:8,13;40:3,4,10,12,13;
41:10,19;48:11;52:18;
53:7;58:23;65:1,2;66:15,
19,20;67:2;71:24;72:8,14,
15,17;75:13,23,24;76:2,
14;77:6;78:15;80:15,19;
81:2;84:1;88:1,2;101:14;
104:3,13;106:24;107:5,6;
111:22,24;114:6;153:5;
154:20;156:8;166:8,10;
168:1,23;169:8;171:9;
173:12;174:1;175:8,9,11
Site 19:24;21:23;24:18
sites 13:4,5
sitting 45:11;89:9;95:21

situation 13:15
six 58:10;83:10;115:12;
168:3
Skidsteer 37:9
skipped 120:3
slang 173:20
slightly 43:24;44:6;60:17
slip 135:9;137:17,18,19,
22;148:13;164:6;173:2
Slip 137:9;159:1,8;161:13
slips 65:4;135:8,10,14,
16;137:5,10,11,12,14,24;
145:12;147:2,3,19;149:24;
150:1,3;153:18,20;163:12,
20,23;164:12
slit 55:15;58:15
Slit 55:10
slope 44:1;61:16;166:4,
21;167:10,14,20
slopes 60:13;161:6
small 43:3;58:13;152:20;
165:6
smaller 69:22
SMI 161:14,17,21;171:19;
173:3
SMS 138:17
SMS0104 138:15
snow 52:3;53:14;137:17,
19;160:6
Snowplow 53:12
soccer 30:10
sod 27:20,21,22;34:15;
38:11;39:18
sodding 27:18;37:18
soil 9:1;56:9;59:1
sole 129:17
somebody 94:1;146:18
somehow 56:10;82:11
some-odd 69:24
someone 82:1;94:4,8;
101:9;110:13;151:1;164:3;
173:10,24
Someone 91:8
sometime 10:18;38:20;
83:7;174:20
Sometime 72:5
sorry 24:11;29:11;35:9;
39:10;45:7,21;57:11;71:6;
82:22;84:21;86:13;89:20;
93:8,8;116:22;117:14;
118:8;121:3;123:6;128:17;
129:6;137:12;144:2,2;
155:14;166:15;172:11
Sorry 159:8
sort 12:24;22:7;42:10;
44:2;53:4;71:21;76:15,15;
77:4;92:22;97:11;106:15;
109:8;126:10;133:7;
140:21;177:5
south 31:20;46:12;144:21
southeast 50:10
southwest 66:4
speak 80:2;81:12,12;

82:1;85:9;100:2;109:3,7;
110:1,24;169:18;170:7;
176:5
speaking 26:12;42:9,10;
104:1;107:9,12;141:19;
155:8;166:23
specific 25:24;40:11;
74:24;120:13;157:8
specifically 27:5;106:12;
109:21;152:10;156:4
Specifically 122:1
specify 157:13
speculate 47:11
speculation 47:9;61:11
speedy 112:8
spend 62:9
spoke 42:2;70:8,24;76:6;
89:9;99:12;101:12
spoken 39:16
spring 42:19;72:2;107:8;
128:24;140:22;143:4;
144:13
squat 155:4
squeezing 173:23
Sr 155:1,24;156:3
St 86:19;90:17;91:15;
92:10,12,19;97:12,20
staff 12:5
stand 138:17
Standen 13:24;14:10;
15:23;16:7,8,16,23;17:10,
23;18:8;21:10;23:8;9:24:2;
25:3;27:10,10;32:12,13,
24;33:16,17;34:19;35:1,7;
42:4;49:12;54:24;65:12;
71:14;76:24;77:1,3;78:2,6;
79:17;96:23,24;99:8;
101:21;121:2,12,22;123:8;
124:1,7,9,12;126:6,14,23;
134:7;139:3,8;142:24;
143:11,16,17,20
Standen's 141:10
stapled 86:7;91:12
star 127:2
start 14:12;15:15;25:23;
30:20,22;72:3;80:9;157:14
started 10:2,6,11;25:9;
32:24;33:5;34:14;63:10,
17;64:2;69:3;80:5;82:17
starting 50:6;64:1,14
Starting 109:23;129:15
starts 101:3
state 119:14;177:13
State 8:23
stated 14:11,20;15:18,22;
22:3;38:3;50:12;56:12;
60:7;86:4;98:13;105:7;
109:1;113:16;114:10;
141:6
statement 6:24;24:5;
55:21;98:20;108:10;120:8
statements 56:1;60:5;
62:5;106:7,11;107:15,15,

82:1;85:9;100:2;109:3,7;
110:1,24;169:18;170:7;
176:5
speaking 26:12;42:9,10;
104:1;107:9,12;141:19;
155:8;166:23
specific 25:24;40:11;
74:24;120:13;157:8
specifically 27:5;106:12;
109:21;152:10;156:4
Specifically 122:1
specify 157:13
speculate 47:11
speculation 47:9;61:11
speedy 112:8
spend 62:9
spoke 42:2;70:8,24;76:6;
89:9;99:12;101:12
spoken 39:16
spring 42:19;72:2;107:8;
128:24;140:22;143:4;
144:13
squat 155:4
squeezing 173:23
Sr 155:1,24;156:3
St 86:19;90:17;91:15;
92:10,12,19;97:12,20
staff 12:5
stand 138:17

19,23;108:2,5,14
states 94:5;162:24;
175:24
States 114:24
stating 52:24;67:12
statis 140:22
stay 151:11
Steve 157:6
stick 133:19
sticks 93:23
still 25:18;26:21;36:1;
40:20;44:5;64:3;68:2;82:9;
106:23;119:14;128:22;
148:11;152:13;162:22
stipulations 7:15,16
stockpile 32:20
stood 103:21;144:22
stop 9:20;110:9
storage 41:21;73:16
Storage 46:3
store 21:24
Story 20:20;21:4;48:3,23;
101:18
straight 149:11
straighten 161:7
straightened 160:24
straightening 160:22
straightforward 7:7;
165:7
stream 101:2;150:24
streams 109:2
street 167:8
Street 61:3,3;166:5;
167:2,6,12,24
stretch 64:1
stripped 32:19
strong 98:11
strong-arm 111:14
strong-armed 109:12;
110:21;114:6,15
strong-arming 109:17;
110:17
struck 76:15
structure 21:8,16,20
stuck 114:3
study 105:23
stuff 97:2;115:21
stuffed 146:19
stupidity 164:21
subcontract 13:21;
34:20;77:9;78:4;121:2;
123:7,8,21,24;124:7;
126:22;127:7;129:21;
130:11,22;131:6,7,21,22;
132:24;134:7,9;135:24;
142:2;144:6
subcontractor 33:3;
77:12;122:22;129:17,21;
130:5;156:7;169:16;
171:23;172:3,17,22
subcontractors 12:4;
77:5;92:17;114:5,13;
154:22;170:6;171:4,8;

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

175:24
subgrade 32:22;49:12
submit 70:3
submittals 136:19
submitted 137:4;139:2,
3;143:16;145:2,14;147:20,
20,22,24;148:11;149:4,15,
16;150:9,17;151:13;
163:11
submitting 143:20
subsequent 63:15;
65:17;92:14;128:15;
150:21
Subsequent 113:11
subsequently 148:12,19
sudden 94:20
sue 113:4
sued 104:23,23
suffered 107:7
sufficiently 9:2
suggest 90:16
suggested 27:17;94:22
suggestion 91:14;97:19
suit 75:9;114:16
sum 126:17
summaries 156:20
summarize 9:4
summer 68:9;75:15;
143:4
superintendent 12:1
supplied 20:11
supplier 173:24
supply 59:5;103:19
suppose 6:24;74:8
supposed 52:21,22;72:2;
87:21,22;101:11;167:1
sure 79:7;86:1;110:10;
140:23;151:20;160:16;
176:24;177:2
Sure 19:14;86:17;116:24;
169:21
surety 13:12,19;71:12;
81:11;86:10;88:24;91:24;
92:2,5;93:4,11;96:10,16,
18;100:1,23;111:21;
118:14,17;124:20;125:5
Surety 129:18,20;130:1
surety's 98:2
surface 23:1,2,5,6;26:6;
37:3,7,9,11;38:7,11;
102:18,24
Surface 57:24;73:15,16
surfaces 22:24
surfacing 23:13
surprise 81:16
surprised 68:18;83:23;
84:2,5
surrounding 7:3
suspect 98:17
suspended 177:23;178:6
suspicions 63:9,11;
104:6
sustain 55:23

swing 176:23
switched 24:8
sworn 6:9
system 26:16,18;32:22;
33:4;35:4,5,6;39:20;58:21
systems 26:15

T

T&M 147:1;148:6;154:7;
164:6
tactic 111:14
talk 51:22;92:24;94:17,
20;95:17,18,22;96:1;116:3
talked 25:10;39:7,11;
70:10;76:21;77:13;174:13
talking 48:18;51:17;
60:10;86:3;96:21;100:3,8;
107:5;166:24;169:15
tally 149:2
tank 47:20
tanks 104:9;137:15,16,21
tap 163:4
tasks 55:13;154:7
teachers' 73:19
technologies 9:1
tees 10:21
telephone 45:18,19;
75:17;76:8,10;78:8
telling 78:11
temporary 137:16,21
ten 22:12;43:3;48:10;
73:11;142:22;143:18;
167:24
ten-foot 44:1;60:16
tennis 61:1,2
term 23:15;114:10;173:23
terminate 130:8
terminology 171:17
terms 125:22
test 54:22
testified 6:10;24:8;98:4;
108:12;118:12;121:10;
133:6;160:4
testifying 159:22;177:18
testimony 24:8;42:3;
156:2
thanked 79:20
Thanksgiving 68:12;
89:10
thinking 26:21;80:7;
144:13
third 86:7;129:15
thoroughfare 43:20;
60:19,22;167:18
thoroughfares 43:22
thoroughly 103:23
though 50:8;59:2;103:18;
108:21;141:5;146:9;161:9
thought 23:19;24:8;36:1;
78:14;170:17,17;171:2,7;
177:1
thousand 101:21;118:17

three 95:21;134:14;
176:17
Throughout 42:12
ticket 22:5,6,8;31:15;
88:13
tied 32:23;146:17
Tiffany 125:2
timber 152:14,15
timely 88:3
times 66:10;176:18
title 155:17
today 6:18;28:11;39:17;
45:11;47:11;66:17;77:24;
177:16;178:3
Todd 57:14
together 16:23;19:8;
36:4;87:9;102:6;105:17;
133:1;146:18,19;168:15
told 14:8;15:10;17:10;
21:4;23:8;25:4;26:5;37:3,
8;60:19;61:12,15,16;
67:23;70:11;71:1;72:6;
75:22,23;76:6,13;78:13,
15,22;79:3,9,11,18;80:23;
81:5,10,11;83:23;84:20;
85:11;86:10;91:8;99:3;
105:13,15;146:24;155:20;
168:24;169:11;170:3,6
took 9:15;13:12;32:13;
42:6,10;61:24;68:24;
74:11;83:10;97:16;106:14;
122:8;153:6;173:11
top 23:3;45:8;48:21;52:2;
85:20;86:12;104:9;105:22;
115:17,20,23;116:8;117:1;
129:12;135:17;139:23;
145:6;160:23;161:19
topsoil 32:19;33:2;54:23;
73:19
total 68:17;127:7,11,11;
133:17;138:4;159:9
Total 30:16
toward 108:19;175:13
towards 42:10;113:23;
163:4
town 73:23;74:12
Town 27:2;54:21;68:22;
72:9;75:23;86:21;87:6,11,
19;89:4,6,11,14;103:8;
126:5,8,13;127:20;128:3;
140:13;141:10,10,14;
145:8,24;146:1;147:21;
148:11,14,15,16,18;
150:19;151:14,17;152:5,7;
158:15;159:6,11,12;
164:16;170:8
track 9:21;22:24,24;23:1,
2,5,13;26:4,6,8,11;30:2,9,
11;31:11,18,20;36:10,13;
37:3,12,17;38:4,6,11;
40:23;46:24;49:4,6,9,10,
15;50:8,10;73:4;79:13,15,
16,18;102:13,13,14,17,21;

103:1;110:19;144:21;
148:22
track/football 40:19
tracked 48:21
Tracklite 26:11;79:17
trade 81:19;84:8
trades 28:1;66:8;67:21;
176:5
traffic 55:23;113:12;
176:4
transcribe 8:7
transformers 158:15
transition 167:9
transitional 168:2
transmission 18:1;
45:22;54:2;57:8;59:15
traps 10:21
trash 158:10
Travelers 91:15;97:20
treat 110:22
tree 137:20
tremendous 176:4
trench 20:5;140:9;
141:12,18,22,22
trenching 22:2
tried 47:23;106:23
trouble 63:7,10;72:7;
90:6;147:17
troubled 107:21
truck 52:5
trucks 160:13
true 63:24;76:4
truth 98:23
truthful 98:12,13,18;
105:11;111:3;113:18
try 37:10;70:13;71:9;
72:19;83:16;111:8,10;
131:23;154:23;174:7;
175:1
trying 24:12;27:11;72:3;
109:18;111:8;115:11;
160:15;164:19;172:20;
176:19
Tuesday 86:5;98:17
turf 67:4,5
Turface 59:1
turn 68:5,7;123:2;130:9;
162:19
turned 52:12,14;63:14;
74:16;79:13;89:13;169:14
turning 116:15
Turning 53:5,9;55:10;
123:14
twice 13:22
two 18:18;19:3,7;23:3;
24:17;42:18;58:2,6;60:3;
63:15;67:3;68:14;77:23;
80:22;85:5;87:9;96:6;
114:2,4;131:17;132:24;
133:3;134:24;137:12,14;
146:19;155:3;168:1;171:7
two-inch 163:3,4
type 13:1;23:7;105:2;

160:13
typo 150:16

U

under 17:11;19:24;20:13;
22:16;25:13;34:20;44:8;
51:14;54:13;56:8;69:14;
77:10;81:7;83:3;91:23;
119:20;123:20;124:5;
162:18
Under 21:23;22:17;24:18
underdrain 32:22,24
underground 14:20;
50:6;163:8
understood 38:5;171:2,6
undertake 38:9;55:13
undertook 51:10
undone 41:14
undulations 57:24
unfair 81:19;113:22;
170:23;171:2
unfortunate 88:24
unit 141:14,15
United 114:24
universe 106:16
University 8:23
unless 131:2;157:24;
164:23,23
unmanned 101:1
unreasonable 90:12
unresolved 125:19;
127:4;139:11;142:1
untruthful 98:22
untruths 99:2
up 9:6;11:3,4,19;21:12;
33:8;37:12;47:1;51:4;55:6;
58:20;63:6;64:22;65:3;
66:10;68:11;70:4,20;
78:11;87:13;91:10;97:17;
101:9,15;104:15;111:12;
112:24;113:3;115:17,21;
125:24;132:10,15,19,22;
134:4;142:4;148:20;
151:10;158:10;159:15;
161:8;168:23;169:23;
171:12,14,15;175:20;
176:22;177:2
upbeat 79:22
upon 129:18
use 87:13;88:6,7;129:16,
20;130:8;160:12;175:12
used 23:15;46:24;66:8,9;
114:8;134:3;154:23;164:5;
173:20,23;174:5
USF&G 7:4;28:16,22;
68:11;69:19;71:10,11,13,
20;72:19;81:5,20;82:2;
83:5,7,24;84:8;90:7;91:7,
10;97:12;102:1,3;103:15;
105:1;112:12,19;113:5;
118:5;119:21;120:20;
122:23;123:17;124:14;

Case 4:05-cv-40072-FDS    Document 77-4    Filed 04/18/2007    Page 2 of 31

Neal H. Matthews, Vol. 1
February 13, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

175:15
USF&G's 116:11,13,18;
117:2,24;120:17
using 88:3
usual 7:16
utilities 14:7,21
utility 20:10;22:4,20

**V**

vague 120:10,13;152:11
vaguely 38:5
validity 99:24;108:2
value 125:23;126:11;
127:10,16
valve 46:2,9,10:52:20;
159:4;162:21,22;163:2
valves 52:19
valving 164:8
various 11:12:21:13;
27:23;66:7:67:21;68:3;
152:12;154:7
vehicle 158:12;161:18
ventilation 87:16
ventilators 87:15
verbal 8:4
Verdelotti 157:4
verifies 147:6
verify 164:4
versus 119:21,22,24;
120:7
view 98:23
Virginia 13:7
visit 75:13
visited 65:1
visits 71:24
visually 163:17

**W**

wage 157:17,23
wait 165:10
waive 7:19,22
walk 30:18
walk-through 168:23;
169:11
walkway 41:17:73:13
walkways 41:12;168:2
washing 58:9
watched 163:15
water 9:1;26:15:52:17,21,
23;128:6,7,8;140:20;
141:1,2;142:21,21;143:18;
156:12,14,15;161:1;
162:17,18;163:1,9,16
Waterfield 57:9
Waterman 43:10:54:16;
57:10,11
Watertown 9:16;11:9
way 7:8;8:6;15:16:23:10;
27:13;47:12;71:19:82:9;
90:24;93:22;112:13;132:2;
137:20;146:22;157:14

ways 105:19,21;174:14
weathering 56:16
Wednesday 86:5
Wee 15:6
weeds 58:24
week 63:18:71:24;75:20;
76:1,3:80:23:86:5;157:22
weekends 157:10
weeks 68:14
weighs 155:10
weighted 88:5
weren't 134:4
west 46:14:50:6:73:11
wet 66:9
what's 45:8:105:4;119:1;
143:13,15:149:24
Whenever 150:18
Whereas 173:9
Whereupon 178:5
wherever 174:22
whole 40:3,4,10,12;45:5;
106:23:108:11;161:4
whose 67:7
Whose 101:10;147:8
wife 125:4
willing 89:17
Wing 46:13
winter 53:15:72:1;101:3;
107:3,8;140:17,18;144:12
wires 50:3,8,13
wished 171:3
withheld 127:13:131:14
within 22:12,18:29:23,24;
36:13:125:8;129:23
without 43:15:82:14;
95:23;103:23;108:2;127:6;
170:9
Without 28:5
witness 6:5:44:14;53:24;
74:6;116:5
WITNESS 71:4,6;74:4;
82:22;96:5;115:9;178:4
witnesses 9:5
word 12:24:88:4,5,6;
98:11;107:21;108:22,23;
114:8:170:13;173:19,22
worded 38:5
words 172:20,21
work 9:5:10:11,16;11:3,5,
20,23:12:11:13:9,10;
14:15:15:2,19:16:1,3,16:
18:6,7;19:5,9,16,17,19,19,
20:20:7,8,12,15,16;21:5,
10,12;22:12;23:23,24;
24:15,21;25:5,9,13,17,23;
26:8;27:9;28:12;29:10;
30:15,16;32:14,15,16,17;
33:5,9,13,18:34:11,13,16,
18,20,23,24:35:4;36:7;
37:22;38:4,9;39:4,9,12,13,
15:40:1,6,8,15,16;41:1,3,5,
14;42:4,6,14,16:47:16;
49:12;51:9,13;56:15;60:9;

61:6;63:4;64:15,16;65:5,
11,14;66:1,2,7,15,16,19,
20:67:3,10,13;68:23;69:5;
70:2;72:10,12,13,21;73:9;
75:20,77:5,10;78:15,17,
20;79:15,16,18;81:9;
84:14;87:24;88:1,2;89:3,4,
6;90:20;96:18;101:10,14;
102:9.24;104:13;106:21,
22:107:13,16,20,24;108:7,
9;110:3,5,5,7,8,12,13,14,
24;111:24;112:3;123:20,
22:125:19,20,21,22;126:1,
3,6,12;127:4,10,20;128:3,
4,11,12,14,21,23;129:1,6,
8,8;131:11;133:4;134:6,8;
135:6,9,12;137:5,6,8;
138:23;139:2,4,5,7,7;
140:12,13,16,16,24;141:1;
142:1,19,20,23;143:1,2,6;
144:8,10,11,13;145:5,9,17,
21:148:9,10,15,24;149:17;
150:13,20,21:151:3;152:3,
9,22:153:2,3;154:3,21,23;
156:5,9;157:9,10,10,21;
158:1,9,17;162:11;163:13,
15,24;164:2,7,16,18,22;
165:2,3,23,24;166:12;
168:12,18,19,20;172:4,4,8,
19;173:13,17;174:6;
175:11,13,23;176:6
Work 35:2
worked 9:9,16;11:8;
12:13;13:7:72:2;91:23;
124:5;164:4
working 13:13,19;15:17;
22:4;32:12;48:11;75:10;
77:10;87:9,23;92:1,18;
123:21;173:12
works 72:6;75:18;147:9;
148:13,14;163:14,16,21
worksheet 134:3
worse 125:4
worth 69:6
writes 94:4,9;125:4
writing 25:6;28:24
written 19:9;25:1,2,7;
36:7:48:14;51:18;53:17;
90:16:94:1,22;153:1;
164:15;168:11
wrong 24:4;73:7;82:6;
99:15,20;100:10,13,18;
104:19;105:6;106:14,16;
117:15;170:23;174:13;
176:21
wrote 27:22;45:15;80:13,
20,21;81:10,15;84:20;
86:12;94:23

**Y**

yard 49:8:141:12,15,17,
23

year 27:17;38:19,23;
42:11:54:22;79:23;89:8;
138:21
years 10:5;11:3;95:21
York 13:9,10
younger 155:5

# In The Matter Of:

*Landworks Creations, LLC v.*
*United States Fidelity and Guaranty Company, et al.*

*Neal H. Matthews, Vol. 2*
*February 16, 2007*

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*Videoconference Center*
*50 Franklin Street, Boston, MA 02110*
*Phone: (617) 426-2432*

Original File matthews2.v1, Pages 1-119

**Word Index included with this Min-U-Script®**

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

---

Page 1

Volume II
Pages 2-1 to 2-119
Exhibits 90 - 116
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION
- - - - - - - - - - - - - - - -x
                              :
LANDWORKS CREATIONS, LLC,     :
        Plaintiff,            :
                              :
vs.                           :  Civil Action No.
                              :  05-CV-40072 FDS
UNITED STATES FIDELITY AND    :
GUARANTY COMPANY and          :
LOVETT SILVERMAN CONSTRUCTION :
CONSULTANTS, INC.,            :
        Defendants.           :
                              :
- - - - - - - - - - - - - - - -x

        CONTINUED DEPOSITION OF NEAL H. MATTHEWS,
individually and as designee of LANDWORKS CREATIONS,
LLC, a witness called on behalf of the Defendant
Lovett Silverman Construction Consultants, Inc.,
taken pursuant to the Federal Rules of Civil
Procedure, before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
The Mountain States Law Group, 160 Speen Street,
Suite 307, Framingham, Massachusetts, on Friday,
February 16, 2007, commencing at 12:12 p.m.
PRESENT:
    The Mountain States Law Group
        (by Robert N. Meltzer, Esq.)
        160 Speen Street, Suite 307, Framingham,
        MA 01701, for the Plaintiff.
(Continued on Page 2-2)

---

Page 2

PRESENT (Continued):

    Hermes, Netburn, O'Connor & Spearing, P.C.

        (by Eric C. Hipp, Esq.)

        265 Franklin Street, Seventh Floor, Boston,

        MA 02110-3113, for the Defendant United

        States Fidelity and Guaranty Company.

    Donovan Hatem LLP (by Marianne E. Brown, Esq.)

        World Trade Center East, Two Seaport Lane,

        Boston, MA 02210, for the Defendant Lovett

        Silverman Construction Consultants, Inc.

                    * * * *

---

Page 3

| [1] | | | | I N D E X | | |
|-----|--|--|--|-----------|--|--|
| [2] | WITNESS | | DIRECT | CROSS | REDIRECT | RECROSS |
| [3] | NEAL H. MATTHEWS, | | | | | |
| [4] | Resumed | | | | | |
| [5] | BY MR. HIPP | | 2-7 | | | |
| [6] | BY MS. BROWN | | | | 2-98 | |
| [7] | BY MR. HIPP | | | | | 2-113 |
| [8] | | | | * * * * | | |

| [9] | | E X H I B I T S | |
|-----|-----|-------------|------|
| [10] | NO. | DESCRIPTION | PAGE |
| [11] | 90 | Landworks Creations, LLC, Proposed | 2-7 |
| [12] | | Change Order SMS01404 dated 8/31/04, | |
| | | with handwritten annotation | |
| [13] | 91 | Landworks Creations, LLC, Proposed | 2-9 |
| | | Change Order SMS01504 dated | |
| [14] | | September 27, 2004, with attached | |
| [15] | | job work orders | |
| | 92 | Landworks Creations, LLC, Proposed | 2-10 |
| [16] | | Change Order SMS01604 dated | |
| | | September 27, 2004, with attached | |
| [17] | | job work orders | |
| [18] | 93 | Landworks Creations, LLC, Proposed | 2-12 |
| | | Change Order SMS01704 dated | |
| [19] | | September 27, 2004, with attached | |
| | | letter from Richard McGuinness to | |
| [20] | | Neal H. Matthews dated September 15, | |
| [21] | | 2004 | |
| | 94 | Landworks Creations, LLC, Proposed | 2-13 |
| [22] | | Change Order SMS01804 dated | |
| | | September 27, 2004, with attached | |
| [23] | | letter from Richard McGuinness to | |
| | | Neal H. Matthews dated September 15, | |
| [24] | | 2004 | |

---

Page 4

| [1] | | E X H I B I T S, Continued | |
|-----|-----|------------------------|------|
| [2] | NO. | DESCRIPTION | PAGE |
| [3] | 95 | Subcontract change order from | 2-15 |
| | | Standen Contracting, Inc., to | |
| [4] | | Landworks dated 10/17/03, with | |
| [5] | | attachments | |
| | 96 | Subcontract change order from | 2-15 |
| [6] | | Standen Contracting, Inc., to | |
| | | Landworks dated 12/19/03, with | |
| [7] | | attached letter from Neal H. | |
| | | Matthews to William Gambill dated | |
| [8] | | November 17, 2003 | |
| [9] | 97 | Landworks Creations, LLC, Proposed | 2-17 |
| | | Change Order SMS0504 dated April 11, | |
| [10] | | 2004, with handwritten annotation | |
| [11] | 98 | Landworks Creations, LLC, Proposed | 2-19 |
| | | Change Order SMS0604 dated April 11, | |
| [12] | | 2004 | |
| [13] | 99 | Landworks Creations, LLC, Proposed | 2-20 |
| | | Change Order SMS0704 dated April 11, | |
| [14] | | 2004 | |
| [15] | 100 | Letter from Richard McGuinness to | 2-23 |
| [16] | | Neal H. Matthews dated January 13, | |
| | | 2005, with handwritten annotations | |
| [17] | 101 | Submittal from Neal H. Matthews to | 2-25 |
| | | Richard J. McGuinness dated July 20, | |
| [18] | | 2004, with attachments | |
| [19] | 102 | Request for information from Neal H. | 2-26 |
| | | Matthews to Richard J. McGuinness | |
| [20] | | dated July 20, 2004, with attached | |
| | | letter from Richard McGuinness to | |
| [21] | | Neal H. Matthews dated August 12, | |
| | | 2004 | |
| [22] | | | |
| [23] | 103 | Letter from Neal H. Matthews to | 2-30 |
| | | Jackson Construction Company dated | |
| | | September 8, 2004 | |
| [24] | | | |

---

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 5

E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 104 | Letter from Neal H. Matthews to Robert B. Barton, Jr., dated October 25, 2004, with two pages of attachments | 2-34 |
| 105 | Letter from Richard McGuinness to Neal H. Matthews dated November 15, 2004, with attached fax cover sheet | 2-36 |
| 106 | Letter from Richard McGuinness to Russ Werner dated November 12, 2004, with two pages of attachments | 2-40 |
| 107 | Letter from Jim Kokernak to Katie Crockett dated September 20, 2004, with five attached drawings | 2-51 |
| 108 | Page 1 of 2 of document entitled "Site Work Items to be completed, 9/22/04"; Pages 1 and 3 of 3 of document entitled "Work Items to be completed, Sections A & B, 9/22/04" | 2-59 |
| 109 | Eight-page document entitled "Contractor Deficiency List, 9/23/04" | 2-68 |
| 110 | Four-page letter from Jeff Richards to Todd Manning and Katie Crockett dated December 7, 2004, with handwritten annotations | 2-82 |
| 111 | Copies of six checks from Jackson Construction Company to Landworks Creations, LLC | 2-94 |
| 112 | Contract information worksheet dated 4/29/04 | 2-95 |
| 113 | Printout of e-mail from Al Falango to Russ Fuller, et al., dated August 17, 2005 | 2-98 |

Page 6

E X H I B I T S, Continued

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 114 | Amended complaint of Landworks Creations, LLC, dated June 20, 2006 | 2-100 |
| 115 | Letter from Julie A. Ciollo to Robert N. Meltzer dated January 12, 2007, with attached proposed affidavit of Neal H. Matthews | 2-110 |
| 116 | Two-page letter from Robert N. Meltzer to Jeremy Medeiros dated March 17, 2005 | 2-113 |

* * * *

Page 7

P R O C E E D I N G S

NEAL H. MATTHEWS, Resumed

a witness called for examination by counsel for the
Defendant Lovett Silverman Construction Consultants,
Inc., having been previously duly identified and
sworn, was further examined and testified as
follows:

CROSS EXAMINATION, Continued

BY MR. HIPP:

Q. Mr. Matthews, good afternoon. Again, my
name is Eric Hipp. We're here continuing the
deposition of you that started on Tuesday. We're
here continuing it on Friday.

(Discussion off the record)

Q. Now, Mr. Matthews, as I was last asking you
questions the other day, we were going through
proposed change orders from Landworks that were
submitted to Jackson Construction, and that's where
I'm going to pick back up again. As I see the last
exhibit here was Exhibit 89, which appears to be
Change Order 13. I will show you...

(Document marked as Exhibit 90
for identification)

Q. Do you recognize that document?

Page 8

A. Yes, I do.

Q. Is that Change Order No. 14 for the year
2004?

A. That is marked as my Change Order No. 14,
yes.

Q. There is handwriting at the bottom of this
page. Do you recognize that handwriting?

A. Yes, I do.

Q. Is that yours?

A. Yes, it is.

Q. Could you tell me who requested that this
work be performed.

A. Katie Crockett from Lovett Silverman
Associates.

Q. From Lovett Silverman or from --

A. I'm sorry, Katie Crockett from Lamoureux
Pagano Associates had given what she called an
elevation clarification to Jackson Construction.
Jackson Construction passed it on to me for
revision.

