UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**SUPPLEMENTAL STATEMENT OF FACTS OF THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC., IN SUPPORT OF ITS REPLY TO LANDWORKS CREATIONS, LLC'S OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman")

respectfully submit this Statement of Facts in Support of its Motion for Summary Judgment.

## II.    SUPPLEMENTAL STATEMENT OF FACTS

1.    Mr. Bullock participated in site visit with Bob Cox, "a person that works for the

Town of Shrewsbury", where they discussed Landworks' scope of work.  Depo. of Robert

Bullock at 64:3-12; 101:14-102:4, attached hereto as **Exhibit B**.

2.    Mr. Matthews admitted at his deposition that "Mr. Bullock was the only one [at

Lovett-Silverman] that I had contact with.  He was the only one at that time who spoke to me or

communicated to me in e-mail also."  Depo. of Neal Matthews, Day One, at 99:10-13, attached

hereto as **Exhibit C**.

3.      Mr. Matthews further admitted that the body of e-mail correspondence between himself, Lovett-Silverman employees and consultants, and USF&G employees comprised the basis for Landworks' claims against Lovett-Silverman.  Depo. of Neal Matthews, Day One, at 75-100:7-16, attached hereto as **Exhibit C**.

4.      Russell Fuller, Esquire, of USF&G, wrote to Mr. Bullock and stated, "[p]lease let Mr. Matthews know we are willing to continue to discuss this with him, but in light of the lawsuit, discussion should go through the attorneys." E-Mail of Russell Fuller, Esquire to Robert Bullock, August 19, 2005 at 4:25 p.m., attached hereto at **Exhibit A**.


Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

Dated: April 27, 2007

01086789

## **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 27, 2007.


/s/ Julie A. Ciollo
Julie A. Ciollo

# EXHIBIT A

**Julie Ciollo**

| | |
|---|---|
| **From:** | Robert Bullock [rbullock@lovett-silverman.com] |
| **Sent:** | Wednesday, August 17, 2005 2:33 PM |
| **To:** | 'Al Falango' |
| **Subject:** | Shrewsbury - Landworks |

The president of Landworks just called me and expressed an interest in being ratified.  I told him he will have to drop his law suit, but welcomed this idea and I forwarded the requirements for ratification and my contact information

## Julie Ciollo

**From:** Peters Jr,James Michael [JPETERS@stpaultravelers.com]
**Sent:** Thursday, August 18, 2005 10:49 AM
**To:** Al Falango; Fuller,Russell W
**Cc:** Robert Bullock; bcarver@hinshawlaw.com; Werner,William R
**Subject:** RE: Shrewsbury - Landworks

We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G. The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

By copy of this email to Brad Carver, I am giving him notice of this issue.


James M. Peters, Jr.
St Paul Travelers Bond Claim
One Tower Square  - 4 PB
Hartford, CT 06183

Tel:  (860) 954-6497
Fax: (860) 277-5722
Email: james.m.petersjr@stpaultravelers.com

        -----Original Message-----
        **From:** Al Falango [mailto:afalango@lovett-silverman.com]
        **Sent:** Wednesday, August 17, 2005 3:00 PM
        **To:** Fuller,Russell W; Peters Jr,James Michael
        **Cc:** 'Robert Bullock'
        **Subject:** Shrewsbury - Landworks


        Russ

        The president of Landworks  called  LSCC and expressed an interest in being ratified.   Should we pursue this guy , I know you have issues with him.

**Julie Ciollo**

From:       Robert Bullock [rbullock@lovett-silverman.com]
Sent:       Friday, August 19, 2005 8:09 AM
To:         'Neal H. Matthews'
Subject:    RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,

We checked with the Surety and we were told that we can not deal with Landworks while the legal case is pending.

Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

From: Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
Sent: Thursday, August 18, 2005 3:35 PM
To: Robert Bullock
Subject: Re: Shrewsbury Middle School - Data required for Financial Analysis

Either day will be find to meet.  Let me know what day will be best for you and I'll be down at 9:00am.  I assume the best place would be at the school so we can go over what has to be done to finish the work.

Thank you,
Neal H. Matthews
    ----- Original Message -----
    From: Robert Bullock
    To: 'Neal H. Matthews'
    Sent: Thursday, August 18, 2005 9:10 AM
    Subject: RE: Shrewsbury Middle School - Data required for Financial Analysis

    Neal,
    I can meet with you Tuesday or Wednesday of next week.   Let me know if 9:00 AM either day will work for you.

