UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LANDWORKS CREATIONS, LLC, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 05-40072-FDS |
| ) | |
| UNITED STATES FIDELITY AND ) | |
| GUARANTY COMPANY and ) | |
| LOVETT-SILVERMAN CONSTRUCTION ) | |
| CONSULTANTS, INC., ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action by a subcontractor against a surety on a performance bond, arising out of a default by a contractor on a public-works project. Jurisdiction is based on diversity of citizenship. Plaintiff Landworks Creations, LLC, has brought suit against both the surety, defendant United States Fidelity and Guaranty Company, and a consultant that advised the surety, defendant Lovett-Silverman Construction Consultants, Inc ("L-S"). As to L-S, plaintiff alleges claims of fraud (Count II), tortious interference with contract (Count III and IV), and unfair or deceptive acts in violation of Mass. Gen. Laws ch. 93A (Count VI).

L-S has moved for summary judgment as to all claims against it pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the motion will be granted.

I.   **Statement of the Facts**

The following facts are undisputed unless otherwise noted.

   A.   **The Shrewsbury Middle School Project**

This matter arises from the construction of the Shrewsbury Middle School in Shrewsbury, Massachusetts. At some point before January 2003, the Shrewsbury Public Schools hired Standen Contracting Company, Inc., as the general contractor for the project. Defendant United States Fidelity and Guaranty Company ("USF&G") issued a performance bond that required it to assume responsibility for completion of the project in the event of a default by Standen.

In August 2003, Landworks entered into a subcontract with Standen. The subcontract provided that Landworks was to perform the following work: (1) site demolition, (2) site preparation, (3) earthwork, (4) geotextile fabrics, (5) erosion control, (6) bituminous concrete paving and markings, (7) concrete pavement (preparation only), (8) granite curbing, (9) tracer tape, (10) storm drainage systems and sewer systems, (11) underdrain system and slit damage system athletic fields, (12) water systems, and (13) lawns and grasses. (Ex. E).

   B.   **The Defaults of Standen and Jackson and the Landworks Lawsuit**

In February 2004, Standen defaulted on the project. Shortly afterward, Jackson Construction Company was engaged to take over and complete the project. In March 2004, USF&G entered into a ratification agreement with Landworks, under which Landworks agreed to perform the balance of the work remaining in accordance with the terms and conditions of its subcontract with Standen.[1]

---

[1] No copy of any such agreement was provided to the Court, but it appears that the parties do not dispute that such an agreement exists.

2

In the construction industry, it is common procedure, once a general contractor is in default, for subcontractors not to return to work until they are "ratified." Although neither party explicitly defined ratification in their pleadings, a USF&G witness testified that ratification involves "establish[ing] the terms and conditions under which [subcontractors] would be prepared to resume their subcontract responsibilities and complete their obligations." (Peters Dep. at 85).

In June 2004, Landworks executed a new subcontract with Jackson.[2] Under the new agreement, Landworks' obligations were identical to those contained in its subcontract with Standen. (Ex. H).

Landworks soon began experiencing difficulty receiving payments from Jackson. In June 2004, Landworks' president, Neal Matthews, unsuccessfully requested "a reconciliation of the application for payments that [Landworks] had turned in." (Matthews Dep. at 63). When Landworks finally received past due payments in August 2004, it was about half of what the company had expected to receive. (*Id.*). It did not receive any payments at all for its work in September and October 2004. (*Id.*).

Because of these problems, Landworks suspended performance on the project in the fall of 2004.[3] In March 2005, Jackson went into default. On March 29, 2005, Landworks filed the present action against USF&G in Worcester Superior Court, alleging breach of contract and violation of Mass. Gen. Laws ch. 93A and 176D and seeking damages for money owing for work

---

[2] Landworks contends that this contract was "void," as "Jackson [was] without authority to sign contracts." (Pl. Statement of Material Facts at 13). That dispute is not material to resolution of the motion for summary judgment.

[3] Landworks contends that it remained on the job until January 2005, and that it suspended work at that point due to winter weather. There is no dispute, however, that Landworks never returned to the site. USF&G eventually engaged a new subcontractor, G&R Construction, Inc., to complete the subcontract work.

...

