# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————
                                              )
**LANDWORKS CREATIONS, LLC**                  )
                                              )
    **Plaintiff,**                     )
                                              )
**v.**                                        )    **C.A. No. 4:05-CV-40072-FDS**
                                              )
**UNITED STATES FIDELITY &**                  )
**GUARANTY COMPANY, et al.**                  )
                                              )
    **Defendant,**                     )
———————————————————)

### AFFIDAVIT OF ERIC C. HIPP IN SUPPORT OF
### UNITED STATES FIDELITY AND GUARANTY COMPANY'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

1.    I am an attorney admitted to the bar of the Commonwealth of Massachusetts and bar of the United States District Court of Massachusetts. I represent the United States Fidelity & Guaranty Company in this case. I have personal knowledge of the facts set forth herein.

2.    A copy of the February 6, 2008 Memorandum and Order on Lovett Silverman Construction Consultants, Inc.'s ("L-S") Motion for Summary Judgment is attached hereto as Exhibit 1.

3.    A copy of L-S' Motion for Summary Judgment and Entry of Separate and Final Judgment is attached hereto as Exhibit 2.

4.    A copy of L-S' Memorandum of Law in Support of its Motion for Summary Judgment is attached hereto as Exhibit 3.

5.    A copy of L-S' Statement of Facts in Support of its Motion for Summary Judgment is attached hereto as Exhibit 4.

6.      A copy of the Affidavit of Julie A. Ciollo, including Exhibits A – R, is attached

hereto as Exhibit 5.

7.      A copy of L-S' Reply to the Plaintiff's Opposition to its Motion for Summary

Judgment is attached hereto as Exhibit 6.

8.      A copy of L-S' Supplemental Statement of Facts in Support of its Reply to

Plaintiff's Opposition to its Motion for Summary Judgment, including Exhibits A – C, is

attached hereto as Exhibit 7.

9.      A copy of L-S' Second Supplemental Statement of Facts in Support of its Motion

for Summary Judgment, including Exhibit A, is attached hereto as Exhibit 8.

10.     A copy of Plaintiff's Amended Complaint is attached hereto as Exhibit 9.


I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT.  EXECUTED THIS 5TH DAY OF MARCH, 2008.


/s/ Eric C. Hipp
Eric C. Hipp


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants (none) on March 5,
2008.

/s/ Eric C. Hipp
Eric C. Hipp

G:\DOCS\ECH\Clients\St. Paul Travelers\Jackson Construction\Landworks\Pleadings\Motion for Partial Summary Judgment\Affidavit of ECH re USF&G's Motion for Partial Summary Judgment.doc

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| LANDWORKS CREATIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 05-40072-FDS |
| ) | |
| UNITED STATES FIDELITY AND ) | |
| GUARANTY COMPANY and ) | |
| LOVETT-SILVERMAN CONSTRUCTION ) | |
| CONSULTANTS, INC., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action by a subcontractor against a surety on a performance bond, arising out of

a default by a contractor on a public-works project.  Jurisdiction is based on diversity of

citizenship.  Plaintiff Landworks Creations, LLC, has brought suit against both the surety,

defendant United States Fidelity and Guaranty Company, and a consultant that advised the surety,

defendant Lovett-Silverman Construction Consultants, Inc ("L-S").  As to L-S, plaintiff alleges

claims of fraud (Count II), tortious interference with contract (Count III and IV), and unfair or

deceptive acts in violation of Mass. Gen. Laws ch. 93A (Count VI).

L-S has moved for summary judgment as to all claims against it pursuant to Fed. R. Civ.

P. 56.  For the reasons set forth below, the motion will be granted.

I.      **Statement of the Facts**

The following facts are undisputed unless otherwise noted.

A.      **The Shrewsbury Middle School Project**

This matter arises from the construction of the Shrewsbury Middle School in Shrewsbury, Massachusetts.  At some point before January 2003, the Shrewsbury Public Schools hired Standen Contracting Company, Inc., as the general contractor for the project.  Defendant United States Fidelity and Guaranty Company ("USF&G") issued a performance bond that required it to assume responsibility for completion of the project in the event of a default by Standen.

In August 2003, Landworks entered into a subcontract with Standen.  The subcontract provided that Landworks was to perform the following work:  (1) site demolition, (2) site preparation, (3) earthwork, (4) geotextile fabrics, (5) erosion control, (6) bituminous concrete paving and markings, (7) concrete pavement (preparation only), (8) granite curbing, (9) tracer tape, (10) storm drainage systems and sewer systems, (11) underdrain system and slit damage system athletic fields, (12) water systems, and (13) lawns and grasses.  (Ex. E).

B.      **The Defaults of Standen and Jackson and the Landworks Lawsuit**

In February 2004, Standen defaulted on the project.  Shortly afterward, Jackson Construction Company was engaged to take over and complete the project.  In March 2004, USF&G entered into a ratification agreement with Landworks, under which Landworks agreed to perform the balance of the work remaining in accordance with the terms and conditions of its subcontract with Standen.[1]

---

[1] No copy of any such agreement was provided to the Court, but it appears that the parties do not dispute that such an agreement exists.

In the construction industry, it is common procedure, once a general contractor is in default, for subcontractors not to return to work until they are "ratified." Although neither party explicitly defined ratification in their pleadings, a USF&G witness testified that ratification involves "establish[ing] the terms and conditions under which [subcontractors] would be prepared to resume their subcontract responsibilities and complete their obligations." (Peters Dep. at 85).

In June 2004, Landworks executed a new subcontract with Jackson.[2] Under the new agreement, Landworks' obligations were identical to those contained in its subcontract with Standen. (Ex. H).

Landworks soon began experiencing difficulty receiving payments from Jackson. In June 2004, Landworks' president, Neal Matthews, unsuccessfully requested "a reconciliation of the application for payments that [Landworks] had turned in." (Matthews Dep. at 63). When Landworks finally received past due payments in August 2004, it was about half of what the company had expected to receive. (*Id*.). It did not receive any payments at all for its work in September and October 2004. (*Id*.).

Because of these problems, Landworks suspended performance on the project in the fall of 2004.[3] In March 2005, Jackson went into default. On March 29, 2005, Landworks filed the present action against USF&G in Worcester Superior Court, alleging breach of contract and violation of Mass. Gen. Laws ch. 93A and 176D and seeking damages for money owing for work

---

[2] Landworks contends that this contract was "void," as "Jackson [was] without authority to sign contracts." (Pl. Statement of Material Facts at 13). That dispute is not material to resolution of the motion for summary judgment.

[3] Landworks contends that it remained on the job until January 2005, and that it suspended work at that point due to winter weather. There is no dispute, however, that Landworks never returned to the site. USF&G eventually engaged a new subcontractor, G&R Construction, Inc., to complete the subcontract work.

performed.[4]

## C.    Communication between Landworks and L-S

USF&G (through a sister company, St. Paul Fire and Marine Insurance Company) engaged L-S to be its consultant on the Shrewsbury project (the "Consulting Agreement"). Under the Consulting Agreement, L-S was to provide construction-related experience and support in response to specific requests from the client concerning its performance bond obligations.  A "Work Assignment" addendum to the Consulting Agreement, executed in May 2004, stated that L-S was to:

> Complete a preliminary investigation of the . . . Shrewsbury Middle School . . . assess the progress to date and the ability of the principal to complete the work; . . . ratify subcontractors and suppliers; [and] assist in the assignment of the Completion contractor.

(Ex. C).  Robert Bullock, a project manner for L-S, was given the task of reviewing the condition of the project to see how much site work remained.

Landworks had not resumed performance of work on the project by August 2005.  On August 17, Matthews called Bullock and told him, "[Landworks] wanted to get back to work, and finish this job and be done with it."  (Matthews Dep. at 76-78).  Shortly thereafter, Bullock e-mailed Al Falango (a part-time consultant to L-S) and characterized the Matthews telephone conversation as follows:

> The president of Landworks just called me and expressed an interest in being ratified.  I told him he will have to drop his law suit, but welcomed this idea and I forwarded the requirements for ratification and my contact information.

(Ex. A).

---

[4] On May 12, 2005, USF&G removed the proceeding to this Court.

Bullock then responded to Matthews via e-mail.  The e-mail stated that L-S needed certain information from Landworks to "get started on ratification."  ( Ex. K).  The information requested included the (1) original contract amount, (2) change orders to the original contract, (3) credit change order to the original contract, (4) value of work performed to date or approved material stored at site, (5) total payments received from Standen and Jackson, (6) retainage held to date, (7) outstanding balance, (8) last invoice paid, and (9) last invoice submitted but not paid. (*Id.*).

Fifteen minutes after Bullock sent that e-mail, Falango sent the following e-mail to Bullock:  "Should we pursue this guy [Matthews]?  I know you have issues with him."  (Ex. L). He sent a copy of that e-mail to James Peters of USF&G.[5]  Peters responded by e-mail the next morning (August 18), stating:

> We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G.  The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project.  If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

(Ex. M).[6]

On August 19, Bullock e-mailed the following message to Landworks:  "We checked with [USF&G] and we were told that we cannot deal with Landworks while the legal case is pending." (Ex. N).  Later that day, Bullock sent another e-mail to Landworks, stating "We are willing to

---

[5]  Falango also sent the e-mail to Russ Fuller, an employee of St. Paul.

[6]  According to Peters, he was concerned "that if there were to be negotiations concerning whatever role Landworks might be seeking in connection with this matter that those communications be coordinated with counsel."  (Peters Dep. at 106).

continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys." (Ex. O).

On August 30, counsel for Landworks sent a letter to USF&G counsel. That letter stated: "Please find enclosed the e-mails we discussed. My client and I are prepared to meet at any time to do what is necessary to get back to work." (Ex. P).

On September 21, Falango sent the following e-mail to Bullock and Tony Lardaro (the vice-president of L-S) concerning the project's subcontractors:

> I don't think the 825k is enough for the contingency we already know we have busts in the track work, site work, electric (major), roofs and doors (major) even though the town is holding money I still think we could possibly break the 800k mark with these, we've already spent 400k on G and R for one month and we still don't have checks for the subs. *We can try to bang the subs* but I think that we can never recover from them what we are spending.

(Ex. Q) (emphasis added). No one at USF&G or St. Paul was copied on the e-mail.[7]

L-S contends that in the construction industry, "banging the subs" is a slang term describing a legitimate back-charging of subcontractors for costs when others perform work on their behalf. (Lardaro Dep. at 61-62; *see also* Peters Dep. at 168 (describing banging as "where [USF&G] had incurred costs to complete or fix . . . defective work, which would be chargeable back to the account of the involved subcontractor")). Landworks, however, contends that "banging the subs" means "withholding payment from them, or denying them their rights under their contracts, in the hopes of either forcing the subcontractors to comprise their claims, to be forced to file suit on the payment bond to defer payment for years, to likely compromise as part of a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial

---

[7] USF&G did, however, produce a copy in the course of informal discovery in this lawsuit.

distress." (Gallagher Aff., ¶¶ 27-28).

In August 2006, Landworks amended its complaint to include L-S as a defendant.[8] Landworks has asserted claims against L-S for fraud (Count II), tortious interference with contract (Counts III and IV), and a violation of Mass. Gen. Laws ch. 93A (Count VI).  L-S has moved for summary judgment as to all claims against it.

## II.    <u>Analysis</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

### A.    <u>Fraud (Count II)</u>

Count II alleges a claim of fraud against L-S.   To establish fraud or fraudulent misrepresentation, a plaintiff "must show that the defendant (1) made a false representation of a material fact (2) with knowledge of its falsity (3) for the purpose of inducing the plaintiff to act thereon, and (4) that the plaintiff reasonably relied upon the representation as true and acted upon it (5) to [its] damage." *Eureka Broadband Corp. v. Wentworth Leasing Corp*, 400 F.3d 62, 68 (1st Cir. 2005).

---

[8] USF&G has asserted a counterclaim against Landworks alleging, in substance, that its work was defective and required extensive remedial work.

The complaint alleges the following "specific conduct" by L-S that, according to Landworks, "serve as fraud on the plaintiff":

(a) [USF&G and L-S] failed to effectuate payment of monies due and owing;

(b) knowing that funds were due and owing, [USF&G and L-S] engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract;

(c) knowing that funds were due and owing, [USF&G and L-S] devised and carried out a conspiracy to 'bang' Landworks;

(d) knowing that the Plaintiff was not culpable for defects at the site, USF&G alone and with the support of L-S defamed the Plaintiff, making knowingly false statements in court papers to defend its failure to pay, and otherwise, by its conduct, implying defects in performance that harmed the Plaintiff in its business . . . .

(Am. Complt., ¶ 20).

The listed conduct may be unfair, unpleasant, or even tortious, but it is not actionable fraud. Fraud is not an amorphous, catch-all cause of action that encompasses any kind of unfair or illegal business practice. It is a specific claim with specific elements, and cannot be premised on allegedly bad acts that have nothing to do with any actual representations made by the defendant or any corresponding reliance by the plaintiff.

First, as to L-S's alleged "failure to effectuate payment," it is undisputed that payments made to subcontractors would be made out of ". . . funds that USF&G received from the Town of Shrewsbury and then . . . remitted to Jackson." Other than the vague and conclusory "understandings" of plaintiff's own president, no evidence has been presented that L-S had any

8

contractual or legal obligation to make or "effectuate" payments to plaintiff.[9]  Moreover, even if L-S had a contractual or other legal duty to effectuate project payments to plaintiff, the mere failure of one party to perform such a duty, without any misrepresentation, is not an act of fraud.

Second, L-S's alleged "conduct to deprive plaintiff of funds," including "exclusion of the plaintiff from the project without cause," "failing to communicate with plaintiff," and "failing to engage in good faith and fair dealing" does not constitute fraud.  Again, proof of fraud requires, at a minimum, a false representation by the defendant and reasonable reliance by the plaintiff. Poor communication or a failure to act in good faith simply do not constitute fraud.  Moreover, it bears repeating that L-S had no contract with Landworks and no obligation to pay Landworks anything.

Third, the alleged "conspiracy to 'bang' Landworks" is not actionable as fraud.  This theory is based entirely upon the September 21, 2005 Falango e-mail.  Even assuming plaintiff's characterization of the slang term "bang"—that is, as a failure to pay subcontractors what they are legitimately owed in a malicious attempt to force those subcontractors to compromise their claim or file suit—plaintiff has adduced no evidence of either misrepresentation or reasonable reliance. Even malicious actions intended to harm another person are not "false *representations[s] of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon*." *Eureka*, 400 F.3d at 68 (emphasis added).

Fourth, L-S's alleged "defamation" of plaintiff is not actionable as fraud.  Plaintiff has presented no evidence for its contention that L-S helped USF&G prepare a "false counterclaim" or made knowingly false statements in this or any other court.  Such claims are mere "conclusory

---

[9] There is no evidence of any contractual relationship between L-S and Landworks.

9

allegations, unsupported speculation and improbable inferences" that cannot defeat summary

judgment. *Galloza*, 389 F.3d at 28. And even if plaintiff had actually identified the alleged

defamatory statements, defamation is not fraud.

Indeed, plaintiff makes only one argument in its memorandum opposing summary

judgment that even remotely concerns a possible misrepresentation by L-S.[10] On August 17,

2005, representatives of L-S and plaintiff discussed the possibility of ratification over the

telephone. L-S then sent plaintiff an e-mail, with a list of the information it needed to "get started

on ratification." Plaintiff contends that it relied on this e-mail and thereafter assumed that L-S

was moving forward to ratify it. Plaintiff further contends that in reliance on that e-mail, it did not

seek or accept any other work that would have prevented it from returning to the project.

Again, to prove a claim of fraud, at a minimum there must be *reasonable* reliance by the

plaintiff on a false representation of material fact. *Eureka*, 400 F.3d at 68. On August 18, 2005,

L-S was told by USF&G that if plaintiff wanted to resume work, plaintiff should contact

USF&G's counsel. (Ex. M). On August 19, L-S e-mailed plaintiff stating "We checked with

[USF&G] and we were told that we cannot deal with Landworks while the legal case is pending."

(Ex. N). Later that day, L-S sent a second e-mail to plaintiff: "We are willing to continue to

discuss this with you, but in light of the lawsuit, discussion should go through the attorneys."

(Ex. O).

Plaintiff has not alleged that it changed its position, or suffered a reliance injury, during the

---

[10] Curiously, that allegation is not charged as fraud in the complaint. At a minimum, Fed. R. Civ. P. 9(b) requires that plaintiff "allege the time, place, and contents of the alleged misrepresentation, as well as the identity of the person making them." *Petricca v. Simpson*, 862 F. Supp. 13, 15-16 (D. Mass. 1994); *see also Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) (Fed. R. Civ. P. 9(b) requires specificity with respect to time, place and content of an alleged false representation, but not circumstances or evidence from which fraudulent intent could be inferred). The amended complaint does not come close to meeting that standard.

two-day period from August 17 to 19.  Furthermore, after August 19, it would have been clearly

unreasonable for plaintiff to rely on the August 17 e-mail and assume that the ratification process

was underway.  Plaintiff was at that time (and still is) involved in heated litigation with USF&G.

The parties' communication on August 19 clearly indicated that the only way plaintiff could return

to the job would be through negotiations with USF&G relating to the lawsuit.[11]  Accordingly, any

purported reliance by plaintiff on the August 17 e-mail after August 19 was unreasonable and the

fraud claim cannot survive summary judgment.[12]

## B.   Counts III and IV (Tortious Interference)[13]

To prove tortious interference with contract, the plaintiff must prove that (1) the plaintiff

had a contract with a third party, (2) the defendant knowingly induced the third party to break

that contract, (3) the defendant's interference, in addition to being intentional, was improper in

motive or means, and (4) the plaintiff was harmed by the defendant's actions.  *Platten v. HG*

*Bermuda Exempted Ltd.*, 437 F.3d 118, 129 (1st Cir. 2006) (*citing G.S. Enterprises, Inc. v.*

*Falmouth Marine*, 410 Mass. 262, 271 (1991)).  Here, plaintiff contends that L-S tortiously

interfered with its contractual rights by "carrying out its program of banging the

---

[11]  Before L-S had received USF&G's August 18 e-mail, plaintiff and L-S had exchanged e-mails discussing a possible meeting between Bullock and Matthews at the middle school site.  This meeting was for the purpose, according to Bullock, of "go[ing] over what had to be done to finish the work."  (Ex. N).  Matthews proposed meeting on Tuesday or Wednesday of the following week.  *Id.*  There is no evidence that any such meeting took place.  The failure of the parties to meet should have been a further clear indication that L-S was not moving forward to ratify plaintiff.

[12]  There is also evidence that plaintiff realized that it needed to deal directly with USF&G, not L-S, to resume work on the project.  On August 30, 2005, less than two weeks after the August 17-19 e-mail exchange, counsel for Landworks sent a letter to USF&G counsel stating, "Please find enclosed the e-mails we discussed.  My client and I are prepared to meet at any time to do what is necessary to get back to work."  (Ex. P).

[13]  The amended complaint alleges two identical claims of tortious interference with contract against L-S.  Both counts are identically worded and plaintiff has not attempted to distinguish between them.

subcontractors."[14]

That claim—which rests principally, if not entirely, on the September 21, 2005 Falango e-mail—may be disposed of summarily. Plaintiff filed a complaint against USF&G on March 29, 2005, in which it alleged that USF&G breached the parties' contract by failing to pay money due and owing for past work. Plaintiff thus claimed that USF&G breached the contract nearly six months *before* the Falango e-mail was ever written. There is no evidence that L-S did anything to interfere with any contractual relationship prior to the time of the alleged breach.[15]

Furthermore, the September 21 e-mail was sent only to employees of L-S. Plaintiff has submitted no evidence showing that any USF&G employee ever saw the e-mail or acted on it.[16]

L-S cannot be considered to have "knowingly induced [USF&G] to break [its] contract" based solely on one internal e-mail that was created many months *after* the alleged breach of contract. *Platten*, 437 F.3d at 129. Plaintiff has produced no evidence of L-S's supposed

---

[14] Plaintiff refers to the contract in question as the "contract between plaintiff and USF&G." (Am. Complt., ¶ 23). Presumably, plaintiff is referring to its March 2004 ratification agreement with USF&G, which is not in evidence. Arguably, the relevant contract is the performance bond contract, of which Landworks may have been a third-party beneficiary, or plaintiff's original subcontract with Standen, or its new subcontract with Jackson. For present purposes, it is not necessary to resolve the issue, as it is undisputed that USF&G is responsible for any payment obligations to plaintiff for work performed on the project.

[15] The September 21 e-mail does not by its terms suggest a past (or ongoing) course of conduct, but a possible future action ("We can try to bang the subs"). Indeed, plaintiff's president essentially acknowledged that the allegedly wrongful conduct occurred *after* the alleged breach. When he was asked to establish the basis for the tortious interference counts, he responded as follows:

[L-S] . . . did not investigate [plaintiff's] claim, by not at least looking into the possibilities that . . . monies were owed, and . . . by not . . . giving [plaintiff] a full and fair hearing on the amounts that I say were owed to [plaintiff] . . . and not presenting them to the surety.

(Matthews Dep. at 108-109).

[16] As noted, however, the e-mail was produced to plaintiff by USF&G in response to an informal discovery request.

12

interfering activities before April 2005.  To the extent plaintiff has made other allegations, they

consist of mere unsupported speculation and improbable inferences.  Accordingly, summary

judgment will be granted as to the claim of tortious interference with contract.

### C.    Count VI (Mass. Gen. Laws ch. 93A)

Mass. Gen. Laws ch. 93A § 2(a) prohibits "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce."  In order to prevail on a

claim under ch. 93A, the plaintiff must show that defendant's actions "(1) fall within the penumbra

of some common-law statutory, or other established concept of unfairness, (2) [are] immoral,

unethical, oppressive, or unscrupulous, and (3) caused substantial injury."  *Albright v. Morton*,

321 F. Supp. 2d 130, 141 (D. Mass. 2004) (*quoting Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 15

(1st Cir. 1999)).

Here, plaintiff alleges that L-S "set out to harm [plaintiff] by denying it access to the

Project and to funds due and owing."  Plaintiff further contends that "the pattern and practice of

fraud, [tortious] interference and such conduct constitutes violations of c. 93A by [L-S]."

This claim likewise cannot survive summary judgment.[17]  In its opposition memorandum,

plaintiff supports its ch. 93A claim only by incorporating all its other arguments by reference and

summarily concluding "there is no doubt that engaging in a deliberate effort to deny 20

subcontractors its economic rights would rise to a level of unfair and deceptive trade practices as

a matter of law."  As noted, the evidence is not sufficient to establish either a claim of fraud or

tortious interference with contract.  Furthermore, the amended complaint and other filings are rife

---

[17]  Defendant asserts that plaintiff's failure to send a demand letter is a bar to the ch. 93A claim.  Such a
letter is only a "jurisdictional prerequisite to suit" under ch. 93A, § 9, not § 11, which governs here.  *See, e.g.,
Multi Technology, Inc. v. Mitchell Management Systems, Inc.*, 25 Mass. App. Ct. 333, 335 (1988).

with unspecific, unsubstantiated, and conclusory references to defendant's alleged conspiratorial actions, negligence, defamation, and false statements made to this Court.

It is undisputed is that on August 18, 2005, L-S was directed by USF&G to not deal with plaintiff except through counsel, because of ongoing litigation initiated by plaintiff.  L-S informed plaintiff, the very next day, of that fact.  Plaintiff then *did*, in fact, initiate a dialogue with USF&G counsel, beginning on August 30, 2005.  Plaintiff does not dispute that the contractual payments it contends that it is entitled to would come from USF&G, not L-S.  At most, L-S disengaged from a heated dispute that was already in litigation, informed plaintiff that it was doing so, and told plaintiff to deal with USF&G, which was in contractual privity with plaintiff and which was ultimately responsible for any payments under the contract.

In short, there is insufficient evidence, even when viewed in the light most favorable to plaintiff, to support a claim under Mass. Gen. Laws ch. 93A.  Summary judgment will therefore be granted as to that claim.

## III.    Conclusion

For the foregoing reasons, the motion of defendant Lovett-Silverman Construction Consultants, Inc., for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  February 6, 2008

14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| _____ ) | |
| LANDWORKS CREATIONS, LLC. ) | C.A. NO.05-CV-40072 FDS |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES FIDELITY AND GUARANTY ) | |
| COMPANY and ) | |
| LOVETT-SILVERMAN CONSTRUCTION ) | |
| CONSULTANTS, INC. ) | |
| ) | |
| Defendants ) | |
| _____ ) | |

## MOTION FOR SUMMARY JUDGMENT AND ENTRY OF SEPARATE AND FINAL JUDGMENT OF THE DEFENDANT, LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.

The defendant, Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman"),

respectfully submits this Motion for Summary Judgment, and respectfully requests that this

Court enter an Order granting its motion and order the immediate entry of separate and final

judgment pursuant to Fed. R. Civ. P. 54(b).

Judgment in favor of Lovett-Silverman on all claims is warranted because (1) the plaintiff

cannot provide evidence of fraud with particularity as required by Fed. R.Civ. P. 9(b); (2) the

plaintiff has to provide evidence sufficient to support the elements of its tortious interference

claim against Lovett-Silverman; (3) the plaintiff's M.G.L. c. 93A claim is barred by the

plaintiff's failure to send a c. 93A demand letter to Lovett-Silverman 30 days before filing suit

and (4) the plaintiff is unable to provide evidence sufficient to support the elements of its c. 93A

claim against Lovett-Silverman.

WHEREFORE, the defendant, Lovett-Silverman Construction Consultants, Inc., respectfully requests that this Honorable Court dismiss the claims against it or, in the alternative:

(1)     GRANT its motion for summary judgment against the plaintiff;

(2)     GRANT separate and final judgment; and

(3)     GRANT whatever additional relief it deems necessary and proper.

<u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1</u>

The undersigned certify that counsel have conferred and attempted in good faith to resolve or narrow the issue presented by the instant motion by requesting that the plaintiff, Landworks Creations, LLC, withdraw its claims against Lovett-Silverman Construction Consultants, Inc.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo_____
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
Dated: March 23, 2007          (617) 406-4500
jciollo@donovanhatem.com

01075819

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
|       Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
|       Defendants | ) | |
| _____ | ) | |

## THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.'S  MEMORANDUM OF LAW  IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The defendant, Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman")

respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment.

## I.    PRELIMINARY STATEMENT

On or about April 11, 2005, Landworks Creations, LLC ("Landworks") filed a Complaint

in Worcester Superior Court against United States Fidelity & Guaranty Company ("USF&G").

Landworks' claims arose out of the design and construction of the Shrewsbury Middle School in

Shrewsbury, Massachusetts (the "Project").  Landworks made claims against USF&G for breach

of contract and violations of M.G.L. c. 93A and 176D.  USF&G acted as a surety to Standen

Construction Company ("Standen"), the Project's defaulted general contractor.  Landworks was

a sitework subcontractor to Standen.  On May 12, 2005, the case was removed to the United

States District Court for the District of Massachusetts.  Landworks and USF&G spent the next

fifteen months engaged in disputes concerning a remand to the Superior Court, motions to compel discovery, and a motion to sever and stay.

Lovett-Silverman was a construction consultant to USF&G, assisting it in the Project's completion after Standen defaulted. Through informal discovery of Lovett-Silverman's Project files, an internal e-mail drafted by a part-time, outside consultant to Lovett-Silverman was produced. This e-mail formed the basis of Landworks' subsequent Amended Complaint, which it served on August 4, 2006. The Amended Complaint added Lovett-Silverman as a defendant and added new claims against USF&G. The Amended Complaint contains causes of action against Lovett-Silverman for: (1) fraud; (2) tortious interference; and (3) violation of M.G.L. c. 93A.

In the six months since the filing of the Amended Complaint, the parties have engaged in extensive written and oral discovery regarding each and every claim brought by Landworks. Depositions have been taken of the Project's architect, Lovett-Silverman employees, and corporate designees from Lovett-Silverman, Landworks and USF&G. Such discovery has failed to uncover any factual basis whatsoever for the allegations made by Landworks against Lovett-Silverman. Indeed, the allegations, as testified to by Landworks' own corporate designee, are based on a manifest misunderstanding of Lovett-Silverman's role and obligations on the Project and a willful misconstruction of the facts. For the reasons stated herein, Lovett-Silverman is entitled to summary judgment as a matter of law on each claim brought against it by Landworks.

## II.   STATEMENT OF UNDISPUTED FACTS

Lovett-Silverman incorporates by reference its Local Rule 56.1 Statement of Undisputed Facts, filed simultaneously herewith.

III.    **ARGUMENT**

A.    **SUMMARY JUDGMENT STANDARD**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for a trial." <u>Tyler v. United States</u>, 397 F.Supp. 2d 176, 178  (D. Mass. 2005) <u>quoting</u> <u>Mesnick v. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fr. R. Civ. P. 56(c).  The burden is on the moving party to show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine only if "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  <u>Nat'l Amusements, Inc. v. Town of Dedham</u>, 43 F. 3d 731, 735 (1st Cir. 1995) (internal citation omitted).  A fact is material only if it "might affect the outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Tyler</u>, 397 F. Supp. 2d. at 178.

The "court must 'view the entire record in the light most favorable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.'  If no genuine issue of material fact emerges, then the motion for summary judgment may be granted."

McCarthy v. Northwest Airlines, Inc., 56 F. 3d 313, 315 (1st Cir. 1995) (internal citations omitted).

> **B.    LOVETT-SILVERMAN IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II AS  LANDWORKS HAS NOT AND CANNOT STATE OR PRESENT EVIDENCE OF FRAUD BY LOVETT-SILVERMAN**
>
> **1.    Landworks' Fraud Claim Fails to Present a Genuine Issue of Material Fact for Trial**

Even if Count II was pled with the requisite specificity as established by Fed. R. Civ. P. 9(b)[1], Landworks has still failed to establish a genuine issue of material fact with respect to its fraud claim.  To establish a cause of action for fraud or fraudulent misrepresentation, a plaintiff "must show that the defendant [1] made a false representation of a material fact [2] with knowledge of its falsity [3] for the purpose of inducing the plaintiff to act thereon, and [4] that the plaintiff reasonably relied upon the representation as true and acted upon it [5] to his damage." Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62, 68 (1st Cir. 2005). A plaintiff cannot maintain such a claim without alleging that fraudulent representations were made.  See Sprague Energy Corp. v. Massey Coal Sales Co., 2006 U.S. Dist. LEXIS 10582, at *17 (D. Mass. March 15, 2006) (denying claim for fraud where plaintiff "fail[ed] to set forth any 'content' – namely, the existence of any actual false statement").

---

[1] Count II  fails the particularity test of Fed. R. Civ. P. 9(b), because it does not identify any misrepresentations.  Nor does it identify the time, place, content or person making any alleged misrepresentation.  Petricca v. Simpson, 862 F. Supp.13, 15-16 (D. Mass. 1994).   Indeed, Landworks cannot cure this shortcoming.  When asked to identify how Lovett-Silverman engaged in fraud on Landworks, Neal Matthews, Landworks' corporate designee, did not testify that any Lovett-Silverman employees made false or fraudulent representations to him.  SOF ¶¶ 50, 55-56, 59-60. This failure justifies the granting of summary judgment in favor of Lovett-Silverman on Count II.

   a.   **There is no evidence to support the allegation that Lovett-Silverman failed to effectuate payments of monies due and owing to the Plaintiff; indeed, it is undisputed that Lovett-Silverman had no responsibility to effectuate payments from the Surety.**

As part of its fraud allegation, Landworks alleged that Lovett-Silverman failed to "effectuate payments of monies due and owing" to Landworks. SOF ¶ 50. On its face, such an allegation does not constitute fraud. Moreover, the Agreement between Lovett-Silverman and USF&G sets forth Lovett-Silverman's scope of work. SOF ¶ 9. This scope was confirmed at depositions by Lovett-Silverman and USF&G, the two parties to the Agreement. SOF ¶¶ 8-10. As James Peters, the corporate designee of USF&G, testified, USF&G hired Lovett-Silverman to be its consultant, providing experience and support regarding USF&G's performance and payment bond obligations after Standen defaulted. SOF ¶ 8. As Anthony Lardaro, the Vice-President of Lovett-Silverman, testified, Lovett-Silverman was to compile Project costs and determine the terms of each subcontractor's contractual scope of work. SOF ¶ 10.

Landworks' corporate designee, Neal Matthews, testified at his deposition that the basis for the fraud allegation was his understanding that "Lovett-Silverman ... [had to] go through all of your billing to make certain what you said you were owed you were owed. And then they would, in turn, give that to the surety, and the surety would pay you." SOF ¶ 51. Mr. Matthews further admitted that he did not know "who was the decision maker, whether it was USF&G or whether it was Lovett-Silverman". SOF ¶ 47. Such "unsupported speculation" that Lovett-Silverman was responsible for effectuating payment, especially where Landworks' own corporate designee has admitted to a lack of understanding as to Lovett-Silverman's role, should not be considered by the Court. McCarthy, 56 F. 3d at 315. Landworks' misunderstanding does not create a dispute of material fact suitable for trial.

Most importantly, the failure of one party to perform an act, even if that act is a duty, is not fraudulent as it does not meet the standard of a "false statement of material fact". Robinson v. Bodoff, 355 F. Supp. 2d 578, 584 (D. Mass. 2005). (holding that "allegations of poor communication and ignored requests sound in negligence, not fraud or misrepresentation"). As evidenced by Lovett-Silverman's limited scope of work with USF&G, Lovett-Silverman was not responsible for paying Landworks or any other subcontractor, nor was it responsible for determining if subcontractors merit payment. SOF ¶ 8-10, 48-49. USF&G's corporate designee, James Peters, testified that payment applications would be submitted by the general contractor to USF&G, who would in turn pay the general contractor out of funds received by the Town of Shrewsbury. The general contractor would then pay the subcontractors. SOF ¶¶ 48-49. Moreover, if the Court indulges the inference that Lovett-Silverman was responsible for paying subcontractors or "effectuating payment", such an inference of non-payment still does not create a genuine issue of material fact because such failure does not amount to fraud. See Robinson, 355 F. Supp. 2d. at 584. No rational factfinder could resolve the dispute over whether Lovett-Silverman failed to effectuate payment and thus committed fraud in Landworks' favor. Thus, Lovett-Silverman is entitled to summary judgment as a matter of law.

> **b.** **There is no evidence to support the allegation that Lovett-Silverman excluded the Plaintiff from the Project, failed to communicate with the Plaintiff and failed to engage in good faith and fair dealing. Moreover, none of these allegations constitute fraud.**

Landworks' Fraud claim further alleges that Lovett-Silverman "engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract" SOF ¶ 50. Again, these allegations do not

constitute fraud. Moreover, there is no genuine dispute as to any material fact concerning these allegations and at most, Plaintiff has only made "improbable inferences" based upon a serious misunderstanding of Lovett-Silverman's role on the Project. <u>McCarthy</u>, 56 F. 3d at 315.

On or about the Summer of 2005, Jackson defaulted and Lovett-Silverman again assisted USF&G in completing the Project. SOF ¶ 25-26. USF&G used a ratification process for each subcontractor "to establish terms and conditions under which [the subcontractors] would be prepared to resume their subcontract responsibilities and complete their obligations." SOF ¶ 27. Landworks was subject to this process and in March 2005, had already filed suit against USF&G. SOF ¶ 24.

On or about August 17, 2005, Mr. Matthews called Robert Bullock, whom he had not spoken to before, to discuss returning to the Project. SOF ¶ 31. Robert Bullock, a Project Manager for Lovett-Silverman, was in charge of reviewing work completed and in need of completion with respect to the exterior trades. SOF ¶ 29. Mr. Bullock responded by asking Mr. Matthews to forward contracts, change orders, invoice balances and information pertaining to the value of work performed by Landworks in order to develop a ratification agreement. SOF ¶ 32.

That same afternoon, Al Falango, a part-time, outside consultant to Lovett-Silverman, informed James Peters and Russ Fuller, Esquire, of USF&G about Mr. Matthews' interest in returning to the Project. SOF ¶ 33. Mr. Falango wrote, "Should we pursue this guy [Neal Matthews]? I know you [Mr. Fuller] have issues with him." SOF ¶ 34. No response to Mr. Falango's statement regarding Mr. Fuller's alleged "issues" was given by Mr. Peters or Mr. Russell and USF&G's deponent, Mr. Peters, was unaware of what those issues could have been. SOF ¶ 34. However, James Peters instructed Mr. Bullock not to engage in any correspondence with Mr. Matthews while the lawsuit against USF&G was pending and to inform Mr. Matthews

that all future communications should occur between attorneys for Mr. Matthews and USF&G. SOF ¶¶ 36-38.

In the view of USF&G and its in-house counsel, Russ Fuller, the fact that Landworks had sued USF&G created a situation unsuitable for USF&G's outside construction consultant, Lovett-Silverman, to handle. SOF ¶ 38. Though USF&G had "no specific written policy" for handling subcontractor claims, there was "a general expectation that if there were negotiations involving matters in litigations that counsel would be involved." SOF ¶ 42. In keeping with this directive from USF&G, Mr. Bullock wrote to Mr. Matthews to inform him that "we were told that we cannot deal with Landworks while the legal case is pending" and "we are willing to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys [for Landworks and USF&G]". SOF ¶¶ 39-40. Mr. Bullock's statements to Mr. Matthews, explaining that communication must go through the attorneys, was consistent with USF&G's desires and did not contravene any company policy. Moreover, it certainly does not constitute any fraudulent misrepresentation.

Despite undisputed evidence establishing that Lovett-Silverman was under instruction from USF&G not to deal directly with Landworks, Mr. Matthews, the corporate designee of Landworks, remains steadfast that Lovett-Silverman "[denied Landworks] access to the Project" by refusing to "tak[e] [his] request that [he] made for [Lovett-Silverman] to meet with attorneys present to mediate, negotiate the amounts owed to [Landworks]". SOF ¶ 44. Such testimony creates an improbable inference unsupported by any fact. Perplexingly, Mr. Matthews admits to having seen the full e-mail exchange between USF&G and Mr. Bullock, in which USF&G directs Lovett-Silverman to have no contact with Landworks, before he chose to file suit against Lovett-Silverman. SOF ¶ 43. Thus, Landworks was well-aware that Lovett-Silverman was only

8

acting at the direction of the entity it had been hired to assist and that it had been directed not to deal with Landworks. Lovett-Silverman's limited scope of duties also shows that Lovett-Silverman did not have the authority to independently give Project access to subcontractors or negotiate claims if under orders not to do so. SOF ¶ 8-10.

Mr. Matthews testified that Landworks' Amended Complaint is based upon Lovett-Silverman's "conduct of ... not relating to me ... that Russ Fuller had a problem with me ... and that's why they couldn't deal with me." SOF ¶ 35. Even if true such alleged behavior cannot constitute fraud. It is settled under Massachusetts law that Landworks cannot allege that Lovett-Silverman committed fraud in giving statements of "opinion, estimate or judgment." Pearce, 392 F. Supp. 2d. at 73. Even assuming that Lovett-Silverman had a duty to share USF&G's counsel's alleged opinion with Mr. Matthews, "concealment alone does not constitute fraud." Cherniack v. Newcombe, 1997 Mass. Super LEXIS 546, at *10 (January 14, 1997) (internal citations omitted). Mr. Bullock was not the originator of Mr. Fuller's opinion. SOF ¶ 34. Though Mr. Bullock knew of the e-mail from Mr. Falango to Mr. Fuller, "nondisclosure can be actionable only where there is a 'duty' to disclose such as when the parties are in a fiduciary relationship." Urman v. So. Boston Sav. Bank, 3 Mass. L. Rep. 123, at *13 (Mass. Super. Oct. 19, 1994). It is undisputed that Landworks did not have a contract with Lovett-Silverman. SOF ¶ 14. Mr. Bullock had no duty to disclose a statement that did not originate with him, did not concern him, and was not verified. Furthermore, there was no fiduciary responsibility towards Landworks on Lovett-Silverman's part. SOF ¶ 8-10.

It is undisputed and established by testimony from Mr. Bullock and Mr. Peters, that Lovett-Silverman did not have the authority to allow or deny Project access to any subcontractor. SOF ¶ 36-38,45. Thus, the claim that Lovett-Silverman "exclude[ed] ... [Landworks] from the

Project without cause" is a "conclusory allegation" that creates no genuine issue of material fact for trial. <u>McCarthy</u>, 56 F. 3d at 315. Lovett-Silverman's undisputed scope of duties to USF&G leaves no room for speculation that it had the authority to exclude any entity from the Project. Any doubt concerning the reason for Landworks' alleged exclusion from the Project would have been cured by Robert Bullock's offer to Mr. Matthews to have his attorney contact attorneys for USF&G. In fact, counsel for Landworks did contact Brad Carver, Esq., counsel for USF&G shortly after Mr. Matthews' exchange with Robert Bullock. SOF ¶ 41. Any alleged "fraud" on Lovett-Silverman's part would have been negated by a direct exchange between counsel for both Landworks and USF&G. Viewed in the light most favorable to Landworks, there is no genuine issue of material fact which has the potential to affect the outcome of the suit concerning the fraud allegation. Thus, Lovett-Silverman is entitled to summary judgment as a matter of law.

> ### c. There is no evidence to support the allegation that Lovett-Silverman devised and carried out a conspiracy to 'bang' Landworks, which, in any event, would not constitute fraud.

Plaintiff's contention that Lovett-Silverman committed fraud in that it "devised and carried out a conspiracy to 'bang' Landworks" also fails to present a genuine triable issue. SOF ¶ 50. Landworks complains of an internal Lovett-Silverman e-mail in which its part-time consultant, Al Falango, wrote, "We can try to bang the subs but I think that we can never recover from them what we are spending." SOF ¶ 50. Landworks has described this e-mail in several pleadings as the reason for adding Lovett-Silverman as an additional party to this litigation and the crux of Landworks' allegations. To wit, reference to this e-mail appears in every count made against Lovett-Silverman in the Amended Complaint. SOF ¶¶ 50, 64, 70.

Mr. Matthews testified on behalf of Landworks that he believed that "bang" meant "that there was a realization sometime on this job that it was not going well and that it was not going

to go well and that there needed to be savings wherever it could be made." SOF ¶ 57. Indeed, this characterization conforms with Mr. Falango's meaning of the phrase "bang" and the way in which it was understood by USF&G and other Lovett-Silverman employees. Mr. Falango explained to James Peters that by "banging the subs," he meant "identify[ing] instances where we had incurred costs or would incur costs to ... complete work or to correct defective work, which would be chargeable back to the account of the involved subcontractor." SOF ¶ 54. Anthony Lardaro, the Vice-President of Lovett-Silverman, testified that the term "bang" is a slang term describing "back-charg[ing] subcontractors for costs when others perform work on their behalf." SOF ¶ 53. James Peters testified that the term "bang the subs" is "slang" and is used "where [USF&G] had incurred costs to complete or fix ... defective work, which would be chargeable back to the account of the involved subcontractor." SOF ¶ 45. Neal Matthews testified that "[t]o back charge a subcontractor would be to back charge them for incomplete work that they had not corrected themselves ... and to present them with a bill for work they had done to correct whatever." SOF ¶ 55.

Back charging subcontractors for unfinished or defective work is sound construction practice meant to keep project costs as low as possible and to make subcontractors responsible for work which they agreed to complete in a workmanlike manner. Nothing in this practice gives rise to even an inference of fraud. In Landworks' own words, "they [USF&G] were going to have to try to recuperate costs as best they could to drive the overall cost of the project down, because they were going to run over any of the projections that they had." SOF ¶ 58. Back charging is one such way of legitimately and lawfully recuperating money spent due to a subcontractor's failure to perform its work properly. Such behavior is not fraudulent.

Even if the Court views the phrase "banging" in the light most favorable to Landworks –
meaning failing to pay the subcontractors what they are legitimately owed – such a
characterization still fails to present a genuine issue of material fact for trial to support any of
Landworks' claims against Lovett-Silverman.  A fact is material only if it "might affect the
outcome of the suit under the governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Tyler</u>, 397
F. Supp. 2d. at 178.  That Lovett-Silverman allegedly meant the phrase "bang" in a malicious
way is irrelevant to a fraud claim.  A malicious intent or actions meant to harm another are not
"false representation[s] of a material fact with knowledge of its falsity for the purpose of
inducing the plaintiff to act thereon".  <u>Eureka</u>, 400 F.3d at 68.  Thus, Lovett-Silverman is entitled
to summary judgment as a matter of law.

> **d.    Plaintif has not and cannot produce evidence to support the
> allegation that Lovett-Silverman supported USF&G in
> defam[ing] Landworks.  Moreover, defamation does not
> constitute fraud.**

Lastly, Landworks' allegation that Lovett-Silverman assisted USF&G "in defam[ing] the
Plaintiff" is not actionable under a claim of fraud and presents no triable issue.  Neal Matthews
testified on behalf of Landworks that Lovett-Silverman:

> "made statements about [Landworks'] deficiency in the work which are not
> attributable to me or Landworks, and that in so making these statements without
> first investigating the validity of then, that that's defamatory."

SOF ¶ 61.

Furthermore, Mr. Matthews testified that in assisting USF&G with its allegedly false
counterclaim, Lovett-Silverman:

> "provid[ed] information that was knowingly false – for example, passing off work
> that was not within the scope of Landworks as the scope of Landworks, and by

otherwise lying to Landworks as to why Landworks was not being permitted to return to the site."

SOF ¶ 62.

Such allegations do not give rise to a claim for fraud.  First, Landworks has not identified the particular defamatory statements Lovett-Silverman is alleged to have made to support USF&G.  Second, assuming that defamatory statements are contained in the counterclaim that only USF&G filed against Landworks in this action, such statements were not made with the intent of "inducing the plaintiff to act thereon."  Eureka, 400 F.3d at 68.  If, as Landworks alleges, these statements are false, Landworks would have no reason to rely upon them as true.  Thus, Landworks cannot maintain that Lovett-Silverman committed fraud by assisting USF&G in making these allegedly defamatory statements.

Absent a showing that Lovett-Silverman made a  "false representation of material fact with knowledge of its falsity," see Danca v. Taunton Sav. Bank, 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982), Landworks has failed to raise a genuine issue with regard to any of the required elements of a common law fraud claim.  Thus, Lovett-Silverman is entitled to summary judgment as a matter of law on Count II of the Amended Complaint.

### C.    LOVETT-SILVERMAN IS ENTITLED TO SUMMARY JUDGMENT ON COUNT III OF THE AMENDED COMPLAINT

Count III of Landworks' Amended Complaint ("Tortious Interference") does not present a genuine issue of material fact.  The count alleges that "Lovett-Silverman, by carrying out its program of "banging" the subcontractors, did tortuously (sic) interfere in the contract between the Plaintiff and USF&G, for ulterior motives." SOF ¶  64.  A plaintiff's claim for tortious interference must prove that: (1) the plaintiff had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in

addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed

by the defendant's actions. Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (1st Cir.

2006). The Supreme Judicial Court of Massachusetts has held "improper motive or means" to

mean "actual malice." Shea v. Emmanuel Coll., 425 Mass. 761, 764, 682 N.E.2d 1348, 1351

(Mass. 1997). Actual malice, in turn, is defined as "any spiteful, malignant purpose, *unrelated to*

*the legitimate corporate interest*. (emphasis added)" Id. (citation and internal quotation marks

omitted).

When asked to identify the basis for this count, Neal Matthews, Landworks' corporate

designee, testified that Lovett-Silverman:

> "did not investigat[e] [Landworks'] claim , by not at least looking into the
> possibilities that ... monies were owed, and ... by not ... giving [Landworks] a full
> and fair hearing on the amounts that I say were owed to [Landworks] ... and not
> presenting them to the surety".

SOF ¶ 65. Such alleged inaction on the part of Lovett-Silverman does not constitute

tortious interference with Landworks' contract.

Landworks, by virtue of having a contract with both Standen and Jackson, had a

contractual relationship with USF&G, the Project's surety. Landworks cannot put forth any

evidence, however, that Lovett-Silverman induced USF&G to break its contract with Landworks.

Indeed, Neal Matthews' only basis for this claim is that Lovett-Silverman did not perform a duty

(investigating Landworks' claim against USF&G) that was indisputably not within its scope.

SOF ¶¶ 8-10, 65. Extensive discovery has produced no evidence that Lovett-Silverman induced

USF&G to break its contractual relationship with Landworks. In response to an interrogatory

asking, "State the basis of your contention ... that Lovett-Silverman interfered in the business

relationship between Landworks and USF&G", Landworks answered:

Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. ... An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF&G with false data provided by Lovett-Silverman.

SOF ¶ 67. By reference to other interrogatory answers, Landworks also answered,

... Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information. Based upon the e-mails subsequently identified, it is clear that Landworks would be barred from its right to perform its work.

SOF ¶ 67.

Such alleged conduct of fabricating a contention of "abandonment", providing false data for USF&G's counterclaim, and pumping Landworks for information, even if true, does not constitute an inducement to USF&G to break a contract with Landworks. Landworks itself alleges that the counterclaim and alleged false data used to support it was a joint venture between Lovett-Silverman and USF&G. SOF ¶ 68. There is no suggestion in the record, or even Plaintiff's allegations, that Lovett-Silverman drafted the language of the USF&G counterclaim or that it had any role in the Surety's decision to file the claim. Indeed, it is undisputed that USF&G simply asked Lovett-Silverman, its hired consultant, to review the status of the site work, and Lovett-Silverman determined that there was incomplete or incorrectly done work. SOF ¶ 69.

Even if it were true that Lovett-Silverman provided false evidence for the counterclaim, Landworks has not provided any evidence to show that Lovett-Silverman provided false evidence with "any spiteful, malignant purpose, unrelated to the legitimate corporate interest." Shea, 425 Mass. at 764. Anthony Lardaro of Lovett-Silverman testified that Lovett-Silverman used each subcontractor's subcontract agreement to determine each subcontractor's scope of work. SOL ¶ 10, 69. Such a method of determining a subcontractors' responsibility was related

to the legitimate corporate interest of determining if Landworks was accountable for extra Project costs. Whether one refers to this method as "banging" or back charging, it is undisputed that it is a legitimate business practice. SOF ¶¶ 53-55.

Furthermore, there is no evidence that Al Falango's internal "bang the subs" e-mail was even given to USF&G, let alone that it was given to it in furtherance of an alleged malicious goal to take money from the Project's subcontractors. Each person identified in the "To:" or "Cc:" lines of the e-mail are Lovett-Silverman employees. Indeed, James Peters testified that he had not seen this communication until *after* Landworks filed suit against USF&G when it was produced in response to an informal discovery request. SOF ¶ 59. Thus, Landworks has no evidence to support its contention that Lovett-Silverman's alleged "program of banging" the subcontractors in any way induced USF&G, who was not privy to the only communication making such a reference, to break its contract with Landworks. Because there is no genuine issue of material fact regarding Landworks' claim for tortious interference, Lovett-Silverman is entitled to summary judgment as a matter of law on Count III of the Amended Complaint.

**D.    LOVETT-SILVERMAN IS ENTITLED TO SUMMARY JUDGMENT ON COUNT VI OF THE AMENDED COMPLAINT**

**1.    Massachusetts Courts Have Consistently Held That the Failure to Send a 93A Demand Letter Thirty Days Before Filing Suit is Grounds for Dismissal**

Lovett-Silverman is entitled to summary judgment on Landworks' Chapter 93A claim because Landworks failed to send a Chapter 93A demand letter to Lovett-Silverman prior to filing suit, and because the claim raises no genuine issue of material fact for trial.

The purpose of a Chapter 93A demand letter is to facilitate the settlement and damage assessment aspects of M.G.L. c. 93A, and as such, the demand letter and notice therein is a procedural requirement, the absence of which is a bar to suit. Slaney v. Westwood Auto, Inc.,

16

366 Mass. 688, 704-705 (1975) (noting that plaintiff must plead that it sent a demand letter to prospective defendant at least thirty days prior to filing complaint).  In order to comply with the statute, the demand letter must be sent thirty days before the commencement of the action, must identify the particular acts alleged to be unfair or deceptive, and must identify the injury suffered as a result.  Spring v. Geriatric Authy. of Holyoke, 394 Mass. 274, 288 (1985) (affirming trial judge's judgment notwithstanding the verdict based on plaintiff's failure to plead and prove service of 93A demand letter to defendant because "the legislature has made it clear that those procedural steps [of] … M.G.L. c. 93A are not merely technical, but are important conditions precedent to recovery under the statutes"); Cassano v. Gogos, 20 Mass. App. Ct. 348, 353 (1985) (denying relief under 93A due to failure of demand letter to reference the deceptive practice under which recovery was obtained).

Landworks did not serve a Chapter 93A demand letter on Lovett-Silverman.  SOF ¶ 72. This failure precludes Landworks from asserting a Chapter 93A claim.  As a result, Lovett-Silverman is entitled to summary judgment as a matter of law on Count VI.

> ## 2.   Landworks' 93A Claim Fails to Meet Any of the Statute's Prerequisites

Even if Landworks had sent a demand letter prior to filing suit, it cannot raise any issue of material fact for trial concerning this claim. In Count VI of the Amended Complaint ("Violations of c. 93A") Landworks alleges:

> "Lovett-Silverman set out to harm Landworks by denying it access to the Project and to funds due and owing ... [and] The pattern and practice of fraud, tortous (sic) interference and such conduct constitutes violations of c. 93A".

Amended Complaint at ¶¶ 70-71.

Landworks cannot show that any action by Lovett-Silverman was unfair or deceptive. Even Landworks' President, Neal Matthews, distanced himself from the serious allegations made

in the Amended Complaint and expressed a manifest misunderstanding of Lovett-Silverman's

role on the Project.  When asked, "Are you aware of any other subcontractors at the site who you

would say were strong-armed or extorted by Lovett-Silverman?", Neal Matthews testified,

> "I didn't think I ever used the word 'extorted' by Lovett-Silverman. ... I think
> that would be a term I would not apply to them."

SOF ¶ 72.  Furthermore, Mr. Matthews testified,

> "I don't know of the dealings with other subcontractors with Lovett-Silverman. ....
> So I don't know if other subcontractors were strong-armed or not."

SOF ¶ 73.  When asked, "Do you believe that Lovett-Silverman strong-armed

Landworks?", Neal Matthews testified, "*I don't know if it constitutes strong-arming*."

(emphasis added)  SOF ¶ 74.

In its response to Lovett-Silverman's interrogatory asking, "Please identify each

subcontractor that you allege ... was denied rights by Lovett-Silverman and set forth the specific

rights denied by each such subcontractor", Landworks answered:

> "Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly
> extortionist conduct in attempting to dangle payment with a precondition of
> waiving legal rights under G.L. c. 149 § 29.  This also violated Plaintiff's rights,
> and may even have been criminal in nature."

Landworks further answered,

> The e-mail traffic that has been produced indicates that *Lovett-Silverman were*
> *nothing more than the Surety's foul-mouthed thugs, operating on the ground as*
> *on-the-ground hatchet men*.  Aside from the language about "banging" the
> subcontracts (sic), Landworks finds it significant that Al Falango of Lovett-
> Silverman would send an e-mail .. to Rick Noblet [also a Lovett-Silverman
> employee] referring to "my F-in" vacation."  On August 17, 2005, Al Falango
> sent an e-mail to a claims attorney, Russ Fuller, ... referring to the president of
> Landworks as "this guy."  Landworks is not a "guy."  It is a well-know (sic) and
> respected corporation.  This kind of e-mail confirms that Lovett-Silverman
> consultants were not behaving in the type of professional, credible construction
> consultants tasked with representing the best interests of all involved in this
> project

SOF ¶ 75 (emphasis added).

In order for Landworks to succeed with a Chapter 93A claim, it would have to establish that Lovett-Silverman engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2. Liability under Chapter 93A is determined by analyzing whether the practice in question is within any recognized conception of unfairness, is immoral or unscrupulous, or causes substantial injury to consumers. Ellis v. Safety Ins. Co., 41 Mass. App. Ct. 630 (1996). The mere alleged breach of a legal obligation, without more, does not amount to an unfair or deceptive trade practice. Framingham Auto Sales, Inc. v. Workers' Credit Union, 41 Mass. App. Ct. 416, 418 (1996); Squeri v. McCarrick, 32 Mass. App. Ct. 203, 207 (1992) (an alleged negligent act by itself does not give rise to a claim under Chapter 93A); Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 10, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979) (explaining that "objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce" in order to support a Chapter 93A action). Certainly Mr. Matthews, an individual with over twenty years of experience in the construction industry, would be inured to rough language and slang. SOF ¶ 12. Heightened sensitivity is not the basis of a Chapter 93A claim.

Landworks' allegations concerning alleged errors committed by Lovett-Silverman do not rise to the level of conduct required for a Chapter 93A claim. Accordingly, Landworks' Chapter 93A claim should fail as a matter of law. See Squeri, 32 Mass. App. Ct. at 207.

## CONCLUSION

For all of the above reasons, Lovett-Silverman respectfully requests the court to enter summary judgment in its favor on Count II (Fraud), Count III (Tortious Interference), and Count

VI (violation of G.L. c. 93A), and dismiss the plaintiff's Amended Complaint as to all counts against it with prejudice.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
Dated: March 23, 2007             (617) 406-4500
                                  jciollo@donovanhatem.com

01073806

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| _____ ) | C.A. NO.05-CV-40072 FDS |
| LANDWORKS CREATIONS, LLC.           ) | |
|                                     ) | |
|      Plaintiff                  ) | |
|                                     ) | |
| v.                                  ) | |
|                                     ) | |
| UNITED STATES FIDELITY AND GUARANTY ) | |
| COMPANY and                         ) | |
| LOVETT-SILVERMAN CONSTRUCTION       ) | |
| CONSULTANTS, INC.                   ) | |
|                                     ) | |
|      Defendants                 ) | |
| _____ ) | |

## STATEMENT OF FACTS OF THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC., IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Defendant Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman") respectfully submit this Statement of Facts in Support of its Motion for Summary Judgment.

### II.     STATEMENT OF FACTS

1.     This matter arises from the design and construction of the Shrewsbury Middle School in Shrewsbury, Massachusetts (the "Project"). Amended Complaint at ¶ 6, attached to the Affidavit of Julie Ciollo, Esq., Tab 1 ("Tab 1") as Exhibit A.

2.     Standen Contracting Company, Inc. "Standen" was the first general contractor on the Project. Amended Complaint, Tab 1 at Ex. A, ¶ 5.

3.     On or about the Winter of 2004, Standen defaulted on the Project. Deposition of James Peters, February 23, 2007 ("Peters Depo."), at 22:22-24, attached Tab 1 as Exhibit B.

4.     James Peters, a regional claims officer and corporate designee of Defendant United States Fidelity & Guaranty Company ("USF&G") pursuant to F. R. Civ. P. 30(b)(6), testified that Standen was bonded by USF&G, who had "an obligation to discharge [Standen's] responsibilities under that bond." Peters Depo., Tab 1 at Ex. B, 22:22-24.

5.     USF&G's responsibilities included "labor materials, [and] services ... incorporated in the bonded construction project." Peters Depo., Tab 1 at Ex. B, 23:4-5.

6.     "United States Fidelity & Guaranty Company [USF&G] is one of several underwriting companies that make up part of the St. Paul Travelers Companies." Peters Depo., Tab 1 at Ex. B, 7:17-19.

7.     On or about January 10, 2003, Lovett-Silverman entered into an Agreement with St. Paul Fire and Marine Insurance Company ("St. Paul") (the "Lovett-Silverman Agreement"). A true and accurate copy is attached to Tab 1 as Exhibit C.

8.     USF&G, through St. Paul, hired Lovett-Silverman to be its consultant, providing "construction-related experience and support in response to [USF&G's] specific request and involving matters pertaining to the discharge of [USF&G's] performance bond obligation and in matters pertaining to the discharge of [USF&G's] payment bond obligations" after Standen defaulted. Peters Depo., Tab 1 at Ex. B at 46:6-11.

9.     By the terms of its Agreement with St. Paul/USF&G, Lovett-Silverman was tasked to:

> Complete a preliminary investigation of the ... Shrewsbury Middle School ... assess the progress to date and the ability of the principal to complete the work; ... ratify subcontractors and suppliers; [and] assist in the assignment of the Completion contractor.

Lovett-Silverman Agreement, Tab 1 at Ex. C at Exhibit A.

10.     Anthony Lardaro, Lovett-Silverman's Vice-President, testified that as part of its duties on the Project, Lovett-Silverman was to:

> [C]ompile the costs involved with finishing the work, ... determine the scope of the work that [subcontractors] were to perform pursuant to their subcontract agreement or purchase order agreement ... [and] assess the costs actually expended to perform any of that scope by others.

Deposition of Anthony Lardaro, January 11, 2007 ("Lardaro Depo.") at 56:3-17, attached to Tab 1 as Exhibit D.

11.     On August 28, 2003, the Plaintiff, Landworks Creations LLC ("Landworks"), entered into an agreement (the "Standen Agreement") with the Project's then-General Contractor, Standen Contracting Company, Inc. ("Standen") pursuant to which Landworks was to perform sitework for the Project.  A true and accurate copy is attached to Tab 1 as Exhibit E.

12.     Neal Matthews, Landworks President, has experience in the construction industry dating back over twenty years.  Deposition of Neal Matthews, Day One, February 13, 2007 ("Matthews Depo."), at 9:7-19, attached to Tab 1 as Exhibit F.

13.     Landworks' agreed-to scope of work included:

> "Site Demolition"; "Site Preparation": "Earthwork"; Bit[uminous] Conc[rete] Paving & Markings"; "New Track Surfaced Areas"; "Asphalt"; "Granite Curbing"; "Storm Drainage"; "Water Systems": and "Lawns and Grasses".

Standen Agreement, Tab 1 at Ex. E, p. 8.

14.     Landworks did not have a contract with Lovett-Silverman.  <u>See</u> the testimony of Neal Matthews, corporate designee under Fed. R. Civ. P. 30(b)(6) and President of Landworks, who testified that Landworks "did not have a contract with Lovett-Silverman."  Matthews Depo., Day One, Tab 1 at Ex. F, 77:16-20.

15.     "Standen ... was bonded by United States Fidelity & Guaranty Co." ("USF&G"). Amended Complaint, Tab 1 at Ex. A, ¶ 7.

3

16.    In the Spring of 2004, "Standen got into difficulty" and defaulted on the Project. Peters Depo., Tab 1 at Ex. B, 60:10-14.

17.    On or about the Spring of 2004, Jackson Construction Company ("Jackson") became the Project's General Contractor.  Lardaro Depo., Tab 1 at Ex. D, 25:2-10; Peters Depo., Tab 1 at Ex. B, 60:10-14.

18.    On or about April 29, 2004, Landworks entered into an agreement with Jackson (the "Jackson Agreement").  A true and accurate copy is attached to Tab 1 as Exhibit H.

19.    Landworks' scope of work on the Jackson Agreement included

"Site Demolition"; "Site Preparation": "Earthwork"; "Bituminous Concrete Paving & Markings"; "Granite Curbing"; "Storm Drainage Systems & Sewer Systems"; "Water Systems": and "Lawns and Grasses".

Jackson Agreement, Tab 1 at Ex. H, Article 2.25.

20.    Neal Matthews testified that on or about June of 2004, Landworks "asked for a reconciliation of the application for payments that [he] had turned in" but did not receive any reconciliation.  Matthews Depo., Day One, Tab 1 at Ex. F,  63:12-16.

21.    According to Landworks, on or about August of 2004, "the payment application [from Jackson] was cut in half" from what Landworks had expected to receive.  Matthews Depo., Day One, Tab 1 at Ex. F, 63:18-22.

22.    According to Landworks, Jackson did not pay Landworks in September or October of 2004.  Matthews Depo., Day One, Tab 1 at Ex. F, 63:12-13.

23.    As of March 2005, Landworks was no longer performing work on the Project. Matthews Depo. Day One, Tab 1 at Ex. F, 72:5-20.

24.    On or about March 29, 2005, Landworks filed a Complaint in the Worcester Superior Court against USF&G, making claims for breach of contract and violation of M.G.L. c.

93A and 176D and seeking damages for money alleged to be owing for work performed on the Project.  A true and accurate copy of the Complaint is attached to Tab 1 as Exhibit I.

      25.     USF&G's corporate designee testified that on or about the Summer of 2005, "there was a perception from the Town [of Shrewsbury] that Jackson had not been paying subcontractors.  Peters Depo., Tab 1 at Ex. B, 72:8-10; 77:17-21.

      26.     Before USF&G considered Jackson to be in default, "Lovett-Silverman became involved again in [the] Project".  Peters Depo., Tab 1 at Ex. B, 82:12-17.

      27.     There was a "ratification process following the failure of Jackson ... [because] it was in [USF&G's] best interest to establish terms and conditions under which [the subcontractors] would be prepared to resume their subcontract responsibilities and complete their obligations."  Peters Depo., Tab 1 at Ex. B, 85:10-17.

      28.     Lovett-Silverman acknowledges that it is "common procedure, once a contractor is in default, for subcontractors not to return to the work until they are ratified."  Deposition of Robert Bullock, Project Manager for Lovett-Silverman, January 11, 2007, attached to Tab 1 as Exhibit J at 40:23-41:4.

      29.     Robert Bullock, a Project Manager for Lovett-Silverman, was "tasked with reviewing the condition of the [Project] site" to "see what site work remained" and "the exterior trades" or "anything outside the building." Bullock Depo., Tab 1 at Ex. J, 18:4-7; Lardaro Depo., Tab 1 at Ex. D, 28:23-29:3.

      30.     As part of his duties on the Project, Mr. Bullock "made a list of items which needed to be completed during [his] walk-through of the [Project] site and review of the [Project] plans."  Bullock Depo., Tab 1 at Ex. J, 47: 2-4.

31.    On or about August 17, 2005, Neal Matthews "called [Robert Bullock] up ... and ... told him that [he wanted to] get back to work, and finish this job and be done with it."  Mr. Matthews got Mr. Bullock's phone number from the Shrewsbury Clerk of the Works.  Matthews Depo., Day One, Tab 1 at Ex. F, 76:6-10; 78:11-18.

32.    Mr. Bullock responded by asking Mr. Matthews to forward contracts, change orders, invoice balances and information pertaining to the value of work performed by Landworks in order to develop a ratification agreement for Landworks.  E-mail from Robert Bullock to Neal Matthews, August 17, 2005, 2:42 p.m. ("Bullock E-mail, 8/17/05, 2:42 p.m."), attached to Tab 1 at Exhibit K.

33.    That same afternoon, Al Falango, a part-time, outside consultant to Lovett-Silverman, informed James Peters and Russ Fuller, Esquire, of USF&G of Mr. Matthews' request to return to the Project.  E-mail from Al Falango to Russ Fuller, James Peters and Robert Bullock, August 17, 2005, 3:00 p.m. ("Falango E-mail, 8/17/05, 3:00 p.m."), attached to Tab 1 as Exhibit L.

34.    Mr. Falango wrote, "Should we pursue this guy [Neal Matthews]?  I know you have issues with him."  Falango E-mail, 8/17/05, 3:00 p.m., Tab 1 at Ex. L.

35.    When asked, "What was your basis for this allegation that Lovett-Silverman strong-armed the subcontractors?", Mr. Matthews testified that the allegation is based upon:

> [Lovett-Silverman's] conduct of ... not relating to me ... that Russ Fuller had a problem with me ... and that's why they couldn't deal with me.

Matthews Depo., Day Two, Tab 1 at Ex. G,106:1-5.

36.    James Peters of USF&G then "requested that [Lovett-Silverman consultants] refrain from direct communications as a result of the existence of litigation [regarding] Landworks".  Peters Depo., Tab 1 at Ex. B, 105:11-16.

6

37.     Mr. Peters also

"asked Lovett-Silverman to refrain from engaging in negotiations with
Landworks and to suggest that if there was any communication with them that it
would be more appropriate for those communications to be exchanged between
Landworks counsel and USF&G's counsel."

Peters Depo., Tab 1 at Ex. B,106:2-8, E-mail of James Peters to Al Falango and Russell

Fuller, August 18, 2005, 10:49 a.m. (Peters E-mail, 8/18/05, 10:49 a.m.), attached to Tab

1 as Exhibit M.

38.     Mr. Peters' "concern was that if there were to be negotiations concerning

whatever role Landworks might be seeking in connection with this matter that those

communications be coordinated with counsel."  Peters Depo., Tab 1 at Ex. B, 106:17-20.

39.     Following the directive from USF&G, on August 19, 2005, Mr. Bullock wrote to

Mr. Matthews to inform him that "we were told that we cannot deal with Landworks while the

legal case is pending."  E-Mail from Robert Bullock to Neal Matthews, August 19, 2005, 8:09

a.m. ("Bullock E-mail, 8/19/05, 8:09 a.m."), attached to Tab 1 as Exhibit N.

40.     Mr. Bullock also wrote to Mr. Matthews that he was

"told by [USF&G] that he could not speak with [Neal Matthews] ... while the
lawsuit was pending" and "we are willing to discuss this with you, but in light of
the lawsuit, discussion should go through the attorneys" for Landworks and
USF&G.

Matthews Depo., Day Two, Tab 1 at Ex. G, 81:11-14, 89:16-19; Bullock Depo., Tab 1,

Ex. J at 56:12-15.; E-Mail from Robert Bullock to Neal Matthews, August 19, 2005, 4:36

p.m. ("Bullock E-mail, 8/19/05, 4:36 p.m."), attached to Tab 1 as Exhibit O.

41.     On August 30, 2005, counsel for Landworks wrote to Brad Carver, Esq., counsel

for USF&G, stating:

"Please find enclosed the e-mails we discussed.  My client and I are prepared to meet at any time to do what is necessary to secure payment and get me (sic) client back to work."

Letter from Robert Meltzer, Esq. to Brad Carver, Esq., August 30, 2005, attached to Tab 1 as Exhibit P.

42.    USF&G had "no specific written policy" for handling subcontractor claims, only "a general expectation that if there were negotiations involving matters in litigations that counsel would be involved."  Peters Depo., Tab 1 at Ex. B,106:23-24.

43.    Mr. Matthews admitted that before Landworks chose to file suit against Lovett-Silverman, he had knowledge of "the e-mail traffic between the parties" in which USF&G directs Lovett-Silverman to have no contact with Landworks.  Matthews Depo., Day Two, Tab 1 at Ex. G, 104:15-23.

44.    When asked, at his 30(b)(6) deposition on behalf of Landworks, "how it is that Lovett-Silverman denied you access to the project?", Neal Matthews testified:

Lovett-Silverman denied access to Landworks by refusing to "taking [his] request that [he] made for [Lovett-Silverman] to meet with attorneys present to mediate, negotiate the amounts owed to [Landworks].

Matthews Depo., Day Two, Tab 1 at Ex. G,109:13-21.

45.    Under the terms of its Agreement with USF&G, Lovett-Silverman had no obligation to mediate or negotiate with subcontractors on behalf of USF&G, especially when explicitly told by USF&G *not* to do so. See scope of work in the Lovett-Silverman Agreement, Tab 1 at Ex. C, Exhibit A.

46.    When asked, at his 30(b)(6) deposition, "What is your basis to assert that Lovett-Silverman had the authority to authorize payments?", Neal Matthews testified as to his own

"belief" as to Lovett-Silverman's duties and responsibilities under its Agreement with USF&G, stating:

> "Lovett-Silverman was charged with investigating the claim [and to find] out which portions of it were valid ... and then ... tell the surety ... the amount that is owed."

Matthews Depo., Day Two, Tab 1 at Ex. G, 101:10-16.

47.     Neal Matthews admitted that he did not know "who was the decision maker, whether it was USF&G or whether it was Lovett-Silverman." Matthews Depo., Day Two, Tab 1 at Ex. G, 102:1-5. Amended Complaint Tab 1 at Ex. A, ¶ 12.

48.     In fact, as the 30(b)(6) designee for USF&G testified, it is undisputed that "[w]hen Jackson would submit requests for payment and requisitions to pay subcontractors ... preliminary payment applications would be submitted to Russ Werner" of St. Paul.  Peters Depo., Tab 1 at Ex. B, 77:22-78:2.

49.     USF&G's witness further testified that "the payments to be made to the subcontractors would be made out of ... funds that [USF&G] received from the Town of Shrewsbury and then ... remitted to Jackson."  Peters Depo., Tab 1 at Ex. B, 79:9-12.

50.     Count II ("Fraud") of Landworks' Amended Complaint alleges that in providing its consulting services, Lovett-Silverman:

> (a) "failed to effectuate payments of monies due and owing";
>
> (b) ... "engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract";
>
> (c) ... "devised and carried out a conspiracy to 'bang' Landworks"; and
>
> (d) supported USF&G in "defam[ing] the Plaintiff".

Amended Complaint at Tab 1, Ex. A ¶ 20.

51.     Landworks' corporate designee, Neal Matthews testified that the basis for this

allegation was his understanding that:

> Lovett-Silverman ... [had to] go through all of your billing to make certain what
> you said you were owed you were owed.  And then they would, in turn, give that
> to the surety, and the surety would pay you.

Matthews Depo., Day Two, Tab 1 at Ex. G, 101:8-24.

52.     Landworks' bases its entire case against Lovett-Silverman on an internal Lovett-

Silverman e-mail in which Al Falango writes:

> "I don't think 825k is enough for the contingency we already know we have busts
> in the track work, site work, electric (major), roofs and doors (major) even though
> the town is holding money I still think we could possibly break the 800k mark
> with these, we've already spent 400k on G and R for one month and we still don't
> have checks for the subs.  We can try to bang the subs but I think that we can
> never recover from them what we are spending."

E-mail from Al Falango to Tony Lardaro and Robert Bullock, September 21, 2005 at

9:08 a.m., attached to Tab 1 as Exhibit Q; Lardaro Depo., Tab 1 at Ex. D, 60:8; Peters

Depo., Tab 1 at Ex. B, 167:12-13; Amended Complaint, Tab 1 at Ex. A, ¶¶ 12, 14, 20, 23,

27, 40.

53.     As Tony Lardaro, Lovett-Silverman's Vice-President and recipient of Mr.

Falango's internal e-mail testified, the term "bang" is a "slang" term describing "back-charg[ing]

subcontractors for costs when others perform work on their behalf."  Lardaro Depo., Tab 1 at Ex.

D, 61:22-62:3.

54.     James Peters also testified that the term "bang the subs" is "slang" and is used

"where [USF&G] had incurred costs to complete or fix ... defective work, which would be

chargeable back to the account of the involved subcontractor."  Peters Depo., Tab 1 at Ex. B,

168:10-19.

55.     When asked, "Can you tell me what it means to back charge a subcontractor", Mr. Matthews agreed that:

> "[t]o back charge a subcontractor would be to back charge them for incomplete work that they had not corrected themselves ... and to present them with a bill for work they had done to correct whatever."

Matthews Depo. Day One, Tab 1 at Ex. F, 172:3-8.

56.     According to Mr. Matthews, he believed that the phrase "bang" meant "to try to extract more from [a person or entity] than what was maybe the original intentions (sic) of getting from them."  Matthews Depo. Day One, Tab 1 at Ex. F, 174:7-9.

57.     When asked, given Mr. Matthews' definition of bang, "do you believe that Lovett-Silverman engaged in a bang of Landworks?", Mr. Matthews further testified:

> "I believe that there was a realization sometime on this job that it was not going well and that it was not going to go well and that there needed to be savings wherever it could be made."

Matthews Depo., Day One, Tab 1 at Ex. F, 174:19-22.

58.     Mr. Matthews further testified:

> "[T]hey [USF&G] were going to have to try to recuperate costs as best they could to drive the overall cost of the project down, because they were going to run over any of the projections that they had."

Matthews Depo., Day One, Tab 1 at Ex. F, 175:1-5.

59.     It is undisputed that the internal e-mail communication between Al Falango and others at Lovett-Silverman was not produced to USF&G until after Landworks filed suit against USF&G and it was turned over with Lovett-Silverman's Project files in informal discovery.  At that time, Mr. Peters discussed the inappropriateness of using the term "bang" with Mr. Falango.  Peters Depo., Tab 1 at Ex. B, 167:4-8.

60.     In addition to the allegation that Lovett-Silverman wrongfully intended to "bang" Landworks, Landworks' further bases its Fraud Count on the alleged "compilation of ... a false counterclaim that Lovett-Silverman helped prepare for [USF&G]".  Matthews Depo., Day Two, Tab 1 at Ex. G, 107:7-10.

61.     When asked at his 30(b)(6) deposition, how "did [Lovett-Silverman defame you?", Neal Matthews testified:

> "Lovett-Silverman made statements about [Landworks'] deficiency in the work which are not attributable to me or Landworks, and that in so making these statements without first investigating the validity of them, that that's (sic) defamatory."

Matthews Depo., Day One, Tab 1 at Ex. F, 107:23-108:3.

62.     In answering Lovett-Silverman's First Set of Interrogatories, Landworks claims that in assisting USF&G with its allegedly false counterclaim,

> Lovett-Silverman "provid[ed] information that was knowingly false – for example, passing off work that was not within the scope of Landworks as the scope of Landworks, and by otherwise lying to Landworks as to why Landworks was not being permitted to return to the site."

Landworks' Supplemental Answers to Lovett-Silverman's First set of Interrogatories ("Answers to Interrogatories"), at Answer 5, attached to Tab 1 as Exhibit P.

63.     To the contrary, it is undisputed that Lovett-Silverman simply reviewed the Landworks subcontract to determine its scope of work.  Lovett-Silverman "determine[d] the scope of work that each party was responsible to perform ... by reading the subcontract agreement or the purchase order agreement" for each subcontractor.  Lardaro Depo., Tab 1 at Ex. D, 56:8-14.  Bullock Depo., Tab 1 at Ex. J, 50:14-24.

64.     Count III of the Amended Complaint ("Tortious Interference") alleges that

Lovett-Silverman, by carrying out its program of "banging" the subcontractors, did tortuously (sic) interfere in the contract between the Plaintiff an USF&G, for ulterior motives.

Amended Complaint, Tab 1 at Ex. A, ¶ 23.

65.    When asked, "how is it that you believe that Lovett-Silverman interfered in your contract with the surety?", Neal Matthews testified that:

Lovett-Silverman did not investigat[e] [Landworks'] claim , by not at least looking into the possibilities that ... monies were owed, and ... by not ... giving [Landworks] a full and fair hearing on the amounts that I say were owed to [Landworks] ... and not presenting them to the surety.

Matthews Depo., Day Two, Tab 1 at Ex. G, 108:18-109:5.

66.    Contrary to Neal Matthews' testimony as to what he thinks Lovett-Silverman's scope of work should have been, it is undisputed that in fact, it was not within Lovett-Silverman's scope of work to investigate claims made by subcontractors against USF&G or to preside over a hearing for such subcontractors. Lovett-Silverman Agreement, Tab 1 at Ex. B., Exhibit A; Peters Depo., Tab 1 at Ex. B at 46:6-11; Lardaro Depo., Tab 1 at Ex. D, 56:3-17.

67.    In response to an interrogatory asking, "State the basis of your contention ... that Lovett-Silverman interfered in the business relationship between Landworks and USF&G", Landworks responded:

Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. ... An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF&G with false data provided by Lovett-Silverman.

By reference to other interrogatory answers, Landworks also replied,

... Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information. Based upon the e-mails subsequently identified, it is clear that Landworks would be barred from its right to perform its work.

Answers to Interrogatories, Tab 1 at Ex. P, Answers No. 17 and 18.

68.     Neal Matthews testified that he believed that "Lovett-Silverman prepared the counterclaim to give to USF&G so that they could file a counterclaim against me."  Matthews Depo., Day One, Tab 1 at Ex. F, 102:2-4.

69.     To the contrary, it is undisputed that in fact, USF&G "tasked Lovett-Silverman with doing a review of the status of the project ... and they identified aspects of the site work that were either incomplete or which required corrective measures."  Peters Depo., Tab 1 at Ex. B, 142:4-9.

70.     In Count VI of the Amended Complaint ("Violations of c. 93A") Landworks alleges:

> "Lovett-Silverman set out to harm Landworks by denying it access to the Project
> and to funds due and owing ... [and] The pattern and practice of fraud, tortous
> (sic) interference and such conduct constitutes violations of c. 93A by Lovett-
> Silverman."

Amended Complaint Tab 1 at Ex. A, ¶¶ 38, 40.

71.     The Amended Complaint also alleges that Lovett-Silverman "engag[ed] in extortion toward the subcontractors."  Amended Complaint, Tab 1 at Ex. A ¶ 12

72.     Landworks did not send an M.G.L. c. 93A demand letter to Lovett-Silverman at any time prior to filing suit against Lovett-Silverman.  See Affidavit of Julie A. Ciollo, affirming that no such letter was sent to Lovett-Silverman.

73.     When asked, "Are you aware of any other subcontractors at the site who you would say were strong-armed or extorted by Lovett-Silverman?", Neal Matthews testified,

> "I didn't think I ever used the word 'extorted' by Lovett-Silverman.  ... I think
> that would be a term I would not apply to them."

Matthews Depo., Day One, Tab 1 at Ex. F, 114:10-11.

74.     Furthermore, Mr. Matthews testified,

"I don't know of the dealings with other subcontractors with Lovett-Silverman. ....
So I don't know if other subcontractors were strong-armed or not."

Matthews Depo., Day One, Tab 1 at Ex. F, 114:12-15.

75.     When asked, "Do you believe that Lovett-Silverman strong-armed Landworks?",

Neal Matthews testified,

"I don't know if it constitutes strong-arming."

Matthews Depo., Day One, Tab 1 at Ex. F, 109:11-17.

76.     In its response to Lovett-Silverman's interrogatory asking,

" Please identify each subcontractor that you allege ... was denied rights by
Lovett-Silverman and set forth the specific rights denied by each such
subcontractor",

Landworks answered,

"Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly
extortionist conduct in attempting to dangle payment with a precondition of
waiving legal rights under G.L. c. 149 § 29.  This also violated Plaintiff's rights,
and may even have been criminal in nature."

Landworks further answered,

The e-mail traffic that has been produced indicates that *Lovett-Silverman were
nothing more than the Surety's foul-mouthed thugs, operating on the ground as
on-the-ground hatchet men*.  Aside from the language about "banging" the
subcontracts (sic), Landworks finds it significant that Al Falango of Lovett-
Silverman would send an e-mail .. to Rick Noblet [also a Lovett-Silverman
employee] referring to "my F-in' vacation."  On August 17, 2005, Al Falango
sent an e-mail to a claims attorney, Russ Fuller, ... referring to the president of
Landworks as "this guy."  Landworks is not a "guy."  It is a well-know (sic) and
respected corporation.  This kind of e-mail confirms that Lovett-Silverman
consultants were not behaving in the type of professional, credible construction
consultants tasked with representing the best interests of all involved in this
project.

Supplemental Answers to Interrogatories, Tab 1 at Ex. M, Answer No. 7 (emphasis
added).

77.     In its response to Lovett-Silverman's interrogatory asking,

" State the basis of your contention ... that Lovett-Silverman's conduct constitutes a violation of c. 93A",

Landworks answered,

"Banging Landworks, lying about their status, assisting in the preparation of a false lawsuit and other such conduct, all for the purposes of avoiding payment, sounds like unfair and deceptive trade practices to this Plaintiff."

Supplemental Answers to Interrogatories, Tab 1 at Ex. M, Answer No. 21.

<div style="margin-left: 40%;">

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

</div>

Dated:  March 23, 2007

01074882

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |

## AFFIDAVIT OF JULIE A. CIOLLO

1.    I am an attorney in good standing and admitted to the bar of the Commonwealth of Massachusetts and the Federal District Court for the District of Massachusetts.

2.    I am an associate in the law firm of Donovan Hatem LLP, counsel to the Defendant, Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman").

3.    I submit this affidavit in support of the Memorandum of Law in Support of Lovett-Silverman's Motion for Summary Judgment.

4.    The exhibits attached hereto are true and accurate copies of the original documents.

5.    I am familiar with the record of this matter and affirm that counsel for the Plaintiff, Landworks Creations, LLC, did not send an M.G.L. c. 93A demand letter to Lovett-Silverman at any time prior to filing suit in this matter.

I declare under the penalties of perjury that the foregoing is true and correct.

Executed this 23rd day of March, 2007.

_/s/ Julie A. Ciollo_____
Julie A. Ciollo

01078081

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on March 23, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | AMENDED COMPLAINT |
| | ) | |
| UNITED STATES FIDELITY AND | ) | |
| GUARANTY COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |

1. Plaintiff, Landworks Creations, LLC ("the Plaintiff") is a limited liability corporation with a principal place of business at 1500A Lafayette Road in Portsmouth in the State of New Hampshire.

2. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("USF & G") is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts.

3. Defendant, Lovett-Silverman Construction Consultants, Inc. ("L-S") is a business entity with a principle place of business at 380 Townline Road, Haupauge, in the state of New York.

4. Jurisdiction may be had over L-S based upon the conducting of business by L-S in the Commonwealth of Massachusetts, and by nature of its torts within the Commonwealth of Massachusetts, and based upon the existence of offices within the Commonwealth of Massachusetts.

5. The Plaintiff entered into a contract with Standen Contracting Company, Inc. of North Dartmouth, Massachusetts.

6. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project")

7. Standen Contracting Company, Inc. was bonded by USF & G, United States Fidelity & Guaranty Co.

8. Standen Contracting Company, Inc. was unable to complete its work at the Project, and USF & G, pursuant to its obligations under a performance bond SW5041 assumed responsibility for completion of the Project in the stead of Standen Contracting Company, Inc.

9. The Plaintiff has performed it work under the Standen contract, and is owed funds by USF & G for the work performed.

10. USF & G has failed to pay the Plaintiff for work performed at the Project, to the extent of $135,101.00.

11. At some point in the winter of 2004-2005, or in the spring of 2005, USF & G brought L-S to the Project to oversee completion of the Project.

12. L-S engaged in a scheme to reduce costs to USF & G on the Project by refusing to authorize payments to subcontractors, including the Plaintiff, by engaging in extortion toward the subcontractors, by strong-arming the subcontractors and by attempting to deny the subcontractors their rights under their contracts.

13. L-S also engaged in conduct that compelled subcontractors to file suit to receive payment, as part and parcel of a scheme to extort payments from subcontractors to USF & G through frivolous and fraudulent lawsuits.

2

14. In the words of Al Falango at L-S, there was an organized and on-going effort by L-S "to

bang the subs…"

15. Landworks was a victim of L-S's conduct.

<div align="center">

COUNT I
BREACH OF CONTRACT
LANDWORKS v. USF & G

</div>

16. The Plaintiff restates allegations 1-16 and incorporates them by reference.

17. USF & G breached its contract by failing to perform its obligations to make payment

under the bond between USF & G and Standen for the benefit of the Plaintiff..

18. As a result of this breach, the Plaintiff has been denied its expectancy and has otherwise

been harmed.

<div align="center">

COUNT II
FRAUD
LANDWORKS v. BOTH DEFENDANTS

</div>

19. The Plaintiff restates allegations 1-18 and incorporates them by reference.

20. The Defendants engaged in specific conduct which serve as fraud on the Plaintiff:

a.   the Defendants failed to effectuate payments of monies due and owing

b.   knowing that funds were due and owing, the Defendants engaged in conduct to deprive

the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without

cause, failing to communicate with the Plaintiff to explain its conduct and failing to

engage in good faith and fair dealing implied in each contract

c.   knowing that funds were due and owing, the Defendants devised and carried out a

conspiracy to "bang" Landworks.

<div align="center">

3

</div>

    d.  knowing that the Plaintiff was not culpable for defects at the site, USF & G alone and

with the support of L-S defamed the Plaintiff, making knowingly false statements in court

papers to defend its failure to pay, and otherwise, by its conduct, implying defects in

performance that harmed the Plaintiff in its business

    e.  knowing that the Plaintiff was not culpable for defects at the site, USF & G filed false

statements with this Court, obstructed access to documents by thwarting the discovery

process, asserted false affirmative defenses, manipulated the legal system by removing

this matter to the federal court in the hope of slowing the progress of litigation, assisted in

and filed a knowingly false counterclaim.

    f.  Knowing that the Plaintiff was not culpable for defects at the site, USF & G has engaged

in a pattern and practice of hindering or delaying the resolution of this litigation.

21. This conduct, which constituted fraud on the Plaintiff, caused harm to the Plaintiff.

<div align="center">

COUNT III
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

</div>

22. The Plaintiff restates allegations 1-21 and incorporates them by reference.

23. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere

in the contract between the Plaintiff and USF & G, for ulterior motives.

24. L-S was aware of the advantageous business relationship between the Plaintiff and USF

& G.

25. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

<div align="center">4</div>

COUNT IV
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

26. The Plaintiff restates allegations 1-25 and incorporates them by reference.

27. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere in the contract between the Plaintiff and USF & G, for ulterior motives.

28. L-S was aware of the advantageous business relationship between the Plaintiff and USF & G.

29. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

COUNT V
CONVERSION
LANDWORKS v. USF & G

30. The Plaintiff restates allegations 1-29 and incorporates them by reference.

31. USF & G received the benefit of the Plaintiff's work, to a value of $135,000.

32. USF & G kept that value.

33. USF & G converted the value of that work to its own benefit.

34. As a result of this conversion, the Plaintiff has been harmed.

COUNT VI
VIOLATIONS OF c. 93A AND c. 176D
LANDWORKS v. BOTH DEFENDANTS

35. The Plaintiff restates allegations 1-34

36. The Plaintiff and both defendants are involved in trade or commerce.

37. Defendant, USF & G failed to investigate a claim and make prompt payment. Notwithstanding that liability was reasonably clear, USF & G has declined to make full settlement of the claim, without cause or excuse.

38. Defendant, L-S, set out to harm Landworks by denying it access to the Project and to funds due and owing.

39. The Plaintiff has made demand for its funds, a demand which has been ignored.

40. The pattern and practice of fraud, tortous interference and such conduct constitutes violations of c. 93A by L-S.

41. The pattern and practice by USF & G of refusing to make payments and to investigate violate both c. 93A and c. 176D.

42. As a result of this conduct, the Plaintiff has been harmed in its business.

<div align="center">

COUNT VII
VICARIOUS LIABILITY
LANDWORKS v. USF & G

</div>

43. The Plaintiff restates allegations 1-42

44. To the extent that L-S was acting as an agent of USF & G, USF & G is liable for the torts of its agents.

45. The Plaintiff was harmed by the tortous conduct of L-S.

46. Defendant, USF & G is liable for that harm.

<div align="center">

COUNT VIII
NEGLIGENT SUPERVISION
LANDWORKS v. USF & G

</div>

47. The Plaintiff restates allegations 1-46

48. To the extent that L-S was acting as an agent of USF & G,  USF & G had a duty to supervise its agent to assure that the agent did not commit harm.

49. Defendant, USF & G breached that duty.

As a result of its negligence, the Plaintiff was harmed.

WHEREFORE, the Plaintiff respectfully requests that:

1.  this Honorable Court enter judgment against USF & G as to all Counts in which it is named;

2.  this Honorable Court enter judgment against L-S as to all Counts in which it is named

3.  this Honorable Court award the Plaintiff the amount of $135,101 together with interest and costs, trebled, along with attorney's fees

4.  this Honorable Court award damages in an amount that will make the Plaintiff whole on the tort claims, trebled, along with attorney's fees; and

5.  this Honorable Court award any further relief as deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: June 20, 2006

# EXHIBIT B

Page 7

1    identification.)

2        Q.    (By Mr. Meltzer) Mr. Peters, could you

3    please tell me where you reside?

4        A.    I reside in Simsbury, Connecticut.

5        Q.    What is the address?

6        A.    38 Latimer Lane.

7        Q.    How long have you lived there?

8        A.    Approximately 27 years.

9        Q.    Do you have any plans to move from there in

10    the next year?

11        A.    No.

12        Q.    Who is your employer?

13        A.    I'm employed by, in this case, United

14    States Fidelity and Guaranty Company.

15        Q.    When you say "in this case," what do you

16    mean by that?

17        A.    United States Fidelity and Guaranty Company

18    is one of several underwriting companies that make

19    up part of the St. Paul Travelers Companies.

20        Q.    Do you actually receive a paycheck from

21    USF&G?

22        A.    No.

23        Q.    Where does your paycheck come from?

24        A.    My recollection is that the paycheck is

Page 22

1   the Commonwealth of Massachusetts?

2       A.  I don't recall that I have been deposed in

3   the Commonwealth of Massachusetts.

4       Q.  Within the category of handling claims on

5   surety bonds, can you explain what kind of surety

6   bonds we are talking about, in terms of the kind of

7   bonds?

8       A.  For the most part they include performance

9   bonds, payment bonds, and occasionally some bonds of

10  a miscellaneous nature that might pertain to the

11  operations of a construction company.

12      Q.  When you say "performance bonds," what does

13  that phrase mean to you?

14      A.  It is a bond that is generally conditioned

15  upon the performance by our bond principal of a

16  construction contract.

17          And, to the extent that the principal

18  fulfills the obligations of that underlying

19  contract, then the bond would be null and void, to

20  the extent that the principal would default and be

21  terminated on that obligation.

22          The surety would, generally speaking, have

23  an obligation to discharge its responsibilities

24  under that bond.

Page 23

1    Q.   Payment bond; what does that mean to you?

2    A.   A payment bond is generally conditioned

3  upon the obligation of the bond principal to pay for

4  labor, materials, or services that are incorporated

5  in the bonded construction project.

6         To the extent that they don't, there is an

7  obligation under that bond, and the surety would

8  have an obligation to discharge that responsibility.

9    Q.   Does the Travelers have their own

10  construction company?

11   A.   Not that I know of.

12        No.

13   Q.   When Travelers has to take up an obligation

14  under a performance bond is there a policy or set of

15  policies in writing that explain how those

16  obligations are to be met by the Travelers?

17   A.   No.

18   Q.   Were you aware of any kind of committees or

19  groups that exist within the Travelers for purposes

20  of creating policies for handling claims under

21  performance bonds?

22   A.   No.

23   Q.   If there are no written policies that

24  dictate that, what is the general method for how the

Page 46

1    obligations were at this project; the Shrewsbury

2    Middle School?

3        A.   What I understand it to be?

4            Yes, I think I do.

5        Q.   What are those obligations?

6        A.   In essence, to provide construction-related

7    experience and support in response to our specific

8    request and involving matters pertaining to the

9    discharge of our performance bond obligation and in

10   matters pertaining to the discharge of our payment

11   bond obligations.

12       Q.   Do you know when that document you referred

13   to was prepared?

14       A.   The more specific one was prepared around

15   the time of when the Standen claim arose.

16           I don't recall when the more general

17   agreement was executed.

18       Q.   Do you have an understanding that

19   Lovett-Silverman became involved when Standen

20   failed?

21       A.   That's my general recollection.

22       Q.   Do you know when Standen failed?

23       A.   My general recollection is it's sometime in

24   the early part of 2004.

Page 60

1    realize you were not personally involved with this

2    from the moment of failure on the Standen/Shrewsbury

3    project -- but the time line as it transpired from

4    the failure of Standen until the time the work was

5    back up and running under Jackson, how that would

6    all unfold?

7        A.  Is this with respect to Shrewsbury?

8        Q.  Yes.

9        A.  I have a general recollection of how

10   Standen got into difficulty in the spring of 2005

11   and that Jackson became involved within a relatively

12   short period of time thereafter.

13       Q.  2005 or 2004?

14       A.  I'm sorry.  2004.

15           Yes.  Spring of 2004.

16       Q.  At what point would Lovett-Silverman have

17   been brought in on the Shrewsbury Middle School

18   project?

19       A.  I don't have a specific recollection.

20       Q.  They'd have been brought in before Jackson

21   was on the job?

22       A.  I could only say that I have a general

23   understanding that they were involved in issues that

24   followed Standen's default, but I don't recall

Page 72

1    A.  I was.

2    Q.  How about from their side?

3    A.  My primary contact was Bob Barton.

4    Q.  Do you know what Bob Barton's position with

5    the company was?

6    A.  My general understanding is he was an

7    officer.  I don't remember his title.

8    Q.  During the time between the period when

9    they signed the agreement and then their failure in

10   the summer of 2005, were they also still a bond

11   account for your company?

12   A.  Not an active one.

13       No.

14   Q.  When did they start becoming an active

15   account?

16   A.  I don't recall.

17   Q.  Do you know if it was during that time

18   between signing that contract and the time of that

19   failure?

20   A.  That's my general understanding.

21       Yes.

22   Q.  During that time period before they stopped

23   being an active account were their finances under

24   any kind of regular audit or inspection by your

Page 77

1          I do recall a meeting in that same trip

2    with Dan Morgado just by way of an introduction.

3          I recall attending a meeting with Russ

4    Warner and Bob Barton from Jackson and various

5    members of the representatives of the Town of

6    Shrewsbury.

7          Q.  Do you recall Bob Barton explaining why the

8    work wasn't being completed in a timely manner?

9          A.  I have a general recollection that he was

10   being tasked by the town to respond to questions of

11   that nature.

12         Yes.

13         Q.  Do you recall what he said, in terms of his

14   explanation?

15         A.  I don't remember the specifics.

16         No.

17         Q.  Was there a perception that Jackson had not

18   been paying subcontractors?

19         A.  There was a perception from the town.  Yes.

20         And I think at a point in time USF&G shared

21   that same perception.

22         Q.  When Jackson would submit requests for

23   payment and requisitions to pay the subcontractors,

24   who would those requisitions be submitted to?

Page 79

1      A.  My general understanding is that Jackson

2  would be paid in accordance with the payment

3  applications that had been approved by the architect

4  and by the Town of Shrewsbury.

5      Q.  Was there an expectation to keep the job

6  moving that Jackson would pay the subcontractors and

7  then be reimbursed on those amounts?

8      A.  My general recollection of the sequence is

9  that the payments to be made to the subcontractors

10  would be made out of the proceeds of the funds that

11  we had received from the Town of Shrewsbury and then

12  had, in turn, remitted to Jackson.

13          And to the extent that there were

14  subcontractors who were entitled to be paid in the

15  same proportion that those payments had been

16  received from the town that the payments would be

17  made to them.

18      Q.  Did the money go from the town, then to the

19  surety, down to Jackson for payment to

20  subcontractors?

21          Was that the general route?

22      A.  That would be my general understanding.

23      Q.  And was there an issue that not enough

24  money was being provided by the town to trickle down

Page 82

1          A.   Again, I don't have a specific

2    recollection.

3          Q.   Do you recall at that time frame whether

4    particular subcontractors stated that they would not

5    return to the job until they had received payment on

6    their invoices?

7          A.   I have a general recollection that

8    allegations of that type had been made at some

9    point.

10         Q.   Do you know which subcontractors?

11         A.   I don't have a specific recollection.

12         Q.   At some point did Lovett-Silverman become

13   involved again in this project?

14         A.   Yes.

15         Q.   Do you know when that occurred?

16         A.   It occurred in advance of our giving notice

17   to Jackson that we consider them to be in default

18   under the terms of their completion agreement.

19         Q.   Did your company have a performance bond

20   that pertained to Jackson for completion of the

21   Shrewsbury Middle School project?

22         A.   Not a performance bond that was issued on

23   behalf of Jackson as a bond principal.

24         Q.   Do you know if they had a performance bond

Page 85

1    John Lovett.

2         There may be others.  I don't recall.

3    Q.  What would Al Falango's responsibilities

4    have been, as you understood them?

5    A.  To assist us in a general way with respect

6    to our efforts to locate and secure a replacement

7    contractor for Jackson and, to some extent, to

8    participate in the subcontractor ratification and

9    payment bond claim processing activities.

10   Q.  Why would there be a ratification process

11   following the failure of Jackson?

12   A.  To the extent that we wanted to be able to

13   utilize existing subcontractors.

14        We believed that it was in our interest to

15   establish terms and conditions under which they

16   would be prepared to resume their subcontract

17   responsibilities and complete their obligations.

18   Q.  Would the subcontractors who had signed

19   ratification agreements after the failure of Standen

20   be expected to sign a second, what's referred to as

21   a hold agreement?

22   A.  In most instances, yes.

23        Although, I think the particular form that

24   we used referred to it as a ratification agreement,

Page 105

1    ratification?

2        A.   It would depend on the circumstances.

3        Q.   What circumstances?

4        A.   There were some instances in which, by

5    agreement with counsel, our consultants would be

6    asked to become involved in some communications.

7            There were other instances in which counsel

8    representing one or more subcontractors would

9    initially make contact with one of our consultants.

10           And I have a recollection of one instance

11   in which I had requested that our consultants

12   refrain from direct communications as a result of

13   the existence of litigation in one particular

14   matter.

15       Q.   Which matter was that?

16       A.   The Landworks Creations litigation.

17       Q.   Tell me, again, what you determined was

18   appropriate for communication there?

19       A.   It was my understanding that we were

20   involved in litigation with Landworks.

21           My understanding was that Landworks had

22   been -- that our consultant, Lovett-Silverman, had

23   been contacted by Landworks and that they had

24   expressed an interest in exploring the possibility

Page 106

1   of having their subcontract ratified.

2         I asked Lovett-Silverman to refrain from

3   engaging in negotiations with Landworks and to

4   suggest that if there was any communication with

5   them that it would be more appropriate for those

6   communications to be exchanged between Landworks

7   counsel and United States Fidelity and Guaranty

8   Company's counsel.

9         Q.   Was there a policy specifically that

10  precluded the consultant from speaking to Landworks

11  specifically?

12        A.   There was not a policy that would have

13  precluded them from speaking to Landworks.

14        It's really more that the substance of the

15  communications that I had a concern about.

16        Q.   What was your concern?

17        A.   My concern was that if there were to be

18  negotiations concerning whatever role Landworks

19  might be seeking in connection with this matter that

20  those communications be coordinated with counsel.

21        Q.   Was that a policy throughout USF&G, those

22  matters be handled in that way?

23        A.   I can't say that there is a specific

24  written policy.

Page 142

1  of attorney-client privilege.

2          You can answer to the extent you have your

3  own personal knowledge.

4      A.  My general understanding is that we tasked

5  Lovett-Silverman with doing a review of the status

6  of the project prior to the time that G&R was

7  brought in and that they had identified that there

8  were aspects of the site work that were either

9  incomplete or which required corrective measures.

10     Q.  You relied on Lovett-Silverman for that

11 discovery?

12     A.  That's my understanding.  Yes.

13     Q.  Who at Lovett-Silverman?

14     A.  Bob Bullock is one name that comes to mind.

15 There may have been others.

16     Q.  Do you know what he did as part of his

17 investigation that led to this discovery?

18     A.  I have a general understanding that he made

19 one or more visits to the site.

20     Q.  What else did he do?

21     A.  I have a general recollection of having

22 prepared some documents evidencing his findings.

23     Q.  Do you know if he spoke to anybody at

24 Jackson?

Page 167

1    Do you recall seeing this email?

2    A.  Yes.

3    Q.  When did you first see this email?

4    A.  I don't know that I could pin a date on it.

5    My general recollection is is that it was a

6    document that was identified during the course of

7    discovery of Lovett-Silverman's business records and

8    it was brought to my attention after that.

9    Q.  You had a chance to read this email?

10    A.  Yes, I have.

11    Q.  You saw the language at the bottom that

12    says, We can try to bang the subs, but I think that

13    we can never recover from them what we are spending.

14    See that reference?

15    A.  Yes.

16    Q.  In fact, at the top of that paragraph it

17    actually talks about site work; correct?

18    A.  Among other things, yes.

19    Q.  Do you know what it means to bang subs?

20    A.  I don't know what Mr. Falango meant by

21    that.

22    Q.  Did you ever call up Al Falango and ask him

23    what he meant by it?

24    A.  I remember having a conversation with him

Page 168

1   about it.

2        Q.   When was that conversation?

3        A.   After I had seen the email.

4        Q.   Why did you have a conversation with him

5   about it?

6        A.   Because I wanted to understand more clearly

7   what he was talking about and to express some

8   disappointment in his choice of words.

9        Q.   Why disappointment?

10        A.   Because it appears to be the use of slang,

11   which could be taken out of context.

12        Q.   Did he explain to you what he meant by

13   that; we can try to bang the subs?

14        A.   My understanding was that he was talking

15   about to identify instances where we had incurred

16   costs or would incur costs to complete or to fix

17   corrective -- to complete work or to correct

18   defective work, which would be chargeable back to

19   the account of the involved subcontractor.

20        Q.   That's what he said?

21        A.   In general terms, yes.

22        Q.   Do you recall when that conversation took

23   place?

24        A.   Again, it was after I had seen the email.

# EXHIBIT C

EXHIBIT A

FIRE AND MARINE WORK ASSIGNMENT
Revision 0
April 13, 2004

THIS WORK ASSIGNMENT is subject to the terms of the Professional Services Agreement between the parties, dated January 10, 2003 (the "Agreement"). The terms of this Work Assignment shall control if there is a conflict with the terms of the Agreement.

PRINCIPAL:    Standen Contracting Company, Inc.

CONTRACTOR: Lovett Silverman Construction Consultants

SERVICES PERFORMED BY:    Al Falango, Rick Noblet

FEES:

| | | | |
|---|---|---|---|
| Number of Work Hours:    800 x $  130  /hr | | $ | 104,000 |
| Number of Travel Hours:  ____ x $ ____ /hr | | $ | Included above |
| Transportation Costs: | | $ | 5,000 |
| Lodging/Meals: | | $ | 0 |
| Other:  Miscellaneous expenses (photographs, copies, etc.) | | $ | 15,000 |

ESTIMATED TOTAL:    $    124,000

START DATE:  January 01, 2004

END DATE:  July 31, 2004

CLAIM NO(S).:    SW5041

PROJECT NO(S).:

PROJECT NAME(S):    Shrewsbury Middle School, Shrewsbury Massachusetts
Westford – North Street, Westford Massachusetts
Bryantville Elementary, Pembroke, Massachusetts
Wrentham Safety Complex, Wrentham Massachusetts
Old Hammondtown School, Mattapoisett Massachusetts

FIRE AND MARINE CONTACT: Russ Werner (410) 578-2025

DESCRIPTION OF SERVICES:

1. Complete a preliminary investigation of the jobsites at Shrewsbury Middle School and Westford to assess the progress to date and the ability of the principal to complete the work.
2. Obtain project documentation from the office's of Standen Contracting
3. Shrewsbury:
   a. Ratify subcontractors and suppliers
   b. Assist in the assignment of the Completion contractor,

4. Westford:

COPY

JUN 2004
RECEIVED

RECEIVED

JUN 2 8 2004

SURETY CLAIM

      a.   Ratify subcontractors and suppliers
      b.   Solicit lump sum price for completion of work and review same.
      c.   Assist in assignment of the Completion contractor

5.  Bryantville Elementary & Wrentham Safety Complex:
      a.   Investigate work remaining of these two projects
      b.   Obtain available documentation from Standen's office.
      c.   Advise as to best course of action to complete the work at these sites
      d.   Assist in completion of work.
      c.   Ratify subcontractors and suppliers.

6)  Old Hammondtown
      a.   Investigate work remaining.
      b.   Obtain available documentation from Standen's office.
      c.   Advise as to best course of action to complete the work at these sites.
      d.   Assist in completion of work.
      c.   Ratify subcontractors and suppliers.

## SPECIAL TERMS AND CONDITIONS:

Contractor represents that it does not currently represent any other party with any interest in this matter and that there are otherwise no conflicts of interest to this work assignment which would in any way impair Contractor to fulfill its obligations to Fire and Marine or its ability to provide objective information to Fire and Marine.

IN WITNESS WHEREOF, the parties by their authorized representatives have signed this Work Assignment.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY

Signature: _____

Name:  Robert E. Schumaker

Title:   Director of Engineering

Date:   5/28/04

CONTRACTOR

Signature: _____

Name:  ANTHONY J. LAZZARO

Title:   REGIONAL MANAGER

Date:   5/18/04

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY

Signature: _____

Name:  Russ Werner

Title:   Engineer

Date:  May 19, 2004

cc:    Claim Attorney

      File

# EXHIBIT D

Page 25

1      A.  No, sir.

2      Q.  Was your involvement with this project

3    ongoing after February 2003?

4      A.  Subsequent to ratifications, the surety

5    obtained a completion contract to finish the work in

6    lieu of Standen.  Our services ended at that point.

7      Q.  Do you know who that replacement contractor

8    was?

9      A.  I believe it was Jackson Construction

10   Company.

11     Q.  Had you ever heard of Jackson Construction

12   Company before the Shrewsbury Middle School project?

13     A.  No, sir.

14     Q.  At some point did you become involved in

15   this project?

16     A.  Yes.

17     Q.  Do you know when that was?

18     A.  I want to say it was in May, around May of

19   '05, I believe.

20     Q.  So about two years later?

21     A.  I think so, yeah.

22     Q.  How did you get involved in May of 2005?

23     A.  Apparently Jackson was having some

24   difficulty in completing the project in Shrewsbury,

Page 28

1    A.   I don't know that.

2    Q.   Can you tell me what Lovett-Silverman's

3    involvement was after May of 2005, after the

4    preliminary exposure reports were generated?

5    A.   We were asked to ratify contractors that

6    were interested in completing their scope of work.

7    We were asked to solicit bids for the completion of

8    the remaining work.   And we were asked to help

9    negotiate open change orders with the school.   And

10    we were asked to monitor the completion of the work

11    for the surety.

12    Q.   Who were the individuals for

13    Lovett-Silverman who were actively involved in that

14    process?

15    A.   Al Falango, Robert Bullock, Pedro Rosario,

16    Bill Meritz.

17    Q.   Were any of the various scopes of

18    responsibility assigned to individuals, or were they

19    all working on everything?

20    A.   We tried to split up the responsibilities.

21    Pedro handled most of the mechanical, electrical and

22    plumbing, light safety issues.   Bill Meritz, I

23    believe, did most of the interior trades.   And Bob

24    Bullock did mostly the exterior trades.

Page 56

1      Q.  What is the involvement of Lovett-Silverman

2   during that process?

3      A.  I assume we would compile the costs

4   involved with finishing the work, and pass that on

5   to the bonding company.

6      Q.  What would be the process for determining

7   what the party would be responsible for?

8      A.  In most cases we would determine the scope

9   of work that the party was responsible to perform

10  pursuant to their subcontract agreement or purchase

11  order agreement.

12     Q.  How would the scope be determined?

13     A.  By reading the subcontract agreement or the

14  purchase order agreement.

15     Q.  What else would you do?

16     A.  We would assess the costs actually expended

17  to perform any of that scope by others.

18     Q.  Were you involved in this process at the

19  Shrewsbury Middle School?

20     A.  Which process?

21     Q.  Of assessing back charges against prior

22  subcontractors.

23     A.  I wasn't involved in the actual process of

24  it, no.

Page 60

1    **Q.**  Have you discussed this e-mail with anyone,

2    other than counsel, in preparation for this

3    deposition?

4        **A.**  Other than Al Falango and Robert Bullock,

5    no.

6        **Q.**  Go to the end of the paragraph, the long

7    paragraph at the end, there is a sentence that

8    starts with, "We can try to bang the subs."  Do you

9    see that reference?

10       **A.**  Yes.

11       **Q.**  Do you ever recall seeing that reference

12   September 21st, 2005?

13       **A.**  I don't recall seeing it at that point.

14       **Q.**  Do you know what it means to try to bang

15   the subs?

16       **A.**  I know what it means in the context of this

17   e-mail.

18       **Q.**  Why don't you tell me.

19       **A.**  It means to back charge the subcontractors

20   for costs incurred by others in performing their

21   work.

22       **Q.**  Which subs are being referred to?

23       **A.**  My interpretation of what he is referring

24   to is the track sub, site sub, the electric sub,

Page 61

1    roof and door sub.

2        Q.  What do you base that on?

3        A.  What did he base what on?

4        Q.  Why do you think it's those subs?

5        A.  He is referring to busts in their figures.

6        Q.  When you talk about "busts," what does that

7    mean?

8        A.  Busts, in this contract, I take to mean

9    what is remaining in those subcontractors' accounts

10   versus what our estimate to complete the remaining

11   scope of work related to their accounts is.

12       Q.  Did you respond to this e-mail to Al?

13       A.  I believe I did, yes.

14       Q.  Did you ask him what he meant by the phrase

15   "try to bang the subs"?

16       A.  No.

17       Q.  Did you know what he meant in the context

18   of this e-mail?

19       A.  Yes.

20       Q.  Is banging the subs something

21   Lovett-Silverman does all the time?

22       A.  We back charge subcontractors for costs

23   when others perform work on their behalf.

24       Q.  Do you know why the phrase is used to "try

# EXHIBIT E

# Standen Contracting Company Inc.

**Date:**      **August 28, 2003**                          **Contract Number:**   **573-059**

**THIS AGREEMENT,** made as of the day and year written above by and between **STANDEN CONTRACTING COMPANY, INC.** of 445 Faunce Corner Road, N. Dartmouth, MA. 02747 (hereinafter referred to as "the Contractor")

And the subcontractor:      **Landworks**
                             **PMB 291**
                             **1500A Lafayette Road**
                             **Portsmouth, NH 03801**

The Contractor has made a general contract for construction dated ___**October 1, 2002**___ with
The Owner:   **Town of Shrewsbury**
             **100 Maple Avenue**
             **Shrewsbury, MA 01545**

For the construction of the following project:      **Shrewsbury Middle School - West**
                                                    **45 Oak Street**
                                                    **Shrewsbury, MA 01545**

The Architect for the project is:      **Lamoureux Pagano Associates**
                                       **14 East Worcester Street**
                                       **Worcester, MA 01604**

## The Contractor and Subcontractor agree as follows:

**ARTICLE 1. THE WORK.** The Subcontractor agrees to furnish all labor, materials, equipment and all else required to perform and complete the following Work required by the general contract: **Earthwork, Seeding & Site Demolition**

*CODE:*      *2-100-010-S*                          *Amount:  $824,823.00*

This Subcontract includes Addenda No. 1, 2, 3, 4, 5 and Alternates 1,2,3,4 & 5
This Subcontract includes  Exhibit "A"  Scope of work         Dated   August 28, 2003
                           Exhibit "B"  Unit Pricing           Dated   N/A
                           Exhibit "C"  Safety Program         Dated   August 28, 2003
                           Exhibit "D"  Drawing Schedule       Dated   November 7, 2002
                           Exhibit "E"  Tax Exempt Cert.       Dated   November 4, 2002
                           Exhibit "F"  Project Schedule       Dated   Pending Issuance

All of the work is to be done in accordance with the contract documents, defined as the general contract and other contract documents enumerated therein, including general, supplementary and other conditions, drawings, specifications, addenda and modifications (all of said documents being a part of this Subcontract) and in accordance with the provisions of this Subcontract. The Subcontractor agrees to be bound to the contractor by the terms of the General contract and to assume to the Contractor, with respect to that portion of the work described above, all obligations and responsibilities that the Contractor has assumed to the Owner.

**ARTICLE 2. PAYMENT:**
2.1 The contractor agrees to pay the Subcontractor, as full payment for all Work, including labor, materials, services, equipment and transportation, the sum of:      **Eight Hundred Twenty Four Thousand Eight Hundred Twenty Three Dollars and No Cents**

95%  NHM

**Dollars ($824,823.00)** payable in monthly

Payments as follows: Ninety percent **(90%)** of all work performed during the previous month and for which payment has been received by the Contractor.

Final payment shall be made to the Subcontractor promptly upon receipt of final payment by the Contractor. Provided that an application for payment is actually received by the contractor from the subcontractor not later than the twentieth day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next application for payment which the contractor is entitled to submit to the Owner. The Contractor shall pay the Subcontractor each progress payment within ten working days after the Contractor receives payment from the Owner, subject to the provisions of Section 2.1 hereof

2.2 It shall be a condition precedent to the Contractor's obligation to make any payment to the Subcontractor that the Contractor shall have first received payment for the Subcontractor's Work from the Owner. The Subcontractor agrees to look only to those amounts actually received by the contractor from the Owner as the source of payment to the Subcontractor. The Subcontractor understands and agrees that the Contractor shall have no obligation to pay any sum to the Subcontractor if the Contractor shall not have received a corresponding payment from the Owner, and the Subcontractor (not the Contractor) assumes the risk of nonpayment by the Owner. Any payments that may be made by the Contractor to the Subcontractor prior to the Contractor's receipt of payment from the Owner shall be accepted by the Subcontractor solely as payment on account and shall not constitute a waiver of the provisions of this Section 2.2.

## ARTICLE 3. SUBCONTRACTOR'S OBLIGATION

3.1 The Subcontractor agrees that it shall do, perform, obtain, furnish and provide, at its own expense, all work, labor, materials, permits, tools, equipment, scaffolding and staging in a workmanlike manner and to the full satisfaction of the Architect, Contractor and Owner, and in proper cooperation with the Contractor and other Subcontractors so as not delay or otherwise interfere with or obstruct their work; that it shall provide sufficient, safe and proper facilities at all times for the Inspection of its Work; that it shall, within twenty-four hours or such reasonable time as the Contractor allows, after receiving written notice from the Contractor, at its own cost and expense, remove from the grounds or building all materials condemned by the Architect, Owner or Contractor, and to take down and/or rebuild all portions of the Work which the Architect, Owner or Contractor shall, by like written notice, condemn as unsound oz- improper, or as in any way failing to conform to the Contract Documents. Work performed and materials furnished by the Subcontractor and not approved by the Architect, Owner and Contractor shall not be accepted.

3.2 The Subcontractor shall, at its own cost and expense, apply for and obtain all necessary permits and the Subcontractor further agrees that all Work performed and materials furnished by it under this Subcontract shall comply strictly with the laws, ordinances, regulations, rules and orders of the municipal, state and federal government and of any and all of their departments, bureaus and boards in force in the locality in which the Work is done (hereinafter "the governing laws"), and that it will comply promptly with the governing laws and that it will perform the Work and furnish the materials in accordance with the governing laws whether the Work and materials to accomplish the same are or are not included and provided for in the Contract Documents; and all such Work and materials made necessary by the governing laws in order to complete the Work shall be performed and furnished without additional charge or expense to the Contractor. The Subcontractor will be responsible for all violations of the governing laws will indemnify the Contractor for any loss or damage resulting to the Contractor as a result of any such violation.

3.3 The Subcontractor shall promptly prepare and furnish all shop drawings, samples, submittals, certificates and similar information, as required, for the approval of the Architect, Engineer, Contractor and Owner and as required for the efficient, expeditious and prompt performance of the Work. The Subcontractor shall, upon the request of the Contractor, provide such reports, certificates and information to the Owner and the Architect as may be reasonably requested by them at no cost or expense to the Contractor.

3.4 The Subcontractor agrees to perform the work diligently in accordance with the directions of the Contractor and in compliance with the job schedules of the Contractor. The Subcontractor shall at all times provide a sufficient number of workers and sufficient materials and equipment to accomplish the foregoing. It is specifically understood that time is of the essence of this agreement. The Subcontractor may be held liable for all damages, costs, losses and expenses resulting directly or consequentially from its failure to meet time limits contained or referred to in the Contract Documents. A labor dispute, other than an industry-wide dispute, shall not provide an excuse for failure to meet such time limits. The Subcontractor shall promptly notify the Contractor of any anticipated delay in its Work and the cause therefor and shall also notify the Contractor of any delay anticipated in the Work of others and of any deficiency in the Work of others which may cause delay in the progress of the Subcontractor's Work. No provision in the Contract Documents shall in any way prevent or interfere with the Contractor's right to modify or change the time for the performance of the Work and the completion thereof to meet the requirements of the Contractor for the efficient completion of the Project as may be determined by the Contractor in its absolute discretion.

3.5 If any matters contained in the specifications have been omitted from the plans or vice versa, the same shall be construed as if contained in both. Any matters contained in any portion of the Contract Documents shall be construed as being part of the Work covered by this Subcontract. The Subcontractor shall promptly inform the Contractor in writing of any inconsistency in the Contract Documents or the Subcontractor shall be barred from making any claims based on such inconsistency. The decision of the Architect or the Contractor resolving any such inconsistency shall be binding on the Subcontractor and shall be deemed to be included in the Work of the Subcontractor.

3.6 The Subcontractor shall, at its own expense, remove from the site all debris caused by the Work of this Subcontract as and when required by the Contractor and, if the Subcontractor fails to do so, the Contractor, without further notice, may cause such removal of debris and all amounts incurred by the Contractor in so doing shall be chargeable against any amounts due or to become due to the Subcontractor.

3.7 The Subcontractor agrees that it will remove from the Project site any worker or supervisor whose employment thereon shall be objected to by the Contractor, the Owner or the Architect.

3.8 The Subcontractor shall promptly notify the Contractor of any actual or threatened labor dispute or difficulty. In the event that any labor dispute or difficulty arises which is related in any manner to or involves the Subcontractor's employees, agents suppliers or sub –subcontractors, thereby causing any delay, interference, or stoppage of any portion of the Work, and such delay, interference or stoppage continues for twenty-four (24) hours, the Contractor may, at its option, then, or at any time thereafter, terminate this Subcontract in accordance with the provisions of Section 4.1, and the Contractor shall thereupon have no further liability hereunder to the Subcontractor except as provided in Section 4,.1. In lieu of or prior to such termination, the Contractor may suspend the Subcontractor's right to be on the Project site or to perform any of the Work.

3.9 At the request of the Contractor, the Subcontractor shall cooperate to the fullest extent in the resolution of labor disputes including, without limitation, and at the Subcontractor's expense, the filing of complaints with the National Labor Relations Board, State Labor Agency or other courts of competent jurisdiction, as may be appropriate, to prosecute such complaints and appear and testify and execute such affidavits and documents as may be necessary and desirable in connection therewith as well as to appear, testify and execute affidavits and documents in any proceeding brought by the Contractor.

3.10 The Subcontractor shall be responsible for the prevention of accidents and agrees to comply with and abide by any safety program established by the Contractor or the Architect and with all laws, regulations and codes concerning safety as they shall be applicable to the Work. If the Subcontractor fails or neglects to comply with the safety program or any of the applicable laws, regulations or codes concerning safety, the Contractor may take whatever measures are necessary to bring the Subcontractor's performance into compliance and the Contractor may deduct the cost of such measures from any payments due or to become due to the Subcontractor.

3.11 **CHANGES IN THE WORK.** Without invalidating this Subcontract, the Subcontractor may be ordered in writing by the Contractor to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions including those required by modifications to the general contract. The Subcontractor shall make no claim for extension of the time for performance or for additional compensation unless done in pursuance of a written Change Order from the Contractor and such claim must be presented to the Contractor prior to the commencement of the Work affected by the Change Order. No claim for extra work or for a change in the work will be recognized or paid for unless agreed to in writing by the Contractor before the extra work is done or the change is made, such agreement to specify in detail the extra work or change to be performed and the adjustment to the Subcontract price and/or time for performance to result therefrom. Payments on account of extra work or changes shall be made as provided in the Contract Documents. At the written direction of the Contractor, the Subcontractor shall promptly perform any such extra work or change in the Work notwithstanding that a Change Order shall not have been issued, or the price has not been agreed upon. Any dispute arising therefrom shall be subsequently resolved between the parties.

3.12 **CLAIMS.** The Subcontractor shall make no claim for additional compensation for any work done by it or by reason of any act of the Contractor during the performance of this Subcontract unless done pursuant to a written order from the Contractor, and notice of all such claims shall be given to the Contractor in writing before the next ensuing payment under this Subcontract after commencement of such additional Work or it shall be considered as abandoned by the Subcontractor. The Subcontractor understands that no officer, employee or other representative of the Contractor has the authority to waive compliance with this provision except as authorized by a vote of the Directors of the Contractor.

3.13 The subcontractor agrees that it shall have no claim for money damages or additional compensation for delay no matter how caused, but for any delay or increase in the time required for the performance of this Subcontract not due to the fault of the Subcontractor, it shall be entitled only to such extension of time for performance of its Work as shall be actually allowed to the Contractor or by the Contractor.

3.14 If, and to the extent that, reimbursement is authorized for the performance of overtime work, the amounts to be reimbursed to the Subcontractor are limited to the premium portion of the hourly rate plus taxes imposed by law. No allowance shall be permitted for any portion of fringe benefits, insurance, overhead or profit.

3.15 The Subcontractor agrees to cause the prompt discharge and release of any claims and liens (provided that same are asserted by a sub-subcontractor or supplier of the Subcontractor or any other party claiming through the Subcontractor) against the Contractor, the Contractor's surety, the Owner and the property involved in the Work, which claims or liens are based upon or relate to the Work performed or to be performed by the Subcontractor. If the Subcontractor fails to cause the discharge of any such claim or lien after three (3) days written notice, the Contractor may cause the discharge of such claim or lien and deduct all costs, expenses and attorney's fees thereby incurred from any amounts due or to become due to the Subcontractor. If required, the Subcontractor shall provide evidence satisfactory to the Contractor that, within five (5) days after receipt of payment from the Contractor, the Subcontractor has paid or discharged all of its obligations relating in any manner to the Work and covered by such payment (including, but not limited to, any obligations for withholding taxes and fringe benefits). If the Subcontractor fails to satisfy such requirement, then, and without prejudice to any other of its rights or remedies, the Contractor may pay the same directly and deduct the amount of such payment from any sums due or to become due to the Subcontractor. The Contractor may withhold any payments thereafter coming due to the Subcontractor until such requirement has been satisfied as to all payments theretofore made.

3.16 If, and to the extent that, the Subcontractor shall do any Work based upon the direct order, direction or request of the Owner or the Architect, the Contractor shall have no liability whatsoever with respect thereto,

3.17 **WARRANTIES.** The Subcontractor warrants that all materials and equipment furnished by it will be new unless otherwise specified in the Contract Documents and that all Work will be of first-class quality, free from faults and defects and in conformance with the Contract Documents. The Subcontractor does hereby guaranty its Work and, without limiting the foregoing, agrees to make good, at no cost to the Contractor or the Owner, any and all defects due to nonconformity or imperfect workmanship or materials; and the Subcontractor shall pay for any damages resulting therefrom, including any for which the Contractor may be liable under the Contract Documents or by law. All warranties, guarantees and agreements contained in this Subcontract shall apply to any nonconformity, defect or damage, which may appear within one year from the date of the Final Completion of the Project or such longer time as may be provided in the Contract Documents. Upon written notice from the Architect, Owner or Contractor of the nature and existence of such nonconformity, defect or damage, the Subcontractor shall proceed immediately to cure such nonconformity or defect and any damage resulting therefrom. The foregoing guaranty shall be in addition to, and does not supersede, the terms of any special guaranty or warranty given by the Subcontractor or provided in the Contract Documents. It is further agreed that no payment under this Subcontract shall be proof of the proper performance of the Subcontract, either in whole or in part, nor shall any payment be construed as an acceptance of defective Work.

3.18 **INSURANCE.** The Subcontractor shall maintain Workers' Compensation Insurance as required by law and shall also purchase and maintain in force such insurance as the Contractor may require, with insurance companies approved by the Contractor. If the Contract Documents require additional insurance to be provided, the Subcontractor shall provide the same. Coverage's shall be maintained without interruption from the date of commencement of the Subcontractor's Work until the date of final payment and termination of any coverage required to be maintained after final payment. Certificates of insurance acceptable to the Contractor and naming the Contractor as an insured shall be filed with the Contractor prior to the commencement of the Subcontractor's Work. These certificates and the insurance policies required by this Section or the Contract Documents shall contain a provision that coverage's afforded thereunder will not be canceled or allowed to expire until at least thirty days' prior written notice has been given to the Contractor. If any of the insurance coverage's are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the final application for payment.

**SECTION 4, CONTRACTOR'S RIGHTS AND REMEDIES**
4.1 Should the Subcontractor at any time refuse or neglect to supply a sufficient number of properly skilled workers or materials of the proper quality and quantity, or fail in any respect to prosecute the Work promptly and diligently, or fail to complete punch list work in a timely fashion, or fail to produce any documentation required by the Contract Documents (including warranties, special warranties, manuals and other submittals) in a timely fashion, or fail to perform any of the agreements on its part contained in this Subcontract or the Contract Documents, the Contractor shall be at liberty, after twenty-four (24) hours' written notice, which notice may be delivered by telecopier, to provide any such labor or materials and deduct the cost thereof from any amounts due or to become due to the Subcontractor; and the Contractor shall also be at liberty, without further notice and without prejudice to any other remedy the Contractor may have, to terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor deems expedient. If the unpaid balance of the Subcontract sum exceeds the expense of finishing the Subcontractor's Work (including reasonable compensation for the additional architectural, managerial, professional and administrative services of both the Contractor and third parties, and reasonable attorney's fees incurred lay the Contractor, and sums charged to the Contractor for delay, damages and attorney's fees as provided in the Contract Documents), such excess shall be paid to the Subcontractor subject to other provisions of this Subcontract, including Article 2; but if such expense exceeds such unpaid balance, the Subcontractor shall pay the difference to the Contractor on demand.

4.2 If the Subcontractor shall be adjudged a bankrupt or shall file a petition in bankruptcy or for reorganization under any provisions of the bankruptcy laws, or if such a petition is filed against the Subcontractor and is not dismissed within ten (10) days thereafter, or if the Subcontractor shall make an assignment or trust mortgage for the benefit of creditors, or if a receiver is appointed for all or a substantial portion of the Subcontractor's property or business, or if the Subcontractor seeks relief from its obligations under any applicable law or by voluntary agreement with its creditors, then, in any of such events, the Contractor may, without prejudice to any other right or remedy provided in this Subcontract or by law, terminate this Subcontract and finish the Subcontractor's obligations as provided in Section 4.1 hereof.

4.3 Any amounts chargeable to the Subcontractor under any provision of this Subcontract may, at the election of the Contractor, be deducted from any payment or payments otherwise due or to become due to the Subcontractor under this Subcontract or any other subcontract with the Subcontractor, or the Contractor may sue the Subcontractor therefor. The Subcontractor further agrees that no portion of the Work hereunder shall be assigned or sublet without the written consent of the Contractor and any attempt to do so shall constitute an abandonment by the Subcontractor and sufficient grounds for termination of the Subcontractor as provided in Section 4.1. It is also agreed that any damage, loss, cost or expense, including attorney's fees suffered or incurred by the Contractor as a result of the failure of the Subcontractor to perform any of its obligations under this Subcontract, shall be chargeable to and paid by the Subcontractor.

**ARTICLE 5. INDEMNITY**

5.1 To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Contractor, the Owner, the Owner's lender and the Architect, and all agents and employees of any of them, from and against any and all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from, in whole or in part, the performance of the Subcontractor's work under this Subcontract, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property, including the loss of use resulting therefrom, but only to the extent caused in whole or in part by the negligent acts or omissions of the Subcontractor, the Subcontractor's sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose, acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or otherwise reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 5.1.

5.2 Without limiting the provisions of section 5.1, the Subcontractor shall also indemnify and hold harmless the Contractor from and against any and all liability, loss, cost, damage and expense, including reasonable attorney's fees, based upon or arising out of: (a) any legal or equitable attachments (including, but not limited to, attachments by means of trustee process) made or attempted; (b) liens, including tax liens, asserted against the Subcontractor and served or levied upon the Contractor or Owner; or (c) any violation of law.

**ARTICLE 6. MISCELLANEOUS**

6.1 Notwithstanding any provision anywhere in the Contract Documents to the contrary, the Contractor shall not be required to engage in any arbitration proceeding relating to the Subcontract or the Subcontractor unless the Contractor elects, in writing, to participate in such arbitration proceeding.

6.2 Nothing contained in this Subcontract shall create any contractual relationship between the Subcontractor and the Owner nor shall it create any obligation on the part of the Owner to pay or see to the payment of any sums to the Subcontractor.

6.3 Should any provision of this Subcontract be invalid as a matter of law or public policy, such invalidity shall affect only such provision and shall not invalidate or affect the remaining provisions of this Subcontract.

6.4 This Subcontract shall be governed by the laws of the Commonwealth of Massachusetts applicable to contracts made and to be performed entirely within the commonwealth.

6.5 This Subcontract constitutes the entire agreement of the parties hereto relative to the subject matter hereof and all prior negotiations with respect to and drafts of this Subcontract are merged herein. This Subcontract may not be modified or amended except by a writing signed by an officer of the Contractor.

**6.6 THE SUBCONTRACTOR HEREBY ACKNOWLEDGES AND AGREES THAT THE CONTRACTOR'S FIELD PERSONNEL DO NOT HAVE AUTHORITY TO MODIFY IN ANY WAY THE SCOPE OF THIS AGREEMENT WHERE SUCH MODIFICATION SHALL AFFECT THE PRICE TO BE PAID TO THE SUBCONTRACTOR OR WHERE SUCH MODIFICATION MAY PRODUCE A VARIANCE WITH THE CONTRACT DOCUMENTS.**

WITNESS our hands and seals, hereunto duly authorized, on the dates written below:


Standen Contracting, Inc                          Landworks
                                                  (Subcontractor)


By: _____          By: _____
   Title: _CEO_                          Title: _Owner_
   Date: _9/4/03_                        Date: _9/03/03_

SITE WORK SCOPE
AUGUST 28, 2003

EXHIBIT "A"

SHREWSBURY MIDDLE SCHOOL - WEST
45 OAK STREET, SHREWSBURY, MA
RENOVATIONS

A. FURNISH LABOR, EQUIPMENT, MATERIALS AND SUPERVISION NECESSARY TO PERFORM THE WORK OF THE
   FOLLOWING SECTIONS IN THEIR ENTIRETY:

| | |
|---|---|
| 02060 | SITE DEMOLITION |
| 02100 | SITE PREPERATION |
| 02200 | EARTHWORK |
| 02240 | GEOTEXTILE FABRICS |
| 02250 | EROSION CONTROL |
| 02511 | BITUMINOUS CONCRETE PAVING & MARKINGS |
| 02515 | CONCRETE PAVEMENT (PREP. ONLY) |
| 02525 | GRANITE CURBING |
| 02649 | TRACER TAPE |
| 02705 | STORM DRAINAGE SYSTEMS & SEWER SYSTEMS |
| 02710 | UNDERDRAIN SYSTEM  AND SLIT DRAINAGE SYSTEM ATHLETIC FIELDS |
| 02713 | WATER SYSTEMS |
| 02930 | LAWNS AND GRASSES |

B. IN ADDITION, THE FOLLOWING ARE INCLUDED IF NOT MENTIONED ELSEWHERE.  IT IS THE INTENT THAT THE ITEMS LISTED
   BELOW ARE A GENERAL GUIDELINE.  IT SHOULD NOT BE CONSTRUED THAT THIS IS THE ONLY LIMIT OF WORK.  ALL WORK
   WHETHER LISTED BELOW OR NOT WILL BE IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS.
   1  DIVISION 1 - GENERAL REQUIREMENTS.
   2  SEE ATTACHED SECOND SHEET FOR FULLER SCOPE BUT NOT LIMITED TO.
   3  UNDERDRAIN SAND TO BE FURNISHED BY STANDEN CONTRACTING COMPANY, INC.
   4  MILESTONE FOR SEEDING OF ATHLETIC FIELDS IS OCTOBER 15, 2003.

C. ACKNOWLEDGE AND INCLUDE:
   1.  ALL PLANS AND SPECIFICATIONS AND ALL ALTERNATES.
   2.  ADDENDA NUMBERED #1, #2, #3, #4, & #5
   3.  CONSTRUCTION PHASING AND SCHEDULE.
   4.  PREVAILING WAGES
   5.  EQUAL EMPLOYMENT OPPORTUNITY RATIOS
   6.  UNIT PRICES ( SEE SEPARATE ATTACHMENT IF APPLICABLE)

D. PROVIDE:
   1.  INSURANCE:
        a.  LIMITS PER SPECIFICATIONS
        b.  MUST PROVIDE INSURANCE CERTIFICATES NAMING STANDEN CONTRACTING COMPANY, INC.
            AND THE TOWN OF SHREWSBURY AS ADDITIONAL INSURED.
   2.  COST BREAKDOWNS ON A.I.A. FORMAT.
   3.  CERTIFIED PAYROLL AFFIDAVITS TO BE SUBMITTED WEEKLY.
   4.  SHOP DRAWINGS AND SUBMITTALS ON A TIMELY BASIS.
        NOTE:    IF PRODUCTS SUBMITTED FOR APPROVAL ARE SUBSTITUTIONS FROM THOSE SPECIFIED, PROVIDE
                 DATA OF SPECIFIED PRODUCT ALONG WITH COMPARISON INFORMATION TO PROVE EQUAL
   5.  COMPANY SAFETY PROGRAM.

# SHREWSBURY MIDDLE SCHOOL

## EARTHWORK EXHIBIT A

02060,02070,02100,02200,02240,02250,02511,02515,02525,
02649,02705,02710,02713,02800,02808,02810,02815,02930

WORK INCLUDES BUT IS NOT LIMITED TO THE FOLLOWING:

**NOTE. ALL ALTERNATES HAVE BEEN ACCEPTED AND ARE TO BE INCLUDED IN BASE BID PRICING. EACH ITEM LISTED ON THIS PAGE REFERENCES WORK THROUGHOUT THE ENTIRE SITE.**

| | | | | |
|---|---|---|---|---|
| | PREVAILING WAGE | | 02200 | EARTHWORK |
| | TAX EXEMPT | | | DEWATERING |
| | PER PLANS & SPECS | | | SET PINS AT CORNERS OF FIELDS |
| | STAGING, HOISTING, RIGGING INCLUDED | | | EXCAV. WITHIN BLDG. FOR NEW UTILITIES & FTGS |
| | | | | IMPORT, PLACE NEW SLAB BASE WITHIN BLDG |
| | ADDENDUM NO.: 1, 2, 3, 4, 5 | | | ADJUST SITE STRUCTURES AS REQ'D |
| | | | | E & B for UTILITIES,COMPLETE INCL:PIPE,MH,CB,etc.. |
| | ENGINEERING; GIVEN INITIAL LAY-OUT POINTS BY GC | | | WATER |
| | PERMITS/FEES | | | SEWER |
| | AS-BUILTS | | | SITE DRAINAGE |
| | SNOW REMOVAL | | | BLDG.DRAINAGE |
| | POLICE DUTY | | | CUTS/FILLS; BRING SITE TO PROPOSED GRADE |
| | BARRELS/BARRICADES | | | BASE & PREP FOR ASPHALT AT PLOT & SIDEWALK |
| | UNLOAD REBAR | | | SIDEWALK BASE / PREP FOR CONC. |
| | ACKNOWLEDGE RECEIPT OF GEOTECH DATA 00320 | | | SITE ENCASED CONDUIT:   TRENCH & BACKFILL ONLY |
| | | | | TRENCH/BKFILL FOR CONDUIT BET. UTILITY POLES |
| | | | | UTILITY POLE BASES:   EXCAVATE & BKFILL |
| 02060 | SITE DEMOLITION | | | INSTALL POLE BASES |
| | REMOVE ASPHALT ; SAWCUT AS REQ'D | | | FURNISH POLE BASES |
| | REM. EXIST./ PREP FOR NEW HC SIDEWALK RAMPS | | | REPLACE PIPING UNDER GRANDSTAND |
| | DEMO ALL CHAIN LINK FENCE | | | SAVE REUSE MAT'L AT SKINNED AREAS:REPAIR FIELDS |
| | TRENCH  FOR REMOOVAL OF EXISTING GAS LINE | | | EXCAV. FOR NEW LOADING DOCK & EXT. |
| | REMOVE EXISTING GAS LINE / BACKFILL | | | EARTHWORK/BASE/etc. TO MODIFY TRACK LENGTH |
| | DEMO. LIGHT POLE BASES | | 02240 | GEOTEXTILE FABRICS WHERE SHOWN |
| | REM. HYDRANT, CAP | | 02250 | EROSION CONTROL |
| | REM. SITE CONC. PADS | | | CLEAR / GRUB |
| | REM. IRRIGATION SYS. | | | SNOW FENCING |
| | REM. BALLFIELD DRAINAGE SYS. | | | HAY BALES |
| | REM. BOCCEE COURT | | 02511 | BIT. CONC. PAVING & MARKINGS |
| | REM. PLAY STRUCTURE AND BASE AT COURTYARD | | | NEW BIT. CONC. OVERLAY |
| | REM. JERSEY BARRIERS | | | NEW ASPHALT TOP COURSE WHERE INDICATED |
| 02100 | SITE PREPERATION | | | ASPHALT CURB |
| | PREP FOR ALT #5 FIELD EVENT WORK | | | NEW TRACK SURFACED AREAS:COLDPLANE EXIST. |
| | | | | NEW TRACK SURFACED AREAS:ASPHALT TOP COAT |
| | REM. & REINST. GRANITE SIGN ("LIONS CLUB") | | | ASPHALT  @ OFF-SITE STREET PATCH |
| | RELOCATE FIELD SIGN' | | | @ PARKING LOTS & DRIVES |
| | CLEAR / GRUB | | | @ SIDEWALKS |
| | STRIP LOAM | | | @ SWALE |
| | STOCKPILE LOAM ON-SITE | | | ASPHALT PATCH |
| | RESPREAD LOAM AS REQ'D, MODIFY/ IMPORT AS REQ'D | | | PAVEMENT MARKINGS |
| | REM. & STORE GRANITE CURBING | | 02515 | CONCRETE PAVEMENT (PREP. ONLY) |
| | CAP EXIST. WATER WHERE SHOWN | | 02525 | GRANITE CURBING; PER DRWGS and SPECS |
| | DISPOSE OF EXCESS SITE MATERIAL | | 02649 | TRACER TAPE |
| | PREP FOR SITE PADS | | 02705 | STORM DRAINAGE and SEWER SYSTEMS |
| | NEW GAS LINE TRENCHING & BEDDING | | | F & I NEW GREASE TRAP |
| | REGRADE TO EXTEND LOT PAVING AS SHOWN | | | F & I NEW STORM WATER DETENTION BED |
| | ENLARGE PLANTER, PART OF GENERAL SITE PREP | | 02710 | UNDERDRAIN SYSTEM; COMPLETE.PLANS/SPECS |
| | RELOCATE TICKET BOOTH. INCLUDES DEMO EX. FND. | | | 3" x 10" SAND DRAIN SLIT SYSTEM |
| | RELOCATE STORAGE BUILDING, INCLS DEMO EX. FND. | | | STRIP DRAIN SYSTEM |
| | | | | SAND BED, IMPORT AS REQUIRED, MEET SPEC |
| | INTERIOR EXCAVATION & BACKFILL | | | LOAM, IMPORT / BLEND AS REQUIRED , MEET SPEC. |
| | GAS TRAP, HANDICAP LIFT, FOLDING PART. PIERS | | 02713 | WATER SYSTEMS |
| | MEZZANINE FOOTINGS. | | | F & I NEW WATER LINE; PROVIDE STREET TAP & HYD. |
| | | | 02930 | LAWNS AND GRASSES |

## August 28, 2003

## Exhibit C

### Standen Contracting Safety Program Acknowledgement

Attached to and constituting an integral part of the subcontract between Standen Contracting Co., Inc., as the contractor, and **LANDWORKS** as the subcontractor, with respect to the Project known as the Wrentham Public Safety Complex.

Representation from the subcontractor is in the form of a person, who is in a supervisory position with the subcontractor's firm, is required at all weekly Safety Meetings conducted by Standen's Project Superintendent. Attendance will be monitored by means of a sign-in sheet. This requirement will be waived if the subcontractor produces a Company Safety Plan, which is acceptable to Standen Contracting. If one exists, the subcontractor should submit its Company Safety Plan to Standen Contracting for review and record. Standen Contracting will inform the subcontractor in writing as to the status on acceptability.

For any breach of violation of the terms or provisions of any program or law referred t in the subcontract by any employee, agent, materialman, supplier or contractor of subcontractor. Which breach, as determined by Contractor, Contractor shall have the right, in addition to all other rights and remedies available to Contractor as a result thereof, and in addition to anything else contained in the subcontract, to assess against subcontractor a fine according to the Schedule of Fines attached hereto. If subcontractor shall fail to pay Contractor the amount of any such fine upon demand, Contractor may deduct the amount of any such fine from the next or any succeeding payment due subcontractor under the subcontract.

It is understood and agreed that nothing herein contained is intended to relieve the subcontractor of its legal and contractual obligations to comply with the subcontract. The Contractor is not assuming the responsibility of enforcement, inspection, or policing for safety compliance, all of which remain with the subcontractor. If, however, Contractor does find violations, Contractor, in addition to the other remedies afforded Contractor, has the right to assess fines as aforesaid.

Subcontractor acknowledges that the fines set forth on the Schedule of Fines are reasonable and appropriate in order to encourage compliance with all safety programs and laws.

## Standen Contracting Company, Inc.

MAR 04 2004 15:51                                        603 749 1838          PAGE.09

## Safety Violation Assessment Schedule

| Violation | Warning | 2nd Offense | 3rd Offense | 4th Offense |
|---|---|---|---|---|
| Guardrails / Staging | No $ | $50.00 | $100.00 | $200.00 |
| Floor Openings Roof Perimeter & Barricades | $50.00 | $100.00 | $200.00 | $500.00 |
| Compressed Gas | $100.00 | $200.00 | $500.00 | Dismissal |
| Electrical Panel | $50.00 | $100.00 | $200.00 | Dismissal |
| Ladder | No $ | $50.00 | $100.00 | $200.00 |
| Clothing (protective) | No $ | $50.00 | $100.00 | Dismissal |
| Housekeeping | No $ | $50.00 | $100.00 | $200.00 |
| Power Tool | No $ | $50.00 | $100.00 | $200.00 |
| Fire Prevention | $50.00 | $100.00 | $200.00 | Dismissal |
| Non-Attendance of Required Safety Meetings | No $ | $50.00 Per Employee | $50.00 Per Employee | $50.00 Per Employee |

Page 2 of 2

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 11 of 18

*Exhibit D*

**Current Drawing List**

Summary Log, Grouped by Discipline

**Standen Contracting Inc.**

**Shrewsbury Middle School**
49 Oak Street
Shrewsbury, MA

Project # 573-000
Tel    Fax

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| **Architectural** | | | | | | | | | |
| A1.1 | 0 | Legend, Partition Types and Master Plans | 7/1/2002 | | 100 | | Construction Set | | |
| A10.1 | 0 | Millwork | 7/1/2002 | | 100 | | Construction Set | | |
| A10.2 | 0 | Millwork | 7/1/2002 | | 100 | | Construction Set | | |
| A10.3 | 0 | Millwork | 7/1/2002 | | 100 | | Construction Set | | |
| A10.4 | 0 | Millwork Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A10.5 | 0 | Existing Millwork and Misc. Details | 7/1/2002 | | 100 | | Construction Set | | |
| A11.1 | 0 | Door Schedule | 7/1/2002 | | 100 | | Construction Set | | |
| A11.2 | 0 | Door Schedule, Hollow Metal Frame Types and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A12.1 | 0 | Room Finish Schedule | 7/1/2002 | | 100 | | Construction Set | | |
| A12.2 | 0 | Room Finish Schedule and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A2.1 | 0 | Roof Plan and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A3.1 | 0 | Ground Floor Plan | 7/1/2002 | | 100 | | Construction Set | | |
| A3.2 | 0 | First Floor Plan, Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| A3.3 | 0 | First Floor Plan, Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| A3.4 | 0 | First Floor Plan, Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| A3.5 | 0 | First Floor Plan, Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| A4.1 | 0 | Ground Floor Reflected Ceiling Plan | 7/1/2002 | | 100 | | Construction Set | | |
| A4.2 | 0 | First Floor Reflected Ceiling Plan, Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| A4.3 | 0 | First Floor Reflected Ceiling Plan, Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| A4.4 | 0 | First and Second Floor Reflected Ceiling Plan, Section C-C | 7/1/2002 | | 100 | | Construction Set | | |

*Prolog Manager*    Printed on: 11/7/2002    standen master    Page 1

## Current Drawing List
### Summary Log, Grouped by Discipline

| Numbe | Rev | Title | RelV Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFI's |
|---|---|---|---|---|---|---|---|---|---|
| A4.5 | 0 | First Floor Reflected Ceiling Plan, Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| A5.1 | 0 | Exterior Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A5.2 | 0 | Exterior Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A5.3 | 0 | Exterior Elevations /Building Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.1 | 0 | Wall Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.2 | 0 | Canopy Sections, Elevations and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.3 | 0 | Aluminum Windows, Curtain Wall Door Entry Frame Types & Details | 7/1/2002 | | 100 | | Construction Set | | |
| A6.4 | 0 | Miscellaneous Details | 7/1/2002 | | 100 | | Construction Set | | |
| A7.1 | 0 | Stair Plans, Sections and Details | 7/1/2002 | | 100 | | Construction Set | | |
| A8.1 | 0 | Toilet Room Plans and Elevations / Interior Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A8.2 | 0 | Corridor Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| A9.1 | 0 | Kitchen Equipment Plan | 7/1/2002 | | 100 | | Construction Set | | |
| D1.1 | 0 | Demolition Plans | 7/1/2002 | | 100 | | Construction Set | | |
| D1.2 | 0 | First Floor Demolition Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.1 | 0 | Existing Conditions Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.10 | 0 | Enlarged Plans, Planting Plan and Details (Alternates) | 7/1/2002 | | 100 | | Construction Set | | |
| L1.2 | 0 | Site Preparation /Demolition Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.3 | 0 | Site Grading & Utility Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.4 | 0 | Irrigation Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.5 | 0 | Layout and Materials Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.6 | 0 | Enlarged Site Plan & Details | 7/1/2002 | | 100 | | Construction Set | | |
| L1.7 | 0 | Planting Plan | 7/1/2002 | | 100 | | Construction Set | | |
| L1.8 | 0 | Miscellaneous Details | 7/1/2002 | | 100 | | Construction Set | | |
| L1.9 | 0 | Alternates | 7/1/2002 | | 100 | | Construction Set | | |

### Electrical

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CT0.1 | 0 | Comm-Tech Legend & Notes | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.1 | 0 | Comm-Tech Ground Floor - | 7/1/2002 | | 100 | | Construction Set | | |

Prolog Manager    Printed on: 11/7/2002    standon master

MAR 04 2004 15:53

603 749 1838    PAGE.12

**Current Drawing List**
Summary Log, Grouped by Discipline

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| CT1.2 | 0 | Comm-Tech First Floor - Section A-A & B-B Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.3 | 0 | Comm-Tech First Floor - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.4 | 0 | Comm-Tech First Floor - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| CT1.5 | 0 | Comm-Tech First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| CT2.1 | 0 | Comm-Tech Detail Sheet | 7/1/2002 | | 100 | | Construction Set | | |
| CT2.2 | 0 | Comm-Tech Part Plans & Elevations | 7/1/2002 | | 100 | | Construction Set | | |
| CT2.3 | 0 | Comm-Tech Part Plans & Elevations & Risers | 7/1/2002 | | 100 | | Construction Set | | |
| E0.1 | 0 | Electrical Legend, Notes & Drawing List | 7/1/2002 | | 100 | | Construction Set | | |
| E0.2 | 0 | Electrical Site Plan | 7/1/2002 | | 100 | | Construction Set | | |
| E0.3 | 0 | Electrical Lighting Details & Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E1.1 | 0 | Electrical Demolition Part Plan | 7/1/2002 | | 100 | | Construction Set | | |
| E1.2 | 0 | Electrical First Floor Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| E2.1 | 0 | Electrical Lighting Plan Ground Floor - Section A-A, B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E2.2 | 0 | Electrical Lighting Plan First Floor - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| E2.3 | 0 | Electrical Lighting Plan First Floor - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E2.4 | 0 | Electrical Lighting Plan First Floor - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| E2.5 | 0 | Electrical Lighting Plan First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| E3.1 | 0 | Electrical Power Plan Ground Floor - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E3.2 | 0 | Electrical Power Plan First Floor - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| E3.3 | 0 | Electrical Power Plan First Floor - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| E3.4 | 0 | Electrical Power Plan First Floor - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 14 of 18

## Current Drawing List
### Summary Log, Grouped by Discipline

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| E3.5 | 0 | Electrical Power Plan First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| E3.6 | 0 | Electrical Roof Plan | 7/1/2002 | | 100 | | Construction Set | | |
| E4.1 | 0 | Electrical Power Riser and Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E4.2 | 0 | Electrical Miscellaneous Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E4.3 | 0 | Electrical Mechanical Schedules | 7/1/2002 | | 100 | | Construction Set | | |
| E4.4 | 0 | Electrical Kitchen Equipment Schedule & Details | 7/1/2002 | | 100 | | Construction Set | | |
| E4.5 | 0 | Electrical Miscellaneous Riser Diagrams & Details | 7/1/2002 | | 100 | | Construction Set | | |
| E4.6 | 0 | Electrical Telecommunications Riser & Miscellaneous Details | 7/1/2002 | | 100 | | Construction Set | | |

### Fire Protection

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| F0.1 | 0 | Fire Protection Legend Details & Hydraulic Info. | 7/1/2002 | | 100 | | Construction Set | | |
| F1.1 | 0 | Fire Protection Ground Floor - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| F1.2 | 0 | Fire Protection First Floor - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| F1.3 | 0 | Fire Protection First Floor - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| F1.4 | 0 | Fire Protection First Floor - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| F1.5 | 0 | Fire Protection First Floor - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| F1.6 | 0 | Fire Protection Second Floor - Section C-C & D-D | 7/1/2002 | | 100 | | Construction Set | | |

### Mechanical

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| BC1.0 | 0 | Building Control Legend & Notes | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.1 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.2 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.3 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |

MAR 04 2004 15:55

603 749 1838    PAGE.14

## Current Drawing List
### Summary Log, Grouped by Discipline

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| BC1.4 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| BC1.5 | 0 | Building Control Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| H0.0 | 0 | HVAC Legends & Notes | 7/1/2002 | | 100 | | Construction Set | | |
| H2.0 | 0 | Ground and First Floor HVAC Demolition Plans | 7/1/2002 | | 100 | | Construction Set | | |
| H2.1 | 0 | Ground Floor Plan HVAC Ductwork - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H2.2 | 0 | First Floor Plan HVAC Ductwork - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| H2.3 | 0 | First Floor Plan HVAC Ductwork - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H2.4 | 0 | First Floor Plan HVAC Ductwork - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| H2.5 | 0 | First Floor Plan HVAC Ductwork - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| H2.6 | 0 | Roof HVAC Plan | 7/1/2002 | | 100 | | Construction Set | | |
| H3.1 | 0 | Ground Floor Plan HVAC Piping - Section A-A & B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H3.2 | 0 | First Floor Plan HVAC Piping - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| H3.3 | 0 | First Floor Plan HVAC Piping - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| H3.4 | 0 | First Floor Plan HVAC Piping - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| H3.5 | 0 | First Floor Plan HVAC Piping - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| H4.1 | 0 | HVAC Part Plans and Details | 7/1/2002 | | 100 | | Construction Set | | |
| H5.1 | 0 | HVAC Details Sheet 1 | 7/1/2002 | | 100 | | Construction Set | | |
| H5.2 | 0 | HVAC Details Sheet 2 | 7/1/2002 | | 100 | | Construction Set | | |
| H5.3 | 0 | HVAC Details Sheet 3 | 7/1/2002 | | 100 | | Construction Set | | |
| H6.1 | 0 | HVAC Schedules Sheet 1 | 7/1/2002 | | 100 | | Construction Set | | |
| H6.2 | 0 | HVAC Schedules Sheet 2 | 7/1/2002 | | 100 | | Construction Set | | |
| H6.3 | 0 | HVAC Schedules Sheet 3 | 7/1/2002 | | 100 | | Construction Set | | |

### Plumbing

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| P0.1 | 0 | Plumbing Legend | 7/1/2002 | | 100 | | Construction Set | | |

*Prolog Manager*    Printed on: 11/7/2002    stardon master

MAR 04 2004 15:55

603 749 1838    PAGE.15

## Current Drawing List
### Summary Log, Grouped by Discipline

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| P0.2 | 0 | Plumbing Diagrams | 7/1/2002 | | 100 | | Construction Set | | |
| P1.1 | 0 | Plumbing Underground – Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| P1.2 | 0 | Plumbing Ground Floor – Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| P1.3 | 0 | Plumbing First Floor – Demolition | 7/1/2002 | | 100 | | Construction Set | | |
| P2.1 | 0 | Plumbing Ground Floor – Section A-A/B-B | 7/1/2002 | | 100 | | Construction Set | | |
| P2.2 | 0 | Plumbing First Floor – Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| P2.3 | 0 | Plumbing First Floor – Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| P2.4 | 0 | Plumbing First Floor – Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| P2.5 | 0 | Plumbing First Floor – Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| P3.1 | 0 | Plumbing Enlarged Kitchen Plan & Diagrams | 7/1/2002 | | 100 | | Construction Set | | |

**Structural**

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|--------|-----|-------|----------|----------|------------|--------|----------|---------------|----------|
| S1.1 | 0 | Lower Foundation Plan - Section A-A and B-B | 7/1/2002 | | 100 | | Construction Set | | |
| S2.1 | 0 | Main Level Foundation Plan Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| S2.2 | 0 | Main Level Foundation Plan Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| S2.3 | 0 | Main Level Foundation Plan Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| S2.4 | 0 | Main Level Foundation Plan Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| S2.5 | 0 | Main Level Foundation Plan Sections | 7/1/2002 | | 100 | | Construction Set | | |
| S3.1 | 0 | Roof Framing Plan - Section A-A | 7/1/2002 | | 100 | | Construction Set | | |
| S3.2 | 0 | Roof Framing Plan - Section B-B | 7/1/2002 | | 100 | | Construction Set | | |
| S3.3 | 0 | Roof Framing Plan - Section C-C | 7/1/2002 | | 100 | | Construction Set | | |
| S3.4 | 0 | Roof Framing Plan - Section D-D | 7/1/2002 | | 100 | | Construction Set | | |
| S3.5 | 0 | Roof Framing Sections | 7/1/2002 | | 100 | | Construction Set | | |

*Prolog Manager*    Printed on: 11/7/2002    standen master

MAR 04 2004 15:56

603 749 1838    PAGE.16

## Current Drawing List
### Summary Log, Grouped by Discipline

| Number | Rev | Title | Rev Date | Bulletin | % Complete | Status | Category | General Notes | Ref RFIs |
|---|---|---|---|---|---|---|---|---|---|
| S3.6 | 0 | Roof Framing Sections | 7/1/2002 | | 100 | | Construction Set | | |
| S4.1 | 0 | Auditorium, Gymnasium and Boys Locker Room Framing | 7/1/2002 | | 100 | | Construction Set | | |
| S5.1 | 0 | Wall Anchor Details | 7/1/2002 | | 100 | | Construction Set | | |
| S6.1 | 0 | Typical Details and General Notes | 7/1/2002 | | 100 | | Construction Set | | |

10/08/02  12:36 FAX 1 508 842 0587      SHREWS TOWN HALL                    @001

# EXHIBIT E

ST-2

## MASSACHUSETTS DEPARTMENT OF REVENUE

### CERTIFICATE OF EXEMPTION



Certification is hereby made that the organization herein named is an exempt purchaser under General Laws, Chapter 64H, Sections 6(d) and (e). All purchases of tangible personal property by this organization are exempt from taxation under said chapter to the extent that such property is used in the conduct of the business of the purchaser. Any abuse or misuse of this certificate by any tax-exempt organization or any unauthorized use of this certificate by any individual constitutes a serious violation and will lead to revocation. Willful misuse of this Certificate of Exemption is subject to criminal sanctions of up to 1 year in prison and $10,000 ($50,000 for corporations) in fines. (See reverse side).

TOWN OF SHREWSBURY
100 MAPLE AVENUE
SHREWSBURY, MA. 01545

EXEMPTION NUMBER &
046-001-300

ISSUE DATE
01/04/89

CERTIFICATE EXPIRES ON
NONE

NOT ASSIGNABLE OR TRANSFERABLE

COMMISSIONER OF REVENUE
STEPHEN W. KIDDER

# NOVEMBER 4, 2002

# EXHIBIT F

63

1                  AFTERNOON SESSION

2      BY MS. BROWN:

3      Q.    What happened -- can you explain to us what

4  happened with Jackson ceasing work on the project

5  and what you and Landworks experienced at that time

6  and the time leading up to it.  Did you know Jackson

7  was in trouble?

8            MR. MELTZER:  Objection to the form.

9      A.    I had suspicions that Jackson was in

10 trouble.  It started in August of 2004 --

11     Q.    What were your suspicions based on?

12     A.    In June of 2004, I asked for a

13 reconciliation of the application for payments that

14 I had turned in, and Rich McGuinness said that he

15 would get that to me, and in the next two subsequent

16 meetings he did not.

17           From that point on I started continuously

18 asking for them each week.  In August of 2004 the

19 payment application -- and the payments had been

20 pretty close to what I was applying for -- the

21 payment application was cut in half, the amount of

22 money that I actually received.  And I asked him

23 why, and I don't remember the reason he gave me, but

24 it was a reason that did not ring true.

72

1   the winter.  There was items that were left to be

2   worked on in the spring that we were supposed to

3   start on.  I continued with the lines trying to

4   contact them.  They were not returning calls.

5           Sometime in February, 1st of February, I

6   believe it was the clerk of the works had told me

7   that Jackson was in trouble, that they were probably

8   going to be asked to be removed from the site by the

9   Town.  That continued on until March, when there was

10  very little work being done inside the building, as

11  well as out.

12          I made inquiries of the clerk if any work

13  was going on.  He said there was very little work

14  being done at the site, that most of the contractors

15  had left the site.  I asked them why.  He said

16  "nonpayment."  And then -- I don't know exactly when

17  Jackson was asked to leave the site.  I know that I

18  continued through my attorneys and through myself to

19  try to contact them and USF&G, but I didn't get any

20  response from them.

21      Q.   What work did you have left to complete at

22  that point in time?

23      A.   In the east portion of the football field,

24  there was the removal of the debris that was left

76

1    following week.  And he's like, "And you are the

2    site contractor of record, so I'm assuming you're

3    going to be back next week."  And I was like, "Well,

4    hopefully that's true, but I haven't heard

5    anything."

6           I asked him who he spoke with.  He told me

7    that it was Mr. Bullock.  And I asked him if he had

8    a telephone number for Mr. Bullock so I could call

9    him.  And he said that he did, and he gave me the

10   telephone number, and then I called Mr. Bullock.

11   I'm not certain -- it was August 11th or 15th or

12   something like that.

13          So I called him and told him that I had

14   heard that I was going to be back on the site.  And

15   he sort of struck me as sort of being taken a little

16   bit off guard by it.  And he was like, "Well" --

17       Q.    You hadn't had any conversations directly

18   with Lovett Silverman at this point; is that

19   correct?

20       A.    Not this time.

21       Q.    We talked about the earlier time?

22       A.    Yes.

23       Q.    At --

24       A.    When Standen failed.

77

1      Q.    When Standen failed.  What was your

2  understanding of who Lovett Silverman was?

3      A.    My understanding from the Standen failure

4  was that Lovett Silverman was brought in to sort

5  through the subcontractors that were doing work on

6  site, to look at the amounts of money that were owed

7  to them, and that they would determine if they were

8  owed that money, and then they would sign them to

9  subcontract hold agreements so that they could then

10  proceed with the work, working under the -- being

11  paid by the bonding company.

12      Q.    And by a subcontractor holding agreement,

13  are you referring to what has been talked about in

14  other depositions as being ratification agreements?

15      A.    Yes.

16      Q.    Now, you did not have a contract with

17  Lovett Silverman yourself, Landworks; is that

18  correct?

19      A.    No, I did not have a contract with Lovett

20  Silverman.

21      Q.    In fact, the only contracts that you,

22  Landworks, had that are involved in the middle

23  school project are the two that we looked at earlier

24  today --

78

1          MR. MELTZER:   Objection.

2     Q.    -- is that correct, the Standen contract

3 and the Jackson contract?

4     A.    I would think that the subcontract hold

5 agreement would also be like a contract.

6     Q.    From the Standen failure?

7     A.    Yes.

8     Q.    Back to the telephone conversation with Mr.

9 Bullock.  So can you explain what was said back and

10 forth in that conversation, as you best recall.

11    A.    So I called him up, and so, after telling

12 him who I was and explaining to him that -- what had

13 been told to me by the clerk, I believe he said that

14 he thought that I didn't have any interest in

15 completing the site work.  And I told him that that

16 was not the case, that the only thing I had ever

17 wanted to do was to be paid, get back to work, and

18 finish this job and to be done with it.

19          And he said that that was good, that they

20 had much preferred to work with the people that were

21 already involved with the project.  And he said --

22 he told me at that time, he was like, "What I will

23 need from you are a set of items," and I don't

24 recall exactly what he explained to me they were at

102

1      USF&G?

2          A.    I'm saying Lovett Silverman prepared the

3      counterclaim to give to USF&G so that they could

4      file a counterclaim against me.    And there are items

5      in there that -- first of all, it appears that it

6      has been hastily put together, in that there's a

7      deadline to meet, and it's more important to meet

8      that deadline than it is to get it right, and there

9      are items in there that are clearly not my work.

10     And --

11         Q.    Like what, for example?

12         A.    It appears to me, in the counterclaim, that

13     the track is in there, and the track being all the

14     track.    And you have seen the change order or the

15     letter of intent from Jackson about the scope

16     dealing with the removal of the old asphalt and the

17     overlay of the track, but then also the rubberized

18     surface.

19             I mean, there's going to be -- I figure

20     there's going to be an argument where they're going

21     to say that I owed the pavement on the track, and I

22     am going to that I did not.    There was never any

23     doubt that there was always a contractor hired for

24     doing the work for putting down the surface on the

107

1          Now, the job sat unmanned from late fall --

2     no, it wouldn't be late fall, it would be early

3     winter -- wasn't actively manned daily until I'm not

4     certain when.  August of 2005 is when they were

5     talking about bringing contractors back on site.  I

6     don't know who maintenanced the site.  I don't know

7     what kind of damage it suffered over the period of

8     the winter and the spring.

9          In speaking to some of the deficiencies, I

10    don't know how much of that would have been

11    considered, you know, damage done by others.  And I

12    think that if they're speaking to deficiencies in

13    the work, then some of that is defamatory.

14    Q.    Are you saying that Lovett Silverman made

15    false statements, knowingly made false statements

16    about deficiencies in the work and who caused those

17    deficiencies?

18         MR. MELTZER:  Objection.

19    A.    I think that they may have made statements

20    about deficiencies in the work, and I'm a little

21    troubled by the word "knowingly," because that would

22    ask me to actually know their mind-set.

23         I think that they made statements about

24    deficiency in the work that are not attributable to

108

1    me or to Landworks, and that in so making these

2    statements without first investigating the validity

3    of them, that that's defamatory.

4        Q.    Anything else that Lovett Silverman did

5    that involved false statements with regard to you?

6        A.    I think the counterclaim, in presenting

7    this counterclaim, that they were attributing work

8    to me that was clearly, in my opinion, not in my

9    scope of work, and that by presenting that as fact,

10    I think, was a false statement and contributed to

11    the prolonging of this whole ordeal.

12        Q.    Other than what you've just testified to

13    regarding the counterclaim, and setting aside the

14    counterclaim, are there any other false statements

15    that you're aware of that Lovett Silverman has made

16    regarding Landworks?

17        A.    Not that I can recall at this time.

18        Q.    Do you believe that Lovett Silverman

19    engaged in extortion toward you?

20        MR. MELTZER:    Objection.

21        A.    Even though I would be -- I easily applied

22    that word to Jackson in their practice, I don't

23    think that I would apply the word "extortion" to

24    Lovett Silverman.

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 10 of 14

109

1          I think that when they stated in their

2    e-mail streams to me that basically they could not

3    speak with me as long as I have a lawsuit pending,

4    it's a continuation of the holding the carrot out of

5    "If you drop this lawsuit" -- and this is only my

6    opinion of this -- "If you drop this lawsuit, then

7    we can speak with you." And that to me is not

8    extortion, but sort of a coercion to get something

9    out of me in response of getting something out of

10   them.

11        Q.   Do you believe that Lovett Silverman

12   strong-armed Landworks?

13        A.   I believe that Lovett Silverman, through

14   the progression from August of 2005 through 2006,

15   engaged in a pattern of things that -- engaged in a

16   pattern of conduct that I don't know if it

17   constitutes strong-arming, but I think it

18   constituted trying to apply certain charges to me

19   that were clearly not mine, and that in doing so,

20   they were basically taking money away from me.

21        Q.   And what specifically was this pattern of

22   conduct?

23        A.   Starting with the e-mail in which Mr.

24   Bullock, I think, gave a false reason for why he

114

1     A.   I can't think of something right now.

2  There may be one or two more instances, but there is

3  nothing that has stuck in my mind as much as those

4  two instances.

5     Q.   Are you aware of any other subcontractors

6  at the site who you would say were strong-armed or

7  extorted by Lovett Silverman?

8     A.   I don't think I ever used the word

9  "extorted" by Lovett Silverman.  I think, as I

10  stated before, I think that would be a term that I

11  would not apply to them.

12       I don't know of the dealings with other

13  subcontractors with Lovett Silverman.  I can only

14  tell you my dealings with them.  So I don't know if

15  other contractors were strong-armed or not.  I know

16  other contractors had to file suit on this job to

17  get paid.

18       MS. BROWN:  I don't have anything further

19  right now.  Mr. Hipp is going to ask you a few

20  questions.

21              CROSS EXAMINATION

22    BY MR. HIPP:

23     Q.   Good afternoon, Mr. Matthews.  As you know,

24  my name is Eric Hipp, and I represent United States

172

1      A.    I can only tell you what I believe it is.

2      Q.    That's my question, what you believe it is.

3      A.    To back charge a subcontractor would be to

4  back charge them for incomplete work or damaged work

5  that they had not corrected themselves.

6      Q.    And what does it mean to back charge?

7      A.    It means to present them with a bill for

8  work they had done to correct whatever.

9      Q.    It means to present them with a bill, or it

10  means to --

11      A.    If you're going to -- I'm sorry.  I didn't

12  mean to interrupt you.

13      Q.    Maybe you can just explain, in a given

14  circumstance, what it would mean to back charge.

15          MR. MELTZER:  Objection.

16      Q.    Does it mean to say the amount that you

17  claim you're due, you, subcontractor, is going to be

18  reduced by X amount as a back charge because of

19  defects in the work?  Does it mean that?  I'm not

20  trying to put words in your mouth, but I would like

21  to know what it means, in your own words, what it

22  means for a subcontractor to be back charged on a

23  job.

24      A.    I think it can mean several things.

174

1    that basically you've got their materials on site,

2    and then you're going to, after doing so, you're

3    going to bang them down to reduce their price to

4    you, give you a better price.

5         And I've heard it used to say, "I'm going

6    to bang this person that's doing this work for me,"

7    and try to extract more from them than what was

8    maybe the original intentions of getting from them.

9    I don't know if that's clear enough for you, but

10   that's my understanding of it.

11       Q.   When I was questioning you earlier, I was

12   asking you about what you believed Lovett Silverman

13   had done wrong on this project, and we talked about

14   different ways of characterizing what they had done.

15   And I want to ask you, do you believe that Lovett

16   Silverman engaged in a bang of Landworks?

17       A.   Yes.

18       Q.   And you how would you describe that?

19       A.   I believe that there was a realization

20   sometime on this job that it was not going well and

21   that it was not going to go well and that there

22   needed to be savings made wherever it could be made.

23       This is my feeling now, my interpretation

24   of things, and that there was a determination made

Case 4:05-cv-40072-FDS     Document 68     Filed 03/23/2007     Page 14 of 14

175

1     at some time that they were going to have to try to

2     recuperate costs as best they could to drive the

3     overall cost of the project down, because they were

4     definitely going to run over any of the projections

5     that they had.

6              With respect to myself, my feeling is that

7     if they did not have to pay the $135,000 to me to

8     get me back on the site, and if they could then

9     bring in another site contractor, which they would

10    not have to initially pay to remobilize for the

11    site, then they could get this work done, and they

12    could at that time use the $135,000 and put it

13    toward the work that was being done by the

14    contractor.

15       Q.    When you say "they," it was USF&G that you

16    contend owed you that money, right?

17       A.    That's correct.

18       Q.    Not Lovett Silverman?

19       A.    That's correct.

20       Q.    Now, what facts do you have to back up this

21    belief?

22       A.    Communications between individuals that

23    work for Lovett Silverman, the e-mail that basically

24    states banging the subcontractors.

# EXHIBIT G

2-81

1    and was not caused by construction damage.

2        Q.    Are you familiar with the item referenced

3    in No. 92?

4        A.    No, sir.  I can't be certain of where that

5    sidewalk is.  I have an idea of where it is, but I

6    can't be certain.

7        Q.    Would that damage have been caused by

8    Landworks?

9        A.    No, sir.  It was --

10            MR. MELTZER:  Objection.

11       A.    I'm sorry.

12       Q.    He made an objection.  You can go ahead and

13   answer.

14       A.    It would have been an area, if it's the

15   area that I am thinking about, it would have been an

16   area that was outside of the limits of our work.

17       Q.    Item No. 93, is that work within the scope

18   of Landworks' responsibility to complete?

19       A.    In lawn areas, no, sir.  That was not in my

20   obligations to complete or in my contract to

21   complete.  It was outside my scope of work.

22       Q.    Could you describe just generally where the

23   lawn areas at the project that were not within the

24   scope of Landworks' contract work -- let me ask it

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 3 of 10

2-89

1    they expected me to maintain them.  But if they had

2    to be maintained, I had done the maintenance on

3    them.

4        Q.    I believe it was your testimony previously

5    that once grass grows back over the top of the sand

6    slit drains, maintenance would not be required?

7        A.    That's correct.

8        Q.    As of December 7th, 2004, had the grass

9    grown back over the sand slit drains?

10       A.    It was starting to knit itself in, but it

11   had not completely established on top of it.  There

12   were still areas that were open.

13       Q.    Under "Curbing and edging," were any of

14   these items within the scope of Landworks'

15   responsibility to correct?

16       A.    The first item is yes.  Second item was no,

17   but I moved it anyway.  The next item, as far as I

18   know, was still talking about that upper walkway,

19   and as I have marked beside it, it meets the ADA

20   requirement.

21            And the miscellaneous damage to the curb,

22   by the time this had been generated, in December,

23   the paving had been in since August, end of August,

24   and bituminous curb is going to start to get

2-101

1      Q.    Mr. Matthews, I direct your attention to

2    Paragraph 12.  You state that "Lovett Silverman

3    engaged in a scheme to reduce costs to USF&G on the

4    project by refusing to authorize payments to

5    subcontractors, including the Plaintiff."  Do you

6    see that?

7      A.    Yes.

8      Q.    What is your basis to assert that Lovett

9    Silverman had the authority to authorize payments?

10     A.    From the previous ratification, Lovett

11   Silverman was charged with investigating the claim.

12   Once they found out which portions of it were valid,

13   then they would sit there and they would put

14   together the ratification about how much was owed.

15   And then they would tell the surety at that time

16   that this is the amount that is owed to this

17   contractor, for them to be ratified or to be held.

18          So that's what I am gauging this on, that

19   basically you had to work through the surety's -- or

20   through Lovett Silverman for them to go through all

21   of your billing to make certain what you said you

22   were owed you are owed.  And then they would, in

23   turn, give that to the surety, and the surety would

24   pay you.

2-102

1      Q.    Do you know for a fact who was the decision

2   maker, whether it was the surety or whether it was

3   Lovett Silverman?

4            MR. MELTZER:  Objection.

5      A.    No, I do not.

6      Q.    Now, you testified a few days ago that you

7   do not believe that Lovett Silverman engaged in

8   extortion.  Do you recall that testimony?

9            MR. MELTZER:  Objection.

10     A.    Yes, I do.  I think I said that they were

11  more coercive, not extorting.

12     Q.    Is this a mistake in Paragraph 12 --

13           MR. MELTZER:  Objection.

14     Q.    -- of your complaint, that Lovett Silverman

15  engaged in a scheme by engaging in extortion towards

16  subcontractors?

17           MR. MELTZER:  Objection.

18     A.    No.  No.

19     Q.    Are you changing your testimony?

20           MR. MELTZER:  Objection.

21     Q.    You said "extortion" was a very strong

22  word, you said two days ago.  Are you now changing

23  your testimony?

24           MR. MELTZER:  Objection.

2-104

1    any; is that correct?

2         MR. MELTZER:  Objection.

3    A.    Like I said, I would have to review to make

4    certain what there is in documents.  There are so

5    many documents to go back over, I cannot recall all

6    of them right now.  But I would have to review them

7    and see.

8    Q.    Now, are there any other -- we went through

9    this before.  I don't want to repeat the questions

10   that I asked you before.  You recall I asked you

11   before about strong-arming and asked you what

12   evidence you had that you were strong-armed by

13   Lovett Silverman, not USF&G, but Lovett Silverman?

14   A.    Yes.

15   Q.    And in the context here of this scheme to

16   reduce costs to the surety by refusing to authorize

17   payments to subcontractors and strong-arming the

18   subcontractors, do you have any evidence to support

19   that allegation?

20        MR. MELTZER:  Objection.

21   A.    The conduct that was exhibited by the

22   e-mail traffic back and forth between the parties

23   and Lovett Silverman --

24   Q.    I'm not talking about -- those e-mails you

2-106

1    in my opinion, see is the conduct of first not

2    relating to me what I saw as the truth being, that

3    Russ Fuller had a problem with me or whoever it was

4    had a problem with, and that's why they couldn't

5    deal with me.

6           Secondly, in that even though the surety

7    had -- may have told them they couldn't deal with

8    me, that it was still, in my opinion, the

9    responsibility of Lovett Silverman to investigate

10   clearly, plainly and thoroughly the claim that I had

11   that I was owed money.

12          And for them not to do any type of

13   investigation, from August of 2005 until they were

14   pressed to make a counterclaim in the December-

15   January time frame following, then it lacks a

16   sincerity about their actions.  I mean, it's not --

17   they're not presenting in their counterclaim an

18   accurate portrayal of things that were in my scope

19   of work.

20       Q.   Can we look just briefly, and we'll be

21   done, on Count III.  Well, Count II is a fraud

22   count.  You've accused Lovett Silverman of fraud.

23   Can you explain in your own words how it is that you

24   believe that Lovett Silverman engaged in a fraud on

2-107

1   you.

2          MR. MELTZER:  Objection.  Asked and

3   answered at least four times.

4          MS. BROWN:  We haven't talked about Count

5   II at all yet.

6      Q.    Go ahead.

7      A.    The compilation of what I believe to be a

8   false counterclaim that Lovett Silverman helped

9   prepare for the surety, I believe, in my opinion is

10  fraud.

11     Q.    Anything else?

12     A.    At this moment, I can't think of anything

13  else, but I may.

14     Q.    Okay.  Well, if you do, you can tell your

15  attorney, and he will supplement your response?

16     A.    Yes.

17     Q.    Now, Count III is tortious -- it's a

18  misspelling here, it's t-o-r-t-i-o-u-s, but

19  computers constantly make those corrections to these

20  legal words.

21         MR. MELTZER:  What are you looking at

22  that's spelled wrong?

23         MS. BROWN:  Tortious.  It's spelled with an

24  I, isn't it?

2-108

1          MR. MELTZER:  No.  It's fine.  That's the

2   way it is.

3          MS. BROWN:  That's fine?  You spell it

4   without an I?  Okay.

5      Q.   Tortuous, but in the law we mean tortious,

6   with an I, interference, not tortures us.  But would

7   you look at Paragraph 23 of Count III, please.

8          You state, "Lovett Silverman, by carrying

9   out its program of 'banging' the subcontractors, did

10  tortuously interfere with the contract between the

11  Plaintiff and USF&G for ulterior motives."

12         And I would like to ask you, just in your

13  own words, how is it that you believe that Lovett

14  Silverman interfered in your contract with the

15  surety?

16         MR. MELTZER:  Objection.  Asked and

17  answered.

18     A.   I believe that they interfered with my

19  relationship with the surety, in that by not

20  investigating the claim, by not at least looking

21  into the possibilities that these monies were owed,

22  and by -- it was evident that they were having

23  trouble finding a site contractor to complete the

24  work, and that the surety, up until the point that

2-109

1    basically I filed suit against them, didn't seem to

2    have any problem with me -- that by not sitting

3    there, giving me a full and fair hearing on the

4    amounts that I say were owed to me, and not

5    presenting them to the surety as "Maybe we should

6    sit down and talk with this person," was interfering

7    with the working relationship that I had had with

8    USF&G.

9         Q.    Thank you.  Now, Paragraph 38, this is the

10   last question I have on the amended complaint,

11   "Defendant Lovett Silverman set out to harm

12   Landworks by denying it access to the project and to

13   funds due and owing."  Can you tell me how it is

14   that Lovett Silverman denied you access to the

15   project?

16             MR. MELTZER:  Objection.  Asked and

17   answered.  Go ahead.

18        A.    By not proceeding with or, as I stated

19   before, by not taking the request that I made for

20   them to meet with attorneys present to work this

21   out, to mediate, negotiate the amounts owed to me

22   out, so that I could return to work on the job site

23   and to finish what my contractual obligations were.

24        Q.    So Lovett Silverman --

# EXHIBIT H



Jackson Construction Company
20 Dan Road    Suite 3
Canton, MA  02021

PH (781) 737-1500
FX (781) 737-1550

RECEIVED
JUN 17 2004
JACKSON CONSTRUCTION
COMPANY

LANDWORK CREATIONS, LLC
PMB 291 1500A Layayette Road
Portsmouth, NH  03801

PH 603-498-1295

SUBCONTRACT NO.
381-02-200

AGREEMENT made this 29TH day of APRIL in the year TWO THOUSAND FOUR

between JACKSON CONSTRUCTION COMPANY, 20 Dan Road, Canton, MA  02021, a Massachusetts Business Trust, the Contractor,

and LANDWORK CREATIONS, LLC, the Subcontractor, concerning the project

### SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street, Shrewsbury, MA  01545

For TOWN OF SHREWSBURY, the Owner.

### The Contractor and Subcontractor agree as follows:

## ARTICLE 1.    THE CONTRACT DOCUMENTS

This Subcontract consists of the following Contract Documents: this Agreement and any Exhibits attached hereto, the Contract between the Owner and Contractor dated MARCH 1, 2004, the Conditions of the Contract between the Owner and Contractor (General, Supplementary and other Conditions), Drawings, Specifications, all Addenda issued prior to execution of the Contract between the Owner and Contractor, all Change Orders issued subsequent thereto.

### ATTACHED TO AND MADE PART OF THIS CONTRACT
ATTACHMENT "A"  STANDARD ATTACHMENTS

Affirmative Action Program for Equal Employment Opportunity

Safety Policy

    Exhibit #1 – OSHA Hazard Communications Standard Requirements

    Exhibit #2 – Problem Solving Procedures

    Exhibit #3 – Safety Policy Fines/Backcharges

    Exhibit #4 – Accident/Incident Report

    Exhibit #5 – Weekly Safety Meeting Report

    Exhibit #6 – Safety & Health Program Requirements

Drug Free Workplace Policy

Wage Breakdown

Weekly Payroll Report

Subcontractor Requisition for Payment

Continuation Sheet (Application and Certificate for Payment)

Trade Contractor Certification Indemnification of Wavier & Liens

Tax Exempt Certificates

ATTACHMENT "B"  SPECIFICATIONS
ATTACHMENT "C"  DRAWING INDEX
ATTACHMENT "D"  LIST OF ADDENDUM
ATTACHMENT "E"  SCHEDULE
ATTACHMENT "F"  PREVAILING WAGE RATES

All of the above documents are a part of this Subcontract and shall be available for inspection by the Subcontractor upon request.

## ARTICLE 2.    THE WORK

The Subcontractor shall furnish all labor, materials, plant equipment, permits and other facilities and things necessary or proper for or incidental to, and shall do all things to perform and complete, the following (hereinafter collectively referred to as the Work:)

THIS SUBCONTRACT SHALL COMPLETE ALL Site Work PER SECTION(S) 02060  SITE DEMOLITION, 02100  SITE PREPARATION, 02200  EARTHWORK, 02240  GEOTEXTILE FABRICS, 02250  EROSION CONTROL, 02511  BITUMINOUS CONCRETE PAVING & MARKINGS, 02515  CONCRETE PAVEMENT, 02525  GRANITE CURBING, 02649  TRACER TAPE, 02705  STORM DRAINAGE SYSTEMS & SEWER SYSTEMS, 02710  UNDERDRAIN SYSTEM - ATHLETIC FIELD, 02713  WATER SYSTEMS, AND 02930  LAWNS AND GRASSES IN ACCORDANCE WITH PLANS AND SPECIFICATIONS DATED 7/01/2002 INCLUDING ADDENDA 1-5 AND ALTERNATES 1-5, IF APPLICABLE, AS PREPARED BY LAMOUREUX PAGANO ASSOCIATES, 14 EAST WORCESTER STREET, WORCESTER, MA  01604 FOR SHREWSBURY MIDDLE SCHOOL.

The work shall include but not necessarily be limited to the following:

1.  Submission of Certificate of Insurance with limits in accordance with Contract Documents. JCC Job #381, Shrewsbury Middle School – West to be included in the description box.  The Town of Shrewsbury and Jackson Construction Company are to be listed as additionally insured.

2.  Provide eleven (11) complete sets of submittal and shop drawings as specified for all items for Architect/Engineer's approval prior to work on site.

3.  Coordination Drawings.

4.  Warranty / Guarantees and Maintenance instructions at job close out per contract documents.

---

5. Subcontractor agrees to maintain a reasonable and consistent effort to complete all work in accordance with the project schedule.

6. Project Completion Date: August 24, 2004

7. Union labor, unless otherwise noted.

8. Tax Exempt Project [046-001-300].

9. Worker Conduct, Appearance, and Rules.

A. Worker Conduct, Appearance, and Rules: Because this project is in close proximity to the existing occupied school, the conduct of each worker at the job site is of paramount importance. The Owner reserves the right to require any worker to be banished from the Owner's property.

(1) Privacy-Conduct: All work of the Contract with the maximum effort to maintain the privacy of the Owner's operations, staff, and students. Do not permit workers to peer into areas of the existing building visible from the work area. Invasion of privacy is a major infraction of the work rules.

(2) General Conduct and Demeanor: All construction workers shall treat the Owner's staff, students, and the public professionally with respect and courtesy. Appropriate work attire is required. Foul language and loud conduct are prohibited.

(3) Radios and Television: The use of entertainment devices including personal devices with headphones or earphones is strictly prohibited at all times. Control the volume of communication radios and loudspeakers to avoid creating a nuisance.

(4) Smoking: Smoking is strictly prohibited on school property.

(5) Sexual Harassment: All forms of physical and verbal sexual harassment including, with limitation: touching, whistling, sexually explicit stories, jokes, drawings, photos, and representations, exhibitionism, and all other sexually oriented offensive behavior is strictly prohibited and is a major infraction of the work rules.

(6) Student Contact: Except for necessary warnings and safety related instructions, construction personnel are strictly prohibited from having any direct or indirect contact with students including, with limitation, verbal or written communication, touching, staring, whistling, howling, and any other action or behavior which makes a student uncomfortable or which could be interpreted by the student as harassment. A violation of this type may be considered, on a case-by-case basis, as a major infraction of the work rules.

(7) Warnings and Dismissal: For minor infractions of the rules, the Owner may issue a warning. Only one warning will be allowed per worker from the Owner's property. For major infractions of the work rules, the worker shall be dismissed immediately without prior warning and possibly subject to criminal prosecution.

10. Provide all labor and equipment rates [Wage Breakdown] with signed contract.

11. Submit weekly-certified payroll reports and Equal Employment Opportunity Ratios (two copies). [Once you have begun work at the job site they must be sent weekly even if there was no work performed.]

12. Requisitions are due by the 25th of each month. Submit three copies with Schedule of Values.

13. Clean up of debris to Jackson's dumpster unless otherwise noted.

14. If applicable, Jackson Construction Company shall issue deductive change orders to Landwork Creations, LLC for benefits in conjunction with the Laborers' Unified Trust Agreement. If Landwork Creations, LLC fails delinquent in the payment of their benefits to the Laborers' Union, Jackson Construction shall continue to issue deductive change orders for these benefits.

15. Subcontractor shall furnish, erect, and maintain all scaffolding as required for the performance of their work unless otherwise noted.

16. The Subcontractor agrees to Project Restrictions i.e. off-hours, start time, noise levels, etc. required by the Owner, as instituted and enforced by the project superintendent or his representatives.

17. Subcontractor shall perform the WORK in the safest and most responsible manner. This includes all obligations pursuant to Accident prevention, but not limited to:

   A. Safety indoctrination of all employees before start work.

   B. Providing all employees with personal protective equipment including hard hats, safety glasses, gloves, back belts, etc. and require their use at all times.

   C. Plan and organize weekly toolbox meetings solely for the purpose of discussing project safety.

18. Subcontractor agrees to establish and implement a Hazard Communication Program. This includes, but is not limited to, furnishing Material Safety Data Sheets to the Contractor upon receipt and implementing a training program on the jobsite.

19. It is agreed and understood that this scope is general in nature and is not intended to include each, and every, item of work required by the Subcontractor to comply with the Contract Documents.

20. Subcontractor acknowledges that he has visited the jobsite and is fully aware of the existing conditions and constraints involved with performing THE WORK.

21. Smoking is prohibited within all areas of the project. The Contractor will designate an area for the purpose of smoking in the general vicinity of the project. Subcontractor shall inform his employees of this policy and be solely responsible for policing their actions.

22. Allowances for changes in THE WORK shall be as follows:

   A. Change proposals shall be submitted in a timely manner and include a detailed breakdown of all costs including but not limited to labor (breakdown by classification), material, equipment, and subcontractors.

23. Related Documents:

   A. All of the contract documents, including General Conditions, Supplementary Conditions and Division 1 General Requirements, apply to the work in this section.

24. ALTERNATE(S), if applicable.



25. Furnish labor, equipment, materials and supervision necessary to perform the work of the following sections in their entirety:

   A.  02060 Site Demolition.
   B.  02100 Site Preparation.
   C.  02200 Earthwork.
   D.  02240 Geotextile Fabrics.
   E.  02250 Erosion Control.
   F.  02511 Bituminous Concrete Paving & Markings.
   G.  02515 Concrete Pavement.
   H.  02525 Granite Curbing.
   I.  02649 Tracer Tape.
   J.  02705 Storm Drainage Systems & Sewer Systems.
   K.  02710 Underdrain System - Athletic Field.
   L.  02713 Water Systems.
   M.  02930 Lawns and Grasses.

The Subcontractor shall complete the work in a first-class manner equal in all respects to the best standards of practice and to the full satisfaction of contractor, the architect and/or owner, all in accordance with, or as reasonably implied by, the Contract Documents; and the Subcontractor does hereby agree to be bond to and assume toward the Contractor all of the obligations and responsibilities pertaining to the Work that the Contractor, by the Contract Documents, has assumed to the Owner, except as specifically modified by this Subcontract.

### ARTICLE 3.    COMMENCEMENT OF WORK

The Contractor shall, as soon as practicable following execution of the Subcontract, notify the Subcontractor to attend a scheduling conference for the purpose of reviewing and analyzing the time, labor and material requirements of the Subcontractor. To such conference the Subcontractor shall bring what he believes to be a practicable schedule showing the dates on which he proposes to order material necessary for the Work and the order and time within which he plans to complete various portions of the work and the personnel to be utilized. Following such scheduling conference and analysis by Contractor of Subcontractor's requirements, the Subcontractor shall submit to Contractor a schedule revised as a result of such conference and analysis; such revised or further revised) schedule, when accepted in writing by the contractor, shall be the job Schedule of Record, which shall at all times govern the Subcontractor's prosecution of the Work, as may from time to time be modified by the directions of the Architect or by Change Order. The Subcontractor acknowledges the right of the Contractor to fix finally the schedule of Subcontractor based on data submitted by Subcontractor, other subcontractors, and requirements of the contract between Owner and Contractor. As part of the Job Schedule of Record the Subcontractor shall warrant that he has satisfied himself (a) that sufficient labor is available to him to perform the Work according to the Job Schedule of Record and (b) that he has placed firm orders for all materials required by the Work. The Subcontractor shall commence the Work on notice from the contractor and shall complete such work faithfully and diligently under the direction of the Contractor in accordance with the Job Schedule of Record. ALL TIME LIMITS STATED IN THE CONTRACT DOCUMENTS AND THE JOB SCHEDULE OF RECORD ARE OF THE ESSENCE OF THIS SUBCONTRACT, NO EXTENSION OF TIME WILL BE VALID WITHOUT THE CONTRACTORS WRITTEN CONSENT. THE SUBCONTRACT, AT THE OPTION OF THE CONTRACTOR, MAY BE HELD RESPONSIBLE FOR ALL DAMAGES, COSTS, LOSSES, AND EXPENSES RESULTING DIRECTLY OR CONSEQUENTIALLY FROM HIS FAILURE TO MEET TIME LIMITS.

### ARTICLE 4.    PROGRESS OF WORK

The Subcontractor shall, al all times, provide sufficient working forces and shall do and perform and finish at his own expense all things necessary or proper for or incidental to the prosecution of the Work in accordance with the Job Schedule of Record, as it may be modified from time to time by the directions of the Architect or by Change Order or in accordance with the reasonable needs of the Contractor. The Subcontractor shall at all times cooperate with the schedule consultant of Contractor, if one is appointed, or the Contractor's scheduling agent. If the Subcontractor falls behind the Job Schedule of Record, the Contractor may order the Subcontractor, by written notice, to increase the number of shifts, overtime operation, days of work and the amount of construction, plant, materials, equipment and other facilities as the Contract may deem appropriate to regain time lost, all without additional cost to the Contractor. If the Subcontractor fails to comply with such written directions and notice within 48 hours after the giving of such notice, or within such further time as the Contract may allow, the Contractor shall have the right to furnish such plant, materials, equipment and other facilities, employ such additional men, do such other things as it had specified in its notice to the Subcontractor, all at the Subcontractor's expense, and/or at its option, hold the Subcontractor in default under the provisions of this Subcontract and terminate the Subcontract in accordance with the provisions of Article 9 hereof.

### ARTICLE 5.    THE SUBCONTRACT PRICE

The Contractor shall pay the Subcontractor in current funds for the performance of his obligations under this Subcontract, subject to additions and deductions as herein provided, the total sum of

($303,535.00)  (the Subcontract Price).

Three Hundred Three Thousand Five Hundred Thirty-five-00/100 Dollars

### ARTICLE 6.    PAYMENTS IN GENERAL AND PROGRESS PAYMENTS

The Contractor agrees to pay the Subcontractor as follows: 99% of the value of the labor performed, plant and equipment furnished, and materials incorporated into the Work, and, if approved by the Architect, materials stored on the site in any one month as to which the Subcontractor has presented proper bills, vouchers and receipts for such stored materials at the main office of the Contractor on or before the twenty-seventh day of the month, to be paid ;not later than the fifteenth day following receipt of each payment from the Owner by the Contractor. The Subcontractor shall, before the first application for payment, submit to the Contractor a schedule of values of the various parts of the Work aggregating the total sum of this Subcontract, made out in such detail as the Contractor may reasonably require (or as may be required by the Owner), and supported by such evidence as to its

correctness as the Contractor may request. This schedule, when approved by the Contractor, shall be used by the Subcontractor as a basis for application for payment, unless it is found to be in error, in which event it shall be revised to the reasonable satisfaction of the Contractor. The Subcontractor shall furnish to the Contractor with the second application for payment, and with each application for payment thereafter, a completed and signed Subcontractor's Partial Payment Waiver And Release in the form provided by the Contractor. In no event shall the Contractor be required or obligated to pay to the Subcontractor any amounts in excess of the amount previously received by the Contractor from the Owner and attributable to the Work of the Subcontractor. Receipt of progress and/or final payments by the Contractor from the Owner shall be, in each instance, a condition precedent to the Subcontractor's right to receive his share of any such payment from Contractor. The Subcontractor shall indemnify and save the Contractor harmless from all claimed and actual obligations of Subcontractor to tax authorities, subcontractors, workmen, material men and furnishers and/or; lessors of machinery and parts thereof, equipment, and all supplies, including, without limitation, gasoline, oil and commissary, incurred in the furtherance of the performance of this Subcontract. The Subcontractor shall upon request provide to the Contractor reasonably satisfactory evidence that all obligations of the foregoing nature have been paid, discharged or waived, and if the Subcontractor fails to do so the Contractor may, after two days' written notice to the Subcontractor either pay any such unpaid bills, withhold or retain in addition to retainage provided for under the first sentence of this Article from payments otherwise due or to become due to Subcontractor such sums of money the Contractor deems sufficient to pay any and all such claims until such time as satisfactory evidence is furnished that all such claims have been satisfied or discharged. In no event, however, shall the provisions of this Article be construed to impost any obligation upon the Contractor to either the subcontractor or his Surety and in paying unpaid bills of the subcontractor the Contractor shall be deemed the agent of the subcontractor; any such payment shall be considered as a payment made under the Subcontract by the Contractor to the subcontractor and the Contractor shall not be liable to the Subcontractor as to any such payment made in good faith. Any sum or sums chargeable to the Subcontractor under any of the Articles of this Subcontract may, at the option of the Contractor, be deducted from any payment or payments which otherwise are due or may become due to the Subcontractor hereunder. No part nor the whole of the Work to be performed hereunder shall be sublet or assigned, nor monies due or to become due, nor rights with respect thereto, shall be assigned without the prior written consent of the Contractor and in the event that the Subcontractor shall purport or attempt to assign or sublet any part of or the whole of the Work or monies or rights with respect thereto without such consent, such purported assignment, subletting or attempt may, at the option of the Contractor, be deemed a repudiation of this Subcontract and a refusal by the Subcontractor to perform the same constituting a default hereunder and in any such case the Contractor shall have, cumulatively, the remedies provided for in Article 9 hereof and under law.

## ARTICLE 7. FINAL PAYMENT

Final payment shall be due when the Work is fully completed and performed in accordance with the Contract Documents and is reasonably satisfactory to the Contractor, Architect and Owner. The right to final payment shall be subject to the terms and conditions of Article 6. Before issuance of final payment, the Subcontractor shall submit additional evidence reasonably satisfactory to the Contractor showing that all known liabilities and indebtedness, including, without limitation, those referred to in Article 6 arising out of or resulting from or incurred in connection with the Subcontractor's performance of this Subcontract, have been satisfied.

## ARTICLE 8.
## INSPECTION AND CORRECTION OF WORK

The Subcontractor shall provide proper facilities for the inspection of the Work at all times by the Contractor, Architect, Owner, and other parties interested therein. The Subcontractor shall promptly take down and remove from the premises all materials, whether worked or unworked, and all portions of the Work condemned by the Architect or Contractor as failing to conform to the Subcontract notwithstanding that such material or work may have been previously overlooked by the Architect or the Contractor and accepted or estimated for payment, the provisions of the Conditions regarding the replacement of such Work to govern the Subcontractor's obligations hereunder with respect thereto. If the Subcontractor shall fail to remove condemned Work or materials, the Contractor may remove at the Subcontractor's expense and store same for the account of the Subcontractor and may replace all condemned Work and materials at the expense of the Subcontractor. In the event, the Contractor deems it inexpedient to correct such Work or materials a deduction in the Subcontract Price shall be made if acceptable to the Architect and the Owner. Neither the issuance of a final certificate for payment nor any provision of the Contract Documents shall relieve the Subcontractor of responsibility for negligence or for faulty materials or workmanship within the period provided by law or his guaranty, whichever period is longer, and upon written notice shall remove the same or correct such defects and pay for any damages to other work resulting there from.

## ARTICLE 9. CONTRACTOR'S RIGHT TO TERMINATE AND DAMAGES

If the Subcontractor shall be involved in financial difficulties as evidenced by:

(a) his admitting in writing his inability to pay his debts generally as they become due;

(b) his filing a petition in bankruptcy or for reorganization or for the adoption of an arrangement under the Bankruptcy Act (as now or in the future amended) or an answer or other pleading admitting or failing to deny the material allegations of such a petition or seeking, consenting to or acquiescing in the relief therein provided;

(c) his making an assignment for the benefit of his creditors;

(d) his consenting to the appointment of a receiver for all or a substantial part of his property;

(e) his being adjudicated a bankrupt;

(f) the entry of a court order which shall not be vacated, set aside or stayed within 10 days from the date of entry, (i)

appointment of a receiver or trustee for all or a substantial part of his property, or (ii) approving a petition filed against him for, or effecting an arrangement in, bankruptcy or for a reorganization pursuant to said Bankruptcy Act or for any other judicial modification or alternation of the rights of creditors; or

(g) the assumption of custody or sequestration by a court of competent jurisdiction of all or substantially all of his property, which custody or sequestration shall not be suspended or terminated with 10 days from its inception;

or if the Subcontractor should refuse or fail, except in cases in which extension of time is approved in writing by the Contractor, to meet the time requirements of the Job Schedule of Record, or to furnish enough skilled workmen, proper materials, equipment, facilities, plant or to make timely orders of materials, or if he should fail to make prompt payment to his subcontractors or suppliers or if he shall fail to make payments when due to any governmental unit as required by applicable tax laws and regulations, or if he shall disregard laws or ordinances or the instructions of the Contractor and/or Architect or otherwise be guilty of a violation of any provision of this Subcontract, then the Contractor may, without prejudice to any other right or remedy and after giving the Subcontractor and his Surety, if any, three days' written notice, terminate the employment of the Subcontractor, take possession of the premises and all materials, tools and equipment thereon and finish the Work in whatever manner it may deem expedient. In such event, the Subcontractor shall not be entitled to any further payment until the Work is finished; if the unpaid balance of the Subcontract Price shall exceed the expense of finishing the Work, including reasonable compensation for additional architectural, managerial, professional (including reasonable attorneys' fees) and administrative services and sums chargeable to Contractor for delay or otherwise, such excess shall be paid to the Subcontractor. If such expenses and sums chargeable shall exceed such unpaid balance, the Contractor shall retain the unpaid balance and the Subcontractor shall pay the differences to the contractor. The Contractor shall have, in addition, all of its rights in law and equity against the Subcontractor to enforce claims for damages and other relief.

Notwithstanding the above paragraph, the Contractor reserves the right to terminate this Subcontract for its convenience upon written notice to the Subcontractor stating the extent and effective date of such termination. Immediately upon receipt of such notice, the Subcontractor shall then provide similar written notice to its Sub-Subcontractors and suppliers and shall thereupon stop all work and place not further orders or Sub-Subcontracts for materials, services, equipment or supplies, except as may be necessary to complete portions of the Work not terminated, to protect property in the Subcontractor's possession in which the Owner or Contractor has or may acquire an interest, or to otherwise take any other action toward termination of the Work which the Contractor may direct. In such instance of termination for convenience, the Subcontractor will be paid an equitable amount for its work completed under the Subcontract and other reasonable cancellation costs incurred as a result of said termination. Prior to making any payments under this clause, the Contractor shall have the right to audit the records of the Subcontractor.

## ARTICLE 10.     CHANGES IN THE WORK

The Contractor, without invalidating the Subcontract, may order extra work or make changes by altering, adding to or deducting from the Work, the Subcontract Price to be adjusted if, and as provided for, in the Conditions. All such work shall be executed under the original conditions, except that any claim for extension of time caused thereby shall be adjusted in accordance with the determination of the Architect at the time of ordering such change. The Subcontractor shall make no claim for extension of time or extra compensation for extra work or any change unless done in pursuance of a written Change Order from the Contractor, and such claim is presented to the Contractor prior to commencement of the extra work, and no claim for any addition or extra shall be valid unless so ordered. The Subcontractor shall immediately furnish a detailed estimate of the costs of any extra work so ordered. The value of any such extra work or change shall be determined by one or more or a combination of the following methods:

(1) By unit bid prices names in the Subcontract or subsequently agreed upon;

(2) By an agreed lump sum;

(3) By cost and percentage or by cost and a fixed fee,

all as provided for in the portions of the Conditions relating to changes in the Work.

The Subcontractor shall furnish satisfactory evidence of all costs and shall give the Contractor access to accounts relating thereto. Payments on account of extra work or changes shall be made only in accordance with the Architect's determination as provided for in the Conditions. The Subcontractor shall obtain and deliver to the Contractor, if requested, the written assent of any Surety on any bond furnished by the subcontractor to such changes before the same are made.

## ARTICLE 11.     GENERAL GUARANTY OF WORK

The Subcontractor warrants that all materials and equipment furnished an incorporated by him in the Work shall be new unless otherwise specified and that all Work under this Subcontract shall be of first-class quality, free from all faults and defects and in accordance with the Contract Documents. All Work not conforming to these requirements, including substitutions not properly approved may be considered defective. The Subcontractor shall execute a written guaranty and warranty applicable to all phases of the Work in accordance with this Subcontract and all other applicable provisions of the Contract Documents pertaining to warranties and guarantees. The Subcontractor shall remedy any defects due to faulty materials or workmanship and pay for the damage to other work resulting there from, which shall appear within the period of one year from the date of final payment, unless a longer period is specified. Neither occupancy of the premises by the Owner, nor any provision in the Contract Documents, nor final payment, shall constitute an acceptance of work not done in accordance with the Contract Documents, nor relieve the Subcontractor of liability in respect to any express warranties or responsibility for faulty materials or workmanship, nor shall nay of the foregoing, or any provision of the Contract Documents, nor shall any of the foregoing, or

any provision of the Contract Documents, nor any special guaranty be held to limit the Subcontractor's liability for defects or faulty materials less than the legal limit of liability in accordance with the law of the place of building. The Contractor shall give notice of observed defects with reasonable promptness.

## ARTICLE 12.    INDEMNITY

The Subcontractor shall indemnify and hold harmless the Contractor and all of its agents and employees from and against all claims, damages, losses and expenses (including attorneys' fees) arising out of or resulting from the performance of the Subcontractor's Work (or failure in such performance), provided that any such claim, damage, loss or expense (a) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (b) is caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly contracted with by him (subcontractors or suppliers) or anyone for whose acts he may be liable, regardless of whether it is caused in part by a party indemnified hereunder. In any and all claims against the Contractor or any of its agents or employees by any employee of the Subcontractor, anyone directly or indirectly employed by him or anyone for whose acts he may be liable or anyone having contracted with the Subcontractor, the indemnification obligation under this Article 12 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under Worker's Compensation acts, disability benefit acts or other employee benefit acts. The obligations of the Subcontractor under this Article 12 shall not extend to the liability of the Architect, his agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, his agents or employees, provided such giving or failure to give is the primary cause of the injury or damage.

The Subcontractor shall provide in the policy of comprehensive General Public Liability insurance required by this Subcontract Agreement a contractual indemnity endorsement, which insures Subcontractor's liability under the provisions of this Article 12.

Any sum or sums chargeable to the Subcontractor under this provision, or any other provision, of this Subcontract may at the election of the Contractor, be deducted from any payments otherwise due or to become due to the Subcontractor under this or any other Subcontract between the Contractor and the Subcontractor.

## ARTICLE 13.    INSURANCE

The Subcontractor shall maintain Liability Insurance for the risks and in the limits specified below UNLESS OTHERWISE STATED IN THE SPECIFICATIONS DATED 7/01/2002, AS PREPARED BY LAMOUREUX PAGANO ASSOCIATES, 14 EAST WORCESTER STREET, WORCESTER, MA 01604 FOR SHREWSBURY MIDDLE SCHOOL.

1.  Workers Compensation

    a.  State:                                              Statutory

    b.  Applicable Federal (e.g. long-
        shoremen, harbor work, Work at or
        outside U.S. Boundaries);                           Statutory

    c.  Maritime:                                           $N/A

    d.  Employer's Liability:                               $1 Million

    e.  Benefits Required by Union
        labor contacts:                                     As applicable

2.  Comprehensive General Liability must be occurrence policy (including Premises-Operations; Independent Contractors' Protective; Products and Completed Operations; Broad Form Property Damage);

    a.  Bodily Injury:

        $ 1 Million                          Each Occurrence

        $ 1 Million                          Aggregate, Products and
                                             Completed Operations

    b.  Property Damage:

        $ 1 Million                          Each Occurrence

        $ 2 Million                          Aggregate

    c.  Products and Completed Operations Insurance shall be maintained for a minimum of ☒ 1 ☐ 2 year(s) after final payment and Contractor shall continue to provide evidence of such coverage to Owner on an annual basis during the aforementioned period.

    d.  Property Damage Liability Insurance shall include coverage for the following hazards:

        ☒ X (Explosion)

        ☒ C (Collapse)

        ☒ U (Underground)

    e.  Contractual Liability (Hold Harmless Coverage);

        1.  Bodily Injury:

            $ 1 Million                      Each Occurrence

        2.  Property Damage:

            $ 1 Million                      Each Occurrence

            $ 2 Million                      Aggregate

    f.  Personal Injury, with Employment Exclusion deleted:

        $ 1 Million                          Aggregate

3.  Comprehensive Automobile Liability (owned, non-owned, hired):

(a) Bodily Injury:

| | |
|---|---|
| $ 1 Million | Each Person |
| $ 2 Million | Each Accident |

(b) Property Damage:

| | |
|---|---|
| $ 5 Million | Each occurrence |

4.  Aircraft Liability (owned and non-owned) when applicable, as follows:

☐ With limits proposed by Contractor for Owner's approval

☒ Not applicable

Evidence of the above coverage, represented by certificates issued by the insurance carrier, which must be satisfactory to Contractor, shall be furnished to the Contractor prior to the signing of this Subcontract. Certificates of Insurance shall state that the Contractor will be notified in writing at least ten (10) days prior to cancellation or renewal of any insurance. All insurance held by the Subcontractor shall also name the Contractor and Owner as Insured.

**ARTICLE 14.    LIENS**

No part of the retained percentage (or any other sums withheld) shall become due until the Subcontractor, if so required, shall deliver to the Contractor a complete release of all liens arising out of this Subcontract, or receipts in full in lieu thereof and, if required in either case, an affidavit that so far as he has knowledge or information, the releases and receipts include all the labor and material for which a lien could be filed; but the Subcontractor may, if any of his subcontractors refuse to furnish a release or receipt in full, furnish a bond satisfactory to the Contractor to indemnify the Contractor against any lien. The Subcontractor shall use his best efforts to prevent any laborers, materialman's, mechanic's or other similar liens from being filed or otherwise imposed on any part of the Work or the site. If any laborer's, material men's, mechanic's or other similar lien or claim of lien is filed or otherwise imposed by the Subcontractor or any sub-subcontractor, material men or supplier in connection with the Work, and the Subcontractor does not cause such lien to be released and discharged forthwith or file a bond in lieu thereof, Contractor shall have the right to pay all sums necessary to obtain its release and discharge. The Contractor shall have the right to deduct all amounts so paid from the Subcontract Price or to deduct the same from the next succeeding Requisition until the total amount expended shall be recouped. If any liens remain unsatisfied after all payments to the Subcontractor are made, the Subcontractor shall reimburse the Contractor for all monies that the latter may be compelled to pay in discharging such a lien, including all cost and expenses (including reasonable attorneys' fees). The Subcontractor shall indemnify, defend and hold harmless the Contractor and Owner from all costs and expense, including attorneys' fees, claims, losses, demands, causes of action or suits of whatever nature arising out of any such lien.

**ARTICLE 15**
**OMISSIONS AND SUBSURFACE CONDITIONS**

In the event that any matters contained in the Specifications have been omitted from the Plans or vice versa, the same shall be construed as if contained in both. The Subcontractor shall promptly inform the Contractor in writing of any inconsistency in the specifications and Plans. Any changes made therein by the Architect or the Contractor shall thereupon be binding upon the Subcontractor, and similarly any portion of the general specifications to which this Subcontract pertains which are omitted from the specifications shall be construed a binding in this agreement.

Should conditions encountered below the surface of the ground be determined by the Architect to materially differ from the conditions indicated by the plans and specifications, any adjustment in the Subcontract Price, claimed by either party, shall be determined in accordance with Article 10 hereof.

**ARTICLE 16.**
**COMPETENCE OF WORKMEN-LABOR CONDITIONS**

The Subcontractor shall promptly discharge from the Work such employees as the Contractor or the Architect finds not competent or compatible with other personnel on the job. The Subcontractor shall promptly notify the Contractor of any labor dispute or difficulty. The Subcontractor agrees to procure materials and supplies from such sources and to perform all Work on the Project with labor and Subcontractors that will work harmoniously with other elements of labor involved in the construction of the Project. In the event that any labor dispute and/or difficulty arises, in any way related to the Subcontractor's employees or independent contractors, thereby causing any delay in any portion of the entire job, and such delay, interference or stoppage continues for three (3) days, the Contractor may, at its option, terminate this contract under Article 9 for default, and the Contractor shall have no further liability hereunder to the Subcontractor, except as provided in Article 9. The Subcontractor expressly agrees not to participate in or accede to any stoppage in the Work, which may result from any labor dispute.

**ARTICLE 17.**
**NO CLAIMS FOR DAMAGES FOR DELAY**

In the event of delay in the Work the Subcontractor agrees that he hall have no claim for money damages or additional compensation for delay regardless of how such delay is caused, but in the case of any delay in the Work not due to his fault he shall be entitled only to such extension of time for the performance of the work as shall be allowed to the Contractor by the Owner and/or Architect. All claims for such extension of time shall be made in the manner and within the time provided for in the Contract Documents between the Owner and Contractor for like claims by the Contractor upon the Owner.

**ARTICLE 18.**
**PAYMENT AND PERFORMANCE BONDS**

The Subcontractor shall, simultaneously with execution of this Subcontract, deliver to the Contractor and pay all premiums for performance and payment bonds running to the Contractor in sums equal to _0_ % of the Subcontract Price in the case of the performance bond, and _0_ % of the Subcontract Price in the case of the payment bond, each such bond to have corporate sureties satisfactory to the Contractor, conditioned

upon the faithful performance by the Subcontractor of the Subcontract in each and every of its particulars, as it may from time to time be modified by Change Order, such bonds to be in such form and otherwise to contain such provisions as are satisfactory to the Contractor.

## ARTICLE 19.     WEATHER CONDITIONS

In the event of temporary suspension of Work during inclement weather or whenever the Architect shall direct, the Subcontractor will protect carefully his work and all materials on the job site connected with the furtherance of his Work against damage or injury from the weather. If, in the opinion of the Contractor and/or the Architect, any work or materials shall have been damaged or injured by reason of failure on the part of the Subcontractor or any of his subcontractors so to protect his work, such materials shall be removed and replaced or work redone at the expense of the Subcontractor.

## ARTICLE 20.
## ALL WORK SUBJECT TO CONTRACT DOCUMENTS AND ARCHITECT'S CONTROL

The Subcontractor acknowledges that he has familiarized himself with all the details of the Contract Documents, including the Conditions and all addenda thereto, and the Plans and Specifications relating to the Work undertaken by him under this Subcontract and particularly the authority over and control of the Work granted to the Architect and Contractor there under and hereunder and agrees to be bound in each respect and in every detail in accordance with the terms thereof and hereof. All disputes arising under this Subcontract shall be determined by the Architect as provided for in said Conditions. To the extent the Conditions provide that any such determination by the Architect shall be binding on the Contractor all such determinations shall be equally binding upon the Subcontractor. Notwithstanding any provision contained in any Contract Document requiring arbitration, Subcontractor agrees that any dispute under this Subcontract shall be submitted to Arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association only upon the written election of Contractor to submit to arbitration. Contractor may, in its sole discretion, withhold such election to arbitrate. Subcontractor's execution hereof constitutes and acknowledges Subcontractor's agreement to arbitrate at such election of Contractor. Each such dispute, which is submitted to arbitration, shall be heard before the American Arbitration Association in Boston, Massachusetts unless the Contractor specifies some other location.

The Subcontractor agrees, upon Contractor's written demand thereof, to become a party to and be bound by any arbitration proceeding involving the contractor, the Architect or the Owner to the extent that such proceedings involve any of the rights or obligations of the Subcontractor hereunder.

## ARTICLE 21.     ACCIDENT PREVENTION

The Subcontractor shall be responsible for the prevention of accidents, and agrees to comply with all laws, regulations and codes concerning safety as they shall be applicable to the Work and to the safety standards established during the

progress of the Work by the Architect and/or Contractor. Should the Subcontractor neglect to adopt corrective safety measures ordered by the Architect and/or Contractor, the Contractor may perform them and deduct the cost from any payments due or to become due the Subcontractor. The absence of a stop order from the Contractor shall in no way relieve the Subcontractor of his responsibility. The Subcontractor agrees to comply with and be bound by the Contractor's Safety Policy, which is attached hereto and made part of this Subcontract.

## ARTICLE 22.     CLEAN UP

The Subcontractor shall, at his own expense, periodically clean up and remove from the job site all debris caused by the Work hereunder, and such clean up and removal shall include the removal of all debris and refuse left by the Subcontractor's working forces from meal periods, or from the uncrating of materials. The Subcontractor shall, upon the completion of his Work, clean up and remove from the job site all his plant, materials and equipment and all debris and refuse caused by the Work and/or his working forces. If the Subcontractor fails to clean up as provided herein, the Contractor may, upon 24 hours' written notice to the Subcontractor, cause such clean up of debris and elimination of nuisances and removal to be done at the expense and for the account of the Subcontractor. The decision of the Contractor as to the identity of the person or persons responsible for clean up and removal of debris, refuse, plant and equipment and materials, the cost thereof and the responsibility for such cost, shall be final and any charge back to Subcontractor for clean up and removal shall not be appealable to the Architect or any other forum but shall be conclusive.

## ARTICLE 23.
## SUBCONTRACTOR'S OBLIGATION TO EXPEDITE WORK

If delay is caused the Contractor or other subcontractors of the Contractor through the fault of the Subcontractor (or his subcontractors or suppliers) the Subcontractor shall be liable to the Contractor for all direct and consequential damages, including losses, costs and expenses (including attorneys' fees) resulting from such delay or non-performance. The Subcontractor shall promptly notify the Contractor in writing of any anticipated delay. The Subcontractor shall cooperate with the Contractor in scheduling and performing his Work to avoid conflict or interference with the work of others. The Subcontractor shall promptly submit shop drawings and samples as required in order to perform his Work efficiently, expeditiously and in a manner that will not cause delay in the progress of the Work of the Contractor or other subcontractors.

## ARTICLE 24.
## COMPLIANCE WITH LAWS AND REGULATIONS

The Subcontractor shall comply with Federal, State and local tax laws, social security acts, unemployment compensation acts and workmen's compensation acts and all other laws, regulations, ordinances, and by-laws applicable to the performance of his Subcontract. The Subcontractors work shall conform strictly to all applicable laws and ordinances in

---

force in the locality in which the Work is done. The Subcontractor acknowledges that he has carefully examined and is thoroughly familiar with and will comply with the provisions in the Conditions and in Exhibits hereto relating to Wage Rate, Apprentices' Overtime, Posting Minimum Wage Rate, Payment of Employees (by Subcontractors), Anti-Kickback Statute and Regulations, Wage Underpayments and Adjustments, Payrolls of Subcontractors, Interest of Officials and Prohibited Interests. The Subcontractor will comply with the provisions of the Occupational Safety and Health Act of 1970 (or any successor). The Subcontractor is required to implement the Community Provisions of Chapter #470 of the Acts of 1983 of the General Laws of Massachusetts, the so-called "Right to Know" law, effective September 6, 1984. The Subcontractor shall indemnify and hold the Contractor harmless for any loss, expense, cost, or damage occasioned by any violation of provisions of any or all of the foregoing.

## ARTICLE 25.
## EQUAL EMPLOYMENT OPPORTUNITIES

The Contractor is dedicated to the furtherance of equal employment opportunity. Therefore, there are incorporated herein by reference, whether or not strictly applicable by law to the Work, federal Executive Order 11246 or any successor thereto; Title VII of the Civil Rights Act of 1964; the Massachusetts Fair Employment Practice law; or regulations and rulings under each or any of the foregoing; and all amendments to each and any of the foregoing. The Subcontractor agrees to be bound by and to comply with the provisions of all of the foregoing and to maintain an affirmative action program and plan to assure equal employment opportunity throughout the performance of the Work. Without in any way limiting the right of the Contractor under Article 9 hereof, the Subcontractor shall indemnify and hold the Contractor harmless for any loss, expense, cost or damage occasioned by any failure to observe the provisions of this Article 25.

## ARTICLE 26.     NOTICES

All notices to the Subcontractor having to do with this Subcontract shall be deemed sufficient if delivered in writing to any representative of the Subcontractor or if mailed, by certified or registered mail, to his address on the signature page hereof. All notices to the Contractor shall be sent to it at

20 Dan Road
Canton, MA 02021

Either party may designate another address for notice by written notice delivered or mailed as aforesaid to the other party.

## ARTICLE 27.     SECURITY

Contractors shall have no liabilities to Subcontractor for security of materials, equipment, or tools at the job site, which shall be stored and used there solely at risk of Subcontractor. Subcontractor shall comply with all security rules of general applicability promulgated by Contractor.

## ARTICLE 28.     SEVERABILITY

In the event any provision of this Subcontract shall be found to be prohibited by law, such provision shall be ineffective only to the extent of such prohibition, and shall not in any manner invalidate or affect the enforceability of the remaining provisions of this Subcontract.

## ARTICLE 29.     EXHIBITS

See exhibits listed on page one (1) of this contract which have been initialed for identification by the parties and constitute a part hereof.

## ARTICLE 30.     FINAL AGREEMENT ·

It is understood that this Subcontract, including all instruments incorporated herein be reference, constitutes the full and complete agreement now existing between the Contractor and Subcontractor and supersedes any and all prior agreements or understanding, written or oral, express or implied, between the Contractor and Subcontractor, except as otherwise expressly provided herein.



IN WITNESS WHEREOF, the parties have hereto, by their duly authorized representatives, set their hands and seals as of the day and year first above written. Each person signing below who purports to do so in a representative capacity personally warrants and represents to the other party that he is fully authorized to execute and deliver this Subcontract and that the corporation, trust or other body he purports to represent is empowered to enter into this Subcontract and will become fully bound by his execution and delivery.

**CONTRACTOR:**

**JACKSON CONSTRUCTION COMPANY**

By: _Richard M'hun_                    6-21-04
                                         Date

_____Richard McGuinness_____
            Printed Name
_____Project Manager_____
                Title

**SUBCONTRACTOR:**

**LANDWORK CREATIONS, LLC**

By: _Neil W. Matth_ ——— 6/12/04
                                         Date

_Neil H. Matthews_
            Printed Name
_Principal_
                Title

**ADDRESS OF SUBCONTRACTOR:**

_PMB 291 1500A Lafayette Road_
_Portsmouth, NH  03801_

---

# Attachment A

## SHREWSBURY MIDDLE SCHOOL - WEST
45 Oak Street, Shrewsbury, MA 01545

### JCC JOB #381

**ATTACHED TO AND MADE PART OF
JACKSON CONSTRUCTION COMPANY
&
LANDWORK CREATIONS, LLC
Contract 381-02-200**

### TABLE OF CONTENTS

| | |
|---|---|
| Affirmative Action Program for Equal Employment Opportunity | Page 2 |
| Safety Policy | Pages 3-4 |
| Exhibit #1 –  *The Occupational Safety & Health Administration (OSHA) Hazard Communications Standard 1926.59(E)(2) Requirements* | Page 5 |
| Exhibit #2 –  *Problem Solving Procedures* | Page 6 |
| Exhibit #3 –  *Safety Policy Fines / Backcharges* | Page 7 |
| Exhibit #4 –  *Jackson Construction Company Incident Report* | Page 8 |
| Exhibit #5 –  *Jackson Construction Company Weekly Safety Meeting Report* | Page 9 |
| Exhibit #6 –  *Safety & Health Program Requirements* | Pages 10-12 |
| **Think Safety ---- Work Safety Statement  (to be signed and returned)** | Page 12 |
| Drug Free Workplace Policy  **Statement of Understanding  (to be signed and returned)** | Page 13 |
| Weekly Payroll Report Form and EEO Anti-Discrimination & Affirmative Action Program | Pages 14-16 |
| Wage Breakdown  **(to be completed and returned <u>for each job classification</u>)** | Page 17 |
| Subcontractor Requisition for Payment  (to be completed 25th day of month) | Page 18 |
| Continuation Sheet (Application and Certificate for Payment) | Page 19 |
| Trade Contractor Certification Indemnification & Waiver of Liens | Page 20 |
| Owner's Certificate of Exemption  (Form ST-2)  Massachusetts | Page 21 |
| Contractor's Exempt Purchase Certificate  (Form ST-5C)  Massachusetts | Page 22 |

## AFFIRMATIVE ACTION PROGRAM
## FOR
## EQUAL EMPLOYMENT OPPORTUNITY

JACKSON CONSTRUCTION COMPANY is an Affirmative Action contractor. Our involvement in equal employment opportunities is a matter of tradition.

In past years we were actively involved with C.A.B. at their Roxbury office. We were participants and committee attendees during the formation and structuring of the original Boston Plan and cooperated with Third World organizations.

As a result of the JACKSON CONSTRUCTION COMPANY's aggressive and affirmative history in assisting minority employment, the Federal Government selected us to participate as a joint venture with a minority contractor on several occasions. One case was a school building at Ft. Devens, Ayer, MA and the other was the National Cemetery at Otis Air Force Base in Bourne, Massachusetts.

JACKSON CONSTRUCTION COMPANY will not discriminate against any employee or applicant for employment because of race, creed, color, sex or national origin. JACKSON CONSTRUCTION COMPANY shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, creed, color, sex or national origin. Such action shall include, but not be limited to the following:

a) Employment, upgrading, demotion or transfer

b) Recruitment or recruitment advertising

c) Layoff or termination

d) Rate of pay or other forms of compensation

e) Selection for training, including apprenticeship

f) Employment of Veterans of the Vietnam War

g) Handicapped people

JACKSON CONSTRUCTION COMPANY in all solicitations or advertisement for employees placed by or on behalf of the Company states that all qualified applicants will receive consideration for employment without regard to race, creed, color, sex or national origin.

JACKSON CONSTRUCTION COMPANY sends to each labor union or representative of workers with which we have a collective bargaining agreement or other contract or understanding advising the labor union or workers' representative of our commitments.

JACKSON CONSTRUCTION COMPANY notifies subcontractors/vendors during negotiations of our company E.E.O. policy. Our program as well as Owner requirements become attachments or riders to the ultimate subcontract document.

JACKSON CONSTRUCTION COMPANY notifies Job Superintendents who have hiring responsibilities of our company's E.E.O. and Affirmative Action Policy including non-segregated facilities.

JACKSON CONSTRUCTION COMPANY is fully cognizant of Federal Executive order 11246 and the Boston Resident Plan.

As a result of many years experience we have established a mailing list of small businesses and minority owned businesses. During the pre-bid period invitations are equally sent to all subcontractors and vendors qualified to provide the particular expertise required for the project being bid. For those requiring pre-bid assistance, our Estimating Department offers to review the plans, specifications and clarifications necessary for an appropriate subcategory bid.

Upon award of a contract, JACKSON CONSTRUCTION COMPANY has often contacted the several associations representing minority companies in an effort to stimulate the inclusion of qualified minority companies in the local construction industry on a fair and equal competitive basis. Our objective in this regard is to increase the number of minority companies with expertise for the variety of vendor or subcontract services needed for a building project. We assume that the involvement of these companies will result in the employment of skilled minority employees.

Our company philosophy has been and continues to make a good faith effort to achieve the goals of equal opportunity for all.



Landwork Creations, LLC  Subcontract 381-02-200

## SAFETY POLICY

Project safety is not only a requirement but it is most important for the successful operation of JACKSON CONSTRUCTION COMPANY.

JACKSON CONSTRUCTION COMPANY has formulated the following written policy to indicate their commitment in providing a safe and healthy work environment for its employees, subcontractors and their employees, visitors to the worksite and to the general public.

To achieve a safe and healthy work environment, JACKSON CONSTRUCTION COMPANY requires as a condition of -

    a)    <u>Employment</u>:  All employees adhere to the policies, procedures, rules and responsibilities set forth elsewhere pertaining to safety;

    b)    <u>Subcontracts and Purchase Orders</u>:  JACKSON CONSTRUCTION COMPANY requires all applicable state, federal and local rules, regulations and laws pertaining to safety and the environment, including OSHA's Haz-Com Standard 1926.59 (e) 2, are adhered to.  (See EXHIBIT #1)  Failure to comply with any of the above will be considered as a breach of a contract.

    c)    <u>Visitation to the Site</u>:  All visitors must follow the safety rules and regulations set forth by JACKSON CONSTRUCTION COMPANY.

It will be expected by <u>all</u> on the site to report any unsafe conditions to JACKSON CONSTRUCTION COMPANY management personnel on the site.  (See EXHIBIT #2)

The constant monitoring of the procedures and operations of <u>all</u> concerned at the project will assure safety to the general public.

The Safety Engineer, Job Superintendent and Foremen have the full support of the JACKSON CONSTRUCTION COMPANY in enforcing this policy.

## PROJECT SAFETY

JACKSON CONSTRUCTION COMPANY takes a "pro-active approach" to project safety.  It will be monitored on a daily basis by the Project Superintendent and the field crew.  Moreover, on a regular basis, or as needed, the company Safety Engineer will:

    a)    visit the site to conduct a more thorough safety investigation; looking for potential hazards and violations and to document those findings.

    b)    correspond with the subcontractors' management to point out any violations and hazards. The Safety Engineer has the authority and support of JACKSON CONSTRUCTION COMPANY to issue fines and penalties as described in the section entitled "Fines/Backcharges."  (See EXHIBIT #3)

    c)    require each subcontractor to forward a copy of their company's safety policy, safety program and their Haz-Com Program signed by their designated Safety Person, along with their signed contract or letter of intent.

    d)    require a pre-job safety meeting with each subcontractor to clearly identify their responsibilities in regard to safety.

    e)    require immediate notification of all accidents/incidents and resultant reports.  (See EXHIBIT #4)

    f)    keep the client informed of any subcontractor who is in continual noncompliance of the established program.

## HAZARDOUS SUBSTANCES

If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the Subcontractor, the Subcontractor's Sub-subcontractors or anyone directly or indirectly employed by them, the Subcontractor will, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the Contractor in sufficient detail and time to permit compliance with such laws by the Contractor, other Subcontractors and other employees on the site.

In the event the Subcontractor encounters on the site material reasonably believed to be asbestos or polychlorinated biphenyl (PCB) which has not been rendered harmless, the Subcontractor will immediately stop Work in the area affected and report the condition to the Contractor in writing. The Work in the affected area will resume in the absence of asbestos or polychlorinated biphenyl (PCB), or when it has been rendered harmless, by written agreement of the Contractor and Subcontractor, or in accordance with final determination by the Architect on which arbitration has not been demanded or by arbitration as provided in this agreement. The Subcontractor will not be required pursuant to Article 5 to perform without consent any Work relating to asbestos or polychlorinated biphenyl (PCB).

## INSURANCE

Each subcontractor's certificate of insurance will be monitored to verify that the coverage is up to date, including Workers' Compensation, and that all requirements are met. No subcontractors will be allowed on the project until JACKSON CONSTRUCTION COMPANY has received their certificate of insurance.

## TRAINING

Weekly toolbox talks/safety meetings will be held for all JACKSON CONSTRUCTION COMPANY employees. Each employee will be asked to acknowledge, by signature, that training or talks were given them. This includes JACKSON CONSTRUCTION COMPANY's Haz-Com Program. These talks will relate to the ongoing activity that the construction is in at the time. (See EXHIBIT #5)

## WELCOME TO JOBSITE POLICY

All Subcontractors, Superintendent and/or Foremen will be given JACKSON CONSTRUCTION COMPANY's Safety and Health Program Requirements (EXHIBIT #6) on the first day they are scheduled to commence work on the project. It will be their responsibility to understand, implement and abide by such rules and regulations and assure their employees, vendors, the supplier's and/or visitors to do the same.

Other programs that will be addressed are emergency first aid, fire safety and evacuation, and drug/alcohol abuse.



EXHIBIT #1

## THE OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION (OSHA)
## HAZARD COMMUNICATIONS STANDARD 1926.59 (E)(2) REQUIREMENTS

The Occupational Safety and Health Administration (OSHA) Hazard Communications Standard 1926.59 (e)(2) requires that on multi-employer work sites such as building construction, all employers ...........

- MUST provide other employers (subcontractors) with a copy of their Material Safety Data Sheets (MSDS) for each hazardous chemical to which other subcontractors' employees may be exposed.

- MUST exchange information about precautionary measures necessary to protect employees.

- MUST provide an indication of the type of labeling system in use where exposures may occur to other employer's (subcontractors') employees.


To coordinate this exchange of hazard information and to insure that all employees have sufficient information to protect themselves at the workplace, JACKSON CONSTRUCTION COMPANY requires that a copy of all MSDS's that your company intends to use on this project be forwarded to

(1)  the Job Superintendent who will put this document in a readily available central file and

(2)  Jackson Construction Company's Safety Engineer at our main office.

---

Landwork Creations, LLC  Subcontract 381-02-200

Page 5

EXHIBIT #2

## PROBLEM SOLVING PROCEDURES

It is JACKSON CONSTRUCTION COMPANY's intent to provide a safe work place for all on the site.  All supervisory personnel have been instructed to observe and correct unsafe conditions.  If you observe a condition that needs corrective action, you should immediately:

1.   Correct the situation yourself, if possible; e.g., replace a missing guardrail.

2.   If the situation is beyond your capabilities, report this condition to your immediate supervisor.

3.   If you feel that the corrective action is not effective or is not being expedited, you may contact the company's Safety Engineer, Mark Walraven at 781-737-1527.

We appreciate your concern and cooperation in making our projects SAFE PROJECTS.



**EXHIBIT #3**

## SAFETY POLICY FINES/BACKCHARGES

In addition to all of the remedies and rights granted to JACKSON CONSTRUCTION COMPANY elsewhere under the Contract Documents, JACKSON CONSTRUCTION COMPANY may assess backcharges against the subcontractor for continued safety violations as follows:

> In the event of a safety violation, a verbal warning AND a written warning will be given to the worker (if applicable), the Foreman of the subcontractor and the subcontractor's home office.

> If after the issuance of said verbal and written warnings, the safety violation has not been corrected, a second written notice will be given with the backcharge amount attached. A copy of this will be sent to the subcontractor's home office, Jackson Construction Company's office and to the subcontractor's insurance carrier.

It is expressly understood that although JACKSON CONSTRUCTION COMPANY may from time to time issue verbal or written warnings and in some instances issue fines, such actions by JACKSON CONSTRUCTION COMPANY will in no way relieve the subcontractor(s) of their obligations and/or liabilities with respect to safety laws, rules and regulations.

The amount of the backcharge will be in accordance with the listed schedule below:

| CATEGORY "A" - $100.00 | CATEGORY "B" - $500.00 |
|---|---|
| Hard Hats | Open Electrical Panels |
| Safety Glasses | Missing Protective Cages |
| Work Boots | Damaged Cords - Missing Ground Pins, Cuts |
| Unsecured Gas Cylinders | Damaged Electrical Equipment |
| Safety Gas Cans | Missing or Improper Lighting |
| Backup Alarms | Floor Openings |
| Damaged Ladders | Missing or Not Replacing Guardrails |
| Missing Blade Guard | Scaffold Not Erected Properly |
| Housekeeping | Trenches |
| Other | Other |



**EXHIBIT #4**

## JACKSON CONSTRUCTION COMPANY

## INCIDENT REPORT

Job Location: __45 Oak Street, Shrewsbury, MA  01545__                    Job No. __381__

Job Name:___ SHREWSBURY MIDDLE SCHOOL - WEST _____

Date of Loss: _____              Day of Week: _____

Hour of Day: _____               Type of Loss: _____

Claimant's Name:_____

    Address: _____

    Phone Number: (Home) _____      (Work)_____

    Employer: _____

Witness: Name: _____

    Address: _____

    Phone Number: (Home) _____      (Work)_____

Description: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Date of this Report:_____

Reported by _____

Signed by: _____

---

Landwork Creations, LLC  Subcontract 381-02-200

Page 8

**EXHIBIT #5**

## JACKSON CONSTRUCTION COMPANY

### WEEKLY SAFETY MEETING REPORT

Date: _____

Project Name: S̲H̲R̲E̲W̲S̲B̲U̲R̲Y̲ ̲M̲I̲D̲D̲L̲E̲ ̲S̲C̲H̲O̲O̲L̲ ̲-̲ ̲W̲E̲S̲T̲ _____    Project No. __381____

Topic: _____

_____

Conducted by: _____

Number of People in Attendance: _____

Suggestions Offered: _____

_____

_____

_____

_____

_____

Comments: _____

_____

_____

_____

Discussion of Recent Accidents or Near Misses: _____

_____

_____

_____

_____

How to Prevent/Avoid: _____

_____

_____

Signatures of Those in Attendance:

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

Landwork Creations, LLC  Subcontract 381-02-200

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 21 of 33

EXHIBIT #6

SUBCONTRACTOR:  **Landwork Creations, LLC**

WELCOME TO JACKSON CONSTRUCTION COMPANY'S

SAFETY AND HEALTH PROGRAM REQUIREMENTS

PROJECT:  Shrewsbury Middle School - West  - JCC #381

** PLEASE READ AND SIGN LAST PAGE**

| PROJECT TEAM: | | JOB PHONE: |
|---|---|---|
| Project Manager: | Richard McGuinness | 781-737-1500 |
| Project Superintendent: | Frank Leonardo | Cell #508-326-7617 |
| Safety & Health Director: | Mark Walraven | 781-737-1527 |
| Designated Site Safety Person: | Frank Leonardo | Cell #508-326-7617 |

| EMERGENCY NUMBERS: | | EMERGENCY REPAIR: |
|---|---|---|
| Fire - | 911 | Electric: |
| Police - | 911 | Telephone: |
| Ambulance - | 911 | Water: |
| | | Gas: |

1. Floor openings will be covered or barricaded.  Under no circumstances will any person permit an opening to be left uncovered or unbarricaded.

2. Guard rails and barricades will be erected and maintained.  If removed for access, they will be replaced immediately by the removing party.

3. New employees and subcontractor employees will be given a brief safety orientation by their supervisors or the Project Supervisor before they start to work.  This orientation will apply to general instructions regarding safety rules of the project.

4. Tool Box Safety Meetings will be held weekly.  Attendees and minutes of the meetings are recorded.  ATTENDANCE IS MANDATORY.

5. Signs and posters bearing pertinent regulations will be used to convey warnings, directions, and instructions to Personnel and the public as required by the contractor and the client.  The observance of warning signs will be required of the company personnel and visitors while on the job.

6. HARD HATS - All project construction areas will be considered "Hard Hat Areas."  The wearing of hard hats by ALL employees, subcontractors, and visitors in the construction area will be strictly enforced.  Long pants, shirts and hard sole shoes will be worn.  Tennis shoes, sandals, etc. are prohibited.

7. All injuries no matter how slight must be reported to your Foreman IMMEDIATELY.  All doctors' referrals must be authorized through the job office unless an emergency situation exists.

8.   No horseplay, fighting, creating a disturbance, or scuffling is permitted. Offenders are subject to disciplinary action.

9.   Report all unsafe practices and conditions to your foreman at once. If not corrected within a reasonable length of time, report to the job superintendent.

10.  Housekeeping, safety and efficiency go hand in hand. Always keep your job clean. If you do not, we will, at your expense.

11.  All projecting nails will be removed or turned down immediately.

12.  Familiarize yourself with the fire extinguisher, first aid, and emergency egress locations.

13.  Do not use defective or broken tools and equipment. Use the proper tool or equipment for any job you do. Make sure that all guards and protective devices are in place and operating correctly.

14.  Goggles, and protective clothing and footwear must be worn when chipping, grinding, welding, cutting and working with compressed air, or when necessary to be close to such an operation being performed by another employee.

15.  Riding on equipment or trucks is forbidden.

16.  Do not attempt to lift or move heavy loads without adequate assistance. Learn to lift properly. Lift with your leg muscles, not your back.

17.  Do not place speed above SAFETY. If each worker will be watchful of everyone else, as well as himself, accidents can be held to a minimum.

18.  Always face ladders when ascending or descending. Tie off all ladders and report broken or unsafe ladders immediately.

19.  Keep clear of swinging buckets, loads and counterweights. Never walk on a blind side of equipment.

20.  Only authorized persons are permitted to operate specific equipment; follow these regulations: No one but qualified personnel or electrician is to make repairs and service electrical equipment.

21.  No employee will be allowed to report for work while under the influence of intoxicants or drugs. Possession of intoxicants, tranquilizers, narcotics or other dangerous drugs is prohibited and will result in company action. Violators of this policy will be subject to disciplinary action.

22.  Materials and equipment will be stored in a safe manner. All major deliveries will be arranged and coordinated with the Jackson Construction Company Project Superintendent.

23.  Spillage of any liquids of any kind on floors will be immediately cleaned up to avoid slipping, falling, or possible fire.

24.  Personnel protective equipment (safety glasses, respirators, earmuffs or plugs, special gloves, special boots, safety belts, etc.) will be provided as required by the hazards involved in work assignments. This equipment must be worn when specified by project supervision, or when conditions warrant their use.

25.  All fire lanes, aisles, stairways, passageways, etc., are to be kept clean and free from loose materials and debris. No such space will be used for storage of any kind.

26.  STUDY YOUR JOB FROM THE SAFETY ANGLE. Think before start work. Search out the hazards and take precautions to prevent accidents from happening. Be sure you have all necessary protective equipment with you when you start to work. If you are in doubt about hazards or the proper protective clothing or equipment, consult your supervisor.

---



Landwork Creations, LLC  Subcontract 381-02-200

27. It is imperative that all SUBCONTRACTORS on the jobsite comply with Jackson Construction Company's Safety Policy and that of all Industry Standard Safety and Health Regulations. Any SUBCONTRACTOR not complying with these regulations is subject to fines assessed as backcharges, as follows:

<u>First Offense</u> - The job foreman will be verbally warned and a written notification will be forwarded to the home office.

<u>Second Offense</u> - If after the issuance of the first notice the violation is not corrected, penalties will be assessed per the schedule below:

| CATEGORY "A" - $100.00 | CATEGORY "B" - $500.00 |
|---|---|
| Hard Hats | Open Electrical Panels |
| Safety Glasses | Missing Protective Cages |
| Work Boots | Damaged Cords - Missing Ground Pins, Cuts |
| Unsecured Gas Cylinders | Damaged Electrical Equipment |
| Safety Gas Cans | Missing or Improper Lighting |
| Backup Alarms | Floor Openings |
| Damaged Ladders | Missing or Not Replacing Guardrails |
| Missing Blade Guard | Scaffold Not Erected Properly |
| Housekeeping | Trenches |
| Other | Other |

It is expressly understood that although Jackson Construction Company may from time to time issue verbal or written warnings and in some instances issue fines, such actions by Jackson Construction Company will in no way relieve the subcontractor(s) of their obligation's and/or liabilities with respect to safety laws, rules and regulations.

---

### WELCOME TO JACKSON CONSTRUCTION COMPANY'S SAFETY AND HEALTH PROGRAM REQUIREMENTS

### THINK SAFETY ***** WORK SAFELY STATEMENT

I have read and understand the rules and information on the preceding pages and any violations on my part or anyone working under my supervision will be grounds for disciplinary action and/or removal from this project.

SIGNED: _Todd W. Franklin_

COMPANY: <u>Landwork Creations, LLC</u>

DATE: _6/12/04_

---

Landwork Creations, LLC  Subcontract 381-02-200

Page 12

### DRUG FREE WORKPLACE POLICY

JACKSON CONSTRUCTION COMPANY is committed to maintaining a drug free workplace in accordance with the federal law known as the "Drug Free Workplace Act, effective March 1989".

The policy of the JACKSON CONSTRUCTION COMPANY is to not allow the use of alcoholic beverages nor the use of any illegal drugs by ANY PERSON working on or visiting any of our construction sites.

The manufacture, purchase, distribution, dispensing, possession, sale of controlled substances, alcohol or illegal drugs on the work site or in the immediate vicinity of the workplace is prohibited.

Being under the influence of a drug or alcohol on the job may pose serious safety and health risks, not only to the user but to those working with or around the user. As a condition of your employment on a JACKSON CONSTRUCTION COMPANY project you are expected to adhere to this policy. You should know that violation of this rule is a serious offense and could lead to discipline, including suspension from work or discharge from Jackson Construction Company's employment.

Furthermore, if you are convicted of violating any drug statute for offenses, which occurred at work, you are expected to notify your employer within five (5) days of your conviction. The employer must so notify the agency within 10 days. If you do not notify your employer, you will also be subject to discipline up to and including suspension and discharge.

Help is available if you are experiencing problems with drug abuse or alcohol. Each state has an occupational program officer who assists in identifying resources in your area. This official is usually located in the state capital.

Resources for Drug and Alcohol Assistance can be obtained by calling any of the following toll-free numbers:

| | |
|---|---|
| 1-800-356-9996 | Al-Anon |
| 1-800-527-5344 | American Council on Alcoholism |
| 1-800-COCAINE | Cocaine Hotline |
| 1-800-843-4971 | National Institute on Drug Abuse Help line |

Attached you will find a "Statement of Understanding." Please read and sign your name to this form and forward it to your supervisor.

---

### DRUG FREE WORKPLACE POLICY

### STATEMENT OF UNDERSTANDING

I, _Neal A. McAthews_ have read in its entirety and fully understand JACKSON CONSTRUCTION COMPANY's Drug Free Workplace Policy.

Signed _Reco McAthett_          Date _6/12/04_

Company _LANDWORK CREATIONS, LLC_

Witness _Amber Price_          Date _6/12/04_

---

# WEEKLY PAYROLL REPORT FORM

**Company Name:** LANDWORK CREATIONS, LLC

**Prime Contractor:** ☐

**Project Name:** SHREWSBURY MIDDLE SCHOOL - WEST

JCC JOB #381

**Subcontractor** ☐

**List Prime Contractor:** _____

**Awarding Auth.:** TOWN OF SHREWSBURY

**Employer Signature:** _____

**Work Week Ending:** _____

**Print Name & Title:** _____

☐ **Final Report**

| Employee Name & Address | Work Classification | Hours Worked | | | | | | | (A) Tot. Hrs. | (B) Hourly Base Rate | Employer Contributions | | | (F) (B+C+D+E) Hourly Total Wage (prev wage) | (G) (A*F) Weekly Total Amount |
| | | S | M | T | W | T | F | S | | | (C) Health & Welfare | (D) Pension | (E) Supp. Unemp. | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

**NOTE:** Every contractor and subcontractor is required to submit a copy of their weekly payroll records to the Awarding Authority

# WEEKLY PAYROLL RECORDS REPORT
## & STATEMENT OF COMPLIANCE

In accordance with Massachusetts General law c149, §27B, a true and accurate record must be kept of all persons employed on the public works project for which the enclosed rates have been provided. A Payroll Form has been printed on the reverse of this page and includes all the information required to be kept by law. Every contractor or subcontractor is required to keep these records and preserve them for a period of three years from the date of completion of the contract.

In addition, every contractor and subcontractor is required to submit a copy of their weekly payroll records to the awarding authority. This is required to be done on a weekly basis. Once collected, the awarding authority is also required to preserve those records for three years.

In addition, each such contractor, subcontractor or public body shall furnish to the Department of Labor & Workforce Development / Division of Occupational Safety within fifteen days after completion of its portion of the work a statement, executed by the contractor, subcontractor or public body who supervises the payment of wages, in the following form:

---

## STATEMENT OF COMPLIANCE

_____
(Date)

I, _____, _____
(Name of signatory party)                              (Title)

do hereby state:

That I pay or supervise the payment of the persons employed by

**LANDWORK CREATIONS, LLC.**
(Contractor, subcontractor or public body)
on the
**SHREWSBURY MIDDLE SCHOOL - WEST**
(Building or project)

and that all mechanics and apprentices, teamsters, chauffeurs and laborers employed on said project have been paid in accordance with wages determined under the provisions of sections twenty-six and twenty-seven of chapter one hundred and forty nine of the General Laws.

Signature _____

Title _____

---

DIVISION OF OCCUPATIONAL SAFETY, 100 CAMBRIDGE STREET, 11TH FL., BOSTON, MA 02202

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 27 of 33

## SHREWSBURY MIDDLE SCHOOL – WEST PROJECT

### Equal Opportunity Anti-Discrimination and Affirmative Action Program
### Reporting Form

Date: _____

Contractor: ___ Landwork Creations, LLC ___    Contact: _____    Page ___ of ___

Address: ___ PMB 291 1500A Lafayette Road ___    Fax: _____    Telephone: 603-498-1295

___ Portsmouth, NH 03801 ___    E-mail: _____

Period of this Report: _____    Report Number: _____

| Job Title/Classification | Total Work Hours as of Last Report | Total Minority Work Hours as of Last Report | Percent Minority Hours | Total Work Hours this Report | Total Minority Work Hours this Report | Percent Minority Hours | Updated Total Work Hours | Updated Total Minority Work Hours | Percent Minority Hours |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Signature of Preparer: _____    Check Here If This A Final Report _____

Landwork Creations, LLC  Subcontract 381-02-200

Page 16

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 28 of 33

## WAGE RATE BREAKDOWN

NOTE: FILL OUT A COMPLETE FORM FOR ALL JOB CLASSIFICATIONS. I.E. CARPENTERS, LABORER, ETC. MAKE COPIES OF THIS FORM AS REQUIRED.

SUBCONTRACTOR:  LANDWORK CREATIONS, LLC

PROJECT:  SHREWSBURY MIDDLE SCHOOL - WEST

Job Classification: _____

JCC JOB#:  381

| | STRAIGHT TIME | OVERTIME | PREMIUM TIME |
|---|---|---|---|
| **BASE RATE** attach union contract | $ _____ | $ _____ | $ _____ |
| **FRINGE BENEFITS** per union contract | $ _____ | $ _____ | $ _____ |
| **MEDICARE** 1.45% | $ _____ | $ _____ | $ _____ |
| **FICA** 6.2% | $ _____ | $ _____ | $ _____ |
| **FUTA** | $ _____ | $ _____ | $ _____ |
| **SUTA** | $ _____ | $ _____ | $ _____ |
| **GENERAL LIABILITY** copy of insurance form stating rate | $ _____ | $ _____ | $ _____ |
| **WORKMAN'S COMP.** copy of insurance form stating rate | $ _____ | $ _____ | $ _____ |
| **PROFIT & OH%** | $ _____ | $ _____ | $ _____ |
| **HOURLY RATE** | $ _____ | $ _____ | $ _____ |

From: __LANDWORK CREATIONS, LLC__                To: Jackson Construction Company
                                                     20 Dan Road    Suite 3
                                                     Canton, MA  02021

## SUBCONTRACTOR REQUISITION FOR PAYMENT

Requisition Number_____    Date _____
Job  381
      SHREWSBURY MIDDLE SCHOOL - WEST _____
      45 Oak Street, Shrewsbury, MA  01545 _____

| | | |
|---|---|---|
| 1. | Original Contract Amount | $303,535.00 _____ |
| 2. | Approved Change Order #_____ - #_____ | $_____ |
| 3. | Adjusted Contract Sum | $_____ |
| 4. | Work Completed to date _____%        ($              ) | $_____ |
| 5. | Less _10_ % Retainage | $_____ |
| 6. |                                            Subtotal | $_____ |
| 7. | Less Payments Received to Date | $_____ |
| 8. | Less Backcharges Accepted to Date | $_____ |
| 9. |                                            BALANCE DUE | $_____ |

In consideration of this payment, the Subcontractor does hereby waive, release and relinquish all claims against Owner and Jackson, all claims and rights of lien and all claims upon Jackson's bond for work performed and materials supplied up to and including the date of _____
                                                                    (Date)

The Subcontractor hereby certifies that payment has been made through the aforementioned date in connection with the performance of this contract (1) to all his subcontractors and sub-subcontractors, (2) to all suppliers of material and equipment, and (3) to all his employees and employees of his subcontractors and sub-subcontractors including all union benefits as required. The Subcontractor further certifies that he has complied with Federal, State and Local employees Withholding Tax and Deposit requirements insofar as applicable to the performance of this contract.

Dated:_____            __LANDWORK CREATIONS, LLC_____
                                                     (SUBCONTRACTOR)

                                        By:_____
                                                   (SIGNATURE & TITLE)

---

Subscribed and sworn to before me this_____day of_____ , _____.

_____ My commission expires _____
Notary public

---

Landwork Creations, LLC  Subcontract 381-02-200

Case 4:05-cv-40072-FDS     Document 68     Filed 03/23/2007     Page 30 of 33

**CONTINUATION SHEET**

**APPLICATION AND CERTIFICATE FOR PAYMENT**
Containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

JCC Job #381
Landwork Creations, LLC

Application No. _____
Application Date: _____
Period To: _____
Architect's Project No. _____

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREV (D + E) | E COMPLETED THIS PERIOD | F MATERIALS CURRENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED & STORED TO DATE (D + E + F) | % (G / C) | H BALANCE TO FINISH (C – G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

Landwork Creations, LLC  Subcontract 381-02-200



Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 31 of 33

**TRADE CONTRACTOR CERTIFICATION,**
**INDEMNIFICATION AND WAIVER OF LIENS**

PROJECT:    <u>JCC Job #381</u>
            <u>SHREWSBURY MIDDLE SCHOOL - WEST</u>
            <u>45 Oak Street, Shrewsbury, MA  01545</u>

        In connection with the submissions of Application for Payment No. _____, this undersigned hereby:

1.    CERTIFIES to <u>JACKSON CONSTRUCTION COMPANY AND TOWN OF SHREWSBURY</u> that all laborers and all trade subcontractors, materialmen, services, machinery, equipment, insurance, and supplies ("work") to or through the undersigned on the above-captioned project have been duly paid for all said work, furnished up to and including the date of the previous Application for Payment ($ _____), and further certifies that all taxes and bills of any other descriptive title in connection with the work furnished for or through the undersigned up to the date of the previous Application for Payment have been made in full;

2    WAIVES, relinquishes, and dissolves all rights to any lien upon the property, real estate, buildings, or improvements comprising the above-captioned project or upon which any work was performed or materials and equipment supplied up to date of the Previous Application for Payment.

3.    AGREES to indemnify and save harmless <u>JACKSON CONSTRUCTION COMPANY AND TOWN OF SHREWSBURY</u> their successors and assigns, from all liens (including without limitation, General Laws Chapter 254, Mechanics Liens and Internal Revenue Service Liens), claims and demands, and all expenses incurred, including attorney's fees and costs of defense for or on account of or in any way growing out of claims for payment for any work and any labor performed and material and equipment furnished to or through the undersigned in connection with the above captioned project.

        This certification, indemnification, and waiver of liens is made by the undersigned for the purpose of inducing <u>JACKSON CONSTRUCTION COMPANY AND TOWN OF SHREWSBURY</u> to make payment under the Application for Payment No. _____.

SIGNED AND SEALED this _____ day of _____ _____.

TRADE CONTRACTOR: <u>LANDWORK CREATIONS, LLC</u>

BY: _____

COMMONWEALTH OF MASSACHUSETTS

_____ County, _____, _____

        Then personally appeared before me _____ and took oath that he/she is the duly elected _____ of _____ that the certifications made in the above paragraphs of the foregoing instrument are true, that the foregoing is his/her free act and deed and that of said company, and that he/she is duly authorized to execute, seal, and deliver this instrument on behalf of _____.

Notary public: _____ My commission expires _____.

ST-2 Certificate of Exemption

**ST-2**

## MASSACHUSETTS DEPARTMENT OF REVENUE

## CERTIFICATE OF EXEMPTION



Certification is hereby made that the organization herein named is an exempt purchaser under General Laws, Chapter 64H, Sections 6(d) and (e). All purchases of tangible personal property by this organization are exempt from taxation under said chapter to the extent that such property is used in the conduct of the business of the purchaser. Any abuse or misuse of this certificate by any tax-exempt organization or any unauthorized use of this certificate by any individual constitutes a serious violation and will lead to revocation. Wilful misuse of this Certificate of Exemption is subject to criminal sanctions of up to 1 year in prison and $10,000 ($50,000 for corporations) in fines. (See reverse side).

TOWN OF SHREWSBURY
100 MAPLE AVENUE
SHREWSBURY, MA 01545

EXEMPTION NUMBER
046-001-300

ISSUE DATE
01/04/89

CERTIFICATE EXPIRES ON
NONE

NOT ASSIGNABLE OR TRANSFERABLE

COMMISSIONER OF REVENUE
STEPHEN W. KIDDER

Case 4:05-cv-40072-FDS    Document 98    Filed 03/23/2007    Page 33 of 33

ST-5C                     Contractor's           Exempt        Purchase        Certificate
Form ST-5C

## THE COMMONWEALTH OF MASSACHUSETTS
### DEPARTMENT OF REVENUE
### SALES AND USE TAX BUREAU

### CONTRACTOR'S EXEMPT PURCHASE CERTIFICATE

To:    Seller's
       Name _____
       Address _____

I hereby certify under the penalties of perjury that I am engaged in the performance of the following described contract for the construction, reconstruction, alteration, remodeling or repair of a building or structure for an exempt governmental agency or for a certified exempt organization; and that the following described quantities of building materials and supplies are being purchased for use exclusively in said contract:

Name of Exempt Agency
or Organization _____ **Town of Shrewsbury** _____

Address _____ **100 Maple Avenue, Shrewsbury, MA  01545** _____
Exemption No. __**046-001-300**__        Contract No. __**JCC #381**__
Date of Contract __**March 1, 2004**__   Est. Date of Completion __**August 24, 2004**__
Location and Description of Project _____ **JCC Job #381** _____

**Shrewsbury Middle School**

**45 Oak Street, Shrewsbury, MA  01545**

Description of Kind and Quantity of Property to be Purchased _____

### ALL MATERIALS

To the best of my knowledge and belief, building materials and supplies used in said contract are exempt from the sales and use tax under the provision of Subsection 6 (f) of Section 1 of Chapter 14 of the Acts of 1966. I will maintain adequate records to show the disposition of all building materials and supplies purchased under this certificate. I hereby assume full liability for the payment of any use tax due in the event that the property purchased under this certificate is used for any other purpose.

Signature _____          Title __**Chief Financial Officer**__
Name of Firm __**JACKSON CONSTRUCTION COMPANY**__
Address __**20 Dan Road, Canton, MA  02021**__
Date __**March 1, 2004**__          Registration No. __**012 312 638**__

FORM 1972 HOBBS & WARREN, INC., BOSTON, MASS. 02101          THIS FORM APPROVED BY COMMISSIONER OF REVENUE

Landwork Creations, LLC  Subcontract 381-02-200

Page 22

# EXHIBIT I

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 2 of 50

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 2 of 8
Case 4:05-cv-40072-FDS    Document 29-2    Filed 04/03/2006    Page 2 of 8

# COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

**LS**

CORPORATE LITIGATION
HARTFORD

APR 26 2005

*Landworks Creations, LLC*

RECEIVED PM

Plaintiff (s)

v.

USF&O

Defendant (s)

Superior Court
**Department of the Trial Court
of the Commonwealth**
Civil Action

No.    **05-0647** c

)
)
)
)
)    **SUMMONS**
)
)
)
)

* **To the above-named Defendant:**

You are hereby summoned and required to serve upon *Robert N Wertzo* .................................................................., plaintiff's attorney, whose address is *PO Box 1957, Framingham MA 01701* ..................................................., an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the SUPERIOR COURT Department of the Trial Court at WORCESTER either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counter-claim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Barbara J. Rouse

Witness, S~~████████~~, Esquire, at Worcester, the *11th* ................ day of *April* ...............................................in the year of our Lord two thousand and *05* ........ .

*Francis A. Ford*

**Clerk**

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to that particular defendant.

TRUE COPY, ATTEST

DEPUTY SHERIFF
DATE *4/21/05*

PLEASE CIRCLE TYPE OF ACTION INVOLVED: TORT — MOTOR VEHICLE TORT — CONTRACT EQUITABLE RELIEF — CH. 93A — MEDICAL MALPRACTICE — OTHER

* NOTICE TO DEFENDANT: You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein AND also file the original in the Clerk's Office, Superior Court, Room 21.

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                              SUPERIOR COURT DEPARTMENT
                                            OF THE TRIAL COURT
                                            CIVIL ACTION NO:

LANDWORKS CREATIONS, LLC            )
                                    )
Plaintiff                           )
                                    )
v.                                  )       VERIFIED COMPLAINT
                                    )
UNITED STATES FIDELITY AND          )
GUARNTY COMPANY                     )
                                    )
Defendant                           )

1. Plaintiff, Landworks Creations, LLC ("the Plaintiff") is a limited liability corporation with a principal place of business at 1500A Lafayette Road in Portsmouth in the State of New Hampshire.

2. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts.

3. The Plaintiff entered into a contract with Standen Contracting Company, Inc. of North Dartmouth, Massachusetts.

4. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project")

5. Standen Contracting Company, Inc. was bonded by the Defendant, United States Fidelity & Guaranty Co.

6. Standen Contracting Company, Inc. was unable to complete its work at the Project, and the Defendant, pursuant to its obligations under a performance bond SW5041 assumed

1

MAR-29-2006  17:01          OFFICES OF                              P.02/04

responsibility for completion of the Project in the stead of Standen Contracting Company, Inc.

7. The Plaintiff has performed it work under the Standen contract, and is owed funds by the Defendant for the work performed.

8. The Defendant has failed to pay the Plaintiff for work performed at the Project, to the extent of $135,101.00.

## COUNT I
## BREACH OF CONTRACT

9. The Plaintiff restates allegations 1-8 and incorporates them by reference.

10. The Defendant breached its contract by failing to perform its obligations to make payment under the bond between the Defendant and Standen for the benefit of the Plaintiff..

11. As a result of this breach, the Plaintiff has been denied its expectancy and has otherwise been harmed.

## COUNT II
## VIOLATION OF G.L. c. 93A and 176D

12. The Plaintiff restates allegations 1-11 and incorporates them by reference.

13. Notwithstanding that liability was reasonably clear, the Defendant has declined to make full settlement of the claim, without cause or excuse.

14. The Plaintiff has made demand for its funds, a demand which has been ignored.

15. As a result of this conduct, the Plaintiff has been harmed in its business.

WHEREFORE, the Plaintiff respectfully requests that:

2

1. this Honorable Court enter judgment against the Defendant as to all Counts;

2. this Honorable Court award the Plaintiff the amount of $135,101 together with interest and costs, trebled, along with attorney's fees; and

3. this Honorable Court award any further relief as deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

_____
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: March 29, 2005

3

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 6 of 8
MAR-29-2005  17:01        OFFICES OF                                    P.04/04
Case 4:05-cv-40072-FDS    Document 29-2    Filed 04/03/2006    Page 6 of 8

## VERIFICATION

I, Neal Matthews, an officer of Landworks Creations, LLC and duly authorized to sign this document on behalf of the corporation, do hereby certify that I have reviewed the attached document, and that the facts contained herein stating the funds owed are true to the best of my knowledge and belief, and represent a true and accurate accounting of the funds due and owing to Landworks Creations, Inc.

Signed under the pains and penalties of perjury this 29th day of March, 2005

_Neal N Miller_
Neal Matthews

4

TOTAL P.04

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                           SUPERIOR COURT DEPARTMENT
                                         OF THE TRIAL COURT
                                         CIVIL ACTION NO: 05-647C


LANDWORKS CREATIONS, LLC             )
                                     )
Plaintiff                            )
                                     )
v.                                   )          PLAINTIFF'S FIRST
                                     )          REQUEST FOR PRODUCTION
UNITED STATES FIDELITY AND           )          OF DOCUMENTS FROM THE
GUARANTY COMPANY                     )          DEFENDANT, USF & G
                                     )
Defendant                            )


Now comes the Plaintiff, Landworks Creations, LLC ("the Plaintiff") and requests that

Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") provide

the following documents pursuant to Mass. R. Civ. P. 34. If any document is deemed by the

Defendant to be subject to a privilege of any kind, request is made for the creation and provision

of a privilege log, containing specific information sufficient for the Plaintiff to understand the

nature of the document, the date of creation of the document, the creator of the document, the

recipient of the document and the general subject matter of the document:


Request 1: A complete copy of the USF & G claim file demonstrating the independent

investigation by USF & G of the claim made by Landworks against the surety bond on or about

March 17, 2005, including, but not limited to correspondence, e-mails, photographs, memoranda,

documents received and, documents provided, that formed the basis of USF & G's denial of the

Plaintiff's claim for funds owed on the Shrewsbury project referenced in the Plaintiff's

Complaint.


1

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 8 of 50

Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 8 of 8
Case 4:05-cv-40072-FDS    Document 29-2    Filed 04/03/2006    Page 8 of 8

Request 2: A copy of the contract between USF & G and Jackson Construction for the Shrewsbury Project referenced in the Plaintiff's Complaint.

Request 3: Copies of invoices and requisitions tendered by Jackson to USF & G with regard to the Plaintiff's work, and any documents that reference payment, or failure to make payment, to the Plaintiff for its work.

Request 4: Copies of any and all correspondence in the possession of the Defendant between any party or parties that in any way references, evidences, relates to or refers to the Plaintiff's work at the Shrewsbury project, including correspondence to and from Jackson, to and from the Defendant, and to and from the town of Shrewsbury, its agents, employees, construction managers, clerks of the work, servants or assigns.

Request 5: Copies of any and all change orders that in any way relate to the Plaintiff's work at the Project.

> Respectfully Submitted,
> **Landworks Creations, LLC**
> By its attorney,
>
> _____
> Robert N. Meltzer, BBO #564745
> PO Box 1459
> Framingham, MA 01701
> Phone: (508) 872-7116

Dated: April 11, 2005

2

# EXHIBIT J

Page 18

1     Q.   For what reason?

2     A.   To see if they were completed or not.

3     Q.   Okay.   What else did you do?

4     A.   I was tasked with reviewing the condition

5     of the site.

6     Q.   Meaning what?

7     A.   See what work remained.

8     Q.   What else did you do?

9     A.   Reviewed drawings.

10    Q.   What else?

11    A.   I reviewed some of the documents that were

12    in the office that we were given.

13    Q.   Where did those documents come from?

14    A.   I don't know.

15    Q.   Where was that office?

16    A.   In the school.

17    Q.   Did you talk to the project architect in

18    that first couple months?

19    A.   Yes.

20    Q.   Who was the project architect?

21    A.   Katie.   I forgot her last name.

22    Q.   Crockett?

23    A.   Yes.

24    Q.   What did you talk to her about?

Page 40

1    **Q.**  Was there another e-mail on the morning of

2    August 18th, between you and Al Falango?

3    **A.**  I don't recall.

4    **Q.**  Did you have a telephone conversation with

5    Al Falango on the morning of the 18th?

6    **A.**  I don't recall.

7    **Q.**  When he talks about "the misinformation

8    this morning," you don't know what that refers to?

9    **A.**  I don't remember.

10    **Q.**  During these two or three days, August

11    17th, 18th, when this conversation was transpiring,

12    did anybody involved in the series of conversations

13    ever state there were any deficiencies in the work

14    performed by Landworks?

15    **A.**  Repeat.

16    **Q.**  During these two days, between all this

17    correspondence between various people, did anybody

18    ever state that there had been any deficiencies on

19    the work done by Landworks under Jackson?

20    **A.**  I don't remember.

21    **Q.**  In your experience at Lovett-Silverman and

22    other particular companies you worked for, is it

23    common procedure, once a contractor is in default,

24    for subcontractors not to return to the work until

Page 41

1    they are ratified?

2         A.   Repeat, please.

3                   (Pending question read back.)

4         A.   Yes.

5         Q.   Who is William Werner?

6         A.   I don't know.

7         Q.   Look at the second page of No. 55 for a

8    moment.

9         A.   Okay.

10        Q.   This, you will notice, is the same e-mail

11   as we've already had on Page 1.  You will notice at

12   the bottom it seems to be blacked out.  Do you see

13   that?

14        A.   Yes.

15        Q.   Do you know who blacked that out?

16        A.   No.

17        Q.   Have you ever talked to anybody about why

18   that might be blacked out?

19        A.   No.

20                   (Short recess taken.)

21        Q.   If you would take a look at that.  Does

22   this look familiar to you?

23        A.   Yes.

24                   MR. MELTZER:  For the record, I'm

Page 47

1    list?

2        A.  I made a list of items which needed to be

3    completed during my walk-through of the site and

4    review of the plans.

5        Q.  What did that list look like?

6        A.  Rephrase.

7        Q.  You said there is a list.  A physical list?

8        A.  Yes.

9        Q.  Was it handwritten?

10        A.  No.

11        Q.  Typed?

12        A.  Yes.

13        Q.  Was it typed after your visit to the site?

14        A.  Yes.

15        Q.  When is the last time you saw that list?

16        A.  I don't know.

17        Q.  Do you maintain files in Pennsylvania, your

18    home, on this project?

19        A.  Yes.

20        Q.  Do you provide copies of what is in your

21    personal possession to the home office in New York?

22        A.  No.

23        Q.  This list that you have, where would that

24    list be filed?

Page 50

1    A.    Weeds.   Predominantly weeds.

2    Q.    No evidence something had been planted?

3    A.    No.

4    Q.    This may have been work to be completed as

5    opposed to remedial?  You are not saying the work

6    that was done had to be ripped up and redone?

7    A.    The lawns.

8    Q.    The islands?

9    A.    Sure it had to be ripped up, what I saw.

10   Q.    The next sentence, "I will look at

11   Landworks' scope and make a list,"  did you look at

12   Landworks' scope?

13   A.    Yes.

14   Q.    How did you look at Landworks' scope?

15   A.    I looked at the exhibit with their

16   subcontractor.

17   Q.    Whose subcontractor?

18   A.    The subcontract between them and Jackson.

19   Q.    What subcontract?  What does it look like?

20   A.    Please rephrase.

21   Q.    Tell me physically what that contract looks

22   like.  Can you describe what that contract was?  No

23   idea?

24   A.    It's a subcontract.

Page 56

1    to the one that was sent to you from Al Falango,

2    right, so we're on the same time frame?

3                    MR. HIPP:  You are wanting to

4    compare 58 and 34?

5                    MR. MELTZER:  Let's look at 57.

6        Q.  You have this 8:09 e-mail?

7        A.  Yes.

8        Q.  This was sent obviously shortly before the

9    one was sent by Al Falango at 8:14 AM, so we're

10   clear on the time frame?

11       A.  Yes.

12       Q.  Your comment, "We checked with surety and

13   we were told we cannot deal with Landworks while the

14   legal case is pending," correct?

15       A.  Correct.

16       Q.  Now we're going to look at 34 for a moment.

17   The message that was sent, it says, "We are

18   presently a defendant in a legal action brought by

19   your company."

20       A.  I see.

21                   MS. BROWN:  To clarify, let's go

22   off the record.

23                   (Discussion off the record.)

24       Q.  On Exhibit 34, that's an e-mail from you to

# EXHIBIT K

**To:** 'Neal H. Matthews'
**Sent:** Thursday, August 18, 2005 9:10 AM
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,
I can meet with you Tuesday or Wednesday of next week.   Let me know if 9:00 AM either day will work for you.

Robert J. Bullock, PE
Lovett Silverman Construction Consultants Inc.

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Wednesday, August 17, 2005 6:07 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Bob,
        Thank you for taking the time to talk with me.  The amount of paper work I have with back up is such that transmittal through e-mail or fax may not go through without some interruption.  Jackson Construction Co. had all of this information and should have passed it on to St. Paul.  I would like to meet with you and see if we can resolve this in a manner that would be to the advantage of St. Paul and myself.  Delayed payment and non-payment started in August of 2004 by Jackson and after many months of calls to them and St. Paul I needed to protect my rights under Massachusetts law.  This is the only reason that I have filed suit.  I have always preferred to have been paid what is owed to me, (Landworks Creations, LLC) and complete this project.  I feel that I can do this more cost effective than if you have to hire another contractor.  I can make copies of all paper work and bring them with me when we meet.  I will put together an overview of the complete amount owed in the format you have sent to me.  You may contact me with any questions or comments.


Thank you,
Neal H. Matthews
Landworks Creations, LLC

    —— Original Message ——
    **From:** Robert Bullock
    **To:** lonewolf@maine.rr.com
    **Sent:** Wednesday, August 17, 2005 2:42 PM
    **Subject:** Shrewsbury Middle School - Data required for Financial Analysis

    Neil,
    Here is the text from the letter we send out for the Data required to get started on the ratification:

    LSCC is consultant to the St. Paul in connection with the completion of work on the above referenced project.  We anticipate work at the site to proceed again immediately and the job to move forward to

2/9/2007

completion as expeditiously as possible. Jackson Construction Corp will be replaced by G & R Construction, Inc. and future direction of this project will be managed by them.

Please provide the following information to start developing your ratification agreement:
    1)    Original Contract Amount.
    2)    Change Orders to the Original Contract.
    3)    Credit Change orders to Original Contract.
    4)    Value of Work performed to date or Approved Material Stored at Site.
    5)    Total Payments Received from Standen and Jackson.
    6)    Retainage Held to Date.
    7)    Outstanding Balance.
    8)    Last Invoice Paid
    9)    Last Invoice Submitted but not Paid, if any

If you have any questions or comments concerning the above or require anything further in connection with this claim, please give me a call, I can be reached at the following numbers:
            Cell  717 422 7518          Fax  717 766 1715

Robert J. Bullock, PE

Lovett Silverman Construction Consultants Inc.
19 Goldenrod Drive
Carlisle, PA  17013

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518
Web Site: Lovett-Silverman.com

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

2/9/2007

# EXHIBIT L

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 20 of 50
Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 2 of 2
Message                                                              Page 1 of 1

**Julie Ciollo**

| | |
|---|---|
| **From:** | Al Falango [afalango@lovett-silverman.com] |
| **Sent:** | Wednesday, August 17, 2005 3:00 PM |
| **To:** | 'Fuller,Russell W'; 'Peters Jr,James Michael' |
| **Cc:** | 'Robert Bullock' |
| **Subject:** | Shrewsbury – Landworks |



Russ

The president of Landworks called LSCC and expressed an interest in being ratified. Should we pursue this guy , I know you have issues with him.

2/15/2007

# EXHIBIT M

Message

## Julie Ciollo

| | |
|---|---|
| **From:** | Peters Jr,James Michael [JPETERS@stpaultravelers.com] |
| **Sent:** | Thursday, August 18, 2005 10:49 AM |
| **To:** | Al Falango; Fuller,Russell W |
| **Cc:** | Robert Bullock; bcarver@hinshawlaw.com; Werner,William R |
| **Subject:** | RE: Shrewsbury - Landworks |

We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G. The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

By copy of this email to Brad Carver, I am giving him notice of this issue.


James M. Peters, Jr.
St Paul Travelers Bond Claim
One Tower Square  - 4 PB
Hartford, CT 06183


Tel:  (860) 954-6497
Fax: (860) 277-5722
Email: james.m.petersjr@stpaultravelers.com

> -----Original Message-----
> **From:** Al Falango [mailto:afalango@lovett-silverman.com]
> **Sent:** Wednesday, August 17, 2005 3:00 PM
> **To:** Fuller,Russell W; Peters Jr,James Michael
> **Cc:** 'Robert Bullock'
> **Subject:** Shrewsbury - Landworks
>
>
> Russ
>
> The president of Landworks called  LSCC and expressed an interest in being ratified.   Should we pursue this guy , I know you have issues with him.

3/22/2007

# EXHIBIT N

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 24 of 50
Page 1 of 3
Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 2 of 2

## Julie Ciollo

**From:**      Robert Bullock [rbullock@lovett-silverman.com]
**Sent:**      Friday, August 19, 2005 8:09 AM
**To:**        'Neal H. Matthews'
**Subject:**   RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,

We checked with the Surety and we were told that we can not deal with Landworks while the legal case is pending.

Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

----

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Thursday, August 18, 2005 3:35 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Either day will be find to meet.  Let me know what day will be best for you and I'll be down at 9:00am.  I assume the best place would be at the school so we can go over what has to be done to finish the work.

Thank you,
Neal H. Matthews

----- Original Message -----
**From:** Robert Bullock
**To:** 'Neal H. Matthews'
**Sent:** Thursday, August 18, 2005 9:10 AM
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,
I can meet with you Tuesday or Wednesday of next week.   Let me know if 9:00 AM either day will work for you.

Robert J. Bullock, PE
Lovett Silverman Construction Consultants Inc.

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

3/22/2007

# EXHIBIT O

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 26 of 50
Page 1 of 4
Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 2 of 5

## Julie Ciollo

| | |
|---|---|
| **From:** | Robert Bullock [rbullock@lovett-silverman.com] |
| **Sent:** | Friday, August 19, 2005 4:36 PM |
| **To:** | 'Neal H. Matthews' |
| **Cc:** | 'Fuller,Russell W' |
| **Subject:** | RE: Shrewsbury Middle School - Data required for Financial Analysis |

Neal,

We are willing to continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys.

Thanks.
Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Friday, August 19, 2005 9:45 AM
**To:** Robert Bullock
**Cc:** Rob N. Meltzer
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Mr. Bullock,
    I'm sorry to hear that. I felt that I could have provided information and service to St. Paul that would have saved them expense in completing the project. There were many things in the actions of Town of Shrewsbury and Jackson Construction Company that should have been corrected before the project moved forward. It is unfortunate that the surety did not respond to my and my lawyers numerous inquiries concerning Jackson's refusal to pay for work that was requested and completed. Much of the work was billable to the Town of Shrewsbury. They had requested the work to be done and as of my last contact with them, they had not been billed by Jackson or the surety for the work. I guess that when people become entrenched in certain mind sets they can not see the benefit of just talking to resolve problems. The Town of Shrewsbury would have no incentive to have me come back as they will benefit from having work completed in which they think they will not have to pay for. As for St. Paul continuing to not address my legitimate concerns, it shows me they still are acting in bad faith. It's sad that individuals can not step back from the overall picture and have a meaningful discussion based on respect of each other's positions.


Respectfully,
Neal H. Matthews
  ----- Original Message -----
  **From:** Robert Bullock
  **To:** 'Neal H. Matthews'
  **Sent:** Friday, August 19, 2005 8:09 AM
  **Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

3/22/2007

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 27 of 50
Page 2 of 4
Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 3 of 5

Neal,

We checked with the Surety and we were told that we can not deal with Landworks while the legal case is pending.

Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Thursday, August 18, 2005 3:35 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Either day will be find to meet.  Let me know what day will be best for you and I'll be down at 9:00am.  I assume the best place would be at the school so we can go over what has to be done to finish the work.

Thank you,
Neal H. Matthews

----- Original Message -----
**From:** Robert Bullock
**To:** 'Neal H. Matthews'
**Sent:** Thursday, August 18, 2005 9:10 AM
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,
I can meet with you Tuesday or Wednesday of next week.   Let me know if 9:00 AM either day will work for you.

Robert J. Bullock, PE
Lovett Silverman Construction Consultants Inc.

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Wednesday, August 17, 2005 6:07 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 28 of 50
Page 3 of 4
Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 4 of 5

Dear Bob,

Thank you for taking the time to talk with me. The amount of paper work I have with back up is such that transmittal through e-mail or fax may not go through without some interruption. Jackson Construction Co. had all of this information and should have passed it on to St. Paul. I would like to meet with you and see if we can resolve this in a manner that would be to the advantage of St. Paul and myself. Delayed payment and non-payment started in August of 2004 by Jackson and after many months of calls to them and St. Paul I needed to protect my rights under Massachusetts law. This is the only reason that I have filed suit. I have always preferred to have been paid what is owed to me, (Landworks Creations, LLC) and complete this project. I feel that I can do this more cost effective than if you have to hire another contractor. I can make copies of all paper work and bring them with me when we meet. I will put together an overview of the complete amount owed in the format you have sent to me. You may contact me with any questions or comments.

Thank you,
Neal H. Matthews
Landworks Creations, LLC

----- Original Message -----
**From:** Robert Bullock
**To:** lonewolf@maine.rr.com
**Sent:** Wednesday, August 17, 2005 2:42 PM
**Subject:** Shrewsbury Middle School - Data required for Financial Analysis

Neil,
Here is the text from the letter we send out for the Data required to get started on the ratification:

LSCC is consultant to the St. Paul in connection with the completion of work on the above referenced project. We anticipate work at the site to proceed again immediately and the job to move forward to completion as expeditiously as possible. Jackson Construction Corp will be replaced by G & R Construction, Inc. and future direction of this project will be managed by them.

Please provide the following information to start developing your ratification agreement:
1) Original Contract Amount.
2) Change Orders to the Original Contract.
3) Credit Change orders to Original Contract.
4) Value of Work performed to date or Approved Material Stored at Site.
5) Total Payments Received from Standen and Jackson.
6) Retainage Held to Date.
7) Outstanding Balance.
8) Last Invoice Paid
9) Last Invoice Submitted but not Paid, if any

If you have any questions or comments concerning the above or require anything further in connection with this claim, please give me a call, I can be reached at the following numbers:

Cell  717 422 7518        Fax  717 766 1715

Robert J. Bullock, PE

Lovett Silverman Construction Consultants Inc.
19 Goldenrod Drive
Carlisle, PA  17013

Phone: 717-796-9595
Fax:   717-766-1715
Cell:  717-422-7518
Web Site: Lovett-Silverman.com

Case 4:05-cv-40072-FDS    Document 98-9    Filed 03/05/2008    Page 29 of 50
Page 4 of 4
Case 4:05-cv-40072-FDS    Document 68    Filed 03/23/2007    Page 5 of 5

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

3/22/2007

# EXHIBIT P

Case 4:05-cv-40072-FDS   Document 98-9   Filed 03/05/2008   Page 31 of 50
FEB-15-2007  15:08                                                        P.02/02
Case 4:05-cv-40072-FDS     Document 68     Filed 03/23/2007     Page 2 of 3
********* -COMM. JOU    L- ********************** DATE AUG-30-2005 ***** TIME 16:14 *** P.01

MODE = MEMORY TRANSMISSION              START=AUG-30 16:13     END=AUG-30 16:14

    FILE NO.= 106

STN NO.    COM    ABBR NO.    STATION NAME/TEL.NO.    PAGES    DURATION

 001       OK      &           16172137001            004/004  00:01'16"

                                                    -LAW OFFICES OF        -

************************************* -ROBERT MELTZER  - *****  -           - *********

## ROBERT N. MELTZER
### ATTORNEY AT LAW
P.O. Box 1459
Framingham, Massachusetts 01701

(508) 8/2-7118
fax (508) 872-8204
robmeltzer@aol.com

August 30, 2005

Hinshaw & Culbertson
One International Place
Boston, MA 02110
Attn: Brad Carver, Esq.
BY FAX 617-213-7001

    Re:  Landworks Creations, LLC v. USF & G
         Civil Action No: 05-40072 -FDS

Dear Brad:

    Please find enclosed the e-mails we discussed.

    My client and I are prepared to meet at any time to do what is necessary in secure
payment and get me client back to work.

                                        Very truly yours,

                                        Robert N. Meltzer

Cc:    client

## Robert N. Meltzer
*Attorney At Law*

February 15, 2007

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02110
Attn: Eric C. Hipp Esq.
BY FAX 617-728-0052

Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, MA 02210
Attn: Julie Ciollo, Esq.
BY FAX 617-406-4501

        Re:    <u>Landworks Creations, LLC v. USF & G</u>
                 Civil Action No: 05-40072 -FDS

Dear Counsel:

       I am enclosing a letter from my files which you may not have seen.

       I did notice that this letter was not included in the USF & G documents that Eric's office made available for inspection and copying.

       The e-mails referenced in the letter would be the chain of e-mails that we have marked at numerous depositions.

       Thank you.

                                   Very truly yours,

                                   Robert N. Meltzer

Cc:    client

P.O. Box 1459
Framingham, MA 01701
508.872.7116
robmeltzer@aol.com



**The Mountain States Law Group**
COLORADO · MASSACHUSETTS · UTAH
IDAHO
info@mountainstateslawgroup.com

# EXHIBIT Q

## Julie Ciollo

| | |
|---|---|
| **From:** | Al Falango [afalango@lovett-silverman.com] |
| **Sent:** | Wednesday, September 21, 2005 9:08 AM |
| **To:** | 'Tony Lardaro'; 'Robert Bullock' |
| **Cc:** | 'Bill Meritz'; awerth@lovett-silverman.com |
| **Subject:** | Shrewsbury CTC |

On the Shrewsbury CTC

The C/O logs lists all c/o's as pco's are they approved change orders or still pco's

Bill Meritz had mentioned a slew of potential c/o's for work done by JCC for the town under protest, (Tony wants AJ to pick this up) should we make mention of these potential receivables even if we cant put a number on them.

I dont think the 825k is enough for the contingency we already know we have busts in the track work, site work , electric (major), roofs and doors (major) even though the town is holding money I still think we could possibly break the 800k mark with these, we've already spent 400k on G and R for one month and we still dont have checks for the subs. We can try to bang the subs but I think that we can never recover from them what we are spending.

3/16/2007

# EXHIBIT R

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| LANDWORKS CREATIONS, LLC. | ) C.A. NO.05-CV-40072 FDS |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY AND GUARANTY | ) |
| COMPANY and | ) |
| LOVETT-SILVERMAN CONSTRUCTION | ) |
| CONSULTANTS, INC. | ) |
| | ) |
| Defendants | ) |

**PLAINTIFF LANDWORKS, LLC.'S SUPPLEMENTAL ANSWERS TO
DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.'S
FIRST SET OF INTERROGATORIES TO PLAINTIFF**

**INTERROGATORY NO. 1:**

Identify the individual signing the interrogatories.

Answer 1: Neal H. Matthews, of Landworks Creations, LLC.

**INTERROGATORY NO. 2:**

In preparing your answers to these interrogatories, did you make such inquiry of your attorney or other representatives, and review your records in such a manner to enable you to make full and true answers and, if so, identify by name, the present address of, each person consulted and each document reviewed in preparing your answers to these interrogatories.

Answer 2: Objection. The Plaintiff objects to this interrogatory in that it specifically seeks to invade the attorney/client privilege, and is otherwise not reasonably calculated to lead to the discovery of admissible evidence.

Supplemental Answer 2. I spoke only to my attorney. Since the date of the initial answers, I have also spoken to William Gallagher, of 1 Homestead Drive, Medfield, who will likely be serving as Landworks Creations, LLC's expert witness. I have reviewed my own business records, as well as records provided by USF & G, Lovett-Silverman, and the project architect. My understanding is the some of the records of the project architect may have included records from the town of Shrewsbury. I have also reviewed deposition transcripts of individuals of Lovett-Silverman and the project architect. I have also re examined certain pleadings in this case, including the Complaint, the Amended Complaint and the Counterclaim. I have also reviewed photographs of the site.


## INTERROGATORY NO. 3:

With respect to each person you or your attorney expect to call as an expert witness at trial, state the name and address of each such expert witness; the subject matter on which each such expert is expected to testify; the facts and opinions as to which each such expert is expected to testify; and a summary of the grounds for each such opinion.

Answer: The Plaintiff has not yet determined who it intends to call as an expert witness and reserves the right to supplement this answer in a timely manner.

Supplemental Answer: The Plaintiff is likely to call William Gallagher as its expert witness. Mr. Gallagher is a construction manager of substantial experience, and knowledge of the local construction industry. He has extensive knowledge of public construction practices and policies, as well as means and methods. He is expected to testify as to these areas, and he is expected to testify as to the numerous ways that the defendants in these cases violated the practices and policies, as well as the means and methods usually employed in bringing public construction projects to completion. He is expected to testify as to the rights that Landworks identifies in Supplemental Answer 7, and the industry practice with regard to how owners, contractors and consultants generally behave with regard to rights and obligations of the parties, and that both the Surety and Lovett-Silverman disregarded those rights. He is expected to further testify that in his experience the concept of "banging" the subcontractors means the practice of refusing, in bad faith, to pay subcontractors, forcing them to file suit, to compromise valid claims as a business decision, to delay payment or, in an ideal circumstance, hope that the subcontractor cannot afford to pursue a claim, or goes out of business before payment can be made. Mr. Gallagher has been reviewing the documents in this case, including the deposition transcripts, the plans and specifications. At this juncture, several deposition transcripts, including the deposition transcript of USF & G, is not available for Mr. Gallagher's inspection and review. Consequently, he has not yet finalized his conclusions and opinions, which he expects to do shortly after the transcript is received. This answer will be further supplemented shortly, as the transcript of the USF & G representative is expected shortly.


## INTERROGATORY NO. 4:

2

List the name, address, professional background, and/or occupation of each and every expert whom Landworks does not expect to call at trial, but whom Landworks has retained or specifically employed in anticipation of the instant litigation or in preparation for trial of this action.

Answer: The Plaintiff has not yet determined who it intends to call as an expert witness and reserves the right to supplement this answer in a timely manner.

## INTERROGATORY NO. 5:

State the basis of your claim in paragraph 12 of your Amended Complaint that Lovett-Silverman strong-armed subcontractors, by defining the term "strong-arm" and identifying, with particularity, "strong-arming" behavior engaged in by Lovett-Silverman, and identifying specifically each subcontractor so affected by each alleged act of "strong-arming."

Answer: The Plaintiff relies upon statements explicitly made by Lovett-Silverman agents and employees in e-mails provided to the Plaintiff, and referenced specifically in the document request served on Lovett-Silverman. Lovett-Silverman's own employees and agents concede that there was insufficient funds to pay the subcontractors, and Lovett-Silverman's own employees and agents talked about "banging" the subcontractors. Lovett-Silverman's own employees and agents colluded with USF & G on the false charge of abandonment, and in the false filing of a counterclaim by providing information that was knowingly false—for example, passing off work that was not within the scope of Landworks as the scope of Landworks, and by otherwise lying to Landworks as to why Landworks was not being permitted to return to the site. It appears that Lovett-Silverman engaged in this same conduct with the other subcontractors mentioned in the Lovett-Silverman e-mails. In short, the e-mail record confirms that Lovett-Silverman and USF & G were banging the subcontractors, which the Plaintiff construes as "strong-arming." The Plaintiff looks forward to hearing an innocuous explanation for why banging subcontractors and aiding the filing of false lawsuits is not "strong-arming." The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its discovery requests and produces long-overdue documents.

## INTERROGATORY NO. 6:

Please identify each right that you allege, in paragraph 12 of the Amended Complaint, Lovett-Silverman denied the subcontractors, and identify the contractual basis for each right.

Answer: Landworks, LLC had a legal right to complete its work pursuant to its ratification agreement with USF & G. Lovett-Silverman clearly interfered in that right.

## INTERROGATORY NO. 7:

3

Please identify each subcontractor that you allege, in paragraph 12 of the Amended Complaint, was denied rights by Lovett-Silverman and set forth the specific rights denied by each such subcontractor.

Answer: The subcontractors were, in part, identified in the Plaintiff's document requests. The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its own discovery requests by producing long-overdue documents.

Supplemental Answer: Landworks Creations, LLC first became aware of the possibility that the Surety was acting in bad faith toward its subcontractors from someone, who I cannot recall, who worked for the town of Shrewsbury. Landworks ultimately saw an e-mail from Al Falango of Lovett-Silverman to Tony Lardaro and Robert Bullock at Lovett-Silverman dated September 21, 2005 in which it was discussed that "we can try to bang the subs but I think that we can never recover from them what we are spending." In the construction community in Massachusetts, this phrase has a very definite meaning.

The phrase indicates that, based upon the shortage of funds identified in the same September 21, 2005 e-mail ("I don't think the 825k is enough for the contingency..."), the Surety, by its consultant, is going to stonewall payment to subcontractors, forcing them to either accept deep discounts in order to file suit, or by forcing them to file suit in the hope that the subcontractor will discount the amount owed to avoid litigation costs, or in the hope that false backcharges will gain traction in litigation, or that the subcontractor will cease to go out of business without every getting payment. The phrase at the end, referring to recovering funds, further suggests a plan to file false counterclaims to make the subcontractors either reduce their claims, or pay for the cost overruns on the project.

It has now been confirmed by James Peters of USF & G that at least 20 subcontractors were required to file suit, including Coughlin Electric, ESCOA, Landworks, Kitridge Equipment. Century Drywall, Dadario, All State Steel and Steelco. Landworks has also heard of suits by the carpet installer, and by K & K, the records of which are available at the Worcester Superior Court. In addition, the employee from Shrewsbury suggested that KMD Mechanical was required to reduce the amounts it was owed in order to get paid.

On a project of approximately $14,000,000, it thus appears that almost every subcontractor was required to file suit, or to compromise legitimate claims in order to be paid. The substantial number of suits and claims confirms that Lovett-Silverman and the Surety moved forward to "bang" the subcontractors. The frivolous counterclaim filed against Landworks indicates an operation attempt to bang Landworks and get money back.

Counsel for Century Drywall has informed the Plaintiff that USF & G's conduct in responding to its suit has also been heavy handed and clearly delay-oriented. Indeed, USF & G simply failed to respond to discovery, and was put in to default.

Landworks has worked with the Zilioli family for a number of years. It has been the understanding of Landworks in 2005 that one of the Zilioli companies, perhaps Framingham Excavating, was a party to a case in which the Massachusetts court specifically ruled that

4

subcontractors on a public job, including site contractors, have a right to suspend work pending payment, and that a contractor is not obligated to continue incurring costs when it is not being paid. It is Landworks' understanding that a subcontractor has a right to do this without being declared to have "abandoned" the work. Since this is an important part of construction law, Landworks has assumed and inferred that USF & G and Lovett-Silverman understand this as well. Landworks therefore infers that the insistence by Lovett-Silverman and USF & G in the Counterclaim that Landworks abandoned the job is a deliberately false effort to distort the facts and deny Landworks its rights under the law.

It is also the Plaintiff's understanding that a subcontractor has the "right" to a termination letter, or some kind of communication expressing the position of the other contracting party. It is my understanding from years of work that a subcontractor is entitled to be paid money owing to it if it is terminated for the convenience of the owner of contractor, and that the subcontractor is entitled to the profit and overhead. It is also the Plaintiff's understanding that, because the ratification agreement was not terminated, the failure of the Surety and USF & G to either terminate the contract, or behave with good faith, violated Landworks' rights. This inference is drawn from all of the e-mails, especially the "bang" the subcontractor e-mail, the August 2005 correspondence pertaining to a meeting with Landworks, and the January-February e-mail in which the false and frivolous Counterclaim was created.

It is Landworks belief that each subcontractor has a right to payment for the work completed by the subcontractor, and to be treated in decent and respectful manner. Massachusetts state law also requires that claims be investigated in a responsible and reasonable manner, and to be free from defamatory conduct about their work. The fact that more than 20 subcontractors had to file suit or fight for their money to protect their rights indicates that individual subcontractors were not at fault, but rather that there was a systematic effort, evidenced by the September 21, 2005 e-mail, to deny them their rights to payment, reasonable settlement of claims and the right to be free from unfair and deceptive trade practices conducted for the purposes of saving money for the Surety.

Landworks believes that it has a right, as a subcontractor on a public project, to have a reasonable investigation performed by the Surety's construction consultant to ascertain the scope of work, and to provide an opportunity to return to that work unless good cause is shown. Substantial e-mail traffic indicates that Lovett-Silverman breached that obligation. For example, an e-mail dated January 16, 2006 from Bill Meritz to Robert Bullock of Lovett-Silverman refers to Frias Concrete, and notes that "they were probably a sub to Landworks." In fact, Frias was a sub to Jackson Construction. Another e-mail of September 26, 2005 from Bill Meritz to Robert Bullock confirms that no reasonable investigation was being performed by Lovett-Silverman. In that e-mail, it is confirmed that the sole method of investigating the scope of Landworks Creations, LLC's scope was reading certain contracts. This evidence has confirmed, by oral testimony of Lovett-Silverman officials and the Surety, that neither Lovett-Silverman nor the Surety, spoke to the town, the project architect, the landscape architect or the clerk of the works, or even the parties to those contracts, to understand the scope of the Landworks contract. These e-mails confirm, along with the testimony, that the Plaintiff's right to a reasonable investigation and fair treatment was completely disregarded.

5

This issue continues throughout this case; Lovett-Silverman and the Surety continue to allege that Landworks did not perform its work adequately and in a workmanlike manner. However, this position has been determined to be false. An e-mail from Katie Crockett, the project architect, to Bill Meritz, dated February 1, 2006, confirms that the site work was not completed, not that it was deficient in scope by each subcontractor. Indeed, the e-mail referenced demonstrates an inability of the project architect to identify deficiencies as to Landworks specifically just prior to the Surety filing a Counterclaim stating the contrary. Continuing efforts by the Surety and Lovett-Silverman to elevate punch-list items to defective work is an ongoing act of fraud against Landworks.

Landworks also believes that every subcontractor is entitled to a uniform and consistent method of addressing claims. Various e-mails confirm that Lovett-Silverman was operating with different methodologies, creating further unfairness in the process. Am e-mail from Bill Meritz to Al Falango dated September 8, 2005, demonstrates the unevenness, stating that some sub-contractors were allowed back without ratification. An e-mail of September 15, 2005 from Bill Meritz to Al Falango discusses the uneven ratification process. Another example of discriminatory unevenness was found in an e-mail from Jason Goodwin to a number of individuals on September 15, 2005 in which it was noted that some contractors who were not on site due to non-payment were being ratified and returned to work, while the Surety has used the same issue by Landworks to declare "abandonment." Deposition Exhibit 33 indicates that Lovett-Silverman and the Surety were uneven and inconsistent in their decisions as to whether or not they would speak to claimants and their attorneys—no one has been able to provide a comprehensive explanation as to why these entities could speak freely to Steelco, but not to Landworks.

On this same topic, the Plaintiff notes that USF & G's attorney spent nearly two days of deposition time walking through Landworks' change orders, scope of work and theory of payment. Landworks notes that this was the kind of conversation that Landworks intended to have with Lovett-Silverman in August of 2004. In the same July 18, 2005 e-mail from Al Falango to Robert Bullock in which Rick talks about his "f-in vacation," it is noted that Lovett-Silverman was struggling to find a new site contractor. Landworks was ready, willing and able to perform the work on the project. All that was necessary to get Landworks back to work was a good faith attempt to resolve the outstanding payment issue. The fact that a desperate consultant wouldn't talk to Landworks, notwithstanding that no one had specifically stated deficiencies in Landworks' ability to perform, infers that the key obstacle, payment, was the basis for lack of communication and refusal to speak. This particular e-mail demonstrates that a decision had been made not to talk to Landworks because Landworks would have required funds to return to work.

In regard to the same issue, Landworks learned through the deposition of James Peters that the Surety has no written policies or guidelines for handling surety claims, and does not provide training seminars to its claims adjustors to ensure a predictable and even and consistent method of claim adjudication. The subcontractors, who are beneficiaries of these payment and performance bonds, have every right to expect that their claims will be handled in a uniform and predictable manner that ensures fairness and even handedness, and does not result in ad hoc conduct that appears extortionists or discriminatory.

6

Landworks also believes that every subcontractor is entitled to honesty from the Surety and its consultant. Deposition exhibits 34, 55 and 58 show that Lovett-Silverman was being dishonest to Landworks in its explanation as to why Lovett-Silverman would not meet with Landworks. These e-mails demonstrate that USF & G requested that Lovett-Silverman inform Landworks that the issues should be addressed between counsel. Instead, Lovett-Silverman told Landworks (August 17, 2005) that "he will have to drop his law suit" if Landworks wished to be ratified. The response from Al Falango that same day, "don't do that if you haven't done it already" demonstrates that even Al Falango recognized the extortionist flavor in the prior e-mail. In any event, Lovett-Silverman failed to tell the truth to Landworks, and engaged in openly extortionist conduct in attempting to dangle payment with a precondition of waiving legal rights under G.L. c. 149 §29. This also violated the Plaintiff's rights, and may even have been criminal in nature.

The Plaintiff believes that it, like every other subcontractor, has the right to a speedy and fair trial in the Superior Court under the law. Landworks believes that in agreeing to come to Massachusetts to engage in public construction work, it has submitted to the jurisdiction of the state court identified in the law, and that the Surety has equally accepted that jurisdiction. The Superior Court seems to have an expertise in these matters, and handles them routinely. The Plaintiff notes that this case has been substantially slowed by several elements. First, although over twenty lawsuits have been filed in the Middle School project, USF & G decided, apparently, only to remove this case to the federal court. Also, USF & G has admitted that it had four different law firms on this case, serially. Since USF & G wouldn't admit why it fired three experienced Boston firms, the jury can infer, if it wishes, that USF & G moved this case around until it found a lawfirm willing to file the counterclaim that was apparently so frivolous. The Plaintiff bases its inference from the testimony of James Peters and the e-mails from February and January of 2006 in which the counterclaim was being concocted, and from the fact that this case was so singled out for different treatment, implying a greater need for delay while a counterclaim was fabricated. The facts suggest to Landworks that there was no legitimate basis for a counterclaim when the suit was originally filed.

The Plaintiff believes it has a legal right to know the basis of a counterclaim against it so that it may question witnesses and prepare a defense. The fact that the Surety's own representative could not even identify the contract which, it was alleged, had been breached, demonstrates and infers that the Counterclaim has never had any merit.

Finally, the Plaintiff believes that it has a right to treated respectfully and with dignity and respect. The e-mail traffic that has been produced indicates that Lovett-Silverman were nothing more than the Surety's foul-mouthed thugs, operating as on-the-ground hatchet men. Aside from the language about "banging" the subcontracts, Landworks finds it significant that Al Falango of Lovett-Silverman would send an e-mail dated July 18, 2005 to Rick Noblet referring to "my F-in vacation." On August 17, 2005, Al Falango sent an e-mail to a claims attorney, Russ Fuller, at the Surety, referring to the president of Landworks as "this guy." Landworks is not a "guy." It is a well-know and respected corporation. This kind of e-mail confirms that the Lovett-Silverman consultants were not behaving in the type of professional, credible construction consultants tasked with representing the best interests of all involved in this project.

**INTERROGATORY NO. 8:**

Please identify the specific subcontractors who filed suit to receive payment, including the case name and docket number of each such lawsuit filed by the subcontractors, as alleged in paragraph 13 of the Amended Complaint.

Answer: The subcontractors were, in part, identified in the Plaintiff's document requests. The Plaintiff anticipates supplementing this answer if Lovett-Silverman complies with its own discovery requests by producing long-overdue documents.

Supplemental Answer: James Peters stated in his deposition that approximately 20 lawsuits have been filed. This has confirmed the September 21, 2005 e-mail that the Surety and Lovett-Silverman has engaged in the practice of "banging" the subcontractors. Landworks does not have the information pertaining to the docket information of each of these lawsuits, which apparently were filed in disparate courts throughout the Commonwealth. Landworks notes that in the deposition of James Peters, this agent of USF & G couldn't even discuss the counterclaim without getting in to attorney/client privilege issues. Landworks notes, without waiving any rights to the attorney/client privilege, that Landworks is put in to the same bind with this question, noting that Landworks has been aware that its attorney continually bumps in to Shrewsbury Middle School cases in random courts, from Suburban Insulation in Norfolk to Century Drywall in Worcester, making it abundantly clear that voluminous litigation has been in progress, of which Attorney Hipp is apparently the person most knowledgeable of the specifics. Attorney Hipp is on the Plaintiff's mandatory disclosures and will likely testify as to this issue, since USF & G cannot.

**INTERROGATORY NO. 9:**

Please identify, by invoices or specific written demands, the specific payments sought by each individual subcontractor, as alleged in paragraph 13 of the Amended Complaint.

Answer: With the exception of Landworks' own claim, Landworks has no idea. As to other subcontractors, the question is irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence as required by F.R.C.P. 26.

**INTERROGATORY NO. 10:**

Please define the terms "frivolous" and "fraudulent" and describe in what way, as to each lawsuit individually, the lawsuits filed by subcontractors to receive payment, as alleged in paragraph 13 of the Amended Complaint, were frivolous and fraudulent.

Answer: Objection. The Plaintiff objects to the interrogatory as it is vague and unclear As to other subcontractors, the specifics are irrelevant. Paragraph 13 refers to the patently frivolous and fraudulent lawsuits against Landworks cooked up by Lovett-Silverman and USF & G.

Supplemental Answer: The counterclaim filed against Landworks was both frivolous and fraudulent, and was consistent with the e-mail of September 21, 2005 which referenced plans to recover funds. At this point in this case, with discovery at an end, there has not been a shred of evidence to support the claims of the counterclaim. Indeed, in February 1, 2006, Bill Meritz sent an e-mail to the project architect asking "do you have any correspondence in your file pertaining to deficient work performed by Landworks?" The project architect was unable to provide any such documentation showing "deficient" work to Landworks' scope. Nonetheless, this did not stop Lovett –Silverman in its correspondence from identifying site costs that were unrelated to Landworks and from assisting the Surety in preparing a Counterclaim against Landworks that was utterly without merit.

Paragraph 11 of the Counterclaim made false statements that "Landworks abandoned its work at the Project in the fall of 2004." In fact, Landworks remained on the site until the typical winter shut down that affects all site contractors. Exhibit 63 includes an e-mail from G & R Construction to Robert Bullock of Lovett-Silverman dated January 10, 2006 in which G & R notes that "there will be more site work done in the spring time," acknowledging that winter shut down is part and parcel of this project, not abandonment. Nonetheless, the Surety claimed that Landworks "abandoned" the work for suspending exterior work due to inclement conditions. In addition, the Surety has had no logical explanation for how a contractor, who is begging to return to work, can be said to have abandoned the work. Exhibit 121 marked at the deposition of James Peters consisted of interrogatories served by sheriff on USF & G in April of 2005 in which the Plaintiff, in exasperation of the Surety's refusal to talk to the Plaintiff, asked, in question 2 "please explain why the Defendant has refused to discuss the Plaintiff's return to the Project, and has otherwise declined to participate in discussions pertaining to a return to the Project." Thus, there is evidence, contrary to the Counterclaim, that the Plaintiff was endeavoring to return to the site in April of 2005. A schedule marked at the deposition of the project architect confirmed that Landworks' work was to be performed in the spring of 2005, not earlier. The deposition of the person most knowledgeable at USF & G specifically sought information on this topic, asking the same question as specified in the interrogatory. The Surety continues to insist, in a manner bordering on fantasy, that the Plaintiff abandoned the work.

Paragraph 13 refers to substandard work, and paragraph 12 refers to "substandard and unworkmanlike." There has never been a shred of documentation to support these claims. Based upon the fact that the project architect informed Lovett-Silverman that she did not have documents specifically identifying such deficiencies in response to Meritz' e-mail, it was known that these statements were false when made in the pleading.

Count I of the Counterclaim claims damages for breach of contract. The representative of USF & G, at his deposition, couldn't even specify which contract Landworks was alleged to have breached. One would assume, when filing a claim for breach of contract, that the suing party could at least, in good faith, identify the contract being breached.

9

Paragraph 17 alleges that Landworks failed to perform in accordance with plans and specifications, but USF & G could not testify at to the basis of that statement.

In addition, even though the Counterclaim was drafted a year ago, the representative of USF & G couldn't identify damages or explain the basis for damages, stating that they were still being calculated.

The Plaintiff intends to move for summary judgment on this Counterclaim, as it is apparent that USF & G has absolutely no basis to support its Counterclaim, and can't even state the basis for it.

This interrogatory asks for the Plaintiff's definition of frivolous and fraudulent. To Landworks, it means filing a counterclaim without any legal basis, without any foundation, without any investigation, without any capacity to explain the claim and without any notion of the damages being sought, even a year after the Counterclaim was drafted. The Counterclaim is so fraudulent and frivolous that even the witness for USF & G couldn't identify which contract was breached, and what work was not right. In short, this Counterclaim seems to fall within the category of the September 21, 2005 e-mail concerning "banging" the subcontractors and getting money back. It is clear that this Counterclaim was filed to encourage Landworks to compromise the underlying claim. Finally, the Plaintiff notes that using this tactic, with its potential to harm the reputation of Landworks, without any basis, constitutes fraud, as it damages the reputation of the Plaintiff in the community, which should not be allowed with impunity.


## INTERROGATORY NO. 11:

State the basis of your contention in paragraph 14 of your Amended Complaint that there was an organized and ongoing effort by Lovett-Silverman "to bang the subs," defining the term "bang the subs" and describing with particularity how the alleged effort was ongoing.

Answer: The employees and agents of Lovett-Silverman admitted to this in their own e-mails. The conduct perpetrated against Landworks makes it clear that the scheme was carried in to operation.


## INTERROGATORY NO. 12:

State the basis of your contention in paragraph 20 of your Amended Complaint that Lovett-Silverman engaged in specific conduct which serves as fraud on you.

Answer: See Answer 5, which is not an exclusive list. Lovett-Silverman simply lied to Landworks and engaged in conduct which denied Landworks the lawful right to complete its work under its ratification agreement. Lovett-Silverman, by its own e-mails with USF & G and its counsel, were complicit in filing a false lawsuit against Landworks.

10

Supplemental Answer: The Plaintiff refers to Supplemental Answer 7 and Supplemental
Answer 10

**INTERROGATORY NO. 13:**

Please identify by date, description and author each and every document that
evidences, describes, pertains or relates to the "harm" referenced in paragraph 21 of the
Amended Complaint.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails
identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The
Plaintiff will supplement this answer when Lovett-Silverman produces its records.
Supplemental Answer: The Plaintiff refers to its Supplemental Answer 7 and 10.

**INTERROGATORY NO. 14:**

For each item of damage you have allegedly suffered as a result of conduct of Lovett-
Silverman, identify the item and dollar amount of damage followed by the conduct giving rise
to such damage, the methodology used to calculate such item of damage and the basis for
your contention that Lovett-Silverman caused such damage.

Answer: The amount is specified in the Complaint. The amount of attorney's fees is not yet
determined. The Plaintiff is seeking treble damages. The Plaintiff reserves the right to
supplement this answer.

**INTERROGATORY NO. 15:**

Please identify by date, description and author each and every document that
evidences, describes, pertains or relates to the "program of 'banging'" that Lovett-Silverman
allegedly engaged in, referenced in paragraphs 14, 20(c), 23, and 27 of your Amended
Complaint.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails
identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The
Plaintiff will supplement this answer when Lovett-Silverman produces its records.

**INTERROGATORY NO. 16:**

State the basis of your contention in paragraph 20(d) of the Amended Complaint that
Lovett-Silverman supported US F&G in defaming Landworks, describing in detail the nature

11

of such support, making specific reference to written documents evidencing such alleged support, and providing the dates of such efforts and the names of the person(s) lending such support.

Answer: The Plaintiff relies upon the e-mails produced by Lovett-Silverman. These e-mails identify the relevant documents, which Lovett-Silverman apparently refuses to produce. The Plaintiff will supplement this answer when Lovett-Silverman produces its records.

Supplemental Answer: The Plaintiff refers to its Supplemental Answer 7 and Supplemental Answer 10. The Plaintiff also refers to the serious of e-mails marked as Exhibit 63 and 65, which was the communication between Lovett-Silverman and the Surety's counsel in February of 2006 discussing the Counterclaim. These e-mails show a hasty attempt to fashion some form of counterclaim in order to comply with deadlines of the federal court. Most telling is an e-mail from Attorney Hipp to Robert Bullock on February 2, 2006 in which even Attorney Hipp seems to recognize something amiss with Lovett-Silverman's accounting, which appeared to be totally inconsistent. In fact, it will be noted at trial that the questions that Attorney Hipp asked in February of 2006 appear to be the first indication of an intelligent attempt to sort out the issue of site work scope and cost, a process which continued at the Plaintiff's deposition. It should also be noted that, notwithstanding that Attorney Hipp was asking probing, logical questions, the responses provided by Lovett-Silverman were deficient and inadequate, and continued the practice of failing to investigate. In short, Lovett-Silverman responded with false, knee-jerk answers, rather than engaging in intelligent investigation of the questions. An example of this is found in an earlier e-mail from Robert Bullock to Jason Goodwin on January 25, 2006, in which Bullock wrote "Bill said he will extract the information from your billings and forward it to Eric. Please provide the break down of your future site work costs to Eric, Bill and me, no later than Monday." Thus, Lovett-Silverman was fabricating numbers based not-upon Landworks' actual scope, but rather on the broader scope by G & R. There is no evidence that Lovett-Silverman ever attempted to parse out Landworks' scope, assess the values, and calculate costs as against the credits offered by Landworks. The Court should also note that as late as January 25, 2006, even Attorney Hipp was looking for "documentary support for these charges," making one wonder how what the Surety was doing in terms of investigating this claim between March of 2005 and January of 2006. When pushed, Lovett-Silverman, as shown in the exhibits, merely took the completion price of non-scope work, and attributed it all to Landworks. Attorney Hipp is on the witness list and is expected to testify at trial how the information provided to him was incorporated in to the Counterclaim, since USF & G's representative apparently could not.

**INTERROGATORY NO. 17:**

State the basis of your contention in paragraph 24 of your Amended Complaint that Lovett-Silverman was aware of the advantageous business relationship between Landworks and US F&G, identifying the person(s) with such awareness, and please define the term "advantageous business relationship."

Answer: The information is contained in the e-mails that have already been produced. Landworks was in communication with Lovett-Silverman, particularly Robert Bullock. In

these conversations, Lovett-Silverman, under the pretense of working to bring Landworks back on the site, pumped Landworks for information. Based upon the e-mails subsequently identified, it is clear that Landworks would be barred from its right to perform its work. The term advantageous business relationship is self explanatory.

## INTERROGATORY NO. 18:

State the basis of your contention in paragraph 25 of your Amended Complaint that Lovett-Silverman interfered in the business relationship between Landworks and US F&G.

Answer: Lovett-Silverman's own e-mails admit that there was not enough money to both pay Landworks and to complete the work. See the answer to Interrogatory 5 and Interrogatory 17. An entire bogus contention of "abandonment" was fabricated, as was the counterclaim filed by USF & G with false data provided by Lovett-Silverman.

## INTERROGATORY NO. 19:

State the basis of your contention in paragraph 38 of your Amended Complaint that Lovett-Silverman set out to harm Landworks by denying it access to the Project and to funds due and owing.

Answer: See, interrogatory 5, 17 and 18.

## INTERROGATORY NO. 20:

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to your allegedly ignored demand for funds, as referenced in paragraph 39 of your Amended Complaint.

Answer: This information has previously been provided.

## INTERROGATORY NO. 21:

State the basis of your contention in paragraph 40 of your Amended Complaint that Lovett-Silverman's conduct constitutes a violation of c. 93A.

Answer: Banging Landworks, lying about their status, assisting in the preparation of a false lawsuit and other such conduct, all for the purposes of avoiding payment, sounds like unfair and deceptive trade practices to this Plaintiff.

## INTERROGATORY NO. 22:

13

Please identify by date, description and author each and every document that evidences, describes, pertains or relates to the alleged harm your business has undergone, as referenced in paragraph 42 of your Amended Complaint.

Answer: I do not yet have all of the information, as this case is ongoing. I have been denied payment for my work, and for work of my subcontractors, even though I have paid those subcontractors. I was denied the right to complete the work, which was vital for the ongoing success of the company; the company had to borrow funds to maintain its operations. The company has been forced to incur substantial attorney's fees to seek funds that were not in dispute until Lovett-Silverman discovered it did not have the funds to pay the subcontractors, as revealed in the e-mails. My company, which has never been subject to claims of defective workmanship, has been defamed for the purposes of saving USF & G money. The documents that support this are kept in the usual course of business, and will be produced. My understanding is that defamation damages are presumed. Attorney's fees cannot be calculated at this point, nor can the treble damages.

Sworn under the pains and penalties of perjury this 9th day of March, 2007

14

As to Objections,


Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,


The Mountain States Law Group
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: March 9, 2007


## CERTIFICATE OF SERVICE


I, Robert N. Meltzer, do hereby certify that on this 28th of February, 2007 I served a copy of the foregoing on the following counsel of record by first class mail, postage prepaid:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Eric Hipp, Esq.

Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, MA 02210
Attn: Julie Ciollo, Esq.


Robert N. Meltzer

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |

**REPLY OF LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC. TO THE
PLAINTIFF'S OPPOSITION TO LOVETT-SILVERMAN CONSTRUCTION
CONSULTANTS, INC.'S MOTION FOR SUMMARY JUDGMENT**

I.     **INTRODUCTION**

Lovett-Silverman Construction Consultants, Inc's ("Lovett-Silverman") Reply to

Landworks Creations, LLC's ("Landworks") Opposition ("Opposition") to Lovett-Silverman's

("Lovett-Silverman") Motion for Summary Judgment will not restate the arguments set out in

detail in its Motion for Summary Judgment and supporting papers, which are incorporated herein

by reference.  Instead, Lovett-Silverman will offer pinpointed citations to the record to correct

each of Landworks' misstatements of the record, which permeate its Opposition.  We also file

this Reply to voice our objection to Landworks' inappropriate reliance upon unsubstantiated

expert opinion as "facts" to create material issues.  The record itself clearly establishes Lovett-

Silverman's entitlement to summary judgment.

## II.     ARGUMENT: LANDWORKS HAS NOT MET ITS BURDEN OF SHOWING THAT THERE IS A GENUINE, TRIABLE ISSUE

In motioning the Court for summary judgment, the burden is on the moving party to show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Tyler v. United States, 397 F. Supp. 2d. 176, 178 (D. Mass. 2005).  If no genuine issue of material fact emerges, then the motion for summary judgment may be granted."  McCarthy v. Northwest Airlines, Inc., 56 F. 3d 313, 315 (1st Cir. 1995) (internal citations omitted).

### A.     Landworks' Citation of Opinion as Fact is Both Irrelevant and Inappropriate and Should Be Disregarded by the Court

In seeking to avoid summary judgment, Landworks relies heavily on the opinion of its expert, William Gallagher ("Gallagher").[1]  Gallagher is a Project Manager/Owner's Representative at a construction management firm.  To begin, the subject matter of Gallagher's opinion is wholly irrelevant to Landworks' claims.  Moreover, Gallagher's opinion is nothing more than "conclusory allegations, improbable inferences, and unsupported speculation," and provides no grounds to defeat Lovett-Silverman's Motion for Summary Judgment.  Orient Overseas Container Line v. Clark & Sons of Boston, Inc., 229 F. Supp. 2d 4, 8 (D. Mass. 2002) (granting summary judgment and disqualifying expert affidavit where non-movant used conclusory expert affidavit in support of its opposition).

---

[1] Mr. Gallagher was just identified by the Plaintiff and has not yet been deposed.  From his resume, he does not appear to have substantial experience as a construction consultant.

The focus of Gallagher's opinion – whether Lovett-Silverman met an alleged objective standard of care for a construction consultant – is irrelevant to Landworks' claims of fraud, tortious interference, and violations of M.G.L. c. 93A. Moreover, it does not create a genuine issue for trial. Landworks' Statement of Facts, ¶¶ 16-21, 26, and 28 (as well as the arguments in which they are incorporated) consists entirely of Gallagher's opinion-based statements. Simply put, Gallagher's opinion has no bearing on the claims against Lovett-Silverman.

For example, paragraph 16 of the Statement of Facts (Gallagher ¶ 5) sets forth "certain tasks that [in Gallagher's opinion] are customarily performed [by a construction consultant] in order to get the work back on track and finished." The identification of these alleged customary tasks is irrelevant to the instant action because Landworks' Amended Complaint does not allege that Lovett-Silverman was in any way negligent or failed to conform its behavior to that of a reasonable construction consultant. Moreover, even if such allegations were stated in the Amended Complaint, they are irrelevant to establishing the elements of Landworks' claims of fraud, tortious interference, and violations of c. 93A.

In paragraph 9, Gallagher opines that because Lovett-Silverman did not consult with agents of various other entities including Landworks, other subcontractors, and (unnamed) Shrewsbury officials, it failed to act as a construction consultant should.[2] At all relevant times, however, Lovett-Silverman acted pursuant to its contract with USF&G and acted at UF&G's discretion. Gallagher may disagree with the directions given to Lovett-Silverman by USF&G, but this is irrelevant to Landworks' claims, and does not defeat Lovett-Silverman's motion.

Paragraph 17 (Gallagher ¶ 6) notes that, in Gallagher's opinion, it is "preferred by construction consultants and managers to ratify prior subcontractors." This opinion is irrelevant.

---

[2] Though Gallagher asserts that he reviewed Robert Bullock's deposition transcript, he fails to note that in July 2005, Mr. Bullock participated in site visit with Bob Cox, "a person that works for the Town of Shrewsbury", where they discussed Landworks' scope of work. Supplemental Statement of Facts ("SSOF") ¶ 1.

In fact, this opinion confirms that Landworks was not legally entitled to ratification by USF&G on the Shrewsbury Project, and that ratification was, at best, just a "preferred" practice. In any event, the decision whether to ratify or not was USF&G's alone.

Paragraph 18 (Gallagher ¶ 7) states that "[a]s a general rule in the construction industry, a subcontractor is brought back to work unless there is a compelling reason not to bring a subcontractor back to work." Paragraph 20 (Gallagher ¶ 8) further states, "[t]he fact that a subcontractor may be owed money or may be claiming to be owed money, is not, customarily, a compelling reason not to bring a subcontractor back to work." Again, Gallagher's opinion as to custom in the industry is irrelevant here. Moreover, what Gallagher and Landworks fail to note is that it is undisputed that it was not Lovett-Silverman's responsibility to determine which subcontractors are ratified and what qualifies as a compelling reason for ratification. See Lovett-Silverman Statement of Facts to its Motion for Summary Judgment ("SOF") at ¶¶ 9-10 and quotations contained therein.

Paragraph 21 (Gallagher ¶ 9) gives several examples of how "Lovett-Silverman did not engage in specific tasks customarily employed by ... consultants when taking over or assessing a project in mid-stream." Again, customs of other construction consultants and whether Lovett-Silverman engaged in these alleged customs are irrelevant to Landworks' claims of fraud, tortious interference, and violations of c. 93A.

Likewise, paragraph 22 of the Statement of Facts, which asserts that Lovett-Silverman failed "to engage in any form of reasonable or proper investigation as to the role of subcontractors" is irrelevant. Here, too, Landworks fails to recognize that Lovett-Silverman's contractual duty was to USF&G and not it.[3] Whether Lovett-Silverman performed a proper

---

[3] On the record, Landworks acknowledged that it had no contract with Lovett-Silverman. See Lovett-Silverman SOF at ¶ 14 and citation contained therein.

4

investigation into the role of subcontractors is immaterial to Landworks' allegations against it of fraud, tortious interference, and violations of M.G.L. c. 93A. Similarly, whether Lovett-Silverman employees admitted to a failure to perform to industry standards (as asserted in paragraph 23 of Landworks' Statement of Facts), which is denied, is also irrelevant.

The determination of industry standards of care through expert opinion is simply not relevant to establishing Landworks' claims in this action. Moreover, Gallagher's opinion establishes no new facts to expose a material issue to defeat Lovett-Silverman's Motion for Summary Judgment. Therefore, it should be disregarded.

> **B.    Landworks Bases its Opposition Motion on Incorrect Citations to the Record**

In addition to Landworks' misguided and inappropriate use of opinion, Landworks also misstates the record in attempting to identify evidence of alleged wrongdoing of Lovett-Silverman. Correct citations to the record reveal that, contrary to Landworks' rhetoric, there are no genuine, triable issues of fact to preclude summary judgment here.

Landworks would have this Court believe, through paragraph 29 of its Statement of Facts, that Lovett-Silverman "committed fraud in its communication with Landworks ... and also that Lovett-Silverman was not acting pursuant to USF&G instructions in dealing with Landworks." Landworks makes reference to selected e-mails over a three-day period prompted by Neal Matthews of Landworks contacting Robert Bullock of Lovett-Silverman to discuss returning to the Project. Mr. Matthews admitted at his deposition that "Mr. Bullock was the only one [at Lovett-Silverman] that I had contact with. He was the only one at that time who spoke to me or communicated to me in e-mail also." SSOF ¶ 2. Mr. Matthews further admitted that the body of e-mail correspondence between himself, Lovett-Silverman employees and consultants,

and USF&G employees comprised the basis for Landworks' claims against Lovett-Silverman. SSOF ¶ 3.

It is undisputed that James Peters of USF&G instructed Mr. Bullock to tell Mr. Matthews that "if Landworks is interested in settling [the] legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation." E-Mail of James Peters to Robert Bullock, August 18, 2005 at 10:49 a.m., attached to the Supplemental Statement of Facts at **Exhibit A**. Russell Fuller, Esquire, also of USF&G, reiterated that direction, writing to Mr. Bullock, "[p]lease let Mr. Matthews know we are willing to continue to discuss this with him, but in light of the lawsuit, discussion should go through the attorneys." SSOF ¶ 4. Landworks would have this Court believe, that *after* hearing this directive, Mr. Bullock instead simply told Mr. Matthews, "he will have to drop his law suit" in order to be ratified and return to the Project. E-Mail of Robert Bullock to Al Falango, August 17, 2005 at 2:33 p.m., recounting telephone conversation with Neal Matthews that same day, attached to the Supplemental Statement of Facts at **Exhibit A**.

In truth, Mr. Bullock's communication to Mr. Matthews regarding dropping the suit (on August 17, 2005) had occurred one day *before* Mr. Peters issued his instruction (on August 18, 2005) and two days *before* Mr. Fuller issued his instruction (on August 19, 2005). Landworks omits mention of subsequent e-mails from Mr. Bullock to Mr. Matthews (on August 19, 2005), sent *after* the instructions from Mr. Peters and Mr. Fuller, where Mr. Bullock corrected his earlier statement and wrote, "we [Lovett-Silverman] cannot deal with Landworks while the legal case is pending" and "in light of the lawsuit, discussion should go through the attorneys." E-Mail of Robert Bullock to Neal Matthews, August 19, 2005 at 8:09 a.m., attached to the

Supplemental Statement of Facts at **Exhibit A**;  E-Mail of Robert Bullock to Neal Matthews, August 19, 2005 at 4:36 p.m., attached to the Supplemental Statement of Facts at **Exhibit A**.

Thus, Mr. Bullock did communicate to Landworks "pursuant to USF&G instructions". See Lovett-Silverman SOF at ¶¶ 36-38 and quotations contained therein.  It is irrelevant that USF&G had no written policy in place for communicating with subcontractors, as Landworks notes.  See Lovett-Silverman SOF at ¶ 42 and quotation contained therein.  What is relevant is that James Peters and Russell Fuller, having the authority and discretion to direct USF&G's construction consultant on such communications, instructed Lovett-Silverman not to engage in any further direct correspondence or discussion with Neal Matthews.  See Lovett-Silverman SOF at ¶¶ 36-38 and citations contained therein.  Landworks itself admits (in paragraph 29 of its Statement of Facts) that it knows of no USF&G policy to the contrary; in fact, no policy requiring USF&G's consultant to discuss ongoing litigation with a subcontractor exists.

Landworks' claim, in paragraph 30 of its Statement of Facts, that Lovett-Silverman did not act in accordance with USF&G policy, is simply false.  Landworks cannot use fabricated "facts" to create a genuine issue for trial, and thus Lovett-Silverman is entitled to summary judgment. Celotex at 477 U.S. at 324.

> ### C.      Landworks Opposition Motion Attempts to Distract the Court By Including Gratuitous, Unsupported Statements as Facts

Landworks assumes, in paragraph 34 of its Statement of Facts, that because twenty subcontractors on the Project allegedly filed suit against USF&G – without naming Lovett-Silverman - they, too, must have been "banged" by Lovett-Silverman.  First, this is irrelevant speculation.  Second, the phrase "bang", as used by Lovett-Silverman's outside consultant, Al Falango, is slang for "back charge," meaning to charge the cost of incomplete or defective work to the account of the responsible Project subcontractor.  See Lovett-Silverman SOF at ¶¶ 53-54

and citations to the testimony of Lovett-Silverman and USF&G deponents in this regard set forth

therein. Though Landworks contends that "bang" means preventing payment of monies owed to

subcontractors, this cannot be the meaning as used by Al Falango as it is undisputed that Lovett-

Silverman did not have the authority under its contract with USF&G to pay or withhold payment

from the subcontractors. See Lovett-Silverman SOF at ¶¶ 48-19 (discussing USF&G having

responsibility for making payment to subcontractors), 56-58 (discussing Mr. Matthews' belief as

to the definition of "bang.") and quotations contained therein. Therefore, it could not have

engaged in "banging" Landworks even accepting Landworks' definition.

Similarly, discussion of the removal of this case from state to federal court and changes

in USF&G's legal counsel add nothing to the claims against Lovett-Silverman. Lovett-

Silverman was not yet a party to this action when it was removed to this Court, or when USF&G

made changes to its legal representation. Discussion of removal and legal counsel only serves to

distract this Court from the fact that Landworks cannot substantiate the claims of fraud, tortious

interference and violations of c. 93A made against Lovett-Silverman.

Landworks also attempts to divert this Court's attention from its inability to substantiate

the claims by asserting, in paragraph 36 of its Statement of Facts, that "the defendant has failed

to pay the Plaintiff for work performed at the Project, to the extent of $135,101.00." Lovett-

Silverman bore no responsibility for making payment for subcontractors; USF&G bore that

responsibility. See Lovett-Silverman SOF at ¶¶ 48-49 and quotations contained therein. It is

undisputed that it was USF&G's responsibility to pay the general contractor, who would in turn

pay the subcontractors. See Lovett-Silverman SOF at ¶¶ 48-49 and quotations contained therein.

Even if USF&G improperly failed to pay Landworks, this does not create a material issue to

defeat Lovett-Silverman's Motion for Summary Judgment.

8

Landworks uses an irrelevant affidavit of its counsel, Robert Meltzer, to attempt to show that because ratification of a subcontractor occurred after the filing of a suit on a <u>different</u> project involving a <u>different</u> construction consultant, Robert Bullock of Lovett-Silverman allegedly lied to Neal Matthews. <u>See</u> Affidavit of Robert Meltzer at ¶ 6.   Landworks does not say what this lie was, but it is undisputed on the record in this action that Robert Bullock communicated truthfully to Landworks and pursuant to USF&G's instruction. <u>See</u> Lovett-Silverman SOF at ¶¶ 36-40 and quotations contained therein.   At no time did Mr. Bullock say that no subcontractor may be ratified while a lawsuit was pending; he simply told Mr. Matthews that he could no longer communicate with him directly and that future exchanges should go though counsel. <u>See</u> **Exhibit A**; <u>see also</u> Lovett-Silverman SOF at ¶ 40 and quotation to Robert Bullock deposition testimony contained therein.   Landworks' use of an irrelevant set of unsubstantiated and unrelated facts to reveal alleged dishonesty in the instant matter shows that Landworks cannot make out any claim against Lovett-Silverman using the facts before this Court.   These unfounded allegations do not create a genuine issue for trial, again making summary judgment in favor of Lovett-Silverman appropriate.

### D.    Landworks Has Not Created a Triable Issue on Its Claim of Fraud

In its Opposition Motion, Landworks has not identified any facts that would support a claim of fraud.   In fact, it cannot, because the record does not contain any evidence which would support such a claim.

Landworks relies upon case law that provides, "conduct calculated to mislead and which in fact do mislead one who is acting reasonably [is] enough to constitute fraud." <u>Boston Five Cents Sav. Bank v. Brooks</u>, 309 Mass. 52, 55 (1941).   Even assuming that the facts of <u>Brooks</u> are

in any way analogous to the facts here, which they are not, Landworks has still not provided any evidence to show that Lovett-Silverman engaged in any conduct calculated to mislead.[4]

It is undisputed in the record, and clearly established through deposition testimony and through exhibits containing e-mail communications, that Lovett-Silverman employees had no intent to mislead and did not mislead Landworks in any regard. See Supplemental Statement of Facts, **Exhibit A**; see also Lovett-Silverman SOF at ¶¶ 36-40, 42 and quotations contained therein. That USF&G instructed Lovett-Silverman to cease direct communication with Landworks because of the lawsuit, despite beginning the ratification process, does not support any claim of fraud. Lovett-Silverman informed Landworks of the change, the need to communicate through attorneys, and the reason for the change. See Lovett-Silverman SOF at ¶¶ 39-40 and quotations contained therein. Even if such conduct were to evidence fraud, which is denied, such conduct would have been cured by USF&G and Lovett-Silverman's invitation that further communication to go through counsel. See Supplemental Statement of Facts, **Exhibit A**; see also Lovett-Silverman SOF at ¶ 40 and quotations contained therein. Thus, Landworks has failed to meet its burden of creating a genuine issue for trial on its claim of fraud against Lovett-Silverman.

### E.    Landworks Has Not Created a Triable Issue on Its Claim of Tortious Interference

Landworks has failed to create a triable issue with respect to its claim of tortious interference because it cannot set forth any specific facts to show that Lovett-Silverman intentionally interfered with the business relationship between Landworks and USF&G for any improper purpose or by improper means.

---

[4] Brooks involves an allegation of fraud against the maker of a promissory note in securing a payee's execution of the note.

Landworks alleges that it has satisfied its burden of production on this claim by simply providing its expert's opinion on the meaning of the phrase "bang." Even if "bang" meant to prevent payment of monies owed to subcontractors, as Landworks' expert asserts, it is undisputed that Lovett-Silverman was not responsible for effectuating payment to subcontractors. See Lovett-Silverman SOF at ¶¶ 48-49 and quotations contained therein. Furthermore, Landworks has not cited any facts in the record to show that Lovett-Silverman influenced or coerced USF&G into keeping payment from subcontractors. Without this essential element shown, Landworks cannot make out a claim for tortious interference. Thus, Landworks had failed to meet its burden of opposing Lovett-Silverman's Motion for Summary Judgment with respect to its tortious interference claim.

### F. Landworks Has Not Created a Triable Issue on Its Claim of Violations of M.G.L. c. 93A

As with its claims for fraud and tortious interference, Landworks has failed to create a genuine issue of material fact with respect to its M.G.L. c. 93A claim against Lovett-Silverman. Landworks offers no facts in the record to support this claim, but only the unsubstantiated opinion of its expert. See Gallagher Affidavit at ¶¶ 27-28, 34. Citing the "construction industry" as his only source, Gallagher opines that Lovett-Silverman forced unnamed subcontractors to compromise unnamed claims or file unnamed suits to recover payment on the Project. We have already stated, in Section C of this brief, that "bang" was slang, meaning to back charge subcontractors for incomplete or defective work. Moreover, it is undisputed that Lovett-Silverman had no responsibility under its contract with USF&G to effectuate payment to subcontractors; it was solely USF&G's responsibility. See Lovett-Silverman SOF at ¶¶ 48-49 and quotations contained therein. Thus, Lovett-Silverman cannot bear responsibility for the alleged withholding of payment to subcontractors.

In the absence of any actual evidence, Gallagher, in his paragraph 30, suggests that the alleged high number of lawsuits from subcontractors against the Surety (and not Lovett-Silverman) is indicative of Lovett-Silverman's failure to address claims. This speculation is unsupported in the record and should be disregarded. Thus, Landworks cannot find any facts in the record to support Landworks' 93A claim or to defeat Lovett-Silverman's Motion for Summary Judgment.

## III.  CONCLUSION

For all the foregoing reasons, Lovett-Silverman respectfully requests that the Court enter summary judgment in its favor.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
Dated: April 27, 2007                                (617) 406-4500
jciollo@donovanhatem.com

01085071

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 27, 2007.

/s/ Julie A. Ciollo
Julie A. Ciollo

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**SUPPLEMENTAL STATEMENT OF FACTS OF THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC., IN SUPPORT OF ITS REPLY TO LANDWORKS CREATIONS, LLC'S OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT**

### I.    INTRODUCTION

Defendant Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman")

respectfully submit this Statement of Facts in Support of its Motion for Summary Judgment.

### II.    SUPPLEMENTAL STATEMENT OF FACTS

1.    Mr. Bullock participated in site visit with Bob Cox, "a person that works for the

Town of Shrewsbury", where they discussed Landworks' scope of work.  Depo. of Robert

Bullock at 64:3-12; 101:14-102:4, attached hereto as **Exhibit B**.

2.    Mr. Matthews admitted at his deposition that "Mr. Bullock was the only one [at

Lovett-Silverman] that I had contact with.  He was the only one at that time who spoke to me or

communicated to me in e-mail also."  Depo. of Neal Matthews, Day One, at 99:10-13, attached

hereto as **Exhibit C**.

3.     Mr. Matthews further admitted that the body of e-mail correspondence between himself, Lovett-Silverman employees and consultants, and USF&G employees comprised the basis for Landworks' claims against Lovett-Silverman.  Depo. of Neal Matthews, Day One, at 75-100:7-16, attached hereto as **Exhibit C**.

4.     Russell Fuller, Esquire, of USF&G, wrote to Mr. Bullock and stated, "[p]lease let Mr. Matthews know we are willing to continue to discuss this with him, but in light of the lawsuit, discussion should go through the attorneys." E-Mail of Russell Fuller, Esquire to Robert Bullock, August 19, 2005 at 4:25 p.m., attached hereto at **Exhibit A**.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

Dated: April 27, 2007

01086789

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 27, 2007.

/s/ Julie A. Ciollo

Julie A. Ciollo

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**SECOND SUPPLEMENTAL STATEMENT OF FACTS OF THE DEFENDANT
LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC., IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

With the consent of counsel and leave of the Court, Defendant Lovett-Silverman

Construction Consultants, Inc. ("Lovett-Silverman") respectfully submits this Second

Supplemental Statement of Facts in Support of its Motion for Summary Judgment.  This

Statement is meant to supplement Exhibit C to the Statement of Facts in Support of Lovett-

Silverman's Motion for Summary Judgment, of which an incomplete copy was previously

submitted.

## II.     SUPPLEMENTAL STATEMENT OF FACTS

1.      On or about January 10, 2003, Lovett-Silverman entered into an Agreement with St.

Paul Fire and Marine Insurance Company ("St. Paul") (the "Lovett-Silverman Agreement").  A true

and accurate copy is attached hereto as Exhibit A.

1

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

Dated:  June 1, 2007

01095004

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on June 1, 2007.

/s/ Julie A. Ciollo_____
Julie A. Ciollo

# EXHIBIT A

Case 4:05-cv-40072-FDS    Document 98-11    Filed 03/05/2008    Page 8 of 41
Page 1 of 1
Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 2 of 6

**Julie Ciollo**

| | |
|---|---|
| **From:** | Robert Bullock [rbullock@lovett-silverman.com] |
| **Sent:** | Wednesday, August 17, 2005 2:33 PM |
| **To:** | 'Al Falango' |
| **Subject:** | Shrewsbury - Landworks |

The president of Landworks just called me and expressed an interest in being ratified.  I told him he will have to drop his law suit, but welcomed this idea and I forwarded the requirements for ratification and my contact information

## Julie Ciollo

**From:**     Peters Jr,James Michael [JPETERS@stpaultravelers.com]
**Sent:**     Thursday, August 18, 2005 10:49 AM
**To:**       Al Falango; Fuller,Russell W
**Cc:**       Robert Bullock; bcarver@hinshawlaw.com; Werner,William R
**Subject:** RE: Shrewsbury - Landworks

We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G. The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project. If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

By copy of this email to Brad Carver, I am giving him notice of this issue.


James M. Peters, Jr.
St Paul Travelers Bond Claim
One Tower Square  - 4 PB
Hartford, CT 06183

Tel:  (860) 954-6497
Fax: (860) 277-5722
Email: james.m.petersjr@stpaultravelers.com


        -----Original Message-----
        **From:** Al Falango [mailto:afalango@lovett-silverman.com]
        **Sent:** Wednesday, August 17, 2005 3:00 PM
        **To:** Fuller,Russell W; Peters Jr,James Michael
        **Cc:** 'Robert Bullock'
        **Subject:** Shrewsbury - Landworks


        Russ

        The president of Landworks called  LSCC and expressed an interest in being ratified.   Should we pursue
        this guy , I know you have issues with him.


4/20/2007

## Julie Ciollo

**From:** Robert Bullock [rbullock@lovett-silverman.com]
**Sent:** Friday, August 19, 2005 8:09 AM
**To:** 'Neal H. Matthews'
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,

We checked with the Surety and we were told that we can not deal with Landworks while the legal case is pending.

Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Thursday, August 18, 2005 3:35 PM
**To:** Robert Bullock
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Either day will be find to meet. Let me know what day will be best for you and I'll be down at 9:00am. I assume the best place would be at the school so we can go over what has to be done to finish the work.

Thank you,
Neal H. Matthews

----- Original Message -----
**From:** Robert Bullock
**To:** 'Neal H. Matthews'
**Sent:** Thursday, August 18, 2005 9:10 AM
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Neal,
I can meet with you Tuesday or Wednesday of next week. Let me know if 9:00 AM either day will work for you.

Robert J. Bullock, PE
Lovett Silverman Construction Consultants Inc.

Phone: 717-796-9595
Fax:    717-766-1715
Cell:   717-422-7518

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

3/22/2007

## Julie Ciollo

**From:** Fuller,Russell W [RFULLER@stpaultravelers.com]
**Sent:** Friday, August 19, 2005 4:25 PM
**To:** Robert Bullock
**Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

Bob:

Please let Mr. Matthews know that we are willing to continue to discuss this with him, but in light of the lawsuit, discussion should go through the attorneys. I think that is what we are trying to convey. Thanks.

-----Original Message-----
**From:** Robert Bullock [mailto:rbullock@lovett-silverman.com]
**Sent:** Friday, August 19, 2005 2:30 PM
**To:** Fuller,Russell W; Peters Jr,James Michael
**Cc:** 'Al Falango'; 'Tony Lardaro'
**Subject:** FW: Shrewsbury Middle School - Data required for Financial Analysis

Gentlemen,

Attached is the email thread summarizing my discussions with Mr. Matthews of Landworks. The event that initiated this was a call from Matthews to my cell phone after he had spoken to someone at the Town of Shrewsbury on Wednesday 08/17/05.

Robert Bullock, PE
Lovett Silverman Construction Consultants Inc.
19 Goldenrod Drive
Carlisle, PA  17013

Phone: 717-796-9595
Fax:   717-766-1715
Cell:  717-422-7518

This message may be an attorney-client communication, and as such is privileged and confidential. The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. if you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Friday, August 19, 2005 9:45 AM
**To:** Robert Bullock
**Cc:** Rob N. Meltzer
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Mr. Bullock,
    I'm sorry to hear that. I felt that I could have provided information and service to St. Paul that would have saved them expense in completing the project. There were many things in the actions of Town of Shrewsbury and Jackson Construction Company that should have been corrected before the project moved forward. It is unfortunate that the surety did not respond to my and my lawyers numerous inquiries concerning Jackson's refusal to pay for work that was requested and completed. Much of the work was *billable to the Town of Shrewsbury. They had requested the work to be done* and as of my last contact with them, they had not been billed by Jackson or the surety for the work. I guess that when

4/26/2007

**Julie Ciollo**

| | |
|---|---|
| **From:** | Robert Bullock [rbullock@lovett-silverman.com] |
| **Sent:** | Friday, August 19, 2005 4:36 PM |
| **To:** | 'Neal H. Matthews' |
| **Cc:** | 'Fuller,Russell W' |
| **Subject:** | RE: Shrewsbury Middle School - Data required for Financial Analysis |

Neal,

We are willing to continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys.

Thanks.
Bob Bullock
Lovett Silverman Construction Consultants Inc.

The information contained in this e-mail is confidential information intended only for the use of the individual or entity named. If the reader of the message is not the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by reply e-mail and then delete the message.

---

**From:** Neal H. Matthews [mailto:Lonewolf@maine.rr.com]
**Sent:** Friday, August 19, 2005 9:45 AM
**To:** Robert Bullock
**Cc:** Rob N. Meltzer
**Subject:** Re: Shrewsbury Middle School - Data required for Financial Analysis

Dear Mr. Bullock,
     I'm sorry to hear that. I felt that I could have provided information and service to St. Paul that would have saved them expense in completing the project. There were many things in the actions of Town of Shrewsbury and Jackson Construction Company that should have been corrected before the project moved forward. It is unfortunate that the surety did not respond to my and my lawyers numerous inquiries concerning Jackson's refusal to pay for work that was requested and completed. Much of the work was billable to the Town of Shrewsbury. They had requested the work to be done and as of my last contact with them, they had not been billed by Jackson or the surety for the work. I guess that when people become entrenched in certain mind sets they can not see the benefit of just talking to resolve problems. The Town of Shrewsbury would have no incentive to have me come back as they will benefit from having work completed in which they think they will not have to pay for. As for St. Paul continuing to not address my legitimate concerns, it shows me they still are acting in bad faith. It's sad that individuals can not step back from the overall picture and have a meaningful discussion based on respect of each other's positions.

Respectfully,
Neal H. Matthews
| ----- Original Message -----
| **From:** Robert Bullock
| **To:** 'Neal H. Matthews'
| **Sent:** Friday, August 19, 2005 8:09 AM
| **Subject:** RE: Shrewsbury Middle School - Data required for Financial Analysis

3/22/2007

# EXHIBIT B

Page 64

1   Meritz.   You reference a conversation with Bob Cox

2   or it says you recall Bob Cox.   Who is Bob Cox?

3        A.   Bob Cox is a person that works for the Town

4   of Shrewsbury.

5        Q.   This conversation says, "I recall Bob Cox

6   saying..."   Where did that conversation take place?

7        A.   This took place when I walked around the

8   job site.

9        Q.   When was that?

10       A.   In July.

11       Q.   Who else was walking with you when you --

12       A.   Just Bob and I.

13       Q.   What did he say?

14       A.   He said that the north and east perimeter

15   of the baseball field may be at the wrong slope.

16       Q.   Was it identified as to whether or not the

17   grading, whether it was at the wrong slope and did

18   require some additional grading?

19       A.   When?

20       Q.   At any time.

21       A.   I don't know.

22       Q.   You referenced there also

23   "Jackson/Landworks may have already performed the

24   survey."   Do you see that reference?

Page 101

1    within Landworks' subcontract with Jackson?

2        A.  If this includes the rubber track, the

3    rubber track is not part of Landworks' contract.

4        Q.  Do you know how much of that 185?

5        A.  I don't know.

6        Q.  There is a section for G&R.  Comes out to

7    only about 1,300, but concrete form for head walls?

8        A.  Yes.

9        Q.  Would you state that is Landworks' scope of

10   work?

11       A.  Yes.

12       Q.  Based upon what?

13       A.  I don't recall.

14       Q.  Then we have electrical work at the

15   football field, 12,450.  Would you tell me why that

16   would be within Landworks' scope?

17       A.  It was removed under site demolition.

18       Q.  Under site demolition, that belonged to

19   Landworks?

20       A.  If it was damaged by them.

21       Q.  Was it damaged by them?

22       A.  During this site demolition.  My

23   investigation showed it was.

24       Q.  What investigation was that?

Page 102

1      A.  Discussions.

2      Q.  With whom?

3      A.  Bob Cox when I walked around with him in

4  July.

5      Q.  What did he tell you?

6      A.  I don't recall exactly, but that's why I

7  listed it as Landworks.

8      Q.  You don't recall exactly what he told you?

9      A.  No.

10     Q.  Your understanding was based upon some July

11  conversation with Bob Cox, Landworks damaged

12  electrical?

13     A.  Yes.

14     Q.  Did Bob Cox point out something and say,

15  Landworks damaged this?

16     A.  Yes.

17     Q.  Specifically he mentioned Landworks?

18     A.  I don't recall.

19     Q.  Did he say site guy or Landworks?

20     A.  I don't recall.

21     Q.  What exactly were you looking at that he

22  claimed was broken?

23     A.  At that point we were looking around the

24  track area where the site demolition took place.

# EXHIBIT C

Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 2 of 25

75

1    date of that, but it was first of March?

2        Q.   Of 2005?

3        A.   Of 2005.  First of March in 2005, end of

4    February, first of March.

5             MR. HIPP:  The 17th of March.

6        Q.   The 17th of March.  The record will reflect

7    when it was.  But approximately in March of 2005?

8        A.   Yes.

9        Q.   Had you ever filed suit before on a job

10   where you're working?

11       A.   No.

12       Q.   So what happened next?

13       A.   In August I would visit the site from time

14   to time, and there didn't seem to be much going on

15   from that time frame of March until into the summer

16   outside the building.

17            And then in August I got a telephone call

18   from the clerk of the works that -- and he said to

19   me, he's like, "So I hear you're going to be back to

20   work next week."  And I was like, "Well, that's news

21   to me.  It's good news, but what have you heard?"

22            And he told me that Lovett Silverman had

23   told the Town in the meeting that the site

24   contractor was going to be back on site the

Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 3 of 25

102

1    USF&G?

2        A.    I'm saying Lovett Silverman prepared the

3    counterclaim to give to USF&G so that they could

4    file a counterclaim against me.  And there are items

5    in there that -- first of all, it appears that it

6    has been hastily put together, in that there's a

7    deadline to meet, and it's more important to meet

8    that deadline than it is to get it right, and there

9    are items in there that are clearly not my work.

10   And --

11       Q.    Like what, for example?

12       A.    It appears to me, in the counterclaim, that

13   the track is in there, and the track being all the

14   track.  And you have seen the change order or the

15   letter of intent from Jackson about the scope

16   dealing with the removal of the old asphalt and the

17   overlay of the track, but then also the rubberized

18   surface.

19            I mean, there's going to be -- I figure

20   there's going to be an argument where they're going

21   to say that I owed the pavement on the track, and I

22   am going to that I did not.  There was never any

23   doubt that there was always a contractor hired for

24   doing the work for putting down the surface on the

79

1    that time.    Part of them were billing records and

2    some other items.

3            And I told him that I could provide him

4    that, and I gave him my e-mail address, and asked

5    him -- or he asked me for my e-mail address, because

6    I asked him if he would fax me a copy of what his

7    requirements were so that I could make sure I got

8    everything to him quickly, and he asked me if I had

9    an e-mail address, and I told him that I did.   He

10   said, "Because I am on the road, it would be easier

11   for me to just e-mail it to you," and I told him

12   that would be fine.

13           Then the conversation turned to the track,

14   and he asked me at that time, he was like, "What is

15   your understanding of the track work?"   And I'm

16   like, "My understanding of the track work is that

17   Standen had contracted with Tracklite to do the

18   track work."   And he told me that that was his

19   understanding of it also.

20           And he thanked me for calling him, and it

21   was a pleasant conversation, and I can remember that

22   I was pretty upbeat about it, because after -- you

23   know, from basically November the year before until

24   August, there had been really nothing forthcoming

Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 5 of 25

80

1    from anyone, and this was the first person that I

2    had actually been able to speak to about it.

3          And so, when I got back to the office, I

4    checked my e-mail.  He had sent his requirements.

5    And then I -- as I started pulling everything out,

6    he had asked me to fax it to him, and I was, like,

7    thinking to myself that it was an awful lot of

8    documents, and I get a little bit paranoid when I

9    start faxing so many documents through a fax

10   machine, because normally halfway through it jams or

11   whatever, and I'm not certain what has been sent or

12   not.

13         So I wrote him back an e-mail and asked

14   him, since there was a lot of documents, if I could

15   just meet him at the site and give him the

16   documents, and at that time go over with him any

17   questions that he may have that he might find

18   beneficial in helping him process this, and that I

19   can meet him any time on the site.

20         He wrote me back on e-mail and said that --

21   and I believe the next e-mail he wrote me back was

22   that he could meet me like two days in the next

23   week, which day would be better.  And I told him to

24   pick a date, it didn't matter to me which day it

81

1    was, nine o'clock would be fine, and I would meet

2    him there on the site.

3            And then I believe the next e-mail that I

4    got from him, he inquired if I had a lawsuit pending

5    against USF&G.  And I told him that I did, but the

6    only reason that I had filed the lawsuit was to

7    protect my rights under Massachusetts law, and that

8    I had always just preferred to settle this out and

9    get back to work and finish it.

10           And then he wrote back to me and told me

11   that he had been told by the surety that he could

12   not speak with me -- I don't know if it was speak

13   with me or deal with me, but basically he couldn't

14   deal with me while the lawsuit was pending.

15           And I wrote him back --

16      Q.   Did that surprise you?

17      A.   Yes.  It deflated me.

18      Q.   Did you think that you could file a lawsuit

19   for unfair and deceptive trade practices against

20   USF&G and then continue to do business directly with

21   it and a company like Lovett Silverman?  Was that

22   what your expectation was?

23           MR. MELTZER:  Objection.

24      A.   My expectation was that at some time, that

Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 7 of 25

82

1    someone would have to sit down and speak with me

2    about my claims against USF&G.

3        Q.    In the lawsuit?

4        A.    No.    That at some time, because even if I

5    had filed a lawsuit -- and this is just my

6    understanding, and I may be wrong -- but my

7    understanding is that I had never been released from

8    my contractual duties for this job, and they were

9    still going to have to deal with me one way or

10   another.    They were going to have to fire me or they

11   were going to have to remove me somehow, or they

12   were going to have to sit down and say, "Okay, let's

13   look at what you've got and see if we can resolve

14   this without having to go through all this."

15           And --

16       Q.    But you did get an answer to -- you did get

17   a response through the mechanism that you started of

18   the lawsuit, right?    You got an answer to your

19   complaint?

20       A.    At the time that I --

21           MR. MELTZER:    Objection.

22           THE WITNESS:    I'm sorry.

23           MR. MELTZER:    You can answer.

24       Q.    You did get a response.    You said you

83

1    expected a response, and you filed the lawsuit and

2    you got a response, correct?

3        A.    At that time I don't believe I had a

4    response.

5        Q.    From USF&G?

6        A.    I don't think I had a response.  I think at

7    that time, sometime in April or maybe May, USF&G

8    removed the case to the Federal Court, and then it

9    just sat there, and I don't know how long it takes

10   to read these things, but it took them six months to

11   read this.

12       Q.    The judge or the court?

13       A.    Whoever, I don't know who reads it, and to

14   make the determination.  But I don't believe that

15   there was any response to it at first, other than to

16   try to remove it.  I'm not absolutely certain, but

17   from my knowledge, there wasn't anything.

18            Did you want me to continue on with the

19   e-mail --

20       Q.    Certainly.  So I think I asked you the

21   question -- I will ask you this question about your

22   first conversation with Mr. Bullock.  When Mr.

23   Bullock told you that he was surprised that you were

24   interested in continuing to do business with USF&G

84

1    at the site, do you have an understanding as to why

2    he was surprised?

3              MR. MELTZER:   Objection.

4         A.   I don't recall having any opinion of why he

5    might have been surprised.

6         Q.   It didn't occur to you that it might be

7    because you had filed this breach of contract and

8    deceptive trade practices claim against USF&G?

9              MR. MELTZER:   Objection.

10        A.   No, because of the continuation of the

11   conversation.  He said to me that he preferred to

12   ratify the people that were, you know, involved with

13   the project and that it would be beneficial to

14   ratify me to get this work going.

15        Q.   And then at a later point in these e-mail

16   exchanges, he asked you about whether there was a

17   lawsuit or not?

18        A.   Yes, he did.

19        Q.   And then what happened next?

20        A.   I wrote him back and I told him that I was

21   sorry to hear that this was the case, because it had

22   always been my intention -- the only thing I ever

23   wanted to do was to go back to the job and finish

24   this job, and that the only reason that I filed the

85

1    lawsuit was because I had had no response from

2    anyone involved on the other side, and that to

3    protect my rights under Massachusetts law was the

4    only reason that I filed this, and that it was a

5    shame that two sides couldn't sit down and have a

6    conversation, just like this.

7              I mean, you've got your job to do, I

8    understand that, but we can sit here, and we can be

9    civil about it, and we can speak and we can see if

10   we can find, you know, a common ground.

11        Q.   I understand.  I think you told me -- we'll

12   take a second and we can find those e-mails, and it

13   will help the conversation.  I think I have them

14   all.

15             MS. BROWN:  We can mark them all as Exhibit

16   75.

17                  (Document marked as Exhibit 75

18                  for identification)

19        Q.   Actually, Mr. Matthews, as you can see from

20   these e-mails, if we look at the top, I think it

21   looks like we see on Page 1, Mr. Bullock asks you to

22   send nine items, and you respond about the -- we'll

23   just go through these quickly, if you don't mind.

24   We don't need to take a lot of time with them.

1          You respond that you are not sure you

2     really want to send this through the fax machine,

3     just as we were just talking about.  And then as you

4     stated, Mr. Bullock says, "I can meet with you

5     either Tuesday or Wednesday of next week," and you

6     say, "Either day would be fine."

7          And then on the third stapled set of

8     e-mails that we have collectively marked here as

9     Exhibit 75, Bob says, "Neal, we checked with the

10    surety, and we were told we cannot deal with

11    Landworks while the legal case is pending."  And

12    then you wrote a response at the top of the page,

13    Friday, August 19th, "Dear Mr. Bullock, I'm sorry to

14    hear that."

15         I wanted to ask you a couple of questions

16    about this response, if you would be so kind.

17    A.    Sure.

18    Q.    "I felt that I could have provided

19    information and service to St. Paul that would have

20    saved them expense in completing the project.  There

21    were many things in the actions of the Town of

22    Shrewsbury and Jackson Construction Company that

23    should have been corrected before the project moved

24    forward."

Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 12 of 25

87

1          Do you remember what you were referring to

2     when you said that?

3          A.    Yes.

4          Q.    And what was that?

5          A.    The relationship between Jackson and the

6     Town had deteriorated to the point -- I think if you

7     look at CTM's deficiency and job meeting notes, you

8     will see that there is a deterioration in the

9     relationship of the two working together.  It became

10    adversarial in the end.

11         The Town was becoming more adversarial to

12    everyone involved in the project, in that any

13    concerns brought up to them about -- I'll just use

14    an item -- inside the building, because I said in

15    many of these meetings that the hood ventilators for

16    ventilation of the building became just a long,

17    drawn-out intransigence on both sides, because

18    neither one would -- they'd just sit and say, "We

19    don't know exactly what you want," and the Town

20    would say, "We don't care if you don't know what we

21    want.  You're supposed to put it in.  You're

22    supposed to know."

23         Jackson was working out of sequence, a

24    logical sequence of work.  That was causing problems

88

1    in site work, and they were not providing

2    information that was needed to complete site work in

3    a timely fashion.   And Jackson was using extortion,

4    for lack of a better word, to --

5        Q.   Well, that's a very weighted word.   I mean,

6    is that really the word you want to use?

7        A.   Yes, it is, because I don't use it lightly.

8        Q.   What does it mean to you, "extortion"?

9        A.   Extortion would be to me that -- I'll give

10   you an instance.   There was a change that they

11   wanted to make; they wanted to bring a conduit out

12   of the side of the shop area and run it into the

13   area where the new ticket booth would be placed.   It

14   was not the area that it was originally to be placed

15   in.   We had already run the conduit from the

16   original areas.

17        They would not provide a change order for

18   doing it.   And so to get it installed, they said

19   plainly, "If you want to see any more payment,

20   you're going to put the conduit in."   I would

21   consider that extortion.

22        Q.   In your next sentence, and this is

23   consistent with what you've been saying, "It is

24   unfortunate that the surety did not respond to me,"

89

1    I think you meant to say, "and my lawyer's numerous

2    inquiries concerning Jackson's refusal to pay for

3    work that was requested and completed.  Much of the

4    work was billable to the Town of Shrewsbury."

5              What is that a reference to, that much of

6    the work was billable to the Town of Shrewsbury?

7         A.   There were several change orders that had

8    been given to Jackson the previous year, the ones

9    that I had spoke to earlier about sitting down in

10   the Thanksgiving meeting with them, of going over,

11   that were billable to the Town of Shrewsbury.  And

12   as of this date right here, I had seen no evidence

13   that those bills had actually been turned in to the

14   Town for payment.

15        Q.   Okay.  Now, in the next set of e-mails, we

16   have a response from Bob to you, "Neal, We are

17   willing to discuss this with you, but in light of

18   the lawsuit, discussion should go through the

19   attorneys."

20        A.   I'm sorry.  Which --

21        Q.   If you go to the next set.  You see this is

22   your e-mail we were just reading, and here is the

23   response.  I am asking you if you recall that

24   response.

90

1      A.    Yes.

2      Q.    Did you understand what he was saying, that

3  because of the lawsuit, discussions needed to go

4  through attorneys?

5      A.    In my mind it was so that he didn't get

6  himself into trouble, he needed to have, like, the

7  attorney for USF&G present to have any discussion.

8      Q.    Did you think --

9      A.    That was just my --

10     Q.    Your opinion?

11     A.    My opinion of it.

12     Q.    But you didn't think that was unreasonable

13  on its face?

14     A.    No.   And I think that, you know, my

15  response to him was fairly close after that, that I

16  had written to him to suggest that I -- that Mr.

17  Bullock and myself, and the attorneys for St. Paul

18  and my attorney, you know, meet at the end of the

19  month at a time that would be convenient for them,

20  at Shrewsbury Middle School, to see if we could work

21  this out, and resolve -- by resolve the matter, I

22  meant all of it, resolve it so that we could do away

23  with it.

24     Q.    And, by the way, do you see in Mr.

91

1    Bullock's e-mail to you that he has copied a Russ

2    Fuller?

3        A.    Yes.

4        Q.    Do you know who Russ Fuller is?

5        A.    No, I don't.

6        Q.    Does it refresh your recollection if I tell

7    you that he is an attorney for USF&G?

8        A.    Someone may have told me that before,

9    because I had an idea that he might have been an

10   attorney for USF&G.  I think that when I saw it up

11   there, I figured that must have been who it was.

12       Q.    Now, if we go to the next stapled set of

13   documents, you see Bob's response back to you.

14   "Neal, I will pass this suggestion along to Russ

15   Fuller at St. Paul Travelers."  Do you see that?

16       A.    Yes.  I do.

17       Q.    Now, at this point, you had not named

18   Lovett Silverman or had you named -- you had not

19   named Lovett Silverman as a Defendant in this case,

20   had you?

21       A.    No, I had not.

22       Q.    And did you have an understanding that

23   Lovett Silverman worked under contract with the

24   surety?

Case 4:05-cv-40072-FDS    Document 79    Filed 04/27/2007    Page 17 of 25

92

1       A.    I wasn't certain what the working

2   relationship was now with the surety.

3       Q.    And did you have an understanding as to who

4   called the shots, whether Bob Bullock called the

5   shots or the surety called the shots as to resolving

6   this dispute with you and how this dispute with you

7   would be resolved?

8           MR. MELTZER:  Objection as to form.

9       Q.    I mean, can you see reading this e-mail

10  that Mr. Bullock is saying that St. Paul is the

11  decision maker, and not Lovett Silverman, and he

12  must pass this on to St. Paul?

13          MR. MELTZER:  Objection.

14      A.    In my discussion with him and my subsequent

15  e-mails to him, in my opinion, Lovett Silverman was

16  charged with finding out, you know, what were the

17  disputes and ratifying the subcontractors if they,

18  you know, wanted to be ratified, and working this

19  out for St. Paul's.

20          But other than that, I'm not certain -- in

21  my opinion they were the ones that were the lead in

22  being able to sort through the mess of the Jackson

23  failure and ratifying people.  They were the only

24  people that I knew to talk to to get the process

93

1    going.

2        Q.    And when we were at the depositions of the

3    Lovett Silverman people, your attorney showed them

4    the e-mails from the surety, instructing them not to

5    deal with you.  Do you remember those e-mails?

6        A.    Yes.

7        Q.    So in hindsight --

8        A.    I'm sorry.  I'm sorry.  Would you repeat

9    that.

10       Q.    At the time of these e-mails, there were

11   other e-mails that went from the surety to Lovett

12   Silverman?

13       A.    Yes.

14       Q.    Saying -- instructing Mr. Bullock at Lovett

15   Silverman not to deal with you directly, and

16   instructing Lovett Silverman to tell you that

17   communications had to go through the lawyers because

18   of the lawsuit.  Do you remember seeing those

19   e-mails --

20            MR. MELTZER:   Objection.

21       Q.    -- at the Lovett Silverman depositions?

22       A.    I don't remember that that way.  What I

23   remember -- what really sticks out in my mind about

24   the set of e-mails that dealt with this was an

Case 4:05-cv-40072-FDS     Document 79     Filed 04/27/2007     Page 19 of 25

94

1    e-mail that was written by somebody to Bob Bullock

2    in which he asked about Landworks, and "Is there any

3    reason why we're not pursuing this guy?"

4         And someone writes back that Russ Fuller

5    has a problem with this guy.  And then he states

6    that -- he says something to the effect that "Then I

7    will tell him that we can't deal with him as long as

8    the lawsuit is pending."  And then someone else

9    writes back and says, "Don't do that if you have not

10   already done so."

11        So through all this my feeling was that,

12   you know, these were people that I had dealt with

13   before.  I had seen, you know, the first

14   ratification.

15        Q.   Yes.

16        A.   And that these were the people that I

17   needed to talk to, to go through.  And to be taken

18   from a point of where it looked like they were going

19   to -- let's get this resolved and everything, and

20   then all of a sudden saying they can't talk to me,

21   and I think even after the e-mails that I had

22   written about this where I suggested we meet with

23   him, I think I wrote him one more e-mail that said,

24   "Did you pass the information along, and will they

95

1   meet?", and then finding out later on that this was

2   not really the case.

3           It wasn't the case that they couldn't deal

4   with me.  It was a case that one person, who I have

5   never met in my life, as far as I know, has a

6   problem with me, and --

7       Q.   That would be Russ Fuller, the lawyer?

8       A.   Russ Fuller or whoever it was -- I'm not

9   certain if -- I know that in one e-mail it says

10  that, I think it was, "Russ Fuller has a problem

11  with this guy."  It was in response to an e-mail

12  from Mr. Bullock saying, "Why aren't we pursuing

13  this guy?"  And he says, well, I think it was, "Russ

14  Fuller has a problem with this guy."

15          And then to find that out later on, just --

16  you know, it just added more to the fact that the

17  only thing we had to do was to talk about this, and

18  we could have resolved it, and nobody would talk to

19  me.

20          And to have everything, you know, my life,

21  sitting there put on hold for three years because

22  one person will not talk to me -- lawsuits can be

23  resolved every day.  They can be resolved without

24  having to go through depositions and courtrooms and

96

1    anything else if just they would talk.  And the only

2    thing he had to tell me then was give me an honest

3    answer, and I don't think that he gave me an honest

4    answer.

5            THE WITNESS:  If you don't mind, can I have

6    just like a minute or two.

7            MS. BROWN:  Yes, we'll take a short break.

8            (Recess)

9    BY MS. BROWN:

10   Q.    Did you think that Landworks and the surety

11   were legally obligated to ratify your contract, your

12   Jackson contract?

13           MR. MELTZER:  Objection.  Answer if you

14   understand the question.

15   A.    Actually, I considered I already had a

16   contract with the surety.  That's what I considered

17   the ratification agreement to be, was a contract

18   with the surety to proceed and finish the work on

19   the Shrewsbury Middle School.

20   Q.    Which contract are you referring to?

21   A.    I'm talking about the ratification

22   agreement.

23   Q.    After the Standen failure?

24   A.    After the Standen failure, Lovett Silverman

97

1    had ratified me.  And my understanding of that,

2    which I don't know the legal stuff, but my

3    understanding of that was that was basically going

4    to be my contract to finish the job, the

5    ratification agreement.

6        Q.    So you didn't believe that you needed a new

7    contract after Jackson failed?

8        A.    No, not really.  I believe that I had one

9    that had been -- that had been negotiated before.

10   But I had never been through this before, so I

11   didn't -- I was sort of -- I didn't know, but I felt

12   that I had a contract already with USF&G, or St.

13   Paul's, whoever, that was the ratification

14   agreement, that that was my contract with them.

15   So...

16       Q.    Now, just before we took our break, we were

17   finishing up this series of e-mails, and I believe

18   you made reference -- Mr. Bullock said to you,

19   "Neal, I will pass the suggestion along to Russ

20   Fuller at St. Paul Travelers."  And then you

21   responded back a few days later, "Dear Mr. Bullock,

22   Did you pass on my request...  and if so, what was

23   the response?"

24           And Mr. Bullock says, "See my response to

98

1    you of Friday, August 19th."  This is the final

2    page.  "This matter has been passed to the surety's

3    attorney.  The communication will come through the

4    attorneys.  Thank you."  And I think you testified

5    about your disappointment about receiving this

6    response.

7        A.    Yes.

8        Q.    Now, do you believe that Mr. Bullock lied

9    to you about anything here?

10       A.    I believe that he lied to me -- that to me

11   is a strong word also, so let me restate that.  I

12   don't believe that Mr. Bullock was truthful,

13   completely truthful to me, when he stated the

14   reasons why he could not deal with me.

15       Q.    What do you think --

16       A.    I don't believe -- I have no reason to

17   suspect that his last response on Tuesday, August

18   23rd, was not being truthful, that he had already

19   passed this on to the attorneys.  But prior to that,

20   I think that the initial statement, that he said

21   that he couldn't deal with me because of the pending

22   lawsuit, was untruthful.

23       Q.    And what was the truth, in your view?

24       A.    That he couldn't deal with me because Russ

99

1    Fuller had a problem with me.

2         Q.    Any other untruths that you believe you

3    were told by Mr. Bullock?

4         A.    At this time I can't think of any more, no.

5         Q.    Did you have any communications with anyone

6    else at Lovett Silverman?  And now I'm referring not

7    to at the time of the ratification of the contract

8    you had with Standen, but I'm referring to the post-

9    Jackson-failure time frame.

10        A.    Mr. Bullock was, as far as I know, Mr.

11   Bullock was the only one that I had contact with.

12   He was the only one at that time who spoke to me or

13   communicated to me in e-mail also.

14        Q.    Do you believe Lovett Silverman did

15   anything wrong in how Lovett Silverman handled the

16   Jackson failure and dealt with you on the Jackson

17   failure?  Should they have done something different?

18             MR. MELTZER:    Objection.

19        A.    Yes.

20        Q.    What did Lovett Silverman do that was wrong

21   in your mind?

22        A.    I think that they could have taken my

23   information and that they could have looked at it

24   for the validity of it and could have communicated

100

1    to the surety that there was a legitimate claim here

2    and that maybe we should speak with them.  And this

3    is only, now I'm talking about, the portion of the

4    second ratification process.  This doesn't go any

5    further than that point right there.  There are

6    other issues later.

7        Q.   And what else should they have done --

8    we're talking about this time frame in August of

9    2005, the time of these e-mails that you believe

10   that Lovett Silverman was wrong in their conduct and

11   that they should have done what you just described.

12   Is there anything else that you think Lovett

13   Silverman did wrong and should have done

14   differently?

15       A.   I can't think of anything at this point in

16   time.

17       Q.   Did there come another point in time when

18   you believe Lovett Silverman did something wrong?

19       A.   Yes.

20       Q.   And what was that?

21       A.   That would have been in early 2006.  I'm

22   not certain what the dates are.  But there are

23   e-mails in which attorneys for the surety asked

24   Lovett Silverman to help prepare a counterclaim

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## SECOND SUPPLEMENTAL STATEMENT OF FACTS OF THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC., IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

With the consent of counsel and leave of the Court, Defendant Lovett-Silverman

Construction Consultants, Inc. ("Lovett-Silverman") respectfully submits this Second

Supplemental Statement of Facts in Support of its Motion for Summary Judgment.  This

Statement is meant to supplement Exhibit C to the Statement of Facts in Support of Lovett-

Silverman's Motion for Summary Judgment, of which an incomplete copy was previously

submitted.

### II.    SUPPLEMENTAL STATEMENT OF FACTS

1.    On or about January 10, 2003, Lovett-Silverman entered into an Agreement with St.

Paul Fire and Marine Insurance Company ("St. Paul") (the "Lovett-Silverman Agreement").  A true

and accurate copy is attached hereto as Exhibit A.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo_____
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

Dated:  June 1, 2007

01095004

2

## CERTIFICATE OF SERVICE

    I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on June 1, 2007.

/s/ Julie A. Ciollo _____
Julie A. Ciollo

3

# EXHIBIT A

05/18/2004  15:29  6319797602          LOVETT SILVERMAN          PAGE  02/03

## EXHIBIT A

COPY

## FIRE AND MARINE WORK ASSIGNMENT
### Revision 0
### April 13, 2004

THIS WORK ASSIGNMENT is subject to the terms of the Professional Services Agreement between the parties, dated January 10, 2003 (the "Agreement"). The terms of this Work Assignment shall control if there is a conflict with the terms of the Agreement.

**PRINCIPAL:**    Standen Contracting Company, Inc.

**CONTRACTOR:** Lovett Silverman Construction Consultants

**SERVICES PERFORMED BY:**    Al Falango, Rick Noblet

**FEES:**

| | | |
|---|---|---|
| Number of Work Hours:  800 x $ 130 /hr | $ | 104,000 |
| Number of Travel Hours: _____ x $_____ /hr | $ | Included above |
| Transportation Costs: | $ | 5,000 |
| Lodging/Meals | $ | 0 |
| Other:  Miscellaneous expenses (photographs, copies, etc.) | $ | 15,000 |

**ESTIMATED TOTAL:**                                    $    124,000

**START DATE:**  January 01, 2004

**END DATE:**    July 31, 2004

**CLAIM NO(S).:**    SW5041

**PROJECT NO(S).:**

**PROJECT NAME(S):**    Shrewsbury Middle School, Shrewsbury Massachusetts
Westford – North Street, Westford Massachusetts
Bryantville Elementary, Pembroke, Massachusetts
Wrentham Safety Complex, Wrentham Massachusetts
Old Hammondtown School, Mattapoisett Massachusetts

**RECEIVED**

**JUN 2 8 2004**

**SURETY CLAIM**

**FIRE AND MARINE CONTACT:** Russ Werner (410) 578-2025

**DESCRIPTION OF SERVICES:**

1. Complete a preliminary investigation of the jobsites at Shrewsbury Middle School and Westford to assess the progress to date and the ability of the principal to complete the work.
2. Obtain project documentation from the office's of Standen Contracting
3. Shrewsbury:
   a. Ratify subcontractors and suppliers
   b. Assist in the assignment of the Completion contractor,

4. Westford:

05/18/2004  15:29  6319797682              LOVETT SILVERMAN                    PAGE  03/03

  a.  Ratify subcontractors and suppliers
  b.  Solicit lump sum price for completion of work and review same.
  c.  Assist in assignment of the Completion contractor

5.  Bryantville Elementary & Wrentham Safety Complex:
  a.  Investigate work remaining of these two projects
  b.  Obtain available documentation from Standen's office.
  c.  Advise as to best course of action to complete the work at these sites
  d.  Assist in completion of work.
  e.  Ratify subcontractors and suppliers.

6)  Old Hammondtown
  a.  Investigate work remaining.
  b.  Obtain available documentation from Standen's office.
  c.  Advise as to best course of action to complete the work at these sites
  d.  Assist in completion of work.
  e.  Ratify subcontractors and suppliers.


**SPECIAL TERMS AND CONDITIONS**


Contractor represents that it does not currently represent any other party with any interest in this matter and that there are otherwise no conflicts of interest to this work assignment which would in any way impair Contractor to fulfill its obligations to Fire and Marine or its ability to provide objective information to Fire and Marine.

**IN WITNESS WHEREOF**, the parties by their authorized representatives have signed this Work Assignment.

| ST. PAUL FIRE AND MARINE INSURANCE COMPANY | CONTRACTOR |
|---|---|
| Signature: _____ | Signature: _____ |
| Name:  Robert E. Schumaker | Name:  ANTHONY J. LEONARD |
| Title:  Director of Engineering | Title:  REGIONAL MANAGER |
| Date:  5/28/04 | Date:  5/18/04 |

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY

Signature: WRWerner

Name:  Russ Werner

Title:  Engineer

Date:  May 19, 2004


cc:    Claim Attorney

       File


MAY 18 2004 16:05

## PROFESSIONAL SERVICES AGREEMENT

**THIS PROFESSIONAL SERVICES AGREEMENT** ("Agreement") is entered into by and between St. Paul Fire and Marine Insurance Company, ("Fire and Marine") and *Lovett Silverman* , ("Contractor").

**PURPOSE AND SCOPE.** Contractor has represented that it is capable of supplying qualified, trained and experienced personnel to provide the Services as identified below. The parties agree that Contractor will provide Services to Fire and Marine and its subsidiaries and affiliates pursuant to the terms and conditions contained in this Agreement.

1. **WORK ASSIGNMENTS**

   A. Services. Contractor agrees to assign employees who possess the requisite skillsets to provide Services requested by the Surety Claim Operation at Fire and Marine. The Services to be provided by Contractor must be memorialized by a written Work Assignment, **Exhibit A** ("Services"). Fire and Marine shall not have the right to assign to any of Contractor's employees any assignments not set forth on the Work Assignment. Nothing in this Agreement will preclude Fire and Marine from (a) contracting with other persons or entities engaged in the same or similar business as Contractor, or (b) independently developing or acquiring materials or services that are similar to or competitive with Contractor. Prior to performing any Services, Contractor will execute and return to Fire and Marine the applicable Work Assignment.

   B. Acceptance. Fire and Marine has the right to review all Services performed under a Work Assignment prior to payment. Fire and Marine reserves the option to reject any unacceptable Services and/or to require Contractor to repeat, correct or replace any unacceptable Services at no additional charge.

   C. Performance Standards. Contractor understands that its performance under this Agreement will be monitored by Fire and Marine with respect to such factors as: (a) competitiveness of rates; (b) quality of Services supplied; (c) responsiveness in supplying qualified employees to perform the services (d) effectiveness of Contractor systems and processes; and (e) compliance with Fire and Marine processes and procedures.

   D. Management Committee. Within two (2) days after the effective date of this Agreement, Fire and Marine and Contractor shall each appoint a member from their respective management staffs to serve as Management Liaison. The Management Liaison shall be authorized and responsible for generally overseeing the performance of this Agreement.

2. **PERSONNEL**

   A. Project Staff. Contractor shall recruit and provide employees with suitable training and skills to perform the Services. Contractor represents and warrants that each Contractor employee assigned to perform any services for Fire and Marine shall have been fully briefed on his/her obligations under this Agreement to Fire and Marine.

   B. Subcontractors. Contractor may subcontract the Services to other parties only with Fire and Marine's consent, which consent Fire and Marine may withhold for any reason whatsoever.

RECEIVED

JAN 1 0 2003

SURETY CLAIM

If Fire and Marine consents to a particular subcontract, Contractor shall assume the same liability and responsibility for that subcontractor's conduct and performance as if Contractor performed all of the subcontractor's services. Fire and Marine will not incur any additional fees, costs or charges with regard to any subcontract unless otherwise approved in writing by Fire and Marine. Contractor agrees to require subcontractors to: (a) comply with all applicable federal, state and local laws, executive orders and regulations issued; and (b) abide by all of the terms and conditions of this Agreement

C.  Solicitation of Personnel.  During the term of this Agreement, Contractor agrees not to solicit for employment or engagement by Contractor or any other person any employee of Fire and Marine without Fire and Marine's prior authorized written consent.

## 3.  ADMINISTRATIVE MATTERS

A  Compliance.  Contractor and Contractor's employees shall at all times during the term of this Agreement, conform to and comply with all applicable federal, state, and local laws, regulations, orders and other governmental requirements, now or hereafter in force, that relate to the performance of the Services, including, by way of illustration and not limitation, all worker's compensation, social security, unemployment insurance, hours of labor, wages, working conditions, employment discrimination and other employer/employee related matters, the Fair Labor Standards Act, the Williams-Steiger Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. sections 9601 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. sections 6901 et seq.) the Family & Medical Leave Act; Title VII of the Civil Rights Act of 1964; the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, section 790.03 of the California Insurance Code, and the Immigration Reform & Control Act of 1986. Contractor shall verify the identity and work authority of its personnel under the U.S. immigration laws. Contractor and Contractor's employees are not provided or granted any benefit provided to Fire and Marine employees. Contractors and its employees expressly disclaim and waive any interest in or claim to employee benefits of Fire and Marine.

B  Conduct of Project Staff  While at Fire and Marine locations, Contractor shall require its personnel to: (a) comply with requests, rules, and regulations of Fire and Marine regarding personal and professional conduct (including the wearing of an identification badge or personal protective equipment, maintaining a professional appearance, and adhering to regulations and general safety and security practices or procedures) generally applicable to Fire and Marine locations, (b) be courteous and professional, and (c) otherwise conduct themselves in a businesslike manner.  In the event that Fire and Marine determines in good faith that a particular member of Contractor's personnel is not conducting himself or herself in accordance with this Section, Fire and Marine may, in its discretion, (a) require Contractor to immediately remove him or her from the Fire and Marine location, or (b) provide Contractor with notice and documentation in respect of such conduct. Upon receipt of such notice, Contractor shall promptly correct the improper conduct and, if such improper conduct is not corrected within a reasonable time or any time period specified by Fire and Marine, Contractor shall (a) remove him or her, and (b) provide Fire and Marine with prompt notice of such removal.   Nothing herein shall prevent Fire and Marine from immediately terminating its need for Contractor's services as described in Section 4 of this Agreement.

C.  Substance Free Workplace Policy Suitability Screening  Contractor understands that all of Fire and Marine's places of business are a weapon, smoke, drug, and alcohol free zones ("Free Zone").  Contractor will take all steps necessary and appropriate in accordance with

applicable law to maintain the Free Zone in the assignment and management of personnel performing Services. When Contractor's personnel are engaged to work at Fire and Marine's office(s) on a routine basis, unless otherwise approved in writing by Fire and Marine, Contractor shall ensure that all personnel, including its subcontractors, have successfully passed all requisite drug and background screening prior to commencement of Services to include: (a) criminal history check including felonies and misdemeanors; (b) education and employment verification to confirm all employment positions and degrees earned; (c) drug testing to be performed in accordance with industry standards and applicable law; (d) credit check for assigned personnel having access to Fire and Marine funds; and (e) motor vehicle report for assigned personnel having access to Fire and Marine vehicles. Fire and Marine may require that Contractor remove and permanently exclude any individual providing Services in violation of the Free Zone. Prompt replacement is required. Fire and Marine reserves the right to deny payment for a Work Assignment performed by an individual found to violate the Free Zone and Contractor shall be responsible for any damages incurred as a result of that person's conduct or any untimely departure.

4.  **TERM AND TERMINATION**

This Agreement will become effective on the date set forth on the signature page. This Agreement shall continue unless terminated by either party upon thirty (30) days prior written notice to the other party. Fire and Marine may terminate any Work Assignment at any time for any reason upon prior written notice to Contractor. Either party may terminate this Agreement immediately for an uncured breach by the other party. Any license granted by this Agreement will not be affected or limited by termination. Fire and Marine will pay Contractor for all accepted, undisputed Services and reimbursable expenses accrued as of the effective date of termination of a Work Assignment.

5.  **PAYMENT**

A.  Fee for Services. Unless otherwise specified in the applicable Work Assignment, Fire and Marine agrees to pay Contractor for the Services, monthly in arrears.

B.  Expenses. Fire and Marine will only reimburse Contractor for approved expenses authorized for reimbursement by the St. Paul Billing Guidelines attached as Exhibit B.

C.  Invoice Procedures. All invoices are to be submitted to St. Paul Surety Director of Engineering or Director of Accounting. Contractor shall submit invoices on a monthly basis for hours worked the previous month by Contractor's employees. Fire and Marine will pay a properly submitted and undisputed itemized invoice, supported by all relevant receipts, within thirty (30) days of receipt. Invoices must include a brief description of the Services performed, the time expended by Contractor in performing the Services and expenses incurred during the preceding month, with supporting documentation allocated by project number, and Fire and Marine contact or project manager. Unless otherwise agreed upon in a Work Assignment, Contractor will not be compensated for Services or reimbursed for expenses which are invoiced more than ninety (90) days after the performance of such Services or the incurring of such expenses. An invoice will not be processed unless there is a current, approved budget relating to that invoice. Further, payment of any invoice may be delayed until receipt by Fire and Marine of the fully executed Work Assignment document

D.  The fees paid to Contractor pursuant to this Agreement are inclusive of any applicable sales, use, personal property, value added, or other taxes attributable to periods on or after the applicable effective date of the applicable Work Assignment(s) and based upon or measured by Contractor's cost in providing the Services under this Agreement, including all personal property and use taxes, if any, due on equipment or software owned by Contractor.

Contractor agrees to pay, and hold Fire and Marine harmless against, any penalty, interest, or additional tax that may be assessed or levied as a result of the failure or delay of Contractor or its agents to file any tax return or information required by law, rule or regulation.

## 6. RIGHTS TO WORK PRODUCT

A. <u>Work Product</u>. The parties acknowledge that performance of this Agreement may result in the discovery, creation or development of inventions, combinations, machines, methods, formulae, techniques, processes, improvements, software designs, computer programs, strategies, Fire and Marine specific know-how, data and original works of authorship ("Work Product"). Contractor agrees that it will promptly and fully disclose to Fire and Marine any and all Work Product generated, conceived, reduced to practice or learned by Contractor, either solely or jointly with others, during the term of this Agreement which in any way relates to the business of Fire and Marine. Contractor further agrees that neither Contractor nor any party claiming through Contractor or Contractor's employees, will make use of or disclose to others any Work Product or Fire and Marine Confidential Information relating to the Work Product, other than in the performance of this Agreement. Fire and Marine will have the right to inspect and review any and all Work Product created under this Agreement at any time and Contractor will provide Fire and Marine with immediate access to such Work Product, wherever located, upon request.

B. <u>Work Product Ownership</u>. Contractor agrees that, whether or not the Services are considered works made for hire or an employment to invent, all Work Product discovered, created or developed under this Agreement will be and remain the sole property of Fire and Marine and its assigns and Fire and Marine will have all copyright, patent and all other intellectual property rights with respect to such Work Product without regard to its origin.

C. <u>Transfer, Assignment and Waiver</u>. If and to the extent that Contractor or Contractor's employees or agents may, under applicable law, be entitled to claim any ownership interest in the Work Product, Contractor hereby transfers, grants, conveys, assigns and relinquishes exclusively to Fire and Marine any and all right, title and interest that Contractor or its employees now have or may hereafter acquire in and to the Work Product under patent, copyright, trade secret and trademark law in perpetuity or for the longest period otherwise permitted by law. If any moral rights are created, Contractor hereby waives and shall cause its agents and employees to waive such rights in the Work Product. To the extent such waivers are deemed unenforceable under applicable law, Contractor grants, and agrees to cause its employees and agents to grant, to Fire and Marine and its successors and assigns, the exclusive perpetual, irrevocable, worldwide and royalty-free license to use, modify, market and create derivative works based upon the Work Product without identifying or seeking the consent of Contractor or any of its employees or agents. Contractor further agrees to assist Fire and Marine in every reasonable way to obtain and, from time to time, enforce patents, copyrights, trade secrets and other rights and protection relating to said Work Product, and to that end, Contractor will execute all documents for use in applying for and obtaining such patents, copyrights, trade secrets and other rights and protections with respect to such Work Product, as Fire and Marine may desire, together with any assignments thereof to Fire and Marine or persons designated by it. Contractor's obligations to assist Fire and Marine in obtaining and enforcing patents, copyrights, trade secrets and other rights and protections relating to the Work Product will continue beyond the termination of this Agreement.

D. __License to Pre-existing Work__. Unless agreed in writing otherwise with Fire and Marine, if and to the extent that any pre-existing Contractor or third party rights, including software, are embodied in or required to utilize the Work Product, Contractor hereby grants to Fire and Marine and its affiliates for their benefit and for the benefit of their agents and/or customers, the irrevocable, perpetual, non-exclusive, worldwide, royalty-free, paid-up right and license to (a) use, execute, reproduce, display, perform, modify, distribute copies of and prepare derivative works based upon such preexisting rights and any derivative works thereof and (b) authorize others to do any or all of the foregoing in conjunction with Fire and Marine's business.

E. __Materials Return__. Upon the request of Fire and Marine, Contractor will immediately prepare a list of and return to Fire and Marine all copies, in whatever form, of any and all Confidential Information as defined in Section 7A, Work Product, and other materials obtained through the Work Assignment. Upon the request of Fire and Marine, Contractor is obligated to return all Fire and Marine Work Product, including electronic versions, hard copies and reproductions and will not retain copies of any such Work Product, and any Work Product stored on Contractor's computer systems shall also be deleted. Upon the prior written approval of Fire and Marine, Contractor, but not its subcontractors or employees, may be permitted to retain a copy of Fire and Marine Work Product for archival purposes only.

## 7. NON-DISCLOSURE OF INFORMATION

A. __Fire and Marine Confidential Information__. Contractor acknowledges that much, if not all, of the material and information which has or will come into Contractor's possession or knowledge in connection with the performance of this Agreement consists of confidential and proprietary information or software of or related to Fire and Marine and its affiliates, agents, customers or third parties ("Confidential Information"). Contractor agrees to hold such Confidential Information in strictest confidence and agrees not to release such information to any individual whether employee, subcontractor, or subcontractor employee, unless such individual has a need for such knowledge to perform services on behalf of Fire and Marine. Contractor shall be responsible for maintaining the security of such Confidential Information in its possession and for complying with all federal, state and local laws, regulations or other requirements governing the privacy and non-disclosure of such information. Contractor agrees that any materials prepared by Contractor which contain Confidential Information will be conspicuously marked with the caption, "Fire and Marine Confidential" or "Fire and Marine Registered Confidential," as directed by the responsible St. Paul representative. Contractor further agrees not to make use of Confidential Information for its own benefit or for the benefit of any third parties, other than for the performance of this Agreement, and not to release or disclose it to any other party either during the term or after the termination of this Agreement. In the event of any breach of this confidentiality obligation or of the obligations relative to the rights to Work Product, Contractor acknowledges that Fire and Marine would be irreparably injured by such a breach and that Fire and Marine shall be entitled to equitable relief, including injunctive relief and specific performance. Contractor also waives the requirement of any bond being posted as security for such equitable relief. Such remedies shall not be deemed to be the exclusive remedies for a breach of this Agreement, but shall be in addition to all other remedies available at law or in equity.

B. __Exclusions__. The above limits on disclosure do not include information which (a) is or becomes known publicly through no fault of the Contractor; (b) is learned by the Contractor from a third party entitled to disclose it; (c) is already known to the Contractor before receipt from Fire and Marine, as shown by the Contractor's written records; (d) is independently

developed by the Contractor, as shown by the Contractor's written records; or (e) must be disclosed by operation of law. The Contractor shall promptly notify Fire and Marine of any such request for disclosure in order to allow Fire and Marine full opportunity to seek the appropriate protective orders.

C. <u>Contractor's Confidential Information</u>. No Contractor information will be considered confidential unless disclosure and use of that information have been specifically identified and addressed in the Work Assignment or in a nondisclosure agreement.

D. <u>Third Party Confidential Information</u>. Contractor will not disclose or otherwise introduce confidential information of a third party. Contractor will also treat as Confidential Information and will not use or disclose except as necessary in providing services to Fire and Marine, any software licensed by Fire and Marine from a third party.

## 8. PRIVACY REQUIREMENTS

In the course of providing services under this Agreement, Fire and Marine may provide to Contractor or Contractor shall gain access to and generate personally identifiable, financial and/or health information of Fire and Marine consumers, customers, insureds or claimants which may include Fire and Marine Confidential Information (hereinafter collectively "Protected Information") which may be subject to federal, state and local laws. Contractor acknowledges and agrees that it shall only use the Protected Information for the purposes for which it was provided to Contractor under this Agreement and for no other purpose except pursuant to a written agreement signed by the parties. Except as required by applicable law or as necessary to carry out its obligations under this Agreement, Contractor shall not disclose Protected Information to a third party.

Each party shall be solely responsible for maintaining the security of such Protected Information in its possession in order to comply with the Privacy Requirement provided under this Agreement and under federal, state and local laws and regulations governing the privacy and non-disclosure of such information.

Contractor shall at all times comply with all federal, state and local laws and regulations applicable to a person who performs any of the functions or services performed by Contractor under the Agreement including but not limited to laws and regulations concerning privacy, confidentiality or security of personally identifiable financial or health information. Contractor shall immediately notify Fire and Marine of any violations of any such law or regulation applicable to provision of services under this Agreement or of any complaint or judicial or administrative proceeding initiated concerning any actual or alleged violation of such law or regulation. Upon termination or expiration of this Agreement, or at any time upon request of Fire and Marine, Contractor shall return all Protected Information in its or its subcontractor's possession or any other third party over which Contractor has control.

## 9. REPRESENTATIONS AND WARRANTIES

Contractor represents and warrants as follows:

A. <u>Services</u>. The Services will be performed in a professional and workmanlike manner and will be of a quality conforming to the highest standards generally accepted in the industry. Fire and Marine reserves any remedies which may be available.

B. <u>Ownership</u>. The Services and any Work Product will be Contractor's own work and will not infringe upon any United States or foreign copyright, patent, trade secret or other proprietary right, or misappropriate any trade secret of any third party, and it has neither assigned nor otherwise entered into an agreement by which it purports to assign or transfer any right, title or interest to any Work Product that would conflict with its obligations under this Agreement. Contractor warrants that it is not a party to any other existing agreement which would prevent Contractor from entering into this Agreement or which would adversely affect this Agreement.

C. <u>Malicious Codes</u>. Any Work Product that is software will be free of any and all "disabling devices," "drop dead devices," "time bombs," "trap doors," "trojan horses," "worms," or other computer viruses detectable by current industry standard means and copy protection mechanisms, which may disable the Work Product or any similar types of software infirmities. Contractor will scan his electronic Work Product utilizing current industry standard means prior to sending Work Product to Fire and Marine and Contractor will be responsible for any data loss which results from such virus if present in his Work Product when delivered to Fire and Marine. Any Work Product provided will not contain any authorization codes or disabling mechanisms which may prohibit access to the Work Product, any data base or other software.

E. <u>Contractor's Viability</u>. Contractor has the financial capacity to perform and continue to perform its obligations under this Agreement, that no legal proceedings have been threatened or brought against Contractor that could threaten performance of this Agreement and that entering into this Agreement is not prohibited by any contract, applicable law, governmental regulation or order by any court of competent jurisdiction. Contractor shall immediately notify Fire and Marine in writing in the event of any material change that could effect this representation.

## 10. LIABILITY AND INDEMNIFICATION

A. <u>Indemnification</u>. Contractor shall indemnify Fire and Marine from, and defend Fire and Marine against, any and all liability or expenses (including attorneys' fees and expenses as reasonably incurred) arising out of or relating to (a) any claim that the Services or any Work Product infringes upon the intellectual property rights of any third party, (b) any act or omission by Contractor in its capacity as an employer of a person arising out of or relating to federal, state, local or other laws or regulations that relate to (1) the protection of persons or members of a protected class or category of persons, (2) unlawful discrimination or harassment, (3) accrued employee benefits, and (4) any other aspect of the employment relationship or its termination (including claims for breach of an expressed or implied contract of employment) and which, in all such cases, arose when the person asserting the claim, demand, charge, action, cause of action, or other proceeding was an employee of Contractor, (c) any amounts including taxes, interest, and penalties assessed against Fire and Marine which are obligations of Contractor or which relate to Contractor's workers who perform services for Fire and Marine, (d) personal injury, death, or damage to tangible personal or real property in any way incident to, or in connection with or arising out of the act or omission of Contractor, its employees, contractors, or agents, and (e) any claims asserted by workers paid by Contractor with respect to any employee benefit programs

maintained by Fire and Marine. Contractor shall be responsible for any costs and expenses, including attorney's fees, incurred by Fire and Marine in connection with the enforcement of this Section.

B.  Indemnification Procedure. With respect to any claim asserted by a person to which Section 9A applies, Fire and Marine will promptly notify Contractor in writing of the claim, allow Contractor to control the defense, and reasonably cooperate with Contractor in the defense and any related settlement negotiations. In addition to any defense provided by Contractor, Fire and Marine may, at its expense, retain its own counsel. If Contractor does not promptly assume Fire and Marine's defense against such claim, Fire and Marine reserves the right to engage its own counsel and otherwise undertake its own defense at Contractor's expense.

## 11. INSURANCE

A.  Insurance Certificates. All insurance obtained by Contractor will be (1) underwritten by an insurer having a minimum AM Best Insurance rating of "A". Contractor will furnish to Fire and Marine certificates of insurance and/or other appropriate documentation (including evidence of renewal of insurance) evidencing all coverage referenced below. Such certificates or other documentation must provide for thirty (30) days prior written notice to Fire and Marine prior to coverage cancellation, nonrenewal or alteration of the coverage by either Contractor or the applicable insurer. Such cancellation or alteration will not relieve Contractor of its continuing obligation to maintain insurance coverage in accordance with this Agreement.

B.  Insurance Limits. During the term of this Agreement, Contractor will maintain insurance of the type and in the amounts specified below, unless approved in writing otherwise by Fire and Marine:

(i)  **Workers' Compensation/Employers Liability** in accordance with all federal, state, and local requirements and shall include Employer's Liability coverage with a minimum limit of $500,000 each accident, with a policy limit of not less than $500,000, and $500,000 each employee;

(ii)  **Commercial General Liability** - $1,000,000 each occurrence and annual aggregate to include coverage for bodily injury, property damage and personal injury liability. Coverage shall include Premises/Operations, Products/Completed Operations Broad Form Property Damage, Independent Contractors Liability and Contractual Liability, along with "per project" aggregate. Medical payments - $10,000 per person, Fire Damage Liability - $500,000;

(iii)  **Business Automobile Liability** covering all vehicles that Contractor owns, hires, or leases in an amount not less than $1,000,000 (each accident for bodily injury and property damages);

(iv)  **Commercial Excess\Umbrella** in an amount not less than $2,000,000 each occurrence and annual aggregate;

(v) **Professional Liability** in an amount not less than $1,000,000 each occurrence;

(vi) **Employee Dishonesty** - $500,000 limit.

C. <u>Subcontractor Insurance</u>. Should any of the Services be subcontracted, Contractor shall require the subcontractors, or anyone directly or indirectly engaged by any of them, to procure and maintain the same coverages in the same amounts specified herein, unless approved in writing otherwise by Fire and Marine.

D. <u>Scope of Insurance and Special Hazards</u>. The insurance required under this Section shall provide adequate protection for Contractor and Fire and Marine against claims which may arise from operations performed by Contractor or by anyone directly or indirectly engaged by them in the performance of this Agreement. Contractor's insurance must respond on a primary basis without contribution from any other insurance carrier by Fire and Marine, until limits become exhausted. Fire and Marine retains the right to request an increase in the above stated insurance limits. All insurance policies carried by the Contractor shall contain waivers of any and all rights of subrogation against Fire and Marine.

## 12. DISPUTE RESOLUTION.

A. <u>Binding Arbitration and Jury Trial Waiver</u>. Any dispute with respect to this Agreement which is not resolved within ten (10) days shall at any time thereafter at the initiation of either party, be submitted to arbitration which shall be the exclusive means for resolving any such disputes. Such arbitration shall be held in Baltimore, Maryland and shall be conducted by JAMS/ENDISPUTE, Incorporated in accordance with its Arbitration Rules and Procedures then in effect. The arbitrators will be selected from a panel of retired judges and will have familiarity with dispute resolution. Any costs associated with the arbitration shall be borne by the non-prevailing party. All decisions of the arbitrators shall be binding on both parties. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY AND IRREVOCABLY WAIVE THEIR RIGHT TO A TRIAL BY JURY and agree that if the foregoing binding arbitration provision is determined for any reason to be unenforceable or inapplicable to a particular dispute, then such dispute shall be decided solely by a judge, without the use of a jury, sitting in a court of competent jurisdiction. This binding arbitration and jury trial waiver provision shall survive termination of this Agreement. Nothing in this Agreement will prevent the parties from applying for injunctive relief in any court of competent jurisdiction. Contractor shall be responsible for securing from each of its employees who perform services for Fire and Marine an agreement to abide by the terms of this section.

B. <u>Continuity of Services</u>. Fire and Marine and Contractor each acknowledges that provision of the Services is critical to the business and operations of Fire and Marine. Accordingly, in the event of a dispute between Fire and Marine and Contractor pursuant to which Fire and Marine in good faith believes it is entitled to withhold payment for the disputed portion of the Services and during the pendency of an arbitration pursuant to Subsection B above, Contractor shall continue to provide the Services and Fire and Marine shall continue to pay any undisputed amounts to Contractor.

## 13. GENERAL

A. <u>Independent Contractor</u>.  Contractor represents and warrants that it is an independent contractor with no authority to contract for Fire and Marine or in any way to bind or to commit Fire and Marine to any agreement of any kind or to assume any liabilities of any nature in the name of or on behalf of Fire and Marine.  Under no circumstances will Contractor, or any of its employees or subcontractors, hold itself out as or be considered an agent or an employee of Fire and Marine.  It is expressed, understood, and agreed for all purposes by Contractor that no person, whether an individual or an employee of Contractor will be considered an employee of Fire and Marine, nor will any such person be entitled to any benefits that Fire and Marine provides to Fire and Marine employees.

B. <u>No Joint Employer</u>.  Except when Services are provided by its authorized agents or subcontractors, Contractor shall be the sole employer of all individuals performing services hereunder and agrees to comply with all applicable federal, state, and local laws and regulations pertaining to the employment of employees, including but not limited to the statutes listed in Section 3A. of this Agreement; the withholding and payment of payroll taxes; prohibitions against discrimination; minimum wage and wage payment statutes.  Only Contractor shall have the right to hire and fire its employees, provide instructions as to the manner in which an employee performs his or her job and to set the hours of work of its employees.  In addition, Contractor shall manage all employment aspects of any employees assigned to Fire and Marine's account, including, without limitation, employment based counseling, terminations, salary reviews, performance evaluations, work schedules, orientation, placement and rotation of assignments.  The parties further acknowledge and agree that any employees of Contractor assigned to Fire and Marine's account shall have no rights or entitlements to any of Fire and Marine's employee benefit plans.  Contractor shall assume sole and exclusive responsibility for the payment of wages to its personnel for services performed for Fire and Marine.  Contractor shall, with respect to its assigned employees, be responsible for withholding federal, state and local income taxes, paying Social Security taxes, unemployment insurance and maintaining workers' compensation insurance coverage in an amount and under such terms as required by State law.

C. <u>Governing Law</u>.  This Agreement shall be governed by the laws of the State of Maryland, without giving effect to principles of Conflict of Laws or the United Nations Convention on the International Sale of Goods, and shall benefit and be binding upon the parties hereto and their respective successors and assigns.  In the event that the Uniform Computer Information Transactions Act, any version thereof or a substantially similar law ("UCITA") is enacted as part of the law of Maryland, said statute shall not govern any aspect of this Agreement, any license granted under this Agreement, nor any of the parties' rights and obligations arising pursuant to this Agreement.  The Agreement and the Parties' rights and obligations shall be governed by the law as it existed prior to the enactment of the UCITA Law.  The parties hereby consent to jurisdiction in the State of Maryland and agree that the courts within Maryland shall have exclusive jurisdiction over any issues regarding the enforcement of this Agreement.

D. <u>Audits</u>.  Upon notice from Fire and Marine, Contractor shall provide such auditors and inspectors as Fire and Marine or any regulatory authority may designate in such notice with reasonable access during normal business days and hours to Contractor's business locations for the purpose of performing audits or inspections of the business systems and processes of Contractor utilized in connection with supporting the delivery of Services to Fire and Marine under this Agreement.  Contractor shall provide such auditors and inspectors or a regulatory authority having jurisdiction over Fire and Marine or Contractor with any assistance that they

may reasonably require. In the event access to Contractor customer data is required, access will be provided in such a way as to preserve the confidentiality of Contractor's customer data. Fire and Marine may notify Contractor of any deficiencies in its business systems and processes, and Contractor agrees to correct such deficiencies or failure to comply within the time period specified by the auditors/inspectors.    Reference Exhibit B for more specific Auditing requirements regarding Contractor invoices.

E.  <u>Advertising</u>.  Contractor shall not use Fire and Marine's name or refer to Fire and Marine or any of its affiliates, directly or indirectly, in any manner without receiving prior written approval from Fire and Marine's authorized representative.

F.  <u>Notices</u>.  Any notice given pursuant to this Agreement must be in writing and will be given by overnight courier service, personal delivery, or by United States certified mail, return receipt requested, postage prepaid, to the addresses appearing at the end of this Agreement, or as changed through written notice to the other party.  Notice will be deemed effective on the date it is delivered to the addressee.  Either party may change its address for notice purposes by giving the other party notice of such change in accordance with this Section.

G.  <u>No Electronic Signatures or Records</u>.  For all purposes of providing (a) notices or other communications required or permitted by this Agreement, (b) waiving any right under this Agreement, or (c) amending any terms or provision of this Agreement and notwithstanding any law recognizing electronic signatures or records, "a writing signed" and "in writing" shall mean only a writing in tangible form bearing an actual "wet" signature in ink manually applied by the person authorized by the respective party, unless both parties agree otherwise by making a specific reference to this section of this Agreement.

H.  <u>No Waiver</u>.  The failure of either party to insist upon a strict performance of or to seek remedy of any one of the terms or conditions of this Agreement or to exercise any right, remedy or election set forth herein or permitted by law shall not constitute nor be construed as a waiver or relinquishment for the future of such term, condition, right, remedy or election, but such items shall continue and remain in force and effect.  All rights or remedies of either party specified in this Agreement and all other rights or remedies that either party may have at law, in equity or otherwise shall be distinct, separate and cumulative rights or remedies, and no one of them, whether exercised by the party seeking enforcement or not, shall be deemed to be in exclusion of any other right or remedy of such party.  Any consent, waiver or approval by either party of any act or matter must be in writing and shall apply only to the particular act or matter to which such consent or approval is given.

<u>Assignment</u>.  This Agreement may not be assigned by Contractor without the written consent of Fire and Marine which may be withheld for any reason, and any such purported assignment, including full or partial assignment or delegation to any agent or subcontractor, is void.

J.  <u>Captions</u>.  The captions are for convenience and in no way define, limit or enlarge the scope of this Agreement or any of its Sections.

K.  <u>Severability</u>.  If any provisions of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement, or the application of such provisions or circumstances other than those as to which it is determined to be invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

L. <u>Survival.</u> The provisions of this Agreement regarding Representations and Warranties, Rights to Work Product, Non-Disclosure of Information, Privacy Requirements, Liability and Indemnification, Arbitration and Survival will survive the expiration or termination of this Agreement or any applicable Work Assignment.

M. <u>Affiliates. Business Partners.</u> Fire and Marine shall be entitled, at its discretion, to extend the terms of this Agreement to Fire and Marine affiliates, agents, customers and business partners.

## 14. ENTIRE AGREEMENT

The following are attached to this Agreement and are incorporated by reference and made a part of this Agreement for all purposes:

**Exhibit A** Work Assignment Standard Form;

This Agreement and its Exhibit(s), constitute the entire agreement between the parties and supersedes any and all previous representations, understandings, discussions or agreements between Fire and Marine and Contractor as to the subject matter hereof. The parties further agree that they are not relying upon any representations, statements, or agreements from the other as a basis for entering into this Agreement except for those expressly set forth in this Agreement. This Agreement may only be amended by an instrument in writing signed by Fire and Marine and Contractor. Terms in a Work Assignment have precedence over conflicting terms in this Agreement, but have applicability only to that Work Assignment. Any modification or extension of a Work Assignment must be by written amendment to that Work Assignment.

Fire and Marine and Contractor each acknowledge that it has had the opportunity to review this Agreement with its legal counsel.

Executed on the dates set forth below by the undersigned authorized representatives of the parties and effective as of _____ 1/10/03 _____.

| ST. PAUL FIRE AND MARINE INSURANCE COMPANY | CONTRACTOR |
|---|---|
| By: | By: |
| Signature: _Bruce L. Corrigan_ | Signature: _Lovett_ |
| Name: _Bruce L. Corrigan_ | Name: _John J Lovett_ |
| Title: Its _AVP_ | Title: Its _President_ |
| Date: _1/13/2003_ | Date: _9 Jan 2003_ |

ok
NCS
1/13/03

Case 4:05-cv-40072-FDS     Document 98-12     Filed 03/05/2008     Page 19 of 19
JUL 05 2006 05:32 FR ST PAUL CO          420 000 0010 10 3120000
Case 4:05-cv-40072-FDS     Document 80-3     Filed 06/01/2007     Page 8 of 8

Address for Notice:                               Address for Notice:

St. Paul Fire and Marine
Insurance Company
5801 Smith Avenue
Baltimore, MD 21209
ATTN: Senior Vice President – Surety Claim        Attention: Executive Officer


Address for Invoices:

St. Paul Fire and Marine Insurance Company
Surety Claim
Mail Code: MC41
5801 Smith Avenue
Baltimore, MD 21209
Attention: Director of Engineering – Surety Claim


Revised 01/09/200311/15/200211/06/2003          13          Fire and Marine Confidential

** TOTAL PAGE.14 **

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | AMENDED COMPLAINT |
| | ) | |
| UNITED STATES FIDELITY AND | ) | |
| GUARANTY COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |

1. Plaintiff, Landworks Creations, LLC ("the Plaintiff") is a limited liability corporation with a principal place of business at 1500A Lafayette Road in Portsmouth in the State of New Hampshire.

2. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("USF & G") is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts.

3. Defendant, Lovett-Silverman Construction Consultants, Inc. ("L-S") is a business entity with a principle place of business at 380 Townline Road, Haupauge, in the state of New York.

4. Jurisdiction may be had over L-S based upon the conducting of business by L-S in the Commonwealth of Massachusetts, and by nature of its torts within the Commonwealth of Massachusetts, and based upon the existence of offices within the Commonwealth of Massachusetts.

5.   The Plaintiff entered into a contract with Standen Contracting Company, Inc. of North
     Dartmouth, Massachusetts.

6.   The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at
     the Shrewsbury Middle School ("the Project")

7.   Standen Contracting Company, Inc. was bonded by USF & G, United States Fidelity &
     Guaranty Co.

8.   Standen Contracting Company, Inc. was unable to complete its work at the Project, and
     USF & G, pursuant to its obligations under a performance bond SW5041 assumed
     responsibility for completion of the Project in the stead of Standen Contracting Company,
     Inc.

9.   The Plaintiff has performed it work under the Standen contract, and is owed funds by
     USF & G for the work performed.

10.  USF & G has failed to pay the Plaintiff for work performed at the Project, to the extent of
     $135,101.00.

11.  At some point in the winter of 2004-2005, or in the spring of 2005, USF & G brought L-S
     to the Project to oversee completion of the Project.

12.  L-S engaged in a scheme to reduce costs to USF & G on the Project by refusing to
     authorize payments to subcontractors, including the Plaintiff, by engaging in extortion
     toward the subcontractors, by strong-arming the subcontractors and by attempting to deny
     the subcontractors their rights under their contracts.

13.  L-S also engaged in conduct that compelled subcontractors to file suit to receive
     payment, as part and parcel of a scheme to extort payments from subcontractors to USF
     & G through frivolous and fraudulent lawsuits.

2

14. In the words of Al Falango at L-S, there was an organized and on-going effort by L-S "to bang the subs…"

15. Landworks was a victim of L-S's conduct.

## COUNT I
### BREACH OF CONTRACT
### LANDWORKS v. USF & G

16. The Plaintiff restates allegations 1-16 and incorporates them by reference.

17. USF & G breached its contract by failing to perform its obligations to make payment under the bond between USF & G and Standen for the benefit of the Plaintiff..

18. As a result of this breach, the Plaintiff has been denied its expectancy and has otherwise been harmed.

## COUNT II
### FRAUD
### LANDWORKS v. BOTH DEFENDANTS

19. The Plaintiff restates allegations 1-18 and incorporates them by reference.

20. The Defendants engaged in specific conduct which serve as fraud on the Plaintiff:

a. the Defendants failed to effectuate payments of monies due and owing

b. knowing that funds were due and owing, the Defendants engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract

c. knowing that funds were due and owing, the Defendants devised and carried out a conspiracy to "bang" Landworks.

3

d.   knowing that the Plaintiff was not culpable for defects at the site, USF & G alone and
     with the support of L-S defamed the Plaintiff, making knowingly false statements in court
     papers to defend its failure to pay, and otherwise, by its conduct, implying defects in
     performance that harmed the Plaintiff in its business

e.   knowing that the Plaintiff was not culpable for defects at the site, USF & G filed false
     statements with this Court, obstructed access to documents by thwarting the discovery
     process, asserted false affirmative defenses, manipulated the legal system by removing
     this matter to the federal court in the hope of slowing the progress of litigation, assisted in
     and filed a knowingly false counterclaim.

f.   Knowing that the Plaintiff was not culpable for defects at the site, USF & G has engaged
     in a pattern and practice of hindering or delaying the resolution of this litigation.

21. This conduct, which constituted fraud on the Plaintiff, caused harm to the Plaintiff.

COUNT III
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

22. The Plaintiff restates allegations 1-21 and incorporates them by reference.

23. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere
    in the contract between the Plaintiff and USF & G, for ulterior motives.

24. L-S was aware of the advantageous business relationship between the Plaintiff and USF
    & G.

25. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

4

COUNT IV
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

26. The Plaintiff restates allegations 1-25 and incorporates them by reference.

27. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere

in the contract between the Plaintiff and USF & G, for ulterior motives.

28. L-S was aware of the advantageous business relationship between the Plaintiff and USF

& G.

29. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

COUNT V
CONVERSION
LANDWORKS v. USF & G

30. The Plaintiff restates allegations 1-29 and incorporates them by reference.

31. USF & G received the benefit of the Plaintiff's work, to a value of $135,000.

32. USF & G kept that value.

33. USF & G converted the value of that work to its own benefit.

34. As a result of this conversion, the Plaintiff has been harmed.

COUNT VI
VIOLATIONS OF c. 93A AND c. 176D
LANDWORKS v. BOTH DEFENDANTS

35. The Plaintiff restates allegations 1-34

36. The Plaintiff and both defendants are involved in trade or commerce.

5

37. Defendant, USF & G failed to investigate a claim and make prompt payment. Notwithstanding that liability was reasonably clear, USF & G has declined to make full settlement of the claim, without cause or excuse.

38. Defendant, L-S, set out to harm Landworks by denying it access to the Project and to funds due and owing.

39. The Plaintiff has made demand for its funds, a demand which has been ignored.

40. The pattern and practice of fraud, tortous interference and such conduct constitutes violations of c. 93A by L-S.

41. The pattern and practice by USF & G of refusing to make payments and to investigate violate both c. 93A and c. 176D.

42. As a result of this conduct, the Plaintiff has been harmed in its business.

COUNT VII
VICARIOUS LIABILITY
LANDWORKS v. USF & G


43. The Plaintiff restates allegations 1-42

44. To the extent that L-S was acting as an agent of USF & G,  USF & G is liable for the torts of its agents.

45. The Plaintiff was harmed by the tortous conduct of L-S.

46. Defendant, USF & G is liable for that harm.

COUNT VIII
NEGLIGENT SUPERVISION
LANDWORKS v. USF & G


47. The Plaintiff restates allegations 1-46

48. To the extent that L-S was acting as an agent of USF & G, USF & G had a duty to supervise its agent to assure that the agent did not commit harm.

49. Defendant, USF & G breached that duty.

As a result of its negligence, the Plaintiff was harmed.

WHEREFORE, the Plaintiff respectfully requests that:

1. this Honorable Court enter judgment against USF & G as to all Counts in which it is named;

2. this Honorable Court enter judgment against L-S as to all Counts in which it is named

3. this Honorable Court award the Plaintiff the amount of $135,101 together with interest and costs, trebled, along with attorney's fees

4. this Honorable Court award damages in an amount that will make the Plaintiff whole on the tort claims, trebled, along with attorney's fees; and

5. this Honorable Court award any further relief as deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: June 20, 2006