UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-CV-40072 FDS

| | |
|---|---|
| LANDWORKS CREATIONS, LLC | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY & | ) |
| GUARANTY COMPANY | ) |
| | ) |
| Defendant | ) |

### LANDWORKS CREATIONS, LLC 'S PRE TRIAL MEMORANDUM

Now comes the Plaintiff, Landworks Creations, LLC and provides this pre-trial memorandum to the Court. Notwithstanding the Court's Order waiving filing of the pre-trial memorandum, the Plaintiff believes that this memorandum will assist this Court in understanding the issues prior to trial.

I.  BRIEF STATEMENT OF THE CASE

This is a straightforward claim brought under G.L. c. 149 §29 for non-payment of sums due and owing to Plaintiff, Landworks Creations, LLC ("the Plaintiff") arising out of a construction project at the Shrewsbury Middle School, following the failure of Standen Contracting. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") provided the payment and performance bond that is in issue to

cover the amounts due and owing is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project"). Standen Contracting Company, Inc. was unable to complete its work at the Project, and the Defendant, pursuant to its obligations under a performance bond SW5041 assumed responsibility for completion of the Project in the stead of Standen Contracting Company, Inc. The Plaintiff has performed it work under the Standen contract, and is owed funds by the Defendant for the work performed. The Defendant has failed to pay the Plaintiff for work performed at the Project, claimed to the extent of $135,101.00.

## II. CONTESTED ISSUES OF FACT

The Defendant denies liability for work performed by Landworks, and has falsely claimed that Landworks abandoned the Project, and that the Defendant was required to complete the work at Landworks' expense. Landworks contests these facts. Landworks further believes it is entitled to payment of treble damages, as well as its attorney's fees based upon the Defendant's bad faith refusal to honor this straightforward claim.

The Plaintiff notes that Lovett-Silverman was the Defendant's eyes and ears on the ground, entrusted with the day to day obligation of the Defendant's responsibilities to the Plaintiff. The Defendant, alone and by its agent, utterly failed to comply with standard industry practice for reviewing and processing claims, and operating the construction site in accordance with industry standards and practices. Thus, the Defendant cannot claim

2

abandonment as a matter of law, or seek remedies against the Plaintiff. These breaches of industry standards, in conjunction with e-mail traffic which demonstrates a willful failure to comply with industry standards, warrants imposition of treble damages.

### III. PLAINTIFF'S WITNESS/EXPERT WITNESS LIST

Neal Matthews
Landworks Creations, LLC
PMB 291 1500A Lafayette Rd.
Portsmouth, NH 03801

Mr. Matthews has personal knowledge of the Plaintiff's contract with Standen Construction, the work performed by the Plaintiff on behalf of Standen, the invoices submitted to Standen and paid either by Standen or USF & G, as well as the attempted completion of the work with Jackson, the change orders signed and accepted by Jackson as agent of USF & G, the work itself, the invoices submitted and the damages sought. Mr. Matthews also has personal knowledge of his attempts to return to the site to perform any additional work that required performing and the Defendant's refusal to allow the Plaintiff to complete the work, notwithstanding that the Plaintiff was always ready, willing and able to perform work and had not been, in any way, terminated from the work.

William Gambill
Formerly of Standen Contracting
445 Faunce Corner Road
N. Dartmouth, MA 02747

Bill Gambill has familiarity with the scope of the Landworks/Standen contract, the work performed by Landworks, the invoices submitted by Landworks to Standen and

the monies paid, the condition and state of the project at the time Standen left the project, the payment and performance bond contracts with USF & G and the project supervision and oversight in general

Michael Pagano
Katie Crockett (sp?)
Todd Manning
Lamoureux Pagano Associates
14 East Worcester Street
Worcester, MA 01604

These are the project architects, with knowledge of the project overall, the scope of the work, the work performed by Landworks, the status of the project at the time Standen left the project, the administrative and contractual issues caused by Jackson, and the completion of the project.

Dan Morgado, Town Manager
 "Duffy" Lanciani Clerk of the Works
Robert Cox-Superintendent, Public Buildings Dept
Shrewsbury Town Hall
Shrewsbury, MA

The town manager has personal knowledge of the scope of the project in general, and the business side of the retention and termination of Standen, the negotiations with USF & G and the entire Jackson involvement in the project. Duffy has personal knowledge of the work, the progression of the work, and the conduct and misconduct of Jackson toward the subcontractors on the job. Cox was kept fully apprised of the scope of the work and the progress of the work, and the consequences of Jackson's failure to make appropriate payments.

