UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS-CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | PLAINTIFF, LANDWORKS |
| | ) | CREATIONS, LLC'S |
| UNITED STATES FIDELITY AND | ) | MOTION IN LIMINE TO |
| GUARANTY COMPANY and | ) | DISQUALIFY GEORGE G. |
| LOVETT-SILVERMAN CONSTRUCTION | ) | BYL AS AN EXPERT |
| CONSULTANTS, INC. | ) | WITNESS FOR DEFENDANT, |
| | ) | USF & G |
| Defendants | ) | |

Now comes the Plaintiff, Landworks Creations, LLC ("the Plaintiff") and requests in limine that this Court exclude the expert testimony pursuant to Rule 702 and Rule 704 of the Federal Rules of Evidence. The expert "evidence" to be proffered by Defendant, USF & G, apparently in support of its counterclaim against Landworks, will not "assist the trier of fact to understand the evidence" and on the grounds that the proffered testimony is not based upon "sufficient facts or data." As further grounds for this motion, the Plaintiff states as follows:

1. The Plaintiff brought this straightforward collection case seeking funds due and owing for construction work at the Shrewsbury Middle School ("the Project"). The Plaintiff had replaced a prior site contractor, the Hole Story, as the excavation subcontractor to Standen. The Plaintiff agreed to perform a limited and partial portion of the site excavation work under subcontract to Standen.

2. While it is possible that Hole Story originally owned all of the site work prior to portions being reassigned by Standen after Hole Story left the Project, it is typical in public construction for site work (landscaping, paving, athletic fields, track, lighting, bleachers,

drainage, grading) to be divided into a number of smaller contracts for specialized portions of the work.

3. Standen Construction ceased business operations during the Project. Standen's surety, USF & G, accepted its responsibility under a performance bond to complete the work.

4. USF & G signed a "ratification agreement" under which Landworks agreed to complete the work of its Standen contract. USF & G retained Jackson Construction to manage the completion work.

5. Landworks, under its ratification agreement, was directed in its work by Jackson. In addition to its accepted scope, Landworks performed additional tasks as directed by Jackson in order to move the Project to completion.

6. The ratification agreement and the relationship between Landworks and USF & G is defined by G.L. c. 149 § 29.

7. Jackson Construction also ceased business operations during the period of the Project.

8. Consistent with industry practice, the collapse of Jackson brought the project to a halt. USF & G retained a construction consultant, Lovett Silverman, to coordinate completion of the final work at the Project.

9. As even the Pre Trial Memorandum of USF & G now concedes, at least $105,000 of the funds claimed by Landworks, out of $135,000, were justified.

10. The evidence at trial will show that following seasonal shut down in the winter of 2005, Landworks repeatedly demanded meetings to address its outstanding invoices, to schedule its remaining work and to complete the remaining work under the ratification agreement that had been signed following the Standen failure.

11. The evidence at trial will also show that all trades stopped work on this project pending review of the project, and that cessation of work is industry practice in this circumstance.

12. Landworks Creations, LLC filed suit against USF & G to protect its rights to bond payments by USF & G as required by G.L. c. 149 §29.

13. The evidence at trial, in the form of expert testimony of William Gallagher, an experienced construction project manager, will also show that it was standard in the industry at the time, particularly with the Jackson failure, coming in close proximity to failures of six other major general contractors on public projects, to suspend payment during resolution of claims for past payment.

14. Testimony will also be proffered that ratification and work completion moved in parallel and in tandem with surety litigation in 2005. In short, it had become industry standard, including in matters involving Jackson and USF & G, for subcontractors and construction consultants to move forward on completing projects while litigation essentially was stayed. This was true with the Hull High School project, and the Ambrose Elementary School in Winchester.

15. In the case at bar, Lovett Silverman utterly refused to talk to Landworks, and claimed that this was the policy of USF & G. Deposition testimony in this case confirmed that USF & G had no such policy in place.

16. It was also confirmed during depositions of various employees of Lovett Silverman that Lovett Silverman made no inquiry into the scope of the Landworks contract, had no conversations with Landworks personnel about the scope of the Landworks obligations, had no conversations with Standen or Jackson personnel, and otherwise made no inquiry as to the scope of the work for which Landworks was responsible. Instead, Lovett

Silverman erroneously, and without basis, decided that Landworks owned the entire site work contract.

17. Lovett Silverman also testified that it relied on an April, 2004 "contract" between Jackson and Landworks, a contract which Landworks denies has any force or effect and which Landworks states is not, and never became, binding or in force and effect.

