**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **LANDWORKS CREATIONS, LLC,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES FIDELITY AND GUARANTY COMPANY, and LOVETT SILVERMAN CONSTRUCTION CONSULTANTS, INC.** | ) **C.A. No. 4:05-CV-40072-FDS** |
| **Defendants,** | ) |

**MOTION IN LIMINE OF THE DEFENDANT,**
**UNITED STATES FIDELITY AND GUARANTY COMPANY**
**TO LIMIT EVIDENCE PRESENTED BY THE PLAINTIFF**
**UNDER COUNTS I AND VI OF THE AMENDED COMPLAINT**

Defendant, United States Fidelity and Guaranty Company ("USF&G"), moves *in limine* to limit the evidence presented by the plaintiff, Landworks Creations, LLC ("Landworks"), under Count I of the Amended Complaint to evidence regarding the performance of work and the payments received under the Landworks' contracts. USF&G also moves to preclude Landworks from presenting evidence relating to other projects, other contracts, other subcontractors on other construction projects and other claims against USF&G and/or filed by USF&G against parties unrelated to Landworks, and USF&G's bad faith "history" under Count VI (Ch. 93A/Ch. 176D) of the Amended Complaint.

## I. FACTS

In August 2003, Landworks signed a subcontract with Standen Contracting Company, Inc. ("Standen") for site work at the Shrewsbury Middle School Project ("Shrewsbury Project"). In February 2004, Standen defaulted. In March 2004, the Town of Shrewsbury and USF&G signed a Takeover Agreement, and Landworks and USF&G signed a Hold Agreement.

Landworks then negotiated a subcontract with Jackson Construction Company ("Jackson"), the new general contractor ("Jackson Subcontract").

With respect to Count I, the evidence described below that Landworks proposes to offer is irrelevant because it is unrelated to the breach of contract claim alleged in Count I of the Amended Complaint. The issues relating to the breach of contract are the performance (or not) of work by Landworks, the payment (or not) of contract funds by those parties with whom Landworks proves it had a contract and the backcharges properly assessable against Landworks because its work either was incomplete or defective.

In addition, the introduction of evidence with respect to allegedly improper claim handling is prejudicial if heard by the jury determining Count I because it introduces issues extraneous to the contract issues about improper conduct or ill motive on the part of USF&G which has no bearing on Landworks' entitlement to recover for breach of contract.

With respect to Count VI, the evidence described below is irrelevant because the claim alleged by Landworks against USF&G under Count VI is a failure to pay once liability has become reasonably clear. Therefore, the evidence relevant to that claim is whether liability was (or was not) reasonably clear, not whether any practice or procedure of USF&G under any other contract or on any other project was different from any practice followed with respect to the Landworks claim.

## II. SUMMARY OF PROPOSED EVIDENCE

This motion is directed specifically at the following "evidence" identified by plaintiff's counsel in Landworks' Pre-Trial Memorandum:

1. Landworks listed two witnesses (John Lemieux and Terry Scalzo) who were involved with a construction project at the Hull High School, unrelated to the Shrewsbury

Project, in order to introduce evidence regarding USF&G's handling of other unrelated construction claims. (Exhibit 2 – Landworks' Pre-Trial Memorandum p. 9.)

2. Landworks listed several subcontractors' keeper of the records and persons most knowledgeable (Century Drywall, Steelco Fence, K&K, and Brodny Floors) that presumably were involved with the Shrewsbury Project, but who were not involved with any of the site or landscaping work, in order to introduce evidence of other subcontractor lawsuits against USF&G. (Exhibit 2 – Landworks' Pre-Trial Memorandum p. 10.)

3. Landworks listed Frias Concrete, the Jackson concrete subcontractor, as a witness in order to introduce evidence of Frias Concrete's scope of work in the Shrewsbury Project and how it came to be "declared" a subcontractor. (Exhibit 2 – Landworks' Pre-Trial Memorandum p. 10-11.)

4. Landworks listed several witnesses (James M. Peters, Kevin J. O'Connor, Scott S. Spearing, and Eric C. Hipp) in order to introduce evidence of USF&G's separate and distinct claim against Jackson that is unrelated to Landworks. (Exhibit 2 – Landworks' Pre-Trial Memorandum p. 7, 8.)

5. Finally, Landworks also listed James M. Peters from USF&G in order to introduce evidence of USF&G's failure to settle, and "USF&G's regular consent to litigation in the Massachusetts state courts." (Exhibit 2 – Landworks' Pre-Trial Memorandum p. 7.)

## III. ADMISSIBILITY OF EVIDENCE – COUNT I

Federal Rule of Evidence 401 defines relevant evidence as evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. See *Tiller v. Baghdady*, 244 F.3d 9, 14 (2001). Evidence regarding other construction claims, other lawsuits involving

USF&G and Jackson, and other subcontractors' contract history and scope of work, is irrelevant to Landworks' performance or payment under its contracts at the Shrewsbury Project, which is the subject of Count I of the Amended Complaint. As such, it is inadmissible. See *Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618 (R.I. 1988)**(** Evidence of self-dealing to prove defendant acted suspiciously and evidence of events occurring after contract was executed were irrelevant).

A second basis for the exclusion of the evidence with respect to Count I is that the evidence is unduly prejudicial and will be confusing to the jury considering a breach of contract claim. On Count I, the issue is whether or not the contract was performed, whether payment was made for the performance that was completed and whether there are any backcharges with respect to the work performed under the contract. Evidence relating to the existence of insurance coverage of one kind or another to pay the amounts proven to be due is prejudicial as a matter of law. See *Goldstein v. Gontarz*, 364 Mass. 800, 807-914 (1974) (evidence of insurance is both irrelevant and highly prejudicial). This rule has been applied in numerous cases in the Massachusetts Superior Court in which the court has severed and stayed Chapter 93A claims because the introduction of the evidence concerning the alleged statutory violations would taint unfairly the jury's determination of the underlying dispute between the parties. See *Belcher v. Pawtucket Mut. Ins. Co.,* Appeals Court No. 89-J-672 (September 27, 1989)(Kass, J.), *Gross v. Liberty Mutual Ins. Co*., Appeals Court No. 84-0138 (April 24, 1984)(Kass, J.)(Claims against an insurer based upon violations of Chapters 93A and 176D are premature until the insured has been found liable). (Exhibit 3). *See also Bixby v. Allstate Ins. Co*., 1986 Mass. App. Div. 118, 119, citing *Royal Globe Ins. Co. v. Superior Court of Butt County*, 23 Cal.3d 880, 502 P.2d 329 (1979)(The issue of reasonable settlement practice is most effectively gauged by the resolution

of the underlying tort action). (Exhibit 4).

The only purpose for the introduction of the evidence on Count I is to prejudice the jury's determination of the amount owed, if any, on the contract claim. Of necessity, evidence with respect to other claims, other projects and other lawsuits cannot be probative of the value of the work performed by Landworks. Its value to Landworks on the contract claim can only be to obscure the issues and to prejudice the jury so that it will make an award in favor of Landworks that cannot be justified on the merits of the contract claim. Therefore, the proposed evidence identified above should be excluded on Count I.

