# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LANDWORKS CREATIONS, LLC,  )
  Plaintiff,      )
            )
    v.        )
            )
UNITED STATES FIDELITY AND  ) C.A. No. 4:05-CV-40072-FDS
GUARANTY COMPANY, and   )
LOVETT SILVERMAN CONSTRUCTION )
CONSULTANTS, INC.     )
  Defendants.      )

## MOTION IN LIMINE OF THE DEFENDANT,
## UNITED STATES FIDELITY AND GUARANTY COMPANY
## TO EXCLUDE THE TESTIMONY OF WILLIAM GALLAGHER,
## THE PLAINTIFF'S EXPERT AND TO PRECLUDE THE PLAINTIFF FROM
## PRESENTING EVIDENCE ON ITS CHAPTER 93A CLAIM
## <u>DUE TO THE ABSENCE OF EXPERT TESTIMONY</u>

Defendant, United States Fidelity and Guaranty Company ("USF&G"), moves *in limine* to exclude William Gallagher, the expert for the plaintiff, Landworks Creations, LLC ("Landworks"), from testifying at the trial because disclosure of his opinion is defective, not in accordance with F.R.Civ.P. 26(a)(2), and is late. USF&G also moves to preclude Landworks from offering any evidence on its G.L. c. 93A claim due to the absence of expert testimony.

## I.  FACTS

In August 2003, Landworks signed a subcontract with Standen Contracting Company, Inc. ("Standen"), for site work at the Shrewsbury School Project (the "Project"). In February 2004, Standen defaulted. In March 2004, the Town of Shrewsbury and USF&G signed a Takeover Agreement. Landworks eventually signed a subcontract with Jackson Construction Company, the new general contractor ("Jackson"). Jackson defaulted and USF&G hired Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman") to assess the Project. Landworks

eventually filed a complaint alleging that USF&G failed to make payment to it under the bond and violated G.L. c. 93A. The complaint was amended later to add Lovett-Silverman as a defendant.[1]

Landworks disclosed its only expert, William Gallagher, a construction manager, on June 15, 2007, by way of a report. Mr. Gallagher's report is the affidavit submitted in opposition to Lovett Silverman's motion for summary judgment. (Exhibit 1 – Landworks' Expert Disclosures and Gallagher Affidavit.)

Lovett-Silverman moved for summary judgment in March 2007. In July 2007, Lovett-Silverman moved for an extension of time to disclose experts three weeks after the Court ruled on the summary judgment, which the Court allowed. (Exhibit 2 - Motion to Extend Expert Disclosure Deadline, and Court's Order). The Court ruled on the summary judgment on February 6, 2008. (Exhibit 3 – Court's Order.) Therefore, expert disclosures were due three weeks later, on February 27, 2008. USF&G disclosed its experts on February 27, 2008. (Exhibit 4 – USF&G's expert disclosures.) Landworks did not "supplement" its disclosure until 61 days later, on April 28, 2008, the day before the pre-trial conference. (Exhibit 5 – Plaintiff's Pre-Trial Memorandum.)

## II.    DISCUSSION

### A.    William Gallagher's March 29, 2007 Affidavit

William Gallagher's March 29, 2007 affidavit is completely focused on Lovett-Silverman's conduct and not that of USF&G. It contains Mr. Gallagher's opinion regarding the so-called "customary" tasks employed by a construction consultant (Lovett-Silverman) when assessing a project in mid-stream and asserts, among many other allegations, that Lovett-

---

[1] Lovett-Silverman's motion for summary judgment was allowed on February 6, 2008. USF&G was granted summary judgment on the same counts related to Lovett-Silverman's conduct on March 25, 2008.

Silverman's deviations from industry custom and practice were substantial and pervasive. He opined that Landworks was a "banged" subcontractor; was intentionally prevented (by Lovett-Silverman) from: (a) doing its work; (b) addressing its claim with the Surety; and (c) receiving payment for its work; and was forced to file suit to collect money "that appears to be appropriate due and owing." (Exhibit 1 – Gallagher Affidavit, p. 10.)

Mr. Gallagher should be precluded from testifying regarding his March 29, 2007 affidavit because: (1) he does not address USF&G's conduct in his affidavit; (2) the party he does address was granted summary judgment on all claims filed against it, and USF&G was also granted summary judgment on those claims; (3) his affidavit is vague and contains no accounting of the costs involved with the Project, or a dollar amount of the money allegedly owed to Landworks; and (4) his affidavit contains no opinion regarding any act or failure to act of USF&G.

### B.    Landwork's Expert Disclosure in the April 28, 2008 Pre-Trial Memorandum

Landworks "supplemented" its expert disclosure in its Pre-Trial Memorandum of April 28, 2008. The supplementation consisted of many of the same statements made by Mr. Gallagher in his 2007 affidavit; however, several entire paragraphs and many phrases were deleted.[2]

The Pre-Trial Memorandum disclosure is deficient for several reasons. First, it is not in the form of a report. Federal Rules of Civil Procedure 26(a)(2)(B) requires that the expert produce a report if he is retained to provide expert testimony. *See In re Ephedra Products Liability Litigation*, 478 F. Supp.2d. 624 (2007). Second, the disclosure is not signed and has been altered and amended. In *Gust v. Jones*, 162 F3d. 587 (10th Cir. 1998) the court held that the report is the property of the expert and cannot be altered or amended by a party. Third, the

---

[2] For example, page 3, paragraph 9; page 4, paragraphs b-g and 10; page 6, most of paragraph 16; page 7, most of paragraph 23; and page 8, paragraph 25, of the Gallagher Affidavit were all deleted from the supplemented Pre-Trial Memorandum expert disclosure.

disclosure is defective because it does not disclose any opinion regarding the amount owed to Landworks by USF&G, but contains only bald assertions against another party. In *King v. Ford Motor Co.*, 209 F.3d. 886 (6th Cir. 2000), the court held that the expert report must contain an opinion, and not just bald conclusions. Fourth, Mr. Gallagher cannot cure or satisfy the requirements of Rule 26(a)(2) by testifying on the stand as to his opinion regarding USF&G and/or the money owed to Landworks, because any opinion not disclosed in the report must be excluded. *Lamarca v. United States*, 31 F. Supp.2d. 110 (E.D.N.Y 1998). Finally, even if the disclosure were not deficient, it would still be excluded because it is late. Expert disclosures were due on February 27, 2008, and Landworks did not "supplement" its disclosure until 61 days later, on April 28, 2008, the day before the pre-trial conference.

Due to these deficiencies, Mr. Gallagher should be precluded from testifying as an expert at the trial.

### C.    Chapter 93A Claim

In Count VI of the amended complaint, Landworks alleges USF&G engaged in unfair claim practices by failing to settle when liability was reasonably clear. Landworks has not disclosed any expert who will testify regarding an insurer's claims practices and the failure of an insurer to settle when liability is reasonably clear. Because the underlying insurance issues in most bad-faith cases tend to be fairly complex, it is widely held that expert testimony on pertinent issues and insurer practices is admissible in the general discretion of the trial court when offered by an appropriately qualified expert. *See Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830 (C.A.1 Mass 1990), *Palmi v. Metropolitan Prop. and Cas. Ins. Co.*, 12 Mass L. Rptr. 464 (Mass Superior 2000).

It is also clear that an expert witness is required in order for Landworks to prove its case under this Count, because only an expert in insurance claims handling would have the knowledge, skill, experience, and training necessary to aid the trier of fact in understanding these specialized issues.

Because Landworks has failed to disclose an expert in this area, it should be precluded from presenting any evidence on these issues.

### III.    CONCLUSION

Therefore, USF&G moves *in limine* to exclude Landworks' expert, William Gallagher, from testifying at the trial because disclosure of his opinion is defective, not in accordance with F.R.Civ.P. 26(a)(2), and is late.  USF&G also moves to preclude Landworks from offering any evidence on its G.L. c. 93A claim due to the absence of expert testimony.

Respectfully submitted,

**UNITED STATES FIDELITY &
GUARANTY COMPANY,**
By its attorneys,

/s/ Peter G. Hermes
Peter G. Hermes, BBO No. 231840
Kevin J. O'Connor, BBO No. 555249
Cynthia J. Stephens, BBO No. 560670
HERMES, NETBURN, O'CONNOR
            & SPEARING, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050
Dated:  May 2, 2008                    (617) 728-0052 (F)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (none) on May 2, 2008.

/s/ Peter G. Hermes _____

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| LANDWORKS CREATIONS, LLC. ) | C.A. NO.05-CV-40072 FDS |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES FIDELITY AND GUARANTY ) | |
| COMPANY and ) | |
| LOVETT-SILVERMAN CONSTRUCTION ) | |
| CONSULTANTS, INC. ) | |
| ) | |
| Defendants ) | |

## PLAINTIFF LANDWORKS, LLC.'S EXPERT DISCLOSURE
## PURSUANT TO F.R.C.P. 26(a)(2)

Now comes the Plaintiff, Landworks Creations, LLC, and discloses its expert pursuant

to F.R.C.P. 26(a)(2)(A) and F.R.C.P. 26(a)(2)(B). The Plaintiff will call William Gallagher, of

One Homestead Drive in Medway as its expert witness.

Mr. Gallagher has previously provided a ten page affidavit which was appended to the

Plaintiff's Opposition to Defendant, Lovett-Silverman's Motion for Summary Judgment. The

affidavit is his written report and was signed by him. This affidavit, which included Mr.

Gallagher's curriculum vitae, provided his background and areas of expertise, the documents

and materials which he reviewed and relied upon in preparing his expert opinions, the identity

of witnesses interviewed and his expert opinions derived from his investigation. As is noted

on the curriculum vitae, Mr. Gallagher has published no articles, and has not testified as an

expert witness before. His fee for producing his report was $125/hr. Mr. Gallagher was also

identified and disclosed in the final supplemental answers of the Plaintiff to interrogatories,

which was served on all parties on April 7, 2007.


Respectfully Submitted,
**Landworks Creations, LLC**
By its attorney,


s/Robert N. Meltzer_____
The Mountain States Law Group
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116

Dated: June 15, 2007

CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this 15th day of June, 2007  I served a copy of the foregoing on the following counsel of record by first class mail, postage prepaid:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Eric Hipp, Esq.

Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, MA 02210
Attn: Julie Ciollo, Esq.

s/Robert N. Meltzer
Robert N. Meltzer

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | |
|---|---|
| LANDWORKS CREATIONS, LLC | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY AND | ) |
| GUARANTY COMPANY and | ) |
| LOVETT-SILVERMAN CONSTRUCTION | ) |
| CONSULTANTS, INC. | ) |
| | ) |
| Defendants | ) |

Case 4:05-cv-40072-FDS    Document 75    Filed 04/18/2007    Page 1 of 12

AFFIDAVIT OF WILLIAM V. GALLAGHER IN SUPPORT OF THE PLAINTIFF'S
OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANT,
LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.

I, William V. Gallagher, do depose and swear as follows:

1. I am a Project Manager / Owner's Representative at Daedalus Projects, a construction

   management firm located in Boston

2. I have been retained as an expert witness on the issue of construction project management

   at the Shrewsbury Middle School project ("the Project"). My resume, attached hereto,

   details my background in both public and private construction management.

3. I have reviewed, with regard to the Project, the construction file of Landworks Creations,

   LLC, and the deposition transcripts of the project architect, Katie Crocket, of Lovett-

   Silverman employees Tony Lardaro, Bill Mertz and Robert Bullock, of USF & G

   representative Jim Peters and of the Neal Matthews of Landworks. I have also reviewed

the deposition exhibits, documents produced by the parties in this case and by the project

architect, and I have spoken in extensive and exhaustive detail with Neal Matthews.

4. I base my opinions upon the specific facts and documents in this case, as well as upon my

prior experience as a construction manager on public and private projects.

5. When a construction consultant or construction manager takes over a project that is

already underway, and in which a general contractor has left a job or has undergone

business failure, there are certain tasks that are customarily performed in order to get the

work back on track and finished. These tasks include:

a. Assessing the status of the work and the work performed by each subcontractor. Defining

the scope of each sub contractor's contractual obligations and the work remaining is

crucial.

b. Ascertaining the status of payment to subcontractors, who generally and customarily

suspend work or demobilize pending review of payment issues. Reviewing open

proposed change orders, agreed upon change orders not processed, extra payment claims

of the sub contractor and claimed back charges from the General Contractor, Owner or

Owner's agents is customary.

c. Ratifying subcontractors, that is, bringing the subcontractors back to work under the

control of the Surety on public projects.

d. Completing the work in the fastest way possible especially when the project is a public

school and the learning process is hindered. This minimizes the incurred costs towards

the Owner, Owner's agents, Surety and Sub contractor.

6. It is always preferred by construction consultants and managers to ratify prior

subcontractors; these subcontractors generally know the Project better than the new

consultants, and are generally the best source of information about the Project and what needs to be done to get the project finished. They also do not require time to get up to speed on the work, they can mobilize quickly, and they are generally locked-in to a lower price than replacement subcontractors by the nature of the contract date. They can be held accountable for their own punch list, deficient and back charged items rather than having another sub contractor come finish the open items and argue of the value at a latter date.

Case 4:05-cv-40072-FDS    Document 75    Filed 04/18/2007    Page 3 of 12

7.  In addition, it is often difficult to find a subcontractor willing to pick up where another subcontractor has left off and where a project is already troubled. As a general rule in the construction industry, a subcontractor is brought back to work unless there is a compelling reason not to bring a subcontractor back to work.

8.  The fact that a subcontractor may be owed money, or may be claiming to be owed money, is not, customarily, a compelling reason not to engage a subcontractor to complete the work. Almost without exception the cost of the replacement sub-contractor to finish is more than the monies left to complete the scope.

9.  In my review, I noted that Lovett-Silverman did not engage in specific tasks customarily employed by construction managers and construction consultants when taking over or assessing a project in mid-stream. By way of example, and not by way of exhaustive list, Lovett-Silverman failed, with regard to Landworks, to:

a.  consult with agents or employees of Standen and Jackson to ascertain the status of the work and the scope of the contracts with sub-contractors, and the status of those contracts and entitlements to payment with those contracts

3

b.  consult with the project architect to ascertain the project architect's knowledge of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors

c.  consult with the project's owner's representative (CTM) to ascertain CTM's knowledge of particular site work and the status of that site work, and the scope of the work

performed by specific subcontractors.

d.  consult with the landscape architect (Waterman) to ascertain Waterman's knowledge of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors.

e.  consult with officials of the town of Shrewsbury to ascertain the knowledge of those individuals of particular site work and the status of that site work, and the scope of the work performed by specific subcontractors.

f.  consult with Landworks to ascertain the understanding of Landworks to ascertain the status of the work and the scope of the contracts as perceived by Landworks, and the status of the contracts and entitlement to payment with the contracts

g.  consult with other subcontractors, such as Frias Concrete, to ascertain whether such subcontractors were, in fact, working for Landworks, as Lovett-Silverman hypothesized.

10. Lovett-Silverman's own employees testified that the only steps taken to ascertain the scope of the Landworks contract consisted of reading the Standen and Jackson contracts, as well as a prior ratification agreement.

11. In the construction industry, particularly involving contracts with site contractors, the scope of a contract cannot be determined by mere contract documents. Change orders,

4

scope modifications, agreements made in the field and extras given by the sub contractor

in lieu of certain relief of contractual obligations must be considered also.

12. Lovett-Silverman's employees testified that they viewed the recitation of the site work

sections defining the scope of the work to be all conclusive. However, in the construction

industry, particularly public construction, where all site work is collected under Division

2, the recitation of all specification under Division 2 does not constitute the scope, but

rather then location where the broad scope of work is included. In other words, since

parts of the work are found in multiple parts of Division 2, all elements of Division 2 are

customarily included.

13. The assertions made by Lovett-Silverman that the scope of work can be entirely found by

strictly construing the contract, without further investigation, contradicts both custom and

industry practice, and reflects a failure to perform the usual investigation performed in

the context of this case.

14. Similarly, it is evident, because Lovett-Silverman conducted no investigation, that

Lovett-Silverman never considered or had the ability to consider, whether the Jackson

contract was binding or even in force and effect for purposes of defining scope.

15. This investigation would be particularly important in this case; as Neal Matthews noted

in his deposition testimony, Jackson engaged in a pattern and practice of demanding extra

work outside of the Landworks scope as Jackson neared insolvency. These items of extra

work confirm that the prior scope had been limited, and that defining the scope of

obligation could not be inferred from earlier contract documents.

16. I have seen documentation that demonstrates that Landworks removed its forces from the

Project in January of 2005, and that it was scheduled to complete its work in the spring of

2005. It is customary for site contractors to engage in "winter shut down," as weather conditions preclude certain types of work from being performed. This is customary in the industry, and it is not considered "abandonment" of the work. Furthermore, I conclude that a sub contractor who abandoned the job with no intention of returning would not have left his as-built notes, contract drawings, written scope, considerable hand tools and

Case 4:05-cv-40072-FDS    Document 75    Filed 04/18/2007    Page 6 of 12

materials at a place of storage onsite designated for his use during construction.

17. I have also seen documentation that both Landworks and many other sub contractors did not return to the Project after the failure of Jackson and pending payment, and that this has been acknowledged both by Lovett-Silverman and USF & G. This is also customary in the construction industry; following failure of a general contractor, it is essential for a pause in the work so that the scope of remaining work may be assessed and the issue of unpaid invoices to the subcontractors may be addressed. In the construction industry, it is not customary to assume that a sub contractor who is awaiting payment following the failure of a general contractor has "abandoned" the work.

18. I have reviewed the so-called "deficiency reports." These are merely "punch list" items. Punch list items are inventories of work that have yet to be performed or which have minor deviations which must be fixed before the work is acceptable to the owner of the project. Most of the deficiency items were corrected or were agreed to be corrected by Landworks after they returned from winter shut down.

19. Punch lists occur on every job, and are distributed to every contractor and subcontractor. Even though punch lists may be titled "deficiencies" or "defective items," they are customary on every job and merely inventory work left to be performed. Normally, the deficiencies are identified at the very end of the project. The existence of punch lists,

6

both by industry custom and industry standards, does not create a presumption of breach

of contract by the contractor or subcontractor.

20. I have seen documents in this case which indicate that Landworks had punch list items to

complete. Since the work had not yet reached completion when Jackson failed, this is not

unusual or unexpected. I have seen no documents that demonstrate the existence of

defects in the work performed by Landworks that would cause concern to a construction

manager or construction consultant, or which would suggest an inability or unwillingness

to complete the work.

21. I have seen nothing in the papers or documents or testimony in this case that would

indicate a compelling need to replace Landworks as the site contractor.

22. On the contrary, the record shows that Landworks was always ready, willing and able to

perform work that needed to be done, demonstrating a degree of teamwork that should

have made Landworks a desirable subcontractor on the Project. As a construction

manager and consultant, I always encourage these kinds of extra-mile subcontractors to

become pro-active in getting the work done. This would also be customary in the

industry.

23. I have seen in the materials in this case a demonstration of what transpires when a

consultant declines to ratify a subcontractor; the difficulty had by Lovett-Silverman in

trying to find a site subcontractor at a reasonable price who could perform the work

confirms why, customarily, a subcontractor is retained. I believe the school would have

opened sooner and at a lesser cost to USF & G based on reduced general conditions costs

and rework of completed scope not protected or maintained.

7

24. I have seen no document in this case that would serve as a termination of the Landworks'
contract. As a construction consultant reviewing the file, I would assume, from reviewing
the file, that Landworks continued to have a binding contract in the form of the post-
Standen ratification agreement which defined the rights of the parties, and the obligation
of the Surety to deal in good faith with Landworks' claims for payment and its demand

for its right to return to work. It would be customary in the construction industry to view
the situation in this way.

25. I have reviewed the e-mail from Lovett-Silverman that suggests that USF & G would not
talk to Landworks because a lawsuit was filed. It is always prudent to reopen
communication with a sub-contractor who has filed suit in an effort to persuade him to
return to work and drop the claim, but it is not customary, or proper as I understand the
law to demand dismissal as a condition precedent to returning to work. Even if this
statement was true, this would not be the custom of the industry; protection of payment
bond claims by filing suit to comply with the law is regarded as part and parcel of making
a claim, much like filing a mechanic's lien is a statutory vehicle to protect rights.

