UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

CIVIL ACTION NO: 05-CV-40072 FDS

| | |
|---|---|
| LANDWORKS CREATIONS, LLC | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES FIDELITY AND | ) |
| GUARANTY COMPANY and | ) |
| LOVETT-SILVERMAN CONSTRUCTION | ) |
| CONSULTANTS, INC. | ) |
| | ) |
| Defendants | ) |

OPPOSITION OF LANDWORKS CREATIONS, LLC TO THE MOTION IN LIMINE OF THE DEFENDANT, UNITED STATES FIDELITY AND GUARANTY COMPANY, TO LIMIT EVIDENCE PRESENTED BY THE PLAINITFF UNDER COUNTS I AND IV OF THE AMENDED COMPLAINT, AND REQUESTS FOR COSTS FOR RESPONDING TO A BAD FAITH MOTION IN LIMINE

Now comes the Plaintiff, Landworks Creations, LLC, and requests that this Honorable Court summarily reject the frivolous and bad faith Motion in Limine to Limit Evidence As grounds for this Opposition, the Plaintiff states as follows:

1. Strangely, USF & G lacks a comprehensive, written set of policies to guide the company when assuming obligations under a performance bond claim. Even more strange, USF & G has no comprehensive system for informing subcontractors of their rights and remedies when a bonded party has become incapable of performing under the contract.

2. In the deposition of James Peters, of USF & G, and in transcript testimony previously provided, Peters admitted that USF & G did not have "a policy or set of policies in writing that explain how those obligations are to be met by the Travelers." Page 23.

3. In this case, then, a primary issue is not whether USF & G followed written policies (as it had none), but rather how USF & G dealt with these matters de facto and in the real world; real world practice constitutes the policy of USF & G.

4. The issue of de facto behavior is an ultimate issue in this case; people within the construction community, such as subcontractors, certainly had the legal right to rely upon prior practices and policies which appeared to be in effect by the surety, and to conform their behavior to what the surety was doing in the expectation of consistent treatment.

5. The Plaintiff intends to introduce evidence in this case in the form of testimony of other contractors, attorneys and consultants, that the behavior of Landworks was consistent with USF & G's public policies in 2005, and that the conduct of USF & G in treating Landworks differently not only precludes counterclaims by USF & G, but also precludes all of their defenses in this case.

6. This evidence to be proffered is limited to almost identical cases, not distinguishable by any obvious distinctions. The two projects in question involve the Ambrose School in Winchester and the Hull High School project in Hull. Specifically, the cases to be introduced include evidence of three lawsuits involving Hermes Engineering (HVAC) and Emanouil Brothers (site work) These cases all have these common characteristics:

a. These projects, as well as Shrewsbury, all involved post-Jackson failure

b. USF & G provided surety bonds to all three projects

c. These cases all transpired in or about 2005

    d. Hermes, Netburn represented USF & G in all four matters

    e. Plaintiff's counsel represented all three plaintiffs

    f. Suit was filed prior to ratification in all four cases

    g. Existence of suit was not a bar to ratification in three cases[1]

    h. Work was performed/non performed subsequent to ratification in three cases

    i. Lawsuits were resolved without expansive litigation after work was complete in three cases

    j. In Ambrose and Hull, USF & G's construction consultant spoke frequently with the subcontractor even after suit was filed.

7. In the case at bar, Lovett-Silverman informed Landworks that it could not speak to Landworks once suit was filed. It is unclear why this was the case, as it was not the case in any other project, and it did not violate any written policy of USF & G.

8. Landworks in this lawsuit was acting in conformance with USF & G's prior conduct as it had been demonstrated throughout the Commonwealth.

9. In other cases, failure to return was not considered a bar to returning to work, nor was failure to return deemed a basis for counterclaims. In prior cases, refusal to return to work was, instead, deemed a final termination of a contract already legally terminated by failure of the general contractor.

10. In the case at bar, the Court has already seen an e-mail from Lovett-Silverman indicating that cost containment (not paying the subcontractors their claims) was the driving consideration.

---

[1] In fact, Emanouil was considered a good candidate to complete the landscaping at the Shrewsbury Middle School, even though it was involved in litigation against USF & G at the Shrewsbury High School. The mere filing of lawsuits rarely, if ever, served as a bar to the performance of additional, new work, even on other projects.

3

11. Plaintiff contends that this testimony is relevant on a number of levels. First, it tends to demonstrate that filing suit was not deemed abandonment by USF & G or its consultants as a matter of policy. Second, it tends to demonstrate that Lovett-Silverman utterly violated industry standards, even standards reflected by USF & G. Finally, it is evidence of unfair and deceptive trade practices, as USF & G clearly singled out a subcontractor not to pay for reasons other than industry practice.

12. Defendant's counsel, who was intimately involved in these other suits, knows full well that the Landworks matter is unique and distinct, and that it represents a substantial deviation from industry standard. Defendant's counsel also knows that USF & G invited the industry to rely upon its public performance in addressing claims.

13. Defendant's counsel seems to be confusing "probative evidence" with embarrassing evidence. The mere fact that evidence that is not favorable to the Defendant is not prejudicial—it is the nature of evidence.

14. The Defendant is seeking to exclude relevant evidence on the grounds that it will be bad for USF & G. This is hardly grounds for exclusion.

15. Also, strangely, USF & G itself has named Vertex, the construction managers who the Plaintiff has already subpoenaed, as *their own expert witness.* Vertex was the construction consultant on Ambrose and Hull who routinely spoke to subcontractors even after lawsuits were filed. USF & G is now seeking to exclude testimony from its own experts.

