1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4    Landworks Creations, LLC,        )
                      Plaintiff,       )
5                                      )
                                       )
6    vs.                               ) Case No. 05cv40072-FDS
                                       )
7                                      )
     United States Fidelity and        )
8    Guaranty Company,                 )
                      Defendant.       )
9


10

     BEFORE:  The Honorable F. Dennis Saylor, IV
11

12

                              Pretrial Conference
13

14


15
                                  United States District Court
16                                Courtroom No. 2
                                  595 Main Street
17                                Worcester, Massachusetts
                                  May 8, 2008
18

19

20

21

22
                          Marianne Kusa-Ryll, RDR, CRR
23                            Official Court Reporter
                           United States District Court
24                         595 Main Street, Room 514A
                            Worcester, MA 01608-2093
25                               508-929-3399
                      Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    Robert N. Meltzer, Esquire
     P.O. Box 1459
3    Framingham, Massachusetts 01701
     for the Plaintiff

4
     Hermes, Netburn, O'Connor & Spearing
5    by Peter G. Hermes, Esquire
     265 Franklin Street
6    7th Floor
     Boston, Massachusetts 02110
7    for the Defendant United States Fidelity and Guaranty Company

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2

3          THE CLERK:  All rise.

4          Court is now open.  You may be seated.

5          Case No. 05-40072, Landworks Creations versus United

6   States Fidelity & Guaranty Company.

7          Counsel, please note your appearance for the record.

8          MR. MELTZER:  Good afternoon, your Honor, Rob Meltzer

9   for the plaintiff, Landworks Creations, LLC.

10          THE COURT:  Good afternoon.

11          MR. HERMES:  Good afternoon, your Honor.  Peter Hermes

12   for the defendant, United States Fidelity & Guaranty Company.

13          THE COURT:  All right.  Good afternoon.

14          All right.  This is a pretrial conference in this

15   case.  We have four pending motions in limine plus the issue of

16   a -- a jury trial.

17          Let me -- well, let me start with the most basic issue

18   of all.  Are we really going to go to trial for a week or two

19   in this case given the relatively small amount of money at

20   stake?

21          Mr. Meltzer.

22          MR. MELTZER:  Well, I believe there has been no offer

23   to settle the case.  I believe we have to try the case.

24          THE COURT:  Mr. Hermes.

25          MR. HERMES:  Your Honor, the evidence in support of

1    the counterclaim is that it's mulitples of the plaintiff's

2    complaint.  If the multiple -- if the plaintiff wishes to

3    dismiss its complaint, I will take that offer to my client and

4    see whether it will drop its counterclaim.

5              THE COURT:  All right.  I'm not going to insert any

6    time or energy on that if you're not even speaking to one

7    another, but let me then start with, I guess, what are some

8    obvious points, at least from my -- from my standpoint.

9              This is basically a breach of contract claim with a

10   Chapter 93A claim appended.

11             Mr. Hermes, are there other claims in the case at this

12   stage?  I've lost track of them.

13             MR. HERMES:  No, there are not, your Honor.  The only

14   two remaining counts are Count II for breach of contract and

15   Count VI with respect to Chapter 93A.  The other claims against

16   USF & G were handled by the motion for summary judgment.  I

17   believe it was towards the end of March or --

18             THE COURT:  All right.  So we have a breach of

19   contract by Landworks essentially for failure to be paid and a

20   counterclaim breach of contract alleging that the construction

21   work was defective.  I mean, again, I'm grossly simplifying,

22   but that's --

23             MR. HERMES:  That's essentially it, yes, your Honor.

24             THE COURT:  All right.  All right.  It seems to me

25   reasonably clear that both parties are entitled to a jury

1    trial, so we will impanel a jury on the breach of contract

2    claims.

3         The Chapter 93A claim will be tried to the court, that

4    is, to me, and I am not going to admit testimony at the trial

5    that relates only to a 93A claim; for example, evidence of a

6    failure to settle, for example, or an alleged improper

7    insurance practice.

8         I'm expressing no opinion about whether -- what that

9    evidence ought to look like, but I think it would be unduly

10   prejudicial to the trial of the other claims to have the jury

11   see or hear whatever that evidence is.

12        One of the things that the parties are contesting and

13   that I'm having trouble understanding, and I think my question

14   is directed to you, Mr. Meltzer, is this:  It seems to me that

15   this is a breach of contract claim, and like any other breach

16   of contract claim, you have issues about what the contract

17   means, whether the contract was breached one way or the other,

18   either because Landworks wasn't paid, or Landworks performed

19   inferior work, or walked off the job, or what have you, but

20   it's a contract, and the scope of the contract is determined by

21   its language.  Sometimes contracts can be modified after

22   they're entered into, or they may be ambiguous, and a course of

23   performance might explain an ambiguity, but I'm having trouble

24   understanding what -- why all of this evidence of industry

25   practice and custom is relevant.  I don't see what it's

1    relevant to.

2         You could have an industry practice and custom in

3    every construction job in United States other than this one,

4    and if the contract said something different, you're

5    going to -- we're going to try this case on the contract, not

6    based on what other people in other jobs are doing.  I don't

7    get it.

8         MR. MELTZER:  Your Honor, what this is, the -- the

9    underlying count, Landworks versus USF & G, is an extremely

10   simple case.  The amount of evidence and the witnesses on our

11   case in chief is really de minimis.  It's a very

12   straightforward case.  The reason this case gets complicated is

13   that USF & G has taken a position contrary to the Framingham

14   Heavy Equipment case in 2004.

15        THE COURT:  Let me -- let me -- let me stop there.  I

16   read Framingham Heavy Equipment, and I think it's a pretty

17   unremarkable case in the sense that it just says, with some

18   wrinkles, if you aren't paid, you don't have to keep working.

19   If you're not being paid, that's a breach.

20        MR. MELTZER:  It -- it was, your Honor.  It was a

21   remarkable case, in fact, the Zilioli family is one of my

22   clients out of Framingham, but that case was incredibly

23   significant.  It was prior to that, 2004.  It was not settled

24   and had never been adjudicated whether an excavator, which is

25   not a filed sub bidder on a public job, is subject to the same

1    ability to leave the job when or not he is paid.  Up until that

2    time there was an exception that the public good required the

3    subcontractors to go out and continue to work until it was

4    bankrupt.  So that case was an incredibly significant case,

5    because it expanded not only to nonfiled subs, but it also

6    spanned into the public context.  The case was incredibly

7    important.

8            The problem we have here is that they have argued, not

9    withstanding Framingham Heavy Equipment, that this is

10    abandonment, which was what was foreclosed by Framingham Heavy

11    Equipment.  We demonstrated that the work was done; and in

12    fact, the work was done appropriately, and they're entitled to

13    the payment of it, and they are not being paid.  Under

14    Framingham Heavy Equipment, it is not abandonment to actually

15    leave the job.  In fact, the obligations are terminated.  What

16    makes this case a little strange is that in 2005, when all of

17    these companies were collapsing, USF & G had adopted that

18    policy and that position that you don't go back to work until

19    you are paid.