Q. And could you describe this work.

A. I'm referring to Sheet L 1.3, which is the
site grading and utility plan. Actually, I believe
that the paving plan may be -- an indication of

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 9

[1] that -- Sheet L 1.5, which is the layout and
[2] materials plan.
[3]       And the area that was dealt with by this
[4] change order end the revision of grades by Lamoureux
[5] Pagano are the parking lot and the drive-through
[6] areas that are north of the shop area of the school
[7] building, this shaded area (indicating).
[8]       There was a catch basin in this aree that
[9] needed to be raised by approximately 14 inches to
[10] allow for the drainage of the shop area and the
[11] adjacent parking areas.
[12]   Q. Were T&M slips signed for this work, or was
[13] this simply a proposal that was made to the Town?
[14]   A. There were no T&M slips for this work. If
[15] I remember correctly, I spoke with Richard
[16] McGulnness about it, and the revision of the grades,
[17] and he stated then that any changes in grades made
[18] by Lamoureux Pagano, Katie Crockett, that they would
[19] issue a change to the Town for and for me to build
[20] them for the cost.
[21]   Q. Okay.
[22]       (Document marked as Exhibit 91
[23]       for identification)
[24]   Q. Mr. Matthews, I've handed you Exhibit 91.

Page 11

[1] change order?
[2]   A. There was earthen ramps constructed at the
[3] lower entrances of the school, the south side of the
[4] school. And then there were changes to the access
[5] ramps on Oak Street, handicap access ramps on Oak
[6] Street.
[7]   Q. I believe we've had testimony and some
[8] documents about ADA compliance or noncompliance of
[9] those access ramps on Oak Street. Could you
[10] describe in any more detail the work performed under
[11] Slip No. 1102?
[12]   A. That, again, was changes that they made --
[13] I think they made another change to where the
[14] location of the handicap ramps were going to be.
[15] They called for additional grading of the arees, the
[16] new areas where the handicap ramps were going to be,
[17] adjacent to the Oak Street entrances.
[18]   Q. Is this work a change to what was required
[19] under the contract, or was this repairing the work
[20] that had already been performed?
[21]       MR. MELTZER: Objection.
[22]   A. This was a change in the work. These ramps
[23] had not been put in yet. When they first moved them
[24] down, the original location, there was still not

Page 10

[1] Do you recognize that document?
[2]   A. Yes, I do.
[3]   Q. And what is that document?
[4]   A. It is my Change Order No. 15.
[5]   Q. And who requested that -- let me back up.
[6] What work was performed under this change order?
[7]   A. Richard McGuinness and Frank Leonardo of
[8] Jackson Construction.
[9]   Q. I think you just answered the question I
[10] was starting with, who requested this work. The
[11] next question is, what work was performed?
[12]   A. I'm sorry. You did ask me that. The work
[13] performed was cleaning up debris and rubbish at the
[14] buildings and around the fencing and backstop of the
[15] baseball field.
[16]       (Document marked as Exhibit 92
[17]       for identification)
[18]   Q. Do you recognize the document which has
[19] been marked as Exhibit 92?
[20]   A. Yes, I do.
[21]   Q. And what is that?
[22]   A. It is my change order or Landworks' Change
[23] Order 16.
[24]   Q. And what work was performed under this

Page 12

[1] enough area to give them the proper amount of slope.
[2]   Q. And who requested that this work be
[3] performed?
[4]   A. This work was requested in a walk-through
[5] with -- I can't think of his name, first name, Mr.
[6] Pagano of Lamoureux Pagano, and Richard McGuinness
[7] and Frank Leonardo on a walk-through.
[8]       The school was going to open in the next
[9] couple of days, and the back entrances had
[10] step-offs, and the building inspector would not
[11] allow them to open the school unless there were
[12] ramps constructed that were flush with the back pads
[13] coming out of the doors. It had to be walk-outs.
[14]       And then also the changes up in the front,
[15] Mr. McGuinness and Mr. Leonardo brought to the
[16] attention that there was not enough room for the
[17] cross slopes. And so Mr. Pagano requested that this
[18] work be done to Jackson, and then Jackson requested
[19] to me that it be done.
[20]   Q. I believe Mr. Pagano's first name is
[21] Michael.
[22]   A. Yes.
[23]       (Document marked as Exhibit 93
[24]       for identification)

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 13

[1]   Q. Mr. Matthews, do you recognize the document
[2]  marked as Exhibit 93?
[3]   A. Yes, I do.
[4]   Q. And what is that?
[5]   A. That is the removal of the rubberized track
[6]  surface of the track on the southern side,
[7]  southeastern side of the school.
[8]   Q. And who requested that this work be
[9]  performed?
[10]   A. Jackson Construction.
[11]       (Document marked as Exhibit 94
[12]       for identification)
[13]   Q. Mr. Matthews, do you recognize the document
[14]  that's been marked as Exhibit 94?
[15]   A. Yes, I do.
[16]   Q. And what is that?
[17]   A. That is my Change Order No. 18.
[18]   Q. And what work is described in that change
[19]  order?
[20]   A. This was the extension of sod on either
[21]  side of the playing surface of the football field.
[22]   Q. Was only the actual playing surface of the
[23]  football field originally sodded?
[24]   A. Yes, sir.

Page 14

[1]   Q. And how were the areas between the playing
[2]  surface and the track prepared originally?
[3]   A. They were seeded.
[4]   Q. And who requested that this work be
[5]  performed?
[6]   A. Bob Barton and Richard McGuinness.
[7]   Q. Why was the request made?
[8]   A. The original dimensions of the football
[9]  field were 360 by I believe 150, and an actual
[10]  football field is 360 by 180 -- no, I'm sorry. The
[11]  football field should be 320 by 160, and the
[12]  original configuration was 320 by 150, and it had
[13]  been dimensioned incorrectly by the architects.
[14]       And so the original agreement with Standen
[15]  Contracting was that the playing surfaces of the
[16]  football field and the baseball/soccer field
[17]  combination would be sodded. That would be the only
[18]  thing to be sodded.
[19]       When they found that the football field had
[20]  been dimensioned incorrectly, then the Town
[21]  requested that it be -- the sod be extended out to
[22]  the actual playing surface. So we removed the grass
[23]  that was there, seeded grass, and extended the sod
[24]  by the amount shown.

Page 15

[1]       (Document marked as Exhibit 95
[2]       for identification)
[3]   Q. Now, Mr. Matthews, going back in time
[4]  chronologically, do you recognize this document
[5]  here, marked as Exhibit 95?
[6]   A. Yes, I do.
[7]   Q. And what is that document?
[8]   A. That's a change order issued by Standen
[9]  Contracting to Landworks.
[10]   Q. Is that your signature on behalf of
[11]  Landworks on that document?
[12]   A. Yes, it is.
[13]   Q. I believe, as we have seen on Exhibit 66,
[14]  the subcontract between Standen and Landworks, the
[15]  subcontract amount was $824,822; is that correct?
[16]   A. Yes.
[17]   Q. And this was a change order in the amount
[18]  of $6,221?
[19]   A. Yes, it is.
[20]       (Document marked as Exhibit 96
[21]       for identification)
[22]   Q. Mr. Matthews, do you recognize Exhibit 96?
[23]   A. Yes, I do.
[24]   Q. What is that?

Page 16

[1]   A. That is a change order from Standen
[2]  Contracting to -- or Standen Construction to
[3]  Landworks.
[4]   Q. And is this Standen Change Order No. 2?
[5]   A. Yes, it is.
[6]   Q. And this change order is in the amount of
[7]  $67,000?
[8]   A. That is correct, yes.
[9]   Q. And turning to the second page of the
[10]  document, is the $67,000 change reflected in
[11]  Landworks Change Order No. 0203?
[12]       MR. MELTZER: Objection.
[13]   A. Yes.
[14]   Q. Turning back to Exhibit No. 95, the change
[15]  order in the amount of $6221, is that reflected on
[16]  the second page in Landworks Proposed Change Order
[17]  No. 0303?
[18]   A. Yes it is. The numbers aren't exactly
[19]  correct. They rounded up the amount that I was
[20]  requesting.
[21]   Q. So they actually paid 26 cents more than
[22]  requested?
[23]   A. Yes, sir, that's correct.
[24]

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 17

[1]        (Document marked as Exhibit 97
[2]        for identification)
[3]    Q. Before we look at Exhibit 97, let's turn
[4] our attention to Exhibit No. 78. Now, Exhibit No.
[5] 78 is a ratification agreement signed -- is Exhibit
[6] No. 78 the ratification agreement signed between
[7] Landworks and USF&G?
[8]    A. Yes, sir.
[9]    Q. And it reflects that the original
[10] subcontract was $824,823, which correlates with
[11] Exhibit 66; is that correct?
[12]    A. Yes, sir.
[13]    Q. And Line 2 of the ratification agreement,
[14] Exhibit 78, reflects "Changes in subcontract amount
[15] approved by Standen Contracting Company" in the
[16] amount of $73,221; is that correct?
[17]    A. Yes. It has an asterisk beside it.
[18]    Q. Is that $73,221 the amount of the two
[19] change orders reflected in Exhibits 95 and 96?
[20]    A. Without my calculator, it would seem that
[21] that is what the two change orders would have added
[22] up to. Sometimes I get myself in trouble by adding
[23] in my head.
[24]    Q. Do you want to take a minute to look at it

Page 18

[1] closer? I actually have a calculator if you so
[2] prefer.
[3]    A. No, sir, that's not necessary. I'm all
[4] set. Those two change orders add up to be the
[5] amount that's on the subcontract hold agreement.
[6]    Q. Now, turning our attention to Exhibit No.
[7] 97 --
[8]    A. Did you want me to keep this one, or did
[9] you want this one back?
[10]    Q. That's one of our original exhibits. You
[11] can put it in the pile.
[12]        Turning your attention to Exhibit No. 97,
[13] do you recognize that document?
[14]    A. Yes, sir, I do.
[15]    Q. And what is that?
[16]    A. That is my Change Order No. 5 to Jackson
[17] Construction Company.
[18]    Q. And what is this change order for?
[19]    A. This change order is for a fuel surcharge
[20] that was being charged in the spring of 2004 due to
[21] spikes in crude oil prices.
[22]    Q. It's a surcharge that Landworks added?
[23]    A. It was a surcharge that was added to my
[24] cost of the sod that was being delivered. So this

Page 19

[1] was just an increase in delivery charges for the
[2] sod.
[3]    Q. The sod supplier --
[4]    A. Was charging -- yes, sir.
[5]    Q. -- added this amount of $3900?
[6]    A. Yes, sir.
[7]    Q. And you were passing it along?
[8]    A. That's correct.
[9]        (Document marked as Exhibit 98
[10]        for identification)
[11]    Q. Mr. Matthews, do you recognize the document
[12] shown as Exhibit 98?
[13]    A. Yes, I do.
[14]    Q. And what is that?
[15]    A. This is my change order to Jackson
[16] Construction, No. 6.
[17]    Q. And what is -- what work is reflected in
[18] this change order?
[19]    A. This was for grading around the
[20] southwestern portion of the buildings, areas that
[21] had been driven over by other trades on the job that
[22] they wanted to be graded out.
[23]    Q. Was this change order solely for grading?
[24] Did it include seeding?

Page 20

[1]    A. No. The seeding was by others, was to be
[2] by others.
[3]    Q. And who requested this work be performed?
[4]    A. Richard McGuinness and -- Richard
[5] McGuinness had received a request from CTM.
[6]        (Document marked as Exhibit 99
[7]        for identification)
[8]    Q. Mr. Matthews, do you recognize the document
[9] marked as Exhibit No. 99?
[10]    A. Yes, I do.
[11]    Q. And what is that?
[12]    A. This is my Change Order No. 7 to Jackson
[13] Construction Company.
[14]    Q. And what work is reflected in this change
[15] order?
[16]    A. That is for the demolition of concrete gas
[17] storage pads and regrading of the area for lawn.
[18] And there were two areas -- actually there may have
[19] been three areas. One of them was in the
[20] southwestern portion of the building, and one was on
[21] the northern side of the shop and gymnasium area.
[22]    Q. Is there a third area?
[23]    A. I believe there was an additional area in
[24] the courtyard by the two front entrances. It was

**Neal H. Matthews, Vol. 2**
**February 16, 2007**

**Landworks Creations, LLC v.**
**United States Fidelity and Guaranty Company, et al.**

Page 21

[1] for the demolition of the concrete gas pads and the
[2] regrading of the areas.
[3]   Q. And who requested that this work be
[4] performed?
[5]   A. Richard McGuinness of Jackson Construction.
[6]   (Brief discussion off the record)
[7]   Q. Okay, Mr. Matthews, I believe we have at
[8] this point gone through Landworks' Proposed Change
[9] Orders 1 through 18. Are you aware of any other
[10] change orders that Landworks submitted to Jackson
[11] Construction?
[12]   A. Without looking at them -- if we've gone
[13] through all 1 through 18 -- I would have to just
[14] look and see if --
[15]   Q. They should all be right here marked as
[16] exhibits.
[17]   A. Okay. I think that 1 through 18 was it,
[18] but I'm not certain if there was more than that.
[19]   Q. Would looking through them refresh your
[20] recollection of whether there are additional?
[21]   A. There was a letter that was given to
[22] Richard McGuinness and Bob Barton at the November
[23] meeting that reflected the total change orders.
[24] That would refresh my memory more than looking

Page 23

[1] the change orders. And he said that he would review
[2] them and review the status of them, and then he
[3] would get back to me.
[4]   It took him from the November,
[5] Thanksgiving, approximately, meeting until in
[6] December I spoke with him. He said he was still
[7] working on it. And I finally received this letter
[8] in January from him.
[9]   I believe this was in fact the last
[10] communication that I -- or written communication
[11] that I had gotten from Jackson Construction. But
[12] this is the letter that I was referring to that
[13] would refresh my memory.
[14]   MR. HIPP: Why don't we go ahead and mark
[15] this as the next exhibit.
[16]   (Document marked as Exhibit 100
[17]   for identification)
[18]   Q. Let me ask, Mr. Matthews, are you aware of
[19] a document produced by or on behalf of Landworks
[20] that contains an itemization of the change orders
[21] that Landworks contends were not paid or had been
[22] presented to Jackson?
[23]   MR. MELTZER: Objection.
[24]   A. I would have to go back through the file

Page 22

[1] through all of them, because they had the total
[2] amount of change orders.
[3]   MR. HIPP: Do you have that document?
[4]   MR. MELTZER: We can probably find it. We
[5] have your records. Do you want to take a minute to
[6] find it?
[7]   MR. HIPP: That sounds like it would be
[8] helpful.
[9]   MR. MELTZER: Why don't we take a break.
[10]   (Recess)
[11] BY MR. HIPP:
[12]   Q. Now, Mr. Matthews, your counsel just handed
[13] me a document. It appears to be a letter from
[14] Jackson Construction Company to Landworks Creations,
[15] dated January 13th of 2005; is that correct?
[16]   A. That's correct.
[17]   Q. Now, before we took the break, you had made
[18] reference to a letter of November 2004 referring to
[19] a November meeting. Is this that letter?
[20]   A. This is the letter. I was mistaken about
[21] the date of the letter received from Richard
[22] McGuinness. In the November meeting we went over
[23] all of the change orders that at that time were
[24] outstanding, which in fact were just about all of

Page 24

[1] and look to see if there was an actual letter in the
[2] format that this letter is in.
[3]   At the November meeting I had taken all of
[4] the Landworks change orders, the ones that we have
[5] gone through, to that meeting, and we were going
[6] through those one by one, and Mr. McGuinness was
[7] making notes of them. And I left him copies of all
[8] the change orders. But I'm not certain, without
[9] reviewing the file, if I actually had them in a
[10] format like this.
[11]   Q. In a format of a list?
[12]   A. As a list, yes, sir.
[13]   Q. Now, my previous question to you was
[14] whether there were any proposed change orders other
[15] than Nos. 1 -- let me start over.
[16]   Were there any proposed change orders
[17] submitted by Landworks to Jackson, other than Nos. 1
[18] through 18?
[19]   A. To the best of my knowledge, 1 through 18
[20] were all.
[21]   Q. Okay. There are some additional items
[22] mentioned in this letter of January 13th, correct?
[23]   A. That's correct.
[24]   Q. The item below No. 18 says, "Paving and

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 25

[1] regarding change"; is that correct?
[2]     A. Yes, but that is a typo, and it should have
[3] been "Paving and regrading." But it's there, yes,
[4] sir.
[5]     Q. And do you recall what that was a reference
[6] to?
[7]     A. Yes, sir. There is a letter that -- a
[8] letter of intent issued by Jackson Construction that
[9] dealt with increases to the paving and work at the
[10] track, and I don't -- I've seen it in the last day
[11] or so of the depositions, but I don't know exactly
[12] where it is right now.
[13]     Q. That's fine.
[14]     A. But that's what it refers to.
[15]     Q. I think I'm going to get to it. This is
[16] kind of out of the order.
[17]     Let me show you what we'll mark as the next
[18] exhibit.
[19]             (Document marked as Exhibit 101
[20]             for identification)
[21]     Q. Do you recognize this document?
[22]     A. Yes, sir, I do.
[23]     Q. And what is this?
[24]     A. It is a submittal for -- to Jackson

Page 26

[1] Construction Company for granite curbing.
[2]     Q. And it's a submittal in the amount of
[3] $1,452.83; is that correct?
[4]     A. Yes, it is.
[5]     Q. Is this submittal shown on Exhibit No. 100
[6] as a charge to match existing curb?
[7]     A. Yes. That's correct.
[8]     Q. And who requested that this work be
[9] performed?
[10]     A. This was contract work that was to be
[11] performed, but the specification -- the details on
[12] the working drawings differed from what curbing was
[13] called then in specifications, and the curbing
[14] company had priced the new granite curbing by the
[15] detail sheets that were given.
[16]     The curbing that was in the specification
[17] was larger curbing and would cost more. I believe
[18] that Mr. McGuinness inquired with Lamoureux Pagano
[19] what type curbing they wanted, and they stated that
[20] they wanted the VA curbing.
[21]             (Document marked as Exhibit 102
[22]             for identification)
[23]     Q. Mr. Matthews, do you recognize the document
[24] marked as Exhibit 102?

Page 27

[1]     A. Yes, I do.
[2]     Q. What is that?
[3]     A. This is an RFI or request for information
[4] from Jackson Construction on how they wanted us to
[5] proceed with the paving at the Shrewsbury Middle
[6] School.
[7]     In early July there was concern about the
[8] positive drainage in the front of the school, where
[9] the kids would be let out, the school bus drop-off
[10] areas. And the architect requested what it would
[11] cost to install drainage in this area and to regrade
[12] and pave to full depth instead of doing a pavement
[13] overlay. At the same time they requested what it
[14] would -- what net decrease or increase it would cost
[15] to do the paving out front.
[16]     And there was another area. I'm not
[17] certain of the area they were talking about --
[18] actually, I'm sorry, there would be a full depth
[19] pavement from in front of the school leading all the
[20] way to the area north of the -- north of where the
[21] generator pad was, which was the teachers' parking
[22] lot, for full depth pavement, reducing the overlay
[23] into the main parking lot, and seal coating -- crack
[24] sealing and seal coating that parking lot. And so

Page 28

[1] they were interested in finding out what the
[2] different variations of cost would be.
[3]     Q. And the increase for curbing in the amount
[4] of $1452.83 is reflected on Exhibit 102 and 101; is
[5] that correct?
[6]     A. I'm sorry. Could you repeat that.
[7]     Q. The curbing increase of $1,452.83 shown on
[8] Exhibit 101 is also reflected on Exhibit 102; is
[9] that correct?
[10]     A. That's correct.
[11]     Q. Could you describe the proposed increase
[12] from pavement at track in the amount of $9,900 shown
[13] on Exhibit 102.
[14]     A. That was for paving the full depth pavement
[15] of the high jump runways and the -- I'm sorry, the
[16] long jump runways and the high jump pit.
[17]     Q. Could you describe the $25,502.17 item.
[18]     A. Yes. The original paving contractor, after
[19] the failure of Standen, would not stand by his
[20] original price, and they had not been assigned to
[21] contracts. And so when it was rebid in the spring
[22] of the year, our asked-for prices for paving, there
[23] was an increase in that amount due to the spike in
[24] crude oil prices.

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 29

[1] Q. Who was the original intended
[2] subcontractor?
[3] A. Keating, I believe it was.
[4] Q. And did they -- were they retained as the
[5] actual subcontractor?
[6] A. Excuse me. Let me correct myself. It was
[7] Lynch, not Keating. When it was put back out, we
[8] asked Keating then for a price, and one other. I
[9] think it may have been Pike, but I'm not certain.
[10] Lynch actually came in with the best price, which
[11] was at $25,000 more than the original pricing for
[12] the job.
[13] Q. Could you describe this $11,000 item,
[14] increase from one inch to 1 1/4 inches.
[15] A. The overlay in front of the school, the
[16] front entrance, and the overlay of the main parking
[17] lots were spec'd to be one-inch overlays. All
[18] paving contractors told me that it would be almost
[19] impossible to pave a one-inch overlay, since the
[20] specification for the pavement required to have
[21] 3/4-inch aggregate in it, and that the finish of the
[22] pavement would not be a smooth and uniform finish.
[23] So they were all concerned that by paving just that
[24] one-inch thickness to the overlay, that the job

Page 31

[1] referred to there?
[2] A. The original contract for paving and
[3] asphalt curbing.
[4] Q. Is that the original contract between
[5] Landworks and Lynch?
[6] A. No. That was the original contract that I
[7] had given to Standen for the contract.
[8] Q. Is that amount reflected anywhere in the
[9] subcontract between Standen and Landworks?
[10] A. No. I don't believe that the amount in the
[11] Standen contract is the bulk amount. I think that
[12] you would have to go back into the billing summaries
[13] as to the breakout of how each money was applied,
[14] and the original paving amount was the $111,645.
[15] Q. So you're saying that there are breakdowns
[16] from Standen Contracting that would reflect that
[17] amount for the paving?
[18] A. There are documents given by me to Standen
[19] that would reflect that amount.
[20] Q. Okay. In looking at the second page of
[21] Exhibit 102, is that the letter to which you were
[22] referring earlier?
[23] A. Yes.
[24] Q. This second page of Exhibit 102 is a letter

Page 30

[1] would not be acceptable.
[2] Q. Was this paving actually performed by
[3] Landworks?
[4] A. Yes, it was.
[5] Q. And what was the actual thickness of the
[6] paving that was performed by Landworks?
[7] A. One inch.
[8] (Document marked as Exhibit 103
[9] for identification)
[10] Q. Do you recognize the document that's been
[11] marked as Exhibit 103, Mr. Matthews?
[12] A. Yes, I do.
[13] Q. What is that?
[14] A. This is a letter to Jackson Construction
[15] Company that was written by me.
[16] Q. And this is a letter about the increases in
[17] the paving that were reflected in Exhibit 102; is
[18] that correct?
[19] A. That's correct.
[20] Q. May I ask you another question about
[21] Exhibit 102. I notice an amount of original
[22] contract listed as $111,645; is that correct?
[23] A. That's correct.
[24] Q. What is the original contract that's

Page 32

[1] from Jackson to Landworks dated August 12th, 2004;
[2] is that correct?
[3] A. That's correct.
[4] Q. And it references an intent to award your
[5] firm an increase for the bituminous pavement
[6] contractor in the amount of $14,402; is that
[7] correct?
[8] A. That's correct.
[9] Q. And it also references an increase for the
[10] thickness of pavement in the amount of $11,000?
[11] A. Yes, sir.
[12] Q. Can you explain why the total price shown
[13] on Exhibit No. 103 is less than the amount in this
[14] letter?
[15] A. Because I don't think that they added them
[16] up correctly -- and I would have to have the
[17] calculator to do that -- and that was the reason for
[18] generating this letter.
[19] (Calculator handed to the witness
[20] by Mr. Hipp)
[21] A. (Calculating) If you add up the amounts in
[22] the Jackson letter of intent, I believe it only
[23] comes out to be $38,177.
[24] Q. Are you finished with your answer?

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 33

[1]     A. Yes, sir.
[2]     Q. Is that your signature on the letter of
[3] August 12th?
[4]     A. Yes, it is.
[5]     Q. And it makes reference to -- let me start
[6] over. By signing this letter of August 12th, were
[7] you agreeing to the increase in cost for the
[8] bituminous pavement contractor in the amount of
[9] $14,402, as opposed to the $25,502?
[10]    A. No. I was -- at the time of this letter,
[11] and if you can look in the margins between the first
[12] and second paragraph, then --
[13]    Q. I'm sorry. Just for the record, which
[14] letter are you referring to?
[15]    A. The August 12th letter. In that I had
[16] written in there from this letter there was some --
[17] there was a -- the 9800 was for certain portions of
[18] the track, so there were some things in this letter
[19] that were not correct.
[20]        So I spoke with Mr. McGuinness about it
[21] over the next week or so and had not signed this
[22] letter. At the same time we were also preparing to
[23] pave. On the September 8th, because he still had
[24] not reissued a letter to me, I asked him to sign

Page 34

[1] Exhibit 103, which was less than the total of the
[2] $52,579 that he was saying was a total in his August
[3] 12th letter by almost $2,000, because the amount of
[4] the add-ups for the increased cost of paving and the
[5] additional paving was only going to be $50,830.
[6]        After another day or so of haggling about
[7] this, Bob Barton said that they would not sign this,
[8] and just sign the letter that they had sent out on
[9] the original letter of intent for the $52,579,
[10] because paving work was proceeding then. And I was
[11] becoming concerned about putting down the pavement
[12] without having the corrected amounts on this, and he
[13] told me at that time, he was like, "If it's $52,000,
[14] then so be it." But I was concerned about their
[15] math not adding up.
[16]        (Document marked as Exhibit 104
[17]        for identification)
[18]    Q. Mr. Matthews, do you recognize the document
[19] marked as Exhibit 104?
[20]    A. Yes, I do.
[21]    Q. And what is that document?
[22]    A. It's a letter to Bob Barton regarding
[23] change orders that have not been processed.
[24]    Q. And with this letter, did you send Jackson

Page 35

[1] a signed copy of the August 12th letter?
[2]     A. With this letter, did I send them the copy
[3] that is attached to this?
[4]     Q. Yes.
[5]     A. I may have, but I don't recall.
[6]     Q. Looking at the letter of August 25th, 2004,
[7] at the end of the third line, it says, "I have
[8] enclosed a copy of the letter of intent for the
[9] $52,579 for paving concerns." Did I read that
[10] correctly?
[11]        MR. MELTZER: Which letter are we looking
[12] at?
[13]        MS. BROWN: Did you say August? You meant
[14] October.
[15]        MR. HIPP: I'm sorry. I'll start over.
[16]    Q. Looking at the October 25th, 2004, letter
[17] from Landworks to Jackson, starting at the end of
[18] the third line, it reads, "I have enclosed a copy of
[19] the letter of intent for the $52,579 for paving
[20] concerns"; is that correct?
[21]    A. That's correct. So I probably did include
[22] the letter with it, yes, sir.
[23]    Q. So redirecting our attention to Exhibit
[24] 100, do the documents that we've just gone through

Page 36

[1] refresh your recollection as to what the paving and
[2] regrading -- or as it's typed, "regarding" -- change
[3] is?
[4]     A. That would be for the paving increases
[5] mentioned in the letter of intent. There's another
[6] letter also that is associated with that, a second
[7] letter of intent associated with the paving and
[8] grading increases.
[9]     Q. There's a letter of intent other than the
[10] August 12th, 2004, letter?
[11]    A. Yes.
[12]    Q. Do you recall what -- when that other
[13] letter was written?
[14]    A. I don't. It's in the file someplace.
[15] Basically, after all the paving work had been done
[16] and I requested for them to process it and pay me
[17] for it, I got a letter back from Richard McGuinness
[18] where he reduced the amount of his letter of intent
[19] after the work had already been performed, and
[20] brought it down to, I don't know, something like
[21] $41,000, after the fact.
[22]        (Document marked as Exhibit 105
[23]        for identification)
[24]    Q. Mr. Matthews, is the exhibit marked as 105

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 37

[1] the letter to which you're referring?
[2]   A. Yes, it is.
[3]   Q. And according to this letter of intent, the
[4] total amount agreed is $39,830; is that correct?
[5]   A. That's correct.
[6]   Q. Is it accurate that the only difference
[7] between the amount in this letter of intent and the
[8] previous letter of intent is the $11,000 for the
[9] increase in thickness of the paving?
[10]   A. Yes.
[11]   Q. Is there a reason provided for the
[12] rejection of that $11,000 amount?
[13]   A. "The letter of intent dated August 12th,
[14] 2004, was based on getting the Town to approve this
[15] change, which they did not, will be retracted."
[16]       So after the fact of paving, providing them
[17] with the increases, then they made it conditioned
[18] upon getting Town approval, which was not a
[19] condition in the original letter.
[20]       Could I correct myself for just a second.
[21] You asked me how much we paved on the overlay. I
[22] believe I told you a one-inch, but that was an inch
[23] and a quarter, and that can be documented by the
[24] testing services that were out on the job site.

Page 38

[1]       I would have to get their name, but all the
[2] paving was tested for the heat of the mix when it
[3] was brought out and for the depth and the compaction
[4] and the final compacted depth, and all of the paving
[5] overlays were done at 1 1/4 inch.
[6]   Q. Now, the paving depth of 1 1/4 inch was --
[7] that proposed change was made -- let me start over.
[8]       The genesis for the requested change for
[9] increase in paving depth came from Landworks, is
[10] that correct, meaning it wasn't requested by the
[11] Town or by Jackson?
[12]   A. The genesis of the paving increase was
[13] generated by all three paving contractors that I had
[14] come look at the job. When I told them that it was
[15] a one-inch overlay, they asked me what the paving
[16] mix was, and I can't remember what Mass. Spec. was
[17] on it, but I believe it was like Mass. Spec.
[18] Standard Highway, which has 3/4-inch aggregate.
[19]       When I presented that to them, they said,
[20] "You cannot pave a one-inch overlay with 3/4-inch
[21] aggregate and get a uniform finish, because the
[22] aggregate is too thick, and some of it is going to
[23] be out through the top."
[24]       That was presented to Katie Crockett. She

Page 39

[1] said that they could reduce the size of aggregate.
[2] And it was presented back to her that, if you reduce
[3] the size of the aggregate, then you were not giving
[4] them Mass. Spec. Standard Highway.
[5]       So the genesis of it was brought about by
[6] the paving contractors. I brought this up to Bob
[7] Barton and Richard McGuinness, that if they wanted a
[8] smooth uniform finish, that that would be what they
[9] would need to do, would be to pave it like an inch
[10] and a quarter.
[11]       They then said, "Proceed with paving it at
[12] an inch and a quarter," because my main concern was
[13] that the paving on the overlay areas would not be
[14] accepted at one inch if it had a rough and ragged
[15] finish.
[16]   Q. But you understand that the paving would
[17] have been accepted by the Town if the aggregate had
[18] been smaller with a one-inch depth?
[19]       MR. MELTZER: Objection.
[20]   A. I wasn't present during their conversation.
[21] This is what they told me -- what they relayed to me
[22] that the architect had said.
[23]   Q. Who is the "they"?
[24]   A. I'm sorry. Bob Barton and Richard

Page 40

[1] McGuinness related to me that what the architect had
[2] said was that you could pave with a smaller
[3] aggregate, and I asked them then, "Are they changing
[4] the specification for pavement?" And they said,
[5] "No, it has to be Mass. Highway Spec.," but that
[6] Mass. Highway Spec. had a range of aggregate from
[7] 1/2-inch to 3/4-inch.
[8]       And I spoke with the paving contractors,
[9] and they said that Mass. Highway Spec. did have a
[10] range, but it still had 3/4-inch aggregate in it,
[11] and that if they weren't released from that to use,
[12] like, a 3/8-inch aggregate, there was no way they
[13] could guarantee a smooth finish
[14]       (Document marked as Exhibit 106
[15]       for identification)
[16]   Q. Do you recognize what's been marked as
[17] Exhibit 106?
[18]   A. No, I don't believe I've seen this.
[19]   Q. This document appears to be a Jackson
[20] Proposed Change Order No. 39, dated November 12th,
[21] 2004; is that correct?
[22]   A. Does "PCO" mean proposed change order?
[23]   Q. Well, we'll just say what it is. Is this
[24] document PCO No. 39 from Jackson, dated November

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 41

[1]    12th, 2004?
[2]       A.  Yes, sir.
[3]       Q.  And among the items -- start over. The
[4]    item for Landworks Creations is an amount of
[5]    $39,830; is that correct?
[6]       A.  That's correct.
[7]       Q.  Is that the same amount listed in the
[8]    November 15th, 2004, letter of intent marked as
[9]    Exhibit 105?
[10]      A.  Yes, sir.
[11]      Q.  So back to the Exhibit 100 paving and
[12]   regarding, or as you corrected it, paving and
[13]   regrading change?
[14]      A.  Yes.
[15]      Q.  Is the amount at issue there simply the
[16]   $11,000 for the increased thickness of the paving?
[17]          Let me go back and ask it this way: On
[18]   Exhibit 103, you had requested total paving changes
[19]   of $50,830; is that correct?
[20]      A.  Yes, sir.
[21]      Q.  And the amount reflected on the November
[22]   15th, 2004, letter of intent marked as Exhibit 105
[23]   is simply $11,000 less; is that correct?
[24]      A.  Yes, sir.