    Robert J. Bullock, PE
    Lovett Silverman Construction Consultants Inc.

    Phone: 717-796-9595
    Fax:    717-766-1715
    Cell:   717-422-7518

    The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

3/22/2007

**Julie Ciollo**

**From:** Fuller,Russell W [RFULLER@stpaultravelers.com]
**Sent:** Friday, August 19, 2005 4:25 PM
**To:** Robert Bullock
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Bob:

Please let Mr. Matthews know that we are willing to continue to discuss this with him, but in light of the lawsuit, discussion should go through the attorneys. I think that is what we are trying to convey. Thanks.

-----Original Message-----
**From:** Robert Bullock [mailto:rbullock@lovett-silverman.com]
**Sent:** Friday, August 19, 2005 2:30 PM
**To:** Fuller,Russell W; Peters Jr,James Michael
**Cc:** 'Al Falango'; 'Tony Lardaro'
**Subject:** FW: Shrewsbury Middle School - Data required for Financial Analysis

Gentlemen,

Attached is the email thread summarizing my discussions with Mr. Matthews of Landworks. The event that initiated this was a call from Matthews to my cell phone after he had spoken to someone at the Town of Shrewsbury on Wednesday 08/17/05.

Robert Bullock, PE
Lovett Silverman Construction Consultants Inc.
19 Goldenrod Drive
Carlisle, PA  17013

Phone: 717-796-9595
Fax:     717-766-1715
Cell:    717-422-7518

This message may be an attorney-client communication, and as such is privileged and confidential. The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Friday, August 19, 2005 9:45 AM
**To:** Robert Bullock
**Cc:** Rob N. Meltzer
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Mr. Bullock,
        I'm sorry to hear that. I felt that I could have provided information and service to St. Paul that would have saved them expense in completing the project. There were many things in the actions of Town of Shrewsbury and Jackson Construction Company that should have been corrected before the project moved forward. It is unfortunate that the surety did not respond to my and my lawyers numerous inquiries concerning Jackson's refusal to pay for work that was requested and completed. Much of the work was billable to the Town of Shrewsbury. *They had requested the work to be done and as of my last contact with them, they had not been billed by Jackson or the surety for the work. I guess that when*

4/26/2007

**Julie Ciollo**

| | |
|---|---|
| **From:** | Robert Bullock [rbullock@lovett-silverman.com] |
| **Sent:** | Friday, August 19, 2005 4:36 PM |
| **To:** | 'Neal H. Matthews' |
| **Cc:** | 'Fuller,Russell W' |
| **Subject:** | RE: Shrewsbury Middle School - Data required for Financial Analysis |

Neal,

We are willing to continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys.

Thanks.
Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Friday, August 19, 2005 9:45 AM
**To:** Robert Bullock
**Cc:** Rob N. Meltzer
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Mr. Bullock,
   I'm sorry to hear that. I felt that I could have provided information and service to St. Paul that would have saved them expense in completing the project. There were many things in the actions of Town of Shrewsbury and Jackson Construction Company that should have been corrected before the project moved forward. It is unfortunate that the surety did not respond to my and my lawyers numerous inquiries concerning Jackson's refusal to pay for work that was requested and completed. Much of the work was billable to the Town of Shrewsbury. They had requested the work to be done and as of my last contact with them, they had not been billed by Jackson or the surety for the work. I guess that when people become entrenched in certain mind sets they can not see the benefit of just talking to resolve problems. The Town of Shrewsbury would have no incentive to have me come back as they will benefit from having work completed in which they think they will not have to pay for. As for St. Paul continuing to not address my legitimate concerns, it shows me they still are acting in bad faith. It's sad that individuals can not step back from the overall picture and have a meaningful discussion based on respect of each other's positions.


Respectfully,
Neal H. Matthews

> ----- Original Message -----
> **From:** Robert Bullock
> **To:** 'Neal H. Matthews'
> **Sent:** Friday, August 19, 2005 8:09 AM
> **Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

3/22/2007

# EXHIBIT B

Page 64

Meritz.   You reference a conversation with Bob Cox

or it says you recall Bob Cox.   Who is Bob Cox?

    A.   Bob Cox is a person that works for the Town

of Shrewsbury.

    Q.   This conversation says, "I recall Bob Cox

saying..."   Where did that conversation take place?