...

performed.[4]

### C. Communication between Landworks and L-S

USF&G (through a sister company, St. Paul Fire and Marine Insurance Company) engaged L-S to be its consultant on the Shrewsbury project (the "Consulting Agreement"). Under the Consulting Agreement, L-S was to provide construction-related experience and support in response to specific requests from the client concerning its performance bond obligations. A "Work Assignment" addendum to the Consulting Agreement, executed in May 2004, stated that L-S was to:

> Complete a preliminary investigation of the . . . Shrewsbury Middle School . . . assess the progress to date and the ability of the principal to complete the work; . . . ratify subcontractors and suppliers; [and] assist in the assignment of the Completion contractor.

(Ex. C). Robert Bullock, a project manner for L-S, was given the task of reviewing the condition of the project to see how much site work remained.

Landworks had not resumed performance of work on the project by August 2005. On August 17, Matthews called Bullock and told him, "[Landworks] wanted to get back to work, and finish this job and be done with it." (Matthews Dep. at 76-78). Shortly thereafter, Bullock e-mailed Al Falango (a part-time consultant to L-S) and characterized the Matthews telephone conversation as follows:

> The president of Landworks just called me and expressed an interest in being ratified. I told him he will have to drop his law suit, but welcomed this idea and I forwarded the requirements for ratification and my contact information.

(Ex. A).

---

[4] On May 12, 2005, USF&G removed the proceeding to this Court.

Bullock then responded to Matthews via e-mail. The e-mail stated that L-S needed certain information from Landworks to "get started on ratification." ( Ex. K). The information requested included the (1) original contract amount, (2) change orders to the original contract, (3) credit change order to the original contract, (4) value of work performed to date or approved material stored at site, (5) total payments received from Standen and Jackson, (6) retainage held to date, (7) outstanding balance, (8) last invoice paid, and (9) last invoice submitted but not paid. (*Id*.).

Fifteen minutes after Bullock sent that e-mail, Falango sent the following e-mail to Bullock: "Should we pursue this guy [Matthews]? I know you have issues with him." (Ex. L). He sent a copy of that e-mail to James Peters of USF&G.[5] Peters responded by e-mail the next morning (August 18), stating:

> We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G. The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

(Ex. M).[6]

On August 19, Bullock e-mailed the following message to Landworks: "We checked with [USF&G] and we were told that we cannot deal with Landworks while the legal case is pending." (Ex. N). Later that day, Bullock sent another e-mail to Landworks, stating "We are willing to

---

[5] Falango also sent the e-mail to Russ Fuller, an employee of St. Paul.

[6] According to Peters, he was concerned "that if there were to be negotiations concerning whatever role Landworks might be seeking in connection with this matter that those communications be coordinated with counsel." (Peters Dep. at 106).

5

continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys." (Ex. O).

On August 30, counsel for Landworks sent a letter to USF&G counsel. That letter stated: "Please find enclosed the e-mails we discussed. My client and I are prepared to meet at any time to do what is necessary to get back to work." (Ex. P).

On September 21, Falango sent the following e-mail to Bullock and Tony Lardaro (the vice-president of L-S) concerning the project's subcontractors:

> I don't think the 825k is enough for the contingency we already know we have busts in the track work, site work, electric (major), roofs and doors (major) even though the town is holding money I still think we could possibly break the 800k mark with these, we've already spent 400k on G and R for one month and we still don't have checks for the subs. *We can try to bang the subs* but I think that we can never recover from them what we are spending.

(Ex. Q) (emphasis added). No one at USF&G or St. Paul was copied on the e-mail.[7]

L-S contends that in the construction industry, "banging the subs" is a slang term describing a legitimate back-charging of subcontractors for costs when others perform work on their behalf. (Lardaro Dep. at 61-62; *see also* Peters Dep. at 168 (describing banging as "where [USF&G] had incurred costs to complete or fix . . . defective work, which would be chargeable back to the account of the involved subcontractor")). Landworks, however, contends that "banging the subs" means "withholding payment from them, or denying them their rights under their contracts, in the hopes of either forcing the subcontractors to comprise their claims, to be forced to file suit on the payment bond to defer payment for years, to likely compromise as part of a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial

---

[7] USF&G did, however, produce a copy in the course of informal discovery in this lawsuit.

distress." (Gallagher Aff., ¶¶ 27-28).

In August 2006, Landworks amended its complaint to include L-S as a defendant.[8] Landworks has asserted claims against L-S for fraud (Count II), tortious interference with contract (Counts III and IV), and a violation of Mass. Gen. Laws ch. 93A (Count VI). L-S has moved for summary judgment as to all claims against it.