Richard McGuinness

Frank Leonardo
Robert Barton
Jennifer Fletcher
Jackson Construction Company
20 Dan Road
Canton, MA 02021

Jackson Construction and its agents, employees and managers, have personal knowledge of the project overall, the Plaintiff's work, the invoices submitted, the invoices paid, the change orders submitted and the change orders approved and not paid, the condition of the work at the time the Plaintiff left the project, and the status of Jackson's lawsuit with USF&G. Frank Leonardo also worked for Standen and has the same personal knowledge as Gambill

Jeff Richards
Waterman Design Associates
31 East Main Street
Westborough, MA 01581

Waterman Design's staff engineer was familiar with the scope of the work, the progress of the work and the quality of the Plaintiff's work.

Craig M. Valente
D.A.Collins Construction Co.
Mechanicsville, NY

Mr. Valente is a contractor who was bidding a construction project in Newburyport. The Plaintiff was recommended to D.A. Collins by Waterman Designs based upon the staff engineer's recommendation based upon the quality of the Plaintiff's work at the project.

Jack Ferguson

CTM

CTM was the town's construction manager, with personal knowledge of the scope of the work, the progression of the work and the issues with the various contractors during the course of the project.


Robert Bullock
Lovett Silverman Construction Consultants, Inc.
19 Goldenrod Drive
Carlisle, PA 17013

Mr. Bullock is the construction consultant for the Defendant. Mr. Bullock has personal knowledge through communication with the Plaintiff that the Plaintiff was at all times ready, willing and able to meet with the consultant and to address issues of unpaid invoices and to return to the site to perform any work necessary at the site. Mr. Bullock has knowledge that he refused to meet with the Plaintiff, and refused to allow the Plaintiff to return to the site. He is expected to have knowledge as to why he wrote to the Plaintiff in August of 2005 stating "we checked with the surety and we were told that we can not deal with Landworks while the legal case is pending"


Tony Lardaro
Bill Mertz
Al Falango
Pedro Rosario
Lovett Silverman Construction Consultants, Inc.

Each of these individuals was apparently involved in the assessment, or lack thereof, of the claim of Landworks, LLC, and otherwise was involved in the completion of the project at the Shrewsbury Middle School, and in the search for replacement contractors, ratification of contractors and the decision not to ratify Landworks LLC.

These individuals also have personal knowledge of Defendant, USF & G's failure to properly investigate the claim, and in preparation of a knowingly false counterclaim.

James M. Peters
Russell Fuller
United States Fidelity & Guaranty
Hartford, CT

      Mr. Peters, by his own affidavit, has "responsibility for the oversight, handling and management of claims arising under surety bonds executed by United States Fidelity and Guaranty Company…on behalf of Standen Contracting Company, Inc. Upon information and belief, Mr. Peters will be the primary witness pertaining to USF & G's unfair and deceptive claims settlement practices, with information pertaining to the methods and policies used by USF & G to resist valid claims through hindrance, delay, prolonged litigation and other means and methods to avoid payment of the Plaintiff's uncontested claims. Mr. Peters is also expected to testify as to the principal/agent relationship between USF & G and Jackson Construction, and USF & G's regular consent to litigation in the Massachusetts state courts. Mr. Peters is also expected to have knowledge regarding its awareness of Jackson's fraudulent and deceptive trade practices as noted in <u>United States Fidelity & Guaranty Co. v. Jackson Construction Co. et al</u>, 05-11397 NMG, and is expected to provide some explanation why it is credible for USF & G to rely upon Jackson in denying the Plaintiff's claim. Mr. Peters is also expect to have information as to why the surety blocked the Plaintiff from the site and why the surety prevented its agent for engaging in an investigation of the claim. Mr. Peters is also expected to have actual knowledge of the fraud claims brought against Jackson, and is expected to have actual knowledge of Jackson's fundamental unreliability.

Russell Fuller has the same general knowledge, and he participated in conversations in which Lovett-Silverman, in conjunction with USF & G, acted unlawfully toward Landworks, LLC in its ratification process. According to e-mails produced by Lovett-Silverman, Fuller had some form of unspecified "problem" with Landworks.

Kevin J. O'Connor, Esq.
Scott S. Spearing, Esq.
Eric Hipp, Esq.
Hermes Netburn O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109

On or about July 1, 2005, these individuals affixed their signatures under F.R.C.P. 11 to a suit filed against Jackson Construction in the United States District Court in Boston entitled United States Fidelity & Guaranty Co. v. Jackson Construction Co. et al, 05-11397 NMG which includes claims for fraudulent conveyance and unfair and deceptive trade practices, amongst other allegations. These individuals have broad knowledge of Jackson's pattern and practice of fraud in the construction industry.