18. Evidence at trial will also show that Lovett Silverman was frequently incorrect in asserting that certain site work was within the scope of the Landworks contract. This is particularly true with respect to concrete work, which was assigned to a separate contractor.

19. Regardless, USF & G moved forward to complete the work without the assistance to Landworks, and without even the $105,000 partial payment to Landworks. As this Court is aware, e-mail traffic between Lovett Silverman employees suggested that non-payment was a litigation strategy.

20. USF & G has filed a counterclaim in this case, seeking payment for completion of site work at the project. As noted, no investigation had been made to determine the scope of the Landworks obligation, and the counterclaim seeks payment for work never assigned to Landworks.

21. On February 26, 2008, USF & G submitted an expert report by George Byl, a professional expert witness.[1]  The 11 page report reviews the documents and testimony in this case, and then arrives at specific conclusions. The conclusions, curiously, strongly

---

[1] Plaintiff has encountered Byl's argumentative and long-winded testimony in a number of matters not listed in the expert CV. Byl has developed a reputation of testifying about anything and everything, thus weakening his value as an expert. Aside from other problems with Byl's purported testimony, the process of depleting his credibility will likely prolong the trial unnecessarily by about three hours. Not only will his testimony not add to the trial, but it will also detract from efficient administration of this trial.

suggest that the cost of completion by the surety's own completion contractor, G & R, may not be accurate or correct.

22. Nonetheless, the report of Byl, attached hereto, relies heavily on the April 2004 contract between Jackson and Landworks which is contested as valid by Landworks, and further illustrates that as of February of 2008 neither USF & G, nor Byl, had an understanding of the scope of the Landworks contract.

23. Notwithstanding that Byl does not have adequate information to draw accurate conclusions, he is tendered as an expert testimony for just that purpose.[2] In addition, as the attached report demonstrates, all he has done is sift the evidence and assess the evidence, essentially usurping the role of the trier of fact.

24. His testimony is essentially drawn from incorrect assertions and questionable documents, which he resolves by favoring the credibility of the party paying his bill at the expense of the Plaintiff.

25. His testimony is not tendered to address the issues of expert testimony (industry practices during failure of contractors and the usual practice of the parties in such cases) but rather a litany of deficiencies in work which, he concludes, were the responsibility of the Landworks.

26. In effect, USF & G intends to introduce evidence of defects in work which did not belong to Landworks as some form of res ipsa loquitur evidence of liability by Landworks.

27. Baldly put, his testimony boils down to the fact that he is going to testify by reviewing documents and testimony, without personal knowledge or observation as to the scope of the Landworks/Standen contract, the scope of the Landworks/USF & G ratification

---

[2] Again, the Court should note that Byl lacks this information because USF & G and Lovett Silverman were deficient in gathering appropriate information during 2005.

agreement, the approval/disapproval of Landworks/Jackson change orders, the fair value of those change orders, the validity or merit of defects he has never seen, the contents of the purported Jackson/Landworks contract,  the legal and factual implications of that document, the quality and necessity of work performed by G & R, and the value of the completion work performed by others.

28. The Federal Rules of Evidence, 702, states that "a witness qualified as an expert by knowledge, skill, experience, training or education, may testify…if…the testimony is based upon sufficient facts or data…"  The rule also requires that the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue…"

29. The meaning of this rule, in conjunction with Rule 704, has been widely discussed by the Court. The Court has noted that "Rule 704 of the Federal Rules of Evidence allows an expert to offer opinion evidence even if it 'embraces an ultimate issue to be determined by the trier of fact….The Federal Rules, however, do not allow an expert to offer testimony that merely tells the jury what result they should reach….Expert testimony of this type is often excluded on the ground that it states a legal conclusion, usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law." United States v. Simpson, 7 F 3rd 186,188 (1993).

30. As the Court concluded on  the same page, "[w]hen an expert merely states an opinion on an ultimate issue without adequately exploring the criteria upon which the opinion is based, the jury is provided with no independent means by which it can reach its own conclusions or give proper weight to the expert testimony."

31. In the case at bar, the report indicates that Byl is providing an opinion to the jury on the ultimate issues of the counterclaim. In any court of law, the appropriate process for a

defendant in proving his counterclaim would be submission of the original and proper evidence.

32. Here, if USF & G wishes to argue that certain work belonged to Landworks under the Standen/Landworks contract, then the appropriate witnesses would be individuals from Landworks and Standen.

33. If USF & G wishes to argue that certain work belonged to Landworks under the ratification agreement, then the appropriate witnesses would be individuals from Landworks and USF & G.