## IV. ADMISSIBILITY OF EVIDENCE – COUNT VI

With respect to Landworks' Chapter 93A/Chapter 176D claims, Landworks' allegations with respect to USF&G are that USF&G failed to make payments once liability became reasonably clear on the Landworks claim. Evidence of USF&G's activities on other projects, on other subcontracts or with respect to other civil actions against parties with whom Landworks denies it had a contract, cannot be relevant to the issue of whether liability was reasonably clear and whether USF&G failed to make a payment.

If the case goes forward on Landworks' G.L. c. 93A claim, the evidence should be presented to the Court outside the presence of the jury. The test for determining whether an insurer violated G.L. c. 93A/176D by failing to settle the claim when liability was "reasonably clear" is "whether a reasonable person, with the knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." *Demeo v. State Farm Mut. Auto. Ins. Co.*, 38 Mass. App. Ct. 955, 956 (1995). See also *O'Leary-Alison v. Metropolitan Property & Casualty Insurance Co*., 52 Mass. App. Ct. 214, 215 (2001) (insurer's duty to settle arises only when liability has become reasonably clear).

## V. CONCLUSION

Therefore, USF&G moves *in limine* to preclude Landworks from presenting evidence of other projects, contracts, parties, and claims unrelated to Landworks' performance or payment under its contacts. USF&G also moves *in limine* to preclude Landworks from introducing any bad faith evidence to the jury, and requests that Landworks be limited to introducing objective evidence only on the issue of whether liability was reasonably clear if the bad faith claim is presented to the Court.

Respectfully submitted,
**UNITED STATES FIDELITY & GUARANTY COMPANY,**
By its attorneys,

*/s/ Peter G. Hermes*

Peter G. Hermes, BBO No. 231840
Kevin J. O'Connor, BBO No. 555249
Cynthia J. Stephens, BBO No. 560670
HERMES, NETBURN, O'CONNOR & SPEARING, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050
(617) 728-0052 (F)

Date: May 2, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 2, 2008.

*/s/ Peter G. Hermes*
Peter G. Hermes

G:\DOCS\CJS\Travelers\Landworks\TRIAL Pleadings\Motions in Limine\Robin Changes MIL Irrelevant.doc

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

LANDWORKS CREATIONS, LLC

Plaintiff

v.

UNITED STATES FIDELITY AND GUARANTY COMPANY and LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.

Defendants

AMENDED COMPLAINT

1. Plaintiff, Landworks Creations, LLC ("the Plaintiff") is a limited liability corporation with a principal place of business at 1500A Lafayette Road in Portsmouth in the State of New Hampshire.

2. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("USF & G") is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts.

3. Defendant, Lovett-Silverman Construction Consultants, Inc. ("L-S") is a business entity with a principle place of business at 380 Townline Road, Haupauge, in the state of New York.

4. Jurisdiction may be had over L-S based upon the conducting of business by L-S in the Commonwealth of Massachusetts, and by nature of its torts within the Commonwealth of Massachusetts, and based upon the existence of offices within the Commonwealth of Massachusetts.

5. The Plaintiff entered into a contract with Standen Contracting Company, Inc. of North Dartmouth, Massachusetts.

6. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project")

7. Standen Contracting Company, Inc. was bonded by USF & G, United States Fidelity & Guaranty Co.

8. Standen Contracting Company, Inc. was unable to complete its work at the Project, and USF & G, pursuant to its obligations under a performance bond SW5041 assumed responsibility for completion of the Project in the stead of Standen Contracting Company, Inc.

9. The Plaintiff has performed it work under the Standen contract, and is owed funds by USF & G for the work performed.

10. USF & G has failed to pay the Plaintiff for work performed at the Project, to the extent of $135,101.00.

11. At some point in the winter of 2004-2005, or in the spring of 2005, USF & G brought L-S to the Project to oversee completion of the Project.

12. L-S engaged in a scheme to reduce costs to USF & G on the Project by refusing to authorize payments to subcontractors, including the Plaintiff, by engaging in extortion toward the subcontractors, by strong-arming the subcontractors and by attempting to deny the subcontractors their rights under their contracts.

13. L-S also engaged in conduct that compelled subcontractors to file suit to receive payment, as part and parcel of a scheme to extort payments from subcontractors to USF & G through frivolous and fraudulent lawsuits.

14. In the words of Al Falango at L-S, there was an organized and on-going effort by L-S "to bang the subs…"

15. Landworks was a victim of L-S's conduct.

COUNT I
BREACH OF CONTRACT
LANDWORKS v. USF & G

16. The Plaintiff restates allegations 1-16 and incorporates them by reference.

17. USF & G breached its contract by failing to perform its obligations to make payment under the bond between USF & G and Standen for the benefit of the Plaintiff..

18. As a result of this breach, the Plaintiff has been denied its expectancy and has otherwise been harmed.

COUNT II
FRAUD
LANDWORKS v. BOTH DEFENDANTS

19. The Plaintiff restates allegations 1-18 and incorporates them by reference.

20. The Defendants engaged in specific conduct which serve as fraud on the Plaintiff:

a. the Defendants failed to effectuate payments of monies due and owing

b. knowing that funds were due and owing, the Defendants engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract

c. knowing that funds were due and owing, the Defendants devised and carried out a conspiracy to "bang" Landworks.

d. knowing that the Plaintiff was not culpable for defects at the site, USF & G alone and with the support of L-S defamed the Plaintiff, making knowingly false statements in court papers to defend its failure to pay, and otherwise, by its conduct, implying defects in performance that harmed the Plaintiff in its business

e. knowing that the Plaintiff was not culpable for defects at the site, USF & G filed false statements with this Court, obstructed access to documents by thwarting the discovery process, asserted false affirmative defenses, manipulated the legal system by removing this matter to the federal court in the hope of slowing the progress of litigation, assisted in and filed a knowingly false counterclaim.

f. Knowing that the Plaintiff was not culpable for defects at the site, USF & G has engaged in a pattern and practice of hindering or delaying the resolution of this litigation.

21. This conduct, which constituted fraud on the Plaintiff, caused harm to the Plaintiff.

COUNT III
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

22. The Plaintiff restates allegations 1-21 and incorporates them by reference.

23. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere in the contract between the Plaintiff and USF & G, for ulterior motives.

24. L-S was aware of the advantageous business relationship between the Plaintiff and USF & G.

25. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

COUNT IV
TORTOUS INTERFERENCE
LANDWORKS v. BOTH DEFENDANTS

26. The Plaintiff restates allegations 1-25 and incorporates them by reference.

27. L-S, by carrying out its program of "banging" the subcontractors, did tortuously interfere in the contract between the Plaintiff and USF & G, for ulterior motives.

28. L-S was aware of the advantageous business relationship between the Plaintiff and USF & G.

29. L-S interfered in that relationship.

As a result, the Plaintiff was harmed.