26. I have also seen the e-mail from Lovett-Silverman in which an employee of Lovett-
Silverman refers to shortages of money, and the idea of "banging" the subcontractors.

27. Banging the subcontractors has a very specific meaning in the construction industry,
especially when paired with the first part of the e-mail reflecting a shortage of funds.
Banging the subcontractors means withhold payment from them, or denying them their
rights under their contracts, in the hopes of either forcing the subcontractors to
compromise their claims, to be forced to file suit on the payment bond to defer payment

8

for years, to likely compromise a claim as part of a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial distress.

28. Banging the subcontractors is a form of violence to them, and it is a means and method of denying subcontractors what may be theirs. In the construction industry, the less violent, but equally suggestive term for this inappropriate behavior would be "strong arming." This includes the practice of withholding payment until the sub contractor yields to accepting another agreement with more scope or at a lesser fee.

29. I have noted from the deposition of James Peters of USF & G that more than 20 lawsuits were filed on the payment bond in this Project; that would easily represent the vast majority of subcontractors working on the Project. I also note that this refers to the number of claims in suit, and would not include the subcontractors who settled for less in order to avoid suit.

30. In the construction industry, this number of lawsuits on a single public project is highly unusual, and suggests an intentional failure to address claims by Lovett-Silverman and the Surety, as opposed to systemic failure by all of the subcontractors.

31. In light of the unusual number of claims, paired with lack of competent review of the project details by Lovett-Silverman, read in conjunction with the e-mail identifying the shortage of funds, and coupled with the statement about "banging" the subcontractors, It is evident that Lovett-Silverman intentionally engaged in conduct, which includes failing to engage in reasonable conduct, which would interfere with Landworks' rights under the original Standen contract or subsequent ratification of the original contract.

32. The number of defects in performance by Lovett-Silverman in terms of deviation from industry custom and practice when dealing with subcontractors following the failure of a general contractor are substantial and pervasive.

33. The deviations from industry custom and practice are so complete that it would suggest to any competent construction manager a willful deviation from custom, as it would be almost impossible for negligence to explain these deviations.

Case 4:05-cv-40072-FDS    Document 75    Filed 04/18/2007    Page 10 of 12

34. In short, the facts presented, in my opinion, based upon my expertise and experience in the field, is that Landworks is a banged subcontractor, and that it was intentionally prevented from doing its work on the Project and addressing its claim with the Surety, and from receiving payment for its work, and was otherwise forced to file suit to collect money that appears to be appropriate due and owing.

Sworn under the pains and penalties of perjury this 29th day of March, 2007

William V. Gallagher  LEED AP

## William V. Gallagher

1 Homestead Drive
Medfield, MA 02052
(617) 276-4801  wvgallagher@verizon.net

**STRENGTHS**

- Proven talents contributing to numerous multimillion-dollar projects in commercial/community construction projects.
- Effective and proactive working with trades people, company/organizational contacts, attorneys and other to mediate problems and deliver project solutions.
- Background includes strengths in budgeting/financial control, prioritizing and scheduling work, and coordinating assignments with sub contractors, purchasing, hiring, and training personnel, and moving projects through successful completion.
- A hands-on manager who enjoys working with people from diverse international backgrounds.
- Familiarity working with and responding to the needs of both aging and state of the art mechanical systems and building structures.

Case 4:05-cv-40072-FDS     Document 75     Filed 04/18/2007     Page 11 of 12

**EXPERIENCE**

**Daedalus Projects Inc.**: *Clerk of the Works/Project Manager; 2000-Present*
- Acted as the Owner's Project Manager for the Franklin Senior Center, Medfield Adult Community Center, Medfield Parks and Recreation. Coordinated the program development of the Medfield Department of Public Works and new Police and Fire building.
- Acted as the Owner's Representative on the following public sector projects;
- Worcester State College six story, 500 cars capacity precast parking garage. Ensured the safety of the students while a 300 ton crane set structure. Included a 265 X 31 feet segmented retaining wall.
- Harvard University 80,000 sq. ft LEED Platinum office remodeling project. Converted a heavy timber frame diary manufacturing plant into state of the art office space. Special recognition from Tom Vautin, VP Operations. Project included two 1500 ft geo-thermal wells and a pollution cleansing vegetated bio-swale.
- Williams Middle School 110,000 sq. ft. new construction project valued at $26 million. On time on budget despite correcting mold infection caused by the general contractor. Included 465 GPM municipal well and onsite sewage treatment plant.
- Apponequet Regional High School 140,000 sq. ft. remodeling project valued at $11 million. Extremely tight budget, coordinated moving teachers and students during this double shifted, three phased project.

**Sciaba**: *Site Superintendent/Project Manager; 1999- 2000*
- Deliver results on community projects including $3 million contract for complete renovations of 3 fire departments (approximately $1 million each) and $1+ million contract to update elementary school to make it handicapped accessible.

**Callahan Construction Co.**: *Assistant Project Manager, 1998-1999*
- Worked closely with senior executives John Spath and Mike Callahan, with responsibilities as project engineer and for reviewing/processing submittal samples and revising change orders. Multitasked wide-ranging leadership duties on $16 million Cohasset Elementary School. $15.4 million Tewksbury Elementary School, $14 million Hyde Park High School. $3 million Brooks Public Library, and $2.4 million Bridgewater Middle School Projects.

**Town of Bridgewater**: *Clerk of the Works, 1996-1998*
- Successfully moved 1,400+ elementary/middle school children from substandard buildings to new classrooms via $12.4 million renovation and personally saved Town of Bridgewater $300,000 via negotiations of project terms with general contractor's attorney. Supervised $3.2 million Bridgewater Public Library, $1.8 million Williams Middle School, and $160,000 Bridgewater Fire Department renovations projects.

**The Boston Building Company/Hale Street Properties**: *Founder/Partner, 1995-1996*
- Launched and grew business, securing 5 and 6-figure contracts with North Key West restaurant and C.J. Scooters as well as renovation and development of 2 factories (Bridgewater, MA) into commercial/retail space and complete overhaul of Plymouth County Sheriffs Brockton office.

**All-Temp Service:** *Project Manager/Site Supervisor, 1993-1995*
- Completed HV AC/R duties from hands-on work to system design including duct and controls. Attended Old Colony Trade School during this time.

**E.T. Engineering and Construction Management:** *Independent Contractor, 1991-1993*
- Conducted field-work involving EDM total stations and residential/commercial site development.

**American Environmental:** *Superintendent, 1989-1991*
- Led multi-state projects including contracts with American Standard, Boston City Hall, The Green School, Filenes at Downtown Crossing, The Lake Placid Club, and The North End Library.

| | |
|---|---|
| **EDUCATION** | **United States Navy:** *1981-1989* |

Case 4:05-cv-40072-FDS     Document 75     Filed 04/18/2007     Page 12 of 12

- Meritoriously promoted twice ahead of schedule. Studies included Aviation Fundamentals, Basic Avionics, Advanced Avionics, Ground and Search Radar, Advanced Microprocessors, Avionics Cryptologic Systems, Instructor Training School, and Basic and Advanced First Aid.

**New England Theological College:** *1983-1987*
- Studies included Old Testament Survey, New Testament Survey, Greek and Hebrew, Pastoral Counseling, and Middle East History.

**Embry-Riddle Aviation University:** *1982-1983*
- Studies included Aviation Management, Introduction to Computer Programming, and Pre-Calculus.

| | |
|---|---|
| **PROFESSIONAL DEVELOPMENT** | Massachusetts Construction Supervisors license, OSHA 10 hour safety course, Boston ABC License course, LEED Accredited Professional credential. I recently was asked to speak at Harvard University's Green Campus Initiative symposium and at Build Boston January 2007 in reference to construction site procedures and systems. |
| **COMPUTERS** | Expedition Contract Control, Microsoft Word, Lotus 1-2-3, and the Internet |
| **INTERESTS** | Sea kayaking, rock climbing, and reading. |

# EXHIBIT 2

## Eric C. Hipp

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Monday, July 23, 2007 10:43 AM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 4:05-cv-40072-FDS Landworks Creations, LLC v. United States Fidelity And Guaranty Company Order on Motion for Extension of Time |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 7/23/2007 at 10:43 AM EDT and filed on 7/23/2007

| | |
|---|---|
| **Case Name:** | Landworks Creations, LLC v. United States Fidelity And Guaranty Company |
| **Case Number:** | 4:05-cv-40072 |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
Judge F. Dennis Saylor IV: Electronic ORDER entered granting [85] Motion for Extension of Time to disclose experts. (Castles, Martin)

**4:05-cv-40072 Notice will be electronically mailed to:**
David J. Hatem dhatem@donovanhatem.com
Jay S. Gregory jgregory@donovanhatem.com
Kevin J. O'Connor koconnor@hnso.com
Robert N. Meltzer robmeltzer@aol.com
Eric C. Hipp ehipp@hnso.org
Marianne E. Brown mbrown@donovanhatem.com
Julie A. Ciollo jciollo@donovanhatem.com

**4:05-cv-40072 Notice will not be electronically mailed to:**

9/6/2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC. | ) | C.A. NO.05-CV-40072 FDS |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FIDELITY AND GUARANTY | ) | |
| COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC. | ) | |
| | ) | |
| Defendants | ) | |

## EMERGENCY MOTION TO EXTEND THE DEFENDANT LOVETT-SILVERMAN CONSTRUCTION CONSULTANTS, INC.'S DEADLINE FOR THE DISCLOSURE OF ITS EXPERT WITNESSES

The defendant, Lovett-Silverman Construction Consultants, Inc. ("Lovett-Silverman"), hereby moves this Court pursuant to Rule 6(b) of the Federal Rules of Civil Procedure to extend the deadline for disclosure of its expert witnesses and to set a date for a scheduling conference as follows:  Lovett-Silverman's July 30, 2007 deadline for the disclosure of its expert witnesses shall be postponed until three weeks from the date of the Court's ruling on Lovett-Silverman's motion for summary judgment.