16. As Plaintiff has noted, USF & G conceded that it had no written policy pertaining to its handling of these issues, and it could provide no such written policy. The Court should

recall that this lack of policy is found in one of the world's largest surety companies, a company which handled hundreds of matters within this Commonwealth alone.[2]

17. When Plaintiff brought its original motion for remand, it expressed the concern that this Court, hearing a single case in the federal court under diversity grounds, lacked the context and experience that the Worcester Superior Court had gained during the collapse of the public construction industry in the early part of this decade. (This case deals with the failure of Standen and Jackson. The same era saw the failure of Westcott, Granger, Eastern, Peyton, T.R. White, Mello and others. The other big players of the time, Callahan, GVW and TLT, also came close to default. By some calculations, by 2005, more than 1000 subcontractor claims were pending) The Worcester Superior Court, in fact, had even considered most of the same issues, and had met most of the same parties, in the Shrewsbury High School case.

18. The sheer number of contractor collapse cases during this time frame is highly relevant, since knowledge of this collapse gives some necessary understanding of the stress and strain placed on subcontractors, sureties and their attorneys during this time frame. Especially in light of the <u>Framingham Heavy Equipment</u> case of 2004, which explicitly excused performance on public construction projects even by non-filed subcontractors, the somewhat collegial, even if adversarial, processes that evolved explain how lawyers and sureties stepped up to manage the chaos and get these projects completed.

19. It is highly relevant for the trier of fact to understand that the Landworks case was one of many such cases, and that it cannot be viewed as a simple and isolated case. The trier of fact also needs to understand why Landworks proceeded as it did, and that filing suit was

---

[2] Indeed, Hermes,Netburn represented a subcontractor against Granger, insured by USF & G, in the Shrewsbury High School lawsuits pending in 2005.

5

not "jumping the gun" or foreclosing return to the site if asked, but rather part and parcel of a process that USF & G and its attorneys and consultants had created and fostered.

20. Without this testimony, the jury will not understand that these cases do not exist in a vacuum. This testimony will demonstrate a truth about construction law in the Commonwealth in the mid 2000s. As contractors failed, a standard set of expectations and practices evolved, which are quintessentially demonstrated by the Hull and Ambrose cases.[3]

21. The Plaintiff has been harmed in its burden of proof as the issues of policy, and definition of abandonment and ratification, by USF & G's failure to have a policy, and to enunciate such policies.

22. In the absence of such policies, and in the absence of an explanation to others of such policies, Landworks has the right, and the need, to demonstrate USF & G's own practices by introducing evidence of contemporaneous claims handling. This evidence will show that even USF & G did not regard Landworks' conduct as "abandonment."

23. Indeed, following the Framingham Heavy Equipment case in 2004, the failure of payment serves as an absolute bar to any claim of abandonment or claim for work completion. Framingham Heavy Equipment excused future performance, and was accepted as such by the construction community. Thus, the entry of evidence of prior cases is relevant and necessary as a defense to both abandonment and the counterclaim.

24. The Plaintiff could have offered to introduce evidence of nearly 95 lawsuits involving USF & G resulting from the failure of many public contractors. Instead, the Plaintiff has

---

[3] Because the Court may not address many of these matters, the Court is likely unaware that 11 major school contractors ceased business operations during this time frame, a substantial number of them were bonded by USF & G. Plaintiff's counsel, alone, handled nearly 200 subcontractor cases during this time frame, all but one in the state courts.

targeted, very narrowly, three lawsuits based upon identical circumstances, nearly identical parties, identical counsel and narrow time frame.

25. Nothing would preclude USF & G from explaining to the jury why certain acts in one case constitute "abandonment," but why the same acts, three weeks later, involving nearly identical circumstances, do not. It is not prejudicial for a Plaintiff to ask USF & G, in the absence of written policies, to explain its conduct.

26. Similarly, there is nothing prejudicial in asking USF & G to explain why different subcontractors on the same project were treated differently.

27. Finally, in the face of testimony from Lovett-Silverman witnesses demonstrating that they were simply wrong in making assertions as to the scope of the Landworks contract, evidence from the likes of Frias Concrete are absolutely crucial and probative to demonstrate, by way of example, that Landworks is not responsible for concrete work being assessed to it in the counterclaim.

28. The Defendant's reliance on the <u>Willco</u> case is misplaced. The Plaintiff is not trying to raise issues of suspicious conduct and is not somehow trying to create insidious theories of conspiracy. Rather, the testimony of other matters, and other contractors, serves as a hard evidence as a means for the trier of fact to understand exactly how this particular surety, USF & G, responded in exactly the same circumstance, at exactly the same time, using exactly the same lawyers. It allows the trier of fact to infer the procedures of USF & G, and to then determine if USF & G was following its own procedures, and whether Landworks had acted in accordance with those procedures.

29. In short, in the absence of written policies, the trier of fact can discern the industry definition of "abandonment" by testimony and evidence which shows that USF & G

7

followed the industry practice identified by William Gallagher, but that it outright failed to do so here.

30. This testimony is an ultimate defense against abandonment and the counterclaim, and it cannot be excluded without causing confusion for the trier of fact and prejudice to the Plaintiff.

31. The Defendant, by not having written policies, cannot now claim that the Plaintiff has no right to prove its defacto policies by its own acts.

32. Finally, Plaintiff questions whether this issue, raised for the first time at this late date, with this material having been identified in its disclosures two years ago, is even raised in good faith at this time. The Plaintiff views this motion as yet one more effort to conceal misconduct and bad faith, and requests costs for responding to this motion.

33. The material is probative, and the motion to exclude must be DENIED.

                              Respectfully Submitted,

                              The Plaintiff,

                              By its attorney,

                              s/Robert N. Meltzer
                              Robert N. Meltzer, BBO #564745
                              The Mountain States Law Group
                              P.O. Box 1459
                              Framingham, MA 01701
                              Phone: (508) 872-7116

May 7, 2008