20            So if they were to raise the issue of abandonment, we

21    have a right to demonstrate that even USF & G did not view this

22    as abandonment.  This is how they handled these cases, hundreds

23    of these cases.  All we've asked is to do three cases from the

24    same time frame that contradicts the e-mails and documents that

25    were sent to my client from Lovett-Silverman to USF & G as to

1    why they are not allowing him back on the job.  It goes to the

2    heart of the case, because if there is no abandonment, there's

3    also no counterclaim.  And they can't, on the one hand, engage

4    in certain behavior that obviates abandonment and then turn

5    around and say, well, now also you're still responsible under

6    the contract.  The contract in this case is a ratification

7    agreement that refers to the prior standing contracts.  It's

8    silent on those issues.  So the industry practice as to how

9    these claims are handled and being determined, which is for

10   resolving the issue of abandonment.

11        THE COURT:  I don't -- there may be an issue lurking

12   here on 93A, and let me take that off the table for now,

13   because I'm not going to resolve that issue now, but on a

14   contract claim, what they did with other subcontractors or in

15   other construction projects, it seems to me, is not relevant.

16        MR. MELTZER:  Your Honor, it is absolutely, because

17   the reality is that what Landworks does, and this is why it is

18   relevant.  Landworks looks at what USF & G has done

19   systemically in 2005 and says, oh, that's what USF & G does.

20   They don't want us here.  For them to be able to argue that

21   this is abandonment without Landworks being able to put in

22   testimony that says this is not abandonment, and they know it,

23   because it's their own policy takes the entire case out of

24   context in what was happening during this time frame.  This is

25   their behavior.  This is the same time frame, Jackson, USF & G.

1    It's Vertex, and the jury needs to understand, because my

2    client is going to have to testify, well, of course, during

3    that time frame, I did not going back when I wasn't being paid.

4    That was the expectation.  The expectation is created by

5    USF & G.

6            THE COURT:  No, no, no, no, they don't -- the right or

7    lack of right is created by the contract.  You -- I don't

8    understand this -- this idea that we're getting off the

9    contract.  Now, in the abstract, again without getting into the

10   details, it seems to me that you would be entitled to a jury

11   instruction based on Framingham Heavy Equipment that says, in

12   substance, if you're not being paid, you have a right to walk

13   off the job --

14           MR. MELTZER:  And -- and in this instance --

15           THE COURT:  -- and the jury can so find.

16           MR. MELTZER:  Now, because if they're relying

17   specifically on USF & G's interpretation of Framingham Heavy

18   Equipment, it's more than a jury instruction.

19           THE COURT:  It's not -- it's not their interpretation

20   of the law.  It's what does the contract say; and if the

21   contract is ambiguous in some way, ambiguities, issues are then

22   for the court to resolve, not for the jury to resolve, at least

23   in the first instance.

24           I mean, as I understand your position, you say

25   something like this:  The contract says Landworks shall do A

1    through T.  Landworks gets part way through the job, it does A

2    through K.  They've only been paid A through F, and they, you

3    know, again, gross oversimplifying, they say, "I'm not coming

4    back until I'm paid," and the -- you know, as I understand

5    Framingham Heavy Equipment, they have the right to do that,

6    again putting aside whatever particular wrinkles may be in the

7    contractual language.

8           MR. MELTZER:  But where -- I mean it's the issue of

9    the defense.  We're saying that the defendant cannot argue

10   abandonment when it's contrary to the message it sends to the

11   community.

12          THE COURT:  What case supports that?  I don't get

13   that.  Contracts are not decided on messages to the community.

14   It's what does the language of the contract say.  The rights of

15   Landworks --

16          MR. MELTZER:  Actually, your Honor --

17          THE COURT:  -- and USF & G are totally bound up in the

18   contractual obligations.

19          MR. MELTZER:  Well, it's 176D, and that's where the

20   overflap is, because what 176D says is that USF & G must have a

21   policy and practice for adjudicating claims.  They admit it in

22   their testimony they did not have one, and so the question is

23   when you have a bond claim, what Landworks is saying is:  How

24   do I make this claim.  And we're saying that they relied upon

25   what this same group of people did.  It would be absurd to

1    suggest that in the absence of a policy they are allowed to

2    simply say, well, in this case we're following this, and in

3    this case it's abandonment.

4         THE COURT:  But isn't that a failure to settle a

5    claim; in other words, a 176D claim is like a 93A claim; isn't

6    for me to decide as the court, and we could have a hearing

7    after the trial about those issues?  Why does the jury hear

8    that?  What's in the contract?

9         MR. MELTZER:  It is our response to abandonment that

10   even they don't consider it abandonment.  And it is important

11   that they -- that their conduct consistent, showing this is not

12   abandonment, is absolutely relevant, because it is the context

13   of an industry in collapse.

14        In 2005, this is the message USF & G is sending.  This

15   is what we expect.  This is what we want you to do.  And if

16   language has relied on that, as it has to remove that context,

17   to apprise the jury of understanding the mind-set of Landworks,

18   they're not just following the law.  They are not abandoning

19   the project, because what they have done has been deemed by

20   USF & G not to be abandonment.  In that time frame, with

21   Jackson, it is absolutely germane to their mind set.

22        THE COURT:  Putting that in terms of the law of

23   contracts, because that's what we are talking about here,

24   what -- what principal of contract law permits that evidence to

25   come into the trial?

1          MR. MELTZER:  Your Honor, we're saying that if they're

2     putting in a defense of abandonment, and they're interpreting

3     my client as abandonment --

4          THE COURT:  Well, wait a minute.  The defense of

5     abandonment, they're saying that a material breach, right, that

6     the contract was materially breached, because Landworks walked

7     off the job and didn't finish, right?  That's essentially what

8     they're saying?

9          MR. MELTZER:  That is contrary to Framingham Heavy

10    Equipment and their own pattern and practice of behavior in

11    their own way of adjudicating the claims.  This is what they

12    did.  This is how that worked.

13         MR. HERMES:  Your Honor --

14         THE COURT:  Yes.

15         MR. HERMES:  -- at some point, I would like the

16    opportunity to present my client's view of what his claims are,

17    as opposed to the distortion by plaintiff's counsel.

18         THE COURT:  All right.  Why don't you do so.

19         MR. HERMES:  First, your Honor, as your Honor found in

20    the summary judgment decision, it was in the fall of 2004 that

21    Landworks left this job.  So events of 2005 are irrelevant to

22    whether or not when it left it either was in effect suspending

23    for nonpayment, or it determined to leave, because it couldn't

24    complete the remaining work that it had under its subcontract

25    for the remaining subcontract balance and decided to get off

1    the job, rather than spend vastly more money completing its

2    contract than it was to receive.

3           THE COURT:  But I think there's a third issue floating

4    around is whether they took the winter off and couldn't do the

5    work in the winter, but --

6           MR. HERMES:  All right.  Also, your Honor, the

7    plaintiff's own claim is that the balance remaining on the

8    contract was $160,000, but that it gives a credit of $25,000

9    for incomplete work.  So, it can only recover what you had, in

10   fact, done.  So, there are two issues.

11          Let's assume that the plaintiff in the fall of 2004

12   properly suspended for nonpayment.  It still can only recover

13   the fair value of the work it, in fact, performed.  And if the

14   value of the work it did not perform was more than $25,000,

15   then concomitantly, the 135 it claims is reduced by that fair

16   value.  That's number one.

17          Number two, if the court should happen or the trier of

18   facts should happen to find that the reason they left was that

19   they had done basically defective work, as defined by the

20   landscape architect on the job, then there is a claim over, not

21   only for the reduction in the amount of work that they -- for

22   the value of work they're not entitled to, because they didn't

23   do it, but the fair value of collecting all -- correcting all

24   of the defective work.