Page 42

[1]       Q.  And that letter of intent amount is
[2]    reflected in Potential Change Order No. 39 from
[3]    Jackson, marked as Exhibit 106?
[4]       A.  Less their overhead and profit, yes, sir.
[5]       Q.  I see. Those amounts are in addition to
[6]    the $39,000, correct?
[7]       A.  Yes, sir, they are.
[8]       Q.  So with respect to Exhibit 100, the amount
[9]    at issue on the paving and regarding or paving and
[10]   regrading change is the $11,000 amount; is that
[11]   correct?
[12]      A.  I don't know. At this time of this letter
[13]   of January 13th, 2005, I still had not received
[14]   payment for the change order. So in this letter I
[15]   wasn't absolutely certain what they were talking
[16]   about.
[17]          I had not seen this potential change order,
[18]   as it states up at the top, from Jackson
[19]   Construction to Russ Werner at St. Paul Travelers,
[20]   so I couldn't get an answer out of them, you know,
[21]   what the status of the change orders were.
[22]          So when this letter came in stating that
[23]   "paving and regrading change not accepted," at that
[24]   time I wasn't certain what hadn't been accepted.

Page 43

[1]    I think that I had a change order from
[2]    them, a change order in the amount of somewhere
[3]    around $41,000 that may have included this $39,000
[4]    plus a couple of other change orders, but I hadn't
[5]    received payment. At this time -- by this time, I
[6]    couldn't get anyone from Jackson to speak with me.
[7]       Q.  Mr. Matthews, turning your attention to the
[8]    third page of Exhibit No. 79, is that Jackson Change
[9]    Order No. 3 signed by both Jackson and Landworks?
[10]      A.  Yes it is.
[11]      Q.  And is there an item on there for an
[12]   addition for bituminous pavement?
[13]      A.  Yes, it is.
[14]      Q.  And what is that amount?
[15]      A.  $39,830.
[16]      Q.  And what was the date of that?
[17]      A.  That was the November 12th, 2004.
[18]      Q.  So would you agree, then, that having
[19]   signed the change order with Jackson, that the only
[20]   amount that would be reflected on Exhibit 100 for
[21]   paving and regrading would be the $11,000?
[22]          MR. MELTZER: Objection.
[23]      A.  No. Because, like I said, this -- from the
[24]   November meeting that I had with them, up until a

Page 44

[1]    day or two after I got this letter, the only contact
[2]    that I had with Jackson was two telephone calls that
[3]    I had made to Richard McGuinness at 6:30 in the
[4]    morning so I could make certain that I could get
[5]    ahold to him. And the only reason I could get ahold
[6]    to him then was because someone told me that he was
[7]    always in his office and gave me a number that he
[8]    would answer. .
[9]          So when I got this letter on January 13th,
[10]   after leaving repeated calls about what was the
[11]   status of change orders, I wasn't certain at that
[12]   time what the status of this was.
[13]          I had a letter of intent that was
[14]   originally for 52,000 and some odd dollars. That
[15]   letter of intent had been -- did not contain any
[16]   conditions, and then had been rescinded at a later
[17]   date.
[18]          It seemed to me that they were playing fast
[19]   and loose with all of these documents. And at the
[20]   time I got this January 13th letter, I was not
[21]   certain what was meant by "change not accepted," if
[22]   they had then rescinded this change order that they
[23]   had sent out.
[24]          The amounts — I know what you're saying.

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 45

[1] The amounts of the change order that they issued to
[2] me would be $11,000 less than the original amount
[3] that I had requested in my letter that was
[4] previously marked. That is true. But at the time
[5] of this letter, I didn't know what the mind-set of
[6] Jackson was, and I could not speak to anyone from
[7] Jackson, because they were not returning calls.
[8]   Q. Well, I'm not asking you to interpret
[9] Jackson's intent or Jackson's mind-set. I'm asking
[10] about the amount that you have claimed on behalf of
[11] Landworks for work at this project.
[12]     And I guess with respect to a paving and
[13] regrading charge that's not reflected in a Landworks
[14] potential or proposed change order, is the only
[15] amount that's not accounted for in the signed change
[16] order with Jackson the $11,000 for paving?
[17]   MR. MELTZER: Objection.
[18]   A. I'm trying not to be difficult on this, and
[19] if I understand your question, then the only amount
[20] that's not accounted for by a signed change order by
[21] Jackson is the $11,000 difference in what I was
[22] requesting from Jackson and what they actually
[23] placed into a change order.
[24]     That's not to say that I agree anyway with

Page 46

[1] the fact of the recision of a letter of intent to
[2] pay me an amount of -- what they placed down was
[3] 52,000 and some odd dollars, and the amount that it
[4] should have been was the $50,000.
[5]   Q. I'm certainly not asking you if you agree
[6] that the amount reflected in Change Order No. 3 is
[7] the only amount that Landworks is entitled to.
[8]     I guess what I'm just trying to figure out
[9] is the amount that Jackson -- excuse me, that
[10] Landworks is claiming for paving and regrading work
[11] and if the only amount in addition to what is
[12] reflected in Change Order No. 3 is the $11,000 for
[13] the thickness in the paving.
[14]   A. Yes.
[15]   Q. Is that the only difference in the claim?
[16]   A. Yes, sir.
[17]   Q. Again, on Exhibit No. 100, there's
[18] reference to "T&M invoice dated 9/27/04 for manhole
[19] installation west in progress." Do you see that?
[20]   A. Yes.
[21]   Q. Could you describe what's reflected in that
[22] line.
[23]   A. Change Order No. 4.
[24]   Q. That's SMS0404?

Page 47

[1]   A. I believe it is SMS0404. If I could just
[2] go back and look at it real quickly.
[3]   Q. Absolutely.
[4]   A. Does this have the change orders from the
[5] previous deposition?
[6]   Q. We do have those.
[7]   A. (Reviewing documents) So the "T&M invoice
[8] dated 9/27 for manhole installation west in
[9] progress" is reflected by the SMS0404.
[10]   Q. Which was marked as which exhibit number?
[11]   A. 83.
[12]   Q. And the next line on Exhibit 100, "T&M slip
[13] dated 9/27/04 for changes to the access ramp in
[14] progress submitted to town," do you know or could
[15] you describe what's reflected in that line.
[16]   A. Yes, sir. If you will give me just one
[17] second to go back through.
[18]   Q. Take your time. These are the ones from
[19] the other day.
[20]   A. I have it right here. (Reviewing
[21] documents) That would be -- the "T&M slip dated
[22] 9/27/04 for changes to the access ramp in progress
[23] submitted to town" would be reflected by Exhibit No.
[24] 92.

Page 48

[1]   Q. Exhibit 92, which is SMS01604?
[2]   A. That's correct.
[3]   Q. And the final item listed, "Back charge for
[4] concrete not given to Landworks yet," negative $778?
[5]   A. Yes, sir.
[6]   Q. Could you describe what that's a reference
[7] to.
[8]   A. That was for the concrete for the headwalls
[9] at the drainage, at the extreme western end of the
[10] project, out near the stockpile area.
[11]   Q. So this is a reference to a back charge to
[12] Landworks?
[13]   A. It is a reference to a back charge to
[14] Landworks. It was the first time that I realized
[15] that I was supposed to have poured the concrete
[16] headwalls, because I had excluded that, end Jackson
[17] Construction had in fact poured the headwalls, or
[18] they had someone pour the headwalls.
[19]   Q. Is that a back charge, whether in writing
[20] or otherwise, that is accepted by Landworks?
[21]   A. No, sir.
[22]   Q. What is the basis for not accepting that
[23] back charge?
[24]   A. Because we were excavating and backfilling

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 49

[1] for all concrete work and not actually doing the
[2] concrete work.
[3]    Q. So it's Landworks' contention that that
[4] item was not within Landworks' scope of work?
[5]    A. Yes, sir.
[6]    Q. Mr. Matthews, I'll represent to you that
[7] the document that you have been handed is a copy of
[8] Exhibit No. 12 marked at a deposition in this case
[9] on January 10th, 2007. This is not the original
[10] exhibit, which is not available at this moment.
[11]       THE WITNESS: May I have just one moment.
[12]       (Discussion off the record)
[13]    Q. Now, Mr. Matthews, do you recognize the
[14] document shown as Exhibit 12?
[15]    A. I think I've seen this before, yes.
[16]    Q. This is a letter from Waterman Design
[17] Associates to Lamoureux Pagano Associates, the
[18] architects, dated October 26th, 2004; is that
[19] correct?
[20]    A. August 26th, 2004, yes, sir.
[21]    Q. And this letter reflects an athletic field
[22] sod areas punch list; is that correct?
[23]    A. Yes, sir.
[24]    Q. Now, Item A, could you review that and just

Page 50

[1] take a minute to review that.
[2]    A. (Reviewing documents) Yes, sir.
[3]    Q. Are the items described in Item A the
[4] responsibility of Landworks to correct?
[5]    A. Yes, sir.
[6]    Q. And were those items corrected by
[7] Landworks?
[8]    A. Yes, sir. And I will just add to that,
[9] items like slit drain settlements was an ongoing
[10] maintenance. They had to continually be filled and
[11] compacted. So you might fix all of them today, and
[12] next week there might be some more areas that would
[13] have to be fixed.
[14]    Q. Is that something that requires regular
[15] maintenance by the school?
[16]    A. Once the turf grew back across the slit
[17] drains, then there should be no further maintenance
[18] required.
[19]    Q. With respect to Item B, is that item the
[20] responsibility of Landworks?
[21]    A. No, sir.
[22]    Q. Why not?
[23]    A. We were not the irrigation contractor.
[24]    Q. Item C, is that the responsibility of

Page 51

[1] Landworks to correct?
[2]    A. Part of it.
[3]    Q. Which part?
[4]    A. We removed the weeds from the infield, and
[5] we actually did top off the field with the
[6] admixture, but it was not our responsibility to add
[7] the admixture to the skin infield.
[8]    Q. And what about Item D; is that the
[9] responsibility of Landworks to correct -- to
[10] resolve?
[11]    A. Yes, sir.
[12]    Q. And was that done?
[13]    A. Yes, sir. There was fertilization
[14] recommendations given to the Town, and also a
[15] contractor that did that type of work and had done
[16] work for the Town also.
[17]       And just to go back, C has two items in it.
[18] Just for clarity, Item 2, the pitcher's rubbers and
[19] bases were not in our scope to do.
[20]       (Document marked as Exhibit 107
[21]       for identification)
[22]    Q. Mr. Matthews, do you recognize the document
[23] marked as Exhibit 107?
[24]    A. (Reviewing document) No, sir. I don't

Page 52

[1] believe I have seen this document until now.
[2]    Q. Is it accurate that this is a letter from
[3] CTM to the project architect dated September 20,
[4] 2004?
[5]       MR. MELTZER: Objection.
[6]    A. Yes.
[7]    Q. And is the subject area of this letter
[8] bituminous sidewalk surfaces that are not -- that
[9] have too great a slope?
[10]       MR. MELTZER: Objection. Answer if you
[11] understand it. You can answer.
[12]    A. This letter is written to Katie Crockett
[13] from Jim Kokemak, and it deals with, as I have
[14] reviewed through the rest of the attachments to this
[15] document, it deals with slopes of sidewalks and
[16] other items in this.
[17]    Q. Are the excessive slopes referred to in
[18] this letter and demonstrated on the attached
[19] drewings the responsibility of Landworks?
[20]       MR. MELTZER: Objection.
[21]    A. I don't agree with the premise that these
[22] elevations are excessive. I don't know who did
[23] this. If Jim Kokernak did this, then he did not
[24] have the proper or adequate equipment to check

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v,
United States Fidelity and Guaranty Company, et al.

Page 53

[1]  these. And if he didn't, then I would need to know
[2]  who did it.
[3]       The only thing I can tell you is the 578
[4]  contour line had been met behind the gymnasium back
[5]  entrance on the FKS No. 1, and that if there was
[6]  excessive slope adjacent to the building, the little
[7]  step out in the building, then it was because of
[8]  design. The elevations for the 577 contour line
[9]  which meets the step where this walkway goes down to
[10]  were met and put right on. Jackson Construction
[11]  installed these steps, and the elevation of the
[12]  pavement met with that.
[13]       On FKS No. 2, we have previously talked
[14]  about the bituminous sidewalk that ran from the
[15]  upper school, the elementary school, down to the
[16]  middle school. The slopes are somewhat indicative
[17]  to readings that I had also gotten in the area. As
[18]  I stated before, this was bound by the catch basin
[19]  that is shown in the drawing, where the slope ends,
[20]  and the need to keep the curbing lower in this area.
[21]       It is also adjacent to a thoroughfare that
[22]  was used by the buses' entrance to the Sherwood
[23]  Street extension, which was the disagreement that I
[24]  had or the argument that I had that it did not have

Page 54

[1]  to comply with the ADA.
[2]       FKS No. 3, the best I can tell, deals with
[3]  a concrete handicap ramp that was poured by Jackson
[4]  Construction or a subcontractor to Jackson
[5]  Construction. And other than excavation of the
[6]  subgrade, I did not perform the pouring of the
[7]  concrete or have anything to do with the slopes.
[8]       FKS No. 4 is a hand-drawn diagram of an
[9]  inset, which is also a concrete accessible ramp that
[10]  we did not have -- that we did not install.
[11]       FKS No. 3 is a section of sidewalk that is
[12]  adjacent to the -- a section of sidewalk adjacent to
[13]  the generator pad, and there was no grading shown on
[14]  plans to change the elevations of the existing
[15]  conditions. The only thing that had to happen in
[16]  the area was the old bituminous asphalt was to be
[17]  removed and new bituminous asphalt put in its place.
[18]       Q. Now, with respect to the concrete ramps
[19]  that you referred to, it's your testimony that
[20]  Landworks did not pour that concrete?
[21]       A. Yes, sir.
[22]       Q. Is it your testimony that Landworks did
[23]  perform the grading preparation for those ramps?
[24]       A. Yes, sir, we did.

Page 55

[1]       Q. Let me direct your attention on the letter
[2]  of Exhibit 107. I believe ten lines down, over on
[3]  the far right, starting with the word "Careful," I'm
[4]  going to read this out loud. "Careful attention to
[5]  grading preparation prior to paving most likely
[6]  would have eliminated excessive pitch at this
[7]  location. This same careful attention would have
[8]  eliminated excessive pitch at the sidewalk location
[9]  adjacent to the emergency generator." Do you see
[10]  those lines?
[11]       A. Yes, sir.
[12]       Q. Is it your testimony that Landworks
[13]  performed the grading in accordance with the
[14]  specifications, or would you agree that the grading
[15]  had not been performed correctly, and that's what
[16]  led to the excessive pitches?
[17]       MR. MELTZER: Objection to the form.
[18]       MR. HIPP: Let me reask the question, then.
[19]       Q. Did Landworks correctly perform the grading
[20]  referred to that I just read from Exhibit No. 107?
[21]       A. Yes, we did.
[22]       Q. So you disagree with Mr. Kokernak's
[23]  representation about the grading being incorrect?
[24]       A. I think he uses the word "excessive cross

Page 56

[1]  slope." And I don't believe, actually, on FKS that
[2]  that is excessive cross slope. I would have to
[3]  check the -- I think 5 percent is allowable on the
[4]  cross slope also -- or maybe it's 2 percent, 2
[5]  percent cross slope.
[6]       Yes, I would disagree with his premise
[7]  altogether. The grading of some of these areas
[8]  were -- there was not really any grading. It was
[9]  just to remove existing asphalt and to replace it
[10]  with new asphalt so it could meet new concrete
[11]  ramps. And in the areas in the back of the school,
[12]  where he has -- where it says "excessive cross
[13]  slopes," the grading was performed to the elevations
[14]  that were shown on plan.
[15]       So I do not know if there was any backup to
[16]  his -- to what he had gone out and graded or not. I
[17]  know that at this time there was some animosity
[18]  between Mr. Kokernak and myself.
[19]       Q. What was the basis of that animosity?
[20]       A. The installation of the drainage at the --
[21]  the drainage manhole at the south side of the track.
[22]       Q. What about the drainage at that manhole?
[23]       A. The backfill of the line, the concrete line
[24]  that was going under the track, the existing

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 57

[1] material was a clay-based material, and we had
[2] purchased gravel material to go back into the
[3] excavation. And we were placing that, and Mr.
[4] Kokernak came out, and some clay had fallen down
[5] onto a lift of material we were compacting, and he
[6] had basically been accusatory that we were placing
[7] clay material into the backfill.
[8]         The backfill was being monitored by the
[9] geotechnical engineering firm, but he was becoming
[10] difficult about the matter, and I asked him, not so
[11] politely, to leave the area, and that if he needed
[12] to come back, to bring the clerk of the works with
[13] him, but never to interfere with my workers again.
[14]     Q. What was the time frame of this dispute?
[15]     A. That was -- I would have to go back and
[16] look to make certain, but I believe that would have
[17] been in early September.
[18]     Q. 2004?
[19]     A. Yes, sir. And so Mr. Kokernak would not
[20] speak to me after that. He became snipy.
[21]         MR. HIPP: Off the record.
[22]         (Discussion off the record)
[23]     Q. Mr. Matthews, as previously, I'll represent
[24] to you that the document that I've just handed you

Page 59

[1] presence of the geotechnical engineer and tested and
[2] passed.
[3]     Q. Just so I can understand your testimony,
[4] are you saying that only Item No. 5 was within the
[5] scope of Landworks' contract?
[6]     A. Yes.
[7]     Q. Why would none of the other items be within
[8] the responsibility of Landworks?
[9]     A. Because we were not doing anything with the
[10] track. We were not going to remove the rubberized
[11] surface, resurface the track -- or resurface the
[12] track.
[13]     Q. Did Landworks remove the rubberized surface
[14] of the track?
[15]     A. Yes, we did.
[16]         (Document marked as Exhibit 108
[17]         for identification)
[18]     Q. Mr. Matthews, do you recognize the document
[19] that was just marked as Exhibit 108?
[20]     A. (Reviewing document) I may have seen this
[21] document. I have seen documents like this.
[22]         MR. HIPP: I'm sorry. Can we take a break
[23] for a minute.
[24]         (Recess)

Page 58

[1] was previously marked as Exhibit No. 9 at a
[2] deposition in this case on January 10th of 2007.
[3] You have been handed a copy of it, not the original
[4] exhibit.
[5]     A. Yes, sir.
[6]     Q. Do you recognize the document marked as
[7] Exhibit 9?
[8]     A. Yes, sir, I've seen this before.
[9]     Q. And is this a letter reflective -- or from
[10] Landwork Design Associates (sic) to the project
[11] architects dated October 14th, 2004, reflective of
[12] items that needed to be addressed with respect to
[13] the bituminous concrete base of the track?
[14]     A. Yes, sir.
[15]     Q. Are the items numbered 1 through 11 the
[16] responsibility of Landworks to correct?
[17]     A. (Reviewing document) In the original
[18] contract, none of this, with the addition of the
[19] drainage in the south central location of the track,
[20] then the compaction of the backfill material would
[21] have been my responsibility. But that was
[22] compacted, so I don't know if he is just saying that
[23] it would need to be checked to make certain that it
[24] was compacted, because it was compacted in the

Page 60

[1] BY MR. HIPP:
[2]     Q. Mr. Matthews, Exhibit 108 appears to be a
[3] memo entitled "Site work Items to be completed,
[4] 9/22/04," and a second memo entitled "Work Items to
[5] be completed, Sections A and B, 9/22/04"; is that
[6] correct?
[7]     A. Yes, sir.
[8]     Q. The first memo, we appear to have Page 1 of
[9] 2, but not 2 of 2?
[10]     A. Yes, sir.
[11]     Q. And the second memo, we have Page 1 of 3
[12] and 3 of 3, but not 2 of 3; is that correct?
[13]     A. Yes, sir.
[14]     Q. Focusing on the first memo, there are 16
[15] items of site work items to be completed as of
[16] September 22, 2004. Item No. 1, is that within the
[17] responsibility of Landworks to complete?
[18]     A. Yes, sir.
[19]     Q. Was that completed by Landworks?
[20]     A. Yes, sir.
[21]     Q. When was that completed?
[22]     A. It would have been in this time frame of
[23] probably around the end of September. Now, whether
[24] it was completed to the liking of CTM, I'm not

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 61

[1] certain.
[2]   Q.  What about Item 2; is that the
[3] responsibility of Landworks?
[4]   A.  No, sir.
[5]   Q.  And why not?
[6]   A.  Because we did not contract to install
[7] concrete apron pads at the exterior doors.
[8]   Q.  What about Item No. 3?
[9]   A.  No, sir.
[10]   Q.  Was that not within the scope of the
[11] contract?
[12]   A.  No, sir. It was not in Landworks' scope,
[13] no, sir.
[14]   Q.  What about Item 4?
[15]   A.  No, sir.
[16]   Q.  Was that item within the scope of
[17] Landworks' contract?
[18]   A.  No, sir.
[19]   Q.  What about Item No. 5; was that within the
[20] scope of Landworks' responsibility?
[21]   A.  Yes, sir.
[22]   Q.  Was Item No. 5 performed by Landworks?
[23]   A.  The trees were cleared.
[24]   Q.  Was the south --

Page 62

[1]   A.  I'm not quite certain --
[2]   Q.  Let me just finish the question. Was the
[3] loam and seed on the south slope performed by
[4] Landworks?
[5]   A.  I'm not certain what he's talking about,
[6] unless he's talking about this being the south
[7] slope, and it was loamed and seeded. I think that
[8] that might be where he's talking about. On Drawing
[9] L 9, though, I could just look quickly and make
[10] certain. (Reviewing document)  Yes, sir.
[11]   Q.  So all of Item No. 5 was performed?
[12]   A.  Yes, sir. Item 5 extends along this area
[13] in here that he's talking about, and there may have
[14] been minor amounts of seeding left to do in the
[15] western edge of it.
[16]   Q.  What about Item No. 6; was that within the
[17] responsibility of Landworks?
[18]   A.  I don't know what that item is.
[19]   Q.  Okay. What about Item No. 7; was that
[20] within the responsibility of Landworks?
[21]   A.  No, sir.
[22]   Q.  Why not?
[23]   A.  Because we were not contracted to put up
[24] fencing or the backstops at the baseball or football

Page 63

[1] fields.
[2]   Q.  What about Item No. 8; is that within the
[3] responsibility of Landworks?
[4]   A.  No, sir.
[5]   Q.  Was that within the scope of Landworks'
[6] contract?
[7]   A.  No, sir. The field sign had been removed
[8] by a previous contractor, was in the possession of
[9] the school authorities, and they said that they
[10] would reinstall the sign, because they didn't know
[11] if it was going to be placed in the location as
[12] designated or not.
[13]   Q.  Which contractor previously removed the
[14] sign?
[15]   A.  I can't be certain. I was assuming it was
[16] Hole Story, but that would only be an assumption.
[17]   Q.  What about Item No. 9; was that within the
[18] scope of Landworks' responsibility?
[19]   A.  I wasn't aware that there was any traffic
[20] control and parking signage that was needed on site,
[21] other than the pavement marking.
[22]   Q.  Other than the pavement paint markings?
[23]   A.  Yes, pavement paint markings, handicap
[24] markings.

Page 64

[1]   Q.  If there were signs, standing metal signs
[2] to be installed, would that have been within the
[3] responsibility of Landworks?
[4]   A.  It would have depended what portion of the
[5] contract that was under. But like I said, I just
[6] don't know if that was anything -- it was not, to my
[7] knowledge, in my contract.
[8]   Q.  What about Item No. 10; was that within the
[9] responsibility of Landworks?
[10]   A.  Yes.
[11]   Q.  Was that work performed?
[12]   A.  No, sir.
[13]   Q.  How about Item No. 11; was that within the
[14] scope of Landworks' responsibility to perform?
[15]   A.  Yes, sir.
[16]   Q.  Was that work performed?
[17]   A.  No, sir.
[18]   Q.  Item No. 12 refers to paving items on a
[19] deficiency list. Are you familiar with the
[20] referenced list?
[21]   A.  No, sir. It's not to say that I haven't
[22] seen it before. I do not recall seeing a deficiency
[23] list for the paving.
[24]   Q.  If there were deficiency items -- if there

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 65

[1] were paving items on the deficiency list, would
[2] those have been corrected by Landworks?
[3]         MR. MELTZER: Objection.
[4]     A.  It would have depended where it was and
[5] what the deficiency was.
[6]     Q.  Item No. 13, was that within the scope of
[7] Landworks' responsibility?
[8]     A.  Yes, sir.
[9]     Q.  Was that work performed?
[10]     A.  That work was, to the best of my knowledge,
[11] performed, yes.
[12]     Q.  How about Item No. 14; was that within the
[13] scope of Landworks' responsibility to perform?
[14]     A.  I would have had to clarify "prep work for
[15] the installation of the field facilities" from them,
[16] but "relocate the eastmost long jump runway" would
[17] have been in my responsibilities to complete.
[18]     Q.  Is it your testimony that the installation
[19] of the field facilities referenced was not within
[20] the scope of Landworks' responsibility?
[21]         MR. MELTZER: Objection.
[22]     Q.  Let me just ask it this way: Was the
[23] installation of field facilities referenced within
[24] the scope of Landworks' responsibility?

Page 66

[1]     A.  The field facilities, no.  Doing the prep
[2] work, yes.
[3]     Q.  And was the prep work completed by
[4] Landworks?
[5]     A.  All that is related to the eastmost long
[6] jump runway or the runway pits.  All of these are
[7] sort of tied together.  And the preparatory work for
[8] that was in my scope, yes, and was not completed.
[9]     Q.  Item No. 15, do you understand what that
[10] reference is?
[11]     A.  Yes.
[12]     Q.  And was that work within the scope of
[13] Landworks' responsibility?
[14]     A.  No, sir.
[15]     Q.  Was it outside the scope of Landworks'
[16] contract?
[17]     A.  Yes, sir.  In my opinion, it was outside of
[18] the scope of Landworks' contract.
[19]     Q.  What's your understanding of what "complete
[20] bituminous paving at track and field events"
[21] referenced?
[22]     A.  It would have been the installation of the
[23] full depth pavement at the long jump and high jump
[24] areas and the addition of an overlay to the running

Page 67

[1] track.
[2]     Q.  And Item No. 16, was that within the scope
[3] of Landworks' responsibility?
[4]     A.  No, sir.
[5]     Q.  Was that not within the scope of Landworks'
[6] contract?
[7]     A.  No, sir.
[8]     Q.  I think I asked a negative and you answered
[9] a negative.  Was Item No. 16 within the scope of
[10] Landworks' contract?
[11]     A.  Item No. 16 was not in the scope of
[12] Landworks' contract, no, sir.
[13]     Q.  Thank you.  Turning to the second page of
[14] Exhibit No. 108, it's a separate memo entitled "Work
[15] Items to be completed, Sections A and B."
[16]     A.  Yes, sir.
[17]     Q.  Are any of Items 1 through 15 within the
[18] scope of Landworks' responsibility?
[19]     A.  No, sir.
[20]     Q.  Same questions for 33 through 37.
[21]         MS. BROWN:  Are we missing 16 through 32?
[22]         MR. MELTZER:  Yes.
[23]     A.  No, sir.
[24]

Page 68

[1]         (Document marked as Exhibit 109
[2]          for identification)
[3]     Q.  Mr. Matthews, do you recognize the document
[4] that's been marked as Exhibit 109?
[5]     A.  I have seen a contractor's deficiency list
[6] in the presence of Frank Leonardo that had it.  One
[7] was not sent to me by any of the parties related to
[8] this job.  But I don't know if it was this
[9] contractor deficiency list or not.
[10]     Q.  Directing your attention to Item No. 12,
[11] was that item within the scope of Landworks'
[12] responsibility?
[13]     A.  No, sir.
[14]     Q.  Why not?
[15]     A.  Because it was damage to an existing
[16] bituminous concrete walkway that was on -- if I'm
[17] correct, 100 feet south of the administration
[18] entrance and adjacent A wing would have been in
[19] sidewalk portion here, which falls completely out of
[20] the scope of any grading or any reason why I would
[21] have had any equipment in the area, and if it had
[22] been damaged, it would have needed to be repaired by
[23] whoever damaged it.
[24]     Q.  Turning your attention to Item 14, is that

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 69

[1] within the scope of Landworks' responsibility?
[2]    A. I'm sorry, which one?
[3]    Q. No. 14.
[4]    A. No, sir. Well, partially.
[5]    Q. Could you explain.
[6]    A. The curbing they're talking about is this
[7] piece right here, and there was a section right in
[8] here (indicating), we damaged it, we removed it, and
[9] it had not been replaced by the time we had shut
[10] down for the fall. And then there was another
[11] section just to the south of that where, when they
[12] were moving into the school, the tractor-trailer
[13] truck came in this entrance and drove across the top
[14] of it and crushed it.
[15]    So the part that I damaged I would have
[16] replaced. The part that was damaged by the school
[17] system, I would have expected compensation for, for
[18] replacing.
[19]    Q. I believe you said Landworks did remove the
[20] section that it had damaged, but it had not replaced
[21] it?
[22]    A. Had not replaced it.
[23]    Q. Could you describe verbally, for the
[24] record, the location of the curb that Landworks

Page 70

[1] damaged.
[2]    A. It would have been directly in front of the
[3] flagpole installation at the front entrance. There
[4] was approximately a four-foot section that had been
[5] damaged, or may have been just a little bit bigger,
[6] four-to-six-foot section.
[7]    Q. Directing your attention to No. 26, is that
[8] an item within the scope of Landworks'
[9] responsibility?
[10]    A. Yes. As noted, the exterior masonry corner
[11] was hit by me, as I previously stated, I believe,
[12] and that we had hired the masonry contractor to
[13] repair it, I guess, which was Cornerstone, which is
[14] noted here as being repaired in April.
[15]    Their complaint is that it must be washed
[16] down and that it's a poor color match. So I guess
[17] it would have been my responsibility to wash the
[18] bricks, yes, sir.
[19]    Q. Did Landworks do anything to remedy Item
[20] No. 26?
[21]    A. To wash the bricks?
[22]    Q. Right.
[23]    A. No, sir. I wasn't aware that the bricks
[24] needed washing. If I had known the bricks needed

Page 71

[1] washing, I would have been glad to wash the bricks
[2] for them.
[3]    Q. With respect to the color match, do you
[4] recall the area of the repair?
[5]    A. Yes, sir, I do.
[6]    Q. How would you describe the bricks that were
[7] used to make the repair as opposed to the existing
[8] bricks?
[9]    MR. MELTZER: Objection.
[10]    A. The corner that was hit was the northeast
[11] corner of the shop building, and in that same
[12] location, the overhead doors for the shop were being
[13] replaced, which required new brickwork to be done.
[14]    So the masonry contractor was working in
[15] the area, no more than ten feet from where the
[16] repair was made. We used the same bricks they were
[17] using to do the new work on the repair.
[18]    I did not know that it would be a concern
[19] that the color of the bricks didn't match up, since
[20] it was basically the same bricks that were being
[21] used that had been chosen by the architect and
[22] approved by them for the repair work.
[23]    There was a definite differential in color,
[24] because they were new bricks as compared to older

Page 72

[1] bricks that were bleached, but I don't know how
[2] to -- that I would have matched the color.
[3]    Q. Turning your attention to Item No. 27, is
[4] that within the scope of Landworks' responsibility?
[5]    A. Yes.
[6]    Q. Was that item resolved by Landworks?
[7]    A. I don't know if there was anything to
[8] resolve. We replaced and reset all of the granite
[9] curb in that courtyard adjacent to the cafeteria
[10] that had been damaged by the demolition contractor,
[11] and I don't think they had requested anything more
[12] than what we had done.
[13]    Q. Item No. 30, was that within the scope of
[14] Landworks' responsibility?
[15]    A. I don't know what they were talking about
[16] in Item No. 30. If they were talking about where we
[17] made the excavation through the south central side
[18] of the track for the drainage line, I don't know.
[19] So I can't venture to guess what they're talking
[20] about.
[21]    Q. Item No. 32, was that within the
[22] responsibility of Landworks?
[23]    A. Yes. At the time, no, I did not think it
[24] was, but we damaged the conduits between the poles,

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 73

[1] and we replaced the conduit.