    A.   This took place when I walked around the

job site.

    Q.   When was that?

    A.   In July.

    Q.   Who else was walking with you when you --

    A.   Just Bob and I.

    Q.   What did he say?

    A.   He said that the north and east perimeter

of the baseball field may be at the wrong slope.

    Q.   Was it identified as to whether or not the

grading, whether it was at the wrong slope and did

require some additional grading?

    A.   When?

    Q.   At any time.

    A.   I don't know.

    Q.   You referenced there also

"Jackson/Landworks may have already performed the

survey."   Do you see that reference?

Page 101

within Landworks' subcontract with Jackson?

    A.  If this includes the rubber track, the

rubber track is not part of Landworks' contract.

    Q.  Do you know how much of that 185?

    A.  I don't know.

    Q.  There is a section for G&R.  Comes out to

only about 1,300, but concrete form for head walls?

    A.  Yes.

    Q.  Would you state that is Landworks' scope of

work?

    A.  Yes.

    Q.  Based upon what?

    A.  I don't recall.

    Q.  Then we have electrical work at the

football field, 12,450.  Would you tell me why that

would be within Landworks' scope?

    A.  It was removed under site demolition.

    Q.  Under site demolition, that belonged to

Landworks?

    A.  If it was damaged by them.

    Q.  Was it damaged by them?

    A.  During this site demolition.  My

investigation showed it was.

    Q.  What investigation was that?

Page 102

1      A.   Discussions.

2      Q.   With whom?

3      A.   Bob Cox when I walked around with him in

4  July.

5      Q.   What did he tell you?

6      A.   I don't recall exactly, but that's why I

7  listed it as Landworks.

8      Q.   You don't recall exactly what he told you?

9      A.   No.

10      Q.   Your understanding was based upon some July

11  conversation with Bob Cox, Landworks damaged

12  electrical?

13      A.   Yes.

14      Q.   Did Bob Cox point out something and say,

15  Landworks damaged this?

16      A.   Yes.

17      Q.   Specifically he mentioned Landworks?

18      A.   I don't recall.

19      Q.   Did he say site guy or Landworks?

20      A.   I don't recall.

21      Q.   What exactly were you looking at that he

22  claimed was broken?

23      A.   At that point we were looking around the

24  track area where the site demolition took place.

# EXHIBIT C

75

1    date of that, but it was first of March?

2        Q.    Of 2005?

3        A.    Of 2005.  First of March in 2005, end of

4    February, first of March.

5            MR. HIPP:  The 17th of March.

6        Q.    The 17th of March.  The record will reflect

7    when it was.  But approximately in March of 2005?

8        A.    Yes.

9        Q.    Had you ever filed suit before on a job

10   where you're working?

11       A.    No.

12       Q.    So what happened next?

13       A.    In August I would visit the site from time

14   to time, and there didn't seem to be much going on

15   from that time frame of March until into the summer

16   outside the building.

17           And then in August I got a telephone call

18   from the clerk of the works that -- and he said to

19   me, he's like, "So I hear you're going to be back to

20   work next week."  And I was like, "Well, that's news

21   to me.  It's good news, but what have you heard?"

22           And he told me that Lovett Silverman had

23   told the Town in the meeting that the site

24   contractor was going to be back on site the

1    USF&G?

2       A.    I'm saying Lovett Silverman prepared the

3    counterclaim to give to USF&G so that they could

4    file a counterclaim against me.  And there are items

5    in there that -- first of all, it appears that it

6    has been hastily put together, in that there's a

7    deadline to meet, and it's more important to meet

8    that deadline than it is to get it right, and there

9    are items in there that are clearly not my work.

10   And --

11      Q.    Like what, for example?

12      A.    It appears to me, in the counterclaim, that

13   the track is in there, and the track being all the

14   track.  And you have seen the change order or the

15   letter of intent from Jackson about the scope

16   dealing with the removal of the old asphalt and the

17   overlay of the track, but then also the rubberized

18   surface.

19          I mean, there's going to be -- I figure

20   there's going to be an argument where they're going

21   to say that I owed the pavement on the track, and I

22   am going to that I did not.  There was never any

23   doubt that there was always a contractor hired for

24   doing the work for putting down the surface on the

1    that time.   Part of them were billing records and

2    some other items.