**II.   Analysis**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

**A.   Fraud (Count II)**

Count II alleges a claim of fraud against L-S. To establish fraud or fraudulent misrepresentation, a plaintiff "must show that the defendant (1) made a false representation of a material fact (2) with knowledge of its falsity (3) for the purpose of inducing the plaintiff to act thereon, and (4) that the plaintiff reasonably relied upon the representation as true and acted upon it (5) to [its] damage." *Eureka Broadband Corp. v. Wentworth Leasing Corp*, 400 F.3d 62, 68 (1st Cir. 2005).

---

[8] USF&G has asserted a counterclaim against Landworks alleging, in substance, that its work was defective and required extensive remedial work.

The complaint alleges the following "specific conduct" by L-S that, according to Landworks, "serve as fraud on the plaintiff":

(a) [USF&G and L-S] failed to effectuate payment of monies due and owing;

(b) knowing that funds were due and owing, [USF&G and L-S] engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract;

(c) knowing that funds were due and owing, [USF&G and L-S] devised and carried out a conspiracy to 'bang' Landworks;

(d) knowing that the Plaintiff was not culpable for defects at the site, USF&G alone and with the support of L-S defamed the Plaintiff, making knowingly false statements in court papers to defend its failure to pay, and otherwise, by its conduct, implying defects in performance that harmed the Plaintiff in its business . . . .

(Am. Complt., ¶ 20).

The listed conduct may be unfair, unpleasant, or even tortious, but it is not actionable fraud. Fraud is not an amorphous, catch-all cause of action that encompasses any kind of unfair or illegal business practice. It is a specific claim with specific elements, and cannot be premised on allegedly bad acts that have nothing to do with any actual representations made by the defendant or any corresponding reliance by the plaintiff.

First, as to L-S's alleged "failure to effectuate payment," it is undisputed that payments made to subcontractors would be made out of ". . . funds that USF&G received from the Town of Shrewsbury and then . . . remitted to Jackson." Other than the vague and conclusory "understandings" of plaintiff's own president, no evidence has been presented that L-S had any

contractual or legal obligation to make or "effectuate" payments to plaintiff.[9]  Moreover, even if L-S had a contractual or other legal duty to effectuate project payments to plaintiff, the mere failure of one party to perform such a duty, without any misrepresentation, is not an act of fraud.

Second, L-S's alleged "conduct to deprive plaintiff of funds," including "exclusion of the plaintiff from the project without cause," "failing to communicate with plaintiff," and "failing to engage in good faith and fair dealing" does not constitute fraud.  Again, proof of fraud requires, at a minimum, a false representation by the defendant and reasonable reliance by the plaintiff.  Poor communication or a failure to act in good faith simply do not constitute fraud.  Moreover, it bears repeating that L-S had no contract with Landworks and no obligation to pay Landworks anything.

Third, the alleged "conspiracy to 'bang' Landworks" is not actionable as fraud.  This theory is based entirely upon the September 21, 2005 Falango e-mail.  Even assuming plaintiff's characterization of the slang term "bang"—that is, as a failure to pay subcontractors what they are legitimately owed in a malicious attempt to force those subcontractors to compromise their claim or file suit—plaintiff has adduced no evidence of either misrepresentation or reasonable reliance.  Even malicious actions intended to harm another person are not "false *representations[s]* of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon." *Eureka*, 400 F.3d at 68 (emphasis added).

Fourth, L-S's alleged "defamation" of plaintiff is not actionable as fraud.  Plaintiff has presented no evidence for its contention that L-S helped USF&G prepare a "false counterclaim" or made knowingly false statements in this or any other court.  Such claims are mere "conclusory

---

[9] There is no evidence of any contractual relationship between L-S and Landworks.

allegations, unsupported speculation and improbable inferences" that cannot defeat summary judgment. *Galloza*, 389 F.3d at 28. And even if plaintiff had actually identified the alleged defamatory statements, defamation is not fraud.

Indeed, plaintiff makes only one argument in its memorandum opposing summary judgment that even remotely concerns a possible misrepresentation by L-S.[10] On August 17, 2005, representatives of L-S and plaintiff discussed the possibility of ratification over the telephone. L-S then sent plaintiff an e-mail, with a list of the information it needed to "get started on ratification." Plaintiff contends that it relied on this e-mail and thereafter assumed that L-S was moving forward to ratify it. Plaintiff further contends that in reliance on that e-mail, it did not seek or accept any other work that would have prevented it from returning to the project.