Eric Hipp engaged in e-mail correspondence with employees of Lovett-Silverman shortly prior to the filing of the Counterclaim in which the false backcharges were specified. Hipp is expected to testify about the substance of his communications with Lovett-Silverman in which it was noted that Lovett-Silverman was not acting with proper speed in determining merit of Landworks' claims.

Brad Carver, Esq.
Hinshaw & Culbertson
One International Place
Boston, MA 02110

Mr. Carver has personal knowledge that he was informed by Plaintiff's counsel during the spring and summer of 2005 that the Plaintiff was ready, willing and able to return to the site to perform any work requested by the surety, that the surety and Jackson were unlawfully barring access to the site and that the Plaintiff was incurring further damages as a result of the surety's refusal to meet its obligation to address the Plaintiff's claim. Brad Carver was included in e-mail traffic in which questionable conduct by Lovett-Silverman and USF & G toward Landworks was discussed.

John Lemieux
Terry Scalzo
Vertex Engineering

These individuals were involved in investigating the claims of subcontractors at the Hull High School project after the failure of Jackson Construction in the summer of 2005 on behalf of USF & G, Jackson's surety. The Hull project involved the same contractor, Jackson, the same surety, USF & G, and the same attorneys for USF & G, as is found in this case. These individuals were also involved in the project completion on behalf of USF & G following the failure of Jackson Construction, and in the ratification process on behalf of USF & G in conjunction with counsel for USF & G. These individuals have actual knowledge as to the fact that USF & G's construction consultants were permitted to be in active contact with subcontractors and their attorneys, that meetings were held in which all parties were present, that investigation of a claim being reviewed in good faith included communication with all parties involved and knowledgeable of the facts, and the methods and procedures of reviewing claims. These individuals also have actual knowledge that in the summer of 2005 USF & G and its

construction consultants and its attorneys continued this good faith behavior, even after a claim had been filed under G.L. c. 149 § 29 and G.L. c. 176D and 93A, and that ratification was permissible even during the pendency of such a lawsuit, and that this conduct was transpiring during the summer and autumn of 2005, even as USF & G and Lovett-Silverman were informing the Plaintiff in this case that USF & G policy dictated otherwise. This testimony is also expected to demonstrate that the Plaintiff's expectations of USF & G's response to its claim was not in any way unsupported by prior demonstration of USF & G's policies as they were carried out in 2005-2006.

PMK and KOR Century Drywall
PMK and KOR Steelco Fence
PMK and KOR K & K
PMK and KOR Brodny Floors

These subcontractors include three companies, Brodny, Century and K & K, who were compelled to bring suit to recover monies due and owing without good excuse for non-payment. Century, in particular, is expected to testify about the tactics used against it, and the delays caused in payment, without good excuse for non-payment. In addition to Landworks, these are "banged" subcontractors. Steelco also has knowledge that the so-called policies of USF & G pertaining to communication between the surety and its consultant, as represented to Landworks, was not true.

Frias Concrete

Frias Concrete was Jackson Construction Company's concrete subcontractor, and has actual knowledge as to the scope of its work at the project, the contracting practices of

Jackson, and the fact that no one contacted Frias to discuss its role at the Project during the time that Lovett-Silverman was declaring Frias to be a subcontractor to Landworks.

Expert-The Plaintiff will call William Gallagher as its expert witness. Mr. Gallagher is a construction manager of substantial experience, and knowledge of the local construction industry. He has extensive knowledge of public construction practices and policies, as well as means and methods. He is expected to testify as to these areas, and he is expected to testify as to the numerous ways that the defendants in these cases violated the practices and policies, as well as the means and methods usually employed in bringing public construction projects to completion. He is expected to testify consistent with prior interrogatory answers, affidavits and expert disclosures. Specifically, he will testify as follows: he has reviewed, with regard to the Project, the construction file of Landworks Creations, LLC, the deposition transcripts of the project architect, Katie Crocket, of Lovett-Silverman employees Tony Lardaro, Bill Mertz and Robert Bullock, of USF & G representative Jim Peters and of the Neal Matthews of Landworks. He has also reviewed the deposition exhibits, documents produced by the parties in this case and by the project architect, and he has spoken in extensive and exhaustive detail with Neal Matthews. He bases his opinions upon the specific facts and documents in this case, as well as upon his prior experience as a construction manager on public and private projects. He will testify that when a construction consultant or construction manager takes over a project that is already underway, and in which a general contractor has left a job or has undergone business failure, there are certain task that are customarily performed in order to get the work back on track and finished. These tasks include:

   a. assessing the status of the work and the work performed by each subcontractor.