34. If USF & G wants to argue that the April, 2004 document between Landworks and Jackson is a valid contract, then the appropriate witnesses would be from Landworks and Jackson. The terms of that contract must be proven by those same people.

35. As to the quality of the work, the witness needs to be a person who reviewed it, and understood it. USF & G would still confront the obligation of proving by witnesses with actual knowledge that the work belonged to Landworks *and* was deficient. The witness who would testify as to the value of the repair work would be the person or entity who performed it.

36. Even if the scope of work was within the original contract of Landworks, USF & G would still be required to submit factual evidence that Landworks was ordered to perform work and refused to perform it.

37. It would still be within the ambit of the Court and jury, not Byl, to address whether Landworks had demonstrated legal justification for not performing such work (non payment of contract invoices, thus suspending the obligation of further performance).

38. Finally, it would be within the ambit of the Court and jury, not Byl, to address the issue whether the conduct of USF & G excused further performance by Landworks, thus rendering the entire counterclaim a nullity.

39. The expert report of Byl indicates that rather than go through the circuitous process of proffering best evidence by the people who lived the facts, USF & G intends to simply submit the judgment of an expert with no personal knowledge to spoon-feed conclusions of fact to the jury.

40. This is absolutely inappropriate as a matter of both fact and law, and it is not permitted under Rule 702 or Rule 704.

41. George Byl does not have personal knowledge of any facts in this case. His testimony is proffered to supplant the testimony of those who do have personal knowledge. He is not being offered to provide any assistance to the jury on any specialized field of endeavor. His testimony is not only not probative and based upon lack of personal knowledge, but also unhelpful.

42. In addition, his proffered testimony would tend to confuse the jury, as the lecturing tone of his testimony suggests a weight of authority that offers a simple storyline to an otherwise, but necessarily complicated, case in chief for USF & G.

43. Under Rule 702 and Rule 704, the proffered testimony of George Byl is not probative, does not assist the jury, has a tendency to usurp and supplant the legitimate role of judge and jury, threatens to prolong the trial without cause, threatens unwarranted prejudice to the Plaintiff, and otherwise seeks to direct the jury on questions of fact based upon questionable assertions and assumptions.

WHEREFORE, for the foregoing reasons, the Motion in Limine to Disqualify George Byl

must be ALLOWED.


Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer
The Mountain States Law Group
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: May 1, 2008

CERTIFICATE OF SERVICE

   I, Robert N. Meltzer, do hereby certify that on this day I served a copy of the foregoing on all counsel of record by mailing the same, postage prepaid, to:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Peter Hermes, Esq.


         s/Robert N. Meltzer

May 1, 2008

# ReStructure Company, Inc.

66 Sycamore Street
Holbrook, MA 02343

Tel:  (781) 767-1600
Fax: (781) 767-0947
rsc@restruct.com

Construction Consultants

February 26, 2008

Eric C. Hipp, Esq.
Hermes, Netburn, O'Connor and Spearing
265 Franklin Street, F - 7
Boston, MA 02110

Re:    Matter:          Landworks v.  U.S.F.& G.
       Civil Action:   05-CV-40072
       RSC No.:         299.08
       Subject:         Preliminary Report

Dear Eric,

The following RSC preliminary report is based on the Shrewsbury Middle School West (Project)
Specifications and Site Plans L 1.1 through L 1.10; Standen Contracting Co., Inc. (Standen)
Contract with the Town of Shrewsbury, Massachusetts (Town) dated October 1, 2002 and
Applications for Payment numbers 2 - 14; Jackson Construction Company (Jackson)
Applications for Payment numbers 15 - 23 and 32; G & R Construction, Inc. Invoices to St. Paul
Travelers numbers 1 - 14; G & R Invoice Review Worksheet by Lovett-Silverman Construction
Consultants, Inc.; Deposition Exhibits; Vertex Construction Services Inc. Report; Deposition
Transcripts of Bullock, Matthews, Crockett, Lardaro, Meritz, Peters; photographs of sitework by
Bob Bullock and/or Bill Meritz and photographs of ramp reconstruction; aerial photographs
dated April 9, 2005 and April 1, 2007; Landworks' Project Estimate; Landworks' Proposal to
Standen dated July 27, 2003; Standen Letter of Intent to Landworks dated August 1, 2003;
Standen Subcontract Agreement with Landworks dated August 28, 2003; Subcontract Hold
Agreement between Landworks and USF&G dated March 24, 2004; Jackson Subcontract
Agreement with Landworks dated April 29, 2004; Landworks Applications for Payment to both
Standen and Jackson; Landworks daily reports and Certified Payrolls; the RSC Library and the
experience, training and education of George G. Byl, P.E. (RSC).  Deposition transcripts are
referenced in the report as deponent, volume, page and line number but are not contained as an
exhibit to the report.