COUNT V
CONVERSION
LANDWORKS v. USF & G

30. The Plaintiff restates allegations 1-29 and incorporates them by reference.

31. USF & G received the benefit of the Plaintiff's work, to a value of $135,000.

32. USF & G kept that value.

33. USF & G converted the value of that work to its own benefit.

34. As a result of this conversion, the Plaintiff has been harmed.

COUNT VI
VIOLATIONS OF c. 93A AND c. 176D
LANDWORKS v. BOTH DEFENDANTS

35. The Plaintiff restates allegations 1-34

36. The Plaintiff and both defendants are involved in trade or commerce.

37. Defendant, USF & G failed to investigate a claim and make prompt payment. Notwithstanding that liability was reasonably clear, USF & G has declined to make full settlement of the claim, without cause or excuse.

38. Defendant, L-S, set out to harm Landworks by denying it access to the Project and to funds due and owing.

39. The Plaintiff has made demand for its funds, a demand which has been ignored.

40. The pattern and practice of fraud, tortous interference and such conduct constitutes violations of c. 93A by L-S.

41. The pattern and practice by USF & G of refusing to make payments and to investigate violate both c. 93A and c. 176D.

42. As a result of this conduct, the Plaintiff has been harmed in its business.

COUNT VII
VICARIOUS LIABILITY
LANDWORKS v. USF & G

43. The Plaintiff restates allegations 1-42

44. To the extent that L-S was acting as an agent of USF & G, USF & G is liable for the torts of its agents.

45. The Plaintiff was harmed by the tortous conduct of L-S.

46. Defendant, USF & G is liable for that harm.

COUNT VIII
NEGLIGENT SUPERVISION
LANDWORKS v. USF & G

47. The Plaintiff restates allegations 1-46

48. To the extent that L-S was acting as an agent of USF & G, USF & G had a duty to supervise its agent to assure that the agent did not commit harm.

49. Defendant, USF & G breached that duty.

As a result of its negligence, the Plaintiff was harmed.

WHEREFORE, the Plaintiff respectfully requests that:

1. this Honorable Court enter judgment against USF & G as to all Counts in which it is named;
2. this Honorable Court enter judgment against L-S as to all Counts in which it is named
3. this Honorable Court award the Plaintiff the amount of $135,101 together with interest and costs, trebled, along with attorney's fees
4. this Honorable Court award damages in an amount that will make the Plaintiff whole on the tort claims, trebled, along with attorney's fees; and
5. this Honorable Court award any further relief as deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer
Robert N. Meltzer, BBO #564745
PO Box 1459
Framingham, MA 01701
Phone: (508) 872-7116
Telecopier (508) 872-8284

Dated: June 20, 2006

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-CV-40072 FDS

| | |
|---|---|
| LANDWORKS CREATIONS, LLC | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY & GUARANTY COMPANY | ) ) |
| | ) |
| Defendant | ) |

LANDWORKS CREATIONS, LLC 'S PRE TRIAL MEMORANDUM

Now comes the Plaintiff, Landworks Creations, LLC and provides this pre-trial memorandum to the Court. Notwithstanding the Court's Order waiving filing of the pre-trial memorandum, the Plaintiff believes that this memorandum will assist this Court in understanding the issues prior to trial.

I. BRIEF STATEMENT OF THE CASE

This is a straightforward claim brought under G.L. c. 149 §29 for non-payment of sums due and owing to Plaintiff, Landworks Creations, LLC ("the Plaintiff") arising out of a construction project at the Shrewsbury Middle School, following the failure of Standen Contracting. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") provided the payment and performance bond that is in issue to

cover the amounts due and owing is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project"). Standen Contracting Company, Inc. was unable to complete its work at the Project, and the Defendant, pursuant to its obligations under a performance bond SW5041 assumed responsibility for completion of the Project in the stead of Standen Contracting Company, Inc. The Plaintiff has performed it work under the Standen contract, and is owed funds by the Defendant for the work performed. The Defendant has failed to pay the Plaintiff for work performed at the Project, claimed to the extent of $135,101.00.

## II. CONTESTED ISSUES OF FACT

The Defendant denies liability for work performed by Landworks, and has falsely claimed that Landworks abandoned the Project, and that the Defendant was required to complete the work at Landworks' expense. Landworks contests these facts. Landworks further believes it is entitled to payment of treble damages, as well as its attorney's fees based upon the Defendant's bad faith refusal to honor this straightforward claim.

The Plaintiff notes that Lovett-Silverman was the Defendant's eyes and ears on the ground, entrusted with the day to day obligation of the Defendant's responsibilities to the Plaintiff. The Defendant, alone and by its agent, utterly failed to comply with standard industry practice for reviewing and processing claims, and operating the construction site in accordance with industry standards and practices. Thus, the Defendant cannot claim

abandonment as a matter of law, or seek remedies against the Plaintiff. These breaches of industry standards, in conjunction with e-mail traffic which demonstrates a willful failure to comply with industry standards, warrants imposition of treble damages.

III. PLAINTIFF'S WITNESS/EXPERT WITNESS LIST

Neal Matthews
Landworks Creations, LLC
PMB 291 1500A Lafayette Rd.
Portsmouth, NH 03801

Mr. Matthews has personal knowledge of the Plaintiff's contract with Standen Construction, the work performed by the Plaintiff on behalf of Standen, the invoices submitted to Standen and paid either by Standen or USF & G, as well as the attempted completion of the work with Jackson, the change orders signed and accepted by Jackson as agent of USF & G, the work itself, the invoices submitted and the damages sought. Mr. Matthews also has personal knowledge of his attempts to return to the site to perform any additional work that required performing and the Defendant's refusal to allow the Plaintiff to complete the work, notwithstanding that the Plaintiff was always ready, willing and able to perform work and had not been, in any way, terminated from the work.

William Gambill
Formerly of Standen Contracting
445 Faunce Corner Road
N. Dartmouth, MA 02747

Bill Gambill has familiarity with the scope of the Landworks/Standen contract, the work performed by Landworks, the invoices submitted by Landworks to Standen and

the monies paid, the condition and state of the project at the time Standen left the project, the payment and performance bond contracts with USF & G and the project supervision and oversight in general

Michael Pagano
Katie Crockett (sp?)
Todd Manning
Lamoureux Pagano Associates
14 East Worcester Street
Worcester, MA 01604

These are the project architects, with knowledge of the project overall, the scope of the work, the work performed by Landworks, the status of the project at the time Standen left the project, the administrative and contractual issues caused by Jackson, and the completion of the project.

Dan Morgado, Town Manager
"Duffy" Lanciani Clerk of the Works
Robert Cox-Superintendent, Public Buildings Dept
Shrewsbury Town Hall
Shrewsbury, MA

The town manager has personal knowledge of the scope of the project in general, and the business side of the retention and termination of Standen, the negotiations with USF & G and the entire Jackson involvement in the project. Duffy has personal knowledge of the work, the progression of the work, and the conduct and misconduct of Jackson toward the subcontractors on the job. Cox was kept fully apprised of the scope of the work and the progress of the work, and the consequences of Jackson's failure to make appropriate payments.