In support of this motion, Lovett-Silverman states as follows:

1. On March 23, 2007, Lovett-Silverman filed its motion for summary judgment.

2. At the summary judgment hearing held on May 31, 2007, the Court set a June 29, 2007 deadline for the plaintiff, Landworks Creations, LLC, to disclose its expert

01105661

witness. The Court also set a July 30, 2007 deadline for Lovett-Silverman to disclose its expert witness.

3. At the hearing, the Court acknowledged that Lovett-Silverman's hiring and preparation of an expert witness would be rendered unnecessary should it rule in Lovett-Silverman's favor. The Court also acknowledged the hiring and preparation of an expert witness is costly and time-consuming, and thus that It would endeavor to issue a ruling soon so as to afford Lovett-Silverman a sufficient amount of time for its disclosure if necessary.

4. The Court has not yet issued a ruling on Lovett-Silverman's motion for summary judgment.

5. It is not financially tenable for Lovett-Silverman to procure and prepare an expert witness for this matter until the Court issues a ruling on Lovett-Silverman's motion for summary judgment.

6. Lovett-Silverman's deadline for the disclosure of its expert witnesses should be postponed until three weeks after the Court issues a ruling on its motion for summary judgment.

WHEREFORE, Lovett-Silverman requests that this Honorable Court ALLOW this motion and enter an order establishing the expert witness disclosure deadline as requested.

Respectfully submitted,

LOVETT-SILVERMAN
CONSTRUCTION CONSULTANTS, INC.
By its attorneys,

/s/ Julie A. Ciollo
David J. Hatem, PC (BBO #225700)
Marianne E. Brown (BBO #668237)
Julie A. Ciollo (BBO #666080)
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
(617) 406-4500
jciollo@donovanhatem.com

Dated:  July 17, 2007

01105661

## LOCAL RULE 7.1(a)(2) CERTIFICATE

I, Julie A. Ciollo, hereby certify that pursuant to Local Rule of the United States District Court for the District of Massachusetts 7.1(a)(2), counsel have conferred in good faith concerning this motion.

_/s/ Julie A. Ciollo_

Julie A. Ciollo

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on July 17, 2007.

_/s/ Julie A. Ciollo_

Julie A. Ciollo

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LANDWORKS CREATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 05-40072-FDS |
| | ) | |
| UNITED STATES FIDELITY AND | ) | |
| GUARANTY COMPANY and | ) | |
| LOVETT-SILVERMAN CONSTRUCTION | ) | |
| CONSULTANTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action by a subcontractor against a surety on a performance bond, arising out of

a default by a contractor on a public-works project. Jurisdiction is based on diversity of

citizenship. Plaintiff Landworks Creations, LLC, has brought suit against both the surety,

defendant United States Fidelity and Guaranty Company, and a consultant that advised the surety,

defendant Lovett-Silverman Construction Consultants, Inc ("L-S"). As to L-S, plaintiff alleges

claims of fraud (Count II), tortious interference with contract (Count III and IV), and unfair or

deceptive acts in violation of Mass. Gen. Laws ch. 93A (Count VI).

L-S has moved for summary judgment as to all claims against it pursuant to Fed. R. Civ.

P. 56. For the reasons set forth below, the motion will be granted.

I.     **Statement of the Facts**

The following facts are undisputed unless otherwise noted.

A.     **The Shrewsbury Middle School Project**

This matter arises from the construction of the Shrewsbury Middle School in Shrewsbury,

Massachusetts.  At some point before January 2003, the Shrewsbury Public Schools hired

Standen Contracting Company, Inc., as the general contractor for the project.  Defendant United

States Fidelity and Guaranty Company ("USF&G") issued a performance bond that required it to

assume responsibility for completion of the project in the event of a default by Standen.

In August 2003, Landworks entered into a subcontract with Standen.  The subcontract

provided that Landworks was to perform the following work:  (1) site demolition, (2) site

preparation, (3) earthwork, (4) geotextile fabrics, (5) erosion control, (6) bituminous concrete

paving and markings, (7) concrete pavement (preparation only), (8) granite curbing, (9) tracer

tape, (10) storm drainage systems and sewer systems, (11) underdrain system and slit damage

system athletic fields, (12) water systems, and (13) lawns and grasses.  (Ex. E).

B.     **The Defaults of Standen and Jackson and the Landworks Lawsuit**

In February 2004, Standen defaulted on the project.  Shortly afterward, Jackson

Construction Company was engaged to take over and complete the project.  In March 2004,

USF&G entered into a ratification agreement with Landworks, under which Landworks agreed to

perform the balance of the work remaining in accordance with the terms and conditions of its

subcontract with Standen.[1]

---

[1] No copy of any such agreement was provided to the Court, but it appears that the parties do not dispute that such an agreement exists.

2

In the construction industry, it is common procedure, once a general contractor is in

default, for subcontractors not to return to work until they are "ratified."  Although neither party

explicitly defined ratification in their pleadings, a USF&G witness testified that ratification

involves "establish[ing] the terms and conditions under which [subcontractors] would be prepared

to resume their subcontract responsibilities and complete their obligations."  (Peters Dep. at 85).

In June 2004, Landworks executed a new subcontract with Jackson.[2]  Under the new

agreement, Landworks' obligations were identical to those contained in its subcontract with

Standen.  (Ex. H).

Landworks soon began experiencing difficulty receiving payments from Jackson.  In June

2004, Landworks' president, Neal Matthews, unsuccessfully requested "a reconciliation of the

application for payments that [Landworks] had turned in."  (Matthews Dep. at 63).  When

Landworks finally received past due payments in August 2004, it was about half of what the

company had expected to receive.  (*Id.*).  It did not receive any payments at all for its work in

September and October 2004.  (*Id.*).

Because of these problems, Landworks suspended performance on the project in the fall of

2004.[3]  In March 2005, Jackson went into default.  On March 29, 2005, Landworks filed the

present action against USF&G in Worcester Superior Court, alleging breach of contract and

violation of Mass. Gen. Laws ch. 93A and 176D and seeking damages for money owing for work

---

[2] Landworks contends that this contract was "void," as "Jackson [was] without authority to sign contracts."  (Pl. Statement of Material Facts at 13).  That dispute is not material to resolution of the motion for summary judgment.

[3] Landworks contends that it remained on the job until January 2005, and that it suspended work at that point due to winter weather. There is no dispute, however, that Landworks never returned to the site.  USF&G eventually engaged a new subcontractor, G&R Construction, Inc., to complete the subcontract work.

performed.[4]

### C.    Communication between Landworks and L-S

USF&G (through a sister company, St. Paul Fire and Marine Insurance Company)

engaged L-S to be its consultant on the Shrewsbury project (the "Consulting Agreement").

Under the Consulting Agreement, L-S was to provide construction-related experience and

support in response to specific requests from the client concerning its performance bond

obligations.  A "Work Assignment" addendum to the Consulting Agreement, executed in May

2004, stated that L-S was to:

> Complete a preliminary investigation of the . . . Shrewsbury Middle
> School . . . assess the progress to date and the ability of the principal to complete
> the work; . . . ratify subcontractors and suppliers; [and] assist in the assignment of
> the Completion contractor.

(Ex. C).  Robert Bullock, a project manner for L-S, was given the task of reviewing the condition

of the project to see how much site work remained.

Landworks had not resumed performance of work on the project by August 2005.  On

August 17, Matthews called Bullock and told him, "[Landworks] wanted to get back to work,

and finish this job and be done with it."  (Matthews Dep. at 76-78).  Shortly thereafter, Bullock e-

mailed Al Falango (a part-time consultant to L-S) and characterized the Matthews telephone

conversation as follows:

> The president of Landworks just called me and expressed an interest in being
> ratified.  I told him he will have to drop his law suit, but welcomed this idea and I
> forwarded the requirements for ratification and my contact information.

(Ex. A).

---

[4] On May 12, 2005, USF&G removed the proceeding to this Court.

4

Bullock then responded to Matthews via e-mail.  The e-mail stated that L-S needed certain information from Landworks to "get started on ratification." ( Ex. K).  The information requested included the (1) original contract amount, (2) change orders to the original contract, (3) credit change order to the original contract, (4) value of work performed to date or approved material stored at site, (5) total payments received from Standen and Jackson, (6) retainage held to date, (7) outstanding balance, (8) last invoice paid, and (9) last invoice submitted but not paid. (*Id.*).

Fifteen minutes after Bullock sent that e-mail, Falango sent the following e-mail to Bullock: "Should we pursue this guy [Matthews]?  I know you have issues with him." (Ex. L). He sent a copy of that e-mail to James Peters of USF&G.[5]  Peters responded by e-mail the next morning (August 18), stating:

> We are presently a defendant in a legal action brought by Landworks against Jackson Construction and USF&G.  The underlying issue is a dispute regarding their sitework subcontract on the Shrewsbury Middle School project.  If Landworks is interested in settling that legal action and resuming their work, they should communicate that desire through their counsel to Brad Carver who represents USF&G in that litigation.

(Ex. M).[6]

On August 19, Bullock e-mailed the following message to Landworks:  "We checked with [USF&G] and we were told that we cannot deal with Landworks while the legal case is pending." (Ex. N).  Later that day, Bullock sent another e-mail to Landworks, stating "We are willing to

---

[5] Falango also sent the e-mail to Russ Fuller, an employee of St. Paul.

[6] According to Peters, he was concerned "that if there were to be negotiations concerning whatever role Landworks might be seeking in connection with this matter that those communications be coordinated with counsel." (Peters Dep. at 106).

continue to discuss this with you, but in light of the lawsuit, discussion should go through the

attorneys." (Ex. O).

On August 30, counsel for Landworks sent a letter to USF&G counsel. That letter stated:

"Please find enclosed the e-mails we discussed. My client and I are prepared to meet at any time

to do what is necessary to get back to work." (Ex. P).

On September 21, Falango sent the following e-mail to Bullock and Tony Lardaro (the

vice-president of L-S) concerning the project's subcontractors:

> I don't think the 825k is enough for the contingency we already know we have
> busts in the track work, site work, electric (major), roofs and doors (major) even
> though the town is holding money I still think we could possibly break the 800k
> mark with these, we've already spent 400k on G and R for one month and we still
> don't have checks for the subs. *We can try to bang the subs* but I think that we
> can never recover from them what we are spending.