25          And so, either way, the value of the incomplete work

1   is a fact issue in this case, as well as whether there was

2   abandonment or not or suspension for nonpayment or not.

3          To direct myself to the issue of Landworks somehow

4   relying on some conduct of USF & G in 2005, of course, as I

5   just said, Landworks was off the job; and Mr. Matthews, the

6   president of Landworks, was asked at his deposition what his

7   experience had been going through the relent process, and so

8   this was your first experience in going through this process

9   working with a surety and the ratification or nonratification

10  of a contract.  Yes, except we went through it twice on this

11  project, because of the Standen Jackson issue.  So, Landworks

12  had no expectation of what a relent was about, because

13  Landworks had never been through one.  The contract claim is

14  precisely as your Honor suggests it is.  My client's position

15  is that we relate largely to, first of all, what does the money

16  do under the contract.  There are some extras in dispute.  Then

17  because the work admittedly was not complete, what's the value

18  of the incomplete work; and therefore, the credit that is

19  deducted from the remaining contract balance.  That's what the

20  contract claim is about, your Honor.  It has nothing to do with

21  the rest of it.  Your Honor is correct that -- that if the

22  reason that USF & G refused to pay has something to do with

23  some -- I won't say improper motive, but some violation of duty

24  it owed under 176D or 93A, then -- and motive is relevant

25  perhaps to not necessarily the damages caused, but possibly

1     multiple damages, possibly, that's for the court to determine

2     if we get there; but on the contract case, your Honor, if the

3     court determines that, in fact, as the case law indicates, even

4     if USF & G was wrong in its judgment that it was entitled to a

5     larger credit, if it had evidence with respect to a difference

6     in value, then a near fuss over whether something is owed under

7     a contract is not a violation of Chapter 93A.  It's simply your

8     dispute over a contract that gets resolved by the court.

9           Also, I believe Mr. Meltzer has now said this is a

10    claim on the ratification agreements.  That is the contract

11    between USF & G and Landworks.  It has various terms, and it

12    also has terms in it that says that under certain circumstances

13    it will be handed off to a completing contractor, Jackson, and

14    then there are certain things that follow from that.  I just

15    make the point here, your Honor, this is a claim on a

16    ratification agreement.  There is no claim on an insurance

17    policy, and 176D goes out the window.

18          THE COURT:  All right.  I -- I -- I --

19          MR. MELTZER:  Your Honor, may I just respond to two

20    points?

21          THE COURT:  Yes.

22          MR. MELTZER:  Landworks is on the job from January

23    2005.  They did not -- they were not off the job in the fall of

24    2004, and there certainly has been substantial testimony, and

25    there will be testimony that they were on the job in 2005.

1          Second, this is a contract between Landworks and

2     USF & G.  It is absolutely a 176D claim.

3          Your Honor, in terms of the -- I think what troubles

4     me is that there have been misrepresentations about the facts

5     here.  This is a $25,000 credit for specific work asked for,

6     and then some employee at that point told them they didn't need

7     to do it.  This is not a contract.

8          This is a situation in which Landworks is being asked

9     by the surety to do certain things to help get this job done,

10    and those practices, how that worked that said, well, let's get

11    this done, this is how USF & G does this is a germane issue to

12    why Landworks behaved as it did; and if it knew that other

13    cases were happening in another vein, that is admissible, and

14    it is relevant, and it is necessary.

15         THE COURT:  I -- I'm -- I don't see any case law in

16    your filing to support that.  I'm having trouble understanding

17    it.  I mean, let's say, for example, that USF & G had 95

18    construction projects around the country, or around

19    Massachusetts, and it handled 94 of them one way, waiving its

20    contractual rights, or something similar, but decided in one

21    instance to stick by its contract.

22         Don't they have the right to do that?  I mean --

23         MR. MELTZER:  No, they can't.  That's a violation of

24    176D.

25         THE COURT:  All right.  Let's put that aside then.

1  What is going to be tried to the jury?  The jury is not going

2  to hear about unfair insurance practices.

3         MR. MELTZER:  No, what the jury is going to hear about

4  is that at that time that the practice was that the signing of

5  a ratification agreement or filing of a lawsuit prior to did

6  not preclude somebody from coming to finish the job, did not

7  constitutes abandonment.  These projects that I want to

8  introduce are situations where a lawsuit is filed, then the

9  ratification, the work done, case resolved.  And

10 however -- what you have in this case is there is e-mail

11 traffic back and forth where it's being told to Landworks, oh,

12 you filed a lawsuit.  That's now -- that now terminates your

13 agreement, and we can't move forward.  That's not how they

14 behave, and we're saying that Landworks had a right to expect

15 that in the absence of a policy on completing performance, and

16 not the claim, but the performance bond, he had a right to rely

17 on what everyone else in the industry was being treated as in

18 the same way to act accordingly.

19        THE COURT:  Do you have a case that supports that

20 proposition?

21        MR. MELTZER:  Your Honor, generally how is my defense

22 for abandonment.  Why is it not abandonment.  It's a state of

23 mind.  This is what they are doing.

24        THE COURT:  State of mind is -- is not -- it may be

25 admissible under 93A or a 176D case, but it's not admissible in

1    a breach of contract.  The question is what does the contract

2    says, and was there performance or not, right?

3    That's -- just -- just a moment.

4            (The court conferred with the law clerks.)

5            MR. MELTZER:  Your Honor, if I may.

6            THE COURT:  Yes.

7            MR. MELTZER:  Vertex is listed on their pretrial.

8    They are the consultant that actually is the -- is a relevant

9    witness to this entire issue.  They've identified them, too.

10   I've said that --

11           THE COURT:  I'm sorry.  Hold on.  Hold on.  I want to

12   come to closure on this.

13           The bottom line is is that a party to a contract has

14   the right to enforce the contract, and the party is not bound

15   by what it did on other contracts.  It may be the circumstance

16   that there is some Chapter 93/176D angle on this that requires

17   a different result in that context, and it could be that you're

18   liable for 176D, even though you're not liable on the contract,

19   but the fact of the matter is -- I mean, to use an analogy, I

20   have a contract that requires me to make a mortgage payment

21   every month to my mortgage lender.  If I hear or understand

22   that my mortgage lender frequently lets people skip a payment

23   around Christmastime, because they want everyone to be filled

24   with holiday cheer, and I decide not to make my mortgage

25   payment, they could still come after me for that mortgage.  I

1    am contractually obligated to file -- to make that payment.

2            MR. MELTZER:  It's a different analogy.

3            THE COURT:  I can't say -- I can't say later, oh, by

4    the way, I heard that in Maryland you were, you know, letting

5    people get away without paying their mortgages.

6            MR. MELTZER:  It's the other way around, your Honor.

7    This is for the convenience of USF & G, because the

8    subcontractor has to get that bond claim filed under the

9    statute, and so they're using abandonment as a, quote, a shield

10   and a sword; and you're telling me, and you're asking me, that

11   I'm not allowed to defend against that what they did for their

12   convenience that my client relied on.  That's the issue.

13           THE COURT:  I'm telling you that if it's contract

14   claim, we're going to try it as a contract claim; and if there

15   is 176D claim/93A claim, we're going to try that.  It could be

16   that the peculiar way in which an insurer defends its

17   contractural rights might constitute a 176D violation.  I'm

18   saying that off the top of my head.  I don't know.  At least I

19   can conceive of a circumstance like that.  But as a matter of

20   contract claim, what they did on -- with other subcontractors

21   and other construction projects, other contracts, is not

22   relevant to a contract claim in this case.