[2]    Q.  Is that different than what's listed in

[3] Item No. 32?

[4]    A.  No. That's what I'm assuming this means.

[5]    Q.  So Item No. 32 was within the scope of

[6] Landworks' responsibility?

[7]        MR. MELTZER: Objection.

[8]    A.  No. We made the repairs to it. We damaged

[9] the underground electrical conduit, and we replaced

[10] the damaged sections.

[11]   Q.  So do I understand that Item No. 32 was

[12] within the scope of Landworks' responsibility, and

[13] Landworks corrected it?

[14]       MR. MELTZER: Objection. Answer if you

[15] understand it.

[16]   A.  And I'm not trying to be difficult, but

[17] electrical conduit, the electrical conduit

[18] underground running around the track was damaged by

[19] Landworks. In all the areas that it was damaged, we

[20] replaced them. I did not consider this to be in my

[21] scope of work, but I repaired and replaced the

[22] conduits because it was requested to do so.

[23]       Now, what they are talking about in this

[24] item, whether it is more than that, I have no idea,

Page 74

[1] because there has been some talk about repairing the

[2] electrical lines that ran through the conduits, and

[3] the electrical lines that ran through the conduits

[4] were not connected to the lights; they were not the

[5] wires that were feeding the lights. So I don't know

[6] what they're talking about in this. The only thing

[7] I can tell you is that we broke the conduits, and we

[8] replaced the conduits.

[9]    Q.  Did Landworks, at the time it broke the

[10] conduits, break the lines?

[11]   A.  No, sir.

[12]   Q.  How is it that Landworks would have broken

[13] the conduits but not the lines contained in the

[14] conduits?

[15]   A.  Because the conduits are plastic, PVC.

[16] Most of them were broken in the initial stripping of

[17] the topsoil. And whenever we hit lines, my

[18] operators are experienced enough to know not to just

[19] keep ripping them out. And so they had shattered

[20] some conduits, but they did not rip the lines up.

[21]   Q.  Did Landworks test in any way to see if the

[22] lines had been broken in the areas that the conduits

[23] were broken?

[24]   A.  Visual inspection.

Page 75

[1]    Q.  Item No. 40, I believe we've had testimony

[2] about this earlier, but was this within the scope of

[3] Landworks' responsibility?

[4]        MR. MELTZER: Objection as to form.

[5]    Q.  Is this a reference to the fire hydrant

[6] that was driven over by Landworks during snow?

[7]    A.  Yes, sir, by the excavator. It wasn't by a

[8] loader.

[9]    Q.  I believe you testified previously that a

[10] different subcontractor struck the hydrant and broke

[11] it, which required it to be replaced?

[12]   A.  The Sheetrock contractor drove a boom truck

[13] and broke the nipple on the hydrant, so the head had

[14] to be replaced, yes, sir.

[15]   Q.  Item No. 59, is that within the scope of

[16] Landworks' responsibility?

[17]       MR. MELTZER: Objection as to form.

[18]   Q.  Is the work referenced -- is the deficiency

[19] item referenced in Item No. 59 within the scope of

[20] Landworks' responsibility to correct?

[21]       MR. MELTZER: Objection.

[22]   A.  (Reviewing document) Can we go off the

[23] record?

Page 76

[1]    Q.  No, I would prefer not to go off the

[2] record.

[3]    A.  Okay. I'm having a little trouble with the

[4] description of "the northmost construction entrance

[5] at the south side." I'm not certain who damaged the

[6] bituminous curb, but we did some corrective work on

[7] some bituminous curb that had been damaged by

[8] snowplow work. I would not say that that was in my

[9] scope of work, though.

[10]   Q.  Did Landworks perform snowplow work or

[11] snowplow duties at the project?

[12]   A.  Not in the winter of 2003. That was during

[13] the Standen failure, so we did no work at the site

[14] in 2003. We did remove some snow early, but like

[15] during most of the winter, no. And the entryways,

[16] if they are looking up in here, then I don't know

[17] if -- I don't know who would have damaged that.

[18]   Q.  Do you know who did snowplow work in the

[19] winter of 2003-2004, other than Landworks?

[20]   A.  I'm assuming that the school would have

[21] done it. They had asked, and we had gone in to

[22] remove snow from where the trucks needed to get to

[23] the gas tanks, where they were providing heat for

[24] the building, so things wouldn't freeze up. And we

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 77

[1] complied with that just so that -- it was a good-
[2] faith effort to help out the school system.
[3] Q. Did Landworks do any snowplowing other than
[4] in the area of the gas tanks?
[5] A. To my knowledge, no, just in the areas that
[6] would have been serviced by the gas tanks, because I
[7] believe that the Town had opened up the entryways
[8] and the roadways, and then we were charged with
[9] going in and excavating or clearing the snow out
[10] from the area so that the trucks could get to the
[11] gas tanks to keep them filled.
[12] Q. Item No. 61, is that within the scope of
[13] Landworks' responsibility?
[14] MR. MELTZER: Objection.
[15] A. No, sir. Absolutely not.
[16] Q. Turning your attention to Item No. 71, is
[17] that within the scope of Landworks' responsibility
[18] to correct?
[19] MR. MELTZER: Objection as to form.
[20] A. I'm not certain what they're talking about.
[21] Q. Is it your testimony that Landworks
[22] repaired all the conduits that had it broken?
[23] A. To the best of my knowledge, we repaired
[24] all the conduits that we knew about that was broken.

Page 78

[1] I beg your pardon. When we excavated the
[2] new drain line in the south central portion of the
[3] track, we were told by the Town of Shrewsbury that
[4] the conduit on the outside of the track that fed the
[5] old press boxes and any items to the west end was a
[6] dead line and we didn't have to worry about it. And
[7] one of my guys almost got electrocuted when we cut
[8] through it, because we did not expect to find
[9] anything. And that conduit was not replaced and was
[10] not repaired. It was very much live when we cut
[11] through it, with 480.
[12] Q. With respect to Item No. 81, was that a
[13] deficiency item within the scope of Landworks'
[14] responsibility to correct?
[15] MR. MELTZER: Objection.
[16] A. Yes, sir.
[17] Q. And was corrective action taken by
[18] Landworks with respect to Item No. 81?
[19] A. No, sir. That was scheduled for the spring
[20] of 2005.
[21] Q. Is the deficiency item listed in No. 82 the
[22] deficiency listed in Exhibit No. 107?
[23] A. I can't speak to the mind-set of CTM and
[24] whether or not they were referencing that or not.

Page 79

[1] Q. Do you understand what the item referenced
[2] in No. 82 is?
[3] A. "The handicapped accessible concrete ramps
[4] and bituminous concrete paving exceed allowable
[5] pitch at several locations throughout the project."
[6] It could very well be a reference back to
[7] the exhibit you just mentioned, but I'm not certain
[8] what they were including in this.
[9] Q. With respect to Item No. 83, is that work
[10] within the scope of Landworks' responsibility to
[11] correct?
[12] A. Yes, sir.
[13] Q. Was that corrected?
[14] A. No, sir.
[15] Q. No. 85, could you describe the deficiency
[16] item listed in that.
[17] A. That is the concrete headwalls that we --
[18] Q. I'm sorry, No. 85.
[19] A. I'm sorry. I would be guessing to guess
[20] where 480 is. It's one of two locations, but I
[21] cannot say that I can accurately identify that area.
[22] Q. Was that damage caused by Landworks?
[23] A. No, sir.
[24] Q. No. 89, was that damage caused by

Page 80

[1] Landworks?
[2] MR. MELTZER: Objection.
[3] A. In my opinion, no, it was not.
[4] Q. Do you believe that the damage was caused
[5] by someone other than Landworks?
[6] A. No, sir. I believe the existing conditions
[7] of the track were the cause of the appearance of
[8] damage.
[9] Q. Could you describe what you mean by that.
[10] A. The track was, I don't know, 20, 30 years
[11] old. The pavement had been placed on it for that
[12] long. It was placed on a clay base without much
[13] gravel support under it. It was in poor condition,
[14] and it was cracked throughout.
[15] So the edges of the track, before we ever
[16] did anything to the track, were already in a
[17] crumbly, cracking condition. And I think that CTM's
[18] deficiency list was to go out and to find anything
[19] and everything that they possibly could find to
[20] enhance the Town's position against the surety.
[21] Q. So is it your testimony that the referenced
[22] deficiency in No. 89 was an existing condition?
[23] MR. MELTZER: Objection as to form.
[24] A. In my opinion, it was an existing condition

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 81

[1] and was not caused by construction damage.

[2] **Q.** Are you familiar with the item referenced

[3] in No. 92?

[4] **A.** No, sir. I can't be certain of where that

[5] sidewalk is. I have an idea of where it is, but I

[6] can't be certain.

[7] **Q.** Would that damage have been caused by

[8] Landworks?

[9] **A.** No, sir. It was --

[10]     **MR. MELTZER:** Objection.

[11] **A.** I'm sorry.

[12] **Q.** He made an objection. You can go ahead and

[13] answer.

[14] **A.** It would have been an area, if it's the

[15] area that I am thinking about, it would have been an

[16] area that was outside of the limits of our work.

[17] **Q.** Item No. 93, is that work within the scope

[18] of Landworks' responsibility to complete?

[19] **A.** In lawn areas, no, sir. That was not in my

[20] obligations to complete or in my contract to

[21] complete. It was outside my scope of work.

[22] **Q.** Could you describe just generally where the

[23] lawn areas at the project that were not within the

[24] scope of Landworks' contract work -- let me ask it

Page 82

[1] one more time.

[2] Could you describe where the lawn areas at

[3] the project were located that were not within the

[4] scope of Landworks' responsibility to seed and

[5] complete.

[6] **A.** Except for the area west of the track on

[7] Drawing L 1.7, then all areas marked as "Lawn seed

[8] mix to be applied in areas indicated by," and the

[9] diagram is next to it, would have been lawn grass

[10] areas.

[11] So quickly pointing them out to you --

[12] **Q.** Well, let me ask it this way: Are you

[13] saying that all of the lawn grass areas shown on

[14] Diagram L 1.7 are not within the scope of

[15] Landworks' responsibility, except for the areas to

[16] the west of the track?

[17] **A.** Yes, sir. Seeding of the grass there.

[18] Yes, sir.

[19]     **MS. BROWN:** Off the record.

[20]     (Discussion off the record)

[21]     (Document marked as Exhibit 110

[22]      for identification)

[23] **Q.** Mr. Matthews, do you recognize the Exhibit

[24] 110?

Page 83

[1] **A.** I've seen this before, yes, sir.

[2] **Q.** There's handwriting on this. Do you

[3] recognize that handwriting?

[4] **A.** Yes, sir. The document that I referenced

[5] before with going over with Frank Leonardo at the

[6] site was this document.

[7] **Q.** Is that your handwriting on the left-hand

[8] side of the document?

[9] **A.** Yes, sir.

[10] **Q.** This appears to be site work deficiencies,

[11] work yet to be complete, as of December 7, 2004; is

[12] that correct?

[13] **A.** Yes, sir.

[14] **Q.** With respect to the first group under Item

[15] A, "Major Topical Facilities," were any of those

[16] items within the scope of Landworks' responsibility?

[17] **A.** No, sir. Oops, I'm sorry. Reinstalling of

[18] the monument was.

[19] **Q.** With respect to the second grouping under

[20] "lower ball field," were any of those items within

[21] the scope of Landworks' responsibility?

[22] **A.** a, b, c, yes. d, no. e, I believe yes.

[23] **Q.** Were Items a, b, c and e completed by

[24] Landworks?

Page 84

[1] **A.** No. That is the area that we have said

[2] previously, the west end of the track area, needed

[3] to be loamed and seeded.

[4] **Q.** The cut and fill items on the second page,

[5] were any of those within the scope of Landworks'

[6] responsibility?

[7] **A.** The first one, no. The second one, regrade

[8] the bike path, is the item that we had previously

[9] talked about, about the walkway leading from the

[10] elementary school to the middle school that Katie

[11] Crockett and I had discussed about it complying with

[12] the ADA letter.

[13] **Q.** Under "Storm drainage" were any of those

[14] items within the scope of Landworks' responsibility

[15] to correct?

[16] **A.** The first item is a restating of the item

[17] above that, which is a restatement of item back on

[18] the first page, talking about the headwalls. They

[19] are all the same headwalls. There was just two

[20] concrete headwalls on the whole job. And as I said

[21] before, no.

[22] **Q.** With respect to the other three items, were

[23] those within the scope of Landworks' responsibility

[24] to correct, the other three items under "Storm

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 85

[1] drainage" other than the concrete headwalls?
[2]     A. The drainage manhole in the west end of the
[3] football field would have been the drainage manhole
[4] basically at the west end of the football field,
[5] which was never to be touched or removed, so the
[6] correctness of the rim elevation would have been
[7] what it was, since it was never touched or removed.
[8] And if there was any touch-up work to be done with
[9] the finish grading, then, yes, that would have
[10] possibly been our work to do.
[11]     Q. What about the final two items under "Storm
[12] drainage"?
[13]     A. "Clean and repair swale along south
[14] property line," it had already been cleaned. I
[15] don't know that it could have been cleaned to what
[16] they wanted, because it had tree roots that were
[17] growing up into the asphalt. But it had been
[18] cleaned and repaired, and then additional washing
[19] into that. If it had to be repaired any more or
[20] cleaned any more, than it would have been our
[21] responsibility to do it.
[22]     Q. And the last item under "Storm drainage"?
[23]     A. I don't know what they're talking about
[24] there.

Page 86

[1]     Q. Under "Rough grading," are any of those
[2] items within the scope of Landworks' responsibility
[3] to correct?
[4]     A. Yes.
[5]     Q. Which ones?
[6]     A. The handicap ramp, feathering the sods to
[7] that, I believe that work actually was done in early
[8] December.
[9]         The second item, no. The next item, yes.
[10] (Reviewing document) I don't know what that item
[11] is, the next item. I don't know what that is.
[12]     Q. Are you talking about the fourth item?
[13]     A. "At walk connecting fields of middle school
[14] west with middle school east, abrupt edge near the
[15] baseball field foul line to feather." I'm not
[16] certain where they're talking about there.
[17]     Q. Is your reference -- is your handwriting
[18] "LW" to the side of that item a reference that you
[19] did agree that it was within Landworks'
[20] responsibility to correct at the time you wrote
[21] that?
[22]     A. My recollection was that Frank Leonardo was
[23] going down and assigning what he considered to be my
[24] responsibility, and I was writing to the side of it

Page 87

[1] that it might have been, but I don't know that we
[2] knew exactly what we were talking about then. I
[3] just -- I can't say for certain.
[4]     Q. With respect to the third item, which you
[5] said was within Landworks' responsibility, was that
[6] work completed?
[7]     A. No, sir.
[8]     Q. What about the fifth or six items under
[9] "Rough grading"?
[10]     A. That would have been an addition. That was
[11] not in the scope of the work. There was no grading
[12] plan given for the ends of the end zones of the
[13] track and football field. They were graded back out
[14] to existing conditions and seeded after the fact.
[15] Sometime in late September, I believe, Lamoureux
[16] Pagano issued a grade clarification again, and at
[17] that time they had discussed regrading the areas.
[18]     Q. Under "Respread topsoil," are those items
[19] within the responsibility of Landworks to correct?
[20]     A. First item, yes. Second item, yes. Third
[21] item yes. Next item, no. Next item, no. Next
[22] item, no. Next item, yes, but at an additional
[23] charge. It was from traffic construction driving on
[24] the grass.

Page 88

[1]     Q. Is the item which you just referred "near
[2] (future) ticket booth location"?
[3]     A. Yes.
[4]     Q. Please continue.
[5]     A. The next item would have been no. The next
[6] item is no. I'm not certain of what they are
[7] speaking of in that area. If it was items within
[8] the limits of work, it would have been my
[9] responsibility to make certain that it was at a
[10] smooth, proper grade with topsoil on it.
[11]     Q. Is that the item that begins, "in all areas
[12] reworked per cut/fill, storm drainage, and rough
[13] grading"?
[14]     A. Yes. As long as those areas hadn't been
[15] damaged by miscellaneous traffic, that seemed to
[16] wait until I would grade something smooth, and then
[17] they would grade across it.
[18]         Next item is no, even though it is in -- it
[19] has my name beside it, "LW" beside it. "With
[20] baseball field dugouts, place processed gravel in
[21] conjunction with installation of benches and bring
[22] to grade," that was not in my contract.
[23]         And the sand silt drains, I had maintained
[24] them for six months. I don't know how much longer

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 89

[1] they expected me to maintain them. But if they had
[2] to be maintained, I had done the maintenance on
[3] them.
[4]     Q. I believe it was your testimony previously
[5] that once grass grows back over the top of the sand
[6] slit drains, maintenance would not be required?
[7]     A. That's correct.
[8]     Q. As of December 7th, 2004, had the grass
[9] grown back over the sand slit drains?
[10]     A. It was starting to knit itself in, but it
[11] had not completely established on top of it. There
[12] were still areas that were open.
[13]     Q. Under "Curbing and edging," were any of
[14] these items within the scope of Landworks'
[15] responsibility to correct?
[16]     A. The first item is yes. Second item was no,
[17] but I moved it anyway. The next item, as far as I
[18] know, was still talking about that upper walkway,
[19] and as I have marked beside it, it meets the ADA
[20] requirement.
[21]        And the miscellaneous damage to the curb,
[22] by the time this had been generated, in December,
[23] the paving had been in since August, end of August,
[24] and bituminous curb is going to start to get

Page 90

[1] damaged, and I'm not certain what they were talking
[2] about repairing.
[3]        The areas that were in front of the school
[4] that we had damaged, the small area we had damaged,
[5] we were going to replace. If it was damage that was
[6] caused by traffic driving over the top of the curb
[7] or something like that, then I would have expected
[8] compensation.
[9]     Q. With respect to the first item, that was
[10] within Landworks' responsibility, was that work
[11] completed?
[12]     A. No, sir.
[13]     Q. Going back to the "Respread topsoil," Items
[14] 1, 2 and 3, was that work completed by Landworks?
[15]     A. Item 1, I'm not certain. Item 2, yes.
[16] Item 3, yes.
[17]     Q. Under "Bituminous concrete drive/parking,"
[18] were either of those items within the scope of
[19] Landworks' responsibility to correct?
[20]     A. No. The sidewalk from the upper school to
[21] the lower school, which has been discussed
[22] previously, relates to this, and this is where it
[23] says that the catch basin is basically too low and
[24] it is causing the problem with the slope of the

Page 91

[1] walkway and that it might be necessary to raise the
[2] driveway at the catch basin, which means that you
[3] would have to raise the top of the catch basin, and
[4] that was not in our scope. It was not part of the
[5] contract. The building loading dock was not in my
[6] contract.
[7]     Q. Under "Pavement markings," are any of these
[8] three items within the scope of Landworks'
[9] responsibility to correct?
[10]     A. Yes.
[11]     Q. Were all three of those items within
[12] Landworks' responsibility?
[13]     A. Yes.
[14]     Q. Were all three of those items completed?
[15]     A. No. They were scheduled for springtime,
[16] but they were not completed.
[17]     Q. With respect to "Bituminous concrete
[18] walks," were any of those items within the scope of
[19] Landworks' responsibility? I'm sorry.
[20]     A. I believe that the handicap space markings
[21] had been marked on this job, but I'm not completely
[22] certain.
[23]     Q. The third item under "Pavement markings"?
[24]     A. Yes. "Bituminous concrete walks"?

Page 92

[1]     Q. Yes.
[2]     A. The first item would have been done as an
[3] addition, but since I was doing the paving, then
[4] that was -- then I would have been taking care of
[5] that.
[6]     Q. Is it your testimony that the first item
[7] was not contract work?
[8]     A. No, sir. I mean, yes, sir, it is not
[9] contract work.
[10]        Item No. 2 was my responsibility.
[11]     Q. Was that work completed?
[12]     A. No, sir. The second item and the third
[13] item were both in my --
[14]     Q. Scope?
[15]     A. -- scope to do, yes.
[16]     Q. Was the third item completed?
[17]     A. No. That area and the area around the
[18] flagpole in front had binder paving down and only
[19] needed topcoat. And as I stated before, I believe
[20] that's talking about that walkway again.
[21]        The next item was talking about the walkway
[22] again that I felt complied with the ADA.
[23]     Q. What about the fifth item?
[24]     A. At the entry to the gymnasium, is that the

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 93

[1] item you're talking about?

[2] Q. Yes.

[3] A. No, sir, that was not. That was not

[4] damaged by me, and it's not -- was not in my

[5] contract.

[6] The overlay to the 400-meter running track

[7] was an addition to the contract. And the handralls

[8] for the steps was not my responsibility, not in my

[9] contract.

[10] Q. What about the four items under "Signs and

[11] accessories"; were any of those within the scope of

[12] Landworks' responsibility?

[13] A. To my knowledge, no, sir.

[14] Q. And under "Fencing and gates," were any of

[15] those items within the scope of Landworks'

[16] responsibility?

[17] A. I'm sorry, go back to "Signs and

[18] accessories." The first item, to my knowledge, was

[19] not in there. The rest of the items were definitely

[20] not in my scope.

[21] Under "Fencing and gates," chain link

[22] fence, no fencing was in my contract.

[23] Q. Under "Planting and seeding"?

[24] A. Yes, sir.

Page 94

[1] Q. Were any of those items within the scope of

[2] Landworks' responsibility?

[3] A. The first item, no. The second item, no.

[4] Q. Are any of the items listed under

[5] "Irrigation" within the scope of Landworks'

[6] responsibility?

[7] A. No, sir.

[8] Q. Is the item listed under "General site

[9] cleanup" within the scope of Landworks'

[10] responsibility?

[11] A. Part of it would have been, yes, sir.

[12] Q. What general site cleanup was within the

[13] scope of Landworks' responsibility left to be done

[14] as of December 7th, 2004?

[15] A. The stockpile at the west end of the

[16] football field needed to be removed and that area

[17] graded out and cleaned up. There may have been

[18] miscellaneous items elsewhere on the site, but that

[19] was the majority of it.

[20] MR. HIPP: If you'll bear with me for just

[21] a second, I'll rearrange these.

[22] (Document marked as Exhibit 111

[23] for identification)

[24] Q. Mr. Matthews, do you recognize the

Page 95

[1] documents that are attached as Exhibit 111?

[2] A. They are checks -- appear to be checks

[3] written from Jackson Construction to Landworks

[4] Creations.

[5] Q. They appear to be checks written by Jackson

[6] to Landworks for work with respect to the Shrewsbury

[7] Middle School construction project?

[8] A. Yes.

[9] Q. Did any of the checks that Jackson

[10] Construction submitted to Landworks fall to clear or

[11] bounce?

[12] A. Not to my knowledge.

[13] (Document marked as Exhibit 112

[14] for identification)

[15] Q. Do you recognize the document shown as

[16] Exhibit 112?

[17] A. (Reviewing document)

[18] Q. Let me ask, have you seen this document

[19] before?

[20] A. I'm not certain. This may have been the

[21] worksheet that Richard McGuinness showed me. It

[22] looks something similar to what he was showing me

[23] during that November meeting as to how he came up

[24] with the contract figure.

Page 96

[1] Q. Over in the upper left-hand corner, you

[2] will see the reference to $254,718.53?

[3] A. Yes, I do.

[4] Q. Is that the amount left to complete as

[5] noted in the ratification agreement marked as

[6] Exhibit No. 78?

[7] A. Yes, it is.

[8] Q. Do you see the reference on Exhibit No. 112

[9] to SMS0204, $5,100?

[10] A. Yes.

[11] Q. Does that number correlate with the amount

[12] of Landworks Proposed Change Order No. 2, Exhibit

[13] 81?

[14] A. Yes, it does.

[15] MR. HIPP: Off the record for a second.

[16] (Discussion off the record)

[17] Q. I'll just ask, are the amounts indicated on

[18] Exhibit 112 for SMS0504, 0604 and 0704 correctly

[19] represented on the proposed change orders from

[20] Landworks marked as exhibits?

[21] A. Yes, they are.

[22] Q. Is the total of the work left to complete

[23] as of the ratification agreement, plus Landworks

[24] Proposed Change Orders 2, 5, 6 and 7, $271,368.53?

**Landworks Creations, LLC v.**
**United States Fidelity and Guaranty Company, et al.**

Neal H. Matthews, Vol. 2
February 16, 2007

Page 97

[1]        MR. MELTZER: Objection.
[2]    A.   I don't know. I would need to check with
[3]   this, and there was additional change orders that
[4]   were still pending.
[5]    Q.   I understand there might be --
[6]    A.   You're asking me if all these numbers add
[7]   up to be $271,368.53?
[8]    Q.   Yes, that's the question.
[9]        MR. MELTZER: Objection. You can answer.
[10]    A.   (Calculating) Yes.
[11]    Q.   And, Mr. Matthews, is the retainage
[12]   withheld, noted in the ratification agreement marked
[13]   on Exhibit No. 78, $32,166.27?
[14]    A.   At the bottom it is, yes.
[15]    Q.   Is it also on Exhibit No. 78?
[16]    A.   Yes.
[17]    Q.   And is the total of the work left to
[18]   complete Landworks Change Orders No. 2, 5, 6 and 7,
[19]   plus the retainage withheld as of the ratification
[20]   agreement -- does that all add up to the $303,535,
[21]   which is reflected as the contract amount, the
[22]   Jackson subcontract marked as Exhibit No. 67?
[23]    A.   Yes. It would appear. If I could find the
[24]   number that that -- is that the Jackson?

Page 98

[1]    Q.   I think it's on the second page.
[2]    A.   (Reviewing document) Yes.
[3]        MR. HIPP: I think I'm finished asking
[4]   questions for now. I might have a few more after
[5]   Ms. Brown asks you more.
[6]        FURTHER REDIRECT EXAMINATION
[7]   BY MS. BROWN:
[8]    Q.   I'm going to changes gears a little bit
[9]   this afternoon and follow up on a few items that we
[10]   talked about, Mr. Matthews, the day before
[11]   yesterday. I'll start with this exhibit.
[12]        (Document marked as Exhibit 113
[13]        for identification)
[14]    Q.   Mr. Matthews, when we spoke last time, I
[15]   was asking you about what Lovett Silverman, my
[16]   client, had done wrong that gave rise to you adding
[17]   Lovett Silverman as a Defendant in this case. And
[18]   you talked about the communications between you and
[19]   Mr. Bullock in August of 2005, where initially Mr.
[20]   Bullock was receptive to your interest in ratifying
[21]   the contract, and later stated that he could not
[22]   speak with you directly. Do you recall that
[23]   testimony?
[24]    A.   Yes, I do.

Page 99

[1]    Q.   And you stated that you had been aware of
[2]   someone named Russ Fuller had stated that he had
[3]   e-mails between Lovett Silverman and USF&G wherein
[4]   issues with you. Do you recall that testimony of
[5]   yours?
[6]        MR. MELTZER: Objection.
[7]    A.   I stated that I became aware later.
[8]    Q.   Later, right?
[9]    A.   That there were e-mails that related to
[10]   this. At the time of the discussions with Mr.
[11]   Bullock, I was not aware of any discussions with
[12]   anybody else.
[13]    Q.   And at the time that you added Lovett
[14]   Silverman to the complaint, you were not aware
[15]   either, were you?
[16]        MR. MELTZER: Objection.
[17]    A.   Could you --
[18]    Q.   Well, let's look at this e-mail, and let me
[19]   ask you, this e-mail that we've marked as Exhibit
[20]   113, is this the communication that you were
[21]   referring to?
[22]    A.   No. When you're speaking about the e-mail
[23]   where I said that Mr. Bullock said that he couldn't
[24]   deal with me, there was an e-mail somewhere later

Page 100

[1]   that stated to him that -- I think it was "Russ
[2]   Fuller has a problem with this guy." But this isn't
[3]   the e-mail.
[4]    Q.   Okay.
[5]    A.   There's another one somewhere.
[6]    Q.   All right.
[7]        MS. BROWN: Let's mark this as the next
[8]   one.
[9]        (Document marked as Exhibit 114
[10]        for identification)
[11]    Q.   Are you familiar with the document that
[12]   we've marked 113?
[13]    A.   Yes.
[14]        MR. HIPP: Do you mean 114?
[15]        MS. BROWN: 114, excuse me.
[16]    Q.   And this is the amended complaint that
[17]   added my client to this litigation; is that correct?
[18]    A.   Yes, that's what it would appear to be,
[19]   yes.
[20]    Q.   And did you review this document before
[21]   your attorney filed it?
[22]        MR. MELTZER: Objection as to form.
[23]   Actually, attorney-client privilege, and I'm going
[24]   to instruct him not to answer that question.