3            And I told him that I could provide him

4    that, and I gave him my e-mail address, and asked

5    him -- or he asked me for my e-mail address, because

6    I asked him if he would fax me a copy of what his

7    requirements were so that I could make sure I got

8    everything to him quickly, and he asked me if I had

9    an e-mail address, and I told him that I did.   He

10   said, "Because I am on the road, it would be easier

11   for me to just e-mail it to you," and I told him

12   that would be fine.

13           Then the conversation turned to the track,

14   and he asked me at that time, he was like, "What is

15   your understanding of the track work?"   And I'm

16   like, "My understanding of the track work is that

17   Standen had contracted with Tracklite to do the

18   track work."   And he told me that that was his

19   understanding of it also.

20           And he thanked me for calling him, and it

21   was a pleasant conversation, and I can remember that

22   I was pretty upbeat about it, because after -- you

23   know, from basically November the year before until

24   August, there had been really nothing forthcoming

80

1    from anyone, and this was the first person that I

2    had actually been able to speak to about it.

3            And so, when I got back to the office, I

4    checked my e-mail.  He had sent his requirements.

5    And then I -- as I started pulling everything out,

6    he had asked me to fax it to him, and I was, like,

7    thinking to myself that it was an awful lot of

8    documents, and I get a little bit paranoid when I

9    start faxing so many documents through a fax

10   machine, because normally halfway through it jams or

11   whatever, and I'm not certain what has been sent or

12   not.

13           So I wrote him back an e-mail and asked

14   him, since there was a lot of documents, if I could

15   just meet him at the site and give him the

16   documents, and at that time go over with him any

17   questions that he may have that he might find

18   beneficial in helping him process this, and that I

19   can meet him any time on the site.

20           He wrote me back on e-mail and said that --

21   and I believe the next e-mail he wrote me back was

22   that he could meet me like two days in the next

23   week, which day would be better.  And I told him to

24   pick a date, it didn't matter to me which day it

1    was, nine o'clock would be fine, and I would meet

2    him there on the site.

3            And then I believe the next e-mail that I

4    got from him, he inquired if I had a lawsuit pending

5    against USF&G.  And I told him that I did, but the

6    only reason that I had filed the lawsuit was to

7    protect my rights under Massachusetts law, and that

8    I had always just preferred to settle this out and

9    get back to work and finish it.

10           And then he wrote back to me and told me

11   that he had been told by the surety that he could

12   not speak with me -- I don't know if it was speak

13   with me or deal with me, but basically he couldn't

14   deal with me while the lawsuit was pending.

15           And I wrote him back --

16   Q.    Did that surprise you?

17   A.    Yes.  It deflated me.

18   Q.    Did you think that you could file a lawsuit

19   for unfair and deceptive trade practices against

20   USF&G and then continue to do business directly with

21   it and a company like Lovett Silverman?  Was that

22   what your expectation was?

23           MR. MELTZER:  Objection.

24   A.    My expectation was that at some time, that

82

1    someone would have to sit down and speak with me

2    about my claims against USF&G.

3        Q.    In the lawsuit?

4        A.    No.    That at some time, because even if I

5    had filed a lawsuit -- and this is just my

6    understanding, and I may be wrong -- but my

7    understanding is that I had never been released from

8    my contractual duties for this job, and they were

9    still going to have to deal with me one way or

10   another.    They were going to have to fire me or they

11   were going to have to remove me somehow, or they

12   were going to have to sit down and say, "Okay, let's

13   look at what you've got and see if we can resolve

14   this without having to go through all this."

15           And --

16       Q.    But you did get an answer to -- you did get

17   a response through the mechanism that you started of

18   the lawsuit, right?    You got an answer to your

19   complaint?

20       A.    At the time that I --

21           MR. MELTZER:    Objection.

22           THE WITNESS:    I'm sorry.

23           MR. MELTZER:    You can answer.

24       Q.    You did get a response.    You said you

83

1    expected a response, and you filed the lawsuit and

2    you got a response, correct?

3        A.    At that time I don't believe I had a

4    response.

5        Q.    From USF&G?

6        A.    I don't think I had a response.  I think at

7    that time, sometime in April or maybe May, USF&G

8    removed the case to the Federal Court, and then it

9    just sat there, and I don't know how long it takes

10   to read these things, but it took them six months to

11   read this.

12       Q.    The judge or the court?

13       A.    Whoever, I don't know who reads it, and to

14   make the determination.  But I don't believe that

15   there was any response to it at first, other than to

16   try to remove it.  I'm not absolutely certain, but

17   from my knowledge, there wasn't anything.