Again, to prove a claim of fraud, at a minimum there must be *reasonable* reliance by the plaintiff on a false representation of material fact. *Eureka*, 400 F.3d at 68. On August 18, 2005, L-S was told by USF&G that if plaintiff wanted to resume work, plaintiff should contact USF&G's counsel. (Ex. M). On August 19, L-S e-mailed plaintiff stating "We checked with [USF&G] and we were told that we cannot deal with Landworks while the legal case is pending." (Ex. N). Later that day, L-S sent a second e-mail to plaintiff: "We are willing to continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys." (Ex. O).

Plaintiff has not alleged that it changed its position, or suffered a reliance injury, during the

---

[10] Curiously, that allegation is not charged as fraud in the complaint. At a minimum, Fed. R. Civ. P. 9(b) requires that plaintiff "allege the time, place, and contents of the alleged misrepresentation, as well as the identity of the person making them." *Petricca v. Simpson*, 862 F. Supp. 13, 15-16 (D. Mass. 1994); *see also Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) (Fed. R. Civ. P. 9(b) requires specificity with respect to time, place and content of an alleged false representation, but not circumstances or evidence from which fraudulent intent could be inferred). The amended complaint does not come close to meeting that standard.

two-day period from August 17 to 19. Furthermore, after August 19, it would have been clearly unreasonable for plaintiff to rely on the August 17 e-mail and assume that the ratification process was underway. Plaintiff was at that time (and still is) involved in heated litigation with USF&G. The parties' communication on August 19 clearly indicated that the only way plaintiff could return to the job would be through negotiations with USF&G relating to the lawsuit.[11] Accordingly, any purported reliance by plaintiff on the August 17 e-mail after August 19 was unreasonable and the fraud claim cannot survive summary judgment.[12]

### B. Counts III and IV (Tortious Interference)[13]

To prove tortious interference with contract, the plaintiff must prove that (1) the plaintiff had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, (3) the defendant's interference, in addition to being intentional, was improper in motive or means, and (4) the plaintiff was harmed by the defendant's actions. *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 129 (1st Cir. 2006) (*citing G.S. Enterprises, Inc. v. Falmouth Marine*, 410 Mass. 262, 271 (1991)). Here, plaintiff contends that L-S tortiously interfered with its contractual rights by "carrying out its program of banging the

---

[11] Before L-S had received USF&G's August 18 e-mail, plaintiff and L-S had exchanged e-mails discussing a possible meeting between Bullock and Matthews at the middle school site. This meeting was for the purpose, according to Bullock, of "go[ing] over what had to be done to finish the work." (Ex. N). Matthews proposed meeting on Tuesday or Wednesday of the following week. *Id*. There is no evidence that any such meeting took place. The failure of the parties to meet should have been a further clear indication that L-S was not moving forward to ratify plaintiff.

[12] There is also evidence that plaintiff realized that it needed to deal directly with USF&G, not L-S, to resume work on the project. On August 30, 2005, less than two weeks after the August 17-19 e-mail exchange, counsel for Landworks sent a letter to USF&G counsel stating, "Please find enclosed the e-mails we discussed. My client and I are prepared to meet at any time to do what is necessary to get back to work." (Ex. P).

[13] The amended complaint alleges two identical claims of tortious interference with contract against L-S. Both counts are identically worded and plaintiff has not attempted to distinguish between them.

subcontractors."[14]

That claim—which rests principally, if not entirely, on the September 21, 2005 Falango e-mail—may be disposed of summarily. Plaintiff filed a complaint against USF&G on March 29, 2005, in which it alleged that USF&G breached the parties' contract by failing to pay money due and owing for past work. Plaintiff thus claimed that USF&G breached the contract nearly six months *before* the Falango e-mail was ever written. There is no evidence that L-S did anything to interfere with any contractual relationship prior to the time of the alleged breach.[15]

Furthermore, the September 21 e-mail was sent only to employees of L-S. Plaintiff has submitted no evidence showing that any USF&G employee ever saw the e-mail or acted on it.[16]

L-S cannot be considered to have "knowingly induced [USF&G] to break [its] contract" based solely on one internal e-mail that was created many months *after* the alleged breach of contract. *Platten*, 437 F.3d at 129. Plaintiff has produced no evidence of L-S's supposed

---

[14] Plaintiff refers to the contract in question as the "contract between plaintiff and USF&G." (Am. Complt., ¶ 23). Presumably, plaintiff is referring to its March 2004 ratification agreement with USF&G, which is not in evidence. Arguably, the relevant contract is the performance bond contract, of which Landworks may have been a third-party beneficiary, or plaintiff's original subcontract with Standen, or its new subcontract with Jackson. For present purposes, it is not necessary to resolve the issue, as it is undisputed that USF&G is responsible for any payment obligations to plaintiff for work performed on the project.