   b. ascertaining the status of payment to subcontractors, who generally and customarily suspend work or demobilize pending review of payment issues.

   c. ratifying subcontractors, that is, bringing the subcontractors back to work under the control of the Surety on public projects

   d. completing the work in the fastest way possible

He will testify that it is always preferred by construction consultants and managers to ratify prior subcontractors; these subcontractors generally know the Project better than the new consultants, and are generally the best source of information about the Project and what needs to be done to get the project finished. They also do not require time to get up to speed on the work, they can mobilize quickly, and they are generally locked-in to a lower price than replacement subcontractors by the nature of the contract date. In addition, it is often difficult to find a subcontractor willing to pick up where another subcontractor has left off and where a project is already troubled. As a general rule in the construction industry, a subcontractor is brought back to work unless there is a compelling reason not to bring a subcontractor back to work. He will testify that the fact that a subcontractor may be owed money, or may be claiming to be owed money, is not, customarily, a compelling reason not to engage a subcontractor to complete the work.  He will also testify that in the construction industry, particularly involving contracts with site contractors, the scope of a contract cannot be determined by mere contract documents. Lovett-Silverman's employees testified that they viewed the recitation of the site work sections defining the scope of the work to be all conclusive. However, in the construction

industry, particularly public construction, where all site work is collected under Division 2, the recitation of all specification under Division 2 does not constitute the scope, but rather then location where the broad scope of work is included. In other words, since parts of the work are found in multiple parts of Division 2, all elements of Division 2 are customarily included. The assertions made by Lovett-Silverman that the scope of work can be entirely found by strictly construing the contract, without further investigation, contradicts both custom and industry practice, and reflects a failure to perform the usual investigation performed in the context of this case. Similarly, it is evident, because Lovett-Silverman conducted no investigation, that Lovett-Silverman never considered or had the ability to consider, whether the Jackson contract was binding or even in force and effect for purposes of defining scope. This investigation would be particularly important in this case; as Neal Matthews noted in his deposition testimony, Jackson engaged in a pattern and practice of demanding extra work outside of the Landworks scope as Jackson neared insolvency. These items of extra work confirm that the prior scope had been limited, and that defining the scope of obligation could not be inferred from earlier contract documents. He will testify that he has seen documentation that demonstrates that Landworks removed its forces from the Project in January of 2005, and that it was scheduled to complete its work in the spring of 2005. It is customary for site contractors to engage in "winter shut down," as weather conditions preclude certain types of work from being performed. This is customary in the industry, and it is not considered "abandonment" of the work. He will testify that he has also seen documentation that both Landworks and many other sub contractors did not return to the Project after the failure of Jackson and pending payment, and that this has been acknowledged both by Lovett-

Silverman and USF & G. This is also customary in the construction industry; following failure of a general contractor, it is essential for a pause in the work so that the scope of remaining work may be assessed and the issue of unpaid invoices to the subcontractors may be addressed. In the construction industry, it is not customary to assume that a sub contractor who is awaiting payment following the failure of a general contractor has "abandoned" the work. He will testify that he has reviewed the so-called "deficiency reports." These are merely "punch list" items. Punch list items are inventories of work that have yet to be performed or which have minor deviations which must be fixed before the work is acceptable to the owner of the project. He will testify that punch lists occur on every job, and are distributed to every contractor and subcontractor. Even though punch lists may be titled "deficiencies" or "defective items," they are customary on every job and merely inventory work left to be performed. The existence of punch lists, both by industry custom and industry standards, does not create a presumption of breach of contract by the contractor or subcontractor. He will testify that he has seen documents in this case which indicate that Landworks had punch list items to complete. Since the work had not yet reached completion when Jackson failed, this is not unusual or unexpected. He will testify that he has seen no documents that demonstrate the existence of defects in the work performed by Landworks that would cause concern to a construction manager or construction consultant, or which would suggest an inability or unwillingness to complete the work. He will testify that he has seen nothing in the papers or documents or testimony in this case that would indicate a compelling need to replace Landworks as the site contractor. On the contrary, the record shows that Landworks was always ready, willing and able to perform work that needed to be done, demonstrating a degree of