## Background:

On October 1, 2002, Standen entered into a Contract with the Town of Shrewsbury to renovate
the Shrewsbury Middle School in Shrewsbury, Massachusetts.  Standen subcontracted with Hole

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                                    February 26, 2008

Story Inc. (Hole Story) to perform the sitework including the site demolition. At some point in time, Hole Story was terminated and Standen entered into a Subcontract Agreement on August 28, 2003 with Landworks to do the sitework. At a point in time, Standen voluntary defaulted with the Town and USF&G (Surety) was called upon to complete the Project. The Surety completed a Subcontractor Hold Agreement with Landworks on March 24, 2004 and entered into an agreement with Jackson to complete the Project. Jackson, on April 29, 2004, entered into a Subcontractor Agreement with Landworks to perform the sitework. At some point in time, Jackson was terminated and G & R completed the Project. No Subcontractor Hold Agreement was initiated to retain Landworks and G & R, through its own forces and individual subcontractors, completed the sitework to the point of a few minor punch list items.

On November 12, 2004, Shaheen & Gordon, Attorneys for Landworks, wrote to Robert Barton of Jackson, stating that Jackson failed to make payments for work performed in August and September 2004 and had breached the Subcontract Agreement. The amount claimed by Landworks was $303,000 for contract Work and a minimum of $70,000 in additional work.

On April 8, 2005, Landworks brought suit against USF&G. In August of 2006, Landworks filed an amended complaint and brought Lovett-Silverman Construction Consultants in as an additional defendant and on February 6, 2008, summary judgment was granted in Lovett-Silverman's favor. The Landworks' Amended Complaint dated June 20, 2006, states that "USF&G has failed to pay the Plaintiff for work performed at the Project, to the extent of $135,101."

On March 3, 2006, in the Plaintiff's Answers to USF&G's First Set of Interrogatories, they state that they are due $135,101 for Subcontract Work and additional monies which total $877,864 and include lost revenue due to the inability of Landworks to obtain lines of credit and insurance.

In July 2007, RSC was contacted by Hermes, Netburn & O'Connor and Spearing, P.C. to review the Matter and provide an independent analysis of the completion costs based on the documents provided. This RSC preliminary report is in response to that request.

**RSC Review of Landworks Subcontracts:**

On July 27, 2003, Landworks provided a Proposal to Standen for specific portions of the sitework on the Project (**Exhibit 1**). This Proposal excluded several items of work including: ledge, unsuitable materials, fencing, concrete work, electric lines, winter conditions and rubberized track surface. The building work was to be done on a time and materials basis. On August 1, 2003, Standen responded to Landworks with a "Letter of Intent" (**Exhibit 2**) which excluded only the concrete portion of Specification Section 02515, Concrete Pavement. Then on August 28, 2003, Standen and Landworks entered into a Contract (**Exhibit 3**) for thirteen Specification Sections of the sitework with the exclusion of the concrete work under Section

**ReStructure Company, Inc.**

Eric C. Hipp, Esq.                                                                 February 26, 2008

02515 and the furnishing of the sand for the underdrain system. It should be noted that the Standen Subcontract states:

> "6.5 This Subcontract constitutes the entire agreement of the parties hereto relative to the subject matter hereof and all prior negotiations with respect to and drafts of this Subcontract are merged herein. This subcontract may not be modified or amended except by a writing signed by an officer of the Contractor."

After the default of Standen, on March 24, 2004, USF&G and Landworks signed a Subcontractor Hold Agreement (Hold) with a payment from the Surety for Contract Work performed and unpaid, including $73,221 in Change Order Work **(Exhibit 4).** The amount of the Surety payment was $177,614.60. The Hold Agreement kept Landworks on the Project as the site subcontractor under the same terms and conditions as the Standen Subcontract Agreement and allowed the Surety or the Surety's designee or assignee to keep Landworks as a subcontractor.