Richard McGuinness

Frank Leonardo
Robert Barton
Jennifer Fletcher
Jackson Construction Company
20 Dan Road
Canton, MA 02021

Jackson Construction and its agents, employees and managers, have personal knowledge of the project overall, the Plaintiff's work, the invoices submitted, the invoices paid, the change orders submitted and the change orders approved and not paid, the condition of the work at the time the Plaintiff left the project, and the status of Jackson's lawsuit with USF&G. Frank Leonardo also worked for Standen and has the same personal knowledge as Gambill

Jeff Richards
Waterman Design Associates
31 East Main Street
Westborough, MA 01581

Waterman Design's staff engineer was familiar with the scope of the work, the progress of the work and the quality of the Plaintiff's work.

Craig M. Valente
D.A.Collins Construction Co.
Mechanicsville, NY

Mr. Valente is a contractor who was bidding a construction project in Newburyport. The Plaintiff was recommended to D.A. Collins by Waterman Designs based upon the staff engineer's recommendation based upon the quality of the Plaintiff's work at the project.

Jack Ferguson

CTM

CTM was the town's construction manager, with personal knowledge of the scope of the work, the progression of the work and the issues with the various contractors during the course of the project.

Robert Bullock
Lovett Silverman Construction Consultants, Inc.
19 Goldenrod Drive
Carlisle, PA 17013

Mr. Bullock is the construction consultant for the Defendant. Mr. Bullock has personal knowledge through communication with the Plaintiff that the Plaintiff was at all times ready, willing and able to meet with the consultant and to address issues of unpaid invoices and to return to the site to perform any work necessary at the site. Mr. Bullock has knowledge that he refused to meet with the Plaintiff, and refused to allow the Plaintiff to return to the site. He is expected to have knowledge as to why he wrote to the Plaintiff in August of 2005 stating "we checked with the surety and we were told that we can not deal with Landworks while the legal case is pending"

Tony Lardaro
Bill Mertz
Al Falango
Pedro Rosario
Lovett Silverman Construction Consultants, Inc.

Each of these individuals was apparently involved in the assessment, or lack thereof, of the claim of Landworks, LLC, and otherwise was involved in the completion of the project at the Shrewsbury Middle School, and in the search for replacement contractors, ratification of contractors and the decision not to ratify Landworks LLC.

These individuals also have personal knowledge of Defendant, USF & G's failure to properly investigate the claim, and in preparation of a knowingly false counterclaim.

James M. Peters
Russell Fuller
United States Fidelity & Guaranty
Hartford, CT

Mr. Peters, by his own affidavit, has "responsibility for the oversight, handling and management of claims arising under surety bonds executed by United States Fidelity and Guaranty Company…on behalf of Standen Contracting Company, Inc. Upon information and belief, Mr. Peters will be the primary witness pertaining to USF & G's unfair and deceptive claims settlement practices, with information pertaining to the methods and policies used by USF & G to resist valid claims through hindrance, delay, prolonged litigation and other means and methods to avoid payment of the Plaintiff's uncontested claims. Mr. Peters is also expected to testify as to the principal/agent relationship between USF & G and Jackson Construction, and USF & G's regular consent to litigation in the Massachusetts state courts. Mr. Peters is also expected to have knowledge regarding its awareness of Jackson's fraudulent and deceptive trade practices as noted in United States Fidelity & Guaranty Co. v. Jackson Construction Co. et al, 05-11397 NMG, and is expected to provide some explanation why it is credible for USF & G to rely upon Jackson in denying the Plaintiff's claim. Mr. Peters is also expect to have information as to why the surety blocked the Plaintiff from the site and why the surety prevented its agent for engaging in an investigation of the claim. Mr. Peters is also expected to have actual knowledge of the fraud claims brought against Jackson, and is expected to have actual knowledge of Jackson's fundamental unreliability.

Russell Fuller has the same general knowledge, and he participated in conversations in which Lovett-Silverman, in conjunction with USF & G, acted unlawfully toward Landworks, LLC in its ratification process. According to e-mails produced by Lovett-Silverman, Fuller had some form of unspecified "problem" with Landworks.

Kevin J. O'Connor, Esq.
Scott S. Spearing, Esq.
Eric Hipp, Esq.
Hermes Netburn O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109

On or about July 1, 2005, these individuals affixed their signatures under F.R.C.P. 11 to a suit filed against Jackson Construction in the United States District Court in Boston entitled United States Fidelity & Guaranty Co. v. Jackson Construction Co. et al, 05-11397 NMG which includes claims for fraudulent conveyance and unfair and deceptive trade practices, amongst other allegations. These individuals have broad knowledge of Jackson's pattern and practice of fraud in the construction industry.

Eric Hipp engaged in e-mail correspondence with employees of Lovett-Silverman shortly prior to the filing of the Counterclaim in which the false backcharges were specified. Hipp is expected to testify about the substance of his communications with Lovett-Silverman in which it was noted that Lovett-Silverman was not acting with proper speed in determining merit of Landworks' claims.

Brad Carver, Esq.
Hinshaw & Culbertson
One International Place
Boston, MA 02110

Mr. Carver has personal knowledge that he was informed by Plaintiff's counsel during the spring and summer of 2005 that the Plaintiff was ready, willing and able to return to the site to perform any work requested by the surety, that the surety and Jackson were unlawfully barring access to the site and that the Plaintiff was incurring further damages as a result of the surety's refusal to meet its obligation to address the Plaintiff's claim. Brad Carver was included in e-mail traffic in which questionable conduct by Lovett-Silverman and USF & G toward Landworks was discussed.

John Lemieux
Terry Scalzo
Vertex Engineering

These individuals were involved in investigating the claims of subcontractors at the Hull High School project after the failure of Jackson Construction in the summer of 2005 on behalf of USF & G, Jackson's surety. The Hull project involved the same contractor, Jackson, the same surety, USF & G, and the same attorneys for USF & G, as is found in this case. These individuals were also involved in the project completion on behalf of USF & G following the failure of Jackson Construction, and in the ratification process on behalf of USF & G in conjunction with counsel for USF & G. These individuals have actual knowledge as to the fact that USF & G's construction consultants were permitted to be in active contact with subcontractors and their attorneys, that meetings were held in which all parties were present, that investigation of a claim being reviewed in good faith included communication with all parties involved and knowledgeable of the facts, and the methods and procedures of reviewing claims. These individuals also have actual knowledge that in the summer of 2005 USF & G and its

construction consultants and its attorneys continued this good faith behavior, even after a claim had been filed under G.L. c. 149 § 29 and G.L. c. 176D and 93A, and that ratification was permissible even during the pendency of such a lawsuit, and that this conduct was transpiring during the summer and autumn of 2005, even as USF & G and Lovett-Silverman were informing the Plaintiff in this case that USF & G policy dictated otherwise. This testimony is also expected to demonstrate that the Plaintiff's expectations of USF & G's response to its claim was not in any way unsupported by prior demonstration of USF & G's policies as they were carried out in 2005-2006.