(Ex. Q) (emphasis added). No one at USF&G or St. Paul was copied on the e-mail.[7]

L-S contends that in the construction industry, "banging the subs" is a slang term

describing a legitimate back-charging of subcontractors for costs when others perform work on

their behalf. (Lardaro Dep. at 61-62; *see also* Peters Dep. at 168 (describing banging as "where

[USF&G] had incurred costs to complete or fix . . . defective work, which would be chargeable

back to the account of the involved subcontractor")). Landworks, however, contends that

"banging the subs" means "withholding payment from them, or denying them their rights under

their contracts, in the hopes of either forcing the subcontractors to comprise their claims, to be

forced to file suit on the payment bond to defer payment for years, to likely compromise as part of

a suit settlement process, or to file for bankruptcy or walk away from the claim due to financial

---

[7]  USF&G did, however, produce a copy in the course of informal discovery in this lawsuit.

distress." (Gallagher Aff., ¶¶ 27-28).

In August 2006, Landworks amended its complaint to include L-S as a defendant.[8] Landworks has asserted claims against L-S for fraud (Count II), tortious interference with contract (Counts III and IV), and a violation of Mass. Gen. Laws ch. 93A (Count VI). L-S has moved for summary judgment as to all claims against it.

## II.    Analysis

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

### A.    Fraud (Count II)

Count II alleges a claim of fraud against L-S. To establish fraud or fraudulent misrepresentation, a plaintiff "must show that the defendant (1) made a false representation of a material fact (2) with knowledge of its falsity (3) for the purpose of inducing the plaintiff to act thereon, and (4) that the plaintiff reasonably relied upon the representation as true and acted upon it (5) to [its] damage." *Eureka Broadband Corp. v. Wentworth Leasing Corp*, 400 F.3d 62, 68 (1st Cir. 2005).

---

[8] USF&G has asserted a counterclaim against Landworks alleging, in substance, that its work was defective and required extensive remedial work.

7

The complaint alleges the following "specific conduct" by L-S that, according to Landworks, "serve as fraud on the plaintiff":

(a) [USF&G and L-S] failed to effectuate payment of monies due and owing;

(b) knowing that funds were due and owing, [USF&G and L-S] engaged in conduct to deprive the Plaintiff of its funds, including exclusion of the Plaintiff from the Project without cause, failing to communicate with the Plaintiff to explain its conduct and failing to engage in good faith and fair dealing implied in each contract;

(c) knowing that funds were due and owing, [USF&G and L-S] devised and carried out a conspiracy to 'bang' Landworks;

(d) knowing that the Plaintiff was not culpable for defects at the site, USF&G alone and with the support of L-S defamed the Plaintiff, making knowingly false statements in court papers to defend its failure to pay, and otherwise, by its conduct, implying defects in performance that harmed the Plaintiff in its business . . . .

(Am. Complt., ¶ 20).

The listed conduct may be unfair, unpleasant, or even tortious, but it is not actionable fraud. Fraud is not an amorphous, catch-all cause of action that encompasses any kind of unfair or illegal business practice. It is a specific claim with specific elements, and cannot be premised on allegedly bad acts that have nothing to do with any actual representations made by the defendant or any corresponding reliance by the plaintiff.

First, as to L-S's alleged "failure to effectuate payment," it is undisputed that payments made to subcontractors would be made out of ". . . funds that USF&G received from the Town of Shrewsbury and then . . . remitted to Jackson." Other than the vague and conclusory "understandings" of plaintiff's own president, no evidence has been presented that L-S had any

8

contractual or legal obligation to make or "effectuate" payments to plaintiff.[9]  Moreover, even if

L-S had a contractual or other legal duty to effectuate project payments to plaintiff, the mere

failure of one party to perform such a duty, without any misrepresentation, is not an act of fraud.

Second, L-S's alleged "conduct to deprive plaintiff of funds," including "exclusion of the

plaintiff from the project without cause," "failing to communicate with plaintiff," and "failing to

engage in good faith and fair dealing" does not constitute fraud.  Again, proof of fraud requires,

at a minimum, a false representation by the defendant and reasonable reliance by the plaintiff.

Poor communication or a failure to act in good faith simply do not constitute fraud.  Moreover, it

bears repeating that L-S had no contract with Landworks and no obligation to pay Landworks

anything.

Third, the alleged "conspiracy to 'bang' Landworks" is not actionable as fraud.  This

theory is based entirely upon the September 21, 2005 Falango e-mail.  Even assuming plaintiff's

characterization of the slang term "bang"—that is, as a failure to pay subcontractors what they are

legitimately owed in a malicious attempt to force those subcontractors to compromise their claim

or file suit—plaintiff has adduced no evidence of either misrepresentation or reasonable reliance.

Even malicious actions intended to harm another person are not "false *representations[s]* of a

material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon."

*Eureka*, 400 F.3d at 68 (emphasis added).

Fourth, L-S's alleged "defamation" of plaintiff is not actionable as fraud.  Plaintiff has

presented no evidence for its contention that L-S helped USF&G prepare a "false counterclaim"

or made knowingly false statements in this or any other court.  Such claims are mere "conclusory

---

[9] There is no evidence of any contractual relationship between L-S and Landworks.

9

allegations, unsupported speculation and improbable inferences" that cannot defeat summary judgment. *Galloza*, 389 F.3d at 28.  And even if plaintiff had actually identified the alleged defamatory statements, defamation is not fraud.

Indeed, plaintiff makes only one argument in its memorandum opposing summary judgment that even remotely concerns a possible misrepresentation by L-S.[10]  On August 17, 2005, representatives of L-S and plaintiff discussed the possibility of ratification over the telephone.  L-S then sent plaintiff an e-mail, with a list of the information it needed to "get started on ratification."  Plaintiff contends that it relied on this e-mail and thereafter assumed that L-S was moving forward to ratify it.  Plaintiff further contends that in reliance on that e-mail, it did not seek or accept any other work that would have prevented it from returning to the project.

Again, to prove a claim of fraud, at a minimum there must be *reasonable* reliance by the plaintiff on a false representation of material fact. *Eureka*, 400 F.3d at 68.  On August 18, 2005, L-S was told by USF&G that if plaintiff wanted to resume work, plaintiff should contact USF&G's counsel.  (Ex. M).  On August 19, L-S e-mailed plaintiff stating "We checked with [USF&G] and we were told that we cannot deal with Landworks while the legal case is pending." (Ex. N).  Later that day, L-S sent a second e-mail to plaintiff: "We are willing to continue to discuss this with you, but in light of the lawsuit, discussion should go through the attorneys." (Ex. O).

Plaintiff has not alleged that it changed its position, or suffered a reliance injury, during the

---

[10] Curiously, that allegation is not charged as fraud in the complaint.  At a minimum, Fed. R. Civ. P. 9(b) requires that plaintiff "allege the time, place, and contents of the alleged misrepresentation, as well as the identity of the person making them." *Petricca v. Simpson*, 862 F. Supp. 13, 15-16 (D. Mass. 1994); *see also Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) (Fed. R. Civ. P. 9(b) requires specificity with respect to time, place and content of an alleged false representation, but not circumstances or evidence from which fraudulent intent could be inferred).  The amended complaint does not come close to meeting that standard.

two-day period from August 17 to 19. Furthermore, after August 19, it would have been clearly unreasonable for plaintiff to rely on the August 17 e-mail and assume that the ratification process was underway. Plaintiff was at that time (and still is) involved in heated litigation with USF&G. The parties' communication on August 19 clearly indicated that the only way plaintiff could return to the job would be through negotiations with USF&G relating to the lawsuit.[11] Accordingly, any purported reliance by plaintiff on the August 17 e-mail after August 19 was unreasonable and the fraud claim cannot survive summary judgment.[12]

## B.    Counts III and IV (Tortious Interference)[13]

To prove tortious interference with contract, the plaintiff must prove that (1) the plaintiff had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, (3) the defendant's interference, in addition to being intentional, was improper in motive or means, and (4) the plaintiff was harmed by the defendant's actions. *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 129 (1st Cir. 2006) (*citing G.S. Enterprises, Inc. v. Falmouth Marine*, 410 Mass. 262, 271 (1991)). Here, plaintiff contends that L-S tortiously interfered with its contractual rights by "carrying out its program of banging the

---

[11] Before L-S had received USF&G's August 18 e-mail, plaintiff and L-S had exchanged e-mails discussing a possible meeting between Bullock and Matthews at the middle school site. This meeting was for the purpose, according to Bullock, of "go[ing] over what had to be done to finish the work." (Ex. N). Matthews proposed meeting on Tuesday or Wednesday of the following week. *Id.* There is no evidence that any such meeting took place. The failure of the parties to meet should have been a further clear indication that L-S was not moving forward to ratify plaintiff.

[12] There is also evidence that plaintiff realized that it needed to deal directly with USF&G, not L-S, to resume work on the project. On August 30, 2005, less than two weeks after the August 17-19 e-mail exchange, counsel for Landworks sent a letter to USF&G counsel stating, "Please find enclosed the e-mails we discussed. My client and I are prepared to meet at any time to do what is necessary to get back to work." (Ex. P).

[13] The amended complaint alleges two identical claims of tortious interference with contract against L-S. Both counts are identically worded and plaintiff has not attempted to distinguish between them.

subcontractors."[14]

That claim—which rests principally, if not entirely, on the September 21, 2005 Falango e-mail—may be disposed of summarily. Plaintiff filed a complaint against USF&G on March 29, 2005, in which it alleged that USF&G breached the parties' contract by failing to pay money due and owing for past work. Plaintiff thus claimed that USF&G breached the contract nearly six months *before* the Falango e-mail was ever written. There is no evidence that L-S did anything to interfere with any contractual relationship prior to the time of the alleged breach.[15]

Furthermore, the September 21 e-mail was sent only to employees of L-S. Plaintiff has submitted no evidence showing that any USF&G employee ever saw the e-mail or acted on it.[16]

L-S cannot be considered to have "knowingly induced [USF&G] to break [its] contract" based solely on one internal e-mail that was created many months *after* the alleged breach of contract. *Platten*, 437 F.3d at 129. Plaintiff has produced no evidence of L-S's supposed

---

[14] Plaintiff refers to the contract in question as the "contract between plaintiff and USF&G." (Am. Complt., ¶ 23). Presumably, plaintiff is referring to its March 2004 ratification agreement with USF&G, which is not in evidence. Arguably, the relevant contract is the performance bond contract, of which Landworks may have been a third-party beneficiary, or plaintiff's original subcontract with Standen, or its new subcontract with Jackson. For present purposes, it is not necessary to resolve the issue, as it is undisputed that USF&G is responsible for any payment obligations to plaintiff for work performed on the project.