23           And so, to that extent, I'm going to grant the motion

24   to limit testimony under Counts I and IV; that is, I'm not

25   going to admit in the jury trial testimony concerning other

1    construction projects, other subcontractor lawsuits, other

2    subcontractor situations, USF & G's claim against Jackson, or

3    anything of the sort.  Any claim concerning USF & G's failure

4    to settle or its behavior generally, either under 93A or 176D

5    will be tried to the court; and if there is additional evidence

6    that's relevant on that claim, we'll take it up once the

7    contract claim is concluded.

8         There's also -- part of that motion is to bar the

9    testimony of Frias Concrete, and I understand that there's a

10   dispute there about whether Landworks was responsible for the

11   concrete work; is that right, on the site?

12        MR. MELTZER:  Actually, your Honor, for a substantial

13   number, we list it on our -- on our witness list, a number of

14   subcontractors, who had responsibility for big portions of the

15   site work, and yes, they would be -- they have testified that

16   this was their work, not Landworks' work.  I can't imagine why

17   that wouldn't be relevant.  We're being told that we're

18   responsible for that work, and certainly other people under

19   contract do it.  That's not Landworks' responsibility.

20        THE COURT:  Well, again, I'm thinking out loud here.

21   There is a dispute apparently about the scope of the contract,

22   which suggests to me that there is at least a potential issue

23   of ambiguity.  Either the contract is ambiguous, or it's not.

24   If it is ambiguous, arguably the evidence might be relevant.

25   For example, if it simply said concrete work without any

 1    further specification, it might be the subject of -- of

 2    testimony; but if it said Landworks shall pour the concrete

 3    foundation for the flagpole and nothing else then, you know,

 4    it's not ambiguous, but I'm not sure I can decide that as I sit

 5    here.

 6         Mr. Hermes, what is your position on this issue as to

 7    the scope of the contract, that is, that there are apparently

 8    disputes as to what Landworks was responsible for under the

 9    contract?

10         MR. HERMES:  Your Honor, the scope of the -- of the

11    words within the contract is for the interpretation by the

12    court and to instruct the jury as to what the contract means.

13    There can be circumstances, I will admit, in which a court

14    might seek to listen to evidence even in the case of not true

15    ambiguity, and so I can't say that if you talk about the -- the

16    head walls, for instance, I mean it may be that the court would

17    determine that Section 2200 -- for instance, it's not 2200, but

18    I will use it by way of example, contains within the contract

19    the head walls and the subcontract and old agreement say that

20    Landworks will do the head walls.  There might be an issue as

21    to what a head wall is, for instance, and the court might have

22    assistance from other evidence with respect to that.

23         Without knowing the precise context in which it comes

24    out, it's difficult for me to say that there is a clear bright

25    line one way or the other, your Honor, other than to point the

1    court to the basic rules, which the court knows.

2          THE COURT:  All right.  All right.  I'm going to have

3    to refresh my memory on the role of the court and the jury with

4    regard to alleged ambiguities on the contract.  So, to that

5    extent, I'm going to hold off, that is, this dispute as to the

6    scope of Landworks' obligations under the contract and what

7    evidence might be admissible in that regard.

8          MR. HERMES:  May I offer some assistance there, your

9    Honor?

10         THE COURT:  Yes.

11         MR. HERMES:  There is a case called Eagle Pitcher of

12   Judge Zobel, Rya Zobel, of probably 25 or 30 years ago.  It was

13   an insurance coverage case, and Judge Zobel said even though

14   there isn't true ambiguity, because it's a complex area, I can

15   listen to extrinsic evidence.  I am not suggesting that this is

16   a very bright line test.  If the court has an issue, which it

17   thinks evidence is helpful, even though it's not strictly a

18   case of ambiguity, because it's a case of a term of art, for

19   instance.

20         THE COURT:  All right.  There is also perhaps an

21   intertwined issue of subsequent modification by course of

22   performance or otherwise.  I mean a contractor does not appear

23   to be ambiguous, for example, if there were testimony that -- I

24   don't even know who the right party is, USF & G/Standen/Jackson,

25   someone said, oh, you don't need to do that concrete work,

1    that's outside the scope of your contract.  It might be a

2    modification as well as an interpretation.

3            MR. HERMES:  Admittedly so, your Honor, or someone may

4    come in and say they, in fact, did it perhaps.  I mean --

5            THE COURT:  Right.

6            MR. HERMES:  -- the parameters here are a little bit

7    difficult to talk about without having specific evidence before

8    the court on a given issue.

9            THE COURT:  All right.  I'm going to hold that ruling

10   in abeyance for the time being.

11           Let me take up next this question.  Mr. Hermes says a

12   motion or USF & G has a motion to preclude evidence that more

13   than $42,000 is due.  That's based on the existence of a -- or

14   the claimed existence of a hold agreement, which I think

15   Landworks is disputing, among other things, that there's no

16   consideration for that agreement.

17           Mr. Hermes, let me hear you first.

18           MR. HERMES:  I think not, your Honor, I believe

19   earlier in this hearing, Mr. Meltzer said the contract is

20   the -- I used the term whole, but he said the contract is the

21   ratification agreement or the ratification contract.  I am

22   referring to the document that was executed between USF & G and

23   Landworks under which Landworks agreed to come back after the

24   default by Standen, and Landworks agreed to perform its

25   subcontract work and under which it immediately received

1    payment from USF & G of approximately $177,000.

2         That contract contains a release of all prior claims,

3    except a release with respect to $32,000 of retainage.  There

4    is an asterisk that identifies a $9,864 disputed change order

5    to be sorted out, and then it contains a provision that says

6    Landworks agrees that it will do work for USF & G or a

7    completing contractor subject to the approval of the completing

8    contractor.  That agreement was signed by the parties in March

9    of 2004.

10         There is a subcontract with Jackson Construction

11    Company in April of 2004, your Honor, under -- it was signed by

12    Mr. Matthews, of Landworks, under which he then proceeded to do

13    work on out and, in fact, submitted change orders to and

14    accepted payments from Jackson.

15         And so, if the claim is on the ratification agreement,

16    the ratification agreement also, as I said, contains a partial

17    release.  There are only certain things deemed to be

18    recoverable under the ratification agreement.  I suppose

19    there's a third one.  One is the retainage; one is $9,864,

20    which is stated as an exception; and possibly if Landworks can

21    prove that it did work between March of 2004 and April of 2004,

22    the effective date of the Jackson subcontract there might be a

23    claim in there for that additional amount.  It's not clear to

24    me how when Landworks executes the subcontract with Jackson,

25    goes to work for Jackson, submits its bills to Jackson,

1    negotiates change orders with Jackson, and accepts payments

2    that it then has a claim on the preexisting -- it's essentially

3    a novation here, your Honor.

4         THE COURT:  What's the consideration for the release

5    in that ratification agreement?

6         I mean I think the law is you can't --

7         MR. HERMES:  The consideration for -- the execution of

8    the Jackson subcontract, the ratification agreement, the

9    agreement of Landworks in the ratification agreement was to

10   accept certain money, return and complete the work for an

11   identified completing contractor.  So the consideration was the

12   payment of $177,000 paid by USF & G to procure Landworks'

13   agreement to return and to perform for the completing

14   contractor, which in this case was Jackson Construction

15   Company.

16        THE COURT:  But if -- I mean if you have a contract in

17   which you -- the contractor agrees to pay the sub $100,000.