Case 4:05-cv-40072-FDS    Document 77-4    Filed 04/18/2007    Page 29 of 31

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 101

[1] **Q.** Mr. Matthews, I direct your attention to
[2] Paragraph 12. You state that "Lovett Silverman
[3] engaged in a scheme to reduce costs to USF&G on the
[4] project by refusing to authorize payments to
[5] subcontractors, including the Plaintiff." Do you
[6] see that?
[7] **A.** Yes.
[8] **Q.** What is your basis to assert that Lovett
[9] Silverman had the authority to authorize payments?
[10] **A.** From the previous ratification, Lovett
[11] Silverman was charged with investigating the claim.
[12] Once they found out which portions of it were valid,
[13] then they would sit there and they would put
[14] together the ratification about how much was owed.
[15] And then they would tell the surety at that time
[16] that this is the amount that is owed to this
[17] contractor, for them to be ratified or to be held.
[18] So that's what I am gauging this on, that
[19] basically you had to work through the surety's -- or
[20] through Lovett Silverman for them to go through all
[21] of your billing to make certain what you said you
[22] were owed you are owed. And then they would, in
[23] turn, give that to the surety, and the surety would
[24] pay you.

Page 102

[1] **Q.** Do you know for a fact who was the decision
[2] maker, whether it was the surety or whether it was
[3] Lovett Silverman?
[4] **MR. MELTZER:** Objection.
[5] **A.** No, I do not.
[6] **Q.** Now, you testified a few days ago that you
[7] do not believe that Lovett Silverman engaged in
[8] extortion. Do you recall that testimony?
[9] **MR. MELTZER:** Objection.
[10] **A.** Yes, I do. I think I said that they were
[11] more coercive, not extorting.
[12] **Q.** Is this a mistake in Paragraph 12 --
[13] **MR. MELTZER:** Objection.
[14] **Q.** -- of your complaint, that Lovett Silverman
[15] engaged in a scheme by engaging in extortion towards
[16] subcontractors?
[17] **MR. MELTZER:** Objection.
[18] **A.** No. No.
[19] **Q.** Are you changing your testimony?
[20] **MR. MELTZER:** Objection.
[21] **Q.** You said "extortion" was a very strong
[22] word, you said two days ago. Are you now changing
[23] your testimony?
[24] **MR. MELTZER:** Objection.

Page 103

[1] **A.** No. I think that as I look back at the
[2] conduct, that coercive conduct in trying to have
[3] someone to drop a lawsuit in order to speak with
[4] them, so that -- before they would speak to me, it
[5] was stated that I needed to -- if I resolved my
[6] lawsuit, then they could then move forward with
[7] ratification.
[8] **Q.** Who stated that?
[9] **A.** I believe that was stated by Mr. Bullock.
[10] **Q.** And when was that stated?
[11] **A.** During the e-mails, or it may have been --
[12] I think it was the August 16th e-mails, but it might
[13] have been after that.
[14] **Q.** Was it stated anywhere else other than in
[15] the e-mails that we've previously marked as exhibits
[16] here at this deposition?
[17] **A.** I don't recall. I would have to go back
[18] and review all the documents to see.
[19] **Q.** Well, I'll ask your attorney that if there
[20] is any other evidence of these allegations, other
[21] than the e-mails that we have already marked as
[22] exhibits here, that they be supplied.
[23] **A.** Okay.
[24] **Q.** But sitting here today, you're not aware of

Page 104

[1] any; is that correct?
[2] **MR. MELTZER:** Objection.
[3] **A.** Like I said, I would have to review to make
[4] certain what there is in documents. There are so
[5] many documents to go back over, I cannot recall all
[6] of them right now. But I would have to review them
[7] and see.
[8] **Q.** Now, are there any other -- we went through
[9] this before. I don't want to repeat the questions
[10] that I asked you before. You recall I asked you
[11] before about strong-arming and asked you what
[12] evidence you had that you were strong-armed by
[13] Lovett Silverman, not USF&G, but Lovett Silverman?
[14] **A.** Yes.
[15] **Q.** And in the context here of this scheme to
[16] reduce costs to the surety by refusing to authorize
[17] payments to subcontractors and strong-arming the
[18] subcontractors, do you have any evidence to support
[19] that allegation?
[20] **MR. MELTZER:** Objection.
[21] **A.** The conduct that was exhibited by the
[22] e-mail traffic back and forth between the parties
[23] and Lovett Silverman --
[24] **Q.** I'm not talking about -- those e-mails you

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 105

[1] didn't have back in June when you wrote this
[2] complaint.
[3]         MR. MELTZER: Objection.
[4]     Q. I'm talking about what you -- what
[5] information you had to support these allegations in
[6] the complaint. I'm not talking about e-mails
[7] between -- well, you tell me, what was your basis
[8] for this allegation that Lovett Silverman strong-
[9] armed the subcontractors?
[10]         MR. MELTZER: Objection. Asked and
[11] answered four times.
[12]     A. What are you talking about in June, that I
[13] didn't have in June? What does the June date
[14] represent?
[15]     Q. When this complaint was dated, June 20th,
[16] 2006.
[17]     A. Okay. But I had the e-mails from Mr.
[18] Bullock --
[19]     Q. Okay.
[20]     A. -- before then. They were supplied by the
[21] surety.
[22]     Q. I understand. So that's what you are
[23] basing it on?
[24]     A. So I base a lot of it on that and what I,

Page 106

[1] in my opinion, see is the conduct of first not
[2] relating to me what I saw as the truth being, that
[3] Russ Fuller had a problem with me or whoever it was
[4] had a problem with me, and that's why they couldn't
[5] deal with me.
[6]         Secondly, in that even though the surety
[7] had -- may have told them they couldn't deal with
[8] me, that it was still, in my opinion, the
[9] responsibility of Lovett Silverman to investigate
[10] clearly, plainly and thoroughly the claim that I had
[11] that I was owed money.
[12]         And for them not to do any type of
[13] investigation, from August of 2005 until they were
[14] pressed to make a counterclaim in the December-
[15] January time frame following, then it lacks a
[16] sincerity about their actions. I mean, it's not --
[17] they're not presenting in their counterclaim an
[18] accurate portrayal of things that were in my scope
[19] of work.
[20]     Q. Can we look just briefly, and we'll be
[21] done, on Count III. Well, Count II is a fraud
[22] count. You've accused Lovett Silverman of fraud.
[23] Can you explain in your own words how it is that you
[24] believe that Lovett Silverman engaged in a fraud on

Page 107

[1] you.
[2]         MR. MELTZER: Objection. Asked and
[3] answered at least four times.
[4]         MS. BROWN: We haven't talked about Count
[5] II at all yet.
[6]     Q. Go ahead.
[7]     A. The compilation of what I believe to be a
[8] false counterclaim that Lovett Silverman helped
[9] prepare for the surety, I believe, in my opinion is
[10] fraud.
[11]     Q. Anything else?
[12]     A. At this moment, I can't think of anything
[13] else, but I may.
[14]     Q. Okay. Well, if you do, you can tell your
[15] attorney, and he will supplement your response?
[16]     A. Yes.
[17]     Q. Now, Count III is tortious -- it's a
[18] misspelling here, it's t-o-r-t-i-o-u-s, but
[19] computers constantly make those corrections to these
[20] legal words.
[21]         MR. MELTZER: What are you looking at
[22] that's spelled wrong?
[23]         MS. BROWN: Tortious. It's spelled with an
[24] I, isn't it?

Page 108

[1]         MR. MELTZER: No. It's fine. That's the
[2] way it is.
[3]         MS. BROWN: That's fine? You spell it
[4] without an I? Okay.
[5]     Q. Tortuous, but in the law we mean tortious,
[6] with an I, interference, not tortures us. But would
[7] you look at Paragraph 23 of Count III, please.
[8]         You state, "Lovett Silverman, by carrying
[9] out its program of 'banging' the subcontractors, did
[10] tortuously interfere with the contract between the
[11] Plaintiff and USF&G for ulterior motives."
[12]         And I would like to ask you, just in your
[13] own words, how is it that you believe that Lovett
[14] Silverman interfered in your contract with the
[15] surety?
[16]         MR. MELTZER: Objection. Asked and
[17] answered.
[18]     A. I believe that they interfered with my
[19] relationship with the surety, in that by not
[20] investigating the claim, by not at least looking
[21] into the possibilities that these monies were owed,
[22] and by -- it was evident that they were having
[23] trouble finding a site contractor to complete the
[24] work, and that the surety, up until the point that

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 109

[1] basically I filed suit against them, didn't seem to
[2] have any problem with me -- that by not sitting
[3] there, giving me a full and fair hearing on the
[4] amounts that I say were owed to me, and not
[5] presenting them to the surety as "Maybe we should
[6] sit down and talk with this person," was interfering
[7] with the working relationship that I had had with
[8] USF&G.
[9]    Q. Thank you. Now, Paragraph 38, this is the
[10] last question I have on the amended complaint,
[11] "Defendant Lovett Silverman set out to harm
[12] Landworks by denying it access to the project and to
[13] funds due and owing." Can you tell me how it is
[14] that Lovett Silverman denied you access to the
[15] project?
[16]    MR. MELTZER: Objection. Asked and
[17] answered. Go ahead.
[18]    A. By not proceeding with or, as I stated
[19] before, by not taking the request that I made for
[20] them to meet with attorneys present to work this
[21] out, to mediate, negotiate the amounts owed to me
[22] out, so that I could return to work on the job site
[23] and to finish what my contractual obligations were.
[24]    Q. So Lovett Silverman --

Page 110

[1]    A. -- I believe interfered in that -- in doing
[2] that.
[3]    Q. Okay. Anything else?
[4]    A. Not that I can think of at this moment, but
[5] if I do, I'll let him know, and he can let you know.
[6]    Q. Thank you. Finally, I would like to
[7] quickly show you a final exhibit.
[8]       (Document marked as Exhibit 115
[9]       for identification)
[10]    A. Do I need to have the top letter?
[11]    Q. Yes, you can look at it.
[12]    A. (Reviewing document)
[13]    MR. MELTZER: By the way, Neal, before you
[14] say anything, I'm going to instruct you not to
[15] answer any questions on the basis of attorney-client
[16] privilege about this particular document.
[17]    THE WITNESS: So don't say a word?
[18]    MR. MELTZER: I'm going to instruct you not
[19] to answer any questions put to you about this
[20] particular document on the basis of attorney-client
[21] privilege.
[22]    Q. Just for the record, I'll ask a few
[23] questions, and you can respond in accordance with
[24] your attorney's instructions.

Page 111

[1]    Have you seen this affidavit of Neal
[2] Matthews?
[3]    MR. MELTZER: Objection. I'm instructing
[4] you not to answer that question on the grounds of
[5] attorney-client privilege. I'm instructing you not
[6] to answer.
[7]    Q. So don't answer. He is instructing you not
[8] to answer on the basis of attorney-client privilege,
[9] whether you have seen this document or not.
[10]    MR. MELTZER: I'm instructing you not to
[11] answer.
[12]    A. So do I say --
[13]    Q. You say nothing.
[14]    We reviewed e-mails in this case between
[15] you and Bob Bullock from August 17th, 18th, 19th,
[16] and 23rd of 2005. Do you recall those e-mails that
[17] we reviewed in your deposition here?
[18]    MR. MELTZER: You can answer that question.
[19]    A. Yes, I do.
[20]    Q. Do those e-mail communications comprise all
[21] the e-mail communications from you or anyone else at
[22] Landworks to Lovett Silverman?
[23]    MR. MELTZER: You can answer. Go ahead.
[24]    A. To the best of my knowledge, yes.

Page 112

[1]    Q. Do you have any electronically stored
[2] information or communications pertaining to this
[3] litigation, other than those e-mails between you and
[4] Bob Bullock?
[5]    MR. MELTZER: And pertaining to attorney-
[6] client as well, obviously.
[7]    Q. I'm not interested in e-mails between you
[8] and your attorneys.
[9]    A. I'm not certain what electronically stored
[10] information is unless it's a computer file.
[11]    Q. It could be a computer file. It could be
[12] even deleted e-mails that you've deleted from your
[13] system, which are still stored electronically within
[14] your system. It could be any of that.
[15]    A. To the best of my knowledge, no. But if I
[16] think of anything on that, then I would like to
[17] reserve the right to amend that, because I just --
[18] I've never thought about that before.
[19]    MS. BROWN: I understand. Thank you.
[20] That's all I have.
[21]    MR. HIPP: I just have a couple of
[22] questions for you, Mr. Matthews.
[23]
[24]

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

Page 113

[1]             RECROSS EXAMINATION
[2]     BY MR. HIPP:
[3]     Q. Now, is the amount that Landworks claims
[4]   that it was owed as a result of its work at the
[5]   Shrewsbury Middle School project $135,101?
[6]     A. Yes.
[7]             (Document marked as Exhibit 116
[8]             for identification)
[9]     Q. As part of the itemization of that
[10]   $135,101, does Landworks claim $76,303.98 for change
[11]   order work?
[12]     A. Yes.
[13]     Q. Do you have an itemization of the change
[14]   orders, proposed change orders, that total that
[15]   amount claimed?
[16]     A. I believe we would have to go back to the
[17]   exhibit, like 100, and we would have to bring those
[18]   change orders down through, along with the other
[19]   change orders that have already been signed, which
[20]   are in the file. So I would have to go back through
[21]   the file and look at that.
[22]     Q. I'm going to request that you provide an
[23]   itemization of the change orders that comprise that
[24]   $76,303.98 for change order work claimed other than

Page 114

[1]   the balance of contract work.
[2]     A. Okay.
[3]             MR. MELTZER: I'll note for the record, by
[4]   the way, it has already been provided to the surety
[5]   before I got involved in this. That's where the
[6]   number came from. It's in the possession of the
[7]   surety. At least prior counsel provided that.
[8]             MR. HIPP: I am simply requesting an
[9]   itemization of the change order work.
[10]             MR. MELTZER: To the extent that a prior
[11]   document exists that has that number, we'll provide
[12]   the one that has already been provided to the
[13]   surety.
[14]             MR. HIPP: If one has not been previously
[15]   provided to the surety, will a new one be created?
[16]             MR. MELTZER: We will check and see what
[17]   has been provided to the surety in the past.
[18]             MR. HIPP: I just want to be clear, if you
[19]   are not able to find a previous itemization that has
[20]   been provided to the surety, will you provide one at
[21]   this point?
[22]             MR. MELTZER: I think we can discuss that
[23]   off the record if in fact that document does not
[24]   exist. I'm not going to commit to doing that now.

Page 115

[1]             MR. HIPP: Well, I mean, I'm going to ask
[2]   him to come up with the itemization. He is not only
[3]   the principal of Landworks, but he is also here as a
[4]   30(b)(6) witness.
[5]             MR. MELTZER: If you want to have him take
[6]   all the change orders and a calculator and add it up
[7]   and see what the number comes out to, he can do
[8]   that.
[9]             MR. HIPP: I'm trying to not waste
[10]   everyone's time here. I would ask him to explain as
[11]   a witness on behalf of Landworks --
[12]             MR. MELTZER: Why don't you take all the
[13]   change orders and add them all up and see what the
[14]   number comes out to. The change orders have all
[15]   been marked.
[16]             MS. BROWN: Off the record while he's
[17]   adding them up.
[18]             (Recess)
[19]             MR. MELTZER: I know we have an accounting
[20]   that was provided way back in early 2005, and if we
[21]   cannot find that one, which was attached to the
[22]   first demand to the surety, we will give an
[23]   accounting that shows where those numbers come from.
[24]             But my frustration with this, and I want

Page 116

[1]   this on the record, is we provided that document to
[2]   Cetrulo & Capone, and then to Brad when he left that
[3]   place, we faxed it all over the place, which is why
[4]   I can't lay my hands on it. So I know it has been
[5]   given to the surety on at least three occasions.
[6]             That's just the frustration that it's
[7]   something that -- in fact, I think we all sent a
[8]   copy to Jeremy Medeiros with that breakdown as well,
[9]   so it should be in a number of places.
[10]             MR. HIPP: I just want to state for the
[11]   record I do have Mr. Meltzer's letter of March 17th,
[12]   2005, which was marked as an exhibit to this
[13]   deposition, and I also do have a letter from
[14]   Landworks to its previous counsel, Sean O'Connell,
[15]   dated February 28th, 2005. This letter also does
[16]   not break down and itemize the change order work,
[17]   and that is my request. I don't have any
[18]   documentation itemizing the amount claimed for
[19]   change order work in the amount of $76,303.98.
[20]             MR. MELTZER: I will tell you that when I
[21]   spoke to -- Jeremy Medeiros contacted us after this
[22]   letter was sent out, and they did request a copy of
[23]   that breakdown, and it was provided. But if you
[24]   can't find it, we will provide that accounting for

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Page 117

[1]  you.

[2]      **MR. HIPP:** Thank you.

[3]      **MS. BROWN:** Thank you, Mr. Matthews and Mr.

[4]  Meltzer.

[5]      **THE WITNESS:** Thank you, madam, very much,

[6]  for not draining my blood.

[7]          (Whereupon the deposition was

[8]          concluded at 4:00 p.m.)

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 118

[1]              C E R T I F I C A T E

[2]      I, NEAL H. MATTHEWS, do hereby certify that I

[3]  have read the foregoing transcript of my testimony,

[4]  and further certify under the pains and penalties of

[5]  perjury that said transcript (with/without)

[6]  suggested corrections is a true and accurate record

[7]  of said testimony.

[8]      Dated at _____, this ____ day of _____,

[9]  2007.

[10]

[11]          _____

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 119

[1]  COMMONWEALTH OF MASSACHUSETTS)

[2]  SUFFOLK, SS.                )

[3]      I, Carol E. Kusinitz, Registered Professional

[4]  Reporter and Notary Public in and for the

[4]  Commonwealth of Massachusetts, hereby certify that

[5]  there came before me on the 16th day of February,

[7]  2007, at 12:12 p.m., the person hereinbefore named,

[8]  who was by me duly sworn to testify to the truth and

[9]  nothing but the truth of his knowledge touching and

[10]  concerning the matters in controversy in this cause;

[11]  that he was thereupon examined upon his oath, and

[12]  his examination reduced to typewriting under my

[13]  direction; and that the deposition is a true record

[14]  of the testimony given by the witness.

[15]      I further certify that I am neither attorney or

[16]  counsel for, nor related to or employed by, any

[17]  attorney or counsel employed by the parties hereto

[18]  or financially interested in the action.

[19]      In witness whereof, I have hereunto set my hand

[20]  and affixed my notarial seal this ____ day of

[21]  February, 2007.

[22]

[23]          _____
                    Notary Public

[24]          My commission expires  6/7/13

Case 4:05-cv-40072-FDS    Document 77-5    Filed 04/18/2007    Page 3 of 11

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

**$**

$1,452.83 26:3;28:7
$11,000 29:13;32:10;
37:8,12;41:16,23;42:10;
43:21;45:2,16,21;46:12
$111,645 30:22;31:14
$135,101 113:5,10
$14,402 32:6;33:9
$1452.83 28:4
$2,000 34:3
$25,000 29:11
$25,502 33:9
$25,502.17 28:17
$254,718.53 96:2
$271,368.53 96:24;97:7
$303,535 97:20
$32,166.27 97:13
$38,177 32:23
$39,000 42:6;43:3
$39,830 37:4;41:5;43:15
$3900 19:5
$41,000 36:21;43:3
$5,100 96:9
$50,000 46:4
$50,830 34:5;41:19
$52,000 34:13
$52,579 34:2,9;35:9,19
$6,221 15:18
$6221 16:15
$67,000 16:7,10
$73,221 17:16,18
$76,303.98 113:10,24;
116:19
$778 48:4
$824,822 15:15
$824,823 17:10
$9,900 28:12
$9800 33:17

**0**

0203 16:11
0303 16:17
0604 96:18
0704 96:18

**1**

1 21:9,13,17;24:15,17,19;
29:14;38:5,6;53:5;58:15;
60:8,11,16;67:17;90:14,15
1.3 8:22
1.5 9:1
1.7 82:7,14
1/2-inch 40:7
1/4 29:14;38:5,6
10 64:8
100 23:16;26:5;35:24;
41:11;42:8;43:20;46:17;
47:12;68:17;113:17
101 25:19;28:4,8

102 26:21,24;28:4,8,13;
30:17,21;31:21,24
103 30:8,11;32:13;34:1;
41:18
104 34:16,19
105 36:22,24;41:9,22
106 40:14,17;42:3
107 51:20,23;55:2,20;
78:22
108 59:16,19;60:2;67:14
109 68:1,4
10th 49:9;58:2
11 58:15;64:13
110 82:21,24
1102 11:11
111 94:22;95:1
112 95:13,16;96:8,18
113 98:12;99:20;100:12
114 100:9,14,15
115 110:8
116 113:7
12 49:8,14;64:18;68:10;
101:2;102:12
12th 32:1;33:3,6,15;34:3;
35:1;36:10;37:13;40:20;
41:1;43:17
13 7:21;65:6
13th 22:15;24:22;42:13;
44:9,20
14 8:2,4;9:9;65:12;68:24;
69:3
14th 58:11
15 10:4;66:9;67:17
150 14:9,12
15th 41:8,22
16 10:23;60:14;67:2,9,11,
21
160 14:11
16th 103:12
17th 111:15;116:11
18 13:17;21:9,13,17;
24:18,19,24
180 14:10
18th 111:15
19th 111:15

**2**

2 16:4;17:13;51:18;53:13;
56:4,4;60:9,9,9,12;61:2;
90:14,15;92:10;96:12,24;
97:18
20 52:3;80:10
2003 76:12,14
2003-2004 76:19
2004 8:3;18:20;22:18;
32:1;35:6,16;36:10;37:14;
40:21;41:1,8,22;43:17;
49:18,20;52:4;57:18;
58:11;60:16;83:11;89:8;
94:14
2005 22:15;42:13;78:20;
98:19;106:13;111:16;

115:20;116:12,15
2006 105:16
2007 49:9;58:2
20th 105:15
22 60:16
23 108:7
23rd 111:16
25th 35:6,16
26 16:21;70:7,20
26th 49:18,20
27 72:3
28th 116:15

**3**

3 43:9;46:6,12;54:2,11;
60:11,12,12,12;61:8;
90:14,16
3/4-inch 29:21;38:18,20;
40:7,10
3/8-inch 40:12
30 72:13,16;80:10
30b6 115:4
32 67:21;72:21;73:3,5,11
320 14:11,12
33 67:20
360 14:9,10
37 67:20
38 109:9
39 40:20,24;42:2

**4**

4 46:23;54:8;61:14
4:00 117:8
40 75:1
400-meter 93:6
480 78:11;79:20

**5**

5 18:16;56:3;59:4;61:19,
22;62:11,12;96:24;97:18
52,000 44:14;46:3
577 53:8
578 53:3
59 75:16,20

**6**

6 19:16;62:16;96:24;97:18
6:30 44:3
61 77:12
66 15:13;17:11
67 97:22

**7**

7 20:12;62:19;83:11;
96:24;97:18
71 77:16
78 17:4,5,6,14;96:6;97:13,
15

79 43:8
7th 89:8;94:14

**8**

8 63:2
81 78:12,18;96:13
82 78:21;79:2
83 47:11;79:9
85 79:15,18
89 7:20;79:24;80:22
8th 33:23

**9**

9 58:1,7;62:9;63:17
9/22/04 60:4,5
9/27 47:8
9/27/04 46:18;47:13,22
90 7:22
91 9:22,24
92 10:16,19;47:24;48:1;
81:3
93 12:23;13:2;81:17
94 13:11,14
95 15:1,5;16:14;17:19
96 15:20,22;17:19
97 17:1,3;18:7,12
98 19:9,12
99 20:6,9

**A**

able 114:19
above 84:17
abrupt 86:14
absolutely 42:15
Absolutely 47:3;77:15
acceptable 30:1
accepted 39:14,17;
42:23,24;44:21;48:20
accepting 48:22
access 11:4,5,9;47:13,
22;109:12,14
accessible 54:9;79:3
accessories 93:11,18
accordance 55:13;
110:23
according 37:3
accounted 45:15,20
accounting 115:19,23;
116:24
accurate 37:6;52:2;
106:18
accurately 79:21
accusatory 57:6
accused 106:22
across 50:16;69:13;88:17
action 78:17
actions 106:16
actual 13:22;14:9,22;
24:1;29:5;30:5
actually 16:21;18:1;

20:18;24:9;27:18;29:10;
30:2;45:22;49:1;51:5;56:1;
86:7
Actually 8:23;100:23
ADA 11:8;54:1;84:12;
89:19;92:22
add 18:4;32:21;50:8;51:6;
97:6,20;115:6,13
added 17:21;18:22,23;
19:5;32:15;99:13;100:17
adding 17:22;34:15;
98:16;115:17
addition 42:5;43:12;
46:11;58:18;66:24;87:10;
92:3;93:7
additional 11:15;20:23;
21:20;24:21;34:5;85:18;
87:22;97:3
addressed 58:12
add-ups 34:4
adequate 52:24
adjacent 9:11;11:17;
53:6,21;54:12,12;55:9;
68:18;72:9
administration 68:17
admixture 51:6,7
affidavit 111:1
afternoon 7:10;98:9
again 7:19;11:12;57:13;
87:16;92:20,22
Again 7:10;46:17
against 80:20;109:1
aggregate 29:21;38:18,
21,22;39:1,3,17;40:3,6,10,
12
ago 102:6,22
agree 43:18;45:24;46:5;
52:21;55:14;86:19
agreed 37:4
agreeing 33:7
agreement 14:14;17:5,6,
13;18:5;96:5,23;97:12,20
ahead 23:14;81:12;107:6;
109:17;111:23
ahold 44:5,5
allegation 104:19;105:8
allegations 103:20;105:5
allow 9:10;12:11
allowable 56:3;79:4
almost 29:18;34:3;78:7
along 19:7;62:12;85:13;
113:18
altogether 56:7
always 44:7
amend 112:17
amended 100:16;109:10
among 41:3
amount 12:1;14:24;
15:15,17;16:6,15,19;
17:14,16,18;18:5;19:5;
22:2;26:2;28:3,12,23;
30:21;31:8,10,11,14,17,19;
32:6,10,13;33:8;34:3;

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

36:18;37:4,7,12;41:4,7,15, 21;42:1,8,10;43:2,14,20; 45:2,10,15,19;46:2,3,6,7,9, 11;96:4,11;97:21;101:16; 113:3,15;116:18,19
**amounts** 32:21;34:12; 42:5;44:24;45:1;62:14; 96:17;109:4,21
**animosity** 56:17,19
**answered** 10:9;67:8; 105:11;107:3;108:17; 109:17
**appear** 60:8;95:2,5; 97:23;100:18
**appearance** 80:7
**appears** 7:20;22:13; 40:19;60:2;83:10
**applied** 31:13;82:8
**approval** 37:18
**approve** 37:14
**approved** 17:15;71:22
**approximately** 9:9;23:5; 70:4
**April** 70:14
**apron** 61:7
**architect** 27:10;39:22; 40:1;52:3;71:21
**architects** 14:13;49:18; 58:11
**area** 9:3,6,7,8,10;12:1; 15:3;16:14;18:9;23:3,24; 29:7;31:12;36:17;39:2; 41:11,17;47:2,17;48:11, 13,19,23;50:16;51:17; 53:4;56:11;57:2,12,15; 79:6;84:17;87:13;89:5,9; 90:13;93:17;103:1,17; 104:5,22;105:1;113:16,20; 115:20
**areas** 9:6,11;11:15,16; 14:1;19:20;20:18,19;21:2; 27:10;39:13;49:22;50:12; 56:7,11;66:24;73:19; 74:22;77:5;81:19,23;82:2, 7,8,10,13,15;87:17;88:11, 14;89:12;90:3
**argument** 53:24
**armed** 105:9
**around** 10:14;19:19;43:3; 60:23;73:18;92:17
**asked-for** 28:22
**asphalt** 31:3;54:16,17; 56:9,10;85:17
**assert** 101:8
**assigned** 28:20
**assigning** 86:23
**associated** 36:6,7
**Associates** 8:14,17; 49:17,17;58:10
**assuming** 63:15;73:4; 76:20
**assumption** 63:16
**asterisk** 17:17
**athletic** 49:21
**attached** 35:3;52:18;

95:1;115:21
**attachments** 52:14
**attention** 12:16;17:4; 18:6,12;35:23;43:7;55:1,4, 7;68:10,24;70:7;72:3; 77:16;101:1
**attorney** 100:21;103:19; 107:15
**attorney-** 112:5
**attorney-client** 100:23; 110:15,20;111:5,8
**attorneys** 109:20;112:8
**attorney's** 110:24
**August** 32:1;33:3,6,15; 34:2;35:1,6,13;36:10; 37:13;49:20;89:23,23; 98:19;103:12;106:13; 111:15
**authorities** 63:9
**authority** 101:9
**authorize** 101:4,9;104:16
**available** 49:10
**award** 32:4
**aware** 21:9;23:18;63:19; 70:23;99:1,7,11,14;103:24

**B**

**back** 7:19;10:5;12:9,12; 15:3;16:14;18:9;23:3,24; 29:7;31:12;36:17;39:2; 41:11,17;47:2,17;48:11, 13,19,23;50:16;51:17; 53:4;56:11;57:2,12,15; 79:6;84:17;87:13;89:5,9; 90:13;93:17;103:1,17; 104:5,22;105:1;113:16,20; 115:20
**Back** 48:3
**backfill** 56:23;57:7,8; 58:20
**backfilling** 48:24
**backstop** 10:14
**backstops** 62:24
**backup** 56:15
**balance** 114:1
**ball** 83:20
**banging'** 108:9
**Barton** 14:6;21:22;34:7, 22;39:7,24
**base** 58:13;80:12;105:24
**baseball** 10:15;62:24; 86:15;88:20
**baseball/soccer** 14:16
**based** 37:14
**bases** 51:19
**basically** 57:6;71:20; 85:4;90:23;101:19;109:1
**Basically** 36:15
**basin** 9:8;53:18;90:23; 91:2,3
**basing** 105:23
**basis** 48:22;56:19;101:8;