18             Did you want me to continue on with the

19   e-mail --

20       Q.    Certainly.  So I think I asked you the

21   question -- I will ask you this question about your

22   first conversation with Mr. Bullock.  When Mr.

23   Bullock told you that he was surprised that you were

24   interested in continuing to do business with USF&G

84

1    at the site, do you have an understanding as to why

2    he was surprised?

3            MR. MELTZER:  Objection.

4        A.    I don't recall having any opinion of why he

5    might have been surprised.

6        Q.    It didn't occur to you that it might be

7    because you had filed this breach of contract and

8    deceptive trade practices claim against USF&G?

9            MR. MELTZER:  Objection.

10       A.    No, because of the continuation of the

11   conversation.  He said to me that he preferred to

12   ratify the people that were, you know, involved with

13   the project and that it would be beneficial to

14   ratify me to get this work going.

15       Q.    And then at a later point in these e-mail

16   exchanges, he asked you about whether there was a

17   lawsuit or not?

18       A.    Yes, he did.

19       Q.    And then what happened next?

20       A.    I wrote him back and I told him that I was

21   sorry to hear that this was the case, because it had

22   always been my intention -- the only thing I ever

23   wanted to do was to go back to the job and finish

24   this job, and that the only reason that I filed the

85

1  lawsuit was because I had had no response from

2  anyone involved on the other side, and that to

3  protect my rights under Massachusetts law was the

4  only reason that I filed this, and that it was a

5  shame that two sides couldn't sit down and have a

6  conversation, just like this.

7          I mean, you've got your job to do, I

8  understand that, but we can sit here, and we can be

9  civil about it, and we can speak and we can see if

10  we can find, you know, a common ground.

11     Q.   I understand.  I think you told me -- we'll

12  take a second and we can find those e-mails, and it

13  will help the conversation.  I think I have them

14  all.

15          MS. BROWN:  We can mark them all as Exhibit

16  75.

17                  (Document marked as Exhibit 75

18                  for identification)

19     Q.   Actually, Mr. Matthews, as you can see from

20  these e-mails, if we look at the top, I think it

21  looks like we see on Page 1, Mr. Bullock asks you to

22  send nine items, and you respond about the -- we'll

23  just go through these quickly, if you don't mind.

24  We don't need to take a lot of time with them.

86

1          You respond that you are not sure you

2    really want to send this through the fax machine,

3    just as we were just talking about.  And then as you

4    stated, Mr. Bullock says, "I can meet with you

5    either Tuesday or Wednesday of next week," and you

6    say, "Either day would be fine."

7          And then on the third stapled set of

8    e-mails that we have collectively marked here as

9    Exhibit 75, Bob says, "Neal, we checked with the

10   surety, and we were told we cannot deal with

11   Landworks while the legal case is pending."  And

12   then you wrote a response at the top of the page,

13   Friday, August 19th, "Dear Mr. Bullock, I'm sorry to

14   hear that."

15         I wanted to ask you a couple of questions

16   about this response, if you would be so kind.

17    A.   Sure.

18    Q.   "I felt that I could have provided

19   information and service to St. Paul that would have

20   saved them expense in completing the project.  There

21   were many things in the actions of the Town of

22   Shrewsbury and Jackson Construction Company that

23   should have been corrected before the project moved

24   forward."

1        Do you remember what you were referring to

2   when you said that?

3       A.   Yes.

4       Q.   And what was that?

5       A.   The relationship between Jackson and the

6   Town had deteriorated to the point -- I think if you

7   look at CTM's deficiency and job meeting notes, you

8   will see that there is a deterioration in the

9   relationship of the two working together.  It became

10  adversarial in the end.

11       The Town was becoming more adversarial to

12  everyone involved in the project, in that any

13  concerns brought up to them about -- I'll just use

14  an item -- inside the building, because I said in

15  many of these meetings that the hood ventilators for

16  ventilation of the building became just a long,

17  drawn-out intransigence on both sides, because

18  neither one would -- they'd just sit and say, "We

19  don't know exactly what you want," and the Town

20  would say, "We don't care if you don't know what we

21  want.  You're supposed to put it in.  You're

22  supposed to know."