[15] The September 21 e-mail does not by its terms suggest a past (or ongoing) course of conduct, but a possible future action ("We can try to bang the subs"). Indeed, plaintiff's president essentially acknowledged that the allegedly wrongful conduct occurred *after* the alleged breach. When he was asked to establish the basis for the tortious interference counts, he responded as follows:

> [L-S] . . . did not investigate [plaintiff's] claim, by not at least looking into the possibilities that . . . monies were owed, and . . . by not . . . giving [plaintiff] a full and fair hearing on the amounts that I say were owed to [plaintiff] . . . and not presenting them to the surety.

(Matthews Dep. at 108-109).

[16] As noted, however, the e-mail was produced to plaintiff by USF&G in response to an informal discovery request.

interfering activities before April 2005. To the extent plaintiff has made other allegations, they consist of mere unsupported speculation and improbable inferences. Accordingly, summary judgment will be granted as to the claim of tortious interference with contract.

### C.    Count VI (Mass. Gen. Laws ch. 93A)

Mass. Gen. Laws ch. 93A § 2(a) prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In order to prevail on a claim under ch. 93A, the plaintiff must show that defendant's actions "(1) fall within the penumbra of some common-law statutory, or other established concept of unfairness, (2) [are] immoral, unethical, oppressive, or unscrupulous, and (3) caused substantial injury." *Albright v. Morton*, 321 F. Supp. 2d 130, 141 (D. Mass. 2004) (*quoting Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 15 (1st Cir. 1999)).

Here, plaintiff alleges that L-S "set out to harm [plaintiff] by denying it access to the Project and to funds due and owing." Plaintiff further contends that "the pattern and practice of fraud, [tortious] interference and such conduct constitutes violations of c. 93A by [L-S]."

This claim likewise cannot survive summary judgment.[17] In its opposition memorandum, plaintiff supports its ch. 93A claim only by incorporating all its other arguments by reference and summarily concluding "there is no doubt that engaging in a deliberate effort to deny 20 subcontractors its economic rights would rise to a level of unfair and deceptive trade practices as a matter of law." As noted, the evidence is not sufficient to establish either a claim of fraud or tortious interference with contract. Furthermore, the amended complaint and other filings are rife

---

[17] Defendant asserts that plaintiff's failure to send a demand letter is a bar to the ch. 93A claim. Such a letter is only a "jurisdictional prerequisite to suit" under ch. 93A, § 9, not § 11, which governs here. *See, e.g., Multi Technology, Inc. v. Mitchell Management Systems, Inc.*, 25 Mass. App. Ct. 333, 335 (1988).

with unspecific, unsubstantiated, and conclusory references to defendant's alleged conspiratorial actions, negligence, defamation, and false statements made to this Court.

It is undisputed is that on August 18, 2005, L-S was directed by USF&G to not deal with plaintiff except through counsel, because of ongoing litigation initiated by plaintiff. L-S informed plaintiff, the very next day, of that fact. Plaintiff then *did*, in fact, initiate a dialogue with USF&G counsel, beginning on August 30, 2005. Plaintiff does not dispute that the contractual payments it contends that it is entitled to would come from USF&G, not L-S. At most, L-S disengaged from a heated dispute that was already in litigation, informed plaintiff that it was doing so, and told plaintiff to deal with USF&G, which was in contractual privity with plaintiff and which was ultimately responsible for any payments under the contract.

In short, there is insufficient evidence, even when viewed in the light most favorable to plaintiff, to support a claim under Mass. Gen. Laws ch. 93A. Summary judgment will therefore be granted as to that claim.

### III.  Conclusion

For the foregoing reasons, the motion of defendant Lovett-Silverman Construction Consultants, Inc., for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor  
F. Dennis Saylor IV  
United States District Judge

Dated: February 6, 2008