teamwork that should have made Landworks a desirable subcontractor on the Project. He will testify that as a construction manager and consultant, it is customary to encourage these kind of extra-mile subcontractors to become pro-active in getting the work done. He will testify that he has seen in the materials in this case a demonstration of what transpires when a consultant declines to ratify a subcontractor; the difficulty had by Lovett-Silverman in trying to find a site subcontractor at a reasonable price who could perform the work confirms why, customarily, a subcontractor is retained. He will testify that he has seen no document in this case that would serve as a termination of the Landworks' contract as defined in the industry. He will testify that, from reviewing the file, that Landworks continued to have a binding contract in the form of the post-Standen ratification agreement which defined the rights of the parties, and the obligation of the Surety to deal in good faith with Landworks' claims for payment and its demand for its right to return to work. It would be customary in the construction industry to view the situation in this way. He will also testify that he has seen the e-mail from Lovett-Silverman in which an employee of Lovett-Silverman refers to shortages of money, and the idea of "banging" the subcontractors. He will testify that banging the subcontractors has a very specific meaning in the construction industry, especially when paired with the first part of the e-mail reflecting a shortage of funds. Banging the subcontractors means withholding payment from them, or denying them their rights under their contracts, in the hopes of either forcing the subcontractors to compromise their claims, to be forced to file suit on the payment bond to defer payment for years, to likely compromise a claim as part of a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial distress. Banging the subcontractors is a form of violence to them, and it is a

means and method of denying subcontractors what may be theirs. In the construction industry, the less violent, but equally suggest term for this inappropriate behavior would be "strong arming." He will testify that he has noted from the deposition of James Peters of USF & G that more than 20 lawsuits were filed on the payment bond in this Project; that would easily represent the vast majority of subcontractors working on the Project. He will also testify that this refers to the number of claims in suit, and would not include the subcontractors who settled for less in order to avoid suit. In the construction industry, this number of lawsuits on a single public project is highly unusual, and suggests an intentional failure to address claims by Lovett-Silverman and the Surety, as opposed to systemic failure by all of the subcontractors. In light of the unusual number of claims, paired with lack of competent review of the project details by Lovett-Silverman, read in conjunction with the e-mail identifying the shortage of funds, and coupled with the statement about "banging" the subcontractors, It is evident that Lovett-Silverman, USF & G's agent, intentionally engaged in conduct, which includes failing to engage in reasonable conduct, which would interfere with Landworks' rights under the contract. The number of defects in performance by Lovett-Silverman in terms of deviation from industry custom and practice when dealing with subcontractors following the failure of a general contractor are substantial and pervasive. The deviations from industry custom and practice are so complete that it would suggest to any competent construction manager a willful deviation from custom, as it would be almost impossible for negligence to explain these deviations. In short, the facts presented, based upon his expertise and experience in the field, is that Landworks is a banged subcontractor, and that it was intentionally prevented from doing its work on the Project and addressing its claim with the Surety,

and from receiving payment for its work, and was otherwise forced to file suit to collect money that appears to be appropriate due and owing.

The Plaintiff reserves the right to call any witnesses identified or call by the Defendant.

<div align="center">IV –DOCUMENTS/EVIDENCE</div>

The Plaintiff intends to introduce the following documents into evidence:

1. The contract with Standen
2. The project contract and specifications and drawings
3. Any and all change orders submitted and signed by Jackson
4. Invoices submitted
5. Documents evidencing payment or non-payment
6. Correspondence between the various parties demonstrating the obligations due and owing to Landworks from USF & G as referenced in correspondence to Jackson, and the failure of the surety to make payment, including any and all documents of the town of Shrewsbury, the project architects and engineers.
7. Deposition testimony of officials of Lovett & Silverman who are not physically present at trial, as well as all exhibits marked at those depositions.

<div align="center">IV ISSUES OF LAW</div>

The Plaintiff has already put Defendant, USF & G on notice that it intends to move to disqualify George Byl as Defendant's expert witness on the grounds that the report of Byl indicates an attempt to supplant the role of the jury in this case by assessing credibility,

and weighing and reaching conclusions of fact outside the purview of an expert witness. Byl also lacks the qualification and competence to testify as to standards of the industry pertaining to public school construction management, which is the primary issue in this case.

The Plaintiff has identified numerous attorneys as witnesses as to the 93A portion of this case, which may necessitate filing motions in limine to disqualify these attorneys prior to trial.

V. LENGTH OF TRIAL

The Plaintiff anticipates trial will require ten half days.

Respectfully Submitted,

**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer_____
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: April 28, 2008

CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this day I served a copy of the foregoing on all counsel of record by mailing the same, postage prepaid, to:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Peter Hermes, Esq.

                                                                s/Robert N. Meltzer

April 28, 2008