On April 29, 2004, Jackson entered into a Subcontract Agreement with Landworks for the completion of the sitework based on the thirteen Specifications Sections that were in the Standen Subcontract Agreement without any exclusions **(Exhibit 5).** As of this point in time, the sand that was to be provided by Standen had already been delivered and installed so that exclusion was no longer germane. However, the Jackson Subcontract Agreement now included the concrete portion of the 02515, Concrete Pavement, and all the other conditions and provisions of the listed sitework Specification Sections. It should be noted that the Jackson Subcontractor Agreement included the words:

> "The Subcontractor shall furnish all labor, materials, plant equipment, permits and other facilities and things necessary or proper for or incidental to, and shall do all things to perform and complete, the following (hereafter collectively referred to as the Work)
>
> THIS SUBCONTRACT SHALL COMPLETE ALL SITE WORK PER SECTION(S) 02060   SITE DEMOLITION, 02100   SITE PREPARATION, 02200   EARTHWORK, 02240   GEOTEXTILE FABRICS, 02250   EROSION CONTROL, 02511   BITUMINOUS CONCRETE PAVING & MARKINGS, 02515   CONCRETE PAVEMENT, 02525   GRANITE CURBING,   02649   TRACER TAPE, 02705   STORM DRAINAGE SYSTEMS & SEWER SYSTEMS, 02710   UNDERDRAIN SYSTEM - ATHLETIC FIELD, 02713   WATER SYSTEMS, AND 02930 LAWNS AND GRASSES IN ACCORDANCE WITH PLANS AND SPECIFICATION DATED 7/01/2002 INCLUDING ADDENDA 1-5 AND ALTERNATES 1-5, IF APPLICABLE, AS PREPARED BY LAMOUREUX PAGANO ASSOCIATES, 14 EAST WORCESTER STREET, WORCESTER MA 01604 FOR SHREWSBURY MIDDLE SCHOOL."

> "ARTICLE 30 Final Agreement
> It is understood that this Subcontract, including all instruments incorporated herein be referenced, constitutes the full and complete agreement now existing between the Contractor and the subcontractor and supersedes any and all prior agreements or understandings, written or oral, express or implied, between the Contractor and subcontractor, except as otherwise expressly provided herein."

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                                               February 26, 2008

## Landworks' Subcontract Accounting and Change Order Summary (Exhibit 7):

The following is an accounting of the Landworks' Subcontract claimed amount and RSC's analysis:

| Description of Work | Landworks' Position | RSC's Position |
|---|---|---|
| Original Contract Amount | 824,823.00 | 824,823.00 |
| Total Approved and Proposed Changes | 227,631.30 | 173,236.44 |
| Revised Contract | 1,052,454.30 | 998,059.44 |
| Paid by Standen | 433,544.60 | 433,544.60 |
| Paid USF&G | 177,614.60 | 177,614.60 |
| Paid by Jackson | 281,192.10 | 281,192.10 |
| Total Payments to Landworks | 892,351.30 | 892,351.30 |
| Balance of Work, Change, Orders and Work Orders not paid | 160,103.00 * | 105,708.14 |
| Unfinished Contract Work | | 268,078.20** |
| Value of Claim | 160,103.00 | (162,370.06) |

\*As stated in Landworks' April 3, 2006 Answers to Interrogatories, however, Matthews (Landworks) has allowed $25,000 for incomplete work and a claim amount of $135,101 in his Amended Complaint dated June 20, 2006.

\*\*Column A, RSC Estimate (**Exhibit 10**), if Column B is used the value of the claim would be negative $363,772.37.

See RSC Contract Work and Change Order Analysis spreadsheet (**Exhibit 7**).

## RSC Estimate of Remaining, Incomplete or Improper Work:

From the testimony of the various deponents, it became clear that Landworks believed it was performing work under the thirteen Specification Sections with many exclusions. As the Subcontracts listing the Work as per the Specification Sections are very clear as to the scope of work, there was a large discrepancy in Landworks' contractual work and what it either thought

Page 4

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                                    February 26, 2008

its work was or what Landworks wanted its work to be. The documents that RSC reviewed do
not exclude the concrete portion of Specification Section 02515 from the Landworks'
Subcontract with Jackson even though Landworks had excluded that work in its Subcontract with
Standen. However, as this work is disputed and may be found to be an exclusion to the
Landworks' Subcontract by the Court, RSC has estimated and separated the concrete work in its
estimate under column B (**Exhibit 10**). It should be noted that Landworks did not exclude the
concrete work in Specification Section 02705 and, as such, RSC did not separate the headwall
concrete work.

RSC has done the same separation with the rubberized track surface (**Exhibit 10**).

RSC has used RS Means Repair & Remodeling Cost Data, 2004 (RS Means) as the reference for
costs, labor time and equipment for the various items of work. Where RS Means does not have
an item of work that exactly conforms to the actual work performed or required, RSC used its
own estimate of time and the RS Means labor values. It should be noted, that RSC has done
general contracting for over 30 years and completed numerous school and sitework projects for
sureties. RSC chose 2004 as this was the year that Landworks last performed work on the
Project. All the RSC estimated values reflect costs of materials and labor as of 2004. The repair
and/or completion work actually was done in 2005 and 2006 and, should it be determined that
either 2005 or 2006 is more representative of the completion costs, the RSC estimate can be
adjusted to those years by 1.055 for 2005 and 1.127 for 2006. However, if either of these later
years is used, it should be realized that there could be a remobilization charge due Landworks for
the default of Jackson which would offset some of the increase in costs.