PMK and KOR Century Drywall
PMK and KOR Steelco Fence
PMK and KOR K & K
PMK and KOR Brodny Floors

These subcontractors include three companies, Brodny, Century and K & K, who were compelled to bring suit to recover monies due and owing without good excuse for non-payment. Century, in particular, is expected to testify about the tactics used against it, and the delays caused in payment, without good excuse for non-payment. In addition to Landworks, these are "banged" subcontractors. Steelco also has knowledge that the so-called policies of USF & G pertaining to communication between the surety and its consultant, as represented to Landworks, was not true.

Frias Concrete

Frias Concrete was Jackson Construction Company's concrete subcontractor, and has actual knowledge as to the scope of its work at the project, the contracting practices of

Jackson, and the fact that no one contacted Frias to discuss its role at the Project during the time that Lovett-Silverman was declaring Frias to be a subcontractor to Landworks.

Expert-The Plaintiff will call William Gallagher as its expert witness. Mr. Gallagher is a construction manager of substantial experience, and knowledge of the local construction industry. He has extensive knowledge of public construction practices and policies, as well as means and methods. He is expected to testify as to these areas, and he is expected to testify as to the numerous ways that the defendants in these cases violated the practices and policies, as well as the means and methods usually employed in bringing public construction projects to completion. He is expected to testify consistent with prior interrogatory answers, affidavits and expert disclosures. Specifically, he will testify as follows: he has reviewed, with regard to the Project, the construction file of Landworks Creations, LLC, the deposition transcripts of the project architect, Katie Crocket, of Lovett-Silverman employees Tony Lardaro, Bill Mertz and Robert Bullock, of USF & G representative Jim Peters and of the Neal Matthews of Landworks. He has also reviewed the deposition exhibits, documents produced by the parties in this case and by the project architect, and he has spoken in extensive and exhaustive detail with Neal Matthews. He bases his opinions upon the specific facts and documents in this case, as well as upon his prior experience as a construction manager on public and private projects. He will testify that when a construction consultant or construction manager takes over a project that is already underway, and in which a general contractor has left a job or has undergone business failure, there are certain task that are customarily performed in order to get the work back on track and finished. These tasks include:

a. assessing the status of the work and the work performed by each subcontractor.

b. ascertaining the status of payment to subcontractors, who generally and customarily suspend work or demobilize pending review of payment issues.

c. ratifying subcontractors, that is, bringing the subcontractors back to work under the control of the Surety on public projects

d. completing the work in the fastest way possible

He will testify that it is always preferred by construction consultants and managers to ratify prior subcontractors; these subcontractors generally know the Project better than the new consultants, and are generally the best source of information about the Project and what needs to be done to get the project finished. They also do not require time to get up to speed on the work, they can mobilize quickly, and they are generally locked-in to a lower price than replacement subcontractors by the nature of the contract date. In addition, it is often difficult to find a subcontractor willing to pick up where another subcontractor has left off and where a project is already troubled. As a general rule in the construction industry, a subcontractor is brought back to work unless there is a compelling reason not to bring a subcontractor back to work. He will testify that the fact that a subcontractor may be owed money, or may be claiming to be owed money, is not, customarily, a compelling reason not to engage a subcontractor to complete the work. He will also testify that in the construction industry, particularly involving contracts with site contractors, the scope of a contract cannot be determined by mere contract documents. Lovett-Silverman's employees testified that they viewed the recitation of the site work sections defining the scope of the work to be all conclusive. However, in the construction

industry, particularly public construction, where all site work is collected under Division 2, the recitation of all specification under Division 2 does not constitute the scope, but rather then location where the broad scope of work is included. In other words, since parts of the work are found in multiple parts of Division 2, all elements of Division 2 are customarily included. The assertions made by Lovett-Silverman that the scope of work can be entirely found by strictly construing the contract, without further investigation, contradicts both custom and industry practice, and reflects a failure to perform the usual investigation performed in the context of this case. Similarly, it is evident, because Lovett-Silverman conducted no investigation, that Lovett-Silverman never considered or had the ability to consider, whether the Jackson contract was binding or even in force and effect for purposes of defining scope. This investigation would be particularly important in this case; as Neal Matthews noted in his deposition testimony, Jackson engaged in a pattern and practice of demanding extra work outside of the Landworks scope as Jackson neared insolvency. These items of extra work confirm that the prior scope had been limited, and that defining the scope of obligation could not be inferred from earlier contract documents. He will testify that he has seen documentation that demonstrates that Landworks removed its forces from the Project in January of 2005, and that it was scheduled to complete its work in the spring of 2005. It is customary for site contractors to engage in "winter shut down," as weather conditions preclude certain types of work from being performed. This is customary in the industry, and it is not considered "abandonment" of the work. He will testify that he has also seen documentation that both Landworks and many other sub contractors did not return to the Project after the failure of Jackson and pending payment, and that this has been acknowledged both by Lovett-

Silverman and USF & G. This is also customary in the construction industry; following failure of a general contractor, it is essential for a pause in the work so that the scope of remaining work may be assessed and the issue of unpaid invoices to the subcontractors may be addressed. In the construction industry, it is not customary to assume that a sub contractor who is awaiting payment following the failure of a general contractor has "abandoned" the work. He will testify that he has reviewed the so-called "deficiency reports." These are merely "punch list" items. Punch list items are inventories of work that have yet to be performed or which have minor deviations which must be fixed before the work is acceptable to the owner of the project. He will testify that punch lists occur on every job, and are distributed to every contractor and subcontractor. Even though punch lists may be titled "deficiencies" or "defective items," they are customary on every job and merely inventory work left to be performed. The existence of punch lists, both by industry custom and industry standards, does not create a presumption of breach of contract by the contractor or subcontractor. He will testify that he has seen documents in this case which indicate that Landworks had punch list items to complete. Since the work had not yet reached completion when Jackson failed, this is not unusual or unexpected. He will testify that he has seen no documents that demonstrate the existence of defects in the work performed by Landworks that would cause concern to a construction manager or construction consultant, or which would suggest an inability or unwillingness to complete the work. He will testify that he has seen nothing in the papers or documents or testimony in this case that would indicate a compelling need to replace Landworks as the site contractor. On the contrary, the record shows that Landworks was always ready, willing and able to perform work that needed to be done, demonstrating a degree of