[15] The September 21 e-mail does not by its terms suggest a past (or ongoing) course of conduct, but a possible future action ("We can try to bang the subs"). Indeed, plaintiff's president essentially acknowledged that the allegedly wrongful conduct occurred *after* the alleged breach. When he was asked to establish the basis for the tortious interference counts, he responded as follows:

> [L-S] . . . did not investigate [plaintiff's] claim, by not at least looking into the possibilities that . . . monies were owed, and . . . by not . . . giving [plaintiff] a full and fair hearing on the amounts that I say were owed to [plaintiff] . . . and not presenting them to the surety.

(Matthews Dep. at 108-109).

[16] As noted, however, the e-mail was produced to plaintiff by USF&G in response to an informal discovery request.

interfering activities before April 2005.  To the extent plaintiff has made other allegations, they

consist of mere unsupported speculation and improbable inferences.  Accordingly, summary

judgment will be granted as to the claim of tortious interference with contract.

**C.    Count VI (Mass. Gen. Laws ch. 93A)**

Mass. Gen. Laws ch. 93A § 2(a) prohibits "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce."  In order to prevail on a

claim under ch. 93A, the plaintiff must show that defendant's actions "(1) fall within the penumbra

of some common-law statutory, or other established concept of unfairness, (2) [are] immoral,

unethical, oppressive, or unscrupulous, and (3) caused substantial injury."  *Albright v. Morton,*

321 F. Supp. 2d 130, 141 (D. Mass. 2004) (*quoting Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 15

(1st Cir. 1999)).

Here, plaintiff alleges that L-S "set out to harm [plaintiff] by denying it access to the

Project and to funds due and owing."  Plaintiff further contends that "the pattern and practice of

fraud, [tortious] interference and such conduct constitutes violations of c. 93A by [L-S]."

This claim likewise cannot survive summary judgment.[17]  In its opposition memorandum,

plaintiff supports its ch. 93A claim only by incorporating all its other arguments by reference and

summarily concluding "there is no doubt that engaging in a deliberate effort to deny 20

subcontractors its economic rights would rise to a level of unfair and deceptive trade practices as

a matter of law."  As noted, the evidence is not sufficient to establish either a claim of fraud or

tortious interference with contract.  Furthermore, the amended complaint and other filings are rife

---

[17]  Defendant asserts that plaintiff's failure to send a demand letter is a bar to the ch. 93A claim.  Such a
letter is only a "jurisdictional prerequisite to suit" under ch. 93A, § 9, not § 11, which governs here.  *See, e.g.,*
*Multi Technology, Inc. v. Mitchell Management Systems, Inc.*, 25 Mass. App. Ct. 333, 335 (1988).

with unspecific, unsubstantiated, and conclusory references to defendant's alleged conspiratorial actions, negligence, defamation, and false statements made to this Court.

It is undisputed is that on August 18, 2005, L-S was directed by USF&G to not deal with plaintiff except through counsel, because of ongoing litigation initiated by plaintiff. L-S informed plaintiff, the very next day, of that fact. Plaintiff then *did*, in fact, initiate a dialogue with USF&G counsel, beginning on August 30, 2005. Plaintiff does not dispute that the contractual payments it contends that it is entitled to would come from USF&G, not L-S. At most, L-S disengaged from a heated dispute that was already in litigation, informed plaintiff that it was doing so, and told plaintiff to deal with USF&G, which was in contractual privity with plaintiff and which was ultimately responsible for any payments under the contract.

In short, there is insufficient evidence, even when viewed in the light most favorable to plaintiff, to support a claim under Mass. Gen. Laws ch. 93A. Summary judgment will therefore be granted as to that claim.

**III.    Conclusion**

For the foregoing reasons, the motion of defendant Lovett-Silverman Construction Consultants, Inc., for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor<br>
F. Dennis Saylor IV<br>
United States District Judge

Dated:  February 6, 2008

14

# EXHIBIT 4

2/27/08

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| LANDWORKS CREATIONS, LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| | ) C.A. No. 4:05-CV-40072-FDS |
| **UNITED STATES FIDELITY AND** | ) |
| **GUARANTY COMPANY, and** | ) |
| **LOVETT SILVERMAN CONSTRUCTION** | ) |
| **CONSULTANTS, INC.** | ) |
| | ) |
| **Defendant,** | ) |
| | ) |

### UNITED STATES FIDELITY AND GUARANTY COMPANY'S
### DISCLOSURE OF EXPERT TESTIMONY

In accordance with Fed. R. Civ. P. 26(2), United States Fidelity and Guaranty Company ("USF&G") hereby discloses its expert witnesses. USF&G will call George G. Byl, P.E. of ReStructure Company, Inc. and Michael P. Pellegri of Vertex Construction Services, Inc.

Mr. Byl is expected to testify in accordance with his written report, which is attached hereto as Exhibit A. Mr. Byl's qualifications are contained in his resume, which is attached hereto as Exhibit B. Mr. Byl is compensated for his time at the rate of $195.00 per hour. A list of cases in which Mr. Byl has testified as an expert since 2004 is attached hereto as Exhibit C.

Mr. Pellegri is expected to testify in accordance with his written report, which is attached hereto as Exhibit D. Mr. Pellegri's qualifications are contained in his curriculum vitae, which is attached hereto as Exhibit E. Mr. Pellegri is compensated for his time at the rate of $140.00 per hour. Mr. Pellegri has not previously testified as an expert witness.

Respectfully submitted,

**UNITED STATES FIDELITY &
GUARANTY COMPANY**

Peter G. Hermes, BBO No. 231840
Kevin J. O'Connor, BBO No. 555249
Eric. C. Hipp, BBO No. 642658
HERMES, NETBURN, O'CONNOR &
    SPEARING, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
(617) 728-0050
(617) 728-0052 (F)

Dated: February 27, 2008

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 27th day of February, 2008, a copy of the within document was served by first class, postage prepaid mail upon the following counsel of record:

Robert N. Meltzer, Esq.
The Mountain States Law Group
P.O. Box 1459
Framingham, MA 01701

John B. Connarton, Jr., Esq.
Donovan Hatem
World Trade Center East
Two Seaport Lane
Boston, Massachusetts 02210

Eric C. Hipp

G:\DOCS\ECH\Clients\St. Paul Travelers\Jackson Construction\Landworks\Pleadings\USF&G's Disclosure of Expert Testimony.doc

2

# EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-CV-40072 FDS

LANDWORKS CREATIONS, LLC          )
                                  )
Plaintiff                         )
                                  )
v.                                )
                                  )
UNITED STATES FIDELITY &          )
GUARANTY COMPANY                  )
                                  )
Defendant                         )

## LANDWORKS CREATIONS, LLC 'S PRE TRIAL MEMORANDUM

Now comes the Plaintiff, Landworks Creations, LLC and provides this pre-trial memorandum to the Court. Notwithstanding the Court's Order waiving filing of the pre-trial memorandum, the Plaintiff believes that this memorandum will assist this Court in understanding the issues prior to trial.

## I.    BRIEF STATEMENT OF THE CASE

This is a straightforward claim brought under G.L. c. 149 §29 for non-payment of sums due and owing to Plaintiff, Landworks Creations, LLC ("the Plaintiff") arising out of a construction project at the Shrewsbury Middle School, following the failure of Standen Contracting. Defendant, United States Fidelity & Guaranty Co./St. Paul's Ins. Co ("the Defendant") provided the payment and performance bond that is in issue to

cover the amounts due and owing is an insurance company with a place of business at 124 Grove Street, Franklin, Norfolk County, in the Commonwealth of Massachusetts. The Plaintiff agreed to perform certain work for Standen Contracting Company, Inc. at the Shrewsbury Middle School ("the Project"). Standen Contracting Company, Inc. was unable to complete its work at the Project, and the Defendant, pursuant to its obligations under a performance bond SW5041 assumed responsibility for completion of the Project in the stead of Standen Contracting Company, Inc. The Plaintiff has performed it work under the Standen contract, and is owed funds by the Defendant for the work performed. The Defendant has failed to pay the Plaintiff for work performed at the Project, claimed to the extent of $135,101.00.

II.    CONTESTED ISSUES OF FACT

The Defendant denies liability for work performed by Landworks, and has falsely claimed that Landworks abandoned the Project, and that the Defendant was required to complete the work at Landworks' expense. Landworks contests these facts. Landworks further believes it is entitled to payment of treble damages, as well as its attorney's fees based upon the Defendant's bad faith refusal to honor this straightforward claim.

The Plaintiff notes that Lovett-Silverman was the Defendant's eyes and ears on the ground, entrusted with the day to day obligation of the Defendant's responsibilities to the Plaintiff. The Defendant, alone and by its agent, utterly failed to comply with standard industry practice for reviewing and processing claims, and operating the construction site in accordance with industry standards and practices. Thus, the Defendant cannot claim

abandonment as a matter of law, or seek remedies against the Plaintiff. These breaches of industry standards, in conjunction with e-mail traffic which demonstrates a willful failure to comply with industry standards, warrants imposition of treble damages.

III.    PLAINTIFF'S WITNESS/EXPERT WITNESS LIST

Neal Matthews
Landworks Creations, LLC
PMB 291 1500A Lafayette Rd.
Portsmouth, NH 03801

Mr. Matthews has personal knowledge of the Plaintiff's contract with Standen Construction, the work performed by the Plaintiff on behalf of Standen, the invoices submitted to Standen and paid either by Standen or USF & G, as well as the attempted completion of the work with Jackson, the change orders signed and accepted by Jackson as agent of USF & G, the work itself, the invoices submitted and the damages sought. Mr. Matthews also has personal knowledge of his attempts to return to the site to perform any additional work that required performing and the Defendant's refusal to allow the Plaintiff to complete the work, notwithstanding that the Plaintiff was always ready, willing and able to perform work and had not been, in any way, terminated from the work.