18   The sub isn't paid.  The sub walks off the job.  If there's a

19   ratification agreement or a new agreement that says we'll pay

20   you $100,000 to finish the job, and by the way, release claims

21   against us, there's no consideration for that release, right,

22   because they have the contractual obligation to pay them

23   $100,000 anyway?

24        MR. HERMES:  I don't believe that's the law of the

25   Commonwealth of Massachusetts particularly when you're dealing

1  with issues of dispute.  Change orders at the time of the

2  payment over a certain amount is disclosed.  The ratification

3  agreement contains an agreed-upon statement of the subcontract

4  account liquidating various change orders as of that date, and

5  one of the obligations that Standen assumed for the execution

6  of that agreement was the obligation to work for the completing

7  contractor.

8          Keep in mind, your Honor, if as a matter of law when

9  Standen went down in the traces, that subcontract was

10 terminated.  Landworks had done some amount of work as of that

11 date.  It didn't have a right to continue on the job.  It could

12 have sued for what it was owed as of that date, but because the

13 subcontractor relationship with Standen had been ended, there

14 was a new arrangement developed, and one of the conditions was

15 as part of the consideration given to Landworks was that it

16 would complete for a Jackson, or someone like a Jackson, and

17 it's -- and Mr. Matthews specifically was asked what did he

18 understand that provision to mean; and his statement was that

19 means I go to work for the completing contractor, but they

20 don't have to accept me, because the undertaking was Standen

21 was doing it, respective by the -- by the succeeding general

22 contractor.  Jackson accepted Landworks provided Landworks

23 accepts -- signed Jackson's form of subcontract.  Jackson did

24 not have to accept Landworks; and Mr. Matthews, the President

25 of Landworks, well knew that and testified to that at his

1    deposition.  And so the consideration was the agreement by

2    Jackson to take Landworks on when it didn't need to do so.

3         THE COURT:  But just -- this may be a detail, but

4    Landworks at that point, at the point in which Standen fails,

5    and Landworks isn't being paid, they're entitled to be paid for

6    work performed to that date.  Let's assume that the work is not

7    substandard for the moment here.

8         MR. HERMES:  Yes, your Honor.

9         THE COURT:  They're entitled to be paid for work up to

10   that point, and they're also entitled to their profit

11   expectancy going forward; in other words, if they --

12        MR. HERMES:  If -- if they had brought -- well, I'm

13   not certain that the profit expectancy is covered under -- if

14   they had brought a payment bond claim at that point, they were

15   entitled to the fair value of their work.  Certainly, that was

16   done as of the date of the Standen default.  They were entitled

17   to that.  I think there's possibly some dispute whether they

18   would be entitled to a profit, an unearned profit element at

19   that point; but even assuming that they were, what they

20   had -- what they could not --

21        THE COURT:  Just before I forget the thought.  That

22   would be the normal common law contracts is that, you know,

23   you're entitled to your expectancy damages.  It's possible the

24   bond is framed in a way that the bond is only -- you know, pays

25   a portion of it, and they have to look to Standen for their

1    expectancy damages.

2         MR. HERMES:  Possibly.  The bond contains language

3    about labor and materials provided, and so its profit part of

4    that -- persons in the position of Mr. Meltzer would argue

5    certainly.  I'm -- I'm not trying to say that there's a legal

6    issue that we have to deal with in this case, but as of that

7    moment, what Landworks was entitled to was the amount that it

8    earned and maybe some expectancy.  What it wasn't entitled to

9    was the unearned -- unearned balance of the subcontract price,

10   and it entered into a new agreement to do the work to earn the

11   unearned balance of the subcontract price, and it received

12   consideration for that, which was the payment of $177,000; and

13   in the Commonwealth of Massachusetts, I believe -- I'm not

14   suggesting this was the only consideration that they received,

15   but payment of amounts that are owed, so that someone doesn't

16   have to go chase them can constitute good consideration for

17   entering into a contract.

18        The additional element in that consideration was the

19   liquidation of claims for change orders and agreement to pay

20   now without having dispute over certain change orders and the

21   agreement to try and deal with a certain outstanding change

22   order and the agreement to pay the retainage.  There were

23   certain consideration given when the ratif -- what I'll now

24   refer to as the ratification agreement was signed, and one of

25   its provisions was that Landworks would complete for a

1    completed contact.

2          THE COURT:  Okay.  Mr. Meltzer.

3          MR. MELTZER:  Yeah, except that there was no contract

4    for a completing contractor, which is where the problem begins.

5    As the documents have shown, there is no contract signed in

6    April of 2005 -- '4 between Jackson and Landworks.  There is an

7    agreement between Landworks and USF & G whereby they agree to

8    return to the job for payment of monies owed to them and to

9    complete their contract work.  As we've identified, and it has

10   been testified to, and it's in our brief, Landworks is

11   approached by Jackson saying, sign a contract agreement

12   with -- with Jackson and Landworks.  They declined to do it in

13   April 2004.

14          In their position, they are working for USF & G.  What

15   the documents show in June after they spent three months, at

16   enormous cost to Landworks, Jackson says to them, we're not

17   going to pay you anything.  We're not even going to submit your

18   requisitions until you sign this form of contract.  That is a

19   document that there is no consideration, because they're

20   trying -- they're saying for no due consideration, you sign

21   this document, if you want to be paid the money you've already

22   been owed.  It's unconscionable.  The contractor adhesion, it

23   was not supported by consideration.  The monies that are being

24   sought by Landworks in this case are the disputed change order

25   of $9,800, the retainage on the Standen contract, and the work

1   that was performed after March 2004 by Landworks for USF & G at

2   the direction of their construction manager.

3          What they're asking to do in the motion in limine is

4   to take this bogus document, which they claim is April of 2004,

5   and it is not, and to somehow or other make that binding

6   without a trial.  We are asking for the value of the work

7   performed at the direction of USF & G's agent.  That's it.

8   It's not that complicated.  The document they're trying to

9   interpose, which complicates this is void.

10          THE COURT:  Okay.  Void because?

11          MR. MELTZER:  There's no consideration --

12          THE COURT:  Uh-huh.

13          MR. MELTZER:  -- and because it's unconscionable.

14   They are holding their requisitions and saying, yes, you've

15   done this work at our request for three months; yes, you're

16   owed money, lots of money; but, oh, by the way, we're not going

17   to take these requisitions for money you did under that

18   agreement with USF & G, and we're not going to submit them

19   unless you sign a document basically surrendering substantial

20   rights.  It's absolutely void.  We cite it in our opposition,

21   based on -- it talks about unconscionability at the time of

22   formation.  They're holding a sledge hammer to their head.

23   It's absolutely not enforceable.  And so what we're looking for

24   is the work done Landworks/USF & G at the direction of their

25   construction manager.

1          THE COURT:  There's something wrong with that

2     metaphor.  If you hold a gun to someone's head, or you hold a

3     sledge hammer over them --

4          MR. MELTZER:  I have been representing firearms

5     companies for so long, they had a problem all the time about

6     making references to holding guns over people's heads.

7          THE COURT:  Here's what I am going to do.  I'm going

8     to deny the motion without prejudice.  I'm going to hear the

9     evidence, and we'll see how it goes in the course of the trial,

10    and there is a sufficient amount in dispute here.  I don't

11    think I can decide this on a motion in limine.