105:7;110:15,20;111:8
**bear** 94:20
**became** 57:20;99:7
**becoming** 34:11;57:9
**beg** 78:1
**begins** 88:11
**behalf** 15:10;23:19;45:10; 115:11
**behind** 53:4
**below** 24:24
**benches** 88:21
**beside** 17:17;88:19,19; 89:19
**best** 24:19;29:10;54:2; 65:10;77:23;111:24; 112:15
**bigger** 70:5
**bike** 84:8
**billing** 31:12;101:21
**binder** 92:18
**bit** 70:5;98:8
**bituminous** 32:5;33:8; 43:12;52:8;53:14;54:16, 17;58:13;66:20;68:16; 76:6,7;79:4;89:24
**Bituminous** 90:17;91:17, 24
**bleached** 72:1
**blood** 117:6
**Bob** 14:6;21:22;34:7,22; 39:6,24;111:15;112:4
**boom** 75:13
**booth** 88:2
**both** 43:9;92:13
**bottom** 8:6;97:14
**bounce** 95:11
**bound** 53:18
**boxes** 78:5
**Brad** 116:2
**break** 22:9,17;59:22; 74:10;116:16
**breakdown** 116:8,23
**breakdowns** 31:15
**breakout** 31:13
**bricks** 70:18,21,23,24; 71:1,6,8,16,19,20,24;72:1 11,21;57:16;58:23;61:1; 62:1,5,10;63:15;76:5; 77:20;79:7;81:4,6;86:16; 87:3;88:6,9;90:1,15;91:22; 95:20;101:21;104:4;112:9
**certainly** 46:5
**Cetrulo** 116:2
**chain** 93:21
**change** 7:17;9:4,19;10:6, 22;11:1,13,18,22;13:18; 15:8,17;16:1,6,10,14; 17:19,21;18:4,18,19; 19:15,18,23;20:14;21:10, 23;22:2,23;23:1,20;24:4,8, 14,16;25:1;34:23;36:2; 37:15;38:7,8;40:22;41:13; 42:10,14,17,21,23;43:1,2, 4,19;44:11,21,22;45:1,14,

**buildings** 10:14;19:20
**bulk** 31:11
**Bullock** 98:19,20;99:11, 23;103:9;105:18;111:15; 112:4
**bus** 27:9
**buses'** 53:22

**C**

**cafeteria** 72:9
**Calculating** 32:21;97:10
**calculator** 17:20;18:1; 32:17;115:6
**Calculator** 32:19
**called** 7:3;8:17;11:15; 26:13
**calls** 44:2,10;45:7
**came** 29:10;38:9;42:22; 57:4;69:13;95:23;114:6
**can** 18:11;22:4;33:11; 114:16
**checked** 58:23
**checks** 95:2,2,5,9
**chosen** 71:21
**chronologically** 15:4
**claim** 46:15;101:11; 106:10;108:20;113:10
**claimed** 45:10;113:15,24; 116:18
**claiming** 46:10
**claims** 113:3
**clarification** 8:18;87:16
**clarify** 65:14
**clarity** 51:18
**clay** 57:4,7;80:12
**clay-based** 57:1
**Clean** 85:13
**cleaned** 85:14,15,18,20; 94:17
**cleaning** 10:13
**cleanup** 94:9,12
**clear** 95:10;114:18
**cleared** 61:23
**clearing** 77:9
**clearly** 106:10
**clerk** 57:12
**client** 98:16;100:17;112:6
**closer** 18:1
**coating** 27:23,24
**coercive** 102:11;103:2
**color** 70:16;71:3,19,23; 72:2
**combination** 14:17
**coming** 12:13
**commit** 114:24
**communication** 23:10, 10;99:20
**communications** 98:18; 111:20,21;112:2
**compacted** 38:4;50:11; 58:22,24,24
**compacting** 57:5
**compaction** 38:3;58:20

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

company 26:14
Company 17:15;18:17;
20:13;22:14;26:1;30:15
compared 71:24
compensation 69:17;
90:8
compilation 107:7
complaint 70:15;99:14;
100:16;102:14;105:2,6,15;
109:10
complete 60:17;65:17;
66:19;81:18,20,21;82:5;
83:11;96:4,22;97:18;
108:23
completed 60:3,5,15,19,
21,24;66:3,8;67:15;83:23;
87:6;90:11,14;91:14,16;
92:11,16
completely 68:19;89:11;
91:21
compliance 11:8
complied 77:1;92:22
comply 54:1
complying 84:11
comprise 111:20;113:23
computer 112:10,11
computers 107:19
concern 27:7;39:12;
71:18
concerned 29:23;34:11,
14
concerns 35:9,20
concluded 117:8
concrete 20:16;21:1;
48:4,8,15;49:1,2;54:3,7,9,
18,20;56:10,23;58:13;
61:7;68:16;79:3,4,17;
84:20;85:1;90:17;91:17,24
condition 37:19;80:13,
17,22,24
conditioned 37:17
conditions 44:16;54:15;
80:6;87:14
conduct 103:2,2;104:21;
106:1
conduit 73:1,9,17,17;
78:4,9
conduits 72:24;73:22;
74:2,3,7,8,10,13,14,15,20,
22;77:22,24
configuration 14:12
conjunction 88:21
connected 74:4
connecting 86:13
consider 73:20
considered 86:23
constantly 107:19
constructed 11:2;12:12
construction 76:4;81:1;
87:23;95:7
Construction 7:4,18;
8:18,19;10:8;13:10;16:2;
18:17;19:16;20:13;21:5,

11;22:14;23:11;25:8;26:1;
27:4;30:14;42:19;48:17;
53:10;54:4,5;95:3,10
Consultants 7:4
contact 44:1
contacted 116:21
contain 44:15
contained 74:13
contains 23:20
contends 23:21
contention 49:3
context 104:15
continually 50:10
continue 88:4
Continued 7:8
continuing 7:11,13
contour 53:4,8
contract 11:19;26:10;
30:22,24;31:2,4,6,7,11;
58:18;59:5;61:6,11,17;
63:6;64:5,7;66:16,18;67:6,
10,12;81:20,24;88:22;
91:5,6;92:7,9;93:5,7,9,22;
95:24;97:21;98:21;108:10,
14;114:1
contracted 62:23
Contracting 14:15;15:9;
16:2;17:15;31:16
contractor 28:18;32:6;
33:8;50:23;51:15;63:8,13;
68:9;70:12;71:14;72:10;
75:13;101:17;108:23
contractors 29:18;38:13;
39:6;40:8
contractor's 68:5
contracts 28:21
contractual 109:23
control 63:20
conversation 39:20
copies 24:7
copy 35:1,2,8,18;49:7;
58:3;116:8,22
corner 70:10;71:10,11;
96:1
Cornerstone 70:13
corrected 34:12;41:12;
50:6;65:2;73:13;79:13
corrections 107:19
corrective 76:6;78:17
correctly 9:15;32:16;
35:10;55:15,19;96:18
correctness 85:6
correlate 96:11
correlates 17:10
cost 9:20;18:24;26:17;
27:11,14;28:2;33:7;34:4
costs 101:3;104:16
counsel 7:3;22:12;114:7;
116:14
count 106:22
Count 106:21,21;107:4,
17;108:7
counterclaim 106:14,17;

107:8
couple 12:9;43:4;112:21
courtyard 20:24;72:9
crack 27:23
cracked 80:14
cracking 80:17
created 114:15
Creations 22:14;41:4;
95:4
Crockett 8:13,16;9:18;
38:24;52:12;84:11
cross 12:17;55:24;56:2,4,
5,12
CROSS 7:8
crude 18:21;28:24
crumbly 80:17
crushed 69:14
CTM 20:5;52:3;60:24;
78:23
CTM's 80:17
curb 26:6;69:24;72:9;
76:6,7;89:21,24;90:6
curbing 26:1,12,13,14,
16,17,19,20;28:3,7;31:3;
53:20;69:6
Curbing 89:13
cut 78:7,10;84:4
cut/fill 88:12

**D**

damage 68:15;79:22,24;
80:4,8;81:1,7;89:21;90:5
damaged 68:22,23;69:8,
15,16,20;70:1,5;72:10,24;
73:8,10,18,19;76:5,7,17;
88:15;90:1,4,4;93:4
date 22:21;43:16;44:17;
105:13
dated 22:15;32:1;37:13;
40:20,24;46:18;47:8,13,
21;49:18;52:3;58:11;
105:15;116:15
day 7:16;25:10;34:6;44:1;
47:19;98:10
days 12:9;102:6,22
dead 78:6
deal 99:24;106:5,7
deals 52:13,15;54:2
dealt 9:3;25:9
debris 10:3
December 23:6;83:11;
86:8;89:8,22;94:14
December- 106:14
decision 102:1
decrease 27:14
Defendant 7:4;98:17;
109:11
deficiencies 83:10
deficiency 64:19,22,24;
65:1,5;68:5,9;75:19;78:13,
21,22;79:15;80:18,22
definite 71:23

definitely 93:19
deleted 112:12,12
delivered 18:24
delivery 19:1
demand 115:22
demolition 20:16;21:1;
72:10
demonstrated 52:18
denied 109:14
denying 109:12
depended 64:4;65:4
deposition 7:12;47:5;
49:8;58:2;103:16;111:17;
116:13;117:7
depositions 25:11
depth 27:12,18,22;28:14;
38:3,4,6,9;39:18;66:23
describe 8:21;11:10;
28:11,17;29:13;46:21;
47:15;48:6;69:23;71:6;
79:15;80:9;81:22;82:2
described 13:18;50:3
description 76:4
design 53:8
Design 49:16;58:10
designated 63:12
detail 11:10;26:15
details 26:11
diagram 54:8;82:9
Diagram 82:14
differed 26:12
difference 37:6;45:21;
46:15
different 28:2;73:2;75:11
differential 71:23
difficult 45:18;57:10;
73:16
dimensioned 14:13,20
dimensions 14:8
direct 55:1;101:1
Directing 68:10;70:7
directly 70:2;98:22
disagree 55:22;56:6
disagreement 53:23
discuss 114:22
discussed 84:11;87:17;
90:21
discussion 21:6
Discussion 7:14;49:12;
57:22;82:20;96:16
discussions 99:10,11
dispute 57:14
dock 91:5
document 7:24;10:1,3,
18;13:1,13;15:4,7,11;
16:10;18:13;19:11;20:8;
22:3,13;23:19;25:21;
26:23;30:10;34:18,21;
40:19,24;49:7,14;51:22,
24;52:1,15;57:24;58:6,17;
59:18,20,21;62:10;68:3;
75:23;83:4,6,8;86:10;
95:15,17,18;98:2;100:11,

20;110:12,16,20;111:9;
114:11,23;116:1
Document 7:22;9:22;
10:16;12:23;13:11;15:1,
20;17:1;19:9;20:6;23:16;
25:19;26:21;30:8;34:16;
36:22;40:14;51:20;59:16;
68:1;82:21;94:22;95:13;
98:12;100:9;110:8;113:7
documentation 116:18
documented 37:23
documents 11:8;31:18;
35:24;44:19;47:7;21;50:2;
59:21;95:1;103:18;104:4,5
dollars 44:14;46:3
done 12:18,19;36:15;
38:5;51:12,15;71:13;
72:12;76:21;85:8;86:7;
89:2;92:2;94:13;98:16;
106:21
doors 12:13;61:7;71:12
down 11:24;34:11;36:20;
46:2;53:9,15;55:2;57:4;
69:10;70:16;86:23;92:18;
109:6;113:18;116:16
drain 50:9;78:2
drainage 9:10;27:8,11;
48:9;56:20,21,22;58:19;
72:18;84:13;85:1,2,3,12,
22;88:12
draining 117:6
drains 50:17;88:23;89:6,
9
drawing 53:19
Drawing 62:8;82:7
drawings 26:12;52:19
drive 88:17
drive/parking 90:17
driven 19:21;75:7
drive-through 9:5
driveway 91:2
driving 87:23;90:6
drop 103:3
drop-off 27:9
drove 69:13;75:13
due 18:20;28:23;109:13
dugouts 88:20
duly 7:5
during 39:20;75:7;76:12,
15;95:23
During 103:11
duties 76:11

**E**

earlier 31:22;75:2
early 27:7;57:17;76:14;
86:7;115:20
earthen 11:2
east 86:14
eastmost 65:16;66:5
edge 62:15;86:14
edges 80:15

Doris O. Wong Associates, Inc.

Min-U-Script®

(3) company - edges

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

edging 89:13
effort 77:2
either 13:20;90:18;99:15
electrical 73:9,17,17;
74:2,3
electrocuted 78:7
electronically 112:1,9,
13
elementary 53:15;84:10
elevation 8:18;53:11;
85:6
elevations 52:22;53:8;
54:14;56:13
eliminated 55:6,8
else 99:12;103:14;107:11,
13;110:3;111:21
elsewhere 94:18
e-mail 99:18,19,22,24;
100:3;104:22;111:20,21
e-mails 99:2,9;103:11,12,
15,21;104:24;105:6,17;
111:14,16;112:3,7,12
emergency 55:9
enclosed 35:8,18
end 35:7,17;48:9;60:23;
78:5;84:2;85:2,4;87:12;
89:23;94:15
ends 53:19;87:12
engaged 101:3;102:7,15;
106:24
engaging 102:15
engineer 59:1
engineering 59:1
enhance 80:20
enough 12:1,16;74:18
entitled 46:7;60:3,4;
67:14
entrance 29:16;53:5,22;
68:18;69:13;70:3;76:4
entrances 11:3,17;12:9;
20:24
entry 92:24
entryways 76:15;77:7
equipment 52:24;68:21
Eric 7:11
established 89:11
even 88:18;106:6;112:12
events 66:20
everyone's 115:10
evidence 103:20;104:12,
18
evident 108:22
exactly 16:18;25:11;87:2
examination 7:3
EXAMINATION 7:8;98:6;
113:1
examined 7:6
excavated 78:1
excavating 48:24;77:9
excavation 54:5;57:3;
72:17
excavator 75:8
exceed 79:4

except 82:15
Except 82:6
excessive 52:17,22;53:6;
55:6,8,16,24;56:2,12
excluded 48:16
excuse 46:9;100:15
Excuse 29:6
exhibit 7:20;23:15;25:18;
36:24;47:10;49:10;58:4;
79:7;98:11;110:7;113:17;
116:12
Exhibit 7:20,22;9:22,24;
10:16,19;12:23;13:2,11,
14;15:1,5,13,20,22;16:14;
17:1,3,4,4,5,11,14;18:6,12;
19:9,12;20:6,9;23:16;
25:19;26:5,21,24;28:4,8,8,
13;30:8,11,17,21;31:21,
24;32:13;34:1,16,19;
35:23;36:22;40:14,17;
41:9,11,18,22;43:3;43:8,
20;46:17;47:12,23;48:1;
49:8,14;51:20,23;55:2,20;
58:1,7;59:16,19;60:2;
67:14;68:1,4;78:22;82:21,
23;94:22;95:1,13,16;96:6,
8,12,18;97:13,15,22;
98:12;99:19;100:9;110:8;
113:7
exhibited 104:21
exhibits 18:10;21:16;
96:20;103:15,22
Exhibits 17:19
exist 114:24
existing 26:6;54:14;56:9,
24;68:15;71:7;80:6,22,24;
87:14
exists 114:11
expect 78:8
expected 69:17;89:1;
90:7
experienced 74:18
explain 32:12;69:5;
106:23;115:10
extended 14:21,23
extends 62:12
extension 13:20;53:23
extent 114:10
exterior 61:7;70:10
extorting 102:11
extortion 102:8,15,21
extreme 48:9

F

facilities 65:15,19,23;
66:1
Facilities 35:1
fact 22:24;23:9;36:21;
37:16;46:1,48:17;87:14;
102:1;114:23;116:7
fail 95:10
failure 28:19;76:13

fair 109:3
faith 77:2
fall 69:10
fallen 57:4
falls 68:19
false 107:8
familiar 64:19;81:2;
100:11
far 55:3;89:17
fast 44:18
faxed 116:3
feather 86:15
feathering 86:6
February 116:15
fed 78:4
feeding 74:5
feet 68:17;71:15
felt 92:22
fence 93:22
fencing 10:14;62:24;
93:22
Fencing 93:14,21
fertilization 51:13
few 98:4,9;102:6;110:22
field 10:15;13:21,23;14:9,
10,11,16,16,19;49:21;
51:5;63:7;65:15,19,23;
66:1,20;83:20;85:3,4;
86:15;87:13;88:20;94:16
fields 63:1;86:13
fifth 87:8;92:23
figure 46:8;95:24
file 23:24;24:9;36:14;
112:10,11;113:20,21
filed 100:21;109:1
fill 84:4
filled 50:10;77:11
final 38:4;48:3;85:11;
110:7
finally 23:7
Finally 110:6
find 22:4,6;78:8;80:18,19;
97:23;114:19;115:21;
116:24
finding 28:1;108:23
fine 25:13;108:1,3
finish 29:21,22;38:21;
39:8,15;40:13;62:2;85:9;
109:23
finished 32:24;98:3
fire 75:6
firm 32:5;57:9
first 11:23;12:5,20;33:11;
48:14;60:8,14;83:14;84:7,
16,18;89:16;90:9;92:2,6;
93:18;94:3;106:1;115:22
First 87:20
fix 50:11
fixed 50:13
FKS 53:5,13;54:2,8,11;
56:1
flagpole 70:3;92:18
flush 12:12

Focusing 60:14
follow 98:9
following 106:15
follows 7:7
football 13:21,23;14:8,
10,11,16,19;62:24;85:3,4;
87:13;94:18
form 55:17;75:4,18;
77:19;80:23;100:22
format 24:2,10,11
forth 104:22
forward 103:6
foul 86:15
found 14:19;101:12
four 93:10;105:11;107:3
four-foot 70:4
fourth 86:12
four-to-six-foot 70:6
frame 57:14;60:22;106:15
Frank 10:7;12:7;68:6;
83:5;86:22
fraud 106:21,22,24;
107:10
freeze 76:24
Friday 7:13
front 12:14;20:24;27:8,
15,19;29:15,16;70:2,3;
90:3;92:18
frustration 115:24;116:6
fuel 18:19
full 27:12,18,22;28:14;
66:23;109:3
Fuller 99:3;100:2;106:3
funds 109:13
further 7:6;50:17
FURTHER 98:6
future 88:2

G

gas 20:16;21:1;76:23;
77:4,6,11
gates 93:14,21
gauging 101:18
gave 44:7;98:16
gears 99:8
general 94:12
General 94:8
generally 81:22
generated 38:13;89:22
generating 32:18
generator 27:21;54:13;
55:9
genesis 38:8,12;39:5
geotechnical 57:9;99:1
given 8:17;21:21;26:15;
31:7;18;48:4;51:14;87:12;
116:5
giving 39:3;109:3
glad 71:1
goes 53:9
good 7:10
good- 77:1

grade 87:16;88:10,16,22
graded 19:22;56:16;
87:13;94:17
grades 9:4,16,17
grading 8:23;11:15;
19:19,23;36:8;54:13,23;
55:5,13,14,19,23;56:7,8,
13;68:20;85:9;86:1;87:9,
11;88:13
granite 26:1,14;72:8
grass 14:22,23;82:9,13,
17;87:24;89:5,8
gravel 57:2;80:13;88:20
great 52:9
grew 50:16
grounds 111:4
group 83:14
grouping 83:19
growing 85:17
grown 89:9
grows 89:5
guarantee 40:13
guess 45:12;46:8;70:13,
16;72:19;79:19
guessing 79:19
guy 100:2
guys 78:7
gymnasium 20:21;53:4;
92:24

H

haggling 34:6
hand-drawn 54:8
handed 9:24;22:12;
32:19;49:7;57:24;58:3
handicap 11:5,14,16;
54:3;63:23;86:6;91:20
handicapped 79:3
handrails 93:7
hands 116:4
handwriting 8:6,7;83:2,
3,7;86:17
happen 54:15
harm 109:11
head 17:23;75:14
headwalls 8:18,16,17,18;
79:17;84:18,19,20;85:1
hearing 109:3
heat 38:2;76:23
held 101:17
help 77:2
helped 107:8
helpful 22:8
high 28:15,16;66:23
Highway 38:18;39:4;
40:5,6,9
Hipp 7:11;32:20
HIPP 7:9;22:3,7,11;23:14;
35:15;55:18;57:21;59:22;
60:1;94:20;96:15;98:3;
100:14;112:21;113:2;
114:8,14,18;115:1,9;

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

116:10;117:2
hired 70:12
hit 70:11;71:10;74:17
hold 18:5
Hole 63:16
hydrant 75:6,11,14

**I**

idea 73:24;81:5
identification 7:23;9:23;
10:17;12:24;13:12;15:2,
21;17:2;19:10;20:7;23:17;
25:20;26:22;30:9;34:17;
36:23;40:15;51:21;59:17;
68:2;82:22;94:23;95:14;
98:13;100:10;110:9;113:8
identified 7:5
identify 79:21
II 106:21;107:5
III 106:21;107:17;108:7
impossible 29:19
Inc 7:5
inch 29:14;30:7;37:22;
38:5,6;39:9,12,14
inches 9:9;29:14
include 19:24;35:21
included 43:3
including 79:8;101:5
incorrect 55:23
incorrectly 14:13,20
increase 19:1;27:14;
28:3,7,11,23;29:14;32:5,9;
33:7;37:9;38:9,12
increased 34:4;41:16
increases 25:9;30:16;
36:4,8;37:17
indicated 82:8;96:17
indicating 9:7;69:8
indication 8:24
indicative 53:16
infield 51:4,7
information 27:3;105:5;
112:2,10
initial 74:16
initially 98:19
inquired 26:18
inset 54:9
inspection 74:24
inspector 12:10
install 27:11;54:10;61:6
installation 46:19;47:8;
56:20;65:15,18,23;66:22;
70:3;88:21
installed 53:11;64:2
instead 27:12
instruct 100:24;110:14,
18
instructing 111:3,5,7,10
instructions 110:24
intended 29:1
intent 25:8;32:4,22;34:9;
35:8,19;36:5,7,9,18;37:3,

7,8,13;41:8,22;42:1;44:13,
15;45:9;46:1
interest 98:20
interested 28:1;112:7
interfere 57:13;108:10
interfered 108:14,18;
110:1
Interference 108:6
interfering 109:6
interpret 45:8
into 27:23;31:12;45:23;
57:2,7;69:12;85:17,19;
108:21
investigate 106:9
investigating 101:11;
108:20
Investigation 106:13
invoice 46:18;47:7
involved 114:5
irrigation 50:23
irrigation 94:5
issue 9:19;41:15;42:9
issued 15:8;25:8;45:1;
87:16
issues 99:4
item 24:24;28:17;29:13;
41:4;43:11;48:3;49:4;
50:19;61:16;62:18;68:11;
70:8;72:6;73:24;75:20;
78:13,21;79:1,16;81:2;
84:8,16,16,17;85:22;86:9,
9,10,11,12,18;87:4,20,20,
21,21,21,22,22;88:1,5,6,
11,18;89:16,16,17;90:9;
91:23;92:2,6,12,13,16,21,
23;93:1,18;94:3,3,8
Item 49:24;50:3,19,24;
51:8,18;59:4;60:16;61:2,8,
14,19,22;62:11,12,16,19;
63:2,17;64:8,13,18;65:6,
12;66:9;67:2,9,11;68:10,
24;70:19;72:3,13,16,21;
73:3,5,11;75:1,16,20;
77:12,16;78:12,18;79:9;
81:17;83:14;90:15,15,16;
92:10
itemization 23:20;113:9,
13,23;114:9,19;115:2
itemize 116:16
itemizing 116:18
items 24:21;41:3;50:3,6,
9;51:17;52:16;58:12,15;
59:7;60:15,15;64:18,24;
65:1;78:5;83:16,20;84:4,
14,22,24;85:11;86:2;87:8,
18;88:7;89:14;90:18;91:8,
11,14,18;93:10,15,19;94:1,
4,18;98:9
Items 60:3,4;67:15,17;
83:23;90:13

**J**

Jackson 7:18;8:18,19;
10:8;12:18,18;13:10;
18:16;19:15;20:12;21:5,
10;22:14;23:11,22;24:17;
25:8,24;27:4;30:14;32:1,
22;34:24;35:17;38:11;
40:19,24;42:3,18;43:6,8,9,
19;44:2;45:6,7,16,21,22;
46:9;48:16;53:10;54:3,4;
95:3,5,9;97:22,24
Jackson's 45:9,9
January 22:15;23:8;
24:22;42:13;44:9,20;49:9;
58:2;106:15
Jeremy 116:8,21
Jim 52:13,23
job 19:21;29:12,24;37:24;
38:14;68:8;84:20;91:21;
109:22
July 27:7
jump 28:15,16,16;65:16;
66:6,23,23
June 105:1,12,13,13,15

**K**

Katie 8:13,16;9:18;38:24;
52:12;84:10
Keating 29:3,7,8
keep 18:8;53:20;74:19;
77:11
kids 27:9
kind 25:16
knew 77:24;87:2
knit 89:10
knowledge 24:19;64:7;
65:10;77:5,23;93:13,18;
95:12;111:24;112:15
known 70:24
Kokernak 52:13,23;
56:18;57:4,19
Kokernak's 55:22

**L**

lacks 106:15
Lamoureux 8:16;9:4,18;
12:6;26:18;49:17;87:15
Landwork 58:10
Landworks 7:17;15:9,11,
14;16:3,11,16;17:7;18:22;
21:10;22:14;23:19,21;
24:4,17;30:3,6;31:5,9;
32:1;35:17;38:9;41:4;43:9;
45:11,13;46:7,10;48:4,12,
14,20;50:4,7,20;51:1,9;
52:19;54:20,22;55:12,19;
58:16;59:8,13;60:17,19;
61:3,22;62:4,17,20;63:3;
64:3,9;65:2;66:4;69:19,24;
70:19;72:6,22;73:13,19;
74:9,12,21;75:7;76:10,19;
77:3,21;78:18;79:22;80:1,

5;81:8;83:24;87:19;90:14;
95:3,6,10;96:12,20,23;
97:18;109:12;111:22;
113:3,10;115:3,11;116:14
Landworks' 10:22;21:8;
49:3,4;59:5;61:12,17,20;
63:5,18;64:14;65:7,13,20;
24;66:13,15,18;67:3,5,10,
12,18;68:11;69:1;70:8;
72:4,14;73:6,12;75:3,17,
21;77:13,17;78:13;79:10;
81:18,24;82:4,15;83:16,
21;84:5,14,23;86:2,19;
87:5;89:14;90:10,19;91:8,
12,19;93:12,15;94:2,5,9,13
larger 26:17
last 7:15,19;23:9;25:10;
85:22;98:14;109:10
late 87:15
later 44:16;98:21;99:7,24
Later 99:8
law 108:5
lawn 20:17;81:19,23;82:2,
9,13
Lawn 82:7
lawsuit 103:3,6
lay 116:4
layout 9:1
leading 27:19;84:9
least 107:3;108:20;114:7;
116:5
leave 57:11
leaving 44:10
led 55:16
left 24:7;62:14;94:13;
96:4,22;97:17;116:2
left-hand 83:7;96:1
legal 107:20
Leonardo 10:7;12:7,15;
68:6;83:5;86:22
less 32:13;34:1;41:23;
45:2
Less 42:4
letter 21:21;22:13,18,19,
20,21;23:7,12;24:1,2,22;
25:7,8;30:14,16;31:21,24;
32:14,18,22;33:2,6,10,14,
15,16,18,22,24;34:3,8,9,
22,24;35:1,2,6,8,11,16,19,
22;36:5,6,7,9,10,13,17,18;
37:1,3,7,8,13,19;41:8,22;
42:1,12,14,22;44:1,9,13,
15,20;45:3,5;46:1;49:16,
21;52:2,7,12,18;55:1;58:9;
84:12;110:10;116:11,13,
15,22
lift 57:5
lights 74:4,5
likely 55:5
liking 60:24
limits 81:16;88:8
line 35:7,18;46:22;47:12,
15;53:4,8;56:23,23;72:18;

78:2,6;85:14;86:15
Line 17:13
lines 55:2,10;74:2,3,10,
13,17,20,22
link 93:21
list 24:11,12;49:22;64:19,
20,23;65:1;68:5,9;80:18
listed 30:22;41:7;48:3;
73:2;78:21,22;79:16;94:4,
8
litigation 100:17;112:3
little 53:6;70:5;76:3;98:8
live 78:10
loader 75:9
loading 91:5
loam 62:3
loamed 62:7;84:3
located 82:3
location 11:14,24;55:7,8;
58:19;63:11;69:24;71:12;
88:2
locations 79:5,20
long 28:16;65:16;66:5,23;
80:12;88:14
longer 88:24
look 17:3,24;21:14;24:1;
33:11;38:14;47:2;57:16;
62:9;99:18;103:1;106:20;
108:7;110:11;113:21
looking 21:12,19,24;
31:20;35:11;76:16;107:21;
108:20
Looking 35:6,16
looks 95:22
loose 44:19
lot 9:5;27:22,23,24;105:24
lots 29:17
loud 55:4
Lovett 7:4;8:13,15;98:15,
17;99:2,13;101:2,8,10,20;
102:3,7,14;104:13,13,23;
105:8;106:9,22,24;107:8;
108:8,13;109:11,14,24;
111:22
low 90:23
lower 11:3;53:20;83:20;
90:21
LW 86:18;88:19
Lynch 29:7,10;31:5

**M**

madam 117:5
main 27:23;29:16;39:12
maintain 89:1
maintained 88:23;89:2
maintenance 50:10,15,
17;89:2,6
Major 83:15
majority 94:19
maker 102:2
makes 33:5
making 24:7

Doris O. Wong Associates, Inc.