23       Jackson was working out of sequence, a

24  logical sequence of work.  That was causing problems

88

1    in site work, and they were not providing

2    information that was needed to complete site work in

3    a timely fashion.  And Jackson was using extortion,

4    for lack of a better word, to --

5        Q.    Well, that's a very weighted word.  I mean,

6    is that really the word you want to use?

7        A.    Yes, it is, because I don't use it lightly.

8        Q.    What does it mean to you, "extortion"?

9        A.    Extortion would be to me that -- I'll give

10   you an instance.  There was a change that they

11   wanted to make; they wanted to bring a conduit out

12   of the side of the shop area and run it into the

13   area where the new ticket booth would be placed.  It

14   was not the area that it was originally to be placed

15   in.  We had already run the conduit from the

16   original areas.

17            They would not provide a change order for

18   doing it.  And so to get it installed, they said

19   plainly, "If you want to see any more payment,

20   you're going to put the conduit in."  I would

21   consider that extortion.

22       Q.    In your next sentence, and this is

23   consistent with what you've been saying, "It is

24   unfortunate that the surety did not respond to me,"

1    I think you meant to say, "and my lawyer's numerous

2    inquiries concerning Jackson's refusal to pay for

3    work that was requested and completed.  Much of the

4    work was billable to the Town of Shrewsbury."

5           What is that a reference to, that much of

6    the work was billable to the Town of Shrewsbury?

7       A.    There were several change orders that had

8    been given to Jackson the previous year, the ones

9    that I had spoke to earlier about sitting down in

10   the Thanksgiving meeting with them, of going over,

11   that were billable to the Town of Shrewsbury.  And

12   as of this date right here, I had seen no evidence

13   that those bills had actually been turned in to the

14   Town for payment.

15      Q.    Okay.  Now, in the next set of e-mails, we

16   have a response from Bob to you, "Neal, We are

17   willing to discuss this with you, but in light of

18   the lawsuit, discussion should go through the

19   attorneys."

20      A.    I'm sorry.  Which --

21      Q.    If you go to the next set.  You see this is

22   your e-mail we were just reading, and here is the

23   response.  I am asking you if you recall that

24   response.

1    A.    Yes.

2    Q.    Did you understand what he was saying, that

3  because of the lawsuit, discussions needed to go

4  through attorneys?

5    A.    In my mind it was so that he didn't get

6  himself into trouble, he needed to have, like, the

7  attorney for USF&G present to have any discussion.

8    Q.    Did you think --

9    A.    That was just my --

10   Q.    Your opinion?

11   A.    My opinion of it.

12   Q.    But you didn't think that was unreasonable

13  on its face?

14   A.    No.  And I think that, you know, my

15  response to him was fairly close after that, that I

16  had written to him to suggest that I -- that Mr.

17  Bullock and myself, and the attorneys for St. Paul

18  and my attorney, you know, meet at the end of the

19  month at a time that would be convenient for them,

20  at Shrewsbury Middle School, to see if we could work

21  this out, and resolve -- by resolve the matter, I

22  meant all of it, resolve it so that we could do away

23  with it.

24   Q.    And, by the way, do you see in Mr.

1    Bullock's e-mail to you that he has copied a Russ

2    Fuller?

3        A.    Yes.

4        Q.    Do you know who Russ Fuller is?

5        A.    No, I don't.

6        Q.    Does it refresh your recollection if I tell

7    you that he is an attorney for USF&G?

8        A.    Someone may have told me that before,

9    because I had an idea that he might have been an

10   attorney for USF&G.  I think that when I saw it up

11   there, I figured that must have been who it was.

12       Q.    Now, if we go to the next stapled set of

13   documents, you see Bob's response back to you.

14   "Neal, I will pass this suggestion along to Russ

15   Fuller at St. Paul Travelers."  Do you see that?

16       A.    Yes.  I do.

17       Q.    Now, at this point, you had not named

18   Lovett Silverman or had you named -- you had not

19   named Lovett Silverman as a Defendant in this case,

20   had you?

21       A.    No, I had not.

22       Q.    And did you have an understanding that

23   Lovett Silverman worked under contract with the

24   surety?

92

1    A.    I wasn't certain what the working

2 relationship was now with the surety.

3    Q.    And did you have an understanding as to who

4 called the shots, whether Bob Bullock called the

5 shots or the surety called the shots as to resolving

6 this dispute with you and how this dispute with you

7 would be resolved?