The RS Means values are a national average of values and the labor rates are computed from an
average of 30 US cities. RSC has adjusted these RS Means values to reflect construction costs in
the Worcester, Massachusetts area. RSC has used RS Means for over 30 years and considers it to
be a fair and reasonable cost data reference.

## Documents RSC Relied on in its Estimate (Exhibit 6):

The following documents describe sitework that, as of the date of the document, was incomplete
or required corrective action. Note, from Landworks' Certified Payrolls, week ending September
25, 2004, John April, listed as an operator, was the last person to work on the Project (**Exhibit
6**). Landworks' Daily Field Reports for this Project ended approximately two months earlier,
July 22, 2004.

> March 19, 2004
> CTM's Contractor Deficiency List dated 3/19/04 lists several items of work which were
> attributable to Landworks which are: damage to a gate valve, damage to bituminous sidewalk and
> curb, damage to brickwork, damage to granite curb, damage to track, damage to underground

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                    February 26, 2008

electric at south side of track, damage to fire hydrant, record water line change on as-builts and snow plow damage to bituminous curb and sidewalk.

#### July 20, 2004

Jackson's "Completion Game Plan" dated July 20, 2004 listed several items of incomplete work with completion dates in August. It appears from the G & R accounting records that the Granite curbing was completed (at least there is no charge for work under Specification Section 02525), however, the other items of work were not completed as there were considerable charges for Bituminous Concrete Paving and Markings. RSC carried the charges for the pavement markings under column A.

#### July 26, 2004

On July 26, 2004, Jackson faxed a July 1, 2004 Architect letter with the Waterman June 30, 2004 inspection report of the athletic fields. It should be noted that the time frame between the Waterman inspection and the notice to Landworks is 26 days. The Waterman report recommends reconstruction of undulating grass surface areas near or within the baseball field, aeration of the athletic fields due to over compaction and completion of the silt sand trenches. The report notes that as of June 30, the site work around the periphery of the athletic field was not completed.

#### August 26, 2004

Waterman Design Associates, Inc's (Waterman) letter to the Architect dated August 26, 2004 listed several items of repair work to the athletic fields. It should be noted that corrective work recommended by Waterman in their June 30, 2004 inspection report, surface undulations, had not been addressed by Landworks. RSC reviewed the Landworks daily reports and found the last entry was July 22, 2004. RSC was unable to find any document that indicated the defective work was repaired and/or re-inspected during Landworks time on the Project and has carried these items in its estimate, column A.

#### September 20, 2004

CTM's letter to the Architect concerning the excessive slopes to the bituminous sidewalk surfaces. RSC carried the cost for this asphalt sidewalk removal and replacement under column A.

#### September 22, 2004

CTM listed "Site work items to be completed 9/22/04" which included bituminous work, pavement striping, concrete work, clearing, loaming and seeding work which was the responsibility of Landworks as well as other items, such as, signage, fencing gates and rubberized track that may not be Landworks responsibility.

# ReStructure Company, Inc.

On or about September 25, 2004, the Landworks' Certified Payrolls ended and, if it is an accurate record of labor provided, would indicate that the late September and the following incomplete or deficient sitework was not addressed by Landworks.

### October 19, 2004

On October 19, 2004, Jackson faxed an Architect's letter dated September 24, 2004 to Mr. Matthews (Landworks) concerning "finish site work" that does not meet the Specifications. The Architect listed six concrete ramps and a portion of a sidewalk that would require replacement. RSC used the attached part plans supplied by the Architect to estimate the required work and carried the removal, regrading and compaction under column A and the entire work under column B.

### December 7, 2004

Waterman letter to the Architect dated December 7, 2004 listed "Site Work Deficiencies - Work yet to complete" and there were numerous items that Mr. Matthews had written the initials "LW" which appears to indicate his company was responsible for those items (Matthews, Vol. 2. P. 82, L. 23 to P. 83 9). Mr. Matthews denies responsibility for the concrete headwalls, see "Storm drainage", page 2 where he indicates "N/A" to the left of "2 concrete headwalls . . ." RSC disagrees with Mr. Matthews as the headwalls are in the scope of work under "Storm Drainage Systems & Sanitary Sewer Systems" (02075) and Landworks did not exclude concrete work in Specification Section 02075 even in his original proposal to Standen.