teamwork that should have made Landworks a desirable subcontractor on the Project. He will testify that as a construction manager and consultant, it is customary to encourage these kind of extra-mile subcontractors to become pro-active in getting the work done. He will testify that he has seen in the materials in this case a demonstration of what transpires when a consultant declines to ratify a subcontractor; the difficulty had by Lovett-Silverman in trying to find a site subcontractor at a reasonable price who could perform the work confirms why, customarily, a subcontractor is retained. He will testify that he has seen no document in this case that would serve as a termination of the Landworks' contract as defined in the industry. He will testify that, from reviewing the file, that Landworks continued to have a binding contract in the form of the post-Standen ratification agreement which defined the rights of the parties, and the obligation of the Surety to deal in good faith with Landworks' claims for payment and its demand for its right to return to work. It would be customary in the construction industry to view the situation in this way. He will also testify that he has seen the e-mail from Lovett-Silverman in which an employee of Lovett-Silverman refers to shortages of money, and the idea of "banging" the subcontractors. He will testify that banging the subcontractors has a very specific meaning in the construction industry, especially when paired with the first part of the e-mail reflecting a shortage of funds. Banging the subcontractors means withholding payment from them, or denying them their rights under their contracts, in the hopes of either forcing the subcontractors to compromise their claims, to be forced to file suit on the payment bond to defer payment for years, to likely compromise a claim as part of a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial distress. Banging the subcontractors is a form of violence to them, and it is a

means and method of denying subcontractors what may be theirs. In the construction industry, the less violent, but equally suggest term for this inappropriate behavior would be "strong arming." He will testify that he has noted from the deposition of James Peters of USF & G that more than 20 lawsuits were filed on the payment bond in this Project; that would easily represent the vast majority of subcontractors working on the Project. He will also testify that this refers to the number of claims in suit, and would not include the subcontractors who settled for less in order to avoid suit. In the construction industry, this number of lawsuits on a single public project is highly unusual, and suggests an intentional failure to address claims by Lovett-Silverman and the Surety, as opposed to systemic failure by all of the subcontractors. In light of the unusual number of claims, paired with lack of competent review of the project details by Lovett-Silverman, read in conjunction with the e-mail identifying the shortage of funds, and coupled with the statement about "banging" the subcontractors, It is evident that Lovett-Silverman, USF & G's agent, intentionally engaged in conduct, which includes failing to engage in reasonable conduct, which would interfere with Landworks' rights under the contract. The number of defects in performance by Lovett-Silverman in terms of deviation from industry custom and practice when dealing with subcontractors following the failure of a general contractor are substantial and pervasive. The deviations from industry custom and practice are so complete that it would suggest to any competent construction manager a willful deviation from custom, as it would be almost impossible for negligence to explain these deviations. In short, the facts presented, based upon his expertise and experience in the field, is that Landworks is a banged subcontractor, and that it was intentionally prevented from doing its work on the Project and addressing its claim with the Surety,

and from receiving payment for its work, and was otherwise forced to file suit to collect money that appears to be appropriate due and owing.

The Plaintiff reserves the right to call any witnesses identified or call by the Defendant.

IV –DOCUMENTS/EVIDENCE

The Plaintiff intends to introduce the following documents into evidence:

1. The contract with Standen
2. The project contract and specifications and drawings
3. Any and all change orders submitted and signed by Jackson
4. Invoices submitted
5. Documents evidencing payment or non-payment
6. Correspondence between the various parties demonstrating the obligations due and owing to Landworks from USF & G as referenced in correspondence to Jackson, and the failure of the surety to make payment, including any and all documents of the town of Shrewsbury, the project architects and engineers.
7. Deposition testimony of officials of Lovett & Silverman who are not physically present at trial, as well as all exhibits marked at those depositions.

IV ISSUES OF LAW

The Plaintiff has already put Defendant, USF & G on notice that it intends to move to disqualify George Byl as Defendant's expert witness on the grounds that the report of Byl indicates an attempt to supplant the role of the jury in this case by assessing credibility,

and weighing and reaching conclusions of fact outside the purview of an expert witness. Byl also lacks the qualification and competence to testify as to standards of the industry pertaining to public school construction management, which is the primary issue in this case.

The Plaintiff has identified numerous attorneys as witnesses as to the 93A portion of this case, which may necessitate filing motions in limine to disqualify these attorneys prior to trial.

V.LENGTH OF TRIAL

The Plaintiff anticipates trial will require ten half days.

Respectfully Submitted,

**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer______________
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: April 28, 2008

CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this day I served a copy of the foregoing on all counsel of record by mailing the same, postage prepaid, to:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Peter Hermes, Esq.

s/Robert N. Meltzer

April 28, 2008

# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

89-J-672

JENNIFER BELCHER

vs.

PAWTUCKET MUTUAL INSURANCE COMPANY.

MEMORANDUM AND ORDER

It seems apparent that once a tort claim is reported by an insured to the insurance company for a defense and payment if there is liability, the file material accumulated by the insurance company is largely in anticipation of litigation.

It seems equally apparent to me, as set forth in an earlier memorandum and order on the subject in Gross v. Liberty Mut. Ins. Co. and others, single justice docket no. 84-0138, that to authorize discovery in an unfair settlement claim before the underlying claim has been established is to get the cases in the wrong order. The argument that the situation lies otherwise if the injured party has not actually filed a claim in court is unpersuasive. There may be no complaint in court, but there is an underlying claim and, as the insurance company has argued, the distinction would encourage postponement of filing the underlying injury claim in favor of an unfair settlement claim against the insurance company.

I shall respond to the petition with a protective

order along the lines requested.

If I may be permitted an aside, it seems extraordinary that the insurance company in its memorandum suggests questions in the case about liability. This is a dog bite case. A child has been injured. Absent the most extraordinary circumstances, there is going to be liability and the question is how much are the damages. One would expect conscientous counsel to evaluate the claim and to give the company the benefit of its advice. In terms of the litigation posture of the insurance company, I am struck by the wholly routine nature of its answer to the plaintiffs' complaint against the insurance company.

Upon examination of the papers, which included the helpful memorandum filed by the plaintiff in Superior Court, it is ordered that until the underlying personal injury claim is settled or litigated to judgment, the insurance company need not produce memoranda and notes of its investigators or its lawyers in connection with the concern the claim of Jennifer Belcher against Rodney and Anne Lockyer. The plaintiff may have access to other material.

By the Court (Kass, J.),

Nancy Finch Foley
Clerk

Entered: September 27, 1989.

COMMONWEALTH OF MASSACHUSETTS
APPEALS COURT

No. 84-0138

JACQUELYN R. GROSS, ET AL.

vs.

LIBERTY MUTUAL INSURANCE COMPANY
and
CNA INSURANCE COMPANIES.

MEMORANDUM & ORDER

The petitioner here is CNA Insurance Companies (CNA). It seeks relief under G. L. c. 231, § 118, from an order of a Superior Court judge denying a protective order and, in effect, requiring it to make discovery from files involving pending litigation.

The action against CNA, brought under G. L. c. 93A, is for failure to make a reasonable offer of settlement in a tort case. CNA has made an offer of $40,000. The plaintiffs have rejected this offer and say that an offer of anything less than the policy limits ($100,000) is not reasonable.

The case raises interesting issues concerning the degree to which the lawyer-client privilege may be penetrated by a party alleging unfair practice by an insurance company.