William Gambill
Formerly of Standen Contracting
445 Faunce Corner Road
N. Dartmouth, MA 02747

Bill Gambill has familiarity with the scope of the Landworks/Standen contract, the work performed by Landworks, the invoices submitted by Landworks to Standen and

the monies paid, the condition and state of the project at the time Standen left the project,

the payment and performance bond contracts with USF & G and the project supervision

and oversight in general

Michael Pagano
Katie Crockett (sp?)
Todd Manning
Lamoureux Pagano Associates
14 East Worcester Street
Worcester, MA 01604

These are the project architects, with knowledge of the project overall, the scope

of the work, the work performed by Landworks, the status of the project at the time

Standen left the project, the administrative and contractual issues caused by Jackson, and

the completion of the project.

Dan Morgado, Town Manager
"Duffy" Lanciani Clerk of the Works
Robert Cox-Superintendent, Public Buildings Dept
Shrewsbury Town Hall
Shrewsbury, MA

The town manager has personal knowledge of the scope of the project in general,

and the business side of the retention and termination of Standen, the negotiations with

USF & G and the entire Jackson involvement in the project. Duffy has personal

knowledge of the work, the progression of the work, and the conduct and misconduct of

Jackson toward the subcontractors on the job. Cox was kept fully apprised of the scope of

the work and the progress of the work, and the consequences of Jackson's failure to make

appropriate payments.

Richard McGuinness

4

Frank Leonardo
Robert Barton
Jennifer Fletcher
Jackson Construction Company
20 Dan Road
Canton, MA 02021

Jackson Construction and its agents, employees and managers, have personal knowledge of the project overall, the Plaintiff's work, the invoices submitted, the invoices paid, the change orders submitted and the change orders approved and not paid, the condition of the work at the time the Plaintiff left the project, and the status of Jackson's lawsuit with USF&G. Frank Leonardo also worked for Standen and has the same personal knowledge as Gambill

Jeff Richards
Waterman Design Associates
31 East Main Street
Westborough, MA 01581

Waterman Design's staff engineer was familiar with the scope of the work, the progress of the work and the quality of the Plaintiff's work.

Craig M. Valente
D.A.Collins Construction Co.
Mechanicsville, NY

Mr. Valente is a contractor who was bidding a construction project in Newburyport. The Plaintiff was recommended to D.A. Collins by Waterman Designs based upon the staff engineer's recommendation based upon the quality of the Plaintiff's work at the project.

Jack Ferguson

CTM

CTM was the town's construction manager, with personal knowledge of the scope of the work, the progression of the work and the issues with the various contractors during the course of the project.

Robert Bullock
Lovett Silverman Construction Consultants, Inc.
19 Goldenrod Drive
Carlisle, PA 17013

Mr. Bullock is the construction consultant for the Defendant. Mr. Bullock has personal knowledge through communication with the Plaintiff that the Plaintiff was at all times ready, willing and able to meet with the consultant and to address issues of unpaid invoices and to return to the site to perform any work necessary at the site. Mr. Bullock has knowledge that he refused to meet with the Plaintiff, and refused to allow the Plaintiff to return to the site. He is expected to have knowledge as to why he wrote to the Plaintiff in August of 2005 stating "we checked with the surety and we were told that we can not deal with Landworks while the legal case is pending"

Tony Lardaro
Bill Mertz
Al Falango
Pedro Rosario
Lovett Silverman Construction Consultants, Inc.

Each of these individuals was apparently involved in the assessment, or lack thereof, of the claim of Landworks, LLC, and otherwise was involved in the completion of the project at the Shrewsbury Middle School, and in the search for replacement contractors, ratification of contractors and the decision not to ratify Landworks LLC.

These individuals also have personal knowledge of Defendant, USF & G's failure to properly investigate the claim, and in preparation of a knowingly false counterclaim.

James M. Peters
Russell Fuller
United States Fidelity & Guaranty
Hartford, CT

Mr. Peters, by his own affidavit, has "responsibility for the oversight, handling and management of claims arising under surety bonds executed by United States Fidelity and Guaranty Company...on behalf of Standen Contracting Company, Inc. Upon information and belief, Mr. Peters will be the primary witness pertaining to USF & G's unfair and deceptive claims settlement practices, with information pertaining to the methods and policies used by USF & G to resist valid claims through hindrance, delay, prolonged litigation and other means and methods to avoid payment of the Plaintiff's uncontested claims. Mr. Peters is also expected to testify as to the principal/agent relationship between USF & G and Jackson Construction, and USF & G's regular consent to litigation in the Massachusetts state courts. Mr. Peters is also expected to have knowledge regarding its awareness of Jackson's fraudulent and deceptive trade practices as noted in <u>United States Fidelity & Guaranty Co. v. Jackson Construction Co. et al</u>, 05-11397 NMG, and is expected to provide some explanation why it is credible for USF & G to rely upon Jackson in denying the Plaintiff's claim. Mr. Peters is also expect to have information as to why the surety blocked the Plaintiff from the site and why the surety prevented its agent for engaging in an investigation of the claim. Mr. Peters is also expected to have actual knowledge of the fraud claims brought against Jackson, and is expected to have actual knowledge of Jackson's fundamental unreliability.

Russell Fuller has the same general knowledge, and he participated in conversations in which Lovett-Silverman, in conjunction with USF & G, acted unlawfully toward Landworks, LLC in its ratification process. According to e-mails produced by Lovett-Silverman, Fuller had some form of unspecified "problem" with Landworks.

Kevin J. O'Connor, Esq.
Scott S. Spearing, Esq.
Eric Hipp, Esq.
Hermes Netburn O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109

On or about July 1, 2005, these individuals affixed their signatures under F.R.C.P. 11 to a suit filed against Jackson Construction in the United States District Court in Boston entitled <u>United States Fidelity & Guaranty Co. v. Jackson Construction Co. et al</u>, 05-11397 NMG which includes claims for fraudulent conveyance and unfair and deceptive trade practices, amongst other allegations. These individuals have broad knowledge of Jackson's pattern and practice of fraud in the construction industry.

Eric Hipp engaged in e-mail correspondence with employees of Lovett-Silverman shortly prior to the filing of the Counterclaim in which the false backcharges were specified. Hipp is expected to testify about the substance of his communications with Lovett-Silverman in which it was noted that Lovett-Silverman was not acting with proper speed in determining merit of Landworks' claims.

Brad Carver, Esq.
Hinshaw & Culbertson
One International Place
Boston, MA 02110

8

Mr. Carver has personal knowledge that he was informed by Plaintiff's counsel during the spring and summer of 2005 that the Plaintiff was ready, willing and able to return to the site to perform any work requested by the surety, that the surety and Jackson were unlawfully barring access to the site and that the Plaintiff was incurring further damages as a result of the surety's refusal to meet its obligation to address the Plaintiff's claim. Brad Carver was included in e-mail traffic in which questionable conduct by Lovett-Silverman and USF & G toward Landworks was discussed.

John Lemieux
Terry Scalzo
Vertex Engineering

These individuals were involved in investigating the claims of subcontractors at the Hull High School project after the failure of Jackson Construction in the summer of 2005 on behalf of USF & G, Jackson's surety. The Hull project involved the same contractor, Jackson, the same surety, USF & G, and the same attorneys for USF & G, as is found in this case. These individuals were also involved in the project completion on behalf of USF & G following the failure of Jackson Construction, and in the ratification process on behalf of USF & G in conjunction with counsel for USF & G. These individuals have actual knowledge as to the fact that USF & G's construction consultants were permitted to be in active contact with subcontractors and their attorneys, that meetings were held in which all parties were present, that investigation of a claim being reviewed in good faith included communication with all parties involved and knowledgeable of the facts, and the methods and procedures of reviewing claims. These individuals also have actual knowledge that in the summer of 2005 USF & G and its

9

construction consultants and its attorneys continued this good faith behavior, even after a

claim had been filed under G.L. c. 149 § 29 and G.L. c. 176D and 93A, and that

ratification was permissible even during the pendency of such a lawsuit, and that this

conduct was transpiring during the summer and autumn of 2005, even as USF & G and

Lovett-Silverman were informing the Plaintiff in this case that USF & G policy dictated

otherwise. This testimony is also expected to demonstrate that the Plaintiff's expectations

of USF & G's response to its claim was not in any way unsupported by prior

demonstration of USF & G's policies as they were carried out in 2005-2006.

PMK and KOR Century Drywall
PMK and KOR Steelco Fence
PMK and KOR K & K
PMK and KOR Brodny Floors

These subcontractors include three companies, Brodny, Century and K & K, who were

compelled to bring suit to recover monies due and owing without good excuse for non-

payment. Century, in particular, is expected to testify about the tactics used against it, and

the delays caused in payment, without good excuse for non-payment. In addition to

Landworks, these are "banged" subcontractors. Steelco also has knowledge that the so-

called policies of USF & G pertaining to communication between the surety and its

consultant, as represented to Landworks, was not true.


Frias Concrete

Frias Concrete was Jackson Construction Company's concrete subcontractor, and has

actual knowledge as to the scope of its work at the project, the contracting practices of

Jackson, and the fact that no one contacted Frias to discuss its role at the Project during the time that Lovett-Silverman was declaring Frias to be a subcontractor to Landworks.