12          All right.  Let me take up next the motion to exclude

13    testimony of William Gallagher, which is a USF & G motion.

14          Mr. Meltzer, I did not see anywhere in the record an

15    expert report.

16          MR. MELTZER:  Your Honor, the expert report, as we

17    stated in the expert disclosure, it is the affidavit of

18    Mr. Gallagher submitted in opposition to the motion for summary

19    judgment.  We also provided it, essentially the same thing, in

20    the answers to interrogatories.  So the report is the

21    affidavit.  What the disclosure did is met the remaining

22    requirements of Rule 26 by identifying that as a report and

23    then showing the other issues of the requirements of Rule 26.

24          THE COURT:  And is it your position that that

25    affidavit complies with Rule 26(e)(2)(B)?

1          MR. MELTZER:  Yeah, it serves as the expert report.

2     It contained his resume, and the other course of what he says

3     are met in the expert disclosure that was provided in a

4     separate document.  Yes, it does comply.

5          THE COURT:  Well, the affidavit does not comply by

6     itself.  I think you will agree, right?  It does not include

7     everything required, for example, compensation, other cases in

8     which the witness testified, lists of all publications, things

9     of that nature, right?

10          MR. MELTZER:  It -- what it does, your Honor, we have

11     that indication that compensation was in the actual expert

12     disclosure.  It was a separate document.  He has not testified

13     in court and does not have publications.  His resume had

14     everything else.

15          THE COURT:  And the time to disclose that expert

16     testimony, I believe that I set a deadline for disclosure of

17     that information; and even assuming the affidavit constitutes

18     the expert report, your supplement was filed well after the

19     deadline, correct?

20          MR. MELTZER:  No, your Honor, it was not.  In the

21     actual document, it was the report or the affidavit was well

22     before their summary judgment mentioned.  The affidavit, which

23     is from his report, which is obviously incorporated by

24     reference in the -- in the disclosure that -- that is well

25     timed within the court's order.

1          THE COURT:  I don't -- I don't get it.  The rule

2     pretty clearly requires an expert report in a particular form.

3     I set a deadline.  The deadline was extended, and your position

4     basically is, well, this affidavit is pretty much like an

5     expert report, and there's no harm, because we provided you

6     some of the information later.

7          MR. MELTZER:  I don't understand why an affidavit on

8     which he identified the testimony and basis for it and

9     attaching his resume would not constitute an expert report.

10          THE COURT:  Well, it doesn't follow a very basic rule.

11     That's one of the things I'm struggling with.  I mean the

12     question -- and I think it's pretty clear you didn't follow the

13     rule.

14          MR. MELTZER:  I don't believe so, your Honor.  I don't

15     believe that the rule says it cannot be by affidavit.

16          THE COURT:  Well, let's -- let's be a little bit

17     linear about this.  Let me find the affidavit.  Just a moment.

18          All right.  I have the affidavit that was filed in

19     opposition to the motion for summary judgment.  The -- it was

20     filed April 18, 2007; is that right?  Let me double check that

21     against the docket.  Yes, April 18, 2007, Docket No. 75.

22          The rule requires a written report.  It's an affidavit

23     in opposition to a motion for summary judgment.  The report

24     must contain a complete statement of all opinions the witness

25     will express and the bases and reasons for them.  I will assume

1    for the moment that that information is there.

2        The data and other -- or other information considered

3    by the witness informing them.

4        MR. MELTZER:  That's there as well.

5        THE COURT:  Well, let's assume for the moment that

6    that's there.  The witness's qualification, including a list of

7    all publications offered in the previous ten years.  We have a

8    resume with no list of publications, a list of all other cases

9    in which the witness testified.  There was no list of cases.

10        MR. MELTZER:  There are none, your Honor.

11        THE COURT:  A statement of the compensation to be paid

12    for the study and testimony in the case.  There is no --

13        MR. MELTZER:  That's actually in the separate witness

14    disclosure, which does identify his compensation.

15        THE COURT:  All right.  Then that separate witness

16    disclosure, let me get there.  Under the -- I have on May 31st,

17    an order that expert reports would be due by July 30, '07;

18    expert depositions to be completed by September 14th.

19        Was that extended?

20        MR. HERMES:  Your Honor, I believe at the time of the

21    motion for summary judgment, there was a motion the court

22    allowed to extend the time for expert reports until three weeks

23    after the court's decision on the motion for summary judgment.

24    The timing of that is, I believe, the court's decision on

25    summary judgment on the Lovett-Silverman motion was

1    February 6th of 2008, which I -- which would make the deadline

2    the twenty -- I believe the 27th of February, 2008.

3            THE COURT:  All right.  I have a -- I have an

4    electronic order entered on July 23rd, granting motion for

5    extension of time to disclose experts.  I don't have that in

6    front of me, the underlying motion, but I granted it.  The

7    representation is that it was due three weeks after the

8    memorandum and order granting motion for summary judgment, or

9    the decision rather that was February 6th.  Again 21 days after

10   that is February 27th.

11           MR. HERMES:  That's my understanding, your Honor, the

12   motion did request a three-week extension.

13           THE COURT:  All right.  Now, Mr. Meltzer, what you're

14   talking about is a pretrial filing that you made, not signed by

15   the witness that was filed on May the 2nd; it that right?

16           MR. MELTZER:  No, we're talking about an actual

17   document entitled "Expert Witness Disclosure."

18           THE COURT:  All right.  What document is that?

19           MR. MELTZER:  I believe it was in June of 2007.  It

20   was way back.  I think it was in time for the first -- the

21   first deadline.

22           THE COURT:  Was it filed with the court, or was it

23   simply provided to me?

24           THE CLERK:  Eighty-one.

25           THE COURT:  Eighty-one.  Disclosure pursuant to

1    Rule 26 by Landworks Creations, LLC.

2              All right.  Do you have a -- Marty, do you have that?

3              THE CLERK:  Yeah.

4              THE COURT:  Why don't you print it out and let me look

5    at it.

6              All right.  I'll try to be quick in light of the hour.

7    I'm looking at document No. 81, which is plaintiff Landworks,

8    LLC's expert disclosure pursuant to Rule 26(a)(2) in which it's

9    a document signed by Mr. Meltzer, which indicates that Mr.

10   Gallagher has published no articles, has not testified as an

11   expert witness before.  His fee for producing his report was

12   $125 per hour.  The amount of number of hours required is not

13   set forth; and therefore, his full compensation is not

14   concluded.  And, of course, it's not signed by Mr. Gallagher.

15             I find that the filings do not comply with

16   Rule 26(a)(2)(B).  The question is whether under the

17   circumstances I can forgive the failure.  While I'm tempted to

18   exclude the report in its entirety, because I see no good cause

19   for the failure, it's simply, as near as I can tell, a sloppy

20   or negligent -- the reason is sloppiness or negligence, as

21   opposed to any particular cause for failure to adhere to the

22   rule.  Because I don't think there is any particular prejudice

23   to USF & G, I'm not going to exclude it.  I will deem these

24   documents taken together as the expert report, although I am

25   going to order that Landworks provide USF & G with the total

1   amount of compensation of the study and expect the testimony to

2   be provided forthwith.