Min-U-Script®

(5) hired - making

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

manhole 46:18;47:8;
56:21,22;85:2,3
many 104:5
March 116:11
margins 33:11
mark 23:14;25:17;100:7
marked 7:22;8:4;9:22;
10:16,19;12:23;13:2,11,
14;15:1,5,20;17:1;19:9;
20:6,9;21:15;23:16;25:19;
26:21,24;30:8,11;34:16,
19;36:22,24;40:14,16;
41:8,22;42:3;45:4;47:10;
49:8;51:20,23;58:1,6;
59:16,19;68:1,4;82:7,21;
89:19;91:21;94:22;95:13;
96:5,20;97:12,22;98:12;
99:19;100:9,12;103:15,21;
110:8;113:7;115:15;
116:12
marking 63:21
markings 63:22,23,24;
91:7,20,23
masonry 70:10,12;71:14
Mass 38:16,17;39:4;40:5,
6,9
match 26:6;70:16;71:3,19
matched 72:2
material 57:1,1,2,5,7;
58:20
materials 9:2
math 34:15
matter 57:10
Matthews 7:10,15;9:24;
13:1,13;15:3,22;19:11;
20:8;21:7;22:12;23:18;
26:23;30:11;34:18;36:24;
43:7;49:6,13;51:22;57:23;
59:18;60:2;68:3;82:23;
94:24;97:11;98:10,14;
101:1;111:2;112:22;117:3
MATTHEWS 7:2
may 8:24;20:18;29:9;
35:5;43:3;59:20;62:13;
70:5;94:17;95:20;103:11;
106:7;107:13
May 30:20;49:11
maybe 56:4
Maybe 109:5
McGuinness 9:16;10:7;
12:6,15;14:6;20:4,5;21:5,
22;22:22;24:6;26:18;
33:20;36:17;39:7;40:1;
44:3;95:21
mean 40:22;80:9;92:8;
100:14;106:16;108:5;
115:1
meaning 38:10
means 73:4;91:2
meant 35:13;44:21
Medeiros 116:8,21
mediate 109:21
meet 56:10;109:20

meeting 21:23;22:19,22;
23:5;24:3,5;43:24;95:23
meets 53:9;89:19
Meltzer 117:4
MELTZER 11:21;16:12;
22:4;9;23:23;35:11;39:19;
43:22;45:17;52:5,10,20;
55:17;65:3,21;67:22;71:9;
73:7,14;75:4,18,22;77:14,
19;78:15;80:2,23;81:10;
97:1,9;99:6,16;100:22;
102:4,9,13,17,20,24;104:2,
20;105:3,10;107:2,21;
108:1,16;109:16;110:13,
18;111:3,10,18,23;112:5;
114:3,10,16,22;115:5,12,
19;116:20
Meltzer's 116:11
memo 60:3,4,8,11,14;
67:14
memory 21:24;23:13
mentioned 24:22;36:5;
79:7
met 53:4,10,12
metal 64:1
Michael 12:21
middle 53:16;84:10;
86:13,14
Middle 27:5;95:7;113:5
might 50:11,12;62:8;
87:1;91:1;97:5;98:4;
103:12
mind-set 45:9,9;78:23
minor 62:14
minute 17:24;22:5;50:1;
59:23
miscellaneous 88:15;
89:21;94:18
missing 67:21
misspelling 107:18
mistake 102:12
mistaken 22:20
mix 38:2,16;82:8
moment 49:10,11;
107:12;110:4
money 31:13;106:11
monies 108:21
monitored 57:8
months 88:24
monument 83:18
more 11:10;16:21;21:18,
24;26:17;29:11;50:12;
71:15;72:11;73:24;82:1;
85:19,20;98:4,5;102:11
morning 44:4
most 55:5;76:15
Most 74:16
motives 108:11
move 103:6
moved 11:23;89:17
moving 69:12
much 37:21;78:10;80:12;
88:24;101:14;117:5

must 70:15
myself 17:22;29:6;37:20;
56:18

**N**

name 7:11;12:5,5,20;
38:1;88:19
named 9:3
Neal 110:13;111:1
NEAL 7:2
near 48:10;86:14;88:1
necessary 18:3;91:1
need 39:9;53:1,20;58:23;
97:2;110:10
needed 9:9;57:11;58:12;
63:20;68:22;70:24,24;
76:22;84:2;92:19;94:16;
103:5
negative 48:4;67:8,9
negotiate 109:21
net 27:14
new 11:16;26:14;54:17;
56:10,10;71:13,17,24;
78:2;114:15
next 10:11;12:8;23:15;
25:17;33:21;47:12;50:12;
82:9;86:9,11;88:5,5;89:17;
92:21;100:7
Next 87:21,21,21,22;
88:18
nipple 75:14
noncompliance 11:8
none 58:18;59:7
north 9:6;27:20,24
northeast 71:10
northern 20:21
northmost 76:4
Nos 24:15,17
note 114:3
noted 70:10,14;96:5;
97:12
notes 24:7
notice 30:21
November 21:22;22:18,
19,22;23:4;24:3;40:20,24;
41:8,21;43:17,24;95:23
number 44:7;47:10;
96:11;97:24;114:6,11;
115:7,14;116:9
numbered 58:15
numbers 16:18;97:6;
115:23

**O**

Oak 11:5,5,9,17
objection 81:12
Objection 11:21;16:12;
23:23;39:19;43:22;45:17;
52:5,10,20;55:17;65:3,21;
71:9;73:7,14;75:4,18,22;
77:14,19;78:15;80:2,23;

81:10;97:1,9;99:6,16;
100:22;102:4,9,13,17,20,
24;104:2,20;105:3,10;
107:2;108:16;109:16;
111:3
obligations 81:20;
109:23
obviously 112:6
occasions 116:5
O'Connell 116:14
October 35:14,16;49:18;
58:11
odd 44:14;46:3
off 7:14;21:6;49:12;51:5;
57:22;75:23;76:1;82:20;
96:16;114:23
Off 57:21;82:19;96:15;
115:16
office 44:7
oil 18:21;28:24
old 54:16;78:5;80:11
older 71:24
once 89:5
Once 50:16;101:12
one 18:8,9,10;20:20;24:6,
6;29:8,14;39:14;47:16;
49:11;69:2;78:7;79:20;
82:1;84:7,7;100:5,8;
114:12,14,15,20;115:21
One 20:19;30:7;68:6
one-inch 29:17,19,24;
37:22;38:15,20;39:18
ones 24:4;47:18;86:5
ongoing 50:9
only 13:22;14:17;32:22;
34:5;37:6;43:19;44:1,5;
45:14,19;46:7,11,15;53:3;
54:15;59:4;63:16;74:6;
92:18;115:2
onto 57:5
Oops 83:17
open 12:8,11;89:12
opened 77:7
operators 74:18
opinion 66:17;80:3,24;
106:1,8;107:9
opposed 33:9;71:7
order 9:4;10:6,22;11:1;
13:19;15:8,17;16:1,6,15;
18:18,19;19:15,18,23;
20:15;25:16;40:22;42:14,
17;43:1,2,19;44:22;45:1,
14,16,20,23;103:3;113:11,
24;114:9;116:16,19
Order 7:21;8:2,4;10:4,23;
13:17;16:4,11,16;18:16;
20:12;40:20;42:2;43:9;
46:6,12,23;96:12
orders 7:17;17:19,21;
18:4;21:10,23;22:2,2,23;
23:1,20;24:4,8,14,16;
34:23;42:21;43:4;44:11;
47:4;96:19;97:3;113:14,

14,18,19,23;115:6,13,14
Orders 21:9;96:24;97:18
original 11:24;14:8,12,
14;17:9;18:10;28:18,20;
29:1,11;30:21,24;31:2,4,6,
14;34:9;37:19;45:2;49:9;
58:3,17
originally 13:23;14:2;
44:14
others 20:1,2
otherwise 48:20
out 12:13;14:21;19:22;
25:16;27:9,15;28:1;29:7;
32:23;34:8;37:24;38:3,23;
42:20;44:23;46:8;48:10;
53:7;55:4;56:16;57:4;
68:19;74:19;77:2,9;80:18;
82:11;87:13;94:17;101:12;
108:9;109:11,21,22;115:7,
14;116:22
outside 66:15,17;78:4;
81:16,21
outstanding 22:24
over 19:21;22:22;24:15;
33:6,21;35:15;38:7;41:3;
55:2;75:7;83:5;89:5,9;
90:6;104:5;116:3
Over 96:1
overhead 42:4;71:12
overlay 27:13,22;29:15,
16,19,24;37:21;38:15,20;
39:13;66:24;93:6
overlays 29:17;38:5
owed 101:14,16,22,22;
106:11;108:21;109:4,21;
113:4
owing 109:13
own 106:23;108:13

**P**

pad 27:21;54:13
pads 12:12;20:17;21:1;
61:7
Pagano 8:17;9:5,18;12:6,
6,17;26:18;49:17;87:16
Pagano's 12:20
page 8:7;16:9,16;31:20,
24;43:8;67:13;84:4,18;
98:1
Page 60:8,11
paid 16:21;23:21
paint 63:22,23
paragraph 33:12
Paragraph 101:2;102:12;
108:7;109:9
pardon 78:1
parking 9:5,11;27:21,23,
24;29:16;63:20
part 51:3;69:15,16;91:4;
113:9
Part 51:2;75:5;94:11
partially 69:4

Landworks Creations, LLC v,
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

particular 110:16,20
partles 68:7;104:22
passed 8:19;59:2
passing 19:7
past 114:17
path 84:8
Paul 42:19
pave 27:12;29:19;33:23;
38:20;39:9;40:2
paved 37:21
pavement 27:12,19,22;
28:12,14;29:20,22;32:5,
10;33:8;34:11;40:4;43:12;
53:12;63:21,22,23;66:23;
80:11
Pavement 91:7,23
paving 8:24;25:9;27:5,
15;28:14,18,22;29:18,23;
30:2,6,17;31:2,14,17;34:4,
5,10;35:9,19;36:1,4,7,15;
37:9,16;38:2,4,6,9,12,13,
15;39:6,11,13,16;40:8;
41:11,12,16,18;42:9,9,23;
43:21;45:12,16;46:10,13;
55:5;64:18,23;65:1;66:20;
79:4;89:23;92:3,18
Paving 24:24;25:3
pay 36:16;46:2;101:24
payment 42:14;43:5
payments 101:4,9;
104:17
PCO 40:22,24
pending 97:4
per 88:12
percent 56:3,4,5
perform 54:6,23;55:19;
64:14;65:13;75:5;76:10
performed 8:12;10:6,11,
13,24;11:10,20;12:3;13:9;
14:5;20:3;21:4;26:9,11;
30:2,6;36:19;55:13,15;
56:13;61:22;62:3,11;
64:11,16;65:9,11
person 109:6
pertaining 112:2,5
pick 7:19
piece 69:7
Pike 29:9
plle 18:11
pit 28:16
pitch 55:6,8;79:5
pitcher's 51:18
pitches 55:16
pits 66:6
place 54:17;88:20;116:3,
3
placed 45:23;46:2;63:11;
80:11,12
places 116:9
placing 57:3,6
plainly 106:10
Plaintiff 101:5;108:11
plan 8:23,24;9:2;56:14;

87:12
plans 54:14
Planting 93:23
plastic 74:15
playing 13:21,22;14:1,15,
22;44:18
please 108:7
Please 88:4
plus 43:4;96:23;97:19
pm 117:8
point 21:8;108:24;114:21
pointing 82:11
poles 72:24
politely 57:1
poor 70:16;80:13
portion 19:20;20:20;64:4;
68:19;78:2
portions 33:17;101:12
portrayal 106:18
position 80:20
positive 27:8
possession 63:8;114:6
possibilities 108:21
possibly 80:19;85:10
potential 42:17;45:14
Potential 42:2
pour 48:18;54:20
poured 48:15,17;54:3
pouring 54:6
prefer 18:2;76:1
premise 52:21;56:6
prep 65:14;66:1,3
preparation 54:23;55:5
preparatory 66:7
prepare 107:9
prepared 14:2
preparing 33:22
presence 59:1;68:6
present 39:20;109:20
presented 23:22;38:19,
24;39:2
presenting 106:17;109:5
press 78:5
pressed 106:14
previous 24:13;37:8;
47:5;63:8;101:10;114:19;
116:14
previously 7:5;45:4;
53:13;57:23;58:1;63:13;
70:11;75:10;84:2,8;89:4;
90:22;103:15;114:14
price 28:20;29:8,10;32:12
priced 26:14
prices 18:21;28:22,24
pricing 29:11
principal 115:3
prior 55:5;114:7,10
privilege 100:23;110:16,
21;111:5,8
probably 22:4;35:21;
60:23
problem 90:24;100:2;
106:3,4;109:2

proceed 27:5
Proceed 39:11
proceeding 34:10;
109:18
process 36:16
processed 34:23;88:20
produced 23:19
profit 42:4
program 108:9
progress 46:19;47:9,14,
22
project 45:11;48:10;52:3;
58:10;76:11;79:5;81:23;
82:3;95:7;101:4;109:12,
15;113:5
proper 12:1;52:24;88:10
property 85:14
proposal 9:13
proposed 7:17;24:14,16;
28:11;38:7;40:22;45:14;
96:19;113:14
Proposed 16:16;21:8;
40:20;96:12,24
provide 113:22;114:11,
20;116:24
provided 37:11;114:4,7,
12,15,17,20;115:20;116:1,
23
providing 37:16;76:23
punch 49:22
purchased 57:2
put 11:23;18:11;29:7;
53:10;54:17;62:23;101:13;
110:19
putting 34:11
PVC 74:15

**Q**

quarter 37:23;39:10,12
quickly 47:2;62:9;82:11;
110:7
quite 62:1

**R**

ragged 39:14
raise 91:1,3
raised 9:9
ramp 47:13,22;54:3,9;
86:6
ramps 11:2,5,5,9,14,16,
22;12:12;54:18,23;56:11;
79:3
ran 53:14;74:2,3
range 40:6,10
ratification 17:5,6,13;
96:5,23;97:12,19;101:10,
14;103:7
ratified 101:17
ratifying 98:20
read 35:9;55:4,20
readings 53:17

reads 35:18
real 47:2
realized 48:14
really 56:8
rearrange 94:21
reask 55:18
reason 32:17;37:11;44:5;
68:20
rebid 28:21
recall 25:5;35:5;36:12;
64:22;71:4;98:22;99:4;
102:8;103:17;104:5,10;
111:16
received 20:5;22:21;
23:7;42:13;43:5
receptive 98:20
Recess 22:10;59:24;
115:18
recision 46:1
recognize 7:24;8:7;10:1,
18;13:1,13;15:4,22;18:13;
19:11;20:8;25:21;26:23;
30:10;34:18;40:16;49:13;
51:22;58:6;59:18;68:3;
82:23;83:3;94:24;95:15
recollection 21:20;36:1;
86:22
recommendations
51:14
record 7:14;21:6;33:13;
49:12;57:21,22;69:24;
75:24;76:2;82:19,20;
96:15,16;110:22;114:3,23;
115:16;116:1,11
records 22:5
RECROSS 113:1
REDIRECT 98:6
redirecting 35:23
reduce 39:1,2;101:3;
104:16
reduced 36:18
reducing 27:22
reference 22:18;25:5;
33:5;46:18;48:6,11,13;
66:10;75:6;79:6;86:17,18;
96:2,8
referenced 64:20;65:19,
23;66:21;75:19,20;79:1;
80:21;81:2;83:4
references 32:4,9
referencing 78:24
referred 31:1;52:17;
54:19;55:20;88:1
referring 8:22;22:18;
23:12;31:22;33:14;37:1;
99:21
refers 25:14;64:18
reflect 31:16,19
reflected 16:10,15;17:19;
19:17;20:14;21:23;28:4,8;
30:17;31:8;41:21;42:2;
43:20;45:13;46:6,12,21;
47:9,15,23;97:21

reflective 58:9,11
reflects 17:9,14;49:21
refresh 21:19,24;23:13;
36:1
refusing 101:4;104:16
regarding 25:1;34:22;
36:2;41:12;42:9
regrade 27:11;84:7
regrading 20:17;21:2;
25:3;36:2;41:13;42:10,23;
43:21;45:13;46:10;87:17
regular 50:14
reinstall 63:10
Reinstalling 83:17
reissued 33:24
rejection 37:12
related 40:1;66:5;68:7;
99:9
relates 90:22
relating 106:2
relationship 108:19;
109:7
relayed 39:21
released 40:11
relocate 65:16
remedy 70:19
remember 9:15;38:16
removal 13:5
remove 56:9;59:10,13;
69:19;76:14,22
removed 14:22;51:4;
54:17;63:7,13;69:8;85:5,7;
94:16
repair 70:13;71:4,7,16,17,
22;85:13
repaired 68:22;70:14;
73:21;77:22,23;78:10;
85:18,19
repairing 11:19;74:1;
90:2
repairs 73:8
repeat 28:6;104:9
repeated 44:10
replace 56:9;90:5
replaced 69:9,16,20,22;
71:13;72:8;73:1,9,20,21;
74:8;75:12,15;78:9
replacing 69:18
represent 49:6;57:23;
105:14
representation 55:23
represented 96:19
request 14:7;20:5;27:3;
109:19;113:22;116:17,22
requested 8:11;10:5,10;
12:2,4,17,18;13:8;14:4,21;
16:22;20:3;21:3;26:8;
27:10,13;36:16;38:8,10;
41:18;45:3;72:11;73:22
requesting 16:20;45:22;
114:8
required 11:18;29:20;
50:18;71:13;75:12;89:6

Neal H. Matthews, Vol. 2
February 16, 2007

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

requirement 89:20
requires 50:14
rescinded 44:16,22
reserve 112:17
reset 72:8
resolve 51:10;72:8
resolved 72:6;103:5
respect 42:8;45:12;
50:19;54:18;58:12;71:3;
78:12,18;79:9;83:14,19;
84:22;87:4;90:9;91:17;
95:6
respond 110:23
response 107:15
responsibilities 65:17
responsibility 50:4,20,
24;51:6,9;52:19;58:16,21;
59:8;60:17;61:3,20;62:17,
20;63:3,18;64:3,9,14;65:7,
13,20,24;66:13;67:3,18;
68:12;69:1;70:9,17;72:4,
14,22;73:6,12;75:3,17,21;
77:13,17;78:14;79:10;
81:18;82:4,15;83:16,21;
84:6,14,23;85:21;86:2,20,
24;87:5,19;88:9;89:15;
90:10;91:9,12,19;
92:10;93:8,12,16;94:2,6,
10,13;106:9
Respread 87:18;90:13
rest 52:14;93:19
restatement 84:17
restating 84:16
result 113:4
Resumed 7:2
resurface 59:11,11
retainage 97:11,19
retained 29:4
retracted 37:15
return 109:22
returning 45:7
review 23:1,2;49:24;50:1;
100:20;103:18;104:3,6
reviewed 52:14;111:14,
17
reviewing 24:9
Reviewing 47:7,20;50:2;
51:24;58:17;59:20;62:10;
75:23;86:10;95:17;98:2;
110:12
revision 8:20;9:4,16
reworked 88:12
RFI 27:3
Richard 11:5;10:7;12:6;
14:6;20:4,4;21:5,22;22:21;
36:17;39:7,24;44:3;95:21
right 21:15;25:12;47:20;
53:10;55:3;69:7,7;99:8;
100:6;104:6;112:17
Right 70:22
rim 85:6
rip 74:20
ripping 74:19

rise 98:16
roadways 77:8
room 12:16
roots 85:16
rough 39:14;88:12
Rough 86:1;87:9
rounded 16:19
rubberized 13:5;59:10,
13
rubbers 51:18
rubbish 10:13
running 66:24;73:18;93:6
runway 65:16;66:6,6
runways 28:15,16
Russ 42:19;99:3;100:1;
106:3

S

same 27:13;33:22;41:7;
55:7;71:11,16,20;84:19
Same 67:20
sand 88:23;89:5,9
saw 106:2
saying 31:15;34:2;44:24;
58:22;59:4;82:13
scheduled 78:19;91:15
scheme 101:3;102:15;
104:15
school 9:6;11:3,4;12:8,
11;13:7;27:8,9,19;29:15;
50:15;53:15,15,16;56:11;
63:9;69:12,16;76:20;77:2;
84:10,10;86:13,14;90:3,
20,21
School 27:6;95:7;113:5
scope 49:4;51:19;59:5;
61:10,12,16,20;63:5,18;
64:14;65:6,13,20,24;66:8,
12,15,18;67:2,5,9,11,18;
68:11,20;69:1;70:8;72:4,
13;73:5,12,21;75:2,16,20;
76:9;77:12,17;78:13;
79:10;81:17,21,24;82:4,
14;83:16,21;84:5,14,23;
86:2;87:11;89:14;90:18;
91:4,8,18;92:15;93:11,15,
20;94:1,5,9,13;106:18
Scope 92:14
seal 27:23,24
sealing 27:24
Sean 116:14
second 16:9,16;31:20,24;
33:12;36:6;37:20;47:17;
60:4,11;67:13;83:19;84:4,
7;86:9;92:12;94:3,21;
96:15;98:1
Second 87:20;89:16
Secondly 106:6
section 54:11,12;69:7,11,
20;70:4,6
sections 73:10
Sections 60:5;67:15

seed 62:3;82:4,7
seeded 14:3,23;62:7;
84:3;87:14
seeding 19:24;20:1;
62:14;93:23
Seeding 82:17
seeing 64:22
seem 17:20;109:1
seemed 44:18;88:15
send 34:24;35:2
sent 34:8;44:23;68:7;
116:7,22
separate 67:14
September 33:23;52:3;
57:17;60:16,23;87:15
serviced 77:6
services 37:24
set 18:4;109:11
settlements 50:9
several 79:5
shaded 9:7
shattered 74:19
Sheet 8:22;9:1
Sheetrock 75:13
sheets 26:15
Sherwood 53:22
shop 9:6,10;20:21;71:11,
12
show 7:21;25:17;110:7
showed 95:21
showing 95:22
shown 14:24;19:12;26:5;
28:7,12;32:12;49:14;
53:19;54:13;56:14;82:13;
95:15
shows 115:23
Shrewsbury 27:5;78:3;
95:6;113:5
shut 69:9
sic 58:10
side 11:3;13:6,7,21;
20:21;56:21;72:17;76:5;
83:8;86:18,24
sidewalk 52:8;53:14;
54:11,12;55:8;68:19;81:5;
90:20
sidewalks 52:15
sign 33:24;34:7,8;63:7,
10,14
signage 63:20
signature 15:10;33:2
signed 9:12;17:5,6;
33:21;35:1;43:9,19;45:15,
20;113:19
signing 33:6
signs 64:1,1
Signs 93:10,17
Silverman 7:4;8:13,15;
98:15,17;99:2,14;101:2,9,
11,20;102:3,7,14;104:13,
13,23;105:8;106:9,22,24;
107:8;108:8,14;109:11,14,
24;111:22

similar 95:22
simply 9:13;41:15,23;
114:8
sincerity 106:16
sit 101:13;109:6
site 8:23;37:24;60:15;
63:20;76:13;83:6,10;94:8,
12,18;108:23;109:22
Site 60:3
sitting 103:24;109:2
six 87:8;88:24
size 39:1,3
skin 51:7
slip 47:12,21
Slip 11:11
slips 9:12,14
slit 50:9,16;88:23;89:6,9
slope 12:1;52:9;53:6,19;
56:1,2,4,5;62:3,7;90:24
slopes 12:17;52:15,17;
53:16;54:7;56:13
small 90:4
smaller 39:18;40:2
smooth 29:22;39:8;
40:13;88:10,16
SMS01604 48:1
SMS0204 96:9
SMS0404 46:24;47:1,9
SMS0504 96:18
snipy 57:20
snow 75:7;76:14,22;77:9
snowplow 76:8,10,11,18
snowplowing 77:3
sod 13:20;14:21,23;
18:24;19:2,3;49:22
sodded 13:23;14:17,18
sods 86:6
solely 19:23
someone 44:6;48:18;
80:5;99:3;103:3
someplace 36:14
Sometime 87:15
Sometimes 17:22
somewhat 53:16
somewhere 43:2;99:24;
100:5
sorry 8:16;10:12;14:10;
27:18;28:6,15;33:13;
35:15;39:24;59:22;69:2;
79:18,19;81:11;83:17;
91:19;93:17
sort 66:7
sounds 22:7
south 11:3;56:21;58:19;
61:24;62:3,6;68:17;69:11;
72:17;76:5;78:2;85:13
southeastern 13:7
southern 13:6
southwestern 19:20;
20:20
space 91:20
speak 43:6;45:6;57:20;
78:23;98:22;103:3,4

speaking 88:7;99:22
Spec 38:16,17;39:4;40:5,
6,9
spec'd 29:17
specification 26:11,16;
29:20;40:4
specifications 26:13;
55:14
spell 108:3
spelled 107:22,23
spike 28:23
spikes 18:21
spoke 9:15;23:6;33:20;
40:8;98:14;116:21
spring 18:20;28:21;78:19
springtime 91:15
St 42:19
stand 28:19
Standard 38:18;39:4
Standen 14:14;15:8,14;
16:1,2,4;17:15;28:19;31:7,
9,11,16,18;76:13
standing 64:1
start 24:15;33:5;35:15;
38:7;41:3;89:24;98:11
started 7:12
starting 10:10;35:17;
55:3;89:10
state 101:2;108:8;116:10
stated 9:17;26:19;53:18;
70:11;92:19;98:21;99:1,3,
7;100:1;103:5,8,9,10,14;
109:18
states 42:18
stating 42:22
status 23:2;42:21;44:11,
12
step 53:7,9
step-offs 12:10
steps 53:11;93:8
still 11:24;23:6;33:23;
40:10;42:13;89:12,18;
97:4;106:8;112:13
stockpile 48:10;94:15
storage 20:17
stored 112:1,9,13
storm 88:12
Storm 84:13,24;85:11,22
Story 63:16
Street 11:5,6,9,17;53:23
stripping 74:16
strong 102:21
strong- 105:8
strong-armed 104:12
strong-arming 104:11,
17
struck 75:11
subcontract 15:14,15;
17:10,14;18:5;31:9;97:22
subcontractor 29:2,5;
54:4;75:11
subcontractors 101:5;
102:16;104:17,18;105:9;

requirement - subcontractors (8)

Min-U-Script®

Doris O. Wong Associates, Inc.

Landworks Creations, LLC v.
United States Fidelity and Guaranty Company, et al.

Neal H. Matthews, Vol. 2
February 16, 2007

108:9
subgrade 54:6
subject 52:7
submittal 25:24;26:2,5
submitted 7:18;21:10;
24:17;47:14,23;95:10
suit 109:1
summaries 31:12
supplement 107:15
supplied 103:22;105:20
supplier 19:3
support 80:13;104:18;
105:5
supposed 48:15
surcharge 18:19,22,23
surety 80:20;101:15,23,
23;102:2;104:16;105:21;
106:6;107:9;108:15,19,24;
109:5;114:4,7,13,15,17,20;
115:22;116:5
surety's 101:19
surface 13:6,21,22;14:2,
22;59:11,13
surfaces 14:15;52:8
swale 85:13
sworn 7:6
system 69:17;77:2;
112:13,14

T

T&M 9:12,14;46:18;47:7,
12,21
talk 74:1;109:6
talked 53:13;84:9;98:10,
18;107:4
talking 27:17;42:15;62:5,
6,8,13;69:6;72:15,16,19;
73:23;74:6;77:20;84:18;
85:23;86:12,16;87:2;
89:18;90:1;92:20,21;93:1;
104:24;105:4,6,12
tanks 76:23;77:4,6,11
teachers' 27:21
telephone 44:2
ten 55:2;71:15
test 74:21
tested 38:2;59:1
testified 7:6;75:10;102:6
testimony 11:7;54:19,22;
55:12;59:3;65:18;75:1;
77:21;80:21;89:4;92:6;
98:23;99:4;102:8,19,23
testing 37:24
Thanksgiving 23:5
thick 38:22
thickness 29:24;30:5;
32:10;37:9;41:16;46:13
thinking 81:15
third 20:22;35:7,18;43:8;
87:4;91:23;92:12,16
Third 87:20
thoroughfare 53:21

thoroughly 106:10
though 62:9;76:9;88:18;
106:6
thought 112:18
three 20:19;38:13;84:22,
24;91:8,11,14;116:5
throughout 79:5;80:14
ticket 88:2
tied 66:7
times 105:11;107:3
today 50:11;103:24
together 66:7;101:14
told 29:18;34:13;37:22;
38:14;39:21;44:6;78:3;
106:7
took 22:17;23:4
top 38:23;42:18;51:5;
62:13;89:5,11;90:6;91:3;
110:10
topcoat 92:19
Topical 83:15
topsoil 74:17;87:18;
88:10;90:13
tortious 107:17;108:5
t-o-r-t-i-o-u-s 107:18
Tortious 107:23
Tortuous 108:5
tortuously 108:10
tortures 108:6
total 21:23;22:1;32:12;
34:1,2;37:4;41:18;96:22;
97:17;113:14
touched 85:5,7
touch-up 85:8
towards 102:15
town 47:14,23
Town 9:13,19;14:20;
37:14,18;38:11;39:17;
51:14,16;77:7;78:3
Town's 80:20
track 13:5,6;14:2;25:10;
28:12;33:18;56:21,24;
58:13,19;59:10,11,12,14;
66:20;67:1;72:18;73:18;
78:3,4;80:7,10,15,16;82:6,
16;84:2;87:13;93:6
tractor-trailer 69:12
trades 19:21
traffic 63:19;87:23;88:15;
90:6;104:22
Travelers 42:19
tree 85:16
trees 61:23
trouble 17:22;76:3;
108:23
truck 69:13;75:13
trucks 76:22;77:10
true 45:4
truth 106:2
trying 45:18;46:8;73:16;
103:2;115:9
Tuesday 7:12
turf 50:16

turn 17:3;101:23
turning 16:9;18:6;43:7
Turning 16:14;18:12;
67:13;68:24;72:3;77:16
two 17:18,21;18:4;20:18,
24;44:1,2;51:17;79:20;
84:19;85:11;102:22
type 26:19;51:15;106:12
typed 36:2
typo 25:2

U

ulterior 108:11
under 10:6,24;11:10,19;
56:24;64:5;80:13;83:14,
19;84:24;85:11,22;87:8;
91:23;93:10,14;94:4,8
Under 84:13;86:1;87:18;
89:13;90:17;91:7;93:21,23
underground 73:9,18
uniform 29:22;38:21;39:8
unless 12:11;62:6;112:10
up 7:19;10:5,13;12:14;
16:19;17:22;18:4;32:16,
21;34:15;39:6;42:18;
43:24;62:23;71:19;74:20;
76:16,24;77:7;85:17;
94:17;95:23;97:7,20;98:9;
108:24;115:2,6,13,17
upon 37:18
upper 53:15;89:18;90:20;
96:1
use 40:11
used 53:22;71:7,16,21
uses 55:24
USF&G 17:7;99:2;101:3;
104:13;108:11;109:8
using 71:17
utility 8:23

V

VA 26:20
valid 101:12
variations 28:2
venture 72:19
verbally 69:23
Visual 74:24

W

wait 88:16
walk 86:13
walk-outs 12:13
walks 91:18,24
walk-through 12:4,7
walkway 53:9;68:16;
84:9;89:18;91:1;92:20,21
wash 70:17,21;71:1
washed 70:15
washing 70:24;71:1;
85:18

waste 115:9
Waterman 49:16
way 27:20;40:12;41:17;
65:22;74:21;82:12;108:2;
110:13;114:4;115:20
weeds 51:4
week 33:21;50:12
weren't 40:11
Werner 42:19
west 46:19;47:8;78:5;
82:6,16;84:2;85:2,4;86:14;
94:15
western 48:9;62:15
what's 40:16;46:21;
47:15;73:2
What's 66:19
whenever 74:17
wherein 99:2
Whereupon 117:7
whole 84:20
wing 68:18
winter 76:12,15,19
wires 74:5
withheld 97:12,19
within 49:4;59:4,7;60:16;
61:10,16,19;62:16,20;
63:2,5,17;64:2,8,13;65:6,
12,19,23;66:12;67:2,5,9,
17;68:11;69:1;70:8;72:4,
13,21;73:5,12;75:2,16,20;
77:12,17;78:13;79:10;
81:17,23;82:3,14;83:16,
20;84:5,14,23;86:2,19;
87:5,19;88:7;89:14;90:10,
18;91:8,11,18;93:11,15;
94:1,5,9,12;112:13
without 24:8;34:12;
80:12;108:4
Without 17:20;21:12
witness 7:3;32:19;115:4,
11
WITNESS 49:11;110:17;
117:5
word 55:3,24;102:22;
110:17
words 106:23;107:20;
108:13
work 8:12,21;9:12,14;
10:6,10,11,12,24;11:10,18,
19,22;12:2,4,8;13:8,18;
14:4;19:17;20:3,14;21:3;
25:9;26:8,10;34:10;36:15,
19;45:11;46:10;49:1,2,4;
51:15,16;60:3,15;64:11,
16;65:9,10,14;66:2,3,7,12;
71:17,22;73:21;75:5,19;
76:6,8,9,10,13,18;79:9;
81:16,17,21,24;83:10,11;
85:8,10;86:7;87:6,11;88:8;
90:10,14;92:7,9,11;95:6;
96:22;97:17;101:19;
106:19;108:24;109:20,22;
113:4,11,24;114:1,9;

116:16,19
Work 60:4;67:14
workers 57:13
working 23:7;26:12;
71:14;109:7
works 57:12
worksheet 95:21
worry 78:6
writing 48:19;86:24
written 23:10;30:15;
33:16;36:13;52:12;95:3,5
wrong 98:16;107:22
wrote 86:20;105:1

Y

year 8:2;28:22
years 80:10
yesterday 98:11

Z

zones 87:12

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| LANDWORKS CREATIONS, LLC. ) | C.A. NO.05-CV-40072 FDS |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES FIDELITY AND GUARANTY ) | |
| COMPANY and ) | |
| LOVETT-SILVERMAN CONSTRUCTION ) | |
| CONSULTANTS, INC. ) | |
| ) | |
| Defendants ) | |
| ) | |

## PLAINTIFF LANDWORKS, LLC.'S SUPPLEMENTAL ANSWERS TO DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

### INTERROGATORY NO. 1:

Identify the individual signing the interrogatories.