8            MR. MELTZER:  Objection as to form.

9    Q.    I mean, can you see reading this e-mail

10 that Mr. Bullock is saying that St. Paul is the

11 decision maker, and not Lovett Silverman, and he

12 must pass this on to St. Paul?

13            MR. MELTZER:  Objection.

14    A.    In my discussion with him and my subsequent

15 e-mails to him, in my opinion, Lovett Silverman was

16 charged with finding out, you know, what were the

17 disputes and ratifying the subcontractors if they,

18 you know, wanted to be ratified, and working this

19 out for St. Paul's.

20            But other than that, I'm not certain -- in

21 my opinion they were the ones that were the lead in

22 being able to sort through the mess of the Jackson

23 failure and ratifying people.  They were the only

24 people that I knew to talk to to get the process

93

1   going.

2       Q.    And when we were at the depositions of the

3   Lovett Silverman people, your attorney showed them

4   the e-mails from the surety, instructing them not to

5   deal with you.  Do you remember those e-mails?

6       A.    Yes.

7       Q.    So in hindsight --

8       A.    I'm sorry.  I'm sorry.  Would you repeat

9   that.

10      Q.    At the time of these e-mails, there were

11  other e-mails that went from the surety to Lovett

12  Silverman?

13      A.    Yes.

14      Q.    Saying -- instructing Mr. Bullock at Lovett

15  Silverman not to deal with you directly, and

16  instructing Lovett Silverman to tell you that

17  communications had to go through the lawyers because

18  of the lawsuit.  Do you remember seeing those

19  e-mails --

20            MR. MELTZER:  Objection.

21      Q.    -- at the Lovett Silverman depositions?

22      A.    I don't remember that that way.  What I

23  remember -- what really sticks out in my mind about

24  the set of e-mails that dealt with this was an

1  e-mail that was written by somebody to Bob Bullock

2  in which he asked about Landworks, and "Is there any

3  reason why we're not pursuing this guy?"

4          And someone writes back that Russ Fuller

5  has a problem with this guy.  And then he states

6  that -- he says something to the effect that "Then I

7  will tell him that we can't deal with him as long as

8  the lawsuit is pending."  And then someone else

9  writes back and says, "Don't do that if you have not

10  already done so."

11          So through all this my feeling was that,

12  you know, these were people that I had dealt with

13  before.  I had seen, you know, the first

14  ratification.

15      Q.    Yes.

16      A.    And that these were the people that I

17  needed to talk to, to go through.  And to be taken

18  from a point of where it looked like they were going

19  to -- let's get this resolved and everything, and

20  then all of a sudden saying they can't talk to me,

21  and I think even after the e-mails that I had

22  written about this where I suggested we meet with

23  him, I think I wrote him one more e-mail that said,

24  "Did you pass the information along, and will they

95

1  meet?", and then finding out later on that this was

2  not really the case.

3          It wasn't the case that they couldn't deal

4  with me.  It was a case that one person, who I have

5  never met in my life, as far as I know, has a

6  problem with me, and --

7      Q.    That would be Russ Fuller, the lawyer?

8      A.    Russ Fuller or whoever it was -- I'm not

9  certain if -- I know that in one e-mail it says

10 that, I think it was, "Russ Fuller has a problem

11 with this guy."  It was in response to an e-mail

12 from Mr. Bullock saying, "Why aren't we pursuing

13 this guy?"  And he says, well, I think it was, "Russ

14 Fuller has a problem with this guy."

15         And then to find that out later on, just --

16 you know, it just added more to the fact that the

17 only thing we had to do was to talk about this, and

18 we could have resolved it, and nobody would talk to

19 me.

20         And to have everything, you know, my life,

21 sitting there put on hold for three years because

22 one person will not talk to me -- lawsuits can be

23 resolved every day.  They can be resolved without

24 having to go through depositions and courtrooms and

1    anything else if just they would talk.  And the only

2    thing he had to tell me then was give me an honest

3    answer, and I don't think that he gave me an honest

4    answer.

5            THE WITNESS:  If you don't mind, can I have

6    just like a minute or two.

7            MS. BROWN:  Yes, we'll take a short break.

8            (Recess)

9        BY MS. BROWN:

10       Q.   Did you think that Landworks and the surety

11   were legally obligated to ratify your contract, your

12   Jackson contract?

13           MR. MELTZER:  Objection.  Answer if you

14   understand the question.