### February 2, 2005

The Architect's letter to CTM dated February 2, 2005 has two attachments which list punch list work to be $14,100 and unfinished items to be $269,000. When being deposed, Kathryn Crockett stated that "there was significant work remaining" (Crockett, P. 102, L. 8 - 9). Based on the Jackson Subcontract, it is the opinion of RSC that a significant portion of the sitework, if not all, was Landworks responsibility and that that work would be significant.

### September 8, 2005

Email from Bill Meritz to Al Falango dated September 8, 2005 stating that the Architect indicated the site "demolition contractor caused all the damage and they expect the lighting to be restored." As Landworks is responsible for the site demolition work, Specification Section 02060, even if the damage were done by Hole Story, the trenching and installation of the electrical was carried in the RSC estimate under column A.

### September 22, 2005

Email from Robert Bullock to Jason Goodwin dated September 22, 2005 stating that there were three subcontractors each responsible for the athletic equipment. As such, RSC did not include any costs of the athletic equipment in its estimate. Should additional documents be provided that indicate otherwise, RSC's estimate would be revised.

# ReStructure Company, Inc.

Eric C. Hipp, Esq.

February 26, 2008

### September 26, 2005

Lamoureux Pagano Associates (Architect) letter to Lovett-Silverman Construction Consultants (Lovett) dated September 26, 2005. This letter from the Architect indicates that a portion of the damaged track asphalt base was due to "lack of protection of the base and other construction related causes." As Landworks was responsible for protection of property by many of his Specification Sections and for all of his Work under the General Conditions, specifically 6.2.4 and 10.2.1, RSC considered the damage to the asphalt base of the track to be in part due to Landworks work around and within the track area.

### September 29, 2005

Email from Al Falango to Robert Bullock stating that the Owner will be responsible for 67% of the charge to pulverize the track base and the Surety for 33%. The cost to pulverize the base should be a backcharge to the site contractors and total approximately $16,499. RSC concludes from this email that TrackLite had an existing Subcontract to do the new track and that only the cost for the base should be passed on to the site contractors. Based on the related work within and around the track, RSC considers 50% of the track base work to be the responsibility of Landworks and carried ($16,499 x 50% = $8,249.50) $8,249.50 in column A and the track work itself in column B of its estimate.

### February 1, 2006

Email from Jason Goodwin to Robert Bullock dated February 1, 2006 stating that as of that date there were six concrete ramps that did not meet ADA requirements, a concrete stoop, concrete pad for the oil tank, asphalt paving at the flag pole, asphalt sidewalk, loam, seeding, grading, installation of athletic equipment, fence, seeding, fertilizing and as-built drawings for a total of $245,000.

## Deposition Testimony of Neal Matthews (Landworks) Relied On in the RSC Estimate :

### Incomplete Work:

#### Track

Landworks removed the original track overlay and stockpiled it on the site, however, Landworks never removed the base (Matthews, Vol. 1: P. 38, L.9 -16).

#### Grading

Landworks did not complete the entire grading and the east side of the track and miscellaneous areas between the track and the baseball field were not done (Matthews, Vol. 1: P. 40, L.13-23).

#### Loam & Seed

Landworks did not complete the loam and seeding in the island northwest of the teachers parking lot (Matthews, Vol. 1: P. 73, L.18-20). Landworks admits that there could have been minor amounts of seeding at the south slope (south of the track at property line) left undone. (Matthews, Vol. 2: P. 62, L.11-15).

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                                                        February 26, 2008

#### Debris
Landworks did not remove the debris at the east end of the track (Matthews Vol. 1: P. 72, L.23 to P.73, L-1).

#### Grass
Landworks did not prepare or plant the grass at the east end of the track (Matthews Vol. 1: P. 72, L.23 to P.73, L-1).

#### Shot Put Area
Landworks did not prepare or construct the shot put area. (Matthews Vol. 1: P. 73, L.1-5).

#### Bituminous Paving at the Flag Pole
Landworks did not prepare or construct the bituminous area around the flag pole (Matthews Vol. 1: P. 73, L.16- 18).

#### Bituminous Paving
Landworks did not complete the walkway to the elementary school, pavement around the storage shed, east side of the gymnasium, shop area, and the area around the flagpole (Matthews Vol. 1: P. 41, L.14 -24).

#### Bituminous Paving of Track and Field Events
Landworks did not complete the bituminous paving for the track and field events (Matthews, Vol. 2: P.66, L.5 to P. 67, L. 1).