In the instant case, however, those questions have been brought forward prematurely. The significant fact is that the liability of CNA's insured, and the damages flowing from that liability, have yet to be

CNA's [illegible], should there be [illegible] range of the $40,000 offered, or should there be a settlement within the range of the $40,000 offered, a claim of unfair settlement could scarcely be made out. Without intimating that the plaintiff here may properly have access to CNA's files should the verdict in the underlying suit be far in excess of CNA's best offer, I conclude that, in any event, there ought to be no access to those files until the underlying civil action (Essex Superior Court Civil No. 81-2314) has been determined.

Accordingly, I vacate so much of the order of the Superior Court judge as required CNA to identify and make available to the plaintiffs every document in CNA's control which concerns the settlement value and likelihood of recovery at trial by the plaintiffs against CNA's insureds and the settlement value and likelihood of recovery at trial of the Straubs against the insureds. Nor shall CNA be required to identify the persons involved with the valuation of the Gross and Straub claims. Nor shall CNA be required to divulge what persons CNA consulted to determine the settlement value or probability of recovery at trial on the Gross and Straub claims. Nor shall CNA be required to state what it considers the likelihood of recovery by the plaintiffs against the insureds. Nor shall CNA at this time be required to respond to

interrogatories 8, 9, 10, 11, 12, 14, and 15. As to interrogatory number 13, CNA shall answer what its record retention policy is. It goes without saying that CNA is not to destroy any material now in its files and shall retain such material for six years following final determination of the tort suit or as a court otherwise orders. A copy of this order shall be placed in those files of CNA affected by this order.

By the Court, (Kass, J.),

[signature]

Assistant Clerk

Entered: April 24, 1984.

# EXHIBIT 4

Considering all of the defendant's claims, we find no prejudicial error by the trial judge and this report is dismissed.

## Fred G. Bixby *vs.* Allstate Insurance Company

Western District—August 19, 1986.

Present: Lenhoff, McGuane & Dohoney, J.J.

*Insurance*, Unfair settlement practices.
*Consumer Protection Act*, G.L.c. 93A.
*Practice, Civil*, Motion to stay proceedings; Judicial discretion.

Report of court's dismissal of plaintiff's report. Action heard in the Northampton Division by Apkin, J.

William A. Norris for the plaintiff.
George F. Kelly and Marcia Brayton Julian for the defendant.

Dohoney, J. This case involves a report from the action of a trial justice in allowing a Motion to Stay Proceedings. Certain background is essential to our understanding of the present case. The plaintiff Bixby was the passenger in an automobile involved in an accident on December 29, 1984. The defendant Allstate is the liability insurer for the other vehicle involved in the collision. This suit was instituted alleging violation of General Laws, Chapter 93A in that Allstate engaged in unfair settlement practices. Thereafter, the plaintiff brought suit against the defendant's insured in what we will call the underlying action. Subsequently, Allstate filed a Motion to Stay Proceedings in this case which was allowed by the Trial Justice. It is this action which is before us.

I. The first matter to address is whether the appeal is properly before us. Action on a Motion to Stay Proceedings is an interlocutory matter. *Cappadona v. Riverside 400 Function Room, Inc.*, 372 Mass. 167 (1977); *Cronin v. Strayer*, 392 Mass. 525 (1984); *Mancuso v. Mancuso*, 10 Mass. App. Ct. 395 (1980). An interlocutory matter may only be reported if the trial justice deems it appropriate. Mass. Rules Civil Procedure, Rule 64 (d) provides:

> (d) Reports of Interlocutory Rulings. Interlocutory rulings may be reported in accordance with the procedure prescribed above in paragraph (c), provided that if the court in its discretion deems it appropriate, such rulings shall be reported without delay to the appellate division. When the court so decides to report such an interlocutory ruling without a delay, it may order that the party requesting the report prepare and file a draft report thereof within a period specified by the court. Failure of a party to comply with such an order shall constitute a waiver of his right to request a report on the ruling at issue.

See *Dufresne-Henry v. John R. Murphy Engineering Corporation*, 1980 Mass. App. Dec. 126. Here the Trial Justice exercised his discretion to report the case. In view of the nature of the motion, this was entirely appropriate. A motion of this type would clearly be moot if it were to wait for final judgment.

II. The second matter to address is the standard to be applied in a Motion to

...udicial error by the

Company

J.J.

...ection.

...tion heard in the

...tant.

...n of a trial justice in ...nd is essential to our ...the passenger in an ...984. The defendant ...ked in the collision. Chapter 93A in that ...eafter, the plaintiff ...t we will call the Stay Proceedings in ...tion which is before

properly before us. matter. *Cappadona* ...; *Cronin* v. *Strayer*, ... Ct. 395 (1980). An ...al justice deems it ...vides:

rulings may be ...ribed above in ...etion deems it ...t delay to the ...eport such an that the party ...hereof within a ...nply with such ...est a report on

...*ration*, 1980 Mass. ...to report the case. ...priate. A motion of judgment.

...plied in a Motion to



Stay Proceedings. A Motion to Stay is addressed to the discretion of the Trial Justice. *Travenol Laboratories, Inc.* v. *Zotal, Ltd.*, 394 Mass. 95 (1985); *Taunton Gardens Company* v. *Hills*, 557 F.2d 877 (1st Cir. 1977).

III. In determining whether the judge properly exercised his discretion, we are brought to the substantive issue as to whether a claim for unfair settlement practices may be resolved before the underlying suit against the insured.

This is an area of frequent recent litigation. As more states have enacted legislation regulating unfair settlement practices, litigation has ensued over the right of private individuals to avail themselves of these statutes. The more frequently contested issue is whether there is a private cause of action. See *Patterson* v. *Globe American Casualty Co.*, 101 N.M. 541, 685 P.2d 396 (1984) for a collection of cases setting forth those jurisdictions which have allowed a private cause of action and those jurisdictions which have not permitted such claims. This issue is easily determined in Massachusetts since General Laws, Chapter 93A, Section 9 (1) specifically makes a violation of General Laws, Chapter 176D, Section 3, Clause 9 (regarding unfair settlement practices) an unfair and deceptive practice and thus it is actionable by a private party.

The issue which is much less litigated but which confronts us is whether this action may be resolved independently of or prior to the underlying suit.

The apparent first court to resolve this issue was *Royal Globe Ins. Co.* v. *Superior Court of Butt County*, 23 Cal.3d 880, 592 P. 2d 329, 153 Cal. Reporter 842 (1979). There the plaintiff fell at a supermarket. She sued the supermarket and the company which had issued a liability insurance policy (Royal Globe). The court concluded that a private cause of action existed but then stated that the claim may not be joined in the same lawsuit. The reasoning of the court is helpful to us:

> Moreoever, unless the trial against the insurer is postponed until the liability of the insured is first determined, the defense of the insured may be seriously hampered by discovery initiated by the injured claimant against the insurer. In addition, damages suffered by the injured party as a result of the insurer's violation of subdivisions (h) (5) and (h) (14) may best be determined after the conclusion of the action by the third party claimant against the insured. Thus, plaintiff's claim against defendant was brought prematurely and the trial court should have sustained defendant's demurrer and granted the motion for judgment on the pleadings on that ground.