Expert-The Plaintiff will call William Gallagher as its expert witness. Mr. Gallagher is a construction manager of substantial experience, and knowledge of the local construction industry. He has extensive knowledge of public construction practices and policies, as well as means and methods. He is expected to testify as to these areas, and he is expected to testify as to the numerous ways that the defendants in these cases violated the practices and policies, as well as the means and methods usually employed in bringing public construction projects to completion. He is expected to testify consistent with prior interrogatory answers, affidavits and expert disclosures. Specifically, he will testify as follows: he has reviewed, with regard to the Project, the construction file of Landworks Creations, LLC, the deposition transcripts of the project architect, Katie Crocket, of Lovett-Silverman employees Tony Lardaro, Bill Mertz and Robert Bullock, of USF & G representative Jim Peters and of the Neal Matthews of Landworks. He has also reviewed the deposition exhibits, documents produced by the parties in this case and by the project architect, and he has spoken in extensive and exhaustive detail with Neal Matthews. He bases his opinions upon the specific facts and documents in this case, as well as upon his prior experience as a construction manager on public and private projects. He will testify that when a construction consultant or construction manager takes over a project that is already underway, and in which a general contractor has left a job or has undergone business failure, there are certain task that are customarily performed in order to get the work back on track and finished. These tasks include:

11

a.   assessing the status of the work and the work performed by each subcontractor.

b.   ascertaining the status of payment to subcontractors, who generally and customarily suspend work or demobilize pending review of payment issues.

c.   ratifying subcontractors, that is, bringing the subcontractors back to work under the control of the Surety on public projects

d.   completing the work in the fastest way possible

He will testify that it is always preferred by construction consultants and managers to ratify prior subcontractors; these subcontractors generally know the Project better than the new consultants, and are generally the best source of information about the Project and what needs to be done to get the project finished. They also do not require time to get up to speed on the work, they can mobilize quickly, and they are generally locked-in to a lower price than replacement subcontractors by the nature of the contract date. In addition, it is often difficult to find a subcontractor willing to pick up where another subcontractor has left off and where a project is already troubled. As a general rule in the construction industry, a subcontractor is brought back to work unless there is a compelling reason not to bring a subcontractor back to work. He will testify that the fact that a subcontractor may be owed money, or may be claiming to be owed money, is not, customarily, a compelling reason not to engage a subcontractor to complete the work.  He will also testify that in the construction industry, particularly involving contracts with site contractors, the scope of a contract cannot be determined by mere contract documents. Lovett-Silverman's employees testified that they viewed the recitation of the site work sections defining the scope of the work to be all conclusive. However, in the construction

12

industry, particularly public construction, where all site work is collected under Division 2, the recitation of all specification under Division 2 does not constitute the scope, but rather then location where the broad scope of work is included. In other words, since parts of the work are found in multiple parts of Division 2, all elements of Division 2 are customarily included. The assertions made by Lovett-Silverman that the scope of work can be entirely found by strictly construing the contract, without further investigation, contradicts both custom and industry practice, and reflects a failure to perform the usual investigation performed in the context of this case. Similarly, it is evident, because Lovett-Silverman conducted no investigation, that Lovett-Silverman never considered or had the ability to consider, whether the Jackson contract was binding or even in force and effect for purposes of defining scope. This investigation would be particularly important in this case; as Neal Matthews noted in his deposition testimony, Jackson engaged in a pattern and practice of demanding extra work outside of the Landworks scope as Jackson neared insolvency. These items of extra work confirm that the prior scope had been limited, and that defining the scope of obligation could not be inferred from earlier contract documents. He will testify that he has seen documentation that demonstrates that Landworks removed its forces from the Project in January of 2005, and that it was scheduled to complete its work in the spring of 2005. It is customary for site contractors to engage in "winter shut down," as weather conditions preclude certain types of work from being performed. This is customary in the industry, and it is not considered "abandonment" of the work. He will testify that he has also seen documentation that both Landworks and many other sub contractors did not return to the Project after the failure of Jackson and pending payment, and that this has been acknowledged both by Lovett-

Silverman and USF & G. This is also customary in the construction industry; following

failure of a general contractor, it is essential for a pause in the work so that the scope of

remaining work may be assessed and the issue of unpaid invoices to the subcontractors

may be addressed. In the construction industry, it is not customary to assume that a sub

contractor who is awaiting payment following the failure of a general contractor has

"abandoned" the work. He will testify that he has reviewed the so-called "deficiency

reports." These are merely "punch list" items. Punch list items are inventories of work

that have yet to be performed or which have minor deviations which must be fixed before

the work is acceptable to the owner of the project. He will testify that punch lists occur on

every job, and are distributed to every contractor and subcontractor. Even though punch

lists may be titled "deficiencies" or "defective items," they are customary on every job

and merely inventory work left to be performed. The existence of punch lists, both by

industry custom and industry standards, does not create a presumption of breach of

contract by the contractor or subcontractor. He will testify that he has seen documents in

this case which indicate that Landworks had punch list items to complete. Since the work

had not yet reached completion when Jackson failed, this is not unusual or unexpected.

He will testify that he has seen no documents that demonstrate the existence of defects in

the work performed by Landworks that would cause concern to a construction manager

or construction consultant, or which would suggest an inability or unwillingness to

complete the work. He will testify that he has seen nothing in the papers or documents or

testimony in this case that would indicate a compelling need to replace Landworks as the

site contractor. On the contrary, the record shows that Landworks was always ready,

willing and able to perform work that needed to be done, demonstrating a degree of

14

teamwork that should have made Landworks a desirable subcontractor on the Project. He

will testify that as a construction manager and consultant, it is customary to encourage

these kind of extra-mile subcontractors to become pro-active in getting the work done.

He will testify that he has seen in the materials in this case a demonstration of what

transpires when a consultant declines to ratify a subcontractor; the difficulty had by

Lovett-Silverman in trying to find a site subcontractor at a reasonable price who could

perform the work confirms why, customarily, a subcontractor is retained. He will testify

that he has seen no document in this case that would serve as a termination of the

Landworks' contract as defined in the industry. He will testify that, from reviewing the

file, that Landworks continued to have a binding contract in the form of the post-Standen

ratification agreement which defined the rights of the parties, and the obligation of the

Surety to deal in good faith with Landworks' claims for payment and its demand for its

right to return to work. It would be customary in the construction industry to view the

situation in this way. He will also testify that he has  seen the e-mail from Lovett-

Silverman in which an employee of Lovett-Silverman refers to shortages of money, and

the idea of "banging" the subcontractors. He will testify that banging the subcontractors

has a very specific meaning in the construction industry, especially when paired with the

first part of the e-mail reflecting a shortage of funds. Banging the subcontractors means

withholding payment from them, or denying them their rights under their contracts, in the

hopes of either forcing the subcontractors to compromise their claims, to be forced to file

suit on the payment bond to defer payment for years, to likely compromise a claim as part

of a suit settlement process, or to file for bankruptcy or walk away from the claim due to

financial distress. Banging the subcontractors is a form of violence to them, and it is a

means and method of denying subcontractors what may be theirs. In the construction

industry, the less violent, but equally suggest term for this inappropriate behavior would

be "strong arming." He will testify that he has noted from the deposition of James Peters

of USF & G that more than 20 lawsuits were filed on the payment bond in this Project;

that would easily represent the vast majority of subcontractors working on the Project. He

will also testify that this refers to the number of claims in suit, and would not include the

subcontractors who settled for less in order to avoid suit. In the construction industry, this

number of lawsuits on a single public project is highly unusual, and suggests an

intentional failure to address claims by Lovett-Silverman and the Surety, as opposed to

systemic failure by all of the subcontractors. In light of the unusual number of claims,

paired with lack of competent review of the project details by Lovett-Silverman, read in

conjunction with the e-mail identifying the shortage of funds, and coupled with the

statement about "banging" the subcontractors, It is evident that Lovett-Silverman, USF &

G's agent, intentionally engaged in conduct, which includes failing to engage in

reasonable conduct, which would interfere with Landworks' rights under the contract.

The number of defects in performance by Lovett-Silverman in terms of deviation from

industry custom and practice when dealing with subcontractors following the failure of a

general contractor are substantial and pervasive. The deviations from industry custom and

practice are so complete that it would suggest to any competent construction manager a

willful deviation from custom, as it would be almost impossible for negligence to explain

these deviations. In short, the facts presented, based upon his expertise and experience in

the field, is that Landworks is a banged subcontractor, and that it was intentionally

prevented from doing its work on the Project and addressing its claim with the Surety,

16

and from receiving payment for its work, and was otherwise forced to file suit to collect money that appears to be appropriate due and owing.

The Plaintiff reserves the right to call any witnesses identified or call by the Defendant.

## IV –DOCUMENTS/EVIDENCE

The Plaintiff intends to introduce the following documents into evidence:

1. The contract with Standen

2. The project contract and specifications and drawings

3. Any and all change orders submitted and signed by Jackson

4. Invoices submitted

5. Documents evidencing payment or non-payment

6. Correspondence between the various parties demonstrating the obligations due and owing to Landworks from USF & G as referenced in correspondence to Jackson, and the failure of the surety to make payment, including any and all documents of the town of Shrewsbury, the project architects and engineers.

7. Deposition testimony of officials of Lovett & Silverman who are not physically present at trial, as well as all exhibits marked at those depositions.

## IV ISSUES OF LAW

The Plaintiff has already put Defendant, USF & G on notice that it intends to move to disqualify George Byl as Defendant's expert witness on the grounds that the report of Byl indicates an attempt to supplant the role of the jury in this case by assessing credibility,

and weighing and reaching conclusions of fact outside the purview of an expert witness. Byl also lacks the qualification and competence to testify as to standards of the industry pertaining to public school construction management, which is the primary issue in this case.

The Plaintiff has identified numerous attorneys as witnesses as to the 93A portion of this case, which may necessitate filing motions in limine to disqualify these attorneys prior to trial.


V. LENGTH OF TRIAL


The Plaintiff anticipates trial will require ten half days.

Respectfully Submitted,

**Landworks Creations, LLC**
By its attorney,

s/Robert N. Meltzer
Robert N. Meltzer, BBO #564745
P.O. Box 1459
Framingham, MA 01701
Phone: (508) 872-7116


Dated: April 28, 2008

CERTIFICATE OF SERVICE

I, Robert N. Meltzer, do hereby certify that on this day I served a copy of the foregoing on all counsel of record by mailing the same, postage prepaid, to:

Hermes, Netburn, O'Connor & Spearing
265 Franklin Street, Seventh Floor
Boston, MA 02109
Attn: Peter Hermes, Esq.


  s/Robert N. Meltzer

April 28, 2008