3           Let me turn then to the substance of Mr. Gallagher's

4   proposed testimony, which it's not clear to me whether any of

5   this testimony is relevant to the contract claims, as opposed

6   to the 93A or 176D claims.

7           Essentially, it's as we indicated, it's the custom and

8   practice in the industry what Lovett-Silverman did, and to some

9   extent what USF & G did, or what Lovett-Silverman did as

10  USF & G's agent, and whether or not that was a pattern or a

11  practice in the industry, or rather -- rather, whether it

12  complied with the industry standards.  So, I don't see how this

13  is relevant to the trial of the contract claims.

14          Mr. Meltzer.

15          MR. MELTZER:  No, it's not under the 93A/176D portion,

16  your Honor.

17          THE COURT:  All right.  So I will, to that extent, I

18  will exclude the testimony of Mr. Gallagher from the jury trial

19  portion of it, and we'll leave for another day the question of

20  the 176D and 93A issue.

21          And lastly, we have the motion to disqualify George

22  Byl -- Byl --

23          MR. MELTZER:  Byl.

24          MR. HERMES:  Byl, your Honor.

25          THE COURT:  -- brought by Landworks.  Mr. Byl is an

1    expert witness for USF & G.

2          Mr. Meltzer.

3          MR. MELTZER:  Your Honor, we've provided a copy of his

4    report.  As you can see, what he is essentially doing is he

5    is usurping the role of the jury.  He has no personal

6    knowledge.  His entire testimony is going to be based upon

7    reviewing the documents and weighing the credibility and

8    deciding who's right and who's wrong.  That is the jury's role.

9    He has -- at this point, his conclusions are expressly that.

10   He intends to testify to what he thinks the jury ought to find

11   as a matter of fact.

12          He is not testifying as to anything that is relevant

13   on the issue of contract.  He's not testifying to anything that

14   goes to a direct relative issue of practice in the industry

15   that would have any relevance to explain the counterclaim.  It

16   is simply him assessing the evidence and his conclusion as

17   saying how the jury should move with it is absolutely not

18   admissible.

19          THE COURT:  Well, to the extent that his -- his

20   opinion is not based on personal knowledge, I mean that's close

21   to 100 percent of all experts don't have personal knowledge

22   almost by definition.  I mean they have to review some body of

23   evidence or other data to reach their conclusion.

24          MR. MELTZER:  The deficiency here, your Honor, is that

25   as identified in the -- in the complaint -- in the discovery in

1    this case that USF & G and Lovett-Silverman never made an

2    inquiry into a substantial number of issues.  They never went

3    to the individuals to have the best evidence to testify, but

4    what Mr. Byl is doing in his report is he is looking at the

5    discovery in this case in a vacuum; and essentially instead of

6    having Jackson or Standen or CTM, or Lamoureux Pagano testify,

7    he is essentially synthesizing their testimony, weighing it in

8    reaching conclusions.  That's not just lack of personal

9    knowledge.  That's somebody supplanting the role of the jury,

10   and his report is clear on that.

11          Even in his conclusions, if you look at how he arrives

12   at them, he is essentially redundant to the people, who are

13   there and who have personal knowledge.  There's nothing here to

14   help the jury understand the contract or anything else.  That

15   is left as best evidence to the witnesses who were there.

16          THE COURT:  Well, I -- I mean what he says essentially

17   is, you know, this is my estimate of how much it -- well, it

18   would cost to correct work that I -- that he considered

19   defective and how much it would cost to finish work that was

20   reported to be unfinished.  Of course, you can cross-examine

21   him and attempt to undermine his conclusions on the grounds

22   that, you know, he wasn't there, he didn't look at anything,

23   he, you know, took someone's word for something that turns out

24   not to be true.  I mean you can --

25          MR. MELTZER:  And, your Honor, he does not know what

1    the scope is.  He's basically going to testify the work was

2    defective.  It has not been established to be Landworks' work,

3    and my concern is there is going to be a witness here, who is

4    called as an expert in front of a jury, testifying as to the

5    scope when that testimony is left to those people first.  There

6    is no testimony as to what that scope is, and the witnesses are

7    being provided by USF & G.  So, he is essentially surmising and

8    then trying to assess values.  If there are issues that are

9    defective, then the replacement contractor is the person to

10   testify to that.  If there's work within the scope that wasn't

11   done, that's Jackson or Standen or Lovett-Silverman.  That's

12   not George Byl to say this was Landworks' scope, and oh, by the

13   way, this work was defective; oh, by the way, this is what it's

14   worth.  That is the ambit of the other witnesses in this case.

15   It's a synthesis expert.  That's what he does.

16       We have in other cases in front of Judge Hillman, we

17   have a similar situation where he simply synthesizes what's out

18   there.  My point is that that testimony is left to the people

19   with personal knowledge.  It's not expert testimony.  There are

20   witnesses who can testify to this and should be testifying to

21   this.

22       THE COURT:  All right.  I'm going to deny the motion

23   to disqualify or exclude him.  It may be that there is some

24   wrinkle on this.  Like any expert report, it's based on

25   assumptions, the data, the expert report, if for some reason it

1    turns out that it's based on some inappropriate data in some

2    respect, we can look at it at that point, and --

3        MR. MELTZER:  Your Honor, may I suggest that prior to

4    his being put on the stand that out of the presence of the

5    jury, the court explores that issue with Mr. Byl.  I think he

6    will ascertain that he is going to be testifying as to what he

7    has read.  I think upon that, I think that before it prejudices

8    the jury, the court should consider whether he's going to add

9    anything to this trial.

10        THE COURT:  Well, I will consider a voir dire at an

11    appropriate time, but I have to say that the mere fact that he

12    has looked through the file and has rendered an expert report

13    about what these items are and how much it would cost, I find

14    not even slightly surprising or shocking; and of course, you're

15    free to say that, you know, with respect to items A, B, C, D

16    and E that, in fact, Landworks was not responsible for, and

17    that he's simply dead wrong, but we'll -- we'll take that up

18    as -- at an appropriate time.

19        MR. MELTZER:  Well, your Honor, may I ask that

20    we -- that that be asserted that it be taken up prior to him

21    taking the stand.  If there is no foundation testimony to

22    support this that, in fact, he will not be included and allowed

23    to testify.  If he is put in as a sole fact witness here, I

24    think that's a problem.

25        THE COURT:  He's not a fact witness.  He's an expert

1  witness, and an expert can testify or can base his opinions on

2  data that is not admissible or not admitted in the trial.  I

3  mean my concern is not that, but if, for example, I rule that

4  the contract covers only X and Y, and not Z, I won't let him

5  opine about Z, but I can't tell that until we get farther into

6  the case.  So, I'm going to deny it without prejudice to its

7  renewal at least in part at a later time; but based on what I

8  can see in the expert report, he's doing what experts do, which

9  is relying on data, disclosing the data, and rendering an

10 opinion as to the cost of work that's said to be defective and

11 the cost of work that's said to be unfinished, and --

12          MR. MELTZER:  Your Honor, I think --

13          THE COURT:  -- I'm not going --

14          MR. MELTZER:  -- before he is allowed to testify to

15 the work, there has to be testimony that this is work that

16 belonged to Landworks and testimony from the parties that

17 prepares it that it was actually defective.  I'm saying there's

18 no foundation for this.  He's drawing off of documents upon

19 admission that nobody ever inquired as to the scope.  He is now

20 taking it out to tell the jury what the scope is.