Answer 1: Neal H. Matthews, of Landworks Creations, LLC.

### INTERROGATORY NO. 2:

In preparing your answers to these interrogatories, did you make such inquiry of your attorney or other representatives, and review your records in such a manner to enable you to make full and true answers and, if so, identify by name, the present address of, each person consulted and each document reviewed in preparing your answers to these interrogatories.

Answer 2: Objection. The Plaintiff objects to this interrogatory in that it specifically seeks to invade the attorney/client privilege, and is otherwise not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Answer 2. I spoke only to my attorney. Since the date of the initial answers, I have also spoken to William Gallagher, of 1 Homestead Drive, Medfield, who will likely be serving as Landworks Creations, LLC's expert witness. I have reviewed my own business records, as well as records provided by USF & G, Lovett-Silverman, and the project architect. My understanding is the some of the records of the project architect may have included records from the town of Shrewsbury. I have also reviewed deposition transcripts of individuals of Lovett-Silverman and the project architect. I have also re examined certain pleadings in this case, including the Complaint, the Amended Complaint and the Counterclaim. I have also reviewed photographs of the site.

## INTERROGATORY NO. 3:

With respect to each person you or your attorney expect to call as an expert witness at trial, state the name and address of each such expert witness; the subject matter on which each such expert is expected to testify; the facts and opinions as to which each such expert is expected to testify; and a summary of the grounds for each such opinion.

Answer: The Plaintiff has not yet determined who it intends to call as an expert witness and reserves the right to supplement this answer in a timely manner.

Supplemental Answer: The Plaintiff is likely to call William Gallagher as its expert witness. Mr. Gallagher is a construction manager of substantial experience, and knowledge of the local construction industry. He has extensive knowledge of public construction practices and policies, as well as means and methods. He is expected to testify as to these areas, and he is expected to testify as to the numerous ways that the defendants in these cases violated the practices and policies, as well as the means and methods usually employed in bringing public construction projects to completion. He is expected to testify as to the rights that Landworks identifies in Supplemental Answer 7, and the industry practice with regard to how owners, contractors and consultants generally behave with regard to rights and obligations of the parties, and that both the Surety and Lovett-Silverman disregarded those rights. He is expected to further testify that in his experience the concept of "banging" the subcontractors means the practice of refusing, in bad faith, to pay subcontractors, forcing them to file suit, to compromise valid claims as a business decision, to delay payment or, in an ideal circumstance, hope that the subcontractor cannot afford to pursue a claim, or goes out of business before payment can be made. Mr. Gallagher has been reviewing the documents in this case, including the deposition transcripts, the plans and specifications. At this juncture, several deposition transcripts, including the deposition transcript of USF & G, is not available for Mr. Gallagher's inspection and review. Consequently, he has not yet finalized his conclusions and opinions, which he expects to do shortly after the transcript is received. This answer will be further supplemented shortly, as the transcript of the USF & G representative is expected shortly.

## INTERROGATORY NO. 4:

2

List the name, address, professional background, and/or occupation of each and every expert whom Landworks does not expect to call at trial, but whom Landworks has retained or specifically employed in anticipation of the instant litigation or in preparation for trial of this action.

Answer: The Plaintiff has not yet determined who it intends to call as an expert witness and reserves the right to supplement this answer in a timely manner.

## INTERROGATORY NO. 5:

State the basis of your claim in paragraph 12 of your Amended Complaint that Lovett-Silverman strong-armed subcontractors, by defining the term "strong-arm" and identifying, with particularity, "strong-arming" behavior engaged in by Lovett-Silverman, and identifying specifically each subcontractor so affected by each alleged act of "strong-arming."

Answer: The Plaintiff relies upon statements explicitly made by Lovett-Silverman agents and employees in e-mails provided to the Plaintiff, and referenced specifically in the document request served on Lovett-Silverman. Lovett-Silverman's own employees and agents concede that there was insufficient funds to pay the subcontractors, and Lovett-Silverman's own employees and agents talked about "banging" the subcontractors. Lovett-Silverman's own employees and agents colluded with USF & G on the false charge of abandonment, and in the false filing of a counterclaim by providing information that was knowingly false—for example, passing off work that was not within the scope of Landworks as the scope of Landworks, and by otherwise lying to Landworks as to why Landworks was not being permitted to return to the site. It appears that Lovett-Silverman engaged in this same conduct with the other subcontractors mentioned in the Lovett-Silverman e-mails. In short, the e-mail record confirms that Lovett-Silverman and USF & G were banging the subcontractors, which the Plaintiff construes as "strong-arming." The Plaintiff looks forward to hearing an innocuous explanation for why banging subcontractors and aiding the filing of false lawsuits is not "strong-arming." The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its discovery requests and produces long-overdue documents.

## INTERROGATORY NO. 6:

Please identify each right that you allege, in paragraph 12 of the Amended Complaint, Lovett-Silverman denied the subcontractors, and identify the contractual basis for each right.

Answer: Landworks, LLC had a legal right to complete its work pursuant to its ratification agreement with USF & G. Lovett-Silverman clearly interfered in that right.

## INTERROGATORY NO. 7:

Please identify each subcontractor that you allege, in paragraph 12 of the Amended Complaint, was denied rights by Lovett-Silverman and set forth the specific rights denied by each such subcontractor.

Answer: The subcontractors were, in part, identified in the Plaintiff's document requests. The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its own discovery requests by producing long-overdue documents.

Supplemental Answer: Landworks Creations, LLC first became aware of the possibility that the Surety was acting in bad faith toward its subcontractors from someone, who I cannot recall, who worked for the town of Shrewsbury. Landworks ultimately saw an e-mail from Al Falango of Lovett-Silverman to Tony Lardaro and Robert Bullock at Lovett-Silverman dated September 21, 2005 in which it was discussed that "we can try to bang the subs but I think that we can never recover from them what we are spending." In the construction community in Massachusetts, this phrase has a very definite meaning.

The phrase indicates that, based upon the shortage of funds identified in the same September 21, 2005 e-mail ("I don't think the 825k is enough for the contingency..."), the Surety, by its consultant, is going to stonewall payment to subcontractors, forcing them to either accept deep discounts in order to file suit, or by forcing them to file suit in the hope that the subcontractor will discount the amount owed to avoid litigation costs, or in the hope that false backcharges will gain traction in litigation, or that the subcontractor will cease to go out of business without every getting payment. The phrase at the end, referring to recovering funds, further suggests a plan to file false counterclaims to make the subcontractors either reduce their claims, or pay for the cost overruns on the project.

It has now been confirmed by James Peters of USF & G that at least 20 subcontractors were required to file suit, including Coughlin Electric, ESCOA, Landworks, Kitridge Equipment. Century Drywall, Dadario, All State Steel and Steelco. Landworks has also heard of suits by the carpet installer, and by K & K, the records of which are available at the Worcester Superior Court. In addition, the employee from Shrewsbury suggested that KMD Mechanical was required to reduce the amounts it was owed in order to get paid.

On a project of approximately $14,000,000, it thus appears that almost every subcontractor was required to file suit, or to compromise legitimate claims in order to be paid. The substantial number of suits and claims confirms that Lovett-Silverman and the Surety moved forward to "bang" the subcontractors. The frivolous counterclaim filed against Landworks indicates an operation attempt to bang Landworks and get money back.

Counsel for Century Drywall has informed the Plaintiff that USF & G's conduct in responding to its suit has also been heavy handed and clearly delay-oriented. Indeed, USF & G simply failed to respond to discovery, and was put in to default.

Landworks has worked with the Zilioli family for a number of years. It has been the understanding of Landworks in 2005 that one of the Zilioli companies, perhaps Framingham Excavating, was a party to a case in which the Massachusetts court specifically ruled that

4

subcontractors on a public job, including site contractors, have a right to suspend work pending payment, and that a contractor is not obligated to continue incurring costs when it is not being paid. It is Landworks' understanding that a subcontractor has a right to do this without being declared to have "abandoned" the work. Since this is an important part of construction law, Landworks has assumed and inferred that USF & G and Lovett-Silverman understand this as well. Landworks therefore infers that the insistence by Lovett-Silverman and USF & G in the Counterclaim that Landworks abandoned the job is a deliberately false effort to distort the facts and deny Landworks its rights under the law.

It is also the Plaintiff's understanding that a subcontractor has the "right" to a termination letter, or some kind of communication expressing the position of the other contracting party. It is my understanding from years of work that a subcontractor is entitled to be paid money owing to it if it is terminated for the convenience of the owner of contractor, and that the subcontractor is entitled to the profit and overhead. It is also the Plaintiff's understanding that, because the ratification agreement was not terminated, the failure of the Surety and USF & G to either terminate the contract, or behave with good faith, violated Landworks' rights. This inference is drawn from all of the e-mails, especially the "bang" the subcontractor e-mail, the August 2005 correspondence pertaining to a meeting with Landworks, and the January-February e-mail in which the false and frivolous Counterclaim was created.

It is Landworks belief that each subcontractor has a right to payment for the work completed by the subcontractor, and to be treated in decent and respectful manner. Massachusetts state law also requires that claims be investigated in a responsible and reasonable manner, and to be free from defamatory conduct about their work. The fact that more than 20 subcontractors had to file suit or fight for their money to protect their rights indicates that individual subcontractors were not at fault, but rather that there was a systematic effort, evidenced by the September 21, 2005 e-mail, to deny them their rights to payment, reasonable settlement of claims and the right to be free from unfair and deceptive trade practices conducted for the purposes of saving money for the Surety.

Landworks believes that it has a right, as a subcontractor on a public project, to have a reasonable investigation performed by the Surety's construction consultant to ascertain the scope of work, and to provide an opportunity to return to that work unless good cause is shown. Substantial e-mail traffic indicates that Lovett-Silverman breached that obligation. For example, an e-mail dated January 16, 2006 from Bill Meritz to Robert Bullock of Lovett-Silverman refers to Frias Concrete, and notes that "they were probably a sub to Landworks." In fact, Frias was a sub to Jackson Construction. Another e-mail of September 26, 2005 from Bill Meritz to Robert Bullock confirms that no reasonable investigation was being performed by Lovett-Silverman. In that e-mail, it is confirmed that the sole method of investigating the scope of Landworks Creations, LLC's scope was reading certain contracts. This evidence has confirmed, by oral testimony of Lovett-Silverman officials and the Surety, that neither Lovett-Silverman nor the Surety, spoke to the town, the project architect, the landscape architect or the clerk of the works, or even the parties to those contracts, to understand the scope of the Landworks contract. These e-mails confirm, along with the testimony, that the Plaintiff's right to a reasonable investigation and fair treatment was completely disregarded.

5

This issue continues throughout this case; Lovett-Silverman and the Surety continue to allege that Landworks did not perform its work adequately and in a workmanlike manner. However, this position has been determined to be false. An e-mail from Katie Crockett, the project architect, to Bill Meritz, dated February 1, 2006, confirms that the site work was not completed, not that it was deficient in scope by each subcontractor. Indeed, the e-mail referenced demonstrates an inability of the project architect to identify deficiencies as to Landworks specifically just prior to the Surety filing a Counterclaim stating the contrary. Continuing efforts by the Surety and Lovett-Silverman to elevate punch-list items to defective work is an ongoing act of fraud against Landworks.

Landworks also believes that every subcontractor is entitled to a uniform and consistent method of addressing claims. Various e-mails confirm that Lovett-Silverman was operating with different methodologies, creating further unfairness in the process. Am e-mail from Bill Meritz to Al Falango dated September 8, 2005, demonstrates the unevenness, stating that some sub-contractors were allowed  back without ratification. An e-mail of September 15, 2005 from Bill Meritz to Al Falango discusses the uneven ratification process. Another example of discriminatory unevenness was found in an e-mail from Jason Goodwin to a number of individuals on September 15, 2005 in which it was noted that some contractors who were not on site due to non-payment were being ratified and returned to work, while the Surety has used the same issue by Landworks to declare "abandonment." Deposition Exhibit 33 indicates that Lovett-Silverman and the Surety were uneven and inconsistent in their decisions as to whether or not they would speak to claimants and their attorneys—no one has been able to provide a comprehensive explanation as to why these entities could speak freely to Steelco, but not to Landworks.

On this same topic, the Plaintiff notes that USF & G's attorney spent nearly two days of deposition time walking through Landworks' change orders, scope of work and theory of payment. Landworks notes that this was the kind of conversation that Landworks intended to have with Lovett-Silverman in August of 2004. In the same July 18, 2005 e-mail from Al Falango to Robert Bullock in which Rick talks about his "f-in vacation," it is noted that Lovett-Silverman was struggling to find a new site contractor. Landworks was ready, willing and able to perform the work on the project. All that was necessary to get Landworks back to work was a good faith attempt to resolve the outstanding payment issue. The fact that a desperate consultant wouldn't talk to Landworks, notwithstanding that no one had specifically stated deficiencies in Landworks' ability to perform, infers that the key obstacle, payment, was the basis for lack of communication and refusal to speak. This particular e-mail demonstrates that a decision had been made not to talk to Landworks because Landworks would have required funds to return to work.

In regard to the same issue, Landworks learned through the deposition of James Peters that the Surety has no written policies or guidelines for handling surety claims, and does not provide training seminars to its claims adjustors to ensure a predictable and even and consistent method of claim adjudication. The subcontractors, who are beneficiaries of these payment and performance bonds, have every right to expect that their claims will be handled in a uniform and predictable manner that ensures fairness and even handedness, and does not result in ad hoc conduct that appears extortionists or discriminatory.

Landworks also believes that every subcontractor is entitled to honesty from the Surety and its consultant. Deposition exhibits 34, 55 and 58 show that Lovett-Silverman was being dishonest to Landworks in its explanation as to why Lovett-Silverman would not meet with Landworks. These e-mails demonstrate that USF & G requested that Lovett-Silverman inform Landworks that the issues should be addressed between counsel. Instead, Lovett-Silverman told Landworks (August 17, 2005) that "he will have to drop his law suit" if Landworks wished to be ratified. The response from Al Falango that same day, "don't do that if you haven't done it already" demonstrates that even Al Falango recognized the extortionist flavor in the prior e-mail. In any event, Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly extortionist conduct in attempting to dangle payment with a precondition of waiving legal rights under G.L. c. 149 §29. This also violated the Plaintiff's rights, and may even have been criminal in nature.

The Plaintiff believes that it, like every other subcontractor, has the right to a speedy and fair trial in the Superior Court under the law. Landworks believes that in agreeing to come to Massachusetts to engage in public construction work, it has submitted to the jurisdiction of the state court identified in the law, and that the Surety has equally accepted that jurisdiction. The Superior Court seems to have an expertise in these matters, and handles them routinely. The Plaintiff notes that this case has been substantially slowed by several elements. First, although over twenty lawsuits have been filed in the Middle School project, USF & G decided, apparently, only to remove this case to the federal court. Also, USF & G has admitted that it had four different law firms on this case, serially. Since USF & G wouldn't admit why it fired three experienced Boston firms, the jury can infer, if it wishes, that USF & G moved this case around until it found a lawfirm willing to file the counterclaim that was apparently so frivolous. The Plaintiff bases its inference from the testimony of James Peters and the e-mails from February and January of 2006 in which the counterclaim was being concocted, and from the fact that this case was so singled out for different treatment, implying a greater need for delay while a counterclaim was fabricated. The facts suggest to Landworks that there was no legitimate basis for a counterclaim when the suit was originally filed.

The Plaintiff believes it has a legal right to know the basis of a counterclaim against it so that it may question witnesses and prepare a defense. The fact that the Surety's own representative could not even identify the contract which, it was alleged, had been breached, demonstrates and infers that the Counterclaim has never had any merit.

Finally, the Plaintiff believes that it has a right to treated respectfully and with dignity and respect. The e-mail traffic that has been produced indicates that Lovett-Silverman were nothing more than the Surety's foul-mouthed thugs, operating as on-the-ground hatchet men. Aside from the language about "banging" the subcontracts, Landworks finds it significant that Al Falango of Lovett-Silverman would send an e-mail dated July 18, 2005 to Rick Noblet referring to "my F-in vacation." On August 17, 2005, Al Falango sent an e-mail to a claims attorney, Russ Fuller, at the Surety, referring to the president of Landworks as "this guy." Landworks is not a "guy." It is a well-know and respected corporation. This kind of e-mail confirms that the Lovett-Silverman consultants were not behaving in the type of professional, credible construction consultants tasked with representing the best interests of all involved in this project.

## INTERROGATORY NO. 8:

Please identify the specific subcontractors who filed suit to receive payment, including the case name and docket number of each such lawsuit filed by the subcontractors, as alleged in paragraph 13 of the Amended Complaint.

Answer: The subcontractors were, in part, identified in the Plaintiff's document requests. The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its own discovery requests by producing long-overdue documents.

Supplemental Answer: James Peters stated in his deposition that approximately 20 lawsuits have been filed. This has confirmed the September 21, 2005 e-mail that the Surety and Lovett-Silverman has engaged in the practice of "banging" the subcontractors. Landworks does not have the information pertaining to the docket information of each of these lawsuits, which apparently were filed in disparate courts throughout the Commonwealth. Landworks notes that in the deposition of James Peters, this agent of USF & G couldn't even discuss the counterclaim without getting in to attorney/client privilege issues. Landworks notes, without waiving any rights to the attorney/client privilege, that Landworks is put in to the same bind with this question, noting that Landworks has been aware that its attorney continually bumps in to Shrewsbury Middle School cases in random courts, from Suburban Insulation in Norfolk to Century Drywall in Worcester, making it abundantly clear that voluminous litigation has been in progress, of which Attorney Hipp is apparently the person most knowledgeable of the specifics. Attorney Hipp is on the Plaintiff's mandatory disclosures and will likely testify as to this issue, since USF & G cannot.

## INTERROGATORY NO. 9:

Please identify, by invoices or specific written demands, the specific payments sought by each individual subcontractor, as alleged in paragraph 13 of the Amended Complaint.

Answer: With the exception of Landworks' own claim, Landworks has no idea. As to other subcontractors, the question is irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence as required by F.R.C.P. 26.

Supplemental Answer 9: See, Answer 8

## INTERROGATORY NO. 10:

Please define the terms "frivolous" and "fraudulent" and describe in what way, as to each lawsuit individually, the lawsuits filed by subcontractors to receive payment, as alleged in paragraph 13 of the Amended Complaint, were frivolous and fraudulent.

Answer: Objection. The Plaintiff objects to the interrogatory as it is vague and unclear As to other subcontractors, the specifics are irrelevant. Paragraph 13 refers to the patently frivolous and fraudulent lawsuits against Landworks cooked up by Lovett-Silverman and USF & G.

Supplemental Answer: The counterclaim filed against Landworks was both frivolous and fraudulent, and was consistent with the e-mail of September 21, 2005 which referenced plans to recover funds. At this point in this case, with discovery at an end, there has not been a shred of evidence to support the claims of the counterclaim. Indeed, in February 1, 2006, Bill Meritz sent an e-mail to the project architect asking "do you have any correspondence in your file pertaining to deficient work performed by Landworks?" The project architect was unable to provide any such documentation showing "deficient" work to Landworks' scope. Nonetheless, this did not stop Lovett –Silverman in its correspondence from identifying site costs that were unrelated to Landworks and from assisting the Surety in preparing a Counterclaim against Landworks that was utterly without merit.

Paragraph 11 of the Counterclaim made false statements that "Landworks abandoned its work at the Project in the fall of 2004." In fact, Landworks remained on the site until the typical winter shut down that affects all site contractors. Exhibit 63 includes an e-mail from G & R Construction to Robert Bullock of Lovett-Silverman dated January 10, 2006 in which G & R notes that "there will be more site work done in the spring time," acknowledging that winter shut down is part and parcel of this project, not abandonment. Nonetheless, the Surety claimed that Landworks "abandoned" the work for suspending exterior work due to inclement conditions. In addition, the Surety has had no logical explanation for how a contractor, who is begging to return to work, can be said to have abandoned the work. Exhibit 121 marked at the deposition of James Peters consisted of interrogatories served by sheriff on USF & G in April of 2005 in which the Plaintiff, in exasperation of the Surety's refusal to talk to the Plaintiff, asked, in question 2 "please explain why the Defendant has refused to discuss the Plaintiff's return to the Project, and has otherwise declined to participate in discussions pertaining to a return to the Project." Thus, there is evidence, contrary to the Counterclaim, that the Plaintiff was endeavoring to return to the site in April of 2005. A schedule marked at the deposition of the project architect confirmed that Landworks' work was to be performed in the spring of 2005, not earlier. The deposition of the person most knowledgeable at USF & G specifically sought information on this topic, asking the same question as specified in the interrogatory. The Surety continues to insist, in a manner bordering on fantasy, that the Plaintiff abandoned the work.

Paragraph 13 refers to substandard work, and paragraph 12 refers to "substandard and unworkmanlike." There has never been a shred of documentation to support these claims. Based upon the fact that the project architect informed Lovett-Silverman that she did not have documents specifically identifying such deficiencies in response to Meritz' e-mail, it was known that these statements were false when made in the pleading.

Count I of the Counterclaim claims damages for breach of contract. The representative of USF & G, at his deposition, couldn't even specify which contract Landworks was alleged to have breached. One would assume, when filing a claim for breach of contract, that the suing party could at least, in good faith, identify the contract being breached.

Paragraph 17 alleges that Landworks failed to perform in accordance with plans and specifications, but USF & G could not testify at to the basis of that statement.

In addition, even though the Counterclaim was drafted a year ago, the representative of USF & G couldn't identify damages or explain the basis for damages, stating that they were still being calculated.

The Plaintiff intends to move for summary judgment on this Counterclaim, as it is apparent that USF & G has absolutely no basis to support its Counterclaim, and can't even state the basis for it.

This interrogatory asks for the Plaintiff's definition of frivolous and fraudulent. To Landworks, it means filing a counterclaim without any legal basis, without any foundation, without any investigation, without any capacity to explain the claim and without any notion of the damages being sought, even a year after the Counterclaim was drafted. The Counterclaim is so fraudulent and frivolous that even the witness for USF & G couldn't identify which contract was breached, and what work was not right. In short, this Counterclaim seems to fall within the category of the September 21, 2005 e-mail concerning "banging" the subcontractors and getting money back. It is clear that this Counterclaim was filed to encourage Landworks to compromise the underlying claim. Finally, the Plaintiff notes that using this tactic, with its potential to harm the reputation of Landworks, without any basis, constitutes fraud, as it damages the reputation of the Plaintiff in the community, which should not be allowed with impunity.

### INTERROGATORY NO. 11:

State the basis of your contention in paragraph 14 of your Amended Complaint that there was an organized and ongoing effort by Lovett-Silverman "to bang the subs," defining the term "bang the subs" and describing with particularity how the alleged effort was ongoing.

Answer: The employees and agents of Lovett-Silverman admitted to this in their own e-mails. The conduct perpetrated against Landworks makes it clear that the scheme was carried in to operation.

### INTERROGATORY NO. 12:

State the basis of your contention in paragraph 20 of your Amended Complaint that Lovett-Silverman engaged in specific conduct which serves as fraud on you.

Answer: See Answer 5, which is not an exclusive list. Lovett-Silverman simply lied to Landworks and engaged in conduct which denied Landworks the lawful right to complete its work under its ratification agreement. Lovett-Silverman, by its own e-mails with USF & G and its counsel, were complicit in filing a false lawsuit against Landworks.

Supplemental Answer: The Plaintiff refers to Supplemental Answer 7 and Supplemental Answer 10

10

## INTERROGATORY NO. 13:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the "harm" referenced in paragraph 21 of the Amended Complaint.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records. Supplemental Answer: The Plaintiff refers to its Supplemental Answer 7 and 10.

## INTERROGATORY NO. 14:

For each item of damage you have allegedly suffered as a result of conduct of Lovett-Silverman, identify the item and dollar amount of damage followed by the conduct giving rise to such damage, the methodology used to calculate such item of damage and the basis for your contention that Lovett-Silverman caused such damage.

Answer: The amount is specified in the Complaint. The amount of attorney's fees is not yet determined. The Plaintiff is seeking treble damages. The Plaintiff reserves the right to supplement this answer.

## INTERROGATORY NO. 15:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the "program of 'banging'" that Lovett-Silverman allegedly engaged in, referenced in paragraphs 14, 20(c), 23, and 27 of your Amended Complaint.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records.

## INTERROGATORY NO. 16:

State the basis of your contention in paragraph 20(d) of the Amended Complaint that Lovett-Silverman supported US F&G in defaming Landworks, describing in detail the nature of such support, making specific reference to written documents evidencing such alleged support, and providing the dates of such efforts and the names of the person(s) lending such support.

11

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records.

Supplemental Answer: The Plaintiff refers to its Supplemental Answer 7 and Supplemental Answer 10. The Plaintiff also refers to the serious of e-mails marked as Exhibit 63 and 65, which was the communication between Lovett-Silverman and the Surety's counsel in February of 2006 discussing the Counterclaim. These e-mails show a hasty attempt to fashion some form of counterclaim in order to comply with deadlines of the federal court. Most telling is an e-mail from Attorney Hipp to Robert Bullock on February 2, 2006 in which even Attorney Hipp seems to recognize something amiss with Lovett-Silverman's accounting, which appeared to be totally inconsistent. In fact, it will be noted at trial that the questions that Attorney Hipp asked in February of 2006 appear to be the first indication of an intelligent attempt to sort out the issue of site work scope and cost, a process which continued at the Plaintiff's deposition. It should also be noted that, notwithstanding that Attorney Hipp was asking probing, logical questions, the responses provided by Lovett-Silverman were deficient and inadequate, and continued the practice of failing to investigate. In short, Lovett-Silverman responded with false, knee-jerk answers, rather than engaging in intelligent investigation of the questions. An example of this is found in an earlier e-mail from Robert Bullock to Jason Goodwin on January 25, 2006, in which Bullock wrote "Bill said he will extract the information from your billings and forward it to Eric. Please provide the break down of your future site work costs to Eric, Bill and me, no later than Monday." Thus, Lovett-Silverman was fabricating numbers based not-upon Landworks' actual scope, but rather on the broader scope by G & R. There is no evidence that Lovett-Silverman ever attempted to parse out Landworks' scope, assess the values, and calculate costs as against the credits offered by Landworks. The Court should also note that as late as January 25, 2006, even Attorney Hipp was looking for "documentary support for these charges," making one wonder how what the Surety was doing in terms of investigating this claim between March of 2005 and January of 2006. When pushed, Lovett-Silverman, as shown in the exhibits, merely took the completion price of non-scope work, and attributed it all to Landworks. Attorney Hipp is on the witness list and is expected to testify at trial how the information provided to him was incorporated in to the Counterclaim, since USF & G's representative apparently could not.

## INTERROGATORY NO. 17:

State the basis of your contention in paragraph 24 of your Amended Complaint that Lovett-Silverman was aware of the advantageous business relationship between Landworks and US F&G, identifying the person(s) with such awareness, and please define the term "advantageous business relationship."

Answer: The information is contained in the e-mails that have already been produced. Landworks was in communication with Lovett-Silverman, particularly Robert Bullock. In these conversations, Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information. Based upon the e-mails subsequently

12

identified, it is clear that Landworks would be barred from its right to perform its work. The term advantageous business relationship is self explanatory.

## INTERROGATORY NO. 18:

State the basis of your contention in paragraph 25 of your Amended Complaint that Lovett-Silverman interfered in the business relationship between Landworks and US F&G.

Answer: Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. See the answer to Interrogatory 5 and Interrogatory 17. An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF & G with false data provided by Lovett-Silverman.

## INTERROGATORY NO. 19:

State the basis of your contention in paragraph 38 of your Amended Complaint that Lovett-Silverman set out to harm Landworks by denying it access to the Project and to funds due and owing.

Answer: See, interrogatory 5, 17 and 18.

## INTERROGATORY NO. 20:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to your allegedly ignored demand for funds, as referenced in paragraph 39 of your Amended Complaint.

Answer: This information has previously been provided.

## INTERROGATORY NO. 21:

State the basis of your contention in paragraph 40 of your Amended Complaint that Lovett-Silverman's conduct constitutes a violation of c. 93A.

Answer: Banging Landworks, lying about their status, assisting in the preparation of a false lawsuit and other such conduct, all for the purposes of avoiding payment, sounds like unfair and deceptive trade practices to this Plaintiff.

## INTERROGATORY NO. 22:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the alleged harm your business has undergone, as referenced in paragraph 42 of your Amended Complaint.

Answer: I do not yet have all of the information, as this case is ongoing. I have been denied payment for my work, and for work of my subcontractors, even though I have paid those subcontractors. I was denied the right to complete the work, which was vital for the ongoing success of the company; the company had to borrow funds to maintain its operations. The company has been forced to incur substantial attorney's fees to seek funds that were not in dispute until Lovett-Silverman discovered it did not have the funds to pay the subcontractors, as revealed in the e-mails. My company, which has never been subject to claims of defective workmanship, has been defamed for the purposes of saving USF & G money. The documents that support this are kept in the usual course of business, and will be produced. My understanding is that defamation damages are presumed. Attorney's fees cannot be calculated at this point, nor can the treble damages.

Sworn under the pains and penalties of perjury this 9th day of March, 2007

14

As to Objections,

Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

The Mountain States Law Group
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: March 9, 2007

## CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this 28th of February, 2007 I served a copy of the foregoing on the following counsel of record by first class mail, postage prepaid:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Eric Hipp, Esq.

Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, MA 02210
Attn: Julie Ciollo, Esq.

Robert N. Meltzer