15       A.   Actually, I considered I already had a

16   contract with the surety.  That's what I considered

17   the ratification agreement to be, was a contract

18   with the surety to proceed and finish the work on

19   the Shrewsbury Middle School.

20       Q.   Which contract are you referring to?

21       A.   I'm talking about the ratification

22   agreement.

23       Q.   After the Standen failure?

24       A.   After the Standen failure, Lovett Silverman

97

1    had ratified me.  And my understanding of that,

2    which I don't know the legal stuff, but my

3    understanding of that was that was basically going

4    to be my contract to finish the job, the

5    ratification agreement.

6        Q.    So you didn't believe that you needed a new

7    contract after Jackson failed?

8        A.    No, not really.  I believe that I had one

9    that had been -- that had been negotiated before.

10   But I had never been through this before, so I

11   didn't -- I was sort of -- I didn't know, but I felt

12   that I had a contract already with USF&G, or St.

13   Paul's, whoever, that was the ratification

14   agreement, that that was my contract with them.

15   So...

16       Q.    Now, just before we took our break, we were

17   finishing up this series of e-mails, and I believe

18   you made reference -- Mr. Bullock said to you,

19   "Neal, I will pass the suggestion along to Russ

20   Fuller at St. Paul Travelers."  And then you

21   responded back a few days later, "Dear Mr. Bullock,

22   Did you pass on my request...  and if so, what was

23   the response?"

24           And Mr. Bullock says, "See my response to

98

1   you of Friday, August 19th."  This is the final
2   page.  "This matter has been passed to the surety's
3   attorney.  The communication will come through the
4   attorneys.  Thank you."  And I think you testified
5   about your disappointment about receiving this
6   response.
7       A.   Yes.
8       Q.   Now, do you believe that Mr. Bullock lied
9   to you about anything here?
10      A.   I believe that he lied to me -- that to me
11  is a strong word also, so let me restate that.  I
12  don't believe that Mr. Bullock was truthful,
13  completely truthful to me, when he stated the
14  reasons why he could not deal with me.
15      Q.   What do you think --
16      A.   I don't believe -- I have no reason to
17  suspect that his last response on Tuesday, August
18  23rd, was not being truthful, that he had already
19  passed this on to the attorneys.  But prior to that,
20  I think that the initial statement, that he said
21  that he couldn't deal with me because of the pending
22  lawsuit, was untruthful.
23      Q.   And what was the truth, in your view?
24      A.   That he couldn't deal with me because Russ

99

1  Fuller had a problem with me.

2      Q.    Any other untruths that you believe you

3  were told by Mr. Bullock?

4      A.    At this time I can't think of any more, no.

5      Q.    Did you have any communications with anyone

6  else at Lovett Silverman?  And now I'm referring not

7  to at the time of the ratification of the contract

8  you had with Standen, but I'm referring to the post-

9  Jackson-failure time frame.

10     A.    Mr. Bullock was, as far as I know, Mr.

11  Bullock was the only one that I had contact with.

12  He was the only one at that time who spoke to me or

13  communicated to me in e-mail also.

14     Q.    Do you believe Lovett Silverman did

15  anything wrong in how Lovett Silverman handled the

16  Jackson failure and dealt with you on the Jackson

17  failure?  Should they have done something different?

18          MR. MELTZER:  Objection.

19     A.    Yes.

20     Q.    What did Lovett Silverman do that was wrong

21  in your mind?

22     A.    I think that they could have taken my

23  information and that they could have looked at it

24  for the validity of it and could have communicated

100

1    to the surety that there was a legitimate claim here

2    and that maybe we should speak with them.  And this

3    is only, now I'm talking about, the portion of the

4    second ratification process.  This doesn't go any

5    further than that point right there.  There are

6    other issues later.

7        Q.    And what else should they have done --

8    we're talking about this time frame in August of

9    2005, the time of these e-mails that you believe

10   that Lovett Silverman was wrong in their conduct and

11   that they should have done what you just described.

12   Is there anything else that you think Lovett

13   Silverman did wrong and should have done

14   differently?

15       A.    I can't think of anything at this point in

16   time.

17       Q.    Did there come another point in time when

18   you believe Lovett Silverman did something wrong?

19       A.    Yes.

20       Q.    And what was that?

21       A.    That would have been in early 2006.  I'm

22   not certain what the dates are.  But there are

23   e-mails in which attorneys for the surety asked

24   Lovett Silverman to help prepare a counterclaim