**Repair Work:**

#### Bituminous Curb
Landworks removed damaged curb and did not replace it (Matthews, Vol. 2: P. 69, L.6- 14).

#### Oil Tank Fill Cover
Landworks had replaced/taken over for the initial site contractor, Hole Story, and as such was responsible for its work. The damaged fill cover at the exterior oil tank was Landworks' responsibility and was not repaired (Matthews Vol. 1: P. 47, L.19 to P. 48, L. 3).

#### Track
Landworks damaged part of the asphalt track and did not repair the damage (Matthews Vol. 1: P. 49, L.12 -18).

#### Aeration
Landworks never aerated the athletic fields due to the dense soil compaction (Matthews Vol. 1: P. 54, L.18 to P.55, L.9).

#### Sidewalks
Landworks did not repair the non-compliant sidewalks or the concrete ramps (Matthews Vol. 1: P. 60, L.3 to P. 62, L.11).

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                                                                    February 26, 2008

Damaged Grass Areas
Damaged grass areas outside of the building were not repaired by Landworks (Matthews Vol. 1:
P. 65, L.9 -14).

Long Jump Area
Landworks installed the long jump area incorrectly (Matthews Vol. 1: P. 73, L.6 -12).

Damaged and Repaired Brick Corner
Landworks damaged the bricks at a corner of the school and had them replaced, however, the
color was not acceptable. Landworks did not correct the color (Matthews, Vol. 2: P. 70, L.7-24).

Electrical Lines
Landworks damaged electrical lines and states that they replaced the conduit. This is impossible
as the conduit cannot be replaced without pulling the wires out, replacing the conduit and pulling
the wires back through (Matthews, Vol. 2: P. 72, L.21 to P. 74, L 20). In addition the electrical
lines in the south central portion of the track was broken and not repaired (Matthews, Vol. 2: P.
77, L. 16 to P. 78, L.11).

## Conclusion:

RSC relied on the deposition testimony of the individuals involved in this Matter, documents
provided and construction photographs to estimate the value of the completion and corrective
work. As RSC was not present during the actual completion work, any legitimate charges for
related rework activities, regrading of adjacent areas to the repairs, correction of disturbed areas
damaged during the replacement operations or clean up after the construction activities, were not
included in the RSC estimate. It is the opinion of RSC that work it estimated is conservative as
the actual work was greatly affected by loss of efficiency and productivity due to the numerous
locations of small repair work items. Work crews were required to jump around the entire site
and never had the benefit of scale. This loss of productivity is obvious when one considers the
repair and patch work required on the athletic fields.

The Architect, Michael Pagano, listed a value for the punch list sitework at $14,100 and the
unfinished items at $269,000 (**Exhibit 6**). Kathryn Crockett stated in her deposition "I know
Landworks did do grading on the site that needed to be corrected. I do know that." (Crockett,
P.132, L. 18 - 21). And she continued to state, "I know Landworks was responsible for the
concrete at the accessible sidewalks that had to be redone." (Crockett, P.133, L. 8 - 12). Ms.
Crockett was asked about the Pagano values for the punch list work and unfinished items and
stated in reference to the Landworks work remaining "There was significant work
remaining."(Crockett, P.102, L. 8 - 9).

RSC reviewed the G & R Job Cost Reports. G & R, as they were the General Contractor
controlling, coordinating and directing the completion work, were the most familiar and
knowledgeable of the actual site completion costs. RSC's estimate did not equal the G & R's

# ReStructure Company, Inc.

Eric C. Hipp, Esq.                                                                      February 26, 2008

detailed cost record of the site work completion work which should not be construed as meaning RSC believes that the actual G & R's costs were excessive or incorrect. The G & R cost record should be considered the most detailed and accurate accounting of the cost to complete the sitework with the understanding that G & R may not have controlled the completion of the site work in the most efficient manner as they were completing the building work and negotiating with the Town and the Surety at the same time. It was their job to finish the Project and they addressed the site punch list and incomplete work as it was reported to them. Pre-planning of many work items was not possible and as such they were completed in a manner similar to change order work. The labor for change order work or in this case corrective or punch list work can be 10% or more and down time loss can be even more, as items of work are small and widespread. This loss of productivity would have affected any completing site contractor including Landworks.

That being stated, RSC has estimated the corrective and unfinished work (**Exhibit 7**) that was the responsibility of Landworks to be $469,480.51 considering the signed Landworks Subcontracts (column B) and $268,078.20, if there were a contractual understanding between the general contractors and Landworks to exclude the concrete placement (02515) and rubberized track.

Respectfully submitted,

George G. Byk, P.E.

GGB/mm
Copy   Files
Exhibits