Subsequently, the issue was presented to the Supreme Court of Appeals of West Virginia in *Jenkins* v. *J.C. Penney Casualty Ins. Co.*, 280 S.E. 2d 252 (W. Va. 1981). Here the plaintiff suffered minor damage to her motor vehicle and alleged it was caused by the insured of J.C. Penney. She alleged J.C. Penney had not attempted in good faith to settle the case. The Court first determined that a private cause of action existed but held that a direct action against the insurance company cannot be maintained before the underlying claim is settled. Their comments were:

> It can hardly be doubted that in a given factual situation there may be some bonafide dispute over what is a fair settlement offer or whether liability is reasonably clear. Given the adversarial nature of the settlement of tort claims, it can be expected that the parties will often disagree as to whether there has been a reasonable attempt made to promptly and fairly settle a claim where the liablity is reasonably clear.

[4,5] To permit a direct action against the insurance company before the underlying claim is ultimately resolved may result in duplicitous litigation since the issue of liability and damages as they relate to the statutory settlement duty are still unresolved in the underlying claim. Once the underlying claim has been resolved, the issues of liability and damages have become settled and it is possible to view the statutory claim in light of the final result of the underlying action. A further policy reason to delay the bringing of the statutory claim is that once the underlying claim is resolved, the claimant may be sufficiently satisfied with the result so that there will be no desire to pursue the statutory claim. Moreover, it is not until the underlying suit is concluded that the extent of reasonable damages in the statutory action will be known. The California court for reasons less explicit than those has reached the same conclusion. *Royal Globe Insurance Co. v. Superior Court, supra.* We, therefore, conclude that a private cause of action cannot be maintained for a violation of W. Va. Code, 33-11-4(9), until the underlying suit is resolved.

* The apparent last court to address the matter was the Supreme Court of Montana in *Klaudt v. Flink*, 658 P.2d 1065 (Mont. 1983). There the decedent was a passenger in an auto operated by Flink. Flink was apparently intoxicated and admitted criminal violation. The issue before the court was whether the statute gave cause of action against the insurer which could be presented jointly with the underlying civil action. The court held that it could and said:

[4] However, at this point, we must differ with the position adopted by the other jurisdictions which allow an action such as this to be prosecuted only after the insured's liability has been adjudicated. We believe that the action may be filed and tried before, concurrent with, or after liability has been determined. We see no problems with the possibility of contrary findings in the two actions, the doctrine of res judicata, collateral estoppel or the like because different issues are involved in the two cases. The issue in the action against the insurer for violation of the insurance code is simply an action to determine whether or not the insurer violated its duty of fair dealing in settlement negotiations with the claimant, while the action to determine the ultimate liability of the driver rests on considerations of negligence and comparative negligence.

The obligation to negotiate in good faith and to promptly settle claims does not mean that liability has been determined. Section 33-18-201(6) states that the insurer's obligation arises when liability has become 'reasonably clear.' In evaluating the insurance case, the jury must determine whether the insurer negotiated in good faith given the facts it then had. This consideration is separate and apart from the jury's ultimate consideration of the merits of any given action.

We have considered whether the result here reached contravenes the purpose of Rule 411, M.R. Evid., on the admissibility of insurance. The rule only prohibits the introduction of insurance where it is offered for the purpose of showing negligence or liability. Here, the issues to be tried are separate and the rule is not violated.

We realize that many will view this result as harsh. However, the legislature has reacted to what it perceives to be an important

company before
it in duplicitous
hey relate to the
underlying claim.
issues of liability
ible to view the
erlying action. A
tatutory claim is
laimant may be
ll be no desire to
d the underlying
damages in the
: for reasons less
ion. *Royal Globe*
re, conclude that
a violation of W.
olved.
he Supreme Court of
. There the decedent
ink was apparently
before the court was
surer which could be
urt held that it could

osition adopted
ich as this to be
een adjudicated.
fore, concurrent
o problems with
the doctrine of
different issues
tion against the
ly an action to
ty of fair dealing
e the action to
considerations

ctly settle claims
Section 33-18-
een liability has
e case, the jury
ood faith given
and apart from
given action.

contravenes the
insurance. The
ere it is offered
the issues to be

. However, the
an important

problem. Insurance companies have, and are able to exert, leverage against individual claimants because of the disparity in resource base. Justice delayed is often justice denied. Public policy calls for a meaningful solution. The legislature has spoken and we, by this decision, breathe life into the legislative product.

In considering all of these factors, substantial deference should be paid to the Trial Justice. He was in a far better position to assess the possible prejudice to the Defendant as to the status of discovery. He was also better able to determine the prejudice to the plaintiff by having to wait for a possible recovery under his claim for unfair settlement practices.

Therefore, while there appears to be no general rule in Massachusetts as to whether a claim for unfair settlement practices must await the result of the underlying action, plaintiff has failed to show an abuse of discretion in doing so in this case.

Thus, the Report be and hereby is dismissed.

---

## Richard P. Boyer, Jr., PPA and others[1] *vs.* Edward Russell and others[2]

Western District—August 28, 1986.

Present: Turcotte, P.J., Lenhoff & Dohoney, JJ.

*Tort,* Dog bite.
*Practice, Civil,* Dist./Mun. Cts. R. Civ. P., Rule 64 (c) (2); Draft report.

Report of the court's dismissal of plaintiffs' report. Action heard in the Northampton Division by Morse, J.

Leon W. Malinowsky for the plaintiffs.
David G. Carlson and John C. Sikorski for the defendants.

Lenhoff, J. The Trial Court's dismissal of the submitted Draft Report[3] (same appears below with the findings of the Trial Court excluded therefrom) was proper; and, such disposition was legally correct.

The plaintiffs clearly failed to comply with Dist./Mun. Cts. R. Civ. P., Rule 64 (c) (2) entitled "Contents of the Draft Report." The substantial lack of compliance therewith justified the Trial Court in invoking the action taken. See *Partlow v. Hertz Corp.*, 370 Mass. 787, 790 (1976).

Therefore, the report here presented pursuant to Dist./Mun. Cts. R. Civ. P., Rule 64 (c) (6), be and is hereby dismissed.

---

[1] Margaret A. Boyer and Margaret A. Boyer.
[2] Robert LaPointe, and Richard P. Boyle as trustee of Dick Boyle Realty Trust.
[3] On October 28, 1985, the Court, Morse, J., heard the facts of this dog-bite case, and entered the appended findings dated Dec. 18, 1985.
The Court ruled that the lease, appended between the defendants Boyle and LaPointe, did not constitute LaPointe's neighbors in the complex (plaintiffs) as third-party beneficiaries of the lease contract entitled to recover under Massachusetts Law.
Plaintiffs respectfully assert that they should have been found entitled to recover by virtue of their status as third-party beneficiaries of the no-pets clause in the lease, regardless of the fact the said clause allowed pets if the landlord (Boyle) gave the tenant (LaPointe) written permission for pets, since no such written permission had been given.