21          THE COURT:  I said -- Mr. Meltzer, I said we would

22 revisit it at an appropriate time at the trial.  Again,

23 if -- if there is no evidence that the contract covers Z, and

24 he testifies that Landworks didn't complete X, Y and Z, I'm not

25 going to let him testify as to Z; but just simply because you

1    dispute X and Y is not a reason to keep X and Y out of the

2    trial.  And I can't tell at this point.  I don't have enough

3    information in front of me.  I'm certainly not going to exclude

4    it wholesale based solely on the representation that all he

5    did was, you know, look through the file and render an opinion.

6              MR. MELTZER:  Your Honor, that's what he says he did.

7              THE COURT:  All right.

8              MR. MELTZER:  He's the one who was synthesizing.

9              THE COURT:  All right.  It's late.  I've made my

10   ruling.  We'll revisit it, need be it, at the trial.

11             All right.  The plan, as I understand it, is we are

12   impaneling a jury on Friday, a week from tomorrow; is that

13   right?

14             MR. MELTZER:  That's correct.

15             MR. HERMES:  Correct, your Honor.

16             THE COURT:  With the case to begin, evidence to begin

17   on Monday.

18             I do have a criminal trial going on now that I at

19   least have some concerns about whether we would be done in

20   time.  I was assured by the government today that we would be.

21   I just warn you.  It's hanging out there.  Of course, we can

22   impanel while another jury is deliberating, but I'll -- stay in

23   contact with Mr. Castles to make sure you know the progress of

24   that case.  It was supposed to go to the jury on Tuesday or

25   Wednesday, and at least there is some doubt in that regard.

1           This is the final pretrial conference.  I'm not going

2      to see you again before we impanel.  All right.

3           MR. HERMES:  I believe there is certain deadlines for

4      submissions --

5           THE COURT:  Yes.

6           MR. HERMES:  -- at the close of business on Tuesday,

7      your Honor.

8           THE COURT:  Yes.  And because I don't have those

9      submissions, it's not clear to me whether there's something

10     else we ought to talk about, but let me just offer some

11     thoughts on empanelment.

12          And remind me, how many -- did I say it was going to

13     be eight or nine jurors?

14          MR. HERMES:  I don't believe your Honor said.

15          THE COURT:  I didn't rule?

16          MR. MELTZER:  No.

17          MR. HERMES:  I don't believe so, sir.

18          THE COURT:  All right.  We'll have eight jurors then.

19     Let's talk about how we're going to impanel.  The jury panel

20     will be brought into the courtroom -- I don't know how many

21     people we'll have, but let's say there's 40 people.  I will ask

22     the entire panel a number of questions concerning possible

23     issues of cause.  To state some of the obvious ones, whether

24     they know the attorneys, whether they know the parties, whether

25     they're familiar with the project and so forth.  For those

1   people who respond affirmatively, I'll call them up to sidebar,

2   examine them one by one.  Counsel will be permitted to do brief

3   and respectful follow-up, if invited by the court.  Once we

4   have eliminated everyone for cause, we will put eight jurors in

5   the box.  They will be the -- you will have a randomized list.

6   So, they will be the first eight people on the list, who have

7   not been struck.  In other words, you will know who is going to

8   go in the box, and you will know when you exercise the

9   peremptory who the next person on the list is.

10          So, for example, if I have struck jurors one and two

11  for cause, because they're counsel's best friends, we will put

12  jurors three through ten in the box, and the peremptories will

13  start then.  And if one peremptory is exercised, say as to

14  Juror No. 3, we will put Juror No. 11 in the box and so on.

15          Peremptories will be exercised -- I think you're

16  entitled to three apiece.  They will be exercised by rounds.

17  The plaintiff will go first in the first round.  So it will go

18  plaintiff, defendant, plaintiff in the first round; defendant

19  plaintiff, defendant in the second round.

20          Again, you will know who is next up on the list.

21  There are no backstrikes, that is, if you've had an opportunity

22  to pass on someone, and you haven't taken it, you've lost the

23  opportunity to challenge the person in the future.

24          So, to get back to my hypothetical, we put jurors

25  three through ten in the box.  The plaintiff challenges Juror

1    No. 3; the defendant challenges Juror No. 4, and say that

2    they're satisfied, we will replace jurors 3 and 4, and the next

3    round of challenges may only be to the jurors who are now

4    replacing 3 and 4, which I think are 11 and 12.  Okay.

5            Any questions in that regard?

6            Mr. Meltzer.

7            MR. MELTZER:  No questions, your Honor.

8            MR. HERMES:  None, your Honor.

9            THE COURT:  We will, as I indicated, impanel only on

10   Friday.  Typically, the jury watches a video, or the jury

11   panel.  It's about 20 minutes to 10:00 by the time they are

12   done with that.  With only eight jurors, I would guess we'll

13   probably be done at 12:00 or 12:30, depending on what happens

14   with this criminal case and kind of how all that plays out.

15   One scenario that's possible, for example, is that we have

16   closing arguments in that case, and the jury empanelment

17   doesn't begin until that's done, you know, 11:00 or 11:30.  I

18   just don't know.  I have to see how the case goes, but I would

19   like to have the jury impaneled that Friday.

20           And at that time we can talk about whatever else needs

21   to be done.  I am supposed to be in Boston Friday afternoon at

22   three o'clock, so I'm going to need to leave here no later than

23   2:00.  So, that's another sort of piece of this puzzle that's

24   hanging out there.  But, again, stay in touch with Mr. Castles;

25   and if there is a problem, we'll let you know.

1          MR. HERMES:  I'm sorry.  You're referring to a week

2    from tomorrow?

3          THE COURT:  A week -- yes, I'm sorry.  I think now I'm

4    confused as to whether I need to be in Boston tomorrow or a

5    week from tomorrow.

6          (The clerk conferred with the court.)

7          THE COURT:  Tomorrow.  All right.  So it may not be a

8    problem.  It's late in the day.  I'm having trouble keeping my

9    thoughts straight.

10          We theoretically have electronic capability in this

11    courtroom and a document camera.  As you can see by the

12    equipment, it's not working right now.  It's supposed to be

13    fixed this weekend.  So be forewarned.  Although we have it,

14    it's at least possible it may not be working.

15          And, I guess, let me ask you:  Do you have any

16    questions about presentation of the evidence or how you are to

17    conduct yourself during the trial?

18          Mr. Meltzer.

19          MR. MELTZER:  No.

20          MR. HERMES:  No, your Honor.

21          THE COURT:  All right.  And if something occurs to

22    you, we can try to take that up when we impanel.

23          Okay.  Anything else while I have you here?

24          MR. HERMES:  No, your Honor.

25          MR. MELTZER:  No, your Honor.

1          THE COURT:  All right.  I will see you then a week

2    from tomorrow barring any unforeseen development in the case

3    pending.

4          All right.  Thank you.

5          MR. HERMES:  Thank you, your Honor.

6

7          (At 6:12 p.m., court was adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4   certify that the foregoing transcript, consisting of 49 pages

5   inclusive, is a true and accurate transcription of my

6   stenographic notes in Case No. 05cv40072, Landworks Creations,

7   LLC versus United States Fidelity and Guaranty Company, before

8   F. Dennis Saylor, IV, on May 7, 2008, to the best of my skill,

9   knowledge, and ability.

10

11

12                              /s/ Marianne Kusa-Ryll

13                              Marianne Kusa-Ryll, RDR, CRR

14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25